# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

## SPECIAL APPENDIX

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
(718) 762-1324

Order granting in part Defendants' Motion for Summary Judgment ............. SA-001

Clerk's Judgment ........................................................................... SA-027

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

LETICIA FRANCINE STIDHUM,

                        Plaintiff,

        -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
and ANDRIS GUZMAN,

                        Defendants.
-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CV-07163 (OEM) (LB)

ORELIA E. MERCHANT, United States District Judge:

Plaintiff Leticia Francine Stidhum ("Plaintiff") commenced this action against Defendants 161-10 Hillside Auto, LLC ("Hillside Auto Outlet"), Hillside Auto Mall, Inc. ("Hillside Auto Mall"), and individual defendants Ishaque Thanwalla ("Thanwalla"), Ronald M. Baron,[1] Jory Baron ("Baron"), and Andris Guzman ("Guzman") (collectively, "Defendants"), asserting claims of employment discrimination on the basis of sex, pursuant to the Pregnancy Discrimination Act ("PDA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. 2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), NY Exec. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL") NYC Admin. § 8-107.

Before the Court is Defendants' fully briefed motion for summary judgment.[2]  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED in part.

---

[1] On May 18, 2023, the Court so ordered a Stipulation of Voluntary Dismissal with Prejudice, ECF 69, dismissing, Ronald M. Baron.  Accordingly, the Court *sua sponte* amends the caption of this case.

[2] *See* Defendants' Motion for Summary Judgment ("Defs.' Mot."), ECF 99; Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem."), ECF 100; Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Defs. 56.1"); Defendants' Affidavit/Declaration

SA-0001

# BACKGROUND[3]

### A. The Parties

Hillside Auto Outlet, a domestic limited liability company, was formed on June 12, 2017, under the laws of the State of New York, and is authorized to do business in New York. Defs. 56.1 ¶ 1. Hillside Auto Outlet is a used car dealership located at 16110 Hillside Avenue, Jamaica, New York, 11432. *Id.* ¶ 2. Josh Aaronson ("Aaronson"), Baron, The Estate of David Baron (the "Baron Estate"), and Thanwalla, each own twenty-five percent of Hillside Auto Outlet. *Id.* ¶ 3.

According to Defendants, each owner has different responsibilities within the dealership. Thanwalla is the only LLC member with the power to hire and fire employees and, as general manager, is the only member active in the dealership's daily operations. *Id.* ¶ 4-6. Defendants assert and Plaintiffs dispute that David Baron had no day-to-day responsibilities at the dealership before his death. *Id.* ¶¶ 7-8; Pl.'s Counter ¶ 8. Defendants assert that Baron's involvement at Hillside Auto Outlet was limited only to signing checks and maintaining the "financial health of the Dealership." Defs. 56.1 ¶ 11. David Baron's role did not include interacting with employees, hiring or firing employees, or overseeing employees, but was limited to managing finances. Pl.'s Counter ¶¶ 9-11. Defendants further assert that Aaronson had no responsibilities at Hillside Auto Outlet other than taking the occasional phone call with David Baron and Thanwalla, his co-members. Defs. 56.1 ¶ 12.

---

in Support of Motion for Summary Judgment, ECF 102; Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("Defs.' Reply Mem."), ECF 103; Plaintiff's Meemorandum of law in opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp."), ECF 105; Plaintiff's Affidavit/Declaration in Opposition to Defendants' Motion for Summary Judgment, ECF 106; Defs. 56.1; Plaintiff's Counter Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Counter"), ECF 106-13; Defendants' Reply to Plaintiff's Additional Material Facts, ("Defs.' Reply to Pl.'s Counter"), ECF 104.

[3] The following facts are drawn from the parties' respective statements of material facts and supporting exhibits. The facts are undisputed unless otherwise noted. *See* Examination of Leticia Francine Stidhum ("Pl.'s Dep."), Ex. K, ECF 102-11; Virtual Examination Before Trial of Andris Guzman ("Guzman's Dep."), Ex. J, ECF 102-10; Affidavit of Leticia Stidhum ("Pl.'s Aff."), ECF 106-1; Virtual Examination Before Trial of Ishaque Thanwalla ("Thanwalla's Dep."), Ex. I, ECF 102-9.

SA-0002

Defendant Guzman was a "sales manager" at Hillside Auto Outlet from the "beginning" of 2018 to the "end of the summer" in 2018. Guzman Dep., Ex. J at 50:10-51:17. Guzman was then promoted to "general sales manager," a position he held from 2018 through August 2019. Defs. 56.1 ¶ 13. As a sales manager, Guzman ensured that transactions were processed, and as a general sales manager, Guzman "work[ed] with banks, g[o]t customers approved for loans, and r[a]n[] credit for customers," but did not have the power to hire, fire, or discipline employees. *Id.* ¶¶ 14-15. Plaintiff disputes that Guzman did not have the power to fire, hire or discipline employees from the period of September 2018 to January 2019. Pl.'s Counter ¶ 14.

Distinct from Hillside Auto *Outlet*, Hillside Auto *Mall* is a domestic business corporation that was formed on December 2, 2005, under the laws of the State of New York. Defs. 56.1 ¶¶ 18-19. Hillside Auto Mall is also a used car dealership, and is located at 15001 Hillside Avenue, Jamaica, NY 11432. Defs. 56.1 ¶ 19. Ronald Baron, Aaronson, Raymond Phelan ("Phelan"), and the Baron Estate own Hillside Auto Mall. *Id.* ¶ 20. Phelan was the general manager of Hillside Auto Mall (and owed no duties to Hillside Auto Outlet). *Id.* ¶¶ 21, 146.

Although the two dealerships are located several blocks away from each other and have owners in common, Hillside Auto Outlet and Hillside Auto Mall "operate as two (2) separate automobile dealerships." *Id.* ¶¶ 3, 20, 141-42. The only employer who at times worked for both dealerships was Deana Jennings, a controller for Hillside Auto Mall. *See id.* ¶¶ 152, 158. Plaintiff never worked for Hillside Auto Mall, and Hillside Auto Mall never controlled Plaintiff's daily activities. *Id.* ¶¶ 143, 147. Hillside Auto Outlet at times purchased vehicles from other dealerships including Hillside Auto Mall, but did not prefer to purchase from Hillside Auto Mall. *Id.* ¶ 159.

### B. Plaintiff's Hiring and Initial Tenure at Hillside Auto Outlet

Plaintiff started working at Hillside Auto Outlet on May 22, 2018, after a brief interview with Thanwalla and a former manager named Jeanique, who is not a party to this case. Defs. 56.1 ¶¶ 23-25. Plaintiff was hired at Hillside Auto Outlet as a car salesperson. Defs. 56.1 ¶ 23. Her duties as a salesperson included showing customers cars, ascertaining whether a customer intended to use financing to purchase a car, helping customers complete credit applications, and asking a manager to run a "credit application." *Id.* ¶¶ 28, 44-47. Thanwalla trained Plaintiff on how to "(i) sell cars, how to meet and greet; (ii) take a credit application; and (iii) use VIN solutions, a lead management system." *Id.* ¶ 30.

Generally, Hillside Auto Outlet employed two assistant managers and two finance managers, who supervised salespeople and handled the financing for the car sale process. *Id.* ¶¶ 32, 48. Thanwalla, Guzman, and Jeanique supervised Plaintiff during her tenure at Hillside Auto Outlet. *Id.* ¶ 28. Defendants assert that sales managers, general sales managers, and finance managers were the only personnel authorized to run credit reports using "DealerTrack," the dealership management system which serves as a "liaison with banks that provide financing for vehicles." *Id.* ¶¶ 40-41, 47-48.

Plaintiff asserts that, in addition to her regular tasks as a salesperson, she was also responsible for "running and reading the credit of the customers" through her access to DealerTrack. Pl.'s Counter ¶ 27. Defendants assert that no salesperson, including Plaintiff, was authorized use DealerTrack. Defs. 56.1 ¶¶ 41, 46. Plaintiff disputes this assertion. Pl.'s Counter ¶ 46. According to Plaintiff, she was the only salesperson with access to DealerTrack. *See* Pl.'s Dep., Ex. K, 45:12-48:5. To access the platform, Plaintiff used Thanwalla's username and

4

password, which Thanwalla gave Plaintiff or "type[d] in [] himself" in Plaintiff's computer. *See id.* Thanwalla denies providing Plaintiff with his password. *See* Thanwalla's Dep., Ex. I, 62:4-19. Defendant Guzman denies any knowledge of Plaintiff ever having access to the DealerTrack system, and asserts that he never provided the DealerTrack log-in information to Plaintiff because he "did not have the authority to give any management tools to salespersons." *See* Guzman Dep., Ex. J at 76:16-77:11; 102:5-103:19.

Defendants also assert that every car sale transaction is different and dependent on: whether the customer can locate a car they wish to purchase, whether the customer is paying cash or credit, and whether any delays arise when checking a customer's credit and financing eligibility. Defs. 56.1 ¶¶ 43-44, 49. Defendants assert that the process of "running" a customer's credit can be riddled with roadblocks that arise when verifying a customer's paystubs and employment, helping customers apply for credit from banks, and resolving inconsistent or conflicting information in a customer's credit report, such as fraud alerts. Defs. 56.1 ¶¶ 49, 52-61. Moreover, after the bank provides a credit offer, the customer must meet with a finance manager to go over the vehicle cost and the Dealership must verify that the paperwork complies with Department of Motor Vehicles regulations. Defs. 56.1 ¶¶ 62, 67. Defendants assert that many of these factors are out of the Dealership's control and that each of these roadblocks lengthens the credit application process. Defs. 56.1 ¶¶ 49, 68-69; Pl.'s Counter ¶¶ 68-69. Defendants also assert that the financing process could be delayed regardless of whether Plaintiff went to Thanwalla, Jeanique, Guzman, or a finance manager Serge Zanan ("Zanan") to process credit applications. Defs. 56.1 ¶¶ 16, 49.

Plaintiff disputes that the verification process is subject to arbitrary delays, stating that "40 to 50 percent of the time" she was able to get customers "in and out of the door" within an hour or less when she had access to DealerTrack. *See* Pl.'s Counter ¶ 43; Pl.'s Dep. at 46:2-13. According

SA-0005

to Plaintiff, the verification process was "instantaneous," the sales managers did not have to contact the customer's employer for verification, and fraud alerts were "rare." Pl.'s Aff. ¶¶ 18-21. Ultimately, Plaintiff admits that even without delays "there was no guarantee she would make a sale because the customer could decide [they] no longer wanted a vehicle once qualified, or refuse to close on the deal because the monthly payment or down-payment required by the bank could be too high." Pl.'s Counter ¶ 50.

### C. Alleged Incidents at Hillside Auto Outlet Giving Rise to Plaintiff's Claims

#### 1. Plaintiff's Increased Wait Times After Pregnancy Announcement

According to Plaintiff, she announced her pregnancy to most employees at Hillside Auto Outlet, including Guzman, on November 23, 2018. Defs 56.1 ¶ 80. Guzman denies he was present for the announcement and stated he was not aware Plaintiff was pregnant. *Id.* ¶ 91. Plaintiff does not know whether Thanwalla was present when she made her announcement. *Id.* ¶ 80.

After Plaintiff's announcement, in or around December 20, 2018, Thanwalla went on vacation. *Id.* ¶ 81; Thanwalla's Dep. at 64:3-16. Another sales manager was hired in mid-November to early December of 2018 to assist with the dealership during Thanwalla's absence. *Id.* ¶ 82. When Thanwalla left on vacation, Plaintiff lost access to DealerTrack, as Plaintiff had been using Thanwalla's password to access the program. *Id.* ¶¶ 83; Pl.'s Counter ¶¶ 173, 193-94. Plaintiff asserts that despite having previously had access to the platform, Guzman did not provide her with access when Thanwalla was on vacation. Pl.'s Counter ¶¶ 83-84, 193-94. Guzman admits that as a manager he had access to DealerTrack, but he disputes having the authority to change the password or to provide it to another employee. Defs 56.1 ¶ 84; *see* Guzman's Dep., Ex. J, at 102:5-25.

Plaintiff did not have access to DealerTrack during Thanwalla's vacation, thus, Plaintiff, like other salespeople, had to ask Guzman to process customer credit applications. *See* Defs. 56.1 ¶¶ 81, 83.  Plaintiff alleges that when she submitted applications to Guzman for processing, Guzman made her customers wait an unreasonable amount of time, causing many of her potential clients to walk out. *See* Pl.'s Counter ¶¶ 113, 196-99.  Plaintiff alleges she was made to wait for extended periods of time only after she announced her pregnancy. *Id.* ¶ 85.  Defendants assert that Guzman took longer than other managers to process applications even *before* Plaintiff announced her pregnancy, Defs. 56.1 ¶ 86, which Plaintiff admits, but only in relation to Guzman's training period in August 2018.  Pl.'s Counter ¶ 86.  Plaintiff attempted to have finance manager Zanan run customer credit applications instead of Guzman, however, Zanan told her he was busy, and "that she had to wait for Guzman."  Defs. 56.1 ¶ 89.

Plaintiff confronted Guzman about the purported longer wait times "multiple times" and stated that Guzman would not respond but would "look at [her] with blank eyes."  Pl.'s Counter ¶ 90.  Plaintiff admits that Guzman never made any comments to Plaintiff about her pregnancy. *Id.* ¶ 94.  Defendants assert that Plaintiff complained to Thanwalla about the longer wait times, without mentioning her pregnancy, and stated that Guzman "sucks" and that the dealership had been a "shit show" since Thanwalla went on vacation.  Defs. 56.1 ¶ 88.  Plaintiff also complained to Thanwalla about the wait times when he returned from vacation, and Thanwalla suggested they discuss the issue later.  Pl.'s Counter ¶ 97.  Defendants assert that Plaintiff "never complained of discrimination."  Defs. 56.1 ¶ 101.[4]  Plaintiff claims she sent emails and texts concerning the

---

[4] Plaintiff argues that she "complained of discrimination," but the testimony she cites in support is unclear.  Pl.'s Counter ¶ 101 *citing* Thanwalla Dep. 232:8-233:8.  Plaintiff cites Thanwalla's deposition. *Id.*  However, the line of questioning in the deposition refers to a "Complaint" filed by an employee, while Plaintiff's response references "complain[ing]" to Thanwalla.  Pl.'s Counter ¶ 101.  It is unclear from Plaintiff's usage of the line of questioning whether Thanwalla's answers refer to Plaintiff's complaints about of the situation or Thanwalla's receipt of Plaintiff's legal complaint.

alleged discrimination but did not keep a record of her emails and texts because she changes phones "pretty often." Pl.'s Counter ¶ 111.

### 2. Plaintiff's Compensation

As a salesperson at Hillside Auto Outlet, Plaintiff received a $300.00 weekly salary, a $150.00 flat commission fee for each vehicle sold, and an occasional five percent bonus "of the profit of any vehicle which was sold that made in excess of $3,000.00 in profit." Defs. 56.1 ¶ 33. Hillside Auto Outlet gave Plaintiff a form to track the cars she sold and the payment she received. *Id.* ¶¶ 36-37.

Plaintiff asserts she suffered a decrease in income because Guzman waited too long to run credit checks and thus Plaintiff's would-be customers, tired of waiting, left Hillside Auto Outlet before Plaintiff could secure the sale. Pl.'s Aff. ¶¶ 25-28. Defendants provide a chart detailing Plaintiff's compensation history, showing Plaintiff's pay date, salary, commission, the number of cars she sold, and her approximate bonus. Defs. 56.1 ¶ 105. Defendants assert that "Plaintiff's average weekly commission before her pregnancy was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential." *Id.* ¶ 108. Defendants compare (a) Plaintiff's compensation from the start of Plaintiff's employment to immediately before Plaintiff's pregnancy announcement (Pay Dates 6/1/2018 to 11/23/2018) with (b) her compensation immediately after her pregnancy announcement, to the end of Plaintiff's employment (Pay Dates 11/30/2018 to 1/18/2019). *Id.* ¶ 105; *see also* Defs.' Mem. at 15-16. Plaintiff disputes the average numbers Defendants reference, stating that after her pregnancy she experienced a drop in average commissions of around 40 percent. *Id.* ¶¶ 105-08. Plaintiff provides a different chart detailing her compensation. Pl.'s Counter ¶ 106. However, unlike Defendants, Plaintiff does not use her pregnancy announcement as the point of comparison. Instead, Plaintiff

chooses seemingly arbitrary dates: she compares her pay for the period from September 4, 2018, to December 17, 2018, with her pay for the period from December 18, 2018, to January 14, 2019. *Id.* ¶¶ 106-08.  Plaintiff does not explain why she includes dates *after* she announced her pregnancy to calculate her pre-pregnancy announcement average weekly pay.

*{REST OF PAGE INTENTIONALLY LEFT BLANK}*

| Week | Pay Date | Salary | Commission | Cars Sold | Approx. Bonus |
|---|---|---|---|---|---|
| 1 | 6/1/2018 | $300.00 | $780.00 | 5 | $780.00 - $750.00 = $30.00 |
| 2 | 6/8/2018 | $300.00 | $425.00 | 2 | $425.00 - $300.00 = $125.00 |
| 3 | 6/15/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 4 | 6/22/2018 | $300.00 | $660.00 | 4 | $660.00 - $600.00 = $60.00 |
| 5 | 6/29/2018 | $300.00 | $615.00 | 4 | $615.00 - $600.00 = $15.00 |
| 6 | 7/6/2018 | $300.00 | $655.00 | 4 | $655.00 - $600.00 = $55.00 |
| 7 | 7/13/2018 | $300.00 | $0.00 | 0 | $0.00 |
| 8 | 7/20/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 9 | 7/27/2018 | $300.00 | $1,400.00 | 9 | $1400.00 - $1350.00 = $50.00 |
| 10 | 8/3/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 11 | 8/10/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 12 | 8/17/2018 | $0.00 | $0.00 | 0 | $0.00 |
| 13 | 8/24/2018 | $300.00 | $1,450.00 | 9 | $1450.00 - $1350.00 = $100.00 |
| 14 | 8/31/2018 | $300.00 | $1,200.00 | 8 | $0.00 |
| 15 | 9/7/2018 | $300.00 | $150.00 | 1 | $0.00 |
| 16 | 9/14/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 17 | 9/21/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 18 | 9/28/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 19 | 10/5/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 20 | 10/12/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 21 | 10/19/2018 | $300.00 | $700.00 | 4 | $700.00 - $600.00 = $100.00 |
| 22 | 10/26/2018 | $300.00 | $800.00 | 5 | $800.00 - $750.00 = $50.00 |
| 23 | 11/2/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 24 | 11/9/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 25 | 11/16/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 26 | 11/23/2018 | $300.00 | $1,375.00 | 9 | $1375.00 - $1350.00 = $25.00 |
| 27 | 11/30/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 28 | 12/7/2018 | $300.00 | $1,600.00 | 4 | $1600.00 - $600.00 = $1000.00 |
| 29 | 12/14/2018 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 30 | 12/21/2018 | $300.00 | $625.00 | 4 | $625.00 - $600.00 = $25.00 |
| 31 | 12/28/2018 | $300.00 | $500.00 | 3 | $500.00 - $450.00 = $50.00 |
| 32 | 1/4/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| 33 | 1/11/2019 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 34 | 1/18/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| | AVERAGE | $300.00 | $705.44 | 4.32 | $56.91 |
| | TOTAL | $10,200.00 | $23,985.00 | 4.30 | $1,935.00 |

Defendants' Chart Detailing Plaintiff's Compensation at Hillside Auto Outlet.  Defs. 56.1 ¶ 105.

SA-0010

| Week | Period | | Salary | Commission | Total Pay |
|---|---|---|---|---|---|
| 1 | 2018-05-22 | 2018-05-28 | $300.00 | $780.00 | $1,080.00 |
| 2 | 2018-05-29 | 2018-06-04 | $300.00 | $425.00 | $725.00 |
| 3 | 2018-06-05 | 2018-06-11 | $300.00 | $300.00 | $600.00 |
| 4 | 2018-06-12 | 2018-06-18 | $300.00 | $ - | $300.00 |
| 5 | 2018-06-19 | 2018-06-25 | $300.00 | $615.00 | $915.00 |
| 6 | 2018-06-26 | 2018-07-02 | $300.00 | $655.00 | $955.00 |
| 7 | 2018-07-03 | 2018-07-09 | $300.00 | $ - | $300.00 |
| 8 | 2018-07-10 | 2018-07-16 | $300.00 | $900.00 | $1,200.00 |
| 9 | 2018-07-17 | 2018-07-23 | $300.00 | $1,400.00 | $1,700.00 |
| 10 | 2018-07-24 | 2018-07-30 | $300.00 | $450.00 | $750.00 |
| 11 | 2018-07-31 | 2018-08-06 | $300.00 | $300.00 | $600.00 |
| 12 | 2018-08-07 | 2018-08-13 | | | $ - |
| 13 | 2018-08-14 | 2018-08-20 | $300.00 | $1,450.00 | $1,750.00 |
| 14 | 2018-08-21 | 2018-08-27 | $300.00 | $1,200.00 | $1,500.00 |
| 15 | 2018-08-28 | 2018-09-03 | $300.00 | $150.00 | $450.00 |
| 16 | 2018-09-04 | 2018-09-10 | $300.00 | $450.00 | $750.00 |
| 17 | 2018-09-11 | 2018-09-17 | $300.00 | $450.00 | $750.00 |
| 18 | 2018-09-18 | 2018-09-24 | $300.00 | $750.00 | $1,050.00 |
| 19 | 2018-09-25 | 2018-10-01 | $300.00 | $750.00 | $1,050.00 |
| 20 | 2018-10-02 | 2018-10-08 | $300.00 | $900.00 | $1,200.00 |
| 21 | 2018-10-09 | 2018-10-15 | $300.00 | $700.00 | $1,000.00 |
| 22 | 2018-10-16 | 2018-10-22 | $300.00 | $800.00 | $1,100.00 |
| 23 | 2018-10-23 | 2018-10-29 | $300.00 | $1,050.00 | $1,350.00 |
| 24 | 2018-10-30 | 2018-11-05 | $300.00 | $1,050.00 | $1,350.00 |
| 25 | 2018-11-06 | 2018-11-12 | $300.00 | $900.00 | $1,200.00 |
| 26 | 2018-11-13 | 2018-11-19 | $300.00 | $1,375.00 | $1,675.00 |
| 27 | 2018-11-20 | 2018-11-26 | $300.00 | $450.00 | $ 750.00 |
| 28 | 2018-11-27 | 2018-12-03 | $300.00 | $1,600.00 | $1,900.00 |
| 29 | 2018-12-04 | 2018-12-10 | $300.00 | $825.00 | $1,125.00 |
| 30 | 2018-12-11 | 2018-12-17 | $300.00 | $625.00 | $925.00 |
| 31 | 2018-12-18 | 2018-12-24 | $300.00 | $500.00 | $800.00 |
| 32 | 2018-12-25 | 2018-12-31 | $300.00 | $350.00 | $650.00 |
| 33 | 2019-01-01 | 2019-01-07 | $300.00 | $825.00 | $1,125.00 |
| 34 | 2019-01-08 | 2019-01-14 | $200.00 | $350.00 | $550.00 |

Plaintiff's Chart[5] Detailing Her Compensation at Hillside Auto Outlet.  Pl.'s Counter ¶ 106.

---

[5] The Court has reformatted this table for readability.

SA-0011

### D. Plaintiff's Resignation from Hillside Auto Outlet

Plaintiff resigned from Hillside Auto Outlet in January 2019. Pl.'s Counter ¶ 116. Plaintiff cites the following reasons for her resignation: (1) the longer wait times her customers were subjected to by Guzman, (2) the decrease in her income due to the longer wait times, and (3) Thanwalla's refusal to give Plaintiff a promotion he allegedly promised her before he left for vacation. Pl.'s Counter ¶¶ 117-18, 120-24. Plaintiff asserts that she left Hillside Auto Outlet because she was not making money, and was "blatantly ignored by Guzman when [she] had a customer" who needed credit. *See id.* ¶¶ 117, 120; Pl.'s Dep., Ex. K at 232:4-14. Additionally, Plaintiff asserts that Thanwalla promised her a promotion but when he returned from vacation and she asked to meet with him, he "told her he w[ould] discuss [it] with her later." Pl.'s Counter ¶¶ 118-20. Plaintiff stated that following Thanwalla's discuss it later comment, she felt "it was clear as day" that Thanwalla would not give her the promotion. *Id.* ¶¶ 122-23.

Defendants claim Thanwalla never *told* Plaintiff he would not give her a promotion, which Plaintiff does not dispute, *id.* ¶ 123, and that Plaintiff did not follow up on the conversation regarding the promotion. *Id.* ¶ 124. Moreover, Thanwalla, disputes ever having promised Plaintiff a promotion in the first place. Thanwalla Dep. at 83:21-25; 84:2-18.

Approximately ten days after Plaintiff quit, Defendants assert that Plaintiff contacted Baron to discuss her pay and did not mention her pregnancy or discrimination related to her pregnancy during that conversation. Defs. 56.1 ¶¶ 125-26. In response, Plaintiff contends that she complained about her pay and told Baron that she had been "sabotaged." Pl.'s Counter ¶ 126. Following Baron's discussion with Plaintiff, Baron discussed the payment issue with Thanwalla, and concluded that no money was owed to Plaintiff. Defs. 56.1 ¶ 129.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that they are entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). Therefore, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

If the moving party meets its burden of demonstrating the absence of a disputed issue of material fact, then the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." FED.R.CIV.P. 56(e); *Sheet Metal Workers' Nat'l Pension Fund v. Accra Sheetmetal, LLC*, 993 F. Supp. 2d 245, 248 (E.D.N.Y. 2014). The nonmoving party cannot rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." *Anderson* 477 U.S. at 249-50 (internal citations omitted).

## DISCUSSION

### A. Plaintiff's Title VII and NYSHRL Claims for Sex and Pregnancy Discrimination

Defendants argue that Plaintiff's Title VII sex discrimination claim and Pregnancy Discrimination Act ("PDA") claim against Hillside Auto Outlet and Hillside Auto Mall "must be dismissed." Defs.' Mem. at 9. Likewise, Defendants argue that Plaintiff's NYSHRL sex discrimination claim should be dismissed against all defendants. *Id.* at 17.

Title VII of the Civil Rights Act of 1964 forbids a covered employer from "discriminat[ing] against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The PDA "makes clear" that Title VII's prohibition against sex discrimination "applies to discrimination based on pregnancy." *See Young v. United Parcel Service, Inc.*, 575 U.S. 206, 210 (2015). The PDA states that employers must treat "'women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.' 42 U.S.C. § 2000e(k)." *See id.*; *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

Claims asserted under Title VII and the NYSHRL "are analyzed pursuant to the same standard; therefore, analysis of identical claims brought by an individual under both of these laws can be performed in tandem." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013) (citations omitted); *accord Lenzi*, 944 F.3d at 107 n.7; *see Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 140-41 (2d Cir. 2006)) ("[T]he outcome of an employment discrimination claim made pursuant to the

14

NYSHRL is the same as it is under . . . Title VII.").  Therefore, the Court analyzes Plaintiff's Title VII and NYSHRL claims alleging sex discrimination concurrently.[6]

In cases where no direct evidence of discriminatory intent is available, courts analyze Title VII discrimination claims under the familiar *McDonnell Douglas* framework to "assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment."  *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024), *cert. denied*, 23-1346, 2024 WL 4426694 (U.S. Oct. 7, 2024); *accord Young*, 575 U.S. at 228 (an "individual pregnant worker who seeks to show disparate treatment through indirect evidence may do so through application of the *McDonnell Douglas* framework.").  Here, Plaintiff relies only on circumstantial evidence and thus application of *McDonnell Douglas* is appropriate.

The *McDonnell Douglas* framework requires a plaintiff to make out a *prima facie* case of discrimination by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" Title VII.  *Young*, 575 U.S. at 228.  The burden of making this showing "is not onerous."  *Id.*  To establish a *prima facie* case of discriminatory treatment a plaintiff must show that "(1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Bloomberg L.P.*, 967 F. Supp. 2d at 833.

---

[6] Notwithstanding the impact that dismissal of Plaintiff's federal claims might have on the Court's decision regarding whether to exercise supplemental jurisdiction over Plaintiff's state law claims, in furtherance of judicial economy, the Court exercises jurisdiction over Plaintiff's NYSHRL claims, because the NYSHRL's legal standards are identical to Title VII's.  *See Maragh v. Roosevelt Island Operating Corp.*, 16-CV-7530 (JMF), 2021 WL 3501238, at *10 (S.D.N.Y. Aug. 5, 2021), *aff'd*, 21-2129, 2022 WL 14199384 (2d Cir. Oct. 25, 2022) (finding no abuse of discretion where the district court exercised supplemental jurisdiction over an NYSHRL claim because its standard is identical to the Title VII claim).

SA-0015

If the plaintiff establishes a prima facie case, "a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." *Id.*; *Lenzi*, 944 F.3d at 107-08. "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi*, 944 F.3d at 107-08. If the plaintiff cannot prove the presence of such a pretext by a preponderance of the evidence, then summary judgment for the defendant is appropriate. *Bloomberg L.P.*, 967 F. Supp. 2d at 833.

### 1. *Prima Facie* Case

The parties agree that Plaintiff satisfies the first two prongs of a *prima facie* case of discrimination. Defs.' Mem. at 10; Pl.'s Opp. at 7.[7] However, Defendants contend that Plaintiff has failed to establish the third and fourth prongs, i.e. that plaintiff has suffered an adverse employment action, that gives rise to an inference of discriminatory intent. Defs.' Mem. at 12-13.

### a. Adverse Employment Action

Plaintiff argues she suffered adverse employment actions in the form of (1) increased "wait times" for her customers' credit processing, which resulted in a "demotion evidenced by a decrease in her salary that she received[,]" (2) constructive discharge, and (3) failure to promote. *See* Pl.'s Opp. at 8-9, 11.

An adverse employment action is an action that imposes "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). The alleged adverse employment action must have left the plaintiff "worse off,

---

[7] During the incidents in this case, Plaintiff was a pregnant woman and thus a member of a protected class. *See Young*, 575 U.S. at 210. The parties also agree that Plaintiff was qualified for her employment. Defs.' Mem. at 10; Pl.'s Opp. at 7.

SA-0016

but need not have left her significantly so." *Id.* at 359. The decision in *Muldrow* overruled prior Second Circuit precedent which required that an adverse employment action be "*materially adverse with respect to the terms and conditions of employment.*" *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam) (citation omitted); *see Back v. Hapoalim*, 24-CV-1064, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024). The "materially adverse" standard describes an action that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Davis*, 804 F.3d at 235.[8] The party asserting discrimination need not show that the harm was "'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar. 'Discriminate against' means treat worse, here based on sex. But neither that phrase nor any other says anything about how much worse." *Muldrow*, 601 U.S. at 355 (internal citations omitted). Following *Muldrow*, the party asserting discrimination must assert a harm or injury that, as Justice Thomas wrote, is "more than trifling". *Id.* at 360 (Thomas, J., concurring).

### (1) Wait Times

Plaintiff argues that Guzman's "targeted and intentional delay in running and reading the credit applications" for her customers after her pregnancy announcement constitutes an adverse employment action because the longer wait times caused her to have "lower commissions and

---

[8] There is some disagreement among district courts as to whether *Muldrow* applies to Title VII cases outside of the context of involuntary job transfers. *See, e.g.*, *Rackley v. Constellis, LLC.*, 22-CV-4066 (GHW) (RWL), 2024 WL 3498718, at *21 (S.D.N.Y. June 17, 2024) ("It is uncertain whether the Supreme Court's 'some harm' standard . . . applies to discrimination claims beyond the involuntary transfer context."); *Cavanaugh v. Wal-Mart Stores E., LP.*, 22-CV-1908 (MEM), 2024 WL 2094010, at *4 (M.D. Pa. May 9, 2024) (declining to apply the "some harm" standard to a case where the plaintiff's alleged adverse employment action was not an involuntary transfer); *Anderson v. Amazon.com, Inc.*, 23-CV-8347 (AS), 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) (applying the "some harm" standard outside the involuntary transfer context). The Second Circuit has not yet opined on this issue. *See Back*, 2024 WL 4746263 (applying 'some harm' standard in context of Title VII involuntary transfer case). However, this Court agrees that "Because the basis for the Supreme Court's decision was the express language of Section § 200e-2(a)(1), the some harm standard likely does apply outside the involuntary transfer context." *McCarthy v. Motorola Solutions, Inc.*, 21-CV-4020 (RER), 2024 WL 3965950, at *10, n. 3 (E.D.N.Y. Aug. 28, 2024).

SA-0017

lower wages." Pl.'s Opp. at 9. Defendants retort that "increased wait times" do not comprise an "'adverse employment action' within the meaning of the law." Defs.' Mem. at 11.

Courts in this Circuit have found that actions such as waiting for a locker or having to move to another floor to enter a patient's information in a work computer, are inconveniences and not sufficiently disruptive to constitute adverse employment actions. *See Paul v. Lenox Hill Hosp.*, 13-CV-01566 (CBA) (LB), 2016 WL 4775532, at *11 (E.D.N.Y. Jan. 15, 2016), *report and recommendation adopted*, 13-CV-1566 (CBA) (LB), 2016 WL 1271034 (E.D.N.Y. Mar. 29, 2016) (finding there was no adverse employment action where the employer did not assign Plaintiff a computer and thus she "was required to record patient notes on computers in the main office when her assigned floor did not have terminals available."); *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 266 (E.D.N.Y. 2012) (finding that a transfer to a workstation away from filing cabinets made plaintiff's job logistically more difficult but did not rise to the level of being materially adverse); *Batchelor v. City of New York*, 12 F. Supp. 3d 458, 473-74 (E.D.N.Y. 2014) (finding a four-week wait for a locker where there were no lockers available did not constitute an adverse action but a mere inconvenience).

Plaintiff argues that Guzman made her customers wait an unreasonable amount of time, causing many of her potential clients to walk out due to the long wait. Pl.'s Opp. at 10-11; *see* Pl.'s Counter ¶ 113. Defendants assert that Guzman took longer than other managers to process all salespersons' applications "*before*" Plaintiff announced her pregnancy. Defs.' Mem. at 4, 13; Defs. 56.1 ¶ 86. Plaintiff admits Guzman took longer with applications before her announcement, but insists that he only took so long during his training period in August 2018 and got faster after. Pl.'s Counter ¶ 86.

*Muldrow* prohibits treating someone worse with respect to a "condition of employment." 601 U.S. at 355. Assuming Plaintiff's wait times increased, that increase likely only mirrors what other employees without DealerTrack access already experienced. Longer wait times, while inconvenient and annoying, are so not harmful or injurious that they constitute "some harm" related to Plaintiff's employment. Increased wait times have only an incidental and attenuated effect on Plaintiff's compensation. They do not, however, reflect a change to the *conditions* of Plaintiff's employment itself. The Court finds that waiting for a customer's credit application to be processed is like waiting for a locker, or having to move to another floor to enter patient information in a work computer, in that it is not more than trifling and does not rise above a mere inconvenience in the workplace, particularly where Plaintiff's coworkers experienced roughly the same wait times as her[9] and a shorter wait time does not guarantee a customer will make a purchase.

Plaintiff argues that the increased wait times negatively affected her compensation and thus she suffered a "demotion evidenced by a decrease in [the] salary that she received." Pl.'s Opp. at 8-9. Plaintiff does not argue that her job title changed or that she was transferred to another position, but instead contends that she lost access to a tool that was previously available to her, and that the lack of access resulted in lower compensation.[10] Defs.'s 56.1 ¶ 81; Thanwalla's Dep. at 64:8-16.

Courts in this Circuit have held that a demotion evidenced by a decrease in "wage or salary" or resulting in a less distinguished title constitutes an adverse employment action. *See, e.g.*,

---

[9] Plaintiff argues against the idea that Guzman took the same time to process credit applications for all salespeople by arguing that the increased wait time, "decrease in car sales," and that "many coworkers who were car salesmen observed and commented upon the drastic decrease in numbers after Plaintiff's pregnancy announcement, which made other salespeople that didn't sell that many cars look successful" undermines this idea. Pl.'s Opp. at 14. That Plaintiff sold fewer cars than before and other salespeople noticed has no bearing on whether Plaintiff was subject to the same wait times as other employees.

[10] Plaintiff's weekly compensation ($300) and commission rate ($150) are undisputed. Defs.' 56.1 ¶ 33.

SA-0019

*Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (*Galabya*, 202 F.3d at 640.

The parties dispute whether Plaintiff suffered a decline in her income sufficient to rise to the level of an adverse employment action. Defendants argue Plaintiff's income did not decrease significantly after her pregnancy announcement. Defs.' Mem. at 15. Comparing the period from start of employment to pre-pregnancy announcement, to the period from post pregnancy announcement to Plaintiff's resignation, Defendants conclude that "[p]laintiff's average weekly commission before her pregnancy [announcement] was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential." Defs.' 56.1 ¶ 108; Defs.' Mem. at 15. Calculating her average pre-pregnancy wages based on her pay from "September 4, 2018 to December 17, 2018," Plaintiff concludes that her total pay decreased post-pregnancy by $363.75 per week or 31.8 percent, while her commission decreased by $338.75 or 40 percent. Pl.'s Opp. at 10; *see also* Pl.'s Counter ¶ 106.

The Court broadly agrees with Defendants; Plaintiff's salary largely stayed the same and her commissions throughout her tenure at Hillside Auto Outlet follow no discernible trend line or pattern connected to the date Plaintiff announced her pregnancy. Plaintiff's income fluctuated but the fluctuation is marginal and untethered to the announcement. As another court in this Circuit has held, "'an indirect and minor effect on commission income . . . is not sufficient to transform a [change in job responsibilities] into a demotion.'" *Szwalla v. Time Warner Cable, LLC*, 135 F. Supp. 3d 34, 51 (N.D.N.Y. 2015) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)), *aff'd*, 670 F. App'x 738 (2d Cir. 2016). A reduction in commission earnings is unlikely to constitute an adverse employment action on the basis of discrimination because commission earnings are proportional to sales. *See Bristol-Myers Squibb Co.*, 85 F.3d at 274.

SA-0020

Therefore, an action from an employer that reduces an employee's sales and, by extension her commissions, would hurt the employer too, by reducing its profit. *Id.* By contrast a reduction in commission *rate* may constitute a demotion. *Id.* However, Plaintiff has not argued that her commission *rate* changed. It is undisputed that her commission rate remained the same. Defs. 56.1 ¶ 33.

Therefore, any increased wait times Plaintiff experienced do not constitute an adverse employment action under *Muldrow*.

**(2) Constructive Discharge**

Constructive discharge is an adverse employment action. *See, e.g.*, *Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 478 (S.D.N.Y. 2019). For a court to consider constructive discharge a plaintiff must show that the employer intentionally created a work atmosphere so intolerable that the employee is forced to quit involuntarily. *See Bloomberg L.P.*, 967 F. Supp. 2d at 835 (omissions in original); *see also Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) (holding that allegations of constructive discharge as a whole must be so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign). However, "an employee's mere dissatisfaction with job assignments or criticism from a supervisor do not, alone, give rise to such a claim." *Bloomberg L.P.*, 967 F. Supp. 2d at 835.

Defendants assert that Plaintiff does not argue she was constructively discharged. Defs.' Mem. at 10. Plaintiff responds that she was constructively discharged because her resignation was "involuntary as a result of coercion and duress." Pl.'s Opp. at 8. In support, Plaintiff cites to Plaintiff's Counter Statement of Undisputed Material Facts, where Plaintiff contends that she was constructively discharged by stating: "in describing why she left employment at Hillside Auto Outlet, Plaintiff described the workplace as being 'intolerable' [and she was] 'pregnant, tired, and

not making any money' as a result of the pregnancy discrimination. (Plf Depo. 230:22-232:9)." Pl.'s Counter ¶ 117.  In the cited deposition, Plaintiff states her resignation was "because who wants to sit in a place for ten hours a day pregnant, tired and not making any money" as well as being "blatantly ignored" by Andris Guzman.  Pl.'s Dep. 231:22-232:9.

A reasonable jury could not find that Plaintiff's testimony demonstrates that her employer "intentionally create[d] a work atmosphere so intolerable that [the employee] [wa]s forced to quit involuntarily." *Bloomberg L.P.*, 967 F. Supp. 2d at 835.  Plaintiff's employer intentionally reduced her access to DealerTrack, consistent with the company's policies.  However, Plaintiff's testimony does not establish that her employer, by limiting her access to DealerTrack, created "working conditions would have been so difficult or unpleasant that a reasonable person in [Plaintiff's] shoes would have felt compelled to resign." *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001). Plaintiff laments that she was "not making any money," Pl.'s Dep. 231:22-232:9, but as her own compensation chart reveals, Plaintiff *was* making money.[11]  Thus, Plaintiff has not pointed to enough evidence to support a claim for adverse employment based on constructive discharge.

### (3) Failure to Promote

For purposes of an employment discrimination action under Title VII, a failure to promote can constitute an adverse employment action.  *See* 42 U.S.C.A. § 2000e–2(a)(1); *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014).  To establish a *prima facie* case for discriminatory failure to promote, a plaintiff must demonstrate that "(1) she is a member of a

---

[11] As explained *supra* at 8-9, Plaintiff does not explain why she includes dates *after* she announced her pregnancy to calculate her pre-pregnancy announcement average weekly pay.  Without a reasoned basis for her calculations, the Court concludes that Plaintiff's pay only decreased on average by about $20—an amount that does not "compel" someone to resign.  "A *severe* reduction in pay may constitute a constructive discharge."  *See Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) (emphasis added) (holding constructive discharge may be shown "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions").  A $20 reduction is not severe.

SA-0022

protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998).

Plaintiff alleges she was promised a promotion. Pl.'s Opp. at 11. When Plaintiff asked to discuss a promotion, Thanwalla asked her to wait to have the discussion. Pl.'s Counter ¶¶ 118-20. Plaintiff stated she felt "it was clear as day" Thanwalla would not give her the promotion because he made her wait. *Id.* ¶¶ 122-23. Plaintiff did not follow up on the conversation regarding the promotion, *id.* ¶ 124, and Defendants assert Thanwalla never told Plaintiff he would not give her a promotion, which Plaintiff does not dispute, *id.* ¶ 123.

Even considering the evidence in the light most favorable to Plaintiff, Plaintiff's opposition is devoid of any argument regarding whether she applied for the position or how she was qualified for the position. Normally, an application for the position is required to satisfy the second prong of the discriminatory failure to promote test. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004). There is a narrow exception to this requirement, where "a plaintiff can 'demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.'" *Bloomberg L.P.*, 967 F. Supp. 2d at 846. Plaintiff cites no evidence demonstrating there was a vacancy, nor does she cite evidence showing she was rejected for the position and has not shown there was a position open that remained open after she left. Thus, Plaintiff has not met the requirements to show an adverse employment action based on a failure to promote theory.

For the aforementioned reasons, Defendants' motion for summary judgment is granted in part. Specifically, Plaintiff's Title VII, and PDA claims against defendants Hillside Auto Outlet and Hillside Auto Mall and Plaintiff's NYSHRL sex discrimination claim against defendants Hillside Auto Outlet, Hillside Auto Mall, Thanwalla, J. Baron, and Guzman are dimissed.

### B. Plaintiff's NYSHRL Disability Discrimination and NYCHRL Pregnancy Discrimination Claims

Having dismissed Plaintiff's federal law claims, as well as the NYSHRL sex discrimination claims governed under the same standards as their federal counterpart, the Court declines to exercise supplemental jurisdiction over the remaining NYSHRL disability and NYCHRL claims. *See* 28 U.S.C. §§ 1367(a), (c) (giving district courts discretion to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's NYSHRL and NYCHRL claims after dismissing all federal claims. *See, e.g.*, *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 37 (E.D.N.Y. 2015) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Bunting v. Gap, Inc.*, 714 F. Supp. 3d 152 (E.D.N.Y. 2024). Furthermore, "recognizing that the NYCHRL has a lower threshold of proof than its federal counterparts, comity suggests that the state courts should resolve these local law claims." *Thomas v. City of New York*, 953 F. Supp. 2d 444, 462 (E.D.N.Y. 2013) (citing *Mihalik v. Credit Agricole*

*Cheuvreaux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013). Accordingly, Plaintiff's NYSHRL and NYCHRL claims are dismissed without prejudice to refiling in state court.

### C. Plaintiff's Aiding & Abetting Claims

Plaintiff also argues that defendants, Guzman, Thanwalla, and Baron are liable under the NYSHRL and NYCHRL for aiding and abetting discriminatory conduct. Pl.'s Opp. at 22-24. The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is "virtually identical." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004). However, a plaintiff can maintain an aiding and abetting claim only when an underlying violation has taken place. *See Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009). Thus, where the employer is not found liable, no employee may be accessorial liable as an aider and abettor. *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012).

Given dismissal of Plaintiff's NYSHRL and NYCHRL claims, there is no predicate violation under either statute. Accordingly, Plaintiff's claim for aiding and abetting is also dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part, as to Plaintiff's federal law and NYSHRL sex discrimination claims and denied as to Plaintiff's NYSHRL disability discrimination claim and NYCHRL sex discrimination claim because the Court declines supplemental jurisdiction.  Thus, Plaintiff's NYCHRL claims and NYSHRL disability discrimination claims are dismissed without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

/s/_____
ORELIA E. MERCHANT
United States District Judge

Dated: January 29, 2025
       Brooklyn, New York

SA-0026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                            Plaintiff,                       JUDGMENT

       v.                                       21-CV-07163 (OEM) (LB)

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE
AUTO MALL INC d/b/a HILLSIDE AUTO
MALL, ISHAQUE THANWALLA,
JORY BARON, and ANDRIS GUZMAN,

                            Defendants.
-------------------------------------------------------------X

      A Memorandum and Order of the Honorable Orelia E. Merchant, United States District Court, having been filed on January 29, 2025, granting in part Defendants' motion for summary judgment as to Plaintiff's federal law and NYSHRL sex discrimination claims and denying as to Plaintiff's NYSHRL disability discrimination claim and NYCHRL sex discrimination claim because the Court declines supplemental jurisdiction; and dismissing Plaintiff's NYCHRL claims and NYSHRL disability discrimination claims without prejudice to refiling in state court; it is

      ORDERED and ADJUDGED that Defendants' motion for summary judgment is GRANTED in part, as to Plaintiff's federal law and NYSHRL sex discrimination claims and denied as to Plaintiff's NYSHRL disability discrimination claim and NYCHRL sex discrimination claim because the Court declines supplemental jurisdiction; and that Plaintiff's NYCHRL claims and NYSHRL disability discrimination claims are dismissed without prejudice to refiling in state court.

Dated: Brooklyn, New York
   January 30, 2025

Brenna B. Mahoney
Clerk of Court

By:  /s/Jalitza Poveda
   Deputy Clerk

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 1 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

## TABLE OF CONTENTS

Plaintiff's Letter Motion for Sanctions dated April 25, 2023 ........................ A-0001

Defendants' Response to Plaintiff's Letter Motion dated April 26, 2023 ...... A-0002

Order dated April 27, 2023 ................................................. A-0008

Minute Entry dated May 4, 2023 .................................................. A-0009

Order dated May 4, 2023 ............................................................ A-0010

Plaintiff's Discovery Dispute Letter and Motion for Sanctions ................... A-0011

    Exhibit 1 Declaration of Deana Jennings ........................................ A-0014

    Exhibit 2 Declaration of Jory Baron...................................................... A-0016

    Exhibit 3 Declaration of Andris Guzman ........................................... A-0018

    Exhibit 4 Declaration of Ishaque Thanwalla ....................................... A-0021

    Exhibit 5 Supplemental Declaration of Deana Jennings ..................... A-0024

    Exhibit 6 Excerpt from Deposition Transcript of Deanna Jennings .... A-0027

    Exhibit 7 Excerpt from Hearing Transcript from May 4, 2023........... A-0035

Defendants' Opposition to Plaintiff's Motion for Sanctions ........................ A-0042

    Exhibit A Supplemental Declaration of Ishaque Thanwalla ................ A-0049

    Exhibit B Supplemental Declaration of Jory Baron ............................ A-0054

    Exhibit C Supplemental Declaration of Andris Guzman ..................... A-0057

    Exhibit D Supplemental Declaration of Deana Jennings ..................... A-0061

Memorandum & Order Denying Plaintiff's Motion for Sanctions ............... A-0065

Defendants' Letter Motion for Pre-Motion Conference ................................ A-0072

    Exhibit A Text Messages .................................................................... A-0075

i

Exhibit B Declaration of Serge Zanan ................................................. A-0079

Exhibit C Defendants' Rule 56.1 Statement of Undisputed Facts ....... A-0082

Plaintiff's Objection to Report & Recommendation ...................................... A-0107

Exhibit 1 Department of Building Permit and Actions Search ............ A-0113

Exhibit 2 Department of Building Permit and Actions Search ........... A-0117

Exhibit 3 Pictures of Storage Room ...................................................... A-0123

Notice of Appeal of Magistrate Judge's Decision to District Court............... A-0133

Declaration in Support ................................................................................. A-0135

Exhibit 1 Department of Building Permit and Actions Search  * ........ A-0113

Exhibit 2 Department of Building Permit and Actions Search * ......... A-0117

Exhibit 3 Pictures of Storage Room * ................................................... A-0123

Memorandum in Support ............................................................................. A-0140

Plaintiff's Counter-Statement of Undisputed Material Facts ........................ A-0155

Declaration of John Troy in Opposition to Defendants' Motion for Pre-Motion
Conference for Summary Judgment ..................................................... A-0184

Exhibit 1 Affidavit of Leticia Stidhum in Opposition ......................... A-0187

Exhibit 2 Excerpt of Deposition Transcript of Leticia Stidhum .......... A-0193

Exhibit 3 Excerpt of Deposition Transcript of Ishaque Thanwalla...... A-0295

Exhibit 4 Excerpt of Deposition Transcript of Andris Guzman........... A-0357

Exhibit 5 Excerpt of Deposition Transcript of Jory Baron .................. A-0388

\*      Documents marked with an asterisk is a duplicate of a document previously
incorporated into the Appellant's Appendix. The duplicate has not been
incorporated and reference is made to the first page of the copy previously
incorporated into the Appellant's Appendix.

Exhibit 6 Excerpt of Deposition Transcript of Deanna Jennings ......... A-0415

Exhibit 7 Text Message between Stidhum and Thanwalla .................. A-0438

Exhibit 8 Paystubs of Plaintiff .................................................... A-0441

Exhibit 9 Supplemental Responses to Interrogatories ......................... A-0505

Exhibit 10 Paystubs of Comparators .................................................... A-0509

Exhibit 11 Second Supplemental Affidavit by Jennings ...................... A-0704

Plaintiff's Letter Opposition to Defendants' Motion for Pre-Motion Conference for Summary Judgment ................................................................ A-0708

Defendants' Memorandum in Law in Opposition to Plaintiff's Objections to Report & Recommendation ................................................................ A-0711

Plaintiff's Reply Memorandum in Law in Support ......................................... A-0730

Defendants' Motion for Summary Judgment .................................................. A-0739

Defendants' 56.1 Statement * ........................................................................ A-0082

Defendants' Memorandum of Law in Support ............................................... A-0741

Kataev Declaration in Support ........................................................................ A-0773

Exhibit A Entity Information for 161-10 Hillside Auto Ave LLC ...... A-0776

Exhibit B Defendants' Supplemental Response to Plaintiff's First Set of Interrogatories* .................................................................. A-0505

Exhibit C Entity Information for Hillside Auto Mall Inc .................... A-0778

Exhibit D Text Messages between Plaintiff and others ...................... A-0780

Exhibit E Complaint dated December 29, 2021 .................................. A-0854

Exhibit F Payroll Records .................................................................... A-0870

Exhibit H Excerpt of Deposition Transcript of Deanna Jennings ........ A-0935

Exhibit I Excerpt of Deposition Transcript of Ishaque Thanwalla ...... A-1035

iii

Exhibit J Excerpt of Deposition Transcript of Andris Guzman ........... A-1313

Exhibit K Excerpt of Deposition Transcript of Leticia Stidhum ......... A-1448

Exhibit L Excerpt of Deposition Transcript of Jory Baron .................. A-1742

Exhibit M Declaration of Serge Zanaan ................................................ A-1859

Reply Memorandum in Support ...................................................... A-1862

Defendants' Reply Statement of Undisputed Material Facts ......................... A-1873

Plaintiff's Memorandum of Law in Opposition ............................................. A-1886

Declaration of John Troy in Opposition to Defendants' Motion for Summary
  Judgment ............................................................................... A-1916

Exhibit 1 Affidavit of Leticia Stidhum in Opposition* ....................... A-0187

Exhibit 2 Excerpt of Deposition Transcript of Leticia Stidhum* ........ A-0193

Exhibit 3 Excerpt of Deposition Transcript of Ishaque Thanwalla*.... A-0295

Exhibit 4 Excerpt of Deposition Transcript of Andris Guzman*......... A-0357

Exhibit 5 Excerpt of Deposition Transcript of Jory Baron* ............... A-0388

Exhibit 6 Excerpt of Deposition Transcript of Deanna Jennings*....... A-0415

Exhibit 7 Text Message between Stidhum and Thanwalla* ............... A-0438

Exhibit 8 Paystubs of Plaintiff*........................................................... A-0441

Exhibit 9 Supplemental Responses to Interrogatories*........................ A-0505

Exhibit 10 Paystubs of Comparators* .................................................. A-0509

Exhibit 11 First Supplemental Declaration by Jennings* .................... A-0024

Exhibit 12 Second Supplemental Declaration by Jennings*................ A-0704

Exhibit 13 Plaintiff's Counter-Statement of Material Facts*............... A-0155

# TROY LAW, PLLC

ATTORNEYS / COUNSELORS AT LAW

Tel: (718) 762-1324   troylaw@troypllc.com   Fax: (718) 762-1342

41-25 Kissena Boulevard, Suite 110, Flushing, NY 11355

April 25, 2023

**Via ECF**

Hon. Lois Bloom, U.S.M.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     **Plaintiff's Letter Motion for Sanctions regarding
Defendants' Failure to Provide Compelled Text Messages**
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (PKC) (RLM), (E.D.N.Y.)

Dear Judge Bloom:

We respectfully write to report that we have not yet received the text messages subject to the Order to Compel issued by the Court on April 3, 2023. In the Order, the Court stated, in relevant part, as follows: "Plaintiff's motion to compel text messages between parties that pertain to plaintiff or to pregnancy discrimination is granted. Any text messages responsive to plaintiff's second set of document requests, request nos. 3-6 [ECF No. 58-3 at 11], and third set of document requests, request nos. 3-6, 8 [ECF No. 58-4 at 11], shall be produced by April 23, 2023. This is a Court Order and defendants must comply. Defendants are warned that if they fail to comply with this Order, the Court may hold them in contempt pursuant to Fed. R. Civ. P. 45(g). A person found to be in contempt is subject to sanctions, which may include a monetary fine, attorney's fees, costs, and even imprisonment." To date, we have received no response from Defendants.

Defendants' counsel has previously claimed that he "misread" the Court's Order with respect to the sales logs and that this only came to defendants' counsel's attention "due to plaintiff's email." As this was part of that same April 3, 2023 order, we respectfully request this failure to respond to the Court's order be addressed in Plaintiff's in-person Motion for Sanctions hearing on May 4, 2023 at 10 a.m. We thank the Court for its prompt and kind attention to this matter.

Respectfully Submitted,
/s/ Tiffany Troy
Tiffany Troy
*Attorney for Plaintiffs*

JT/mh
cc:. (via ECF)

A0001

# MILMAN LABUDA LAW GROUP PLLC

**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**

————

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

April 26, 2023

<u>VIA ECF</u>
United States District Court
Eastern District of New York
<u>Attn</u>: Hon. Lois Bloom, U.S.M.J.
225 Cadman Plaza East
Courtroom 11A South
Brooklyn, NY 11201-1804

> *Re:* **Stidhum v. 161-10 Hillside Auto Ave, LLC,** *et al.*
> **Case No.: 1:21-cv-7163 (HG) (RLM)**
> **MLLG File No.: 94-2019** _____

Dear Judge Bloom:

      This firm represents the Defendants, 161-10 Hillside Auto Ave., LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet"), Hillside Automall Inc d/b/a Hillside Auto Mall (hereinafter "Hillside Auto Mall") (Hillside Auto Outlet and Hillside Automall collectively hereinafter the "Corporate Defendants"), Ishaque Thanwalla (hereinafter "Thanwalla"), Jory Baron (hereinafter "Jory"), Ronald M. Baron (hereinafter "Baron"), and Andris Guzman (hereinafter "Guzman") (Thanwalla, Jory, Baron, and Guzman hereinafter "Individual Defendants") (the Corporate Defendants and Individual Defendants collectively hereinafter the "Defendants") in the above-referenced case.

      Defendants write to oppose Plaintiff's second application for sanctions on the grounds that: (i) Defendants already produced all text messages and are not in possession, custody, or control of any responsive documents, including emails; (ii) Plaintiff failed to meet and confer with Defendants as required by the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") and the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (hereinafter referred to as "Local Rules" or "LCR"); and (iii) Plaintiff is engaging in vexatious conduct in retaliation for a prior case in which Defendants' counsel obtained an award of sanctions[1] against Plaintiff's counsel for engaging in conduct similar to that undertaken here, such that a finding of bad faith conduct is warranted pursuant to 28 U.S.C. § 1927.

      As further set forth below, Plaintiff's motion must be denied.

---

[1] In <u>Jianjun Chen v. 2425 Broadway Chao Rest., LLC</u>, No. 1:16-CV-5735 (GHW), 2019 WL 2250336, Judge Woods Ordered Plaintiff's counsel to pay 50% of the reasonable fees and costs associated with their motion for summary judgment and 100% of their reasonable fees and costs associated with their subsequent motion for sanctions pursuant to Rule 26(g) (approximately $50,000.00) because Plaintiff's counsel still pursued a case on untenable theory).

A0002

## Relevant Procedural History

"The federal rules envision that discovery will be conducted by skilled [persons] of the bar, without wrangling and without the intervention of the court. The vision is an unreal dream." See Harlem River Consumers Co-op., Inc., v. Associated Grocers of Harlem, Inc., 54 F.R.D. 551, 553 (S.D.N.Y. 1972).

On September 1, 2022, Plaintiff served discovery demands. The only demands that relate to communications sought those between: (i) Defendants and Plaintiff's comparator car salespersons; (ii) Defendants and agents of the United States Equal Employment Opportunity Commission ("EEOC"); (iii) any current or former employees, officers, representatives, attorneys, or agents of Defendants or any third party concerning the EEOC charge. See ECF Docket Entry 33-5 at 17 (Request 34), 25 (Request 58), 26 (Request 60), and 29 (Request 69). Defendants objected to each of these requests, except Requests 60 and 69 (for which Defendants stated they were not in possession, custody, or control of any responsive documents). Id.

That motion was decided by the Hon. Roanne L. Mann, U.S.M.J. ("Judge Mann") on December 22, 2022. See ECF Docket Entry 37. There, Defendants were directed to supplement their responses to, inter alia,[2] Request Nos. 17, 21, 39, 40, 46, and 47. Id. at 9. Thus, none of the requests relating to "communications" were compelled to be produced by the Court. More importantly, *Plaintiff never previously sought any text messages or e-mails between herself and the Defendants*.

On February 1, 2023, this Court held a conference to schedule depositions and address discovery disputes. During that conference, this Court stated that there will be no post-deposition discovery requests. See February 1, 2023 Transcript at 41:3-20.[3] The only carveout, as quoted below, was for any documents relied on during the depositions.[4]

The parties conducted depositions on: (i) February 17, 2023 for the Plaintiff; (ii) February 24, 2023 for Defendant Ishaque Thanwalla ("Thanwalla"); (iii) March 3, 2023 for Defendant Jory Baron ("Jory"); (iv) March 9, 2023 for Defendant Andris Guzman ("Guzman"); and (v) March 10, 2023 for the Rule 30(b)(6) witness of both corporate Defendants.

---

[2] Defendants were also directed to supplement their responses to certain interrogatories, which are not relevant here.

[3] **THE COURT:** Was there anything else today, Ms. Troy, before we adjourn? **MS. TROY:** Yes, Your Honor. So if during the deposition we request for documents, that's not allowed, right? **THE COURT:** No. **MS. TROY:** Right. **THE COURT:** *The only thing is if they refer that there was a document during their deposition that they were relying on, but it hasn't been produced, then you could ask them to produce something that they say they were relying on in their testimony. But no, there are no follow-up requests after the depositions.* I'm closing out discovery. See ECF Docket Entry 57 (emphasis added).

[4] In its April 12, 2023 Order, another carveout provided by the Court was for any responses not produced in the course of discovery, such as responses to previously served demands.

2

Plaintiff produced <u>zero</u> text messages prior to her deposition.

On February 24, 2023, Defendants <u>voluntarily</u> produced one page of ten text messages between Thanwalla and Plaintiff, four pages of a complete text message exchange between Thanwalla and Plaintiff on the WhatsApp platform, one page of excerpted text messages between Thanwalla and a non-party named Ali, and an eleven page set of complete text messages to supplement the initial page produced. In total, Defendants <u>voluntarily</u> produced 17 pages of texts. Defendants did not Bates stamp those documents, but intend to do so and reproduce them in Bates stamped form. There are no other responsive text messages from Thanwalla.

On March 3, 2023, in advance of the deposition of Jory, Defendants <u>voluntarily</u> produced three (3) pages of a complete set of text messages between the Plaintiff and Jory Bates stamped D1905-D1907. There are no other responsive text messages from Jory.

On March 9, 2023, in advance of or during the deposition of Guzman, Defendants <u>voluntarily</u> produced fifty-four (54) pages of text messages, consisting of a complete set of text messages between the Plaintiff and Guzman totaling thirteen (13) pages, as well as a complete set of a group text between Guzman, Plaintiff, and others at Hillside Auto Outlet totaling forty-one (41) pages, Bates stamped D1908-D1960. There are no other responsive text messages from Guzman.

On March 10, 2023, Deana Jennings appeared as the corporate representative of Defendants 161-10 Hillside Auto Ave LLC d/b/a Hillside Auto Outlet and Hillside Auto Mall Inc d/b/a Hillside Auto Mall. She is not in possession, custody, or control of any responsive text messages.

On March 23, 2023, Plaintiff moved to compel Defendants to produce "weekly car commission sales logs" and "text messages." Your undersigned was unavailable to meet and confer with Plaintiff because he was engaged in preparation for a hearing before the Hon. Pamela K. Chen, U.S.D.J. ("Judge Chen") on Monday, March 27, 2023, during which time all of your undersigned's attention was devoted to that matter.

In support of her request concerning the "weekly car commission sales logs," Plaintiff cites that she previously requested these documents and referred to documents Bates stamped D28-D67. Those consist of monthly reports of cars sold, which were produced for every month between May 2018 through December 2018 in Defendants' initial production of documents totaling 1,904 pages. Defendants supplemented these documents as to January 2019 on April 17, 2023. Plaintiff never requested or sought "weekly car commission sales logs" until after the depositions, which requests were improper, because they did not fall within this Court's carveout of a "document during [a] deposition that [a witness was] relying on, but … hasn't been produced," [such that Plaintiff] could ask [Defendants] to produce something that they say they were relying on in their testimony." <u>See</u> ECF Docket Entry 57 at 41:3-20.

In support of her request for text messages, Plaintiff seeks documents that Judge Mann previously <u>denied</u>.

A0004

Indeed, Plaintiff filed a blunderbuss omnibus motion to compel discovery, which Judge Mann denied in its entirety except for Request Nos. 17, 21, 39, 40, 46, and 47, none of which have anything to do with text messages. Request Nos. 34 and 58, which do deal with messages between Defendants and anyone else concerning Plaintiff, were denied. In any event, Defendants are not in possession, custody, or control of any other such messages. Indeed, as set forth above, Defendants already voluntarily produced text messages between Thanwalla and one "Ali," a non-party who poached the Plaintiff to leave to another dealership, which precipitated her decision to quit her employment at Hillside Auto Outlet.

Defendants thus respectfully submit that Plaintiff has hood-winked this Court into believing that they have failed to comply with their discovery obligations. The truth is, as is evident from the foregoing, that they have not. Moreover, Plaintiff seeks discovery of items that this Court has expressly foreclosed at the February 1, 2023 conference. None of the items Plaintiff seeks falls within the carveout permitted by the Court, as no weekly car commission sales logs or text messages between Defendants and anyone else concerning Plaintiff were relied on for anything, except for the exchange between Thanwalla and Ali, which Defendants have voluntarily produced.

Defendants' position is supported by this Court's April 3, 2023 Order, which was entered without opposition by Defendants merely four (4) days after your undersigned's March 27, 2023 hearing before Judge Chen. See Text Only Order dated April 3, 2023.

The Order required Defendants to produce the same car sales logs they previously produced, *not* weekly car commission sales logs, for the entire period of May 2018 through January 14, 2019. Id. As set forth above, Defendants previously produced all such logs for May 2018 through December 2018 and supplemented their production by producing such a log for the period of January 1, 2019 through January 14, 2019 on April 17, 2023. Those documents are Bates stamped D1966-D1968.

The Order further required Defendants to produced "text messages *between parties* that pertain to Plaintiff or to pregnancy discrimination." As set forth thoroughly *supra,* Defendants voluntarily produced these text messages prior to the time Plaintiff's March 23, 2023 letter motion to compel on February 24, 2023, March 3, 2023, and March 9, 2023 so that Plaintiff could adequately examine the witnesses concerning these text messages.

As a result, Defendants have complied with their discovery obligations concerning the April 3, 2023 Order, and Plaintiff is simply engaged in unwarranted vexatious litigation fueled by their hatred of Defendants' counsel and a desire to retaliate against them because they were previously sanctioned in the amount of $50,000.00 for engaging in similar behavior in another case. The Plaintiff must be stopped. Defendants have complied with their discovery obligations. Discovery must be declared over.

## Plaintiff Failed to Comply with Local Civil Rule ("LCR") 37.3

Plaintiff's motion for sanctions must also be denied for failure to meet-and-confer.

4

Prior to seeking judicial resolution of a discovery pretrial dispute, the attorneys for the affected parties shall attempt to confer in good faith in person or by telephone in an effort to resolve the dispute, in conformity with Rule 37(a)(1) of the Rules.  See LCR 37.3(a).  Rule 37 provides that a motion for an Order compelling disclosure or discovery must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.  Indeed, this Court previously denied Defendants' letter motion to compel, in part, for failing to meet-and-confer with Plaintiff. See Text Only Order dated April 12, 2023 ("Defendants' request to compel additional discovery is denied for defendants' failure to meet and confer with plaintiff …").

Plaintiff has now fired off two motions for sanctions against your undersigned, see ECF Docket Entries 61 and 66, without once attempting to meet and confer with Defendants.  In fact, Plaintiff lobbed the first motion at 12:37 PM on Monday, April 17, 2023 despite acknowledging receipt of an e-mail from your undersigned at 11:59 AM and notwithstanding a subsequent e-mail, which is not acknowledged, at approximately 12:30 PM.  Defendants produced the documents required by this Court's April 3, 2023 Order at 12:42 PM, just five (5) minutes later.  Surely, it is obvious that Plaintiff has chosen to act in bad faith and vexatiously.   The same applies to the most recent motion, once again filed with zero attempts to meet-and-confer.

"[A] federal court . . . may exercise its inherent power to sanction a party or an attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." See Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013) "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" See Chambers v. NASCO, Inc., 501 U.S. 43-44 (1991); accord, e.g., Ransmeier, 718 F.3d at 68 (the Court's "authority to impose sanctions is grounded, first and foremost, in [its] inherent power to control the proceedings that take place before [it]"). Here, it is evident on its face that Plaintiff is engaging in bad faith conduct that warrants sanctions under 28 U.S.C. § 1927.  Accordingly, Plaintiff's successive sanctions motions must be denied, discovery must be declared over, and Defendants' motion for relief due to Plaintiff's vexatious conduct must be granted.  Defendants thank this Court for its time and attention to this matter, and once more regret that Plaintiff made this unnecessary application.

Dated: Lake Success, New York
      April 26, 2023                Respectfully submitted,

                               **MILMAN LABUDA LAW GROUP PLLC**
                               */s/ Emanuel Kataev, Esq.*
                               Emanuel Kataev, Esq.
                               3000 Marcus Avenue, Suite 3W8
                               Lake Success, NY 11042-1073
                               (516) 328-8899 (office)
                               (516) 303-1395 (direct dial)
                               (516) 328-0082 (facsimile)
                               emanuel@mllaborlaw.com

                               *Attorneys for Defendants*

A0006

**<u>VIA ECF</u>**
Troy Law, PLLC
<u>Attn</u>: John Troy, Tiffany Troy, and Aaron Schwietzer, Esqs.
4125 Kissena Boulevard, Suite 103
Flushing, NY 11355-3101
johntroy@troypllc.com
tiffanytroy@troypllc.com
troylaw@troypllc.com

*Attorneys for Plaintiff*

A0007

4/28/23, 9:27 AM      Troy Law, PLLC Mail - Activity in Case 1:21-cv-07163-HG-LB Stidhum v. 161-10 Hillside Auto Ave, LLC et al Scheduling Order



**TROY LAW <troylaw@troypllc.com>**

## Activity in Case 1:21-cv-07163-HG-LB Stidhum v. 161-10 Hillside Auto Ave, LLC et al Scheduling Order

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov>      Thu, Apr 27, 2023 at 9:07 AM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 4/27/2023 at 9:07 AM EDT and filed on 4/27/2023
**Case Name:**      Stidhum v. 161-10 Hillside Auto Ave, LLC et al
**Case Number:**      1:21-cv-07163-HG-LB
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORDER: The Court is in receipt of plaintiff's motion for sanctions, ECF No. [66], and defendant's response to the motion, ECF No. [67]. Plaintiff's motion shall be addressed at the conference scheduled for May 4, 2023. The parties shall refrain from filing further requests on the docket. Any other outstanding discovery issues can be addressed at the May 4 conference. Ordered by Magistrate Judge Lois Bloom on 4/27/2023. (EW)**

**1:21-cv-07163-HG-LB Notice has been electronically mailed to:**

John Troy    johntroy@troypllc.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com, williamwang@troypllc.com

Emanuel Kataev    emanuel@mllaborlaw.com, 4119461420@filings.docketbird.com, mail@emanuelkataev.com

Aaron Schweitzer    troylaw@troypllc.com, aaronschweitzer@troypllc.com, aschwei4@gmail.com, docket@troypllc.com, troylawpllc@gmail.com

Tiffany Troy    troylegalpllc@gmail.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com

**1:21-cv-07163-HG-LB Notice will not be electronically mailed to:**

A0008



**TROY LAW <troylaw@troypllc.com>**

## Activity in Case 1:21-cv-07163-HG-LB Stidhum v. 161-10 Hillside Auto Ave, LLC et al Motion Hearing
1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov>                                                   Thu, May 4, 2023 at 3:37 PM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 5/4/2023 at 3:37 PM EDT and filed on 5/4/2023
**Case Name:**        Stidhum v. 161-10 Hillside Auto Ave, LLC et al
**Case Number:**     1:21-cv-07163-HG-LB
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Magistrate Judge Lois Bloom: Motion Hearing held on 5/4/2023 (FTR Log #10:14-11:11). (EW)**


**1:21-cv-07163-HG-LB Notice has been electronically mailed to:**

Joseph M. Labuda     joe@mllaborlaw.com, info@mllaborlaw.com

John Troy     johntroy@troypllc.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com, williamwang@troypllc.com

Emanuel Kataev     emanuel@mllaborlaw.com, 4119461420@filings.docketbird.com, mail@emanuelkataev.com

Aaron Schweitzer     troylaw@troypllc.com, aaronschweitzer@troypllc.com, aschwei4@gmail.com, docket@troypllc.com, troylawpllc@gmail.com

Tiffany Troy     troylegalpllc@gmail.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com

**1:21-cv-07163-HG-LB Notice will not be electronically mailed to:**



**TROY LAW <troylaw@troypllc.com>**

---

### Activity in Case 1:21-cv-07163-HG-LB Stidhum v. 161-10 Hillside Auto Ave, LLC et al Order on Motion for Sanctions

1 message

---

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov>
To: nobody@nyed.uscourts.gov

Thu, May 4, 2023 at 3:44 PM

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Eastern District of New York**

#### Notice of Electronic Filing

The following transaction was entered on 5/4/2023 at 3:44 PM EDT and filed on 5/4/2023
**Case Name:**      Stidhum v. 161-10 Hillside Auto Ave, LLC et al
**Case Number:**    1:21-cv-07163-HG-LB
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORDER: The Court held a conference in plaintiff's employment discrimination case on May 4, 2023. Plaintiff's motions for sanctions, ECF Nos. [61] and [66], are denied for the reasons stated on the record. As discussed during the conference, defendants shall produce all outstanding discovery, as well as defendants' sworn affidavits and stipulations related to text messages on their phones and the dismissal of the case against defendant Ronald M. Baron by <u>noon</u> on May 17, 2023. Discovery remains closed, and the Court shall not entertain any further discovery requests in this matter. Any pre-motion conference request shall be filed by June 7, 2023 in accordance with Judge Gonzalez's Individual Rules. Ordered by Magistrate Judge Lois Bloom on 5/4/2023. (EW)**

**1:21-cv-07163-HG-LB Notice has been electronically mailed to:**

Joseph M. Labuda      joe@mllaborlaw.com, info@mllaborlaw.com

John Troy      johntroy@troypllc.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com, williamwang@troypllc.com

Emanuel Kataev      emanuel@mllaborlaw.com, 4119461420@filings.docketbird.com, mail@emanuelkataev.com

Aaron Schweitzer      troylaw@troypllc.com, aaronschweitzer@troypllc.com, aschwei4@gmail.com, docket@troypllc.com, troylawpllc@gmail.com

Tiffany Troy      troylegalpllc@gmail.com, docket@troypllc.com, troylaw@troypllc.com, troylawpllc@gmail.com

**1:21-cv-07163-HG-LB Notice will not be electronically mailed to:**

# TROY LAW, PLLC
### ATTORNEYS / COUNSELORS AT LAW
Tel: (718) 762-1324   troylaw@troypllc.com   Fax: (718) 762-1342
41-25 Kissena Boulevard, Suite 110, Flushing, NY 11355

**Via ECF**                                               June 12, 2023
Hon. Lois Bloom
U.S.D.C. Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> **Re:    Plaintiff's Discovery Dispute Letter and Motion for Sanctions for Spoliation**
> _Stidhum v. 161-10 Hillside Auto Ave, LLC, No. 21-cv-07163 (PKC) (RLM) (E.D.N.Y)_

Your Honor,

    We write respectfully, and pursuant to your Honor's Individual Rules 5.A, after a meet and confer on June 5, 2023 from 4:00 p.m. to 5:30 p.m. between Tiffany Troy for Plaintiff and Joseph Labuda and Emanuel Kataev for Defendants. After a "good faith effort by parties to resolve disputes," it has become clear that the Defendants have once again failed to comply with the Court's directives to turn over evidence contemplated in the May 4, 2023 in-person discovery conference. At that time, the Court denied without prejudice Plaintiff's motion to sanction Defendants for their repeated bad faith and dilatory tactics in failing to produce discovery, and ordered Defendants to produce _Jackson_ affidavits evidencing their searches of the text messages and emails based on Defendants' representations that such searches were conducted.

### I.    Facts

    Defendants were required to produce "documents pertaining to car sales of plaintiff and comparators from August 25, 2018 to January 24, 2019," pursuant to the Order to Compel dated April 3, 2023. Dkt. 58. By the same Order, Defendants were also required to produce text messages that "pertain to plaintiff or to pregnancy discrimination." Dkt 58. The deadlines set by the April 3 Order for the two kinds of evidence were April 10 and April 23, respectively. The former deadline was extended from April 10 to April 17 at noon. Dkt. 59. On April 17 _after the deadline_, Defendants produced some documents; however, they did not include the car sales and comparators documents or the text messages specifically required by the Orders. Dkt 58, 59. Plaintiffs then twice moved for sanctions. Dkt 61, 66.  In the following May 4 conference, Plaintiff's motion for sanctions was denied, and Defendants were again ordered to produce the required documents with a new deadline of May 17, 2023. Dkt. 68.

    On May 17, 2023, Defendants produced affidavits stating that they could not produce the required documents. Specifically, Defendants declared that they were "unable to find the records at either dealership nor at the outside storage facility." Exhibit 01 Deanna Jennings Declaration at *2 ¶10. Further, Defendants declared that they were "uncertain as to where [the sales log] may be stored and have no knowledge nor recollection as to where they are kept." I.d. ¶ 11. Defendants' affidavits were also lacking in information regarding the required text messages. The April 3 Order specifically required production of text messages that "pertain to plaintiff _or to pregnancy discrimination_ [emphasis added]." Dkt 58. However, Defendants' affidavits only contained a declaration that there were no text messages pertaining _to the plaintiff_.  Exhibits 02-04 Jory Baron Declaration; Andris Guzman Declaration; and Ishaque Thanwalla Declaration.

Hon. Lois Bloom
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (PKC) (RLM), (E.D.N.Y.)
Page 2 of 3

On the same day the affidavits were received, Plaintiffs promptly informed Defendants that their affidavits in lieu of production were deficient, specifically regarding the weekly sales log and the text messages. On May 26, after more delay by the Defendants, Defendants offered to provide a supplemental affidavit, which they finally provided on June 2, 2023. Exhibit 05 Supplemental Deanna Jennings Declaration. However, this supplemental affidavit was still deficient in the relevant aspects. Regarding the sales log, Defendants "do not believe that the [weekly] sales logs are lost or destroyed"; rather, [they] were "misplaced." Exhibit 05 at *3 ¶ 18. Defendants previously stated that (1) they were in possession of the weekly sales logs and (2) that they were required by law to preserve those sales logs. *See* Exhibit 06 Jennings Depo at *26-31 (25:19-27:22 testimony about record-keeping practices at Hillside Auto Mall; 27:23-28:4 testimony that the record-keeping practices at Hillside Auto Outlet was kept in the same manner as Hillside Auto Mall; 28:5-28:21 testifying that there were two folders for each car salespeople at Hillside Auto Mall and one or two folders for each car salesperson at Hillside Auto Outlet; 28:22-29:5 testimony about law requiring preservation of records for seven years prior to their destruction or shredding, and that no records were lost or discarded; 31:16-24 describing that commission sheets were "pretty much the same" at Hillside Auto Outlet as Hillside Auto Mall).

However, in the hearing on May 4, 2023, Defendants represented that such sales logs were *in fact* destroyed, which contradicts both their earlier statement and their June 2 supplemental affidavit. Exhibit 07 Transcript May 4th hearing at *28:25-29:5.

MR LABUDA: -- but we're almost there. So the weekly [handwritten commissions sales logs] -- we don't believe that we have any. We've asked them to review, to look --
THE COURT: Because any of the handwritten things got destroyed after they were inputted?
MR LABUDA: Yes. Because that information was already taken.

MR. KATAEV: So that's the issue, and so we're asking the general manager, Mr. Thanwalla, where are these records. He says I think Deana has them. We ask Deana where are the records. She says I don't have them. Exhibit 07 Transcript May 4th hearing at *31:12-15.

Notably, to date, Defendants have also failed to produce *any* documentation reflecting the actual cars sold despite the request despite Mr. Kataev's representation that "they kept these records" regarding the actual car sales made, which are inputted into a comparator. Exhibit 07 32:12

Regarding the text messages, only Deanna Jennings, who has testified that she kept her text messages "to who [she] spoke to and – on a daily basis, and the list is short" 69:16-69:24. Only this witness ran through the list of thirteen search terms used to search for the required text messages. However, this search *still* fails to comply with the Orders. First, the supplemental affidavit only pertains to Defendant Jennings; Defendants have failed to provide any information on the text messages specifically "pertain[ing] to plaintiff or to pregnancy discrimination" in possession of the other Defendants. Minute Entry Order dated May 4, 2023; Order dated April 3, 2023; *see also* Order dated April 12, 2023.  Moreover, Defendants have failed to provide any search terms used by those other Defendants. Second, the supplemental affidavit specified that "[n]one of these [search] terms returned any text messages *related to the Plaintiff* [emphasis added]." Order dated April 3, 2023. However, the Order specifically required text messages pertaining to "plaintiff *or to pregnancy discrimination* [emphasis added]." Order dated April 3,

Hon. Lois Bloom
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (PKC) (RLM), (E.D.N.Y.)
Page 3 of 3

2023. Therefore, if the search terms returned any text messages related to pregnancy discrimination but not related to the Plaintiff, Defendants would be required to produce those items.

In an attempt to resolve the dispute prior to this motion, parties in a conference call on June 5, 2023, from 4:00PM to 5:30PM. During this conference, Defendants' counsels once again equivocated on whether the car sales log do or do not exist, stating that we "most likely have them somewhere, but lost in all of the paperwork." Mr. Labuda stated that these documents have "not disappeared on us," but a diligent search was done for a day, and no documents can be found. With respect to the text messages, Mr. Labuda represented that a further search will be conducted and that a supplemental affidavit will be provided by June 19, 2023. Mr. Labuda further acknowledged that the Affidavit does not provide as much information as it should in terms of what is done in the search.

## II.   Argument

The Court should sanction Defendants for spoliation of evidence. The Second Circuit made clear in *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) that spoliation is "destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Furthermore, the Second Circuit has held that once the court finds spoliation, culpability is not required in order to form an adverse inference against the party responsible for the spoliation, because "the risk that the evidence would have been detrimental […] should fall on the party responsible for its loss." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002).

Defendants' allegation that the sales logs were "misplaced" but not "destroyed or lost" clearly meets the legal standard for spoliation under the "failure to preserve property […] as evidence in pending […] litigation." *See West*, 167 F.3d at 779. It does not matter that the sales logs were not destroyed. Regardless of Defendant's culpability in the "misplace[ment]" of the evidence, the end result is that the evidence is unavailable for Plaintiff to use in litigation., Defendants knew that they had an obligation to preserve and maintain the records. Therefore, under the rule in *Residential Funding Corp.*, the risk (that the evidence was detrimental) should fall on the Defendants. Moreover, with regard to both the sales log and the text messages, Defendants have already been threatened by sanctions from the Court—yet they continue to delay discovery by playing affidavit word games. Dkt. 59.

The sanctions of an adverse jury instruction and monetary sanctions for spoliation are appropriate here because of the significant prejudice to Plaintiff's case. Plaintiff's pregnancy discrimination case heavily relies on showings of disparate impact and/or discriminatory animus, both of which require the evidence that the Defendants refuse to produce. Defendants should not profit from their alleged "misplace[ment]" of sales logs and their blatant refusal to produce the text messages in compliance with the April 3 Order. We thank the Court for its attention to and consideration of this matter.

Respectfully submitted,
TROY LAW, PLLC
*/s/ John Troy*
John Troy
*Attorney for Plaintiff*

3

A0013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                                Plaintiff,

      -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                                Defendants.
-------------------------------------------------------------X

Case No.: 1:21-cv-7163 (HG) (RLM)

**DECLARATION OF**
**DEANA JENNINGS**

     Deana Jennings declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

     1.     I am the designated corporate representative of Defendants 161-10 Hillside Auto

Ave, LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet") and Hillside Auto Mall

Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall

collectively hereinafter the "Corporate Defendants") in the above-referenced case, and have served

as a part-time controller for Hillside Auto Outlet during the time Plaintiff worked there and have

also served as a controller for Hillside Auto Mall, where I remain employed today.

     2.     As such, I am familiar with all the facts and circumstances heretofore had herein

based upon my personal knowledge and a review of the documents I maintain at Hillside Auto

Mall as well as at Hillside Auto Outlet during my tenure there.

     3.     I have conducted a search of my telephone for all text messages related to the

Plaintiff.

     4.     I am not in possession, custody, or control of any responsive text messages.

A0014

5.    I also searched my emails and am not in possession, custody, or control of any responsive emails other than those with my counsel.

6.    I do not recall exchanging any emails with the Plaintiff.

7.    Similarly, I conducted a search for the weekly sales logs of Hillside Auto Outlet and am unable to find them.

8.    As I recall, we moved those and other records to an outside storage facility due to construction at Hillside Auto Mall.

9.    I searched that outside storage facility for these records on May 9, 2023 after I could not find them at the dealerships.

10.    I was unable to find the records at either dealership nor at the outside storage facility.

11.    I am uncertain as to where they may be stored and have no knowledge nor recollection as to where they are kept.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 17, 2023.

_____
Deana Jennings

2

A0015

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                          Plaintiff,

                    -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                          Defendants.

-----------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (RLM)

**DECLARATION OF
JORY BARON**

      Jory Baron declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

      1.    I am a Defendant in the above-referenced case.

      2.    As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge.

      3.    I have conducted a search of my telephone for all text messages related to the Plaintiff.

      4.    Other than the text messages I have already produced, I am not in possession, custody, or control of any responsive text messages.

      5.    I also searched my emails and am not in possession, custody, or control of any responsive emails other than those with my counsel.

      6.    I do not recall exchanging any emails with the Plaintiff.

      7.    I did not conduct any search for the weekly sales logs because I do not maintain such records in my role at either of the Corporate Defendants.

A0016

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 17, 2023.

Jory Baron

A0017

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                       Plaintiff,

       -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                       Defendants.
---------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (RLM)

**DECLARATION OF**
**ANDRIS GUZMAN**

        Andris Guzman declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

        1.     I am a Defendant in the above-referenced case who used to be employed by 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet").

        2.     As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge.

        3.     I have conducted a search of my telephone for all text messages related to the Plaintiff.

        4.     Other than the text messages I have already produced, I am not in possession, custody, or control of any responsive text messages.

        5.     I also searched my emails and am not in possession, custody, or control of any responsive emails other than those with my counsel.

        6.     I do not recall exchanging any emails with the Plaintiff.

        7.     I did not conduct any search for the weekly sales logs because I am no longer employed by Hillside Auto Outlet.

8.      I was not employed by Hillside Auto Mall Inc. d/b/a Hillside Auto Mall.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May <u>17</u>, 2023.

andris guzman (May 17, 2023 11:35 EDT)

Andris Guzman

A0019

# 2023-05-17 Guzman Declaration

Final Audit Report                                                                    2023-05-17

| | |
|---|---|
| Created: | 2023-05-17 |
| By: | Emanuel Kataev (mail@emanuelkataev.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYbuyaUoRsSZ2oVFPDkqEbjlFadBePh2o |

## "2023-05-17 Guzman Declaration" History

📄 Document created by Emanuel Kataev (mail@emanuelkataev.com)
2023-05-17 - 2:49:44 PM GMT- IP address: 65.51.198.20

📧 Document emailed to andris-03@live.com for signature
2023-05-17 - 2:50:04 PM GMT

📄 Email viewed by andris-03@live.com
2023-05-17 - 3:33:57 PM GMT- IP address: 151.205.161.176

✍️ Signer andris-03@live.com entered name at signing as andris guzman
2023-05-17 - 3:35:03 PM GMT- IP address: 151.205.161.176

✍️ Document e-signed by andris guzman (andris-03@live.com)
Signature Date: 2023-05-17 - 3:35:05 PM GMT - Time Source: server- IP address: 151.205.161.176

✅ Agreement completed.
2023-05-17 - 3:35:05 PM GMT



A0020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                      Plaintiff,

     -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,


                    Defendants.
----------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (RLM)

**DECLARATION OF**
<u>**IS  A  UE T  AN   ALLA**</u>

Isha  ue Thanwalla declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am a Defendant in this case, and am a member of 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet").[1]

2.     As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of the documents I maintain at the Hillside Auto Outlet dealership.

3.     I have conducted a search of my telephone to the best of my abilities for all text messages related to the Plaintiff.

4.     Other than the text messages I have already produced, including that with a non-party to this case named Ali, I am not aware of any further responsive text messages that I am in possession, custody, or control of.

---

[1] Hillside Auto Mall Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") has been named a Defendant in this case, but I hold no interest in that dealership, and the Plaintiff in this case never worked there.

A0021

5.      I have also searched my emails and am not in possession, custody, or control of any responsive emails other than those with my counsel, as well as three (3) blank emails attaching resumes from prospective sales representatives to myself, the Plaintiff, and others.

6.      Similarly, I conducted a search for the weekly sales logs and am unable to find them.

7.      Before we hired our current full-time controller, Deana Jennings ("Ms. Jennings") – who worked and still works at Hillside Auto Mall – served as our controller part time until we found a full-time controller.

8.      It is my understanding that Ms. Jennings was the controller during virtually the entire time period that Plaintiff worked at Hillside Auto Outlet from in or about May 2018 to in or about January 201 .

.      Ms. Jennings maintained the weekly sales logs and I understood that she was in possession of them.

10.      Upon the re uest of my counsel, I asked Ms. Jennings for these logs but she informed me that she does not have them.

11.      I searched the records we have at Hillside Auto Outlet and am unable to find these records.

12.      I am uncertain as to where they may be stored and have no knowledge nor recollection as to where they are kept.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May  17 , 2023.

*Ishaque Thanawalla*
Ishaque Thanawalla (May 17, 2023 16:55 GMT+2)
Isha ue Thanwalla

2

# 2023-05-17 Thanwalla Declaration

Final Audit Report                                                                 2023-05-17

| | |
|---|---|
| Created: | 2023-05-17 |
| By: | Emanuel Kataev (mail@emanuelkataev.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA1M1FHwB-FuFMq7jruvYDDAcDdYvSi9Pp |

## "2023-05-17 Thanwalla Declaration" History

Document created by Emanuel Kataev (mail@emanuelkataev.com)
2023-05-17 - 2:37:54 PM GMT- IP address: 65.51.198.20

Document emailed to Savvas Kay (isaac@hillsideautooutlet.com) for signature
2023-05-17 - 2:38:21 PM GMT

Email viewed by Savvas Kay (isaac@hillsideautooutlet.com)
2023-05-17 - 2:39:49 PM GMT- IP address: 146.75.244.1

Signer Savvas Kay (isaac@hillsideautooutlet.com) entered name at signing as Ishaque Thanawalla
2023-05-17 - 2:55:57 PM GMT- IP address: 45.93.58.203

Document e-signed by Ishaque Thanawalla (isaac@hillsideautooutlet.com)
Signature Date: 2023-05-17 - 2:55:59 PM GMT - Time Source: server- IP address: 45.93.58.203

Agreement completed.
2023-05-17 - 2:55:59 PM GMT



A0023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                       Plaintiff,

        -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                       Defendants.
------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (LB)

**SUPPLEMENTAL
DECLARATION OF
DEANA JENNINGS**

Deana Jennings declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

    1.    I am the designated corporate representative of Defendants 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet") and Hillside Auto Mall Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall collectively hereinafter the "Corporate Defendants") in the above-referenced case, and have served as a part-time controller for Hillside Auto Outlet during the time Plaintiff worked there and have also served as a controller for Hillside Auto Mall, where I remain employed today.

    2.    As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of the documents I maintain at Hillside Auto Mall as well as at Hillside Auto Outlet during my tenure there.

    3.    I submit this declaration to supplement my prior declaration dated May 17, 2023.

    4.    As I have previously declared, I have conducted a search of my telephone for all text messages related to the Plaintiff.

A0024

5.    My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

6.    None of these key words returned any text messages related to the Plaintiff.

7.    Thus, I am not in possession, custody, or control of any responsive text messages.

8.    I also searched my emails and am not in possession, custody, or control of any responsive emails other than those with my counsel.

9.    My search consisted of the following key words using my email's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

10.    None of these key words returned any emails related to the Plaintiff.

11.    Thus, I am not in possession, custody, or control of any responsive emails.

12.    As I previously declared, I do not recall exchanging any emails with the Plaintiff.

13.    Similarly, I conducted a search for the weekly sales logs of Hillside Auto Outlet and am unable to find them.

14.    As I recall, we moved those and other records to an outside storage facility due to construction at Hillside Auto Mall.

15.    I searched that outside storage facility for these records on May 9, 2023 after I could not find them at the dealerships.

16.    I was unable to find the records at either dealership nor at the outside storage facility.

17.    I am uncertain as to where they may be stored and have no knowledge nor recollection as to where they are kept.

2

A0025

18.   I do not believe that the sales logs are lost or destroyed; I believe they have been misplaced following the construction project at Hillside Auto Mall.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 3 1, 2023.

_____
Deana Jennings

A0026

```
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF NEW YORK

 3            ----------------------------------------X

 4            LETICIA FRANCINE STIDHUM,

 5                              Plaintiff,

 6               -against-          CASE: 21-CV-07163

 7            161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
              AUTO OUTLET, and HILLSIDE AUTO MALL INC
 8            d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
              JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

 9

10                              Defendants.

11            ----------------------------------------X

12                              March 10, 2023

13                              10:00 A.M.

14

15            VIRTUAL EXAMINATION BEFORE TRIAL of

16            DEANA JENNINGS, via Zoom, a 30(b)6 witness

17            herein, held at the above-mentioned time and

18            taken before Lynn Luckman, a Notary Public

19            and Shorthand Reporter within and for the

20            State of New York.

21

22

23                     SANDY SAUNDERS REPORTING
                    254 South Main Street, Suite 216
24                      New City, New York 10956
                          (845) 634-7561
25
```

A0027

26

```
 1                    Deana Jennings
 2        commission sheets. How are the commission
 3        sheets kept?
 4                    A.  At Auto Outlet or Auto Mall?
 5                    Q.  Let's start from Auto Mall and
 6        then we will move on to Auto Outlet.
 7                    A.  I would keep them in the
 8        employee file.
 9                    Q.  That file, is that a paper file
10        or an electronic file?
11                    A.  Paper.
12                    Q.  When you say ''employee file,''
13        what category of employees are you talking
14        about?
15                    A.  I just had a folder with the
16        employee's names and I would keep all of
17        their commission sheets in that folder.
18                    Q.  Let me sort of try to clarify my
19        question.  My question is: what type of
20        employees would have an employee file with
21        the commission sheets, was that all the
22        employees or --
23                    A.  Just the sale sales associates.
24                    Q.  Would the business development
25        center people have any employee files as
```

27

Deana Jennings

```
 1                    Deana Jennings
 2          well?
 3                    A.  Yes.
 4                    Q.  Were employee files kept for
 5          non-commission employees?
 6                    A.  I have an employee file for
 7          them, yes.
 8                    Q.  Was that for each employee that
 9          there is a separate file folder?
10                    A.  Yes.  Whoever is hired, they get
11          a folder.
12                    Q.  For how long are the records
13          kept?
14                    A.  I think I still have them.
15                    Q.  Between 2008 and the present
16          day, did you throw out any of the employee
17          files?
18                    A.  No.
19                    Q.  Were any of the employee files
20          missing or lost that you know of between
21          2008 and the present day?
22                    A.  Not to my knowledge.
23                    Q.  Let's turn our attention to
24          Hillside Auto Outlet. How are the employee
25          records kept there?
```

28

```
 1                    Deana Jennings
 2                A.  To the best of my knowledge,
 3        it's the same way.  There is an employee
 4        folder.
 5                Q.  Let's turn our attention now for
 6        a second to the car salespeople
 7        specifically, what would be in a typical car
 8        salesperson's employee folder?
 9                A.  Driver's license, another form
10        of identification, their social security,
11        passport, the employee package.  That would
12        be the employee package, and they might have
13        had a folder for commission sheets, Hillside
14        Auto Mall had separate at that point.
15                Q.  You are saying that Hillside
16        Auto Mall would have two folders, if it's
17        for a car salesperson; one folder is with
18        the driver's license, ID and the employee
19        package and another folder is for the
20        commission sheets?
21                A.  Yes.
22                Q.  To your knowledge, were the
23        records ever lost or did you guys ever
24        discard any records between 2018 and the
25        present day?
```

Case 1:21-cv-07163-HG-LB   Document 73-6   Filed 06/12/23   Page 5 of 8 PageID #: 619

29

```
 1                    Deana Jennings
 2              A.  No.  I think there was a law
 3         that you have to hold documentation for at
 4         least seven years before discarding it or
 5         shredding it.
 6              Q.  Let's focus on commission sheets
 7         for a second.  The commission sheets are
 8         filled out on a weekly basis; is that
 9         correct?
10              A.  Correct.
11              Q.  The commission sheets that are
12         filled out on a weekly basis, would that
13         include what information, can you describe
14         it for me?
15              A.  For Auto Mall?
16              Q.  Let's start from Auto Mall and
17         then we will go to Auto Outlet.
18              A.  Okay.  For Auto Mall, we have a
19         sheet with the salesperson's name or the
20         BDC, rep's name.  It would list the amount
21         of time, it would be the customer's name,
22         possibly a partial VIN number, VIN number of
23         the car that they purchased. Sometimes the
24         date that it was sold.
25              Q.  Any other information that would
```

30

```
 1                        Deana Jennings
 2          be contained?
 3                    A.  That is pretty much it.
 4                    Q.  Would it include the sales price
 5          and the commission that the car salesperson
 6          would receive?
 7                    A.  Sometimes they would write it on
 8          there for me.
 9                    Q.  If it was not written on there
10          for you, what would happen?
11                    A.  I know their pay plan.
12                    Q.  What was the pay plan for a
13          Hillside Auto Mall?
14                    A.  Hillside Auto Mall is 250
15          salary, $250 salary and 100 commission.
16                    Q.  Would that $100 commission be
17          per car?
18                    A.  Yes.
19                    Q.  Was there any bonus structure at
20          Hillside Auto Mall?
21                    A.  No.
22                    Q.  When you said that you would
23          tally up the numbers, you would tally the
24          number of cars sold and multiply it by the
25          commission, then add the salary; is that
```

31

```
 1                      Deana Jennings
 2        correct?
 3                 A.  On the sheet, I would just tally
 4        up their commissions, and the salary was
 5        just standard.
 6                 Q.  So, when you would tally up the
 7        number, that would be the number of cars
 8        sold?
 9                 A.  Yes.
10                 Q.  Once you tallied up the number
11        of cars sold, you would then pass that
12        information to a third party, whether that
13        was ADP or some other company; is that
14        correct?
15                 A.  Correct.
16                 Q.  Now let's turn your attention to
17        Hillside Auto Outlet.  Are the commission
18        sheets the same or different from that of
19        Hillside Auto Mall?
20                 A.  It was pretty much the same,
21        although they had a bookkeeper there and I
22        would print out the name and they would tell
23        me who gets paid this per week with the
24        commission, what it was and whatnot.
25                      MR. KATAEV:  Can you hang
```

69

```
 1                        Deana Jennings
 2              Q.  Do you use an iPhone currently?
 3              A.  Yes, I do.
 4              Q.  What is your phone number?
 5              A.  732-858-2614.
 6              Q.  Is that number back in
 7    2018/2019?
 8              A.  When did I change my number
 9    last?  I believe so, but I can't remember.
10    I don't know exactly when I changed it.
11              Q.  While you were the controller of
12    Hillside Auto Outlet, did you communicate
13    with any of the named defendants or the
14    plaintiff by text?
15              A.  I'm sure I have.
16              Q.  Do you still have any of those
17    text messages?
18              A.  No.
19              Q.  Do you know why not?
20              A.  I don't like a long list of
21    messages on my phone.  I have OCD, and I
22    don't like having all of those names.  I try
23    to keep it to who I spoke to and -- on a
24    daily basis, and the list is short.
25              Q.  Were any of the text messages
```

Case 1:21-cv-07163-HG-LB   Document 73-7   Filed 06/12/23   Page 1 of 7 PageID #: 623   1

1                        UNITED STATES DISTRICT COURT

2                        EASTERN DISTRICT OF NEW YORK

3       LETICIA FRANCINE STIDHUM,     .    Docket No.
                                      .    1:21-CV-07163-HG-LB
4            Plaintiff,               .
                                      .
5              v.                     .    Brooklyn, New York
                                      .    Thursday, May 4, 2023
6       161-10 HILLSIDE AUTO AVE,     .    10:14 a.m.
        LLC, ET AL.,                  .
7                                     .
             Defendants.              .
8        . . . . . . . . . . . . .    .
                                      .
9          .                          .
                                      .
10

11                          TRANSCRIPT OF MOTION HEARING
                          BEFORE THE HONORABLE LOIS BLOOM
                            UNITED STATES MAGISTRATE JUDGE
12

13       APPEARANCES:

14       For the Plaintiff:          Troy Law, PLLC
                                     TIFFANY TROY, ESQ.
15                                   41-25 Kissena Boulevard
                                     Suite 110
16                                   Flushing, New York 11355
                                     718-762-1324

17       For the Defendants:         Milman Labuda Law Group PLLC
                                     EMANUEL KATAEV, ESQ.
18                                   JOSEPH M. LABUDA, ESQ.
                                     3000 Marcus Avenue
19                                   Suite 3W8
                                     Lake Success, New York 11042
20                                   516-328-8899

21

22       Transcription Service:      Superior Reporting Services LLC
                                         P.O. Box 5032
                                         Maryville, TN 37802
23                                       865-344-3150

24

25       Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

Superior Reporting LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com

A0035

1  handwritten logs that were done on a weekly basis, and it was

2  a -- it was a summary for all of the salespeople.  That

3  information was generally texted to Ms. Jennings over the

4  phone.  She does not have any of the texts of these sheets

5  because then when she got that information about the

6  commissions, she'd go and put it into the system, and Mr.

7  Kataev can correct me if I'm wrong on anything.

8           THE COURT:  Are those the weekly sheets, again?

9           MR. LABUDA:  It was a weekly commission.  We asked

10  about a weekly commissions sales log and that's what the

11  response was about these weekly commissions sales logs.

12           So there's a form, you know, a blank form that's

13  handwritten, then it's sent to Ms. Jennings -- again,

14  generally speaking -- by text with a picture.  She then takes

15  that information and uploads it into the system for the

16  monthly and weekly commissions that the salespeople get.

17           THE COURT:  But they only got, from what I

18  understand, the monthly.

19           MR. LABUDA:  Yes.  So we're getting there.  It's

20  long, long story --

21           THE COURT:  Okay.  I'll be patient.  Go on.

22           MR. LABUDA:  -- but we're almost there.  So the

23  weekly -- we don't believe that we have any.  We've asked

24  them to review, to look --

25           THE COURT:  Because any of the handwritten things

1   got destroyed after they were inputted?

2          MR. LABUDA:  Yes.  Because that information was

3   already taken.  They are looking through storage to see if

4   there's any of these logs.  So they're looking for that.

5   There was also some --

6          THE COURT:  Can I just ask?  The handwritten

7   ones -- I'm not in the automotive business, obviously, and

8   I've run a dealership, but since you guys are knee deep in

9   this -- was it that, like, a customer comes in -- from what I

10  understand, Ms. Stidhum would go to financing because they'd

11  have to get somebody to write something up of what the price

12  and the percentage on the loan would be -- who's writing what

13  on the handwritten log?  Like, is that at the time that the

14  sale is being made, or is that at the time that -- what is

15  the handwritten log?

16         MR. LABUDA:  My understanding is that it's a

17  summary for each employee.  So it's, I think -- my -- again,

18  my understanding is that it's one page.  I could be wrong on

19  it, but that's at least my concept that it's one page, and it

20  lists all of the salespeople and I -- there may be various

21  information that's contained in that particular --

22         THE COURT:  Who's writing this?

23         MR. KATAEV:  I'll explain.

24         THE COURT:  Okay.  Go ahead.

25         MR. KATAEV:  There are sales managers that oversee

A0037

1  the salespeople, and so every week and every month, there's a

2  tally of the number of cars sold, and that's important

3  because for every car sold, there's a flat commission of

4  $150.  You sell a car, no matter what price it was, whether

5  we made on it or didn't make money on it, you get 150 bucks.

6  And that's what it says in the complaint.

7           And so the paystubs that we provided show one check

8  for a weekly salary and separate check for every week for the

9  commission.

10          THE COURT:  Can we go back though?

11          MR. KATAEV:  Sure.

12          THE COURT:  The handwritten sales log.  That's what

13 was asking about.

14          MR. KATAEV:  The sales manager fills that out.

15          THE COURT:  And what is he putting on that?  And

16 who is he of the Guzman, Thanwalla -- who is the sales

17 manager?

18          MR. KATAEV:  There's a lot of turnaround.  It was

19 Guzman at one point, then it was another person at another

20 point, and, because of the high amount of turnaround, there

21 is no sense as to where these documents are.  Further --

22          THE COURT:  If they exist.

23          MR. KATAEV:  To further complicate this, Deana

24 Jennings worked at Hillside Auto Outlet temporarily while we

25 were looking for a full-time comptroller there.  That

A0038

1  comptroller now is Susan, but she came in after the plaintiff

2  left.  So Deana Jennings came with the corporate

3  representative for Hillside Auto Outlet where --

4       THE COURT:  Because it was during the time period

5  when your client --

6       MR. KATAEV:  -- she worked there.

7       THE COURT:  -- where the plaintiff was there.

8       MR. KATAEV:  And she's the comptroller for Hillside

9  Auto Mall because that's always been her title, even though

10  the plaintiff never worked there.  There's a joint employer

11  theory on that, whatever.

12       So that's the issue, and so we're asking the

13  general manager, Mr. Thanwalla, where are these records.  He

14  says I think Deana has them.  We ask Deana where are the

15  records.  She says I don't have them.

16       THE COURT:  So let me back up a second.  She has

17  what was downloaded into the computer, though.

18       MR. KATAEV:  Which is placed into the paystubs.  On

19  every paystub, it lists the commission.

20       THE COURT:  But what they're looking for is the

21  comparators so to see --

22       MR. KATAEV:  We gave all the paystubs of all the

23  comparators.

24       THE COURT:  I'm not looking for paystubs because

25  the paystubs are only saying what that person made.

```
 1                MR. KATAEV:  Right.

 2                THE COURT:  What they want is to see the car sale

 3    logs.

 4                MR. KATAEV:  And all I'm saying, Your Honor, it's

 5    cumulative because the paystubs -- you divide commission by

 6    150, and you get the number of cars.

 7                THE COURT:  Mr. Kataev --

 8                MR. KATAEV:  I'm sorry.

 9                THE COURT:  -- you're telling me that they kept

10    these records.  Again, I credit Mr. Milman's version of it,

11    but they don't that they kept them.  They don't know if they

12    exist.

13                MR. KATAEV:  Correct.

14                THE COURT:  But we're after discovery close, we're

15    after Judge Mann back in December of 2022 ordered you to

16    produce the car sale logs.

17                MR. KATAEV:  But we produced the monthly logs, Your

18    Honor.

19                THE COURT:  But what I'm saying to you is, again,

20    this is not a game of, like -- I understand lawyers can parse

21    language, and if you don't use the exact right

22    language -- but we're here now.  We're looking for weekly.

23    We're not looking for monthly.

24                MR. KATAEV:  Got it.

25                THE COURT:  We're not looking for paystubs, so she
```

Case 1:21-cv-07163-HG-LB   Document 73-7   Filed 06/12/23   Page 7 of 7 PageID #: 629

1  does the comparative paystubs.  We're looking for the weekly

2  car sale logs.  And again, I never knew what Deana's position

3  was.  I didn't know who was there.  I'm just relying on

4  you -- and I have cases with 50 defendants where we're

5  talking about huge amounts of damages, and I don't have as

6  much work as I do in this case.  I'm serious.

7          MR. KATAEV:  We're trying to get to the bottom of

8  it, and if we had it -- we have nothing to hide.

9          THE COURT:  But it shouldn't be now, and it

10  shouldn't because I'm calling you on the --

11          MR. KATAEV:  Fair enough.

A0041

# MILMAN LABUDA LAW GROUP PLLC

**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**

————

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

June 20, 2023

**VIA ECF**
United States District Court
Eastern District of New York
Attn: Hon. Lois Bloom, U.S.M.J.
225 Cadman Plaza East
Courtroom 11A South
Brooklyn, NY 11201-1804

> *Re:*   **Stidhum v. 161-10 Hillside Auto Ave, LLC,** *et al.*
> **Case No.: 1:21-cv-7163 (HG) (RLM)**
> **MLLG File No.: 94-2019**

Dear Judge Bloom:

This office represents the Defendants in the above-referenced case.  This letter shall serve as Defendants' letter response in opposition to Plaintiff's motion for sanctions for alleged spoliation.  Plaintiff's motion should be denied because: (i) Defendants have not destroyed any evidence; (ii) the records sought were misplaced before this litigation was reasonably foreseeable; (iii) Defendants have done diligent searches that do not give rise to the relief sought by Plaintiff; and (v) the evidence Plaintiff seeks is irrelevant and cumulative of evidence already produced.

**Facts**

Following depositions in February and March 2023, and despite the fact this Court stated at a February 1, 2023 conference that no post-deposition discovery is permitted, Plaintiff served her second and third requests for the production of documents on February 26, 2023 and March 14, 2023, respectively.  See ECF Docket Entries 57 at 41:5-16, 58-3, and 58-4.  Defendants objected on the grounds that this Court expressly forbid post-deposition discovery.  See ECF Docket Entry 67 at 2.

Notwithstanding, on April 3, 2023, this Court entered an Order: (i) requiring production of car sales logs[1] for the relevant time period; and (ii) compelling the production text messages[2] between parties that pertain to plaintiff or to pregnancy discrimination, i.e., any text messages responsive to plaintiff's second set of document requests, request nos. 3-6 [ECF No. 58-3 at 11], and third set of document requests, request nos. 3-6, 8 [ECF No. 58-4 at 11].

---

[1] The Order did not specify whether monthly or weekly, and Defendants produced the remaining monthly sales logs.  See ECF Docket Entry 67 at 3.

[2] As set forth in Defendants' April 26, 2023 letter, Defendants produced all text messages on the day of each witnesses deposition.

A0042

Although the text messages were produced, as well as the complete set of monthly sales logs in compliance with the April 3, 2023 Order, Plaintiff filed successive letter motions for sanctions. See ECF Docket Entries 61 and 66. This prompted the Court to schedule a conference on May 4, 2023. See Text Only Orders dated April 18, 2023, April 21, 2023, and April 27, 2023. At the May 4, 2023 conference, this Court denied Plaintiff's motions for sanctions and required Defendants to search for and produce weekly sales logs and/or any other text messages and emails or provide a declaration as to the searches conducted by noon on May 17, 2023. See Text Only Orders dated May 4, 2023. Defendants searched for the requested documents but could not find any such documents. Defendants timely complied with this Order by providing the declarations of Defendants Ishaque Thanwalla ("Thanwalla"), Jory Baron ("Baron"), Andris Guzman ("Guzman"), and Deana Jennings ("Jennings") (the designated corporate representative of the corporate Defendants) explaining the scope of the search and that no responsive documents were found. See ECF Docket Entries 73-1, 73-2, 73-3, and 73-4. The declarations provide that each Defendant: (i) searched his or her cellular phone for responsive text messages and did not find any other responsive text messages; (ii) searched his or her email inbox for responsive text messages and did not find any responsive emails; and (iii) with respect to the declarations of Thanwalla and Jennings,[3] they both searched for weekly sales logs in multiple locations but were unable to find them.

Upon being provided with these declarations, Plaintiff complained that Jennings' declaration is insufficient and wanted to inquire about the circumstances of how the weekly sales logs were lost or destroyed, and separately raised an issue about the failure to reference the search terms set forth in her second and third requests for the production of documents. In response, on June 2, 2023, Jennings submitted a supplemental declaration. See ECF Docket Entry 73-5. There, she explained that she used the search terms on her cellular phone and her email inbox and found no responsive text messages or emails. Id. at ¶¶ 4-12. She also described in detail how she conducted a search for the weekly sales logs and was unable to find them, even after conducted another supplemental search on May 9, 2023 at both an outside storage facility and at the dealership. Id. at ¶¶ 13-18.

Upon being provided with this declaration, Plaintiff raised additional concerns that: (i) the remaining Defendants failed to provide a declaration as to whether they used the key words for their searches; (ii) Defendants did not specify whether they searched for text messages or emails related to the Plaintiff *or pregnancy discrimination* despite the fact Plaintiff provided key words for Defendants to use; and (iii) there was insufficient details concerning the efforts to search for the weekly sales logs. Defendants offered to once more conduct a search as to both the electronic communications and weekly sales logs and provide more detailed declarations.

On June 19, 2023, Defendants submitted the supplemental declarations of Thanwalla, Baron, Guzman, and Jennings (second supplemental) outlining their search efforts. See supplemental declarations of the Defendants, *sans* exhibits, annexed hereto as **Exhibits "A," "B," "C," and "D."** As set forth in the supplemental declarations, despite a diligent search, the weekly sales logs could not be found except for one such log, which was produced.

---

[3] Defendants Baron (a partner who is not involved with employees) and Guzman (a former employee) were not responsible for maintaining such records and did not search for them.

In order to confirm full compliance with the Court's Order and Plaintiff's discovery requests, as set forth in the supplemental declarations, on Friday, June 9, 2023, your undersigned met with Defendants Thanwalla and Baron to personally oversee another search of their cellular phones for responsive text messages and email inboxes for responsive emails. That same Friday, your undersigned separately met with Jennings to personally oversee her additional search of her cellular phone for responsive text messages and email inboxes for responsive emails. Finally, on the evening of Monday, June 12, 2023, your undersigned met with Defendant Andris Guzman to personally oversee his additional search of his cellular phone for responsive text messages and email inboxes for responsive emails.

As outlined further below, Defendants believe the 2018 weekly sales logs were misplaced years ago when Jennings ceased serving as a part-time controller at 161-10 Hillside Auto Ave LLC ("Hillside Auto Outlet") and returned to work full-time at Hillside Auto Mall Inc. ("Hillside Auto Mall").[4] Thanwalla sent these logs from Hillside Auto Outlet Jennings, but Jennings never received them at her office at Hillside Auto Mall. Defendants engaged in a thorough and diligent effort to search, locate, and provide Plaintiff with these weekly sales logs but were only able to locate one weekly sales log pertaining to Plaintiff and produced it to her counsel on June 19, 2023.

**Legal Standard**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). Rule 37 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") allows a district court to impose sanctions when a party spoliates evidence in violation of a court order, but even without a discovery order, a district court may impose sanctions for spoliation under its inherent power to manage the litigation. See id. (collecting cases); see also Fed. R. Civ. P. 37(b)(2).

To succeed on a spoliation motion, the movant must show "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). Relevance in this context "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." Id. at 108–09. In particular, it requires the moving party to "adduce sufficient evidence from which a reasonable trier of fact could infer that 'the [unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" Id. at 109 (quoting Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998)).

Severe sanctions, such as an adverse inference (which is what Plaintiff seeks here) are only available under Rule 37(e)(2), and must be grounded on a finding that the non-moving party "acted with the intent to deprive another party of the information's use in the litigation." See Rule 37(e)(2) (emphasis added).

---

[4] These two dealerships are about four (4) blocks away from each other, and – apart from having two common owners – are distinct dealerships that operate separately.

A0044

If the evidence does not support a finding that a party acted with the requisite intent to deprive, then the Court is limited to awarding less severe sanctions under Rule 37(e)(1), that are "no greater than necessary to cure the prejudice" caused by the spoliation.  Id.

### No Spoliation Occurred Because the Records Were Misplaced Before This Suit Began[5]

Plaintiff's spoliation motion fails because she failed to prove that Defendant had control over the evidence after the lawsuit was filed and failed to timely produce the evidence with a culpable state of mind.  See Residential Funding Corp., 306 F.3d at 107.  As set forth in the declarations of Thanwalla, he believed that Jennings kept the records when she ceased working part-time at Hillside Auto Outlet at Hillside Auto Mall.  See ECF Docket Entry 73-4 at ¶¶ 7-10; see also Exhibit A.  Jennings searched for the records at Hillside Auto Mall and an outside storage facility on May 9, 2023 but was unable to find them.  See ECF Docket Entry 73-5 at ¶¶ 13-17; see also Exhibit D.  Plaintiff has not provided any evidence nor a basis to believe that the records sought were lost after she first filed suit in September 2019.  Indeed, it appears that the records were lost or misplaced when Jennings ceased working at Hillside Auto Outlet part-time and returned to work full-time at Hillside Auto Mall, which occurred in or about early 2019, well before Plaintiff's September 2019 lawsuit.

Further, a party cannot produce records that it does not have, and given the diligent search and multiple declarations attesting to the efforts made to find these documents, there is no basis for sanctions.  See Uni-Sys., LLC. v. U.S. Tennis Assn., Inc., No. 17-CIV.-147 (KAM) (CLP), 2020 WL 8266015, at *6 (E.D.N.Y. July 6, 2020) ("Given that Hardesty has represented that it does not have the 'missing' documents, the Court cannot order Hardesty to produce what it does not have. The Court Orders Hardesty to submit an affidavit from a records custodian, affirming that Hardesty conducted the ESI search according to the previously-agreed-to search terms and custodians, and that it has produced all responsive documents in its possession, custody and control … At this time, the Court finds no basis on which to impose sanctions, and therefore denies Hardesty's request for sanctions").  As such, Plaintiff's motion must be denied on this ground.

### The Misplaced Records are Irrelevant to Plaintiff's Claims

It must also be mentioned that Plaintiff has not articulated any real need for the documents sought, establishing the relevance of same, nor any prejudice as a result of not having them.

---

[5] Plaintiff's motion must also be denied as premature, as she failed to wait until receiving the aforementioned supplemental declarations before seeking relief from this Court.  See Raymond v. City of New York, No. 15-CIV.-6885 (LTS), 2020 WL 1067482, at *9 (S.D.N.Y. Mar. 5, 2020), reconsideration denied, 2020 WL 1847056 (S.D.N.Y. Apr. 13, 2020), and objections overruled, 2020 WL 3619014 (S.D.N.Y. July 2, 2020), and objections overruled, 2020 WL 3619014 (S.D.N.Y. July 2, 2020) (Plaintiffs' counsel's refusal to cooperate in meet and confer sessions contributed in part to the problem. Therefore, neither of Plaintiffs' proposed orders—striking Defendants' Answer or an adverse inference—would be just in this instance, where one party failed to comply with the Court's Order, but the other party seems to have frustrated the compliance").

A0045

Plaintiff claims in her instant papers in support that her "discrimination case[6] heavily relies on showings of disparate impact and/or discriminatory animus, both of which require the evidence that the Defendants refuse to produce."  But Defendants have already produced Plaintiff's and all other salespersons paystubs evidencing how much each salesperson earns in salary and commissions,[7] such that the evidence sought here is cumulative.  See Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 291 (S.D.N.Y. 2009) (quotation omitted) (rejecting motion for spoliation sanctions where there was no evidence that any of the lost or destroyed documents would have been unfavorable to defendant); see also Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 414 (S.D.N.Y. 2010) (same); Khaldei v. Kaspiev, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions").

To the extent that Plaintiff believes that there may be evidence of discrimination in weekly sales logs that is somehow not evident from comparing her paystubs with all the other salespersons working at Hillside Auto Outlet at the same time, "she cannot establish her right to sanctions by claiming that Defendants' conduct deprived her of a pond in which she would like to have gone on a fishing expedition." See New York State Nat. Org. for Women v. Cuomo, No. 93-CIV.-7146 (RLC) (JCF), 1998 WL 395320, at *3 (S.D.N.Y. July 14, 1998) (internal quotations and alterations omitted).  Moreover, "for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed." See Farella v. City of New York, Nos. 05-cv-5711 (NRB) & 05-cv-8264 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007). Accordingly, Plaintiff's motion to compel and for sanctions must be denied.

Defendants thank this honorable Court for its time and attention to this case.

Dated: Lake Success, New York
      June 20, 2023

Respectfully submitted,
**MILMAN LABUDA LAW GROUP PLLC**
_____/s/ *Emanuel Kataev, Esq.*_____
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
joe@mllaborlaw.com

*Attorneys for Defendants*

---

[6] It must be noted that Plaintiff also commenced a state court action against the Defendants for alleged wage-and-hour violations, which action remains pending.

[7] Each salesperson receives a separate check for salary and commissions on a weekly basis, with the paystub clearly marked.

A0046

**VIA ECF**
Troy Law, PLLC
<u>Attn</u>: John Troy, Tiffany Troy, and Aaron Schwietzer, Esqs.
4125 Kissena Boulevard, Suite 103
Flushing, NY 11355-3101
johntroy@troypllc.com
tiffanytroy@troypllc.com
troylaw@troypllc.com

*Attorneys for Plaintiff*

# EXHIBIT A

A0048

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                             Plaintiff,

         -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                          Defendants.
-----------------------------------------------------------------X

Case No.: 1:21-cv-7163 (HG) (RLM)

**SUPPLEMENTAL
DECLARATION OF
ISHAQUE THANWALLA**

       Ishaque Thanwalla declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that

the following is true and correct:

       1.      I am a Defendant in this case, and am a member of 161-10 Hillside Auto Ave, LLC

d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet").[1]

       2.      As such, I am familiar with all the facts and circumstances heretofore had herein

based upon my personal knowledge and a review of the documents I maintain at the Hillside Auto

Outlet dealership.

**Search of Text Messages and Emails**

       3.      I have conducted another search of my telephone to the best of my abilities for all

text messages related to the Plaintiff or pregnancy discrimination.

       4.      My search consisted of the following key words using my phone's search function:

(i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii)

Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

---

[1] Hillside Auto Mall Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") has been named a
Defendant in this case, but I hold no interest in that dealership, and the Plaintiff in this case never
worked there.

5.      Because I used my iPhone to conduct this search, I omitted the wild cards (*) in search terms (i), (ii), (iii), and (iv), and searched for "women" or "woman" for the search term (xi).

6.      Other than the text messages I have already produced, I am not in possession, custody, or control of any other responsive text messages relating to Plaintiff or pregnancy discrimination.

7.      I have also searched my emails and am not in possession, custody, or control of any emails responsive to the requests, i.e., relating to Plaintiff or pregnancy discrimination, other than three (3) blank emails attaching resumes from prospective sales representatives to myself, the Plaintiff, and others, which I referenced in my previous declaration.

8.      My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

9.      I conducted the instant search of text messages and emails together with my counsel on June 9, 2023.

10.     We determined together that none of the texts or emails that came up with the foregoing search words related to Plaintiff nor pregnancy discrimination other than those text messages which were already produced.

11.     In an abundance of caution, however, I am producing the aforementioned blank emails.  They are attached hereto as **Exhibit "A."**

**Weekly Sales Logs Search**

12.     Similarly, I conducted another search for the weekly sales logs and am unable to find them.

2

A0050

13. Before we hired our current full-time controller, Deana Jennings ("Ms. Jennings") – who worked and still works at Hillside Auto Mall – served as our controller part time until we found a full-time controller.

14. It is my understanding that Ms. Jennings was the controller during virtually the entire time period that Plaintiff worked at Hillside Auto Outlet from in or about May 2018 to in or about January 2019.

15. Ms. Jennings maintained the weekly sales logs and I understood that she was in possession of them.

16. Upon the request of my counsel, I asked Ms. Jennings for these logs but she informed me that she does not have them.

17. I searched the records we have at Hillside Auto Outlet on multiple occasions and am unable to find the weekly sales logs for the relevant time period of May 2018 through January 2019.

18. While I am uncertain as to where they may be stored and have no knowledge nor recollection as to where they are kept, I looked in the following places where we keep records.

19. First, I checked the controller's office for the records, and did not find any there.

20. In the controller's office, there are four (4) filing cabinets where records are kept. I searched each and every file cabinet and the records were not there.

21. Second, we have a storage room on-site at Hillside Auto Outlet. The storage room is approximately 10' x 6' x 7' high.

22. There are about twenty filing cabinets and approximately fifteen to eighteen boxes in the on-site storage facility.

A0051

23.    I searched the filing cabinets with Ms. Jennings and another employee for the records a second or third time on June 6, 2023, after previously having searched this room for the records.

24.    While I did not find the records sought, I did find many weekly sales logs from 2019 after the Plaintiff resigned from employment in January 2019.

25.    These weekly sales logs are attached hereto as **Exhibit "B."**

26.    In addition, I did find a screenshot of a December 2018 weekly sales log of the Plaintiff on my phone.

27.    This screenshot is attached hereto as **Exhibit "C."**

28.    All in all, my most recent search on June 6, 2023 took almost the entire working day, approximately six (6) hours, to complete.

29.    Pictures of our search efforts are annexed hereto as **Exhibit "D."**

30.    My previous searches took a similar amount of time, spanning from three (3) to five (5) hours each time.

31.    Finally, we have an outside storage facility, consisting of two rooms that are approximately 10' x 10' each.

32.    Ms. Jennings and another employee conducted a search for these records and, as far as I know, no weekly sales logs for the relevant period were found.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 19, 2023.

Ishaque Thanwalla

# EXHIBIT B

A0053

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                            Plaintiff,

          -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                         Defendants.
-------------------------------------------------------------------X

Case No.: 1:21-cv-7163 (HG) (LB)

**SUPPLEMENTAL
DECLARATION OF
JORY BARON**

Jory Baron declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

1.     I am a Defendant in the above-referenced case. As such, I am familiar with all the

facts and circumstances heretofore had herein based upon my personal knowledge.

**Search of Text Messages and Emails**

2.     I have conducted another search of my telephone for all text messages related to

the Plaintiff or pregnancy discrimination.

3.     My search consisted of the following key words using my phone's search function:

(i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii)

Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

4.     Because I used my iPhone to conduct this search, I omitted the wild cards (*) in

search terms (i), (ii), (iii), and (iv), and searched for "women" or "woman" for the search term (xi).

5.     Other than the text messages I have already produced, I am not in possession,

custody, or control of any other responsive text messages relating to Plaintiff or pregnancy

discrimination.

6.    I did, however, find the complete set of text messages I previously produced.

7.    The complete set of text messages is attached hereto as **Exhibit "A."**

8.    I also searched my emails and am not in possession, custody, or control of any emails responsive to the requests.

9.    My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

10.    I do not recall exchanging any emails with the Plaintiff, so it makes sense that I did not find any.

11.    I conducted the instant search of text messages and emails together with my counsel on June 9, 2023.

12.    We determined together that none of the texts or emails that came up with the foregoing search words related to Plaintiff nor pregnancy discrimination other than those text messages which were already produced.

**Weekly Sales Logs Search**

13.    I did not conduct any search for the weekly sales logs because I do not maintain such records in my role at either of the corporate Defendants 161-10 Hillside Auto Ave LLC nor Hillside Auto Mall Inc.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19th, 2023.

_Jory Baron_
Jory Baron (Jun 19, 2023 15:48 EDT)
Jory Baron

2

A0055

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                          Plaintiff,

          -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                     Defendants.
----------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (LB)

**SUPPLEMENTAL
DECLARATION OF
ANDRIS GUZMAN**

      Andris Guzman declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

      1.     I am a Defendant in the above-referenced case who used to be employed by 161-

10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet").

      2.     As such, I am familiar with all the facts and circumstances heretofore had herein

based upon my personal knowledge.

**Search of Text Messages and Emails**

      3.     I have conducted a search of my telephone for all text messages related to the

Plaintiff or pregnancy discrimination.

      4.     My search consisted of the following key words using my phone's search function:

(i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii)

Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.  Because I used my iPhone

to conduct this search, I omitted the wild cards (*) in search terms (i), (ii), (iii), and (iv), and

searched for "women" or "woman" for the search term (xi).

A0057

Case 1:21-cv-07163-OEM-LB   Document 76   Filed 06/20/23   Page 17 of 23 PageID #: 649

5.     Other than the text messages I have already produced, I am not in possession, custody, or control of any other responsive text messages relating to Plaintiff or pregnancy discrimination.

6.     However, there is one text message I did not previously produce where the Plaintiff is mentioned in an exchange with a coworker who wanted to know whether the Plaintiff was at work that day in relation to a deal she was working on.

7.     Although it has nothing to do with her pregnancy or discrimination, I was advised to produce it in an abundance of caution.

8.     The text message exchange is attached hereto as **Exhibit "A."**

9.     I also searched my emails and am not in possession, custody, or control of any emails responsive to the requests.

10.     My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

11.     I do not recall exchanging any emails with the Plaintiff, so it makes sense that I did not find any.

12.     I conducted the instant search of text messages and emails together with my counsel on June 12, 2023; we determined together that none of the texts or emails that came up with the foregoing search words related to Plaintiff nor pregnancy discrimination other than those text messages which were already produced

**Weekly Sales Logs Search**

13.     I did not conduct any search for the weekly sales logs because I am no longer employed by Hillside Auto Outlet.

2

A0058

14.     I was not employed by Hillside Auto Mall Inc. d/b/a Hillside Auto Mall.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19, 2023.

Andris Guzman

A0059

# EXHIBIT D

A0060

Case 1:21-cv-07163-OEM-LB   Document 76   Filed 06/20/23   Page 20 of 23 PageID #: 652

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                            Plaintiff,

        -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                        Defendants.
-----------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (LB)

**SECOND SUPPLEMENTAL
DECLARATION OF
DEANA JENNINGS**

        Deana Jennings declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

        1.     I am the designated corporate representative of Defendants 161-10 Hillside Auto

Ave, LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet") and Hillside Auto Mall

Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall

collectively hereinafter the "Corporate Defendants") in the above-referenced case, and have served

as a part-time controller for Hillside Auto Outlet during the time Plaintiff worked there and have

also served as a controller for Hillside Auto Mall, where I remain employed today.

        2.     As such, I am familiar with all the facts and circumstances heretofore had herein

based upon my personal knowledge and a review of the documents I maintain at Hillside Auto

Mall as well as at Hillside Auto Outlet during my tenure there.  I submit this declaration to

supplement my prior declarations dated May 17, 2023 and May 30, 2023.

**Search of Text Messages and Emails**

        3.     As I have previously declared twice, I have conducted a search of my telephone for

all text messages related to the Plaintiff or pregnancy discrimination.

A0061

4.      My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

5.      When I initially conducted this search, I omitted the wild cards (*) in search terms (i), (ii), (iii), and (iv), and searched for "women" or "woman" for the search term (xi).

6.      None of these key words returned any text messages related to the Plaintiff or pregnancy discrimination.

7.      Thus, I am not in possession, custody, or control of any responsive text messages.

8.      I also searched my emails and am not in possession, custody, or control of any emails responsive to the requests, i.e., relating to Plaintiff or pregnancy discrimination.

9.      My search consisted of the following key words using my email's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

10.     None of these key words returned any emails related to the Plaintiff or pregnancy discrimination.

11.     Thus, I am not in possession, custody, or control of any responsive emails.

12.     As I previously declared, I do not recall exchanging any emails with the Plaintiff, so it makes sense that I did not find any.

13.     I conducted the instant search of text messages and emails together with counsel for the Defendants on June 9, 2023.

14.     We determined together that none of the texts or emails that came up with the foregoing search words related to Plaintiff nor pregnancy discrimination.

2

A0062

**Weekly Sales Logs Search**

15. Similarly, I conducted a search for the weekly sales logs of Hillside Auto Outlet and am unable to find them.

16. I previously recalled that we moved those and other records to an outside storage facility due to construction at Hillside Auto Mall.

17. However, upon review, the construction predates the Plaintiff's employment at Hillside Auto Outlet, which indicates that we did not have to move these weekly sales logs to any outside storage facility.

18. Further, as I previously declared, I searched that outside storage facility for these records on May 9, 2023 after I could not find them at both dealerships, i.e., Hillside Auto Outlet and Hillside Auto Mall.

19. I was unable to find the records at either dealership nor at the outside storage facility, except I am aware that Defendant Ishaque Thanwalla found some 2019 weekly sales logs at Hillside Auto Outlet's on-site storage facility upon another search at that dealership.

20. While I am uncertain as to where the May 2018 to January 2019 weekly sales logs may be stored and have no knowledge nor recollection as to where they are kept, I conducted another search in the following places where I keep records.

21. My most recent search took approximately six (6) hours.

22. Specifically, there are two offices at Hillside Auto Mall where records are kept.

23. The first office has about seven boxes consisting of 2022 deal jackets for cars sold in 2022.

24. I searched this office and all the boxes within it for the weekly sales logs of Hillside Auto Outlet and did not find any.

3

A0063

25. The second office has about four boxes consisted of 2023 deal jackets for cars sold in 2023 year to date. I searched this office and all the boxes within it for the weekly sales logs of Hillside Auto Outlet and did not find any.

26. In addition, we have a storage area on-site at Hillside Auto Mall.

27. Specifically, there is a space under the stairs leading up to our office where we kept records stored in boxes until we moved same to an outside storage facility due to construction being done at Hillside Auto Mall from approximately September 2017 through February 2018, which predates Plaintiff's employment with Hillside Auto Outlet that started in May 2018.

28. At the time I conducted a search, there were no boxes or documents in the on-site storage area.

29. I also conducted a thorough search of our off-site storage facility, where we have two rooms that are approximately 10' x 10' each.

30. The first room in the off-site storage facility has two filing cabinets, four cabinet drawers, and approximately fifty boxes.

31. The second room in the off-site storage facility has three filing cabinets and approximately sixty boxes.

32. On June 6, 2023, I conducted another search of the off-site storage facility.

33. With the help of another employee, I searched every box, filing cabinet, and cabinet drawer, but we did not find any weekly sales logs from May 2018 through January 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 19, 2023.

Deana Jennings

4

A0064

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                    Plaintiff,                                    **MEMORANDUM & ORDER**
        -against-                                                **21 CV 7163 (HG)(LB)**

161-10 HILLSIDE AUTO AVE, LLC,
HILLSIDE AUTO MALL, INC.,
ISHAQUE THANWALLA, JORY BARON,
and ANDRIS GUZMAN,

                    Defendants.
---------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

Plaintiff brings this action against defendants 161-10 Hillside Auto Ave, LLC (d/b/a Hillside Auto Outlet), Hillside Auto Mall Inc. (d/b/a Hillside Auto Mall), Ishaque Thanwalla, Jory Baron, and Andris Guzman for alleged violations under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq*; New York State Human Rights Law, N.Y. Exec. § 290 *et seq*.; and New York City's Pregnant Workers Fairness Act of New York City Human Rights Law, NYC Admin. § 8-107(22) *et seq*. Presently before the Court is plaintiff's motion for spoliation sanctions based on defendant's failure to locate and produce weekly sales logs relating to car sales of plaintiff and her comparators for the relevant time period. The Court previously ordered defendants to produce documents pertaining to sales by other salespersons in response to plaintiff's first set of document requests on December 22, 2022.[1] Mem. & Order at 8–9 [ECF No. 37]. On April 3, 2023 the Court again ordered defendants to produce these documents by April 10, 2023. Plaintiff moved for sanctions for defendants' failure to produce the documents on April 25, 2023. ECF No. 66. At a conference with the parties on May

---

[1] This case was previously overseen by Magistrate Judge Mann who noted in her December 22, 2022 Memorandum and Order the "shrill tone" of the parties' submissions and "their vexing recriminations." Mem. & Order at 1 [ECF No. 37].

A0065

4, 2023, the Court denied plaintiff's motion and ordered defendants to produce all outstanding discovery, including weekly sales logs of plaintiff and her comparators. ECF Order dated May 4, 2023. The Court also stated that it would not entertain further discovery motions, as discovery had closed on April 17, 2023 and remains closed. Id. For the reasons set forth below, plaintiff's renewed motion for sanctions is denied.

## BACKGROUND

The Court assumes familiarity with the facts and procedural history of this case. See Stidhum v. 161-10 Hillside Auto Ave, LLC, No. 21-cv-7163, 2022 WL 4273536 (E.D.N.Y. Sept. 15, 2022). In the instant motion, plaintiff seeks an adverse jury instruction and monetary sanctions for defendants' failure to produce handwritten sales logs that reflect the weekly car sales of plaintiff and her comparators from August 25, 2018 to January 24, 2019, the relevant time period based on the allegations in plaintiff's complaint. See ECF No. 37 at 8–9. Plaintiff requested "documents pertaining to [car] sales" by plaintiff and other salespersons in her first set of document requests and moved to compel production on December 1, 2022. ECF No. 33. The Court granted in part and denied in part plaintiff's motion, finding that "[d]efendants' discovery response suggests that they produced" documents pertaining to sales by other salespersons, but ordered defendants to produce documents pertaining to car sales by plaintiff by January 12, 2023. ECF No. 37.

Plaintiff then moved to compel "weekly car commission sales logs" reflecting the sales of plaintiff and her comparators on March 23, 2023. ECF No. 58. On April 3, 2023, the Court ordered defendants to produce these logs by April 10, 2023. On April 25, 2023, plaintiff moved for sanctions, stating that defendants had not yet produced the sales logs pursuant to the Court's April 3 Order. ECF No. 66.

A0066

The Court held a conference to address plaintiff's motion on May 4, 2023. During the conference, defendants confirmed that log sheets were created on a weekly basis reflecting the car sales of plaintiff and other salespersons. Transcript of the May 4, 2023 Conference ("Tr.") at 27:25–28:2 [ECF No. 72]. Defendants also stated that a log sheet was essentially a "blank form that's handwritten" and sent to their 'comptroller', Deana Jennings, "generally…by text with a picture." Id. at 28:9–14. Jennings then "upload[ed]" the information in the weekly log sheet to a system or software called "Vinsolutions" to create a log of monthly commissions for each salesperson. Id. at 5:5–20, 28:14–16. Defendants stated that while they had been able to produce the Vinsolutions monthly commission logs, they had not located the handwritten weekly logs for the relevant time period. Id. at 28:22–31:15. After hearing from the parties, the Court denied plaintiff's motion for sanctions and directed defendants to conduct a diligent search for the logs and produce all outstanding discovery by May 17, 2023. ECF Order dated May 4, 2023.

Plaintiff's renewed motion for sanctions argues that defendants should be sanctioned for their failure to locate and produce the weekly handwritten sales logs discussed at the May 4, 2023 conference. Plf.'s Mot. for Sanctions at 1 [ECF No. 73]. Defendants state that after searching the offices and storage facilities of both dealership locations, Hillside Auto Mall and Hillside Auto Outlet, as well as an outside storage facility, they could not locate the handwritten logs requested, apart from one weekly log from 2019, which they produced. Supplemental Declaration of Deana Jennings ("Jennings Supp. Decl.") ¶¶ 19–33 [ECF No. 76, Ex. D]; Supplemental Declaration of Ishaque Thanwalla ("Thanwalla Supp. Decl.") ¶¶ 17–32 [ECF No. 76, Ex. A]. Although defendants state that they "believe the 2018 weekly sales logs were misplaced" in early 2019, "when Jennings ceased working at Hillside Auto Outlet[2] part-time and returned to work full-time

---

[2] Plaintiff worked at the Hillside Auto Outlet throughout her employment with defendants. See Compl. ¶¶ 25, 47, 55.

A0067

at Hillside Auto Mall." Defs.' Opp. at 3–4 [ECF No. 76]. Defendants state that Jennings ceased working at Hillside Auto Outlet in early 2019, before plaintiff filed the complaint in this action. Id.

## DISCUSSION

The Court may impose sanctions under Rule 37(b) for a party's failure to comply with discovery orders. Fed. R. Civ. P. 37(b). However, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106 (2d Cir. 2002) (citing DLC Mgt. Corp. v. Town of Hyde Park, 163 F.3d 124, 135-36 (2d Cir. 1998)). "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses... and for the spoliation of evidence." Reilly v. Natwest Mkts Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999).

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). A party seeking an adverse inference instruction under Rule 37(b) based on the spoliation of evidence "must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp., 306 F.3d at 107 (citation and internal quotation marks omitted). The obligation or duty to preserve evidence under the first element of the spoliation test "arises when the party has notice that the evidence is relevant

4

A0068

to the litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).

Here, plaintiff seeks an adverse jury instruction for defendants' failure to produce handwritten weekly sales logs that reflect the weekly car sales of plaintiff and her comparators for the relevant period. Plf.'s Mot. for Sanctions at 3 [ECF No. 73]. However, plaintiff makes no argument that defendants had a duty to preserve the logs at the time they were allegedly either misplaced or destroyed, which defendants believe occurred in early 2019. Plaintiff's complaint herein was not filed until December 29, 2021. ECF No. 1. Attached to the complaint is an undated "document preservation demand" letter, ECF No. 1-1, that plaintiff presumably served on defendants with the summons and a copy of the complaint. Plaintiff does not allege that defendants were on notice of their obligation to preserve documents at any point before that date. Moreover, while defendants may have had a duty to preserve their handwritten sales logs for seven years by state statute, failure to comply with a state law's duty to preserve does not impute a duty to preserve records as potential evidence in a federal lawsuit. See, e.g., Babayev v. Medtronic, Inc., 228 F. Supp. 3d 192, 208 (E.D.N.Y. 2017) (finding that even if defendant had not complied with certain duties imposed by federal regulation, plaintiff "does not cite any authority for the proposition that" this regulatory duty "was designed to assist litigation, or that spoliation sanctions would be appropriate in cases in which a manufacturer failed to comply" with the regulation); see also Med. Shoppe Int'l, Inc. v. Mitsopoulos, No. 04-CV-5207, 2005 WL 8159003, at *2 (E.D.N.Y. Dec. 28, 2005) ("Even if plaintiff had a statutory duty to preserve the document…, there is no evidence that plaintiff deliberately failed to…preserve the [document] in order to thwart suit by defendants.")

Even if defendants had an obligation to preserve the weekly handwritten sales logs in early 2019, plaintiff has not demonstrated that defendants destroyed such evidence with a 'culpable state

A0069

of mind'. "In the Second Circuit, with respect to tangible evidence, the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed knowingly or grossly negligently, even if without intent to breach a duty to preserve it, or negligently." Mule v. 3-D Bldg. & Constr. Mgmt. Corp., No. 18-CV-1997, 2021 WL 2788432, at *9 (E.D.N.Y. July 2, 2021) (citations, internal quotation marks, and alterations omitted). While the Court does not condone defendants' counsel's behavior in this litigation—counsel has blatantly disregarded Court ordered deadlines as well as demonstrated a willingness to waste the Court's resources over petty disputes—plaintiff fails to show that defendants acted with the requisite "degree of culpability" for the imposition of sanctions in this instance. Best Payphones, Inc. v. City of New York, No. 01-CV-3924, 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016), aff'd as modified sub nom. Best Payphones, Inc. v. Dobrin, 409 F. Supp. 3d 130 (E.D.N.Y. 2018).

Moreover, defendants have produced monthly sales logs for the relevant period, diligently searched their offices and storage facilities to locate the handwritten weekly sales logs, and produced the one log they were able to locate. Jennings Supp. Decl. ¶¶ 19–33; Thanwalla Supp. Decl. ¶¶ 17–32. Defendants also produced weekly paystubs of plaintiff's comparators. Tr. at 30:7–9; 31:22–23. Plaintiff has not shown how she may be prejudiced by the alleged destruction of the handwritten weekly sales logs, particularly in light of the production of these other documents. Mule, No. 18-CV-1997, 2021 WL 2788432, at *6 ("A Rule 37(e)(1) sanction may only be imposed upon a finding of 'prejudice' from the loss of the information, and the sanction imposed may be 'no greater than necessary to cure the prejudice.'" (citing Lokai Holdings, LLC v. Twin Tiger USA LLC, No. 15-CV-9363, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018))).

Accordingly, an adverse instruction or monetary sanctions against defendants are not appropriate in this instance. Plaintiff's motion for spoliation sanctions is therefore denied.

SO ORDERED.

_____/S/_____
LOIS BLOOM
United States Magistrate Judge

Dated: June 28, 2023
        Brooklyn, New York

A0071

# MILMAN LABUDA LAW GROUP PLLC
**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**
_____

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

June 28, 2023

<u>**VIA ECF**</u>
United States District Court
Eastern District of New York
<u>Attn</u>: Hon. Hector Gonzalez, U.S.D.J.
225 Cadman Plaza East
Courtroom 6A South
Brooklyn, NY 11201-1804

> *Re:*    **Stidhum v. 161-10 Hillside Auto Ave, LLC,** *et al.*
> **Case No.: 1:21-cv-7163 (HG) (LB)**
> <u>**MLLG File No.: 94-2019**</u>

Dear Judge Gonzalez:

This firm represents the Defendants, 161-10 Hillside Auto Ave., LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet"), Hillside Automall Inc d/b/a Hillside Auto Mall, Ishaque Thanwalla, Jory Baron, Ronald M. Baron, and Andris Guzman (collectively the "Defendants").

Defendants write pursuant to ¶ IV(A) of this Court's Individual Practices (the "Practices") to seek a pre-motion conference in advance of Defendants' anticipated motion to dismiss Plaintiff's complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rule").

Summary judgment in favor of Defendants on Plaintiff's disparate treatment gender discrimination claims is warranted as Plaintiff cannot meet her burden of establishing a *prima facie* case of discrimination, let alone sustain her ultimate burden of proof. Her evidence consists of nothing more than petty slights and, at most, *de minimis* interferences with her work based on nothing more than speculation that such was gender-based, which is insufficient to overcome a motion for summary judgment. <u>See</u> <u>Wade v. New York City Dept. of Ed.</u>, No. 11-CIV.-05278 (LGS), 2014 WL 941754, at *5 (S.D.N.Y. Mar. 10, 2014) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment") (<u>citing</u> <u>Kulak v. City of New York</u>, 88 F.3d 63, 71 (2d Cir. 1996)).

The Complaint alleges that after Plaintiff, a former car salesperson at Hillside Auto Outlet, announced her pregnancy in late November 2018, her waiting times for Defendant Andris Guzman ("Guzman") – a manager at Hillside Auto Outlet with whom she worked – to process credit applications and qualify customers for financing significantly increased such that customers walked out and she suffered a resulting decrease in commissions and bonuses.

<span style="color:red">A0072</span>

However, this allegation is belied by the uncontroverted evidence adduced in discovery that: (i) Guzman took too long to process credit applications <u>before her pregnancy</u>; (ii) Guzman took the same time to process credit applications for all salespeople so Plaintiff was treated no differently; (iii) any delays in processing credit applications was not attributable to Defendants but, rather, the response times from financial institutions or other third parties involved in the verification process; (iv) Plaintiff was able to continue making sales with other customers while credit applications were being processed; (v) there were multiple other reasons unrelated to Guzman taking too long to process credit applications why a customer could walk out before and after being qualified for financing; (vi) Plaintiff's best week in commissions and bonuses immediately followed the alleged announcement of her pregnancy; (vii) Plaintiff does not know why Guzman made her wait longer to process her applications, and was unsure as to whether he did so due to "something personal" <u>or</u> her pregnancy; and (viii) shortly before she quit, Plaintiff sent the general manager at the dealership text messages while he was out on vacation complaining that his team "sucks" and that dealership has been a "shit show" ever since the general manager left for vacation.  <u>See</u> copies of relevant text messages annexed hereto as **Exhibit "A."**

In addition, the undisputed evidence also establishes the process of purchasing a vehicle could take hours, including the qualification process,[1] because of the number of verifications that are required to be done before any paperwork is submitted to a bank to obtain approval for a loan. There are also portions of the process that are completely out of the dealership's control which can affect the time it takes to process credit applications.  Moreover, Plaintiff testified that she had two (2) interpersonal conflicts with Guzman before her pregnancy.

Plaintiff's speculative belief that Guzman made her wait longer due to her pregnancy in light of the foregoing undisputed facts which she concedes amounts to nothing more than conjecture, is insufficient to establish a discrimination claim. <u>See</u> <u>Wade</u>, 2014 WL 941754, at *5. Because there is no genuine issue as to any material fact, and no rational jury could find that Plaintiff was subject to discrimination because of her pregnancy, summary judgment should be granted. <u>See</u> Fed. R. Civ. P. 56(c).

In addition, and crucially, Plaintiff cannot establish that she suffered any adverse employment action.  Plaintiff indisputably quit and does not claim a constructive discharge.  Her sole claim to an adverse employment action is the alleged increased waiting times that Guzman purportedly did on purpose after he found out Plaintiff was pregnant.  <u>See</u> <u>Keshinover v. New York State Off. of Parks, Recreation, and Historic Preservation</u>, 826 Fed. Appx. 109, 110 (2d Cir. 2020) (unpublished) (<u>citing</u> <u>During v. City Univ. of N.Y.</u>, No. 01-CIV.-9584, 2005 WL 2276875, at *10 (S.D.N.Y. Sept. 19, 2005) ("Without an adverse employment action, this incident cannot give rise to a *prima facie* case")).

---

[1] Plaintiff initially complained that the process to obtain numbers from financing took too long. However, when Defendants submitted an October 2022 declaration from a finance manager explaining why that theory is untenable, Plaintiff changed her claim to state that the customer qualification process – which precedes obtaining numbers from financing – took too long.  <u>See</u> Declaration of Serge Zanan annexed hereto as **Exhibit "B."**  As set forth in the Rule 56.1 Statement of Facts, annexed hereto as **Exhibit "C"** pursuant to this Court's Individual Practices ¶ IV(A)(4), this argument fares no better.

Lastly, Plaintiff's average commission for the 26 weeks before she announced her pregnancy was $710.00 per week, while her average commission for the eight (8) weeks after she announced her pregnancy was $690.63 per week.  This meager $19.37 weekly differential between her average commissions before and after her pregnancy is solely attributed to the fact that September through March is the slow season for car dealerships.[2]  Critically, Plaintiff's best week in commissions and bonuses immediately followed the alleged announcement of her pregnancy. As such, she suffered no materially adverse employment action.  See Beharry v. City of New York, No. 18-CIV.-2042 (AJN), 2020 WL 6135147, at *8 (S.D.N.Y. Oct. 19, 2020) (requiring materially adverse employment action to survive summary judgment).

Accordingly, Plaintiff cannot establish the existence of any adverse employment action such that she cannot prevail on her discrimination claims.

Summary judgment is likewise warranted in Defendants' favor on Plaintiff's disability discrimination claim as she has not identified any disability from which she suffered or any adverse employment action she suffered due to such unidentified disability.

Defendants thank this Court for its time and attention to this case.

Dated: Lake Success, New York
      June 28, 2023

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**
  *__/s/ Emanuel Kataev, Esq._____*
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Defendants*

**VIA ECF**
Troy Law, PLLC
Attn: John Troy, Tiffany Troy, and Aaron Schwietzer, Esqs.
4125 Kissena Boulevard, Suite 103
Flushing, NY 11355-3101
johntroy@troypllc.com
tiffanytroy@troypllc.com
troylaw@troypllc.com

*Attorneys for Plaintiff*

---

[2] Plaintiff's average bonus before her pregnancy was $23.46, while the average bonus after her pregnancy was $165.63.

3

A0074

?

12/12/2018 6:25 PM

iPhone (5) (+16618868012)

No

12/12/2018 6:37 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

Then i guess you are going to have to fire me i been feeling like this since 2 this afternoon ask ali I am not staying so you can let me know if i should be here friday or not. I was just going to leave after i made that deal earlier anyways because you yelling at me cus the customers rushing me saying i cant control my customer but not one of your floor managers came out to help either hearing whats going on and look at that the deal was made anyways

12/12/2018 6:39 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

so it is what is because im
so tired of everyone else getting slack n im here 6 days a week 10 hours a day faithfully maybe 2 or 3 days last month i went home early but other than that i dont even call out n when i do i make up for it unlike everyone else there so like i said you let me know if i should be here friday or not

12/12/2018 6:40 PM

Latisha Outlet (3472560067)

shaun comes 30 mins late everyday francisco dont come till 11 its bullshit

12/12/2018 7:28 PM

iPhone (5) (+16618868012)

You okay

1/7/2019 4:13 PM (Viewed 1/7/2019 4:15 PM)

Latisha Outlet (3472560067)

I left for the day tomorrow we need to talk because this place has been a shit show since you left

1/9/2019 10:17 AM

Latisha Outlet (3472560067)

my commissions sheet is under your keyboards

1/9/2019 10:17 AM

iPhone (5) (+16618868012)

**D3295**

**A0075**

Ok

1/9/2019 10:18 AM (Viewed 1/9/2019 1:01 PM)

Latisha Outlet (3472560067)

mujahid saeed was supposed to be a split between me and Sean but I had took the customer to Transworld and he ended up getting the Transworld insurance the day I was not in and Sean took it upon himself to take the whole hundred so I should be getting paid on that 100%

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

Ashas asking for my commissions

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

u have it

1/10/2019 1:24 PM (Viewed 1/10/2019 1:49 PM)

Latisha Outlet (3472560067)

I just threw up a bunch im feeling very nauseous and this is the type of thing that concerns me
about being in the car business

1/17/2019 8:27 PM (Viewed 1/17/2019 8:29 PM)

Latisha Outlet (3472560067)

You have absolutely no right too take $100 of my
salary money i worked a full week last week and pays one week behind so i should be receiving another salary check.

1/17/2019 8:30 PM

Latisha Outlet (3472560067)

You fucked me over with my car and i wish you wouldve shown me what you showed me when i bought my car from
you you guys are just a big fucking scam
and for you to call me your daughter and say you love
me and all this bull shit knowing wtf i been going thru this past month you been gone not making shit because your team fucking sucks i work 60 hours a week for 7 months straight no days off n december i slacked because you left and everything went to shit there

You have 90 total messages and 12 total images.

**D3296**
2/24/2023

**A0076**



Latisha Outlet (13472560067)
1/3/2019 2:49 PM

we're trying to do this for the site

Latisha Outlet (13472560067)
1/3/2019 2:49 PM

for tax season

Latisha Outlet (13472560067)
1/3/2019 2:50 PM

davids asking what exactly should we write as a disclaimer

Isaac Ibrahim (16618868012)
1/3/2019 3:12 PM
(sent, delivered, and opened)

Ask Ali or for weight now copy for hillside auto mall

Latisha Outlet (13472560067)
1/5/2019 2:21 PM

 (display:///C:\Users\Kyle\AppData\Roaming\Apple

Computer\MobileSync\Backup\ba095dbc4494b69ec0fe671d38b21d20054c4e12
\e8\e8698bff245177ba7785d7a4168b16cec7bf3a49)

Isaac Ibrahim (16618868012)
1/5/2019 2:22 PM
(sent, delivered, and opened)

Nice

Latisha Outlet (13472560067)
1/6/2019 12:12 PM

Were you aware that Guzman took the X6 & Then the Range rover last
night?

Isaac Ibrahim (16618868012)
1/6/2019 12:15 PM
(sent, delivered, and opened)

Yes

Latisha Outlet (13472560067)
1/7/2019 10:28 AM

Isaac are you back yet? Can you give me a call?

Latisha Outlet (13472560067)
1/7/2019 3:52 PM

I left for the day tomorrow we need to talk because this place has been a
shit show since you left

Isaac Ibrahim (16618868012)
1/7/2019 4:04 PM
(sent, delivered, and opened)

Ok

**D3299**
2/24/2023

Decipher Chat Conversation with Latisha Outlet

Latisha Outlet (13472560067)
1/7/2019 4:05 PM

and you do know that he quit today right and is offering us all a position where he's going

Isaac Ibrahim (16618868012)
1/7/2019 4:06 PM
(sent, delivered, and opened)

Who quit

Latisha Outlet (13472560067)
1/7/2019 4:06 PM

ali

Isaac Ibrahim (16618868012)
1/7/2019 4:07 PM
(sent, delivered, and opened)

Why

Isaac Ibrahim (16618868012)
1/7/2019 4:08 PM
(sent, delivered, and opened)

I just got home from a long flight will talk tomorrow

Latisha Outlet (13472560067)
1/7/2019 4:08 PM

like I said it's been a shit show

Latisha Outlet (13472560067)
1/7/2019 4:08 PM

okay see you tmm

D3300
2/24/2023

A0078

Case 1:21-cv-07163-HG-LB   Document 78-2   Filed 06/28/23   Page 1 of 3 PageID #: 670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,

                             Plaintiff,

          -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                           Defendants.
-------------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (RLM)

**DECLARATION
OF SERGE ZANAN**

     **SERGE ZANAN** declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

     1.     I serve as a Finance & Insurance ("F&I") representative for 161-10 Hillside Auto Ave, LLC, a Defendant in this case, since November 2018.

     2.     I respectfully submit this Declaration to address the allegations of the Plaintiff in this case.

     3.     The Plaintiff was already working as a salesperson at 161-10 Hillside Auto Ave, LLC.

     4.     I never performed any work for Hillside Auto Mall Inc., a separate dealership located three (3) blocks away from 161-10 Hillside Auto Ave, LLC.

     5.     As far as I know, the Plaintiff worked for Hillside Auto Mall Inc. either.

     6.     Whenever the Plaintiff or any other salesperson makes a sale, the customer's information is provided to the Sales Manager or myself (whoever is available and has authorization) to pull the prospective customer's credit profile.

1

A0079

7.     Once the credit profile is pulled, the customer's application to purchase a vehicle is submitted to chosen lenders.

8.     The timeframe to receive any word back from a chosen lender, which is also based on the customer's creditworthiness, ranges from ten (10) minutes to one (1) hour.

9.     This timeframe is completely outside the control of myself or any Sales Manager who pulls a credit profile, and is further dependent on the amount of verification requested by any chosen lender, which is also completely outside the control of myself or any Sales Manager.

10.    Sometimes, a chosen lender instantly approves a loan for a customer, usually for a customer with excellent creditworthiness, which is rare at our dealership.

11.    Even in perfect circumstances, this process can sometimes take up to an hour.

12.    During the time Plaintiff worked here, I worked closely with her as well as all the other salespersons.

13.    Everybody liked each other and treated each other well.

14.    There was no animosity amongst the salespeople, myself, nor the sales managers.

15.    My compensation at 161-10 Hillside Auto Ave, LLC is directly tied to the success of the dealership's sales force.

16.    As a result, it is in my interest as well as the Sales Managers' interests, to do everything possible to ensure a sale is made for each and every customer the dealership processes an application for.

17.    It would not make sense for me to make any customer wait longer than necessary to process an application because doing so would affect my bottom line, the saleperson's bottom line, the sales manager's bottom line, and the dealership as a whole.

2

A0080

18.     In other words, I have no reason to believe anybody would act to sabotage Plaintiff's sales, or any other salesperson's sales.

19.     If a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control, such as the failure of a customer to provide necessary information to the lender, or because the lender requested additional documentation or simply because the dealership had to wait for the lender's response.

20.     In the course of the last four years working at the dealership, customers have waited to obtain information concerning financing approval from twenty (20) minutes until three (3) hours, on average.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 10, 2022.

**SERGE ZANAN**

3

A0081

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                           **Plaintiff,**

              **-against-**

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                         **Defendants.**
-------------------------------------------------------------------X

Case No.: 1:21-cv-7163 (HG) (LB)

**DEFENDANTS' LOCAL CIVIL
RULE 56.1 STATEMENT OF
UNDISPUTED FACTS IN
SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

       Defendants 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet"), Hillside Auto Mall Inc d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall collectively hereinafter the "Corporate Defendants"), Ishaque Thanwalla ("Thanwalla"), Jory Baron ("Jory"), Ronald M Baron ("Baron"), and Andris Guzman ("Guzman") (Thanwalla, Jory, Baron, and Guzman collectively hereinafter the "Individual Defendants") (the Corporate Defendants and the Individual Defendants collectively hereinafter the "Defendants"), by their attorneys, Milman Labuda Law Group PLLC, pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (hereinafter "Local Civil Rule" or "LCR") and ¶¶ IV(A)(4) and IV(B)(7) of this Court's Individual Practices (hereinafter the "Practices") hereby respectfully submit this Rule 56.1 Statement of Undisputed Facts in Support of their Motion for Summary Judgment (hereinafter "SOUF"), as to which Defendants contend there is no genuine issue to be tried.

**Hillside Auto Outlet**

1.  161-10 Hillside Ave Auto, LLC ("Hillside Auto Outlet") is a domestic limited liability company formed on June 12, 2017 under the laws of the State of New York that does business as Hillside Auto Outlet and is authorized to do business in the State of New York.  Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 14:14-24, 17:7-8, 19:2-9; Thanwalla Dep. 17:3-18:11, 27:7-28:3; Guzman Dep. 50:10-14.

2.  Hillside Auto Outlet is a used car dealership located at 16110 Hillside Avenue, Jamaica, NY 11432.  Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 15:9-12; Plaintiff Dep. 31:2-14.

3.  Hillside Auto Outlet's members are Josh Aaronson ("Aaronson"), Jory Baron ("Baron"), The Estate of David Baron ("Estate"), and Ishaque Thanwalla ("Thanwalla"), all of whom own equal membership interests of twenty-five percent (25%).  Kataev Decl. ¶ 4, Ex. B; Baron Dep. 31:2-17, 37:18-38:2, 43:20-44:7, 52:2-6; Thanwalla Dep. 17:3-18:11, 27:7-28:3, 18:12-22, 19:14-20:14, 61:14-15; Guzman Dep. 70:5-71:2, 74:23-25; Jennings Dep. 21:2-6.

4.  At all relevant times, Thanwalla ran the day-to-day operations at Hillside Auto Outlet and served as its general manger.  Thanwalla Dep. 17:3-18:11, 27:7-28:3; Baron Dep. 38:3-6, Jennings Dep. 25:2-5, Baron Dep. 52:2-6.

5.  Thanwalla, but none of the other members, had the power to hire and fire employees, set the schedules and wages of employees, and to discipline employees.  Thanwalla Dep. 68:10-17; Baron Dep. 38:7-16; Jennings Dep. 33:24-34:5, 56:20-57:4.

6.  The only responsibility Thanwalla did not have that the remaining members had was the ability to sign checks at the dealership, which the remaining members did on a weekly basis.  Jennings Dep. 37:9-22.

A0083

7.   David Baron passed away in May 2021 and his estate currently owns his twenty-five (25%) membership interest.  Thanwalla Dep. 18:23-24; Baron Dep. 45:18-20; Guzman Dep. 74:17-22.

8.   When David Baron was alive, he had no responsibilities at Hillside Auto Outlet.  Thanwalla Dep. 61:17-20; Baron Dep. 45:13-17, 45:21-46:2; Jennings Dep. 36:18-22.

9.   Jory Baron had no power to hire or fire employees, nor did he set employees' schedules or compensation.  Baron Dep. 38:25-40:12; 42:2-12; Plaintiff Dep. 58:12-15, 60:13-61:7.

10. Jory Baron did not know basic information about employees' identities, schedules, compensation, and hiring processes, including that of the Plaintiff because he did not deal with that aspect of the dealership.  Baron Dep. 34:7-16, 38:17-24, 40:13-23, 41:9-25, 48:17-49:6, 50:17-25, 54:13-55:18 (did not know of Plaintiff until after she quit and complained and later sued), 81:13-24, Plaintiff Dep. 59:4-13.

11. Jory Baron's role was limited to financial aspects of the dealership, such as signing checks and ascertaining the financial health of the dealership; he had no interactions with or responsibilities in connection with Plaintiff's employment.  Baron Dep. 31:18-32:5, 32:12-33:10, 40:24-41:8, 51:2-25; Jennings Dep. 37:9-14; Thanwalla Dep. 61:21-25, Plaintiff Dep. 58:16-21.

12. Aaronson had no responsibilities at Hillside Auto Outlet other than occasionally joining telephone calls with Baron and Thanwalla to discuss various issues at the dealership unrelated to Plaintiff's employment.  Thanwalla Dep. 62:2-3; Baron Dep. 44:14-24, 44:25-45:12.

13. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019.  Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.

A0084

14. Guzman did not have the power to hire, fire, or discipline employees in either of his roles at Hillside Auto Outlet.  Guzman Dep. 68:16-69:12, 79:24-80:4; Plaintiff Dep. 57:25-58:11, 95:15-96:3; Thanwalla Dep. 152:18-153:24; Guzman Decl.

15. His main responsibility as a sales manager was to ensure that all deals were processed; his responsibilities as a general sales manager included being involved in finance, which required him to work with banks, get customers approved for loans, and running credit for customers (which he also did as a sales manager).  Guzman Dep. 51:18-53:7; Guzman Decl.

16. Serge Zanan ("Zanan") is a finance manager at Hillside Auto Outlet since November 2018. Thanwalla Dep. 55:8-13, 210:15-212:19.

17. Louis is another finance manager at Hillside Auto Outlet.  Thanwalla Dep. 55:14-15.

**Hillside Auto Mall**

18. Hillside Auto Mall, Inc. is a domestic business corporation formed on December 5, 2005 under the laws of the State of New York that does business as Hillside Auto Mall and is authorized to do business in the State of New York.  Kataev Decl. ¶ 5, Ex. C;

19. Hillside Auto Mall is a used car dealership located at 15001 Hillside Avenue, Jamaica, NY 11432.  Kataev Decl. ¶ 5, Ex. C; Jennings Dep. 15:5-8.

20. Hillside Auto Mall is owned by Ronald Baron, Aaronson, Raymond Phelan ("Phelan"), and the Estate of David Baron.  Kataev Decl. ¶ 4, Ex. B; Thanwalla Dep. 21:6-20, Jennings Dep. 21:2-6, 36:10-17.

21. Phelan was the general manager at Hillside Auto Mall.  Jennings Dep. 37:23-38:8.

**Plaintiff's Role, Duties, Compensation, & The Vehicle Sale Process During Her Employment with Hillside Auto Outlet**

22. Plaintiff worked only for Hillside Auto Outlet; she never worked for Hillside Auto Mall. Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3

4

A0085

23. Plaintiff worked at Hillside Auto Outlet as a salesperson and her sole responsibility was selling cars.  Plaintiff Dep. 36:12-20; Thanwalla Dep. 81:23-82:4; Guzman Dep. 80:4-12.

24. She applied for the position with Hillside Auto Outlet on Craigslist, spoke with Thanwalla the following day, and came for an interview with him and a manager named Jeanique that same day; she was hired by Thanwalla on the spot.  Plaintiff Dep. 55:21-57:24; Thanwalla Dep. 28:4-17, 55:3-7.

25. Plaintiff commenced employment with Hillside Auto Outlet on May 22, 2018 and was employed for approximately eight (8) months.  Plaintiff Dep. 213:8-16, Thanwalla Dep. 69:6-18.

26. Plaintiff worked every day except Wednesday and alternated Sundays off.  Plaintiff Dep. 37:14-19.

27. Plaintiff's responsibilities included showing customers vehicles, meeting and greeting customers, and taking a credit application and documentation from the customer in anticipation of making a sale.  Thanwalla Dep. 82:5-12.

28. Plaintiff was supervised by Thanwalla, Jeanique, and Guzman, until Jeanique separated from employment in August 2018.  Plaintiff Dep. 36:21-37:2, 59:21-60:12, 64:15-20, Thanwalla Dep. 55:3-7, 56:25-57:6; Guzman Dep. 80:16-24.

29. Plaintiff was not supervised by nor had any interactions with Jory Baron and David Baron.  Thanwalla Dep. 61:17-62:3, 152:18-153:24; Baron Dep. 31:18-32:5, 32:12-33:10, 34:7-16, 38:17-41:25,  42:2-12,  44:14-45:17,  45:21-46:2,  48:17-49:6,  50:17-51:25,  54:13-55:18,  81:13-24; Jennings Dep. 36:18-22, 37:9-14; Plaintiff Dep. 57:25-58:21, 59:4-13, 60:13-61:7, 95:15-96:3; Guzman Dep. 51:18-53:7, 68:16-69:12, 79:24-80:4.

30. Thanwalla trained Plaintiff on how to: (i) sell cars, how to meet and greet; (ii) take a credit application; and (iii) use VIN Solutions, a lead management system.  Thanwalla Dep. 82:16-21.

A0086

31. Jeanique and Guzman were both assistant managers at the time.  Thanwalla Dep. 57:7-23.

32. Hillside Auto Outlet typically employed two assistant managers and two finance managers.  Thanwalla Dep. 86:21-87:12.

33. Plaintiff's compensation structure at Hillside Auto Outlet consisted of a $300.00 weekly salary, $150.00 flat commission for each car sold (even if it was sold at a loss), and – from time to time – a bonus of five percent (5%) of the profit from the sale of any vehicle which was sold that made in excess of $3,000.00 in profit.  Plaintiff Dep. 37:3-13, 39:2-7, 42:23-43:14, 163:20-164:18, 164:23-166:20; Thanwalla Dep. 28:21-29:15, 60:3-13, 164:8-19.

34. There were various other bonuses offered from time to time on a daily, weekly, or monthly bonus: (i) one bonus was for cars sold after remaining on the lot for more than sixty (60) days; (ii) another was for cars sold after remaining on the lot for more than ninety (90) days; and (iii) another was for selling three (3) cars in one (1) day.  Thanwalla Dep. 29:16-30:11, 30:12-31:13, 57:24-59:23, 60:14-22, 138:2-24.

35. These bonuses operated the same way throughout Plaintiff's employment and did not change in any way when Jeanique left Hillside Auto Outlet.  Thanwalla Dep. 59:24-60:2, 60:23-61:11.

36. Plaintiff received a form utilized at the dealership to keep track of the vehicles she sold in order to ensure she was properly paid; she discarded the form once she was satisfied that she was properly paid.  Plaintiff Dep. 40:19-42:22; Thanwalla Dep. 115:8-116:17.

37. Plaintiff was paid weekly, and verified she was properly paid each week by reviewing a form that was turned into the sales manager which was then provided to payroll.  Plaintiff Dep. 38:5-13; Thanwalla Dep. 115:8-116:20.

A0087

38. Although she claims she stopped receiving additional commissions of five percent (5%) for any vehicle that grossed in excess of $3,000.00 in profit after Jeanique left, she continued her employment with the dealership.  Plaintiff Dep. 43:15-44:12.[1]

39. Although aware of dealership certification programs for salespersons like herself, Plaintiff never took any such courses to advance in her career.  Plaintiff Dep. 31:2-11.

**The Sales Process**

40. Dealertrack is a dealership management system used by Hillside Auto Outlet; it stores customer information that is sensitive, which is why access to it is limited, and serves as a liaison with banks that provide financing for vehicles.  Thanwalla Dep. 54:11-19, 145:6-146:19; Baron Dep. 53:9-18; Guzman Dep. 62:7-63:15, 84:9-86:6; Guzman Decl.

41. Only managers had access to Dealertrack; because salespeople were not authorized to have access to Dealertrack, they did not have authority to run credit for customers on Dealertrack as that was the responsibility of a manager.  Thanwalla Dep. 54:20-55:2, 62:4-22, 62:23-63:4, 146:20-147:19, 149:2-14, 151:17-152:8, 207:13-208:23; Guzman Dep. 62:7-63:15, 84:9-86:6, 88:24-90:13, 101:22-102:25, Jennings Dep. 67:14-22; Plaintiff Dep. 46:19-25, 47:2-10.

42. The purchase of a vehicle is the second biggest purchase one can make after buying a house and there is a lot involved in obtaining a vehicle.  Guzman Dep. 55:2-62:2.

43. Every sale of a vehicle is different and there are so many factors and variables that go into buying a car; that is why you can never measure how long it will take for each customer to purchase a vehicle.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 145:6-146:19 (no two deals are the same in a dealership); Guzman Decl.

---

[1] Plaintiff's pay stubs demonstrate that she was paid bonuses throughout her tenure at Hillside Auto Outlet, including after Jeanique left in August 2018 and in the seven (7) final weeks of her employment in November and December 2018.  See ¶ 104, *infra*, with chart.

A0088

44. A customer has to find a vehicle they like and often check different options before settling on one choice; then the salesperson has to ascertain whether a customer wishes to pay in cash or finance to determine the next steps.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

45. If a customer wishes to finance a vehicle, he or she has to complete an application; once a customer completes a credit application, he or she has to provide all the information that is required to complete a vehicle purchase in order to receive approval from a bank to lend the customer money to purchase the vehicle.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

46. Like all salespeople, Plaintiff was required to go to managers to submit credit applications for customers seeking financing to purchase a vehicle; the credit application process required Plaintiff to complete an application with the customer, whether handwritten or electronically, and have it signed by the customer when completed.  Plaintiff Dep. 62:7-63:5; Thanwalla Dep. 82:22-83:16; Guzman Decl.

47. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could.  Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17-155:25; Guzman Decl.

48. Although it was often the sales manager or general manager's duty to do so, sometimes the finance manager – such as Zanan – handled the process of qualifying a customer for financing. Plaintiff Dep. 67:4-17; Thanwalla Dep. 147:20-148:10; Zanan Decl. ¶¶ 6-7; Guzman Decl.

A0089

49. There were often delays associated with qualifying a customer for financing, regardless of whether Plaintiff went to Thanwalla, Jeanique, Zanan *or* Guzman.  Plaintiff Dep. 64:21-65:12, 66:19-22; Thanwalla Dep. 140:24-145:5; Guzman Decl.

50. Plaintiff acknowledged that even without these delays, there was no guarantee she would make a sale because a customer could decide he or she no longer wanted a vehicle once qualified, or refuse to close on the deal because the monthly payment or down-payment required by the bank could be too high.  Plaintiff Dep. 45:22-25, 237:23-239:5, 239:14-21, 239:6-13.

51. After Jeanique's employment ended in August 2018 (before Plaintiff informed management about her pregnancy in late November 2018), Plaintiff would go to Thanwalla to handle the process of qualifying a customer for financing more often because he was quicker than Guzman.  Plaintiff Dep. 64:9-14.

52. Each customer goes through different verification processes; before anything is submitted to a bank, the customer's identity must be verified (usually by verifying the customer's driver's license is valid) and pay stubs must be obtained. Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 220:20-221:14; Guzman Decl.

53. Often, customers do not have pay stubs with them or at all; once pay stubs are provided, there is a verification process to determine whether the pay stubs are legitimate because there is a lot of fraud involved and this is a big concern for dealerships and banks.  Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 50:5-51:15, 220:20-221:14; Jennings Dep. 78:18-79:22; Guzman Decl.

54. When pay stubs are provided, the sales manager has to contact the employer to verify they are legitimate, which is occasioned by delays if employers do not respond.  Guzman Dep. 56:19-57:9 ("we will have to verify to see if the pay stubs are legitimate"); Guzman Decl.

A0090

55. In addition, banks often require additional documentation after an application is submitted, all of which must be inputted into the system.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

56. After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the circumstances. Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

57. Sometimes, customers have fraud alerts on their credit profiles which cause delays due to extra verification requirements; when that happens, customers receive calls from the bank to make sure that they are, in fact, the ones seeking to obtain vehicle financings.  Guzman Dep. 55:2-62:2.

58. Other times, when information with the credit agencies do not match those the customer provides, additional verification is required by the credit bureaus, which can take one or two days to update.  Guzman Dep. 55:2-62:2; Guzman Decl.

59. Dealerships do not control the process when it comes to obtaining financing, and there are a lot of variables that come into play during the purchase of a vehicle, all of which is entirely up to the banks which make the ultimate decision on financing.  Guzman Dep. 55:2-62:2.

60. Once a customer's credit is successfully run, all documentation is provided, and everything is verified, the information gets sent to the bank for review and approval.[2]  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22, Plaintiff Dep. 174:11-21; Baron Dep. 52:7-16; Guzman Decl.

61. Upon receipt, banks often request additional information. Guzman Dep. 55:2-62:2.

---

[2] Plaintiff's complaint about waiting times deals with the credit application process before information gets submitted to lenders.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3, 78:23-79:13, 80:9-18, 82:9-83:1.

A0091

62. Once a bank approves a deal, the customer has to speak with a finance manager; at that time, the finance manager provides the customer with numbers related to monthly payments, total cost, interest, and related information. Guzman Dep. 55:2-62:2; Guzman Decl.

63. The customer may decide, based on this information, that he or she is no longer interested in purchasing the vehicle or cannot afford it.  Guzman Dep. 55:2-62:2; Guzman Decl.

64. Other times, a customer may decide to buy a different car that is less expensive for a lower payment.  Guzman Dep. 55:2-62:2; Guzman Decl.

65. There is also a requirement for every customer to purchase insurance for the vehicle he or she wishes to buy; often, customers have to wait before they have the funds to pay the insurance company before they can insure the vehicle.  Guzman Dep. 55:2-62:2; Guzman Decl.

66. Other times, a customer is required to have a co-signer in order to get a deal approved by a bank, which adds to further delays.  Guzman Dep. 55:2-62:2; Guzman Decl.

67. Finally, everything has to be in compliance with DMV regulations in order to ensure the vehicle may be sold, which requires the proper documentation in order to register a vehicle, after which a customer can sign all the relevant paperwork.  Guzman Dep. 55:2-62:2; Guzman Decl.

68. All of the foregoing issues are outside of the dealership's control; it could take three (3) to six (6) hours or sometimes even days for a customer to purchase a vehicle. Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24, 181:18-182:9; Thanwalla Dep. 220:20-221:14; Zanan Decl. ¶ 19; Guzman Decl.

69. If a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control such as the failure of a customer to provide necessary information to the lender or because the lender requested additional documentation or simply because the dealership had to wait for the lender's response.  Plaintiff Dep. 179:19-180:5.

11

A0092

70. Guzman wishes that the process was quicker because the dealership is in the business of selling cars and desires to make money; however, a dealership cannot guess or foresee who will come through its doors and what their situation is.  Guzman Dep. 55:2-62:2; Guzman Decl.

71. Plaintiff handled the qualification process and credit application, but never submitted any applications to chosen lenders, which finance managers did.  Plaintiff Dep. 176:13-22.

**Plaintiff Was Unable to Close Deals for Reasons Unrelated to Wait Times**

72. Plaintiff was sometimes unable to sell a vehicle to customers even if their creditworthiness was ascertained; this occurred once in December 2018, after she announced her pregnancy in late November 2019.  Plaintiff Dep. 201:202-9, 204:14-206:7.

73. In December 2018, Plaintiff was assigned a lead who visited the dealership on December 10 and did not purchase a vehicle because he was not able to put any money down until February; that customer did not leave because of the amount of time to check his creditworthiness as that had already been completed.  Plaintiff Dep. 189:23-191:10.

74. In another instance, although Plaintiff was able to successfully pull the credit for a customer on November 26, 2018 with the help of a manager – just three days after she announced her pregnancy – she was unable to make a sale because the customer was involved in a bankruptcy and needed permission from the trustee to make a deal.  Plaintiff Dep. 199:22-201:21.

75. Plaintiff was also unable to sell another vehicle to another customer because Plaintiff was unable to find the car that customer wanted.  Plaintiff Dep. 197:7-199:21.

76. In another instance, Plaintiff was unable to sell a vehicle to a customer who was to purchase the vehicle with cash, and did not need financing.  Plaintiff Dep. 211:12-212:23.

A0093

**Hillside Auto Outlet Prohibits Discrimination**

77. During Plaintiff's employment, Hillside Auto Outlet distributed a written policy regarding discrimination and placed posters in the lunchroom concerning discrimination.  Thanwalla Dep. 63:5-64:2, 64:17-65:6; Baron Dep. 49:7-21, 82:24-83:9; Guzman Dep. 77:12-78:2, 78:9-15; Jennings Dep. 43:18-44:13.

78. Plaintiff received Hillside Auto Outlet's discrimination policy.  Plaintiff Dep. 108:2-7.

**Facts Surrounding Plaintiff's Discrimination Claim**

79. Plaintiff was one of many female salespersons at Hillside Auto Outlet.  Thanwalla Dep. 231:21-232:7.

80. Plaintiff announced her pregnancy on November 23, 2018 to most of the employees at Hillside Auto Outlet, including Guzman; she is unsure whether Thanwalla was there during the announcement. Plaintiff Dep. 69:17-71:2, 200:22-24.

81. Thanwalla went on vacation in December 2018.  Plaintiff Dep. 249:25-250:2, Thanwalla Dep. 64:3-16, 65:7-16.

82. Ali Raskesnia ("Ali") was brought on by Thanwalla as a sales manager in mid-November 2018 to early December 2018 and was being trained to handle the dealership while Thanwalla was not at the dealership.  Plaintiff Dep. 155:12-16, 249:18-24; Thanwalla Dep. 131:5-19; Jennings Dep. 73:2-7.

83. Plaintiff complained that Guzman did not provide her with the Dealertrack password when Thanwalla left for vacation.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3.

84. But Guzman did not have the ability to change the password for Dealertrack.  Plaintiff Dep. 91:10-92:6, 94:15-95:2; Guzman Dep. 90:14-19.

A0094

85. But Plaintiff does not specifically know why Guzman made her wait longer to process her customers applications; critically, she did not know whether it was something personal or due to her pregnancy.  Plaintiff Dep. 107:4-12.

86. Guzman would frequently keep customers waiting longer than necessary *before* Plaintiff announced her pregnancy.  Plaintiff Dep. 78:23-79:13, 80:9-18, 82:9-83:1, 97:7-19, 100:13-24; Kataev Decl. ¶ 7, Ex. E at ¶¶ 36-38 ("Indeed, *prior to December 2018*, STIDHUM was given special trust on the basis of her exemplary work performance.  Specifically, THANWALLA gave STIDHUM his password to the 'Dealertrack' program used by Hillside Auto so that she could help run the credit histories of Hillside Auto customers and pre-fill their automobile purchase financing applications.  *This became necessary because Guzman, whose job in the Finance Department which was running the credit histories of Hillside Auto customers and pre-filling their automobile purchase financing applications, would frequently keep customers waiting longer than necessary, creating poor customer impressions of Hillside Auto's service*") (emphasis added).

87. Plaintiff conceded that "it didn't add up" or make sense as to why Guzman made her wait longer, and that Thanwalla nor Zanan ever took long to qualify customers for financing.  Id.; Plaintiff Dep. 69:4-9.

88. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation.  Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D.

14

89. Plaintiff went to Zanan instead of Guzman while Thanwalla was on vacation, but Zanan told her he was busy, could not do it right then, to give it to Guzman, and that she had to wait for Guzman.  Plaintiff Dep. 87:25-88:10; Guzman Dep. 107:11-18.

90. Plaintiff confronted Guzman about the longer wait times multiple times, once even referencing her pregnancy, but he told her that she has to wait and that there are other people here; Guzman did not say anything about Plaintiff's pregnancy during these conversations.  Plaintiff Dep. 78:2-16, 86:12-24, 96:4-14, 96:15-19.

91. Although Plaintiff asserts that she announced her pregnancy to everyone at the dealership in late November 2018, Guzman has no recollection or knowledge of this, did not know Plaintiff was pregnant until he learned of this lawsuit, and would have treated her the same in any event. Plaintiff Dep. 69:17-71:7; Guzman Dep. 87:6-17, 103:20-105:9; Guzman Decl.

92. Guzman treated Plaintiff fairly, like everybody else, and never prioritized any salesperson over another; he worked on a first come, first serve basis with no preference.  Guzman Dep. 105:15-17, 105:18-106:6; Jennings Dep. 79:23-80:4; Guzman Decl.

93. Plaintiff previously had at least two (2) interpersonal conflicts with Guzman prior to her pregnancy, but cannot recall the nature or circumstances of either.  Plaintiff Dep. 71:8-73:5.

94. Guzman never made any comments to Plaintiff about her pregnancy, and the two did not have any interpersonal conflicts after Plaintiff announced her pregnancy.  Plaintiff Dep. 73:6-74:2.

95. It would not make sense for Guzman to take more time than necessary to ascertain whether customers qualified for financing, as he and everyone at the dealership, except porters, received a commission for every sale.  Plaintiff Dep. 82:9-83:1, 88:11-19, 107:4-12; Thanwalla Dep. 96:12-99:4, 102:5-19; Zanan Decl. ¶¶ 15-17; Guzman Decl.

15

A0096

96. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions.  Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.

97. Plaintiff also confronted Thanwalla about the waiting times with Guzman both during and upon his return from vacation, but Thanwalla told Plaintiff he will discuss this with her later. Plaintiff Dep. 90:5-91:6, 96:20-97:6.

98. Hillside Auto Outlet never received any complaints about discrimination, including pregnancy discrimination, except from Plaintiff, which stunned him.  Thanwalla Dep. 232:8-233:8.

99. Plaintiff is "lawsuit happy" because her step-father previously filed a lawsuit and secured millions.  Thanwalla Dep. 233:9-24; Plaintiff Dep. 146:21-147:4.

100.     She filed a wage-and-hour action against the Defendants.  Plaintiff Dep. 7:9-19.

101.     Plaintiff never complained of discrimination.  Thanwalla Dep. 232:8-233:8.

**Plaintiff Suffered No Adverse Employment Action Related to Her Pregnancy**

102.     Throughout her employment, Plaintiff's job responsibilities and position always remained the same.  Plaintiff Dep. 74:13-15, 77:3-7; Thanwalla Dep. 83:17-20.

103.     Throughout her employment, Plaintiff's weekly salary of $300.00 and flat rate commission of $150.00 per vehicle remained the same, while bonuses fluctuated.  Plaintiff Dep. 75:8-18; Thanwalla Dep. 45:5-21.

104.     Although Plaintiff allegedly stopped receiving bonuses after Jeanique left in August 2019, this was months before Plaintiff announced her pregnancy in November 2019, and she acknowledges receiving a bonus in November 2019 after she announced her pregnancy.  Plaintiff Dep. 75:8-18, 75:19-77:2, Thanwalla Dep. 69:6-18.

A0097

105.     Plaintiff's pay is below.[3]  Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 77:21-25, 213:20-227:2, Thanwalla Dep. 53:13-18, 158:7-10, 132:8-13, 160:16-163:15; Guzman Dep. 66:16-23.

| Week | Pay Date | Salary | Commission | Cars Sold | Approx. Bonus |
|------|----------|--------|------------|-----------|---------------|
| 1 | 6/1/2018 | $300.00 | $780.00 | 5 | $780.00 - $750.00 = $30.00 |
| 2 | 6/8/2018 | $300.00 | $425.00 | 2 | $425.00 - $300.00 = $125.00 |
| 3 | 6/15/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 4 | 6/22/2018 | $300.00 | $660.00 | 4 | $660.00 - $600.00 = $60.00 |
| 5 | 6/29/2018 | $300.00 | $615.00 | 4 | $615.00 - $600.00 = $15.00 |
| 6 | 7/6/2018 | $300.00 | $655.00 | 4 | $655.00 - $600.00 = $55.00 |
| 7 | 7/13/2018 | $300.00 | $0.00 | 0 | $0.00 |
| 8 | 7/20/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 9 | 7/27/2018 | $300.00 | $1,400.00 | 9 | $1400.00 - $1350.00 = $50.00 |
| 10 | 8/3/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 11 | 8/10/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 12 | 8/17/2018 | $0.00 | $0.00 | 0 | $0.00 |
| 13 | 8/24/2018 | $300.00 | $1,450.00 | 9 | $1450.00 - $1350.00 = $100.00 |
| 14 | 8/31/2018 | $300.00 | $1,200.00 | 8 | $0.00 |
| 15 | 9/7/2018 | $300.00 | $150.00 | 1 | $0.00 |
| 16 | 9/14/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 17 | 9/21/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 18 | 9/28/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 19 | 10/5/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 20 | 10/12/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 21 | 10/19/2018 | $300.00 | $700.00 | 4 | $700.00 - $600.00 = $100.00 |
| 22 | 10/26/2018 | $300.00 | $800.00 | 5 | $800.00 - $750.00 = $50.00 |
| 23 | 11/2/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 24 | 11/9/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 25 | 11/16/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 26 | 11/23/2018 | $300.00 | $1,375.00 | 9 | $1375.00 - $1350.00 = $25.00 |
| 27 | *11/30/2018* | *$300.00* | *$450.00* | *3* | *$0.00* |
| 28 | *12/7/2018* | *$300.00* | *$1,600.00* | *4* | *$1600.00 - $600.00 = $1000.00* |
| 29 | *12/14/2018* | *$300.00* | *$825.00* | *5* | *$825.00 - $750.00 = $75.00* |
| 30 | *12/21/2018* | *$300.00* | *$625.00* | *4* | *$625.00 - $600.00 = $25.00* |
| 31 | *12/28/2018* | *$300.00* | *$500.00* | *3* | *$500.00 - $450.00 = $50.00* |
| 32 | *1/4/2019* | *$300.00* | *$350.00* | *2* | *$350.00 - $300.00 = $50.00* |
| 33 | *1/11/2019* | *$300.00* | *$825.00* | *5* | *$825.00 - $750.00 = $75.00* |
| 34 | *1/18/2019* | *$300.00* | *$350.00* | *2* | *$350.00 - $300.00 = $50.00* |
| | **AVERAGE** | **$300.00** | **$705.44** | **4.32** | **$56.91** |
| | **TOTAL** | **$10,200.00** | **$23,985.00** | **4.30** | **$1,935.00** |

[3] Because commissions for vehicles sold were $150.00 per vehicle, the remainder is apportioned to a bonus.  Thanwalla Dep. 110:22-112:8, 164:20-165:11. The post-pregnancy period is *italicized*.

17

A0098

106.    Plaintiff does not have any documents that she believes suggest discrimination, but claims that her paystubs show a decrease in pay of $400.00 to $500.00 per week and allegedly demonstrate a drastic decrease in her pay as a result of waiting longer for Guzman to process credit applications beginning when she purportedly told Guzman she was pregnant in November 2019. Plaintiff Dep. 101:4-23, 144:24-145:2, 235:7-236:23.

107.    However, as demonstrated above, Plaintiff's compensation remained on par in her final weeks of employment with her average compensation.  Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 213:20-227:2.

108.    In fact, Plaintiff's average weekly commission before her pregnancy was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential.  Id.

109.    This differential is attributed to the winter slow season because Hillside Auto Outlet was less busy between September and March.  Thanwalla Dep. 34:12-14.

110.    Plaintiff's best week at Hillside Auto Outlet was for the pay period of November 27, 2018 though December 3, 2018, when she earned $1,600 in commissions and bonuses, which was after she announced her pregnancy.  Plaintiff Dep. 224:6-11, 227:3-15.

111.    Plaintiff claims she sent emails and texts about the alleged discrimination that she endured, but did not keep records of them because she gets new phones pretty often as she likes to have the newest phone and it "probably just got deleted from changing phones or whatever the case may be." Plaintiff Dep. 141:13-142:8, 145:18-146:15.

112.    None of the text messages exchanged between the parties reference any claims of pregnancy discrimination except ten days after she voluntarily quit.  Kataev Decl. ¶ 6, Ex. D.

A0099

113.     The only other events or circumstances giving rise to Plaintiff's belief that she was discriminated against was, according to her, more than one instance where she had to say something to Guzman about her customers waiting and "stuff like that."  Plaintiff Dep. 101:25-102:6.

114.     Plaintiff was treated more favorably than other salespeople because she was provided special access to Dealertrack and received a bonus for selling approximately over twenty (20) vehicles that no one else received right after announcing her pregnancy.  Plaintiff Dep. 105:7-18.

115.     After Plaintiff announced her pregnancy, no employee was treated more favorably than her.  Plaintiff Dep. 105:19-107:3.

116.     Plaintiff's employment with Hillside Auto Outlet ended in January 2019 when she voluntarily quit.  Plaintiff Dep. 36:6-11, 44:16-18.

117.     Plaintiff concedes she was not constructively discharged.  Plaintiff Dep. 230:22-24, 231:22-232:9.

118.     Prior to her quitting, Plaintiff was allegedly promised a promotion to a manager position by Thanwalla.  Plaintiff Dep. 90:5-91:6, 93:2-94:14.

119.     Plaintiff asked about the promotion, but Thanwalla told her he will discuss this with her later.  Plaintiff Dep. 90:5-91:6.

120.     Because Thanwalla was not prepared to discuss a promotion then and there, Plaintiff decided to quit.  Plaintiff Dep. 90:5-91:6.

121.     Specifically, Plaintiff quit because she did not want to wait for Thanwalla to make a decision about her promotion, as she felt that it was obvious she was not getting a promotion. Plaintiff Dep. 231:7-21.

A0100

122.     With respect to the promotion, Plaintiff felt that it "was kind of clear as day" that "if he wanted to give [her] that position, he would have given it to [her] at that point." Plaintiff Dep. 92:7-25, 95:3-7.

123.     Thanwalla never told Plaintiff that he would not give her the promotion; he just wanted to discuss it another time.  Plaintiff Dep. 95:8-10.

124.     Plaintiff did not feel the need to follow up about her promotion despite Thanwalla's request to discuss it later, and only raised an issue concerning her final compensation after quitting. Plaintiff Dep. 108:10-109:3.

125.     Approximately ten (10) days after Plaintiff quit, Plaintiff contacted Jory Baron by text complaining about her pay and spoke to him by phone.  Baron Dep. 54:18-55:18, 55:23-25.

126.     Plaintiff told Baron during their conversation that she quit because of her pay – not because of pregnancy discrimination – and wanted to make sure she got paid for the deals she believed she was owed money on.  Baron Dep. 64:16-65:7.

127.     Jory Baron told her he would speak to Thanwalla and that, if she was owed anything, she would get paid.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:8-15

128.     After speaking to Thanwalla, Baron called Plaintiff back but she was unable to answer; Baron then offered to speak with her when he was available and she said never mind, and that she planned to go a different route.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:16-66:5, 66:23-67:13, 70:10-71:2, 88:8-16.

129.     Thanwalla informed Baron that Plaintiff quit and that there was no money owed to her, and Thanwalla agreed to ascertain whether she is owed money for any pending deals, to which Thanwalla agreed, but stated that at that time, to his knowledge, there was no money owed to her. Baron Dep. 68:15-69:13, 69:21-70:9.

A0101

130.     In the same vein, Plaintiff acknowledged that the dealership would not want her out because of her pregnancy, but that Guzman did because "it was more of a personal thing against me while being pregnant." Plaintiff Dep. 99:7-25.

131.     Plaintiff could not specify how Guzman played any role as a decision-maker at the dealership and described it as a "team effort" because he "would definitely be involved in … decisions," yet acknowledged that Thanwalla was the one who made decisions. Plaintiff Dep. 110:17-111:4.

132.     Guzman was never disciplined while at work, did his job the right way, and viewed as a professional who helped everybody out and jumped in to get the job done. Guzman Dep. 107:24-108:4; Jennings Dep. 60:19-61:2.

133.     Plaintiff and Thanwalla had a good working relationship; they respected each other and were close. Thanwalla Dep. 85:2-15.

134.     Plaintiff never complained about her pay to Thanwalla; in fact, she told him that she made more money at Hillside Auto Outlet than she ever made in her life. Thanwalla Dep. 84:19-25.

**Plaintiff's Alleged Damages**

135.     Plaintiff obtained employment elsewhere almost immediately after quitting at Hillside Auto Outlet; in fact, she had her next job at NYC Motor Cars lined up by Ali, one of the managers that worked with Plaintiff at Hillside Auto Outlet, and worked at several other dealerships thereafter, ultimately leaving the workforce due to the birth of her second child. Plaintiff Dep. 48:6-18, 48:17-50:4, 50:23-51:9, 51:12-17, 51:18-25, 52:4-10, 51:20-25, 52:11-12, 52:15-25, 53:2-25, 54:7-14, 54:2-7, 54:18-55:2, 98:8-16, 114:8-16, 126:18-131:11; Thanwalla Dep. 69:14-70:3, 84:5-18.

A0102

136.     Plaintiff's circumstances got better within a few months of her quitting employment with Hillside Auto Outlet.  Plaintiff Dep. 114:17-18.

137.     Specifically, the volume of Plaintiff's sales at NYC Motor Cars made things better for Plaintiff.  Plaintiff Dep. 114:19-115:15.

138.     Plaintiff is seeking more than $2 million dollars in damages, but is unsure about the basis for seeking these damages.  Plaintiff Dep. 111:5-15, 153:21-154:5.

139.     Plaintiff did not seek any medical treatment or hospitalization concerning her alleged emotional injuries.  Plaintiff Dep. 112:25-113:9.

140.     She has since recovered from any alleged emotional injuries, and any symptoms or injuries allegedly suffered have now been resolved.  Plaintiff Dep. 113:10-114:7.

**Hillside Auto Outlet and Hillside Auto Mall are Not Joint Employers**

141.     Hillside Auto Outlet and Hillside Auto Mall operate as two (2) separate automobile dealerships.  Thanwalla Dep. 218:12-219:7; Baron Dep. 47:9-48:16.

142.     The two dealerships are located several blocks away from each other.  Kataev Decl. Exs. A & C; Thanwalla Dep. 22:3-8; Baron Dep. 46:24-47:8; Guzman Dep. 63:16-19.

143.     Plaintiff worked at Hillside Auto Outlet, and never worked at Hillside Auto Mall.  Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3.

144.     Plaintiff was not sure whether the two dealerships were joint employers.  Plaintiff Dep. 35:18-36:5.

145.     Plaintiff merely included Hillside Auto Mall as a Defendant solely because both dealerships were "kind of run by the same people."  Plaintiff Dep. 35:9-17.

146.     However, this is untrue, as Thanwalla ran Hillside Auto Outlet and had no duties with Hillside Auto Mall, while Phelan ran Hillside Auto Mall, and had no duties with Hillside Auto Outlet.  Jennings Dep. 25:2-5, 38:9-11, 42:3-10.

147.     Hillside Auto Mall had no control over Plaintiff's daily employment activities. Jennings Dep. 30:12-21, 32:24-33:11, 36:23-37:8, 42:3-10, 50:23-25, 51:9-14.

148.     Thanwalla set the pay plans at Hillside Auto Outlet, while Phelan set the pay plans at Hillside Auto Mall.  Jennings Dep. 42:3-10.

149.     Thanwalla handled employee scheduling at Hillside Auto Outlet, while Phelan handled employee scheduling at Hillside Auto Mall.  Jennings Dep. 50:23-25, 51:9-14.

150.     Jory Baron, an owner of Hillside Auto Outlet, had no duties with Hillside Auto Mall.  Baron Dep. 83:10-16; Jennings Dep. 36:23-37:8.

151.     The pay plans for salespersons at Hillside Auto Outlet and Hillside Auto Mall were different from each other.  Jennings Dep. 30:12-21, 32:24-33:11.

152.     Deana Jennings ("Jennings") has been controller of Hillside Auto Mall since she was hired by Aaronson in 2008.  Jennings Dep. 13:23-14:13, 15:13-15, 16:10-17:2.

153.     Aaronson informed Jennings that he was opening up another store in 2018 and asked her to serve as a controller at Hillside Auto Outlet part-time until a full-time controller for that dealership was found.  Jennings Dep. 20:7-20; 17:3-8.

154.     While Jennings mostly continued to work for both dealerships from Hillside Auto Mall Mondays through Fridays from 10:00 AM until 5:00 PM, she would sometimes work on site at Hillside Auto Outlet.  Jennings Dep. 14:6-10, 16:13-17:2, 17:9-24, 19:10-17.

A0104

155.    From 2018 until 2020, Jennings worked at both Hillside Auto Outlet part-time and Hillside Auto Mall full-time concurrently until a full-time controller was found for Hillside Auto Outlet.  <u>Thanwalla Dep. 39:13-40:3, 40:11-23, 42:17-22; Jennings Dep. 16:7-9, 20:21-25, 35:18-36:9; Guzman Dep. 72:23-73:10.</u>

156.    Jennings held the same position as a controller at both dealerships, and her duties at both dealerships - maintaining the books, payroll, bills, sales tax, and some DMV related work – were the same, except that Jennings did not do any DMV related work for Hillside Auto Outlet. <u>Jennings Dep. 15:16-16:6, 17:25-18:5, 19:18-20:2, 21:20-25.</u>

157.    Hillside Auto Outlet's current controller since 2020, Susan Zhivo, does not work at Hillside Auto Mall.  <u>Thanwalla Dep. 41:14-42:16; 219:8-13.</u>

158.    Other than Jennings, no other employee has worked at both Hillside Auto Outlet and Hillside Auto Mall.  <u>Jennings Dep. 55:10-13.</u>

159.    It is common for dealerships to purchase vehicles from other dealerships in order to sell a particular vehicle to a customer that it does not have in stock; Hillside Auto Outlet purchased vehicles from both Hillside Auto Mall and other dealerships in order to do so, with no preference for Hillside Auto Mall.  <u>Baron Dep. 47:9-48:16; Guzman Dep. 63:20-64:14, 64:21-65:15; Jennings Dep. 55:14-56:3; Plaintiff Dep. 34:10-35:14, Thanwalla Dep. 23:8-24:2, 24:9-27:6, 26:11-20; Guzman Decl.</u>

160.    When asked at her deposition about criminal convictions, Plaintiff initially testified that she was solely convicted for a marijuana related offense, until she was presented with evidence of her conviction for uttering forged instruments – a crime of dishonesty.  <u>Plaintiff Dep. 20:21-24:14; Kataev Decl. ¶ 9, Ex. G.</u>

A0105

Dated: Lake Success, New York
          June 28, 2023                                    **MILMAN LABUDA LAW GROUP, PLLC.**

                                                    _____/s_____
                                                    Joseph M. Labuda, Esq.
                                                    Emanuel Kataev, Esq.
                                                    3000 Marcus Avenue, Suite 3W8
                                                    Lake Success, NY 11042-1073
                                                    (516) 328-8899 (office)
                                                    (516) 328-0082 (facsimile)
                                                    joe@mllaborlaw.com
                                                    emanuel@mllaborlaw.com

                                                    *Attorneys for Defendants*

A0106

# TROY LAW, PLLC

ATTORNEYS / COUNSELORS AT LAW
Tel: (718) 762-1324   troylaw@troypllc.com   Fax: (718) 762-1342
41-25 Kissena Boulevard, Suite 110, Flushing, NY 11355

July 12, 2023

*Via* **ECF**
Hon. Orelia E. Merchant, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   **Plaintiff's Objection to Memorandum and Order Denying Motion for Sanctions**
> *Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)

Your Honor,

We represent the Plaintiff in the above-referenced matter. We write respectfully, and pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, to object to the Memorandum and Order of Hon. Lois Bloom, U.S.M.J. denying Plaintiff's motion for sanctions for failure to comply with discovery orders and spoliation of documents. *See* Dkt. No. 77 (June 28, 2023).

**Background**

As set forth in the Memorandum and Order, Hon. Roanne L. Mann, U.S.M.J., "previously ordered defendants to produce documents pertaining to other salespersons [besides Plaintiff] on December 22, 2022." Dkt. No. 77, at *1 (citing Dkt. No. 37 (Dec. 22, 2022)); *see* Dkt. No. 37, at *9 ("Defendants are directed to respond to Requests #17 (documents pertaining to plaintiff's car sales) and #21 (pay records for other salespersons) using the same time period [from August 25, 2018 to January 14, 2019].") They had not done so by April 3, 2023, and on that date Judge Bloom ordered them to "produce[] car sales logs for the relevant time period [from August 25, 2018 to January 14, 2019]… they shall do so by April 10, 2023." Order (Apr. 3, 2023). Her Honor also ordered Defendants to produce "text messages between parties that pertain to plaintiff or to pregnancy discrimination" by April 23, 2023. *Id.* Her Honor "warned" Defendants "that if they fail to comply with this Order, the court may hold them in contempt," and that "[a] person found to be in contempt is subject to sanctions, which may include a monetary fine, attorney's fees, costs, and even imprisonment." *Id.*

In response to Defendants' letter motion to extend the time to complete the discovery compelled by Judge Bloom's April 3, 2023 Order, Judge Bloom observed that Defense counsel's "reason for the request, that he 'misread' the Court's Order and that this only came to defendants' counsel's attention 'due to plaintiff's email'" "entirely unacceptable," and warned Defendants in stronger terms than those of the April 3, 2023 Order that "[i]f the documents are not produced by noon on April 17, 2023, the Court *shall impose* an appropriate sanction." Order (Apr. 12, 2023) (emphasis added).

<span style="color:red">A0107</span>

Hon. Orelia E. Merchant, U.S.D.J.
*Stidhum v. 161-10 Hillside Auto Ave, LLC,* No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)
Page **2** of **6**

On 11:59 AM on April 17, 2023, Defense counsel emailed us to say that he was "bates stamping the documents required to be produced and sending over" having gotten "tied up on phone calls from 10 am until now in three separate matters." *See* Dkt. No. 61. There were no documents attached to this email. At 12:31 PM on April 17, 2023, Defense counsel emailed again to say he was "[d]ouble checking redactions & sending now," and that there would be "264 pages of additional discovery." There were no documents attached to this email either. The documents, consisting of Plaintiff's sales records from January 1 through 13, 2019 (omitting the records from August 25, 2018 through December 31, 2018), and records of pay to other employees from May 4, 2018 through November 30, 2018 (omitting the records from December 1, 2018 through January 14, 2019),[1] would be attached to an email of 12:44 PM asking Plaintiff to withdraw the sanctions motion filed at 12:38 PM. *See* Dkt. No. 61. A 30(b)(6) witness named Deana Jennings had previously testified that Plaintiff's sales records were created in the ordinary course of business and maintained in Defendants' place of business. *See* Dkt. No. 63.

At no point did Defendants produce the text messages that Judge Bloom had on April 3, 2023 Ordered them to produce by April 23, 2023. Accordingly, on April 25, 2023, Plaintiff filed a second sanctions motion regarding the text messages. Both sanctions motions were addressed at a motion hearing on May 4, 2023. Judge Bloom declined to impose sanctions, but Ordered Defendants to "produce all outstanding discovery, as well as defendants' sworn affidavits and stipulations related to text messages on their phones and the dismissal of the case against defendant Ronald M. Baron by noon on May 17, 2023." *See* Order (May 4, 2023) (emphasis in original).

At 11:44 AM on May 17, 2023, Defendants produced no new outstanding discovery, but did produce declarations of Jory Baron, Deana Jennings, Ishaque Thanwalla, and Andris Guzman. Mr. Baron and Mr. Guzman declared that they had conducted searches of their phones and emails and were not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and did not conduct searches for sales logs because maintaining them was outside the scope of their jobs. Ms Jennings declared that she had conducted a search of her phone and emails and was not in possession of text messages or emails responsive to Plaintiff's requests; did conduct a search for Hillside Auto Outlet's sales logs which she was responsible to maintain in her role as controller; but was unable to find them either at Hillside Auto Outlet, Hillside Auto Mall, or a third-party storage facility they used. Mr. Thanwalla declared that he had conducted a search of his phone and emails and was not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and that he conducted a search for Hillside Auto Outlet's sales logs and asked Ms Jennings to do the same, but was unable to find them. *See* Dkt. Nos. 73-1–73-4 (June 12, 2023).

Upon our request, Ms Jennings submitted a supplemental declaration setting forth the keywords she had used to search her phone and email, and repeating her declaration that she had searched Hillside Auto Outlet, Hillside Auto Mall, and a third party storage facility to which the logs might have been moved due to construction at Hillside Auto Mall, but had been unable to find the logs. *See* Dkt. No. 73-5 (June 12, 2023).

---

[1] These were originally produced without Bates numbers on April 12, 2023; they would be produced with Bates numbers D1966–D2229 on April 17, 2023.

Hon. Orelia E. Merchant, U.S.D.J.
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)
Page **3** of **6**

However, on June 19, 2023, Mr. Thanwalla, Mr. Baron, Mr. Guzman, and Ms Jennings submitted supplemental declarations to us (these are reproduced, *sans* attachments, at Dkt. No. 76, at *7–23 (June 20, 2023)). Mr. Baron included a one-page text message exchange between himself and Plaintiff dated January 24, 2019 the end of which had been cut off in his previous production; Mr. Guzman included a one-page text message exchange from June 25, 2018 through 11:56 AM through June 27, 2018 at 2:48 PM that had not been produced previously (prior production of text messages had skipped from June 22 to June 26, and the messages on June 26 and 27 are different from the previous to the June 2023 production). Mr. Thanwalla produced several blank emails, weekly sales logs from after the period ordered by Judges Mann and Bloom, one December 2018 sales log of the Plaintiff's (found on Mr. Thanwalla's phone), and pictures of the storage rooms. The pictures appear to include one picture of a box containing records for 2018. *See* Ex. 3, at *5 (bottom right corner).

Neither any of Ms Jennings' three declarations, nor either of Mr. Thanwalla's declarations, indicated when the logs might have been moved to the third-party storage facility. But it cannot have been related to construction at Hillside Auto Mall. Hillside Auto Mall is located at 150-01 Hillside Avenue, Queens, NY 11432—Queens Block 9706 Lot 98. A search of the New York Department of Buildings' website reveals no actions related to Queens Block 9706 Lot 98 more recent than 1987, and no permits issued for construction on the property. *See* Ex. 1.

The relocation of the documents could plausibly have been related to construction at Hillside Auto *Outlet*. Hillside Auto Outlet is located at 161-10 Hillside Avenue, Queens, NY 11432—Queens Block 9767 Lot 26. A search of the New York Department of Buildings' website reveals four actions for violations of Environmental Control Board liens in December 2020, April 2021, and May 2021—each an instance of unauthorized construction—and no other actions between 1986 and December 2020. *See* Ex. 2. This belies both Judge Bloom's finding in the Order of June 28, 2023, that the documents were "misplaced' in early 2019," *see* Dkt. No. 77, at *3–4; and Ms Jennings' recollection that the construction occurred from September 2017 through February 2018. *C.f.* Dkt. No. 76, at *23 ¶ 27.

Further, contrary to Judge Bloom's findings, Defendants were well aware of the pendency of Plaintiff's lawsuit, and the need to preserve potentially relevant documents, as early as December 30, 2019. *See Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 19-cv-05458 (ENV) (JO) ("*Stidhum I*"), Dkt. Nos. 1-1 (Sep. 25, 2019) (document preservation demand), 6 (Dec. 30, 2019) (notice of appearance by Emanuel Kataev on behalf of all Defendants); *see also* Dkt. No. 1 ¶¶ 6–10 (Dec. 29, 2021) (briefly recounting the procedural history of *Stidhum I*, including its pendency from September 25, 2019 through June 25, 2021). *Stidhum I* was in fact pending throughout the time bounded by the Department of Buildings' actions of December 11, 2020 and May 5, 2021.

### Argument

"A party seeking sanctions has the burden of establishing '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v.*

Hon. Orelia E. Merchant, U.S.D.J.
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)
Page **4** of **6**

*Haltman*, No. 13-cv-04375 (JS) (AKT), 2015 U.S. Dist. LEXIS 113071, at *22–23 (E.D.N.Y. Aug. 25, 2015) (quoting *Residential Funding Corp.*, 306 F.3d at 107 (2d Cir. 2002)).

Defendants had a duty to preserve evidence. "The first element a party must show when seeking sanctions for the destruction of evidence is 'that the party having control over the evidence had an obligation to preserve it at the time it was destroyed.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *23 (quoting *Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)) That *Stidhum I* was ultimately dismissed on an administrative technicality, and refiled as this case, does not absolve Defendants of the need to preserve evidence. *See Haltman*, 2015 U.S. Dist. LEXIS 113071, at *23 ("The Second Circuit has determined that '[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'") (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Pursuant to this obligation, 'anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary.'" *Id.* (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("*Zubulake IV*")). "'In this respect, "relevance" means relevance for the purposes of discovery, which is "an extremely broad concept."'" *Id.* (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (itself quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). "Therefore, while a litigant is under no duty to keep or retain every document in its possession, it is under a duty to preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Id.* at *23–24 (citation and internal quotation marks omitted). "The duty to preserve arises, not when litigation is certain, but rather when it is reasonably foreseeable." *Id.*, at *24 (internal quotation marks omitted; collecting cases).

Defendants' state of mind was culpable. "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake IV*, 220 F.R.D. at 220. "Failures to preserve relevant evidence occur 'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionally.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *25 (quoting *Reilly v. NatWest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)). "In this Circuit, 'the "culpable state of mind" factor is satisfied by showing that the evidence was destroyed "knowingly, even if without intent to breach a duty to preserve it, or negligently."'" *Id.* at *25–26 (quoting *Residential Funding Corp.*, 306 F.3d at 108 (itself quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001))). "In this context, negligence is a failure to conform to the standard of what a party must due to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (citations and internal quotation marks omitted). "A party is negligent even if the failure 'results from a pure heart and an empty head.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *26 (quoting *In re Pfizer*, 288 F.R.D. at 314). "It follows that gross negligence also satisfies the culpability requirement." *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 503 (S.D.N.Y. 2013). "Gross negligence has been described as a failure to exercise even that care which a careless person would use." *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *26***Error! Bookmark not defined.** (quotation marks and citations omitted). "Courts in this circuit have found that the 'failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent,

Hon. Orelia E. Merchant, U.S.D.J.
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)
Page **5** of **6**

and, depending on the circumstances, may be grossly negligent.'" *Id.*, at *26–27 (quoting *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 464–65 (S.D.N.Y. 2010)). "Moreover, although the failure to institute a 'litigation hold' is not gross negligence *per se*, whether the party implemented good document preservation practices is a factor that courts should consider 'in the determination of whether discovery sanctions should issue.'" *Id.*, at *27 (quoting *Chin*, 685 F.3d at 162). "Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction.'" *Haltman*, 2015 WL 5027899, at *10 (quoting *Residential Funding Corp.*, 306 F.3d at 109 (internal alterations and citations omitted).

That the logs are relevant was already recognized by Judges Mann and Bloom when they originally ordered its production in December 2022 and April 2023. "Relevance may be assumed where the breaching party acted in bad faith or with gross negligence." *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *27 (citations omitted). "However, where the spoliating party has acted only negligently, the moving party must make a showing that the lost materials were relevant." *Id.*, at *27–28 (citations omitted). "A party may establish relevance by adducing sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Id.*, at *28 (citations omitted). However, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from its destruction." *Id.* (citations omitted). "As such, it is not incumbent upon the plaintiff to show that specific documents were lost.… rather it would be enough for plaintiff to demonstrate that certain types of relevant documents existed and that they were necessarily destroyed." *Id.* (citations omitted).

The Defendants are unable to cure the prejudice through other discovery. Disclosure of sales records from outside the period of Plaintiff's employment is no substitute for disclosure of her sales records, or other sales records from her period of employment which can act as comparators for disparate treatment.

The sanctions sought are appropriate. It is widely accepted in the Second Circuit that parties should not benefit from spoliation, and the district court may impose sanctions, such as an adverse inference instruction at trial under Rule 37(b) or pursuant to "its inherent power to manage its own affairs" when a party destroys evidence. *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d at 99, 107 (2d Cir. 2002) *superseded by statute on other grounds*; *see also Zubalake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). Determining the appropriate sanction is within "the sound discretion" of the court and "assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "In general, a court should impose the least harsh sanction that can provide an adequate remedy." *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018) (internal quotation marks and citation omitted). Available sanctions include – from least to most harsh – "further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 707 (S.D.N.Y. 2017),

Hon. Orelia E. Merchant, U.S.D.J.
*Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (HG) (LB), (E.D.N.Y.)
Page **6** of **6**

*objections overruled*, No. 14-cv-2385, 2017 WL 3172715 (S.D.N.Y. July 25, 2017) (internal quotation and citation omitted). Here, each of the remedies sought are warranted in light of Defendants' willful failure to comply with court orders.

### Conclusion

For all the reasons set forth above, Plaintiff respectfully requests that the Court reverse Judge Bloom's decision not to issue sanctions.

We thank the Court for its time and consideration in this matter.

Dated: Flushing, NY
      July 12, 2023

<div style="margin-left:40%">

Respectfully submitted,

 */s/ John Troy*                           
John Troy
Aaron Schweitzer
Tiffany Troy
TROY LAW, PLLC
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

</div>

/asb

BIS Menu | Property Profile | DOB Violations | Back

FAQs | Glossary | Jul 12, 2023

**Buildings**

NYC

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
### Property Profile Overview

**NO PREVIOUSLY ISSUED PERMITS FOUND FOR THIS PROPERTY**

| 150-01 HILLSIDE AVENUE | | QUEENS 11432 | | Pre - BIS PA | | BIN# 4571129 | |
|---|---|---|---|---|---|---|---|
| HILLSIDE AVENUE | 150-01 - 150-09 | Health Area | : 2720 | | | Tax Block | : 9706 |
| 150 STREET | NO NUMBER | Census Tract | : 236 | | | Tax Lot | : 98 |
| | | Community Board | : 408 | | | Condo | : NO |
| View DCP Addresses... | Browse Block | Buildings on Lot | : 1 | | | Vacant | : NO |

View Zoning Documents    View Challenge Results    Pre - BIS PA      View Certificates of Occupancy

| | | | | | |
|---|---|---|---|---|---|
| Cross Street(s): | 150 STREET, 163 STREET | | | | |
| DOB Special Place Name: | | | | | |
| DOB Building Remarks: | | | | | |
| Landmark Status: | | Special Status: | | N/A | |
| Local Law: | NO | Loft Law: | | NO | |
| SRO Restricted: | NO | TA Restricted: | | NO | |
| UB Restricted: | NO | | | | |
| Environmental Restrictions: | N/A | Grandfathered Sign: | | NO | |
| Legal Adult Use: | NO | City Owned: | | NO | |
| Additional BINs for Building: | NONE | | | | |
| Additional Designation(s): | MS4 - MS4 AREA | | | | |
| HPD Multiple Dwelling: | No | | | | |
| Special District: | DJ - DOWNTOWN JAMAICA | | | | |

This property is not located in an area that may be affected by Tidal Wetlands, Freshwater Wetlands, Coastal Erosion Hazard Area, or Special Flood Hazard Area. Click here for more information

**Department of Finance Building Classification:**    GU-GARAGE/GAS STATN

**Please Note:** The Department of Finance's building classification information shows a building's tax status, which may not be the same as the legal use of the structure. To determine the legal use of a structure, research the records of the Department of Buildings.

| | Total | Open | |
|---|---|---|---|
| | | | Elevator Records |
| Complaints | 1 | 0 | Electrical Applications |
| Violations-DOB | 6 | 0 | Permits In-Process / Issued |
| Violations-OATH/ECB | 0 | 0 | Illuminated Signs Annual Permits |
| Jobs/Filings | 0 | | Plumbing Inspections |
| ARA / LAA Jobs | 0 | | Open Plumbing Jobs / Work Types |
| Total Jobs | 0 | | Facades |
| Actions | 48 | | Marquee Annual Permits |
| | | | Boiler Records |
| OR Enter Action Type: | | | DEP Boiler Information |
| OR Select from List: | Select... | ∨ | Crane Information |
| AND   Show Actions | | | After Hours Variance Permits |

BIS Menu | Property Profile | DOB Violations | Back

Privacy Policy | Terms of Use

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

A0113

BIS Menu | Property Profile | DOB Violations | Back

FAQs | Glossary   Jul 12, 2023



**NYC**

**Buildings**

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

**NYC Department of Buildings**

**Actions**

Premises: 150-01 HILLSIDE AVENUE QUEENS   BIN: 4571129   Block: 9706   Lot: 98

Page: 1

| NUMBER | | TYPE | FILE DATE |
|---|---|---|---|
| ALT 2387-24 | | ALTERATION | 00/00/1924 |
| ALT 2583-24 | | ALTERATION | 00/00/1924 |
| ALT 3936-36 | | ALTERATION | 00/00/1936 |
| ALT 3039-48W | | ALTERATION | 00/00/1948 |
| ALT 14-51E | | ALTERATION | 00/00/1951 |
| ALT 1782-61 | | ALTERATION | 00/00/1961 |
| ALT 1337-66 | | ALTERATION | 00/00/1966 |
| ALT 1184-76 | | ALTERATION | 00/00/1976 |
| ALT 36-77 | | ALTERATION | 00/00/1977 |
| ALT 1156-79 | | ALTERATION | 00/00/1979 |
| ALT 106-84 | | ALTERATION | 00/00/1984 |
| BN 235-64 | | BUILDING NOTICE | 00/00/1964 |
| BN 2464-70 | | BUILDING NOTICE | 00/00/1970 |
| BN 2012-71 | | BUILDING NOTICE | 00/00/1971 |
| CO Q149441T | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q151137T | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q152449 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q191282 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q192810 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q193334 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q200461 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q52597 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| CO Q69583 | [PDF] | CERTIFICATE OF OCCUPANCY | 00/00/0000 |
| DP 3111-35 | | DEMOLITION PERMIT | 00/00/1935 |
| DP 370-61 | | DEMOLITION PERMIT | 00/00/1961 |

Select Violation Type: Show All Violations   ⌄   Refresh

**Next**

BIS Menu | Property Profile | DOB Violations | Back

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Privacy Policy   Terms of Use

A0114

**Buildings**

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

## NYC Department of Buildings

### Actions

Page: 2

Premises: 150-01 HILLSIDE AVENUE QUEENS   BIN: 4571129   Block: 9706   Lot: 98

| NUMBER | TYPE | FILE DATE |
|---|---|---|
| DP 200-81 | DEMOLITION PERMIT | 000001981 |
| ELEV 69-62 | ELEVATOR | 000001962 |
| ES 178-48 | ELECTRIC SIGN | 000001948 |
| ES 969-50 | ELECTRIC SIGN | 000001950 |
| ES 62-63 | ELECTRIC SIGN | 000001963 |
| ES 63-63 | ELECTRIC SIGN | 000001963 |
| ES 54-77E | ELECTRIC SIGN | 000001977 |
| MISC 5003-46 | MISCELLANEOUS | 000001946 |
| MISC 6522-46 | MISCELLANEOUS | 000001946 |
| MISC 11151-47 | MISCELLANEOUS | 000001947 |
| NB 1694-05 | NEW BUILDING | 000001905 |
| NB 934-08 | NEW BUILDING | 000001908 |
| NB 2115-10 | NEW BUILDING | 000001910 |
| NB 2116-10 | NEW BUILDING | 000001910 |
| NB 5587-31 | NEW BUILDING | 000001931 |
| NB 1139-35 | NEW BUILDING | 000001935 |
| NB 6286-37 | NEW BUILDING | 000001937 |
| NB 2775-46 | NEW BUILDING | 000001946 |
| NB 3795-50 | NEW BUILDING | 000001950 |
| PA 4-77W | PUBLIC ASSEMBLY | 000001977 |
| PRS 598-64 | PLUMBING REPAIR SLIP | 000001964 |
| PRS 4104-66 | PLUMBING REPAIR SLIP | 000001966 |
| PRS 311-77 | PLUMBING REPAIR SLIP | 000001977 |
| V* 00C442J08 | DOB VIOLATION - DISMISSED | 000001900 |
| DISMISSAL DATE: 10/15/1985 | | |
| V* 102777ES0410 | DOB VIOLATION - DISMISSED | 10/27/1977 |
| DISMISSAL DATE: 04/09/1984 | | |

Select Violation Type: Show All Violations ▾   Refresh

Previous   Next

BIS Menu | Property Profile | DOB Violations | Back

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Privacy Policy | Terms of Use

A0115



# Buildings

BIS Menu | Property Profile | DOB Violations | Back

FAQs | Glossary   Jul 12, 2023

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
## Actions

Page: 3

Premises: 150-01 HILLSIDE AVENUE QUEENS    BIN: 4571129   Block: 9708   Lot: 98

| NUMBER | TYPE | FILE DATE |
|---|---|---|
| V* 122883C551Y12 | DOB VIOLATION - DISMISSED | 12/28/1983 |
| DISMISSAL DATE: 04/09/1984 | | |
| V* 2184C552K8 | DOB VIOLATION - DISMISSED | 02/01/1984 |
| DISMISSAL DATE: 04/09/1984 | | |
| V* 093085ELL1081SS06910 | DOB VIOLATION - CLOSED | 00/00/1985 |
| CLOSURE DATE: 08/26/2011 | | |
| V* 100187LL16NRF05747 | DOB VIOLATION - CLOSED | 00/00/1987 |
| CLOSURE DATE: 08/26/2011 | | |

Previous

Select Violation Type: Show All Violations   ✔   Refresh

BIS Menu | Property Profile | DOB Violations | Back

Privacy Policy   Terms of Use

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

A0116



BIS Menu | Property Profile | DOB Violations | Void Details | Back

**Buildings**

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

FAQs | Glossary   Jul 12, 2023

## NYC Department of Buildings
### Property Profile Overview

**NO PREVIOUSLY ISSUED PERMITS FOUND FOR THIS PROPERTY**

**161-02 HILLSIDE AVENUE**    QUEENS   11432    BIN# 4269064

| | | |
|---|---|---|
| 161 STREET | 88-01 - 88-01 | Health Area : 2810 | Tax Block : 9767 |
| 162 STREET | 88-02 - 88-02 | Census Tract : 446.02 | Tax Lot : 26 |
| HILLSIDE AVENUE | 161-02 - 161-16 | Community Board : 412 | Condo : NO |
| | | Buildings on Lot : 1 | Vacant : NO |

View DCP Addresses....    Browse Block

View Zoning Documents    View Challenge Results    Pre - BIS PA    View Certificates of Occupancy

161 STREET, 162 STREET

| | | |
|---|---|---|
| Cross Street(s): | | |
| DOB Special Place Name: | | |
| DOB Building Remarks: | | |
| Landmark Status: | | Special Status: | N/A |
| Local Law: | NO | Loft Law: | NO |
| SRO Restricted: | NO | TA Restricted: | NO |
| UB Restricted: | NO | | |
| Environmental Restrictions: | NOISE | Grandfathered Sign: | NO |
| Legal Adult Use: | NO | City Owned: | NO |
| LL 158/17 Pro Cert Restriction until: | N/A | | |
| LL 158/17 Enhanced Civil Penalties: | Yes | | |
| Additional BINs for Building: | NONE | | |
| Additional Designation(s): | JAM - JAMAICA PLAN AREA | | |
| | MS4 - MS4 AREA | | |
| HPD Multiple Dwelling: | No | | |
| Number of Dwelling Units: | 0 | | |

**Special District:**    DJ - DOWNTOWN JAMAICA

This property is not located in an area that may be affected by Tidal Wetlands, Freshwater Wetlands, Coastal Erosion Hazard Area, or Special Flood Hazard Area. Click here for more information

**Department of Finance Building Classification:**    G1-GARAGE/GAS STATN

Please Note: The Department of Finance's building classification information shows a building's tax status, which may not be the same as the legal use of the structure. To determine the legal use of a structure, research the records of the Department of Buildings.

| | Total | Open | |
|---|---|---|---|
| Complaints | 15 | 0 | Elevator Records |
| Violations-DOB | 2 | 0 | Electrical Applications |
| Violations-OATH/ECB | 4 | 4 | Permits In-Process / Issued |
| | | | Illuminated Signs Annual Permits |
| This property has 2 open OATH/ECB "Work Without A Permit" Violations and may be subject to DOB civil penalties upon application for a permit. After obtaining the permit, a certificate of correction must be filed on the ECB violations. | | | Plumbing Inspections |
| | | | Open Plumbing Jobs / Work Types |
| Job/Filings | 0 | | Facades |
| ARA / LAA Jobs | 0 | | Marquee Annual Permits |
| Total Jobs | 0 | | Boiler Records |
| Actions | 16 | | DEP Boiler Information |
| | | | Crane Information |
| OR Enter Action Type: ___ | | | After Hours Variance Permits |
| OR Select from List: [ Select ] | | | |
| AND [ Show Actions ] | | | |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Void Details | Back

Privacy Policy   |   Terms of Use

A0117

BIS Menu | Property Profile | DOB Violations | Back

**NYC**
**Buildings**

FAQs | Glossary    Jul 12, 2023

**NYC**

☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings

### Actions

Page: 1

**Premises: 161-02 HILLSIDE AVENUE QUEENS**        BIN: 4209004    Block: 9767    Lot: 26

| NUMBER | | TYPE | FILE DATE |
|---|---|---|---|
| ALT 563-23 | | ALTERATION | 08/08/1923 |
| ALT 569-58 | | ALTERATION | 08/08/1958 |
| ALT 1044-76 | | ALTERATION | 08/08/1976 |
| ALT 1044-76 | | ALTERATION | 08/08/1976 |
| BN 1356-74 | | BUILDING NOTICE | 08/08/1974 |
| BN 1247-86 | | BUILDING NOTICE | 07/24/1986 |
| BN 1247-86 | | BUILDING NOTICE | 08/08/1986 |
| COQ 130158 | (PDF) | CERTIFICATE OF OCCUPANCY - QUEENS | 08/08/1958 |
| COQ 192040 | (PDF) | CERTIFICATE OF OCCUPANCY - QUEENS | 08/08/1976 |
| DP 58-58 | | DEMOLITION PERMIT | 08/08/1958 |
| MISC 633-52 | | MISCELLANEOUS | 08/08/1952 |
| NB 3709-14 | | NEW BUILDING | 08/08/1914 |
| NB 900-86 | | NEW BUILDING | 09/19/1986 |
| NB 900-86 | | NEW BUILDING | 08/08/1986 |
| PRS 6457-59 | | PLUMBING REPAIR SLIP | 08/08/1959 |
| V* 00C551E12 | | DOB VIOLATION - DISMISSED | 00/00/1900 |
| DISMISSAL DATE: 11/17/1986 | | | |
| V* 0ONO FORM06-27-84ESS | | DOB VIOLATION - DISMISSED | 00/00/1900 |
| VECL | | VIOLATION ECB LIEN - ACTIVE | 05/05/2021 |
| VECL | | VIOLATION ECB LIEN - ACTIVE | 12/11/2020 |
| VECL | | VIOLATION ECB LIEN - ACTIVE | 04/09/2021 |
| VECL | | VIOLATION ECB LIEN - ACTIVE | 04/09/2021 |

Select Violation Type: Show All Violations    ⌄    Refresh

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Back

Privacy Policy | Terms of Use

A0118



BIS Menu | Property Profile | DOB Violations | Viol Details | Back

**Buildings**

FAQs | Glossary    Jul 12, 2023

**NYC**

☑ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
**DOB Violation Display for**

BIN: 4209004    Block: 9767    Lot: 26

**Premises: 161-02 HILLSIDE AVENUE QUEENS**

| | |
|---|---|
| Issue Date: | 05/05/2021 |
| Violation Type: | CN - CONSTRUCTION |
| Violation Number: | |
| OATH/ECB No.: | 38040666X (refer to for further details) |
| Description: | |

| | |
|---|---|
| Violation Category: | |
| Device No.: | 4209004 |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Viol Details | Back

Privacy Policy | Terms of Use

A0119



BIS Menu | Property Profile | DOB Violations | Viol Details | Back

**NYC Buildings**

FAQs | Glossary | Jul 12, 2023

**NYC**

☑ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
**DOB Violation Display for**

**Premises: 161-02 HILLSIDE AVENUE QUEENS**    BIN: 4209004    Block: 9767    Lot: 26

| | | |
|---|---|---|
| Issue Date: | 12/11/2020 | Violation Category: |
| Violation Type: | CN - CONSTRUCTION | |
| Violation Number: | 39033343X (refer to for further details) | Device No.: 4209004 |
| OATH/ECB No.: | | |
| Description: | | |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Viol Details | Back

Privacy Policy | Terms of Use

A0120



**BIS Menu | Property Profile | DOB Violations | Viol Details | Back**

Buildings

NYC Department of Buildings
**DOB Violation Display for**

**Premises: 161-02 HILLSIDE AVENUE QUEENS**    BIN: 4209004    Block: 9767    Lot: 26

| | | |
|---|---|---|
| **Issue Date:** | 04/09/2021 | **Violation Category:** |
| **Violation Type:** | CN - CONSTRUCTION | |
| **Violation Number:** | | **Device No.:** 4209004 |
| **OATH/ECB No.:** | 39039114J (refer to for further details) | |
| **Description:** | | |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Viol Details | Back

Privacy Policy | Terms of Use

FAQs | Glossary   Jul 12, 2023

NYC

☑ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS



BIS Menu | Property Profile | DOB Violations | Viol Details | Back

**Buildings**

**NYC**

FAQs | Glossary   Jul 12, 2023

☑ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
**DOB Violation Display for**

**Premises: 161-02 HILLSIDE AVENUE QUEENS**    BIN: 4209004   Block: 9767   Lot: 26

| | | |
|---|---|---|
| Issue Date: | 04/09/2021 | Violation Category: |
| Violation Type: | CN - CONSTRUCTION | |
| Violation Number: | | Device No.: 4209004 |
| OATH/ECB No.: | 38038113H (refer to for further details) | |
| Description: | | |

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

BIS Menu | Property Profile | DOB Violations | Viol Details | Back

Privacy Policy | Terms of Use

A0122

# EXHIBIT D



A0124



A0125



A0126

Case 1:21-cv-07163-OEM-LB Document 73-3 Filed 07/12/23 Page 5 of 10 PageID #: 718



A0127



Case 1:21-cv-07163-OEM-LB  Document 79-3  Filed 07/12/23  Page 7 of 19 PageID #: 720



Case 1:21-cv-07163-OEM-JB Document 29-3 Filed 07/12/23 Page 8 of 10 PageID #: 721





Case 1:21-cv-07163-OEM-LB   Document 78-3   Filed 03/12/23   Page 10 of 10 PageID #: 723



A0132

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
LITICIA FRANCINE STIDHUM,

                              Plaintiff,           Case No. 21-cv-07163 (OEM) (LB)

            v.                              **NOTICE OF APPEAL OF**
                                          **MAGISTRATE JUDGE**
161-10 HILLSIDE AUTO AVE, LLC,      **DECISION TO DISTRICT**
HILLSIDE AUTO MALL, INC.,            **COURT**
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

                          Defendants.
-----------------------------------------------------------------x

       **PLEASE TAKE NOTICE**, that upon Plaintiff's Memorandum of Law, the Declaration of

Tiffany Troy, Esq. dated August 7, 2023, and all the prior papers and proceedings herein, Plaintiff

will move this Court, the Hon. Orelia E. Merchant, U.S.D.J., at the United States Courthouse for

the Eastern District of New York, 225 Cadman Plaza East, Courtroom 6C South, Brooklyn, NY

11201, on a date and time to be determined by the Court, for an Order pursuant to Rule 72(a) of

the Federal Rules of Civil Procedure reversing the Order of Magistrate Judge Lois Bloom denying

Plaintiff's motion for sanctions for failure to comply with discovery orders and spoliation of

documents, and for such other and further relief as to the Court may seem just, equitable, and

proper.

       **PLEASE TAKE FURTHER NOTICE**, that pursuant to Local Civil Rule 6.1(b) of the

United States District Court for the Eastern District of New York, opposition papers shall be filed

by August 21, 2023, and reply papers shall be filed by August 28, 2023.

Dated: Flushing, NY
       August 7, 2023

                                     Respectfully submitted,
                                     TROY LAW, PLLC

A0133

/s/ Tiffany Troy
Tiffany Troy, Esq.
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

**To: via ECF**

Emanuel Kataev, Esq.
Joseph M. Labuda Esq.
Milman Labuda Law Group, PLLC
3000 Marcus Avenue
Suite 3W8
New Hyde Park, NY 11042
(516) 328-8899
emanuel@mllaborlaw.com
joe@mllaborlaw.com

/asb

A0134

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
LITICIA FRANCINE STIDHUM,

<table>
<tr><td></td><td>Plaintiff,</td><td>Case No. 21-cv-07163 (OEM) (LB)</td></tr>
<tr><td>v.</td><td></td><td><b>DECLARATION IN SUPPORT<br>OF APPEAL OF MAGISTRATE<br>JUDGE DECISION TO<br><u>DISTRICT COURT</u></b></td></tr>
</table>

161-10 HILLSIDE AUTO AVE, LLC,
HILLSIDE AUTO MALL, INC.,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

                                           Defendants.
------------------------------------------------------------------x

I, Tiffany Troy, declare under penalty of perjury that the following statements are true and correct:

1. I am an attorney of record in this matter, and am admitted to practice before the United States District Court for the Eastern District of New York.

2. I make this declaration in support of Plaintiff's objection to the Memorandum and Order of Hon. Lois Bloom, U.S.M.J. denying Plaintiff's motion for sanctions for failure to comply with discovery orders and spoliation of documents. *See* Dkt. No. 77 (June 28, 2023) (the "Memorandum and Order".

3. As set forth in the Memorandum and Order, Hon. Roanne L. Mann, U.S.M.J., "previously ordered defendants to produce documents pertaining to other salespersons [besides Plaintiff] on December 22, 2022." Dkt. No. 77, at *1 (citing Dkt. No. 37 (Dec. 22, 2022)); *see* Dkt. No. 37, at *9 ("Defendants are directed to respond to Requests #17 (documents pertaining to plaintiff's car sales) and #21 (pay records for other salespersons) using the same time period [from August 25, 2018 to January 14, 2019]."). They had not done so by April 3, 2023, and on that date Judge Bloom ordered them to "produce[] car sales logs for the relevant time period [from August 25, 2018 to January 14, 2019]… they shall do so by

A0135

April 10, 2023." Order (Apr. 3, 2023). Her Honor also ordered Defendants to produce "text messages between parties that pertain to plaintiff or to pregnancy discrimination" by April 23, 2023. *Id.* Her Honor "warned" Defendants "that if they fail to comply with this Order, the court may hold them in contempt," and that "[a] person found to be in contempt is subject to sanctions, which may include a monetary fine, attorney's fees, costs, and even imprisonment." *Id.*

4. In response to Defendants' letter motion to extend the time to complete the discovery compelled by Judge Bloom's April 3, 2023 Order, Judge Bloom observed that Defense counsel's "reason for the request, that he 'misread' the Court's Order and that this only came to defendants' counsel's attention 'due to plaintiff's email'" "entirely unacceptable," and warned Defendants in stronger terms than those of the April 3, 2023 Order that "[i]f the documents are not produced by noon on April 17, 2023, the Court *shall impose* an appropriate sanction." Order (Apr. 12, 2023) (emphasis added).

5. On 11:59 AM on April 17, 2023, Defense counsel emailed us to say that he was "bates stamping the documents required to be produced and sending over" having gotten "tied up on phone calls from 10 am until now in three separate matters." *See* Dkt. No. 61. There were no documents attached to this email. At 12:31 PM on April 17, 2023, Defense counsel emailed again to say he was "[d]ouble checking redactions & sending now," and that there would be "264 pages of additional discovery." There were no documents attached to this email either. The documents, consisting of Plaintiff's sales records from January 1 through 13, 2019 (omitting the records from August 25, 2018 through December 31, 2018), and records of pay to other employees from May 4, 2018 through November 30, 2018 (omitting

the records from December 1, 2018 through January 14, 2019),[1] would be attached to an email of 12:44 PM asking Plaintiff to withdraw the sanctions motion filed at 12:38 PM. *See* Dkt. No. 61. A 30(b)(6) witness named Deana Jennings had previously testified that Plaintiff's sales records were created in the ordinary course of business and maintained in Defendants' place of business. *See* Dkt. No. 63.

6. At no point did Defendants produce the text messages that Judge Bloom had on April 3, 2023 Ordered them to produce by April 23, 2023. Accordingly, on April 25, 2023, Plaintiff filed a second sanctions motion regarding the text messages. Both sanctions motions were addressed at a motion hearing on May 4, 2023. Judge Bloom declined to impose sanctions, but Ordered Defendants to "produce all outstanding discovery, as well as defendants' sworn affidavits and stipulations related to text messages on their phones and the dismissal of the case against defendant Ronald M. Baron by <u>noon</u> on May 17, 2023." *See* Order (May 4, 2023) (emphasis in original).

7. At 11:44 AM on May 17, 2023, Defendants produced no new outstanding discovery, but did produce declarations of Jory Baron, Deana Jennings, Ishaque Thanwalla, and Andris Guzman. Mr. Baron and Mr. Guzman declared that they had conducted searches of their phones and emails and were not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and did not conduct searches for sales logs because maintaining them was outside the scope of their jobs. Ms Jennings declared that she had conducted a search of her phone and emails and was not in possession of text messages or emails responsive to Plaintiff's requests; did conduct a search for Hillside Auto Outlet's sales logs which she was responsible to maintain in her role as

---

[1] These were originally produced without Bates numbers on April 12, 2023; they would be produced with Bates numbers D1966–D2229 on April 17, 2023.

controller; but was unable to find them either at Hillside Auto Outlet, Hillside Auto Mall, or a third-party storage facility they used. Mr. Thanwalla declared that he had conducted a search of his phone and emails and was not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and that he conducted a search for Hillside Auto Outlet's sales logs and asked Ms Jennings to do the same, but was unable to find them. *See* Dkt. Nos. 73-1–73-4 (June 12, 2023).

8. Upon our request, Ms Jennings submitted a supplemental declaration setting forth the keywords she had used to search her phone and email, and repeating her declaration that she had searched Hillside Auto Outlet, Hillside Auto Mall, and a third party storage facility to which the logs might have been moved due to construction at Hillside Auto Mall, but had been unable to find the logs. *See* Dkt. No. 73-5 (June 12, 2023).

9. However, on June 19, 2023, Mr. Thanwalla, Mr. Baron, Mr. Guzman, and Ms Jennings submitted supplemental declarations to us (these are reproduced, *sans* attachments, at Dkt. No. 76, at *7–23 (June 20, 2023)). Mr. Baron included a one-page text message exchange between himself and Plaintiff dated January 24, 2019 the end of which had been cut off in his previous production; Mr. Guzman included a one-page text message exchange from June 25, 2018 through 11:56 AM through June 27, 2018 at 2:48 PM that had not been produced previously (prior production of text messages had skipped from June 22 to June 26, and the messages on June 26 and 27 are different from the previous to the June 2023 production). Mr. Thanwalla produced several blank emails, weekly sales logs from after the period ordered by Judges Mann and Bloom, one December 2018 sales log of the Plaintiff's (found on Mr. Thanwalla's phone), and pictures of the storage rooms. The

pictures appear to include one picture of a box containing records for 2018. *See* Ex. 3, at *5 (bottom right corner).

10. Neither any of Ms Jennings' three declarations, nor either of Mr. Thanwalla's declarations, indicated when the logs might have been moved to the third-party storage facility. But it cannot have been related to construction at Hillside Auto Mall. Hillside Auto Mall is located at 150-01 Hillside Avenue, Queens, NY 11432—Queens Block 9706 Lot 98. A search of the New York Department of Buildings' website reveals no actions related to Queens Block 9706 Lot 98 more recent than 1987, and no permits issued for construction on the property. *See* Ex. 1.

11. The relocation of the documents could plausibly have been related to construction at Hillside Auto *Outlet*. Hillside Auto Outlet is located at 161-10 Hillside Avenue, Queens, NY 11432—Queens Block 9767 Lot 26. A search of the New York Department of Buildings' website reveals four actions for violations of Environmental Control Board liens in December 2020, April 2021, and May 2021—each an instance of unauthorized construction—and no other actions between 1986 and December 2020. *See* Ex. 2. This belies both Judge Bloom's finding in the Order of June 28, 2023, that the documents were "misplaced' in early 2019," *see* Dkt. No. 77, at *3–4; and Ms Jennings' recollection that the construction occurred from September 2017 through February 2018. *C.f.* Dkt. No. 76, at *23 ¶ 27.

12. Further, contrary to Judge Bloom's findings, Defendants were well aware of the pendency of Plaintiff's lawsuit, and the need to preserve potentially relevant documents, as early as December 30, 2019. *See Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 19-cv-05458 (ENV) (JO) ("*Stidhum I*"), Dkt. Nos. 1-1 (Sep. 25, 2019) (document preservation demand), 6 (Dec.

30, 2019) (notice of appearance by Emanuel Kataev on behalf of all Defendants); *see also* Dkt. No. 1 ¶¶ 6–10 (Dec. 29, 2021) (briefly recounting the procedural history of *Stidhum I*, including its pendency from September 25, 2019 through June 25, 2021). *Stidhum I* was in fact pending throughout the time bounded by the Department of Buildings' actions of December 11, 2020 and May 5, 2021.

13. I declare pursuant to the laws of the United States of America and under penalty of perjury that the foregoing is true and correct.

Dated: Flushing, NY
      August 7, 2023

Respectfully submitted,
Troy Law, PLLC

/s/ Tiffany Troy
Tiffany Troy, Esq.
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

<u>To: via ECF</u>
      Emanuel Kataev, Esq.
      Joseph M. Labuda Esq.
      Milman Labuda Law Group, PLLC
      3000 Marcus Avenue
      Suite 3W8
      New Hyde Park, NY 11042
      (516) 328-8899
      emanuel@mllaborlaw.com
      joe@mllaborlaw.com

/asb

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
LITICIA FRANCINE STIDHUM,

                               Plaintiff,          Case No. 21-cv-07163 (OEM) (LB)

                v.

161-10 HILLSIDE AUTO AVE, LLC,
HILLSIDE AUTO MALL, INC.,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

                            Defendants.
----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF APPEAL OF MAGISTRATE JUDGE**
**<u>DECISION TO DISTRICT COURT</u>**

Tiffany Troy, Esq.
TROY LAW, PLLC
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

FACTUAL BACKGROUND & PROCEDURAL HISTORY .................................................. 1

STANDARDS ..................................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

CONCLUSION ................................................................................................................. 10

i

A0142

## TABLE OF AUTHORITIES

**Cases**

*Byrnie v. Town of Cromwell*, 243 F.3d 93 (2d Cir. 2001) ................................................................ 9

*Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135 (2d Cir. 2012) ........................................... 7, 10

*Condit v. Dunne*, 225 F.R.D. 100 (S.D.N.Y. 2004) ....................................................................... 8

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ............................................ 7, 12

*Humphreys v. New York City Health*, No. 16-cv-09707 (VSB), 2023 WL 155446, 2023 U.S. Dist. LEXIS 5222 (S.D.N.Y. Jan. 11, 2023) ....................................................................................... 5

*In re Pfizer Secs. Litig.*, 288 F.R.D. 297 (S.D.N.Y. 2013) ...................................................... 9, 10

*JPMorgan Chase Bank, N.A. v. Reifler*, No. 11-cv-04016 (DAB), 2016 WL 10570981 (S.D.N.Y. July 14, 2016) ........................................................................................................................... 6

*Lan v. Time Warner, Inc.*, No. 11-cv-2870 (AT) (JCF), 2016 U.S. Dist. LEXIS 30488, 2016 WL 928731 (S.D.N.Y. Feb. 9, 2016) .............................................................................................. 6

*Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ................................................................................................................................. 12

*Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman*, No. 13-cv-04375 (JS) (AKT), 2015 U.S. Dist. LEXIS 113071 (E.D.N.Y. Aug. 25, 2015) ........................... passim

*Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429 (S.D.N.Y. 2010) ........................... 8

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010) ............................................................................................................... 10

*Reilly v. NatWest Mkts. Group Inc.*, 181 F.3d 253 (2d Cir. 1999) ................................................ 9

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002) *superseded by statute on other grounds* ......................................................................................... 7, 9, 11, 12

*Tchatat v. O'Hara*, 249 F. Supp. 3d 701 (S.D.N.Y. 2017), *objections overruled*, No. 14-cv-2385, 2017 WL 3172715 (S.D.N.Y. July 25, 2017) ........................................................................ 13

*United States v. Freeman*, 443 F. Appx. 664 (2d Cir. 2011) ........................................................ 5

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ...................................... 8, 9, 12

**Rules**

Fed. R. Civ. P. 72(a) .................................................................................................................... 5

ii

A0143

Case 1:21-cv-07163-OEM-LB   Document 84   Filed 08/07/23   Page 4 of 14 PageID #: 759

iii

A0144

Plaintiff, by and through counsel, hereby submits the following memorandum of law in support of appeal of the Memorandum and Order of Hon. Lois Bloom, U.S.M.J. denying Plaintiff's motion for sanctions for failure to comply with discovery orders and spoliation of documents. *See* Dkt. No. 77 (June 28, 2023).

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

As set forth in the Memorandum and Order, Hon. Roanne L. Mann, U.S.M.J., "previously ordered defendants to produce documents pertaining to other salespersons [besides Plaintiff] on December 22, 2022." Dkt. No. 77, at *1 (citing Dkt. No. 37 (Dec. 22, 2022)); *see* Dkt. No. 37, at *9 ("Defendants are directed to respond to Requests #17 (documents pertaining to plaintiff's car sales) and #21 (pay records for other salespersons) using the same time period [from August 25, 2018 to January 14, 2019].""). They had not done so by April 3, 2023, and on that date Judge Bloom ordered them to "produce[] car sales logs for the relevant time period [from August 25, 2018 to January 14, 2019]… they shall do so by April 10, 2023." Order (Apr. 3, 2023). Her Honor also ordered Defendants to produce "text messages between parties that pertain to plaintiff or to pregnancy discrimination" by April 23, 2023. *Id.* Her Honor "warned" Defendants "that if they fail to comply with this Order, the court may hold them in contempt," and that "[a] person found to be in contempt is subject to sanctions, which may include a monetary fine, attorney's fees, costs, and even imprisonment." *Id.*

In response to Defendants' letter motion to extend the time to complete the discovery compelled by Judge Bloom's April 3, 2023 Order, Judge Bloom observed that Defense counsel's "reason for the request, that he 'misread' the Court's Order and that this only came to defendants' counsel's attention 'due to plaintiff's email'" "entirely unacceptable," and warned Defendants in stronger terms than those of the April 3, 2023 Order that "[i]f the documents are not produced by

noon on April 17, 2023, the Court *shall impose* an appropriate sanction." Order (Apr. 12, 2023) (emphasis added).

On 11:59 AM on April 17, 2023, Defense counsel emailed us to say that he was "bates stamping the documents required to be produced and sending over" having gotten "tied up on phone calls from 10 am until now in three separate matters." *See* Dkt. No. 61. There were no documents attached to this email. At 12:31 PM on April 17, 2023, Defense counsel emailed again to say he was "[d]ouble checking redactions & sending now," and that there would be "264 pages of additional discovery." There were no documents attached to this email either. The documents, consisting of Plaintiff's sales records from January 1 through 13, 2019 (omitting the records from August 25, 2018 through December 31, 2018), and records of pay to other employees from May 4, 2018 through November 30, 2018 (omitting the records from December 1, 2018 through January 14, 2019),[1] would be attached to an email of 12:44 PM asking Plaintiff to withdraw the sanctions motion filed at 12:38 PM. *See* Dkt. No. 61. A 30(b)(6) witness named Deana Jennings had previously testified that Plaintiff's sales records were created in the ordinary course of business and maintained in Defendants' place of business. *See* Dkt. No. 63.

At no point did Defendants produce the text messages that Judge Bloom had on April 3, 2023 Ordered them to produce by April 23, 2023. Accordingly, on April 25, 2023, Plaintiff filed a second sanctions motion regarding the text messages. Both sanctions motions were addressed at a motion hearing on May 4, 2023. Judge Bloom declined to impose sanctions, but Ordered Defendants to "produce all outstanding discovery, as well as defendants' sworn affidavits and stipulations related to text messages on their phones and the dismissal of the case against defendant Ronald M. Baron by <u>noon</u> on May 17, 2023." *See* Order (May 4, 2023) (emphasis in original).

---

[1] These were originally produced without Bates numbers on April 12, 2023; they would be produced with Bates numbers D1966–D2229 on April 17, 2023.

A0146

At 11:44 AM on May 17, 2023, Defendants produced no new outstanding discovery, but did produce declarations of Jory Baron, Deana Jennings, Ishaque Thanwalla, and Andris Guzman. Mr. Baron and Mr. Guzman declared that they had conducted searches of their phones and emails and were not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and did not conduct searches for sales logs because maintaining them was outside the scope of their jobs. Ms Jennings declared that she had conducted a search of her phone and emails and was not in possession of text messages or emails responsive to Plaintiff's requests; did conduct a search for Hillside Auto Outlet's sales logs which she was responsible to maintain in her role as controller; but was unable to find them either at Hillside Auto Outlet, Hillside Auto Mall, or a third-party storage facility they used. Mr. Thanwalla declared that he had conducted a search of his phone and emails and was not in possession of text messages or emails (other than those previously produced) responsive to Plaintiff's requests, and that he conducted a search for Hillside Auto Outlet's sales logs and asked Ms Jennings to do the same, but was unable to find them. *See* Dkt. Nos. 73-1–73-4 (June 12, 2023).

Upon our request, Ms Jennings submitted a supplemental declaration setting forth the keywords she had used to search her phone and email, and repeating her declaration that she had searched Hillside Auto Outlet, Hillside Auto Mall, and a third party storage facility to which the logs might have been moved due to construction at Hillside Auto Mall, but had been unable to find the logs. *See* Dkt. No. 73-5 (June 12, 2023).

However, on June 19, 2023, Mr. Thanwalla, Mr. Baron, Mr. Guzman, and Ms Jennings submitted supplemental declarations to us (these are reproduced, *sans* attachments, at Dkt. No. 76, at *7–23 (June 20, 2023)). Mr. Baron included a one-page text message exchange between himself and Plaintiff dated January 24, 2019 the end of which had been cut off in his previous production;

A0147

Mr. Guzman included a one-page text message exchange from June 25, 2018 through 11:56 AM through June 27, 2018 at 2:48 PM that had not been produced previously (prior production of text messages had skipped from June 22 to June 26, and the messages on June 26 and 27 are different from the previous to the June 2023 production). Mr. Thanwalla produced several blank emails, weekly sales logs from after the period ordered by Judges Mann and Bloom, one December 2018 sales log of the Plaintiff's (found on Mr. Thanwalla's phone), and pictures of the storage rooms. The pictures appear to include one picture of a box containing records for 2018. *See* Ex. 3, at *5 (bottom right corner).

Neither any of Ms Jennings' three declarations, nor either of Mr. Thanwalla's declarations, indicated when the logs might have been moved to the third-party storage facility. But it cannot have been related to construction at Hillside Auto Mall. Hillside Auto Mall is located at 150-01 Hillside Avenue, Queens, NY 11432—Queens Block 9706 Lot 98. A search of the New York Department of Buildings' website reveals no actions related to Queens Block 9706 Lot 98 more recent than 1987, and no permits issued for construction on the property. *See* Ex. 1.

The relocation of the documents could plausibly have been related to construction at Hillside Auto *Outlet*. Hillside Auto Outlet is located at 161-10 Hillside Avenue, Queens, NY 11432—Queens Block 9767 Lot 26. A search of the New York Department of Buildings' website reveals four actions for violations of Environmental Control Board liens in December 2020, April 2021, and May 2021—each an instance of unauthorized construction—and no other actions between 1986 and December 2020. *See* Ex. 2. This belies both Judge Bloom's finding in the Order of June 28, 2023, that the documents were "misplaced' in early 2019," *see* Dkt. No. 77, at *3–4; and Ms Jennings' recollection that the construction occurred from September 2017 through February 2018. *C.f.* Dkt. No. 76, at *23 ¶ 27.

Further, contrary to Judge Bloom's findings, Defendants were well aware of the pendency of Plaintiff's lawsuit, and the need to preserve potentially relevant documents, as early as December 30, 2019. *See Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 19-cv-05458 (ENV) (JO) ("*Stidhum I*"), Dkt. Nos. 1-1 (Sep. 25, 2019) (document preservation demand), 6 (Dec. 30, 2019) (notice of appearance by Emanuel Kataev on behalf of all Defendants); *see also* Dkt. No. 1 ¶¶ 6–10 (Dec. 29, 2021) (briefly recounting the procedural history of *Stidhum I*, including its pendency from September 25, 2019 through June 25, 2021). *Stidhum I* was in fact pending throughout the time bounded by the Department of Buildings' actions of December 11, 2020 and May 5, 2021.

## STANDARDS

Under Rule 72(a), "a district judge will set aside nondispositive matters where the magistrate judge's order is 'clearly erroneous or is contrary to law.'" *Humphreys v. New York City Health*, No. 16-cv-09707 (VSB), 2023 WL 155446, 2023 U.S. Dist. LEXIS 5222, at *7 (S.D.N.Y. Jan. 11, 2023) (quoting Fed. R. Civ. P. 72(a)). "Under a clear error standard of review, 'so long as there is a basis in the evidence for a challenged inference,' the court will 'not question whether a different inference was available or more likely.'" *Id.* (quoting *United States v. Freeman*, 443 F. Appx. 664, 666 (2d Cir. 2011)). "An order is clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *JPMorgan Chase Bank, N.A. v. Reifler*, No. 11-cv-04016 (DAB), 2016 WL 10570981, at *2 (S.D.N.Y. July 14, 2016) (internal quotation marks and citations omitted). "An order is contrary to law when it fails to apply or misapplies relevant statues, case law, or rules of procedure." *Lan v. Time Warner, Inc.*, No. 11-cv-2870 (AT) (JCF), 2016 U.S. Dist. LEXIS 30488, 2016 WL 928731, at *1 (S.D.N.Y. Feb. 9, 2016) (internal quotation marks omitted). "[A] magistrate judge's resolution of a non-dispositive matter should be afforded substantial deference and may be

A0149

overturned only if found to have been an abuse of discretion." *JPMorgan Chase*, 2016 WL 10570981, at *2 (internal quotation marks and citations omitted).

"A party seeking sanctions has the burden of establishing '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman*, No. 13-cv-04375 (JS) (AKT), 2015 U.S. Dist. LEXIS 113071, at *22–23 (E.D.N.Y. Aug. 25, 2015) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) *superseded by statute on other grounds*).

## ARGUMENT

Defendants had a duty to preserve evidence. "The first element a party must show when seeking sanctions for the destruction of evidence is 'that the party having control over the evidence had an obligation to preserve it at the time it was destroyed.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *23 (quoting *Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)) That *Stidhum I* was ultimately dismissed on an administrative technicality, and refiled as this case, does not absolve Defendants of the need to preserve evidence. *See Haltman*, 2015 U.S. Dist. LEXIS 113071, at *23 ("The Second Circuit has determined that '[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'") (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Pursuant to this obligation, 'anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary.'" *Id.* (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("*Zubulake IV*")). "'In this respect, "relevance" means relevance for the

6

A0150

purposes of discovery, which is "an extremely broad concept."'" *Id.* (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (itself quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). "Therefore, while a litigant is under no duty to keep or retain every document in its possession, it is under a duty to preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Id.* at *23–24 (citation and internal quotation marks omitted). "The duty to preserve arises, not when litigation is certain, but rather when it is reasonably foreseeable." *Id.*, at *24 (internal quotation marks omitted; collecting cases).

Defendants' state of mind was culpable. "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake IV*, 220 F.R.D. at 220. "Failures to preserve relevant evidence occur 'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionally.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *25 (quoting *Reilly v. NatWest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)). "In this Circuit, 'the "culpable state of mind" factor is satisfied by showing that the evidence was destroyed "knowingly, even if without intent to breach a duty to preserve it, or negligently."'" *Id.* at *25–26 (quoting *Residential Funding Corp.*, 306 F.3d at 108 (itself quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001))). "In this context, negligence is a failure to conform to the standard of what a party must due to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (citations and internal quotation marks omitted). "A party is negligent even if the failure 'results from a pure heart and an empty head.'" *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *26 (quoting *In re Pfizer*, 288 F.R.D. at 314). "It follows that gross negligence also satisfies the

A0151

culpability requirement." *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 503 (S.D.N.Y. 2013). "Gross negligence has been described as a failure to exercise even that care which a careless person would use." *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *26 (quotation marks and citations omitted). "Courts in this circuit have found that the 'failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending on the circumstances, may be grossly negligent.'" *Id.*, at *26–27 (quoting *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 464–65 (S.D.N.Y. 2010)). "Moreover, although the failure to institute a 'litigation hold' is not gross negligence *per se*, whether the party implemented good document preservation practices is a factor that courts should consider 'in the determination of whether discovery sanctions should issue.'" *Id.*, at*27 (quoting *Chin*, 685 F.3d at 162). "Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction.'" *Haltman*, 2015 WL 5027899, at *10 (quoting *Residential Funding Corp.*, 306 F.3d at 109 (internal alterations and citations omitted).

That the logs are relevant was already recognized by Judges Mann and Bloom when they originally ordered its production in December 2022 and April 2023. "Relevance may be assumed where the breaching party acted in bad faith or with gross negligence." *Haltman*, 2015 U.S. Dist. LEXIS 113071, at *27 (citations omitted). "However, where the spoliating party has acted only negligently, the moving party must make a showing that the lost materials were relevant." *Id.*, at *27–28 (citations omitted). "A party may establish relevance by adducing sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Id.*, at *28 (citations omitted).

However, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from its destruction." *Id.* (citations omitted). "As such, it is not incumbent upon the plaintiff to show that specific documents were lost.… rather it would be enough for plaintiff to demonstrate that certain types of relevant documents existed and that they were necessarily destroyed." *Id.* (citations omitted).

The Defendants are unable to cure the prejudice through other discovery. Disclosure of sales records from outside the period of Plaintiff's employment is no substitute for disclosure of her sales records, or other sales records from her period of employment which can act as comparators for disparate treatment.

The sanctions sought are appropriate. It is widely accepted in the Second Circuit that parties should not benefit from spoliation, and the district court may impose sanctions, such as an adverse inference instruction at trial under Rule 37(b) or pursuant to "its inherent power to manage its own affairs" when a party destroys evidence. *See Residential Funding Corp.*, 306 F.3d at 107; *see also Zubalake IV*, at *216. Determining the appropriate sanction is within "the sound discretion" of the court and "assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "In general, a court should impose the least harsh sanction that can provide an adequate remedy." *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018) (internal quotation marks and citation omitted). Available sanctions include – from least to most harsh – "further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 707 (S.D.N.Y. 2017), *objections overruled*, No. 14-cv-2385, 2017 WL 3172715

9

(S.D.N.Y. July 25, 2017) (internal quotation and citation omitted). Here, each of the remedies

sought are warranted in light of Defendants' willful failure to comply with court orders.

## CONCLUSION

For all the reasons set forth above, Plaintiff respectfully requests that the Court reverse

Judge Bloom's decision not to issue sanctions.

Dated: Flushing, NY
      August 7, 2023

TROY LAW, PLLC


/s/ Tiffany Troy
Tiffany Troy, Esq.
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
Attorneys for Plaintiff

**To: via ECF**
    Emanuel Kataev, Esq.
    Joseph M. Labuda Esq.
    MILMAN LABUDA LAW GROUP, PLLC
    3000 Marcus Avenue
    Suite 3W8
    New Hyde Park, NY 11042
    (516) 328-8899
    emanuel@mllaborlaw.com
    joe@mllaborlaw.com

/asb

A0154

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

LETICIA FRANCINE STIDHUM,                    Case No: 21-cv-07163
                              Plaintiff,

          v.                                 **PLAINTIFF'S COUNTER-
                                             STATEMENT OF
161-10 HILLSIDE AUTO AVE, LLC                UNDISPUTED MATERIAL
      d/b/a Hillside Auto Outlet, and        FACTS IN OPPOSITION TO
HILLSIDE AUTO MALL INC                       DEFENDANTS' MOTION
      d/b/a Hillside Auto Mall,              FOR SUMMARY <u>JUDGEMET</u>**
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,
                              Defendants.
----------------------------------------------------------------x
_____

        Plaintiff LETICIA FRANCINE STIDHUM through her undersigned counsels, submits this
Counter-Statement of Undisputed Facts pursuant to Local Rule 56.1 in opposition to that portion
of Defendants' Motion for Summary Judgment:

**<u>Hillside Auto Outlet</u>**

        1.        161-10 Hillside Ave Auto, LLC ("Hillside Auto Outlet") is a domestic limited
liability company formed on June 12, 2017 under the laws of the State of New York that does
business as Hillside Auto Outlet and is authorized to do business in the State of New York.
<u>Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 14:14-24, 17:7-8, 19:2-9; Thanwalla Dep. 17:3-18:11,
27:7-28:3; Guzman</u> Dep. 50:10-14.
        **Response:** Admit.

        2.        Hillside Auto Outlet is a used car dealership located at 16110 Hillside Avenue,
Jamaica, NY 11432.  <u>Kataev Decl. ¶ 3, Ex. A; Jennings Dep. 15:9-12; Plaintiff Dep. 31:2-14.</u>
        **Response:** Admit.

        3.        Hillside Auto Outlet's members are Josh Aaronson ("Aaronson"), Jory Baron
("Baron"), The Estate of David Baron ("Estate"), and Ishaque Thanwalla ("Thanwalla"), all of
whom own equal membership interests of twenty-five percent (25%).  <u>Kataev Decl. ¶ 4, Ex. B;
Baron Dep. 31:2-17, 37:18-38:2, 43:20-44:7, 52:2-6; Thanwalla Dep. 17:3-18:11, 27:7-28:3,
18:12-22, 19:14- 20:14, 61:14-15; Guzman Dep. 70:5-71:2, 74:23-25; Jennings Dep. 21:2-6.</u>
        **Response:** Admit.

        4.        At all relevant times, Thanwalla ran the day-to-day operations at Hillside Auto
Outlet and served as its general manger.  <u>Thanwalla Dep. 17:3-18:11, 27:7-28:3; Baron Dep. 38:3-</u>

A0155

6, Jennings Dep. 25:2-5, Baron Dep. 52:2-6.

    **Response:** Admit that Ishaque Thanwalla was the general manager of Hillside Auto Outlet at all relevant times; otherwise deny that Ishaque Thanwalla "ran the day-to-day operations" alone from late December to early January 2019. (Stidhum Aff. ¶ 25).

    5.    Thanwalla, but none of the other members, had the power to hire and fire employees, set the schedules and wages of employees, and to discipline employees.  Thanwalla Dep. 68:10-17; Baron Dep. 38:7-16; Jennings Dep. 33:24-34:5, 56:20-57:4.

    **Response:** Admit that Thanwalla had the power to hire and fire employees, set the schedules and wages of employees; otherwise deny. (Jennings Dep. 38:12-39:5).

    6.    The only responsibility Thanwalla did not have that the remaining members had was the ability to sign checks at the dealership, which the remaining members did on a weekly basis. Jennings Dep. 37:9-22.

    **Response:** Admit that the remaining members (Josh Aaronson, Jory Baron, and David Baron) had the ability to sign checks at the dealership, and that they did so on a weekly basis; otherwise, lack knowledge sufficient to admit or deny the truth of this statement.

    7.    David Baron passed away in May 2021 and his estate currently owns his twenty-five (25%) membership interest.  Thanwalla Dep. 18:23-24; Baron Dep. 45:18-20; Guzman Dep. 74:17-22.

    **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

    8.    When David Baron was alive, he had no responsibilities at Hillside Auto Outlet. Thanwalla Dep. 61:17-20; Baron Dep. 45:13-17, 45:21-46:2; Jennings Dep. 36:18-22.

    **Response:** Deny. (Jennings Dep. 38:12-39:5; 56.1 Statement ¶ 6).

    9.    Jory Baron had no power to hire or fire employees, nor did he set employees' schedules or compensation.  Baron Dep. 38:25-40:12; 42:2-12; Plaintiff Dep. 58:12-15, 60:13-61:7.

    **Response:** Deny. (Jennings Dep. 38:12-39:5).

    10.    Jory Baron did not know basic information about employees' identities, schedules, compensation, and hiring processes, including that of the Plaintiff because he did not deal with that aspect of the dealership.  Baron Dep. 34:7-16, 38:17-24, 40:13-23, 41:9-25, 48:17-49:6, 50:17-25, 54:13-55:18 (did not know of Plaintiff until after she quit and complained and later sued), 81:13-24, Plaintiff Dep. 59:4-13.

    **Response:** Deny. (Stidhum Aff. ¶¶ 3-4; Plf Dep. 58:19-21; 59:4-7).

    11.    Jory Baron's role was limited to financial aspects of the dealership, such as signing checks and ascertaining the financial health of the dealership; he had no interactions with or responsibilities in connection with Plaintiff's employment.  Baron Dep. 31:18-32:5, 32:12-33:10, 40:24-41:8, 51:2-25; Jennings Dep. 37:9-14; Thanwalla Dep. 61:21-25, Plaintiff Dep. 58:16-21.

    **Response:**  Deny. (Stidhum Aff. ¶¶ 3-4; Dep. Dep 59:21- 60:15).

A0156

12.     Aaronson had no responsibilities at Hillside Auto Outlet other than occasionally joining telephone calls with Baron and Thanwalla to discuss various issues at the dealership unrelated to Plaintiff's employment.  Thanwalla Dep. 62:2-3; Baron Dep. 44:14-24, 44:25-45:12.
**Response:** Deny. (Jennings Dep. 17:7-8; 25:12-18, 37:18-22; 39:22-25).

13.     Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019.  Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.
**Response:** Admit that Guzman was a sales manager from 2018 to July or August 2018; otherwise deny. (Plf Dep. 57:25-58:3; 60:4-60:7; Stidhum Aff. ¶¶ 5, 7).

14.     Guzman did not have the power to hire, fire, or discipline employees in either of his roles at Hillside Auto Outlet. Guzman Dep. 68:16-69:12, 79:24-80:4; Plaintiff Dep. 57:25-58:11, 95:15-96:3; Thanwalla Dep. 152:18-153:24; Guzman Decl.
**Response:** Admit that Guzman did not have the power to hire, fire, or discipline employees as a sales manager from 2018 to July or August 2018; otherwise deny for period September 2018 to January 2019. (Plf Dep. 57:25-58:3; 60:4-60:7; 110-17:111:4; Stidhum Aff. ¶ 13).

15.     His main responsibility as a sales manager was to ensure that all deals were processed; his responsibilities as a general sales manager included being involved in finance, which required him to work with banks, get customers approved for loans, and running credit for customers (which he also did as a sales manager). Guzman Dep. 51:18-53:7; Guzman Decl.
**Response:** Admit Guzman's responsibilities while being employed as a "sales manager." Admit Guzman's responsibilities thereafter while denying the title of "general sales manager." (Guzman Dep. 68:14-15; Stidhum Aff. ¶¶ 5, 7).

16.     Serge Zanan ("Zanan") is a finance manager at Hillside Auto Outlet since November 2018. Thanwalla Dep. 55:8-13, 210:15-212:19.
**Response:** Admit**.**

17.     Louis is another finance manager at Hillside Auto Outlet.  Thanwalla Dep. 55:14-15.
**Response:** Deny. (Guzman 84:25-85:6).

## Hillside Auto Mall

18.     Hillside Auto Mall, Inc. is a domestic business corporation formed on December 5, 2005 under the laws of the State of New York that does business as Hillside Auto Mall and is authorized to do business in the State of New York.  Kataev Decl. ¶ 5, Ex. C;
**Response:** Admit**.**

19.     Hillside Auto Mall is a used car dealership located at 15001 Hillside Avenue, Jamaica, NY 11432.  Kataev Decl. ¶ 5, Ex. C; Jennings Dep. 15:5-8.

A0157

**Response:** Admit**.**

20.     Hillside Auto Mall is owned by Ronald Baron, Aaronson, Raymond Phelan ("Phelan"), and the Estate of David Baron.  Kataev Decl. ¶ 4, Ex. B; Thanwalla Dep. 21:6-20, Jennings Dep. 21:2-6, 36:10-17.
**Response:** Admit**.**

21.     Phelan was the general manager at Hillside Auto Mall.  Jennings Dep. 37:23-38:8.
**Response:** Admit**.**

**Plaintiff's Role, Duties, Compensation, & The Vehicle Sale Process During Her Employment with Hillside Auto Outlet**

22.     Plaintiff worked only for Hillside Auto Outlet; she never worked for Hillside Auto Mall. Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3
**Response:** Admit that Plaintiff did not directly work for Hillside Auto Mall; otherwise deny under the theory of joint employer liability. (Plf Dep. 34:20-36:5).

23.     Plaintiff worked at Hillside Auto Outlet as a salesperson and her sole responsibility was selling cars.  Plaintiff Dep. 36:12-20; Thanwalla Dep. 81:23-82:4; Guzman Dep. 80:4-12.
**Response:** Admit.

24.     She applied for the position with Hillside Auto Outlet on Craigslist, spoke with Thanwalla the following day, and came for an interview with him and a manager named Jeanique that same day; she was hired by Thanwalla on the spot.  Plaintiff Dep. 55:21-57:24; Thanwalla Dep. 28:4- 17, 55:3-7.
**Response:** Deny insofar as Plaintiff interviewed with general manager Ishaque first prior to the interview with Jeanique. (Plf Dep. 56:11-56:20).

25.     Plaintiff commenced employment with Hillside Auto Outlet on May 22, 2018 and was employed for approximately eight (8) months.  Plaintiff Dep. 213:8-16, Thanwalla Dep. 69:6-18.
**Response:** Admit.

26.     Plaintiff worked every day except Wednesday and alternated Sundays off. Plaintiff Dep. 37:14-19.
**Response:** Admit that this is Plaintiff's regular work schedule.

27.     Plaintiff's responsibilities included showing customers vehicles, meeting and greeting customers, and taking a credit application and documentation from the customer in anticipation of making a sale.  Thanwalla Dep. 82:5-12.
**Response:** Deny. (56.1 Statement ¶ 23). To sell cars, Plaintiff had to do all of the above, in addition to running and reading the credit of the customers, before her DealerTrak access was

taken away in December 2018 after the announcement of her pregnancy in late November 2018. *See* Plf. Dep. 94:6-94:14.

28.     Plaintiff was supervised by Thanwalla, Jeanique, and Guzman, until Jeanique separated from employment in August 2018.  Plaintiff Dep. 36:21-37:2, 59:21-60:12, 64:15-20, Thanwalla Dep. 55:3-7, 56:25-57:6; Guzman Dep. 80:16-24.
     **Response:** Admit.

29.     Plaintiff was not supervised by nor had any interactions with Jory Baron and David Baron. Thanwalla Dep. 61:17-62:3, 152:18-153:24; Baron Dep. 31:18-32:5, 32:12-33:10, 34:7-16, 38:17-41:25,  42:2-12,  44:14-45:17,  45:21-46:2,  48:17-49:6,  50:17-51:25,  54:13-55:18,  81:13-24; Jennings Dep. 36:18-22, 37:9-14; Plaintiff Dep. 57:25-58:21, 59:4-13, 60:13-61:7, 95:15-96:3; Guzman Dep. 51:18-53:7, 68:16-69:12, 79:24-80:4.
     **Response:** Deny. (Plaintiff Dep. 59:4- 60:15; Jennings Dep. 38:12-39:5).

30.     Thanwalla trained Plaintiff on how to: (i) sell cars, how to meet and greet; (ii) take a credit application; and (iii) use VIN Solutions, a lead management system.  Thanwalla Dep. 82:16-21.
     **Response:** Admit.

31.     Jeanique and Guzman were both assistant managers at the time.  Thanwalla Dep. 57:7-23.
     **Response:** Deny. Guzman was promoted as the financial manager in or around July or August 2018, after Jeanique left. (Plaintiff Dep. 57:25-58:3; 60:4-60:7.)

32.     Hillside Auto Outlet typically employed two assistant managers and two finance managers. Thanwalla Dep. 86:21-87:12.
     **Response:** Admit.

33.     Plaintiff's compensation structure at Hillside Auto Outlet consisted of a $300.00 weekly salary, $150.00 flat commission for each car sold (even if it was sold at a loss), and – from time to time – a bonus of five percent (5%) of the profit from the sale of any vehicle which was sold that made in excess of $3,000.00 in profit.  Plaintiff Dep. 37:3-13, 39:2-7, 42:23-43:14, 163:20-164:18, 164:23-166:20; Thanwalla Dep. 28:21-29:15, 60:3-13, 164:8-19.
     **Response:** Deny insofar as the promised bonus of 5% was no longer paid after Jeanique left in July or August 2018. (Plf Depo. 75:8-78:15).

34.     There were various other bonuses offered from time to time on a daily, weekly, or monthly bonus: (i) one bonus was for cars sold after remaining on the lot for more than sixty (60) days; (ii) another was for cars sold after remaining on the lot for more than ninety (90) days; and (iii) another was for selling three (3) cars in one (1) day.  Thanwalla Dep. 29:16-30:11, 30:12-31:13, 57:24- 59:23, 60:14-22, 138:2-24.
     **Response:** Deny. (Plf Aff. ¶ 14).

35.     These bonuses operated the same way throughout Plaintiff's employment and did not change in any way when Jeanique left Hillside Auto Outlet.  Thanwalla Dep. 59:24-60:2, 60:23- 61:11.

**Response:** Deny insofar as the bonus delineated in 56.1 Statement 34 were never promised nor paid. (Plf Aff. ¶ 14).

36.     Plaintiff received a form utilized at the dealership to keep track of the vehicles she sold in order to ensure she was properly paid; she discarded the form once she was satisfied that she was properly paid.  Plaintiff Dep. 40:19-42:22; Thanwalla Dep. 115:8-116:17.

**Response:** Admit that Plaintiff received a copy of the triplicate form, but otherwise deny. (Plf Aff. ¶ 16).

37.     Plaintiff was paid weekly, and verified she was properly paid each week by reviewing a form that was turned into the sales manager which was then provided to payroll. Plaintiff Dep. 38:5-13; Thanwalla Dep. 115:8-116:20.

**Response:** Deny insofar as Plaintiff verified if the number of cars sold is correct, not that the pay is proper according to federal and state wage-and-hour laws. (Plf Aff. ¶ 16).

38.     Although she claims she stopped receiving additional commissions of five percent (5%) for any vehicle that grossed in excess of $3,000.00 in profit after Jeanique left, she continued her employment with the dealership.  Plaintiff Dep. 43:15-44:12.[1]

**Response:** Admit.

39.     Although aware of dealership certification programs for salespersons like herself, Plaintiff never took any such courses to advance in her career.  Plaintiff Dep. 31:2-11.

**Response:** This is not a statement of material fact to which a response is required. To the extent a response is required, deny that attending dealership certification programs is necessary to advance in used car dealerships; such certifications are typically required only in new car stores. (Plf Aff. ¶ 17).

**The Sales Process**

40.     Dealertrack is a dealership management system used by Hillside Auto Outlet; it stores customer information that is sensitive, which is why access to it is limited, and serves as a liaison with banks that provide financing for vehicles.  Thanwalla Dep. 54:11-19, 145:6-146:19; Baron Dep. 53:9-18; Guzman Dep. 62:7-63:15, 84:9-86:6; Guzman Decl.

**Response:** Admit.

41.     Only managers had access to Dealertrack; because salespeople were not authorized to have access to Dealertrack, they did not have authority to run credit for customers on Dealertrack as that was the responsibility of a manager.  Thanwalla Dep. 54:20-55:2, 62:4-22, 62:23-63:4, 146:20-147:19, 149:2-14, 151:17-152:8, 207:13-208:23; Guzman Dep. 62:7-

A0160

63:15,  84:9-86:6, 88:24-90:13, 101:22-102:25, Jennings Dep. 67:14-22; Plaintiff Dep. 46:19-25, 47:2-10.
    **Response:** Deny. (Plf. Dep. 46:19-22; 175:20-176:8).

    42.    The purchase of a vehicle is the second biggest purchase one can make after buying a house and there is a lot involved in obtaining a vehicle.  Guzman Dep. 55:2-62:2.
    **Response:** Lack sufficient information to admit or deny.

    43.    Every sale of a vehicle is different and there are so many factors and variables that go into buying a car; that is why you can never measure how long it will take for each customer to purchase a vehicle.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 145:6-146:19 (no two deals are the same in a dealership); Guzman Decl.
    **Response:** Deny. Plaintiff states that 40 to 50 percent of the time, she can get customers in and out of the door within an hour or less; therefore, the time it takes a customer to purchase a vehicle is predictable. (Plf. Dep. 182:15-23). Furthermore, the statement "you can never measure how long it will take for each customer to purchase a vehicle" is objectively false; the time to purchase a vehicle is necessarily *measurable*, though not necessarily *predictable*.

    44.    A customer has to find a vehicle they like and often check different options before settling on one choice; then the salesperson has to ascertain whether a customer wishes to pay in cash or finance to determine the next steps.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.
    **Response:** Admit.

    45.    If a customer wishes to finance a vehicle, he or she has to complete an application; once a customer completes a credit application, he or she has to provide all the information that is required to complete a vehicle purchase in order to receive approval from a bank to lend the customer money to purchase the vehicle.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.
    **Response:** Admit.

    46.    Like all salespeople, Plaintiff was required to go to managers to submit credit applications for customers seeking financing to purchase a vehicle; the credit application process required Plaintiff to complete an application with the customer, whether handwritten or electronically, and have it signed by the customer when completed.  Plaintiff Dep. 62:7-63:5; Thanwalla Dep. 82:22- 83:16; Guzman Decl.
    **Response:** Deny. (Plf. Dep. 175:20-176:8).

    47.    Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could.  Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.
    **Response:** Deny. (Plf Dep 67:4-67:22).

A0161

48.    Although it was often the sales manager or general manager's duty to do so, sometimes the finance manager – such as Zanan – handled the process of qualifying a customer for financing. Plaintiff Dep. 67:4-17; Thanwalla Dep. 147:20-148:10; Zanan Decl. ¶¶ 6-7; Guzman Decl.

**Response:** Deny. (Plf Dep 67:23-25).

49.    There were often delays associated with qualifying a customer for financing, regardless of whether Plaintiff went to Thanwalla, Jeanique, Zanan *or* Guzman.  Plaintiff Dep. 64:21-65:12, 66:19-22; Thanwalla Dep. 140:24-145:5; Guzman Decl.

**Response:** Deny. (Plf Aff. ¶ 25).

50.    Plaintiff acknowledged that even without these delays, there was no guarantee she would make a sale because a customer could decide he or she no longer wanted a vehicle once qualified, or refuse to close on the deal because the monthly payment or down-payment required by the bank could be too high.  Plaintiff Dep. 45:22-25, 237:23-239:5, 239:14-21, 239:6-13.

**Response:** Admit.

51.    After Jeanique's employment ended in August 2018 (before Plaintiff informed management about her pregnancy in late November 2018), Plaintiff would go to Thanwalla to handle the process of qualifying a customer for financing more often because he was quicker than Guzman.  Plaintiff Dep. 64:9-14.

**Response:** Admit for the period of less than a month in August 2018; otherwise deny. (Plf. Dep. 175:20-176:8).

52.    Each customer goes through different verification processes; before anything is submitted to a bank, the customer's identity must be verified (usually by verifying the customer's driver's license is valid) and pay stubs must be obtained.  Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 220:20-221:14; Guzman Decl.

**Response:** Admit.

53.    Often, customers do not have pay stubs with them or at all; once pay stubs are provided, there is a verification process to determine whether the pay stubs are legitimate because there is a lot of fraud involved and this is a big concern for dealerships and banks. Guzman Dep. 55:2-62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24; Thanwalla Dep. 50:5-51:15, 220:20-221:14; Jennings Dep. 78:18-79:22; Guzman Decl.

**Response:** Admit that there is a verification process; otherwise deny. (Plf Dep. 64:21-65:12, Plf. Aff. ¶¶ 19-20).

54.    When pay stubs are provided, the sales manager has to contact the employer to verify they are legitimate, which is occasioned by delays if employers do not respond.  Guzman Dep. 56:19- 57:9 ("we will have to verify to see if the pay stubs are legitimate"); Guzman Decl.

**Response:** Deny. (Plf. Aff. ¶ 21).

A0162

55.     In addition, banks often require additional documentation after an application is submitted, all of which must be inputted into the system.  Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5- 51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

**Response:** Deny. (Plf. Aff. ¶¶ 19-20).

56.     After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the circumstances. Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22; Guzman Decl.

**Response:** Deny. (Plf. Aff. ¶ 22).

57.     Sometimes, customers have fraud alerts on their credit profiles which cause delays due to extra verification requirements; when that happens, customers receive calls from the bank to make sure that they are, in fact, the ones seeking to obtain vehicle financings.  Guzman Dep. 55:2-62:2.

**Response:** Deny. (Plf. Aff. ¶ 23).

58.     Other times, when information with the credit agencies do not match those the customer provides, additional verification is required by the credit bureaus, which can take one or two days to update.  Guzman Dep. 55:2-62:2; Guzman Decl.

**Response:** Deny. (Plf. Aff. ¶ 24).

59.     Dealerships do not control the process when it comes to obtaining financing, and there are a lot of variables that come into play during the purchase of a vehicle, all of which is entirely up to the banks which make the ultimate decision on financing.  Guzman Dep. 55:2-62:2.

**Response:** Deny. (Plf. Aff. ¶ 25).

60.     Once a customer's credit is successfully run, all documentation is provided, and everything is verified, the information gets sent to the bank for review and approval.[2]  Guzman Dep. 55:2- 62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-79:22, Plaintiff Dep. 174:11-21; Baron Dep. 52:7-16; Guzman Decl.

**Response:** Admit.

61.     Upon receipt, banks often request additional information. Guzman Dep. 55:2-62:2.

**Response:** Admit.

62.     Once a bank approves a deal, the customer has to speak with a finance manager; at that time, the finance manager provides the customer with numbers related to monthly

---

[2] Plaintiff's complaint about waiting times deals with the credit application process before information gets submitted to lenders.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3, 78:23-79:13, 80:9-18, 82:9-83:1.

A0163

payments, total cost, interest, and related information. Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Admit.

63.    The customer may decide, based on this information, that he or she is no longer interested in purchasing the vehicle or cannot afford it.  Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Admit.

64.    Other times, a customer may decide to buy a different car that is less expensive for a lower payment.  Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Admit.

65.    There is also a requirement for every customer to purchase insurance for the vehicle he or she wishes to buy; often, customers have to wait before they have the funds to pay the insurance company before they can insure the vehicle.  Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Deny that "often, customers have to wait before they have the funds to pay the insurance company." (Plf. Aff. ¶ 26).

66.    Other times, a customer is required to have a co-signer in order to get a deal approved by a bank, which adds to further delays.  Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Admit.

67.    Finally, everything has to be in compliance with DMV regulations in order to ensure the vehicle may be sold, which requires the proper documentation in order to register a vehicle, after which a customer can sign all the relevant paperwork.  Guzman Dep. 55:2-62:2; Guzman Decl.
**Response:** Admit.

68.    All of the foregoing issues are outside of the dealership's control; it could take three (3) to six (6) hours or sometimes even days for a customer to purchase a vehicle. Guzman Dep. 55:2- 62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24, 181:18-182:9; Thanwalla Dep. 220:20-221:14; Zanan Decl. ¶ 19; Guzman Decl.
**Response:** Deny that "all the foregoing issues are outside of the dealership's control"— how quickly Guzman chooses to run the credit is squarely within his—and by extension—the dealership's control. (Plf Dep. 69:12-69:16).

69.    If a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control such as the failure of a customer to provide necessary information to the lender or because the lender requested additional documentation or simply because the dealership had to wait for the lender's response.  Plaintiff Dep. 179:19-180:5.
**Response:** Deny that "the only reason for" a customer's wait time "would be based on circumstances outside of the dealership's control". (Counter-Statement 68; Plf Dep. 69:12-69:16).

70.     Guzman wishes that the process was quicker because the dealership is in the business of selling cars and desires to make money; however, a dealership cannot guess or foresee who will come through its doors and what their situation is.  Guzman Dep. 55:2-62:2; Guzman Decl.

**Response:** Lacks sufficient knowledge to ascertain Guzman's state of mind and deny that Guzman's course of conduct facilitated for quick running and reading of credit after the pregnancy announcement in late November 2018. (Plf Dep. 69:12-69:16).

71.     Plaintiff handled the qualification process and credit application, but never submitted any applications to chosen lenders, which finance managers did.  Plaintiff Dep. 176:13-22.

**Response:** Deny. (Plf. Aff. ¶ 30).

**Plaintiff Was Unable to Close Deals for Reasons Unrelated to Wait Times**

72.     Plaintiff was sometimes unable to sell a vehicle to customers even if their creditworthiness was ascertained; this occurred once in December 2018, after she announced her pregnancy in late November 2019.  Plaintiff Dep. 201:202-9, 204:14-206:7.

**Response:** Admit that one sale in December 2018 was lost despite creditworthiness was ascertained; otherwise deny. (Plf Dep. 200:22-24; 192:10-19).

73.     In December 2018, Plaintiff was assigned a lead who visited the dealership on December 10 and did not purchase a vehicle because he was not able to put any money down until February; that customer did not leave because of the amount of time to check his creditworthiness as that had already been completed.  Plaintiff Dep. 189:23-191:10.

**Response:** Admit.

74.     In another instance, although Plaintiff was able to successfully pull the credit for a customer on November 26, 2018 with the help of a manager – just three days after she announced her pregnancy – she was unable to make a sale because the customer was involved in a bankruptcy and needed permission from the trustee to make a deal.  Plaintiff Dep. 199:22-201:21.

**Response:** Deny, the credit report was run by Jenae from Hillside Auto Outlet on November 23, 2018, 5 days prior to the customer's announcement of bankruptcy. Defendant's cherrypicked example—of reports that Defendants admitted is incomplete and fail to accurately reflect "lost leads" were actually "lost"—is of a customer (Rosyln) who has an active bankruptcy case and hence with insufficient budget to purchase the vehicle. *See* Defendants' DP 543 (11/23/2018 2:01 PM).

75.     Plaintiff was also unable to sell another vehicle to another customer because Plaintiff was unable to find the car that customer wanted.  Plaintiff Dep. 197:7-199:21.

**Response:** Deny, the requested car was not on the Hillside Auto Lot. *See* Plf Depo. 197:8-199:21.

76.   In another instance, Plaintiff was unable to sell a vehicle to a customer who was to purchase the vehicle with cash, and did not need financing.  Plaintiff Dep. 211:12-212:23.
   **Response:** Admit.

## Hillside Auto Outlet Prohibits Discrimination

77.   During Plaintiff's employment, Hillside Auto Outlet distributed a written policy regarding discrimination and placed posters in the lunchroom concerning discrimination.  Thanwalla Dep. 63:5-64:2,  64:17-65:6;  Baron Dep.  49:7-21,  82:24-83:9;  Guzman  Dep. 77:12-78:2,  78:9-15; Jennings Dep. 43:18-44:13.
   **Response:** Deny. (Plf. Aff. ¶¶ 31-32).

78.   Plaintiff received Hillside Auto Outlet's discrimination policy.  Plaintiff Dep. 108:2-7.
   **Response:** Deny. (Plf. Aff. ¶ 33).

## Facts Surrounding Plaintiff's Discrimination Claim

79.   Plaintiff was one of many female salespersons at Hillside Auto Outlet.  Thanwalla Dep. 231:21-232:7.
   **Response: Deny.** (Plf. Aff. ¶¶ 34-35).

80.   Plaintiff announced her pregnancy on November 23, 2018 to most of the employees at Hillside Auto Outlet, including Guzman; she is unsure whether Thanwalla was there during the announcement. Plaintiff Dep. 69:17-71:2, 200:22-24.
   **Response:** Admit.

81.   Thanwalla went on vacation in December 2018.  Plaintiff Dep. 249:25-250:2, Thanwalla Dep. 64:3-16, 65:7-16.
   **Response:** Admit.

82.   Ali Raskesnia ("Ali") was brought on by Thanwalla as a sales manager in mid-November 2018 to early December 2018 and was being trained to handle the dealership while Thanwalla was not at the dealership.  Plaintiff Dep. 155:12-16, 249:18-24; Thanwalla Dep. 131:5-19; Jennings Dep. 73:2-7.
   **Response:** Admit.

83.   Plaintiff complained that Guzman did not provide her with the Dealertrack password when Thanwalla left for vacation.  Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3.
   **Response:** Admit.

84.   But Guzman did not have the ability to change the password for Dealertrack. Plaintiff Dep. 91:10-92:6, 94:15-95:2; Guzman Dep. 90:14-19.

**Response:** Deny, Guzman had access to and refused to provide the password for Dealertrack to Leticia Stidhum. (Plf. Aff. ¶¶ 36-37).

85.     But Plaintiff does not specifically know why Guzman made her wait longer to process her customers applications; critically, she did not know whether it was something personal or due to her pregnancy.  Plaintiff Dep. 107:4-12.

Response: Deny, in late December 2018 through the end of Plaintiff's employment in January 2019, Guzman made the customers of Leticia Stidhum wait much longer in running and reading the credit that despite having become *faster* in running Dealertrack since taking the helm of finance manager in July or August 2018, Guzman in fact processed Leticia's customer's applications *more slowly*, despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer. (Plaintiff Dep. 78:2-12; 78:23-79:13; Plf. Aff. ¶¶ 8-9).

86.     Guzman would frequently keep customers waiting longer than necessary *before* Plaintiff announced her pregnancy.  Plaintiff Dep. 78:23-79:13, 80:9-18, 82:9-83:1, 97:7-19, 100:13-24; Kataev Decl. ¶ 7, Ex. E at ¶¶ 36-38 ("Indeed, *prior to December 2018*, STIDHUM was given special trust on the basis of her exemplary work performance. Specifically, THANWALLA gave STIDHUM his password to the 'Dealertrack' program used by Hillside Auto so that she could help run the credit histories of Hillside Auto customers and pre-fill their automobile purchase financing applications.  *This became necessary because Guzman, whose job in the Finance Department which was running the credit histories of Hillside Auto customers and pre-filling their automobile purchase financing applications, would frequently keep customers waiting longer than necessary, creating poor customer impressions of Hillside Auto's service*") (emphasis added).
**Response:** Admit that *in* August 2018, when Andris Guzman is being trained on the DealerTrack system, Guzman would frequently keep customers waiting longer than necessary, otherwise deny. (Plf Dep. 46:19-22; 78:2-12; Plf. Aff. ¶ 9; Guzman Dep. 107:24-108:4).

87.     Plaintiff conceded that "it didn't add up" or make sense as to why Guzman made her wait longer, and that Thanwalla nor Zanan ever took long to qualify customers for financing.  Id.; Plaintiff Dep. 69:4-9.
**Response:** Deny. Plaintiff's statement that "It doesn't add up" is taken out of context. Plaintiff stated: "[Guzman making Plaintiff wait longer] happened only right after I announced my pregnancy, that would be the first reason why, and not to mention, like I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I announced my pregnancy. It wasn't -- I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out. *It doesn't add up* (emphasis added)." Plaintiff meant that pregnancy discrimination was the only possible reason for Guzman's slowness; all other reasons do not "add up." (Plf Dep 78:23-79:13.)

88.     Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation.  Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D.

Response: Deny. *See* Exhibit 7.

89.     Plaintiff went to Zanan instead of Guzman while Thanwalla was on vacation, but Zanan told her he was busy, could not do it right then, to give it to Guzman, and that she had to wait for Guzman.  Plaintiff Dep. 87:25-88:10; Guzman Dep. 107:11-18.

Response: Admit.

90.     Plaintiff confronted Guzman about the longer wait times multiple times, once even referencing her pregnancy, but he told her that she has to wait and that there are other people here; Guzman did not say anything about Plaintiff's pregnancy during these conversations. Plaintiff Dep. 78:2-16, 86:12-24, 96:4-14, 96:15-19.

Response: Admit that Plaintiff confronted Guzman about the longer wait times multiple times, admit that at least once Plaintiff referred to her pregnancy, deny that Guzman "did not say anything" is an accurate reflection of his response. Instead, Guzman "would look at you with blank eyes." (Plf Dep 96:4-10).

91.     Although Plaintiff asserts that she announced her pregnancy to everyone at the dealership in late November 2018, Guzman has no recollection or knowledge of this, did not know Plaintiff was pregnant until he learned of this lawsuit, and would have treated her the same in any event.  Plaintiff Dep. 69:17-71:7; Guzman Dep. 87:6-17, 103:20-105:9; Guzman Decl.

Response: Deny. (56.1 Statement ¶¶ 80, 90).

92.     Guzman treated Plaintiff fairly, like everybody else, and never prioritized any salesperson over another; he worked on a first come, first serve basis with no preference. Guzman Dep. 105:15-17, 105:18-106:6; Jennings Dep. 79:23-80:4; Guzman Decl.

Response: Deny. (Plaintiff Dep. 86:25-87:17).

93.     Plaintiff previously had at least two (2) interpersonal conflicts with Guzman prior to her pregnancy, but cannot recall the nature or circumstances of either.  Plaintiff Dep. 71:8-73:5.

Response: Admit.

94.     Guzman never made any comments to Plaintiff about her pregnancy, and the two did not have any interpersonal conflicts after Plaintiff announced her pregnancy.  Plaintiff Dep. 73:6-74:2.

Response: Admit that that Guzman never made any comments to Plaintiff about her pregnancy; otherwise deny. (Plf Depo. 73:24-74:12; 78:2-13; 78:23-79:13).

95.     It would not make sense for Guzman to take more time than necessary to ascertain

whether customers qualified for financing, as he and everyone at the dealership, except porters, received a commission for every sale.  Plaintiff Dep. 82:9-83:1, 88:11-19, 107:4-12; Thanwalla Dep. 96:12-99:4, 102:5-19; Zanan Decl. ¶¶ 15-17; Guzman Decl.

> **Response:** Admit that Guzman's choice to intentionally delay Leticia Stidhum's customer's running and reading of credit is irrational; otherwise deny. (Plaintiff Dep. 86:25-87:17).

96. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions.  Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.

> **Response:** Deny. (Plf. Dep. 83:13-84:11).

97. Plaintiff also confronted Thanwalla about the waiting times with Guzman both during and upon his return from vacation, but Thanwalla told Plaintiff he will discuss this with her later. Plaintiff Dep. 90:5-91:6, 96:20-97:6.

> **Response:** Admit.

98. Hillside Auto Outlet never received any complaints about discrimination, including  pregnancy discrimination, except from Plaintiff, which stunned him. Thanwalla Dep. 232:8-233:8.

> **Response:** Deny. (Plf Dep. 70:22-73:5).

99. Plaintiff is "lawsuit happy" because her step-father previously filed a lawsuit and secured millions.  Thanwalla Dep. 233:9-24; Plaintiff Dep. 146:21-147:4.

> **Response:** This is not a statement of material fact to which a response is required.

100. She filed a wage-and-hour action against the Defendants.  Plaintiff Dep. 7:9-19.

> **Response:** This is not a statement of material fact to which a response is required.

101. Plaintiff never complained of discrimination.  Thanwalla Dep. 232:8-233:8.

> **Response:** Deny. Plaintiff complained of pregnancy discrimination to Thanwalla multiple times. Thanwalla was asked: "Do you recall receiving a Complaint for sexual or pregnancy discrimination from Lilly or anyone else?" to which Thanwalla replied: "Never received anything *from Lilly* (emphasis added)." Then, when pressed about the "or anyone else" part of the original question, Thanwalla replied: "Received [a Complaint for sexual or pregnancy discrimination] from Leticia and I was stunned." Therefore, Plaintiff Leticia Stidhum did in fact complain of discrimination. Thanwalla Dep. 232:8-16.

### Plaintiff Suffered No Adverse Employment Action Related to Her Pregnancy

102. Throughout her employment, Plaintiff's job responsibilities and position always remained the same.  Plaintiff Dep. 74:13-15, 77:3-7; Thanwalla Dep. 83:17-20.

> **Response:** Admit.

103.     Throughout her employment, Plaintiff's weekly salary of $300.00 and flat rate commission of $150.00 per vehicle remained the same, while bonuses fluctuated.  <u>Plaintiff Dep.</u>

<u>75:8-18; Thanwalla Dep. 45:5-21.</u>
**Response:** Deny. (Counter-statement ¶ 33).

104.     Although Plaintiff allegedly stopped receiving bonuses after Jeanique left in August 2019, this was months before Plaintiff announced her pregnancy in November 2019, and she acknowledges receiving a bonus in November 2019 after she announced her pregnancy. <u>Plaintiff Dep. 75:8-18, 75:19-77:2, Thanwalla Dep. 69:6-18.</u>
**Response:** Admit that Plaintiff stopped receiving the promised bonus of 5% after Jynaique left; otherwise deny. (Plf Depo. 75:8-78:15; Stidhum Aff. ¶ 39).

105.     Plaintiff's pay is below.  <u>Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 77:21-25, 213:20- 227:2, Thanwalla Dep. 53:13-18, 158:7-10, 132:8-13, 160:16-163:15; Guzman Dep. 66:16-23.</u>

| Week | Pay Date | Salary | Commission | Cars Sold | Approx. Bonus |
|------|----------|--------|------------|-----------|---------------|
| 1 | 6/1/2018 | $300.00 | $780.00 | 5 | $780.00 - $750.00 = $30.00 |
| 2 | 6/8/2018 | $300.00 | $425.00 | 2 | $425.00 - $300.00 = $125.00 |
| 3 | 6/15/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 4 | 6/22/2018 | $300.00 | $660.00 | 4 | $660.00 - $600.00 = $60.00 |
| 5 | 6/29/2018 | $300.00 | $615.00 | 4 | $615.00 - $600.00 = $15.00 |
| 6 | 7/6/2018 | $300.00 | $655.00 | 4 | $655.00 - $600.00 = $55.00 |
| 7 | 7/13/2018 | $300.00 | $0.00 | 0 | $0.00 |
| 8 | 7/20/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 9 | 7/27/2018 | $300.00 | $1,400.00 | 9 | $1400.00 - $1350.00 = $50.00 |
| 10 | 8/3/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 11 | 8/10/2018 | $300.00 | $300.00 | 2 | $0.00 |
| 12 | 8/17/2018 | $0.00 | $0.00 | 0 | $0.00 |
| 13 | 8/24/2018 | $300.00 | $1,450.00 | 9 | $1450.00 - $1350.00 = $100.00 |
| 14 | 8/31/2018 | $300.00 | $1,200.00 | 8 | $0.00 |
| 15 | 9/7/2018 | $300.00 | $150.00 | 1 | $0.00 |
| 16 | 9/14/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 17 | 9/21/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 18 | 9/28/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 19 | 10/5/2018 | $300.00 | $750.00 | 5 | $0.00 |
| 20 | 10/12/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 21 | 10/19/2018 | $300.00 | $700.00 | 4 | $700.00 - $600.00 = $100.00 |
| 22 | 10/26/2018 | $300.00 | $800.00 | 5 | $800.00 - $750.00 = $50.00 |
| 23 | 11/2/2018 | $300.00 | $1,050.00 | 7 | $0.00 |
| 24 | 11/9/2018 | $300.00 | $1,050.00 | 7 | $0.00 |

A0170

| 25 | 11/16/2018 | $300.00 | $900.00 | 6 | $0.00 |
| 26 | 11/23/2018 | $300.00 | $1,375.00 | 9 | $1375.00 - $1350.00 = $25.00 |
| 27 | 11/30/2018 | $300.00 | $450.00 | 3 | $0.00 |
| 28 | 12/7/2018 | $300.00 | $1,600.00 | 4 | $1600.00 - $600.00 = $1000.00 |
| 29 | 12/14/2018 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 30 | 12/21/2018 | $300.00 | $625.00 | 4 | $625.00 - $600.00 = $25.00 |
| 31 | 12/28/2018 | $300.00 | $500.00 | 3 | $500.00 - $450.00 = $50.00 |
| 32 | 1/4/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| 33 | 1/11/2019 | $300.00 | $825.00 | 5 | $825.00 - $750.00 = $75.00 |
| 34 | 1/18/2019 | $300.00 | $350.00 | 2 | $350.00 - $300.00 = $50.00 |
| | AVERAGE | $300.00 | $705.44 | 4.32 | $56.91 |
| | TOTAL | $10,200.00 | $23,985.00 | 4.30 | $1,935.00 |

Response: Deny in its entirety, except admit to the "Pay Date," "Salary," and "Commission," for all weeks except for "Salary" of Week 34, which critically is $200, not $300. (Troy Aff ¶ 4; *see* Exhibit 8 D1250 (showing a salary of $200, not $300); D1187-1250 paystubs during the relevant period).

106.    Plaintiff does not have any documents that she believes suggest discrimination, but claims that her paystubs show a decrease in pay of $400.00 to $500.00 per week and allegedly demonstrate a drastic decrease in her pay as a result of waiting longer for Guzman to process credit applications beginning when she purportedly told Guzman she was pregnant in November 2019. Plaintiff Dep. 101:4-23, 144:24-145:2, 235:7-236:23.

**Response:** Deny. Applying the correction of $200.00 base pay for Week 34, the average total pay from September 4, 2018 to December 17, 2018 is $1,145.00, while the average commission is $845. In contrast, the average total pay from December 18, 2018 to January 14, 2019 as $781.25 and the average commission is $506.25. The difference in total pay is $363.75 per week, representing a 31.8% decrease in total pay, while the difference in commission is $338.75, representing a 40% decrease in commission. (Troy Aff ¶¶ 5-8; *see* Exhibit 8 D1187-1250).

| # Week | Period | | Regular | Commission | Total Pay |
|---|---|---|---|---|---|
| 1 | 2018-05-22 | 2018-05-28 | $ 300.00 | $ 780.00 | $ 1,080.00 |
| 2 | 2018-05-29 | 2018-06-04 | $ 300.00 | $ 425.00 | $ 725.00 |
| 3 | 2018-06-05 | 2018-06-11 | $ 300.00 | $ 300.00 | $ 600.00 |
| 4 | 2018-06-12 | 2018-06-18 | $ 300.00 | $ - | $ 300.00 |
| 5 | 2018-06-19 | 2018-06-25 | $ 300.00 | $ 615.00 | $ 915.00 |
| 6 | 2018-06-26 | 2018-07-02 | $ 300.00 | $ 655.00 | $ 955.00 |
| 7 | 2018-07-03 | 2018-07-09 | $ 300.00 | $ - | $ 300.00 |
| 8 | 2018-07-10 | 2018-07-16 | $ 300.00 | $ 900.00 | $ 1,200.00 |
| 9 | 2018-07-17 | 2018-07-23 | $ 300.00 | $ 1,400.00 | $ 1,700.00 |

A0171

| 10 | 2018-07-24 | 2018-07-30 | $ | 300.00 | $ | 450.00 | $ | 750.00 |
| 11 | 2018-07-31 | 2018-08-06 | $ | 300.00 | $ | 300.00 | $ | 600.00 |
| 12 | 2018-08-07 | 2018-08-13 | | | | | $ | - |
| 13 | 2018-08-14 | 2018-08-20 | $ | 300.00 | $ | 1,450.00 | $ | 1,750.00 |
| 14 | 2018-08-21 | 2018-08-27 | $ | 300.00 | $ | 1,200.00 | $ | 1,500.00 |
| 15 | 2018-08-28 | 2018-09-03 | $ | 300.00 | $ | 150.00 | $ | 450.00 |
| 16 | 2018-09-04 | 2018-09-10 | $ | 300.00 | $ | 450.00 | $ | 750.00 |
| 17 | 2018-09-11 | 2018-09-17 | $ | 300.00 | $ | 450.00 | $ | 750.00 |
| 18 | 2018-09-18 | 2018-09-24 | $ | 300.00 | $ | 750.00 | $ | 1,050.00 |
| 19 | 2018-09-25 | 2018-10-01 | $ | 300.00 | $ | 750.00 | $ | 1,050.00 |
| 20 | 2018-10-02 | 2018-10-08 | $ | 300.00 | $ | 900.00 | $ | 1,200.00 |
| 21 | 2018-10-09 | 2018-10-15 | $ | 300.00 | $ | 700.00 | $ | 1,000.00 |
| 22 | 2018-10-16 | 2018-10-22 | $ | 300.00 | $ | 800.00 | $ | 1,100.00 |
| 23 | 2018-10-23 | 2018-10-29 | $ | 300.00 | $ | 1,050.00 | $ | 1,350.00 |
| 24 | 2018-10-30 | 2018-11-05 | $ | 300.00 | $ | 1,050.00 | $ | 1,350.00 |
| 25 | 2018-11-06 | 2018-11-12 | $ | 300.00 | $ | 900.00 | $ | 1,200.00 |
| 26 | 2018-11-13 | 2018-11-19 | $ | 300.00 | $ | 1,375.00 | $ | 1,675.00 |
| 27 | 2018-11-20 | 2018-11-26 | $ | 300.00 | $ | 450.00 | $ | 750.00 |
| 28 | 2018-11-27 | 2018-12-03 | $ | 300.00 | $ | 1,600.00 | $ | 1,900.00 |
| 29 | 2018-12-04 | 2018-12-10 | $ | 300.00 | $ | 825.00 | $ | 1,125.00 |
| 30 | 2018-12-11 | 2018-12-17 | $ | 300.00 | $ | 625.00 | $ | *925.00* |
| 31 | 2018-12-18 | 2018-12-24 | $ | 300.00 | $ | 500.00 | $ | *800.00* |
| 32 | 2018-12-25 | 2018-12-31 | $ | 300.00 | $ | 350.00 | $ | *650.00* |
| 33 | 2019-01-01 | 2019-01-07 | $ | 300.00 | $ | 825.00 | $ | *1,125.00* |
| 34 | 2019-01-08 | 2019-01-14 | $ | 200.00 | $ | 350.00 | $ | *550.00* |

107.     However, as demonstrated above, Plaintiff's compensation remained on par in her final weeks of employment with her average compensation.  Kataev Decl. ¶ 8, Ex. F; Plaintiff Dep. 213:20-227:2.

**Response:** Deny. In fact, after accounting for the week of absence (Week 12), during which no salary is earned, the average commission is $726.82. The average commission earned between December 18, 2018 and January 4, 2019, as stated in Counter-Statement 106 is $506.25, which is significantly less than the average commission of 726.82. (Troy Aff. *see* Exhibit 8 D1187-1250).

108.     In fact, Plaintiff's average weekly commission before her pregnancy was $710.00, while her average weekly commission after her pregnancy was $690.63, representing only a $19.37 weekly differential.  Id.

A0172

**Response:** Deny. The implementation of discrimination began in late-December 2018, one month after the pregnancy announcement. During such time, the differential, as stated in Counter-Statement 106. (Troy Aff ¶¶ 5-8; *see* Exhibit 8 D1187-1250).

109.     This differential is attributed to the winter slow season because Hillside Auto Outlet was less busy between September and March.  Thanwalla Dep. 34:12-14.

**Response:** Deny. Defendants have failed to produce any weekly commission sales sheets of Plaintiff's "comparators" during the relevant period, claiming that the documents have been inexplicably "lost." (Exhibit 10 Jennings Jackson Aff.; Troy Aff ¶ 11).

| ID/ Commission | 11/27/2018-12/03/2018 | 12/04/2018-12/10/2018 | 12/11/2018-12/17/2018 | 12/18/2018-12/24/2018 | 12/25/2018-12/31/2018 | 01/01/2019-01/07/2019 | 01/08/2019-01/14/2019 |
|---|---|---|---|---|---|---|---|
| Plaintiff | $ 1,600.00 | $ 825.00 | $ 625.00 | $ 500.00 | $ 350.00 | $ 825.00 | $ 350.00 |
| 24 | $ 420.00 | $ 215.00 | $ 495.00 | $ 260.00 | $ 345.00 | $ 535.00 | $ 365.00 |
| 17 | $ 290.00 | $ 445.00 | $ 400.00 | $ 445.00 | $ 700.00 | $ 385.00 | $ 490.00 |
| 20 | $ 150.00 | $ 225.00 | $ 300.00 | | $ 500.00 | $ 150.00 | |

110.     Plaintiff's best week at Hillside Auto Outlet was for the pay period of November 27, 2018 though December 3, 2018, when she earned $1,600 in commissions and bonuses, which was after she announced her pregnancy.  Plaintiff Dep. 224:6-11, 227:3-15.

**Response:** Admit.

111.     Plaintiff claims she sent emails and texts about the alleged discrimination that she endured, but did not keep records of them because she gets new phones pretty often as she likes to have the newest phone and it "probably just got deleted from changing phones or whatever the case may be."  Plaintiff Dep. 141:13-142:8, 145:18-146:15.

**Response:** Admit.

112.     None of the text messages exchanged between the parties reference any claims of pregnancy discrimination except ten days after she voluntarily quit.  Kataev Decl. ¶ 6, Ex. D.

**Response:** Deny, Defendants have failed with their discovery obligations to produce all relevant text messages. The text messages that are produced show Ishaque Thanwalla denying Leticia Stidhum's request to take rest as a result of nausea in December 2018 after the announcement of her pregnancy. Plf. Aff. ¶ 30; Exhibit 7 Text Message between Leticia Stidhum and Ishaque Thanwalla.

113.     The only other events or circumstances giving rise to Plaintiff's belief that she was discriminated against was, according to her, more than one instance where she had to say something to Guzman about her customers waiting and "stuff like that."  Plaintiff Dep. 101:25-102:6.

**Response:** Deny. Plaintiff stated: "[Guzman making Plaintiff wait longer] happened only right after I announced my pregnancy, that would be the first reason why, and not to mention, like

A0173

I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I announced my pregnancy. It wasn't -- I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out. *It doesn't add up* (emphasis added)." Plaintiff meant that pregnancy discrimination was the only possible reason for Guzman's slowness; all other reasons do not "add up." (Plf Dep 78:23-79:13).

114.    Plaintiff was treated more favorably than other salespeople because she was provided special access to Dealertrack and received a bonus for selling approximately over twenty (20) vehicles that no one else received right after announcing her pregnancy.  Plaintiff Dep. 105:7-18.

**Response:** Deny that she received the bonus for selling 27 or 28 cars for the month of November 2018 because of a preference but because she was the top saleswoman. (Plf Aff. ¶ 39). Similarly, Ishaque granted him DealerTrack access Similarly, as a result of her top sales, and because Guzman at the time was still learning how to use the DealerTrack system, Thanwalla granted express access to Plaintiff to use the Dealertrack.

115.    After Plaintiff announced her pregnancy, no employee was treated more favorably than her.  Plaintiff Dep. 105:19-107:3.
**Response:** Deny. (Plf Dep. 105:24-106:3).

116.    Plaintiff's employment with Hillside Auto Outlet ended in January 2019 when she voluntarily quit.  Plaintiff Dep. 36:6-11, 44:16-18.
**Response:** Deny that Plaintiff voluntarily quit. (Plf Depo. 230:22-232:9).

117.    Plaintiff concedes she was not constructively discharged.  Plaintiff Dep. 230:22-24, 231:22-232:9.
**Response:** Deny, in describing why she left employment at Hillside Auto Outlet, Plaintiff described the workplace as being "intolerable" "pregnant, tired, and not making any money" as a result of the pregnancy discrimination. (Plf Depo. 230:22-232:9).

118.    Prior to her quitting, Plaintiff was allegedly promised a promotion to a manager position by Thanwalla.  Plaintiff Dep. 90:5-91:6, 93:2-94:14.
**Response:** Admit.

119.    Plaintiff asked about the promotion, but Thanwalla told her he will discuss this with her later.  Plaintiff Dep. 90:5-91:6.
**Response:** Admit.

120.    Because Thanwalla was not prepared to discuss a promotion then and there, Plaintiff decided to quit.  Plaintiff Dep. 90:5-91:6.
**Response:** Deny. Plaintiff quit because she was "tired of being given the runaround and not making money," because she was "scared," and also because she was "getting played at this

place [she] thought [she] was going to grow with." Thanwalla's refusal to discuss a promotion was merely evidence that suggested to Plaintiff that she was "being given the runaround" and "getting played." (Plf Dep. 90:23- 91:6).

121.    Specifically, Plaintiff quit because she did not want to wait for Thanwalla to make a decision about her promotion, as she felt that it was obvious she was not getting a promotion. Plaintiff Dep. 231:7-21.
**Response:** Deny that Plaintiff quit because she "did not want to wait for Thanwalla to make a decision." Plaintiff had already waited for Thanwalla's promotion decision, but quit because she was "pregnant, tired, and not making any money" as a result of the pregnancy discrimination. Plf Depo. 230:22-232:9. (Plf Dep. 231:11-21).

122.    With respect to the promotion, Plaintiff felt that it "was kind of clear as day" that "if he wanted to give [her] that position, he would have given it to [her] at that point." Plaintiff Dep. 92:7-25, 95:3-7.
**Response:** Admit.

123.    Thanwalla never told Plaintiff that he would not give her the promotion; he just wanted to discuss it another time.  Plaintiff Dep. 95:8-10.
**Response:** Deny. While Thanwalla never explicitly told Plaintiff that she would not be promoted, Thanwalla's actions—making Plaintiff wait, and then wait some more—made it clear to Plaintiff that she would not be promoted. (Plf Dep. 92:7-25, 95:3-7).

124.    Plaintiff did not feel the need to follow up about her promotion despite Thanwalla's request to discuss it later, and only raised an issue concerning her final compensation after quitting. Plaintiff Dep. 108:10-109:3.
**Response:** Deny. Plaintiff waited for Ishaque Thanwalla to return from Pakistan, because she "was promised that when he would return that [she] was going to be promoted to sales manager" Plf Dep. 90:8-90:15. Plaintiff's meeting with Thanwalla after his return  was a follow-up on an earlier promise. Furthermore, that Plaintiff "only raised an issue concerning her final compensation after quitting" is irrelevant here, since it would be illogical for Plaintiff to discuss a promotion after quitting. When Thanwalla came back, his refusal to discuss about the promotion was "clear as day" a denial of the same. Plf Dep.

125.    Approximately ten (10) days after Plaintiff quit, Plaintiff contacted Jory Baron by text complaining about her pay and spoke to him by phone.  Baron Dep. 54:18-55:18, 55:23-25.
**Response:** Admit.

126.    Plaintiff told Baron during their conversation that she quit because of her pay – not because of pregnancy discrimination – and wanted to make sure she got paid for the deals she believed she was owed money on.  Baron Dep. 64:16-65:7.
**Response:** Deny. At the time, after texting Jory Baron that she "had not been paid." After Jory Baron called Plaintiff back, Plaintiff "calmly explained how [she] had been sabotaged, why

[she] had quit, and THANWALLA still owed [her] money." At the time, "Jory Baron replied that Plaintiff should 'stop ranting.' Plaintiff is "sabotaged" as a result of her pregnancy. (Exhibit 7 Supplemental Response to Interrogatory 7.)

127.    Jory Baron told her he would speak to Thanwalla and that, if she was owed anything, she would get paid.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:8-15
**Response:** Admit.

128.    After speaking to Thanwalla, Baron called Plaintiff back but she was unable to answer; Baron then offered to speak with her when he was available and she said never mind, and that she planned to go a different route.  Baron Dep. 60:19-63:12, 63:18-64:15, 65:16-66:5, 66:23-67:13, 70:10-71:2, 88:8-16.
**Response:** Admit, but Plaintiff said "never mind" only after Baron told Plaintiff to "stop ranting." (Exhibit 7 Supplemental Response to Interrogatory 7.)

129.    Thanwalla informed Baron that Plaintiff quit and that there was no money owed to her, and Thanwalla agreed to ascertain whether she is owed money for any pending deals, to which Thanwalla agreed, but stated that at that time, to his knowledge, there was no money owed to her. Baron Dep. 68:15-69:13, 69:21-70:9.
**Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

130.    In the same vein, Plaintiff acknowledged that the dealership would not want her out because of her pregnancy, but that Guzman did because "it was more of a personal thing against me while being pregnant."  Plaintiff Dep. 99:7-25.
**Response:** Admit.

131.    Plaintiff could not specify how Guzman played any role as a decision-maker at the dealership and described it as a "team effort" because he "would definitely be involved in … decisions," yet acknowledged that Thanwalla was the one who made decisions.  Plaintiff Dep. 110:17-111:4.
**Response:** Deny, Guzman was promoted as the financial manager in or around July or August 2018. Plaintiff Dep. 57:25-58:3; 60:4-60:7. Thereafter, as the financial manager, Guzman was part of the "team effort" and was "involved [in employment] decisions" even while not having the sole authority to hire, fire, or discipline. *See* Plf Dep. 110-17:111:4. For instance, Plaintiff was hired only after the general manager Ishaque Thanwalla conferred with the financial manager Jeanique. *See* Plf Dep. 56:21-57:6. Guzman made decisions while Thanwalla departed to Pakistan.

132.    Guzman was never disciplined while at work, did his job the right way, and viewed as a professional who helped everybody out and jumped in to get the job done. Guzman Dep. 107:24-108:4; Jennings Dep. 60:19-61:2.
**Response:** Deny. Defendants claim here that Guzman "did his job the right way, and viewed as a professional who helped everybody out and jumped in to get the job done," which is in direct contradiction with Defendants' earlier claim in 86. that "Guzman, whose job in the

Finance Department which was running the credit histories of Hillside Auto customers and pre-filling their automobile purchase financing applications, would frequently keep customers waiting longer than necessary, creating poor customer impressions of Hillside Auto's service."

133.    Plaintiff and Thanwalla had a good working relationship; they respected each other and were close.  Thanwalla Dep. 85:2-15.
**Response:** Admit.

134.    Plaintiff never complained about her pay to Thanwalla; in fact, she told him that she made more money at Hillside Auto Outlet than she ever made in her life.  Thanwalla Dep. 84:19-25.
**Response:** Deny, Plaintiff complained about her pay to Ishaque Thanwalla on numerous occasions. She complained orally that "ever since [she] announced it, that this – XY and Z has been happening." Plf Dep 96:20-97:2.

### Plaintiff's Alleged Damages

135.    Plaintiff obtained employment elsewhere almost immediately after quitting at Hillside Auto Outlet; in fact, she had her next job at NYC Motor Cars lined up by Ali, one of the managers that worked with Plaintiff at Hillside Auto Outlet, and worked at several other dealerships thereafter, ultimately leaving the workforce due to the birth of her second child. Plaintiff Dep. 48:6-18, 48:17-50:4, 50:23-51:9, 51:12-17, 51:18-25, 52:4-10, 51:20-25, 52:11-12, 52:15-25, 53:2-25, 54:7-14, 54:2-7, 54:18-55:2, 98:8-16, 114:8-16, 126:18-131:11;  Thanwalla Dep. 69:14-70:3, 84:5-18.
**Response:** Admit.

136.    Plaintiff's circumstances got better within a few months of her quitting employment with Hillside Auto Outlet.  Plaintiff Dep. 114:17-18.
**Response:** Deny that it was "within a few months." Plaintiff stated that the "grass wasn't greener in the beginning, but of course they got better" after "[m]aybe a few months." Plf Dep 114:8-16.

137.    Specifically, the volume of Plaintiff's sales at NYC Motor Cars made things better for Plaintiff.  Plaintiff Dep. 114:19-115:15.
**Response:** Admit.

138.    Plaintiff is seeking more than $2 million dollars in damages, but is unsure about the basis for seeking these damages.  Plaintiff Dep. 111:5-15, 153:21-154:5.
**Response:** This is not a statement of material fact to which a response is required.

139.    Plaintiff did not seek any medical treatment or hospitalization concerning her alleged emotional injuries.  Plaintiff Dep. 112:25-113:9.
**Response:** Admit.

140.     She has since recovered from any alleged emotional injuries, and any symptoms or injuries allegedly suffered have now been resolved.  Plaintiff Dep. 113:10-114:7.

**Response:** Deny. Plaintiff stated that "I wouldn't say [making money] alleviated everything, no." Plaintiff Dep. 115:14-15.

### Hillside Auto Outlet and Hillside Auto Mall are Not Joint Employers

141.     Hillside Auto Outlet and Hillside Auto Mall operate as two (2) separate automobile dealerships.  Thanwalla Dep. 218:12-219:7; Baron Dep. 47:9-48:16.

**Response:** Deny insofar as Plaintiff alleges that Hillside Auto Mall is part of a single enterprise and a joint employer. Admit that Plaintiff did not directly work for Hillside Auto Mall. (Plf Dep. 34:20-36:5).

142.     The two dealerships are located several blocks away from each other.  Kataev Decl. Exs. A & C; Thanwalla Dep. 22:3-8; Baron Dep. 46:24-47:8; Guzman Dep. 63:16-19.

**Response:** Admit.

143.     Plaintiff worked at Hillside Auto Outlet, and never worked at Hillside Auto Mall. Thanwalla Dep. 35:6-22; Plaintiff Dep. 34:7-35:3.

**Response:** Deny insofar as Plaintiff alleges that Hillside Auto Mall is part of a single enterprise and a joint employer. Admit that Plaintiff did not directly work for Hillside Auto Mall. (Plf Dep. 34:20-36:5).

144.     Plaintiff was not sure whether the two dealerships were joint employers. Plaintiff Dep. 35:18-36:5.

**Response:** Admit that Plaintiff was unsure what the definition of "joint employers" is. Plaintiff alleges that Hillside Auto Mall is part of a single enterprise and a joint employer. Admit that Plaintiff did not directly work for Hillside Auto Mall. (Plf Dep. 34:20-36:5).

145.     Plaintiff merely included Hillside Auto Mall as a Defendant solely because both dealerships were "kind of run by the same people." Plaintiff Dep. 35:9-17.

**Response:** Deny. (Plf Dep. 34:20-36:5).

146.     However, this is untrue, as Thanwalla ran Hillside Auto Outlet and had no duties with Hillside Auto Mall, while Phelan ran Hillside Auto Mall, and had no duties with Hillside Auto Outlet. Jennings Dep. 25:2-5, 38:9-11, 42:3-10.

**Response:** See Counter-Statement 145.

147.     Hillside Auto Mall had no control over Plaintiff's daily employment activities. Jennings Dep. 30:12-21, 32:24-33:11, 36:23-37:8, 42:3-10, 50:23-25, 51:9-14.

**Response:** Admit.

148.     Thanwalla set the pay plans at Hillside Auto Outlet, while Phelan set the pay

plans at Hillside Auto Mall.  Jennings Dep. 42:3-10.
      **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

149.     Thanwalla handled employee scheduling at Hillside Auto Outlet, while Phelan handled employee scheduling at Hillside Auto Mall.  Jennings Dep. 50:23-25, 51:9-14.
      **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

150.     Jory Baron, an owner of Hillside Auto Outlet, had no duties with Hillside Auto Mall.  Baron Dep. 83:10-16; Jennings Dep. 36:23-37:8.
      **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

151.     The pay plans for salespersons at Hillside Auto Outlet and Hillside Auto Mall were different from each other.  Jennings Dep. 30:12-21, 32:24-33:11.
      **Response:** Deny. (Jennings Dep. 30:12-18; 32:24-33:4).

152.     Deana Jennings ("Jennings") has been controller of Hillside Auto Mall since she was hired by Aaronson in 2008.  Jennings Dep. 13:23-14:13, 15:13-15, 16:10-17:2.
      **Response:** Admit.

153.     Aaronson informed Jennings that he was opening up another store in 2018 and asked her to serve as a controller at Hillside Auto Outlet part-time until a full-time controller for that dealership was found.  Jennings Dep. 20:7-20; 17:3-8.
      **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

154.     While Jennings mostly continued to work for both dealerships from Hillside Auto Mall Mondays through Fridays from 10:00 AM until 5:00 PM, she would sometimes work on site at Hillside Auto Outlet.  Jennings Dep. 14:6-10, 16:13-17:2, 17:9-24, 19:10-17.
      **Response:** Admit.

155.     From 2018 until 2020, Jennings worked at both Hillside Auto Outlet part-time and Hillside Auto Mall full-time concurrently until a full-time controller was found for Hillside Auto Outlet.  Thanwalla Dep. 39:13-40:3, 40:11-23, 42:17-22; Jennings Dep. 16:7-9, 20:21-25, 35:18- 36:9; Guzman Dep. 72:23-73:10.
      **Response:** Admit.

156.     Jennings held the same position as a controller at both dealerships, and her duties at both dealerships - maintaining the books, payroll, bills, sales tax, and some DMV related work – were the same, except that Jennings did not do any DMV related work for Hillside Auto Outlet.  Jennings Dep. 15:16-16:6, 17:25-18:5, 19:18-20:2, 21:20-25.
      **Response:** Admit that Jennings is the controller at both dealerships; otherwise lack knowledge sufficient to admit or deny the truth of the rest of the statement.

157.     Hillside Auto Outlet's current controller since 2020, Susan Zhivo, does not work

at Hillside Auto Mall.  Thanwalla Dep. 41:14-42:16; 219:8-13.
>    **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

158.    Other than Jennings, no other employee has worked at both Hillside Auto Outlet
and Hillside Auto Mall.  Jennings Dep. 55:10-13.
>    **Response:** Lack knowledge sufficient to admit or deny the truth of this statement.

159.    It is common for dealerships to purchase vehicles from other dealerships in
order to sell a particular vehicle to a customer that it does not have in stock; Hillside Auto Outlet
purchased vehicles from both Hillside Auto Mall and other dealerships in order to do so, with no
preference for Hillside Auto Mall.  Baron Dep. 47:9-48:16; Guzman Dep. 63:20-64:14, 64:21-
65:15; Jennings Dep. 55:14-56:3; Plaintiff Dep. 34:10-35:14, Thanwalla Dep. 23:8-24:2, 24:9-
27:6, 26:11-20; Guzman Decl.
>    **Response:** Deny. (Plf Aff. ¶ 42).

160.    When asked at her deposition about criminal convictions, Plaintiff initially
testified that she was solely convicted for a marijuana related offense, until she was presented with
evidence of her conviction for uttering forged instruments – a crime of dishonesty.  Plaintiff
Dep. 20:21- 24:14; Kataev Decl. ¶ 9, Ex. G.
>    **Response:** This is not a statement of material fact to which a response is required.


## Additional Material Facts

161.    Each of the members of Hillside Auto Outlet, Josh Aaronson, Jory Baron, The
Estate of David Baron, and Ishaque Thanwalla, had the power to hire and fire at Hillside Auto
Outlet. (Jennings Dep. 38:12-39:5).

162.    Between late December 2018 and early January 2019, Ishaque Thanwalla was in
Pakistan. During this period of time, Andris Guzman assisted Thanwalla in running the day-to-
day operations at Hillside Auto, being the financial manager on site.

163.    Jory Baron was present at the dealership a couple of months each month. As a
result, he knew of the Plaintiff, including her identity, her schedule and compensation at the time
when she reached out to him in January 2019. (Stidhum Aff. ¶¶ 3-4; Plf Dep. 58:19-21; 59:4-7).

164.    When there was an issue that goes beyond the responsibilities of Isaac or Jay,
she would report to Jory Baron "Only when there was an issue." (Plf Dep. Dep 59:21- 60:15).

165.    Guzman was a sales manager at Hillside Auto Outlet from Plaintiff's hiring
through July or August 2018. (Stidhum Aff. ¶5).

166.    Thereafter, from September 2018 through Plaintiff's termination in January
2019, Guzman was the financial manager. (Stidhum Aff. ¶7).

167.    As the financial manager, Guzman was part of the "team effort" and was
"involved [in employment] decisions" even while not having the sole authority to hire, fire, or
discipline. (Plf Dep. 110-17:111:4). For instance, Plaintiff was hired only after the general
manager Ishaque Thanwalla conferred with the financial manager Jeanique. (Plf Dep. 56:21-
57:6).

A0180

168. Guzman was not the general sales manager. (Stidhum Aff. ¶11).

169. The general manager was Ishaque Thanwalla. (Guzman Dep. 68:14-15.)

170. At all relevant times, Deanna Jennings worked concurrently for Hillside Auto Outlet and Hillside Auto Mall. (Jennings Dep. 17:9-14)

171. At the time, Aaronson said he "was opening another store and he wanted me to be controller until they found a full-time person for the position." (Jennings Dep. 20:7-20).

172. Plaintiff, a saleswoman, is expressly given authorization to access to Dealertrack by general manager Ishaque Thanwalla. (Plf Dep. 46:19-22).

173. Plaintiff was given Ishaque Thanwalla's username and password to run and read credit between August 2018 and December 2018. (Plf. Dep. 175:20-176:8).

174. Plaintiff states that 40 to 50 percent of the time, she can get customers in and out of the door within an hour or less; therefore, the time it takes a customer to purchase a vehicle is predictable. (Plf. Dep. 182:15-23).

175. Between August and December 2018, Plaintiff was given express authorization to run, read, and pre-approve the credit applications with DealerTrack. (**Plf. Dep. 175:20-176:8**).

176. For the period of time between late December 2018 and January 2019 up until Thanwalla's return from Pakistan, Plaintiff Leticia Stidhum's only point of contact upon completion of the credit application was Andris Guzman. At that time, Jeanique had departed from Hillside Auto Outlet, Thanwalla was overseas, and Zanan did not typically run the credit. (Plf. Dep. 64:15-20; 68:23-69:3; 175:20-176:8).

177. In 2018 prior to Thanwalla's trip to Pakistan in late December 2018, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away between late December 2018 and January 2019, Guzman was the only one who was responsible for running the credit. (Plf Dep 67:4-67:22).

178. Prior to Thanwalla's trip overseas, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away in December 2018 and January 2019, Guzman was the only one who was responsible for running the credit. *See* Plf Dep 67:4-67:22.

179. Serge Zanan qualified a customer only very rarely. (Plf Dep 67:23-25).

180. In August 2018, Thanwalla taught Plaintiff how to run and read credit and expressly gave her access to DealerTrack(Plf. Dep. 175:20-176:8).

181. "[F]or the most part" because the sales procedure is to "get [the] ID, the most recent two paystubs, and that proof of address if needed," the verification process is instantaneous and conducted not by any employee of Hillside Auto Outlet but by the banks. (Plf Dep. 64:21-65:12, Plf. Aff. ¶¶ 19-20).

182. The sales manager did not have to contact the employer to verify that the paystubs are legitimate. Instead, the sales manager simply deploys a heuristic to quickly determine by sight whether the paystubs are legitimate to upload for the banks. (Plf. Aff. ¶ 21).

183. The dealerships' determination would never take twenty to thirty minutes or hours. Rather, the determination is for the most part instantaneous. (Plf. Aff. ¶ 22).

184. Fraud alerts on Hillside Auto Outlet customer's profiles occurred rarely. (Plf. Aff. ¶ 23).

185. Additional verification on the part of credit bureaus occurred rarely and does not require one or two days to update. (Plf. Aff. ¶ 24).

186. Guzman intentionally delayed the credit applications of Plaintiff's customers

A0181

despite Plaintiff asking Guzman multiple times about the status of the credit applications after her pregnancy announcement in late November 2018 and Ishaque Thanwalla's trip to Pakistan in late December 2018. (Plf. Aff. ¶ 25).

187.    How quickly Guzman chooses to run the credit is squarely within his—and by extension—the dealership's control. (Plf Dep. 69:12-69:16).

188.    Car insurance is mandatory in New York. Thus, regardless of whether customers are paying in cash or through finance, customers who have funds to purchase a vehicle secure enough funds to purchase car insurance in addition to the car purchase. (Plf. Aff. ¶ 26).

189.    Of the two to three people who Plaintiff was seeing daily, on average two customers walked out (roughly 2/3 of the customers) walked out due to the longer wait time caused by Guzman's targeted and intentional delay in running and reading the credit applications. (Plf Dep. 192:10-192:21).

190.    At Hillside Auto Outlet, Plaintiff was the only female salesperson for the first four months of her employment. (Plf Aff. ¶ 34).

191.    Thereafter she was one of two female salespeople at Hillside Auto Outlet. (Plf Aff. ¶ 35).

192.    Thanwalla knew of Stidhum's pregnancy. (Jennings Dep. 62:19-63:3; Decipher Chat Excerpt between Defendant Ishaque Thanwalla and Ali Raskesnia about Plaintiff Leticia Stidhum's pregnancy (Ali: "Your daughter is having a baby [pregnant woman emoji]" Thanwalla: "Which one" Ali: "Leticia" Thanwalla "I know").

193.    Guzman had access to the Dealertrack password. (Plf. Aff. ¶ 36).

194.    Guzman refused to provide Plaintiff Leticia Stidhum with the Dealertrack password. (Plf. Aff. ¶ 37).

195.    Plaintiff was the top salesperson at the dealership up and until November 2018. (Plf Depo. 77:21-25).

196.    Over time, between July or August 2018 to December 2018, Guzman "learned how to navigate through it a little quicker." (Plaintiff Dep. 8:4-7). *Between late December 2018 through the end of Plaintiff's employment in January 2019*, Guzman intentionally delayed the credit applications of Leticia Stidhum's customers despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer. (Plaintiff Dep. 8:4-7; 78:23-79:13; Plf. Aff. ¶¶ 8-9).

197.    Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer. (Plf Depo. 78:23-79:13; Plf. Aff. ¶¶ 8-9).

198.    While previously, the wait time was around 20 minutes to handle these applications (83:3-8), the wait time increased to 40-60 minutes, or longer (Plf Depo. 93:9-12). This lead to customers walking out. (Plf Depo. 83:3-83:17).

199.    This happened "only right after I announced my pregnancy, that would be the first reason why, and not to mention, like I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I announced my pregnancy. It wasn't [like] I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out." (Plf Depo. 78:23-79:13).

200.    A text message sent to Thanwalla from Stidhum reads, in relevant part: "and for

you to call me your daughter and say you love/ me and all this bull shit knowing wtf i been going thru this past month you been gone/ not making shit because your team fucking sucks I work 60 hours a week for 7/ months straight no days off n december i slacked because you left and everything went to shift from there."

201.    Plaintiff lost many customers to Guzman's deliberate delay, including a "couple of customers" who *explicitly stated* that it was due to the wait time. (Plf. Dep. 83:13-84:11).

202.    DMV Clerk Lilly was disciplined while pregnant and departed and she stormed out upset at Hillside Auto Outlet's treatment of her within a week of Plaintiff's start at Hillside Auto Outlet. (Plf. Dep. 100:13-84:11).

203.

Dated: Flushing, NY
            September 1, 2023

                                    TROY LAW, PLLC
                                    *Attorneys for Plaintiffs*

                                     */s/ John Troy*_____
                                    John Troy

A0183

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LETICIA FRANCINE STIDHUM,                Case No: 21-cv-07163

                    Plaintiff,

           v.

161-10 HILLSIDE AUTO AVE, LLC         **DECLARATION OF JOHN**
     d/b/a Hillside Auto Outlet, and       **TROY**
HILLSIDE AUTO MALL INC
     d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

                 Defendants.
------------------------------------------------------------------x

      I, John Troy, declare under penalty of perjury and pursuant to Section 1746 of Title 28 of

the United States Code, that:

      1.     I represent the Plaintiffs in this lawsuit brought under the Fair Labor Standards Act

and New York Labor Law.

      2.     I submit this declaration in opposition to Defendants' Motion for Pre-Motion

Conference for their anticipated motion for summary judgment.

      3.     Attached hereto are the following exhibits:

      Exhibit 1.     Affidavit of Leticia Stidhum;

      Exhibit 2.     Deposition Transcript of Leticia Stidhum;

      Exhibit 3.     Deposition Transcript of Ishaque Thanwalla;

      Exhibit 4.     Deposition Transcript of Andris Guzman;

      Exhibit 5.     Deposition Transcript of Jory Baron;

      Exhibit 6.     Deposition Transcript of Corporate Witness Deanna Jennings;

A0184

Exhibit 7.      Text Message between Leticia Stidhum and Ishaque Thanwalla;

Exhibit 8.      D1187-D1250 Paystubs of Plaintiff Leticia Stidhum;

Exhibit 9.      Supplemental Response to Interrogatory 7;

Exhibit 10.     D1253-1447 Paystubs of Comparators; and

Exhibit 11.     Jennings Jackson Aff.

4.      The salary of Week 34 in Defendants' 56.1 Statement is <u>incorrectly</u> stated as $300.00 when in fact it is $200. *See* Exhibit 8 (D1250).

5.      Applying the correction of $200.00 base pay for Week 34, the average total pay from September 4, 2018 to December 17, 2018 is $1,145.00, while the average commission is $845.

6.      In contrast, the average total pay from December 18, 2018 to January 14, 2019 as $781.25 and the average commission is $506.25.

7.      The difference in total pay is $363.75 per week, representing a 31.8% decrease in total pay.

8.      The difference in commission is $338.75, representing a 40% decrease in commission.

9.      After accounting for the week of absence (Week 12), during which no salary is earned, the average commission is $726.82.

10.     The average commission earned between December 18, 2018 and January 4, 2019, as stated in Counter-Statement 106 is $506.25, which is significantly less than the average commission of 726.82.

A0185

11.     Further, while Defendants failed to provide *any* comparator's weekly commission sheets, claiming that they were lost, the comparators identified as #24, #17, and #20, which each earned a base salary of ($300) all had an increase in the amount of bonus in the months of December 2018 and January 2019, thus debunking the theory that the sales slowed down during the winter months. (D1253-1447).

| ID | 11/27/2018-12/03/2018 | 12/04/2018-12/10/2018 | 12/11/2018-12/17/2018 | 12/18/2018-12/24/2018 | 12/25/2018-12/31/2018 | 01/01/2019-01/07/2019 | 01/08/2019-01/14/2019 |
|---|---|---|---|---|---|---|---|
| Plaintiff | $ 1,600.00 | $ 825.00 | $ 625.00 | $ 500.00 | $ 350.00 | $ 825.00 | $ 350.00 |
| 24 | $ 420.00 | $ 215.00 | $ 495.00 | $ 260.00 | $ 345.00 | $ 535.00 | $ 365.00 |
| 17 | $ 290.00 | $ 445.00 | $ 400.00 | $ 445.00 | $ 700.00 | $ 385.00 | $ 490.00 |
| 20 | $ 150.00 | $ 225.00 | $ 300.00 | | $ 500.00 | $ 150.00 | |

12.     I declare under penalty of perjury and under the laws of the United States that the foregoing statements are true and correct.

Dated: Flushing, NY
        September 1, 2023

TROY LAW, PLLC
*Attorneys for Plaintiffs*

 */s/ John Troy*
John Troy
41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com

A0186

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
LETICIA FRANCINE STIDHUM,                    Case No: 21-cv-07163

                   Plaintiff,

             v.

161-10 HILLSIDE AUTO AVE, LLC          **AFFIDAVIT OF LETICIA**
    d/b/a Hillside Auto Outlet, and        **STIDHUM**
HILLSIDE AUTO MALL INC
    d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

               Defendants.
-------------------------------------------------------------------x

    I, LETICIA STIDHUM, being duly sworn and under penalty of perjury, deposes and states as follows:

    1.    I am a resident of Queens, New York, and I am over 18 years of age.

    2.    I have personal knowledge of the matters stated below.

    3.    JORY BARON knows of me by name, including my identity, my schedule and my compensation at the time when I reached out to him in January 2019.

    4.    JORY BARON had interactions with me concerning my employment.

    5.    ANDRIS GUZMAN was sales manager at Hillside Auto Outlet since at least 2018 until July or August 2018.

    6.    JYNIQUE was the financial manager at Hillside Auto Outlet until July or August 2018.

    7.    Thereafter, from July or August 2018 through Plaintiff's termination in January 2019, ANDRIS GUZMAN is the financial manager.

Page 1 of 6

8.    At the time when ANDRIS GUZMAN got promoted as the financial manager, in July or August 2018, he had to learn how to run and read credit deports in his new role.

9.    Over time, Guzman learned how to navigate through the DealerTrack system more effectively.

10.    During that same time, in July or August 2018, ISHAQUE THANWALLA gave express access to me of DealerTrack because ISHAQUE THANWALLA observed that I was "quick" with computers.

11.    At all relevant times, ANDRIS GUZMAN was not the general sales manager.

12.    The general manager is ISHAQUE THANWALLA.

13.    ANDRIS GUZMAN was part of the team effort and was involved in employment decisions while not having the sole authority to hire, fire, or discipline.

14.    There are no various other bonuses offered from time to time or weekly, or monthly bonus. This includes the bonuses that Defendants claimed was provided: (i) one bonus was for cars sold after remaining on the lot for more than sixty (60) days; (ii) another was for cars sold after remaining on the lot for more than ninety (90) days; and (iii) another was for selling three (3) cars in one (1) day

15.    Weekly commission sheets were kept by Hillside Auto Outlet.

16.    When Plaintiff received the paysheet, she checked if the number of cars sold is correct, not that the pay was proper.

17.    Attending dealership certification programs is not necessary to advance a career in a used car sales lot. I have only worked in used car sales lots, and never in a new car sales lot.

A0188

18.     Once a customer arrives at the Hillside Auto Outlet, the customer sign in, is shown a car of interest including car in lot within their budget. During that conversation, the salesperson will directly ask if the customer wishes to pay in cash or needs financing. The vast majority of customers at Hillside Auto Outlet requires financing.

19.     The verification process of the paystub is instantaneous and conducted not by the employees of Hillside Auto Outlet but by the banks.

20.     At the time, only one bank working with Hillside Auto Outlet required a verification process for the paystub; the remaining banks had instantaneous acceptances or denials.

21.     The sales manager did not have to contact the employer to verify that the paystubs are legitimate. Instead, the sales manager simply deploys a heuristic to quickly determine by sight whether the paystubs are legitimate to upload for the banks.

22.     The dealerships' determination would never take twenty to thirty minutes or hours. Rather, the determination is for the most part instantaneous.

23.     Fraud alerts on Hillside Auto Outlet customer's profiles occurred rarely.

24.     Additional verification on the part of credit bureaus occurred rarely and does not require one or two days to update.

25.     Guzman intentionally delayed the credit applications of my customers despite me asking Guzman multiple times about the status of the credit applications after my pregnancy announcement in late November 2018 and Ishaque Thanwalla's trip to Pakistan in late December 2018.

26.     During this time, Guzman was in finance department.

Page 3 of 6

A0189

27.     This led to a delay in the running and reading of the credit of my customers relative to the rest of the store.

28.     This led to delays that cost both me and Hillside Auto Outlet to lose out on business.

29.     Car insurance is mandatory in New York. Thus, regardless of whether customers are paying in cash or through finance, customers have funds to purchase a vehicle secure enough funds to purchase car insurance in addition to the car purchase.

30.     Between July or August 2018 through December 2018 when Ishaque Thanwalla departed for Pakistan, I was given the express authorization to handle the qualification process and credit applications, along with submitting the application to chosen lenders.

31.     During my employment with Hillside Auto Outlet, Defendants did not distribute a written policy regarding discrimination.

32.     During my employment with Hillside Auto Outlet, Defendants did not place posters in the lunchroom regarding discrimination.

33.     I did not receive a copy of the employment policy of Hillside Auto Outlet; instead I may have signed a receipt of employment policy despite not having received a copy.

34.     For the first few months of my employment, I was the only female salesperson at Hillside Auto Outlet.

35.     Thereafter, I was one of two female salespeople at Hillside Auto Outlet.

36.     Guzman had access to the Dealertrack password.

37.     Guzman refused to provide Leticia Stidhum with the Dealertrack password.

A0190

38.    The promised bonus of 5% was no longer paid after Jyanique left in July or August 2018.

39.    The bonus for $1,000 was paid for selling close to 30 cars (27 or 28 cars) in November 2018.

40.    Ishaque Thanwalla denied Leticia Stidhum's request to take rest as a result of nausea in December 2018 after the announcement of her pregnancy.

41.    I explained how I was sabotaged by ANDRIS GUZMAN as a result of the pregnancy announcement as the reason why I quit in January 2019.

42.    Hillside Auto Outlet has a preference for Hillside Auto Mall cars because (1) they are close by and (2) they are considered affiliated with the Hillside Auto Outlet.

A0191

## VERIFICATION

STATE OF _____Florida_____ )
                        )
                        ) ss:
                        )
COUNTY OF _Hillsborough_ )

       I, Leticia Stidhum, being duly sworn, states that I am a Plaintiff in this action, that I have read the foregoing Plaintiff's Affidavit in Support of Plaintiff's Counter 56.1 Statement and in Opposition to Defendants' Motion for Summary Judgment and 56.1 Statement, and know the contents thereof, and the same are true to my knowledge, information and belief.

Date: __1st__ day of _September_, 20²³

*Leticia Stidhum*
Leticia Stidhum

State: Florida
County: Hillsborough

Sworn to before me on
This __1st__ day of _September_, 20²³
by ___Leticia Stidhum___ who produced a driver license as identification

_____
     ( NOTARY PUBLIC



NELSON E CARABALLO
Notary Public - State of Florida
Commission # HH103504
Expires on October 7, 2025

Notarized online using audio-video communication

Page 6 of 6

A0192

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 1 of 102 PageID #: 810

# In the Matter of

Case No.: 1:21-cv-7163 (HG)(LB)

STIDHUM

v.

161-10 HILLSIDE AUTO AVE, LLC, et al.

---

## Examination of Leticia Francine Stidhum

*Friday, February 17, 2023*

---

**CONDENSED**



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

A0193

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 2 of 102 PageID #: 811

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Case No.: 1:21-cv-7163 (HG)(LB)
----------------------------------------X

LETICIA FRANCINE STIDHUM,

              Plaintiff,

    -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
Hillside Auto Outlet, HILLSIDE AUTO
MALL INC. d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON,
RONALD M. BARON, and ANDRIS GUZMAN,

              Defendants.
----------------------------------------X
        February 17, 2023
        9:23 a.m.


    Examination before Trial of PLAINTIFF,
LETICIA FRANCINE STIDHUM, held pursuant to
Notice, held via Zoom conference, before
Ruthayn Shalom, a Notary Public of the State of
New York.

---

**2**

2  A P P E A R A N C E S :
3        TROY LAW, PLLC
          Attorneys for Plaintiff
4        4125 Kissena Boulevard, Suite 103
          Flushing, New York 11355
5        BY: TIFFANY TROY, ESQ.
          troylaw2troypllc.com
6
7
8        MILMAN LABUDA LAW GROUP, PLLC
          Attorneys for Defendants
9        3000 Marcus Avenue, Suite 3W8
          Lake Success, New York 11042
10       BY: EMANUEL KATAEV, ESQ.
          emanuel@mllaborlaw.com
11
12
    ALSO PRESENT:
13    Ishaque Thanwalla
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

2     IT IS HEREBY STIPULATED AND AGREED, by
3  and between the attorneys for the respective
4  parties hereto, that this examination may be
5  sworn to before any Notary Public.
6
7     IT IS FURTHER STIPULATED AND AGREED that
8  the sealing and filing of the said examination
9  shall be waived.
10
11    IT IS FURTHER STIPULATED AND AGREED that
12  all objections to questions except as to form
13  shall be reserved for trial.
14
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1          L. Stidhum
2   L E T I C I A  F R A N C I N E  S T I D H U M,
3  a Plaintiff, having been first duly sworn by
4  Ruthayn Shalom, a Notary Public of the State of
5  New York, and stating her address as 2815 Murray
6  Street, Flushing, New York, 11354, was examined
7  and testified as follows:
8        MR. KATAEV:  Before we begin, Counsel, we
9  are going to agree to the usual federal stips;
10  is that right?
11       MS. TROY:  Agreed.
12       MR. KATAEV:  For the record that is
13  filing, seal and certification is waived.
14  Objections except as to form are reserved for
15  trial.  The examination may be sworn to before
16  any notary public.  A copy of the transcript
17  will be sent to the attorney representing the
18  witness, correct?
19       MS. TROY:  Correct.  So we are clear,
20  pursuant to Federal Rules of Civil Procedure
21  30E, I'm going to ask that you provide a copy
22  of the transcript to review it and list any
23  changes to be made.
24       MR. KATAEV:  No problem.
25  EXAMINATION BY

---

1 (Pages 1 to 4)

A0194

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**5**

                    L. Stidhum
1
2    MR. KATAEV:
3        Q   Good morning.  My name is Emanuel Kataev.
4    I'm the attorney for the Defendants in this case
5    which are 161-10 Hillside Auto Ave., LLC, Hillside
6    Auto Mall, Inc., Ishaque Thanwalla, Andris Guzman,
7    Jory Baron, and Ronald M. Baron.  From here on in I
8    will refer to 161-10 Hillside Auto Ave. as Hillside
9    Auto Outlet, okay?  I need a yes or no, please.
10       A   Yes.
11       Q   I will refer to Hillside Auto Mall, Inc.
12   as Hillside Auto Mall, okay?
13       A   Yes.
14       MS. TROY:  If you're referring to the
15   corporation as the separate entity, if you
16   could say the entire name so there is no
17   confusion.
18       MR. KATAEV:  No, that's exactly what I'm
19   not doing.  I will be referring to it according
20   to the short name that I provided.
21       MS. TROY:  To the extent that the witness
22   has any confusion, I suggest that, you know,
23   you read out the whole name.
24       MR. KATAEV:  You will have that with Rule
25   30E so you will be good to go.  Hillside Auto

---

**6**

                    L. Stidhum
1
2    Outlet is 161-10, Hillside Auto Mall is
3    Hillside Auto Mall.  I will decide how I ask
4    the questions.
5    BY MR. KATAEV:
6        Q   Jory Baron, I will refer to him as Jory,
7    okay?
8        A   Yes.
9        Q   Ishaque Thanwalla I will refer to as
10   Isaac, okay?
11       A   Yes.
12       Q   Andris Guzman I will refer to as Andris,
13   okay?
14       A   Yes.
15       Q   Ronald M. Baron I will refer to as
16   Mr. Baron or Ronald, okay?
17       A   Yes.
18       MS. TROY:  Excuse me, if both Jory and
19   Ronald are Mr. Barons, I would suggest that you
20   use the full name and not Mr. Baron.
21       MR. KATAEV:  I will primarily use Ronald.
22   I will decide how I ask the question.
23   BY MR. KATAEV:
24       Q   I will be asking you and you will be
25   answering questions today about yourself, the

---

**7**

                    L. Stidhum
1
2    Defendants, your complaint and other related
3    subjects; do you understand?
4        A   Yes.
5        Q   Your testimony today is subject to the
6    same oath and the same penalty of perjury as if you
7    were testifying in court; do you understand that?
8        A   Yes.
9        Q   We are here today concerning your
10   discrimination case, today?
11       A   Correct.
12       Q   You filed a separate wage and hour action
13   as well, correct?
14       A   Yes.
15       MR. KATAEV:  To the extent that any
16   questions are asked or overlap into the other
17   case, Defendants are nonetheless -- reserve the
18   right to conduct a separate deposition in that
19   actions.
20   BY MR. KATAEV:
21       Q   Have you ever been deposed before,
22   Ms. Stidhum?
23       A   No.
24       Q   This is your first time?
25       A   Yes.

---

**8**

                    L. Stidhum
1
2        Q   I'm going to go over some of the basic
3    ground rules for a deposition so we can have a
4    smooth and easygoing deposition, okay?
5        A   Okay.
6        Q   First, keep your voice loud and clear for
7    the court reporter.  Second, please answer in words.
8    The court reporter cannot take down body gestures or
9    mumbling.  Third, allow me to complete my question
10   before you answer and I will give you the same
11   courtesy so as to help the court reporter to not
12   have to write down what two people are saying at the
13   same time.  Do you understand these ground rules so
14   far?
15       A   Yes.
16       Q   Fourth, if you don't understand a question
17   tell me and I will rephrase it.  However, if you
18   answer I will assume that you understood the
19   question, okay?
20       A   Okay, yes.
21       Q   I'm looking for your best recollection of
22   events today.  I realize we are going to be speaking
23   about events that occurred in May of 2018 through
24   January of '19 and sometimes beyond.  I don't want
25   you to guess at answers, however, I'm still entitled

---

                                    2  (Pages 5 to 8)

A0195

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 4 of 102 PageID #: 813

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

9

L. Stidhum

1   to your best recollection of events, okay?
2   A   Okay.
3   Q   You can take a break any time for any
4   reason except if there is a question pending.  You
5   need to answer that question before we take the
6   break, okay?
7   A   Okay.
8   Q   Do you understand these ground rules?
9   A   Yes.
10  Q   Have you consumed any drugs, alcohol or
11  medication within the last 24 hours that would
12  affect your ability to provide truthful testimony
13  today?
14  A   No.
15  Q   Is there any reason you can think of as to
16  why you cannot provide truthful answers to my
17  questions today?
18  A   No.
19  Q   Did you prepare for today's deposition?
20  A   Yes.
21  Q   How did you prepare?
22      MS. TROY:  Objection to the extent that it
23      calls for any attorney/client communication.
24  Q   Don't tell me anything that you said to

---

10

L. Stidhum

1   your attorney or anything that your attorney said to
2   you, but the fact of the conversation is
3   permissible.  You can tell me you did speak without
4   telling me what you said.
5       How did you prepare for the
6   deposition with that qualification?
7   A   Last week we met for two to three hours.
8   Q   In person?
9   A   Yes.
10  Q   Other than meeting in person for two to
11  three hours, did you prepare in any way for your
12  deposition?
13  A   No.
14  Q   During your meeting last week, did you
15  review my documents?
16  A   Yes.
17  Q   Which documents did you review, and again
18  same qualification, don't tell me anything that you
19  said or anything that your attorney said to you.
20  A   The documents you provided pretty much and
21  like a spread of what was -- what I was -- the
22  decrease in pay, I should say.
23  Q   The damage calculation, correct?
24  A   Yes.

---

11

L. Stidhum

1   Q   And also the almost 2,000 pages of
2   documents mostly consisting of leads information,
3   right?
4   A   Yes.
5   Q   Other than those two sets of documents,
6   did you review anything else?
7   A   No.
8   Q   Did you review the complaint?
9   A   I'm sorry?
10  Q   Did you review the complaint in
11  preparation for the deposition?
12  A   No.
13  Q   Did you ever sign any affidavit,
14  statement, declaration or any other document under
15  oath or affirmation concerning your employment with
16  the dealership Hillside Auto Outlet?
17      MS. TROY:  Which case are you talking
18      about?
19      MR. KATAEV:  This case.
20  A   Yes.
21  Q   Do you recall what that was?
22  A   The interrogatories.
23  Q   Okay.  Other than that, do you remember
24  signing anything else?

---

12

L. Stidhum

1   A   No.
2   Q   Did you speak with or obtain statements
3   from any other employees at Hillside Auto Outlet?
4       MS. TROY:  Which case are you talking
5       about?
6       MR. KATAEV:  Any case.
7   A   No.
8   Q   Same question for Hillside Auto Mall?
9       MS. TROY:  Again, now you're trying to
10      split up the two companies.  Both companies are
11      sued.
12      MR. KATAEV:  I'm not trying to split up
13      anything.  I'm asking a question.
14  BY MR. KATAEV:
15  Q   The question is and I will repeat it:  Did
16  you speak to or obtain any statements from any
17  employees at Hillside Auto Mall?
18      MS. TROY:  Does that include coworkers
19      meaning the coplaintiff in the State court
20      case?
21      MR. KATAEV:  I don't know.  She has to
22      tell me.
23      MS. TROY:  You need to be clear in your
24      question.

---

3 (Pages 9 to 12)

A0196

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 5 of 102 PageID #: 814

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

**13**

L. Stidhum

1
2     MR. KATAEV: I think you need to look at
3  Rule 30 and read it carefully. It says all you
4  do is say, Objection, and the grounds therefor.
5  If you continue with the speaking objections --
6     MS. TROY: Objection. Ambiguous.
7     MR. KATAEV: -- I'm going to call the
8  court and I don't want to do that. I'm going
9  to repeat the question.
10 BY MR. KATAEV:
11    Q   Did you speak to or obtain statements from
12 any other employees at Hillside Auto Mall?
13    A   Yes.
14    Q   Who did you obtain statements from?
15    A   David, I mean -- but are we talking about
16 Hillside Auto Outlet and Auto Mall as one? It's
17 kind of confusing.
18    MS. TROY: I'm going to ask that you use
19 the full name of the company, sir. I think
20 it's getting confusing.
21    MR. KATAEV: It's not confusing.
22 161-10 is Hillside Auto Outlet.
23 Hillside Auto Mall is Hillside Auto Mall. Please
24 stop violating Rule 30.
25

---

**14**

L. Stidhum

1
2  BY MR. KATAEV:
3     Q   The question is: Who is David?
4     A   David Manrique.
5     Q   Are you saying that David Manrique is an
6  employee of Hillside Auto Mall?
7     A   No.
8     Q   You can clarify. Go ahead.
9     A   So if we are talking about Hillside Auto
10 Mall specifically, then no.
11    Q   When I asked you earlier, did you obtain
12 any statements from other employees at Hillside Auto
13 Outlet, do you want to clarify your answer?
14    A   David Manrique.
15    Q   Other than David Manrique, did anyone else
16 provide any statements?
17    A   No.
18    Q   What statement did David Manrique provide
19 you?
20    A   It's not a statement. It was more a
21 conversation we had.
22    Q   Was it written down in any way?
23    A   No.
24    Q   Was it a text message or email?
25    A   No.

---

**15**

L. Stidhum

1
2     Q   He didn't sign something swearing under
3  penalty of perjury, XYZ?
4     A   No.
5     Q   What did you and David discuss?
6     A   Just, like, the status of the case.
7     Q   That's because David Manrique is a
8  coplaintiff with you in a State court wage and hour
9  action, correct?
10    A   Correct.
11    Q   Against the same defendants here, correct?
12    A   Right.
13    Q   Other than your attorney, did you speak
14 with anyone else about your deposition today?
15    A   No.
16    Q   Did you tell anyone you would be doing a
17 deposition today?
18    A   No.
19    Q   You said you didn't review the complaint
20 in preparation for the deposition. Did you review
21 the complaint in general ever?
22    A   Yes. When it was first submitted. It was
23 quite some time ago.
24    Q   You verified its contents before it was
25 filed, correct?

---

**16**

L. Stidhum

1
2     A   Yes.
3     Q   Have you had any conversations with anyone
4  other than your attorneys in preparation for during
5  your deposition?
6     A   No.
7     Q   Have you had any conversation with anybody
8  else other than your attorneys and David Manrique
9  about your case against the dealership?
10    A   No.
11    Q   What is every name that you ever used or
12 gone by, other than Leticia Francine Stidhum?
13    A   Letty.
14    Q   L-e-t-t-y?
15    A   Yes.
16    Q   Any other names?
17    A   No.
18    Q   The current address that you provided at
19 the beginning of the deposition, do you rent or own?
20    A   Rent.
21    Q   Who do you live with?
22    A   My mother and stepfather and my two
23 children.
24    Q   How old are your children?
25    A   One and three.

---

4 (Pages 13 to 16)

A0197

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 6 of 102 PageID #: 815

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**17**

L. Stidhum

1
2    Q   What is your birthdate?
3    A   My birthdate?
4    Q   Correct.
5    A   ████████
6        MS. TROY:  I'm going to ask that
7    everything except the birth year be marked as
8    confidential.
9        MR. KATAEV:  We have a confidentiality
10   agreement in this case?
11       MS. TROY:  I don't believe so, but I'm
12   going ask that any filings to court have her --
13   again, everything other than her birth year
14   redacted consistent with the local rules of the
15   Eastern District of New York and on the
16   transcript itself, everything other than the
17   birth year be marked as confidential.
18       MR. KATAEV:  I don't believe that's the
19   way it works.  The rule provides if you file
20   something publicly, you redact that
21   information.  It doesn't entitle you to mark it
22   confidential, it just gets redacted.  We will
23   follow the rule.
24   BY MR. KATAEV:
25       Q   Were you born in the United States,

---

**18**

L. Stidhum

1
2    Ms. Stidhum?
3        A   Yes.
4        Q   When is the last time you left the
5    country?
6        A   September of 2020.
7        Q   Prior to that time and focusing on the
8    timeframe of March 2018 until January of '19, did
9    you leave the United States of America?
10       A   No.
11       Q   Same question, did you leave the State of
12   New York?
13       A   Could you clarify the timeframe again?
14       Q   Sure, no problem.  The timeframe again,
15   May 2018 through January of '19.
16       A   I don't believe so.  Again, it was a long
17   time ago so I don't want to answer dishonestly.
18       Q   Are you currently married?
19       A   No.
20       Q   Were you ever married?
21       A   No.
22       Q   Your children currently live with you?
23       A   Yes.
24       Q   You've lived in New York all your life?
25       A   No.

---

**19**

L. Stidhum

1
2    Q   Where did you live prior to living in
3    New York?
4        MS. TROY:  Objection as to timeframe.
5    Could you clarify what timeframe you're talking
6    about.
7        MR. KATAEV:  Her whole life, her whole
8    life.
9        A   Florida.
10       Q   Were you born in Florida?
11       A   Yes.
12       Q   When did you move to New York?
13       A   I have been back and forth pretty much my
14   whole life.  I did some school there, some school
15   here.  So it's kind of a hard question.
16       Q   Understood.  When is the last time you
17   went to Florida and came back to New York,
18   timeframe?
19       A   Like to live?
20       Q   Yes.
21       A   I want to say June of 2018 or -- no, June
22   of 2017.
23       Q   Is when you left to Florida?
24       A   When I came back to New York.
25       Q   After returning from Florida in June of

---

**20**

L. Stidhum

1
2    '17, when is the next time you went back to Florida,
3    if ever?
4        A   For vacation only pretty much.
5        Q   When was that?
6        A   I don't remember exactly.
7        Q   Month and year?
8        A   I have gone back quite a couple of times.
9    Honestly, I don't remember.
10       MR. KATAEV:  We will follow up in writing
11   with an interrogatory about -- to the extent
12   you were in Florida at any point in time for
13   the period of May 2018 until January of '19, we
14   would want to know what dates you were in
15   Florida, but we will follow up in writing.  You
16   don't have to answer now.
17       (Counsel Request.)
18       A   These times I didn't go to Florida.
19       Q   You know that for a fact?
20   ████████████████████████████████████

---

5 (Pages 17 to 20)

A0198

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023



6 (Pages 21 to 24)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

25

L. Stidhum
1
2   extent that you did not produce a document that
3   is part of the document production request, I
4   don't think you're entitled to use it.
5      MR. KATAEV:  You're wrong.  I objected and
6   you didn't follow up in a motion to compel and
7   you were denied your motion to compel in that
8   regard.
9      Can we proceed?
10     MS. TROY:  I understand that you're trying
11  to --
12     MR. KATAEV:  We are not here to discuss
13  your objections.  This is my deposition.  I
14  want to move on.  Can we move on?
15     MS. TROY:  I understand.  I'm going to
16  make a quick record.  I'm going to make it
17  clear to the record that I requested this as
18  part of the document request.  Mr. Kataev did
19  not produce the document as part of the
20  document production request.
21     MR. KATAEV:  That's correct.  I objected
22  and you failed to follow up in a motion to
23  compel and you already lost your motion to
24  compel in that regard.  We are moving on.
25     MS. TROY:  That is incorrect.

26

L. Stidhum
1
2      MR. KATAEV:  You can take it up with the
3   court.  I'm going to proceed with my
4   deposition.
5   BY MR. KATAEV:
6      Q   Ms. Stidhum, other than this lawsuit and a
7   State court wage and hour lawsuit with Mr. Manrique,
8   have you ever been a party to any other lawsuit as a
9   plaintiff or defendant?
10     A   No.
11     Q   These are the only two lawsuits you have
12  ever been a part of?
13     A   Yes.
14     Q   Have you ever filed a complaint against
15  any of your employers with any administrative agency
16  ever?
17     A   Yes.
18     Q   Which agency did you file a complaint
19  with?
20     MS. TROY:  If she knows.
21     MR. KATAEV:  Don't coach the witness.  You
22  either say, Objection, and the grounds they are
23  for or nothing.  Do not say, If she knows.
24  You're coaching her to say, I don't know, I
25  don't abide by that.  I'm going to call the

27

L. Stidhum
1
2   court.  It's not proper conduct.
3   BY MR. KATAEV:
4      Q   Please answer the question.
5      A   If I'm not mistaken, the EEOC.
6      Q   Other than the EEOC, did you ever file a
7   complaint with any other administrative agency?
8      A   No.
9      Q   Thank you.  Just for the record, the
10  complaint you filed with the EEOC relates to the
11  same defendants here, correct?
12     A   Yes.
13     MS. TROY:  Objection.  It's not a
14  complaint.
15     MR. KATAEV:  It's just, Objection to form.
16  You don't say, It's not a complaint.  Stop with
17  the speaking objections, okay?
18  BY MR. KATAEV:
19     Q   Have you ever filed for unemployment?
20     A   Yes.
21     Q   Against which employer did you file an
22  unemployment claim for?
23     A   Luxury Motor Club.
24     Q   That's after your left your employment
25  with the defendants, correct?

28

L. Stidhum
1
2      A   Right.
3      Q   Have you ever filed a claim for workers'
4   compensation?
5      A   No.
6      Q   Have you ever applied for food stamps?
7      A   Yes.
8      Q   When was the most recent time?
9      A   Currently I have them.
10     Q   For the record, to apply for food stamps,
11  you have to provide information about your income,
12  correct?
13     A   Correct.
14     Q   You provided that information about your
15  income, correct?
16     A   Right.
17     Q   Did you ever apply for Medicare or
18  Medicaid?
19     A   Yes.
20     Q   You currently have that as well, right?
21     A   Right.
22     Q   In order to obtain Medicare/Medicaid, you
23  also have to provide information about your income,
24  correct?
25     A   Yes.

7 (Pages 25 to 28)

A0200

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 9 of 102 PageID #: 818

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

**29**

L. Stidhum

1
2  Q   You did provide that information, correct?
3  A   Yes.
4  Q   Have you ever applied for childcare
5  assistance?
6  A   I'm not sure.
7  MR. KATAEV:  We will follow up in writing.
8  (Counsel Request.)
9  BY MR. KATAEV:
10  Q   What about housing assistance?
11  A   Yes.
12  Q   You currently have that as well?
13  A   Yes.
14  Q   Again, you have to provide information
15  about your income for that, right?
16  A   Yes.
17  Q   You did provide that information, correct?
18  A   Correct.
19  Q   To the extent that food assistance is
20  different from food stamps, did you ever apply for
21  that benefit?
22  A   I don't think so.
23  Q   What about educational assistance?
24  A   No, I don't think so.
25  Q   Did you attend high school?

---

**30**

L. Stidhum

1
2  A   Yes.
3  Q   Where?
4  A   Florida.
5  Q   Name?
6  A   Gateway High School, but that's not where
7  I graduated from.
8  Q   Where did you graduate?
9  A   Alco.  I got my GED.
10  Q   Which schools, if any, did you attend here
11  in New York for high school?
12  A   Flushing High School and Benjamin Cardozo.
13  Q   You didn't get a high school diploma, you
14  got a GED, correct?
15  A   Correct.
16  Q   Did you ever attend any college?
17  A   No.
18  Q   Did you have gap in your education during
19  high school?
20  A   No.
21  Q   There is no graduate or professional
22  school, correct?
23  A   No.
24  Q   What about vocational school?
25  A   No.

---

**31**

L. Stidhum

1
2  Q   Are you familiar with dealership
3  certification programs?
4  A   Not really.
5  Q   Are you aware, for example, that if you
6  sell Ford vehicles that Ford offers certification
7  programs for salespeople?
8  A   Yes.
9  Q   Have you ever taken any of those kind of
10  courses?
11  A   No.
12  Q   Were those offered to you at any of the
13  dealerships you worked for?
14  A   No, I mostly worked for used car lots.
15  Q   Used car lots generally don't offer those?
16  A   No.
17  Q   After you got your GED in Florida, is that
18  the first time you started working?
19  A   I'm not sure.
20  Q   Do you recall whether you ever worked
21  during high school?
22  A   I don't believe so.  No, I didn't.
23  Q   After you got your GED, where was the
24  first place you remember working?
25  A   McDonald's.

---

**32**

L. Stidhum

1
2  Q   Do you remember the month and year you
3  started there?
4  A   No idea.
5  Q   After you worked at McDonald's, where did
6  you work?
7  A   I can't remember that far back.  I want to
8  say it might have been Dollar Tree.
9  Q   The McDonald's that you worked at, was it
10  in Florida or New York?
11  A   Florida.
12  Q   What about Dollar Tree?
13  A   New York.
14  Q   Do you remember the month and year you
15  started at Dollar Tree?
16  A   I don't.
17  Q   Did you get fired from McDonald's?
18  A   No, I quit.
19  Q   Why?
20  A   I was being young and stupid kind of.
21  Q   Understood.  What about Dollar Tree?
22  A   I quit there too actually.
23  Q   Where did you work after Dollar Tree?
24  A   That's when I got the interview with Isaac
25  after that.  No, I'm sorry, that's not true.  I

---

8 (Pages 29 to 32)

A0201

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 10 of 102 PageID #: 819

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**33**

L. Stidhum

1 actually worked at Marco LaGuardia Hotel.
2    Q   Hotel?
3    A   Yes.
4    Q   What position did you work?
5    A   Housekeeping.
6    Q   That was at the airport?
7    A   No.  That's right here off of Main Street,
8 Northern Boulevard.
9    Q   Is that close to where you lived at the
10 time?
11    A   Yes.
12    Q   Is that close to where you live now?
13    A   Pretty much.  Ten-minute drive.
14    Q   Do you remember the month and year you
15 started working at the hotel?
16    A   I don't.  I didn't stay there very long.
17    Q   After the hotel is when you first started
18 working for Hillside Auto Outlet, correct?
19    A   Correct.
20    Q   You started working at Hillside Auto
21 Outlet in May of '18, correct?
22    A   Yes.
23    Q   Hillside Auto Outlet was the first -- was
24 the first automobile business that you ever worked

---

**34**

L. Stidhum

1 in, correct?
2    A   Yes.
3    Q   Therefore, you had no experience in the
4 automobile industry prior to that time, correct?
5    A   Correct.
6    Q   You worked at Hillside Auto Outlet from
7 May of '18 until January of '19, correct?
8    A   Right.
9    Q   Although you are also suing Hillside Auto
10 Mall, you never directly worked at Hillside Auto
11 Mall as an employee, correct?
12    A   I kind of need that question clarified
13 because I have sold cars at Hillside Auto Mall.
14    Q   Let me try.  I'm going to give you a very
15 long question of what I understand to be the case
16 and you will confirm what's accurate and what's not,
17 okay?
18    A   Okay.
19    Q   You came to work as a salesperson for
20 Hillside Auto Outlet and worked at Hillside Auto
21 Outlet and was paid by Hillside Auto Outlet from May
22 of '18 until January of '19.  However, during the
23 time that you worked at Hillside Auto Outlet, you
24 sometimes sold vehicles that were kept or maintained

---

**35**

L. Stidhum

1 by Hillside Auto Mall; is that correct?
2    A   Yes.
3    Q   During the time you worked at Hillside
4 Auto Outlet, you sometimes sold vehicles located at
5 other dealerships unrelated to Hillside Auto Outlet
6 or Hillside Auto Mall, correct?
7    A   Yes.
8    Q   You're not alleging that those other
9 dealerships that you sold vehicles for are also an
10 employer here, correct?
11    A   Right, because from my understanding
12 Hillside Auto Outlet and Mall were kind of run by
13 the same people.
14    Q   That's the reason you included Hillside
15 Auto Mall in this case, correct?
16    A   Right.
17    Q   Because, as your understanding, they are
18 what we call in legal parlance, joint employers,
19 correct?
20    A   I'm sorry, one more time.
21    MR. KATAEV:  Read it back.
22 (Whereupon, the referred to question was read back
23        by the reporter.)
24    MS. TROY:  Objection to the extent it

---

**36**

L. Stidhum

1 calls for a legal conclusion.
2 BY MR. KATAEV:
3    Q   You can answer.  Go ahead.
4    A   I'm not sure.
5    Q   Okay, that's fine.  Your employment with
6 Hillside Auto Outlet ended in January of '19,
7 correct?
8    A   Correct.
9    Q   That's because you quit, correct?
10    A   Yes.
11    Q   During the time you worked at Hillside
12 Auto Outlet, your sole position or job title was
13 salesperson, correct?
14    A   Right.
15    Q   Your primary responsibility was selling
16 cars, correct?
17    A   Right.
18    Q   Any other responsibilities that you had?
19    A   Um, not necessarily responsibilities, no.
20    Q   Who were your supervisors while you worked
21 at Hillside Auto Outlet?
22    A   Isaac was one, Jay or Jenneque, she was
23 another for a short period of time, a couple of
24 months.  Andris Guzman and that was about it as far

---

9  (Pages 33 to 36)

A0202

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 11 of 102 PageID #: 820

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

37

L. Stidhum

1  as supervisors, yes.
2      Q   Can you describe basically what your
3  compensation structure was there?
4      A   So in the beginning when I was first hired
5  after interviewing with Isaac and speaking with
6  Jenneque, I was told I would be paid $300 weekly,
7  $150 flat, and after anything over $3,000 I would
8  receive 5 percent, and it is reflected on my
9  paystubs for the first couple of months up until Jay
10  was fired or quit.  I don't know what happened in
11  that situation.  Then, I started just receiving the
12  $150 flat.
13     Q   Let's say the schedule that you worked was
14  generally Monday to Friday, correct?
15     A   No.
16     Q   What was your schedule like?
17     A   So I had Wednesdays off and we would work
18  alternating Sundays.
19     Q   You either worked five days a week or six
20  days?
21     A   Correct.
22     Q   And so do you know what the actual work
23  week was?  Did they do it Monday through Sunday or
24  did they do it Saturday through Friday?

---

38

L. Stidhum

1      A   I have no idea.  I know that I received my
2  check Thursdays.
3      Q   The check that you received on Thursdays
4  was for the entire prior week, correct, whatever the
5  week was?
6      A   Yes.
7      Q   How did you go about verifying that you
8  got paid properly on any given week?
9      A   So weekly we would get a form that has
10  like three pieces together, so -- for copies, and we
11  would have to turn it into the sales manager and
12  they would give it to the girl who does the payroll.
13     Q   Who was that?
14     A   There was a couple.  From the beginning,
15  it was -- I can't remember who it was in the
16  beginning.  I know it ended with Denise doing my
17  payroll, Denise and Iris.  There was a couple of
18  people in between.
19     Q   Does Dianna Jennings ring a bell?
20     A   No.
21     Q   Dina Jennings?
22     A   Dina, I didn't really meet because she was
23  hardly ever there.  I've probably seen her three or
24  four times.

---

39

L. Stidhum

1      Q   Let's break down the compensation.  $300 a
2  week is the flat $300 a week, right?
3      A   Salary.
4      Q   The $150 per car is for every car you
5  sold, correct?
6      A   Yes.
7      Q   In order for the car to be considered
8  sold, it had to be delivered, right?
9      A   Right.
10     Q   Which means the customer took possession
11  of the vehicle and all the funds had been received
12  from the bank and all of that, right?
13     A   I mean yes and no because there would be
14  times that I would still get paid on all the cars
15  even if it was not funded.  It's a yes-and-no
16  answer.
17     Q   In terms of getting paid for vehicles that
18  were not funded, did it sometimes happen that you
19  did not get paid on a vehicle that hasn't been
20  funded yet?
21     A   One more time.
22     Q   Was it sometimes the case that a vehicle
23  was not funded and you didn't get paid on it?
24     A   Yes.  That happened a couple of times but

---

40

L. Stidhum

1  relatively quickly with the funding, they would do a
2  pretty good job of that.
3      Q   They would like to take care of you while
4  you worked there, correct?
5          MS. TROY:  Objection to form.
6      Q   You can answer.
7      A   I guess.
8      Q   When they paid you for a vehicle that
9  hasn't been funded yet, they did so in their
10  discretion, correct?
11     A   It would be something that I wasn't aware
12  of.  It might have happened, it might have happened.
13  I'm not sure.  I'm not looking at the back end of
14  the dealership.
15     Q   You don't care whether it's funded or not,
16  you want to get your commission, right?
17     A   Of course.
18     Q   How would you keep track of the vehicles
19  that you sold in any given week?
20     A   With that same form.  I would do that
21  monthly.
22     Q   Did you ever take pictures of that form on
23  your cellphone?
24     A   No, because I would have the copies so it

---

10 (Pages 37 to 40)

A0203

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 12 of 102 PageID #: 821

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 41 |
|---|---|

L. Stidhum

1  L. Stidhum
2  wasn't something that I really needed to take
3  pictures of.
4      Q   Have you produced those copies in this
5  case?
6      A   No, because I don't think anybody plans to
7  be mistreated or anything like that to hold on to
8  stuff like that.
9      Q   What you're saying is you never held on to
10  those documents?
11      A   No.  After I would get paid, I would
12  discard them.
13      Q   The reason you discarded them was because
14  you were satisfied that you were properly paid,
15  correct?
16      A   I don't know how to answer that question.
17      Q   Answer to the best of your ability.
18      A   I mean, if I'm getting paid on the deal
19  there is no reason for me to hold on to it.
20      Q   You threw it out because you were
21  satisfied that you were properly paid, right?
22      MS. TROY:  Objection.  Argumentative.
23      Q   You can answer.
24      MS. TROY:  Objection.  Asked and answered.
25      Q   I would like to hear the answer.

|  | 42 |
|---|---|

L. Stidhum

1  L. Stidhum
2      MS. TROY:  Because you don't like the
3  answer doesn't mean you can ask it again.  The
4  witness can answer again.
5  BY MR. KATAEV:
6      Q   Go ahead.
7      A   I'm sorry.
8      Q   The reason why you threw out the document
9  was because you were satisfied that you were paid
10  properly, correct?
11      A   Yes, up until I was owed money.  Up until
12  I was shorted on my commissions.
13      Q   How did you come to be aware that you were
14  owed money or that you were short on the
15  commissions?
16      A   Because I know what I'm owed to start.  I
17  would know how many cars I would sell weekly and
18  what I'm owed weekly.  Again, I was getting paid
19  that $150 flat so it wasn't something that -- it
20  wasn't a mystery to solve.  Of course I know what
21  I'm looking forward to expecting especially upon
22  leaving somewhere.
23      Q   Going through the 5 percent bonus, can you
24  explain that in your own words?
25      A   It wasn't a 5 percent bonus.  It was

|  | 43 |
|---|---|

L. Stidhum

1  L. Stidhum
2  anything paid over -- any deal that made over $3,000
3  because at 5 percent, $3,000 would be $150.
4  Anything that made over that, I was receiving that
5  extra compensation up until Jay was fired and it
6  does reflect on my paystubs.
7      Q   Jay is the person that you referred to as
8  Jenneque, correct?
9      A   Yes.
10      Q   So when you say $3,000, you're saying
11  that's what the vehicle sold for?
12      A   No.  That's what the deal made.
13      Q   The gross profit?
14      A   Right.
15      Q   When is it that Jay was no longer at the
16  company?
17      A   I'm not quite sure.  It had to be at the
18  end of July or sometime in August.  It was sometime
19  in the summer I remember.
20      Q   At some point after July or August of
21  2018, you no longer got that 5 percent, correct?
22      A   Correct.
23      Q   You continued your employment with the
24  dealership, correct?
25      A   Yes.

|  | 44 |
|---|---|

L. Stidhum

1  L. Stidhum
2      Q   Did anyone inform you they are no longer
3  offering the 5 percent in July or August?
4      A   No.
5      Q   Did you come to anyone and say, What
6  happened to the 5 percent?
7      A   I did mention it and it was kind of
8  brushed off.
9      Q   Who did you mention it to?
10      A   Isaac.
11      Q   What did Isaac say to you?
12      A   I don't recall.
13      MR. KATAEV:  Off the record.
14  (Whereupon, an off-the-record discussion was held.)
15  BY MR. KATAEV:
16      Q   You testified that you quit in January of
17  '19, right?
18      A   Correct.
19      Q   What was the reason that you quit?
20      A   It was a combination of things between the
21  pregnancy discrimination, being owed money and not
22  paid it.  It was a couple of things.  Also, I was
23  promised a position that I guess I wasn't receiving
24  due to my pregnancy, so like I said, it was a
25  combination of things.

11 (Pages 41 to 44)

A0204

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 45 |
|---|---|

L. Stidhum

1
2    Q   We are going to get into the pregnancy
3  discrimination position you talked about a little
4  later. I want to focus on the compensation aspect
5  and I have some more granular questions about your
6  decision to quit related to those financial aspects
7  so I'm going to focus in on that for now.
8        A   Okay.
9        Q   Did you quit because you stopped receiving
10 the 5 percent?
11       A   No.
12       Q   Did you quit because of waiting times?
13       A   Yes. That's what one of the factors.
14       Q   Tell me about the waiting times?
15       A   So like I mentioned a couple of times, I
16 did have my own access to Dealertrack and once Isaac
17 did go on vacation, the password was changed and
18 Guzman was the supervising manager at the time and
19 he refused to give it to me. So that did increase
20 my waiting times because I was not able to qualify
21 my customers on my own and they would leave.
22       Q   Assuming you were able to qualify your
23 customers, that doesn't necessarily mean you would
24 make the sale, correct?
25       A   Right.

|  | 46 |
|---|---|

L. Stidhum

1
2        Q   It only increased the chances of making
3  the sale, correct?
4        A   Not necessarily increases it, but it gives
5  me the opportunity to see who I'm wasting time on
6  and who I'm not wasting time on. We were in Jamaica
7  so we would get a lot of customers that did not
8  qualify.
9            Me having my own access to Isaac's
10 Dealertrack would give me the ability to qualify my
11 customers on my own rather than waste time on
12 somebody and wait on Andris or Isaac or whoever to
13 check the credit.
14           MR. KATAEV: Can I have the last question
15       and answer read back?
16 (Whereupon, the referred testimony was read back
17       by the reporter.)
18 BY MR. KATAEV:
19       Q   You acknowledge, however, that you were
20 the only salesperson that had access to Dealertrack
21 to qualify individuals, correct?
22       A   Yes.
23       Q   All the other salespeople did not have
24 that ability that you did for some time, correct?
25       A   That I know of at least.

|  | 47 |
|---|---|

L. Stidhum

1
2        Q   Generally, it was the responsibility of an
3  F&I manager or someone else in the dealership, other
4  than a salesperson, to qualify individuals, correct?
5        A   Not just an F&I. The general manager or
6  sales manager, I don't know their titles exactly,
7  but they have access as well.
8        Q   Those individuals are not salespeople,
9  correct?
10       A   Right.
11       Q   You say that you obtained access to
12 Dealertrack, right?
13       A   I was given it, yes.
14       Q   Who gave it to you?
15       A   Isaac.
16       Q   How did he give it to you?
17       A   Honestly, I don't remember because, like I
18 said, the password would be changed after a certain
19 period of time because it's sensitive information.
20 They would change the password, but he would put it
21 on a sticky note or he would come to my desk and
22 type in the password himself. He was the only one
23 giving me the password.
24       Q   The username for the Dealertrack account,
25 whose was it?

|  | 48 |
|---|---|

L. Stidhum

1
2        A   It was Isaac's. I never had anybody
3  else's.
4        Q   You didn't have your own, correct?
5        A   I did not.
6        Q   After you quit working at Hillside Auto
7  Outlet, where did you work next?
8        A   NYC Motor Cars.
9        Q   Where is that?
10       A   Queens Boulevard.
11       Q   Did you start working there in January of
12 '19 or some other point?
13       A   I'm not sure if I waited until the start
14 of February or not, so I'm not 100 percent sure. It
15 was definitely early that year.
16       Q   In January or February of '19, correct?
17       A   Probably more towards the end of January
18 or beginning of February.
19       Q   In order to begin a job there, you had to
20 fill out an employment application?
21       A   I actually did not.
22       Q   1,000 percent sure you didn't?
23       A   An application?
24           MS. TROY: Objection as to form.
25       Q   You can answer.

12 (Pages 45 to 48)

A0205

Case 1:21-cv-07163-OEM-LB    Document 87-2    Filed 09/01/23    Page 14 of 102 PageID #: 823

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 49 |
|---|---|
| | L. Stidhum |
| 1 | |
| 2 | MS. TROY:  What do you mean by |
| 3 | 1,000 percent sure?  Objection to form. |
| 4 | MR. KATAEV:  I'm not going to qualify that |
| 5 | with a response.  You can answer the question. |
| 6 | MS. TROY:  Rephrase your question, sir. |
| 7 | BY MR. KATAEV: |
| 8 | Q   Please answer the question as asked. |
| 9 | A   Repeat it. |
| 10 | Q   Are you 1,000 percent sure you did not |
| 11 | fill out any employment application at NYC Motor |
| 12 | Cars? |
| 13 | A   I don't remember filling one out.  I was |
| 14 | brought there by a sales manager that Isaac had |
| 15 | working with him. |
| 16 | Q   Who was that? |
| 17 | A   Ali. |
| 18 | Q   When you say you can't remember, you can't |
| 19 | remember one way or the other, correct? |
| 20 | A   What do you mean? |
| 21 | Q   You can't remember whether you did fill |
| 22 | out an employment application or not? |
| 23 | A   Right.  I was brought there by someone |
| 24 | else.  He was kind of like, You don't have to be |
| 25 | interviewed, you don't have to do this, just come. |

|  | 50 |
|---|---|
| 1 | L. Stidhum |
| 2 | Q   Do you know Ali's full name? |
| 3 | A   I'm not sure how to spell it.  Ali |
| 4 | Raskesnia, something like that. |
| 5 | Q   When you started working at NYC Motor |
| 6 | Cars, it was a new dealership? |
| 7 | A   Not that I know of. |
| 8 | Q   Was your compensation structure there the |
| 9 | same as it was at Hillside Auto Outlet? |
| 10 | A   No. |
| 11 | Q   What was the compensation structure there? |
| 12 | A   The commission was doubled. |
| 13 | Q   In other words, it was $300 per car? |
| 14 | A   Yes. |
| 15 | Q   It was the same $300 weekly draw? |
| 16 | A   Yes.  Not draw, it was salary. |
| 17 | Q   Thank you for clarifying.  There was no |
| 18 | 5 percent bonus? |
| 19 | A   No, but I did have a monthly bonus |
| 20 | structure. |
| 21 | Q   Based on volume, correct? |
| 22 | A   Correct. |
| 23 | Q   When did you stop working at NYC Motor |
| 24 | Cars? |
| 25 | A   When I gave birth. |

|  | 51 |
|---|---|
| 1 | L. Stidhum |
| 2 | Q   When was that? |
| 3 | A   In July.  I stayed, like, a week up until |
| 4 | I gave birth so maybe July of 20-something. |
| 5 | Q   2020? |
| 6 | A   2019. |
| 7 | Q   I see what you're saying.  20-something |
| 8 | meaning the day? |
| 9 | A   Yes. |
| 10 | Q   Congratulations by the way. |
| 11 | A   Thanks. |
| 12 | Q   You were there at NYC Motor Cars for |
| 13 | approximately six months, correct? |
| 14 | A   Right, and I did go back. |
| 15 | Q   When did you return? |
| 16 | A   I want to say like October, September, |
| 17 | October around there. |
| 18 | Q   Are you still employed there? |
| 19 | A   No, I'm not. |
| 20 | Q   When did you cease working there? |
| 21 | A   About a month or two after I actually left |
| 22 | because the store was completely different, |
| 23 | employees were different, it was not doing the |
| 24 | volume it was and I became a BDC manager at Luxury |
| 25 | Motor Club. |

|  | 52 |
|---|---|
| 1 | L. Stidhum |
| 2 | Q   Business development center? |
| 3 | A   Yes. |
| 4 | Q   You ceased working at NYC Motor Cars in or |
| 5 | about November or December of 2019, correct? |
| 6 | A   Yes. |
| 7 | Q   You quit? |
| 8 | A   I'm sorry? |
| 9 | Q   You quit? |
| 10 | A   Yes, I did. |
| 11 | Q   You went to Luxury? |
| 12 | A   Motor Club. |
| 13 | Q   Where is that? |
| 14 | A   In Franklin Square. |
| 15 | Q   How did you obtain the position there? |
| 16 | A   Probably on Indeed or something.  Some |
| 17 | type of employment ad. |
| 18 | Q   When did you start there? |
| 19 | A   Mid November of 2019. |
| 20 | Q   Are you still working there? |
| 21 | A   No, I'm not. |
| 22 | Q   When did you stop working there? |
| 23 | A   When Covid hit.  March, early March.  I |
| 24 | got Covid really bad.  I decided to leave and not |
| 25 | get my kids sick. |

13 (Pages 49 to 52)

A0206

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 15 of 102 PageID #: 824

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

53

L. Stidhum
1
2  Q  Did you return to the workforce after
3  March 2020?
4  A  I did.
5  Q  When was that?
6  A  Actually, the owner of NYC Motor Cars
7  called me that he was opening a new store so I don't
8  remember the exact time, but he told me he was
9  opening a new store and he wanted me to run the
10  store that I worked at on Queens Boulevard.  I don't
11  remember the exact month and date.
12  Q  If I understand correctly, the owner of
13  NYC Motor Cars was opening a new store and needed
14  your help with his existing store at NYC Motor Cars?
15  A  Correct.
16  Q  Did you go back to NYC Motor Cars?
17  A  I did as a sales manager.
18  Q  Do you remember what month in 2020 it was?
19  A  I don't.  It was probably maybe late
20  April, early May, around there.
21  Q  That's fine.  Are you still there?
22  A  No, I'm not.
23  Q  When did you stop work there?
24  A  I don't remember the exact timeframe.  I'm
25  not sure.  I was trying to think.

54

L. Stidhum
1
2  Q  Where are you working now?
3  A  I'm not working.
4  Q  When did you stop working?
5  A  I gave birth last year.  I took off pretty
6  much since January of last year.
7  Q  January of 2022?
8  A  Right.  I did work at a dealership for a
9  couple of weeks.  It didn't work out.  It was super
10  slow.
11  Q  Which dealership was that?
12  A  Great Neck Motor Sports.
13  Q  Is that on Great Neck Road?
14  A  Yes.
15  MR. KATAEV:  Off the record.
16  (Whereupon, an off-the-record discussion was held.)
17  BY MR. KATAEV:
18  Q  Other than the last job at NYC Motor Cars
19  as a sales manager and the job at Great Neck Motor
20  Sports, did you work anywhere else after April of
21  2020?
22  A  Yes, I did.  NY Luxury Motors, but again
23  it was a bad situation there.  It was in a bad spot
24  and the dealership wasn't getting any traffic at
25  all, so I decided to leave and look for other

55

L. Stidhum
1
2  employment elsewhere.
3  Q  Were you fired from any of these jobs we
4  talked about today?
5  A  No, I was not.
6  Q  At any of these jobs, did you ever fill
7  out any employment application?
8  A  For Luxury Motor Club, I definitely did.
9  Great Neck, I definitely did.  The only one I can't
10  recall is NYC Motor Cars because Ali was the one who
11  brought me there, I don't remember.  Everywhere else
12  I did fill out an employment application.
13  Q  Whenever you filled out an employment
14  application, you did list Hillside Auto Outlet as a
15  past experience, correct?
16  A  Of course.
17  Q  The only reason there are gaps in your
18  work experience is because of the birth of your two
19  children, correct?
20  A  Right, and Covid.
21  Q  When you applied for a position at
22  Hillside Auto Outlet it was for a salesperson,
23  correct?
24  A  Right.
25  Q  How was it you learned about the position?

56

L. Stidhum
1
2  A  I believe it was Craigslist and I got a
3  call the next day.
4  Q  You called based on the Craigslist ad?
5  A  No.  I sent in my application and got a
6  phonecall the next day.  Not my application, my
7  resume.
8  Q  When you got the call the next day, do you
9  remember who it was?
10  A  Isaac.
11  Q  To the best of your recollection, how did
12  the conversation go?
13  A  I don't remember.  He told me to come in,
14  if I can come in the same day and I was kind of
15  bummed about losing my job -- not losing my job,
16  leaving my job at the hotel and I wanted to get a
17  job so bad, so I went the same day that he called
18  and got the job.
19  Q  You met with Isaac in person that day?
20  A  Yes.
21  Q  What do you recall about your conversation
22  with Isaac in person that day?
23  A  Honestly, I don't remember.  I remember
24  him saying that he was willing to give me a shot and
25  to wait for his partner and then I spoke with Jay.

14 (Pages 53 to 56)

A0207

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

57

L. Stidhum
1
2    Q   When you refer to his partner, that was
3    Jenneque?
4    A   Yes.
5    Q   You also spoke with Jenneque that day?
6    A   Yes, I did.
7    Q   You got the job the same day?
8    A   Right.
9    Q   An interview took place at the dealership,
10   correct?
11   A   Yes.
12   Q   At Hillside Auto Outlet, correct?
13   A   Yes.
14   Q   What is your understanding as to the basis
15   for which you got hired?
16   A   What do you mean by that?
17   Q   Why do you believe you were hired?
18   A   I'm not sure.
19   Q   As far as you understood it, Isaac and/or
20   Jenneque together made a decision to hire you,
21   correct?
22   A   I mean, Isaac already told me he was
23   willing to give me a shot and it was more like a
24   meeting Jay type of thing.
25   Q   At the time you were hired, Andris Guzman

---

58

L. Stidhum
1
2    was not an employee of the dealership yet, correct?
3    A   He was.
4    Q   He did not participate in the decision to
5    hire you, as far as you know, correct?
6    A   No, he did not.
7    Q   You know that for a fact or it's as far as
8    you know?
9    A   It's as far as I know.
10   Q   He did not interview you, correct?
11   A   No.
12   Q   At the time that you were hired, Jory did
13   not participate in the decision to hire you,
14   correct?
15   A   No.
16   Q   Jory was not present daily at the
17   dealership, correct?
18   A   Yes.
19   Q   Was Jory ever present at the dealership?
20   A   He was.  He would pop in a couple of times
21   a month.
22   Q   Same question for Ron:  As far as you
23   know, he did not participate in the decision to hire
24   you, correct?
25   A   No.

---

59

L. Stidhum
1
2    Q   Was Ronald ever present at the dealership?
3    A   Again, same thing.  Yes, here and there.
4    Q   During the times that Jory and/or Ron
5    would visit the dealership, did you interact with
6    either of them?
7    A   Yes.
8    Q   What was the nature of your interaction
9    with them?
10   A   It was more of how we were doing, how
11   things were going.
12   Q   Pleasantries?
13   A   Pretty much.
14   Q   Do you recall receiving a written offer of
15   employment when you were hired?
16   A   No, I did not.
17   Q   Did you start work the same day you were
18   hired?
19   A   I'm not 100 percent sure.  I want to say
20   yes, but I'm not sure.
21   Q   To whom did you report as soon as you
22   started working?
23   A   What do you mean to who did I report?
24   Q   As a salesperson, you reported to someone
25   higher, correct?

---

60

L. Stidhum
1
2    A   Right.  Mostly I would go to Isaac or Jay,
3    when I first started there at least.
4    Q   You did not report to Andris Guzman at the
5    time, correct?
6    A   Not that I can really recall.  Up until
7    Jay leaving, he didn't do too much.
8    Q   Jay left in July or August of?
9    A   2018.
10   Q   After July or August of 2018 is when you
11   started reporting to Andris Guzman; is that right?
12   A   Correct.
13   Q   You never reported to Jory, correct?
14   A   Not on that aspect.  Only when there was
15   an issue.
16   Q   Give me an example.
17   A   Like, when I was missing some of my car
18   pay, I did reach out to him, I called him and sent
19   him a text message as well.
20   Q   That was in January of '19 before you
21   quit, correct?
22   A   Correct.
23   Q   Other than that --
24   A   No, I'm sorry.  It was probably after I
25   quit, once I didn't receive the compensation after

---

15  (Pages 57 to 60)

A0208

Case 1:21-cv-07163-OEM-LB Document 87-2 Filed 09/01/23 Page 17 of 102 PageID #: 826

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

|  | 61 |
|---|---|
| 1 | L. Stidhum |
| 2 | telling Isaac. |
| 3 | Q In January of '19, correct? |
| 4 | A Right. |
| 5 | Q Other than that, you never interacted with |
| 6 | him other than pleasantries, correct? |
| 7 | A For Jory, yes, that's pretty much it. |
| 8 | Q What about Ronald, you never reported to |
| 9 | him, correct? |
| 10 | A Right. |
| 11 | Q You had no interactions with him other |
| 12 | than pleasantries, correct? |
| 13 | A And about the bonus situation. |
| 14 | Q When did you reach out to Ron about the |
| 15 | bonus situation? |
| 16 | A I didn't reach out to him. He was in the |
| 17 | store. He came in, asked how everyone was doing, he |
| 18 | looked really happy. I mentioned -- I don't know |
| 19 | how I worded it, but I mentioned I was pissed |
| 20 | because I didn't get the bonus and I was only a |
| 21 | couple of cars away, and that I was really hoping to |
| 22 | get it because I was pregnant and stuff. That's |
| 23 | when whatever conversation happened between him and |
| 24 | Isaac happened. I don't know what happened after |
| 25 | that. |

|  | 62 |
|---|---|
| 1 | L. Stidhum |
| 2 | Q Do you remember when that was, month and |
| 3 | year? |
| 4 | A Early December or the last two days of |
| 5 | November, something like that. It had to be the end |
| 6 | of November or early December. |
| 7 | Q After Jenneque left, you started reporting |
| 8 | to Andris Guzman. What was the nature of the |
| 9 | working relationship? What did you report to him |
| 10 | on? |
| 11 | A So up until I got my own access -- |
| 12 | actually, I feel like it was right about the same |
| 13 | time because Jay was pretty quick with what she |
| 14 | would do. For the first couple of days, I had to go |
| 15 | to him, give him the application, have him run the |
| 16 | credit and let me know if the customer qualified or |
| 17 | whatever the case may be. That was pretty much it |
| 18 | up until I got my own access, then we really didn't |
| 19 | have to do too much communicating. |
| 20 | Q From the first time you started working at |
| 21 | the dealership initially in order to get financing, |
| 22 | you would have to go to Jay in order to run credit |
| 23 | and apply for financing, correct? |
| 24 | A Right. I mean, I was new to the business |
| 25 | so I don't know much about those things up until I |

|  | 63 |
|---|---|
| 1 | L. Stidhum |
| 2 | was taught it. |
| 3 | Q Fair enough. When Jay left, you continued |
| 4 | doing that with Andris, correct? |
| 5 | A Right. |
| 6 | Q Let's set aside for now the Dealertrack. |
| 7 | I have some questions about this process before you |
| 8 | got the Dealertrack access. |
| 9 | When you worked with Jay to get these |
| 10 | financing applications in, was Jay the exclusive, |
| 11 | only person that did this? |
| 12 | A No. |
| 13 | Q Sometimes you worked with others, correct? |
| 14 | A Yes. Isaac would do it as well. |
| 15 | Q Other than Isaac and Jay, was there anyone |
| 16 | else that did it? |
| 17 | A Later on there was a finance manager hired |
| 18 | after Jay left. |
| 19 | Q Who was that? |
| 20 | A Serge. |
| 21 | Q Serge came on after? |
| 22 | A Yes. |
| 23 | Q After Jay left? |
| 24 | A Yes. |
| 25 | Q In the beginning, it was Isaac or Jay and |

|  | 64 |
|---|---|
| 1 | L. Stidhum |
| 2 | that's it, correct? |
| 3 | A Correct. |
| 4 | Q How did you go about deciding who to go |
| 5 | to? |
| 6 | A Whoever was less busy. I was always |
| 7 | trying to grab whoever I could. Whoever was less |
| 8 | busy is who I would go it. |
| 9 | Q After Jay left, you had the option of |
| 10 | Andris or Isaac, correct? |
| 11 | A Right, and I would choose Isaac more of |
| 12 | the time because he was quicker. Andris was getting |
| 13 | trained to do that part. Once Jay left, he was kind |
| 14 | of taking over her position. |
| 15 | Q Jay left in August or July of '18. Do you |
| 16 | remember in relation to that when Serge started? |
| 17 | A It had to be like end of August because I |
| 18 | remember there was a couple of people that came to |
| 19 | interview and stuff so it had to be after but I'm |
| 20 | not sure exact dates. |
| 21 | Q Whenever you went to Isaac or Jay in the |
| 22 | beginning to run financing applications for |
| 23 | customers of the dealership, prospective customers |
| 24 | of the dealership, there would sometimes be delays |
| 25 | caused because the banks wanted more information, |

16 (Pages 61 to 64)

A0209

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

**Page 65**

1    L. Stidhum
2  correct?
3    A   Yes and no.
4    Q   Explain.
5    A   I mean, when it comes to any delays in
6  banks, it would be because of a document that they
7  needed, but for the most part, you would have all
8  the documents.  It was in our sales procedure to get
9  ID, the most recent two paystubs and that proof of
10 address if needed.  It's kind of hard to answer that
11 question because, for the most part, they would have
12 everything needed.
13   Q   To the extent a customer did not have
14 something that was needed, that would delay the
15 process, correct?
16   A   Yes.
17   Q   Is it not true that sometimes individuals
18 are self-employed and don't necessarily have things
19 like paystubs?
20   A   Of course.
21     MS. TROY:  Objection.  Argumentative.
22   Q   You can answer.
23   A   I mean, yeah.
24   Q   In those situations when you submit the
25 applications there would be a delay, correct?

---

**Page 66**

1    L. Stidhum
2    A   Yes.
3    Q   The only way to prevent the delay from
4  being further delayed is to obtain whatever the
5  document is and submit it to the bank, correct?
6      MS. TROY:  Objection to form.
7    Q   You can answer.
8    A   One more time, your question.
9      MR. KATAEV:  Read it back.
10 (Whereupon, the referred to question was read back
11       by the reporter.)
12   A   Yes.
13   Q   Sometimes the customer would not have that
14 information handy the same day, correct?
15   A   Yes.
16   Q   Sometimes the customer would never return
17 with the information at all, correct?
18   A   Correct.
19   Q   This rings true from the beginning when
20 you worked with Jay and Isaac, to the end when you
21 were working with Andris, Isaac and Serge, correct?
22   A   Right.
23   Q   Towards the end of your employment
24 relationship with Hillside Auto Outlet, you had the
25 ability to go to either Isaac, Andris or Serge to

---

**Page 67**

1    L. Stidhum
2  run financing applications, correct?
3    A   Correct.
4    Q   You're telling me that Andris was the
5  individual who caused you purposefully to wait
6  longer than everyone else, correct?
7    A   I'm sorry.  I got to run back a little
8  bit.  Serge would not run credit.  He would if he
9  was not busy, but for the most part, it was the
10 sales manager or the general manager's job to run
11 the credit and follow up with the customer prior to
12 giving it to the finance manager to not waste his
13 time.
14     So, yeah, Serge did not run the
15 credit.  It was mostly up to Isaac and Guzman to run
16 the credit because Serge would really just submit
17 the deal to the banks.
18   Q   Understood.  What you're saying generally
19 is that, in terms of who you could go to after Jay
20 left, it was really just Isaac and/or Andris,
21 correct?
22   A   Yes.
23   Q   It was very rare that Serge would run the
24 credit?
25   A   Yes.

---

**Page 68**

1    L. Stidhum
2  Q   Okay.
3      MR. KATAEV:  Can we have the original
4  question read back?
5      MS. TROY:  For the record, Mr. Kataev has
6  been coughing throughout this morning.
7      MR. KATAEV:  It's a moot point.  You don't
8  need to make these stupid things on the record.
9      MS. TROY:  I don't appreciate you calling
10 my stuff stupid.
11     MR. KATAEV:  You achieved what you wanted.
12 We are in a remote deposition.  What is the
13 point?  Don't interrupt the deposition.
14     MS. TROY:  I was concerned for my client
15 and my health, and it was perfectly valid
16 because you told me you'd be asymptomatic by
17 Friday.
18     MR. KATAEV:  I said other than a minor
19 cough, but it's a moot point.  Please don't
20 interrupt my deposition.
21 (Whereupon, the referred to question was read back
22       by the reporter.)
23   A   Yes.  Isaac left probably the first week
24 of December, something like that so yes, that's
25 partially the reason why I had extended wait times

---

17 (Pages 65 to 68)

A0210

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

69

L. Stidhum

1  because he did not want to give me the access I had
2  before.
4    Q   Isaac never caused you to wait longer like
5  Andris did, correct?
6    A   Correct.
7    Q   Neither did Serge in the rare circumstance
8  when you would go to him, correct?
9    A   Correct.
10   Q   Your complaint says that the only
11 reason -- withdrawn.
12       Your complaint says that Andris only
13 caused you to wait longer to run the financing
14 applications after you had disclosed to him and
15 others that you were pregnant, correct?
16   A   That's how it seemed, yes.
17   Q   When you disclosed to individuals that you
18 were pregnant, you did so at the dealership,
19 correct?
20   A   Yes.
21   Q   Who was present when you told everyone the
22 great news?
23   A   I mean, all the salespeople were present.
24 I was a few minutes late, I remember that because I
25 came in and everyone was there and I was waving my

---

70

L. Stidhum

1  sonogram picture around. I don't remember if Isaac
2  was there when I got there and said it or not, but I
3  know definitely Guzman was there and I did tell
4  Isaac later that day when he came in for sure.
6    Q   I want to understand. When you first said
7  it, who was immediately in your circle or presence?
8    A   Guzman was there because he would sit at
9  the podium so he was front and center. David was
10 there, I remember Sean being there, he was another
11 salesperson, the other David, I don't remember his
12 last name, I believe it starts with a P. I don't
13 believe Serge was there just yet. He usually came a
14 little later. I'm not sure if Isaac was there yet
15 but I know that same day I did show him the
16 sonogram.
17   Q   When you made that announcement, did
18 Andris say anything to you?
19   A   I don't recall.
20   Q   Do you recall him saying congratulations?
21   A   I don't.
22   Q   Do you recall anyone else saying
23 congratulations?
24   A   Yes. The other salespeople were looking
25 at it together. Everybody was, like, excited for

---

71

L. Stidhum

1
2  me, I guess I could say.
3    Q   Did Andris make any statements at all
4  during that conversation?
5    A   I honestly don't think so. He didn't have
6  much personality, I want to say. I don't feel like
7  he said anything to me.
8    Q   Prior to the time that you announced your
9  pregnancy to him and to the others, did you and
10 Andris have any interpersonal conflicts with each
11 other?
12   A   Honestly, yes, we did, but it was -- we
13 kept it professional. We worked in a professional
14 environment. We kept it professional.
15   Q   What was the nature of the interpersonal
16 conflict that you had?
17   A   Honestly, I don't remember.
18   Q   It was all work-related, of course?
19   A   Yes.
20   Q   Maybe you had some disagreement or
21 argument about something relating to a sale,
22 correct?
23   A   Yes, definitely work-related. Nothing
24 personal, I don't think.
25   Q   Did any of your interpersonal conflicts

---

72

L. Stidhum

1  with each other rise to a level at any point before
2  you announced your pregnancy where someone else had
3  to get involved and mediate you two?
4    A   Not that I recall, no.
6    Q   Whatever happened between you two, you
7  sort of water-under-the-bridge type of thing?
8    A   Pretty much.
9    Q   How many times did that happen prior to
10 the time that you announced your pregnancy?
11       MS. TROY: Objection to form. Ambiguous.
12   Q   You can answer the question.
13   A   Honestly, I don't remember. It's probably
14 once or twice. Nothing like crazy where we hated
15 each other and couldn't speak. It was nothing like
16 that.
17   Q   You had two little squibbles here and
18 there?
19   A   Yes.
20   Q   Do you recall whether those two incidents
21 were close in time to the time that you learned were
22 pregnant?
23   A   I don't remember, no.
24   Q   It could have been at the beginning, it
25 could have been at the middle, or it could have been

18 (Pages 69 to 72)

A0211

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

73

L. Stidhum

1
2  towards the end when you learned you were pregnant?
3      A   As far as after my pregnancy announcement,
4  I definitely remember what transpired.  In those
5  little hiccups we had, I don't remember when, no.
6      Q   Andris was one who never directly made any
7  comments to you about your pregnancy, correct?
8      A   Not that I remember, no.
9      Q   In terms of the two incidents you had
10  prior to the time you learned you were pregnant, did
11  you have similar incidents after the fact?
12      MS. TROY: Objection.  Ambiguous.
13      Q   You can answer.
14      A   I don't recall.
15      Q   One way or the other, correct?
16      MS. TROY: Objection.  Ambiguous.
17      Q   You can answer.
18      A   I don't know what you mean by, One way or
19  the other.
20      Q   It could have happened that you two had a
21  little argument or it could not have happened, you
22  don't remember either way?
23      A   Honestly after announcing my pregnancy,
24  there wasn't much arguing.  It was more like I was
25  doing a lot of crying and upset, so I can't really

---

74

L. Stidhum

1
2  say that yes one way or the other.
3      Q   When you say you cried, did you cry
4  physically in front of Guzman?
5      A   Absolutely.  Multiple times, and in front
6  of Isaac as well.
7      Q   When you cried in front of Guzman, what
8  happened?
9      A   Nothing, absolutely nothing.  He would
10  have no emotion.
11      Q   Did he ask why you were crying?
12      A   No.
13      Q   Your job responsibilities at the
14  dealership never changed, correct?
15      A   No.
16      Q   Are you currently living with the father
17  of your children?
18      A   No.
19      Q   The father of your children is not in any
20  way related to Hillside Auto Outlet, correct?
21      A   No.
22      MS. TROY:  We are going to strike any
23      irrelevant questions and answers after the
24      deposition.
25      MR. KATAEV:  Feel free to make that motion

---

75

L. Stidhum

1
2  whenever you're ready, but don't do it during
3  the deposition.
4  BY MR. KATAEV:
5      Q   You never had any relationship with Andris
6  Guzman outside of work, correct?
7      A   Absolutely not.
8      Q   The compensation rate that you had, other
9  than the 5 percent bonus after Jay left, remained
10  the same, correct?
11      A   I'm sorry, what was that?
12      Q   The compensation structure that you
13  outlined to me, other than the 5 percent bonus going
14  away after Jay left, remained the same, correct?
15      A   Yes.
16      Q   You sold a car, you got an extra $150,
17  correct?
18      A   Yes.
19      Q   That bonus was not discretionary, correct?
20      A   No.  It took me months to get it.
21      MS. TROY:  I don't think she understood
22      your question honestly.
23      Q   When you say it took you months to get it,
24  what did you mean?
25      A   It took me months to get a bonus in

---

76

L. Stidhum

1
2  general.
3      Q   Right.  The 5 percent type of bonus,
4  right?
5      A   No.  That wasn't a bonus.  That was
6  something promised upon being hired.  The bonus was
7  something that came of the blue because I was, like,
8  at 20 cars in the middle of the month and he was
9  like, If you hit 30, I will give you an extra
10  thousand.
11      Q   When you say it took you months to get it,
12  you mean it was only offered to you after working
13  months at the dealership?
14      A   Correct.
15      Q   Your duties remained the same from May of
16  '18 until January of '19, correct?
17      A   Yes.
18      Q   Your pay remained the same except for the
19  5 percent issue from May of '18 to January of '19,
20  correct?
21      MS. TROY:  Objection.  Asked and answered.
22      She may answer again.
23      A   Yes.
24      Q   The 5 percent change occurred prior to
25  your pregnancy, correct?

---

19  (Pages 73 to 76)

A0212

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

77

L. Stidhum

1
2     A   Yes.
3     Q   Your position remained the same from May
4  of '18 until January of '19, correct?
5     MS. TROY:  Objection to form.  Asked and
6  answered twice, but she may answer again.
7     A   Yes.
8     Q   Were you ever disciplined at Hillside Auto
9  Outlet for any work-related issue?
10    A   No, not that I recall.
11    Q   Were you ever suspended from work?
12    A   No, I was not.
13    Q   Did you ever receive a performance
14 evaluation?
15    A   No.
16    Q   What was the most number of cars that you
17 sold in a given week?
18    A   I want to say like seven to -- honestly, I
19 don't recall but the records will show exactly, but
20 I know it was definitely more than seven.
21    Q   In your understanding, were you in any way
22 the top salesperson at the dealership?
23    A   I was.
24    Q   At all times?
25    A   Yes, up until December of 2018.

---

78

L. Stidhum

1
2     Q   When Andris started making you wait longer
3  in December of '18, did you confront him about it?
4     A   Yes, I did.  I did ask him why is he
5  making my customers wait longer.  I would constantly
6  press the issue of, What's going on with this
7  customer, or he would constantly tell me, You have
8  to wait, you have to wait, there's other people
9  here, and I'm like, it wasn't like this.  These
10 people are getting antsy and it happened on multiple
11 occasions that I would have these conversations with
12 him.
13    Q   He never said anything to you about your
14 pregnancy during those conversations, correct?
15    A   I mean, not that I can recall.  What is
16 there to say?
17    Q   To your knowledge, is Andris Guzman
18 married?
19    A   I have no idea.
20    Q   To your knowledge, does Andris Guzman have
21 children?
22    A   No clue.
23    Q   What basis do you have to believe that
24 Andris Guzman made you wait longer solely because of
25 your pregnancy?

---

79

L. Stidhum

1
2     A   It happened only right after I announced
3  my pregnancy, that would be the first reason why,
4  and not to mention, like I said before, he was my
5  point of contact once Jay was fired so I can tell
6  the difference in, you know, from that time and
7  after I announced my pregnancy.
8        It wasn't -- I had customers waiting
9  so long after Jay quit.  From that time after my
10 pregnancy, I know it's clear as day that that's what
11 was going on.  I was a top saleswoman at a point and
12 I went from being the top salesperson to being the
13 one with the least cars out.  It doesn't add up.
14    Q   Isn't it true that December is a slow time
15 of the month for selling cars because it's cold out?
16    A   I wouldn't say because it's cold out.  I
17 honestly believe we sold a lot of cars, anywhere
18 between 45 to 60 cars a month.  Sometimes even
19 exceeded 65 cars, so it's kind of hard to say
20 because if I'm not mistaken, yes, November we sold
21 the most cars but the month prior to that we
22 probably sold the same amount of cars in that store
23 as December.
24    Q   How would you know or keep track of the
25 number of cars sold in total through the dealership?

---

80

L. Stidhum

1
2     A   We had a board in Serge's office that we
3  would keep track of how many sales everybody had.
4  So each salesperson's name would be up there and we
5  would put like a tally mark and keep track of all
6  the sales.  I always wanted to make sure I was
7  number one so I would always be the one keeping
8  track of that board.
9     Q   It's true, isn't it, that prior to your
10 pregnancy, Andris Guzman would frequently keep
11 customers waiting longer than necessary, correct?
12    A   I don't believe that to be correct.  Isaac
13 was every involved and it felt like it was something
14 he did once he saw that Isaac wasn't looking over.
15 He would always be very active in our daily routine.
16 He would ask us, What's going on with this customer,
17 greet the customers and do things like that.  I
18 can't say that that's entirely true, no.
19    Q   I will place up on the screen what will be
20 marked as Defendant's Exhibit 2.  I will represent
21 to you, Ms. Stidhum, that this is the complaint that
22 was filed in this case.  I'm going to scroll up to
23 show the header of page six for your esteemed
24 counsel's edification.
25 (Defendant's Exhibit B, Marked for Identification.)

---

20  (Pages 77 to 80)

A0213

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 22 of 102 PageID #: 831

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

**Page 81**

L. Stidhum
1
2   BY MR. KATAEV:
3      Q   I want to focus your attention on the
4   following paragraphs.
5      A   Can I review the entirety of the document
6   before answering anything?
7      Q   You know what, we can take a break for you
8   to do it. Your esteemed lawyer has a copy of the
9   complaint, I'm sure. So we are going to take a
10  quick break. It's 11:14. We will get back on at
11  11:30.
12     A   Okay.
13     Q   That way you will be ready to answer any
14  questions. I will tell you that my questions, for
15  the record, are solely at this point related to
16  paragraphs 35 through 38, okay?
17     A   All right.
18     Q   I will leave it up on the screen for you.
19        MR. KATAEV:  We are going to take a break.
20  Off the record. Back at 11:30.
21  (Whereupon, an off-the-record discussion was held.)
22  BY MR. KATAEV:
23     Q   Back on the record. Ms. Stidhum, welcome
24  back. I want to ask you before we get back into the
25  questions, during the break, did you have an

---

**Page 82**

L. Stidhum
1
2   opportunity to review the complaint in full?
3      A   Not in full. I skimmed through it.
4      Q   During this break and the break before
5   that, without divulging any of the actual
6   conversations you had, did you discuss your
7   testimony with your counsel?
8      A   No.
9      Q   Okay. My question was: Isn't it true
10  that even prior to the time that you disclosed your
11  pregnancy, Andris Guzman would take a long time with
12  prefilling financing applications for customers?
13     A   So yes, that is partially true, that's why
14  I said that before. He was just getting into Jay's
15  role at the dealership so he was still kind learning
16  the ropes so that's why Isaac saw I was pretty fast
17  with the computer. He sat down with me in his
18  office and showed me how to run credit.
19        You're transferring information from
20  paper to the computer, so he did give me my access
21  at that point, but of course over time, we are
22  talking four months later that we went back to this.
23  Of course over time, Guzman learned how to navigate
24  through it a little quicker but at the time I
25  announced my pregnancy, it doesn't make sense why he

---

**Page 83**

L. Stidhum
1
2   would backtrack, if you get what I'm saying.
3      Q   I understand that. That's a fair
4   explanation. It's true, is it not, that throughout
5   the time once Guzman learned how to do everything
6   properly, he generally would take 20 minutes to
7   handle these applications?
8      A   More or less.
9      Q   Your complaint is that after you disclosed
10  your pregnancy, it would take anywhere from 40 to 60
11  minutes, correct?
12     A   Right or longer.
13     Q   You allege in your complaint that as a
14  result of the longer wait times that we just
15  discussed, most of your customers would walk out and
16  not complete their purchase, correct?
17     A   Yes.
18     Q   How do you know that it's because of the
19  wait times that they decided to walk out?
20     A   Generally, we are the ones who would go
21  back to them and tell them, You don't qualify, or
22  You need X amount of dollars down or you can't get
23  this car, you would need that car. It would be a
24  conversation between the sales manager and the
25  salesperson.

---

**Page 84**

L. Stidhum
1
2         They wouldn't really want to jump
3   into the deal unless they had to, so it's like, I
4   wouldn't get to speak to my sales manager or if I'm
5   like, Hey, hold on, my sales manager got something,
6   at this point, they are frustrated, they are walking
7   out the door.
8      Q   Did any customers actually tell you, We
9   don't want to purchase anything from you because it
10  took you to long to get back to us?
11     A   Yes, it happened a couple of times.
12     Q   Do you remember the names of any of those
13  individuals?
14     A   I don't. I have gone through hundreds,
15  maybe thousands of customers, I don't.
16     Q   Are you familiar with the lead management
17  system at the dealership?
18     A   Lead management system? The CRM that was
19  used?
20     Q   CRM meaning customer relationship
21  management, right?
22     A   Yes.
23     Q   You're familiar with that program?
24     A   Yes.
25     Q   That program is used to track every single

---

21 (Pages 81 to 84)

A0214

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

85

L. Stidhum

1  potential customer that comes in and whether or not
2  it results in a sale, correct?
3      A   Not necessarily correct.  The business
4  development center would focus on their appointments
5  because that's what they're paid on.  They are not
6  paid on walk-in customers, so any walk-in customers
7  are not all accounted for.  I can't say that's
8  completely true.
9      Q   How many walk-in customers in a month do
10  you think come in that are not accounted for?
11      A   Honestly, Saturdays or the weekend were
12  our busiest time because we on a main strip,
13  Hillside has a bunch of dealerships.  I would say
14  it's like a 40/60 or 50/50 because that weekend
15  volume is equivalent to the whole week's worth of
16  volume.  I can't really say how many customers.
17          It was almost equal because of where
18  we were.  Location is everything in this business.
19  We had dealerships in front of us, beside us, down
20  the street from us.  We would have customers leaving
21  one spot to come to us that didn't have an
22  appointment.  I can't put a number on it.
23      Q   Your testimony today is that walk-ins were
24  not accounted for in the CRM system?

---

86

L. Stidhum

1      A   Not every single one.  Sometimes they
2  would log them in, sometimes I would not see them
3  logged in.
4      Q   What be the reason for not logging someone
5  in versus logging them in?
6      A   I can't say.  I didn't work in that
7  department.  I would say it's laziness.
8      Q   Are you speaking from your subsequent
9  experience as a BDC manager?
10      A   Yes.
11      Q   Paragraph 53 of the complaint, you said in
12  December and January of '18 and '19, you would
13  constantly call Guzman to ask how long customers
14  would wait; do you see that?
15      A   Yes.
16      Q   When you say call, do you mean physically
17  with the cellphone?
18      A   No.  I mean call over to him.  He was at a
19  podium.  Our desks were diagonal from each other.
20      Q   What would happen when you would ask
21  Guzman how long?
22      A   He would tell me I would have to wait,
23  that there are other customers here.
24      Q   Did you observe at the same time that this

---

87

L. Stidhum

1  was happening that Andris Guzman would help a
2  different salespeople out and provide information?
3      A   Yes.  There was multiple occasions where I
4  would see that a customer came in after my customer
5  and he still hasn't touched the application or the
6  folder was still sitting up top.
7      Q   With which salespeople did that occur with
8  that you can recall?
9      A   It happened with Sean because me and Sean
10  were kind of, I wouldn't say on the same level.  He
11  was a little bit of my competition at a point.  And
12  David Parsons, and David Manrique also witnessed it
13  because he was selling more cars than me, and he was
14  kind of not the best salesperson, I would say.  He
15  was always second-to-last or last.  It was something
16  that everybody kind of witnessed.
17      Q   During this time, Isaac was out on a
18  month-long vacation?
19      A   Correct.
20      Q   That's the reason why you couldn't go to
21  Isaac to assist you with certain applications,
22  correct?
23      A   Yes.
24      Q   Did you attempt to go to Serge to run

---

88

L. Stidhum

1  applications instead of with Andris Guzman?
2      A   Yes, I did.  It's -- kind of plays each
3  other hand in hand because Guzman's job was to run
4  the credit and if Serge was overwhelmed, he would
5  submit the application.  So whatever credit that
6  Guzman did run was already at Serge, and he's like,
7  I'm busy, I can't do this right now, you have to
8  give it to Guzman, you have to wait on Guzman, so
9  that's what I had to do.
10      Q   Whenever a sale was made, you would
11  receive a commission, correct?
12      A   Yes.
13      Q   To your knowledge, similarly, Serge would
14  also receive a commission, right?
15      A   Yes.
16      Q   To your knowledge, what about Guzman, was
17  he not also entitled to a commission?
18      A   He was.
19      Q   Is it your testimony that Andris Guzman
20  purposely made you wait such that he suffered and
21  didn't get commissions on sales?
22          MS. TROY:  Objection.  Argumentative.
23      Q   You can answer.
24      A   Honestly, it's hard to answer that because

---

22  (Pages 85 to 88)

A0215

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

89

L. Stidhum

1  it's, like, I can't really understand why he would
2  put himself in that position either because one
3  person wins, we all win. He didn't really care. He
4  took on whoever he felt he wanted to take on first.
5      Q   Do you believe that he prioritized other
6  salespeople over yours because he felt that those
7  customers that those salespeople had were more
8  qualified?
9      A   It's hard to answer that question. There
10  is no way to qualify a customer by looking at them.
11  If he's not running my credit, how is he going to
12  make that argument?
13      Q   Isn't it true that sometimes people who
14  work at dealerships stereotype customers and make
15  assumptions about their creditworthiness by looking
16  at them?
17      A   As being in a sales manager position, I
18  learned that that's not the way to properly manage.
19  I have seen people come in raggedy with 800 credit
20  scores and $10,000 to put down on a car, and some
21  people that dressed flashy and don't have anything
22  or don't even have a piece of credit. I can't make
23  that argument because, as a sales manager in
24  previous dealerships, I would never do that.

90

L. Stidhum

1      Q   You have seen other people make those
2  stereotypes, correct?
3      A   Again, I can't really say yes or no.
4      Q   Fair enough. You spoke with Isaac when he
5  returned from vacation in January of '19?
6      A   Yes.
7      Q   What was your conversation with him? What
8  did you say to him and what did he say to you?
9      A   I told him what was going on. I showed
10  him the amounts of cars I have out and he didn't
11  really understand what was going on either. And I
12  was promised that when he would return that I was
13  going to be promoted to sales manager, so I was
14  trying to hang in there.
15          So when he came, I did ask him, I was
16  like, Look, if you have no desire promoting me as
17  sales manager, then I don't really feel that I want
18  to work here anymore unless you're going to give me
19  more of my commission and not put me as a sales
20  manager, and he kind of didn't have any answer for
21  it, he said we would talk about it later.
22          At that point, I was tired of being
23  given the runaround and not making money. As a
24  pregnant woman and being 19 years old, it's hard to

91

L. Stidhum

1  be put in that position and not be scared. Like, I
2  was 19 years old having my first kid and I'm getting
3  played at this place I thought I was going to grow
4  with. I can't really -- it didn't make sense for me
5  to stay there any longer at that point.
6      Q   To your knowledge, is Andris Guzman still
7  employed at this dealership?
8      A   I have no idea. I don't speak to them.
9      Q   To clarify, your testimony as to the basis
10  for your belief that Andris Guzman made you wait
11  longer solely because of your pregnancy was just
12  because it happened that you waited longer after you
13  disclosed your pregnancy than before, correct?
14      A   I'm sorry, one more time.
15          MR. KATAEV: Read it back, please.
16  (Whereupon, the referred to question was read back
17          by the reporter.)
18          MS. TROY: Objection to form.
19  BY MR. KATAEV:
20      Q   You can answer.
21      A   That's not correct. There is more to it.
22  It wasn't just the longer wait period. He obviously
23  had Isaac's access to Dealertrack as well and he
24  refused to give me the password. Like, he didn't

92

L. Stidhum

1  feel the need to, and not to mention the decrease in
2  my sales played a part in Isaac not wanting to
3  promote me to sales manager as well. It goes hand
4  in hand as to why I believe it was pregnancy
5  discrimination.
6      Q   You're alleging, as far as I understand,
7  that Andris Guzman was the only person who
8  discriminated against you based on your pregnancy,
9  correct?
10          MS. TROY: Objection. Calls for a legal
11  conclusion.
12      A   Not really. I do believe Isaac kind of
13  discriminated against me as well by not promoting
14  me. It is what it is at that point, but he did not
15  do anything to fix the issue. He did not -- the
16  promotion can be taken away from anyone so I can't
17  hold it to that, but I do believe it had something
18  to do with my pregnancy as well because it was
19  something I was promised and was working towards
20  getting.
21          I texted him while he was on
22  vacation. He responded but told me he would handle
23  it at a later time which I get it, you're on
24  vacation with your family.

23 (Pages 89 to 92)

A0216

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

93

L. Stidhum
1
2     Q   With respect to the promotion, when was
3   the first time that was a discussion?
4     A   It was sometime in November.  We were
5   talking about it because he was preparing for us for
6   his vacation for a month.  He was kind of the dad of
7   the dealership so he was watching over everything,
8   he made sure everything stayed afloat.
9       It was definitely sometime in
10  November and he told me when he got back, we would
11  discuss it and go over what exactly was going to
12  happen at that point, but this is way before the
13  pregnancy discrimination and everything.
14    Q   This is before the pregnancy announcement?
15    A   Right.
16    Q   Who was the sales manager at that time?
17    A   It was -- at that time, it was kind of
18  weird because Guzman was the sales manager slash
19  finance or whatever, he was kind of doing both.
20  It's a hard question to answer because then he
21  brought in Ali while he was gone.  It was just a
22  mess.  I can't really answer that question
23  truthfully.  It was Guzman and Ali for a short
24  period of time.
25    Q   And so the discussion was that when Isaac

94

L. Stidhum
1
2   returned in January of '19, there would be
3   discussion about who is going to fill the role of
4   sales manager, correct?
5     A   Pretty much.
6     Q   Was the discussion that you would
7   definitely become sales manager?
8     A   Yes.  It wasn't a discussion of who would
9   fill the role.  It was him telling me he was going
10  to make me the sales manager and that was pretty
11  much his purpose of showing me how to run credit and
12  read credit because he was the one that told me how
13  to do both.  It's a whole bunch of numbers and
14  lines.  It's not something that you can understand.
15    Q   When Isaac returned in January of '19,
16  what was the next discussion had about the sales
17  manager position?
18    A   I told him if he had no desire to promote
19  me, then I wanted a raise or I would leave because I
20  was offered that position by Ali making double the
21  commission.
22    Q   What did he say in response?
23    A   I don't recall.  I remember him saying we
24  will talk about more at a later time.  I was fed up
25  at that point because how much more time do you want

95

L. Stidhum
1
2   me to waste not making money.
3     Q   The truth is you didn't wait for a
4   decision, correct?
5     A   It felt like his answer was kind of clear
6   as day.  If he wanted to give me that position, he
7   would have given it to me at that point.
8     Q   He didn't expressly tell you, I'm not
9   giving you the position, correct?
10    A   I don't recall.
11        MR. KATAEV:  Off the record.
12    (Whereupon, an off-the-record discussion was held.)
13  BY MR. KATAEV:
14    Q   We are going to continue.
15        Andris Guzman did not have any
16  authority to discipline you in any way, correct?
17    A   Not that I know of.
18    Q   Andris Guzman did not have the power to
19  fire you, correct?
20    A   Not that I know of.
21    Q   Andris Guzman did not have the power to
22  change your pay, correct?
23    A   No.
24    Q   Andris Guzman did not have the power to
25  change the terms and conditions of your employment,

96

L. Stidhum
1
2   correct?
3     A   No.
4     Q   Okay.  Did you ever tell Andris Guzman, I
5   think you're doing this because I'm pregnant?
6     A   I want to say yes, if I'm remembering
7   correctly.  I do believe I made that statement, yes.
8     Q   What was his response?
9     A   Honestly, he was a very unemotional
10  person.  Like, he would look at you with blank eyes.
11  I don't believe I got any response out of him.
12    Q   That's the way he was towards everybody,
13  correct?
14    A   Yes, for the most part.
15    Q   Was anyone else present when you
16  confronted him?
17    A   I don't recall.
18    Q   Did you confront him at the podium?
19    A   Most likely.
20    Q   Did you complain to Isaac that you felt
21  that the actions being taken against you were
22  because of your pregnancy?
23    A   I'm not sure if I used the words to my
24  pregnancy, but I told him that ever since I
25  announced it, that this -- XY and Z has been

24  (Pages 93 to 96)

A0217

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

97

L. Stidhum

1 happening.

3   Q   What was his response?

4   A   Honestly, I don't remember.  I feel like
5 it was more of, We will talk when I get back, and no
6 talk happened.

7   Q   What about the fact that you had to wait
8 longer for applications to be done makes you believe
9 it was discriminatory?

10   A   I'm sorry, one more time.

11   Q   What about the fact that you had to wait
12 longer for certain customer applications made you
13 believe it was discriminatory?

14   A   Like I said before, I worked with him for
15 months now and I have seen, you know, his growth in
16 the business, I have seen when he was not very good
17 and very, very slow.  Like, I watched him grow in
18 the business so for him to backtrack after my
19 announcement it doesn't really make any sense.

20   Q   Did anyone at Hillside Auto Outlet make
21 any statements to you that you believe suggest
22 discrimination?

23   A   Yes.  Ali and David and actually, I did
24 have somebody working there at the time who was a
25 friend of mine who would always try to calm me down

---

98

L. Stidhum

1 when I would get upset and cry about the situation.
2 And she was like, Yeah, ever since this happened and
3 ever since you announced your pregnancy, this has
4 been going on.

5   Q   What is that person's name?

7   A   Brianna.

8   Q   What did Ali say to you that made you
9 believe it was a suggestion of discrimination?

10   A   He was kind of telling me about this
11 position he was offering so I didn't have to deal
12 with this.

13   Q   Other than that, anything else?

14   A   Not that I can recall.  It was more him
15 telling me that I wouldn't have to deal with these
16 types of things.

17   Q   What about David Manrique?

18   A   He told me that it's clear, because I
19 mean, his numbers were where my numbers usually were
20 so it's clear what was going on.  He actually
21 thought that it may be a strategy to get me out
22 sooner because they knew I would not be able to work
23 at a certain point.

24   Q   Why do you believe the dealership cared
25 that you wouldn't be able to work at a certain

---

99

L. Stidhum

1 point?

3   A   I was bringing in the most numbers.  We
4 hit milestones that they never hit before me working
5 there.  They sold more cars than they sold prior to
6 me working there.

7   Q   As a business, wouldn't the dealership
8 want to maximize the amount of sales before you
9 left?

10   MS. TROY:  Objection.  Argumentative.

11   Q   You can answer.

12   MS. TROY:  Rephrase your question.

13   Q   I'm not rephrasing.  You can answer.

14   A   One more time.

15   MR. KATAEV:  Read it back.

16 (Whereupon, the referred to question was read back
17   by the reporter.)

18   A   Of course.  I would believe that too but
19 again, it's not something that was done by the whole
20 dealership.  It was something done by an individual,
21 so I mean, it was more of a personal thing against
22 me while being pregnant.

23   Q   And personal on whose part, Andris
24 Guzman's, right?

25   A   Right, and also not to mention there was

---

100

L. Stidhum

1 somebody who was working there that was pregnant in
2 the DMV department and she was pregnant and she was
3 probably there not even a week after -- let me
4 rephrase that.

6       She left maybe a week or even sooner
7 than a week of me working there, after me working
8 there, and I remember her storming out upset, so I
9 have reason to believe this might be a strategy used
10 to get out pregnant women.

11   Q   What was that employee's name?

12   A   Lily.  I don't remember her last name.

13   Q   What about Brianna, did she make any
14 statements that you believe suggested
15 discrimination?

16   A   Brianna was more a comforting friend,
17 like, I think this is going on because you're
18 pregnant.  Maybe they want to get somebody else in
19 to fill your place and stuff like that.

20   Q   You realize that one you gave birth and
21 went out on leave, the dealership would hire a
22 salesperson to take your place during that time?

23   A   Of course.  That's why it doesn't make
24 sense to me why things would go this way.

25   Q   You're saying that Andris Guzman was

---

25 (Pages 97 to 100)

A0218

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

101

L. Stidhum

1  behind all of this?
2      A   Yes, and partially Isaac as well.
3      Q   Are there any documents that you believe
4  suggest discrimination?
5      A   I mean, it's more verbal so I can't say
6  documents besides my paystub that show the decrease
7  in pay of four to $500 a week.
8      Q   Any other documents?
9      A   Not that I can think of.
10     Q   Why do you believe the paystubs suggest
11 discrimination?
12     A   It shows a drastic decrease in my pay.
13     Q   You're saying that your paystubs show
14 consistent amounts and they don't fluctuate up and
15 down?
16     A   Not necessarily consistent, that's not
17 what I said.  It's within those timeframes I did --
18 my pay did drop.  Of course the first couple of
19 months I was still getting the hang of things and
20 learning the ropes.  In between that time, I was
21 capitalizing at being a salesperson.  It was most
22 money I ever made at that time.
23     Q   We are going to get into the paystubs.
24         Was there any other event or

---

102

L. Stidhum

1  circumstance that you believe was discriminatory?
2      A   There was more than one instance where I
3  had to say something to Guzman about my customers'
4  waiting and stuff like that.  This is years ago, so
5  I can't say word for word.
6      Q   I understand.  Other than what you
7  testified about so far, can you identify all the
8  other times that you claim you were discriminated
9  against?
10         MS. TROY:  Excuse me, sorry.
11         MR. KATAEV:  Read it back, please.
12 (Whereupon, the referred to question was read back
13         by the reporter.)
14     A   Again, it wasn't something -- it was more
15 work-related than anything.  The longer wait times
16 is not something that I can pinpoint.
17     Q   Is it fair to say that the complaint lists
18 all instances of discrimination against you?
19     A   No.
20     Q   Same question with respect to your
21 interrogatory responses?
22     A   I'm sorry.
23     Q   Fair to say that your interrogatory
24 responses list all instances of discrimination

---

103

L. Stidhum

1  against you?
2      A   No, because I mean, it's a general period
3  so I can't say that everything is written there.
4      Q   Do you believe that you were treated less
5  favorably than other employees?
6      A   At that point, yes.
7      Q   That's even though you were given special
8  access to Dealertrack that no other salesperson was?
9          MS. TROY:  Objection.  Argumentative.
10     Q   You can answer.
11     A   Repeat the question.
12 (Whereupon, the referred to question was read back
13         by the reporter.)
14     A   So I mean, of course up until my
15 announcement, yes.  It's not just that Dealertrack
16 was taken away.  It was the decrease in my pay.
17         MR. KATAEV:  Let the record reflect that
18     every time Plaintiff's counsel has objected, I
19     observe a lot of glances towards the screen and
20     other indications that there is something going
21     on.
22         MS. TROY:  Objection to that whole line.
23         MR. KATAEV:  If it's found that
24     Plaintiff's counsel is coaching the witness by

---

104

L. Stidhum

1  typing instructions or answers on the screen
2  during the deposition, an appropriate motion
3  will be made to sanction Plaintiff and her
4  counsel.  I'm warning you if that's what you're
5  doing, please stop.  I will obtain the forensic
6  evidence to prove it.
7          MS. TROY:  I'm going to object to that
8  whole line of instruction.  Completely
9  inappropriate.
10         MR. KATAEV:  I will be making an
11 appropriate application for forensic evidence.
12 The judge will not be pleased by what is found
13 on that computer because nothing you delete
14 from there is actually deleted.  I'm just
15 letting you know.
16         MS. TROY:  Again, I object to that whole
17 line.
18         MR. KATAEV:  Okay.
19         My client has observed this multiple
20 times and has noted it in notes to me, and I have
21 observed it myself just now.  I'm warning you,
22 Counsel, if you're typing notes to her on the
23 screen, stop doing that.  It's not allowed.
24         MS. TROY:  I'm not doing that.

26 (Pages 101 to 104)

A0219

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

|  | 105 |
|---|---|
| 1 | L. Stidhum |
| 2 | MR. KATAEV:  Good. |
| 3 | Read back the last question. |
| 4 | (Whereupon, the referred to question was read back |
| 5 | by the reporter.) |
| 6 | BY MR. KATAEV: |
| 7 | Q  You admit, however, that when you were |
| 8 | provided access to Dealertrack you were the only |
| 9 | salesperson that was provided that, correct? |
| 10 | A  Yes. |
| 11 | Q  In that regard, you were treated more |
| 12 | favorably, correct? |
| 13 | A  Right. |
| 14 | Q  Can you identify any other ways in which |
| 15 | you were treated more favorably at the dealership |
| 16 | while you worked there? |
| 17 | A  I mean, I guess the fact of me getting the |
| 18 | $1,000 bonus and no one received any bonus. |
| 19 | Q  Can you identify all the employees that |
| 20 | you believe were treated more favorably than you? |
| 21 | A  I mean, are we speaking after my |
| 22 | announcement or prior to my announcement? |
| 23 | Q  After the announcement. |
| 24 | A  After the announcement, I can't really say |
| 25 | anybody was treated more favorably. I can say that |

|  | 106 |
|---|---|
| 1 | L. Stidhum |
| 2 | they were taken -- their customers were taken or |
| 3 | tended to a little more promptly. I can't say |
| 4 | favorably because still nobody did get Dealertrack |
| 5 | access or bonuses or anything like that. |
| 6 | Q  With respect to that answer, that's solely |
| 7 | in relation to Andris Guzman processing the |
| 8 | financing application, correct? |
| 9 | A  Right. |
| 10 | Q  It's not the case with Serge, after |
| 11 | disclosing your pregnancy, Serge processed all the |
| 12 | applications whether it came from you or someone |
| 13 | else the same way, correct? |
| 14 | A  Pretty much. He took them as they went. |
| 15 | Q  Was there anyone else that took longer to |
| 16 | process the financing applications with you than |
| 17 | with anyone else? |
| 18 | A  No. |
| 19 | Q  That's the only way any employee was |
| 20 | treated more favorably than you, correct? |
| 21 | A  Yes. |
| 22 | Q  What is your understanding as to why all |
| 23 | the other employees were being treated more |
| 24 | favorably than you? |
| 25 | A  Again, I didn't say I was being treated |

|  | 107 |
|---|---|
| 1 | L. Stidhum |
| 2 | favorably. I said that he would take them or tend |
| 3 | to them more promptly. |
| 4 | Q  Why do you believe he did that? |
| 5 | A  Again, because I don't know if it had |
| 6 | something to do personal or if it was with my |
| 7 | pregnancy. It's not something that I can really |
| 8 | answer. I don't know why he would do that. If one |
| 9 | of us makes a sale, we all get a commission. It's |
| 10 | not something I can really understand either. I |
| 11 | don't know if he wanted me out of the store because |
| 12 | I pregnant. I don't know. |
| 13 | Q  Fair enough. Do you know the educational |
| 14 | background of Andris Guzman? |
| 15 | A  No. I don't know anything personal. |
| 16 | Q  Do you know Andris Guzman's work |
| 17 | experience with dealerships? |
| 18 | A  No, I do not. |
| 19 | Q  Do you know if he had any work experience |
| 20 | working for any other dealership? |
| 21 | A  I remember being told he worked at Major |
| 22 | World or something. That's about it. |
| 23 | Q  Do you have any knowledge about Hillside |
| 24 | Auto Outlet's policy against discrimination? |
| 25 | A  No. |

|  | 108 |
|---|---|
| 1 | L. Stidhum |
| 2 | Q  Did you ever sign any document |
| 3 | acknowledging receipt of a policy against |
| 4 | discrimination? |
| 5 | A  I believe so. We had an employee packet. |
| 6 | I'm pretty sure it was in there somewhere that I |
| 7 | didn't really see. |
| 8 | Q  Do you still have a copy of it? |
| 9 | A  No, we weren't given a copy of it. |
| 10 | Q  Fair to say that when you had a |
| 11 | conversation with Isaac about the fact that you felt |
| 12 | your pregnancy was playing a role in what was going |
| 13 | on, you never really followed up and you decided to |
| 14 | quit, correct? |
| 15 | MS. TROY:  Objection to form. |
| 16 | Q  You can answer. |
| 17 | A  The question one more time. |
| 18 | (Whereupon, the referred to question was read back |
| 19 | by the reporter.) |
| 20 | A  I mean, at that point I wouldn't think I |
| 21 | had to follow up with something when somebody tells |
| 22 | me, We are going to speak about this later or, Come |
| 23 | Monday, we are going to have a conversation. It |
| 24 | wasn't something I felt the need to follow up on. |
| 25 | No, I did not follow up with it. I only asked later |

27 (Pages 105 to 108)

A0220

Case 1:21-cv-07163-OEM-LB    Document 87-2    Filed 09/01/23    Page 29 of 102 PageID #: 838

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

109

L. Stidhum

1
2  on about my commission I was owed on cars that I did
3  not get paid on.
4      Q  Understood.  Your complaint alleges that
5  you were discriminated against on the basis of your
6  sex or gender, correct?
7          MS. TROY:  Objection.  She can answer if
8      she understand.
9      A  Yes, I don't get it.
10     Q  In your complaint, you say you were
11  discriminated against, right?
12     A  Yes.
13     Q  What is the basis upon which you're saying
14  you were discriminated against, on what grounds?
15     A  My pregnancy.
16     Q  Are you also saying you were discriminated
17  against because of your sex or gender?
18     A  I mean, doesn't that play hand in hand
19  that only women can get pregnant?
20     Q  I'm asking you:  Is that reason why you're
21  saying you were discriminated against?
22         MS. TROY:  Objection.  She can answer.
23     A  I guess.
24     Q  Are you also alleging that you were
25  discriminated against based on disability?

---

110

L. Stidhum

1
2      A  I don't think being pregnant is a
3  disability, is it?
4          MS. TROY:  Objection.  Also calls for
5      legal conclusion.
6      Q  I can't answer your question, Ms. Stidhum,
7  but I will take the answer from what you provided,
8  okay?
9      A  Okay.
10     Q  Do you claim that you were discriminated
11  against on any other basis?
12     A  No.
13     Q  At the time you left, with respect to your
14  pregnancy, were you showing?
15     A  No.  I was not even three months, I
16  believe.
17     Q  You acknowledge that Andris Guzman was not
18  a decision-maker at the dealership, correct?
19     A  Yes and no.  I mean, he played a part in
20  making decisions at some points.
21     Q  The question is how?
22     A  I mean, it was kind of -- it's kind of
23  hard to say.  It was a team effort.  It would be
24  something that was a conversation between whoever it
25  was between, whether it was just management, he

---

111

L. Stidhum

1
2  would definitely be involved in those decisions.
3  For the most part, yes, Isaac was the one who made
4  decisions.
5      Q  In your complaint, you seek damages of an
6  amount over two million dollars, right?
7      A  Yes.
8          MS. TROY:  Objection.
9      Q  You're generally seeking over two million
10  dollars for this case, correct?
11     A  Yes.
12     Q  What is the basis for you seeking those
13  damages?
14     A  I'm not sure.  That's something to discuss
15  with my attorney.
16     Q  Can you describe any injuries that you
17  sustained as a result of any unlawful
18  discrimination?
19     A  I mean, besides being depressed, upset,
20  stressed, scared because I mean -- this is
21  something that Isaac told me that stuck with me when
22  I told him I was leaving.  He told me the grass
23  wasn't always greener on the other side.  For the
24  first couple of months it wasn't and I was
25  definitely scared.  Those are some of the feelings I

---

112

L. Stidhum

1
2  felt.
3      Q  Other than being depressed, upset,
4  stressed and scared, did you suffer any other
5  emotional injuries as a result of any
6  discrimination?
7      A  No, not that I can think of.
8      Q  Would you say you suffered any
9  psychological injuries as a result of the alleged
10  discrimination?
11     A  I'm not sure, but I did experience a lot
12  of anxiety.  I don't want to say one hundred percent
13  it was from this.  It could have been a combination
14  of being pregnant and worried, but I did suffer from
15  a lot of anxiety.
16     Q  Did you suffer any physical injuries as a
17  result of the alleged discrimination?
18     A  No.
19     Q  For the emotional injuries that we had
20  just discussed, what were your symptoms, if any?
21     A  I'm sorry?
22     Q  What were your symptoms, if any, for the
23  emotional injuries we just discussed?
24     A  The same ones; stress, depressed, scared.
25     Q  Did you seek any medical treatment or

---

28  (Pages 109 to 112)

A0221

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 30 of 102 PageID #: 839

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

113

L. Stidhum
1
2  other healthcare for any of these injuries?
3      A   No.
4      Q   Were you ever hospitalized for these
5  injuries?
6      A   No.
7      Q   Did you ever take any medication for any
8  of these injuries?
9      A   Being pregnant I can't so, no.
10     Q   How are you now?
11        MS. TROY:  Objection. How is this
12     relevant? She can answer the question. It's
13     not relevant and it's going against your seven
14     hours.
15        MR. KATAEV:  Just say, Objection,
16     relevance.
17  BY MR. KATAEV:
18     Q   Please answer the question.
19     A   How am I now?
20     Q   Correct.
21     A   What does that mean?
22     Q   How are you now in terms of your emotional
23  state and the injuries you just talked about?
24     A   Based on that it's been years now, of
25  course I have recovered.  It's been years, I got to

---

114

L. Stidhum
1
2  experience a lot of great positions.  Everything
3  happens for good reasons.
4      Q   Okay. Is fair to say that whatever the
5  symptoms or injuries we talked about have now been
6  resolved?
7      A   Yes.
8      Q   None of these symptoms or injuries that we
9  discussed prevented you from working or seeking
10  work?
11     A   Partially.  Even though I was able to get
12  a job immediately after, it wasn't all peaches and
13  cream in the beginning.  I was very stressed out, I
14  was very worried about what's going to happen and
15  like I said, the grass wasn't greener in the
16  beginning but of course they got better.
17     Q   They got better after a few months?
18     A   Maybe a few months, we will say.
19     Q   What made it better after a couple of
20  months?
21        MS. TROY:  Objection as to form.
22     A   Volume, of course, that was my main thing.
23  This whole thing started from my decrease in pay.  I
24  was stressed out about money, I had bills to pay.
25  The volume of the dealership increased definitely

---

115

L. Stidhum
1
2  helped me deal with everything that was going on.
3      Q   When you refer to volume you mean money,
4  correct?
5      A   The volume of customers and cars sold,
6  yes.
7      Q   The fact that you made more money
8  alleviated the emotional injuries, correct?
9        MS. TROY:  Objection. Argumentative. You
10     can answer.
11     A   Yes.  I wouldn't say that making money, it
12  was a weight off my back not having to worry about
13  how I was going to provide for this child I was
14  bringing into this world, yes, but I wouldn't say
15  alleviated everything, no.
16     Q   Do you receive child support?
17     A   No.
18     Q   Have you taken any steps to obtain child
19  support?
20     A   No.
21        MS. TROY:  Objection. How is that
22     relevant?
23        MR. KATAEV:  It's relevant.
24        MS. TROY:  It's not relevant.
25        MR. KATAEV:  Are you instructing her not

---

116

L. Stidhum
1
2  to answer?
3        MS. TROY:  She may answer.
4        MR. KATAEV:  Your objection is noted.
5  BY MR. KATAEV:
6      Q   What was the answer to have you taken any
7  steps to obtain child support?
8        MS. TROY:  She said, No.
9      A   No.
10     Q   Why is that?
11     A   Because I --
12        MS. TROY:  Objection as to relevance.  She
13     may answer.
14     A   I haven't felt the need to.  My child's
15  father helps.
16     Q   How does your child's father help?
17     A   He does what he has to do for our child.
18     Q   He provides financially for the child,
19  correct?
20     A   Yes.
21     Q   Okay.  I understand now.
22        Prior to you working at Hillside Auto
23  Outlet, have you ever sought any treatment from any
24  mental healthcare professionals?
25     A   No.

29 (Pages 113 to 116)

A0222

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

**117**

L. Stidhum

1
2    Q   Prior to your working at Hillside Auto
3  Outlet, have you ever experienced any depression,
4  being upset, stressed or being scared or having
5  anxiety?
6    A   No.
7    Q   Do you use any social media websites?
8    A   Yes.
9    Q   Do you use Facebook?
10    A   Not anymore.
11    Q   What about Instagram?
12    A   Yes.
13    Q   What about LinkedIn?
14    A   I have an account but I don't really use
15  it.
16    Q   Twitter?
17    A   No.
18    Q   Snapchat?
19    A   Yes.
20    Q   With respect to these websites, have you
21  ever posted anything about this lawsuit on any of
22  those four websites that you use; Facebook,
23  Instagram, LinkedIn or Snapchat?
24    A   I don't want to say no because I might
25  have early on.

---

**118**

L. Stidhum

1
2    Q   What is an example of something you may
3  have posted on any of those websites?
4    A   Or maybe I haven't. Honestly, I'm not
5  sure.
6    Q   Did you ever post anything on Facebook
7  about the fact that you are available to sell
8  someone a car at Hillside Auto Outlet?
9    MS. TROY:  Again, sorry.
10    MR. KATAEV:  Read it back.
11  (Whereupon, the referred to question was read back
12         by the reporter.)
13    A   Are we talking after or prior to me
14  leaving?
15    Q   During the time you worked there.
16    A   Probably.  I would always try to advertise
17  as best I could.
18    Q   After you left, did you ever post anything
19  about your working experience at Hillside Auto on
20  any of those sites?
21    A   I don't believe so.
22    Q   Isn't it true you made a Facebook post
23  about the fact that you're seeking two million
24  dollars against Hillside Auto on Facebook?
25    MS. TROY: Objection. Argumentative. She

---

**119**

L. Stidhum

1
2  may answer.
3    A   I don't recall.
4    Q   Isn't it true that you posted something
5  like that and later deleted it?
6    A   Can you give me a timeframe?
7    Q   Some time after you left and filed the
8  original lawsuit?
9    A   Are we talking closer to the time we left
10  or recent?
11    Q   I'm not sure.  Any time after you left?
12    A   I don't recall.
13    Q   One way or the other, correct?
14    MS. TROY:  Sorry?
15    Q   You don't recall one way or the other,
16  correct?
17    A   No.
18    Q   Are you claiming that you're entitled to
19  backpay in this case?
20    MS. TROY:  Objection.  Calls for a legal
21  conclusion.  She can answer if she understands.
22    MR. KATAEV:  Please don't coach the
23  witness with, If she understands.  This is the
24  second time you have done that.
25

---

**120**

L. Stidhum

1
2  BY MR. KATAEV:
3    Q   You can answer the question.
4    A   Honestly, I'm not sure.  I don't know if
5  it was recorded, the customers that I knew that I
6  didn't get paid on, I don't remember.  This is going
7  years back now.
8    Q   I'm going to explain what backpay is in
9  order to help you understand the question so you can
10  answer it, okay?
11    A   Uh-huh.
12    Q   Backpay is an amount of money that you
13  would be entitled to if you continued working at
14  Hillside Auto and didn't have to leave.  It is
15  something that you get to claim, but it's subject to
16  mitigation if your new job that you worked at right
17  after you started paid less than what you received
18  at Hillside.
19    With that basic explanation --
20    MS. TROY:  The explanation is incorrect.
21    Q   With that basic explanation and subject to
22  any objection that she puts, are you claiming
23  backpay in this case; yes or no?
24    MS. TROY: Objection.  The instruction as
25  to backpay is incorrect.  She can answer based

---

30 (Pages 117 to 120)

A0223

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

121

L. Stidhum

1  on your incorrect definition.
2  BY MR. KATAEV:
3     Q   Subject to that objection, you can answer.
4     A   Honestly, I'm not entirely sure because
5  you did say if I was making less at my next job?
6     Q   Correct.
7     A   I don't understand.
8     Q   After you left Hillside Auto Outlet, you
9  went to work at NYC Motor Cars; yes or no?
10    A   Yes.
11    Q   The money that you made at NYC Motor Cars,
12 at least for the first few months, was less than
13 what you were making at Hillside Auto Outlet,
14 correct?
15    A   Yes.
16    Q   Are you claiming the difference for
17 backpay in this case?
18    A   I'm not sure.
19    Q   Is it true that you made less money at NYC
20 Motor Cars initially than when you worked at
21 Hillside Auto Outlet?
22    A   The first couple of weeks, yes.
23    Q   After the first couple of weeks you made
24 more than you ever made at Hillside Auto Outlet,

---

122

L. Stidhum

1  correct?
2     A   Yes.
3     Q   Did there come a time when you didn't make
4  as much as you made at Hillside Auto Outlet after
5  that?
6     A   I mean, up until Covid.
7     Q   When Covid hit, you weren't making
8  anything for some time, right?
9     A   Right.
10    Q   That was because of Covid?
11    A   Right.
12    Q   After you went back in the workforce after
13 Covid, did you ever make less money than you made at
14 Hillside Auto Outlet again?
15    A   No.  Roughly the same or more.
16    Q   Were there any benefits that you had at
17 Hillside Auto Outlet that you didn't have at any of
18 the subsequent dealerships you worked at?
19    A   No.
20    Q   Had everything worked out with Hillside
21 Auto Outlet and you would have continued working
22 there, how long did you assume you would stay at
23 that job?
24    MS. TROY:  Objection.  Purely

---

123

L. Stidhum

1  hypothetical.
2     Q   You can answer.
3     A   Realistically, prior to Isaac leaving, I
4  was pretty happy so who knows.  I probably would
5  have been there until this day.  I probably would
6  have been a finance manager, who knows.
7     Q   What was the longest time period you ever
8  held any prior job?
9     MS. TROY:  Do you have a timeframe,
10 Counselor?
11    Q   Ever in your whole life?
12    A   I want to say two-and-a-half years.
13    Q   That was with?
14    A   NYC Motor Cars.
15    Q   You're saying two-and-a-half years based
16 on your experience initially at Motor Cars and when
17 you returned?
18    A   Yes.
19    Q   You're combining those, right?
20    A   Yes, right.
21    Q   Sometime when you left your prior
22 employment that we discussed earlier in your
23 testimony, you would explain that you sort of saw
24 the writing on the wall with respect to something

---

124

L. Stidhum

1  and you would leave as a result of that, correct?
2     MS. TROY:  Objection.  Ambiguous.  I have
3  no idea what you're talking about.
4     MR. KATAEV:  Just, Objection and
5  ambiguous.  The rest is superfluous.
6  BY MR. KATAEV:
7     Q   You can answer the question.
8     A   Can you repeat it?
9     Q   You testified before about sometimes you
10 would be leaving a job because you saw the writing
11 on the wall with respect to something.  For example,
12 at Luxury Motor Cars, you saw there was really no
13 business and you left; do you remember that
14 testimony?
15    A   Yes.
16    Q   With respect to Hillside Auto Outlet in
17 January of 2019, did you see any such circumstances?
18    MS. TROY:  Objection to the term, Writing
19 on the wall.
20    MR. KATAEV:  That term is not in this
21 question.
22 BY MR. KATAEV:
23    Q   You can answer the question.
24    A   Again.  It's not -- the question is not

---

31 (Pages 121 to 124)

A0224

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 125 |
|---|---|

L. Stidhum

1  clear. Can you rephrase it? I'm sorry.
2  Q   I'll start with an example. In January of
3  2019, prior to making your decision to quit, did you
4  notice, for example, there was less business like
5  you noticed at Luxury Motor Cars?
6  A   No, because there wasn't less business.
7  Q   Using that as an example, were there any
8  other circumstances at that time that led to your
9  decision to quit other than what we already
10  discussed?
11  A   No.
12  Q   It's fair to say that all the jobs you had
13  after you left Hillside Auto Outlet, at those jobs
14  you obtained income, correct?
15  A   Yes.
16  Q   What other income from any other source
17  did you obtain other than from those jobs that we
18  discussed?
19  MS. TROY: Objection. Ambiguous.
20  Q   You can answer.
21  A   Besides that employment, working -- I did
22  start doing -- being a broker but that was very
23  short-lived.
24  Q   Real estate broker?
25

|  | 126 |
|---|---|

L. Stidhum

1  A   No, automobile broker.
2  Q   Did you earn any income as an automobile
3  broker?
4  A   Nothing but a couple of thousand.
5  Q   Why was it short-lived?
6  A   It was during Covid. It was trial and
7  error, definitely error.
8  Q   You decided to stop working in that area?
9  A   Yes. It wasn't paying my bills.
10  Q   Any other source of income?
11  MS. TROY: Can we have one second? I will
12  bring her water.
13  MR. KATAEV: Yes, of course. Off the
14  record.
15  (Whereupon, an off-the-record discussion was held.)
16  BY MR. KATAEV:
17  Q   You testified that you're no longer
18  employed as of right now, correct?
19  A   Yes.
20  Q   That's because of the birth of your second
21  child, correct?
22  A   More or less.
23  Q   Have you made any effort since the birth
24  of your second child to enter back into the
25

|  | 127 |
|---|---|

L. Stidhum

1  workforce?
2  A   I have.
3  Q   What efforts did you make?
4  MS. TROY: Irrelevant. She can answer.
5  A   That was one of the places that I had
6  mentioned. I went to NYC Motor Cars -- I'm sorry,
7  NY Luxury Motors. It didn't work out. They had no
8  business at all, like not a single soul would walk
9  in for weeks at a time.
10  Q   Other than working there and giving that a
11  go, did you work anywhere else?
12  A   Another place I mentioned, Great Neck
13  Motors Sports.
14  Q   No other employers other than those two,
15  right?
16  A   No.
17  Q   Those are places where you worked. What
18  about places were you applied for a job?
19  A   I mean, there is quite a few. Whether or
20  not I would go on the interview is a different story
21  after doing my research about the places. Really
22  the only job offer that I turned down was Audi of
23  Queens, Queens Auto Mall, and I was also offered a
24  position at Baron Auto Emporium.
25

|  | 128 |
|---|---|

L. Stidhum

1  Q   With respect to each of these positions
2  that you were offered, why is it that you were --
3  withdrawn.
4  Why is it that you rejected the offer
5  of employment? Let's start with Audi of Queens.
6  A   It was going to be definitely a different
7  change of environment. New car stores is a lot
8  tougher. I sat there for a couple of hours and I
9  didn't see anybody come in. Coming from places that
10  have walk in traffic, that's alarming to me.
11  You spoke about those certifications.
12  There was going to be a whole lot of certifications
13  so I wouldn't have got to sell a car for a month or
14  two months until I completed those certifications.
15  In those luxury high-end stores, you have to
16  complete everything before you grab your first
17  customer. That's the reason I didn't take that job.
18  Queens Auto Mall didn't offer enough
19  money. I went in there for a BDC manager position
20  and the pay was super low, so I wasn't going to do
21  that. Baron Auto Emporium, I was in fear that I was
22  going to lose my job because it had the name Baron
23  in it. I don't know who the owners are. I was
24  offered the position multiple times and declined

32 (Pages 125 to 128)

A0225

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

|  | 129 |
|---|---|

L. Stidhum

1  because I didn't want to get fired later on.
2     Q   Who offered you the position at Baron?
3     A   I want to say Freddie, the GM.  David was
4  the one who told me about Freddie, they were
5  friends.  Prior to him telling me about it, I had
6  already went on the interview and he offered me the
7  position two or three times.  I just didn't want to
8  deal with having to get fired for any reason because
9  that did happen to David in the past.
10     Q   Where did that happen to David?
11     A   When he was working at North Shore Motors.
12  They ending up firing him after finding out about
13  this case.
14     Q   How do you know that?
15     A   That's what he told me.
16     Q   Do you know how he knows that?
17     A   Honestly, I didn't bother to ask.
18     Q   When was the last time you spoke to David?
19     A   Probably a couple of weeks ago.
20     Q   What is the nature of your relationship
21  with him?
22     A   We are -- I wouldn't say we are close, but
23  we are friends.
24     Q   Other than Audi of Queens, Queens Auto

|  | 130 |
|---|---|

L. Stidhum

1  Mall and Baron Auto Emporium did you submit your
2  resume or job applications for any other positions
3  elsewhere?
4     A   Yes.  A ton of places.
5     Q   Is there a centralized location from which
6  you did that on the internet or elsewhere?
7     A   Indeed.
8     Q   Is it only Indeed?
9     A   For the most part.  I might have submitted
10  a resume or two off the Craigslist, but pretty much
11  Indeed is the only place.
12     Q   Whenever you submitted something on Indeed
13  or Craigslist, you did that with the same email
14  address, correct?
15     A   More or less.
16     Q   What is the email address that you used
17  for Indeed?
18     A   Lsticia3@Gmail.
19     Q   That's the same email address you used for
20  Craigslist?
21     A   Yes.  I would say so, yes.
22     Q   You never looked into recruiters or
23  anything like that, right?
24     A   I don't think so, no.

|  | 131 |
|---|---|

L. Stidhum

1     Q   How much time have you spent on your job
2  search each day since you were ready to return to
3  work following the birth of your second child?
4      MS. TROY:  Objection as to relevance.  She
5  can answer.
6     A   When I get a few minutes, I will look and
7  see if there is anything intriguing.  I'm a numbers
8  person.  If it doesn't make sense, I would rather be
9  home with my children.  I can't put a timeframe on
10  it.
11     Q   How are you supporting yourself while
12  you're unemployed?
13     A   Right now, my mom is currently pretty much
14  supporting me and my kids.
15     Q   What does she do?
16     A   My mom, she sells Auto Trader.
17     Q   Was she involved in the automobile
18  business before you got involved with Hillside Auto
19  Outlet?
20     A   No.
21     Q   What did she do before Auto Trader?
22     A   She worked for Spectrum Communications.
23  She was a territory manager.
24     Q   She no longer works there?

|  | 132 |
|---|---|

L. Stidhum

1     A   No.
2     Q   You testified about taking some time off
3  for a vacation in September of 2020.  Do you recall
4  that?
5     A   Of 2020?
6     Q   I believe so.
7      MS. TROY:  Mischaracterizes witness
8  testimony but she can answer.
9     A   Are we talking when I said I went out of
10  the country?
11     Q   Yes.
12     A   That was actually of 2022, not of 2020.  I
13  went out of the country.  I went on a boat, on a
14  cruise to Bermuda.
15     Q   Since September of 2020 until now, have
16  you taken any vacations?
17     A   No.
18     Q   Prior to September of 2022, when did you
19  take your vacation prior to that time?
20      MS. TROY:  Objection as to relevance.  She
21  can answer.
22     A   I went to Florida in August.
23     Q   How long?
24     A   About two weeks.

33 (Pages 129 to 132)

A0226

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 35 of 102 PageID #: 844

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

133

L. Stidhum

1
2     Q   Prior to that?
3     A   I think before that it would have been
4  like 2021.
5     Q   Do you remember what month?
6     A   I went to Puerto Rico in May for Mother's
7  Day.
8     Q   Prior to that?
9     A   Actually, in June of 2021 -- was it 2021?
10  Yes, in June of 2021, I went to California and also
11  in May of 2021, I went to Florida again.
12     Q   In May and June of 2021, you visited
13  Puerto Rico?
14     A   Yes.
15     Q   Florida and California, correct?
16     A   Yes.
17     Q   What part of California was it?
18        MS. TROY:  Objection as to relevance.
19     Where are we going with this?  She can answer.
20  BY MR. KATAEV:
21     Q   Go on.
22     A   We stayed in Los Angeles.
23     Q   Prior to those vacations in May and June
24  of 2021, when was your last vacation?
25        MS. TROY:  Objection as to relevance.  She

---

134

L. Stidhum

1  can answer.
2
3     A   Honestly, I don't remember.  I know I went
4  on another cruise but I don't remember the
5  timeframe.
6     Q   Did you travel during Covid between March
7  and December of 2020?
8     A   No.
9     Q   There was one other cruise prior to that
10  May or June of 2021 set of vacations.  During any of
11  those vacations, all of them, did you ever do job
12  search activity while on vacations?
13        MS. TROY:  Objection as to relevance.
14     Q   You can answer.
15     A   I don't remember honestly.
16     Q   Were you unavailable to work since the
17  termination of your employment, other than for the
18  birth of your second child?
19     A   One more time.
20     Q   Were you unavailable to work since you
21  left Hillside Auto Outlet, other than due to the
22  birth of your second child?
23     A   No.
24     Q   And first child.
25        Are you currently attending any

---

135

L. Stidhum

1
2  school or taking any classes?
3     A   No.
4     Q   Have you taken on any training courses or
5  anything like that?
6     A   No.
7     Q   Have you ever been self-employed?
8     A   Yes.
9     Q   Can you explain?
10     A   That's when I was doing the broker thing.
11     Q   Have you ever received any long-term or
12  short-term disability insurance benefits?
13     A   No.
14     Q   Did you apply after you gave birth for
15  short-term disability?
16     A   Is that the same thing as the paid family
17  leave or is that different?
18     Q   It's different, but tell me about that.
19     A   I received a paid family leave after my
20  first child was born.
21     Q   Did you apply for that after your second
22  child was born?
23     A   I did not.
24     Q   When you applied for it the first time,
25  when your first child was born, did you have to

---

136

L. Stidhum

1
2  provide information about your income?
3     A   That was all done by the dealership, by
4  Luxury Motor Cars.  I'm not sure exactly.  They
5  filled out everything and sent it in.
6     Q   Other than paid family leave, do you
7  recall whether short-term disability benefits were
8  applied for?
9     A   I don't believe so.
10     Q   You received paid family leave for
11  approximately 12 weeks, right?
12     A   I think so.
13     Q   It was a percentage of your actual income
14  at the dealership, correct?
15     A   I believe it was capped at $700.
16     Q   You received the full cap, right?
17     A   Yes.
18     Q   Have you received any Social Security
19  benefits including Social Security disability
20  insurance benefits since your termination?
21     A   No.
22     Q   Have you received any workers' comp.
23  benefits?
24     A   No.
25        MS. TROY:  Asked and answered.

---

34 (Pages 133 to 136)

A0227

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

| | 137 |
|---|---|

L. Stidhum

1
2    MR. KATAEV:  No, I didn't ask her if she
3    received benefits.  I asked her if she applied
4    for benefits, not if she received benefits.
5    BY MR. KATAEV:
6        Q    You testified that you received
7    unemployment insurance benefits, correct?
8        A    Yes.
9        Q    You only applied for unemployment
10   insurance benefits once, correct?
11       MS. TROY:  Timeframe?
12       Q    In your whole life.
13       A    No.
14       Q    With respect to the testimony that you
15   previously provided about applying for unemployment
16   insurance benefits, what employer did you apply for
17   that from after being let go?
18       A    Luxury Motor Club was the first one.
19       Q    Okay.
20       A    Great Neck Motor Sports.  I was there
21   while I was pregnant.
22       Q    Were those the only two?
23       A    If I'm not mistaken, yes.  Wait, actually,
24   I believe NYC Motor Cars was in there too because
25   that was during the period of Covid.  I'm not

| | 138 |
|---|---|

L. Stidhum

1
2    100 percent sure but it might have been.
3        Q    Understood.  Had you received an offer of
4    reinstatement from Hillside Auto Outlet, would you
5    have returned?
6        A    Possibly.
7        Q    Why would you return?
8        MS. TROY:  Timeframe, but she can answer
9    the question.
10       A    Read it back.
11   (Whereupon, the referred to question was read back
12           by the reporter.)
13       A    If would all depend on the circumstances,
14   of course.  If the offer was presented and it was a
15   decent one, possibly.
16       Q    You are aware that an offer of
17   reinstatement was made, correct?
18       A    When we were at the conference?
19       Q    That's correct.
20       A    Okay.  I didn't completely understand the
21   question.  I thought you meant at the time being.
22   At this point, yes, I would not accept it, but if it
23   was at the time of everything going on, possibly,
24   yes.
25       Q    You rejected the offer of reinstatement at

| | 139 |
|---|---|

L. Stidhum

1
2    the conference, correct?
3        A    Yes.
4        Q    The conference that you attended with your
5    counsel, is that the first time you entered a
6    federal courtroom?
7        A    Yes.
8        Q    You testified previously that Ali, David
9    and Brianna made statements to you concerning the
10   alleged discrimination; do you recall that
11   testimony?
12       A    Yes.
13       Q    Other than those three individuals, did
14   you discuss the alleged discrimination with anyone
15   else?
16       A    Um, yes.
17       Q    Who?
18       A    Iris, which is Jay's sister.  Are we
19   talking about the dealership or in general?
20       Q    In general anyone.
21       A    Family.
22       Q    Such as who?
23       A    My mother, my grandmother, my children's
24   father.
25       Q    Anyone else?

| | 140 |
|---|---|

L. Stidhum

1
2        A    Not that I can recall.
3        Q    No one else at the dealership other than
4    Iris and the three people we discussed, right?
5        A    Yes, pretty much.
6        Q    What did you discuss with Iris?
7        A    I would kind of complain about what's
8    going on.
9        Q    Would it be fair to say you were venting
10   to her?
11       A    Yes.
12       MS. TROY:  Objection to that
13   characterization.
14       Q    When did that discussion happen; month and
15   year?
16       A    I don't recall.  It must have been around
17   December of 2018.
18       Q    Was that discussion held in person, by
19   phone or otherwise?
20       A    At the dealership.
21       Q    At the dealership in person, correct?
22       A    At the dealership in person.
23       Q    What did she say after you complained to
24   her about what happened?
25       A    I don't recall.  I wouldn't put any words

35 (Pages 137 to 140)

A0228

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

141

L. Stidhum

1  in anyone's mouth and I don't remember.
2      Q   That's fine.  Do you have any notes or
3  written records about any of the discussions that we
4  just talked about or in general about the alleged
5  discrimination?
6      A   No.
7      Q   Do you keep a journal or diary?
8      A   No.
9      Q   Did you write anything about the alleged
10  discrimination at all?
11      A   No.
12      Q   Did you email or text anyone about the
13  alleged discrimination?
14      A   Not that I kept records of.
15      Q   So you recall sending texts or emails but
16  you didn't keep them?
17      A   Right.
18      Q   When did you dispose of the emails or the
19  texts?
20      A   It wasn't so much as disposing them.  I do
21  get new phones pretty often, I like to have the
22  newest phone.  It probably just got deleted from
23  changing phones or whatever the case may be.  I
24  don't know.

*(lines numbered 1-25)*

---

142

L. Stidhum

1      Q   When was the last time you replaced your
2  phone?
3      A   Actually this past December.  I got
4  upgraded for Christmas.
5      Q   Someone gave it to you as a gift or you
6  bought it?
7      A   My mother got it for me as a gift.
8      Q   Who do you recall sending text messages or
9  emails to about the alleged discrimination?
10      A   Again, the same three people.  Those were
11  pretty much the only people that I spoke to about
12  the situation in general.
13      Q   Do you have any other notes or writings in
14  any format documenting the alleged discrimination?
15      A   No.
16      MR. KATAEV:  This is a good time for us to
17  stop and take lunch.  We will come back at 1:30
18  and we will start by doing exhibits, and I
19  think -- I'm hoping we will be done by 3:00,
20  but I can't promise.  That's my guesstimate,
21  okay.  I have -- I will have the exhibits
22  mostly up on the screen.
23      MS. TROY:  Whatever that has multiple
24  pages just send it to us, it may be easier so

*(lines numbered 1-25)*

---

143

L. Stidhum

1  we don't have to waste time.
2      MR. KATAEV:  I will try to work on that.
3  I will put them in the same Dropbox as the
4  settlement production and can you work off that
5  and I send you the link again.
6      MS. TROY:  Fine.
7      MR. KATAEV:  We are off the record.
8
9      (Luncheon recess:  12:58 p.m)
10                  ***
11      (Afternoon session: 1:51 p.m.)
12
13  L E T I C I A   F R A N C I N E   S T I D H U M,
14  resumed, having been previously duly sworn, was
15  examined and testified further as follows:
16  EXAMINATION BY
17  MR. KATAEV: (Continued)
18  (Defendant's Exhibit C, Marked for Identification.)
19      Q   Defendant's Exhibit C.  This is
20  Plaintiff's Initial Disclosures.  I will represent
21  to you, Ms. Stidhum, that these were sent to us on
22  June 21st, 2022.  Do you recognize this document?
23      A   Yes.
24      Q   To your knowledge, what is this document?

*(lines numbered 1-25)*

---

144

L. Stidhum

1      A   There is a couple.  So honestly, when you
2  scroll down a little bit, I will be able to...
3      Q   I will represent to you in this document,
4  among other things, you identify witnesses; do you
5  see that?
6      A   Yes.
7      Q   You identify yourself, all employees,
8  David Manrique and the four individual Defendants,
9  right?
10      A   Yes.
11      Q   Why did you not list as witnesses the
12  other three people we discussed; Brianna, Iris and
13  Ali?
14      A   Honestly, those were conversations that
15  were brief and, you know, about the situation at the
16  time so I didn't really think that it would be very
17  useful just because there was no evidence behind it,
18  I guess you can say.
19      MS. TROY:  We will amend initial
20  disclosures and snd it to you.
21      MR. KATAEV:  Okay.
22  BY MR. KATAEV:
23      Q   In here, you identify no documents that
24  are relevant to the case, correct?

*(lines numbered 1-25)*

---

36 (Pages 141 to 144)

A0229

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

145

L. Stidhum

1   A  Right, I didn't have anything.
2   Q  In terms of producing documents, you
3   reproduced the paystubs we produced to you and some
4   information about your sonogram, correct?
5   A  Right.
6   Q  At the end of this, you state that a
7   damage calculation will be provided, correct?
8   A  I'm sorry.
9   Q  At the end of this, you state a
10  computation of the damages will be provided,
11  correct?
12  A  Right.
13  Q  During the lunch break, without divulging
14  the actual conversation you had, did you discuss
15  your testimony with your attorney?
16  A  No.
17  Q  We were talking before about your
18  cellphone and how you like to have the latest model
19  and you most recently got one?
20  A  Right.
21  MS. TROY:  Um, objection.
22  Mischaracterizes witness testimony but fine.
23  BY MR. KATAEV:
24  Q  Whenever you obtained a new phone, you use

---

146

L. Stidhum

1   iCloud to restore the backup from your prior phone,
2   right?
3   A  Sometimes.  Once you lose certain access
4   or if you have a two-factor identification, you
5   can't get into the same iCloud account so that's
6   pretty much what happened to me.  I actually just
7   made a new one again.
8   Q  You still have the old phone in your
9   possession, correct?
10  A  No, I do not.
11  Q  What did you do with the old phone?
12  A  Honestly, I can't tell you what I did with
13  if.  I don't know if that's the one I gave to my
14  great-grandmother.  I'm not sure.
15  Q  We talked earlier about a Facebook post
16  and I asked you questions about whether you posted
17  anything about securing or obtaining millions of
18  dollars in a lawsuit, correct?
19  A  Right.
20  Q  That post was not about your lawsuit
21  against Hillside Auto Outlet, that post was about
22  your mother's lawsuit, correct?
23  A  No, my stepfather.  If this -- I'm not
24  sure.  I don't know what post we are talking about

---

147

L. Stidhum

1   specifically.  Yes, my stepfather did obtain a
2   couple of million dollars working for the Department
3   of Sanitation.
4   Q  Were the attorneys representing your
5   father in that lawsuit the same attorneys
6   representing you here?
7   A  No.
8   Q  Was your mother ever involved in any
9   lawsuit?
10  A  No.
11  Q  Your mother didn't have any lawsuit
12  against Spectrum or Charter?
13  A  No.
14  MS. TROY:  Objection as to relevance.
15  Q  To your knowledge, did your mother ever
16  make any claim without filing a lawsuit against
17  Charter or Spectrum?
18  A  I don't believe so.
19  Q  Did the attorneys that -- did she hire
20  attorneys to pursue that claim?
21  A  She ended up not pursuing it.
22  Q  Did the attorneys that you consult with
23  include the current attorneys that you are utilizing
24  for this lawsuit?

---

148

L. Stidhum

1   MS. TROY:  Objection as to relevance.  You
2   may answer.
3   A  I believe she had a conference with them
4   just to see if there was anything, but I'm not sure.
5   MS. TROY:  Objection to the extent you're
6   prying into attorney/client privilege.
7   Q  Did you learn about this law firm through
8   your mother?
9   A  No.
10  Q  How did you learn about Troy Law?
11  A  Google.
12  Q  What did you search for?
13  A  I don't know.
14  MS. TROY:  Objection to form as to
15  relevance.  She may answer.
16  A  I don't remember honestly.  Attorneys near
17  me maybe.  There were a mile and a half away.
18  Q  You chose them because they were close by?
19  A  They were the first people I spoke to and
20  they made me feel comfortable.
21  Q  I'm going to place up on the screen what
22  has been marked as Defendant's Exhibit D.
23  (Defendant's Exhibit D, Marked for Identification.)

---

37 (Pages 145 to 148)

A0230

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

149

L. Stidhum
1
2  BY MR. KATAEV:
3      Q  I will represent to you these are damage
4  calculations that were produced on January 30, 2023.
5  Do you recognize this document?
6      A  Yes.
7      Q  At the top left, your law firm's name and
8  address is listed, correct?
9      A  Yes.
10     Q  It's titled, Damages Calculations,
11  correct?
12     A  Yes.
13     Q  After that, there is a box where the case
14  name, case number and the forum that it's in is
15  listed, correct?
16         MS. TROY:  Objection.  The document speaks
17  for itself.  You don't need to waste time over
18  this.
19  BY MR. KATAEV:
20     Q  You can answer.
21         MS. TROY:  She can answer the question.
22  You're just wasting time.  Go ahead, answer the
23  question.
24     A  What is the question?  If I see it?  Yes,
25  I see it.

---

150

L. Stidhum
1
2      Q  It lists the case name and case number,
3  correct?
4      A  Yes.
5      Q  After that, it shows the time period of
6  December 1st of '18 through January 14th of '19,
7  correct?
8      A  Yes.
9      Q  The calculated total number of weeks for
10  that time period is listed as 6.43, right?
11     A  Yes.
12     Q  What you're saying is your total weekly
13  pay prior to any discrimination averaged $1,238.64,
14  correct?
15     A  Yes.
16     Q  That's based the on actual paystubs which
17  are listed below, which show all of your paystubs
18  from May of '18 until January of '19, correct?
19     A  Yes.
20     Q  Right here is the calculation of that
21  average and before you announced your pregnancy,
22  correct?
23     A  Yes.
24     Q  After that is the calculation of your
25  average after you announced your pregnancy, correct?

---

151

L. Stidhum
1
2      A  Yes.
3      Q  So taking the difference between those two
4  numbers, you came up --
5         MS. TROY:  Emanuel, this is not an
6  arithmetic test.
7         MR. KATAEV:  Tiffany, stop interrupting.
8         MS. TROY:  You're like, A minus B, is that
9  equal to C?
10        MR. KATAEV:  Stop interrupting my
11  deposition.  Stop.  All you have to say is
12  objection and grounds, that's it.
13        MS. TROY:  Objection.
14        MR. KATAEV:  Your objection is noted for
15  the record.  I'm going to proceed with my
16  deposition.
17  BY MR. KATAEV:
18     Q  The difference of $428.64 is what you
19  obtained when you subtract this $1,238.64 number
20  from the 810 number, correct?
21        MS. TROY:  Objection.  My client is not
22  going to be subject to an arithmetic test.  If
23  she knows how to do it by her brain --
24        MR. KATAEV:  I'm calling the court.  I'm
25  not dealing with this.  We are going to put

---

152

L. Stidhum
1
2  everything you said on the record and we are
3  calling the court.  You will not interrupt my
4  deposition.
5         MS. TROY:  You can tell the court that you
6  asked her --
7         MR. KATAEV:  You can tell the court
8  whatever you want.  This is ridiculous.
9         MS. TROY:  I will make the objections that
10  I need to make but I'm not going to interrupt
11  your deposition.  That's it.
12        MR. KATAEV:  Good.  Please don't do it
13  again.  Say, Objection, and the basis and move
14  on unless you're instructing her not to answer.
15  BY MR. KATAEV:
16     Q  Ms. Stidhum, the difference between
17  $1,238.64 and $810 is calculated as $428.64,
18  correct?
19     A  Yes.
20     Q  What happened is you take the $428.64, you
21  multiple that by the 6.43 weeks and you get a
22  shortfall of $2,755.54, correct?
23     A  Yes.
24     Q  You went over this chart with your
25  attorneys, correct?

---

38 (Pages 149 to 152)

A0231

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

153

L. Stidhum

1
2    A   Yes.
3    Q   You listed this as your economic damages
4  in this place, this place and this place, correct?
5        MS. TROY:  Objection.  She did not herself
6    list it.
7    Q   By and through you, correct?
8    A   Yes.
9    Q   Now you have here $100,000 under the
10  compensatory damages; do you see that?
11   A   Yes.
12   Q   Unlike the damages that we just went over,
13  there is not calculation for the $100,000, correct?
14   A   Yes.
15   Q   Where is the calculation for the $100,000;
16  where is that number coming from?
17   A   Honestly, that's something that has to be
18  discussed with my attorney.
19   Q   The answer is you don't know?
20   A   I don't.
21   Q   Same question for the punitive damages,
22  two million dollars in these three places; do you
23  see that?
24   A   Yes.
25   Q   Where is that number coming from?

---

154

L. Stidhum

1
2    A   That's something to discuss with my
3  attorney.
4    Q   You don't know the answer, correct?
5    A   No.
6    Q   I'm placing up on the screen what will be
7  marked as Defendant's Exhibit E.  It's the Responses
8  to Defendants' Interrogatories.  Are you familiar
9  with this document?
10  (Defendant's Exhibit E, Marked for Identification.)
11       MS. TROY:  Scroll through the doc.
12   A   Yes.
13       MS. TROY:  Make it slightly bigger.  We
14    are having a hard time seeing it.  Too big.
15       MR. KATAEV:  I don't need commentary.
16    Thank you.
17  BY MR. KATAEV:
18   Q   In the first interrogatory that was asked
19  of you, we asked, Set forth with detail and with
20  specific numerical calculation all categories of
21  damages asserted by Plaintiff, correct?
22   A   Yes.
23   Q   In response, you directed us to the
24  damages calculations that we just reviewed, correct?
25   A   Right.

---

155

L. Stidhum

1
2    Q   But as we just went over, there are no
3  calculations for the compensatory damages or the
4  punitive damages, right?
5    A   Right.
6        MS. TROY:  Emanuel, that's factually
7    incorrect.
8        MR. KATAEV:  We can take it up after the
9    deposition.  Please don't interrupt unless you
10   have an objection.  Thank you.
11  BY MR. KATAEV:
12   Q   You identify over here, Ali in response to
13  Interrogatory Number 2 which requests the identity
14  of witnesses Ali Raskesnia.  R-a-s-k-e-s-n-i-a.
15       Do you see that?
16   A   Yes.
17   Q   This is the Ali with whom you went to NYC
18  Motor Cars, correct?
19   A   Correct.
20   Q   Iris Serrano is the Iris we discussed
21  earlier today, correct?
22   A   Yes.
23   Q   You say here that her address and phone
24  number are unknown.  Do you not maintain telephone
25  contact with this individual?

---

156

L. Stidhum

1
2    A   No.
3    Q   The last time you spoke to Iris was at the
4  dealership, correct?
5    A   Not at the dealership.  I do have her on
6  Snapchat so we spoke here and there but not much.
7    Q   On Snapchat you discussed this case?
8    A   No.  The only thing I did ask regarding
9  this case was if she knew the last name of Lily.
10   Q   Understood.  Did she give you the answer?
11   A   No, she wasn't sure what her last name
12  was.
13   Q   In response to Interrogatory Number 7,
14  which asks whether you ever complained to Hillside
15  Auto Outlet about discriminatory conduct and to
16  provide information about each such complaint.  Your
17  answer only provides information about your
18  conversation with Isaac and Jory, correct?
19   A   I'm sorry, one more time.
20  (Whereupon, the referred to question was read back
21       by the reporter.)
22   A   Right.
23   Q   You did not provide any information about
24  your alleged discussion with Ronald, correct?
25   A   Well, that wasn't a discussion about the

---

39 (Pages 153 to 156)

A0232

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

| 157 |
| --- |

L. Stidhum

1  discrimination -- the pregnancy discrimination.
2  That was more about me telling him about the bonus.
3  That was more about me telling him about the bonus.
4     Q   Is it fair to say that the bonus has
5  nothing to do with your pregnancy?
6     A   No, because the bonus kind of played a
7  part in it.  My pregnancy was the reason for me kind
8  of pushing to get this bonus to begin with.
9     Q   Why did you not list your conversation
10  with Ronald in this response?
11    A   Honestly, it must have slipped my mind.
12  Like I said, it was more of a conversation about the
13  bonus and receiving that money for doing x amount of
14  cars rather than the initial complaint of what was
15  going on about the pregnancy discrimination.
16         MR. KATAEV:  I'm going to call for the
17     Plaintiff to supplement her response to
18     Interrogatory Number 7, and we will follow up
19     in writing.
20         (Counsel Request.)
21  BY MR. KATAEV:
22    Q   For clarification, some of the dealerships
23  that you worked at after Hillside Auto both had the
24  name Luxury in them but they were two separate
25  dealerships, correct?

| 158 |
| --- |

L. Stidhum

1     A   Correct.
2     Q   They are two different locations?
3     A   Yes.  Two different locations, different
4  owners.
5     Q   In response to Interrogatory 19, you only
6  identify Queens Auto Mall incorrectly typed here as
7  hall.  You failed to include the other two that you
8  denied positions for, correct?
9     A   Right, because honestly, it wasn't fresh
10  in my mind.
11        MR. KATAEV:  We are going to call for
12     Plaintiff to supplement her response to this
13     interrogatory and we will follow up in writing.
14        (Counsel Request.)
15  BY MR. KATAEV:
16    Q   With respect to every position identified
17  in response to Interrogatory Number 14, is it
18  accurate to state that the pay you received at each
19  of these dealerships was better than what you
20  received at Hillside Auto Outlet?
21    A   Yes.
22    Q   If you have to give your best estimate as
23  to the annual amount of money you would earn at
24  Hillside Auto Outlet, how much would you say that

| 159 |
| --- |

L. Stidhum

1  was?
2     A   Maybe like 60 or 70,000.  I'm not sure.  I
3  didn't work there a full year.
4     Q   When you applied for unemployment both
5  times, did you receive the unemployment for the full
6  six-month period both times?
7     A   I believe so.
8     Q   Do you recall whether it was the capped
9  amount?
10    A   I'm sorry.
11    Q   Do you recall whether it was the capped
12  amount?
13    A   The first time I received it, yes.  The
14  other two times, it was not.
15    Q   Has any injury or disability prevented you
16  from working during any period of time?
17    A   No.
18    Q   Have you ever filed for bankruptcy?
19    A   No.
20    Q   As far as you know, you were never
21  terminated from any job?
22    A   Correct.
23    Q   During the time that you worked at
24  Hillside Auto Outlet, there came a point in time

| 160 |
| --- |

L. Stidhum

1  when you purchased a vehicle from the dealership,
2  correct?
3     A   One more time.
4     Q   When you worked at Hillside Auto Outlet,
5  you purchased a vehicle from the dealership,
6  correct?
7     A   Correct.
8     Q   What car did you purchase?
9     A   Infiniti Q50.
10    Q   Do you still have that car?
11    A   No, I do not.
12    Q   What did you do with the car?
13        MS. TROY:  Objection as to relevance.  She
14     can answer.
15    A   It got totaled.  I was rear-ended.
16    Q   I'm sorry.
17        Did you obtain the vehicle from
18  Hillside Auto Outlet on favorable terms?
19    A   On favorable terms, as in -- what do you
20  mean by that?
21        MS. TROY:  Objection to form.
22    Q   By whatever favorable terms means to you?
23    A   No.  After receiving the discovery, I was
24  charged like every other customer.  They made a

40 (Pages 157 to 160)

A0233

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

161

L. Stidhum
1
2  couple of grand off of me.
3      Q   How much did you purchase the vehicle for?
4      A   I don't remember.
5      Q   Did you do financing?
6      A   Yes, I did.
7      Q   It was a used vehicle, correct?
8      A   Yes.
9      MS. TROY:  Objection as to relevance.
10     Q   Isn't it true that you complained to Isaac
11  that the reason why Andris took so long to process
12  employment applications -- I'm sorry, financing
13  applications for customers is because he sucks?
14     A   I don't remember.  This is --
15     MS. TROY:  Objection.  Argumentative.  She
16  can answer.
17     MR. KATAEV:  Please don't interrupt her
18  while she's answering.
19  BY MR. KATAEV:
20     Q   Repeat your answer.
21     A   I don't remember.
22     MR. KATAEV:  Let the record reflect that
23  the witness laughed at the question.
24     I have placed up on the screen what will
25  be marked as Defendants' Exhibit F.

162

L. Stidhum
1
2  (Defendant's Exhibit F, Marked for Identification.)
3  BY MR. KATAEV:
4      Q   For the record, these are monthly sheets
5  as to cars sold at the dealership using the CRM
6  system.  It's Bates-stamped D2 through D9.  This
7  particular set is for May of 2018.
8         Ms. Stidhum, do you recognize this
9  document?
10     MS. TROY:  Scroll through whatever pages
11  you're talking about.
12     MR. KATAEV:  Sure.  Let the record reflect
13  that these activities are designed to waste
14  time, to run the clock, as the Plaintiff has
15  repeatedly make reference to the time of the
16  deposition.
17     MS. TROY:  If you want to play it that
18  way, let the record reflect you said you wanted
19  to start at 9:00, you started at 9:30.  You
20  said you wanted a 30-minute lunch break, you
21  took a 45-minute lunch break.  You're asking
22  questions that are irrelevant to this case.
23     MR. KATAEV:  Anything else?
24     MS. TROY:  That's it for now.
25     MR. KATAEV:  Let the record reflect that,

163

L. Stidhum
1
2  at Plaintiff's request and insistence, we
3  scrolled through D2 through D9.
4  BY MR. KATAEV:
5      Q   Are you ready to answer some questions
6  about this exhibit?
7      MS. TROY:  Go back to the second page.
8  Okay.
9  BY MR. KATAEV:
10     Q   Ms. Stidhum, other than due to this
11  lawsuit and in the course of discovery, have you
12  ever seen this document while working at the
13  dealership?
14     A   No.
15     Q   Did you have access to the sold log
16  through the CRM system while you worked at the
17  dealership?
18     A   I'm not sure.  I didn't really use the
19  CRM.
20     Q   In this sheet, it says that you sold a car
21  to an individual named Robert Gantt on May 27, 2018;
22  do you see that?
23     A   Yes.
24     Q   It says it was sold for $12,600 and at the
25  front, it says negative 586 and at the back is 2011;

164

L. Stidhum
1
2  do you see that?
3      A   Yes.
4      Q   By the front, that refers to the gross
5  commissionable profit on the front end of the sale
6  for the actual vehicle, correct?
7      A   Yes.
8      Q   On the back, that refers to any
9  aftermarket items sold, whether it's something for
10  the car or something like insurance or protection or
11  warranty and stuff like that, correct?
12     A   Yes.
13     Q   On this particular deal, it was sold at a
14  loss, correct?
15     A   Yes.
16     Q   You received $150 for selling this car,
17  correct?
18     A   Yes.
19     Q   But you didn't receive any bonus for this
20  particular car, correct?
21     A   When you say bonus, I'm not sure what you
22  mean by bonus.
23     Q   If I understand correctly for you to
24  receive that 5 percent bonus, this number on the
25  front end has to be $3,000 or $3,500 or more,

41 (Pages 161 to 164)

A0234

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

165

L. Stidhum

1  correct?
2      MS. TROY:  Objection.  Mischaracterizes
3  witness testimony.
4      A   The total between the front and back would
5  have to equal that, yes.
6      Q   You have to add the two, correct?
7      A   Yes.
8      Q   The next car that's listed as sold by you
9  in May of 2018 is a vehicle sold to one Darell
10 Thomas on May 25th of 2018; do you see that?
11     A   Yes.
12     Q   But there is no information here about the
13 front or back or the sold amount, correct?
14     A   Right.
15     Q   The third vehicle listed that's sold by
16 you is to one John Collado, correct?
17     A   Yes.
18     Q   There was May 24th of 2018, correct?
19     A   Yes.
20     Q   On this particular sale the front and the
21 back had a profit of $1,628 and $1,857 respectively,
22 correct?
23     A   Yes.
24     Q   With the calculator I have on the screen

---

166

L. Stidhum

1  calculating the total between the two, that comes
2  out to $3,485, correct?
3      A   Right.
4      Q   What you're saying is your bonus would be
5  5 percent of that amount for a total of $174.25; is
6  that right?
7      A   Right.  It wouldn't be a bonus to the
8  $150.  It was just that $174.25 total.
9      Q   It would be $150 for making the sale plus
10 $174.25?
11     A   No.  That's what I'm trying to clarify.
12 It would be the $174.25.
13     Q   Whenever you made more, you get 5 percent
14 in lieu of the actual $150 commission?
15     A   Right.  If you do $3,000, that's
16 5 percent, it would be $150.
17     Q   For this particular deal, you do receive
18 $174.25 instead of $150, correct?
19     A   Yes.
20     Q   You know that because you referred to a
21 sheet that was given to you in triplicate and you
22 threw that sheet out after you confirmed that you
23 were paid the right amount, correct?
24     A   That's false actually.  I wouldn't receive

---

167

L. Stidhum

1  anything that showed the actual pay for the
2  5 percent.  It was just -- it would reflect on my
3  paystub.
4      Q   I see.  On that sheet, would it list the
5  front and back end gross commissionable profit?
6      A   No.  It would reflect on my paystub.
7      Q   How would you know whether you would be
8  entitled to a 5 percent bonus on top of -- in lieu
9  of $150 -- higher than $150?
10     A   I just started in the business so I kind
11 of took their word for it.  Jay was very honest with
12 us.  She would make sure that we were paid correctly
13 all the time.  After that, it's obvious -- you can
14 tell the difference between being paid $174.25 and
15 the flat $150.
16     Q   I see.  Could it be possible you didn't
17 sell any vehicles at a profit?
18     A   No, that's impossible because I remember
19 on multiple occasions where Serge would be excited
20 that I did a ten-pounder, which is a $10,000 deal
21 and I would still receive $150 flat.  That's
22 impossible.
23     Q   We just scrolled through all of the May
24 2018 and they were only three or four cars sold.  Is

---

168

L. Stidhum

1  it accurate that you only sold four cars in May of
2  '18?
3      A   I don't believe that's accurate, but then
4  again, I did just start that month so it's a
5  possibility.  I know that this document I've looked
6  over it, I went and checked how many cars it showed
7  that I sold and it's not accurate at all.
8      Q   What makes you say it's not accurate?
9      A   Because even the amounts of cars sold is
10 not the right number.  None of it is the right
11 numbers.  If you look back at when I first received
12 the 1,000 pages, I went -- I calculated based on my
13 paystubs without the 5 percent how many cars did I
14 sell for each month and how many cars it shows on
15 that document you just showed me, which is only
16 input by BDC and it definitely is not accurate.
17     Q   At the top of page D2 next to the word,
18 Sold log, it has in parenthesis the number 46; do
19 you see that?
20     A   Yes.
21     Q   My understanding is this is listing the
22 total amount of cars sold in May of 2018, correct?
23     A   Correct.
24     Q   You're saying that this number is not

---

42  (Pages 165 to 168)

A0235

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 44 of 102 PageID #: 853

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

169

L. Stidhum

1  accurate?
2      A   I can't say for May of 2018 because I just
3  started that month and it was towards the middle of
4  the month and I was not there for the full month,
5  but I can confirm that months moving on, those
6  numbers do not add up to the numbers I have based on
7  my paystubs. Even in the mediation that we had, you
8  said that this might not be everything, so I know
9  for sure it is not.
10     Q   To your knowledge, how did the dealership
11  keep track of the total vehicles sold every month?
12     A   Like I stated before, we had a board in
13  the finance room where we would have the list of all
14  the salespeople and they would tally every time they
15  sold a car, and that's how we kept track of how many
16  cars we had for the month. There was never a set
17  log that was written down by anyone or nothing like
18  that.
19     Q   At the end of the month before starting a
20  new month chart before erasing all the data for the
21  month, did anyone ever take a picture of the board?
22     A   Not to my knowledge.
23     Q   I'm going to mark what will be Defendant's
24  Exhibit G.
25

170

L. Stidhum

1  (Defendant's Exhibit G, Marked for Identification.)
2  BY MR. KATAEV:
3      Q   It is the same type of report for December
4  of 2018 from D62 through D67. On this first page it
5  says the total sold in December '18 is 36 cars,
6  correct?
7      A   Yes.
8      Q   Is that accurate, to your knowledge?
9      A   Honestly, I'm not sure because, again,
10  like I said, I compared the documents and it doesn't
11  look like these -- this log shows everything whether
12  it was a walk-in customer or a appointment. It
13  doesn't look like it shows everything.
14     Q   Looking at page D65. There are two cars
15  that you sold to two different people on the same
16  day, December 10th of 2018, correct?
17     A   Yes.
18     Q   How was it that you were able to sell two
19  cars in a single day?
20     A   I don't understand the question. I have
21  sold six cars in a day.
22     Q   In this particular instance with respect
23  to Monica Hampton, for example, was Andris Guzman
24  the individual who helped you with the financing?
25

171

L. Stidhum

1      A   I don't recall. It does say, Pending
2  delivery. This doesn't mean that I sold them both
3  on the say same.
4      Q   What about Prince Henston, do you recall
5  whether Andris Guzman was the individual that helped
6  you with the financing aspect?
7      A   This is four years ago. I don't know who
8  did what.
9      Q   The following page, D66, there are two
10  additional cars that were sold on or about
11  December 6 and 8, correct?
12     A   Right.
13     Q   Finally on the last page, D67, there is a
14  fifth car that was sold on December 1st of 2018,
15  correct?
16     A   Correct.
17     Q   It's fair to say you sold at least five
18  cars in December of 2018?
19     A   I guess so, based on this.
20     Q   Do you recall whether you sold more than
21  five cars in December of '18?
22     A   Again, I'm not sure because it was such a
23  long time ago. I don't want to sit here and lie,
24  but I don't remember selling -- I remember that I

172

L. Stidhum

1  was very upset because I was probably selling one or
2  two cars a week so this may be accurate.
3      Q   Didn't you testify previously that you
4  typically sold seven cars a month?
5      A   No. Seven cars a week.
6      Q   What was the least amount of cars you sold
7  prior to December of '18 prior to your recollection?
8      A   Again, it's a long time ago. I'm not
9  going to give you fake numbers. I know for sure it
10  was seven cars a week because if we do seven times
11  $150 plus that $300, I would receive a check for
12  $1,050 and that was usually my goal for the week so
13  that way I can bring home at least $800 to $900
14  bucks.
15     Q   I have placed up on the screen what will
16  be marked as Defendant's Exhibit H.
17  (Defendant's Exhibit H, Marked for Identification.)
18  BY MR. KATAEV:
19     Q   My question to you is: Have you ever
20  seen --
21     MS. TROY: Did you skip some numbers from
22  the exhibit?
23     MR. KATAEV: No.
24     MS. TROY: Okay, this is Exhibit H.
25

43 (Pages 169 to 172)

A0236

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

173

```
1              L. Stidhum
2         MR. KATAEV: Yes.
3    BY MR. KATAEV:
4         Q   Have you ever seen a document like this
5    before? It's called cap sheet?
6         A   No.
7         MR. KATAEV: Let's mark this as
8    Defendant's Exhibit I, I believe.
9    (Defendant's Exhibit I, Marked for Identification.)
10   BY MR. KATAEV:
11        Q   I will represent to you that this is a
12   declaration prepared by Serge and signed by him.
13   Have you ever seen this document before?
14        A   Yes, I did.
15        Q   Serge says here in Paragraph one that he
16   has served as an F&I representative since November
17   of 2018; do you see that?
18        A   Yes.
19        Q   Does that comport with your recollection
20   as to when he started working there?
21        A   I thought it was a little sooner after Jay
22   left.
23        Q   He says here in Paragraph six that
24   whenever the Plaintiff or any other salesperson
25   makes a sale, the customer's information is provided
```

---

174

```
1              L. Stidhum
2    to the sales manager or him, whoever is available
3    and has authorization to pull the prospective
4    customer's credit profile; do you see that?
5         A   Yes.
6         Q   That comports with your earlier testimony
7    that typically Andris would handle it but sometimes
8    he would, right?
9         A   Right.
10        Q   Paragraph seven says that once the credit
11   profile is pulled, the customer's application to
12   purchase a vehicle is submitted to chosen lenders;
13   do you see that?
14        A   Yes.
15        Q   Do you know what is meant by, Chosen
16   lenders?
17        A   Yes. Qualifying, they have to qualify the
18   customer based on their credit history.
19        Q   There are different banks that accept
20   different types of customers with different types of
21   credit histories, correct?
22        A   Correct.
23        MS. TROY: Can you speak slower?
24        MR. KATAEV: Sure.
25        MS. TROY: I'm having difficulty
```

---

175

```
1              L. Stidhum
2    following.
3    BY MR. KATAEV:
4         Q   In Paragraph eight, Serge declares that
5    the timeframe to receive any word back from a chosen
6    lender, which is also based on a customer's credit
7    worthiness, ranges from ten minutes to one hour; do
8    you see that?
9         A   Yes, I do.
10        Q   You have no reason to dispute that,
11   correct?
12        A   I mean --
13        MS. TROY: Objection. Argumentative. She
14   can answer.
15        A   I mean, honestly, most approvals are
16   almost instant. I can't agree as long as one hour.
17        Q   Has it ever been one hour since submitting
18   something to a chosen lender?
19        A   Honestly from my experiences, an hour, no.
20        Q   Your experience is limited to the time
21   when you had access to Dealertrack, correct?
22        A   Yes.
23        Q   You had access to Dealertrack since what
24   month in 2018?
25        A   I want to say towards the end -- after Jay
```

---

176

```
1              L. Stidhum
2    left but I don't know how soon after.
3         Q   That was somewhere in July or August of
4    '18, correct?
5         A   Yes.
6         Q   That was taken away from you in December
7    of '18, correct?
8         A   Yes.
9         Q   That's approximately two months, right?
10        MS. TROY: Objection. You need to do your
11   math properly.
12        A   It's four or five months.
13        Q   How many submissions did you make to
14   lenders in the four or five months that you had
15   Dealertrack access?
16        A   I didn't make submissions to lenders. I
17   would run the credit and qualify them myself and
18   prefill the application, so that way when it got to
19   finance, whether it was Isaac or Serge, all they had
20   to do was read over it, make sure I didn't make a
21   mistake, check out their credit, submit the deal.
22   Everything would be done.
23        Q   When you submit the deal, that's when you
24   have to wait for the lender to get back, right?
25        A   Like I said, approvals are almost instant.
```

---

44 (Pages 173 to 176)

A0237

L. Stidhum

Everything is done electronically.

Q You're saying that every time you submit a deal, a bank gets back instantly every single time?

MS. TROY: Objection. Mischaracterizes witness testimony. She can answer.

A Again, I didn't submit it to the lender. I only ran the credit, prefilled the application, would give the folder to the finance. Most of the time, I would stand right over him and wait and see who is going to pick it up, yes. The approvals were almost instant.

Q Since you didn't submit it, you had no independent knowledge as to how long it took, correct?

A That's incorrect. I had access to Dealertrack so I was able to see when the deal got approved or did not get approved.

Q Is there any data as far as you know that's kept in Dealertrack as to how long each deal takes from submission to response?

A No.

Q Paragraph nine, Serge declares that this timeframe of submission is completely outside the control of himself or any sales manager who pulls a



L. Stidhum

credit profile and is further dependent on the amount of verification requested by each chosen lender, which is also completely outside the control of himself or any sales manager; do you see that?

A Yes.

Q Do you agree that it's outside the control of the sales manager, you know, the contents of this paragraph?

A Partially, because my argument was not whether or not the lender is taking x amount of time. It was about my customer's credit being ran and qualifying the customers within a certain amount of time so that's not properly worded.

Q What you're saying is what took longer is the part before this part?

A Right.

Q Okay. In order to complete the part before this part, you have to obtain information from the customer, correct?

A Right.

Q Sometimes the customer does not have all of the information, correct?

A Right.

MS. TROY: Objection. Asked and answered.



L. Stidhum

Q It says in Paragraphs 12 through 14 the following, During the time Plaintiff worked here, I worked closely with her as well as all the other salespersons. Everybody liked each other and treated each other well. There was no animosity amongst the salespeople, myself or nor sales managers; is that true?

A Right up until the announcement of my pregnancy, of course.

Q Of course. What about the fact that you and Andris Guzman had two prior incidents where you got into an argument before you announced your pregnancy?

A Again, we still we kept it very professional. It's not somewhere where you're going to be bickering back and forth in front of potential customers.

Q Number 19 says, if a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control such as the failure of the customer to provide necessary information to the lender or because the lender requested additional documentation or simply because the dealership had to wait for the lender's



L. Stidhum

response.

Do you have any reason to dispute that statement?

A No.

Q Finally at the end it says, In the course of the last four years working at the dealership, customers have waited to obtain information concerning approvals from 20 minutes until three hours on average.

Do you have any reason to dispute that statement?

A I have never seen it go as long as three hours, but...

Q What is the longest you have seen a customer wait to get a deal done?

A Probably, like -- I'm talking about wait times between him actually doing anything with my customer. That's what I'm talking about. I'm not talking about in general the total amount of buying a car. It's two different things we are talking about here. He's speaking about overall car purchase.

Q That's a fair distinction, but does the customer know?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

181

L. Stidhum

1
2    MS. TROY: Objection. Argumentative.
3    A  I'm sorry.
4    Q  Does the customer know?
5    A  Does the customer know what?
6    Q  That there is a distinction between
7    waiting for their credit to be pulled versus
8    submitting it to the bank?
9    A  Absolutely. When your credit is pulled
10   and you're qualified for a customer, you're told to
11   start working on insurance, which can take up to --
12   anywhere from ten minutes to an hour. Yes, the
13   customer would know because immediately they are
14   like, are we approved, are we wasting our time.
15   Once I get the folder, I expect to respond to my
16   customers and say, we are going to get this done,
17   let's work on insurance.
18   Q  In general, the whole car-buying process
19   sometimes takes hours, right?
20   A  It can.
21   MS. TROY: Objection. Argumentative. I'm
22   going to direct my client to please wait if I
23   have an objection or not because she's
24   immediately answering your question.
25

---

182

L. Stidhum

1
2    BY MR. KATAEV:
3    Q  You can answer now.
4    A  It can take up to -- it can take longer,
5    but for the most part, we work relatively quick. So
6    I'm speaking based on my experience, we would move
7    pretty quickly because we were a store that would
8    get a lot of walk-in traffic. I would want to grab
9    two or three customers at a time.
10   Q  What is the fastest that you ever
11   processed the deal for a transaction?
12   MS. TROY: Objection. Specify timeframe.
13   Q  Whenever you worked at Hillside Auto
14   Outlet.
15   A  I mean, getting them in and out the door,
16   probably within an hour or less. I have had
17   instances where I have gotten people out and in
18   their car, registered and everything, in less than
19   an hour.
20   Q  How often does that happen?
21   A  I work relatively quick. I would want to
22   say maybe 40 to 50 percent. It's very rare I have
23   customers waiting for hours.
24   Q  Very impressive. I don't think that's the
25   world's perception of how long it takes a car deal

---

183

L. Stidhum

1
2    to go through, but very impressive.
3    MS. TROY: No need to do your commentary.
4    Ask your question.
5    MR. KATAEV: Do you have an objection,
6    Counselor?
7    MS. TROY: You were not asking a question.
8    You're making a commentary and talking to my
9    client.
10   MR. KATAEV: Do you have an objection?
11   MS. TROY: Again, you can tell the judge.
12   You're talking directly to my client and not
13   asking a question.
14   MR. KATAEV: I'm making sanctions against
15   you for interrupting my deposition.
16   MS. TROY: For telling you not to speak
17   directly to my client?
18   MR. KATAEV: Anything other than object
19   and state the grounds. Please stop
20   interrupting my deposition.
21   MS. TROY: I'm objecting. It's not a
22   question. You're talking to my client.
23   MR. KATAEV: Say, Objection, you're
24   talking to my client and shut up.
25   MS. TROY: Let the record reflect you told

---

184

L. Stidhum

1
2    me to shut up.
3    MR. KATAEV: You are interrupting my
4    deposition and I want you to stop. I'm tired
5    of this problem with you. Please conduct
6    yourself the way you're supposed to conduct
7    yourself at a deposition.
8    MS. TROY: Telling another counselor to
9    shut up is not professional.
10   MR. KATAEV: Okay.
11   BY MR. KATAEV:
12   Q  I'm placing up on the screen what has been
13   marked as Defendants's J. I will represent to you
14   that this a document bearing Bates-stamp numbers
15   D151 through D157.
16   (Defendant's Exhibit J, Marked for Identification.)
17   BY MR. KATAEV:
18   Q  It concerns the lead for an individual
19   named Charles Clark. Do you recognize that
20   individual?
21   A  No.
22   Q  On D151 it says here, Working with
23   Leticia; do you see that?
24   A  Yes.
25   Q  In status, there is multiple statuses

46 (Pages 181 to 184)

A0239

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

185

L. Stidhum

1  listed but two of them are lost, correct?
2
3      A   Right.
4      Q   What does that mean to you that the status
5  of a lead is lost?
6      A   That they either didn't want to come in or
7  they purchased it elsewhere.  The lead was lost.
8      Q   Typically in this program, there is a log
9  of everything that happened with this lead, correct?
10     A   I guess, yes.
11     Q   Let's look at the log.  Starting from the
12  bottom of page D157, there is a inbound phonecall by
13  Aditia on March 17, 2021, correct?
14     A   Okay.
15     Q   You see that?
16     A   Yes.
17         MS. TROY:  Objection as to timeframe.
18  Objection to relevance.
19     Q   We will skip this one.
20         MR. KATAEV:  Let the record reflect that
21  for this particular lead, it's a customer that
22  returned after December 2018.  A lead was lost.
23  The information from December 2018 is not
24  listed.
25

---

186

L. Stidhum

1
2  BY MR. KATAEV:
3      Q   The next exhibit is Defendant's Exhibit J,
4  I believe and it's Bates-stamped D201 through D206.
5  For this particular lead, on D201, the manager is
6  listed as Andris Guzman, correct?
7      A   Yes.
8      Q   Going all the way to the bottom on
9  January 11th of 2019, Tiffany listed that this
10  customer is interested and will be here tomorrow any
11  time from 10:00 to 2:00?
12         MS. TROY:  Objection.  The document speaks
13  for itself.
14     A   Yes.
15     Q   On January 12th of 2019, there is a
16  listing that says the showroom visit started on
17  January 12th at 10:45 a.m. lasting six hours; do you
18  see that?
19     A   Yes.
20         MS. TROY:  Objection.  Document speaks for
21  itself.
22     Q   Is that common that a showroom visit can
23  last up to six hours without a sale being made?
24     A   BDC is in the back so they do not see what
25  is going on in the front so they have to come out,

---

187

L. Stidhum

1
2  grab the book where customers were logged and then
3  they can log them.
4         So realistically was that customer
5  there for six hours, absolutely not.  She ended up
6  logging it in after she saw what happened after she
7  was able to communicate with whatever salesperson
8  was working with them so that way she can log them
9  in.  That is not realistic.
10     Q   Do you have any recollection as to why
11  this particular lead was lost?
12     A   No, I do not.
13     Q   Let's go to Defendant's Exhibit K.  This
14  is Bates-stamped D249 and it ends with D254.
15  (Defendant's Exhibit K, Marked for Identification.)
16  BY MR. KATAEV:
17     Q   At the top of this on January 1, 2019, it
18  says that the customer is here now with Leticia,
19  correct?
20     A   Yes.
21     Q   Then it says the showroom visit started on
22  January 1st of '19 at 4:15 p.m. and lasted for
23  22 hours.
24     A   That goes to show it depends on when the
25  BDC rep decides to come and check on their customer

---

188

L. Stidhum

1
2  and log it in.
3      Q   It says here at 5:15, an hour after the
4  showroom visit started that, Going out under dad
5  Antonio Yanes; do you see that?
6      A   Okay.
7      Q   What does that mean to you?
8      A   He needed a cosigner and he did it under
9  his father.
10     Q   The customer left, as far as you could
11  tell from reading this document, without buying the
12  vehicle, correct?
13     A   It's hard to say because if it went out
14  under Antonio, there would be a new lead set up
15  under Antonio.
16     Q   Over here on January 8 of '19, it says
17  that you made an outbound phonecall to him, correct?
18     A   Yes.
19     Q   How is that tracked?  How did they know
20  you made an outbound phonecall?
21     A   I have no idea.  You can log a call and
22  then put what representative or who made that
23  contact so I don't remember this.
24     Q   It says here on January 26th that this
25  lead was lost, correct?

47 (Pages 185 to 188)

A0240

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

189

L. Stidhum

1
2     A   Yes.
3     Q   There were emails sent just to try to
4  bring the customer back in and none of that worked,
5  correct?
6         MS. TROY:  Objection.  Goes beyond what
7     the witness would know.  She can answer.
8     A   Then again, there is a note there that
9  said that it went out under the dad.  If it says it
10  went out under the dad, that means the car was
11  delivered under the father's name.
12    Q   Are you saying that they marked the lead
13  as lost and that's incorrect?
14    A   Possibly, because it says it went out
15  under the dad.  If we are going to write that it
16  went out under the dad, that means he did not
17  qualify so his father purchased the vehicle for him.
18    Q   It's possible that he did, correct?
19    A   I'm sorry.
20    Q   It's possible that he did, correct?
21    A   I mean, it wouldn't be there in a note if
22  it wasn't true.
23    Q   Let's look at Defendant's Exhibit L.  This
24  is Bates-stamped D288 through D293.
25  (Defendant's Exhibit L, Marked for Identification.)

---

190

L. Stidhum

1
2  BY MR. KATAEV:
3     Q   Starting from the bottom, there is a note
4  here that on December 10th of '18, an appointment
5  was set for December 10, right?
6     A   Yes.
7     Q   There is another text message here from
8  one of the BDC people to come with proof of address
9  and two recent paystubs if available, right?
10    A   Yes.
11        MS. TROY:  Objection.  Document speaks for
12    itself.
13    Q   On the same day later that day, it says
14  the customer was here with you, correct?
15    A   Yes.
16    Q   The next item in the log is outbound
17  phonecalls by you and two days later another by the
18  BDC rep, right?
19    A   Right.
20    Q   As far as you can tell from this document
21  so far, this customer did not purchase any vehicle,
22  correct?
23    A   Right.
24    Q   On December 15th based on a phonecall by
25  the BDC rep, the customer said he needed money down

---

191

L. Stidhum

1
2  and wouldn't be ready until February, correct?
3     A   Yes.
4     Q   At least this customer didn't leave
5  because of your waiting to check creditworthiness,
6  correct?
7     A   From what we can tell at least.
8     Q   The reason he knows he needs money down is
9  because his credit was checked, correct?
10    A   Yes.
11    Q   This happened on December of 2018,
12  correct?
13    A   As it states.
14    Q   Was this a one-off to all the situations
15  that you experienced?
16        MS. TROY:  Objection.  Argumentative.
17    Q   You can answer.
18    A   One more time.
19    Q   Is this a one-off to all the
20  discrimination you allege you suffered from the
21  waiting times?
22    A   I'm not understanding.
23    Q   You claimed the customers walked out
24  because they couldn't their credit checked, right?
25    A   Partially.  That's not exactly what I

---

192

L. Stidhum

1
2  said.
3     Q   You testified it took too long for their
4  credit to be checked such they would get frustrated
5  and leave, right?
6     A   Right.  I didn't state that for every
7  single customer I sat with.
8     Q   How many customers did it happen with?
9     A   I don't remember.  It's four years later.
10    Q   This is very important because it's part
11  of your federal lawsuit in federal court with a
12  federal judge, and I would like to understand how
13  many customers on a ratio basis did this happen with
14  and how many did it not happen with?
15    A   Realistically, I would say I would sit
16  with about two, two to three people daily.  Out of
17  those two to three people, at least two of them were
18  walking out at this time because of the longer wait
19  periods.
20    Q   Every day two out of three people?
21    A   More or less.
22    Q   This is one of the three that didn't walk
23  out?
24    A   Possibly, but then again you did state
25  that I made a phonecall to him.  Can we go back to

---

48  (Pages 189 to 192)

A0241

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

193

L. Stidhum

2  that?
3      Q   Sure.
4      A   It's possible that he did walk out because
5  that phonecall was regarding the results of the
6  credit being run finally.
7      Q   Here with Leticia, outbound phonecall two
8  days later, unable to leave message by the BDC rep.
9  Outbound text message, phonecall by BDC rep said he
10  needs money down and won't be ready until February
11  on December 15th.  December 31st, holding off until
12  February.  Lead lost January 16, 2018.
13      A   It's really hard to remember by customer
14  for something that happened four years ago
15  especially since I have been in the business a
16  couple of years and dealt with a bunch of customers.
17      Q   That's why we have records of these
18  things, correct?
19          MS. TROY:  Objection.  Argumentative.
20      Q   You can answer.
21      A   I mean if the stuff was accurate, I would
22  agree.
23      Q   You're saying this isn't accurate, that he
24  called and said --
25      A   I'm not saying that that isn't accurate.

---

194

L. Stidhum

2  I'm talking about the documents overall.
3      Q   Let's look at Defendant's Exhibit M.
4  Bates-stamped D397 through D402.  This is a bunch of
5  messages here between the customer and someone named
6  Tiffany, a BDC person about doing an application; do
7  you see that?
8  (Defendant's Exhibit M, Marked for Identification.)
9      A   Yes.
10      Q   What is that application referring to?
11      A   It's a prequalification application.
12      Q   Which is something that is designed to
13  assist customers with getting financing if they need
14  it, correct?
15      A   More or less.
16      Q   It's a process that's done in advance to
17  avoid having to do what have you complained about in
18  this case, correct?
19      A   Right.
20      Q   On January 5th of 2019, Brianna, one of
21  your witnesses, listed that the customer wants to
22  know how much she would put down as a down payment,
23  correct?
24      A   Right.
25      Q   The following day, Brianna set up an

---

195

L. Stidhum

2  appointment for the next Saturday, no money down and
3  has a trade-in, right?
4      A   Right.
5      Q   On January 12th, he was working with you
6  and he was greeted by Louis and Manuel, correct?
7          MS. TROY:  Objection.  Documents speak for
8  itself.
9      A   I don't remember who this was, but I
10  guess.
11      Q   After that, the lead is marked lost the
12  following month, correct?
13      A   That was marked lost by the system so what
14  that means is that after a certain amount of time
15  that the customer is not contacted for whatever the
16  case may be, that lead goes into a loss folder.  So
17  like it says there, it's by the system, not by a rep
18  or anybody's name.  There is no telling if that car
19  was sold or not.  I don't recall the name.
20      Q   We will ascertain whether it was sold and
21  we will provide evidence of that.
22          Going back to the January 6, 2019
23  phonecall with Brianna to the customer, when it
24  says, No money down and has a trade-in, what does
25  that mean to you?

---

196

L. Stidhum

2      A   They want to trade in their car.
3      Q   In that situation, is it the normal
4  process that there is no money down required?
5      A   One more time.
6      Q   In a situation where there is a trade-in,
7  is it normal that there is no money down required on
8  the financing?
9      A   In certain situations.  It all depends on
10  a person's credit.
11      Q   On January 5th of '19, before this
12  customer came in, he did the application necessary
13  to check for financing in advance, correct?
14          MS. TROY:  Objection.
15      A   Yes.
16      Q   So you didn't have to wait for anybody for
17  this customer, correct?
18      A   That's not true because this is the
19  prequalification application.  This is not an
20  application that does a hard inquiry on the credit
21  and shows exactly what the banks are looking for.
22  We still have to run the credit ourselves, we still
23  have to handwrite the application in order to do so,
24  so that's not accurate.
25      Q   The prequalification made it easier,

---

49 (Pages 193 to 196)

A0242

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 51 of 102 PageID #: 860

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

197

L. Stidhum

1   didn't it?
2   MS. TROY: Objection. Argumentative.
3   A  No. The prequalification doesn't make it
4   easier unless we have access to those applications
5   prior to them coming in.
6   Q  We are going to look at Defendant's
7   Exhibit N, I believe, which is Bates-stamped D522
8   through D527. With this lead, Brianna set up an
9   appointment for the following day after January 4th
10  of '19, correct?
11  (Defendant's Exhibit N, Marked for Identification.)
12  MS. TROY: Objection. The document speaks
13  for itself.
14  A  Yes.
15  Q  On January 10th, this customer came in for
16  a showroom visit, correct?
17  A  Right.
18  MS. TROY: Objection. The document speaks
19  for itself.
20  Q  In this particular instance, the customer
21  left information on a car she was looking for and
22  asked the dealership to let her know if you find
23  that car, correct?
24  MS. TROY: Objection. The document speaks

---

198

L. Stidhum

1   for itself.
2   A  Yes.
3   Q  Did you take any steps to find the car she
4   wanted?
5   A  Can we go back down to the dates?
6   Q  Sure.
7   A  That was towards the end of me leaving.
8   So again, I don't recall. I don't remember this
9   customer specifically, but I'm sure I did everything
10  I could to look and see, especially at that point
11  where I was at being at that time and that
12  dealership.
13  Q  This customer you didn't lose because of
14  waiting for financing, right?
15  A  No.
16  Q  You lost this customer because you
17  couldn't find the car she wanted, correct?
18  A  I wouldn't say I lost the customer. If
19  I'm not mistaken, I was out of that dealership a day
20  or two later.
21  Q  On January 14th, three days later,
22  correct?
23  A  I guess so.
24  Q  It takes you an hour to sell a car,

---

199

L. Stidhum

1   correct?
2   A  More or less.
3   Q  You had 36 hours to sell a car to this
4   individual customer, correct?
5   A  Yes. If you see there, it says she wants
6   a E43 convertible or a 6 Series convertible. We
7   never had those cars on our lot. Not a convertible,
8   maybe an E class, maybe a 6 Series, yes, but
9   convertible, to my knowledge, we did not have
10  convertibles, either E43 or a 6 Series, on our lot.
11  Q  You could procure one, couldn't you?
12  A  I'm sorry?
13  MS. TROY: Objection. Argumentative.
14  Repeat your question since she didn't hear.
15  Q  You could procure one, couldn't you?
16  MS. TROY: Objection. Argumentative. She
17  can answer.
18  A  I'm sure I did look and I'm sure if I
19  would have found it, she would been right back in
20  the store.
21  Q  Let's look at Defendant's O. It's
22  Bates-stamped D536 through D543. Towards the bottom
23  of this exhibit on November 24th of '18, it says
24  that this customer has a 2010 Pathfinder for trade

---

200

L. Stidhum

1   and mentioned trouble with credit and set an
2   appointment for November 25th; do you see that?
3   A  Yes.
4   Q  On November 26th, it says that this
5   customer worked with you recently, filed for
6   bankruptcy, needs to bring back a letter from the
7   trustee as to the budget she's allowed monthly
8   towards vehicle. Will follow up, correct?
9   A  Yes.
10  Q  Do you remember working with this
11  customer?
12  A  No.
13  Q  Do you recall whether the knowledge of the
14  bankruptcy in this note indicates whether the credit
15  check was done yet?
16  A  Of course it was. How else would we have
17  known about the bankruptcy being active?
18  Q  With respect to this customer, performing
19  the credit check was not an issue, correct?
20  A  It looks like this was in November, so no.
21  Q  Isn't it true you announced your pregnancy
22  on November 23rd of '18?
23  A  I believe so.
24  Q  This happened after you announced your

---

50 (Pages 197 to 200)

A0243

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 52 of 102 PageID #: 861

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

201

L. Stidhum

1  pregnancy, correct?
2      A   Yes.
3      Q   Your argument that your pregnancy was the
4  reason why it took longer to check credit history is
5  inaccurate with respect to this customer, correct?
6      A   No, that's incorrect.  If you recall, I
7  did say that Isaac was the dad of the dealership and
8  when the dad left, everybody did as they pleased, so
9  there is that.
10     Q   As far as you know, Isaac was the one who
11  pulled the credit for this one?
12     A   I'm not sure.  What I'm saying is that,
13  yes, I announced my pregnancy on November 23rd.  I
14  only remember that because it's my mother's
15  birthday.  I remember announcing my pregnancy then,
16  but the discrimination did not happen until after
17  Isaac left because the dad of the dealership was no
18  longer watching.  There was no jumping in or trying
19  to stop things from happening.  That's what my point
20  is.
21     Q   It says here on December 27th, The
22  customer came for a second time and left very upset.
23  She's in the middle of a bankruptcy and we can't
24  help her; do you see that?
25

---

202

L. Stidhum

1      A   Yes.
2      Q   Isn't it true that sometimes you can't
3  help a customer even if you do the credit check?
4         MS. TROY:  Objection.  Argumentative.
5      A   Of course that's true, but again, I
6  mentioned that I might have sat with two or three or
7  maybe more customers a day.  That could have been
8  one of the very few that that happened with.
9      Q   Let's go to Defendant's Exhibit O,
10  Bates-stamped D633 through D636.
11  (Defendant's Exhibit O, Marked for Identification.)
12  BY MR. KATAEV:
13     Q   On this particular one it says, On
14  December 29 of 2018, Brianna found out that this
15  customer was interested in a RAV4 and will be in
16  today and if not with follow up; do you see that?
17     A   Yes.
18     Q   On January 4th, she reiterated the
19  interest in the RAV4 and set an appointment for the
20  following day, correct?
21     A   Yes.
22     Q   It says that on January 5th, the text
23  message by Brianna asked the customer to ask for you
24  when the customer arrives, correct?
25

---

203

L. Stidhum

1         MS. TROY:  Objection.  Document speaks for
2  itself.
3      A   Yes.
4      Q   On January 6th, there is a message by
5  Brianna saying the customer will call back if he's
6  still interested, correct?
7      A   Correct.
8         MS. TROY:  Objection.  The document speaks
9  for itself.
10        MR. KATAEV:  Your objection is noted.
11     Q   On March 28, this individual bought a
12  different car from somewhere else, correct?
13     A   I guess so.
14        MS. TROY:  Objection.  The document speaks
15  for itself.
16     Q   There is no indication there that there
17  were any issues with getting a credit check done,
18  correct?
19     A   It also doesn't indicate that the customer
20  ever came in.  Yes, he made the appointment, yes,
21  Brianna told him to ask for me.  It doesn't look
22  like he ever came in.
23  (Defendant's Exhibit P, Marked for Identification.)
24        MR. KATAEV:  Bates numbered to be D804 to
25

---

204

L. Stidhum

1  D806.  This will be P.
2  BY MR. KATAEV:
3      Q   This is a December 2018 lead, correct?
4         MS. TROY:  Same objection as before, which
5  is again, you're not having the client testify
6  on her personal knowledge.  You're having her
7  read off the document.
8         MR. KATAEV:  Your objection to noted.
9  BY MR. KATAEV:
10     Q   Leticia, is this correct that it's a
11  December 2018 lead?
12     A   Yes.
13     Q   It says here on December 20th of '18 that
14  the cosigner will do an application tomorrow,
15  correct?
16     A   Yes.
17        MS. TROY:  Objection.  The document speaks
18  for itself.  This is document is cut off.
19        MR. KATAEV:  It's right here.
20  BY MR. KATAEV:
21     Q   Based on this note, is it accurate to
22  state that the customer came in?
23        MS. TROY:  Objection.  You're not having
24  her testify on her personal knowledge.  You're

---

51 (Pages 201 to 204)

A0244

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

---

205

L. Stidhum

1
2   having her read off the document.
3      Q   I'm asking her based on her personal
4   knowledge whether, based on this note, the customer
5   would have come in?
6      A   If the customer did come in?
7      Q   Yes.
8      A   Can you scroll down a little more?
9      Q   Did the customer come in?
10     A   Yes.
11     Q   It says here that the customer is coming
12  with his cosigner tomorrow.  Worked with Leticia
13  last night.  He was here, doesn't know specific
14  time; do you see that?
15     A   Yes.
16     Q   In order for all of this to have happened,
17  is it accurate to state that the financing was done
18  already?
19     A   Possible.
20     Q   You did not end up selling this car
21  because the lead was lost?
22        MS. TROY:  Objection.  The document speaks
23     for itself.
24     A   Again, that's a lost lead by the system
25  that was put in three months later which is the

---

206

L. Stidhum

1
2   general timeframe of a lost lead when not contacted,
3   so I can't say it was not sold because he did
4   mention bringing in a cosigner so I can't confirm or
5   deny that.
6      Q   You don't know if it was sold or not?
7      A   I do not.
8      Q   This is Defendant's Exhibit Q.
9   Bates-stamped D812 to D814.
10  (Defendant's Exhibit Q, Marked for Identification.)
11  BY MR. KATAEV:
12     Q   At the bottom over here it says that this
13  individual came in with approval from Capital One,
14  correct?
15        MS. TROY:  Same objection.  You're not
16     having her testify on her personal knowledge.
17     You're having her read off the document.
18     A   Yes.  It does state that, but it doesn't
19  necessarily mean they are approved.
20     Q   You have a note over here, Bonus all
21  capital S's; do you see that?
22     A   Yes.
23     Q   Why did you write this note?
24     A   I have no idea.  I don't remember.
25     Q   This note was written about almost four

---

207

L. Stidhum

1
2   hours after the showroom visit started?
3      A   I don't recall.  It's four years ago.
4      Q   It says here on January 2 of '19 that
5   Brianna noted that she's happy with the purchase?
6      A   Okay.
7      Q   And that means that you were able to make
8   a sale on this vehicle, correct?
9      A   Right.
10     Q   Isaac was not here at this time, correct?
11     A   Right.
12     Q   Andris was the one who did the financing,
13  correct?
14     A   I can't answer that question because it
15  could have been Serge or Andris.
16     Q   Defendant's Exhibit R.  Bates-stamped D815
17  through D820.
18  (Defendant's Exhibit R, Marked for Identification.)
19        MS. TROY:  Same objection.  You're not
20     having her testify on her personal knowledge.
21     You're having her read off the document.
22        MR. KATAEV:  You're only repeating
23     yourself to waste time.  Make a blanket
24     objection.
25        MS. TROY:  I'm going to make a blanket

---

208

L. Stidhum

1
2   objection which is the whole set of documents
3   from I think Exhibit C onwards.  You're
4   basically having her read off the document.  A
5   lot of the times you're not even asking her to
6   testify on her personal knowledge.  So that's
7   not an appropriate objection.  The document
8   speaks for itself.
9         MR. KATAEV:  It is an inappropriate
10     objection and is a violation of Rule 30 and you
11     have been warned multiple times not to do that.
12        MS. TROY:  You asked me to make a blanket
13     objection so I did.
14        MR. KATAEV:  That's it, stop.
15        MS. TROY:  I did.
16        MR. KATAEV:  Stop already.
17        MS. TROY:  I did what you asked me to.  I
18     don't know want you want to me to do.  You
19     asked me to do something and I do it and then
20     you're like, Stop.
21        MR. KATAEV:  Please stop.
22  BY MR. KATAEV:
23     Q   Look at D818 in this particular exhibit.
24  There is a note here from Brianna that the customer
25  is waiting to see if Uber is going to hire him; do

---

52 (Pages 205 to 208)

A0245

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 209 |
|---|---|

L. Stidhum

1  you see that?
2      A  Yes.
3      Q  In this particular instance no credit
4  check was probably performed because he was waiting
5  to see if he was going to be hired, correct?
6      A  That's not entirely true.
7      Q  As far as you know, the credit was done on
8  this particular customer?
9      A  I'm not saying it was or was not done
10  because there is no telling on this document.  I
11  can't really tell.
12      Q  That's fine.  This is Defendant's
13  Exhibit S, bearing Bates-stamped numbers D842 to
14  D847.
15  (Defendant's Exhibit S, Marked for Identification.)
16      MS. TROY:  Same objections as the
17      uniformed one, blanket one.
18      Q  This customer visited the showroom on
19  December 12th of 2018, correct?
20      A  Yes.
21      Q  This lead was subsequently marked lost,
22  correct?
23      A  Again, it's by the system three months
24  later, which is uniform for that CRM to do.  It does

|  | 210 |
|---|---|

L. Stidhum

1  that.  If it has not been contacted within three
2  months as it shows on every one you mentioned that
3  shows lost by the system, it's uniform.
4      Q  Isn't it true that if a vehicle is sold
5  it's marked in the CRM system?
6      MS. TROY:  Objection.  Argumentative.  She
7      can answer.
8      A  Again, it's if they do it.  It's not a yes
9  or no.  If they do it.
10      Q  If they fail to do it, isn't it true they
11  won't get paid a commission?
12      A  I don't believe that is entirely true
13  because they do not get paid on shows that are
14  walk-ins, so I can't say that's entirely true.
15      MR. KATAEV:  Off the record for a minute.
16  (Whereupon, an off-the-record discussion was held.)
17  BY MR. KATAEV:
18      Q  During the course of your employment with
19  Hillside Auto Outlet, there came an occasion where
20  you brought another employee on to work with us,
21  correct?
22      A  Yes.
23      Q  That individual's name is Brianna,
24  correct?

|  | 211 |
|---|---|

L. Stidhum

1      A  Yes.
2      Q  Brianna is a childhood friend of yours,
3  correct?
4      A  Yes.
5      Q  She continued working at the dealership
6  after you left, correct?
7      A  Right.
8      Q  To your knowledge, is she still working at
9  the dealership?
10      A  No.  Not that I know of.
11      Q  This is Defendant's Exhibit T.  1165
12  through 1167.
13  (Defendant's Exhibit T, Marked for Identification.)
14      MS. TROY:  Also just the blanket objection
15      applies to Exhibit T.
16  BY MR. KATAEV:
17      Q  For this particular lead, this customer
18  was noted by Tiffany from BDC as a cash buy,
19  correct?
20      A  Yes.
21      Q  For a cash buy, that means there will be
22  no financing, correct?
23      A  Correct.
24      Q  There is showroom visit on December 8th,

|  | 212 |
|---|---|

L. Stidhum

1  correct?
2      A  Right.
3      Q  You followed up with a phonecall two days
4  later, correct?
5      A  Right.
6      Q  You follow up again two days after that,
7  correct?
8      A  Right.
9      Q  You were not able to sell the vehicle,
10  correct?
11      A  Right.
12      Q  Andris Guzman did not play any role in
13  that because there was no financing, correct?
14      A  Just because it's not noted there doesn't
15  mean he did not because Serge was in the back office
16  so he probably prepared the buyer's order but the
17  first point of contact would have been Guzman.
18      Q  For what?
19      A  Because he's the sales manager so he's
20  going to want to know what's going on, what the
21  customer is asking for, how much he's looking to pay
22  and so on.
23      Q  Going to Defendant's Exhibit U.  It's a
24  document Bates-stamped 1186.  I will represent to

53 (Pages 209 to 212)

A0246

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

213

L. Stidhum

1  you that this is from the payroll company and it
2  lists your hire date and termination date; do you
3  see that?
4       A   Yes.
5  (Defendant's Exhibit U, Marked for Identification.)
6  BY MR. KATAEV:
7       Q   To your knowledge, is this accurate you
8  were hired on May 22nd of 2018?
9       A   Yes.
10      Q   And you were separated from employment on
11 January 14th of 2019, correct?
12      A   Yes.
13      Q   That means you were employed with the
14 dealership for approximately eight months, correct?
15      A   Right.
16      Q   I will represent to you that we are
17 looking at your first paystub, which will be part of
18 this exhibit D1187.
19          I have D1186 through D1250 will be
20 marked as Defendant's Exhibit V.
21 (Defendant's Exhibit V, Marked for Identification.)
22 BY MR. KATAEV:
23      Q   This pay period starts on May 22nd until
24 May 28th of 2018, correct?
25

---

214

L. Stidhum

1       A   Right.
2       Q   This pay period you only received the $300
3  weekly salary, correct?
4       A   That's incorrect.  It shows the $780 in
5  commissions.  We were paid in two separate checks.
6  You get a salary check every week of $300 and
7  commission was separated to reduce the amount of
8  taxes taken out.
9       Q   On this particular case, your first week
10 you sold approximately five cars, correct?
11      A   I think it averages out to 5.2 cars
12 because that's when I was receiving the 5 percent.
13      Q   Right.  The following week, you only sold
14 approximately two cars, correct?
15          MS. TROY:  Can you break that down,
16      Emanuel?
17      A   That looks like it might have been
18 two-and-a-half car because if another salesperson
19 had to help out, you would split the deal with the
20 other salespeople, so I mean, it could have been
21 carrying over from the 5 percent.
22      Q   Approximately two to three cars in this
23 one, right?
24      A   It might been two.  It could have been

---

215

L. Stidhum

1  that 5 percent carrying over.
2       Q   For the third week it was just two cars,
3  correct?
4       A   Right.
5       Q   In the week of June 12 to June 18, it was
6  no cars, correct?
7          MS. TROY:  Emanuel, you're scrolling
8      really fast.  Could you show us the two
9      paystubs corresponding?
10 BY MR. KATAEV:
11      Q   I will represent to you that I see one
12 paystub and it's June 12th to June 18th and the one
13 before is for the week prior and the one after is
14 for the week after.  This is D1193.
15          MS. TROY:  You're saying there is only one
16      for that week?
17 BY MR. KATAEV:
18      Q   You know what, I want to do this on the
19 record.  If you go to the week prior, it shows
20 year-to-date of $1,505.  If you go to the week after
21 it shows $2,165.
22      A   That paystub must just not be in there.
23      Q   Maybe it's later on in the production but
24 we will see.

---

216

L. Stidhum

1          Based on the difference in the gross
2  for commissions and the total being $660, you sold
3  approximately four cars, correct?
4       A   One more time.
5          MS. TROY:  How did you come up with your
6      numbers?
7  BY MR. KATAEV:
8       Q   You look at D1193, which is the week from
9  June 12th, it shows a gross year-to-date of $2,165,
10 if you go to the week prior, it's $1,505.  You get
11 $660.
12          MS. TROY:  What is your question?
13      Q   $660 and you divide that by $150, I get
14 4.4 cars.  You sold approximately four cars,
15 correct?
16      A   Yes.
17      Q   In the following week with the commission
18 being $615, you also sold approximately four cars,
19 correct?
20      A   Yes.
21      Q   In the week after that, $655, again
22 approximately four cars, correct?
23      A   It's hard to say because it's confusing
24 with that 5 percent.

---

54 (Pages 213 to 216)

A0247

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 56 of 102 PageID #: 865

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

217

L. Stidhum

1
2    Q   Four to five, right?
3    A   Yes.
4    Q   Going into the week of July 3rd through
5    July 9 from the prior week that we just went over,
6    your gross remains the same and you didn't receive
7    any commission check.  So you didn't sell any cars
8    that week?
9        MS. TROY:  Slow down a little bit.  In the
10   July 3 to the July 9 for 1198 is your question?
11       MR. KATAEV:  That's correct.
12   BY MR. KATAEV:
13   Q   I'm showing the week before had the same
14   gross and I'm showing going back to the same paystub
15   it's the same gross and this is the following week.
16   So is it accurate to say that you sold no cars the
17   week of July 2018, the first week?
18       MS. TROY:  Could you show me the two pages
19   again with the two numbers?
20       MR. KATAEV:  Yes, of course.
21       MS. TROY:  What number are you talking
22   about?
23       MR. KATAEV:  D1198 is the benchmark.  The
24   gross is listed as $3,435 year to date.  If you
25   go back to $1,197 to the week prior, it remains

218

L. Stidhum

1
2    the same, it's $3,435 year to date.  If you go
3    to D1199, which is the one after, it's the
4    following week.
5    BY MR. KATAEV:
6    Q   Based on those three paystubs from D1197
7    to D1199, is it fair to say that you did not sell
8    any vehicles that week?
9    A   I don't recall.  I'm trying to think back.
10   Maybe I was on vacation or something.
11       MR. KATAEV:  Off the record.
12   (Whereupon, an off-the-record discussion was held.)
13   BY MR. KATAEV:
14   Q   We have reviewed the pages bearing
15   Bates-stamped numbers D1197 through D1200, which is
16   a comparison of two weeks worth of regular pay of
17   $300 a week and commissions for those two weeks.
18   And my question is:  Based on our review of the
19   record of the paystub for July 3rd through July 9th
20   bearing Bates-stamped D1198, you did not sell any
21   cars during that week, correct?
22   A   I did not say that I did not sell any
23   cars.  I was not paid any commission.  Sometimes you
24   wouldn't get paid on all your cars if the deal was
25   not funded.  Sometimes the deals were funded and I

219

L. Stidhum

1
2    would still receive pay on it.  I'm not sure what
3    happened there.
4    Q   In the following week, you received $900
5    in commissions and that means you sold at least --
6    A   Six cars.
7    Q   Correct?
8    A   I don't know if it was all for that week
9    or if there were was some carried over.  $900 would
10   be for six cars.
11   Q   The following week you made $1,400 which
12   means you sold at least nine cars, correct?
13   A   Right.  So there is definitely a
14   possibility they were carried over from previous
15   weeks or I had a really great week.
16   Q   This is your best week so far, two months
17   into your employment?
18   A   I don't remember.
19   Q   I will represent to you that this is the
20   first four-figure week you had.  The following week
21   after you made the $1,400, you made $450 and that
22   means you sold at least three cars, correct?
23   A   Right.
24   Q   The week after that $300 which means at
25   least two cars, correct?

220

L. Stidhum

1
2    A   Right.
3    Q   The week after that you top your prior
4    record and made $1,450 which is a least nine cars,
5    correct?
6    A   Right.
7        MS. TROY:  Could you do the division for
8    us?
9    A   It's a little over nine cars.
10   Q   $1,450 divided by $150 is 9.67.
11   A   It might have been a split deal in there.
12   That looks like it was after the time that I stopped
13   receiving the 5 percent.
14   Q   This is for the week ending August 20th
15   from August 14th with a pay date of August 24th.  I
16   will represent to you that your complaint states
17   that Jay stopped working on August 24.
18   A   Okay.  It might have been part of it.
19   Again, this is a long time ago.  I don't recall
20   exact dates of which she left or was fired.
21   Q   My question is basically:  Did you sell at
22   least nine cars this week?
23   A   Yes.
24   Q   We are moving now into the next week and
25   here you sold -- you have $1,200 in commissions

55 (Pages 217 to 220)

A0248

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

221

L. Stidhum

1
2  which means you sold at least eight cars, correct?
3      A   Right.  It could have been cars carrying
4  over.
5      Q   I understand.  This following week the
6  commission was only $150, which means you sold only
7  one car?
8      A   Possibly.
9      Q   The following week, $450, which means only
10  three cars?
11      A   Again possibly.
12      Q   The following week, again just three cars
13  which is $450, correct?
14      A   Yes.
15      Q   And now the next week, which we are
16  looking at September 18 to September 24, it's $750
17  which is five cars, correct?
18      A   Yes.
19      Q   Again, $750 for the following week is five
20  cars, correct?
21      A   Yes.
22      Q   And this particular week $900 is seven
23  cars, correct?
24      A   Which one are you talking about?  What
25  number are you talking about?

222

L. Stidhum

1
2      MS. TROY:  Could you do your calculation
3  on the screen.
4      Q   We are up to D1223 for the period starting
5  and ending December 2nd through 8th of 2018, and
6  $900 divided by $150 is six.  You sold at least six
7  cars that week, correct?
8      A   Correct.
9      Q   The following week is $700.  Divide that
10  by $150, you sold at least four cars, correct?
11      A   Right.
12      Q   The following week is $800, which means
13  you sold at least five cars, correct?
14      A   I'm sorry.
15      Q   Five cars.
16      MS. TROY:  Put your calculator on the
17  screen.  It's easier.  You're saying $800.  How
18  many cars?
19      A   Five and change.
20      Q   You sold at least five cars that week.
21      A   Again, it might be carried over.  It's
22  hard to say.
23      Q   Okay.  The next week we are approaching
24  the end of October of '18 is $1,050.  When you
25  divide that by $150, it equals exactly seven.  You

223

L. Stidhum

1
2  sold at least seven cars that week, correct?
3      A   Yes.
4      Q   The following week, again, I have $1,050
5  which means you sold at least seven cars the next
6  week?
7      MS. TROY:  Emanuel, instead of at least,
8  do the -- at least seven cars.
9      A   Yes.
10      Q   The same for the following week, which is
11  Bates-stamped D1230, correct?
12      A   Right.
13      Q   I have the first week of November from the
14  6th to the 12th with Bates-stamp D1232 and $900,
15  which means you sold at least six cars, correct?
16      A   Right.
17      Q   And here we have $1,375 for the middle
18  week of November from the 13th to the 19th.  That
19  means you sold at least nine cars, correct?
20      A   Right.
21      Q   Then during the almost last week of
22  November, the 20th to 26th, I have $450 which means
23  three cars, correct?
24      A   Right.
25      Q   And then during the last week of November,

224

L. Stidhum

1
2  I think following Thanksgiving, I have $1,600 which
3  is your best week ever so far and that means you
4  sold at least ten cars, correct?
5      A   Yes.
6      Q   Now we are entering into the first week of
7  December 2018.  By the way, your best week after the
8  $1,600 was for the pay period November 27th to
9  December 3rd after you announced your pregnancy,
10  correct?
11      A   Yes.
12      Q   The following week you made $825, which is
13  at least five cars, correct?
14      A   Right.
15      Q   The second week in December you made $625,
16  which means at least four cars, correct?
17      A   Right.
18      Q   And then $500 for the third week in
19  December, which is approximately three cars,
20  correct?
21      A   Right.
22      Q   The final week in December you didn't sell
23  any cars, correct?
24      A   It looks like I sold two.
25      Q   I apologize, I saw zero.  I didn't see the

56  (Pages 221 to 224)

A0249

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 58 of 102 PageID #: 867

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

225

L. Stidhum
1
2   $350. Withdrawn.
3       For the final week during the
4   Christmas holiday season from December 25th to
5   December 31st, you sold at least two cars, correct?
6       A   Right.
7       Q   Finally in January of '19, you sold at
8   least five cars based on your commission of $825,
9   correct?
10      A   Right.
11      Q   The second week of January, you have $350
12  in commissions which means you sold at least two
13  cars, correct?
14      A   Right.
15      Q   And then you no longer sold anymore
16  vehicles because you quit, correct?
17      A   Correct.
18      Q   Okay.
19      MS. TROY:  With the qualification that
20  it's for the Defendants.
21      MR. KATAEV:  What does that mean?
22      MS. TROY:  Like, she sold cars at other
23  places, just not at the Defendants'.  You said
24  she no longer sold any cars.
25      MR. KATAEV:  Right, only for defendants.

---

226

L. Stidhum
1
2       Skipping a bunch of exhibits, I want to
3   see if I want to do any of the others.  We can
4   take a quick break.  It's 3:59.  Let's
5   reconvene at 4:05.
6       (Whereupon, a short recess was taken.)
7   BY MR. KATAEV:
8       Q   I have placed up on the screen what will
9   be marked as Defendant's Exhibit W.
10      A   Before we move on to this, you caught me
11  in a little bit of confusion.  You said my best week
12  was $1,600 in the first week of December.  If you
13  recall, that was $1,000 of that was a bonus from
14  November.
15      Q   Okay.
16      A   It was really four cars for that first
17  week and that was definitely cars rolling over from
18  November because if we go back to the other document
19  where the sold log was, I didn't sell a car until
20  the 6th or something like that.
21      Q   Okay.  You want to supplement your answer
22  just to explain that?  That's okay, I understand
23  that.
24      A   Of course.  It looks like I sold
25  20-something cars for that month, when there is no

---

227

L. Stidhum
1
2   way I sold that many in three days.
3       Q   What is the most cars you ever sold in a
4   month?
5       A   30.  33, actually but not at this
6   dealership.  When I went to NYC Motor Cars.
7       Q   I'm saying at this dealership?
8       A   27, I believe or 28.
9       Q   Do you remember what month that was?
10      A   That was in the month of November.  That's
11  why I received that $1,000 bonus on December 3rd.
12      Q   The $1,600 that you received was a $1,000
13  bonus and the $600 was for at least four cars,
14  correct?
15      A   Correct.
16      Q   Thank you for clarifying your answer.
17      Going back to Exhibit W, I will
18  represent to you this is an April 28, 2022 order
19  from Judge Pamela J. Chen.  She's the judge that I
20  will represent to you was the prior judge assigned
21  to this case, and the order says here on April 1st,
22  2022, this Court ordered Plaintiff to notify the
23  Court by filing a letter on the docket within seven
24  days of the Second Circuit issuing a decision in
25  Case Number 21-1653.

---

228

L. Stidhum
1
2       It says Second Circuit issued its
3   decision on April 12, 2022.  As of today, April 28,
4   2022, Plaintiff has not filed a letter on the docket
5   to notify the Court.  Accordingly, on or before
6   May 4th, 2022, Plaintiff shall file a letter on her
7   docket with the proposed next step of how this case
8   should proceed.
9       Do you see that?
10      A   Yes.
11      MR. KATAEV:  Off the record.
12      (Whereupon, an off-the-record discussion was held.)
13      MR. KATAEV:  Back on the record.  I was
14  about to ask some questions about this, but
15  Plaintiff wanted to make some objections.  Go
16  ahead.
17      MS. TROY:  The same objection as before.
18  The same blanket objection applies to this
19  exhibit.
20  BY MR. KATAEV:
21      Q   Just a question I have about this,
22  Ms. Stidhum, are you aware that there was an appeal
23  of a prior case?
24      A   Yes.
25      Q   You're aware that the prior case that was

---

57 (Pages 225 to 228)

A0250

Case 1:21-cv-07163-OEM-LB    Document 87-2    Filed 09/01/23    Page 59 of 102 PageID #: 868

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

229

```
 1              L. Stidhum
 2  filed was dismissed, correct?
 3      A   Yes.
 4      Q   You're aware it was dismissed because it
 5  didn't remain with the EEOC for the statutory period
 6  of time?
 7      A   Yes.
 8      Q   You're aware that your law firm decided to
 9  appeal that decision?
10      A   Yes, I am.
11      Q   Are you aware --
12      MS. TROY:  I'm going to make sure to
13   direct my client to not divulge any
14   communication she may have had with her
15   attorney as part of any response.
16  BY MR. KATAEV:
17      Q   For this whole line of questioning, don't
18  tell me anything that you said to your attorneys or
19  your attorneys said to you.
20          You're aware that because there was
21  an appeal filed with the Second Circuit, that there
22  was something scheduled that was called a Camp
23  conference?
24      A   I'm not sure.
25      Q   Just to explain what a Camp conference is,
```

230

```
 1              L. Stidhum
 2  it's a conference designed for the purpose of
 3  discussing settlement over the phone.
 4      A   Okay, yes.
 5      Q   Are you aware that that Camp conference
 6  was held?
 7      A   Yes.
 8      Q   Did you participate in that conference?
 9      A   I don't believe so.  This is not the one
10  we are talking about that was in person, correct?
11      Q   It's not, that's correct.
12      A   So no.
13      Q   You were not present, correct?
14      A   No.
15      Q   Are you aware of what transpired at this
16  conference without telling me what was said?
17      A   Yes.
18      MR. KATAEV:  Go off the record.
19  (Whereupon, an off-the-record discussion was held.)
20  BY MR. KATAEV:
21      Q   Just some general questions.
22          When you quit, you're not alleging
23  that you were constructively discharged, correct?
24      A   No.
25      MS. TROY:  Objection.  Calls for legal
```

231

```
 1              L. Stidhum
 2  conclusion.  I don't know if she knows what
 3  you're asking.
 4  BY MR. KATAEV:
 5      Q   I will give some more layman's terms
 6  question.
 7          The reason why you quit was because
 8  you were not willing to wait until Isaac dealt with
 9  the issues that you were raising to his attention,
10  correct?
11      A   That's not true, because I indeed did wait
12  for Isaac and we did have an in-person conversation
13  prior to me making my final decision.
14      Q   The reason why you quit is because you did
15  not want to wait any further after having that
16  discussion, correct?
17      A   I mean, at that point it was very, you
18  know, obvious that I wasn't getting the promotion I
19  wanted or was promised, not wanted I should say, or
20  any type of raise or anything like that, so yes, I
21  did quit because of that.
22      Q   You're not saying it was intolerable to
23  work at Hillside Auto Outlet based on those
24  conditions, correct?
25      A   I mean, it was because who wants to sit in
```

232

```
 1              L. Stidhum
 2  a place for ten hours a day pregnant, tired and not
 3  make any money.
 4      Q   And the reason why you found it
 5  intolerable to work there is because you were not
 6  making money?
 7      A   And because of the way I was being
 8  treated.  I would be blatantly ignored when I had a
 9  customer.
10      Q   And the only person that was ignoring you
11  was Andris Guzman, correct?
12      A   Which was my point of contact at the time
13  of Isaac's vacation, yes.
14      Q   You testified earlier that with respect to
15  your workweek, you were off on Wednesdays and every
16  other Sunday, correct?
17      A   Yes.
18      Q   What time would you come in every morning
19  and what time would you leave every evening?
20      A   10:00 to 8:00, sometimes 9:00, 10:00 p.m.
21  Depends on the workday, how many customers we have.
22      Q   You had at least a one-hour lunch break,
23  correct?
24      A   Not necessarily.  We would eat as we went.
25  There was no set time or timeframe to eat.
```

58 (Pages 229 to 232)

A0251

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 233 |
|---|---|

L. Stidhum

1
2    Q   Would you eat together with other
3  salespeople or did you eat on your own?
4    A   Depends.  If we both didn't have a
5  customer at the time, we would go grab lunch
6  together.  We didn't have a designated area to eat
7  so we would eat right at our desk.
8    Q   Did you go to restaurants and sit there
9  and eat?
10    A   Never.
11    Q   Never?
12    A   Never.  Picked up food and come back.
13    Q   You had the option of staying at the
14  restaurant if you wanted, correct?
15    A   Not really.  It was kind of eat and go
16  type of place.  Eat and get back to work.
17    Q   When you went to get lunch, how did you
18  pay for lunch?
19    A   I mean, with my money earned there, cash,
20  credit, whatever.
21    Q   Sometimes you used cash, sometimes you
22  used credit?
23    A   Yes.
24    Q   Did you ever have a charge back?
25    A   A charge back?

|  | 234 |
|---|---|

L. Stidhum

1
2    MS. TROY:  Explain that.
3    Q   Dealership parlance.
4    A   I know what a charge back is.  If a car
5  was returned, they would take my commission back.  I
6  never dealt with a charge back, not that I remember
7  at least.
8    Q   Are you aware of any vehicles you sold
9  being returned for any reason?
10    A   Not that I can remember.
11    MS. TROY:  Again, qualifying this is
12  during Hillside?
13    MR. KATAEV:  Yes.
14  BY MR. KATAEV:
15    Q   Would you be surprised to learn there were
16  vehicles that were charged back that were not taken
17  from you?
18    A   Yes.
19    MR. KATAEV:  Off the record.
20  (Whereupon, an off-the-record discussion was held.)
21  BY MR. KATAEV:
22    Q   Are you aware that Defendants filed a
23  motion to dismiss this case?
24    A   Yes.
25    Q   Are you in receipt of a copy of the

|  | 235 |
|---|---|

L. Stidhum

1
2  decision from Judge Gonzalez denying the motion to
3  dismiss?
4    A   Yes.
5    Q   You read it, correct?
6    A   Yes.
7    Q   I'm going to place up on the screen what
8  will be marked as Defendant's Exhibit X.
9  (Defendant's Exhibit X, Marked for Identification.)
10  BY MR. KATAEV:
11    Q   I will represent to you that this is the
12  decision by Judge Gonzalez and I want to point you
13  to a particular paragraph and ask you some questions
14  about it, okay?
15    A   Okay.
16    Q   Look at page seven.  It says, Plaintiff's
17  allegations that she was deprived access to the
18  Dealertrack program and "could no longer run
19  customer credit scores or prefill financing
20  applications," are not enough to constitute adverse
21  actions because as Plaintiff herself described, she
22  was given unique access and received a benefit that
23  none of her colleagues received.
24    You see that?
25    A   Yes.

|  | 236 |
|---|---|

L. Stidhum

1
2    Q   It says in the next sentence, However, the
3  Court finds that a decrease in Plaintiff's take-home
4  pay can constitute an adverse action.
5    Do you see that?
6    A   Yes.
7    Q   You're saying that your decrease in
8  take-home pay occurred because you had to wait
9  longer for Andris to check customer's credit
10  histories, correct?
11    A   Correct.
12    Q   But I have shown you multiple examples
13  where you lost sales for reasons other than that,
14  correct?
15    A   You have showed me examples that don't
16  really apply to this because you showed me a cash
17  deal, which obviously there is no need to run
18  anybody's credit and you showed me two examples of
19  customers needing cosigners and then there is no
20  more notes after, and then it will say that the lead
21  was lost three months later because nobody wrote
22  anything so I can't agree to that.  That is not
23  correct.
24    Q   It says here, Plaintiff has plausibly
25  alleged that Defendants decreased her bonus by

                                    59 (Pages 233 to 236)

A0252

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

---

237

L. Stidhum

1
2   increasing the average wait time for her customers
3   after she announced her pregnancy without doing the
4   same to the customer's of her nonpregnant coworkers
5   thereby decreasing the number of sales she was able
6   to make.
7        Do you see that?
8     A   Yes.
9     Q   How is it that the Defendants increased
10  the average wait time for your customers?
11    A   Again, by making them wait to run their
12  credit, by prioritizing other customers even though
13  they came afterwards, after me having no Dealertrack
14  access.
15    Q   During your employment with Hillside Auto
16  Outlet, did you physically witness new customers
17  coming in, being checked before your customers that
18  were already waiting?
19    A   Yes.  That's how I knew that my customers
20  were being pushed to the side and taken -- I'm
21  sorry, not taken, other customers were being
22  prioritized.
23    Q   You acknowledge either way that even if
24  Andris Guzman quickly processed the applications,
25  you would still have to face the hurdle of closing

---

238

L. Stidhum

1
2   the sale based on whatever the numbers were and so
3   on and so forth, correct?
4     A   That's not my original complaint.
5     Q   I'm asking you even if Andris complied
6   with your request to more quickly do it, there was a
7   greater potential that you would still not be able
8   to close the sale for a variety of different
9   reasons, correct?
10       MS. TROY:  Objection.  Argumentative.  She
11  may answer.
12    A   I'm sorry, one more time.
13       MR. KATAEV:  Read it read.
14  (Whereupon, the referred to question was read back
15       by the reporter.)
16       MS. TROY:  Objection.  Calls for
17  conjecture.  She may answer.
18    A   I don't know how to answer that question
19  properly because if that was the case then it would
20  be the same as before pretty much, before I even had
21  Dealertrack access.  I'm not really sure how to
22  answer that question.
23    Q   Even after Andris would give you the
24  numbers, there was a potential the customer would
25  say, You know what, I don't want to buy this

---

239

L. Stidhum

1
2   vehicle, correct?
3     A   Of course, but that would have been the
4   case the whole time regardless.  That's not what the
5   complaint is.
6     Q   Even after Andris provided you the
7   numbers, the numbers could be such that the monthly
8   payment that would be required by the bank could be
9   too high, correct?
10    A   Yes.
11    Q   The down payment amount required by the
12  bank could also be too high, correct?
13    A   Yes.
14    Q   Even if Andris timely provided you the
15  numbers, it didn't necessary mean you would close
16  the sale, correct?
17    A   It's partially correct.
18    Q   It only increased your chance at making
19  the sale, but it didn't in any way guarantee you
20  would make the sale, correct?
21    A   Correct.
22    Q   Okay.  I have a couple more exhibits.  Let
23  me see if I need them.
24       MS. TROY:  Emanuel, we are sitting at the
25       4:30 mark.

---

240

L. Stidhum

1
2       MR. KATAEV:  We are almost done.
3       MS. TROY:  This has never been produced to
4   us as any document production.
5       MR. KATAEV:  It has been produced to the
6   judge in this case.  Please stop interrupting
7   my deposition.
8       MS. TROY:  I'm 1,000 percent --
9       MR. KATAEV:  Stop interrupting my
10  deposition.
11      MS. TROY:  I'm going to note my objection.
12  This has never been produced before.
13      MR. KATAEV:  Your objection is noted.  It
14  has been produced to the court.  Stop.
15      MS. TROY:  I'm 1,000 percent sure it was
16  not produced.
17      MR. KATAEV:  Are you willing to bet
18  $10,000 on it?
19      MS. TROY:  The Dropbox is only the
20  documents.  This is no audio file.
21      MR. KATAEV:  Stop interrupting my
22  deposition.
23      MS. TROY:  Go ahead.  I'm noting my
24  objection.
25  (Defendant's Exhibit Y, Marked for Identification.)

---

60  (Pages 237 to 240)

A0253

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 62 of 102 PageID #: 871

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

| | 241 |
|---|---|

L. Stidhum

1
2  BY MR. KATAEV:
3      Q   Defendants are producing Exhibit Y and
4  it's an audio recording, which I'm going to play.
5  It's approximately three minutes long.  I would like
6  the witness to listen and I will ask some questions
7  afterwards.
8          Are you ready?
9      A   Yes.
10     Q   Thank you.
11         (Audio is played.)
12     MS. TROY:  Let the record reflect that
13  this was not produced as part of the document
14  production response.  Instead Mr. Kataev
15  recorded me without my consent and subsequently
16  other courts have found that he should not be
17  able to record such conversations.
18  BY MR. KATAEV:
19     Q   Okay.  I have some questions about this
20  recording, Ms. Stidhum.  Were you ever apprized of
21  the fact that your attorney and I had what's called
22  a telephonic meet and confer?
23     A   Yes.
24     Q   Were you aware that this was the tenor of
25  the communications that were had?

| | 242 |
|---|---|

L. Stidhum

1
2      A   No.
3      Q   Do you believe the way the attorneys are
4  acting in this phonecall are acting professional?
5      MS. TROY:  I'm going to object.
6      A   Can I object?  Can I object?
7      Q   No, you can't object.  Your attorney can
8  object and you can answer the question.  Please go
9  ahead and make your objection.
10     MS. TROY:  Repeat your question.  What is
11  your question?
12  BY MR. KATAEV:
13     Q   From what you hear on this phonecall, do
14  you believe the way the attorneys are acting on this
15  phonecall are acting professional?
16     MS. TROY:  How is this relevant?
17     MR. KATAEV:  Are you objecting because of
18  relevance, Counselor?
19     MS. TROY:  I'm objecting.
20     MR. KATAEV:  Your objection is noted.
21  Please answer the question.
22     MS. TROY:  Great.  We will make a motion
23  to strike and potentially move for costs
24  afterward.
25

| | 243 |
|---|---|

L. Stidhum

1
2  BY MR. KATAEV:
3      Q   Please answer the question.
4      A   I'm not sure.  I don't know the nature.  I
5  know that things can get heated.
6      Q   Are you aware that interrogatory number 9
7  is not something that Defendants were compelled to
8  provide?
9      A   Can I know what an interrogatory is?  I
10  don't know what it is.
11     Q   Withdrawn.
12         I believe I have two or three more
13  exhibits.
14     MS. TROY:  You had a couple of exhibits
15  30 minutes ago.
16     MR. KATAEV:  Well, now I have a couple of
17  exhibits 30 minutes later.
18     MS. TROY:  For the record, it's now 4:40.
19  We were supposed to start at 9:00.  He wasn't
20  ready to start at 9:00.
21     MR. KATAEV:  Based on testimonial time.
22  Enough with this.
23         I'm placing up on the screen what will be
24  marked as Defendant's Exhibit Z.
25  (Defendant's Exhibit Z, Marked for Identification.)

| | 244 |
|---|---|

L. Stidhum

1
2  BY MR. KATAEV:
3      Q   I will represent to you that this is a
4  December 6, 2022 order from Judge Mann, who
5  previously presided as the magistrate judge in this
6  case.  You can read the whole thing but my focus
7  will be on this aspect right here.  Let me know when
8  you're done reading it.
9          (Witness perusing document.)
10     MS. TROY:  I would like to note for the
11  record that this does not reflect our
12  correction to some of the misrepresentations
13  made by Defendants' counsel.
14     A   I'm finished.
15     Q   Do you see this part of this order that
16  Judge Mann notes that Plaintiff's counsel persisted
17  in engaging in gratuitous and ad hominem attacks on
18  me, Defense counsel?
19     A   Yes.
20     Q   Are you aware that your attorney spends
21  time on your case engaging in personal attacks
22  against unnecessarily?
23     A   No.
24     Q   You should be aware of that.
25     MS. TROY:  We are going to motion to

61 (Pages 241 to 244)

A0254

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 245 |
|---|---|

L. Stidhum

1  strike that after this deposition.
2      MR. KATAEV: Make the motion after.
3  Please don't interrupt my deposition.
4  BY MR. KATAEV:
5      Q  I'm placing up on the screen what will be
6  marked as Defendant's Exhibit AA. I will represent
7  to you this is a December 22, 2022 decision by
8  Magistrate Judge Mann who previously presided over
9  this case. It's resolving a letter motion filed by
10  your law firm that's representing you.
11      MS. TROY: Scroll through the entirety of
12  the document. It's 10 pages.
13      MR. KATAEV: You have the document. I'm
14  going to focus on what I need to ask.
15      MS. TROY: She's entitled to review the
16  entirety of the document.
17      MR. KATAEV: That's fine. I would like to
18  finish asking the question before I do that.
19      MS. TROY: She can review the entirety of
20  the document.
21      MR. KATAEV: Stop interrupting my
22  deposition. I'm asking a question. Please do
23  not interrupt me. You've interrupted me three
24  times during this question. Make your

|  | 246 |
|---|---|

L. Stidhum

1  objection after I'm done speaking. Wait until
2  I'm done. Have some manners.
3      MS. TROY: I'm asking that she be --
4      MR. KATAEV: Stop. Stop. I want to ask
5  my question. Stop interrupting my deposition.
6      MS. TROY: My request was noted. To the
7  extent you ignore it, it's also noted for the
8  record.
9      MR. KATAEV: It's not being ignored. I
10  would like to ask my question. Please stop
11  interrupting my deposition.
12      MS. TROY: Again, my request was noted.
13      MR. KATAEV: Stop interrupting my
14  deposition. When I finish asking my question,
15  I will give you an opportunity to make an
16  objection. Stop interrupting my deposition.
17  BY MR. KATAEV:
18      Q  As I was saying, I'm presenting to you
19  Defendant's Exhibit AA which is a Memorandum of
20  Order by Judge Mann, the previous judge in this
21  case, and in this decision she's resolving a letter
22  motion filed by your attorneys to compel Defendants
23  to provide supplemental responses to Plaintiff's
24  interrogatories and document demands.

|  | 247 |
|---|---|

L. Stidhum

1      Do you see that?
2      A  Yes.
3      Q  Thank you. If you would like to take a
4  second to read through this and tell me when to
5  scroll I will do so.
6      (Witness perusing document.)
7      A  Okay.
8      Q  I don't have any questions about this, but
9  at your counsel's request, we are going to waste our
10  time reviewing the entire document.
11      MS. TROY: If you don't have any questions
12  about it, we don't need to waste our time going
13  through the document.
14      MR. KATAEV: Thank you, I'm so glad we
15  were able to achieve that.
16  BY MR. KATAEV:
17      Q  I'm highlighting a portion --
18      MS. TROY: If you have a question --
19      MR. KATAEV: I said I don't have a
20  questions about this portion.
21  BY MR. KATAEV:
22      Q  Back on the record. Page two of
23  Document 37. This is Defendants' Exhibit AA and I'm
24  highlighting, Nevertheless Plaintiff's ad hominem

|  | 248 |
|---|---|

L. Stidhum

1  attacks are unwarranted; do you see that?
2      A  Yes.
3      Q  This is the second reference in which your
4  attorneys are being accused of making personal
5  attacks against me.
6      Are you aware of that?
7      A  No.
8      Q  It says in here that while the judge in
9  the Southern District of New York did, in fact,
10  criticize me for quote/unquote making frivolous
11  requests in that case, the firm, Troy Law PLLC,
12  which represents the Plaintiff in the instant action
13  has been sanctioned, punished in literally dozens of
14  cases, too numerous to recount in both this district
15  and the Southern District of New York.
16      Are you aware, Ms. Stidhum, that the
17  law firm that you hired has been sanctioned,
18  punished in dozens of cases too numerous recount?
19      MS. TROY: I'm going to make my objection
20  to this question. Irrelevant to the case and
21  we are going to motion to strike that question
22  and response and we are going to move for costs
23  and fees to that question.
24      MR. KATAEV: Your objection is noted.

62 (Pages 245 to 248)

A0255

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

|  | 249 |
|---|---|

```
 1              L. Stidhum
 2    BY MR. KATAEV:
 3       Q   Please answer the question.
 4       A   No.
 5       Q   I have one final exhibit and this
 6    deposition is over.
 7           Ms. Stidhum, are you aware that there
 8    was an appeal of the decision denying the motion to
 9    dismiss?
10       A   Yes.
11       Q   Are you aware that that appeal has been
12    withdrawn?
13       A   Yes.
14       MR. KATAEV:  I believe I'm done.  I will
15    be right back.
16           (Short recess taken.)
17    BY MR. KATAEV:
18       Q   Ms. Stidhum, do you have a recollection as
19    to when Ali came to first work at Hillside Auto
20    Outlet?
21       A   I don't really remember.  It was between
22    sometime in mid November to early December.  Isaac
23    was trying to train him for when he leaves to kind
24    of handle what he handles while he was on vacation.
25       Q   When did Isaac go on vacation?
```

|  | 250 |
|---|---|

```
 1              L. Stidhum
 2       A   Early December.  Maybe mid December.
 3       Q   It wouldn't be outside the realm of reason
 4    for Ali to have come to begin work in the beginning
 5    of December, correct?
 6           MS. TROY:  Objection as to form.  She may
 7    answer.
 8       A   I'm sorry.  I don't understand.  I don't
 9    understand.
10       Q   You wouldn't find it hard to believe that
11    Ali began working in the beginning of December 2018,
12    correct?
13       A   No.  That's what I just stated.
14       Q   Okay.  You disclosed to everyone that you
15    were pregnant in late November of 2018, correct?
16       A   Correct.
17       Q   The conversation about a sales manager
18    promotion happened after Ali started working there,
19    correct?
20       A   That's incorrect.  That happened prior.
21       Q   That conversation happened between
22    yourself, Ali and Isaac; did it not?
23       A   No.
24       Q   You're saying that Isaac had an
25    independent conversation with you first without Ali
```

|  | 251 |
|---|---|

```
 1              L. Stidhum
 2    present?
 3       A   Ali was never in the equation when we had
 4    that managerial talk.
 5       MR. KATAEV:  Give me one second.
 6           Last question.
 7       MS. TROY:  You have like five last
 8    questions already.
 9       MR. KATAEV:  Congratulations for noting
10    that.
11    BY MR. KATAEV:
12       Q   If the first conversation you had about
13    the promotion occurred with Ali present, then it
14    is --
15       MS. TROY:  Objection.  Mischaracterizes
16    witness testimony.  You can continue to ask
17    your question.
18       MR. KATAEV:  You can't object in the
19    middle of my question.  I'm going to rephrase
20    the question.
21    BY MR. KATAEV:
22       Q   If it is, in fact, true that your
23    conversation with Isaac about a promotion occurred
24    with Ali present, then it is true that that
25    conversation occurred after you told everyone you're
```

|  | 252 |
|---|---|

```
 1              L. Stidhum
 2    pregnant, correct?
 3       MS. TROY:  Objection.  Mischaracterizes
 4    witness testimony.  That's not what she said.
 5       A   I just said Ali was not present for that
 6    conversation at all.  In fact, I thought that the
 7    month of November me exceeding expectations of every
 8    other month was going to push me into that position
 9    even more because it was already a conversation
10    prior to me doing the max cars I ever did at that
11    dealership.
12       MR. KATAEV:  Thank you for your time
13    today.  I have no further questions.
14
15           (Time noted: 4:57 p.m.)
16
17    _____
18           LETICIA F. STIDHUM
19
19    Subscribed and sworn to before me this _____ day
20    of _____ 2023.
21    _____, Notary Public.
22
23
24
25
```

                          63 (Pages 249 to 252)

A0256

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 65 of 102 PageID #: 874

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

### 253

| | L. Stidhum |
| --- | --- |
| 1 | |
| 2 | I N D E X |
| 3 | WITNESS |
| 4 | LETICIA FRANCINE STIDHUM |
| 5 | |
| 6 | EXAMINATION BY                          PAGE |
| 7 | MR. KATAEV                                 4 |
| 8 | |
| 9 | COUNSEL REQUESTS                        PAGE |
| 10 | Dates in Florida                          20 |
| | Childcare assistance                      29 |
| 11 | Response to Interrogatory 7              157 |
| | Response to Interrogatory 19            158 |
| 12 | |
| 13 | E X H I B I T S |
| 14 | |
| | DEFENDANT'S        DESCRIPTION          PAGE |
| 15 | |
| 16 | Exhibit A      Kissimmee Police           21 |
| | Department record |
| 17 | Exhibit 2      Complaint                   81 |
| | Exhibit C      Plaintiff's Initial       143 |
| 18 | Disclosures |
| | Exhibit D      Damage calculations       148 |
| 19 | Exhibit E      Response to               154 |
| | Interrogatories |
| 20 | Exhibit F      Monthly sheets            162 |
| | Exhibit G      Monthly sheets            170 |
| 21 | Exhibit H      Cap sheet                 172 |
| | Exhibit I      Declaration of            173 |
| 22 | Serge |
| | Exhibit J      Bates-stamped             184 |
| 23 | D151-D157 |
| | Exhibit K      Bates-stamped             187 |
| 24 | D249-254 |
| | Exhibit L      Bates-stamped             190 |
| 25 | D288-D293 |

### 254

| | L. Stidhum |
| --- | --- |
| 1 | |
| 2 | |
| 3 | E X H I B I T S (Continued) |
| 4 | |
| | DEFENDANT'S        DESCRIPTION          PAGE |
| 5 | |
| 6 | Exhibit M      Bates-stamped            194 |
| | D397-D402 |
| 7 | Exhibit N      Bates-stamped            197 |
| | D522-D527 |
| 8 | Exhibit O      Bates-stamped            202 |
| | D633-D636 |
| 9 | Exhibit P      Bates-stamped            203 |
| | D804-D806 |
| 10 | Exhibit Q      Bates-stamped            206 |
| | D812-D814 |
| 11 | Exhibit R      Bates-stamped            207 |
| | D815-D820 |
| 12 | Exhibit S      Bates-stamped            209 |
| | D842-D847 |
| 13 | Exhibit T      Bates-stamped            211 |
| | D1165-D1167 |
| 14 | Exhibit U      Bates-stamped 1186       213 |
| | {TR              Exhibit V    Bates-stamped |
| 15 | D1186-D1250 |
| | Exhibit X      Decision by Judge        235 |
| 16 | Gonzalez |
| | Exhibit Y      Audio recording          241 |
| 17 | Exhibit Z      Order by Judge Mann      244 |
| 18 | |
| 19 | Attorney Kataev has retained all exhibits. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

### 255

| | |
| --- | --- |
| 2 | C E R T I F I C A T I O N |
| 3 | |
| 4 | I, RUTHAYN SHALOM, a Court Reporter |
| 5 | and Notary Public within and for the State |
| 6 | of New York, do hereby certify: |
| 7 | That the witness whose deposition |
| 8 | is hereinbefore set forth, was duly sworn |
| 9 | by me, and that the within transcript is a |
| 10 | true record of the testimony given by such |
| 11 | witness. |
| 12 | I further certify that I am not |
| 13 | related to any of the parties to this action |
| 14 | by blood or marriage, and that I am in no way |
| 15 | interested in the outcome of this matter. |
| 16 | IN WITNESS WHEREOF, I have hereunto |
| 17 | set my hand this 6th day of March, 2023. |
| 18 | |
| 19 | |
| 20 | *Ruthayn Shalom* |
| 21 | RUTHAYN SHALOM |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

### 256

| | ERRATA SHEET |
| --- | --- |
| 2 | |
| 3 | |
| 4 | NAME OF CASE: STIDHUM v HILLSIDE AUTO et al. |
| | DATE OF DEPOSITION: February 17, 2023 |
| 5 | NAME OF DEPONENT: Leticia Stidhum |
| | PAGE  LINE(S)       CHANGE           REASON |
| 6 | ___/____/_____/_____ |
| 7 | ___/____/_____/_____ |
| 8 | ___/____/_____/_____ |
| 9 | ___/____/_____/_____ |
| 10 | ___/____/_____/_____ |
| 11 | ___/____/_____/_____ |
| 12 | ___/____/_____/_____ |
| 13 | ___/____/_____/_____ |
| 14 | ___/____/_____/_____ |
| 15 | ___/____/_____/_____ |
| 16 | ___/____/_____/_____ |
| 17 | ___/____/_____/_____ |
| 18 | _____ |
| | LETICIA F. STIDHUM |
| 19 | |
| | Subscribed and sworn to before me |
| 20 | this _____ day of _____, 2023 |
| | _____, Notary Public. |
| 21 | |
| 22 | _____ |
| 23 | MY COMMISSION EXPIRES: |
| 24 | |
| 25 | |

64 (Pages 253 to 256)

A0257

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

257

---

**A**

**a.m** 1:12 186:17
**AA** 245:7 246:20
  247:24
**abide** 26:25
**ability** 9:13 41:17
  46:10,24 66:25
**able** 45:20,22 98:22
  98:25 114:11 144:3
  170:19 177:17
  187:7 207:7 212:10
  237:5 238:7 241:17
  247:16
**absolutely** 74:5,9
  75:7 181:9 187:5
**accept** 138:22 174:19
**access** 45:16 46:9,20
  47:7,11 62:11,18
  63:8 69:2 82:20
  91:24 103:9 105:8
  106:5 146:4 163:15
  175:21,23 176:15
  177:16 197:5
  235:17,22 237:14
  238:21
**account** 47:24 117:14
  146:6
**accounted** 85:8,11,25
**accurate** 34:17
  158:19 168:2,4,8,9
  168:17 169:2 170:9
  172:3 193:21,23,25
  196:24 204:22
  205:17 213:8
  217:16
**accused** 248:5
**achieve** 247:16
**achieved** 68:11
**acknowledge** 46:19
  110:17 237:23
**acknowledging** 108:3
**acting** 242:4,4,14,15
**action** 7:12 15:9
  236:4 248:13
  255:13

**actions** 7:19 96:21
  235:21
**active** 80:15 200:18
**activities** 162:13
**activity** 134:12
**actual** 21:6 37:23
  82:5 136:13 145:15
  150:16 164:6
  166:15 167:2
**ad** 52:17 56:4 244:17
  247:25
**add** 79:13 165:7
  169:7
**additional** 171:11
  179:24
**address** 4:5 16:18
  65:10 130:15,17,20
  149:8 155:23 190:8
**Aditia** 185:13
**administrative** 26:15
  27:7
**admit** 105:7
**advance** 194:16
  196:13
**adverse** 235:20 236:4
**advertise** 118:16
**affect** 9:13
**affidavit** 11:14
**affirmation** 11:16
**afloat** 93:8
**aftermarket** 164:9
**Afternoon** 143:12
**afterward** 242:24
**against-** 1:5
**agency** 26:15,18 27:7
**ago** 15:23 18:17 24:8
  102:5 129:20 171:8
  171:24 172:9
  193:14 207:3
  220:19 243:15
**agree** 4:9 175:16
  178:7 193:22
  236:22
**Agreed** 3:2,7,11 4:11
**agreement** 17:10

**ahead** 14:8 23:7
  24:15 36:4 42:6
  149:22 228:16
  240:23 242:9
**airport** 33:7
**al** 256:4
**alarming** 128:11
**Alco** 30:9
**alcohol** 9:11
**Ali** 49:17 50:3 55:10
  93:21,23 94:20
  97:23 98:8 139:8
  144:14 155:12,14
  155:17 249:19
  250:4,11,18,22,25
  251:3,13,24 252:5
**Ali's** 50:2
**allegations** 235:17
**allege** 83:13 191:20
**alleged** 112:9,17
  139:10,14 141:5,10
  141:14 142:10,15
  156:24 236:25
**alleges** 109:4
**alleging** 35:9 92:7
  109:24 230:22
**alleviated** 115:8,15
**allow** 8:9
**allowed** 104:24 200:8
**alternating** 37:19
**ambiguous** 13:6
  72:11 73:12,16
  124:3,6 125:20
**amend** 144:20
**America** 18:9
**amount** 79:22 83:22
  99:8 111:6 120:12
  157:13 158:24
  159:10,13 165:14
  166:6,24 168:23
  172:7 178:3,11,13
  180:20 195:14
  214:8 239:11
**amounts** 90:11
  101:15 168:10

**and/or** 57:19 59:4
  67:20
**Andris** 1:9 5:6 6:12
  6:12 36:25 46:12
  57:25 60:4,11 62:8
  63:4 64:10,12 66:21
  66:25 67:4,20 69:5
  69:12 70:18 71:3,10
  73:6 75:5 78:2,17
  78:20,24 80:10
  82:11 87:2 88:2,20
  91:7,11 92:8 95:15
  95:18,21,24 96:4
  99:23 100:25 106:7
  107:14,16 110:17
  161:11 170:24
  171:6 174:7 179:12
  186:6 207:12,15
  212:13 232:11
  236:9 237:24 238:5
  238:23 239:6,14
**Angeles** 133:22
**animosity** 179:6
**announced** 71:8 72:3
  72:10 79:2,7 82:25
  96:25 98:4 150:21
  150:25 179:13
  200:22,25 201:14
  224:9 237:3
**announcement** 70:17
  73:3 93:14 97:19
  103:16 105:22,22
  105:23,24 179:9
**announcing** 73:23
  201:16
**annual** 158:24
**answer** 8:7,10,18 9:6
  14:13 18:17 20:16
  23:5,6,7,22 24:10
  27:4 36:4 39:17
  40:7 41:16,17,23,25
  42:3,4 46:15 48:25
  49:5,8 65:10,22
  66:7 72:12 73:13,17
  76:22 77:6 81:13

A0258

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

258

88:24,25 89:10
90:21 91:21 93:20
93:22 95:5 99:11,13
103:11 106:6 107:8
108:16 109:7,22
110:6,7 113:12,18
115:10 116:2,3,6,13
119:2,21 120:3,10
120:25 121:4 123:3
124:8,24 125:21
127:5 131:6 132:9
132:22 133:19
134:2,14 138:8
148:3,16 149:20,21
149:22 152:14
153:19 154:4
156:10,17 160:15
161:16,20 163:5
175:14 177:6 182:3
189:7 191:17
193:20 199:18
207:14 210:8
226:21 227:16
238:11,17,18,22
242:8,21 243:3
249:3 250:7
**answered** 41:24
76:21 77:6 136:25
178:25
**answering** 6:25 81:6
161:18 181:24
**answers** 8:25 9:17
74:23 104:2
**Antonio** 188:5,14,15
**antsy** 78:10
**anxiety** 112:12,15
117:5
**anybody** 16:7 41:6
48:2 105:25 128:10
196:16
**anybody's** 195:18
236:18
**anymore** 90:19
117:10 225:15
**anyone's** 141:2

**apologize** 224:25
**appeal** 228:22 229:9
229:21 249:8,11
**application** 48:20,23
49:11,22 55:7,12,14
56:5,6 62:15 87:6
88:6 104:12 106:8
174:11 176:18
177:8 194:6,10,11
196:12,19,20,23
204:15
**applications** 63:10
64:22 65:25 67:2
69:14 82:12 83:7
87:22 88:2 97:8,12
106:12,16 130:3
161:12,13 197:5
235:20 237:24
**applied** 28:6 29:4
55:21 127:19
135:24 136:8 137:3
137:9 159:5
**applies** 211:16
228:18
**apply** 28:10,17 29:20
62:23 135:14,21
137:16 236:16
**applying** 137:15
**appointment** 85:23
170:13 190:4 195:2
197:10 200:3
202:20 203:21
**appointments** 85:5
**appreciate** 68:9
**apprized** 241:20
**approaching** 222:23
**appropriate** 104:3,12
208:7
**approval** 206:13
**approvals** 175:15
176:25 177:11
180:9
**approved** 177:18,18
181:14 206:19
**approximately** 51:13

136:11 176:9
213:15 214:11,15
214:23 216:4,15,19
216:23 224:19
241:5
**April** 53:20 54:20
227:18,21 228:3,3
**area** 126:9 233:6
**arguing** 73:24
**argument** 71:21
73:21 89:13,24
178:10 179:13
201:4
**Argumentative**
41:22 88:23 99:10
103:10 115:9
161:15 175:13
181:2,21 191:16
193:19 197:3
199:14,17 202:5
210:7 238:10
**Argumentive** 65:21
118:25
**arithmetic** 151:6,22
**arrest** 24:6,7
**arrested** 20:21 23:9
23:15
**arrives** 202:25
**aside** 63:6
**asked** 7:16 14:11
21:25 41:24 49:8
61:17 76:21 77:5
108:25 136:25
137:3 146:17 152:6
154:18,19 178:25
197:23 202:24
208:12,17,19
**asking** 6:24 12:14
23:22 109:20
162:21 183:7,13
205:3 208:5 212:22
231:3 238:5 245:19
245:23 246:4,15
**asks** 156:14

**aspect** 45:4 60:14
171:7 244:7
**aspects** 45:6
**asserted** 154:21
**assigned** 227:20
**assist** 87:22 194:13
**assistance** 29:5,10,19
29:23 253:10
**assume** 8:18 122:23
**Assuming** 45:22
**assumptions** 89:16
**asymptomatic** 68:16
**attacks** 244:17,21
248:2,6
**attempt** 87:25
**attend** 29:25 30:10
30:16
**attended** 139:4
**attending** 134:25
**attention** 81:3 231:9
**attorney** 4:17 5:4
10:2,2,20 15:13
111:15 145:16
153:18 154:3
229:15 241:21
242:7 244:20
254:19
**attorney/client** 9:24
148:7
**attorneys** 2:3,8 3:3
16:4,8 147:5,6,20
147:21,23,24
148:17 152:25
229:18,19 242:3,14
246:23 248:5
**Audi** 127:23 128:6
129:25
**audio** 240:20 241:4
241:11 254:16
**August** 43:18,20 44:3
60:8,10 64:15,17
132:23 176:3
220:14,15,15,17
**authority** 95:16
**authorization** 174:3

The Little Reporting Company
646.650.5055  |  www.littlereporting.com

A0259

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

259

**Auto** 1:7,7,7,8 5:5,6,8
  5:9,11,12,25 6:2,3
  11:17 12:4,9,18
  13:12,16,16,22,23
  13:23 14:6,9,12
  33:19,21,24 34:7,10
  34:11,14,21,21,22
  34:24 35:2,5,6,7,13
  35:16 36:7,13,22
  48:6 50:9 55:14,22
  57:12 66:24 74:20
  77:8 97:20 107:24
  116:22 117:2 118:8
  118:19,24 120:14
  121:9,14,22,25
  122:5,15,18,22
  124:17 125:14
  127:24,25 128:19
  128:22 129:25
  130:2 131:17,19,22
  134:21 138:4
  146:22 156:15
  157:23 158:7,21,25
  159:25 160:5,19
  182:13 210:20
  231:23 237:15
  249:19 256:4
**automobile** 33:25
  34:5 126:2,3 131:18
**available** 118:7 174:2
  190:9
**Ave** 1:7 5:5,8
**Avenue** 2:9
**average** 150:21,25
  180:10 237:2,10
**averaged** 150:13
**averages** 214:12
**avoid** 194:17
**aware** 31:5 40:12
  42:13 138:16
  228:22,25 229:4,8
  229:11,20 230:5,15
  234:8,22 241:24
  243:6 244:20,24
  248:7,17 249:7,11

**B**
**B** 80:25 151:8 253:13
  254:3
**back** 19:13,17,24
  20:2,8 22:14 24:19
  24:22 32:7 35:22,23
  40:14 46:15,16
  51:14 53:16 66:9,10
  67:7 68:4,21 81:10
  81:20,23,24,24
  82:22 83:21 84:10
  91:16,17 93:10 97:5
  99:15,16 102:12,13
  103:13 105:3,4
  108:18 115:12
  118:10,11 120:7
  122:13 126:25
  138:10,11 142:18
  156:20 163:7,25
  164:8 165:5,14,22
  167:6 168:12 175:5
  176:24 177:4
  179:17 186:24
  189:4 192:25
  195:22 198:6
  199:20 200:7 203:6
  212:16 217:14,25
  218:9 226:18
  227:17 228:13
  233:12,16,24,25
  234:4,5,6,16 238:14
  247:23 249:15
**background** 107:14
**backpay** 119:19
  120:8,12,23,25
  121:18
**backtrack** 83:2 97:18
**backup** 146:2
**bad** 52:24 54:23,23
  56:17
**bank** 39:13 66:5
  177:4 181:8 239:8
  239:12
**bankruptcy** 159:19
  200:7,15,18 201:24

**banks** 64:25 65:6
  67:17 174:19
  196:21
**Baron** 1:8,9 5:7,7 6:6
  6:15,16,20 127:25
  128:22,23 129:3
  130:2
**Barons** 6:19
**based** 50:21 56:4
  92:9 109:25 113:24
  120:25 123:16
  150:16 168:13
  169:7 171:20
  174:18 175:6
  179:20 182:6
  190:24 204:22
  205:3,4 216:2 218:6
  218:18 225:8
  231:23 238:2
  243:21
**basic** 8:2 120:19,21
**basically** 37:3 208:4
  220:21
**basis** 57:14 78:23
  91:10 109:5,13
  110:11 111:12
  152:13 192:13
**Bates** 203:25
**Bates-stamp** 184:14
  223:14
**Bates-stamped** 162:6
  186:4 187:14
  189:24 194:4 197:8
  199:23 202:11
  206:9 207:16
  209:14 212:25
  218:15,20 223:11
  253:22,23,24 254:6
  254:7,8,9,10,11,12
  254:13,14,14
**BDC** 51:24 86:10
  128:20 168:17
  186:24 187:25
  190:8,18,25 193:8,9
  194:6 211:19

**bearing** 184:14
  209:14 218:14,20
**began** 250:11
**beginning** 16:19 37:5
  38:15,17 48:18
  63:25 64:22 66:19
  72:24 114:13,16
  250:4,11
**belief** 91:11
**believe** 17:11,18
  18:16 31:22 56:2
  57:17 70:12,13
  78:23 79:17 80:12
  89:6 92:5,13,18
  96:7,11 97:8,13,21
  98:9,24 99:18 100:9
  100:14 101:4,11
  102:2 103:5 105:20
  107:4 108:5 110:16
  118:21 132:7 136:9
  136:15 137:24
  147:19 148:4 159:8
  168:4 173:8 186:4
  197:8 200:24
  210:13 227:8 230:9
  242:3,14 243:12
  249:14 250:10
**bell** 38:20
**benchmark** 217:23
**benefit** 29:21 235:22
**benefits** 122:17
  135:12 136:7,19,20
  136:23 137:3,4,4,7
  137:10,16
**Benjamin** 30:12
**Bermuda** 132:15
**best** 8:21 9:2 41:17
  56:11 87:15 118:17
  158:23 219:16
  224:3,7 226:11
**bet** 240:17
**better** 114:16,17,19
  158:20
**beyond** 8:24 189:6
**bickering** 179:17

A0260

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

260

**big** 154:14
**bigger** 154:13
**bills** 114:24 126:10
**birth** 17:7,13,17
  50:25 51:4 54:5
  55:18 100:20
  126:21,24 131:4
  134:18,22 135:14
**birthdate** 17:2,3
**birthday** 201:16
**bit** 67:8 87:12 144:3
  217:9 226:11
**blank** 96:10
**blanket** 207:23,25
  208:12 209:18
  211:15 228:18
**blatantly** 232:8
**blood** 255:14
**blue** 76:7
**board** 80:2,8 169:13
  169:22
**boat** 132:14
**body** 8:8
**bonus** 42:23,25 50:18
  50:19 61:13,15,20
  75:9,13,19,25 76:3
  76:5,6 105:18,18
  157:3,4,6,8,13
  164:19,21,22,24
  166:5,8 167:9
  206:20 226:13
  227:11,13 236:25
**bonuses** 106:5
**book** 187:2
**born** 17:25 19:10
  135:20,22,25
**bother** 129:18
**bottom** 185:12 186:8
  190:3 199:23
  206:12
**bought** 142:7 203:12
**Boulevard** 2:4 33:9
  48:10 53:10
**box** 149:13
**brain** 151:23

**break** 9:4,7 22:17,23
  24:13,15 39:2 81:7
  81:10,19,25 82:4,4
  145:14 162:20,21
  214:16 226:4
  232:22
**Brianna** 98:7 100:13
  100:16 139:9
  144:13 194:20,25
  195:23 197:9
  202:15,24 203:6,22
  207:5 208:24
  210:24 211:3
**brief** 144:16
**bring** 126:13 172:14
  189:4 200:7
**bringing** 99:3 115:14
  206:4
**broker** 125:23,25
  126:2,4 135:10
**brought** 49:14,23
  55:11 93:21 210:21
**brushed** 44:8
**bucks** 172:15
**budget** 200:8
**bummed** 56:15
**bunch** 85:14 94:13
  193:16 194:4 226:2
**busiest** 85:13
**business** 33:25 52:2
  62:24 85:4,19 97:16
  97:18 99:7 124:14
  125:5,7 127:9
  131:19 167:11
  193:15
**busy** 64:6,8 67:9 88:8
**buy** 211:19,22 238:25
**buyer's** 212:17
**buying** 180:20
  188:11

_____

**C**

**C** 2:2 4:2,2 143:14,14
  143:19,20 151:9
  208:3 253:17 255:2

255:2
**calculated** 150:9
  152:17 168:13
**calculating** 166:2
**calculation** 10:24
  145:8 150:20,24
  153:13,15 154:20
  222:2
**calculations** 149:4,10
  154:24 155:3
  253:18
**calculator** 165:25
  222:16
**California** 133:10,15
  133:17
**call** 13:7 26:25 35:19
  56:3,8 86:14,17,19
  157:16 158:12
  188:21 203:6
**called** 53:7 56:4,17
  60:18 173:5 193:24
  229:22 241:21
**calling** 68:9 151:24
  152:3
**calls** 9:24 23:4,20
  24:24 36:2 92:11
  110:4 119:20
  230:25 238:16
**calm** 97:25
**Camp** 229:22,25
  230:5
**cap** 136:16 173:5
  253:21
**capital** 206:13,21
**capitalizing** 101:22
**capped** 136:15 159:9
  159:12
**car** 31:14,15 39:5,5,8
  50:13 60:17 75:16
  83:23,23 89:21
  118:8 128:8,14
  160:9,11,13 163:20
  164:10,16,20 165:9
  169:16 171:15
  180:21,22 182:18

182:25 189:10
  195:18 196:2
  197:22,24 198:4,18
  198:25 199:4
  203:13 205:20
  221:7 226:19 234:4
**car-buying** 181:18
**Cardozo** 30:12
**care** 40:4,16 89:4
**cared** 98:24
**carefully** 13:3
**carried** 219:9,14
  222:21
**carrying** 214:22
  215:2 221:3
**cars** 34:14 36:17
  39:15 42:17 48:8
  49:12 50:6,24 51:12
  52:4 53:6,13,14,16
  54:18 55:10 61:21
  76:8 77:16 79:13,15
  79:17,18,19,21,22
  79:25 87:14 90:11
  99:5 109:2 115:5
  121:10,12,21
  123:15,17 124:13
  125:6 127:7 136:4
  137:24 155:18
  157:14 162:5
  167:25 168:2,7,10
  168:14,15,23
  169:17 170:6,15,20
  170:22 171:11,19
  171:22 172:3,5,6,7
  172:11 199:8
  214:11,12,15,19,23
  215:3,7 216:4,15,15
  216:19,23 217:7,16
  218:21,23,24 219:6
  219:10,12,22,25
  220:4,9,22 221:2,3
  221:10,12,17,20,23
  222:7,10,13,15,18
  222:20 223:2,5,8,15
  223:19,23 224:4,13

A0261

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

261

224:16,19,23 225:5
225:8,13,22,24
226:16,17,25 227:3
227:6,13 252:10
**case** 1:2 5:4 7:10,17
  11:18,20 12:5,7,21
  15:6 16:9 17:10
  23:23 34:16 35:16
  39:23 41:5 62:17
  80:22 106:10
  111:10 119:19
  120:23 121:18
  129:14 141:24
  144:25 149:13,14
  150:2,2 156:7,9
  162:22 194:18
  195:16 214:10
  227:21,25 228:7,23
  228:25 234:23
  238:19 239:4 240:6
  244:6,21 245:10
  246:22 248:12,21
  256:4
**cases** 248:15,19
**cash** 211:19,22
  233:19,21 236:16
**categories** 154:20
**caught** 226:10
**caused** 64:25 67:5
  69:4,13
**caution** 24:23
**cease** 51:20
**ceased** 52:4
**cellphone** 40:24
  86:18 145:19
**center** 52:2 70:9 85:5
**centralized** 130:6
**certain** 47:18 87:22
  97:12 98:23,25
  146:4 178:13
  195:14 196:9
**certification** 4:13
  31:3,6
**certifications** 128:12
  128:13,15

**certify** 255:6,12
**chance** 239:18
**chances** 46:2
**change** 47:20 76:24
  95:22,25 128:8
  222:19 256:5
**changed** 45:17 47:18
  74:14
**changes** 4:23
**changing** 141:24
**characterization**
  140:13
**charge** 21:6 24:10
  233:24,25 234:4,6
**charged** 21:8 160:25
  234:16
**charges** 21:4,12
**Charles** 184:19
**chart** 152:24 169:21
**Charter** 147:13,18
**check** 38:3,4 46:13
  172:12 176:21
  187:25 191:5
  196:13 200:16,20
  201:5 202:4 203:18
  209:5 214:7 217:7
  236:9
**checked** 168:7 191:9
  191:24 192:4
  237:17
**checks** 214:6
**Chen** 227:19
**child** 115:13,16,18
  116:7,17,18 126:22
  126:25 131:4
  134:18,22,24
  135:20,22,25
**child's** 116:14,16
**childcare** 29:4
  253:10
**childhood** 211:3
**children** 16:23,24
  18:22 55:19 74:17
  74:19 78:21 131:10
**children's** 139:23

**choose** 64:11
**chose** 148:19
**chosen** 174:12,15
  175:5,18 178:3
**Christmas** 142:5
  225:4
**circle** 70:7
**Circuit** 227:24 228:2
  229:21
**circumstance** 69:7
  102:2
**circumstances**
  124:18 125:9
  138:13 179:21
**Civil** 4:20
**claim** 27:22 28:3
  102:9 110:10
  120:15 147:17,21
**claimed** 191:23
**claiming** 119:18
  120:22 121:17
**clarification** 157:22
**clarified** 34:13
**clarify** 14:8,13 18:13
  19:5 24:5 91:10
  166:12
**clarifying** 50:17
  227:16
**Clark** 184:19
**class** 199:9
**classes** 135:2
**clear** 4:19 8:6 12:24
  25:17 79:10 95:5
  98:18,20 125:2
**client** 68:14 104:20
  151:21 181:22
  183:9,12,17,22,24
  204:6 229:13
**clock** 162:14
**close** 33:10,13 72:21
  129:23 148:19
  238:8 239:15
**closely** 179:4
**closer** 119:9
**closing** 237:25

**Club** 27:23 51:25
  52:12 55:8 137:18
**clue** 78:22
**coach** 26:21 119:22
**coaching** 26:24
  103:25
**cold** 79:15,16
**Collado** 165:17
**colleagues** 235:23
**college** 30:16
**combination** 44:20
  44:25 112:13
**combining** 123:20
**come** 42:13 44:5
  47:21 49:25 56:13
  56:14 85:11,22
  89:20 108:22 122:4
  128:10 142:18
  185:6 186:25
  187:25 190:8 205:5
  205:6,9 216:6
  232:18 233:12
  250:4
**comes** 65:5 85:2
  166:2
**comfortable** 148:21
**comforting** 100:16
**coming** 128:10
  153:16,25 197:6
  205:11 237:17
**commentary** 154:15
  183:3,8
**comments** 73:7
**commission** 40:17
  50:12 88:12,15,18
  90:20 94:21 107:9
  109:2 166:15
  210:12 214:8
  216:18 217:7
  218:23 221:6 225:8
  234:5 256:23
**commissionable**
  164:5 167:6
**commissions** 42:12
  42:15 88:22 214:6

A0262

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

262

216:3 218:17 219:5
220:25 225:12
**common** 186:22
**communicate** 187:7
**communicating**
62:19
**communication** 9:24
229:14
**communications**
131:23 241:25
**comp** 136:22
**companies** 12:11,11
**company** 13:19 43:16
213:2
**compared** 170:11
**comparison** 218:16
**compel** 25:6,7,23,24
246:23
**compelled** 243:7
**compensation** 28:4
37:4 39:2 43:5 45:4
50:8,11 60:25 75:8
75:12
**compensatory**
153:10 155:3
**competition** 87:12
**complain** 96:20
140:7
**complained** 140:23
156:14 161:10
194:17
**complaint** 7:2 11:9
11:11 15:19,21
26:14,18 27:7,10,14
27:16 69:10,12
80:21 81:9 82:2
83:9,13 86:12
102:18 109:4,10
111:5 156:16
157:14 220:16
238:4 239:5 253:17
**complete** 8:9 83:16
128:17 178:18
**completed** 128:15
**completely** 51:22

85:9 104:9 138:20
177:24 178:4
**complied** 238:5
**comport** 173:19
**comports** 174:6
**computation** 145:11
**computer** 82:17,20
104:14
**concerned** 68:14
**concerning** 7:9 11:16
139:9 180:9
**concerns** 184:18
**conclusion** 23:5 36:2
92:12 110:5 119:21
231:2
**conditions** 95:25
231:24
**conduct** 7:18 27:2
156:15 184:5,6
**confer** 241:22
**conference** 1:18
138:18 139:2,4
148:4 229:23,25
230:2,5,8,16
**confidential** 17:8,17
17:22
**confidentiality** 17:9
**confirm** 34:17 169:6
206:4
**confirmed** 166:23
**confirming** 24:18
**conflict** 71:16
**conflicts** 71:10,25
**confront** 78:3 96:18
**confronted** 96:16
**confusing** 13:17,20
13:21 216:24
**confusion** 5:17,22
226:11
**congratulations**
51:10 70:20,23
251:9
**conjecture** 238:17
**consent** 241:15
**considered** 39:8

**consistent** 17:14
101:15,17
**consisting** 11:3
**constantly** 78:5,7
86:14
**constitute** 235:20
236:4
**constructively**
230:23
**consult** 147:23
**consumed** 9:11
**contact** 79:5 155:25
188:23 212:18
232:12
**contacted** 195:15
206:2 210:2
**contents** 15:24 178:8
**continue** 13:5 95:14
251:16
**continued** 43:23 63:3
120:13 122:22
143:18 211:6 254:3
**control** 177:25 178:4
178:7 179:21
**conversation** 10:3
14:21 16:7 56:12,21
61:23 71:4 83:24
90:8 108:11,23
110:24 145:15
156:18 157:9,12
231:12 250:17,21
250:25 251:12,23
251:25 252:6,9
**conversations** 16:3
78:11,14 82:6
144:15 241:17
**convertible** 199:7,7,8
199:10
**convertibles** 199:11
**convicted** 20:23
**conviction** 24:6,7
**convictions** 21:12
**copies** 38:11 40:25
41:4
**coplaintiff** 12:20 15:8

**copy** 4:16,21 81:8
108:8,9 234:25
**corporate** 5:15
**corporation** 5:15
**correct** 4:18,19 7:11
7:13 10:24 15:9,10
15:11,25 17:4 23:10
23:12,25 25:21
27:11,25 28:12,13
28:15,24 29:2,17,18
30:14,15,22 33:19
33:20,22 34:2,5,6,8
34:12 35:2,7,11,16
35:20 36:8,9,10,14
36:17 37:15,22 38:5
39:6 40:5,11 41:15
42:10 43:8,21,22,24
44:18 45:24 46:3,21
46:24 47:4,9 48:4
48:16 49:19 50:21
50:22 51:13 52:5
53:15 55:15,19,23
57:10,12,21 58:2,5
58:10,14,17,24
59:25 60:5,12,13,21
60:22 61:3,6,9,12
62:23 63:4,13 64:2
64:3,10 65:2,15,25
66:5,14,17,18,21
67:2,3,6,21 69:5,6,8
69:9,15,19 71:22
73:7,15 74:14,20
75:6,10,14,17,19
76:14,16,20,25 77:4
78:14 80:11,12
83:11,16 85:3,4
87:20,23 88:12 90:3
91:14,22 92:10 94:4
95:4,9,16,19,22
96:2,13 105:9,12
106:8,13,20 108:14
109:6 110:18
111:10 113:20
115:4,8 116:19
119:13,16 121:7,15

A0263

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

263

122:2 124:2 125:15
126:19,22 130:15
133:15 136:14
137:7,10 138:17,19
139:2 140:21
144:25 145:5,8,12
146:10,19,23 149:8
149:11,15 150:3,7
150:14,18,22,25
151:20 152:18,22
152:25 153:4,7,13
154:4,21,24 155:18
155:19,21 156:4,18
156:24 157:25
158:2,9 159:23
160:3,7,8 161:7
164:6,11,14,17,20
165:2,7,14,17,19,23
166:3,19,24 168:23
168:24 170:7,17
171:12,16,17
174:21,22 175:11
175:21 176:4,7
177:15 178:20,23
185:2,9,13 186:6
187:19 188:12,17
188:25 189:5,18,20
190:14,22 191:2,6,9
191:12 193:18
194:14,18,23 195:6
195:12 196:13,17
197:11,17,24
198:18,23 199:2,5
200:9,20 201:2,6
202:21,25 203:7,8
203:13,19 204:4,11
204:16 206:14
207:8,10,13 209:6
209:20,23 210:22
210:25 211:4,7,20
211:23,24 212:2,5,8
212:11,14 213:12
213:15,25 214:4,11
214:15 215:4,7
216:4,16,20,23

217:11 218:21
219:7,12,22,25
220:5 221:2,13,17
221:20,23 222:7,8
222:10,13 223:2,11
223:15,19,23 224:4
224:10,13,16,20,23
225:5,9,13,16,17
227:14,15 229:2
230:10,11,13,23
231:10,16,24
232:11,16,23
233:14 235:5
236:10,11,14,23
238:3,9 239:2,9,12
239:16,17,20,21
250:5,12,15,16,19
252:2
**correction** 244:12
**correctly** 53:12 96:7
164:23 167:13
**corresponding**
215:10
**cosigner** 188:8
204:15 205:12
206:4
**cosigners** 236:19
**costs** 242:23 248:23
**cough** 68:19
**coughing** 68:6
**counsel** 4:8 20:17
24:18 29:8 82:7
103:19,25 104:5,23
139:5 157:20
158:15 244:13,16
244:18 253:9
**counsel's** 80:24
247:10
**counselor** 24:13
123:11 183:6 184:8
242:18
**country** 18:5 132:11
132:14
**couple** 20:8 36:24
37:10 38:15,18

39:25 44:22 45:15
54:9 58:20 61:21
62:14 64:18 84:11
101:19 111:24
114:19 121:23,24
126:5 128:9 129:20
144:2 147:3 161:2
193:16 239:22
243:14,16
**course** 40:18 42:20
55:16 65:20 71:18
82:21,23 99:18
100:23 101:19
103:15 113:25
114:16,22 126:14
138:14 163:11
179:10,11 180:6
200:17 202:6
210:19 217:20
226:24 239:3
**courses** 31:10 135:4
**court** 1:1 7:7 8:7,8,11
12:20 13:8 15:8
17:12 26:3,7 27:2
151:24 152:3,5,7
192:11 227:22,23
228:5 236:3 240:14
255:4
**courtesy** 8:11 22:10
**courtroom** 139:6
**courts** 241:16
**Covid** 52:23,24 55:20
122:7,8,11,14 126:7
134:6 137:25
**coworkers** 12:19
237:4
**Craigslist** 56:2,4
130:11,14,21
**crazy** 72:14
**cream** 114:13
**credit** 46:13 62:16,22
67:8,11,15,16,24
82:18 88:5,6 89:12
89:20,23 94:11,12
174:4,10,18,21

175:6 176:17,21
177:8 178:2,12
181:7,9 191:9,24
192:4 193:6 196:10
196:20,22 200:2,15
200:20 201:5,12
202:4 203:18 209:4
209:8 233:20,22
235:19 236:9,18
237:12
**creditworthiness**
89:16 191:5
**cried** 74:3,7
**crime** 20:23
**criticize** 248:11
**CRM** 84:18,20 85:25
162:5 163:16,19
209:25 210:6
**cruise** 132:15 134:4,9
**cry** 74:3 98:2
**crying** 73:25 74:11
**current** 16:18 147:24
**currently** 18:18,22
28:9,20 29:12 74:16
131:14 134:25
**customer** 39:11
62:16 65:13 66:13
66:16 67:11 78:7
80:16 84:20 85:2
87:5,5 89:11 97:12
128:18 160:25
170:13 174:18
178:20,22 179:19
179:22 180:16,19
180:25 181:4,5,10
181:13 185:21
186:10 187:4,18,25
188:10 189:4
190:14,21,25 191:4
192:7 193:13 194:5
194:21 195:15,23
196:12,17 197:16
197:21 198:10,14
198:17,19 199:5,25
200:6,12,19 201:6

A0264

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

264

201:23 202:4,16,24
202:25 203:6,20
204:23 205:4,6,9,11
208:24 209:9,14
211:18 212:22
232:9 233:5 235:19
238:24
**customer's** 173:25
174:4,11 175:6
178:12 236:9 237:4
**customers** 45:21,23
46:7,11 64:23,23
78:5 79:8 80:11,17
82:12 83:15 84:8,15
85:7,7,10,17,21
86:14,24 89:8,15
106:2 115:5 120:5
161:13 174:20
178:13 179:18
180:8 181:16 182:9
182:23 187:2
191:23 192:8,13
193:16 194:13
202:8 232:21
236:19 237:2,10,12
237:16,17,19,21
**customers'** 102:4
**cut** 204:19

**D**

**D** 4:2 143:14 148:23
148:24 253:2,18
**d/b/a** 1:7,8
**D1165-D1167** 254:13
**D1186** 213:20
**D1186-D1250** 254:15
**D1187** 213:19
**D1193** 215:15 216:9
**D1197** 218:6,15
**D1198** 217:23 218:20
**D1199** 218:3,7
**D1200** 218:15
**D1223** 222:4
**D1230** 223:11
**D1232** 223:14

**D1250** 213:20
**D151** 184:15,22
**D151-D157** 253:23
**D157** 184:15 185:12
**D2** 162:6 163:3
168:18
**D201** 186:4,5
**D206** 186:4
**D249** 187:14
**D249-254** 253:24
**D254** 187:14
**D288** 189:24
**D288-D293** 253:25
**D293** 189:24
**D397** 194:4
**D397-D402** 254:6
**D402** 194:4
**D522** 197:8
**D522-D527** 254:7
**D527** 197:9
**D536** 199:23
**D543** 199:23
**D62** 170:5
**D633** 202:11
**D633-D636** 254:8
**D636** 202:11
**D65** 170:15
**D66** 171:10
**D67** 170:5 171:14
**D804** 203:25
**D804-D806** 254:9
**D806** 204:2
**D812** 206:9
**D812-D814** 254:10
**D814** 206:9
**D815** 207:16
**D815-D820** 254:11
**D818** 208:23
**D820** 207:17
**D842** 209:14
**D842-D847** 254:12
**D847** 209:15
**D9** 162:6 163:3
**dad** 93:6 188:4 189:9
189:10,15,16 201:8

201:9,18
**daily** 58:16 80:15
192:16
**damage** 10:24 145:8
149:3 253:18
**damages** 111:5,13
145:11 149:10
153:3,10,12,21
154:21,24 155:3,4
**Darell** 165:10
**data** 169:21 177:19
**date** 53:11 213:3,3
217:24 218:2
220:15 256:4
**dates** 20:14 64:20
198:6 220:20
253:10
**David** 13:15 14:3,4,5
14:14,15,18 15:5,7
16:8 70:9,11 87:13
87:13 97:23 98:17
129:4,10,11,19
139:8 144:9
**day** 51:8 56:3,6,8,14
56:17,19,22 57:5,7
59:17 66:14 70:5,15
79:10 95:6 123:6
131:3 133:7 170:17
170:20,22 190:13
190:13 192:20
194:25 197:10
198:20 202:8,21
232:2 252:19
255:17 256:20
**days** 37:20,21 62:4
62:14 190:17 193:8
198:22 212:4,7
227:2,24
**deal** 41:18 43:2,12
67:17 84:3 98:11,15
115:2 129:9 164:13
166:18 167:21
176:21,23 177:4,17
177:20 180:16
182:11,25 214:20

218:24 220:11
236:17
**dealership** 11:17
16:9 31:2 40:15
43:24 47:3 50:6
54:8,11,24 57:9
58:2,17,19 59:2,5
62:21 64:23,24
69:18 74:14 76:13
77:22 79:25 82:15
84:17 91:8 93:7
98:24 99:7,20
100:21 105:15
107:20 110:18
114:25 136:3,14
139:19 140:3,20,21
140:22 156:4,5
160:2,6 162:5
163:13,17 169:11
179:25 180:7
197:23 198:13,20
201:8,18 216,10
213:15 227:6,7
234:3 252:11
**dealership's** 179:21
**dealerships** 31:13
35:6,10 85:14,20
89:15,25 107:17
122:19 157:22,25
158:20
**Dealertrack** 45:16
46:10,20 47:12,24
63:6,8 91:24 103:9
103:16 105:8 106:4
175:21,23 176:15
177:17,20 235:18
237:13 238:21
**dealing** 151:25
**deals** 218:25
**dealt** 193:16 231:8
234:6
**December** 23:15 52:5
62:4,6 68:24 77:25
78:3 79:14,23 86:13
134:7 140:17 142:4

A0265

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

265

150:6 170:4,6,17
171:12,15,19,22
172:8 176:6 185:22
185:23 190:4,5,24
191:11 193:11,11
201:22 202:15
204:4,12,14 209:20
211:25 222:5 224:7
224:9,15,19,22
225:4,5 226:12
227:11 244:4 245:8
249:22 250:2,2,5,11
**decent** 138:15
**decide** 6:3,22
**decided** 52:24 54:25
83:19 108:13 126:9
229:8
**decides** 187:25
**deciding** 64:4
**decision** 45:6 57:20
58:4,13,23 95:4
125:4,10 227:24
228:3 229:9 231:13
235:2,12 245:8
246:22 249:8
254:15
**decision-maker**
110:18
**decisions** 110:20
111:2,4
**declaration** 11:15
173:12 253:21
**declares** 175:4
177:23
**declined** 128:25
**decrease** 10:23 92:2
101:7,13 103:17
114:23 236:3,7
**decreased** 236:25
**decreasing** 237:5
**defendant** 26:9
**Defendant's** 21:15,17
80:20,25 143:19,20
148:23,24 154:7,10
162:2 169:24 170:2

172:17,18 173:8,9
184:16 186:3
187:13,15 189:23
189:25 194:3,8
197:7,12 199:22
202:10,12 203:24
206:8,10 207:16,18
209:13,16 211:12
211:14 212:24
213:6,21,22 226:9
235:8,9 240:25
243:24,25 245:7
246:20 253:14
254:4
**defendants** 1:10 2:8
5:4 7:2,17 15:11
27:11,25 144:9
225:20,25 234:22
236:25 237:9 241:3
243:7 246:23
**Defendants'** 154:8
161:25 225:23
244:13 247:24
**Defendants's** 184:13
**Defense** 244:18
**definitely** 48:15 55:8
55:9 70:4 71:23
73:4 77:20 93:9
94:7 111:2,25
114:25 126:8 128:7
168:17 219:13
226:17
**definition** 121:2
**delay** 65:14,25 66:3
**delayed** 66:4
**delays** 64:24 65:5
**delete** 104:14
**deleted** 104:15 119:5
141:23
**delivered** 39:9
189:11
**delivery** 171:3
**demands** 246:25
**denied** 25:7 158:9
**Denise** 38:17,18

**deny** 206:5
**denying** 235:2 249:8
**department** 21:21
86:8 100:3 147:3
253:16
**depend** 138:13
**dependent** 178:2
**depends** 187:24
196:9 232:21 233:4
**DEPONENT** 256:5
**deposed** 7:21
**deposition** 7:18 8:3,4
9:20 10:7,13 11:12
15:14,17,20 16:5,19
21:24 22:9 25:13
26:4 68:12,13,20
74:24 75:3 104:3
151:11,16 152:4,11
155:9 162:16
183:15,20 184:4,7
240:7,10,22 245:2,4
245:23 246:6,12,15
246:17 249:6 255:7
256:4
**depressed** 111:19
112:3,24
**depression** 117:3
**deprived** 235:17
**describe** 37:3 111:16
**described** 235:21
**Description** 22:25
253:14 254:4
**designated** 233:6
**designed** 162:13
194:12 230:2
**desire** 90:17 94:18
**desk** 47:21 233:7
**desks** 86:20
**detail** 21:3 154:19
**development** 52:2
85:5
**diagonal** 86:20
**Dianna** 38:20
**diary** 141:8
**difference** 79:6

121:17 151:3,18
152:16 167:15
216:2
**different** 29:20 51:22
51:23 87:3 127:21
128:7 135:17,18
158:3,4,4 170:16
174:19,20,20
180:21 203:13
238:8
**difficulty** 174:25
**Dina** 38:22,23
**diploma** 30:13
**direct** 23:21 181:22
229:13
**directed** 154:23
**directly** 34:11 73:6
183:12,17
**disability** 109:25
110:3 135:12,15
136:7,19 159:16
**disagreement** 71:20
**discard** 41:12
**discarded** 41:13
**discharged** 230:23
**discipline** 95:16
**disciplined** 77:8
**disclosed** 69:14,17
82:10 83:9 91:14
250:14
**disclosing** 106:11
**disclosures** 143:21
144:21 253:18
**discovery** 22:22
160:24 163:11
**discretion** 40:11
**discretionary** 75:19
**discriminated** 92:9
92:14 102:9 109:5
109:11,14,16,21,25
110:10
**discrimination** 7:10
44:21 45:3 92:6
93:13 97:22 98:9
100:15 101:5,12

A0266

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

266

102:19,25 107:24
108:4 111:18 112:6
112:10,17 139:10
139:14 141:6,11,14
142:10,15 150:13
157:2,2,15 191:20
201:17
**discriminatory** 97:9
97:13 102:2 156:15
**discuss** 15:5 25:12
82:6 93:11 111:14
139:14 140:6
145:15 154:2
**discussed** 83:15
112:20,23 114:9
123:23 125:11,19
140:4 144:13
153:18 155:20
156:7
**discussing** 230:3
**discussion** 44:14
54:16 81:21 93:3,25
94:3,6,8,16 95:12
126:16 140:14,18
156:24,25 210:17
218:12 228:12
230:19 231:16
234:20
**discussions** 141:4
**dishonestly** 18:17
**dismiss** 234:23 235:3
249:9
**dismissed** 229:2,4
**dispose** 141:19
**disposing** 141:21
**dispute** 175:10 180:3
180:11
**distinction** 180:24
181:6
**district** 1:1,1 17:15
248:10,15,16
**divide** 216:14 222:9
222:25
**divided** 220:10 222:6
**division** 220:7

**divulge** 229:13
**divulging** 82:5
145:14
**DMV** 100:3
**doc** 154:11
**docket** 227:23 228:4
228:7
**document** 11:15
21:15,20,23,24 22:2
22:5,6,17,18,21
23:14 24:24 25:2,3
25:18,19,20 42:8
65:6 66:5 81:5
108:2 143:23,25
144:4 149:5,16
154:9 162:9 163:12
168:6,16 173:4,13
184:14 186:12,20
188:11 190:11,20
197:13,19,25 203:2
203:9,15 204:8,18
204:19 205:2,22
206:17 207:21
208:4,7 209:11
212:25 226:18
240:4 241:13 244:9
245:13,14,17,21
246:25 247:7,11,14
247:24
**documentation**
179:24
**documenting** 142:15
**documents** 10:16,18
10:21 11:3,6 24:25
41:10 65:8 101:4,7
101:9 144:24 145:3
170:11 194:2 195:7
208:2 240:20
**doing** 5:19 15:16
38:17 51:23 59:10
61:17 63:4 73:25
93:19 96:5 104:6,24
104:25 125:23
127:22 135:10
142:19 157:13

180:18 194:6 237:3
252:10
**Dollar** 32:8,12,15,21
32:23
**dollars** 83:22 111:6
111:10 118:24
146:19 147:3
153:22
**door** 84:7 182:15
**double** 94:20
**doubled** 50:12
**dozens** 248:14,19
**drastic** 101:13
**draw** 50:15,16
**dressed** 89:22
**drive** 33:14
**drop** 101:19
**Dropbox** 143:4
240:19
**drugs** 9:11
**due** 44:24 134:21
163:10
**duly** 4:3 143:15
255:8
**duties** 76:15

**E**

**E** 2:2,2 4:2,2 143:14
143:14 154:7,10
199:9 253:2,13,19
254:3 255:2
**E43** 199:7,11
**earlier** 14:11 123:23
146:16 155:21
174:6 232:14
**early** 48:15 52:23
53:20 62:4,6 117:25
249:22 250:2
**earn** 126:3 158:24
**earned** 233:19
**easier** 142:25 196:25
197:5 222:17
**Eastern** 1:1 17:15
**easygoing** 8:4
**eat** 232:24,25 233:2,3

233:6,7,9,15,16
**economic** 153:3
**edification** 80:24
**education** 30:18
**educational** 29:23
107:13
**EEOC** 27:5,6,10
229:5
**effort** 110:23 126:24
**efforts** 127:4
**eight** 175:4 213:15
221:2
**either** 26:22 37:20
59:6 66:25 73:22
89:3 90:12 107:10
185:6 199:11
237:23
**electronically** 177:2
**else's** 48:3
**email** 14:24 22:5,8
130:14,17,20
141:13
**emails** 141:16,19
142:10 189:3
**Emanuel** 2:10 5:3
24:23 151:5 155:6
214:17 215:8 223:7
239:24
**emanuel@mllabor...**
2:10
**emotion** 74:10
**emotional** 112:5,19
112:23 113:22
115:8
**employed** 51:18 91:8
126:19 213:14
**employee** 14:6 34:12
58:2 106:19 108:5
210:21
**employee's** 100:11
**employees** 12:4,18
13:12 14:12 51:23
103:6 105:19
106:23 144:8
**employer** 27:21

A0267

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

267

**35:**11 137:16
**employers** 26:15
  35:19 127:15
**employment** 11:16
  27:24 36:6 43:23
  48:20 49:11,22
  52:17 55:2,7,12,13
  59:15 66:23 95:25
  123:23 125:22
  128:6 134:17
  161:12 210:19
  213:11 219:17
  237:15
**Emporium** 127:25
  128:22 130:2
**ended** 36:7 38:17
  147:22 187:5
**ends** 187:14
**engaging** 244:17,21
**enter** 126:25
**entered** 139:5
**entering** 224:6
**entire** 5:16 38:5
  247:11
**entirely** 80:18 121:5
  209:7 210:13,15
**entirety** 81:5 245:12
  245:17,20
**entitle** 17:21
**entitled** 8:25 25:4
  88:18 119:18
  120:13 167:9
  245:16
**entity** 5:15
**environment** 71:14
  128:8
**equal** 85:18 151:9
  165:6
**equals** 222:25
**equation** 251:3
**equivalent** 85:16
**erasing** 169:21
**ERRATA** 256:2
**error** 126:8,8
**especially** 42:21

193:15 198:11
**ESQ** 2:5,10
**estate** 125:25
**esteemed** 80:23 81:8
**estimate** 158:23
**et** 256:4
**evaluation** 77:14
**evening** 232:19
**event** 101:25
**events** 8:22,23 9:2
**everybody** 70:25
  80:3 87:17 96:12
  179:5 201:9
**evidence** 104:7,12
  144:18 195:21
**exact** 53:8,11,24
  64:20 220:20
**exactly** 5:18 20:6
  21:6 47:6 77:19
  93:11 136:4 191:25
  196:21 222:25
**examination** 1:16 3:4
  3:8 4:15,25 143:17
  253:6
**examined** 4:6 143:16
**example** 31:5 60:16
  118:2 124:12 125:3
  125:5,8 170:24
**examples** 236:12,15
  236:18
**exceeded** 79:19
**exceeding** 252:7
**excited** 70:25 167:20
**exclusive** 63:10
**Excuse** 6:18 102:11
**exhibit** 21:16,17 22:3
  22:14 80:20,25
  143:19,20 148:23
  148:24 154:7,10
  161:25 162:2 163:6
  169:25 170:2
  172:17,18,23,25
  173:8,9 184:16
  186:3,3 187:13,15
  189:23,25 194:3,8

197:8,12 199:24
  202:10,12 203:24
  206:8,10 207:16,18
  208:3,23 209:14,16
  211:12,14,16
  212:24 213:6,19,21
  213:22 226:9
  227:17 228:19
  235:8,9 240:25
  241:3 243:24,25
  245:7 246:20
  247:24 249:5
  253:16,17,18,19
  253:20,21,22 253:23,24 254:6,7,8
  254:9,10,11,12,13
  254:14,14,15,16,17
**exhibits** 142:19,22
  226:2 239:22
  243:13,14,17
  254:19
**existing** 53:14
**expect** 181:15
**expectations** 252:7
**expecting** 42:21
**experience** 34:4
  55:15,18 86:10
  107:17,19 112:11
  114:2 118:19
  123:17 175:20
  182:6
**experienced** 117:3
  191:15
**experiences** 175:19
**EXPIRES** 256:23
**explain** 42:24 65:4
  120:8 123:24 135:9
  226:22 229:25
  234:2
**explanation** 83:4
  120:19,20,21
**expressly** 95:8
**extended** 68:25
**extent** 5:21 7:15 9:23
  20:11 23:6,22 25:2

29:19 35:25 65:13
  148:6 246:8
**extra** 43:5 75:16 76:9
**eyes** 96:10

**F**

**F** 4:2 143:14 161:25
  162:2 252:17
  253:20 255:2
  256:18
**F&I** 47:3,5 173:16
**face** 237:25
**Facebook** 117:9,22
  118:6,22,24 146:16
**fact** 10:3 20:19 58:7
  73:11 97:7,11
  105:17 108:11
  115:7 118:7,23
  179:11 241:21
  248:10 251:22
  252:6
**factors** 45:13
**facts** 23:23
**factually** 155:6
**fail** 210:11
**failed** 25:22 158:8
**failure** 179:22
**fair** 63:3 83:3 90:5
  102:18,24 107:13
  108:10 114:4
  125:13 140:9 157:4
  171:18 180:24
  218:7
**fake** 172:10
**false** 166:25
**familiar** 31:2 84:16
  84:23 154:8
**family** 92:25 135:16
  135:19 136:6,10
  139:21
**far** 8:14 32:7 36:25
  57:19 58:5,7,9,22
  73:3 92:7 102:8
  159:21 177:19
  188:10 190:20,21

A0268

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

268

| | | | |
|---|---|---|---|
| 201:11 209:8 | **filling** 49:13 | 137:18 139:5 | 221:12,19 222:9,12 |
| 219:16 224:3 | **final** 224:22 225:3 | 148:20 154:18 | 223:4,10 224:2,12 |
| **fast** 82:16 215:9 | 231:13 249:5 | 159:14 168:12 | **follows** 4:7 143:16 |
| **fastest** 182:10 | **finally** 171:14 180:6 | 170:5 212:18 | **food** 28:6,10 29:19,20 |
| **father** 74:16,19 | 193:6 225:7 | 213:18 214:10 | 233:12 |
| 116:15,16 139:24 | **finance** 63:17 67:12 | 217:17 219:20 | **forced** 179:19 |
| 147:6 188:9 189:17 | 93:19 123:7 169:14 | 223:13 224:6 | **Ford** 31:6,6 |
| **father's** 189:11 | 176:19 177:9 | 226:12,16 249:19 | **forensic** 104:6,12 |
| **favorable** 160:19,20 | **financial** 45:6 | 250:25 251:12 | **forged** 23:2,3,16 |
| 160:23 | **financially** 116:18 | **five** 37:20 171:18,22 | **form** 3:12 4:14 27:15 |
| **favorably** 103:6 | **financing** 62:21,23 | 176:12,14 214:11 | 38:10 40:6,21,23 |
| 105:12,15,20,25 | 63:10 64:22 67:2 | 217:2 221:17,19 | 48:24 49:3 66:6 |
| 106:4,20,24 107:2 | 69:13 82:12 106:8 | 222:13,15,19,20 | 72:11 77:5 91:19 |
| **fear** 128:22 | 106:16 161:5,12 | 224:13 225:8 251:7 | 108:15 114:21 |
| **February** 1:12 48:14 | 170:25 171:7 | **fix** 92:16 | 148:15 160:22 |
| 48:16,18 191:2 | 194:13 196:8,13 | **flashy** 89:22 | 250:6 |
| 193:10,12 256:4 | 198:15 205:17 | **flat** 37:8,13 39:3 | **format** 142:15 |
| **fed** 94:24 | 207:12 211:23 | 42:19 167:16,22 | **forth** 19:13 154:19 |
| **federal** 4:9,20 139:6 | 212:14 235:19 | **Florida** 19:9,10,17,23 | 179:17 238:3 255:8 |
| 192:11,11,12 | **find** 197:23 198:4,18 | 19:25 20:2,12,15,18 | **forum** 149:14 |
| **feel** 62:12 71:6 74:25 | 250:10 | 30:4 31:17 32:10,11 | **forward** 42:21 |
| 90:18 92:2 97:4 | **finding** 129:13 | 132:23 133:11,15 | **found** 103:24 104:13 |
| 148:21 | **finds** 236:3 | 253:10 | 199:20 202:15 |
| **feelings** 111:25 | **fine** 36:6 53:21 141:3 | **fluctuate** 101:15 | 232:4 241:16 |
| **fees** 248:24 | 143:7 145:23 | **Flushing** 2:4 4:6 | **four** 38:25 82:22 |
| **felt** 80:13 89:5,7 95:5 | 209:13 245:18 | 30:12 | 101:8 117:22 144:9 |
| 96:20 108:11,24 | **finish** 245:19 246:15 | **focus** 45:4,7 81:3 | 167:25 168:2 171:8 |
| 112:2 116:14 | **finished** 244:14 | 85:5 244:6 245:15 | 176:12,14 180:7 |
| **fifth** 23:24 24:3,11 | **fire** 95:19 | **focusing** 18:7 | 192:9 193:14 |
| 171:15 | **fired** 32:17 37:11 | **folder** 87:7 177:9 | 206:25 207:3 216:4 |
| **file** 17:19 26:18 27:6 | 43:5 55:3 79:5 | 181:15 195:16 | 216:15,19,23 217:2 |
| 27:21 228:6 240:20 | 129:2,9 220:20 | **follow** 17:23 20:10,15 | 222:10 224:16 |
| **filed** 7:12 15:25 | **firing** 129:13 | 25:6,22 29:7 67:11 | 226:16 227:13 |
| 26:14 27:10,19 28:3 | **firm** 148:8 229:8 | 108:21,24,25 | **four-figure** 219:20 |
| 80:22 119:7 159:19 | 245:11 248:12,18 | 157:18 158:14 | **Fourth** 8:16 |
| 200:6 228:4 229:2 | **firm's** 149:7 | 200:9 202:17 212:7 | **Francine** 1:3,17 |
| 229:21 234:22 | **first** 4:3 7:24 8:6 | **followed** 108:13 | 16:12 253:4 |
| 245:10 246:23 | 15:22 31:18,24 | 212:4 | **Franklin** 52:14 |
| **filing** 3:8 4:13 147:17 | 33:18,24,25 37:5,10 | **following** 81:4 131:4 | **Freddie** 129:4,5 |
| 227:23 | 60:3 62:14,20 68:23 | 171:10 175:2 179:3 | **free** 74:25 |
| **filings** 17:12 | 70:6 79:3 89:5 91:3 | 194:25 195:12 | **frequently** 80:10 |
| **fill** 48:20 49:11,21 | 93:3 101:19 111:24 | 197:10 202:21 | **fresh** 158:10 |
| 55:6,12 94:3,9 | 121:13,23,24 | 214:14 216:18 | **Friday** 37:15,25 |
| 100:19 | 128:17 134:24 | 217:15 218:4 219:4 | 68:17 |
| **filled** 55:13 136:5 | 135:20,24,25 | 219:11,20 221:5,9 | **friend** 97:25 100:16 |

A0269

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

269

211:3
**friends** 129:6,24
**frivolous** 248:11
**front** 70:9 74:4,5,7
  85:20 163:25 164:4
  164:5,25 165:5,14
  165:21 167:6
  179:17 186:25
**frustrated** 84:6 192:4
**full** 6:20 13:19 50:2
  82:2,3 136:16 159:4
  159:6 169:5
**funded** 39:16,19,21
  39:24 40:10,16
  218:25,25
**funding** 40:2
**funds** 39:12
**further** 3:7,11 66:4
  143:16 178:2
  231:15 252:13
  255:12

**G**
**G** 169:25 170:2
  253:20
**Gantt** 163:21
**gap** 30:18
**gaps** 55:17
**Gateway** 30:6
**GED** 30:9,14 31:17
  31:23
**gender** 109:6,17
**general** 15:21 47:5
  67:10 76:2 103:3
  139:19,20 141:5
  142:13 180:20
  181:18 206:2
  230:21
**generally** 31:15
  37:15 47:2 67:18
  83:6,20 111:9
**gestures** 8:8
**getting** 13:20 39:18
  41:18 42:18 54:24
  64:12 78:10 82:14

91:3 92:21 101:20
105:17 182:15
194:13 203:18
231:18
**gift** 142:6,8
**girl** 38:13
**give** 8:10 34:15 38:13
  45:19 46:10 47:16
  56:24 57:23 60:16
  62:15 69:2 76:9
  82:20 88:9 90:19
  91:25 95:6 119:6
  156:10 158:23
  172:10 177:9 231:5
  238:23 246:16
  251:5
**given** 38:9 40:20
  47:13 77:17 90:24
  95:7 103:8 108:9
  166:22 235:22
  255:10
**gives** 46:4
**giving** 47:23 67:12
  95:9 127:11
**glad** 247:15
**glances** 103:20
**GM** 129:4
**go** 5:25 8:2 14:8
  20:18 23:7 24:15
  36:4 38:8 42:6
  45:17 51:14 53:16
  56:12 60:2 62:14,22
  64:4,4,8 66:25
  67:19 69:8 83:20
  87:21,25 93:11
  100:24 127:12,21
  133:21 137:17
  149:22 163:7
  180:13 183:2
  187:13 192:25
  198:6 202:10
  215:20,21 216:11
  217:25 218:2
  226:18 228:15
  230:18 233:5,8,15

240:23 242:8
249:25
**goal** 172:13
**goes** 92:4 187:24
  189:6 195:16
**going** 4:9,21 8:2,22
  13:7,8,18 17:6,12
  21:3,14,22 22:16,22
  23:21 24:23 25:15
  25:16 26:3,25 34:15
  42:23 45:2,7 49:4
  59:11 74:22 75:13
  78:6 79:11 80:16,22
  81:9,19 89:12 90:10
  90:12,14,19 91:4
  93:11 94:3,9 95:14
  98:5,20 100:17
  101:24 103:21
  104:8 108:12,22,23
  113:13 114:14
  115:2,13 120:6,8
  128:7,13,21,23
  133:19 138:23
  140:8 148:22
  151:15,22,25
  152:10 157:15,16
  158:12 169:24
  172:10 177:11
  179:16 181:16,22
  186:8,25 188:4
  189:15 195:22
  197:7 207:25
  208:25 209:6
  212:21,21,24 217:4
  217:14 227:17
  229:12 235:7
  240:11 241:4 242:5
  244:25 245:15
  247:10,13 248:20
  248:22,23 251:19
  252:8
**Gonzalez** 235:2,12
  254:16
**good** 5:3,25 40:3
  97:16 105:2 114:3

142:17 152:12
**Google** 148:12
**gotten** 182:17
**grab** 64:7 128:17
  182:8 187:2 233:5
**graduate** 30:8,21
**graduated** 30:7
**grand** 161:2
**grandmother** 139:23
**granular** 45:5
**grass** 111:22 114:15
**gratuitous** 244:17
**great** 54:12,13,19
  55:9 69:22 114:2
  127:13 137:20
  219:15 242:22
**great-grandmother**
  146:15
**greater** 238:7
**greener** 111:23
  114:15
**greet** 80:17
**greeted** 195:6
**gross** 43:13 164:4
  167:6 216:2,10
  217:6,14,15,24
**ground** 8:3,13 9:9
**grounds** 13:4 26:22
  109:14 151:12
  183:19
**GROUP** 2:8
**grow** 91:4 97:17
**growth** 97:15
**guarantee** 239:19
**guess** 8:25 40:8 44:23
  71:2 105:17 109:23
  144:19 171:20
  185:10 195:10
  198:24 203:14
**guesstimate** 142:21
**Guzman** 1:9 5:6 6:12
  36:25 45:18 57:25
  60:4,11 62:8 67:15
  70:4,8 74:4,7 75:6
  78:17,20,24 80:10

A0270

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 79 of 102 PageID #: 888

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

270

82:11,23 83:5 86:14
86:22 87:2 88:2,7,9
88:9,17,20 91:7,11
92:8 93:18,23 95:15
95:18,21,24 96:4
100:25 102:4 106:7
107:14 110:17
170:24 171:6
179:12 186:6
212:13,18 232:11
237:24
**Guzman's** 88:4 99:24
107:16

**H**

**H** 4:2 143:14 172:17
172:18,25 253:13
253:21 254:3
**half** 148:18
**hall** 158:8
**Hampton** 170:24
**hand** 88:4,4 92:4,5
109:18,18 255:17
**handle** 83:7 92:23
174:7 249:24
**handles** 249:24
**handwrite** 196:23
**handy** 66:14
**hang** 90:15 101:20
**happen** 20:25 39:19
72:9 86:21 93:12
114:14 129:10,11
140:14 182:20
192:8,13,14 201:17
**happened** 37:11
39:25 40:13,13 44:6
61:23,24,24 72:6
73:20,21 74:8 78:10
79:2 84:11 87:10
91:13 97:6 98:3
140:24 146:7
152:20 185:9 187:6
191:11 193:14
200:25 202:9
205:16 219:3

250:18,20,21
**happening** 87:2 97:2
201:20
**happens** 114:3
**happy** 61:18 123:5
207:5
**hard** 19:15 65:10
79:19 88:25 89:10
90:25 93:20 110:23
154:14 188:13
193:13 196:20
216:24 222:22
250:10
**hated** 72:14
**header** 80:23
**health** 68:15
**healthcare** 113:2
116:24
**hear** 41:25 199:15
242:13
**heated** 243:5
**held** 1:17,18 41:9
44:14 54:16 81:21
95:12 123:9 126:16
140:18 210:17
218:12 228:12
230:6,19 234:20
**help** 8:11 53:14 87:2
116:16 120:9
201:25 202:4
214:20
**helped** 115:2 170:25
171:6
**helps** 116:15
**Henston** 171:5
**hereinbefore** 255:8
**hereto** 3:4
**hereunto** 255:16
**Hey** 84:5
**HG** 1:2
**hiccups** 73:5
**high** 29:25 30:6,11,12
30:13,19 31:21
239:9,12
**high-end** 128:16

**higher** 59:25 167:10
**highlighting** 247:18
247:25
**Hillside** 1:7,7,7,8 5:5
5:5,8,8,11,12,25 6:2
6:3 11:17 12:4,9,18
13:12,16,22,23,23
14:6,9,12 33:19,21
33:24 34:7,10,11,14
34:21,21,22,24 35:2
35:4,6,7,13,15 36:7
36:12,22 48:6 50:9
55:14,22 57:12
66:24 74:20 77:8
85:14 97:20 107:23
116:22 117:2 118:8
118:19,24 120:14
120:18 121:9,14,22
121:25 122:5,15,18
122:21 124:17
125:14 131:19
134:21 138:4
146:22 156:14
157:23 158:21,25
159:25 160:5,19
182:13 210:20
231:23 234:12
237:15 249:19
256:4
**hire** 57:20 58:5,13,23
100:21 147:20
208:25 213:3
**hired** 37:5 57:15,17
57:25 58:12 59:15
59:18 63:17 76:6
209:6 213:9 248:18
**histories** 174:21
236:10
**history** 174:18 201:5
**hit** 52:23 76:9 99:4,4
122:8
**hold** 41:7,19 84:5
92:18
**holding** 193:11
**holiday** 225:4

**home** 131:10 172:14
**hominem** 244:17
247:25
**honest** 167:12
**honestly** 20:9 24:8
47:17 56:23 71:5,12
71:17 72:13 73:23
75:22 77:18 79:17
85:12 88:25 96:9
97:4 118:4 120:4
121:5 129:18 134:3
134:15 144:2,15
146:13 148:17
153:17 157:11
158:10 170:10
175:15,19
**hoping** 61:21 142:20
**hospitalized** 113:4
**hotel** 33:2,3,16,18
56:16
**hour** 7:12 15:8 26:7
175:7,16,17,19
181:12 182:16,19
188:3 198:25
**hours** 9:12 10:8,12
113:14 128:9
180:10,14 181:19
182:23 186:17,23
187:5,23 199:4
207:2 232:2
**Housekeeping** 33:6
**housing** 29:10
**hundred** 112:12
**hundreds** 84:14
**hurdle** 237:25
**hypothetical** 123:2

**I**

**iCloud** 146:2,6
**ID** 65:9
**idea** 32:4 38:2 78:19
91:9 124:4 188:21
206:24
**identification** 21:17
80:25 143:19 146:5

A0271

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 80 of 102 PageID #: 889

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

271

148:24 154:10
162:2 170:2 172:18
173:9 184:16
187:15 189:25
194:8 197:12
202:12 203:24
206:10 207:18
209:16 211:14
213:6,22 235:9
240:25 243:25
**identified** 158:17
**identify** 102:8 105:14
105:19 144:5,8,24
155:12 158:7
**identity** 155:13
**ignore** 246:8
**ignored** 232:8 246:10
**ignoring** 232:10
**immediately** 70:7
114:12 181:13,24
**important** 192:10
**impossible** 167:19,23
**impressive** 182:24
183:2
**in-person** 231:12
**inaccurate** 201:6
**inappropriate**
104:10 208:9
**inbound** 185:12
**incidents** 72:20 73:9
73:11 179:12
**include** 12:19 147:24
158:8
**included** 35:15
**including** 136:19
**income** 28:11,15,23
29:15 125:15,17
126:3,11 136:2,13
**incorrect** 25:25
120:20,25 121:2
155:7 177:16
189:13 201:7 214:5
250:20
**incorrectly** 158:7
**increase** 45:19

**increased** 46:2
114:25 237:9
239:18
**increases** 46:4
**increasing** 237:2
**independent** 177:14
250:25
**indicate** 203:20
**indicates** 200:15
**indication** 203:17
**indications** 103:21
**individual** 67:5 99:20
144:9 155:25
163:21 170:25
171:6 184:18,20
199:5 203:12
206:13
**individual's** 210:24
**individuals** 46:21
47:4,8 65:17 69:17
84:13 139:13
**industry** 34:5
**Infiniti** 160:10
**inform** 44:2
**information** 11:3
17:21 28:11,14,23
29:2,14,17 47:19
64:25 66:14,17
82:19 87:3 136:2
145:5 156:16,17,23
165:13 173:25
178:19,23 179:23
180:8 185:23
197:22
**initial** 143:21 144:20
157:14 253:17
**initially** 62:21 121:21
123:17
**injuries** 111:16 112:5
112:9,16,19,23
113:2,5,8,23 114:5
114:8 115:8
**injury** 159:16
**input** 168:17
**inquiry** 196:20

**insistence** 163:2
**Instagram** 117:11,23
**instance** 102:3
170:23 197:21
209:4
**instances** 102:19,25
182:17
**instant** 175:16
176:25 177:12
248:13
**instantly** 177:4
**instructing** 115:25
152:14
**instruction** 104:9
120:24
**instructions** 104:2
**instruments** 23:2,3
23:16
**insurance** 135:12
136:20 137:7,10,16
164:10 181:11,17
**intend** 24:25
**interact** 59:5
**interacted** 61:5
**interaction** 59:8
**interactions** 61:11
**interest** 202:20
**interested** 186:10
202:16 203:7
255:15
**internet** 130:7
**interpersonal** 71:10
71:15,25
**interrogatories** 11:23
154:8 246:25
253:19
**interrogatory** 20:11
102:22,24 154:18
155:13 156:13
157:18 158:6,14,18
243:6,9 253:11,11
**interrupt** 68:13,20
152:3,10 155:9
161:17 245:4,24
**interrupted** 245:24

**interrupting** 151:7
151:10 183:15,20
184:3 240:6,9,21
245:22 246:6,12,14
246:17
**interview** 32:24 57:9
58:10 64:19 127:21
129:7
**interviewed** 49:25
**interviewing** 37:6
**intolerable** 231:22
232:5
**intriguing** 131:8
**involved** 72:4 80:13
111:2 131:18,19
147:9
**Iris** 38:18 139:18
140:4,6 144:13
155:20,20 156:3
**irrelevant** 74:23
127:5 162:22
248:21
**Isaac** 6:10 32:24
36:23 37:6 44:10,11
45:16 46:12 47:15
49:14 56:10,19,22
57:19,22 60:2 61:2
61:24 63:14,15,25
64:10,11,21 66:20
66:21,25 67:15,20
68:23 69:4 70:2,5
70:14 74:6 80:12,14
82:16 87:18,22 90:5
92:3,13 93:25 94:15
96:20 101:3 108:11
111:3,21 123:4
156:18 161:10
176:19 201:8,11,18
207:10 231:8,12
249:22,25 250:22
250:24 251:23
**Isaac's** 46:9 48:2
91:24 232:13
**Ishaque** 1:8 2:13 5:6
6:9

A0272

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 81 of 102 PageID #: 890

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

272

**issue** 60:15 76:19
  77:9 78:6 92:16
  200:20
**issued** 228:2
**issues** 203:18 231:9
**issuing** 227:24
**item** 190:16
**items** 164:9

_____
**J**

**J** 184:13,16 186:3
  227:19 253:22
**Jamaica** 46:6
**January** 8:24 18:8,15
  20:13 34:8,23 36:7
  44:16 48:11,16,17
  54:6,7 60:20 61:3
  76:16,19 77:4 86:13
  90:6 94:2,15 124:18
  125:3 149:4 150:6
  150:18 186:9,15,17
  187:17,22 188:16
  188:24 193:12
  194:20 195:5,22
  196:11 197:10,16
  198:22 202:19,23
  203:5 207:4 213:12
  225:7,11
**Jay** 36:23 37:10 43:5
  43:7,15 56:25 57:24
  60:2,7,8 62:13,22
  63:3,9,10,15,18,23
  63:25 64:9,13,15,21
  66:20 67:19 75:9,14
  79:5,9 167:12
  173:21 175:25
  220:17
**Jay's** 82:14 139:18
**Jenneque** 36:23 37:7
  43:8 57:3,5,20 62:7
**Jennings** 38:20,22
**job** 36:13 40:3 48:19
  54:18,19 56:15,15
  56:16,17,18 57:7
  67:10 74:13 88:4

114:12 120:16
  121:6 122:24 123:9
  124:11 127:19,23
  128:18,23 130:3
  131:2 134:11
  159:22
**jobs** 55:3,6 125:13,14
  125:18
**John** 165:17
**joint** 35:19
**Jory** 1:8 5:7 6:6,6,18
  58:12,16,19 59:4
  60:13 61:7 156:18
**journal** 141:8
**judge** 104:13 183:11
  192:12 227:19,19
  227:20 235:2,12
  240:6 244:4,5,16
  245:9 246:21,21
  248:9 254:15,17
**July** 43:18,20 44:3
  51:3,4 60:8,10
  64:15 176:3 217:4,5
  217:10,10,17
  218:19,19
**jump** 84:2
**jumping** 201:19
**June** 19:21,21,25
  133:9,10,12,23
  134:10 143:23
  215:6,6,13,13
  216:10

_____
**K**

**K** 187:13,15 253:23
**Kataev** 2:10 4:8,12
  4:24 5:2,3,18,24 6:5
  6:21,23 7:15,20
  11:20 12:7,13,15,22
  13:2,7,10,21 14:2
  17:9,18,24 19:7
  20:10 21:14,18,25
  22:7,13,20,24 23:24
  24:2,4,12,15,22
  25:5,12,18,21 26:2

26:5,21 27:3,15,18
  29:7,9 35:22 36:3
  42:5 44:13,15 46:14
  46:18 49:4,7 54:15
  54:17 66:9 68:3,5,7
  68:11,18 74:25 75:4
  81:2,19,22 91:16,20
  95:11,13 99:15
  102:12 103:18,24
  104:11,19 105:2,6
  113:15,17 115:23
  115:25 116:4,5
  118:10 119:22
  120:2 121:3 124:5,7
  124:21,23 126:14
  126:17 133:20
  137:2,5 142:17
  143:3,8,18 144:22
  144:23 145:24
  149:2,19 151:7,10
  151:14,17,24 152:7
  152:12,15 154:15
  154:17 155:8,11
  157:16,21 158:12
  158:16 161:17,19
  161:22 162:3,12,23
  162:25 163:4,9
  170:3 172:19,24
  173:2,3,7,10 174:24
  175:3 182:2 183:5
  183:10,14,18,23
  184:3,10,11,17
  185:20 186:2
  187:16 190:2
  202:13 203:11,25
  204:3,9,10,20,21
  206:11 207:22
  208:9,14,16,21,22
  210:16,18 211:17
  213:7,23 215:11,18
  216:8 217:11,12,20
  217:23 218:5,11,13
  225:21,25 226:7
  228:11,13,20
  229:16 230:18,20

231:4 234:13,14,19
  234:21 235:10
  238:13 240:2,5,9,13
  240:17,21 241:2,14
  241:18 242:12,17
  242:20 243:2,16,21
  244:2 245:3,5,14,18
  245:22 246:5,10,14
  246:18 247:15,17
  247:20,22 248:25
  249:2,14,17 251:5,9
  251:11,18,21
  252:12 253:7
  254:19
**keep** 8:6 40:19 79:24
  80:3,5,10 141:8,17
  169:12
**keeping** 80:7
**kept** 34:25 71:13,14
  141:15 169:16
  177:20 179:15
**kid** 91:3
**kids** 52:25 131:15
**kind** 13:17 19:15
  24:9 31:9 32:20
  34:13 35:13 44:7
  49:24 56:14 64:13
  65:10 79:19 82:15
  87:11,15,17 88:3
  90:21 92:13 93:6,17
  93:19 95:5 98:10
  110:22,22 140:7
  157:6,7 167:11
  233:15 249:23
**Kissena** 2:4
**Kissimmee** 21:21
  253:16
**knew** 98:22 120:5
  156:9 237:19
**know** 5:22 12:22
  20:14,19 21:6 24:10
  26:24 37:11,23 38:2
  38:17 41:16 42:16
  42:17,20 46:25 47:6
  50:2,7 58:5,7,8,9,23

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

273

61:18,24 62:16,25
70:4,15 73:18 77:20
79:6,10,24 81:7
83:18 95:17,20
97:15 104:16 107:5
107:8,11,12,13,15
107:16,19 120:4
128:24 129:15,17
134:3 141:25
144:16 146:14,25
148:14 153:19
154:4 159:21
166:21 167:8 168:6
169:9 171:8 172:10
174:15 176:2
177:19 178:8
180:25 181:4,5,13
188:19 189:7
194:22 197:23
201:11 205:13
206:6 208:18 209:8
211:11 212:21
215:19 219:8 231:2
231:18 234:4
238:18,25 243:4,5,9
243:10 244:7
**knowledge** 78:17,20
88:14,17 91:7
107:23 143:25
147:16 169:11,23
170:9 177:14
199:10 200:14
204:7,25 205:4
206:16 207:20
208:6 211:9 213:8
**known** 200:18
**knows** 23:6 26:20,23
123:5,7 129:17
151:23 191:8 231:2

**L**

**L** 4:1,2 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1

20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1,14
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1

174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1,23,25 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
253:24 254:1
**L-e-t-t-y** 16:14
**LABUDA** 2:8
**LaGuardia** 33:2
**Lake** 2:9
**lasted** 187:22
**lasting** 186:17
**late** 53:19 69:24
250:15
**latest** 145:19
**laughed** 161:23
**law** 2:3,8 148:8,11
149:7 229:8 245:11
248:12,18
**lawsuit** 26:6,7,8
117:21 119:8
146:19,21,23 147:6
147:10,12,17,25

163:11 192:11
**lawsuits** 26:11
**lawyer** 81:8
**layman's** 231:5
**laziness** 86:8
**LB** 1:2
**lead** 84:16,18 184:18
185:5,7,9,21,22
186:5 187:11
188:14,25 189:12
193:12 195:11,16
197:9 204:4,12
205:21,24 206:2
209:22 211:18
236:20
**leads** 11:3
**learn** 148:8,11
234:15
**learned** 55:25 72:21
73:2,10 82:23 83:5
89:19
**learning** 82:15
101:21
**leave** 18:9,11 45:21
52:24 54:25 81:18
94:19 100:21
120:14 124:2
135:17,19 136:6,10
191:4 192:5 193:8
232:19
**leaves** 249:23
**leaving** 42:22 56:16
60:7 85:21 111:22
118:14 123:4
124:11 198:8
**led** 125:9
**left** 18:4 19:23 24:18
27:24 51:21 60:8
62:7 63:3,18,23
64:9,13,15 67:20
68:23 75:9,14 99:9
100:6 110:13
118:18 119:7,9,11
121:9 123:22
124:14 125:14

A0274

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 83 of 102 PageID #: 892

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

274

| | | | |
|---|---|---|---|
| 134:21 149:7 | 144:12 153:6 157:9 | 78:24 80:11 83:12 | **lots** 31:14,15 |
| 173:22 176:2 | 167:5 169:14 | 83:14 91:6,12,13,23 | **loud** 8:6 |
| 188:10 197:22 | **listed** 149:8,15 | 97:8,12 102:16 | **Louis** 195:6 |
| 201:9,18,23 211:7 | 150:10,17 153:3 | 106:15 126:18 | **low** 128:21 |
| 220:20 | 165:9,16 185:2,24 | 131:25 178:15 | **Lsticia3@Gmail** |
| **legal** 23:4 35:19 36:2 | 186:6,9 194:21 | 182:4 192:18 201:5 | 130:19 |
| 92:11 110:5 119:20 | 217:24 | 201:19 225:15,24 | **lunch** 142:18 145:14 |
| 230:25 | **listen** 241:6 | 235:18 236:9 | 162:20,21 232:22 |
| **lender** 175:6,18 | **listing** 168:22 186:16 | **longest** 123:8 180:15 | 233:5,17,18 |
| 176:24 177:7 178:4 | **lists** 102:18 150:2 | **look** 13:2 54:25 90:17 | **Luncheon** 143:10 |
| 178:11 179:23,24 | 213:3 | 96:10 131:7 168:12 | **luxury** 27:23 51:24 |
| **lender's** 179:25 | **literally** 248:14 | 170:12,14 185:11 | 52:11 54:22 55:8 |
| **lenders** 174:12,16 | **little** 45:3 67:7 70:14 | 189:23 194:3 197:7 | 124:13 125:6 127:8 |
| 176:14,16 | 72:17 73:5,21 82:24 | 198:11 199:19,22 | 128:16 136:4 |
| **let's** 24:16 37:14 39:2 | 87:12 106:3 144:3 | 203:22 208:23 | 137:18 157:24 |
| 63:6 128:6 173:7 | 173:21 205:8 217:9 | 216:9 235:16 | |
| 181:17 185:11 | 220:9 226:11 | **looked** 61:18 130:23 | ————————— |
| 187:13 189:23 | **live** 16:21 18:22 19:2 | 168:6 | **M** |
| 194:3 199:22 | 19:19 33:13 | **looking** 8:21 40:14 | **M** 1:9 4:2 5:7 6:15 |
| 202:10 226:4 | **lived** 18:24 33:10 | 42:21 70:24 80:14 | 143:14 194:3,8 |
| **Leticia** 1:3,17 16:12 | **living** 19:2 74:16 | 89:11,16 170:15 | 254:6 |
| 184:23 187:18 | **LLC** 1:7 5:5 | 196:21 197:22 | **magistrate** 244:5 |
| 193:7 204:11 | **local** 17:14 | 212:22 213:18 | 245:9 |
| 205:12 252:17 | **located** 35:5 | 221:16 | **main** 33:8 85:13 |
| 253:4 256:5,18 | **location** 85:19 130:6 | **looks** 200:21 214:18 | 114:22 |
| **letter** 200:7 227:23 | **locations** 158:3,4 | 220:12 224:24 | **maintain** 155:24 |
| 228:4,6 245:10 | **log** 86:3 163:15 | 226:24 | **maintained** 34:25 |
| 246:22 | 168:19 169:18 | **Los** 133:22 | **Major** 107:21 |
| **letting** 104:16 | 170:12 185:8,11 | **lose** 128:23 146:4 | **making** 46:2 78:2,5 |
| **Letty** 16:13 | 187:3,8 188:2,21 | 198:14 | 90:24 94:20 95:2 |
| **level** 72:2 87:11 | 190:16 226:19 | **losing** 56:15,15 | 104:11 110:20 |
| **lie** 171:24 | **logged** 86:4 187:2 | **loss** 164:14 195:16 | 115:11 121:6,14 |
| **lieu** 166:15 167:9 | **logging** 86:5,6 187:6 | **lost** 25:23 185:2,5,7 | 122:8 125:4 166:10 |
| **life** 18:24 19:7,8,14 | **long** 18:16 24:8 33:17 | 185:22 187:11 | 183:8,14 231:13 |
| 123:12 137:12 | 34:16 79:9 82:11 | 188:25 189:13 | 232:6 237:11 |
| **liked** 179:5 | 84:10 86:14,22 | 193:12 195:11,13 | 239:18 248:5,11 |
| **Lily** 100:12 156:9 | 122:23 132:24 | 198:17,19 205:21 | **Mall** 1:8,8 5:6,11,12 |
| **limited** 175:20 | 161:11 171:24 | 205:24 206:2 | 6:2,3 12:9,18 13:12 |
| **line** 103:23 104:9,18 | 172:9 175:16 | 209:22 210:4 | 13:16,23,23 14:6,10 |
| 229:17 | 177:14,20 180:13 | 236:13,21 | 34:11,12,14 35:2,7 |
| **LINE(S)** 256:5 | 182:25 192:3 | **lot** 46:7 73:25 79:17 | 35:13,16 127:24 |
| **lines** 94:14 | 220:19 241:5 | 103:20 112:11,15 | 128:19 130:2 158:7 |
| **link** 143:6 | **long-term** 135:11 | 114:2 128:8,13 | **manage** 89:19 |
| **LinkedIn** 117:13,23 | **longer** 43:15,21 44:2 | 182:8 199:8,11 | **management** 84:16 |
| **list** 4:22 55:14 102:25 | 67:6 69:4,13 78:2,5 | 208:5 | 84:18,21 110:25 |
| | | | **manager** 38:12 45:18 |

A0275

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

275

| | | | |
|---|---|---|---|
| 47:3,5,6 49:14 | 209:16,22 210:6 | 225:12 | **minor** 68:18 |
| 51:24 53:17 54:19 | 211:14 213:6,21,22 | **meant** 138:21 174:15 | **minus** 151:8 |
| 63:17 67:10,12 | 226:9 235:8,9 | **media** 117:7 | **minute** 210:16 |
| 83:24 84:4,5 86:10 | 240:25 243:24,25 | **mediate** 72:4 | **minutes** 69:24 83:6 |
| 89:18,24 90:14,18 | 245:7 | **mediation** 169:8 | 83:11 131:7 175:7 |
| 90:21 92:4 93:16,18 | **marriage** 255:14 | **Medicaid** 28:18 | 180:9 181:12 241:5 |
| 94:4,7,10,17 123:7 | **married** 18:18,20 | **medical** 112:25 | 243:15,17 |
| 128:20 131:24 | 78:18 | **Medicare** 28:17 | **Mischaracterizes** |
| 174:2 177:25 178:5 | **math** 176:11 | **Medicare/Medicaid** | 132:8 145:23 165:3 |
| 178:8 186:5 212:20 | **matter** 21:19 22:9 | 28:22 | 177:5 251:15 252:3 |
| 250:17 | 255:15 | **medication** 9:12 | **misrepresentations** |
| **manager's** 67:10 | **max** 252:10 | 113:7 | 244:12 |
| **managerial** 251:4 | **maximize** 99:8 | **meet** 24:16 38:23 | **missing** 60:17 |
| **managers** 179:8 | **McDonald's** 31:25 | 241:22 | **mistake** 176:21 |
| **Mann** 244:4,16 245:9 | 32:5,9,17 | **meeting** 10:11,15 | **mistaken** 27:5 79:20 |
| 246:21 254:17 | **mean** 13:15 23:2 | 24:19 57:24 | 137:23 198:20 |
| **manners** 246:3 | 39:14 41:18 42:3 | **Memorandum** | **mistreated** 41:7 |
| **Manrique** 14:4,5,14 | 45:23 49:2,20 57:16 | 246:20 | **mitigation** 120:16 |
| 14:15,18 15:7 16:8 | 57:22 59:23 62:24 | **mental** 116:24 | **model** 145:19 |
| 26:7 87:13 98:17 | 65:5,23 69:23 73:18 | **mention** 44:7,9 79:4 | **mom** 131:14,17 |
| 144:9 | 75:24 76:12 78:15 | 92:2 99:25 206:4 | **Monday** 37:15,24 |
| **Manuel** 195:6 | 86:17,19 98:19 | **mentioned** 45:15 | 108:23 |
| **March** 18:8 52:23,23 | 99:21 101:6 103:3 | 61:18,19 127:7,13 | **money** 42:11,14 |
| 53:3 134:6 185:13 | 103:15 105:17,21 | 200:2 202:7 210:3 | 44:21 90:24 95:2 |
| 203:12 255:17 | 108:20 109:18 | **mess** 93:22 | 101:23 114:24 |
| **Marco** 33:2 | 110:19,22 111:19 | **message** 14:24 60:19 | 115:3,7,11 120:12 |
| **Marcus** 2:9 | 111:20 113:21 | 190:7 193:8,9 | 121:12,20 122:14 |
| **marijuana** 21:5,7 | 115:3 122:7 127:20 | 202:24 203:5 | 128:20 157:13 |
| 24:7 | 160:21 164:22 | **messages** 142:9 194:5 | 158:24 190:25 |
| **marijuana-related** | 171:3 175:12,15 | **met** 10:8 56:19 | 191:8 193:10 195:2 |
| 23:10 | 182:15 185:4 188:7 | **mid** 52:19 249:22 | 195:24 196:4,7 |
| **mark** 17:21 21:15 | 189:21 193:21 | 250:2 | 232:3,6 233:19 |
| 80:5 169:24 173:7 | 195:25 206:19 | **middle** 72:25 76:8 | **Monica** 170:24 |
| 239:25 | 212:16 214:21 | 169:4 201:24 | **month** 20:7 32:2,14 |
| **marked** 17:7,17 | 225:21 231:17,25 | 223:17 251:19 | 33:15 51:21 53:11 |
| 21:17 80:20,25 | 233:19 239:15 | **mile** 148:18 | 53:18 58:21 62:2 |
| 143:19 148:23,24 | **meaning** 12:20 51:8 | **milestones** 99:4 | 76:8 79:15,18,21 |
| 154:7,10 161:25 | 84:20 | **million** 111:6,9 | 85:10 93:6 128:14 |
| 162:2 170:2 172:17 | **means** 39:11 160:23 | 118:23 147:3 | 133:5 140:14 168:5 |
| 172:18 173:9 | 189:10,16 195:14 | 153:22 | 168:15 169:4,5,5,12 |
| 184:13,16 187:15 | 207:7 211:22 | **millions** 146:18 | 169:17,20,21,22 |
| 189:12,25 194:8 | 213:14 219:5,12,22 | **MILMAN** 2:8 | 172:5 175:24 |
| 195:11,13 197:12 | 219:24 221:2,6,9 | **mind** 23:2 157:11 | 195:12 226:25 |
| 202:12 203:24 | 222:12 223:5,15,19 | 158:11 | 227:4,9,10 252:7,8 |
| 206:10 207:18 | 223:22 224:3,16 | **mine** 97:25 | **month-long** 87:19 |

A0276

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

276

| | | | |
|---|---|---|---|
| **monthly** 40:22 50:19 162:4 200:8 239:7 253:20,20 | **moving** 25:24 169:6 220:24 | 154:15 176:10 183:3 194:13 236:17 239:23 245:15 247:13 | **note** 47:21 189:8,21 190:3 200:15 204:22 205:4 206:20,23,25 208:24 240:11 244:10 |
| **months** 36:25 37:10 51:13 75:20,23,25 76:11,13 82:22 97:15 101:20 110:15 111:24 114:17,18,20 121:13 128:15 169:6 176:9,12,14 205:25 209:24 210:3 213:15 219:16 236:21 | **multiple** 74:5 78:10 87:4 104:20 128:25 142:24 152:21 167:20 184:25 208:11 236:12 **mumbling** 8:9 **Murray** 4:5 **mystery** 42:20 | **needed** 41:2 53:13 65:7,10,12,14 188:8 190:25 **needing** 236:19 **needs** 191:8 193:10 200:7 **negative** 163:25 **Neither** 69:7 | **noted** 104:21 116:4 151:14 203:11 204:9 207:5 211:19 212:15 240:13 242:20 246:7,8,13 248:25 252:15 **notes** 104:21,23 141:3 142:14 236:20 244:16 |
| **moot** 68:7,19 **morning** 5:3 68:6 232:18 **mother** 16:22 139:23 142:8 147:9,12,16 148:9 | **N** N 2:2 4:2,2 143:14,14 197:8,12 253:2 254:7 255:2 | **never** 21:23,25 22:4,5 34:11 41:9 48:2 60:13 61:5,8 66:16 69:4 73:6 74:14 75:5 78:13 89:25 | **notice** 1:18 125:5 **noticed** 125:6 **notify** 227:22 228:5 **noting** 240:23 251:9 **November** 52:5,19 |
| **mother's** 133:6 146:23 201:15 **motion** 25:6,7,22,23 74:25 104:3 234:23 235:2 242:22 244:25 245:3,10 246:23 248:22 249:8 | **name** 5:3,16,20,23 6:20 13:19 16:11 21:6 30:5 50:2 70:12 80:4 98:6 100:11,12 128:23 149:7,14 150:2 156:9,11 157:24 189:11 195:18,19 210:24 256:4,5 | 99:4 108:13 130:23 159:21 169:17 180:13 199:8 233:10,11,12 234:6 240:3,12 251:3 **Nevertheless** 247:25 **new** 1:1,20 2:4,9 4:5 4:6 17:15 18:12,24 19:3,12,17,24 30:11 | 62:5,6 79:20 93:4 93:10 173:16 199:24 200:3,5,21 200:23 201:14 223:13,18,22,25 224:8 226:14,18 227:10 249:22 250:15 252:7 |
| **Motor** 27:23 48:8 49:11 50:5,23 51:12 51:25 52:4,12 53:6 53:13,14,16 54:12 54:18,19 55:8,10 121:10,12,21 123:15,17 124:13 125:6 127:7 136:4 137:18,20,24 155:18 227:6 | **named** 163:21 184:19 194:5 **names** 16:16 84:12 **nature** 59:8 62:8 71:15 129:21 243:4 **navigate** 82:23 **near** 148:17 **necessarily** 36:20 45:23 46:4 65:18 85:4 101:17 206:19 232:24 | 32:10,13 50:6 53:7 53:9,13 62:24 120:16 128:8 141:22 145:25 146:8 169:21 188:14 237:16 248:10,16 255:6 **newest** 141:23 **news** 69:22 **night** 205:13 | **number** 77:16 79:25 80:7 85:23 149:14 150:2,9 151:19,20 153:16,25 155:13 155:24 156:13 157:18 158:18 164:24 168:11,19 168:25 179:19 217:21 221:25 227:25 237:5 243:6 |
| **Motors** 54:22 127:8 127:14 129:12 **mouth** 141:2 **move** 19:12 25:14,14 152:13 182:6 226:10 242:23 248:23 | **necessary** 80:11 179:23 196:12 239:15 **Neck** 54:12,13,19 55:9 127:13 137:20 **need** 5:9 9:6 12:24 13:2 34:13 68:8 83:22,23 92:2 108:24 116:14 149:17 152:10 | **nine** 177:23 219:12 220:4,9,22 223:19 **nonpregnant** 237:4 **normal** 196:3,7 **North** 129:12 **Northern** 33:9 **notary** 1:19 3:5 4:4 4:16 252:21 255:5 256:20 | **numbered** 203:25 **numbers** 94:13 98:19 98:19 99:3 131:8 151:4 168:12 169:7 169:7 172:10,22 184:14 209:14 216:7 217:19 |

A0277

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 86 of 102 PageID #: 895

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

277

218:15 238:2,24
239:7,7,15
**numerical** 154:20
**numerous** 248:15,19
**NY** 54:22 127:8
**NYC** 48:8 49:11 50:5
50:23 51:12 52:4
53:6,13,14,16 54:18
55:10 121:10,12,20
123:15 127:7
137:24 155:17
227:6

**O**

**O** 199:22 202:10,12
254:8 255:2
**oath** 7:6 11:16
**object** 21:22 104:8,17
183:18 242:5,6,6,7
242:8 251:18
**objected** 25:5,21
103:19
**objecting** 183:21
242:17,19
**objection** 9:23 13:4,6
19:4 23:20 26:22
27:13,15 35:25 40:6
41:22,24 48:24 49:3
65:21 66:6 72:11
73:12,16 76:21 77:5
88:23 91:19 92:11
99:10 103:10,23
108:15 109:7,22
110:4 111:8 113:11
113:15 114:21
115:9,21 116:4,12
118:25 119:20
120:22,24 121:4
122:25 124:3,5,19
125:20 131:5
132:21 133:18,25
134:13 140:12
145:22 147:15
148:2,6,15 149:16
151:12,13,14,21

152:13 153:5
155:10 160:14,22
161:9,15 165:3
175:13 176:10
177:5 178:25 181:2
181:21,23 182:12
183:5,10,23 185:17
185:18 186:12,20
189:6 190:11
191:16 193:19
195:7 196:14 197:3
197:13,19,25
199:14,17 202:5
203:2,9,11,15 204:5
204:9,18,24 205:22
206:15 207:19,24
208:2,7,10,13 210:7
211:15 228:17,18
230:25 238:10,16
240:11,13,24 242:9
242:20 246:2,17
248:20,25 250:6
251:15 252:3
**objections** 3:12 4:14
13:5 23:4 25:13
27:17 152:9 209:17
228:15
**observe** 86:25 103:20
**observed** 104:20,22
**obtain** 12:3,17 13:11
13:14 14:11 28:22
52:15 66:4 104:6
115:18 116:7
125:18 147:2
160:18 178:19
180:8
**obtained** 47:11
125:15 145:25
151:19
**obtaining** 146:18
**obvious** 167:14
231:18
**obviously** 91:23
236:17
**occasion** 210:20

**occasions** 78:11 87:4
167:20
**occur** 87:8
**occurred** 8:23 76:24
236:8 251:13,23,25
**October** 51:16,17
222:24
**off-the-record** 44:14
54:16 81:21 95:12
126:16 210:17
218:12 228:12
230:19 234:20
**offense** 23:10
**offer** 31:15 59:14
127:23 128:5,19
138:3,14,16,25
**offered** 31:12 76:12
94:20 127:24 128:3
128:25 129:3,7
**offering** 44:3 98:11
**offers** 31:6
**office** 80:2 82:18
212:16
**okay** 5:9,12 6:7,10,13
6:16 8:4,5,19,20 9:2
9:3,7,8 11:24 27:17
34:18,19 36:6 45:8
68:2 81:12,16 82:9
96:4 104:19 110:8,9
114:4 116:21
120:10 137:19
138:20 142:22
144:22 163:8
172:25 178:18
184:10 185:14
188:6 207:6 220:18
222:23 225:18
226:15,21,22 230:4
235:14,15 239:22
241:19 247:8
250:14
**old** 16:24 90:25 91:3
146:9,12
**once** 45:16 60:25
64:13 72:14 79:5

80:14 83:5 137:10
146:4 174:10
181:15
**one-hour** 232:22
**one-off** 191:14,19
**ones** 83:20 112:24
**onwards** 208:3
**opening** 53:7,9,13
**opportunity** 46:5
82:2 246:16
**option** 64:9 233:13
**order** 28:22 39:8
48:19 62:21,22
120:9 178:18
196:23 205:16
212:17 227:18,21
244:4,15 246:21
254:17
**ordered** 227:22
**original** 68:3 119:8
238:4
**outbound** 188:17,20
190:16 193:7,9
**outcome** 255:15
**Outlet** 1:7 5:9 6:2
11:17 12:4 13:16,22
14:13 33:19,22,24
34:7,21,22,22,24
35:5,6,13 36:7,13
36:22 48:7 50:9
55:14,22 57:12
66:24 74:20 77:9
97:20 116:23 117:3
118:8 121:9,14,22
121:25 122:5,15,18
122:22 124:17
125:14 131:20
134:21 138:4
146:22 156:15
158:21,25 159:25
160:5,19 182:14
210:20 231:23
237:16 249:20
**Outlet's** 107:24
**outlined** 75:13

A0278

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 87 of 102 PageID #: 896

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

278

**outside** 75:6 177:24
 178:4,7 179:21
 250:3
**overall** 180:22 194:2
**overlap** 7:16
**overwhelmed** 88:5
**owed** 42:11,14,16,18
 44:21 109:2
**owner** 53:6,12
**owners** 128:24 158:5

**P**

**P** 2:2,2 70:12 203:24
 204:2 254:9
**p.m** 143:10,12 187:22
 232:20 252:15
**packet** 108:5
**page** 80:23 163:7
 168:18 170:5,15
 171:10,14 185:12
 235:16 247:23
 253:6,9,14 254:4
 256:5
**pages** 11:2 142:25
 162:10 168:13
 217:18 218:14
 245:13
**paid** 34:22 37:7 38:9
 39:15,18,20,24 40:9
 41:11,14,18,21 42:9
 42:18 43:2 44:22
 85:6,7 109:3 120:6
 120:17 135:16,19
 136:6,10 166:24
 167:13,15 210:12
 210:14 214:6
 218:23,24
**Pamela** 227:19
**paper** 82:20
**paragraph** 86:12
 173:15,23 174:10
 175:4 177:23 178:9
 235:13
**paragraphs** 81:4,16
 179:2

**parenthesis** 168:19
**parlance** 35:19 234:3
**Parsons** 87:13
**part** 25:3,18,19 26:12
 64:13 65:7,11 67:9
 92:3 96:14 99:23
 110:19 111:3
 130:10 133:17
 157:7 178:16,16,18
 178:19 182:5
 192:10 213:18
 220:18 229:15
 241:13 244:15
**partially** 68:25 82:13
 101:3 114:11
 178:10 191:25
 239:17
**participate** 58:4,13
 58:23 230:8
**particular** 162:7
 164:13,20 165:21
 166:18 170:23
 185:21 186:5
 187:11 197:21
 202:14 208:23
 209:4,9 211:18
 214:10 221:22
 235:13
**parties** 3:4 255:13
**partner** 56:25 57:2
**party** 26:8
**password** 45:17
 47:18,20,22,23
 91:25
**Pathfinder** 199:25
**pay** 10:23 60:18
 76:18 95:22 101:8
 101:13,19 103:17
 114:23,24 128:21
 150:13 158:19
 167:2 212:22
 213:24 214:3
 218:16 219:2
 220:15 224:8
 233:18 236:4,8

**paying** 126:10
**payment** 194:22
 239:8,11
**payroll** 38:13,18
 213:2
**paystub** 101:7 167:4
 167:7 213:18
 215:13,23 217:14
 218:19
**paystubs** 37:10 43:6
 65:9,19 101:11,14
 101:24 145:4
 150:16,17 168:14
 169:8 190:9 215:10
 218:6
**peaches** 114:12
**penalty** 7:6 15:3
**pending** 9:5 171:2
**people** 8:12 35:14
 38:19 64:18 78:8,10
 89:14,20,22 90:2
 140:4 142:11,12
 144:13 148:20
 170:16 182:17
 190:8 192:16,17,20
**percent** 37:9 42:23
 42:25 43:3,21 44:3
 44:6 45:10 48:14,22
 49:3,10 50:18 59:19
 75:9,13 76:3,19,24
 112:12 138:2
 164:24 166:6,14,17
 167:3,9 168:14
 182:22 214:13,22
 215:2 216:25
 220:13 240:8,15
**percentage** 136:13
**perception** 182:25
**perfectly** 68:15
**performance** 77:13
**performed** 209:5
**performing** 200:19
**period** 20:13 36:24
 47:19 91:23 93:24
 103:3 123:8 137:25

 150:5,10 159:7,17
 213:24 214:3 222:4
 224:8 229:5
**periods** 192:19
**perjury** 7:6 15:3
**permissible** 10:4
**persisted** 244:16
**person** 10:9,11 43:7
 56:19,22 63:11 89:4
 92:8 96:10 131:9
 140:18,21,22 194:6
 230:10 232:10
**person's** 98:6 196:10
**personal** 71:24 99:21
 99:23 107:6,15
 204:7,25 205:3
 206:16 207:20
 208:6 244:21 248:5
**personality** 71:6
**perusing** 244:9 247:7
**phone** 140:19 141:23
 142:3 145:25 146:2
 146:9,12 155:23
 230:3
**phonecall** 56:6
 185:12 188:17,20
 190:24 192:25
 193:5,7,9 195:23
 212:4 242:4,13,15
**phonecalls** 190:17
**phones** 141:22,24
**physical** 112:16
**physically** 74:4 86:17
 237:16
**pick** 177:11
**Picked** 233:12
**picture** 70:2 169:22
**pictures** 40:23 41:3
**piece** 89:23
**pieces** 38:11
**pinpoint** 102:17
**pissed** 61:19
**place** 31:24 57:9
 80:19 91:4 100:19
 100:22 127:13

A0279

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

279

130:12 148:22
153:4,4,4 232:2
233:16 235:7
**placed** 161:24 172:16
226:8
**places** 127:6,18,19,22
128:10 130:5
153:22 225:23
**placing** 154:6 184:12
243:23 245:6
**plaintiff** 1:4,16 2:3
4:3 24:3,18 26:9
104:4 154:21
157:17 158:13
162:14 173:24
179:3 227:22 228:4
228:6,15 235:21
236:24 248:13
**Plaintiff's** 24:17
103:19,25 143:21
163:2 235:16 236:3
244:16 246:24
247:25 253:17
**plans** 41:6
**plausibly** 236:24
**play** 109:18 162:17
212:13 241:4
**played** 91:4 92:3
110:19 157:6
241:11
**playing** 108:12
**plays** 88:3
**pleading** 23:24 24:11
**pleasantries** 59:12
61:6,12
**please** 5:9 8:7 13:23
27:4 49:8 68:19
91:16 102:12 104:6
113:18 119:22
152:12 155:9
161:17 181:22
183:19 184:5
208:21 240:6 242:8
242:21 243:3 245:4
245:23 246:11

249:3
**pleased** 104:13 201:9
**pled** 24:3
**PLLC** 2:3,8 248:12
**plus** 166:10 172:12
**podium** 70:9 86:20
96:18
**point** 20:12 43:20
48:12 68:7,13,19
72:2 79:5,11 81:15
82:21 84:6 87:12
90:23 91:6 92:15
93:12 94:25 95:7
98:23 99:2 103:7
108:20 138:22
159:25 198:11
201:20 212:18
231:17 232:12
235:12
**points** 110:20
**Police** 21:21 253:16
**policy** 107:24 108:3
**pop** 58:20
**portion** 247:18,21
**position** 33:5 36:13
44:23 45:3 52:15
55:21,25 64:14 77:3
89:3,18 91:2 94:17
94:20 95:6,9 98:11
127:25 128:20,25
129:3,8 158:17
252:8
**positions** 114:2 128:2
130:3 158:9
**positive** 20:20
**possession** 39:11
146:10
**possibility** 168:6
219:14
**possible** 167:17
189:18,20 193:4
205:19
**possibly** 138:6,15,23
189:14 192:24
221:8,11

**post** 118:6,18,22
146:16,21,22,25
**posted** 117:21 118:3
119:4 146:17
**potential** 85:2 179:17
238:7,24
**potentially** 242:23
**power** 95:18,21,24
**prefill** 176:18 235:19
**prefilled** 177:8
**prefilling** 82:12
**pregnancy** 44:21,24
45:2 71:9 72:3,10
73:3,7,23 76:25
78:14,25 79:3,7,10
80:10 82:11,25
83:10 91:12,14 92:5
92:9,19 93:13,14
96:22,24 98:4
106:11 107:7
108:12 109:15
110:14 150:21,25
157:2,5,7,15 179:10
179:14 200:22
201:2,4,14,16 224:9
237:3
**pregnant** 61:22 69:15
69:18 72:22 73:2,10
90:25 96:5 99:22
100:2,3,10,18
107:12 109:19
110:2 112:14 113:9
137:21 232:2
250:15 252:2
**preparation** 11:12
15:20 16:4
**prepare** 9:20,22 10:6
10:12
**prepared** 173:12
212:17
**preparing** 93:5
**prequalification**
194:11 196:19,25
197:4
**presence** 70:7

**present** 2:12 21:14
58:16,19 59:2 69:21
69:23 96:15 230:13
251:2,13,24 252:5
**presented** 21:23
138:14
**presenting** 246:19
**presided** 244:5 245:9
**press** 78:6
**pretty** 10:21 19:13
20:4 33:14 40:3
54:5 59:13 61:7
62:13,17 72:8 82:16
94:5,10 106:14
108:6 123:5 130:11
131:14 140:5
141:22 142:12
146:7 182:7 238:20
**prevent** 66:3
**prevented** 114:9
159:16
**previous** 89:25
219:14 246:21
**previously** 137:15
139:8 143:15 172:4
244:5 245:9
**primarily** 6:21
**primary** 36:16
**Prince** 171:5
**prior** 18:7 19:2 21:24
34:5 38:5 67:11
71:8 72:9 73:10
76:24 79:21 80:9
82:10 99:5 105:22
116:22 117:2
118:13 123:4,9,22
125:4 129:6 132:19
132:20 133:2,8,23
134:9 146:2 150:13
172:8,8 179:12
197:6 215:14,20
216:11 217:5,25
220:3 227:20
228:23,25 231:13
250:20 252:10

A0280

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

280

**prioritized** 89:6
  237:22
**prioritizing** 237:12
**privilege** 148:7
**probably** 38:24 48:17
  52:16 53:19 60:24
  68:23 72:13 79:22
  100:4 118:16 123:5
  123:6 129:20
  141:23 172:2
  180:17 182:16
  209:5 212:17
**problem** 4:24 18:14
  22:7 184:5
**procedure** 4:20 65:8
**proceed** 25:9 26:3
  151:15 228:8
**process** 63:7 65:15
  106:16 161:11
  181:18 194:16
  196:4
**processed** 106:11
  182:11 237:24
**processing** 106:7
**procure** 199:12,16
**produce** 25:2,19
**produced** 41:4 145:4
  149:4 240:3,5,12,14
  240:16 241:13
**producing** 145:3
  241:3
**production** 24:24
  25:3,20 143:5
  215:24 240:4
  241:14
**professional** 30:21
  71:13,13,14 179:16
  184:9 242:4,15
**professionals** 116:24
**profile** 174:4,11
  178:2
**profit** 43:13 164:5
  165:22 167:6,18
**program** 84:23,25
  185:8 235:18

**programs** 31:3,7
**promise** 142:21
**promised** 44:23 76:6
  90:13 92:20 231:19
**promote** 92:4 94:18
**promoted** 90:14
**promoting** 90:17
  92:14
**promotion** 92:17
  93:2 231:18 250:18
  251:13,23
**promptly** 106:3
  107:3
**proof** 65:9 190:8
**proper** 27:2
**properly** 38:9 41:14
  41:21 42:10 83:6
  89:19 176:11
  178:14 238:19
**proposed** 228:7
**prospective** 64:23
  174:3
**protection** 164:10
**prove** 104:7
**provide** 4:21 9:13,17
  14:16,18 28:11,23
  29:2,14,17 87:3
  115:13 136:2
  156:16,23 179:22
  195:21 243:8
  246:24
**provided** 5:20 10:21
  16:18 28:14 105:8,9
  110:7 137:15 145:8
  145:11 173:25
  239:6,14
**provides** 17:19
  116:18 156:17
**prying** 148:7
**psychological** 112:9
**public** 1:19 3:5 4:4
  4:16 21:20 22:2
  23:14 252:21 255:5
  256:20
**publicly** 17:20

**Puerto** 133:6,13
**pull** 174:3
**pulled** 174:11 181:7
  181:9 201:12
**pulls** 177:25
**punished** 248:14,19
**punitive** 153:21
  155:4
**purchase** 83:16 84:9
  160:9 161:3 174:12
  180:23 190:21
  207:5
**purchased** 160:2,6
  185:7 189:17
**Purely** 122:25
**purpose** 94:11 230:2
**purposefully** 67:5
**purposely** 88:21
**pursuant** 1:17 4:20
**pursue** 147:21
**pursuing** 147:22
**push** 252:8
**pushed** 24:9 237:20
**pushing** 157:8
**put** 47:20 80:5 85:23
  89:3,21 90:20 91:2
  131:10 140:25
  143:4 151:25
  188:22 194:22
  205:25 222:16
**puts** 120:22
**Putting** 22:14

**Q**

**Q50** 160:10
**qualification** 10:7,19
  225:19
**qualified** 62:16 89:9
  181:10
**qualify** 45:20,22 46:8
  46:10,21 47:4 49:4
  83:21 89:11 174:17
  176:17 189:17
**qualifying** 174:17
  178:13 234:11

**Queens** 48:10 53:10
  127:24,24 128:6,19
  129:25,25 158:7
**question** 6:22 8:9,16
  8:19 9:5,6 12:9,14
  12:16,25 13:9 14:3
  18:11 19:15 23:6,7
  23:8,18 27:4 34:13
  34:16 35:23 41:16
  46:14 49:5,6,8
  58:22 65:11 66:8,10
  68:4,21 72:12 75:22
  82:9 89:10 91:17
  93:20,22 99:12,16
  102:13,21 103:12
  103:13 105:3,4
  108:17,18 110:6,21
  113:12,18 118:11
  120:3,9 124:8,22,24
  124:25 138:9,11,21
  149:21,23,24
  153:21 156:20
  161:23 170:21
  172:20 181:24
  183:4,7,13,22
  199:15 207:14
  216:13 217:10
  218:18 220:21
  228:21 231:6
  238:14,18,22 242:8
  242:10,11,21 243:3
  245:19,23,25 246:6
  246:11,15 247:19
  248:21,22,24 249:3
  251:6,17,19,20
**questioning** 229:17
**questions** 3:12 6:4,25
  7:16 9:18 22:15,19
  22:22 23:23 45:5
  63:7 74:23 81:14,14
  81:25 146:17
  162:22 163:5
  228:14 230:21
  235:13 241:6,19
  247:9,12,21 251:8

A0281

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 90 of 102 PageID #: 899

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

281

252:13
**quick** 22:16 25:16
    62:13 81:10 182:5
    182:21 226:4
**quicker** 64:12 82:24
**quickly** 40:2 182:7
    237:24 238:6
**quit** 32:18,22 36:10
    37:11 44:16,19 45:6
    45:9,12 48:6 52:7,9
    60:21,25 79:9
    108:14 125:4,10
    225:16 230:22
    231:7,14,21
**quite** 15:23 20:8
    43:17 127:20
**quote/unquote**
    248:11

### R

**R** 2:2 4:2 143:14
    207:16,18 254:11
    255:2
**R-a-s-k-e-s-n-i-a**
    155:14
**raggedy** 89:20
**raise** 94:19 231:20
**raising** 231:9
**ran** 177:8 178:12
**ranges** 175:7
**rare** 67:23 69:7
    182:22
**Raskesnia** 50:4
    155:14
**rate** 75:8
**ratio** 192:13
**RAV4** 202:16,20
**reach** 60:18 61:14,16
**read** 5:23 13:3 35:22
    35:23 46:15,16 66:9
    66:10 68:4,21 91:16
    91:17 94:12 99:15
    99:16 102:12,13
    103:13 105:3,4
    108:18 118:10,11

138:10,11 156:20
176:20 204:8 205:2
206:17 207:21
208:4 235:5 238:13
238:13,14 244:6
247:5
**reading** 188:11 244:8
**ready** 75:2 81:13
    131:3 163:5 191:2
    193:10 241:8
    243:20
**Real** 125:25
**realistic** 187:9
**realistically** 123:4
    187:4 192:15
**realize** 8:22 100:20
**really** 24:9 31:4
    38:23 41:2 52:24
    60:6 61:18,21 62:18
    67:16,20 73:25 84:2
    85:17 89:2,4 90:4
    90:12,18 91:5 92:13
    93:22 97:19 105:24
    107:7,10 108:7,13
    117:14 124:13
    127:22 144:17
    163:18 193:13
    209:12 215:9
    219:15 226:16
    233:15 236:16
    238:21 249:21
**realm** 250:3
**rear-ended** 160:16
**reason** 9:5,16 35:15
    41:13,19 42:8 44:19
    55:17 68:25 69:11
    79:3 86:5 87:21
    100:9 109:20
    128:18 129:9 157:7
    161:11 175:10
    179:20 180:3,11
    191:8 201:5 231:7
    231:14 232:4 234:9
    250:3 256:5
**reasons** 114:3 236:13

238:9
**recall** 11:22 31:20
    44:12 55:10 56:21
    59:14 60:6 70:19,20
    70:22 72:5,20 73:14
    77:10,19 78:15 87:9
    94:23 95:10 96:17
    98:14 119:3,12,15
    132:4 136:7 139:10
    140:2,16,25 141:16
    142:9 159:9,12
    171:2,5,21 195:19
    198:9 200:14 201:7
    207:3 218:9 220:19
    226:13
**receipt** 108:3 234:25
**receive** 37:9 60:25
    77:13 88:12,15
    115:16 159:6
    164:19,24 166:18
    166:25 167:22
    172:12 175:5 217:6
    219:2
**received** 38:2,4 39:12
    105:18 120:17
    135:11,19 136:10
    136:16,18,22 137:3
    137:4,6 138:3
    158:19,21 159:14
    164:16 168:12
    214:3 219:4 227:11
    227:12 235:22,23
**receiving** 37:12 43:4
    44:23 45:9 59:14
    157:13 160:24
    214:13 220:13
**recess** 24:21 143:10
    226:6 249:16
**recognize** 143:23
    149:5 162:8 184:19
**recollection** 8:21 9:2
    56:11 172:8 173:19
    187:10 249:18
**reconvene** 226:5
**record** 4:12 21:20

22:11,12 23:14 24:2
24:17 25:16,17 27:9
28:10 44:13 54:15
68:5,8 81:15,20,23
95:11 103:18
126:15 143:8
151:15 152:2
161:22 162:4,12,18
162:25 183:25
185:20 210:16
215:20 218:11,19
220:4 228:11,13
230:18 234:19
241:12,17 243:18
244:11 246:9
247:23 253:16
255:10
**recorded** 120:5
    241:15
**recording** 241:4,20
    254:16
**records** 77:19 141:4
    141:15 193:17
**recount** 248:15,19
**recovered** 113:25
**recruiters** 130:23
**redact** 17:20
**redacted** 17:14,22
**reduce** 214:8
**refer** 5:8,11 6:6,9,12
    6:15 57:2 115:3
**reference** 162:15
    248:4
**referred** 35:23 43:7
    46:16 66:10 68:21
    91:17 99:16 102:13
    103:13 105:4
    108:18 118:11
    138:11 156:20
    166:21 238:14
**referring** 5:14,19
    194:10
**refers** 164:4,8
**reflect** 22:11 24:2,17
    43:6 103:18 161:22

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 91 of 102 PageID #: 900

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

282

162:12,18,25 167:3
167:7 183:25
185:20 241:12
244:11
**reflected** 37:9
**refused** 45:19 91:25
**regard** 25:8,24
105:11
**regarding** 156:8
193:5
**regardless** 239:4
**registered** 182:18
**regular** 218:16
**reinstatement** 138:4
138:17,25
**reiterated** 202:19
**rejected** 128:5
138:25
**related** 7:2 45:6
74:20 81:15 255:13
**relates** 27:10
**relating** 71:21
**relation** 64:16 106:7
**relationship** 62:9
66:24 75:5 84:20
129:21
**relatively** 40:2 182:5
182:21
**relevance** 113:16
116:12 131:5
132:21 133:18,25
134:13 147:15
148:2,16 160:14
161:9 185:18
242:18
**relevant** 113:12,13
115:22,23,24
144:25 242:16
**remain** 229:5
**remained** 75:9,14
76:15,18 77:3
**remains** 217:6,25
**remember** 11:24
20:6,9 21:4 31:24
32:2,7,14 33:15

38:16 43:19 47:17
49:13,18,19,21 53:8
53:11,18,24 55:11
56:9,13,23,23 62:2
64:16,18 69:24 70:2
70:10,11 71:17
72:13,23 73:4,5,8
73:22 84:12 94:23
97:4 100:8,12
107:21 120:6
124:14 133:5 134:3
134:4,15 141:2
148:17 161:4,14,21
167:19 171:25,25
188:23 192:9
193:13 195:9 198:9
200:11 201:15,16
206:24 219:18
227:9 234:6,10
249:21
**remembering** 96:6
**remote** 68:12
**rent** 16:19,20
**rep** 187:25 190:18,25
193:8,9 195:17
**repeat** 12:16 13:9
23:8 49:9 103:12
124:9 161:20
199:15 242:10
**repeatedly** 162:15
**repeating** 207:22
**rephrase** 8:17 49:6
99:12 100:5 125:2
251:19
**rephrasing** 99:13
**replaced** 142:2
**report** 59:21,23 60:4
62:9 170:4
**reported** 59:24 60:13
61:8
**reporter** 8:7,8,11
35:24 46:17 66:11
68:22 91:19 97:17
102:14 103:14
105:5 108:19

118:12 138:12
156:21 238:15
255:4
**reporting** 60:11 62:7
**represent** 21:19
80:20 143:21 144:4
149:3 173:11
184:13 212:25
213:17 215:12
219:19 220:16
227:18,20 235:11
244:3 245:7
**representative**
173:16 188:22
**representing** 4:17
147:5,7 245:11
**represents** 248:13
**reproduced** 145:4
**request** 20:17 24:24
25:3,18,20 29:8
157:20 158:15
163:2 238:6 246:7
246:13 247:10
**requested** 25:17
178:3 179:24
**requests** 155:13
248:12 253:9
**required** 196:4,7
239:8,11
**research** 127:22
**reserve** 7:17
**reserved** 3:13 4:14
**resolved** 114:6
**resolving** 245:10
246:22
**respect** 93:2 102:21
106:6 110:13
117:20 123:25
124:12,17 128:2
137:14 158:17
170:23 200:19
201:6 232:14
**respective** 3:3
**respectively** 165:22
**respond** 181:15

**responded** 92:23
**response** 49:5 94:22
96:8,11 97:3 154:23
155:12 156:13
157:10,17 158:6,13
158:18 177:21
180:2 229:15
241:14 248:23
253:11,11,19
**responses** 102:22,25
154:7 246:24
**responsibilities** 36:19
36:20 74:13
**responsibility** 36:16
47:2
**rest** 124:6
**restaurant** 233:14
**restaurants** 233:8
**restore** 146:2
**result** 83:14 111:17
112:5,9,17 124:2
**results** 85:3 193:5
**resume** 56:7 130:3,11
**resumed** 143:15
**retained** 254:19
**return** 51:15 53:2
66:16 90:13 131:3
138:7
**returned** 90:6 94:2
94:15 123:18 138:5
185:22 234:5,9
**returning** 19:25
24:19
**review** 4:22 10:16,18
11:7,9,11 15:19,20
22:18 81:5 82:2
218:18 245:16,20
**reviewed** 154:24
218:14
**reviewing** 247:11
**Rico** 133:6,13
**ridiculous** 152:8
**right** 4:10 7:18 11:4
15:12 22:20 23:11
23:13 28:2,16,20,21

A0283

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

283

| | | | |
|---|---|---|---|
| 29:15 33:8 34:9 | **ring** 38:20 | 238:8 239:16,19,20 | 94:23 100:25 |
| 35:12,17 36:15,18 | **rings** 66:19 | **sales** 38:12 47:6 | 101:14 109:13,16 |
| 39:3,9,10,13 40:17 | **rise** 72:2 | 49:14 53:17 54:19 | 109:21 123:16 |
| 41:21 43:14 44:17 | **Road** 54:13 | 65:8 67:10 80:3,6 | 150:12 166:5 |
| 45:25 47:10,12 | **Robert** 163:21 | 83:24 84:4,5 88:22 | 168:25 177:3 |
| 49:23 51:14 54:8 | **role** 82:15 94:3,9 | 89:18,24 90:14,18 | 178:15 189:12 |
| 55:20,24 57:8 60:2 | 108:12 212:13 | 90:20 92:3,4 93:16 | 193:23,25 201:13 |
| 60:11 61:4,10 62:12 | **rolling** 226:17 | 93:18 94:4,7,10,16 | 203:6 209:10 |
| 62:24 63:5 64:11 | **Ron** 58:22 59:4 61:14 | 99:8 174:2 177:25 | 215:16 222:17 |
| 66:22 76:3,4 79:2 | **Ronald** 1:9 5:7 6:15 | 178:5,8 179:7 | 227:7 231:22 236:7 |
| 81:17 83:12 84:21 | 6:16,19,21 59:2 | 212:20 236:13 | 246:19 250:24 |
| 88:8,15 93:15 99:24 | 61:8 156:24 157:10 | 237:5 250:17 | **says** 13:3 22:25 23:15 |
| 99:25 105:13 106:9 | **room** 169:14 | **salespeople** 31:7 | 69:10,12 163:20,24 |
| 109:11 111:6 | **ropes** 82:16 101:21 | 46:23 47:8 69:23 | 163:25 170:6 |
| 120:16 122:9,10,12 | **Roughly** 122:16 | 70:24 87:3,8 89:7,8 | 173:15,23 174:10 |
| 123:20,21 126:19 | **routine** 80:15 | 169:15 179:7 | 179:2,19 180:6 |
| 127:16 130:24 | **rule** 5:24 13:3,24 | 214:21 233:3 | 184:22 186:16 |
| 131:14 136:11,16 | 17:19,23 208:10 | **salesperson** 34:20 | 187:18,21 188:3,16 |
| 140:4 141:18 | **rules** 4:20 8:3,13 9:9 | 36:14 46:20 47:4 | 188:24 189:9,14 |
| 144:10 145:2,6,13 | 17:14 | 55:22 59:24 70:11 | 190:13 195:17,24 |
| 145:21 146:3,20 | **run** 35:13 53:9 62:15 | 77:22 79:12 83:25 | 199:6,24 200:5 |
| 150:10,20 154:25 | 62:22 64:22 67:2,7 | 87:15 100:22 | 201:22 202:14,23 |
| 155:4,5 156:22 | 67:8,10,14,15,23 | 101:22 103:9 105:9 | 204:14 205:11 |
| 158:10 165:15 | 69:13 82:18 87:25 | 173:24 187:7 | 206:12 207:4 |
| 166:4,7,8,16,24 | 88:4,7 94:11 162:14 | 214:19 | 227:21 228:2 |
| 168:11,11 171:13 | 176:17 193:6 | **salesperson's** 80:4 | 235:16 236:2,24 |
| 174:8,9 176:9,24 | 196:22 235:18 | **salespersons** 179:5 | 248:9 |
| 177:10 178:17,21 | 236:17 237:11 | **saleswoman** 79:11 | **scared** 91:2 111:20 |
| 178:24 179:9 | **runaround** 90:24 | **sanction** 104:4 | 111:25 112:4,8 |
| 181:19 185:3 190:5 | **running** 89:12 | **sanctioned** 248:14,18 | 117:4 |
| 190:9,18,19,23 | **Ruthayn** 1:19 4:4 | **sanctions** 183:14 | **schedule** 37:14,17 |
| 191:24 192:5,6 | 255:4,21 | **Sanitation** 147:4 | **scheduled** 229:22 |
| 194:19,24 195:3,4 | | **sat** 82:17 128:9 192:7 | **school** 19:14,14 |
| 197:18 198:15 | **S** | 202:7 | 29:25 30:6,11,12,13 |
| 199:20 204:20 | **S** 2:2 4:2 143:14 | **satisfied** 41:14,21 | 30:19,22,24 31:21 |
| 207:9,11 211:8 | 209:14,16 253:13 | 42:9 | 135:2 |
| 212:3,6,9,12 213:16 | 254:3,12 | **Saturday** 37:25 | **schools** 30:10 |
| 214:2,14,24 215:5 | **S's** 206:21 | 195:2 | **scores** 89:21 235:19 |
| 217:2 219:13,23 | **salary** 39:4 50:16 | **Saturdays** 85:12 | **screen** 80:19 81:18 |
| 220:2,6 221:3 | 214:4,7 | **saw** 80:14 82:16 | 103:20 104:2,24 |
| 222:11 223:12,16 | **sale** 45:24 46:3 71:21 | 123:24 124:11,13 | 142:23 148:22 |
| 223:20,24 224:14 | 85:3 88:11 107:9 | 187:6 224:25 | 154:6 161:24 |
| 224:17,21 225:6,10 | 164:5 165:21 | **saying** 8:12 14:5 41:9 | 165:25 172:16 |
| 225:14,25 233:7 | 166:10 173:25 | 43:10 51:7 56:24 | 184:12 222:3,17 |
| 244:7 249:15 | 186:23 207:8 238:2 | 67:18 70:20,22 83:2 | 226:8 235:7 243:23 |

A0284

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

284

| | | | |
|---|---|---|---|
| 245:6 | **seeing** 154:14 | 173:12,15 175:4 | 150:17 187:24 |
| **scroll** 80:22 144:3 | **seek** 111:5 112:25 | 176:19 177:23 | 215:9 217:18 |
| 154:11 162:10 | **seeking** 111:9,12 | 207:15 212:16 | **showed** 82:18 90:10 |
| 205:8 245:12 247:6 | 114:9 118:23 | 253:22 | 167:2 168:7,16 |
| **scrolled** 163:3 167:24 | **seen** 22:5,17 38:24 | **Serge's** 80:2 | 236:15,16,18 |
| **scrolling** 215:8 | 89:20 90:2 97:15,16 | **Series** 199:7,9,11 | **showing** 94:11 |
| **seal** 4:13 | 163:12 172:21 | **Serrano** 155:20 | 110:14 217:13,14 |
| **sealing** 3:8 | 173:4,13 180:13,15 | **served** 173:16 | **shown** 236:12 |
| **Sean** 70:10 87:10,10 | **self-employed** 65:18 | **session** 143:12 | **showroom** 186:16,22 |
| **search** 131:3 134:12 | 135:7 | **set** 63:6 134:10 | 187:21 188:4 |
| 148:13 | **self-incrimination** | 154:19 162:7 | 197:17 207:2 |
| **season** 225:4 | 23:21 | 169:17 188:14 | 209:19 211:25 |
| **second** 8:7 119:24 | **sell** 31:6 42:17 118:7 | 190:5 194:25 197:9 | **shows** 101:13 150:5 |
| 126:12,21,25 131:4 | 128:14 167:18 | 200:2 202:20 208:2 | 168:15 170:12,14 |
| 134:18,22 135:21 | 168:15 170:19 | 232:25 255:8,17 | 196:21 210:3,4,14 |
| 163:7 201:23 | 198:25 199:4 | **sets** 11:6 | 214:5 215:20,22 |
| 224:15 225:11 | 212:10 217:7 218:7 | **settlement** 143:5 | 216:10 |
| 227:24 228:2 | 218:20,22 220:21 | 230:3 | **shut** 183:24 184:2,9 |
| 229:21 247:5 248:4 | 224:22 226:19 | **seven** 77:18,20 | **sick** 52:25 |
| 251:5 | **selling** 36:16 79:15 | 113:13 172:5,6,11 | **side** 111:23 237:20 |
| **second-to-last** 87:16 | 87:14 164:16 | 172:11 174:10 | **sign** 11:14 15:2 108:2 |
| **securing** 146:18 | 171:25 172:2 | 221:22 222:25 | **signed** 173:12 |
| **Security** 136:18,19 | 205:20 | 223:2,5,8 227:23 | **signing** 11:25 |
| **see** 23:16 46:5 51:7 | **sells** 131:17 | 235:16 | **similar** 73:11 |
| 86:3,15 87:5 108:7 | **send** 142:25 143:6 | **sex** 109:6,17 | **similarly** 88:14 |
| 124:18 128:10 | **sending** 141:16 142:9 | **Shalom** 1:19 4:4 | **simply** 179:24 |
| 131:8 144:6 148:5 | **sense** 82:25 91:5 | 255:4,21 | **single** 84:25 86:2 |
| 149:24,25 153:10 | 97:19 100:24 131:9 | **sheet** 163:20 166:22 | 127:9 170:20 177:4 |
| 153:23 155:15 | **sensitive** 47:19 | 166:23 167:5 173:5 | 192:7 |
| 163:22 164:2 | **sent** 4:17 22:11 56:5 | 253:21 256:2 | **sir** 13:19 22:4 49:6 |
| 165:11 167:5,17 | 60:18 136:5 143:22 | **sheets** 162:4 253:20 | **sister** 139:18 |
| 168:20 173:17 | 189:3 | 253:20 | **sit** 70:8 171:24 |
| 174:4,13 175:8 | **sentence** 236:2 | **Shore** 129:12 | 192:15 231:25 |
| 177:10,17 178:5 | **separate** 7:12,18 24:6 | **short** 5:20 24:21 | 233:8 |
| 184:23 185:15 | 157:24 214:6 | 36:24 42:14 93:23 | **sites** 118:20 |
| 186:18,24 188:5 | **separated** 213:11 | 226:6 249:16 | **sitting** 87:7 239:24 |
| 194:7 198:11 199:6 | 214:8 | **short-lived** 125:24 | **situation** 37:12 54:23 |
| 200:3 201:25 | **September** 18:6 | 126:6 | 61:13,15 98:2 |
| 202:17 205:14 | 51:16 132:4,16,19 | **short-term** 135:12,15 | 142:13 144:16 |
| 206:21 208:25 | 221:16,16 | 136:7 | 196:3,6 |
| 209:2,6 213:4 | **Serge** 63:20,21 64:16 | **shorted** 42:12 | **situations** 65:24 |
| 215:12,25 224:25 | 66:21,25 67:8,14,16 | **shortfall** 152:22 | 191:14 196:9 |
| 226:3 228:9 235:24 | 67:23 69:7 70:13 | **shot** 56:24 57:23 | **six** 37:20 51:13 80:23 |
| 236:5 237:7 239:23 | 87:25 88:5,7,14 | **show** 70:15 77:19 | 170:22 173:23 |
| 244:15 247:2 248:2 | 106:10,11 167:20 | 80:23 101:7,14 | 186:17,23 187:5 |

A0285

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

285

219:6,10 222:6,6
223:15
**six-month** 159:7
**skimmed** 82:3
**skip** 172:22 185:19
**Skipping** 226:2
**slash** 93:18
**slightly** 154:13
**slipped** 157:11
**slow** 54:10 79:14
97:17 217:9
**slower** 174:23
**smooth** 8:4
**Snapchat** 117:18,23
156:6,7
**sned** 144:21
**social** 117:7 136:18
136:19
**sold** 34:14,25 35:5,10
39:6,9 40:20 43:11
75:16 77:17 79:17
79:20,22,25 99:5,5
115:5 162:5 163:15
163:20,24 164:9,13
165:9,10,14,16
167:25 168:2,8,10
168:19,23 169:12
169:16 170:6,16,22
171:3,11,15,18,21
172:5,7 195:19,20
206:3,6 210:5
214:11,14 216:3,15
216:19 217:16
219:5,12,22 220:25
221:2,6 222:6,10,13
222:20 223:2,5,15
223:19 224:4,24
225:5,7,12,15,22,24
226:19,24 227:2,3
234:8
**sole** 36:13
**solely** 78:24 81:15
91:12 106:6
**solve** 42:20
**somebody** 46:12

97:24 100:2,18
108:21
**sonogram** 70:2,16
145:5
**soon** 59:21 176:2
**sooner** 98:22 100:6
173:21
**sorry** 11:10 23:8
32:25 35:21 42:7
52:8 60:24 67:7
75:11 91:15 97:10
102:11,23 112:21
118:9 119:14 125:2
127:7 145:9 156:19
159:11 160:17
161:12 181:3
189:19 199:13
222:14 237:21
238:12 250:8
**sort** 72:7 123:24
**sought** 116:23
**soul** 127:9
**source** 125:17 126:11
**Southern** 248:10,16
**speak** 10:4 12:3,17
13:11 15:13 72:15
84:4 91:9 108:22
174:23 183:16
195:7
**speaking** 8:22 13:5
27:17 37:6 86:9
105:21 180:22
182:6 246:2
**speaks** 149:16 186:12
186:20 190:11
197:13,19,25 203:2
203:9,15 204:18
205:22 208:8
**special** 103:8
**specific** 154:20
205:13
**specifically** 14:10
21:5 147:2 198:10
**Specify** 182:12
**Spectrum** 131:23

147:13,18
**spell** 50:3
**spends** 244:20
**spent** 131:2
**split** 12:11,13 214:20
220:11
**spoke** 56:25 57:5
90:5 128:12 129:19
142:12 148:20
156:3,6
**Sports** 54:12,20
127:14 137:20
**spot** 54:23 85:22
**spread** 10:22
**Square** 52:14
**squibbles** 72:17
**stamps** 28:6,10 29:20
**stand** 177:10
**start** 42:16 48:11,13
52:18 59:17 125:3
125:23 128:6
142:19 162:19
168:5 181:11
243:19,20
**started** 31:18 32:3,15
33:16,18,21 37:12
50:5 59:22 60:3,11
62:7,20 64:16 78:2
114:23 120:17
162:19 167:11
169:4 173:20
186:16 187:21
188:4 207:2 250:18
**starting** 169:20
185:11 190:3 222:4
**starts** 70:12 213:24
**state** 1:19 4:4 12:20
15:8 18:11 26:7
113:23 145:7,10
158:19 183:19
192:6,24 204:23
205:17 206:18
255:5
**stated** 169:13 250:13
**statement** 11:15

14:18,20 96:7 180:4
180:12
**statements** 12:3,17
13:11,14 14:12,16
71:3 97:21 100:14
139:9
**states** 1:1 17:25 18:9
191:13 220:16
**stating** 4:5
**status** 15:6 184:25
185:4
**statuses** 184:25
**statutory** 229:5
**stay** 33:17 91:6
122:23
**stayed** 51:3 93:8
133:22
**staying** 233:13
**step** 228:7
**stepfather** 16:22
146:24 147:2
**steps** 115:18 116:7
198:4
**stereotype** 89:15
**stereotypes** 90:3
**sticky** 47:21
**Stidhum** 1:3,17 4:1
5:1 6:1 7:1,22 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
16:12 17:1 18:1,2
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
26:6 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1

A0286

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

286

| | | | |
|---|---|---|---|
| 74:1 75:1 76:1 77:1 | 211:1 212:1 213:1 | **strip** 85:13 | **Sundays** 37:19 |
| 78:1 79:1 80:1,21 | 214:1 215:1 216:1 | **structure** 37:4 50:8 | **super** 54:9 128:21 |
| 81:1,23 82:1 83:1 | 217:1 218:1 219:1 | 50:11,20 75:12 | **superfluous** 124:6 |
| 84:1 85:1 86:1 87:1 | 220:1 221:1 222:1 | **stuck** 111:21 | **supervising** 45:18 |
| 88:1 89:1 90:1 91:1 | 223:1 224:1 225:1 | **stuff** 41:8 61:22 | **supervisors** 36:21 |
| 92:1 93:1 94:1 95:1 | 226:1 227:1 228:1 | 64:19 68:10 100:19 | 37:2 |
| 96:1 97:1 98:1 99:1 | 228:22 229:1 230:1 | 102:5 164:11 | **supplement** 157:17 |
| 100:1 101:1 102:1 | 231:1 232:1 233:1 | 193:21 | 158:13 226:21 |
| 103:1 104:1 105:1 | 234:1 235:1 236:1 | **stupid** 32:20 68:8,10 | **supplemental** 246:24 |
| 106:1 107:1 108:1 | 237:1 238:1 239:1 | **subject** 7:5 120:15,21 | **support** 115:16,19 |
| 109:1 110:1,6 111:1 | 240:1 241:1,20 | 121:4 151:22 | 116:7 |
| 112:1 113:1 114:1 | 242:1 243:1 244:1 | **subjects** 7:3 | **supporting** 131:12,15 |
| 115:1 116:1 117:1 | 245:1 246:1 247:1 | **submission** 177:21 | **supposed** 184:6 |
| 118:1 119:1 120:1 | 248:1,17 249:1,7,18 | 177:24 | 243:19 |
| 121:1 122:1 123:1 | 250:1 251:1 252:1 | **submissions** 176:13 | **sure** 18:14 22:7 24:9 |
| 124:1 125:1 126:1 | 252:17 253:1,4 | 176:16 | 29:6 31:19 36:5 |
| 127:1 128:1 129:1 | 254:1 256:4,5,18 | **submit** 65:24 66:5 | 40:14 43:17 48:13 |
| 130:1 131:1 132:1 | **stips** 4:9 | 67:16 88:6 130:2 | 48:14,22 49:3,10 |
| 133:1 134:1 135:1 | **STIPULATED** 3:2,7 | 176:21,23 177:3,7 | 50:3 53:25 57:18 |
| 136:1 137:1 138:1 | 3:11 | 177:13 | 59:19,20 64:20 70:5 |
| 139:1 140:1 141:1 | **stop** 13:24 27:16 | **submitted** 15:22 | 70:14 80:6 81:9 |
| 142:1 143:1,22 | 50:23 52:22 53:23 | 130:10,13 174:12 | 93:8 96:23 108:6 |
| 144:1 145:1 146:1 | 54:4 104:6,24 126:9 | **submitting** 175:17 | 111:14 112:11 |
| 147:1 148:1 149:1 | 142:18 151:7,10,11 | 181:8 | 118:5 119:11 120:4 |
| 150:1 151:1 152:1 | 183:19 184:4 | **Subscribed** 252:19 | 121:5,19 136:4 |
| 152:16 153:1 154:1 | 201:20 208:14,16 | 256:19 | 138:2 146:15,25 |
| 155:1 156:1 157:1 | 208:20,21 240:6,9 | **subsequent** 86:9 | 148:5 156:11 159:3 |
| 158:1 159:1 160:1 | 240:14,21 245:22 | 122:19 | 162:12 163:18 |
| 161:1 162:1,8 163:1 | 246:5,5,6,11,14,17 | **subsequently** 209:22 | 164:21 167:13 |
| 163:10 164:1 165:1 | **stopped** 45:9 220:12 | 241:15 | 169:10 170:10 |
| 166:1 167:1 168:1 | 220:17 | **subtract** 151:19 | 171:23 172:10 |
| 169:1 170:1 171:1 | **store** 51:22 53:7,9,10 | **Success** 2:9 | 174:24 176:20 |
| 172:1 173:1 174:1 | 53:13,14 61:17 | **sucks** 161:13 | 193:3 198:7,10 |
| 175:1 176:1 177:1 | 79:22 107:11 182:7 | **sued** 12:12 | 199:19,19 201:13 |
| 178:1 179:1 180:1 | 199:21 | **suffer** 112:4,14,16 | 219:2 229:12,24 |
| 181:1 182:1 183:1 | **stores** 128:8,16 | **suffered** 88:21 112:8 | 238:21 240:15 |
| 184:1 185:1 186:1 | **storming** 100:8 | 191:20 | 243:4 |
| 187:1 188:1 189:1 | **story** 127:21 | **suggest** 5:22 6:19 | **surprised** 234:15 |
| 190:1 191:1 192:1 | **strategy** 98:21 100:9 | 97:21 101:5,11 | **suspended** 77:11 |
| 193:1 194:1 195:1 | **street** 4:6 33:8 85:21 | **suggested** 100:14 | **sustained** 111:17 |
| 196:1 197:1 198:1 | **stress** 112:24 | **suggestion** 98:9 | **swearing** 15:2 |
| 199:1 200:1 201:1 | **stressed** 111:20 112:4 | **suing** 34:10 | **sworn** 3:5 4:3,15 |
| 202:1 203:1 204:1 | 114:13,24 117:4 | **Suite** 2:4,9 | 143:15 252:19 |
| 205:1 206:1 207:1 | **strike** 74:22 242:23 | **summer** 43:19 | 255:8 256:19 |
| 208:1 209:1 210:1 | 245:2 248:22 | **Sunday** 37:24 232:16 | **symptoms** 112:20,22 |

A0287

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 96 of 102 PageID #: 905

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

287

| | | | |
|---|---|---|---|
| 114:5,8 | 194:2 217:21 | 139:8 143:16 192:3 | 110:2 112:7 130:25 |
| **system** 84:17,18 | 221:24,25 230:10 | 232:14 | 133:3 136:12 |
| 85:25 162:6 163:16 | **tally** 80:5 169:15 | **testify** 172:4 204:6,25 | 142:20 144:17 |
| 195:13,17 205:24 | **taught** 63:2 | 206:16 207:20 | 182:24 208:3 |
| 209:24 210:4,6 | **taxes** 214:9 | 208:6 | 214:12 218:9 224:2 |
| | **team** 110:23 | **testifying** 7:7 | **third** 8:9 165:16 |
| **T** | **telephone** 155:24 | **testimonial** 243:21 | 215:3 224:18 |
| **T** 4:2,2 143:14,14 | **telephonic** 241:22 | **testimony** 7:5 9:13 | **Thomas** 165:11 |
| 211:12,14,16 | **tell** 8:17 9:25 10:4,19 | 46:16 82:7 85:24 | **thought** 91:4 98:21 |
| 253:13 254:3,13 | 12:23 15:16 45:14 | 88:20 91:10 123:24 | 138:21 173:21 |
| 255:2,2 | 70:4 78:7 79:5 | 124:15 132:9 | 252:6 |
| **take** 8:8 9:4,6 22:23 | 81:14 83:21 84:8 | 137:14 139:11 | **thousand** 76:10 |
| 24:11,12,15 26:2 | 86:23 95:8 96:4 | 145:16,23 165:4 | 126:5 |
| 40:4,23 41:2 81:7,9 | 135:18 146:13 | 174:6 177:6 251:16 | **thousands** 84:15 |
| 81:19 82:11 83:6,10 | 152:5,7 167:15 | 252:4 255:10 | **three** 10:8,12 16:25 |
| 89:5 100:22 107:2 | 183:11 188:11 | **text** 14:24 60:19 | 38:11,24 110:15 |
| 110:7 113:7 128:18 | 190:20 191:7 | 141:13 142:9 190:7 | 129:8 139:13 140:4 |
| 132:20 142:18 | 209:12 229:18 | 193:9 202:23 | 142:11 144:13 |
| 152:20 155:8 | 247:5 | **texted** 92:22 | 153:22 167:25 |
| 169:22 181:11 | **telling** 10:5 61:2 67:4 | **texts** 141:16,20 | 180:9,13 182:9 |
| 182:4,4 198:4 226:4 | 94:9 98:10,15 129:6 | **Thank** 27:9 50:17 | 192:16,17,20,22 |
| 234:5 247:4 | 157:3 183:16 184:8 | 154:16 155:10 | 198:22 202:7 |
| **take-home** 236:3,8 | 195:18 209:11 | 227:16 241:10 | 205:25 209:24 |
| **taken** 24:21 31:9 | 230:16 | 247:4,15 252:12 | 210:2 214:23 218:6 |
| 92:17 96:21 103:17 | **tells** 108:21 | **Thanks** 51:11 | 219:22 221:10,12 |
| 106:2,2 115:18 | **ten** 175:7 181:12 | **Thanksgiving** 224:2 | 223:23 224:19 |
| 116:6 132:17 135:4 | 224:4 232:2 | **Thanwalla** 1:8 2:13 | 227:2 236:21 241:5 |
| 176:6 214:9 226:6 | **Ten-minute** 33:14 | 5:6 6:9 | 243:12 245:24 |
| 234:16 237:20,21 | **ten-pounder** 167:21 | **therefor** 13:4 | **threw** 41:20 42:8 |
| 249:16 | **tend** 107:2 | **thing** 57:24 59:3 72:7 | 166:23 |
| **takes** 177:21 181:19 | **tended** 106:3 | 99:21 114:22,23 | **Thursdays** 38:3,4 |
| 182:25 198:25 | **tenor** 241:24 | 135:10,16 156:8 | **Tiffany** 2:5 151:7 |
| **talk** 90:22 94:24 97:5 | **term** 124:19,21 | 244:6 | 186:9 194:6 211:19 |
| 97:6 251:4 | **terminated** 159:22 | **things** 44:20,22,25 | **time** 7:24 8:13 9:4 |
| **talked** 45:3 55:4 | **termination** 134:17 | 59:11 62:25 65:18 | 15:23 18:4,7,17 |
| 113:23 114:5 141:5 | 136:20 213:3 | 68:8 80:17 98:16 | 19:16 20:2,12 21:2 |
| 146:16 | **terms** 39:18 67:19 | 100:24 101:20 | 24:8 28:8 31:18 |
| **talking** 11:18 12:5 | 73:9 95:25 113:22 | 144:5 180:21 | 33:11 34:5,24 35:4 |
| 13:15 14:9 19:5 | 145:3 160:19,20,23 | 193:18 201:20 | 35:21 36:12,24 |
| 82:22 93:5 118:13 | 231:5 | 243:5 | 39:22 45:18 46:5,6 |
| 119:9 124:4 132:10 | **territory** 131:24 | **think** 9:16 13:2,19 | 46:11,24 47:19 53:8 |
| 139:19 145:18 | **test** 151:6,22 | 25:4 29:22,24 41:6 | 57:25 58:12 60:5 |
| 146:25 162:11 | **testified** 4:7 44:16 | 53:25 71:5,24 75:21 | 62:13,20 64:12 66:8 |
| 180:17,19,20,21 | 102:8 124:10 | 85:11 96:5 100:17 | 67:13 71:8 72:10,21 |
| 183:8,12,22,24 | 126:18 132:3 137:6 | 101:10 108:20 | 72:21 73:10 79:6,9 |

A0288

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

288

| | | | |
|---|---|---|---|
| 79:14 82:10,11,21 | **timeframes** 101:18 | **touched** 87:6 | 68:5,9,14 72:11 |
| 82:23,24 83:5 85:13 | **timely** 239:14 | **tougher** 128:9 | 73:12,16 74:22 |
| 86:25 87:18 91:15 | **times** 20:8,18 38:25 | **TR** 254:14 | 75:21 76:21 77:5 |
| 92:24 93:3,16,17,24 | 39:15,25 45:12,14 | **track** 40:19 79:24 | 88:23 91:19 92:11 |
| 94:24,25 97:10,24 | 45:15,20 58:20 59:4 | 80:3,5,8 84:25 | 99:10,12 102:11 |
| 99:14 100:22 | 68:25 72:9 74:5 | 169:12,16 | 103:10,23 104:8,17 |
| 101:21,23 103:19 | 77:24 83:14,19 | **tracked** 188:19 | 104:25 108:15 |
| 108:17 110:13 | 84:11 102:9,16 | **trade** 196:2 199:25 | 109:7,22 110:4 |
| 118:15 119:7,9,11 | 104:21 128:25 | **trade-in** 195:3,24 | 111:8 113:11 |
| 119:24 122:4,9 | 129:8 159:6,7,15 | 196:6 | 114:21 115:9,21,24 |
| 123:8 125:9 127:10 | 172:11 180:18 | **Trader** 131:17,22 | 116:3,8,12 118:9,25 |
| 129:19 131:2 132:3 | 191:21 208:5,11 | **traffic** 54:24 128:11 | 119:14,20 120:20 |
| 132:20 134:19 | 245:25 | 182:8 | 120:24 122:25 |
| 135:24 138:21,23 | **tired** 90:23 184:4 | **train** 249:23 | 123:10 124:3,19 |
| 139:5 142:2,17 | 232:2 | **trained** 64:13 | 125:20 126:12 |
| 143:2 144:17 | **title** 36:13 | **training** 135:4 | 127:5 131:5 132:8 |
| 149:17,22 150:5,10 | **titled** 149:10 | **transaction** 182:11 | 132:21 133:18,25 |
| 154:14 156:3,19 | **titles** 47:6 | **transcript** 4:16,22 | 134:13 136:25 |
| 159:14,17,24,25 | **today** 6:25 7:5,9,10 | 17:16 255:9 | 137:11 138:8 |
| 160:4 162:14,15 | 8:22 9:14,18 15:14 | **transferring** 82:19 | 140:12 142:24 |
| 167:14 169:15 | 15:17 55:4 85:24 | **transpired** 73:4 | 143:7 144:20 |
| 171:24 172:9 | 155:21 202:17 | 230:15 | 145:22 147:15 |
| 175:20 177:3,4,10 | 228:3 252:13 | **travel** 134:6 | 148:2,6,11,15 |
| 178:12,14 179:3 | **today's** 9:20 | **treated** 103:5 105:11 | 149:16,21 151:5,8 |
| 181:14 182:9 | **told** 23:9 37:7 53:8 | 105:15,20,25 | 151:13,21 152:5,9 |
| 186:11 191:18 | 56:13 57:22 68:16 | 106:20,23,25 179:6 | 153:5 154:11,13 |
| 192:18 195:14 | 69:21 90:10 92:23 | 232:8 | 155:6 160:14,22 |
| 196:5 198:12 | 93:10 94:12,18 | **treatment** 112:25 | 161:9,15 162:10,17 |
| 201:23 205:14 | 96:24 98:18 107:21 | 116:23 | 162:24 163:7 165:3 |
| 207:10,23 216:5 | 111:21,22,22 129:5 | **Tree** 32:8,12,15,21 | 172:22,25 174:23 |
| 220:12,19 229:6 | 129:16 181:10 | 32:23 | 174:25 175:13 |
| 232:12,18,19,25 | 183:25 203:22 | **trial** 1:16 3:13 4:15 | 176:10 177:5 |
| 233:5 237:2,10 | 251:25 | 126:7 | 178:25 181:2,21 |
| 238:12 239:4 | **tomorrow** 186:10 | **triplicate** 166:22 | 182:12 183:3,7,11 |
| 243:21 244:21 | 204:15 205:12 | **trouble** 200:2 | 183:16,21,25 184:8 |
| 247:11,13 252:12 | **ton** 130:5 | **Troy** 2:3,5 4:11,19 | 185:17 186:12,20 |
| 252:15 | **top** 22:3,25 77:22 | 5:14,21 6:18 9:23 | 189:6 190:11 |
| **timeframe** 18:8,13 | 79:11,12 87:7 149:7 | 11:18 12:5,10,19,24 | 191:16 193:19 |
| 18:14 19:4,5,18 | 167:9 168:18 | 13:6,18 17:6,11 | 195:7 196:14 197:3 |
| 53:24 119:6 123:10 | 187:17 220:3 | 19:4 21:22 22:4,16 | 197:13,19,25 |
| 131:10 134:5 | **total** 79:25 150:9,12 | 23:4,20,25 24:14,23 | 199:14,17 202:5 |
| 137:11 138:8 175:5 | 165:5 166:2,6,9 | 25:10,15,25 26:20 | 203:2,9,15 204:5,18 |
| 177:24 182:12 | 168:23 169:12 | 27:13 35:25 40:6 | 204:24 205:22 |
| 185:17 206:2 | 170:6 180:20 216:3 | 41:22,24 42:2 48:24 | 206:15 207:19,25 |
| 232:25 | **totaled** 160:16 | 49:2,6 65:21 66:6 | 208:12,15,17 |

A0289

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum    ---    February 17, 2023

289

| | | | |
|---|---|---|---|
| 209:17 210:7 | **two** 8:12 10:8,11 11:6 | 145:22 | 117:4 172:2 201:23 |
| 211:15 214:16 | 12:11 16:22 26:11 | **unable** 193:8 | **use** 6:20,21 13:18 |
| 215:8,16 216:6,13 | 51:21 55:18 62:4 | **unavailable** 134:16 | 24:25 25:4 117:7,9 |
| 217:9,18,21 220:7 | 65:9 72:4,6,17,20 | 134:20 | 117:14,22 145:25 |
| 222:2,16 223:7 | 73:9,20 111:6,9 | **underlying** 23:23 | 163:18 |
| 225:19,22 228:17 | 118:23 127:15 | **understand** 7:3,7 | **useful** 144:18 |
| 229:12 230:25 | 128:15 129:8 | 8:13,16 9:9 25:10 | **username** 47:24 |
| 234:2,11 238:10,16 | 130:11 132:25 | 25:15 34:16 53:12 | **usual** 4:9 |
| 239:24 240:3,8,11 | 137:22 151:3 | 70:6 83:3 89:2 | **usually** 70:13 98:19 |
| 240:15,19,23 | 153:22 157:24 | 90:12 92:7 94:14 | 172:13 |
| 241:12 242:5,10,16 | 158:3,4,8 159:15 | 102:7 107:10 109:8 | **utilizing** 147:24 |
| 242:19,22 243:14 | 165:7 166:2 170:15 | 116:21 120:9 121:8 | **uttering** 22:25 23:3 |
| 243:18 244:10,25 | 170:16,19 171:10 | 138:20 164:23 | 23:16 |
| 245:12,16,20 246:4 | 172:3 176:9 179:12 | 170:21 192:12 | |
| 246:7,13 247:12,19 | 180:21 182:9 185:2 | 221:5 226:22 250:8 | **V** |
| 248:12,20 250:6 | 190:9,17 192:16,16 | 250:9 | **v** 213:21,22 254:14 |
| 251:7,15 252:3 | 192:17,17,20 193:7 | **understanding** 35:12 | 256:4 |
| **troylaw2troypllc.c...** | 198:21 202:7 212:4 | 35:18 57:14 77:21 | **vacation** 20:4 45:17 |
| 2:5 | 212:7 214:6,15,23 | 106:22 168:22 | 87:19 90:6 92:23,25 |
| **true** 32:25 65:17 | 214:25 215:3,9 | 191:22 | 93:6 132:4,20 |
| 66:19 79:14 80:9,18 | 217:18,19 218:16 | **understands** 119:21 | 133:24 218:10 |
| 82:9,13 83:4 85:9 | 218:17 219:16,25 | 119:23 | 232:13 249:24,25 |
| 89:14 118:22 119:4 | 224:24 225:5,12 | **understood** 8:18 | **vacations** 132:17 |
| 121:20 161:10 | 236:18 243:12 | 19:16 32:21 57:19 | 133:23 134:10,11 |
| 179:8 189:22 | 247:23 | 67:18 75:21 109:4 | 134:12 |
| 196:18 200:22 | **two-and-a-half** | 138:3 156:10 | **valid** 68:15 |
| 202:3,6 209:7 210:5 | 123:13,16 214:19 | **unemotional** 96:9 | **variety** 238:8 |
| 210:11,13,15 | **two-factor** 146:5 | **unemployed** 131:13 | **vehicle** 39:12,20,23 |
| 231:11 251:22,24 | **type** 47:22 52:17 | **unemployment** 27:19 | 40:9 43:11 160:2,6 |
| 255:10 | 57:24 72:7 76:3 | 27:22 137:7,9,15 | 160:18 161:3,7 |
| **trustee** 200:8 | 170:4 231:20 | 159:5,6 | 164:6 165:10,16 |
| **truth** 95:3 | 233:16 | **uniform** 209:25 | 174:12 188:12 |
| **truthful** 9:13,17 | **typed** 158:7 | 210:4 | 189:17 190:21 |
| **truthfully** 93:23 | **types** 98:16 174:20 | **uniformed** 209:18 | 200:9 207:8 210:5 |
| **truthfulness** 21:9 | 174:20 | **unique** 235:22 | 212:10 239:2 |
| **try** 34:15 97:25 | **typically** 172:5 174:7 | **United** 1:1 17:25 | **vehicles** 31:6 34:25 |
| 118:16 143:3 189:3 | 185:8 | 18:9 | 35:5,10 39:18 40:19 |
| **trying** 12:10,13 25:10 | **typing** 104:2,23 | **unknown** 155:24 | 167:18 169:12 |
| 53:25 64:7 90:15 | | **unlawful** 111:17 | 218:8 225:16 234:8 |
| 166:12 201:19 | **U** | **unnecessarily** 244:22 | 234:16 |
| 218:9 249:23 | **U** 4:2 143:14 212:24 | **unrelated** 35:6 | **venting** 140:9 |
| **turn** 38:12 | 213:6 254:14 | **unwarranted** 248:2 | **verbal** 101:6 |
| **turned** 127:23 | **Uber** 208:25 | **upgraded** 142:5 | **verification** 178:3 |
| **twice** 72:14 77:6 | **Uh-huh** 120:11 | **upset** 73:25 98:2 | **verified** 15:24 |
| **Twitter** 117:16 | **Um** 36:20 139:16 | 100:8 111:19 112:3 | **verifying** 38:8 |

A0290

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

290

**versus** 86:6 181:7
**violating** 13:24
**violation** 208:10
**visit** 59:5 186:16,22
  187:21 188:4
  197:17 207:2
  211:25
**visited** 133:12 209:19
**vocational** 30:24
**voice** 8:6
**volume** 50:21 51:24
  85:16,17 114:22,25
  115:3,5

        **W**

**W** 226:9 227:17
**wage** 7:12 15:8 26:7
**wait** 46:12 56:25 67:5
  68:25 69:4,13 78:2
  78:5,8,8,24 83:14
  83:19 86:15,23 88:9
  88:21 91:11,23 95:3
  97:7,11 102:16
  137:23 176:24
  177:10 179:20,25
  180:16,17 181:22
  192:18 196:16
  231:8,11,15 236:8
  237:2,10,11 246:2
**waited** 48:13 91:13
  180:8
**waiting** 45:12,14,20
  79:8 80:11 102:5
  181:7 182:23 191:5
  191:21 198:15
  208:25 209:5
  237:18
**waived** 3:9 4:13
**walk** 83:15,19 127:9
  128:11 192:22
  193:4
**walk-in** 85:7,7,10
  170:13 182:8
**walk-ins** 85:24
  210:15

**walked** 191:23
**walking** 84:6 192:18
**wall** 123:25 124:12
  124:20
**want** 8:24 13:8 14:13
  18:17 19:21 20:14
  24:12 25:14 32:7
  40:17 45:4 51:16
  59:19 69:2 70:6
  71:6 77:18 81:3,24
  84:2,9 90:18 94:25
  96:6 99:8 100:18
  112:12 117:24
  123:13 129:2,4,8
  152:8 162:17
  171:24 175:25
  182:8,21 184:4
  185:6 196:2 208:18
  208:18 212:21
  215:19 226:2,3,21
  231:15 235:12
  238:25 246:5
**wanted** 53:9 56:16
  64:25 68:11 80:6
  89:5 94:19 95:6
  107:11 162:18,20
  198:5,18 228:15
  231:19,19 233:14
**wanting** 92:3
**wants** 194:21 199:6
  231:25
**warned** 208:11
**warning** 104:5,22
**warranty** 164:11
**wasn't** 40:12 41:2
  42:19,20,25 44:23
  54:24 73:24 76:5
  78:9 79:8 80:14
  91:23 94:8 102:15
  108:24 111:23,24
  114:12,15 125:7
  126:10 128:21
  141:21 156:11,25
  158:10 189:22
  231:18 243:19

**waste** 46:11 67:12
  95:2 143:2 149:17
  162:13 207:23
  247:10,13
**wasting** 46:5,6
  149:22 181:14
**watched** 97:17
**watching** 93:7 201:19
**water** 126:13
**water-under-the-b...**
  72:7
**waving** 69:25
**way** 10:12 14:22
  17:19 49:19 51:10
  66:3 73:15,18,22
  74:2,20 77:21 81:13
  89:11,19 93:12
  95:16 96:12 100:24
  106:13,19 119:13
  119:15 162:18
  172:14 176:18
  184:6 186:8 187:8
  224:7 227:2 232:7
  237:23 239:19
  242:3,14 255:14
**ways** 105:14
**websites** 117:7,20,22
  118:3
**Wednesdays** 37:18
  232:15
**week** 10:8,15 37:20
  37:24 38:5,6,9 39:3
  39:3 40:20 51:3
  68:23 77:17 100:4,6
  100:7 101:8 172:3,6
  172:11,13 214:7,10
  214:14 215:3,6,14
  215:15,17,20,21
  216:9,11,18,22
  217:4,5,8,13,15,17
  217:17,25 218:4,8
  218:17,21 219:4,8
  219:11,15,16,20,20
  219:24 220:3,14,22
  220:24 221:5,9,12

  221:15,19,22 222:7
  222:9,12,20,23
  223:2,4,6,10,13,18
  223:21,25 224:3,6,7
  224:12,15,18,22
  225:3,11 226:11,12
  226:17
**week's** 85:16
**weekend** 85:12,15
**weekly** 37:7 38:10
  42:17,18 50:15
  150:12 214:4
**weeks** 54:9 121:23,24
  127:10 129:20
  132:25 136:11
  150:9 152:21
  218:16,17 219:15
**weight** 115:12
**weird** 93:18
**welcome** 81:23
**went** 19:17 20:2
  52:11 56:17 64:21
  79:12 82:22 100:21
  106:14 121:10
  122:13 127:7
  128:20 129:7
  132:10,14,14,23
  133:6,10,11 134:3
  152:24 153:12
  155:2,17 168:7,13
  188:13 189:9,10,14
  189:16 217:5 227:6
  232:24 233:17
**weren't** 108:9 122:8
**WHEREOF** 255:16
**willing** 56:24 57:23
  231:8 240:17
**win** 89:4
**wins** 89:4
**withdrawn** 69:11
  128:4 225:2 243:11
  249:12
**witness** 4:18 5:21
  23:5 26:21 42:4
  103:25 119:23

A0291

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

291

| | | | |
|---|---|---|---|
| 132:8 145:23 | 160:5 163:16 179:3 | 123:25 124:11,19 | **zero** 224:25 |
| 161:23 165:4 177:6 | 179:4 182:13 189:4 | 157:19 158:14 | **Zoom** 1:18 |
| 189:7 237:16 241:6 | 200:6 205:12 | **writings** 142:14 | |
| 244:9 247:7 251:16 | **workers'** 28:3 136:22 | **written** 14:22 59:14 | **0** |
| 252:4 253:3 255:7 | **workforce** 53:2 | 103:4 141:4 169:18 | |
| 255:11,16 | 122:13 127:2 | 206:25 | **1** |
| **witnessed** 87:13,17 | **working** 31:18,24 | **wrong** 25:5 | **1** 187:17 |
| **witnesses** 144:5,12 | 33:16,19,21 48:6,11 | **wrote** 236:21 | **1,000** 48:22 49:3,10 |
| 155:14 194:21 | 49:15 50:5,23 51:20 | | 105:18 168:13 |
| **woman** 90:25 | 52:4,20,22 54:2,3,4 | **X** | 226:13 227:11,12 |
| **women** 100:10 | 59:22 62:9,20 66:21 | **x** 1:2,11 83:22 157:13 | 240:8,15 |
| 109:19 | 76:12 92:20 97:24 | 178:11 235:8,9 | **1,050** 172:13 222:24 |
| **word** 102:6,6 167:12 | 99:4,6 100:2,7,7 | 253:2,13 254:3,15 | 223:4 |
| 168:18 175:5 | 107:20 114:9 | **XX-XX-1998** 17:5 | **1,197** 217:25 |
| **worded** 61:19 178:14 | 116:22 117:2 | **XY** 96:25 | **1,200** 220:25 |
| **words** 8:7 42:24 | 118:19 120:13 | **XYZ** 15:3 | **1,238.64** 150:13 |
| 50:13 96:23 140:25 | 122:22 125:22 | | 151:19 152:17 |
| **work** 32:6,23 33:5 | 126:9 127:11 | **Y** | **1,375** 223:17 |
| 34:20 37:18,23 48:7 | 129:12 147:3 | **Y** 240:25 241:3 | **1,400** 219:11,21 |
| 53:23 54:8,9,20 | 159:17 163:12 | 254:16 | **1,450** 220:4,10 |
| 55:18 59:17 75:6 | 173:20 180:7 | **Yanes** 188:5 | **1,505** 215:21 216:11 |
| 77:11 86:7 89:15 | 181:11 184:22 | **yeah** 65:23 67:14 | **1,600** 224:2,8 226:12 |
| 90:19 98:22,25 | 187:8 195:5 200:11 | 98:3 | 227:12 |
| 107:16,19 114:10 | 211:6,9 220:17 | **year** 17:7,13,17 20:7 | **1,628** 165:22 |
| 121:10 127:8,12 | 250:11,18 | 32:2,14 33:15 48:15 | **1,857** 165:22 |
| 131:4 134:16,20 | **works** 17:19 131:25 | 54:5,6 62:3 140:15 | **1:21-cv-7163** 1:2 |
| 143:3,5 159:4 | **workweek** 232:15 | 159:4 217:24 218:2 | **1:30** 142:18 |
| 181:17 182:5,21 | **world** 107:22 115:14 | **year-to-date** 215:21 | **1:51** 143:12 |
| 210:21 231:23 | **world's** 182:25 | 216:10 | **10** 190:5 245:13 |
| 232:5 233:16 | **worried** 112:14 | **years** 90:25 91:3 | **10,000** 89:21 167:21 |
| 249:19 250:4 | 114:14 | 102:5 113:24,25 | 240:18 |
| **work-related** 71:18 | **worry** 115:12 | 120:7 123:13,16 | **10:00** 186:11 232:20 |
| 71:23 77:9 102:16 | **worth** 85:16 218:16 | 171:8 180:7 192:9 | 232:20 |
| **workday** 232:21 | **worthiness** 175:7 | 193:14,16 207:3 | **10:05** 24:16,20,22 |
| **worked** 31:13,14,20 | **wouldn't** 79:16 84:2 | **yes-and-no** 39:16 | **10:45** 186:17 |
| 32:5,9 33:2,25 34:7 | 84:4 87:11 98:15,25 | **York** 1:1,20 2:4,9 4:5 | **100** 48:14 59:19 |
| 34:11,21,24 35:4 | 99:7 108:20 115:11 | 4:6 17:15 18:12,24 | 138:2 |
| 36:12,21 37:14,20 | 115:14 128:14 | 19:3,12,17,24 30:11 | **100,000** 153:9,13,15 |
| 40:5 53:10 63:9,13 | 129:23 140:25 | 32:10,13 248:10,16 | **103** 2:4 |
| 66:20 71:13 97:14 | 166:8,25 189:21 | 255:6 | **10th** 170:17 190:4 |
| 105:16 107:21 | 191:2 198:19 | **young** 32:20 | 197:16 |
| 118:15 120:16 | 218:24 250:3,10 | | **11:14** 81:10 |
| 121:21 122:19,21 | **write** 8:12 141:10 | **Z** | **11:30** 81:11,20 |
| 127:18 131:23 | 189:15 206:23 | **Z** 96:25 243:24,25 | **11042** 2:9 |
| 157:23 159:24 | **writing** 20:10,15 29:7 | 254:17 | **11354** 4:6 |

A0292

Case 1:21-cv-07163-OEM-LB   Document 87-2   Filed 09/01/23   Page 101 of 102 PageID #: 910

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

292

**11355** 2:4
**1165** 211:12
**1167** 211:13
**1186** 212:25 254:14
**1198** 217:10
**11th** 186:9
**12** 136:11 179:2
  215:6 228:3
**12,600** 163:24
**12:58** 143:10
**12th** 186:15,17 195:5
  209:20 215:13
  216:10 223:14
**13th** 223:18
**14** 158:18 179:2
**143** 253:17
**148** 253:18
**14th** 150:6 198:22
  213:12 220:15
**150** 37:8,13 39:5
  42:19 43:3 75:16
  164:16 166:9,10,15
  166:17,19 167:10
  167:10,16,22
  172:12 216:14
  220:10 221:6 222:6
  222:10,25
**154** 253:19
**157** 253:11
**158** 253:11
**15th** 190:24 193:11
**16** 193:12
**161-10** 1:7 5:5,8 6:2
  13:22
**162** 253:20
**17** 1:12 20:2 185:13
  256:4
**170** 253:20
**172** 253:21
**173** 253:21
**174.25** 166:6,9,11,13
  166:19 167:15
**18** 33:22 34:8,23
  64:15 76:16,19 77:4
  78:3 86:13 150:6,18

168:3 170:6 171:22
  172:8 176:4,7 190:4
  199:24 200:23
  204:14 215:6
  221:16 222:24
**184** 253:22
**187** 253:23
**18th** 215:13
**19** 8:24 18:8,15 20:13
  34:8,23 36:7 44:17
  48:12,16 60:20 61:3
  76:16,19 77:4 86:13
  90:6,25 91:3 94:2
  94:15 150:6,18
  158:6 179:19
  187:22 188:16
  196:11 197:11
  207:4 225:7 253:11
**190** 253:24
**194** 254:6
**197** 254:7
**19th** 223:18
**1st** 150:6 171:15
  187:22 227:21

**2**

**2** 80:20 155:13 207:4
  253:17
**2,000** 11:2
**2,165** 215:22 216:10
**2,755.54** 152:22
**2:00** 186:11
**20** 76:8 83:6 180:9
  253:10
**20-something** 51:4,7
  226:25
**2010** 199:25
**2011** 163:25
**2017** 19:22 21:2
  23:12,15
**2018** 8:23 18:8,15
  19:21 20:13 43:21
  60:9,10 77:25
  140:17 162:7
  163:21 165:10,11

165:19 167:25
  168:23 169:3 170:5
  170:17 171:15,19
  173:17 175:24
  185:22,23 191:11
  193:12 202:15
  204:4,12 209:20
  213:9,25 217:17
  222:5 224:7 250:11
  250:15
**2019** 51:6 52:5,19
  124:18 125:4 186:9
  186:15 187:17
  194:20 195:22
  213:12
**202** 254:8
**2020** 18:6 51:5 53:3
  53:18 54:21 132:4,6
  132:13,16 134:7
**2021** 133:4,9,9,10,11
  133:12,24 134:10
  185:13
**2022** 54:7 132:13,19
  143:23 227:18,22
  228:3,4,6 244:4
  245:8
**2023** 1:12 149:4
  252:20 255:17
  256:4,20
**203** 254:9
**206** 254:10
**207** 254:11
**209** 254:12
**20th** 204:14 220:14
  223:22
**21** 253:16
**21-1653** 227:25
**211** 254:13
**213** 254:14
**21st** 143:23
**22** 187:23 245:8
**22nd** 213:9,24
**235** 254:15
**23rd** 200:23 201:14
**24** 9:12 220:17

221:16
**241** 254:16
**244** 254:17
**24th** 165:19 199:24
  220:15
**25th** 165:11 200:3
  225:4
**26th** 188:24 200:5
  223:22
**27** 163:21 227:8
**27th** 201:22 224:8
**28** 203:12 227:8,18
  228:3
**2815** 4:5
**28th** 213:25
**29** 202:15 253:10
**2nd** 222:5

**3**

**3** 217:10
**3,000** 37:8 43:2,3,10
  164:25 166:16
**3,435** 217:24 218:2
**3,485** 166:3
**3,500** 164:25
**3:00** 142:20
**3:59** 226:4
**30** 13:3,24 76:9 149:4
  208:10 227:5
  243:15,17
**30-minute** 162:20
**300** 37:7 39:2,3 50:13
  50:15 172:12 214:3
  214:7 218:17
  219:24
**3000** 2:9
**30E** 4:21 5:25
**31st** 193:11 225:5
**33** 227:5
**35** 81:16
**350** 225:2,11
**36** 170:6 199:4
**37** 247:24
**38** 81:16
**3rd** 217:4 218:19

A0293

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

293

| | |
|---|---|
| 224:9 227:11 | 199:7,9,11 244:4 |
| **3W8** 2:9 | **6.43** 150:10 152:21 |
| | **60** 79:18 83:10 159:3 |
| **4** | **600** 227:13 |
| **4** 253:7 | **615** 216:19 |
| **4.4** 216:15 | **625** 224:15 |
| **4:05** 226:5 | **65** 79:19 |
| **4:15** 187:22 | **655** 216:22 |
| **4:30** 239:25 | **660** 216:3,12,14 |
| **4:40** 243:18 | **6th** 203:5 223:14 |
| **4:57** 252:15 | 226:20 255:17 |
| **40** 83:10 182:22 | |
| **40/60** 85:15 | **7** |
| **4125** 2:4 | **7** 156:13 157:18 |
| **428.64** 151:18 152:17 | 253:11 |
| 152:20 | **70,000** 159:3 |
| **45** 79:18 | **700** 136:15 222:9 |
| **45-minute** 162:21 | **750** 221:16,19 |
| **450** 219:21 221:9,13 | **780** 214:5 |
| 223:22 | |
| **46** 168:19 | **8** |
| **4th** 197:10 202:19 | **8** 171:12 188:16 |
| 228:6 | **8:00** 232:20 |
| | **800** 89:20 172:14 |
| **5** | 222:12,17 |
| **5** 37:9 42:23,25 43:3 | **81** 253:17 |
| 43:21 44:3,6 45:10 | **810** 151:20 152:17 |
| 50:18 75:9,13 76:3 | **825** 224:12 225:8 |
| 76:19,24 164:24 | **8th** 23:15 211:25 |
| 166:6,14,17 167:3,9 | 222:5 |
| 168:14 214:13,22 | |
| 215:2 216:25 | **9** |
| 220:13 | **9** 217:5,10 243:6 |
| **5.2** 214:12 | **9.67** 220:10 |
| **5:15** 188:3 | **9:00** 162:19 232:20 |
| **50** 182:22 | 243:19,20 |
| **50/50** 85:15 | **9:23** 1:12 |
| **500** 101:8 224:18 | **9:30** 162:19 |
| **53** 86:12 | **900** 172:14 219:4,9 |
| **586** 163:25 | 221:22 222:6 |
| **5th** 194:20 196:11 | 223:14 |
| 202:23 | **9th** 218:19 |
| | |
| **6** | |
| **6** 171:12 195:22 | |

A0294

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 2 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC D/B/A Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, RONALD M BARON,
JORY BARON, and ANDRIS GUZMAN
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPELLANT'S APPENDIX
### (VOL. 2 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
(718) 762-1324

```
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF NEW YORK

 3            ----------------------------------------X

 4            LETICIA FRANCINE STIDHUM,

 5                               Plaintiff,

 6               -against-              CASE: 21-CV-07163

 7            161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
              AUTO OUTLET, and HILLSIDE AUTO MALL INC
 8            d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
              JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

 9

10                               Defendants.

11            ----------------------------------------X

12                               February 24, 2023

13                               10:00 A.M.

14

15              VIRTUAL EXAMINATION BEFORE TRIAL of

16            ISHAQUE THANWALLA, via Zoom, a Defendant

17            herein, held at the above-mentioned time and

18            taken before Lynn Luckman, a Notary Public

19            and Shorthand Reporter within and for the

20            State of New York.

21

22

23                    SANDY SAUNDERS REPORTING
                   254 South Main Street, Suite 216
24                     New City, New York 10956
                           (845) 634-7561
25
```

2–5

| Page 2 | Page 3 |
|---|---|
| 1     A P P E A R A N C E S: | 1 |
| 2 | 2 |
| 3 | 3     IT IS HEREBY STIPULATED AND AGREED by |
| 4     TROY LAW, PLLC | 4     and between counsel for the respective parties |
| 5     Attorneys for the Plaintiff | 5     hereto that all objections except as to the |
| 6     41-25 Kissena Boulevard, Suite 103 | 6     form shall be reserved to the time of trial. |
| 7     Flushing, NY 13555 | 7     IT IS FURTHER STIPULATED AND AGREED |
| 8     BY: Tiffany Troy, Esq. | 8     that the sealing and filing of this deposition |
| 9 | 9     shall be hereby waived. |
| 10     MILMAN LABUDA LAW GROUP, PLLC | 10     IT IS FURTHER STIPULATED AND AGREED |
| 11     3000 Marcus Avenue, Suite 3W8 | 11     that this examination may be sworn to by the |
| 12     Lake Success, NY 11042-1073 | 12     witness being examined before a notary public |
| 13     BY: Emanuel Kataev, Esq | 13     other than the notary public before whom |
| 14     emanuel@millaborlaw.com | 14     examination was begun examination was begun. |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| Page 4 | Page 5 |
|---|---|
| 1     Ishaque Thanwalla | 1     Ishaque Thanwalla |
| 2     BY THE COURT REPORTER: | 2     I-S-H-A-Q-U-E T-H-A-N-W-A-L-L-A, |
| 3     The attorneys participating | 3     a Defendant herein, after having been |
| 4     in this deposition | 4     duly sworn by a Notary Public of the |
| 5     acknowledge that I am not | 5     State of New York, was examined and |
| 6     physically present in the | 6     testified as follows: |
| 7     deposition room and that I | 7 |
| 8     will be reporting this | 8     BY THE REPORTER: |
| 9     deposition remotely. They | 9     Q. Please state your full name |
| 10     further acknowledge that, in | 10     for the record. |
| 11     lieu of an oath administered | 11     A. Ishaque Thanwalla. |
| 12     in person, I will administer | 12     Q. Please state your present |
| 13     the oath remotely. The | 13     address for the record. |
| 14     parties and their counsel | 14     A. Business address: 161-10 |
| 15     consent to this arrangement | 15     Hillside Avenue Jamaica, New York 11432. |
| 16     and waive any objections to | 16     Home address: 7 Poplar Court, Great |
| 17     this manner of reporting. | 17     Neck, New York 11024. |
| 18     MS. TROY: I consent | 18     THE COURT REPORTER: |
| 19     MR. KATAEV: I consent. | 19     Counsel, Mr. Kataev, will you |
| 20 | 20     be purchasing a copy of this |
| 21 | 21     transcript? |
| 22     *   *   * | 22     MR. KATAEV: I will let |
| 23 | 23     you know. I will speak to my |
| 24 | 24     client. |
| 25 | 25     MS. TROY: Let's deem |

6–9

Page 6

1    Ishaque Thanwalla
2          marked Plaintiff's Exhibit 1.
3          (Plaintiff's Exhibit 1 deemed
4          marked for identification).
5    EXAMINATION BY
6    TIFFANY TROY:
7          Q.  Mr. Thanwalla, was that your
8    business address or your home address?
9          A.  That is my business address.
10         Q.  Can you state your residence for
11   me as well?
12         A.  7 Poplar Court, Great Neck, New
13   York 11024.
14   Welcome today.
15         Q.  Thank you for welcoming me
16   today.  Have you ever been part of a
17   deposition before?
18              MR. KATAEV:  Objection to
19         the form.  You can answer.
20         A.  Yes.
21         Q.  Do you know what a deposition
22   is?
23         A.  A deposition is when you ask
24   questions and I answer the questions.
25         Q.  Correct.  When was the last time

Page 7

1    Ishaque Thanwalla
2    that you had a deposition; you just
3    mentioned that you participated in a
4    deposition before?
5              MR. KATAEV:  Objection to
6         the form.  You can answer.
7         A.  That was over 15 years ago.
8         Q.  Do you recall for what?
9         A.  Not really, I can't recall.
10         Q.  Were you a party to a civil
11   action or was that something else?
12         A.  I don't understand that
13   question.  What do you mean by ''civil
14   action?''  I don't understand the law.
15         Q.  By that, I mean was there a
16   plaintiff bringing an action against the
17   defendant, and if you were either a
18   plaintiff or a defendant in a civil action
19   as opposed to a criminal matter.
20              MR. KATAEV:  Objection to
21         the form.
22         Q.  Do you recall what the lawsuit
23   was about?
24         A.  I can't, it was so long ago.
25         Q.  Since that is the case, I'm

Page 8

1    Ishaque Thanwalla
2    going to briefly explain what a deposition
3    is and lay some ground rules going forward.
4         A.  Okay.
5         Q.  First, this deposition is for me
6    to ask you questions and for you to answer
7    my questions about the subject matter of
8    that lawsuit.  There is a separate action
9    covering the wage and hours, and today we're
10   only going to focus mostly on the pregnancy
11   discrimination lawsuit; do you understand
12   that?
13         A.  Yes, I understand.
14         Q.  Since the court reporter has to
15   take down everything that you say, I ask
16   that you give only verbal responses, so no
17   shaking or nodding or any hand motions, no
18   gestures; do you understand that?
19         A.  I represent to you that I have a
20   habit, and I may do it as this is just a
21   habit, but I might shake my head back and
22   forth. (Indicating).
23         Q.  That is not a problem as long as
24   there is a verbal response together with the
25   shaking or nodding of your head; there is no

Page 9

1    Ishaque Thanwalla
2    problem.
3         A.  Okay.
4         Q.  For the same reason, please
5    speak loudly and clearly when you answer a
6    question; do you understand?
7         A.  Yes.
8         Q.  The stenographer can only write
9    one person down speaking at a time.
10   Therefore, please do not start to answer a
11   question of mine before I finish asking that
12   question; likewise, I will not start a new
13   question until you have finished answering
14   my last question; do you understand?
15         A.  Yes.
16         Q.  If you need to take a break, for
17   example to get a drink of water or to use
18   the restroom, please let me know and I will
19   call for a recess; do you understand?
20         A.  Yes.
21         Q.  However, there can be no break
22   between one of my questions and your answer
23   to that question; do you understand that?
24         A.  I don't understand the question.
25         Q.  Let me repeat it.  Even if you

A0297

10–13

Page 10

Ishaque Thanwalla

1
2  are taking a break at any time, there is an
3  assumption that you will not be calling for
4  a break between one of my questions and
5  before you answer that question; do you
6  understand that?
7        A. I understand -- you mean if I
8  ask to take a break and there is a question,
9  that I have to complete an answer before I
10  ask for that break?
11       Q. Correct.
12       A. Right, correct.
13       Q. From time to time your attorney
14  may make objections to my question.
15  Generally, unless your attorney tells you
16  not to answer, you will still have to
17  respond; do you understand?
18       A. Not really. That's why I have
19  an attorney.
20       Q. Let me backtrack for a second.
21  From time to time as we are going along in
22  the deposition, your attorney may make some
23  objections to my questions saying
24  ''objection'' for blah blah blah reasons.''
25       A. Right.

Page 11

Ishaque Thanwalla

1
2        Q. Generally unless your attorney
3  directs you not to answer, you still need to
4  respond; do you understand that instruction?
5        A. Not to answer? What's the
6  reason for him telling me not to answer a
7  question?
8            MR. KATAEV: She is saying
9        that if I tell you not to
10       answer, then we will deal
11       with that later.
12           THE WITNESS: Yes.
13       Q. Do you understand?
14       A. Yes.
15       Q. If you don't understand a
16  question, tell me and I will rephrase it so
17  that you can; do you understand that?
18       A. Yes.
19       Q. If you do not hear a question,
20  tell me and I will repeat it so that you
21  can; do you understand?
22       A. Yes.
23       Q. We are here together for facts
24  and not speculation. If you don't know the
25  answer to a question, say so; do you

Page 12

Ishaque Thanwalla

1
2  understand that?
3        A. Yes.
4        Q. Before the deposition, you
5  mentioned that a deposition took place 15
6  years ago. Were you ever deposed at any
7  other time?
8        A. No.
9        Q. Do you understand that you have
10  taken an oath to tell the truth?
11       A. Yes.
12       Q. Do you understand that your oath
13  to tell the truth carries the same force and
14  effect as if you are testifying in Court
15  before a Judge?
16       A. Yes.
17       Q. Are you currently taking any
18  medications that could prevent you from
19  recalling the truth or testifying truthfully
20  today?
21       A. Not to my knowledge. I do take
22  a Sudafed for my sinuses.
23       Q. To your knowledge, it would not
24  affect your ability to tell the truth or
25  recall truthfully?

Page 13

Ishaque Thanwalla

1
2        A. Best of my ability, I don't
3  think so, I don't think it's going to
4  affect.
5            MS. TROY: Please zoom in
6        a little bit for the court
7        reporter.
8            THE WITNESS: Okay.
9            MR. KATAEV: Let the
10       record reflect that the
11       plaintiff is present
12       virtually.
13       Q. Mr. Thanwalla, are you currently
14  under any physical or emotional condition
15  that could prevent you from recalling the
16  truth or testifying truthfully today?
17       A. No.
18       Q. Do you have a cell phone on or
19  near you?
20       A. Yes.
21       Q. Do you agree that during this
22  deposition today, except during the break,
23  you will not be using your cell phone?
24       A. Yes. That's why I just turned
25  it off.

A0298

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 5 of 62 PageID #: 916

14–17

**Page 14**

1    Ishaque Thanwalla
2         Q.  Do you understand that except
3    for the documents that I will be showing you
4    on the Zoom screen today, that you will not
5    be reviewing any other documents?
6         A.  I will not be reviewing any
7    other documents.  The only ones are the
8    documents that you provide, is that what you
9    are saying?
10        Q.  Correct.
11        A.  Okay.
12        Q.  I see that you have a notepad on
13   the desk.  I ask that during the pendency of
14   this deposition that you do not use that
15   notepad.
16             MR. KATAEV:  It was just
17             there, we are moving it.
18             (Indicating)
19        A.  Yes.
20        Q.  During this deposition, to make
21   things easier for ourselves, I'm going to be
22   referring to the company 161-10 Hillside
23   Auto Avenue, LLC, which is doing business as
24   Hillside Auto Outlet as Hillside Auto
25   Outlet; do you understand that?

**Page 15**

1    Ishaque Thanwalla
2         A.  Yes.
3         Q.  In the same vein, I'm going to
4    be referring to the corporate defendant
5    Hillside Auto Mall Inc., which is doing
6    business as Hillside Auto Mall; do you
7    understand that?
8         A.  Yes.
9         Q.  Do you own the residence that
10   you gave at the beginning of this
11   deposition?
12             MR. KATAEV:  Objection as
13             to relevancy.  You can answer.
14        A.  No.
15        Q.  Have you lived anywhere else
16   within the past five years?
17        A.  Yes.
18        Q.  Starting from the most recent,
19   where have you lived besides the residence
20   that you gave at the beginning of this
21   deposition?
22        A.  In Bayside.
23        Q.  Prior to that, was that over 10
24   years?
25             MR. KATAEV:  Objection as

**Page 16**

1    Ishaque Thanwalla
2             to relevancy on that
3             question.  The witness can
4             answer.
5         Q.  Do you know?
6         A.  (No response)
7         Q.  Do you have the Bayside address?
8         A.  Correct.
9         Q.  Can you give that to me?
10        A.  1578 Waters Edge Drive,
11   Apartment 1, Bayside, NY 11360.
12        Q.  What is your highest level of
13   education?
14        A.  High school.
15        Q.  What school did you attend?
16        A.  Baf.  B-A-F High school
17        Q.  Was that in the United States?
18        A.  No.
19        Q.  Where did you attend that high
20   school?
21        A.  That was in my country, which
22   was Pakistan that I was born in.
23        Q.  What year did you come to the
24   United States?
25        A.  I would say in the 80s, early

**Page 17**

1    Ishaque Thanwalla
2    80s, but I can't recall the year.
3         Q.  Are you familiar with the
4    Hillside Auto Outlet?
5             MR. KATAEV:  Objection to
6             the form.  You can answer.
7         A.  Yes.
8         Q.  How are you familiar with that
9    company?
10        A.  I run the place and I own 25
11   percentage in that company.
12        Q.  Since when have you run the
13   place?
14        A.  From the day we started.
15        Q.  What year?
16        A.  It was -- I can't -- I would say
17   2018, if I'm not wrong.
18        Q.  You mentioned that you owned
19   shares in the company, what percentage did
20   you own?
21        Q.  What was the question again?
22             MS. TROY:  Ms. Court
23             reporter, can you please read
24             back the last question?
25             (The reporter read back the

18–21

| Page 18 | Page 19 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2    last question) | 2    You are talking about facts |
| 3    A. I own 25 percent. | 3    not in evidence, but he |
| 4    Q. Besides that, did that | 4    answered. |
| 5 percentage ever change? | 5    THE COURT REPORTER: A lot |
| 6    A. I don't understand your | 6    of times I even asked him he |
| 7 question. | 7    said it's fine, I asked him |
| 8    Q. Did that 25 percent, was that | 8    ''do you want me to put in the |
| 9 the same percent from 2018 to the present | 9    objection before he answers |
| 10 day? | 10    or after he answers'' and he |
| 11    A. Yes. | 11    kept saying leave it alone. |
| 12    Q. Who else owns shares of Hillside | 12    So, he objects after the |
| 13 Auto Outlet? | 13    question it answered. |
| 14    A. It is Jory, Josh and David. | 14    Q. What percentage did Jory Baron |
| 15    Q. By Josh, do you mean Josh | 15 own in Hillside Auto Outlet? |
| 16 Aaronson. | 16    MR. KATAEV: Objection to |
| 17    A. Yes. | 17    the form. You can answer. |
| 18    Q. By Jory, do you mean Jory Baron? | 18    A. Twenty five percent. |
| 19    A. Yes. | 19    Q. How about Josh Aaronson? |
| 20    Q. By David, do you mean David | 20    MR. KATAEV: Same |
| 21 Baron? | 21    objection. You can answer. |
| 22    A. Yes. | 22    A. Twenty five percent. |
| 23    Q. When did David Baron pass away? | 23    Q. David Baron own the remaining 25 |
| 24    A. I think it was two years ago. | 24 percent; is that correct? |
| 25    MR. KATAEV: Objection. | 25    A. Yes. |

| Page 20 | Page 21 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2    Q. Was that the same from the start | 2    A. Please. |
| 3 of the company from 2018 to the present day? | 3    Q. Besides Hillside Auto Outlet, do |
| 4    A. Didn't you already ask me that | 4 you currently run any other company? |
| 5 and I answered? | 5    A. No. |
| 6    MR. KATAEV: Objection as | 6    Q. Are you familiar with a company |
| 7    to asked and answered. You | 7 Hillside Auto Mall? |
| 8    may answer again. | 8    A. I am. Oh, what was the question |
| 9    A. Yes. | 9 again? Am I aware of a company called |
| 10    Q. Specifically, I mean just not | 10 Hillside Auto Mall? |
| 11 your own shares, but the other people's | 11    Q. Familiar. |
| 12 shares also represented 25 percent from 2018 | 12    A. Yes, I am familiar with it. |
| 13 to the present day; is that correct? | 13    Q. How are you familiar with it? |
| 14    A. Yes. | 14    A. The way I am familiar with that |
| 15    Q. Are you currently employed? | 15 is my partners may have a shareholder on |
| 16    A. Well, what exactly do you mean, | 16 that company. |
| 17 do you mean if I own shares of my company | 17    Q. By that, do you mean Ronald |
| 18 and I run the company? | 18 Baron, Josh Aaronson and Raymond Phelan. P- |
| 19    Q. I mean -- | 19 H-E-L-A-N? |
| 20    A. So, what exactly do you mean, | 20    A. Yes, possibly. |
| 21 define employed. I am running my own | 21    MR. KATAEV: Objection to |
| 22 company that I own 25 percent of, is that | 22    the form of that question. |
| 23 what you are referring to? | 23    Q. Do you have the address for |
| 24    MS. TROY: I will rephrase | 24 Hillside Auto Mall? |
| 25    the last question. | 25    A. The Mall? I can't remember |

22–25

Page 22

1    Ishaque Thanwalla
2  their address.
3          Q.  How about do you know how far it
4  is from Hillside Auto Outlet?
5          MR. KATAEV:  Objection to
6          the form as to relevancy, you
7          can answer.
8          A.  Approximately 10 or 11 blocks.
9          Q.  Are you familiar with Shylet S-
10  H-Y-L-E-T Motors?
11         A.  Yes.
12         Q.  How are you familiar with them?
13         A.  Yes, they are across the street
14  from me.
15         Q.  ''By me'' do you mean Hillside
16  Auto Outlet; correct?
17         A.  Yes.
18         Q.  How about Gateway Car
19  Dealership?
20         A.  They are on the -- they're close
21  to Hillside Auto Mall.
22         Q.  How about Best Auto Outlet?
23         A.  I'm confused with these
24  questions and why you are asking --
25         Q.  Please don't, please just answer

Page 23

1    Ishaque Thanwalla
2  my questions, don't question my question.
3          MR. KATAEV:  Objection as
4          to relevancy.  You can answer
5          the question.
6          A.  Best Auto Outlet is I think in
7  Suffolk County.
8          Q.  Did Hillside Auto Outlet
9  employees, meaning the car salespeople ever
10  sell cars from nearby auto outlets or
11  dealerships?
12         A.  Can you clarify that question?
13         Q.  The question is a yes or no
14  question.  My question is: have Hillside
15  Auto Outlet car salespeople ever sold cars
16  from other dealerships during their
17  employment with Hillside Auto Outlet?
18         A.  In our business, yes, you
19  mentioned a lot of dealerships names.  So,
20  the customer, so if a customer comes to us
21  and we don't have a car in our stock, so we
22  look at the sales, we look at anywhere if
23  they have a car available, and we call them
24  and request them and we can buy their car to
25  sell to our client.  Does that answer your

Page 24

1    Ishaque Thanwalla
2  question?
3          Q.  To your knowledge, do any of
4  your partners own shares in Shylet Motors?
5          A.  Not that I know of.
6          Q.  How about Gateway Car
7  Dealership?
8          A.  Not that I know of.
9          Q.  Have you ever spoken with
10  Hillside Auto Outlet employees concerning
11  where they should take the customers if the
12  customers did not like any cars in the lots
13  of Hillside Auto Outlet?
14         A.  Are you asking me -- let me
15  understand this question correctly.  Did I
16  ask if a car is not in stock, if we can go
17  to the car dealer across the street, did I
18  ask my salespeople to show them a car, is
19  that what you are asking?
20         MS. TROY:  You can answer
21         my question first based on
22         your understanding and then I
23         will follow-up with more
24         questions.
25         A.  That's what my understanding is,

Page 25

1    Ishaque Thanwalla
2  that's what you are asking me, and I don't
3  know the right way or the wrong way to
4  answer the question.
5          Q.  Again, I'm asking you to answer
6  the questions based on your understanding of
7  the question.
8          A.  This is my understanding --
9          MR. KATAEV:  Let me just
10         say this to help both of you
11         out.  You have to answer the
12         question, you cannot ask her
13         questions. But, if in your
14         question it is based on your
15         understanding --
16         THE WITNESS:  My
17         understanding is that she's
18         mentioning if I don't have a
19         car, my salespeople can go
20         across the street and bring
21         the car to my lot and then
22         sell it?  Is that right?
23         Q.  Have you ever told any Hillside
24  Auto Outlet employees that you better not
25  sell the car from the other dealerships,

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 8 of 62 PageID #: 919

26—29

Page 26

Ishaque Thanwalla

1  mostly you should do so and sell the car
2  from Hillside Auto Mall?
3      A.  Are you saying don't sell anyone
4  the car from the dealership across the
5  street but Hillside Auto Mall, is that what
6  you are asking me?
7      Q.  Yes.
8      A.  No.  Why would I hurt my own
9  sales?
10     Q.  Have you ever informed them
11 because Hillside Auto Mall is owned in part
12 by your partners, Hillside Auto Outlet, they
13 did not have the cars available that you
14 preferred, your preference was for them to
15 go to the Hillside Auto Mall?
16     A.  No.  We look for the inventory
17 wherever it's available and that's why we
18 sell the cars.  That is we pick up the car
19 and bring the car and sell it on our lot.
20     Q.  Have you ever told Hillside Auto
21 employees, Hillside Outlet Auto employees,
22 that you have a preference for them to sell
23 cars if a car is not available at Hillside
24 Auto Outlet for them to go to Hillside Auto

Page 27

Ishaque Thanwalla

1  Mall?
2      MR. KATAEV:  Objection to
3      the form. Asked and answered,
4      you can answer again.
5      A.  No.
6      Q.  What are your responsibilities
7  as the owner, part-owner of Hillside Auto
8  Outlet?
9      A.  My title is general manager.
10 That consists of a lot of responsibilities:
11 hiring the employees, firing the employees,
12 making sure that the deals are done the
13 right way, making sure that the deals are
14 funded, making sure it is running smoothly,
15 the operations are running smoothly, making
16 sure the inventory is serviced, making sure
17 everything with the DMV is done correctly
18 and on time.  If it's not done correctly and
19 on time, I have to make sure that I have to
20 discipline the people who are in that
21 department.
22     I have to look into every department
23 and make sure everything is running smoothly
24 and in a timely fashion where it does not

Page 28

Ishaque Thanwalla

1  affect the business licenses and compliance
2  as well.
3      Q.  You mentioned that part of your
4  responsibilities were to hire employees.  Do
5  you recall hiring Leticia Stidhum?
6      A.  Yes, very well.
7      Q.  Can you describe what the hiring
8  process was like?
9      A.  She came for an interview and
10 she sent a resume to Craig's list, if I can
11 recall that and she came in and interviewed
12 with me.  I like to give people an
13 opportunity when anyone walks in, if it's a
14 candidate that is intelligent enough to hold
15 a conversation right away, and then I hire
16 them.
17     Q.  Do you recall when you hired
18 her, the date?
19     A.  I can't recall that.
20     Q.  During that conversation, during
21 that hiring process that you just described,
22 did you tell her what her pay was going to
23 be?
24     A.  Yes, well, yes.  She is a

Page 29

Ishaque Thanwalla

1  commission salesperson and her compensation
2  consisted of approximately $300 a week
3  salary, plus $150 commission, plus bonus,
4  also, if there was any individual car that
5  had a bonus.  We have many bonuses, we have
6  weekly bonuses, we have daily bonuses,
7  certain cars, it's old age and we have a
8  bonus.
9      Q.  To clarify, when you said plus
10 $150 commission, is that $150 per car
11 commission?
12     A.  It's called a flat commission
13 rate, yes.  Plus the salary, plus the
14 bonuses if there are any changes.
15     Q.  Can you describe for me what the
16 differences are between the monthly, weekly,
17 and daily bonuses?
18     A.  Okay, very simple.  Let's take
19 one step at a time.  So, you have a salary
20 as a side salary, correct?  If they sell a
21 car, they have $150 flat commission, and
22 let's putting that aside for a second.
23     Now, let me explain what the bonuses
24 are, so certain cars are old age, and as an

30–33

Page 30

Ishaque Thanwalla

1  example, in this industry, if we have a car
2  for over 60 days we like to get rid of it as
3  fast as possible because it is costing us
4  and it is depreciating, the money is
5  depreciating. So, we may add another $20 or
6  $25 as a bonus.
7  Sometimes the car is 90 days old, it's a
8  90-day old unit, and we may put $50 or even
9  5 percent additional commission on that,
10  depending on the day.
11  Q. Specifically, when we were
12  talking about Leticia, what was the bonuses
13  that were promised to her?
14  MR. KATAEV: Objection to
15  the form. You can answer.
16  A. There is no promises to begin
17  with, only thing we would tell you our
18  bonuses, our bonus structure changes daily,
19  weekly, and monthly. So, whatever was in
20  that week, that is the bonus that she got.
21  If there's a 5 percent or $25 additional or
22  $50 additional, or maybe $500. I can't
23  answer that question 100 percent. To the
24  best of my ability, I have given you the

Page 31

Ishaque Thanwalla

1  complete structure. It could be 5 percent,
2  25 percent, it could be $5 -- I'm sorry, it
3  could be $50. Maybe a bigger bonus for that
4  week based on the day, based on the time.
5  Every day they have new bonuses, not exactly
6  every day, but let's say on a Saturday just
7  to give you an example, you sell three cars
8  and deliver those cars. You get additional
9  $100 bonus. So, which we provide bonuses or
10  we will say ''it's three cars,'' and we're
11  going to ''give you additional 5 percent.''
12  It all depends.
13  Q. So, let's break down the
14  conversation that happened during hiring;
15  did you talk at all about the schedule,
16  meaning the work schedule that Leticia would
17  be given as a commission salesperson?
18  A. Yes. She was to get a 40-hour
19  schedule.
20  Q. Can you tell me what that
21  schedule is?
22  A. How can I tell you? I don't
23  have a schedule in front of me.
24  Q. Did she regularly work a certain

Page 32

Ishaque Thanwalla

1  number of days or did that change from week-
2  to-week?
3  A. Some days she worked five days,
4  most of the time, but she usually would have
5  weekdays, Thursday, Tuesday, depending on
6  your schedule off, you would have a Sunday.
7  All of the schedules changed every week,
8  every industry, you have to come in the
9  beginning of a week, and you get the
10  schedule.
11  Q. Can you tell me what time she
12  would be expected to arrive at work?
13  A. About 10 o'clock.
14  Q. How about what time would she be
15  expected to leave work?
16  A. The work time would be our
17  business hours are between 10:00 and 7:00 or
18  10:00 to 8:00. It also depends, if it's
19  wintertime or summertime.
20  Q. Let's start from the wintertime,
21  what would that time be?
22  A. About 10:00 to 7:00.
23  Q. How about the summertime?
24  A. Mostly it's 10 to 8:00 is the

Page 33

Ishaque Thanwalla

1  schedule or the dealership opens hours, not
2  the schedule hours. But the dealership is
3  open through 10:00 and 8:00. So, maybe
4  Leticia would start at 12:00 to 8:00 or
5  10:00 to 6:00, something like that. It all
6  depends.
7  Q. How would you describe the foot
8  traffic at Hillside Auto Outlet, and in
9  terms of the timeframe, you can say
10  generally, or specifically, but I'm asking
11  about 2019.
12  A. When you say ''foot traffic,'' can
13  you give me a little more elaboration?
14  Q. Sure. Would you describe your
15  store as a busy store and the timeframe is
16  2019?
17  A. Which timeframe?
18  Q. The year 2019.
19  A. It is too long for me to
20  describe that. Our business changes based
21  on the season.
22  Q. So, why don't you just describe
23  for me generally what the business was like
24  based on the season.

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 10 of 62 PageID #: 921

34–37

Page 34

1        Ishaque Thanwalla
2        A.  Okay.  Giving you an example, it
3   would be busy traffic after March, it would
4   be busy; April, May, June, July August,
5   starting to go down; September goes down;
6   October, November is slow and December is
7   very slow, and January is slow.  February is
8   slow and in March it starts to pick up.
9        Q.  So, you would describe March
10  through August as the busy months?
11       A.  Correct.
12       Q.  September through February as
13  less than busy?
14       A.  Less busy, you got it right.
15       Q.  How many cars would Hillside
16  Auto Outlet sell on a monthly or weekly
17  basis, on a monthly or weekly basis between
18  March and August?
19            MR. KATAEV:  Objection as
20       to compound.  You can answer
21       the question.
22       A.  March would be a busy month and
23  I can't really give you a number.  So, I
24  would say 72 or 75 cars in March and April,
25  and somewhere around that neighborhood and

Page 35

1        Ishaque Thanwalla
2   October and November and December would slow
3   down to 30 or 50 cars a month.
4   It's not only our -- my dealership, it's 90
5   percent of the dealerships.
6        Q.  Has Leticia ever worked a mixed
7   schedule, meaning a schedule that was not
8   fixed during her time at Hillside Auto?
9        A.  What do you mean by ''mixed
10  schedule?''  It's confusing to me.
11            MS. TROY:  Let me
12       rephrase it.
13            THE WITNESS:  Thank you.
14       Q.  When Leticia worked for Hillside
15  Auto Mall, she always reported to work at
16  10:00 a.m.?
17       A.  She never worked for Auto Mall.
18       Q.  I mean Hillside Outlet.
19       A.  That is Outlet, not the Mall.
20  You just said ''Mall,'' that is why she has
21  never worked for the mall.  She worked for
22  only Hillside Auto outlet.
23       Q.  My question is: when Leticia
24  worked for Hillside Auto Outlet, did she
25  always start working at 10:00 a.m.?

Page 36

1        Ishaque Thanwalla
2        A.  No, some days she worked late
3   and some days she was off. I think she chose
4   -- how can she be if she always started at
5   10:00 a.m.?
6        A.  Is it fair to say that on days
7   that she worked, she would start working at
8   10:00?
9        A.  I can't -- you are repeating
10  yourself on this question which is as I
11  said, based on her schedule. If her shift
12  started, let's say she started late, if her
13  shift started at 10 o'clock, she would start
14  at 10 o'clock and her shift says she was
15  supposed to start at 11:00 or 12:00, she
16  would start at 11:00 or 12:00.
17            MR. KATAEV:  Objection to
18       that.  It was asked and
19       answered already.
20       Q.  Are you saying that there is a
21  10:00 a.m. shift and 11:00 a.m. shift and a
22  12:00 p.m. shift?
23            MR. KATAEV:  Objection to
24       form. You can answer.
25       A.  Correct.

Page 37

1        Ishaque Thanwalla
2        Q.  Regardless of what time Leticia
3   started, what time would she end work?
4        A.  She would end work when the
5   shift is finished.
6        Q.  When would the shift be
7   finished; let's start from the 10:00 a.m.
8   shift?
9        A.  When I gave you the answer for
10  my question, what time the operating hours
11  are, the hours are 7 in the wintertime and 8
12  in the summertime.
13            MR. KATAEV:  Objection.
14       Asked and answered.
15       Q.  During the workday, would she
16  have any break time?
17       A.  Sure she did, she went out for
18  the break, always did. Her and David
19  Manrique.
20       Q.  Was there a fixed time for
21  break?
22       A.  Fixed time for break?  This is
23  how the break works.  It's an eight-hour
24  shift and they can either take a whole hour
25  or they can take two different breaks, 25 or

38–41

| | |
|---|---|
| Page 38 | Page 39 |

**Page 38**

Ishaque Thanwalla

1
2  15 minute breaks and one and one half hour
3  break. It depends on them.
4      Q.  Is that every workday?
5      A.  Every workday. Why would it be
6  different?
7      Q.  During that, and let's talk
8  about that for a second, is there a time
9  clock at Hillside Auto?
10      A.  No.
11      Q.  Was there a method by Hillside
12  Auto to keep track of the employee's
13  attendance?
14      A.  We used to keep track, yes. That
15  is how they got paid.
16      Q.  Can you describe how the
17  employee's time was kept track of?
18      A.  They came and signed-in and when
19  they went out for a break, they signed out
20  at the desk.
21      Q.  Do you still have those records?
22      A.  Unfortunately, we had a robbery.
23  There were a lot of records that were
24  missing, that was missing.
25      Q.  When did the robbery take place?

**Page 39**

Ishaque Thanwalla

1
2      A.  I can't recall the exact date.
3      Q.  Do you recall the year?
4      A.  Yes, it was 2019 or 2018.  I
5  have no idea, I have to look.
6      Q.  Was a police report filed in
7  conjunction with the robbery?
8      A.  Yes.
9      Q.  Besides the employee's
10  attendance records, what else was taken?
11      A.  Quite a few files that I can't
12  remember exactly what it was.
13      Q.  Are you familiar with an
14  individual by the name of Deana Jennings?
15      A.  Yes.
16      Q.  How are you familiar with her?
17      A.  She was the controller at the
18  time.
19      Q.  What is her role now?
20      A.  To make sure the payroll is
21  done, making sure the deals were funded,
22  making sure the accountings were good.
23      Q.  Was her role in 2018 and 2019
24  the same as her role is now?
25      A.  She's no longer working with me;

| Page 40 | Page 41 |
|---|---|

**Page 40**

Ishaque Thanwalla

1
2  I have a new controller and her name is
3  Susan.
4      Q.  When did Deana Jennings leave
5  work at Hillside Outlet?
6      A.  I can't recall the exact date.
7      Q.  What was Deana Jennings'
8  position before she left?
9      A.  I don't understand your
10  question.
11      Q.  Did she have a title, like for
12  instance, you are the general manager,
13  right?  Did she have a title?
14      A.  Yes, I answered that question to
15  you as her title was controller.
16      Q.  Was she employed by Hillside
17  Auto Outlet?
18      A.  Yes.
19      Q.  Was she also employed at the
20  same time at Hillside Auto Mall?
21          MR. KATAEV:  Objection to
22          the form.  You can answer.
23      A.  Yes.
24      Q.  What was her title at Hillside
25  Auto Mall?

**Page 41**

Ishaque Thanwalla

1
2      A.  I can't answer that question
3  because I don't know.  Anybody can have two
4  jobs, it's certainly not my place.  Certain
5  hours at my place and certain hours -- I
6  can't answer that, what she did over there.
7      Q.  To your knowledge, was she also
8  in charge of billing at Hillside Auto Mall?
9          MR. KATAEV:  Objection to the
10          form. You can answer.
11      A.  I can't answer that question., I
12  don't know.  I don't go there for me to see
13  what she does.
14      Q.  Right now you've stated that you
15  have a new controller and the name is Susan.
16  Do you have Susan's last name?
17      A.  Her last name is -- I can't
18  pronounce it, but I call her Susan ''Z''.  I
19  can get the name for you; she has been with
20  me since a long time.
21      Q.  Do you know how to spell her
22  last name even if you can't pronounce it.
23      A.  I can't, I will make a phone
24  call when you give me a break.
25          MS. TROY:  Understood.  We

Page 42

Ishaque Thanwalla

1
2      will leave a blank space in
3      the record for the last name
4      for you to fill in
5      subsequently.  Thank you for
6      being helpful.
7
8      (insert)
9          THE WITNESS:  You're
10      always welcome.
11   Q.  Does she also work for Hillside
12  Auto Mall currently?
13      A.  No.
14      Q.  How do you know?
15      A.  How do I know?  Because she was
16  working for me full-time.
17      Q.  Are you telling me that Deana
18  Jennings did not work for you full-time
19  before?
20      A.  Not full-time.
21      Q.  What was her schedule?
22      A.  I can't recall.
23      Q.  Why did she leave work?
24      A.  I answered that question prior,
25  I can't recall.

Page 43

Ishaque Thanwalla

1
2          MR. KATAEV:  Objection.
3      Asked and answered.
4          MR. KATAEV:  Can we take a
5      quick break so that I can
6      stop coughing so much?  We
7      can take that break whenever
8      you want.
9          MS. TROY:  We can take
10      that five-minute break right
11      now and come back at 10:51,
12      if that sounds good to you.
13          MR. KATAEV:  10:50 is
14      fine.
15      (A recess was taken from
16      10:47 a.m. until 10:51 a.m.)
17   Q.  Mr. Thanwalla, when is your
18  birthday?
19      A.  My birthday is ███████.
20      Q.  What are the last four digits of
21  your social security number?
22      A.  Why do you need my social
23  security?
24      Q.  For identification purposes.
25      A.  You have -- you will get a copy

Page 44

Ishaque Thanwalla

1
2  of my driver's license.  That is my privacy
3  and I don't like to give it out while the
4  plaintiff is present on the iPhone.
5          MR. KATAEV:  I'm going to
6      object to this ongoing
7      embarrassment and for the
8      latest items, under Rule 50.
9      Q.  Do you have it?
10      A.  Do I have what?
11      Q.  Do you have your social security
12  number?
13      I just need the last four and we can
14  agree that is not going to be -- that it's
15  going to be marked it's not going to be
16  prejudicial and it's going to be marked as
17  confidential.
18          THE WITNESS:  I don't
19      remember it right now.
20          MS. TROY:  Fine, just
21      please fill it out
22      subsequently, and we agree
23      again, we will be marking
24      this as personal and
25      confidential in the

Page 45

Ishaque Thanwalla

1
2      transcript.
3
4      (insert)
5      Q.  Back on the record now, Mr.
6  Thanwalla, did the pay structure that you
7  mentioned earlier ever change for Leticia
8  Stidhum?
9      A.  I answered that question, it's
10  bonuses and things that we give.  So, it's a
11  yes, it changes not just for Leticia, for
12  everyone.  It's based on the daily bonuses,
13  the weekly bonuses and the monthly bonuses.
14  I have answered your question more than
15  once.
16          MR. KATAEV:  Objection.
17      Asked and answered.
18      Q.  How about the $300 weekly plus
19  the $150 flat commission, did that ever
20  change?
21      A.  Not to my knowledge.
22      Q.  Were all of your car salesmen
23  paid $300 base weekly pay or did some get
24  more or less than that amount?
25          MR. KATAEV:  Objection

46–49

Page 46

Ishaque Thanwalla

1      irrelevant. You can answer.
2         A.  Everybody is different, most of
3   them got paid $300.
4         Q.  Did anyone, during Leticia's
5   employment, get paid $350 a week?
6         A.  I can't remember, possible based
7   on seniority.
8         Q.  How about $200 per week?
9         A.  I can't answer that question, I
10  don't think so, but ---
11        Q.  How about $500 per week?
12        A.  You are repeating the question
13  again and again.  I said ''no,'' numerous
14  times.  How many times do I have to say ''no?''
15        Q.  By ''no'' do you mean that you did
16  not pay anyone $500 base weekly salary?
17           MR. KATAEV:  Objection as
18           asked and answered.
19           MS. TROY:  I am on the
20           last question in that line,
21           please answer to the best of
22           your ability.
23        A.  I can't recall.
24        Q.  How about $600 per week in base

Page 47

Ishaque Thanwalla

1   weekly salary; did anyone during Leticia's
2   employment get paid that amount?
3         A.  I think the managers did.
4         Q.  The managers got paid that base
5   weekly salary plus a commission; is that
6   correct?
7         A.  Yes.
8            MR. KATAEV:  Objection as
9            to relevance. You can answer.
10        Q.  You also mentioned the weekly
11  schedule, did the weekly schedule ever
12  change for Leticia between the start of her
13  employment until the end of her employment?
14        A.  I answered that question
15  previously, every week or every two weeks
16  the schedule changed for everyone.
17           MR. KATAEV:  Objection as
18           to asked and answered.
19        Q.  What were the store hours for
20  Hillside Outlet and the timeframe is 2018
21  and 2019?
22           MR. KATAEV:  Objection.
23           Asked and answered.  You can
24           answer.

Page 48

Ishaque Thanwalla

1         A.  I have answered that question
2   previously to you that the winter hours,
3   about the winter hours and the summer hours.
4            MS. TROY:  You can answer
5            it again.
6         A.  It is 10:00 to 7:00 in the
7   winter and the summertime mostly it is 10:00
8   to 8:00.
9         Q.  If a customer came in before the
10  store closed, would the car salespeople have
11  to serve the customer even if it's around
12  the store closing time?
13        A.  It's mostly the finance manager
14  would have to serve.  The salesmen did not -
15  - they did their jobs and they could leave
16  it to the finance manager, he stays because
17  they are managers and they have to finish
18  the job.
19        Q.  Were there ever times when
20  Hillside Auto Outlet salespeople had to stay
21  after the store closing time?
22        A.  Not have to stay, but they
23  stayed on their time. It was goodwill if
24  they wanted to, it's their choice to stay

Page 49

Ishaque Thanwalla

1   because it's their deal. If they want to
2   stay, they're welcome to stay, if they
3   weren't staying, they didn't have to stay.
4   We made sure that they got compensated.
5         Q.  Typically, how long would they
6   stay after if there was a customer that came
7   in before the closing time?
8         A.  What do you mean by ''before the
9   closing time?'' Right at closing time or
10  hours before closing time or two hours?  It
11  all depends on the deal, how long it takes
12  for the bank to reply back and give us an
13  answer.  You can stay between 30 to 70
14  minutes to reply back and sometimes it may
15  take longer than that.  It all depends, and
16  that's my answer for that question.  It's my
17  answer because it is industry -- it's the
18  auto industry and it works differently than
19  most of the other industries.
20      We cannot answer when the bank is going
21  to reply back and give us approval on the
22  documents.  All the documents on there are
23  there and there is a lot of puzzles that
24  need to be put together before we can say

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 14 of 62 PageID #: 925

50–53

**Page 50**

Ishaque Thanwalla

1
2  that they're going to stay longer or the
3  customer is going to come back tomorrow.
4  Does that answer your question?
5      Q.  Why don't you walk me through
6  the different pieces of the puzzle that need
7  to be put together?
8      MR. KATAEV:  Objection to
9  the form.  You can answer.
10     A.  The puzzle, to put it together,
11 the customer walks in and the salesman
12 approaches them and greets them, correct?
13 Show them a car, then they take a credit
14 application.  Once they take the credit
15 application, we will ask to have some
16 documentation, and we run the credit before
17 we have any documentation, meaning pay
18 stubs, bank statements, and utility bills.
19 It all depends, so we run the credit based
20 on that.  We will ask the salesman to get --
21 to collect all the documentation and they
22 try to get that, and it could take between
23 30 and 40 minutes.
24    From there, we put the deal into
25 finance, and once the papers are all

**Page 51**

Ishaque Thanwalla

1
2  together, sometimes we don't have the
3  paperwork together and we try to do it so
4  that we can upload the documentation.
5  Later, when the salesman is trying to get
6  that, they get the price, and then 40 or 50
7  minutes later, whatever time it takes.
8     So, once you get approval, we search
9  the numbers and give the numbers to the
10 customer, the sales price, the car payments,
11 if they want to buy any accessories.  Once
12 that is all done, the finance manager will
13 get the approval, the finance manager will
14 sign the contract and the guy would deliver
15 the car.
16     Q.  If the customer came in right
17 before the closing time, would sometimes
18 Hillside Auto Outlet car salespeople have to
19 stay until 9:00, 10:00 or 11 o'clock to
20 finish the deal?
21     MR. KATAEV:  Objection.
22     Asked and answered.  You can
23     answer that again.
24     A.  You have asked me that question
25 already.  When you say ''have to stay,'' I

**Page 52**

Ishaque Thanwalla

1
2  answered that question.  No, I said no.
3  Based on the salesperson, if they want to
4  stay on their own goodwill.  Are you going
5  to be repeating the same question a second
6  time?
7     MR. KATAEV:  Please answer
8     the question.
9     MS. TROY:  Please just
10     answer my questions, and
11     again, I appreciate your
12     various comments.  But, this
13     is not your deposition.  So,
14     please stop giving me
15     directions and just answer my
16     questions so that we can get
17     this done as soon as
18     possible.
19     MR. KATAEV:  How long?
20     MS. TROY:  Let's go off
21     the record.
22     (A discussion was held off
23     the record)
24     Q.  Were there times when Leticia
25 Stidhum stayed until 9:00 or 10 o'clock or

**Page 53**

Ishaque Thanwalla

1
2  11 o'clock on her ''own goodwill'' as you put
3  it?
4     A.  Would not even know, my store
5  was open 9:00 or 10:00 or 11:00, we may have
6  stayed to 8:00, or maybe 9 o'clock.
7     Q.  How about during the summertime,
8  were there times when Leticia had to stay
9  until 9:00 or 10:00 or 11:00 p.m.?
10    A.  I answered that question for the
11 summertime.  I said 8 o'clock up to 9
12 o'clock.  I did not say 7 to 8 o'clock.
13    Q.  How would you describe Leticia
14 as a car saleswoman at Hillside Auto Outlet?
15    MR. KATAEV:  Objection.
16    Vague, but you can answer.
17    A.  I hired her, I trained her.  She
18 was a very good salesperson.
19    Q.  Do you recall of the 70 to 75
20 cars that Hillside Auto Outlet sold overall
21 for the months, how many cars would Leticia
22 sell when she was employed?
23    A.  I answered that, but I would say
24 between 20 and 25, sometimes 15.  It
25 depended on her month and her ability.

54–57

Page 54

Ishaque Thanwalla

1
2    Q.  How about for the months of
3    September through February, obviously she
4    did not work there until February during the
5    less busy months, as you called it, how many
6    of the 40 to 50 cars that would be sold by
7    Hillside Auto Outlet overall would be sold
8    by Leticia?
9        A.  I answered that question.
10   Between 15 and 25.
11       Q.  Are you familiar with the
12   software called DealerTrak?
13       A.  (No response)
14           MR. KATAEV:  If you can
15           answer the question.
16       A.  Yes.
17       Q.  How are you familiar with it?
18       A.  It's a dealer deal management
19   system.
20       Q.  At Hillside Auto Outlet between
21   2018 and 2019, who had the username of the
22   DealerTrak system?
23       A.  To the best of my knowledge, it
24   was me, it was Jeanique J-E-A-N-I-Q-U-E.  I
25   believe that was -- also, Serge, and I would

Page 55

Ishaque Thanwalla

1
2    say Louis.
3        Q.  Who is Jeanique?
4        A.  Jeanique was my manager.
5        Q.  From what date to what date?
6        A.  I can't recall. I don't know
7    exactly.
8        Q.  Who is Serge?
9        A.  Finance manager.
10       Q.  Again, from what date to what
11   date?
12       A.  He's still working and I don't
13   know when he started.
14       Q.  Who is Louis?
15       A.  Finance manager.
16       Q.  Between 2018 and 2019, did
17   anyone else have a username in the
18   DealerTrak system?
19       A.  Maybe we can run the DealerTrak
20   and find out.
21       Q.  Do you know an individual by the
22   name of Andris Guzman?
23       A.  Yes.
24       Q.  Who is he?
25       A.  Manager.

Page 56

Ishaque Thanwalla

1
2    Q.  When did he start working for
3    Hillside Auto Outlet?
4        A.  I can't recall the date that he
5    started, neither can I recall the date that
6    he finished.
7        Q.  Do you recall the year?
8        A.  2018/2019/maybe 2020.  I don't
9    know when he left.
10       Q.  When you say 2018/2019 or 2020,
11   do you mean the year he started or finished
12   or both?
13       A.  I said 2018/2019 or 2020.  I
14   don't know when he left, started in 2018.
15       Q.  When he started in 2018, was he
16   the manager?
17       A.  He was my assistant.
18       Q.  When did he become the manager?
19       A.  He was my assistant manager,
20   that's what I meant.
21       Q.  Did his position ever change
22   from the time when he began in 2018 as the
23   assistant manager?
24       A.  Not that I can recall.
25       Q.  Earlier you mentioned that you

Page 57

Ishaque Thanwalla

1
2    do not recall when Jeanique left Hillside
3    Auto Outlet; do you recall what year?
4        A.  It was 2018, if I'm not wrong.
5        Q.  Do you recall what month?
6        A.  No.
7        Q.  Was there a point when Andris
8    Guzman was employed as assistant manager to
9    Jeanique's position?
10       A.  Not that I can recall, Jeanique
11   was assistant too because I have to have two
12   managers because of the hourly schedule.
13   So, one had to cover the time in the
14   afternoon, and it was me who put out the
15   hours from the morning until late, again.
16   I'm going to -- I go in as early as possible
17   and I come out mostly the last person.
18       Q.  Is it fair to say that Andris
19   Guzman took Jeanique's position after she
20   left Hillside Auto Outlet?
21       A.  No.  He had the same rank as
22   Jeanique.  How can he take her place? They
23   were both my assistants.
24       Q.  Before Jeanique left Hillside
25   Auto Outlet, were car salesmen promised

A0309

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 16 of 62 PageID #: 927

58–61

Page 58

Ishaque Thanwalla

1
2  commissions on top of the amount that you
3  just mentioned, the 300 weekly plus the $150
4  flat rate.
5       A.  When you say ''on top of,'' let me
6  just answer your question.  I have answered
7  that question, that nobody was promised, and
8  every day there is a different bonus up to 5
9  percent on a car.  That can change daily, on
10  a daily basis on a car on a weekly or a
11  monthly basis.  So, yes there were bonuses
12  that we put out and nobody was promised
13  anything but $150.
14           MR. KATAEV:  Objection to
15        the form of that.
16       Q.  Do you agree that 5 percent of
17  the $3,000 is 150?
18       A.  Do I agree mathematically?  I
19  agree, but I don't know why you are asking
20  this question, who you are asking this
21  question to.
22       Q.  Between 2018 and when Leticia
23  began working at Hillside Auto Outlet until
24  in or around July or August of 2018, was
25  there in fact an incentive structure in

Page 59

Ishaque Thanwalla

1
2  place whereby the car salesman were promised
3  a 5 percent for the sales made in excess of
4  $3,000?
5       A.  When you go back to your
6  question, please stop saying ''promise,''
7  because I have not promised anything.  I
8  have answered that question numerous times.
9  So, it is a little bit annoying, forgive me
10  to say that, but you say ''promise, promise,''
11  there is no promise.  I answered that
12  question maybe 7 times prior to that we have
13  a bonus structure in place.
14       You understand that or are you going to
15  go back and ask me the same question again
16  and again?  ''Promise, promise,'' I never
17  promised any of my employees.  We do a bonus
18  program that we do every day and sometimes
19  we don't have it, sometimes we do.  Yes,
20  there is no promise, but there is a bonus
21  structure depending on the day and the month
22  and the week.  Did that completely answer
23  your question?
24       Q.  In fact, did the bonus structure
25  stay the same in or around July or August --

Page 60

Ishaque Thanwalla

1
2       A.  It still stays the same.
3       Q.  Did Hillside Auto Outlet in fact
4  pay a 5 percent bonus for sales done in
5  excess of $3,000 between 2018 and in or
6  around July or August of 2018?
7       A.  Let me answer your question.
8  You are asking me if they were paid beyond
9  above 5 percent over $3,000?
10       Let me answer that question as to no,
11  based on the bonus, sometimes we did and
12  sometimes we did not.  Does that answer your
13  question?
14       Q.  By that, let's go a step
15  further: between 2018 and July or August of
16  2019, did Hillside Auto Outlet in fact pay 5
17  percent that we were just mentioning?
18       A.  The answer is no, 5 percent was
19  the bonus subject to the car, subject to the
20  day, subject to the week, and it changed.
21  There was sometimes there was not until
22  today's date the same plan or structure.
23       Q.  Is it fair to say that when
24  Jeanique left, the 5 percent was no longer
25  paid to the car salespeople at Hillside Auto

Page 61

Ishaque Thanwalla

1
2  Outlet?
3       A.  Jeanique had nothing to do with
4  taking the 5 percent.  It was my bonus and I
5  used to give it based again on the day and
6  the car and the week and the month.  It all
7  depended, so Jeanique had no power to give
8  anybody anything, nor could she promise
9  anything.  No, it was me who did, who ran
10  the dealership if that answers your question
11  again.
12       Q.  What was David Baron's position
13  at Hillside Auto Outlet?
14       A.  I answered that question
15  previously, he was a percentage owner.
16       Q.  What were his job
17  responsibilities at Hillside Auto Outlet?
18           MR. KATAEV:  Objection to
19        the form.  You can answer.
20       A.  He had no responsibilities.
21       Q.  How about Jory Baron, what were
22  his responsibilities as a percentage owner?
23           MR. KATAEV:  Objection to
24        the form.  You can answer.
25       A.  No responsibilities.

62–65

Page 62

Ishaque Thanwalla

1
2  Q. How about Josh Aaronson?
3  A. No responsibilities.
4  Q. We were talking about the
5  DealerTrak system; did you at any time
6  provide your username and password to
7  Leticia Stidhum?
8  A. No, and I never will to any
9  employee.
10  Q. Did you write a username and
11  password on a Post-It note and pass it on to
12  Leticia?
13  MR. KATAEV: Objection
14  Asked and answered, but you
15  can answer.
16  A. No.
17  Q. Have you ever personally trained
18  Leticia on the DealerTrak system?
19  A. No.
20  Q. Did Andris Guzman have an
21  account in the DealerTrak system?
22  A. Yes.
23  Q. When Andris Guzman had left
24  Hillside Auto Outlet, was there a time when
25  you told Leticia Stidhum that as the top

Page 63

Ishaque Thanwalla

1
2  saleswoman, you would prefer her to run the
3  DealerTrak system with her customers first?
4  A. No.
5  Q. Does Hillside Auto Outlet have
6  any written policies regarding
7  discrimination?
8  A. Whatever policy we have, we take
9  a policy from corporate, and from the EDD we
10  have it posted for the people, equal
11  opportunity employment posters, the EDD
12  employment. So, we do have posters posted
13  in the lunchroom where we eat lunch.
14  Q. By ''corporate,'' what do you
15  mean?
16  A. Meaning that we have posters for
17  the employment for them to read and know
18  what their rights are.
19  Q. You said you had written
20  policies from corporate?
21  A. Yes. That is what corporate
22  gives us, and things, they were payroll
23  company what I meant, actually. Payroll
24  company provides ADP for us with all the
25  posters and everything. Any updates come

Page 64

Ishaque Thanwalla

1
2  in, we get it.
3  Q. Have you ever traveled outside
4  the country in December of 2018?
5  A. Yes.
6  Q. Where did you travel to?
7  A. Back home, Pakistan.
8  Q. When did you travel outside of
9  the United States?
10  A. In 2018; is that your question?
11  Q. Correct.
12  A. It's between, if I can recall, I
13  usually leave on the 20th or the 21st or the
14  22nd of December, and I usually come back
15  between the 5th or the 7th. That is my
16  usual trip every year except last year.
17  Q. Earlier you mentioned that the
18  posters would be posted in the lunchroom.
19  Can you describe where that was?
20  A. Posted, I have described to you
21  the posters are posted in the lunchroom.
22  What don't you understand?
23  Q. Where is the lunchroom within
24  Hillside Auto Outlet?
25  A. There is a lunchroom right next

Page 65

Ishaque Thanwalla

1
2  to the finance office, my office and the
3  hallway right outside there was a lunchroom.
4  They can sit down, there are tables and
5  stools and they can sit and eat their lunch
6  and the microwave.
7  Q. Specifically in 2018, when did
8  you travel to Pakistan?
9  A. I gave you an approximate which
10  I mentioned to you earlier. I gave you an
11  answer that it was about the 20th, the 21st,
12  and probably back by the 6th or 7th, the
13  5th, 6th or 7th. I am usually back then and
14  I can't recall the exact date. But I can
15  look into it and I can answer that question
16  specifically.
17  MR. KATAEV: Can we take a
18  five-minute break whenever
19  you like?
20  MS. TROY: We just took a
21  break. If you don't mind, I'm
22  going to go for a little bit
23  and then we will take that
24  break if it's not a problem.
25  MR. KATAEV: Okay.

A0311

66–69

Page 66

Ishaque Thanwalla

1
2  Q. Did you speak with anyone in
3  preparation for today's deposition?
4        A. Do you mean about the case?
5  Emmanuel, my attorney.
6        Q. Besides your attorney, did you
7  speak with anyone else?
8        A. No.
9              MS. TROY:  I'm going to
10                  ask the reporter to leave a
11                  blank space in the transcript
12                  for the date when Mr.
13                  Thanwalla traveled outside of
14                  the United States as well as
15                  a blank for the date when he
16                  returned to the United
17                  States.
18
19             (insert)
20
21             (insert)
22        Q. Mr. Thanwalla, you traveled to
23  Pakistan; was that with a passport?
24        A. How else could I travel?
25        Q. In the weeks prior to your

Page 67

Ishaque Thanwalla

1
2  traveling, were you out of Hillside Auto
3  Outlet?
4        A. Can you repeat your question one
5  more time, please?  I didn't hear it right.
6        Q. Sure.  I'm asking you if the
7  week before you traveled physically outside
8  of the United States, if you worked outside
9  of Hillside Auto Outlet, where you are not
10  working at Hillside Auto Outlet during the
11  week before.
12        A. I worked until the last day
13  before I leave.  So, the answer to that is
14  no, I was working until the last day before
15  I left.
16        Q. Until the last day before you
17  left, were you there from the start of the
18  day until the end of the day, every day, in
19  Hillside Auto Outlet?
20        A. Before I left, was that the
21  question?
22        Q. Right, before you left.
23        A. Let's say if I left on a
24  Saturday, correct?  Yes, I would be working
25  Friday from the morning until evening, to

Page 68

Ishaque Thanwalla

1
2  give you a complete understanding.  So, if I
3  was supposed to be leaving around on a
4  Saturday, yes, I would work Wednesday,
5  Thursday, Friday, and through the morning of
6  the day until Friday until Saturday, not for
7  the afternoon.  So, I would not come to work
8  on that day.  Does that answer your
9  question?
10        Q. Was it your practice to
11  interview every single employee for Hillside
12  Auto Outlet?
13        A. In my what?
14        Q. In your practice.
15        A. I do try my best to interview
16  everyone because I am the one who is hiring
17  and I am the only one who is firing.
18        Q. I'm going to show you a document
19  on the screen.
20              MS. TROY:  Ms. Court
21                  reporter, can you mark this
22                  as Plaintiff's Exhibit 2?
23              (Plaintiff's Exhibit 2 marked
24                  for identification)
25        The entire document will just be

Page 69

Ishaque Thanwalla

1
2  marked as Plaintiff's Exhibit 2 and I
3  will be referring to different pages
4  when I speak to  Mr. Thanwalla.
5        Q. Mr. Thanwalla, do you see a
6  document that was Defendant's Document
7  Production, D1186.  On it, it says the hire
8  date was May 22nd of 2018, and the
9  termination date was January 14th, 2019.
10  Does this refresh your recollection as to
11  when Leticia started?
12        A. If the document says it, I am
13  looking at it most likely, yes.
14        Q. How about the end date?
15        A. The end date may be a little --
16  it says again, to the best of my
17  recollection, it looks like Leticia quit her
18  job, left to the other company.
19        Q. Just to clarify, the document
20  says January 14th, of 2019. You are saying -
21  -
22        A. Best of my ability.  I said I
23  can't  recall, I still can't recall.  She
24  came to my office and she said she's going
25  to go with Ali to the other dealership and

A0312

70–73

Page 70

Ishaque Thanwalla

1
2  that was in the afternoon time when she
3  left.
4          MS. TROY:  We can now take
5          a short break for five
6          minutes and come back at
7          11:35.  It is now 11:30 per
8          Manuel's request.
9          (A recess was taken from
10         11:30 a.m. until 11:35 a.m.)
11         THE WITNESS:  Welcome
12         back.
13         MS. TROY:  No need to
14         welcome me back.  When we are
15         doing the deposition, if you
16         don't mind, please don't talk
17         to me.  The Troy's are
18         straightshooters and we don't
19         do that to anyone, we don't
20         welcome back anyone, we just
21         do our jobs.
22     Q.  Are you familiar with an
23  employee for Hillside Auto Outlet whose name
24  is Lilly?
25     A.  Yes.

Page 71

Ishaque Thanwalla

1
2      Q.  How are you familiar with her?
3      A.  She was my DMV clerk.
4      Q.  Do you remember from what date
5  to whay date she worked for Hillside Auto
6  Outlet?
7      A.  I cannot.
8      Q.  Do you recall from what year she
9  began working at Hillside Auto Outlet?
10     A.  Can you repeat the question one
11  more time?
12     Q.  Sure.  Do you recall what year
13  she began working at Hillside Auto Outlet?
14     A.  I believe it's 2018, if I'm not
15  wrong, but I may be wrong.
16     Q.  At the time when Lilly left
17  Hillside Auto Outlet, was she pregnant?
18     A.  Was she pregnant when she worked
19  for me?  She was pregnant when she left, she
20  was pregnant.
21     Q.  Did she quit or did she get
22  fired from Hillside Auto Outlet?
23     A.  Well, let me answer this
24  question in a way where everybody can
25  understand what happened.  When she left,

Page 72

Ishaque Thanwalla

1
2  she was doing the DMV paperwork, and the DMV
3  is a crucial business.  We have to register
4  the car within 5 days and it was a couple of
5  deals that were not registered.  I
6  disciplined her to say ''why aren't these
7  registered?  There was no registration that
8  was performed.  What is the reason behind
9  it?''  She didn't like me disciplining her
10  because I don't want to lose my license to
11  do business.  So, she didn't like my
12  disciplining her and she left.
13     Q.  When she left, did she say
14  anything to you at the dealership?
15     A.  Not really, not that I can
16  recall.
17     Q.  Did Lilly leave upset?
18     A.  I cannot answer that question
19  because I don't--- I can't recall.  You
20  can't have anyone jeopardizing your license
21  in your industry.  I won't have anybody
22  jeopardizing my license.  So, if I
23  discipline someone to tell them how to
24  perform their job the right way, how to
25  finish the job, it's nothing wrong with

Page 73

Ishaque Thanwalla

1
2  that.  I will tell them that they needed to
3  finish this for us to have our license in
4  place.  If they're not going to do that,
5  it's not fair to me.
6      Q.  Did Lilly complain that she was
7  getting fired because she was pregnant?
8      A.  Never.
9      Q.  Do you know how many months'
10  pregnant she was when she left?
11     A.  When she started, when I
12  answered the question, she was pregnant.
13  When she left, she was pregnant and I can't
14  answer that question.
15         MR. KATAEV:  Objection as
16         to relevance and to this
17         entire line of questioning.
18         She is not a plaintiff in
19         this case.
20     Q.  What is Lilly's last name?
21     A.  I can't recall because you can
22  see I can't remember Jeanique's last name
23  and I can't remember a lot of people's last
24  name.  I don't even remember Leticia's last
25  name.

74–77

Page 74

Ishaque Thanwalla

1
2      MS. TROY:  I'm going to
3      leave a blank in the
4      transcript for you to fill
5      that in.
6
7      (insert).
8   A.  --
9      MR. KATAEV:  There is no
10     question pending.
11  Q.  At the time of her termination,
12  what was Lilly's schedule?
13           MR. KATAEV:  Objection as
14     to relevance. You can answer.
15  A.  She was a part-timer, she worked
16  part-time for the DMV work.
17  Q.  At the time that she was fired,
18  how many months had she worked for Hillside
19  Auto Outlet?
20        MR. KATAEV:  Objection,
21        same objection.
22  A.  She was not fired, she quit on
23  her own.
24  Q.  At that time, how many months
25  had she worked for Hillside Auto Outlet?

Page 75

Ishaque Thanwalla

1
2   A.  I can't answer that question, I
3   cannot recall.  When she started, like I
4   said, she was pregnant and she left, she was
5   pregnant.
6   Q.  You mentioned disciplining her;
7   are there any records?
8   A.  There should be a record, like I
9   said, we had a robbery.
10  Q.  Your contention is that the
11  records were stolen?
12  A.  I am not -- I cannot answer that
13  question.
14  Q.  You cannot answer the question
15  because you don't know?
16  A.  I don't know.  Thank you.
17  Q.  Just to be clear, we are talking
18  about one robbery or multiple robberies?
19  A.  One robbery.
20  Q.  During that robbery, were any
21  electronics stolen?
22  A.  I think so, but I'm not sure.
23  Q.  In addition to the electronics,
24  were a few hundred dollars also stolen?
25  A.  I think so, but I'm not sure.  A

Page 76

Ishaque Thanwalla

1
2   lot of paperwork was gone and scattered.
3   Q.  At the time of the robbery or
4   soon thereafter, did you and Leticia
5   together review the surveillance?
6   A.  Yes.
7   Q.  Did Leticia identify the robber
8   as someone who worked for you?
9   A.  Yes.
10  Q.  Do you recall if the
11  surveillance video showed the robber taking
12  any documents?
13  A.  Robbers taking -- the robber,
14  the way I can describe it is when he was
15  inside, he did not get the caption that's
16  what he said when he was going out.
17  Q.  Do you still have surveillance
18  video?
19  A.  I think so, but I'm not sure.
20  Maybe, maybe, but I can't answer that
21  question.  I don't know if our surveillance
22  goes that far back.  I think you only keep
23  the records for 30 days,
24  Q.  At the time when you and Leticia
25  were reviewing the surveillance video, did

Page 77

Ishaque Thanwalla

1
2   you send a copy of that video to your
3   attorney?
4   A.  I think that she sent it to me,
5   probably.
6   Q.  What phone were you using at the
7   time; was it an iPhone, an Android, what was
8   it?
9   A.  A different phone than this
10  iPhone, yes.
11  Q.  You mentioned different phones,
12  how many times have you changed your phone
13  since the robbery?
14  A.  One or two times, if I can
15  recall.
16  Q.  Each time did you change to
17  another iPhone?
18  A.  Yes.
19  Q.  Did you back up your data using
20  the iCloud?
21  A.  I have no idea how to do that.
22  Q.  Did someone back it up for you?
23  A.  I can't answer that question
24  because I don't know.
25  Q.  Do you still have any text

78–81

Page 78

1    Ishaque Thanwalla
2    messages that you had with Leticia?
3        A. Yes.
4        Q. Just to be clear, the text
5    messages that you have with her, was that on
6    a regular text message or was it on another
7    app?
8        A. There were multiple apps, one
9    was the regular text message and one was
10   WhatsApp.
11       Q. You texted with her on both the
12   regular text message, as well as the
13   WhatsApp?
14       A. Yes. When I am back home in
15   Pakistan, when I left, like I said the 20th
16   or the 21st of 2018 and I came back on
17   January 5th and 7th, she frequently texted
18   me on WhatsApp, I had communications with
19   her, as well as other employees on the
20   WhatsApp channel.
21       Q. You don't have those text
22   messages?
23       A. Yes, I do.
24       Q. In addition to the regular text
25   messages and WhatsApp, do you have any other

Page 79

1    Ishaque Thanwalla
2    records of your communications with Leticia
3    Stidhum?
4        A. May be available on my email. I
5    can't recall. 100 percent.
6        MS. TROY: Demand number 1
7    is for the text messages
8    between Ishaque Thanwalla and
9    Stidhum.
10       Demand number 2 is for the
11   WhatsApp messages between
12   Thanwalla and Leticia.
13       Demand number 3 is for
14   the email exchanges between
15   Ishaque Thanwalla and
16   Stidhum. The timeframe is
17   between September of 2018 --
18   actually, let's backtrack.
19   It's from November of 2018
20   through January of 2019.
21       Q. Mr. Thanwalla, what was your
22   phone number at the time?
23       A. Same number as today. It is 661-
24   886-8012.
25       Q. Who is your service provider?

Page 80

1    Ishaque Thanwalla
2        A. Verizon.
3        Q. What'sApp, did you sign up using
4    your phone number?
5        A. Correct.
6        Q. The emails that you mentioned,
7    is that your work email or is that some
8    other email address?
9        A. My work email. To be clear, I
10   do have a Hillside Auto Outlet computer, and
11   it's I-S-H-A-Q-U-E@hillsideautooutlet.com.
12       Q. Please if you don't mind, just
13   confirming that that is the correct email
14   address?
15       (The witness complies)
16       MR. KATAEV: Let the
17   record reflect that
18   plaintiff's counsel typed in
19   I-S-H-A-Q-
20   E@hillsideoutlet.com on the
21   chat.
22       THE WITNESS: Yes.
23       Q. Besides using your work email,
24   did you communicate with Leticia using any
25   other email?

Page 81

1    Ishaque Thanwalla
2        A. No.
3        Q. In the video that we were
4    talking about earlier, was that sent to you
5    from Leticia using text message, WhatsApp or
6    email?
7        A. I can't answer that, I don't
8    recall that. That's why I can't answer that
9    question.
10       MS. TROY: Demand number 4
11   for the surveillance footage.
12       Demand number 5 is for the
13   police report, both of which
14   concerns the robbery that
15   took place at Hillside Auto
16   Outlet. The witness does not
17   recall the timeframe, but the
18   year should be in the year of
19   2018.
20       MR. KATAEV: Please
21   follow-up in writing with all
22   of your requests. Thank you.
23       Q. Before the break I showed you a
24   WhatsApp and the start date and the end date
25   of Leticia Stidhum. What was Leticia

82–85

Page 82

Ishaque Thanwalla

1
2  Stidhum's position at Hillside Auto Outlet?
3      A.  Her position was commission
4  salesperson.
5      Q.  As the commission salesperson,
6  what were her responsibilities?
7      A.  I answered that question prior,
8  but I will answer it again for you.  To show
9  customers the car, meet and greet, show them
10  the car and take a credit application and
11  take documentation.  That was her
12  responsibility.
13      Q.  Did she ever run the credit
14  herself?
15      A.  No.
16      Q.  Earlier you mentioned that you
17  trained her, what did you train her in?
18      A.  How to sell cars; how to meet
19  and greet; how to show them a car; how to
20  take a credit application; how to use a V-I-
21  N Solution.
22      Q.  Can you describe for me what you
23  mean by how to take credit?
24      A.  How to take a credit
25  application, you take the application

Page 83

Ishaque Thanwalla

1
2  whether it's manual or you are welcome to
3  take an application on the Vin V-I-N
4  solutions that they did that sometimes.
5  Sometimes they do not, but if you take a
6  manual application, you use the block
7  letters so that you could read it and it's
8  legible.
9      So, you have first name, last name,
10  driver's license of customer to make sure
11  you are correctly doing it the right way,
12  date of birth, social security and their
13  employment information, their resident
14  information.  You take a simple credit
15  application and make sure that they sign the
16  credit application.
17      Q.  Was Leticia ever given
18  additional responsibilities apart from her
19  position as a commission salesperson?
20      A.  No.
21      Q.  Did you, at any point during
22  Leticia's employment with Hillside Auto
23  Outlet, did you ever talk to her about
24  promoting her to a sales manager position?
25      A.  Never.

Page 84

Ishaque Thanwalla

1
2      Q.  Did you promise her any
3  promotion?
4      A.  Never.
5      Q.  Did you ever tell her that you
6  were traveling to Pakistan, so the
7  discussion about the promotion will wait
8  until you came back to the United States?
9      A.  I never discussed with her any
10  promotions.  What I can recall in her
11  deposition, she mentioned that I promised
12  her a promotion.  She had no right, maybe it
13  was at Ali, maybe he was playing with her
14  head.  No right to promotion, so that he
15  could recruit her if he had another job,
16  which he did.  You can see on the WhatsApp
17  she was going with Ali after the job, but I
18  never did.  He was playing with her mind.
19      Q.  Did Leticia ever complain to you
20  about her pay?
21      A.  Never.  She mentioned that she
22  always made more money than she ever made in
23  her life, so she was very happy.  You can
24  see the text messages and you would see the
25  WhatsApp messages.

Page 85

Ishaque Thanwalla

1
2      Q.  How would you describe your
3  relationship with Leticia during her
4  employment at Hillside Auto Outlet?
5      A.  I treated every employee like my
6  family.  Like she mentioned, the dad of
7  Hillside Auto Outlet.  I was the dad of
8  Hillside Auto Outlet, she respected me and I
9  respected her.
10      Q.  Would it be fair to say that
11  your relationship was quite close?
12      A.  I have close relationships with
13  all my employees.  I am a very caring person
14  and I respect and I love.  That's the only
15  way that I treat my employees.
16      Q.  Earlier you mentioned that Ali
17  was promising her a promotion.  What do you
18  mean, can you describe exactly what you were
19  talking about?
20      A.  When Emanuel (indicating) was
21  taking the deposition from Leticia, she is
22  the one who answered that Ali promised her
23  the promotion, not me.  I never did, she
24  wasn't there to be promoted.  She needed a
25  lot more experience to be promoted as a

A0316

86–89

Page 86

Ishaque Thanwalla

1  sales manager, assistant sales manager to
2  me. Although, she was a good salesperson
3  and that's the best I can tell you.
4      Q. What is the difference between
5  an assistant manager and a sales manager, or
6  was that the same position?
7      A. It was the same position. It is
8  the same to me, my sales manager, because
9  the general manager to me, they are my
10  assistants. One thing I learned, I kept my
11  office right next to my manager so that I
12  could hear what was going on.
13      Q. To be clear, did you also
14  consider the finance manager as an assistant
15  manager?
16      A. Finance manager is my assistant
17  manager. But, they are recognized as the
18  ''finance manager'' because they are the ones
19  who are dealing with the banks.
20      Q. When you talked earlier that you
21  had two assistant managers, did you mean two
22  sales managers or one sales manager and one
23  finance manager?
24      A. Let me just answer that question

Page 87

Ishaque Thanwalla

1  the right way. That's so you do not re-
2  question me again. I had Jeanique as my
3  assistant manager, and I had Guzman as my
4  assistant manager, I had Serge as my finance
5  manager, and I have Louis as my finance
6  manager. Do you understand clearly?
7      Q. Do you not consider the finance
8  manager as the assistant manager?
9      A. They are assistants, it's --
10  they are different divisions, but they are
11  still assistants to me.
12      Q. Is it fair to say that Leticia
13  has left Hillside Auto Outlet, she left in
14  November of 2018, December of 2018, in that
15  timeframe?
16      A. I can't recall so I cannot
17  answer that question.
18      Q. You were saying that Ali
19  promised her the promotion. Was that
20  promotion at Hillside Auto Outlet?
21      A. You asked me, and it was in her
22  deposition that she said it. I am only
23  repeating what she answered the question
24  that Emanuel asked her that question. I am

Page 88

Ishaque Thanwalla

1  just going and referring to that. I am not
2  referring to anything else. Do you
3  understand?
4      Q. So, you don't have any personal
5  knowledge about any promotions whatsoever;
6  is that correct?
7      A. The last time that Emanuel was
8  taking the deposition from her.
9      Q. Have you ever been arrested for
10  any reason before?
11      A. Yes.
12      Q. What were you convicted of
13  before?
14      A. I was mixed up and it was
15  cleared and it was expunged. It was over 15
16  years ago.
17      Q. You mentioned it was over 15
18  years ago, was that the same as the
19  immigration case or different?
20      A. I can't recall honestly, I
21  cannot recall.
22      Q. Do you have any other names
23  besides Ishaque?
24      A. I use Isaac or Abraham, Isaac I-

Page 89

Ishaque Thanwalla

1  S-A-A-C or Ivraham I-V-R-A-H-A-M. I use
2  Abraham A-B-R-A-H-A-M on my business cards
3  just to clarify.
4      Q. Is Abraham the last name or is
5  that part of the first name?
6      A. I used Abraham, that was my
7  father's first name. I don't have a middle
8  initial except it's just Thanwalla.
9      Q. Please take a look at the screen
10  again and we're going to look at the sales
11  log.
12      THE WITNESS: This is --
13      MR. KATAEV: There is no
14  question pending.
15      Q. Mr. Thanwalla, on the screen
16  here we are still on Plaintiff's Exhibit 2.
17  Do you see documents identified as D002 to
18  D067; is that the sales log, if you
19  recognize this document?
20      A. Yes.
21      Q. Were you the one who created
22  this report?
23      A. This was created -- this report,
24  yes.

90–93

Page 90

Ishaque Thanwalla

1
2  Q. To your knowledge, let's start
3  from page 1, to your knowledge, are the
4  number of cars sold on the sold log
5  accurate?
6        A. Not to the best of my ability,
7  no.
8        Q. To your knowledge, does this
9  understate the number of cars sold by the
10  company?
11              MR. KATAEV: Objection to
12        the form. You can answer.
13        A. Sometimes they are correct and
14  sometimes they are not correct, because that
15  is called an ''manual entry.'' So, if my
16  assistant has manually entered it or my
17  salesperson like Leticia had entered it as
18  sold, she had permission in her own name.
19  I just want to add to my answer because the
20  only person that is salesperson is only
21  allowed to see her or his records only.
22  They cannot see anybody else's. If they put
23  it in the -- if the customer came in, they
24  could say that ''the customer came in and is
25  present on the lot. The customer sold -
-''

Page 91

Ishaque Thanwalla

1
2  they can push the button inside and say
3  ''sold.'' It's a salesperson can do that as
4  well as my assistant managers can do that,
5  which is my sales managers.
6        Q. I'm going to show you a
7  different month for the sold log. It is on
8  the screen. My question for you remains the
9  same which is: whether or not the sold log
10  understates for each of the months that I
11  show you the true number of cars sold.
12      We're going to start from May of 2018
13  and we are still on page 2 of the exhibit
14  which also corresponds to defendant's
15  production 32. This is from May of 2018.
16  The car sold are listed as 46.
17        A. My answer is the same exact, and
18  I can't answer that. It looks like 100
19  percent understated, that means 4 or 6 may
20  be understated or maybe it's incorrect.
21  Maybe it was sold, I can't answer based on
22  these records.
23        Q. I am now showing you page 10 for
24  June of 2018; is your answer the same?
25        A. Yes.

Page 92

Ishaque Thanwalla

1
2  Q. For the record, we are on page
3  10, which corresponds to defendant's
4  document production 10.
5      Now we are on page 19 which corresponds
6  to defendant's document production number
7  19. Same question for you, this shows the
8  sold log for the month of July of 2018. Same
9  question.
10        A. I would say so, yes. Whatever I
11  answered previously, this is the exact
12  number. It could be more or less, it all
13  depends. These were on this log and the
14  salesman can do it as well as the assistant
15  manager can do it. That's why they are not
16  100 percent.
17        Q. Now we are on page 28 of exhibit
18  2 which corresponds to defendant's
19  production 28. My question for you is the
20  same, and it's for the month of August of
21  2018.
22        A. My answer is the same.
23        Q. We are on page 37 which
24  corresponds to defendant's document
25  production 37. It is for the month of

Page 93

Ishaque Thanwalla

1
2  September of 2018, is your answer the same?
3        A. Yes.
4        Q. Page 45 now, which corresponds
5  to defendant's document production 45. Is
6  your answer that it covers the month of
7  October of 2018, is your answer the same?
8        A. Yes.
9        Q. Page 52, which corresponds to
10  defendant's document production 52 and
11  covers the month of November of 2018; is
12  your answer the same answer?
13        A. Yes.
14        Q. We are on now page 62 which
15  covers the month of December of 2018. It
16  also corresponds with defendant's document
17  production 62; is your answer the same?
18        A. Yes.
19        Q. Next, I'm going to show you
20  starting from page 1251 which is a list of
21  comparatorS. C-O-M-P-A-R-A-T-O-R-S.
22      We are on page 1251 which corresponds
23  with defendant's document production 1251.
24  My question to you is, can you describe for
25  me what the department code means?

94–97

Page 94

1   Ishaque Thanwalla
2        A.  Department codes are the
3   department codes.
4        Q.  I'm asking about right here, the
5   ''department codes.''
6        A.  Okay.
7        Q.  For the record, I am just
8   highlighting the L-O-C/D-E-P-T.
9        A.  That is the department code, the
10  company code.  The company code may be
11  provided by an ADP company, local
12  department.
13       Q.  Do you know who this individual
14  is that is identified as individual 21?
15       A.  I don't know.  I don't
16  understand your question.  Please repeat it.
17       Q.  Do you know this individual that
18  was paid $2,500 per week, do you know who
19  that is?
20       A.  Who is paid LOC department, I
21  can't answer that because I can't recall who
22  it was.
23       Q.  Is it fair to say that no car
24  salesperson was paid $2,500 a week?
25       A.  No.

Page 95

1   Ishaque Thanwalla
2        MS. TROY:  Can you read
3   back the last question and
4   answer?
5        (The reporter read back the
6   last question and answer)
7        A.  The question is no, yes.  The
8   question is fair.
9        Q.  We are now on page 1252 which
10  corresponds with defendant's document
11  production 1252.  I am going forward with
12  the page numbers and they correspond with
13  defendant's document production numbers.
14  So this individual has a department code of
15  7.  Do you know what that means?
16       A.  No.
17       Q.  This person was paid $650 on a
18  weekly basis, correct?
19       A.  I can't answer that question.
20  It could be anybody else and I can't answer
21  that.  I don't know the codes, and that is
22  what is paid, the payroll is paid to whom.
23       Q.  Is it fair to say that this
24  individual is not a car salesperson?
25       A.  I can't answer that question

Page 96

1   Ishaque Thanwalla
2   because I don't know.
3        Q.  For the record, there is an
4   individual number 22 on page 1254.  I will
5   note for the record that the ''loc department
6   is 200,'' for the L-O-C/department, and there
7   is no individual that is regularly receiving
8   $350.  Do you know if this person is a car
9   salesperson?
10       A.  I can't answer that question, I
11  don't know.
12       Q.  Besides car salespeople, were
13  there any other individuals --
14       A.  Yes.
15       MS. TROY:  I did not
16  finish my question.
17       MR. KATAEV:  Please let
18  Ms. Troy finish her question
19  before you answer.
20       Q.  (Continuing) ---within the
21  Hillside Auto Outlet who were paid
22  commissions?
23       A.  Like I said, anybody else was
24  paid commissions besides the salesperson, is
25  that your question?

Page 97

1   Ishaque Thanwalla
2   Q.  Correct.
3        A.  I don't understand your
4   question.
5        Q.  Were there any other positions
6   or individuals who were paid commission in
7   addition to the car salespeople?
8        A.  The finance manager, which is my
9   assistant, the sales manager, which is my
10  assistant, yes.
11       Q.  Anyone else?
12       A.  Not that I know, not to my
13  knowledge.
14       Q.  Were the porters paid any
15  commission?
16       A.  They got bonuses, but not --
17       Q.  How about the BDC employees did
18  they receive a commission?
19       A.  This is the Business Development
20  Center, is that's what you're referring to?
21       Q.  Yes, did they receive a
22  commission?
23       A.  BDC, the Business Development
24  Center, if that's what you are referring to?
25       Q.  Right.  Did they receive a

98−101

Page 98

Ishaque Thanwalla

1
2  commission?
3        A.  Yes.
4        Q.  Did anyone else,  did the
5  finance and sales managers and members of
6  the BDC receive a commission?
7        A.  I cannot answer that because I
8  don't remember everything, that is why.
9        Q.  Were the BDC employees' base pay
10  similar to that of the salespeople meaning
11  300, around $300 base pay weekly salary plus
12  the commission or something else?
13        A.  I understand that every
14  department has a manager, every department
15  has salespeople and they were all
16  commissioned salespersons.  One was a
17  salesperson, one was a telephone
18  salesperson.  The BDC, they answered the
19  phone and they worked the BDC phone, the
20  salespeople.  They brought the people in and
21  they got paid accordingly too.
22        Q.  Are they also paid a $300 weekly
23  salary plus a flat commission, the 150 per
24  car, or was that arrangement different in
25  that department?

Page 99

Ishaque Thanwalla

1
2        A.  To my knowledge, the arrangement
3  was different, to the best of my ability and
4  the best of my knowledge.
5        Q.  So, the individual identified as
6  2, he was paid $350 flat weekly for the
7  regular pay.  What position did this
8  individual have?
9        A.  I can't answer that because I
10  don't know.  It could be sales or it could
11  be the BDC or finance, I can't answer that
12  question.
13        Q.  We are now on page 1255 and the
14  individual is identified as number 23.  The
15  department is listed as 100.  Is it fair to
16  say that this individual does not work in
17  sales?
18        A.  I cannot answer that question.
19  How would I know?  How would I know by
20  looking at the pay stub?
21        Q.  Who directed the production of
22  these earning statements?
23        A.  What do you mean by that
24  exactly? Please elaborate on the question.
25        Q.  Earlier when I asked you if you

Page 100

Ishaque Thanwalla

1
2  had a role in the preparation of this log
3  you mentioned that you directed that this
4  log be produced.  My question is similar,
5  but do you know who directed the production
6  of the earning statements?
7        A.  I'm still confused by the
8  question.  Let me understand this -- can you
9  tell me differently?  You were telling me
10  who made people's salary when they were
11  going to get paid, is that your question?
12        Q.  Who had the earning statements
13  produced, meaning who asked for the earning
14  statements to be compiled and produced to us
15  and for the Judge?
16        Who requested it to be printed and
17  provided to the Judge and to us within the
18  Hillside Auto Outlet Company?
19        A.  I did.
20        Q.  When you asked for the earning
21  statements to be produced, did you list them
22  by position or did you have the earning
23  statements for all employees implemented?
24        A.  To the best of my ability, I
25  think all employees.

Page 101

Ishaque Thanwalla

1
2        MR. KATAEV:  I will just
3     represent for the record that
4     I believe following June 20
5     of '21 the initial conference
6     before Magistrate Judge Mann,
7     these are items were
8     requested for settlement
9     purposes as this was a
10     settlement conference.  I can
11     represent to you that we
12     worked off of the transcript
13     in order to prepare the
14     production.
15        Q.  To clarify, Mr. Thanwalla,
16  during the conference it was asked for, the
17  comparator to Ms. Stidhum, correct?
18        To the best of your knowledge, were the
19  earnings records of only the sales
20  department produced or was it for all the
21  employees just so that we can get it clear
22  on the record?
23        MR. KATAEV:  Objection.
24     Asked and answered, but you
25     can answer the question.

102–105

Page 102

Ishaque Thanwalla

1
2     A. If I am not wrong, I think to
3  the best of my ability,y it was all the
4  employees.
5     Q. Looking at individual 23, it is
6  listed for $1,825 and the year to date for
7  2018 $150, is it accurate to say that no
8  cars salesperson worked at Hillside Auto
9  Outlet and did not receive a commission?
10    A. I don't understand your
11 question. Please, can you make it a little
12 bit more simple for me?
13    Q. Sure. Are there any non-
14 commission car salespeople at Hillside Auto
15 Outlet?
16    A. No, there is nobody having to do
17 with the sales department -- all of the
18 people having to do with the sales
19 department have commission.
20    Q. Is it accurate to say to the
21 extent that the pay stub reflected that this
22 individual did not receive any commission,
23 that that individual was not a car
24 salesperson?
25    A. I can't answer that question.

Page 103

Ishaque Thanwalla

1
2     Q. Do you know who could?
3     A. We have to look into it.
4     Q. Who would you ask?
5     A. You would ask the controller to
6  figure that out and ask them, the accountant
7  to look at it.
8     Q. Turning your intention to
9  individual 7 on page 1256, it says that the
10 ''Reg'' is $200. Do you know what position
11 that person was in?
12    A. I don't know.
13    Q. How about this individual
14 (indicating)
15    A. Do not know.
16    Q. That was page 1257 individual
17 number 24.
18    Besides the car salespeople, who else
19 was paid 2 paychecks by Hillside Auto Outlet
20 on a weekly basis?
21       MR. KATAEV: Objection to
22       the form. You can answer.
23    A. I can't recall. Maybe BDC and
24 finance, and the managers possibly.
25    Q. In other words, all of the

Page 104

Ishaque Thanwalla

1
2  commission employees received 2 paychecks;
3  is that correct?
4     A. Correct, and some got paid once
5  a month commission.
6     Q. Is it fair to say that any
7  employees who did not receive two paychecks
8  were not car salespeople?
9     A. Again, I don't understand your
10 question. Can you repeat it one more time?
11       MS. TROY: Sure. Ms.
12       Reporter, can you read back
13       the last question for the
14       witness.
15       (The reporter read back the
16       last question)
17    A. I cannot answer that question
18 because I don't know. I can't recall,
19 actually.
20    Q. The same question for the
21 individual on page 1258. The REG wage
22 straight is set at $500. Do you know who
23 this person is or what this person's
24 position is?
25    A. I can't recall.

Page 105

Ishaque Thanwalla

1
2     Q. Page 1259, individual 13. The
3  regular weekly wage rate is $600; who is
4  this individual or what was this
5  individual's position?
6     A. I can't recall. I don't know
7  who.
8     Q. Is there any individual for whom
9  you can tell what the position is by looking
10 at the pay stubs?
11    A. No. Everybody has a different
12 structure.
13    Q. We're going to go through a
14 couple of other pages and my question for
15 you remains the same: that is, are you able
16 to identify the individual based on the pay
17 stub, what that individual's name is or
18 their position?
19    We are on page 1260 for individual 3 and
20 the regular rate is listed at $600.
21    A. I can't answer that question
22 because I can't recall who that would be.
23 Same thing, same pay stub you are showing me
24 and I would say the same.
25       MS. TROY: For the record,

A0321

106–109

| Page 106 | Page 107 |
|---|---|
| 1    Ishaque Thanwalla | 1    Ishaque Thanwalla |
| 2         that was page 1261 individual | 2    A.  No. |
| 3    25. | 3    Q.  Individual 20 on page 1267, same |
| 4    Q.  We are now on page 1262 | 4    question. |
| 5    individual 17.  Do you recognize this | 5    A.  No. |
| 6    individual or this person's position? | 6    Q.  Individual 30 on page 1268, same |
| 7    A.  No. | 7    question. |
| 8    Q.  Did you say ''no'' for the last | 8    A.  No. |
| 9    question? | 9         MR. KATAEV:  Please let me |
| 10    A.  I did. | 10         know when you are done with |
| 11    Q.  Now we are on 1263, individual | 11         this line of questioning so |
| 12    number 26.  Do you recognize this individual | 12         we can take a break. |
| 13    or this individual's position based on the | 13    Q.  We are now on page 1277 and the |
| 14    pay stub? | 14    individual is 31.  Do you recognize this |
| 15    A.  No. | 15    individual or this person's position based |
| 16    Q.  Page 1264 individual number 27, | 16    upon the pay stub? |
| 17    do you recognize this individual or this | 17    A.  No. |
| 18    individual's position based upon the pay | 18    Q.  We are on 1296 individual number |
| 19    stub? | 19    32, do you recognize this individual based |
| 20    A.  No. | 20    upon the pay stub?  For the record, it |
| 21    Q.  There is an individual 28 on | 21    appears that this individual was hired on |
| 22    page 1265, same question. | 22    December 4th of 2018 and then paid $1,000 |
| 23    A.  No. | 23    per week with no commission. |
| 24    Q.  Page 1266 individual number 29, | 24    A.  No. |
| 25    same question. | 25    Q.  Was anyone paid $1,000 per week |

| Page 108 | Page 109 |
|---|---|
| 1    Ishaque Thanwalla | 1    Ishaque Thanwalla |
| 2    salary in the month of December of 2018? | 2    A.  By me looking at the pay stubs, |
| 3    A.  Its same, it may be a draw, that | 3    I can't recall who it is, what it is or what |
| 4    may be a draw, possibly.  It may be a draw | 4    department, even though you are showing me |
| 5    against commission, maybe, but I can't | 5    the loc and department.  I don't know the |
| 6    recall.  I don't know who it is. | 6    local department.  So, no. |
| 7    Q.  Did you hire anyone in December | 7    Q.  We are now on page 3038 for |
| 8    of 2018? | 8    individual 18.  Do you know who this |
| 9    A.  I hired a lot of people and I | 9    individual is and what that person's |
| 10    can't answer who I hired.  I cannot say | 10    position is? |
| 11    anything. | 11    A.  No. |
| 12    Q.  Who was paid $1,000 per week | 12    Q.  Would you be able to find out? |
| 13    upon hire with no commission at Hillside | 13    A.  I have to refer to my office and |
| 14    Auto Outlet? | 14    find out, sure. |
| 15         MR. KATAEV:  Objection as | 15    Q.  Would you be able to tell me |
| 16         to relevance.  You can | 16    what that person's position is? |
| 17         answer. | 17    A.  When I look into it, I will be |
| 18    A.  I answered ''no.  I don't know. | 18    able to answer the question. |
| 19    I cannot recall.'' | 19         MS. TROY:  All right. |
| 20    Q.  We are now on page 1320 for | 20         Demand number 6 will be for |
| 21    individual number 34.  This individual was a | 21         the name as well as the |
| 22    newly hired person in December of 2018 and | 22         position for each of the |
| 23    this individual was paid a regular weekly | 23         individuals who the witness |
| 24    rate of $900.  Do you know who this | 24         identified as numbers 21, 22, |
| 25    individual is? | 25         2, 23, 24, 4, 13, 3, 25, 17, |

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 29 of 62 PageID #: 940

110–113

**Page 110**

1      Ishaque Thanwalla
2           26, 27, 28, 29, 20, 30, 31,
3           32, 33, 34, 18, 19, 35, 36,
4           38, 39, and 37.
5         I know that they are out of
6      order, but that is the order in
7      which the documents presented
8      themselves.  My request is for
9      the positions as well as the
10     name for each of the individuals
11     that are listed here that you
12     produced, apparently as
13     comparator to the plaintiff.
14        MR. KATAEV:  Please put
15     all of your requests in
16     writing.  We object to any
17     characterization.
18        MS. TROY:  Manuel, based
19     upon your characterization of
20     the record -- let's just
21     continue.
22     Q. Going to page 1269, Mr.
23  Thanwalla, do you see on page 69 for the
24  period of November 27th of 2018 through
25  December 3rd of 2018 there is a commission

**Page 111**

1      Ishaque Thanwalla
2  listed for $1,600?
3     A. Okay.
4     Q. Based on that $1,600 figure, how
5  many cars were sold?
6        MR. KATAEV:  Objection.
7     You can answer the question.
8     A. 150 divided by 1600.  Do you
9  have a calculator?
10    Q. The formula is sufficient. Thank
11  you.
12     To your knowledge, is that always an
13  exact number?
14    A. Like I said previously, there is
15  a flat rate commission and I answered that
16  prior.  I said there is a bonus, and the
17  bonus and commission.  So, maybe there is a
18  commission, there is a bonus in there, 5
19  percent bonus, it may be $50 bonus or $200
20  bonus.  I cannot answer that question
21  because the commission plus the weekly
22  bonus, a monthly bonus, I have no idea what
23  is involved.
24    Q. What was the flat rate
25  commission, meaning the $150 per car versus

**Page 112**

1      Ishaque Thanwalla
2  what the bonus was at Hillside Auto Outlet?
3     A. You can take 15, whatever the is
4  amount is, let's take 10 cars would be
5  $1,500.  Am I right?  It would be plus a
6  dollar bonus on top of that, and maybe that
7  was only 8 cars and the rest was bonus.  I
8  can't answer that.
9     Q. My question is different.  My
10  question is: were there records kept as to
11  what portion of the commission is the flat
12  rate commission versus the bonus that you
13  were talking about?
14        MR. KATAEV:  Objection.
15     Asked and answered again.
16    A. May be a portion, possible, but
17  I can't answer that
18    Q. When you say that it ''may be a
19  portion,'' what did you mean?
20    A. It may be possible, I may have a
21  record or I may not have a record.  That's
22  what I'm saying exactly.
23    Q. Does Hillside Auto Outlet have
24  an obligation to keep all of the sales
25  records for a period of time pertaining to

**Page 113**

1      Ishaque Thanwalla
2  the Government regulations as to each car
3  sold?
4        MR. KATAEV:  Objection.
5     It calls for a legal
6     conclusion, but you can
7     answer.
8        MS. TROY:  Answer as to
9     the facts.
10    A. As long as they paid minimum
11  wage, yes.
12        MR. KATAEV:  Objection to
13     the form of that last
14     question.
15    Q. Were there records kept for each
16  car sold in terms of the prior that was
17  sold, the commission for each car?
18        MR. KATAEV:  Objection.
19     Asked and answered, but you
20     can answer it again.
21        MS. TROY:  He did not
22     answer the question, and
23     that's why I had to ask it
24     again.
25    A. I can answer the question, yes.

114–117

Page 114

Ishaque Thanwalla

1  There is probably a way to look at it.
2  
3       Q.  In other words there is a way to
4  assert the answer to the commission and the
5  wages that were given to car salespeople,
6  including Leticia Stidhum that would be more
7  precise than what we see on the pay stub
8  component, is that correct?
9       A.  Yes.  We have to calculate it to
10  make sure that at the end of the month to
11  finish the month, they paid more than the
12  minimum wage, we would have to be in
13  compliance.
14      Q.  Where are those records now?
15      A.  Probably at the dealership,
16  probably missing but I can't answer that due
17  to the robbery.
18      Q.  Those records that we we're
19  talking about in terms of the commissions,
20  the bonuses and the flat rate, is that kept
21  on paper or on the computer?
22      A.  It was kept on the paper.
23      Q.  Was it ever scanned onto the
24  computer?
25      A.  Not to my knowledge.

Page 115

Ishaque Thanwalla

1  
2       Q.  Was it kept on the paper from
3  2018 to the present day; in other words, was
4  there ever a change to the electronic
5  system?
6       A.  No, we have not changed, we have
7  not updated to the electronic system.
8       Q.  Can you describe for me what
9  those records look like on the paper; what
10  type of information is contained therein?
11      A.  It would be a salesperson would
12  fill out the amounts of the cars that they
13  sold, the first name and last name of the
14  customer, as well as they would write down
15  how much bonus they have achieved, and they
16  kept a copy.  And we have a copy.  That copy
17  that would be made, so we verify, we make
18  sure that the bonuses were correct, make
19  sure that the deals were funded and we make
20  sure that everything was to the open ''T'' the
21  right way so that we can take care of the
22  employees that we have by looking at the pay
23  stubs.
24      Q.  Was that the same or different
25  from the triplicate copy that you were

Page 116

Ishaque Thanwalla

1  
2  talking about?
3       A.  I don't understand the question,
4  please.
5       Q.  You mentioned that the paper
6  that you described with the salesperson
7  would fill out, the number of cars, the
8  customer information and the bonuses
9  achieved, et cetera, is that the same or
10  different than the documents that were in
11  triplicate that you mentioned before?
12      MR. KATAEV:  I am
13      confused.  Triplicate?  What
14      does that mean?
15      MS. TROY:  Three copies.
16      A.  You're talking about 1 copy, 2
17  copies, one is for them and one was for us.
18      Q.  Is that filled out on a weekly
19  basis or per-car sold?
20      A.  Weekly basis by the salesperson.
21      Q.  Who would verify if the
22  information is correct?
23      A.  The office manager.
24      Q.  Who was the office manager at
25  the time?

Page 117

Ishaque Thanwalla

1  
2       A.  Deana was the controller and we
3  called the office manager or maybe Asha.  A-
4  S-H-A.
5       Q.  Who is Asha?
6       A.  Asha is the assistant to Deana.
7       Q.  Back for a second to the
8  controller, the office manager, is that the
9  same title?
10      A.  Correct, basically.
11      Q.  What was Asha's title?
12      A.  Asha would give paperwork when
13  it was done, give it to Deana so that Deana
14  could process it and she verified and Deana
15  verified it.
16      Q.  Is she the assistant office
17  manager, was she?
18      A.  Yes, you could call her
19  assistant office manager.
20      Q.  When you said that the documents
21  would be processed, what information would
22  be coded in from the paperwork?
23      A.  What do you mean by ''coded in''?
24      Q.  You said that the documents
25  would be processed, what did you mean?

118–121

Page 118

1        Ishaque Thanwalla
2        A.  Meaning when she goes through to
3   make sure, to verify that the commission is
4   the same, that is the process.  The
5   commission is not coded in.  I said if you
6   write down the name and 150 flat, and then
7   there was any bonus on this, the customer on
8   this car, you write down the bonus and then
9   she verifies it and she processed it.
10       Q.  When she processed it in order
11  for the amount to become an ATM check
12  amount, did she key in anything on the
13  computer?
14       A.  I don't know that.  I can't
15  answer that question.
16           MS. TROY:  The next demand
17           is going to be demand number
18           7.
19           Before I get to that
20           actually, hold on.  Mr.
21           Thanwall.
22       Q.  Besides what you just
23  described to me, were there any other
24  documents kept as to the number of cars
25  sold, what the commission is, what

Page 119

1        Ishaque Thanwalla
2   the bonus is, et cetera for the car
3   salespeople at Hillside Auto Outlet?
4        A.  Let me understand this question
5   correctly.  You are saying did we have any
6   bonus structure?
7        Q.  No.
8        A.  What is the question?  I'm
9   confused by your question.
10       Q.  You mentioned that there was a
11  paper that Deana would process.  Besides
12  that paper that Deana would process, were
13  there any other written records of the
14  number of cars sold and the bonus or
15  commissions earned by the car salespeople at
16  Hillside Auto Outlet?
17       A.  I don't think so.
18           MS. TROY:  Demand number 7
19           is for the written documents
20           containing the cars sold, the
21           name of the customer, the
22           bonus and commissions
23           received.  It is for the car
24           salespeople at Hillside Auto
25           Outlet, and the timeframe is

Page 120

1        Ishaque Thanwalla
2           going to be from October of
3           2018 through February of
4           2019, and that includes,
5           obviously, the plaintiff as
6           well.
7           MR. KATAEV:  Please
8           follow-up in writing.
9           MS. TROY:  Just to be
10          clear, I believe these
11          documents were asked for and
12          directed to be produced by
13          the Court.  To the extent
14          that the defendants state
15          that they don't have the
16          documents or that they are
17          looking for them, it's not
18          really so, just so that we
19          are clear.
20          Demand number 8 will be
21          for any electronic files or
22          inputs by the office manager
23          or her assistant regarding
24          the same.
25          MR. KATAEV:  Please

Page 121

1        Ishaque Thanwalla
2           follow-up in writing.
3           Currently note whether it has
4           been previously required to
5           produce.
6           MS. TROY:  We can now take
7           that lunch break.  Is 30
8           minutes good for everyone?
9           MR. KATAEV:  45 minutes
10          would be fine.
11          MS. TROY:  Fine, let's
12          come back at 1:25.
13          (A recess was taken from
14          12:50 p.m. until 1:33 p.m.)
15       Q.  Mr. Thanwalla, do you have your
16  phone with you?
17       A.  Yes.
18       Q.  Could you go to your text
19  messages that you had with Miss Stidhum?
20       A.  Can I go to those text messages?
21  It's in another office, a different office.
22          MR. KATAEV:  I will get
23          it.
24          (Mr. Manuel Kataev left the
25          room and handed documents to

122–125

| | |
|---|---|
| Page 122 | Page 123 |

**Page 122**

Ishaque Thanwalla

1   the witness)
2   MS. TROY:  Just pull up
3   the text messages that you
4   have with Leticia Stidhum.
5   (The plaintiff Leticia
6   Stidhum stated on the record
7   that she is back on the
8   record)
9   MS. TROY:  Please mark
10  this as Plaintiff's Exhibit
11  3.
12  (Plaintiff's Exhibit 3 marked
13  for identification.)
14  Q.  Mr. Thanwalla, please read the
15  timestamp on the message.
16  A.  The message, it is October 9th,
17  of 2018 and it is 11:03 a.m.  It says ''Q40
18  customer is coming with a check and his
19  insurance.''
20  Q.  Was that from Leticia to you?
21  A.  Yes.
22  Q.  What comes after that?
23  A.  I said ''okay.''
24  Q.  Then, what happened after that?

**Page 123**

Ishaque Thanwalla

1   A.  I am not a good reader.
2   MS. TROY:  Mr. Kataev do
3   you want to read?
4   MR. KATAEV:  We are in the
5   process of producing the text
6   messages to you.  We may not
7   be able to produce them
8   during the deposition.  If
9   you want to take a break, I
10  will be able to produce it to
11  you so that it is easiest for
12  everyone.
13  MS. TROY:  That sounds
14  good to me. How much time do
15  you need?
16  MR. KATAEV:  10 or 15
17  minutes, and we will work as
18  quickly as possible.
19  MS. TROY:  Okay, that
20  sounds good.  That way we
21  don't have to read it into
22  the record.  I agree.
23  It is 1:50, when do you want
24  to come back?

**Page 124**

Ishaque Thanwalla

1   MR. KATAEV:  Let's come
2   back at 1:45.
3   (A discussion held off the
4   record)
5   MS. TROY:  The time is now
6   2:00 p.m. and we are back on
7   the record.  Actually, it is
8   2:07.
9   Q.  The text message that was just
10  sent to me by Emanuel Kataev is a document
11  that I'm going to mark as a PDF file and I'm
12  going to mark that as Plaintiffs 4.
13  MS. TROY:  Please mark
14  that as Plaintiffs 4.
15  (Plaintiffs Exhibit 4 marked
16  for identification)
17  Plaintiffs 3 is going to
18  be text messages, plaintiffs
19  3 and then the PDFs that's
20  the WhatsApp, which we marked
21  as Plaintiff's Exhibit 4.
22  Q.  We were talking about the text
23  message before our break.  It's probably
24  going to be easier if we go in that order.

**Page 125**

Ishaque Thanwalla

1   Q.  I'm going to show you
2   Plaintiff's Exhibit 3 first, which is what
3   counsel just sent to me. Can you describe
4   how you obtained this photograph; did you
5   just use another phone and take a picture of
6   your phone?
7   A.  Correct.
8   Q.  How about the second page which
9   does not appear to be a text message, what
10  is that?
11  A.  This is a text message.  If it's
12  WhatsApp, I have no idea.  You have two
13  separate files, one is WhatsApp and one is
14  text messages.
15  Q.  Looking and drawing your
16  attention to page 2 of the text message
17  file, this --
18  A.  Looking at the text message
19  file, this is all from a single person, this
20  is from Leticia.
21  Q.  When you say ''Q40 customer is
22  coming with a check and his insurance,'' were
23  you the one who said ''okay?''
24  A.  Correct.

126–129

Page 126

Ishaque Thanwalla

1
2  Q.  Do you know where on your phone
3  it itemizes who is speaking when there is a
4  blue bubble versus the white bubble, what
5  that means?
6      A.  I have no idea.
7      Q.  The next line says ''Kaswayne K-
8  A-S-W-A-Y-N-E Bailey is the name,'' is that
9  correct?
10      A.  Correct.
11      Q.  Who is that from?
12      A.  That is from her.
13      Q.  Then, the next line says ''your
14  friend is nice.''  Is that from you?
15      A.  Yes.
16      Q.  Then it says ''yeah, yeah,
17  everyone is nice when they want a job lol.''
18  Who is Leticia referring to?
19      A.  I have no idea.
20      Q.  When do you speak next on this
21  text message?
22      A.  I would have to have my phone to
23  give that answer to that question.
24      MR. KATAEV:  We can't do
25      that because we are using

Page 127

Ishaque Thanwalla

1
2  this export.
3      MS. TROY:  It does not
4  appear that page 23, 2
5  through 23, it does not
6  appear to me to be
7  screenshots of the iPhone
8  text messages.  It looks like
9  something else, but I'm not
10  sure.
11      THE WITNESS:  If it's a
12  screenshot, when you push on
13  the side, this goes into a
14  PDF.
15      Q.  I believe it just doesn't have
16  who is speaking.
17      A.  I spoke very little, mostly
18  communications are by her and I answered
19  very little.
20      Q.  Then, what your attorney is
21  talking about, it doesn't have the date or
22  the time, correct?
23      A.  Right.
24      MS. TROY:  Emanuel, are
25      you working on the text

Page 128

Ishaque Thanwalla

1
2      messages to get the dates?
3      MR. KATAEV:  That is
4      correct.
5      MS. TROY:  You are also
6      working on the WhatsApp too?
7      MR. KATAEV:  Right now we
8      are focusing on WhatsApp.
9      MS. TROY:  Fine, how about
10      we come back to this in a
11      little bit. I'm going to ask
12      you a couple of questions
13      that do not require the text
14      messages. When your
15      attorney's office is finished
16      processing the messages with
17      the date stamp and time, we
18      will come back to it.
19      MR. KATAEV:  That is fine.
20      Q.  Mr. Thanwalla, did you at any
21  point in time find out that Ms. Stidhum was
22  pregnant?
23      A.  No.
24      Q.  Were you aware that she
25  announced her pregnancy at Hillside Auto

Page 129

Ishaque Thanwalla

1
2  Outlet?
3      A.  To my knowledge, she never
4  announced it.
5      Q.  Did she at any time tell you
6  personally about her pregnancy?
7      A.  No.
8      Q.  Did she bring a sonogram to
9  Hillside Auto Outlet?
10      A.  No.
11      Q.  Do you recall which day she
12  brought the sonogram to Hillside Auto
13  Outlet?
14      A.  I answered my question
15  previously, no. She did not bring it, not to
16  my knowledge,'' ever in front of me.
17      Q.  Were other Hillside Auto Outlet
18  employees aware that Ms. Stidhum was
19  pregnant, to your knowledge?
20      A.  To the best of my knowledge,
21  when I learned when I was in Pakistan. Mr.
22  Ali on WhatsApp said ''your daughter is
23  pregnant,'' which is on the WhatsApp app.
24  That was December 27th, if I recall, because
25  I just went there and why I recognized that

130–133

| Page 130 | Page 131 |
|---|---|
| 1        Ishaque Thanwalla | 1        Ishaque Thanwalla |
| 2 date, I said ''which one?'' Because I call | 2 assistant. |
| 3 every one of them my ''daughter.'' I treated | 3        MR. KATAEV: Objection to |
| 4 them like one. | 4     the form of that question. |
| 5     My answer to you was I was the last | 5     Q. Due to the fact that you have |
| 6 person to know, and that was my answer. | 6 multiple assistants, can you clarify whether |
| 7 That was December 27th, according to my | 7 it was the sales manager, the office manager |
| 8 knowledge, and she never announced it. | 8 or the finance manager; what is it? |
| 9 Never brought anything to the dealership. I | 9     A. He was a sales manager and |
| 10 don't think anyone was aware, maybe she got | 10 Guzman as well as Guzman, because I always |
| 11 close to Ali, so she may have told him. She | 11 needed two people to cover the hours. |
| 12 may have told him about the pregnancy. | 12     Q. When was Ali hired as your sales |
| 13     Q. At that time was Ali at Hillside | 13 manager? |
| 14 Auto Outlet? | 14     A. To the best of my knowledge, I |
| 15     A. I don't understand your | 15 can recall that it was in December. |
| 16 question. | 16     Q. Was he hired in preparation for |
| 17     Q. At the time was Ali at Hillside | 17 your departure to Pakistan? |
| 18 Auto Outlet? | 18     A. No. He was hired because I |
| 19     A. ''At the time?'' What do you mean | 19 needed help. |
| 20 by ''at the time''? | 20     Q. Besides Ali, did anyone else |
| 21     Q. At the time, during December, | 21 communicate whether by text, verbal |
| 22 December 27th of 2018, when you supposedly | 22 communication or personal telephone to you |
| 23 received the text messages, on WhatsApp, was | 23 about Leticia's pregnancy? |
| 24 he -- | 24     A. No. |
| 25     A. Yes, he was working as my | 25     Q. To your knowledge, did Leticia |

| Page 132 | Page 133 |
|---|---|
| 1        Ishaque Thanwalla | 1        Ishaque Thanwalla |
| 2 get along well with the other Hillside Auto | 2 that news. |
| 3 Outlets? | 3     Q. Do you recall what your response |
| 4     A. To the best of my ability, yes. | 4 to Ali was? |
| 5     Q. How about with yourself? | 5     A. I mentioned my response to you, |
| 6     A. Well, she did very well, yes. I | 6 ''I was the last one to know.'' |
| 7 treated her like my family. | 7     MS. TROY: Can we have |
| 8     Q. In or around the month of | 8     your office please provide |
| 9 November of 2018, did you congratulate her | 9     the WhatsApp between Ali and |
| 10 for selling many cars for the Hillside Auto | 10     Ishaque Thanwalla? |
| 11 Outlet? | 11     MR. KATAEV: No problem. |
| 12     A. I probably did, because she | 12     MS. TROY: So we don't |
| 13 probably did a good job. | 13     need him to read it into the |
| 14     Q. At that time, did you discuss | 14     record. |
| 15 potentially promoting her to the sales | 15     Q. To be clear Mr. Thanwalla, did |
| 16 manager position? | 16 you communicate with Ali about Leticia on |
| 17     A. Like I answered previously, no. | 17 What'sApp or also on text message? |
| 18 And, my answer is still no, and it still | 18     A. I know I never talked to him on |
| 19 remains no. | 19 text message, only on WhatsApp. I wasn't in |
| 20     Q. What was your reaction when you | 20 the country, and that's the only way you can |
| 21 found out that Leticia was pregnant? | 21 communicate over the WhatsApp. It's an |
| 22     A. My reaction was the way that I | 22 international channel. |
| 23 found out, I was in Pakistan when Ali texted | 23     Q. Let's go back for a second to |
| 24 me -- not texting me, the WhatsApp, | 24 Plaintiff's Exhibit 2 that I am sharing on |
| 25 WhatsApped me. This was the only time I got | 25 the screen with you. Please bear with me |

A0328

134–137

Page 134

1    Ishaque Thanwalla
2  for one moment.
3           MS TROY:  For the record,
4           Plaintiff's Exhibit 2, pages
5           75 to 1179 are customer
6           dashboard logs that were
7           provided to us on the part of
8           the defendant's document
9           production.  We are now on
10          page 812 which corresponds to
11          defendant's document
12          production number 812.
13         Q.  My question for you, is as
14  follows: once you reviewed the document,
15  please tell me to slow down if necessary and
16  I will scroll through it.
17         (Ms. Troy is scrolling down)
18     Can you explain to me why this was
19  marked as "lost?"
20         A.  Jacquelyn Cleary was the first
21  BD agent, the second rep was Mikiael M-I-K-
22  I-A-E-L- and Andris Guzman.  If it was
23  Capital One source of the lead, when we do a
24  Capital One, mailer, it came in, and we
25  created, it just came in on 12/29 2018 at

Page 135

1    Ishaque Thanwalla
2  11:28 a.m.  There is also a serial number.
3  Please scroll down.
4  (Ms. Troy complies.)
5         A.  (Continuing) It says the
6  customer name, Ofelia O-F-E-L-I-A Fuentes F-
7  U-E-N-T-E-S.  Then, the second person took
8  on over, another BD agent ''changed from
9  Heewattie Prashad to Mikiael.
10     It always gives you all the information,
11  what day the lead came in. Can you scroll
12  back up to 1229?
13     (Ms. Troy complies)
14         A.  (Continuing) So, when you see
15  the dates, and please scroll back down to
16  520 of 2019, there was -- the deal was
17  closed because we couldn't get hold of the
18  customer.  It comes out of the system, and
19  after 90 days, that is when it comes out of
20  the system.
21         Q.  Is that the track system?
22         A.  That is what it says here, I
23  think we are both saying the same thing.
24  (The reporter speaks to Ms. Troy on the
25  record)

Page 136

1    Ishaque Thanwalla
2         MS. TROY:  Ms. Luckman has
3         a great point which is in
4         order for us to have a clear
5         record, please just wait
6         until I finish asking you the
7         question.  Then, you can jump
8         right in.
9         THE WITNESS:  I apologize
10        if I jumped in.
11        MS. TROY:  That is
12        perfectly fine.
13        Q.  My question for you is, because
14  the lead is marked as ''lost,'' is it possible
15  that for instance that this deal in fact
16  went through?
17        A.  I don't understand your
18  question.
19        Q.  Because this lead is
20  ''automatically marked as lost,'' after 90
21  days, is it possible that this lead went
22  through, meaning there was a sale on the
23  vehicle?
24        A.  When I can answer that question,
25  is maybe possible because the car was sold,

Page 137

1    Ishaque Thanwalla
2  and Leticia or Mikiael or anybody did not
3  manually put ''sold.''  There's a possible
4  chance yes, that that can happen.
5         Q.  Could it possibly be true that
6  sometimes lead was lost, but was not entered
7  into the system properly?
8         A.  Yes, it can be possible.
9         Q.  Is it generally the case that
10  customers who did not come through the BDC
11  with the amount, that those log-in customers
12  are generally speaking, not logged into the
13  system?
14        A.  They were logged into the system
15  by the salesperson as well as one of the
16  assistant managers.
17        Q.  Were there cases where they were
18  not logged in?
19        A.  It happens, it's like -- you get
20  a salesperson who is not doing his or her
21  job.  The manager is not doing their job,
22  and I can't keep up with everything.
23        Q.  You mentioned that there was a
24  system, what system was it?
25        A.  Vin V-I-N Solutions.

138−141

Page 138

1  Ishaque Thanwalla
2       Q.  When you talked about Vin
3  Solutions, was the salesperson paid the
4  effective amount of bonuses?  In other
5  words, if the car was not logged in the
6  system, would they still get the bonus or
7  the commission, I'm sorry, on the car sold?
8       A.  Let me understand your question
9  correctly. If the Vin Solutions does not
10  have any effect on their bonus over there,
11  that answer is no bonus, they got paid on
12  what they sold.  We have a complete file of
13  the customer and the salesperson provides a
14  commission sheet, like I mentioned in my
15  previous question that you asked me.  They
16  would write down the name of the customer,
17  and if the car had any bonus to it.  If it
18  could be a bonus of 25, $50 or 5 percent,
19  any kind of bonus.  They would write it down
20  because I have a different kind of bonus
21  structure, every -- it's different, every
22  time, it's is different every day.  So, no
23  salesperson would ever not get paid on a
24  deal that they delivered a car.
25       Q.  Now we are looking at

Page 139

1  Ishaque Thanwalla
2  defendant's document production 249 and we
3  are still on that same set of documents,
4  with the customer dashboard log.  Page 249
5  of Plaintiff's Exhibit 2 corresponds to
6  defendant's document production 249.
7       I'm going to turn your attention to a
8  specific section on this particular log
9  pertaining to an individual Franklin Yanes
10  Y-A-N-E-S.
11       Specifically I'm going to turn your
12  intention to defendant's production 252 that
13  corresponds to page 252 of Plaintiff's
14  Exhibit 2.
15       Please turn your attention to the amount
16  of time that the showroom visit lasted.  Can
17  you explain that to me and can you tell me
18  what that shows?
19            MR. KATAEV:  Objection to
20       the form. You can answer.
21       A.  It's a very simple answer.
22  Leticia herself gave the answer for this
23  particular line at the last time at the
24  deposition.  You can look into it on her
25  deposition.  It was marked as an ''visit,''

Page 140

1  Ishaque Thanwalla
2  but nobody marked it until it was the second
3  day.  The customer was not sitting there for
4  22 hours, it is impossible, we are not even
5  open 22 hours straight.
6       Q.  Is it accurate to say that in
7  fact the amount of time is the amount of
8  time it takes the BDC employee to log, for
9  instance the showroom visit as opposed to an
10  actual waiting time?
11       A.  Mostly it is done by the
12  salesperson person.  What happens when the
13  salesperson does not do it, what happens is
14  that BDC person finds out, and they put the
15  visit in.  Like I said, that is controlled
16  by everybody, so they can do either a visit,
17  they can put it next to the sold, it's not
18  the final record for the sale or for the
19  visit.
20            MS. TROY:  Let's go off
21       the record.
22            (A discussion was held off
23            the record)
24       Q.  In terms of the wait time, can
25  you describe to me once the customer comes

Page 141

1  Ishaque Thanwalla
2  in, what do they need to wait for, what are
3  the different things that they need to wait
4  for in order to walk out with the car or
5  walk out without the car, for instance?
6       A.  So, your question is how long it
7  takes to sell a car, is that what your
8  question is?
9       Q.  Yes, with different components
10  broken down.
11       A.  Different components broken
12  down, every situation is a different
13  situation.  Meaning when I say ''situation,''
14  that means I have customers and every deal
15  is different one next to the other.
16       Q.  I'm going to follow-up for a
17  second.  If the customer does not require
18  any mortgage, what would the situation be?
19            MR. KATAEV:  Objection to
20       the form.
21       A.  If it's a cash deal, it still
22  takes time, I still have to go through the
23  process of printing the paper, it's still a
24  process, for the DMV.  Sometimes in our
25  locations, our internet is not the greatest,

142–145

**Page 142**

1           Ishaque Thanwalla
2 and it can take a while. Maybe the printer
3 is not working, maybe the DMV printer which
4 is a Dealer Track Management printer, you
5 have to look up for security purposes, it
6 sometimes does not go on. Maybe the
7 customer has to wait 45 minutes for us to
8 print it because of the internet issues,
9 even in a cash deal, it can take time based
10 on that. Then, once the process is
11 finished, if they can process it with the
12 Department of Motor Vehicles, we do all the
13 DMV in-house.
14      At that time, we are required to make
15 sure that our customer, the consumers have
16 the insurance and have a scanned copy, that
17 way we can scan it into the Department of
18 Motor Vehicles.
19      Everything is time consuming because it
20 is not a washing machine, where you just pay
21 a quarter and you put the washing machine
22 on. You don't just walk out the door This
23 is an automobile, there are legalities which
24 have a lot of crossing your ''T's'' and
25 dotting your ''I's,'' because the Department

**Page 143**

1           Ishaque Thanwalla
2 of Motor Vehicle, it's a Government
3 department. It takes time and we want to do
4 it the right way, not the wrong way, so we
5 have problems.
6      Q. You mentioned doing it the
7 ''right way'' with the DMV, how long does it
8 take, roughly?
9      A. Let me just say, when you say
10 ''the right way,'' we try our best to do the
11 right way. I'm not sure if you get my
12 answer, we try our best.
13      Q. My question is: how long does it
14 take?
15      A. It can take between 30 minutes
16 to 2 hours or 3 hours. I can't answer that
17 question 100 percent.
18      Q. Let's talk about the different
19 types of customers, one that is essentially
20 the cash deal, the one you have to run the
21 credit score, how much additional time with
22 that additional factor that you just
23 described for me?
24      A. It is different, it could be
25 between 1 hour to another 2 hours or 3hours.

**Page 144**

1           Ishaque Thanwalla
2      Q. That 1 to 2 hours, is that all
3 for the customers so that he gets to walk
4 away with the car or --
5      A. It could be, but it could not
6 be, because we are still waiting for the
7 bank to answer, for that answer. Then, we
8 have to get the insurance and sometimes they
9 have no insurance, you have to have multiple
10 processes in the auto industry. To give you
11 an example, there are some online seminars
12 from the FTC, the Federal Trade Commission,
13 and they are saying that if it requires that
14 long to sell a car, they even recognized it
15 because so many processes are involved. It
16 can take between 2 hours to 6 hours and I
17 can't tell you how often.
18      Q. On-average, how much time does
19 it take for customers to walk out with the
20 car; let's start with customers that are
21 doing a cash deal?
22      MR. KATAEV: Objection.
23      Asked and answered but you
24      can answer again.
25      Q. Between 2 and 4 hours.

**Page 145**

1           Ishaque Thanwalla
2      Q. How about the customer that
3 requires some form of credit.
4      A. Like I said, 2 to 4 hours, 6
5 hours maybe.
6      Q. Can you describe how the
7 DealerTrak system works?
8      A. The DealerTrak system, we put
9 the consumer's information, and that is what
10 we don't give a login and a password.
11 Everyone and anyone, we don't give it to
12 them, it's only the service people have it,
13 certain people.
14     You can put in consumer information in
15 there, then you send it to the bank.
16 Because we are a -- because we have a bank
17 hookup directly to the Dealertrak it goes to
18 the banker and notwithstanding, the analysts
19 will look at it, at the application. It
20 depends on the bank how busy they are and
21 what kind of credit structure that is. And,
22 if they have to calculate the LTD, which is
23 the loan to debt.
24     Have to make sure that they verify the
25 employment of whatever the requirement on

146–149

Page 146

Ishaque Thanwalla

1
2  the analyst's side is sometimes they give
3  the answer in half an hour and sometimes it
4  can take three hours.  Sometimes it comes
5  back and asks for more paperwork.
6     They ask to come back maybe in half an
7  hour and we say ''okay.''  It may require on
8  this guy, maybe once you give the pay stub,
9  they provide me with the truth, with the
10  proof of the address, we are going to go
11  back to the consumer, and scan it.  It's a
12  different case, different thing. Every time
13  is different, no 2 cases in your business
14  are the same.  That's the same thing with
15  us, there are no 2 customers that are the
16  same, everyone is different.
17     One takes 3 years to close the case and
18  one takes 3 months to close the case.  It's
19  like in your business.
20     Q.  Let's backtrack for a moment, in
21  November of 2018 who was running the dealer
22  log, who was running that?
23         MR. KATAEV:  Objection to
24         the form.  You can answer.
25     A.  I myself, and whoever was my

Page 147

Ishaque Thanwalla

1
2  assistant.
3     Q.  Who would that be?
4     A.  I don't know who it may be, it
5  may be Guzman, it may be Jeanique.  I don't
6  know who was there, I can't recall who was
7  there at the time.
8     Q.  How about right before you left
9  for Pakistan, who was running the DealerTrak
10  system?
11     A.  Ali.
12     Q.  Besides Ali, anyone else?
13     A.  Yes, Guzman.
14     Q.  Anyone else?
15     A.  Serge has the power, he is the
16  finance manager and Louis had the power, he
17  is a finance manager.  That's about it,
18  that's what I can recall.  Maybe somebody
19  else, but I don't know.  I can't recall.
20     Q.  Is it accurate to say that Serge
21  and Louis were typically running the
22  DealerTrak for the customers just usually,
23  and would it be the sales manager who did it
24  as well?
25     A.  It's not typical.  It's not

Page 148

Ishaque Thanwalla

1
2  typically.  I can't 100 percent answer that
3  to give you an example, let's just say it
4  was one day and Guzman is off and Ali is on
5  the shift, correct?  So what happens is Ali
6  has one file and the other salesman has
7  another customer.  Ali would say ''take this
8  to service to run the credit,'' or take it to
9  Louis to run the credit.  That typically
10  happens.
11     Q.  When you were out in Pakistan,
12  you usually did not run the DealerTrak
13  system, correct?
14     A.  Correct.  But, I have it on the
15  DealerTrack from back home.  I can look up,
16  I can look it up because I look at my
17  reports and I look at my things almost every
18  day.
19     I am hands-on, either when I was in the
20  country or either if I am out of the
21  country, either if on I'm vacation, even if
22  I'm not on vacation.  I am very hands on.
23  That's the only thing I have to say, this is
24  my baby and I work very hard all my life to
25  have something.

Page 149

Ishaque Thanwalla

1
2     Q.  Understood.  The DealerTrak,
3  does it log out when the user logs in, as
4  well as the ICU location?
5     A.  It tracks the ICU location,
6  correct, as well as what not to allow if
7  they look at the credit, but I can run the
8  credit.
9     Q.  In other words you can tell who
10  was logging in where at what time using your
11  account and password?
12     A.  Yes.  Nobody else should get on
13  my log on password, nobody has it unless
14  somebody stole it.
15     Q.  We're going to go now back to
16  Plaintiff's Exhibit 2 for identification and
17  specifically, I'm going to have you take a
18  look at page 1281, which again corresponds
19  to defendant's documents production 1281 for
20  an individual that was identified as ''2.''
21     Mr. Thanwalla, you don't know the
22  individual, is it fair to say that each of
23  the pay stubs that were demarcated with a
24  ''2'' pertaining to an individual, the same
25  individual was marked as 2?

150–153

| Page 150 | Page 151 |
|---|---|

**Page 150**

Ishaque Thanwalla

1
2       MR. KATAEV:  Objection to
3       the form.  You may answer.
4       A. I don't know.  I can't answer
5  that question because I don't know what 2
6  is.
7       MR. KATAEV:  I'm making
8       the representation to counsel
9       that I made an identification
10      marker on there, wherever 2
11      is listed by the ID number,
12      it's the same person.
13      Q.  Okay.  My follow-up question to
14  that is, for each of the different numbers
15  that were placed on the earnings statement,
16  those numbers for instance that say ''35,''
17  would they pertain to the individual 35?
18      MR. KATAEV:  If the
19      question is for the documents
20      labeled 35, it refers to the
21      same person and the answer is
22      yes.  I'll make the
23      representation that I made
24      the markers on this.
25      THE WITNESS:  I was aware

**Page 151**

Ishaque Thanwalla

1
2  of it.
3       MS. TROY:  That you were
4  aware?
5       THE WITNESS:  I was.
6       MS. TROY:  Can you
7       possibly move the speaker
8       closer to you?
9  (The witness complies)
10      MS. TROY:  So that it is
11      clear. Emanuel, please do
12      that.
13  (A discussion was held off
14      the record)
15      MS. TROY:  We are back on
16      the record at 2:46.
17      Q.  Are you alleging now that
18  someone that had unauthorized access to
19  DealerTrak?
20      A. I never alleged that, I never
21  said that.
22      Q.  Did you --
23      THE WITNESS:  I am not
24      done with my answer.
25      MS. TROY:  I'm sorry.  Go

**Page 152**

Ishaque Thanwalla

1
2  ahead.
3       A.  I said ''maybe somebody stole my
4  DealerTrak ID and password.''  I'm not aware
5  of that, just letting you know, just telling
6  you that I never alleged anybody having it,
7  no.  I wasn't giving it out, It's too much
8  of a privacy issue.
9       Q.  Let's backtrack for a moment to
10  the robbery, who was the robber?
11      A.  It was an employee we hired and
12  that was him.  I don't know.  He got caught
13  and he got punished for it.
14      Q.  Was that employee's name
15  Anthony?
16      A.  I think so, not 100 percent
17  recalling everything.
18      Q.  Did Andris Guzman have any
19  authority to discipline employees?
20      A.  Andris Guzman only takes orders
21  from me when I ask him to do.
22      Q.  So, please answer my question;
23  it's a yes or no question, did he have the
24  authority to discipline employees?
25      A.  Did he have any authority to

**Page 153**

Ishaque Thanwalla

1
2  discipline employees?  His job was to run
3  credit and make sure everything was
4  organized, not to my knowledge, he had
5  authority to discipline, no.  To my
6  knowledge, he had no authority to discipline
7  unless he came to me and I disciplined.
8       Q.  Has he ever come to you for you
9  to discipline an employee?
10      A.  Not really.  I never had issues
11  at my dealership, we run a good and happy
12  family, that's the way we work, that is the
13  way that I still work.  You can see by my
14  persona that's the way that I am, I'm very
15  happy and very loving and very caring.  I
16  will give the shirt off my back to my
17  people.
18      Q.  Did Andris Guzman have the
19  authority to hire employees?
20      A.  No.
21      Q.  How about firing employees?
22      A.  No.
23      Q.  How about to set schedules?
24      A.  Set the schedule? Yes.
25      Q.  Did Ali generally --

A0333

Case 1:21-cv-07163-OEM-LB    Document 87-3    Filed 09/01/23    Page 40 of 62 PageID #: 951

154–157

| Page 154 | Page 155 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |

**Page 154**

1          Ishaque Thanwalla
2    A. Ali, did all of that, the people
3 to get you the right answer, complete
4 answer. All of the people, do you mean all
5 the sales managers?
6    Q. The sales managers.
7    A. Sales managers yes, not my
8 finance manager.
9    Q. Did he set the schedule for the
10 salespeople only or for everyone?
11    A. When you say open ''salespeople
12 only,'' and everyone, when you say
13 ''everyone,'' I wouldn't say everyone because
14 he ran his -- his title was sales manager
15 and his department was sales. So, he only
16 managed the salespeople.
17    Q. Who decided which salesperson
18 should go to whom to run the credit through
19 the DealerTrak system?
20    A. Can you repeat your question?
21    Q. I --
22    A. Can you ask your question in a
23 different form, maybe where I can completely
24 answer it and comprehend it?
25      MS TROY: I'm going to

**Page 155**

1          Ishaque Thanwalla
2 have the court reporter read
3 the question back. Let me
4 know if you understand it, if
5 not, I will rephrase it.
6    (The reporter reads back the
7 last question)
8    A. Let me understand this question,
9 which salesperson decided which salesperson
10 can go to which manager, is that the
11 question?
12    Q. To run the credit, yes.
13    A. It is based upon any salesperson
14 can go to any manager who is available at
15 the time. There is no preference, there is
16 no term, anyone can walk up to any manager.
17    Q. During Leticia's employment with
18 Hillside Auto Outlet, did she have you run
19 the credit from time to time?
20    A. The answer to that question is
21 yes, I ran credit, Guzman ran credit,
22 Jeanique ran credit, Ali ran the credit, and
23 sometimes we were all busy and she went to a
24 finance manager and read the credit. Did
25 that answer your question completely?

**Page 156**

1          Ishaque Thanwalla
2    Q. Did there come a time when
3 Andris Guzman was new and he was learning
4 how to run the credit?
5    A. Guzman was my manager since a
6 very long time.
7    Q. I understand. When did he start
8 running the credit for Hillside Auto Outlet?
9    A. The day he started to work with
10 me.
11    Q. To be clear, what was that date?
12    A. I can't recall. I don't know.
13 I can't remember, but he knew it before he
14 came to work for me because he worked with
15 me at a previous location.
16    Q. Where was that previous
17 location?
18    A. Is that relevant?
19      MR. KATAEV: You have to
20 answer. Objection to
21 relevance, but you have to
22 answer.
23    A. Queens Auto Mall.
24    Q. You are saying that he ran the
25 credit at Queens Auto Mall also?

**Page 157**

1          Ishaque Thanwalla
2    A. He worked for me over there,
3 yes, he did things for me, yes.
4    Q. The question specifically is:
5 did he run the credit at Queens Auto Mall?
6    A. Yes.
7    Q. Again, just as a reminder, it's
8 the same place, nothing personal, please just
9 wait until I finish asking the question
10 before you jump in. That way we don't need
11 you to repeat yourself, understood?
12    A. Yes, understood, perfect.
13    Q. During Leticia's employment with
14 Hillside Auto Outlet, was she a dependable
15 employee?
16      MR. KATAEV: Objection,
17 but, you can answer.
18    A. When you say ''dependable
19 employee,'' can you elaborate? Do you mean
20 was she on time every day, is that what you
21 are asking me?
22    Q. Let's start with that.
23    A. Yes. Sometimes she came late
24 and sometimes on time, she was dependable.
25 At times she went early, she left early.

A0334

158–161

Page 158

Ishaque Thanwalla

1
2  That was when she wasn't feeling well or had
3  something else to do based on her ability
4  because she sold a lot of -- she spent a lot
5  of time, and I gave her leeway that she
6  needed.
7          Q.  Would you say that she was an
8  excellent employee?
9          A.  She was an excellent
10  salesperson.
11         Q.  At any point during her
12  employment, was she ever disciplined?
13         A.  I think maybe once, but I can't
14  recall what the reason was.
15         Q.  I know you cannot recall the
16  incident, do you recall maybe when that
17  happened?
18         A.  I cannot answer that, I really
19  can't remember, honestly.
20         Q.  At any point during her
21  employment with Hillside Auto Outlet, was
22  Leticia ever suspended?
23         A.  From Hillside Auto Outlet?
24         Q.  Correct.
25         A.  I don't think so.

Page 159

Ishaque Thanwalla

1
2          Q.  Let's backtrack for a second,
3  were any car salespeople ever given a
4  written evaluation at any point between 2018
5  and 2019?
6          A.  They were given an evaluation
7  every month based on her or his sales.
8          Q.  That evaluation is the same or
9  different from the amounts of money that
10  they got?
11         A.  The amounts of money correlates,
12  the sales, equal amount of money.
13         The more sales that you make, you make a
14  lot of money, if you don't make a lot of
15  money -- if you don't make a lot of sales,
16  you don't make a lot of money.
17         Q.  I understand.  I just want to
18  know the written evaluation every month was
19  based on his or her sales; what form is that
20  report kept?
21         A.  I answered your question.  We
22  did evaluations, but not in writing.  I said
23  we did evaluations based on the sales that
24  they did, a good or great job.  We sat down
25  with them, ''good, now let's move on and do a

Page 160

Ishaque Thanwalla

1
2  better job, you did a great job.  Next time
3  do a better job.''  We say ''are you going to
4  make another 20 sales this month?''  We're
5  going to do this extra so that we can make
6  more deals so that you can make more money.
7  We get more done for the bonuses, whatever
8  the bonuses were.
9          Q.  To be clear, was one of the ways
10  in which the number of cars sold per
11  salesperson tracked on a board with a name
12  and a tally?
13         A.  You got that right, yes.  We
14  used to have a board, but we don't any
15  longer have the board.
16         Q.  Is it accurate to say that when
17  you left for Pakistan that Leticia was
18  leading the board, meaning she was the top
19  saleswoman based on the tally?
20         A.  I can't answer that, I can't
21  recall that in my memory.
22         She was always first or second or third
23  in position.  So, there were three top
24  people at the time, one was Leticia, one was
25  -- I have a person Sean, and he was always

Page 161

Ishaque Thanwalla

1
2  on top.  Or it was one was one month, one
3  was the second month and one was the third
4  month.  She was always first or second or
5  third on the position.  So, there were three
6  top people, one was Leticia, one was David
7  Parsons and the other one was Shane.  They
8  were always on the top of each other,
9  meaning one was one month, one the second
10  month, and one the third month.  They were
11  always first, second and third position,
12  usually.
13         Q.  When you talked about Shane,
14  what was Shane's last name?
15         A.  I can't remember his name, it's
16  an Arabic name and I can't pronounce it.
17         Q.  Is it Shane or Sean?
18         A.  Shane.  When I called him
19  ''Sean,'' he said ''don't call me Sean.''  He
20  said it is ''Shane.''
21         Q.  Do you recall Leticia being the
22  first, second or third; do you recall if she
23  was actually always the first before you
24  left for Pakistan?
25         Q.  Always the first one putting on

A0335

162–165

Page 162

Ishaque Thanwalla
1
2  the board, I said it was between the first,
3  second and third, all of them.
4        A.  Do you recall how many cars were
5  sold on-average by David Parsons?
6        They all averaged between 15 and 25 one
7  month, one is 15 the other, the other is 20,
8  22 or 25.  One did the next month 25 and the
9  other did 15.  It always varied, it's a
10  variable number in between those numbers.
11        Q.  When did David start to work at
12  Hillside Auto Outlets, do you remember the
13  month?
14        A.  I can't remember, but the year
15  would be 2018.  But, the month, I can't
16  answer that.
17        Q.  Do you recall what his base pay
18  was?
19        A.  I can't recall.
20        Q.  How about Shane, when did he
21  start working at Hillside Auto?
22        A.  The same year, 2018.  He is still
23  there.
24        Q.  When did David Parsons end
25  working at Hillside Auto?

Page 163

Ishaque Thanwalla
1
2        A.  I can't recall.
3        Q.  Was the Shane that we were
4  talking about an African-American
5  individual?
6        A.  Shane is Arabic, Middle-Eastern,
7  I would say.
8        Q.  Was that the Middle Eastern
9  individual that you were talking about
10  working for Hillside Auto Outlet, was that
11  at the same time that Leticia was working
12  there?
13        A.  The same time as Leticia was
14  working there?
15        Q.  Correct.
16        A.  Yes.  Supposedly.  So, if that
17  person was working there, he would appear on
18  the earnings statement that were provided by
19  you to your attorney; is that correct?
20        A.  You have all of the documents.
21        MS. TROY:  Cutting to the
22        chase, if you could just
23        provide the unredacted
24        version of the documents,
25        because there is clearly some

Page 164

Ishaque Thanwalla
1
2        confusion as to who and what
3        or even if Mr. Parsons
4        actually was there.
5        MR. KATAEV:  Follow-up in
6        writing and we will respond
7        accordingly.
8        Q.  I'm going to turn your attention
9  to Leticia's pay stub Mr. Thanwalla.  We are
10  on page 1187, which corresponds with
11  defendant's document production 1187.
12        Mr. Thanwalla, does this comport with
13  your understanding in terms of the regular
14  wage rate that was provided to Ms. Stidhum
15  while she was a commissioned salesperson,
16  the regular $300 salary plus the commission?
17        A.  Yes.  That is people on this pay
18  stub, $1,080, but I don't understand minimum
19  wage.
20        Q.  Going to the next page we are
21  now on page 1188 which corresponds to
22  defendant's document production 1188.  Does
23  the $780 figure, the commission, meaning the
24  flat commission $150 per car sold plus a 5
25  percent bonus?

Page 165

Ishaque Thanwalla
1
2        A.  It can represent numerous
3  things.  Like, you can have 5 cars plus a
4  bonus car, or 5 cars plus maybe 1 car, 5
5  percent, 5 cars plus the weekend bonus.
6  There are a lot of -- there can be
7  variations here, this is not an exact thing
8  like I mentioned to you previously numerous
9  times, that we have different bonus
10  structures and that is why we cannot say
11  flat.
12        Q.  That bonus structure is sort of
13  laid out in the weekly deposits that I
14  demanded today, correct?  That was filled out
15  by each car salesperson on a weekly basis?
16        MR. KATAEV:  Objection to
17        the form.  You can answer.
18        A.  I guess, yes.
19        Q.  Was that ever turned over by you
20  to us?
21        MR. KATAEV:  Objection to
22        the form.  You can answer.
23        A.  I have no idea.
24        MR. KATAEV:  If you want
25        to take a look, we can try to

A0336

166–169

| Page 166 | Page 167 |
|---|---|
| 1        Ishaque Thanwalla | 1        Ishaque Thanwalla |
| 2   look and see if we can pull | 2   other messages have very |
| 3   that text. | 3   sensitive financial |
| 4      MS. TROY:  That's fine. | 4   information that we object to |
| 5   The time is now 3:06 p.m. and | 5   producing.  So, if we have to |
| 6   we will come back on the | 6   deal with that objection, we |
| 7   record at 3:20. | 7   will deal with it with the |
| 8      MR. KATAEV:  Yes, 3:20. | 8   Court. |
| 9      MS. TROY:  You need that | 9     I'm just making a |
| 10   much time? | 10   representation to counsel |
| 11      MR. KATAEV:  Yes, to get | 11   that nowhere else in the 18 |
| 12   it printed and scanned. | 12   pages of messages is Leticia |
| 13      MS. TROY:  Fine.  Let's | 13   referenced or anything |
| 14   take that break. | 14   related to this case. It is |
| 15   (A recess was taken from 3:06 | 15   mostly all financial |
| 16   p.m. until 3:24 p.m.) | 16   information and information |
| 17      MR. KATAEV:  I represent | 17   related to particular sales. |
| 18   to you, Tiffany, that I have | 18      MS. TROY:  Is the message |
| 19   sent you the WhatsApp | 19   pertaining to particular |
| 20   messages for the entire | 20   sales related to sales that |
| 21   meeting of Leticia's exchange | 21   Leticia may have done while |
| 22   with the witness.  But, the | 22   she was working at Hillside |
| 23   ones between Ali, that is | 23   Auto Outlet? |
| 24   only for the relevant period | 24      MR. KATAEV:  There is no |
| 25   because the entirety of the | 25   way to tell, I don't think |

| Page 168 | Page 169 |
|---|---|
| 1        Ishaque Thanwalla | 1        Ishaque Thanwalla |
| 2   so.  But, I don't know, the | 2   I believe using a Decipher |
| 3   final thing I want to say is | 3   App, between Mr. Thanwalla |
| 4   that you have the complete | 4   and Leticia that we're going |
| 5   regular text messages | 5   to mark now as Exhibit 5. |
| 6   exchanged between the witness | 6   (Plaintiff's Exhibit 5 marked |
| 7   and your client, the | 7   for identification). |
| 8   plaintiff.  That is in the | 8     Exhibit 6 is his decipher |
| 9   final email that I just sent. | 9   chat between Leticia and Mr. |
| 10   I believe it says ''Leticia's | 10   Thanwalla on the WhatsApp |
| 11   text messages.''  We will | 11   chat.  Then, exhibit 7 is |
| 12   Bate's stamp that when it is | 12   decipher chat conversations |
| 13   time so that we don't have to | 13   page 5 of 18 between Mr. |
| 14   waste time and you can | 14   Thanwalla and Ali. |
| 15   proceed with the deposition. | 15   (Plaintiff's Exhibit 6, and 7 |
| 16      MS. TROY:  Let's go off | 16   now marked for |
| 17   the record. | 17   identification.) |
| 18   (A discussion was held off | 18   Q.  I'm going to show you various |
| 19   the record) | 19   exhibits and ask you a couple of questions. |
| 20      MS. TROY:  It is now 3:40 | 20   We are now looking at exhibit 3 and my |
| 21   p. m. and I will review the | 21   question for you is: when were these |
| 22   documents. | 22   photographs taken? |
| 23     I'm going to mark the | 23   A.  I think yesterday or the day |
| 24   exhibit, the document that | 24   before yesterday. |
| 25   was sent again, text messages | 25   Q.  Why were these photographs |

A0337

170–173

| | Page 170 |
|---|---|
| | Ishaque Thanwalla |

1  Ishaque Thanwalla
2  taken?
3      A. Because I was messaging and I
4  wanted to put them into a file.
5      Q. You believe that you may have
6  done it on Wednesday or Thursday, and you
7  were just putting a photograph of the text
8  message, correct?
9      A. That's the only way that I knew
10 how to do it.
11     Q. You took it on your phone or
12 some other person's phone?
13     A. It's my second phone.
14     Q. Did you text at all with Laticia
15 on your second phone, meaning the phone that
16 you used to take the pictures?
17     A. I never texted to her, this is a
18 form, because too many customers were
19 calling or texting in the middle of the
20 night and I required a phone a few months
21 back and that is the phone.
22     Q. Did you represent to me that
23 these messages were between you and Leticia;
24 if so, you are on the blue and Leticia on
25 the white, actually, on the gray?

Page 171

1  Ishaque Thanwalla
2      A. Yes.
3      Q. Is this an accurate
4  representation of the text messages just
5  that you sent and you received from Leticia?
6      A. It's on the phone, that's
7  accurate on the phone that you are showing
8  me, yes.
9      Q. Is that the same for the
10 entirety of the text messages, meaning all
11 23 pages that I am showing you on the screen
12 right now, is that accurate as far as you
13 can tell?
14     A. Yes.
15     Q. Next we're going to turn our
16 attention to exhibit 4, same question for
17 which is: when was the photograph of the
18 phone taken?
19     A. Either yesterday or the day
20 before yesterday.
21     Q. Why did you take these
22 photographs?
23     A. I wanted to put in the
24 communications, the contents in the file,
25 our communications.

Page 172

1  Ishaque Thanwalla
2      Q. To the best of your knowledge,
3  does the photograph accurately represent the
4  text messages that were from you to Leticia
5  and from Leticia to you?
6      A. Yes.
7      Q. I'm now going to scroll through
8  the 37 pages. To be clear, the green
9  represents you and the white represents
10 Leticia, each bubble; is that correct?
11     A. Yes.
12     Q. Now, I'm showing you what your
13 attorney has provided to us which are
14 conversations between you and Leticia.
15 Again, the text messages, did you have a
16 chance to review the documents, those 11
17 pages.
18     A. Yes.
19     Q. To the best of your knowledge,
20 do the documents accurately represent the
21 text messages that you have sent to Leticia
22 and that you have received from Leticia?
23     A. So far, to the best of my
24 knowledge.
25     Q. Did you have a chance to compare

Page 173

1  Ishaque Thanwalla
2  this with your phone?
3      A. No.
4      Q. On the next break, please take
5  some time and compare it on your phone, and
6  the question after the break will be: Does
7  it accurately reflect what you see on your
8  phone? I will also have some specific
9  questions about this exhibit.
10     A. Go right ahead.
11     Q. We are now on page 6, and I am
12 pointing to your attention to the text
13 message from November 20th of 2018 at
14 approximately 4:07 p.m.
15     This is a text message from Leticia that
16 says ''I got to talk to you about something
17 before it's blown up.''
18     Your response is ''you and your blowup.''
19 Can you explain what you meant by that, if
20 you know?
21     A. Maybe she was talking to the
22 customers unprofessionally.
23     Q. Drawing your attention to the
24 text message that is dated November 20th,
25 2018 at 5:40 p.m.  It says, from Leticia

Page 174

Ishaque Thanwalla

1
2  ''can I go home I have really bad cramps and
3  I can barely move why do you think I was
4  sitting in the back all day?''
5       Were you aware that Leticia at that time
6  was pregnant?
7       A.  No.
8       Q.  Let's go now to page 8.
9       A.  Okay.
10      Q.  Turning your attention between
11  pages seven and 8l.
12           Obviously we see the paper
13  format with the PDF in a black and white
14  photo.  My question for you is: do you have
15  the actual video that is printed on the PDF?
16      A.  I don't think so.  Everything is
17  printed, the only thing we are looking at,
18  that's what I have on my phone and I
19  provided 100 percent of what is in my phone.
20  100 percent, not 98 percent, 100 percent of
21  what I have.
22      Q.  If you could just turn your
23  attention to this video, 11-24-2018 at 5:47
24  p.m., my question is quite simple: are you
25  able to check on your phone and see an

Page 175

Ishaque Thanwalla

1
2  actual video or what is that?
3       A.  I can't answer that question,
4  because I haven't looked at it.  I gave them
5  to my attorney and he downloaded everything
6  and he gave it to you.
7           MS. TROY:  Mr. Kataev, it
8           appears that this is the
9           Decipher app, and it's a
10          black and white photograph of
11          the actual video.  My
12          question is, can you get me
13          the actual video?
14          MR. KATAEV:  I will see, I
15          will speak with my client and
16          you can make a request in
17          writing, please.
18      Q.  Do you have your phone with you,
19  Mr. Thanwalla?
20      A.  Yes.
21      Q.  Can you check your November
22  24th, 2018 conversation with Leticia
23  Stidhum, and there was a video, to see if
24  there is a video.
25          MR. KATAEV:  Let's go off

Page 176

Ishaque Thanwalla

1
2           the record.
3           (A discussion was held off
4           the record)
5           Let the record reflect
6           that I'm looking at November
7           24th of 2018, message at 5:47
8           p.m., and I'm looking at the
9           image.  I see that this is a
10          picture, but there's no way
11          to play a video.  In fact, on
12          the bottom I don't see it on
13          here, on the bottom of this
14          you can see there was like a
15          timestamp, and there is a
16          play button.  When you press
17          the play button, it's just an
18          image, and it is not capable
19          of being played back.
20              MS TROY:  If the image is
21          black and white or in color -
22  -
23              MR. KATAEV:  It's in
24          color.  I will reprint it in
25          color and reproduce the color

Page 177

Ishaque Thanwalla

1
2  print.  We ran out of toner
3  and we could not print it.
4       MS. TROY:  That's fine.
5  When you look on it, does it
6  appear bigger or is it
7  smaller?
8       MR. KATAEV:  It's bigger.
9       THE WITNESS:  It is bigger
10  in the sense that you take
11  the image, it takes up the
12  full screen instead of just
13  showing you a portion.  It's a
14  thumbnail, and --
15      MS TROY:  Can you provide
16  the thumbnail to me?
17      MR. KATAEV:  No problem.
18      MS. TROY:  Just produce
19  that to me at some point
20  during this deposition.
21  We're not going to waste any
22  more time on this.
23      MS. TROY:  I'm going to
24  ask you to print it out or
25  send it to me, whichever.

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 46 of 62 PageID #: 957

178–181

Page 178

Ishaque Thanwalla

1
2    Q. I'm now going to turn your
3  attention to the message that follows here,
4  this is the message from November 25th of
5  2018 at 3:59 p.m. ''I have so many solid
6  deals and it's just taking so long for no
7  reason.''
8     At that time first of all, to your
9  knowledge, did you become aware of Leticia's
10 pregnancy.?
11    A. I can't recall.  I don't think
12 so, but I don't think she ever mentioned it,
13 somebody else mentioned it to me.
14    Q. At that time had Leticia already
15 announced her pregnancy to either yourself
16 or other individuals at Hillside Auto
17 Outlet?
18    A. I don't remember, nor can I say
19 that she ever told me.
20    Q. Now, we are on exhibit 5 and I
21 will turn your attention to the message
22 dated November 25th of 2018 at 4:00 p.m.
23    A. Okay.
24    Q. It says ''okay I am not there at
25 7:00 every dealership work except me.''  What

Page 179

Ishaque Thanwalla

1
2  did you mean by that?
3    A. That I am not there at 7:00,
4  every dealership -- I'm confused.  This is
5  Leticia writing -- no, it's --
6    Q. Does this appear to be you
7  writing to her?
8    A. I have to see the whole thing
9  for me to answer that question.
10    Q. Then, on November 25th at 4:00
11 p.m. it says ''I have one 5,000 down QX60 the
12 other 2000 down Laredo, all 600+ credit.''
13    A. Okay, I'm there.
14    Q. Let me scroll up for you.  This
15 is the entire thread.  Please read it and
16 let me know when you are ready to answer my
17 question.
18    A. ''Okay.  I am not there at 7:00
19 every dealership work except me.''  I don't
20 write well, and maybe I was answering her
21 differently.  I am not there, and I said at
22 7 o'clock.  When I read, I don't read well,
23 and you can see why I write very limited.  I
24 have -- I am dyslexic when I am writing.
25    Q. Is it fair to say that the

Page 180

Ishaque Thanwalla

1
2  November 25th, 2018, 359 message from
3  Leticia to you is a complaint?
4    A. Where does it say "complaint?"
5    Q. Sir, you can answer yes or no.
6    A. I don't see a complaint at all,
7  no.
8    Q. Turning your attention again on
9  page 8, November 25th, 2018 at 8:07 p.m.
10 text message, Leticia writes ''what's up I
11 was in the shower when you called.''
12    THE REPORTER:  I didn't
13      hear that answer.
14    MS. TROY:  Can you repeat
15      your answer?
16    A. Can you repeat the question?
17 (The reporter read back the last question)
18    Q. Can you describe the text
19 message for me, and then the court reporter
20 can just take down his answer.  I want him
21 to read back the question.
22    MR. KATAEV:  I don't
23      understand.  Instead of
24      having him redo his whole
25      answer, have him continue

Page 181

Ishaque Thanwalla

1
2  answering.
3    A. What? You didn't ask me a
4  question.
5    Q. Please relax, I will re-ask the
6  question.  We were talking about the text
7  message at 8:07 p.m.  My question is: is
8  that when you usually called Leticia?
9    A. Yes, if she had a customer that
10 she was not there, she called and said that
11 she would come in late, I would call to see
12 what was going on with the customer so that
13 I could handle the customer appropriately
14 for her.
15    She didn't lose her commission, I could
16 help her make the deal, she would get paid.
17 I was very generous with my employees, like
18 I said.
19    Q. Is it fair to say that you
20 called Leticia more frequently than you
21 texted her?
22    A. I can't answer.  I have called
23 every employee if they are not there, if I
24 have a customer, I call them, yes.
25    Q. Earlier before we were cut off

182–185

| | |
|---|---|
| Page 182 | Page 183 |

**Page 182**

Ishaque Thanwalla

1
2  by your attorney, didn't you say that you
3  called more frequently than you texted
4  Leticia Stidhum?
5       A.  That is not -- I said that I
6  called more frequently, everyone because I
7  don't text well.  You can see that I don't
8  make sense on my own wording.
9       Q.  Turning to the bottom of page 8,
10  the beginning of page 9 it is dated November
11  28th of 2018 at 8:09 p.m.  It says ''the call
12  keeps dropping.  I am going to call him
13  now.''
14       Is it fair to say that Leticia is
15  working outside of business hours?
16       A.  If it's her customer and she is
17  not at work, it's likely that did not show up
18  to work, not her day off.  If she could no
19  longer show up, I would call her, to call
20  the customer and she was supposed to be
21  there, and I would say ''you should show up
22  too.''
23       Q.  Is it fair to say that at the
24  time when she texted you at 8:09 p.m.,
25  during that time, that she called the

**Page 183**

Ishaque Thanwalla

1
2  customer, that it was after store hours?
3       A.  Because she probably was
4  supposed to say that she is going to call
5  him, probably confirming.  It was probably
6  that if she says that she was going to go
7  home, it's a hard deal for her, why should
8  she lose money if she was going to call her
9  -- I probably said ''call him to remind her,
10  and there's nothing wrong with that.  I am
11  aggressive, and she is aggressive enough to
12  make every deal.  That's why I loved her,
13  she was a very good salesperson.
14       Q.  You are emphasizing that she was
15  a good salesperson as opposed to a good
16  employee.  To you, what is the difference?
17       A.  A good salesperson, she was my
18  employee.
19       Q.  What part of the employee role
20  did she play as a salesperson so that she
21  was a great salesperson --
22       A.  Meaning that she was a good
23  employee, simply put.
24       Q.  Let's take a look at the text
25  message on page 9 where it is dated November

| | |
|---|---|
| Page 184 | Page 185 |

**Page 184**

Ishaque Thanwalla

1
2  30th, of 2018 at 3:17 p.m.  Leticia says ''I
3  am really not feeling well I feel nauseous
4  and I was trying to just hang out but I feel
5  hot and I feel my stomach turning.''
6       Is it fair to say that at this time you
7  knew about the pregnancy?
8       A.  Maybe not, I can't recall.  If
9  she was pregnant she would've texted someone
10  anyway, and if I saw any sales, if I saw
11  anything that's said that she was nauseous
12  ''I am pregnant,'' though I did not.  Nowhere
13  in her conversations have I ever seen her or
14  seen any messages that show, it says ''I am
15  nauseous because I am pregnant.''  She is
16  nauseous, and she has done that numerous
17  times.  I can't recall if she told me or she
18  did not tell me whether she was pregnant.
19       Q.  She did not tell you in person
20  that she was pregnant?
21       A.  I cannot recall that because I
22  don't think so.  I don't think she told me,
23  but I got awareness of this from somebody
24  else and I can't exactly recall it at this
25  time who told me.  Maybe her friend Joanna,

**Page 185**

Ishaque Thanwalla

1
2  but I don't know.
3       Q.  Please turn your attention to
4  page 9, the text message dated December 3rd
5  of 2018 at um 11:21 a.m.  Then that shows
6  your response at 11:22 a.m.
7       A.  Okay.
8       Q.  When you said that ''in meeting
9  be there in 2 hours,'' where were you
10  meeting; was at Hillside Auto or somewhere
11  else?
12       A.  Maybe a meeting with my
13  partners.
14       Q.  By ''partners,'' do you mean 3
15  other individuals who you mentioned were
16  also shareholders?
17       A.  Yes.  Or, I could be in a
18  meeting with -- someone for a personal
19  meeting or maybe I am in a -- in my doctor's
20  office. I can't answer that question
21  exactly.
22       Q.  How often would you have
23  meetings with your partners?
24       A.  Once or twice a month.
25       Q.  What would those meetings touch

A0341

186–189

Page 186

Ishaque Thanwalla

1
2  upon?
3        A.  Sales, how are we doing in
4  sales, because it's my job to make sure that
5  they are up-to-date about what is going on
6  there and my business.
7        Q.  As the general manager, did you
8  receive a salary?
9        A.  I received percentage, yes.
10       Q.  Meaning that you received a
11  percentage of the profits; is that correct?
12       A.  Yes.
13       Q.  Is that percentage the same or
14  different from 25 percent?
15       A.  25 percent is my partnership.
16       Q.  The question is how about for
17  the profits?
18       A.  It's my percentage, it's my
19  privacy not to answer that question,
20  Emanuel.
21            MR. KATAEV:  We are going
22       to object on the grounds of
23       confidentiality under Rule
24       30.  The plaintiff has
25       previously requested all

Page 187

Ishaque Thanwalla

1
2  matters of financial
3  information, and the Judge
4  refused to comply with the
5  production of that
6  information.  So, I am
7  directing the witness not to
8  answer that question.
9            MS. TROY:  I am not asking
10       for financial information.  I
11       am asking for the percentage
12       of profits that were given to
13       him.  I am not asking about
14       the sales at Hillside Auto.
15            MR. KATAEV:  Objection
16       Asked and answered. You can
17       answer as to the percentage.
18       A.  I can't recall what the
19  percentage is, I was getting -- it's the
20  same percentage that I was getting today,
21  there is no difference between that day and
22  today's date.
23       Q.  Turning your attention to the
24  text message dated December 12th, 2018 at
25  6:04 p.m.

Page 188

Ishaque Thanwalla

1
2  ''I am really not feeling well.  My
3  stomach is turning and I feel extremely
4  nauseous and I keep feeling like I need to
5  puke I can't stay any longer I need to lay
6  down.''
7        A.  You can see in her question that
8  she probably left because she is sitting
9  right in front of my window.  I said
10  probably ''go.''  But, anyway, you see no
11  mention of pregnancy.
12       Q.  Is it fair to say that at that
13  point you knew of Leticia's pregnancy?
14       A.  I cannot answer that question
15  because I don't recall anything she is
16  mentioning.  If she would've mentioned it,
17  she would've mentioned it in the text.  You
18  can see that she likes to turn everything --
19  put everything in writing, and she should
20  have mentioned something somewhere.
21       You can see from page 1 to whatever the
22  last page is, whatever you have 37 or 27,
23  you don't see anywhere in her conversations
24  that she is saying that she is pregnant.
25  So, no, I did not know if she had mentioned

Page 189

Ishaque Thanwalla

1
2  it, I don't recall.
3        Q.  Is it your understanding, and
4  don't take this the wrong way, but is it
5  your understanding that a pregnant woman
6  needs to remind you of her pregnancy through
7  text?
8            MR. KATAEV:  Objection as
9       to argumentative.  You can
10       answer the question.
11       A.  She at least one minute -- once
12  she was pregnant, she never did say, so she
13  didn't need to remind me.  I don't think I
14  remember her mentioning to me that she was
15  pregnant.
16       Q.  Now let's turn our attention to
17  page 10 and take a look at the text message
18  dated December 12th, 2018 at 6:37 p.m.
19  Please read it and let me know when you are
20  done.  Please read it to yourself.
21  (The witness peruses).
22            MR. KATAEV:  The witness
23       has requested that I read the
24       message to him.
25       (Mr. Kataev read the text

A0342

190–193

| Page 190 | Page 191 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |

**Page 190**

1                Ishaque Thanwalla
2        message as requested to the
3        witness)
4        Q. There is also a text message on
5   12-12- 2018 at 6:39 p.m.
6            MR. KATAEV: Let the
7        record reflect that I have
8        read the first text message
9        and let the record also
10       reflect that I am now reading
11       the second text message to
12       the witness.
13        A. I --
14          MR. KATAEV: There is no
15       question pending.
16       (The attorney reads it to the
17       witness.)
18        Q. What is your response?
19        A. Probably brought into my office
20   and said that I wanted to talk to her about
21   what seemed to be the trouble and then we
22   communicated.
23        Q. Do you recall what that
24   conversation was like?
25        A. I can't recall. The only thing I

**Page 191**

1                Ishaque Thanwalla
2   can see from the content is it says that the
3   customer is rushing her, the customer or she
4   is rushing the customer or the customer is
5   rushing her. I said ''slow down the
6   customer.''  ''If you want to make the deal,
7   you have to slow down the customer.''  Then,
8   I wanted her to make the deal, to slow the
9   customer down and she said ''no rush.''
10   Everything is okay. What happened, when you
11   do it fast, you cut corners and you make
12   mistakes.
13       Maybe I brought her into my office
14   and I told her, I disciplined her, like I
15   mentioned maybe one or two times I guess
16   that was one of the times that I disciplined
17   her. I told her ''you need to slow down the
18   customer, slow down yourself to make it the
19   right way of making the deal instead of
20   losing a deal.''
21        Q. Is it correct that the
22   particular deal that was referenced in the
23   first text message went through?
24        A. Yes. I read that because I
25   disciplined her and told her to slow down

**Page 192**

1                Ishaque Thanwalla
2   the customer.
3        Q. To your knowledge, did that
4   happen before or after the pregnancy
5   announcement, the alleged pregnancy
6   announcement?
7        A. I don't recall her pregnancy
8   announcement, so I can't allege anything.
9        Q. Besides telling her to slow the
10   customer down, do you recall what else was
11   said during that night on December 12th,
12   2018?
13        A. I don't recall.
14        Q. Turning your attention now to
15   the text message dated January 7th of 2019
16   at 4:13 p.m. Leticia writes ''I left for the
17   day tomorrow we need to talk because this
18   place has been a shit show since you left.''
19   Your response to her at 10:17 a.m. which is
20   on page 10 continuing onto page 11 is
21   ''okay.''
22        A. She asked me a question on the
23   7th, and I was probably into the flight or
24   getting out of the flight. When you come
25   off of a 24-hour long flight, you sleep.

**Page 193**

1                Ishaque Thanwalla
2   You have jet lag, maybe my phone was shut
3   off. And I can't answer that, I can't
4   recall everything.
5        Q. Let's scroll down now to page
6   11. I'm going to now draw your attention to
7   the text message from January 10th, 2019 at
8   1:24 p.m. Please read it and let me know
9   when you are finished reading it.
10       (The witness peruses and
11       says, ''she's telling me that
12       she threw up and she can't
13       take the pressure in the car
14       business'')
15         MS. TROY: Please read
16       back the question again.
17       (The reporter read back the
18       last question.)
19        A. Okay.
20        Q. Now that you have finished
21   reading it --
22         MR. KATAEV: Do not
23       interrupt me.
24         MS. TROY: What did you
25       say to the witness?

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 50 of 62 PageID #: 961

194–197

Page 194

Ishaque Thanwalla

1
2      MR. KATAEV:  Please let
3  the record reflect that my
4  instruction to the witness
5  was to listen to the
6  question, and if a question
7  is pending, to answer that
8  question.  If there is no
9  question, there is nothing to
10  be said.  Please proceed.
11      Q.  The question is: when you
12  received this text message from Leticia,
13  were you aware of her pregnancy?
14      A.  Like I said, I can't recall
15  that, I can't answer that question.  Nowhere
16  in that is mentioned that she was pregnant.
17  Maybe she mentioned it to me, and it went in
18  one ear and came out the other.  She was
19  probably talking while she was pregnant to
20  me, maybe I was really busy doing something
21  else when she mentioned it to me.  I can't
22  answer that question.
23      Q.  Please read the text message
24  from January 17th, of 2019 at 8:27 p.m. and
25  let me know when you are done.

Page 195

Ishaque Thanwalla

1
2      A.  You want me to read it?
3      Q.  You can read it to yourself.
4      A.  What was the question?
5      Q.  Let me know when you are done
6  and I will ask you a question.
7      MR. KATAEV:  Please read
8  it and tell her when you are
9  done reading it.
10      THE WITNESS:  Okay, I read
11  it.  What's your question?
12      Q.  Was that a complaint for $100 in
13  old wages?
14      MR. KATAEV:  Objection.
15  It assumes facts not in
16  evidence.  You can answer.
17      A.  Let me answer a complete answer.
18  We never hold a week's pay to begin with,
19  and according to my records, she left on the
20  10th.  Yes, it shows the date of the last
21  pay date was the 14th on ADP records,
22  according to my records, she left on the
23  10th and there was $300 salary that she was
24  supposed to get for the whole three.  She
25  did not work the whole week, so there was

Page 196

Ishaque Thanwalla

1
2  $100 short on her pay because we had an
3  employee that said how many days, they
4  worked and how much pay she was supposed to
5  get.  Based on that, it shows in her own
6  writing on my text message that we only took
7  $100 owed to her, a hundred back and we did
8  not.  Does that answer your question?
9      Q.  Please read the message from
10  January 17th of 2018 at 8:30 p.m. and let me
11  know when you are done.
12      (The witness peruses).
13      A.  Okay. It can't be -- it looks
14  like somebody coached her, it wasn't 1-17 at
15  8:30 p.m.  She bought a car for me, not
16  herself, her grandmother bought a car.  She
17  did not give me the complete documents.  We
18  didn't make any money because she didn't
19  give me any down payment.  She gave a down
20  payment, but not a complete down payment,
21  that's what I meant.  So, it looks like
22  somebody coached her, 60 hours and 7 days?
23  Whatever you can see, how many days she
24  called in sick or left early and had her
25  days off.

Page 197

Ishaque Thanwalla

1
2      Q.  Is it true that on days that she
3  would take off, she would make them up?
4      A.  I can't recall, she hardly did.
5      Q.  In other words, the question is,
6  if she took off for a day, would she make it
7  up on her free days and come to work at
8  Hillside Auto Outlet?
9      A.  She worked 7 days, which she
10  never did, she said she worked 7 days, but
11  she worked five days a week. Sometimes she
12  came to deliver a car to a customer, that
13  was on her prerogative because she was a
14  commissioned salesperson.
15      Q.  To be clear, the text message
16  that you are looking at does not say for
17  ''seven days,'' it says ''for seven months.''
18      A.  Whatever. I told you that I am
19  dyslexic when I read.
20      Q.  That's okay.  We will either
21  have myself or Emanuel read it out for you,
22  how about that?
23      A.  Okay.
24      Q.  I'm going to show you
25  Plaintiff's Exhibit 7 which is the Decipher

A0344

198–201

Page 198

Ishaque Thanwalla

1  chat conversation with Ali.  First, can you
2  tell me, to the best of your knowledge if
3  this comports with your understanding in
4  terms of it being an accurate representation
5  of the WhatsApp conversation you've had with
6  Ali?
7      A.  Yes.
8      Q.  I'm going to show you
9  Plaintiff's Exhibit 7 which is the Decipher
10  chat conversation with Ali.  First, can you
11  tell me to the best of your knowledge, if
12  this comports with your understanding in
13  terms of it being an accurate representation
14  of the WhatsApp conversation you had with
15  Ali?
16      A.  Yes.
17      Q.  If you turn your attention to
18  this specific exchange, and I will read it
19  for you, this is from December 27th of 2018
20  at 11:05 a.m.  Ali texted ''your baby is
21  having a daughter,'' with two emojis.  Then,
22  you text him back ''which one?''  Then, he
23  texted you at 12:13 p.m. on 12-27 saying
24  ''Leticia.''  You texted him back saying ''I

Page 199

Ishaque Thanwalla

1  know.''
2      Do you recall this exchange having
3  happened, and it's a yes or no question?
4      A.  Yes.  May I give you a complete
5  answer?
6      MR. KATAEV:  Yes, you may
7  go ahead.
8      MS. TROY:  It is --.
9      MR. KATAEV:  He wants to
10  complete his answer.
11      MS. TROY:  It's a yes or
12  no question.  He completed his
13  answer.
14      MR. KATAEV:  The answer is
15  not a yes or no.
16      MS. TROY:  You can follow
17  up with your direct.
18      THE WITNESS:  My complete
19  answer would be --
20      MS. TROY:  Fine, go ahead.
21      A.  (Continuing) My complete answer.
22  I told you that somebody mentioned that she
23  was on the call and said ''your daughter is
24  pregnant.''  Yes, at that time and then I

Page 200

Ishaque Thanwalla

1  probably followed up with it.
2      MS. TROY:  I appreciate
3  that additional content.
4      Just so that we are clear, it
5  is a courtesy to let you add
6  whatever you want to add.  If
7  it's a yes or no question, it
8  is complete when you say ''yes
9  or no,'' anyway. It's not that
10  big of a deal.  Let's take a
11  look now at Plaintiff's
12  Exhibit 6.
13      This one is the WhatsApp conversation
14  you've had with Leticia.  Can you just
15  confirm to the best of your knowledge if it
16  comports with your understanding that it is
17  true and accurate copy of your conversations
18  with Leticia on WhatsApp before the 4 pages?
19      A.  Four pages?  Correct.
20      MS. TROY:  I believe your
21  attorney will read it and I
22  will scroll through it.
23      MR. KATAEV:  That will
24  help him answer the question,

Page 201

Ishaque Thanwalla

1  he has four pages in front of
2  him.
3      Please take a look through
4  the whole thing and see if it
5  is comports with your
6  conversation.
7      (The witness complies and
8  peruses)
9      THE WITNESS:  Nothing.
10      MR. KATAEV:  I said that
11  the witness is reviewing a
12  hard copy of the exhibit.
13      Q.  The question that is pending is
14  whether, to your understanding, this is an
15  accurate and complete representation?
16      A.  As to my ability, yes.
17      Q.  The question is whether it's an
18  accurate and complete representation of the
19  WhatsApp conversation that you had on your
20  phone.
21      A.  To the best of my ability, yes.
22      Q.  Is it fair to say that you and
23  Leticia have the WhatsApp conversation
24  because you were in Pakistan?

A0345

202–205

Page 202

1        Ishaque Thanwalla
2        A.  I would say yes, I guess
3    December 20th.
4        Q.  I am now going to turn your
5    attention to page 2, specifically to the
6    text message that is from December 27th of
7    2018 at 8:30 p.m.  If you want, you can have
8    your attorney read it for you also as well.
9            THE WITNESS:  Emanuel?
10           MR. KATAEV:  Let the
11       record reflect that I am
12       reading this message to the
13       witness.
14           MS. TROY:  It's not this
15       part, it's the highlighted
16       part.
17           MR. KATAEV:  Let the
18       record reflect that I will be
19       reading the message time
20       stamped at 8:30 and 8:32 p.m.
21       to the witness, to Ishaque.
22           (The attorney complies)
23       Q.  The question for you is: does
24    this refresh your recollection about
25    Guzman's treatment of Leticia while you were

Page 203

1        Ishaque Thanwalla
2    out?
3        A.  This is a conversation about
4    Leticia, this is Leticia because Guzman,
5    there is no conversation that Leticia had a
6    problem with Guzman.  It looks like he was
7    talking about David, like she was
8    complaining about that.
9        Q.  The question for you is: does
10   this refresh your recollection about
11   Guzman's treatment of Leticia while you are
12   out?
13       A.  There is no conversation about
14   Leticia.  This is Leticia, previously,
15   because Guzman, there is no conversation
16   that Leticia had a problem with Guzman.
17   It's David, it looks like she talked about
18   David, like she's complaining about this.
19   About why Guzman took the Range Rover, and
20   maybe she didn't like that, that Guzman --
21   since Ali started, they probably -- I can't
22   answer that question.  Ali probably changed
23   her mind now and she is again Guzman, she
24   doesn't like that, and that is Guzman is
25   trying to do his job, it looks like that to

Page 204

1        Ishaque Thanwalla
2    me because the one who had gotten the paper,
3    Ali should have gone and given it in order
4    for him, because he had seniority.  He's
5    trying to get everything organized and Ali
6    is sitting and she is just complaining.
7    That's what I understand in this message.
8        Q.  When you received this message,
9    did you respond or call Leticia?
10       A.  I have no idea.  I can't recall.
11       Q.  If you did call her, would it be
12   reflected on the WhatsApp?
13       A.  Yes, the chat room.  I don't
14   know if I called her because I was back home
15   and I probably didn't even see this message
16   until a day later.  I can't answer that
17   question.
18       Q.  Is it fair to say that this text
19   message that was just read aloud to you did
20   not just concern David but it concerned the
21   deal that Leticia had as well?
22           MR. KATAEV:  Objection.
23       You can answer.
24       A.  Does not look like it, it was
25   David's deal and he was trying to do the DMV

Page 205

1        Ishaque Thanwalla
2    and the DMV takes time, as I mentioned
3    previously to you.  Then, they ran the
4    Carfax and I don't know what you call that
5    paper.  There is a lot addressed like I
6    said, nothing goes perfectly.  If you have
7    an internet, is if it's not up or it's slow,
8    maybe the DMV internet is down. Happens all
9    the time.
10       Q.  Did David Enrique from time to
11   time partner with Leticia?
12       A.  Sure, they went out and smoked
13   weed all the time.  That's the problem that I
14   had with --
15       Q.  I don't mean partner in that
16   sense but I appreciate your answer.
17       Let's backtrack for a second, and when
18   the deposition is over and then after the
19   case is over, then we can talk about
20   whatever you want to talk about.
21       Right now, please focus on the question.
22   I mean partner in the sense of was he ever
23   partnered with Leticia in terms of any car
24   sales at Hillside Auto Outlet during her
25   employment with Hillside Auto Outlet?

A0346

Case 1:21-cv-07163-OEM-LB   Document 87-3   Filed 09/01/23   Page 53 of 62 PageID #: 964

206–209

Page 206

Ishaque Thanwalla

1
2  A. Let me understand this
3  correctly. You are telling me that Leticia
4  would give half of her commission to David,
5  is that what you are asking me?
6  Q. No. I'm not asking you that.
7  I'm asking you, were there times when two
8  car salesmen would partner to sell a car;
9  it's a yes or no question.
10  A. It's not a yes or no answer.
11  No, they would not partner up, sometimes on
12  occasion Leticia would give a complete
13  answer and sometimes in the situation, they
14  would deliver, Leticia's car and Leticia
15  would deliver David's car on his days off or
16  on her days off. They would do each other a
17  favor, not partner-up, they would do each
18  other a favor.
19  Q. Let's focus then on the part of
20  the text message where it says ''I got this
21  customer looking to pay cash for the number
22  4 Carfax and we have no paper.''
23  Is it accurate to say that you
24  understood that portion of the text message
25  when you received it to be that Leticia had

Page 207

Ishaque Thanwalla

1
2  her own customer that was looking to pay
3  cash; it's a yes or no question?
4  A. It's not a yes or no question.
5  We may have ran (sic) out of paper and
6  Leticia was the salesperson she could have
7  opened the screen and showed the Carfax on
8  the computer screen and showed it to let the
9  customer see it while the customer was
10  looking at it. Somebody could have gone and
11  gotten the paper. It appears that the
12  customer had to go out and get the paper.
13  Q. When you talked about
14  partnering, was there a time when Leticia
15  would run the credit or David would run the
16  credit?
17  A. How can they run the credit when
18  they had no access to run the credit, nor
19  was she authorized to run the credit? It is
20  the manager's job, management's job which is
21  Guzman and Ali. Supposing if we could show
22  that Leticia did run the credit for David,
23  it's the customer I guess.
24  Q. Is it fair to say that on
25  December 27th of 2018 you were not in the

Page 208

Ishaque Thanwalla

1
2  country?
3  A. What?
4  Q. In 2018, December 27th of 2018,
5  the same date as the text message.
6  A. Yes, I wasn't in the country.
7  Q. Is it fair to say that David
8  could not have run his own credit without
9  the help of Guzman or some other individual
10  who had the authority to access the
11  DealerTrak system?
12  A. Your question is could David
13  have run his credit? David could never run
14  a customer's credit, nor could Leticia, nor
15  could any other sales person could run a
16  credit. It is the manager's job, and I
17  would have more than two available -- if
18  they are not available, I'm going to take
19  the name Ali and Guzman. If they're both
20  busy or somehow for any reason, there is no
21  finance manager, they would have the
22  authority to do that. Does that answer your
23  question?
24  MR. KATAEV: Let's go off
25  the record.

Page 209

Ishaque Thanwalla

1
2  (A discussion was held off
3  the record).
4  We are back on the record
5  at 4:39 p.m.
6  Q. Let's mark. Plaintiff's Exhibit
7  8.
8  (Plaintiff's exhibit 8 marked
9  for identification)
10  MS. TROY: Plaintiff's
11  Exhibit 8 will be the
12  Verification of Ishaque
13  Thanwalla.
14  Q. I am going to show it on the
15  screen, Plaintiff's 8 for identification.
16  MR. KATAEV: I'm going to
17  print it.
18  MS. TROY: While you are
19  at it, you might as well
20  print the other stuff as
21  well. The responses to the
22  document request.
23  MR. KATAEV: Okay.
24  MS. TROY: Let's mark
25  plaintiff's 9 and 10 as well.

A0347

210–213

**Page 210**

1          Ishaque Thanwalla
2          (Plaintiff's Exhibit 9 and 10
3          marked for identification)
4              MS. TROY:  Plaintiff's 9
5      is the Verified Response to
6      Interrogatories, the regular
7      Interrogatories.  Plaintiff's
8      10 is the final Supplemental
9      Responses.
10         Q.  While your attorney is doing
11     that, I'm just going to ask you some other
12     questions about Serge meaning Serge Zanan,
13     correct?
14         A.  Yes, something like that.
15         Q.  Back on Plaintiff's Exhibit 2,
16     this is the Declaration of Serge Zanan,
17     plaintiffs 2 and then on page 72, which is
18     the same as defendant's document production
19     72.
20         I'm going to ask you to read paragraph
21     one and ask you if this refreshes your
22     recollection as to when he started working
23     at Hillside Auto Outlet.
24             MR. KATAEV:  Just for the
25         record, I printed this and

**Page 211**

1          Ishaque Thanwalla
2      I'm going to give all of this
3      to the witness so that he has
4      the full set so that he can
5      read the whole thing.
6          Let the record reflect
7      that I have given the witness
8      the Declaration of Serge
9      Zanan, and I'm asking if he
10     could read the whole thing.
11             MS. TROY:  Let me know
12     when you are done reading it.
13     (The witness peruses)
14             MR. KATAEV:  I'm
15     confirming to him to read
16     everything that is stapled
17     here, all 4 of the boxes to
18     the Interrogatories and
19     document requests are in
20     front of the witness.
21         Do you want to repeat your
22     question?  What was your
23     question?
24         Q.  My question is, however,
25     paragraph 1 of the Declaration, does it

**Page 212**

1          Ishaque Thanwalla
2      refresh your recollection as to when Serge
3      started to work at Hillside Auto was at the
4      end of 2018?
5          A.  Probably started in 2018.
6          Q.  Is that accurate to the best of
7      your knowledge?
8          A.  I can't answer, but it says so,
9      maybe it's accurate.
10         Q.  Was he a finance manager or a
11     finance and insurance representative?
12         A.  The finance manager which we
13     call finance and insurance because they do
14     sell warranties and that is why they call it
15     ''finance and insurance.''
16         Q.  So, finance and insurance
17     representative is the same as a finance
18     manager or is it different?
19         A.  Yes, the same.
20         Q.  When was your last contact with
21     Guzman?
22         A.  A couple of weeks ago.
23         Q.  During that contact, did you
24     talk at all about this case, the present
25     case?

**Page 213**

1          Ishaque Thanwalla
2              MR. KATAEV:  Objection
3      based on attorney/client
4      privilege.
5              MS. TROY:  How is it
6      attorney/client privilege if
7      it is between him and Andris
8      Guzman?
9              MR. KATAEV:  He learned --
10     if you didn't interrupt, you
11     would've heard me say that I
12     was present during that
13     conversation.  I am
14     instructing the witness not
15     to answer that question.
16     Please proceed.
17         Q.  When was the last contact you
18     had with Andris Guzman without your attorney
19     being present?
20         A.  Without my attorney being
21     present?  I didn't have any -- I didn't have
22     any contact with him in a long time.
23         Q.  How about with Ronald M. Baron?
24         A.  A year-and-a-half ago or a year
25     ago.

A0348

214–217

| Page 214 | Page 215 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2 Q. How about Jory Baron? | 2 that question subject to that |
| 3 A. I saw him about two or three | 3 objection. |
| 4 weeks ago. | 4 MR. KATAEV: In other |
| 5 Q. Was that in the presence of your | 5 words, if you talked about |
| 6 attorney or outside the presence of your | 6 this case, don't answer. If |
| 7 attorney? | 7 you talked about something |
| 8 A. He is my partner. | 8 else, you can answer. |
| 9 Q. The question is yes or no, was | 9 A. We talked about something else, |
| 10 it with your attorney or not with your | 10 we did not talk about this case. |
| 11 attorney? | 11 Q. What did you talk about? |
| 12 A. Not with my attorney, not with | 12 A. Business. |
| 13 Jory. | 13 Q. When you say ''business,'' do you |
| 14 Q. What did you talk to him about? | 14 mean Hillside Auto Outlet specifically? |
| 15 MR. KATAEV: Objection, | 15 A. Correct. That is the only |
| 16 asserting a common interest | 16 business he owns with me. |
| 17 prejudice objection. Jory | 17 Q. I'm showing you on the screen |
| 18 Baron is one of the | 18 the Verification to the Interrogatories, the |
| 19 witnesses, one of the | 19 Supplemental Interrogatories which your |
| 20 defendants in this case, and | 20 attorney has printed for you. Let me know |
| 21 if you discussed anything | 21 when to scroll down, it is one page. |
| 22 about this case I am | 22 (The witness peruses) |
| 23 instructing the witness not | 23 THE WITNESS: Okay. |
| 24 to answer that question. | 24 Please back up a little bit. |
| 25 MS. TROY: You can answer | 25 MS. TROY: Okay. |

| Page 216 | Page 217 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2 THE WITNESS: That is | 2 her? |
| 3 good. | 3 A. Yes. |
| 4 Q. The question I have for you is: | 4 Q. How long was that conversation? |
| 5 do you recognize your signature? | 5 A. I can't recall. |
| 6 A. Yes. | 6 Q. When did that conversation take |
| 7 Q. To the best of your knowledge, | 7 place? |
| 8 is everything contained in the | 8 A. I don't remember her ever asking |
| 9 Interrogatories and the Supplemental | 9 me to have a conversation. |
| 10 Interrogatories correct and true? | 10 Q. I understand that your attorney |
| 11 A. Yes. | 11 asked you to have the conversation. My |
| 12 Q. When was this document signed? | 12 question is when? |
| 13 A. I don't remember the date. It | 13 A. Before signing of the paper. |
| 14 says ''February of 2023.'' | 14 Q. You had the conversation with |
| 15 MR. KATAEV: I will make | 15 whom, with your attorney or with Deana |
| 16 the representation that it | 16 Jennings? |
| 17 was on the same day that you | 17 A. Your question was about |
| 18 received it. | 18 conversations with Deana Jennings and I said |
| 19 Q. Prior to signing it, did you | 19 ''yes.'' |
| 20 review the Interrogatory Responses? | 20 Q. You had a conversation with her |
| 21 A. Yes. | 21 right before you signed or when? |
| 22 Q. Did you have a conversation with | 22 A. Right before. |
| 23 Deana Jennings? | 23 Q. What was the content of that |
| 24 A. Right. | 24 conversation? |
| 25 Q. Did you have a conversation with | 25 MR. KATAEV: Objection. |

A0349

218–221

Page 218

Ishaque Thanwalla

1  Based on the same objection,
2  the common interest privilege
3  objection.  To the extent
4  that you and Deana Jennings
5  discussed this case, I
6  instruct you not to answer
7  the question.  If you
8  discussed something else, you
9  may answer.
10  A.  We discussed the case.
11  Q.  Is it fair to say that any of
12  the Responses pertaining to Hillside Auto
13  Mall that you don't have personal knowledge
14  about that?
15  A.  This is a separate company, I am
16  not part of Hillside Auto Mall.  So I don't
17  know what goes on there, it's not my
18  business.
19  Q.  I understand that your
20  Interrogatories had information about
21  Hillside Auto Mall.  My question is: to the
22  extent that your answers included
23  information about Hillside Auto Mall, are
24  you saying that you did not have personal

Page 219

Ishaque Thanwalla

1  knowledge with respect to those?
2  A.  I have no interest in Hillside
3  Auto Mall, so I had no conversations on
4  Hillside Auto Mall.  My business is Hillside
5  Auto Outlet.  Anything pertaining to
6  Hillside Outlet is part of my answer.
7  Q.  Who is Susan Zhivo Z-H-I-V-O.
8  A.  She is my controller.
9  Q.  Susan Zhivo Z-H-I-V-O, is that
10  the Susan that you mentioned earlier that
11  you didn't remember her last name?
12  A.  Yes.  I call her Susan ''Z.''
13  Q.  Besides yourself, are there any
14  other individuals who are responsible for
15  determining the pay and the hours of
16  Hillside Auto employees?
17  A.  Hillside Auto or Hillside
18  Outlet?
19  Q.  We can do Hillside Auto Outlet
20  employees.
21  A.  Okay, what was your question
22  again?
23  Q.  Besides yourself, was anyone
24  else responsible for determining

Page 220

Ishaque Thanwalla

1  compensation or hours?
2  MR. KATAEV:  At Hillside
3  Auto Outlet?
4  MS. TROY:  We can start
5  from there.
6  A.  Hillside Auto Outlet, Susan is
7  my controller and she does the payroll.
8  Then, before Susan it was Deana and before
9  Susan, Deana Jennings, yes.
10  Q.  During the plaintiff's
11  employment with Hillside Auto Outlet, you
12  were saying that in addition to yourself,
13  Deana and Jeanique also determined the
14  compensation and hours?
15  A.  And Asha A-S-H-A as well.
16  Q.  Asha is the assistant office
17  manager, right?
18  A.  Correct.
19  Q.  In terms of the amount of time
20  it takes for Hillside Auto salespeople to
21  hear back from the lender once an
22  application was submitted, how long would
23  that timeframe be?
24  A.  Now you are questioning -- it's

Page 221

Ishaque Thanwalla

1  actually a different thing, you were talking
2  about do we play a role, are you asking
3  about the bank?
4  Q.  Yes.
5  A.  You changed subjects, I just
6  want to make sure we stay on the same path.
7  Your question was how long it takes for the
8  bank to reply back, is that your question?
9  Q.  Right, how much time?
10  A.  It all depends.
11  Q.  Do you have a range?
12  A.  The range is between 20 minutes
13  to an hour, hour-and-a-half or maybe two.
14  Q.  Is it true that most of your
15  customers do not have excellent credit?
16  A.  Most of our geographic location,
17  we do not have the greatest credit.
18  Q.  Do you recall your attorney
19  asking my client a question about racial
20  profiling of the customers; did that happen
21  at Hillside Auto Outlet?
22  A.  What do you mean by ''racial
23  profiling?''
24  Q.  Let's try to do this and address

A0350

222–225

Page 222

1        Ishaque Thanwalla
2   it in the shortest way we can.  In terms of
3   the person who does not have good credit or
4   that person has good credit that happens on
5   your watch.
6        Let's look at it this way the
7   person that person does not have good credit
8   or that person has good credit, that happens
9   under your watch, right?
10       A.  Let me put it this way. I have a
11  very extensive training in the car business.
12  One thing about me, I don't judge a book by
13  its cover.  We do not judge.  You can be any
14  color, any race, any religion, and we treat
15  them equally.  We don't have one -- only one
16  identity that we look at.
17       Q.  Is it true that you hold them to
18  the same standard?
19       A.  Yes, I do.  We only have one
20  identity.  I am very strong about that.
21       Q.  In terms of credit, no one is
22  just turned away because they look a certain
23  way, the credit has to be run, correct?
24       A.  Correct, the credit has to be
25  run if they want to buy on credit, if they

Page 223

1        Ishaque Thanwalla
2   want to pay cash, we don't have to run it.
3   But, we still need to get the social
4   security for the tax form, but no.
5        Q.  You mentioned in your
6   Supplemental Interrogatories that you have a
7   secondhand dealer's license and certificate
8   of authority; is that correct?
9        A.  Secondhand dealer license, yes.
10       Q.  Do you also have a certificate
11  of authority?
12       A.  Authority for what?
13       Q.  I don't know, that's what you
14  wrote.
15       A.  An authority to issue DMV, yes.
16       MS. TROY:  Demand number
17       9, it will be the secondhand
18       dealer license and
19       certificate of authority for
20       161-10 Hillside Auto Avenue,
21       or for you personally.
22       MR. KATAEV:  I am going to
23       place that response in front
24       of the witness.
25       MS. TROY:  That is fine.

Page 224

1        Ishaque Thanwalla
2   I am also asking or
3   requesting the Declaration of
4   Serge.
5        MR. KATAEV:  Should I read
6   this --
7        MS. TROY:  Not all
8   questions require him to read
9   that, but he can read it if
10  it helps him.
11       MR. KATAEV:  This is the
12  Supplemental Response and
13  Interrogatory number 9?
14       MS. TROY:  Correct.  You
15  can read it to him and let me
16  know when you are done
17  reading it.
18  (The witness peruses)
19       THE WITNESS:  Okay.
20       Q.  I am asking you if you
21  identified these documents, they have not
22  been turned over yet, please turn it over.
23  That is another demand.
24       MR. KATAEV:  Documents are
25  being requested.

Page 225

1        Ishaque Thanwalla
2        MS. TROY:  The secondhand
3   dealer license and the
4   certificate of authority that
5   was mentioned and referred to
6   was never produced.
7        MR. KATAEV:  You never
8   made a demand for it,
9        MS. TROY:  I'm making a
10  post-demand request for it.
11       MR. KATAEV:  Put it in
12  writing and we will respond.
13       Q.  Mr. Thanwalla, can you just take
14  a quick look at the two other documents that
15  your attorney has printed for you, which is
16  the documents, it's document request
17  responses and the supplemental responses.
18  Please just take a look at the document and
19  can you just confirm for me that it is
20  accurate and complete to the best of your
21  knowledge.
22       A.  I've been through this document
23  previously, it's the same document, yes.
24       Q.  Just to confirm that both
25  document requests and responses as well as

226–229

Page 226

1       Ishaque Thanwalla
2   the supplemental responses, there were two
3   documents that you looked at, correct?
4           MR. KATAEV:  Let's go off
5       the record.
6           (A discussion was held off
7           the record)
8       A.  Okay, looking at the same
9   thing that I looked at yes.
10          Q.  Just to be clear, the document
11  production responses are the 38 page
12  document, that, and let's start with that,
13  you said that you reviewed the document and
14  it is complete, it is accurate to the best
15  of your knowledge, correct?
16          A.  To the best of my ability, yes.
17          Q.  Then, do you see the five-page
18  document?
19          A.  Yes.
20          Q.  Could you say the same for that
21  5-page document that it is true and complete
22  to the best of your knowledge?
23          A.  To the best of my knowledge,
24  yes.
25          Q.  Now, I'm going to show you this

Page 227

1       Ishaque Thanwalla
2   on the screen, and we are looking at
3   Plaintiff's Exhibit 10 for identification.
4           Q.  We are looking at plaintiff's
5   Exhibit 10 for identification.  I'm just
6   going to point your attention to a couple of
7   different sections and I will have a couple
8   of questions after I point your attention to
9   that section, okay?
10          A.  Okay.
11          Q.  Let's take a look, and if you
12  are looking on the paper it is page 3.
13  there's specific demand responses and we are
14  at number one.  Let me know when you are
15  finished reading demand number 17 and his
16  response.
17          MR. KATAEV:  It is cut off
18      on the screen.  I'm going to
19      ask him to read this.
20          MS. TROY:  Let me know
21      when you guys are done.
22      (The witness peruses the
23      document).
24          THE WITNESS:  What is your
25      question?

Page 228

1       Ishaque Thanwalla
2       Q.  The question is: is it accurate
3   to say that the weekly sales records were
4   not turned over as part of the Supplemental
5   Response?
6       A.  The weekly sales records were
7   not part of this part of the record.
8       Q.  Let me backtrack for a moment.
9   Do you recall earlier today that you
10  mentioned that there was a weekly record of
11  the sales of the cars as well as the
12  commission, and the bonuses, et cetera for
13  each car's salesman at Hillside Auto?
14      A.  Yes, yes.
15          Q.  The question was: was that
16  record  provided as part of the Responses
17  that are in 17, again, it's a yes or no
18  question?
19          MR. KATAEV:  Objection to
20      the form.  You can answer.
21      A.  Yes.
22          Q.  You are saying it was turned
23  over?
24      A.  Yes.
25          MS. TROY:  Please just

Page 229

1       Ishaque Thanwalla
2   turn that over.
3           MR. KATAEV:  Put it in
4       writing and I will respond.
5       Q.  Turning your attention to
6   question 21, a similar process.  Please read
7   over the question with your counsel, read
8   over the question and the response and let
9   me know when you are done because I will
10  have a question for you.
11          MS. TROY:  Does he want on
12      the screen or on the paper?
13          THE WITNESS:  I would like
14      it on the screen better.
15          MS. TROY:  Perfect, tell
16      me when I should scroll down.
17      A.  Okay.
18      Q.  If you don't mind, just read 39
19  and let me know when you are done with the
20  question and the response.
21      A.  Okay.
22          Q.  Is number 39, correct to the
23  best of your knowledge?
24      A.  Yes.
25          Q.  Read the request number 40, and

230–233

| Page 230 | Page 231 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2 let me know when you are done, the request | 2 I asked you if you were a party to any |
| 3 and the response. | 3 Action, do you recall that there was a New |
| 4     A. Okay. What's your question? | 4 York State Court Action against you for |
| 5     Q. My question is, is it correct to | 5 wages? |
| 6 say that there are no complaints for unpaid | 6     A. You bring that up, I respect |
| 7 wages from anyone, including your employees? | 7 that you saw that, I only owed her a hundred |
| 8     A. You are telling me unpaid wages | 8 bucks. A hundred bucks in wages. |
| 9 that I am not paying someone, they have a | 9     Q. My question is: as part of the |
| 10 complaint? | 10 State Law Action, did you receive any |
| 11     Q. Correct. | 11 documents? |
| 12     A. I can't remember -- I have never | 12     A. Yes, probably, but I can't |
| 13 paid anyone lost wages, people I mostly paid | 13 recall 100 percent. |
| 14 people. | 14     Q. Let me just scroll down to |
| 15     Q. The question is not about the | 15 number 46. Please read that request and |
| 16 underlying facts, but the fact that the | 16 answer and let me know when you are done. |
| 17 complaint has the name, whether that was a | 17     A. 47? |
| 18 formal complaint in the Court or a non- | 18     Q. 46, I said. |
| 19 informal complaint. | 19     A. 46? Okay, what's your question |
| 20   My question is: did you turn over all of | 20 on this. |
| 21 the documents that you have in your | 21     Q. Besides Leticia, who else was a |
| 22 possession pertaining to any such | 22 female car salesperson at Hillside Auto |
| 23 complaints? | 23 Outlet? |
| 24     A. Yes, I have. | 24     A. There was a lot of female |
| 25     Q. Earlier when you mentioned, when | 25 salespersons that worked for me in time, but |

| Page 232 | Page 233 |
|---|---|
| Ishaque Thanwalla | Ishaque Thanwalla |
| 1 | 1 |
| 2 I can't recall everybody's name. | 2 until she left, and she changed colors. She |
| 3     Q. Now, when Leticia was working, | 3 was coerced. I don't know. |
| 4 Leticia was a female person -- | 4   Maybe somebody did that coaching, the |
| 5     A. There was more than one, more | 5 only person, her parents or her mother or |
| 6 than one, but I can't recall everybody's | 6 her father. They both were in the lawsuit, |
| 7 name. I can't recall. | 7 maybe she was coached to do that, but I have |
| 8     Q. Do you recall receiving a | 8 no idea. |
| 9 Complaint for sexual or pregnancy | 9     MS. TROY: Let's refrain |
| 10 discrimination from Lilly or anyone else? | 10    from personal attacks of |
| 11     A. Never received anything from | 11    anyone's father or mother. |
| 12 Lilly. | 12    Let's just try to finish |
| 13     Q. How about overall in general | 13    this. |
| 14 from anyone? | 14    THE WITNESS: I am saying |
| 15     A. Received it from Leticia and I | 15    that they are both lawsuit |
| 16 was stunned. After she left, I generally -- | 16    happy. |
| 17 in July and August we received some kind of | 17    MS. TROY: I appreciate |
| 18 pregnancy discrimination, hourly rate, and I | 18    that, but -- |
| 19 was stunned, I was highly stunned. She was | 19    THE WITNESS: She's trying |
| 20 treated like family and she left because she | 20    now. |
| 21 got a better job opportunity elsewhere. I | 21    MS. TROY: I appreciate |
| 22 really took it to heart, because I tried to | 22    your feedback. Let's focus |
| 23 treat her as my own. You can see that on | 23    for a second on the topic. |
| 24 the text messages, 90 percent, close to | 24     A. Yes. |
| 25 that, I have treated her like my family | 25     Q. So, question 47 and the |

234–237

Page 234

1  Ishaque Thanwalla
2  response, can you read that question and
3  answer and let me know when you are done.
4      A. Okay.
5      Q. The question is, whether any
6  other investigations occurred after Leticia
7  complained, made the complaint?
8      A. Not that I know of.
9      Q. I'm going to turn your attention
10 to this portion that is highlighted in the
11 Response. This portion of the Response says
12 that documents ''were previously withheld
13 solely for requests number 21, 34 43, 44, 45
14 (Angris Guzman only), 58, 75, 79, 80, 85,
15 89, 90, 91, and 92.'' Is that a correct
16 statement to the best of your knowledge?
17     A. Is that what you requested
18 earlier?
19     Q. Please focus on my question.
20 The question is: does this statement, is it
21 true to the best of your knowledge, the one
22 that I have highlighted?
23     A. I can't answer that question yes
24 or no. I can't, I don't think the question
25 is so in reality, and I am dyslexic. Can

Page 235

1  Ishaque Thanwalla
2  you elaborate the question and I will answer
3  your question?
4      Q. Sure. So your attorney
5  mentioned that some of the Responses, some
6  of the other Responses, that there are
7  various objections, and the Judge, the
8  defendant, clarified that with respect to
9  some of the Responses. This statement says
10 that there are documents that were not
11 provided because of the objections and then
12 listed the numbers.
13     So, my question for you is, is that
14 correct to the best of your knowledge? If
15 you don't know, just say that you don't
16 know.
17     A. I don't know.
18         MS. TROY: So, if you
19     don't mind, just find out and
20     let me know when you have had
21     a chance to do so. That
22     would be great.
23         I'm going to ask the
24     reporter to leave a blank
25     space in the transcript for

Page 236

1      Ishaque Thanwalla
2      that information.
3
4      (Insert)
5          MS. TROY: That is the
6      last question, those are all
7      the questions I have for you
8      today, Mr. Thanwalla. Thank
9      you. I appreciate your time.
10
11     [Time noted 5:19 p.m)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 237

1      Ishaque Thanwalla
2  WITNESS      EXAMINATION BY           PAGE
3  Mr. Thanwalla     Mr. Troy          6
4      PLAINTIFF EXHIBITS
5  Number      Description          PAGE
6
7  Ex 1   ID (to be Deemed marked)       6
8  Ex 2   Termination letter          68
9  Ex 3   Text messages            122
10 Ex 4   What'sApp             124
11 Ex 5   Text messages sent using       169
12     Decipher App
13 Ex 6   Decipher chat on What'sApp     169
14 Ex 7   Decipher chat conversations    169
15 Ex 8   Verification of Ishaque        209
16     Thanwalla
17 Ex 9   Final Verified response to     209
18     Interrogatories
19 Ex 10  Final Supplemental Response    209
20
21
22
23
24
25

238–241

Page 238

1       Ishaque Thanwalla
2           REQUESTS
3    Number       Description        PAGE
4      1    MS. TROY:  Demand No 1       79
5           Is: Provide the text
6           messages between Ishaque
7           Thanwalla and Stidhum.
8      2    MS. TROY:  Demand No 2 is:   79
9         Provide WhatsApp messages
10          between Thanwalla and Leticia.
11     3    MS. TROY:  Demand No 3 is:   79
12          Provide email exchanges
13          between Ishaque Thanwalla and
14          Stidhum.
15     4     MS. TROY:  Demand No 4 is:   81
16          Provide the surveillance
17          footage.
18     5     MS. TROY:  Demand No 5 is:   81
19          Provide police report, both
20          of which concerns the robbery
21          that took place at Hillside Auto
22          Outlet.
23     6     MS. TROY: Demand No 6 is:   118
24          provide the name as well
25          as the position for each of

Page 239

1       Ishaque Thanwalla
2    the individuals who the
3    witness identified as numbers
4    21,22,2,23,24,4,13,3,25,17,26
5    27,28,29,20,30,31,32,33,34,19,
6    35,36,38,39 and 37.
7      7   MS. TROY:  Demand No. 7 is:    119
8    Provide written documents
9    containing the cars sold,
10     the name of the customer,
11     the bonus and commissions
12     received.
13     8    MS. TROY:  Demand No 8 is:    120
14     provide any electronic files
15     or inputs by the office
16     manager or her assistant
17     regarding the same.
18     9    MS. TROY:  Demand No 9      223
19     is: Provide the unredacted
20     version of the documents,
21     because there is clearly some
22     confusion as to who and what
23     or even if Mr. Parsons
24     actually was there.
25     10   MS. TROY:  Demand No 10 is:   163

Page 240

1       Ishaque Thanwalla
2    Cutting to the chase,
3    if you could just provide
4    the unredacted version of
5    the documents, because there
6    is clearly some confusion as
7    to who and what or even if
8    Mr. Parsons actually was there.
9     11    MS. TROY:  Demand No 11 is:   175
10    Mr. Kataev, it appears that
11    this is the Decipher app,
12    and it's a black and white
13    photograph of the actual video.
14    My question is, can you get me
15    the actual video?
16     12   MS. TROY:  Demand No 12 is:   224
17     The secondhand dealer license
18     and the certificate of authority
19     that was mentioned and referred
20     to was never produced. I'm making
21     a post-demand request for it.
22     13  MS. TROY:  Demand No 13 is:    42
23     (Insert)
24     14  MS. TROY:  Demand No 14 is:    66
25     (Insert)

Page 241

1       Ishaque Thanwalla
2      15   MS. TROY:  Demand No 15 is:    66
3      (Insert)
4      16   MS. TROY:  Demand No 16 is:    74
5      (Insert)
6      17   MS. TROY:  Demand No 17 is:   236
7      (Insert)
8
9
10
11
12
13    QUESTIONS MARKED FOR A RULING:    PAGE/LINE
14    (None)
15
16
17
18
19
20
21
22
23
24
25

A0355

242–244

```
                                                Page 242
1
2                   ACKNOWLEDGEMENT
3
4        STATE OF NEW YORK )
5                          )s.s.
6        COUNTY OF NASSAU  )
7            I, Ishaque Thanwalla, hereby
8        certify that I have read the transcript of
9        my testimony taken under oath in my
10       deposition of February 24, 2023; that the
11       transcript is a true, complete and correct
12       record of my testimony, and that the
13       answers on the record as given by me are
14       true and correct.
15
16            _____
17                 ISHAQUE THANWALLA
18
19       Signed and subscribed before me
20       this _____ day of _____, 2023.
21
22
23       _____
24            Notary Public
25
```

```
                                                Page 243
1                  C E R T I F I C A T E
2        STATE OF NEW YORK   )
3                            )s.s.
4        COUNTY OF NASSAU    )
5
6            I, LYNN LUCKMAN, a Shorthand
7        Reporter and Notary Public within and for
8        the State of New York, do certify that;
9            THAT the witness whose deposition
10       is hereinbefore set forth, was duly sworn by
11       me, and that such deposition is a true
12       record of the testimony given by such
13       witness.
14            I further certify that I am not
15       related to any of the parties to this action
16       by blood or marriage; that I am in no way
17       interested in the outcome of this matter.
18            IN WITNESS WHEREOF, I have
19       hereunto set my hand this 8th day of
20       March, 2023.
21
22
23                 LYNN LUCKMAN
24
25
```

```
                                                Page 244
1     Errata Sheet
2
3     NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4     DATE OF DEPOSITION: 02/24/2023
5     NAME OF WITNESS: ISHAQUE THANWALLA
6     Reason Codes:
7         1. To clarify the record.
8         2. To conform to the facts.
9         3. To correct transcription errors.
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25            _____
```

A0356

```
 1        UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF NEW YORK

 3        -----------------------------------------X

 4        LETICIA FRANCINE STIDHUM,

 5                              Plaintiff,

 6           -against-          CASE: 21-CV-07163

 7        161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
          AUTO OUTLET, and HILLSIDE AUTO MALL INC
 8        d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
          JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

 9

10                              Defendants.

11        -----------------------------------------X

12                              March 09, 2023

13                              10:08 A.M.

14

15           VIRTUAL EXAMINATION BEFORE TRIAL of

16        ANDRIS GUZMAN, via Zoom, a Defendant herein,

17        held at the above-mentioned time and taken

18        before Lynn Luckman, a Notary Public and

19        Shorthand Reporter within and for the State

20        of New York.

21

22

23                    SANDY SAUNDERS REPORTING
                  254 South Main Street, Suite 216
24                    New City, New York 10956
                         (845) 634-7561

25
```

A0357

2–5

Page 2

1       A P P E A R A N C E S:

2

3

4       TROY LAW, PLLC

5       Attorneys for the Plaintiff

6       41-25 Kissena Boulevard, Suite 103

7       Flushing, New York 11355

8       BY: Tiffany Troy, Esq.

9

10      MILMAN, LABUDA LAW GROUP, PLLC

11      3000 Marcus Avenue, Suite 3W8

12      Lake Success, New York 11042-1073

13      BY: Emanuel Kataev, Esq

14      emaanuel@milaborlaw.com

15

16      ALSO PRESENT:  Deana Jennings, Leticia

17      Stidhum and Ishaque Thanwalla (for one hour

18      only).

19

20

21

22

23

24

25

Page 3

1                 FEDERAL STIPULATIONS

2

3            IT IS HEREBY STIPULATED AND AGREED by

4       and between counsel for the respective parties

5       hereto that all objections except as to the

6       form shall be reserved to the time of trial.

7            IT IS FURTHER STIPULATED AND AGREED

8       that the sealing and filing of this deposition

9       shall be hereby waived.

10           IT IS FURTHER STIPULATED AND AGREED

11      that this examination may be sworn to by the

12      witness being examined before a notary public

13      other than the notary public before whom

14      examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                 Andris Guzman

2                 BY THE COURT REPORTER:

3            The attorneys participating

4            in this deposition

5            acknowledge that I am not

6            physically present in the

7            deposition room and that I

8            will be reporting this

9            deposition remotely.  They

10           further acknowledge that, in

11           lieu of an oath administered

12           in person, I will administer

13           the oath remotely.  The

14           parties and their counsel

15           consent to this arrangement

16           and waive any objections to

17           this manner of reporting.

18                MS. TROY:  I consent

19                MR. KATAEV:  So

20           stipulated.

21

22

23                *    *    *

24

25

Page 5

1            Andris Guzman

2            A-N-D-R-I-S G-U-Z-M-A-N, a

3       Defendant herein, after having been duly

4       sworn by a Notary Public of the State of

5       New York, was examined and testified as

6       follows:

7

8       BY THE REPORTER:

9            Q.  Please state your full name

10      for the record.

11           A.  Andris Guzman.

12           Q.  Please state your present

13      address for the record.

14           A.  161-10 Hillside Avenue

15      Jamaica N.Y. 11432

16           Home address is 1230 30th Drive

17      Astoria, N.Y. 11102.

18

19           MS. TROY:  We are

20      going to for the record, we

21      are going to pause the record

22      and the witness is going to

23      show his ID.  Then we're

24      going to mark that as Exhibit

25      16.

6–9

Page 6

1    Andris Guzman
2         (Plaintiff's Exhibit 16
3         deemed marked for
4         identification)
5         MS. TROY:  The witness
6         will show his ID as per the
7         Judge's Order.
8         (The witness complies and
9         shows his ID).
10        MS. TROY:  That is fine.
11        [Time noted is 10:10 a.m.]
12        The recording is going back
13        on now.
14   EXAMINATION BY
15   TIFFANY TROY:
16        Q.  Mr. Guzman, the address that you
17   stated to the court reporter, is that your
18   business address?
19        A.  I'm sorry?
20        Q.  Was the address that you stated
21   your business address?
22        MS. TROY:  Emanuel, if you
23        don't mind adjusting the
24        volume so that we can hear.
25        MR. KATAEV:  I will put it

Page 7

1    Andris Guzman
2         all the way up.
3         A.  Yes, it is Hillside Auto Outlet.
4         Q.  Can you give me your residential
5    address as well?
6         A.  Sure.  1230 30th Drive, Astoria,
7    New York, 11102.
8         Q.  Have you ever been part of a
9    deposition before?
10        A.  No.
11        MR. KATAEV:  Let's go off
12        the record.
13        (A discussion was held off
14        the record)
15        MR. KATAEV:  Note for the
16        record that the plaintiff is
17        attending virtually.
18        Q.  In that case, I am going to
19   explain what a deposition is and lay down
20   some ground rules going forward; do you
21   understand?
22        A.  Yes.
23        Q.  First, this deposition is for me
24   to ask you questions and for you to answer
25   my questions about the subject matter of

Page 8

1    Andris Guzman
2    this lawsuit; do you understand?
3         A.  Yes.
4         Q.  Specifically, we are talking
5    about the pregnancy discrimination case
6    today and my questions will be focused on
7    the pregnancy discrimination case.  Also,
8    there is another separate wage rate and hour
9    case, but that is separate, do you
10   understand that?
11        A.  Yes.
12        Q.  Since the court reporter has to
13   take down everything that you say, I ask
14   that you give verbal responses, no shaking
15   or nodding of your head and no gestures; do
16   you understand that?
17        A.  Yes.
18        Q.  For the same reason, please
19   speak clearly and loudly when you answer a
20   question; do you understand?
21        A.  Yes.
22        Q.  The court stenographer can only
23   write down when one person is speaking at a
24   time.  Therefore, please don't start
25   answering one of my questions before I stop

Page 9

1    Andris Guzman
2    asking it.  Likewise, I will not start a new
3    question until you have finished answering
4    my last question; do you understand that?
5         A.  Yes.
6         Q.  If you need a break, for
7    example, to get a drink of water or to use
8    the restroom, please feel free to tell me
9    and I will call for a recess.  However,
10   there can be no break between one of my
11   questions and your answer to that question;
12   do you understand that?
13        A.  Yes.
14        Q.  From time to time, your attorney
15   may make objections to my questions.
16   Generally, however, unless your attorney
17   tells you not to respond, you will still
18   have to respond; do you understand that?
19        A.  Yes.
20        Q.  If you don't understand a
21   question, tell me and I'll rephrase it so
22   that you can.  If you don't hear a question,
23   tell me and I'll repeat it so that you do;
24   do you understand that?
25        A.  Yes.

10–13

| Page 10 | Page 11 |
|---|---|
| Andris Guzman | Andris Guzman |

**Page 10**

1              Andris Guzman
2       Q. We are here today to gather
3  facts and not speculation. If you don't
4  know the answer to a question, say so; do
5  you understand?
6       A. Yes.
7       Q. Do you understand that you have
8  taken an oath to tell the truth?
9       A. Yes.
10      Q. Do you understand that your oath
11  to tell the truth carries the same force and
12  effect as if you were testifying in Court
13  before a Judge?
14      A. Yes.
15      Q. Are you currently taking any
16  medications that could prevent you from
17  recalling the truth or testifying truthfully
18  today?
19      A. No medications.
20      Q. How about any physical or
21  emotional conditions, are you currently
22  under any physical or emotional conditions
23  that could prevent you from recalling the
24  truth or testifying truthfully today?
25      A. No, no such conditions.

**Page 11**

1              Andris Guzman
2       Q. Besides your attorney, did you
3  speak with anyone in order to prepare for
4  today's deposition?
5      A. I spoke with my attorney.
6      Q. Now, please listen to my
7  question carefully. The question is:
8  besides talking with your attorney, did you
9  speak with anyone else in order to prepare
10  for today's deposition?
11      A. No.
12      MR. KATAEV: The
13      defendants object to the
14      plaintiff appearing without
15      going on the video. We are
16      okay with the fact that she's
17      on the video, but if she
18      doesn't want to, then she has
19      to leave.
20      MS. TROY: The witness has
21      a right to appear at the
22      deposition. I am fine with
23      her showing her face to
24      verify that she is the only
25      person in the room.

| Page 12 | Page 13 |
|---|---|
| Andris Guzman | Andris Guzman |

**Page 12**

1              Andris Guzman
2      MR. KATAEV: That is fine.
3      MS. TROY: The witness is
4      allowed to be present in the
5      deposition.
6      Are you telling me that
7      you are asking her to leave
8      even though she is the
9      plaintiff?
10      MR. KATAEV: We have asked
11      her to leave only if she
12      refuses to remain on the
13      video for the duration of the
14      deposition. She can remain
15      on mute, but the video has to
16      be on. Obviously, if she's
17      not, if she is busy with
18      something else and she has to
19      step out, that is fine. But,
20      the video has to remain on.
21      MS. TROY: Ms. Stidhum,
22      are you there? Can you just
23      open your video feed and
24      maybe just make sure that you
25      are who you say you are. You

**Page 13**

1              Andris Guzman
2      can do that and then you can
3      turn off the video.
4      This can also be off the
5      record.
6      MR. KATAEV: On the
7      record, while we are waiting
8      for the plaintiff to join the
9      video, we have Deana
10      Jennings, the corporate
11      representative joining us.
12      Deana, if you can just
13      identify yourself and keep
14      the volume turned down. That
15      would be great.
16      MS. JENNINGS: That is
17      fine.
18      MR. KATAEV: We have a
19      third party joining. Let the
20      record reflect that Deana
21      Jennings is joining us by
22      video. We are now waiting
23      for the plaintiff to join by
24      video and then we can resume.
25      Let's go off the record.

14–17

Page 14

Andris Guzman

1
2    (A discussion held was held
3    off the record)
4    Q. Let's go back on the record.
5        MS. TROY:  The time now is
6    10:29 and the record should
7    reflect the attendance of
8    Deana Jennings, who is the
9    corporate representative for
10   the two corporate defendants.
11       Ms. Jennings, I am
12   just confirming that there
13   was no one else in the room
14   with you.
15       MS. JENNINGS:  No, no one
16   else, just me.
17       MS. TROY:  Can you confirm
18   that throughout the duration
19   of this deposition, except
20   during on break, that there
21   will be no one else in the
22   room with you, Ms. Jennings?
23       MS. JENNINGS:  Yes.
24       MS. TROY:  We are now
25   ready to proceed.

Page 15

Andris Guzman

1
2    Q.  Without telling me the contents
3    of your communications, did you, yes or no,
4    talk to your attorney to prepare for today's
5    deposition.
6    A.  Yes.
7    Q.  Did you review any documents in
8    preparation for today's deposition?
9    A.  Yes.
10   Q.  What were those documents, can
11   you describe them for me?
12   A.  I don't remember specifically
13   the details of it.  But, I knew that it had
14   to do--- had to do with the situation at
15   hand.
16   Q.  Can you describe the type of
17   documents even if you don't recall the
18   specific details?
19   A.  Papers about the case.
20   Q.  ''By papers about the case,'' do
21   you mean the written documents that were
22   exchanged between the parties?
23   A.  Yes.
24   Q.  Did you review any documents
25   about the pay that Leticia Stidhum received?

Page 16

Andris Guzman

1
2    A.  No.
3    Q.  How about the pay that other car
4    salespeople received, did the documents that
5    you reviewed include such documents?
6    A.  No.
7    Q.  Did the documents that you
8    reviewed include any documents pertaining to
9    the sales of Hillside Auto Outlet?
10   A.  No.
11   Q.  Did you review any text messages
12   or phone records?
13   A.  At some point, yes.
14   Q.  Can you describe the text
15   messages for me?
16   A. I don't know how off the top of
17   my head.
18   Q.  Do you recall who were the
19   parties in the text messages; in other
20   words, who sent text messages to whom in the
21   text messages that you did review?
22   A.  Repeat the question for me,
23   please.
24   Q.  Sure.  You said that you don't
25   know off the top of your head, you could not

Page 17

Andris Guzman

1
2    give a description of the text messages.
3    I am now asking you: do you recall
4    between which two people or which parties
5    the text messages were sent to and from?
6    A.  I was checking to see if there
7    was any communications to text messages,
8    through text message.
9        MR. KATAEV:  The question
10   was with whom, right Tiffany?
11   Q.  Specifically, did you have any
12   communications, and let's start from the
13   plaintiff; did you have any text message
14   communications with Leticia?
15   A.  Before, yes, when I used to work
16   at the dealership.  I meant when I used to
17   work at the dealership.
18   Q.  When did you stop working at the
19   dealership?
20   A.  Few years ago.
21   Q.  Do you recall which year?
22   A.  In 2019.
23   Q.  Do you recall which month in
24   2019?
25   A.  The summer, I believe, August, I

Case 1:21-cv-07163-OEM-LB   Document 87-4   Filed 09/01/23   Page 6 of 31 PageID #: 979

18–21

Page 18

1  Andris Guzman
2  would say.
3          Q.  Right after Hillside Auto, where
4  did you work next?
5          A.  I worked at another dealership.
6          Q.  What was the name of that
7  dealership?
8          A.  That was on Long Island, New
9  York Off Lease.
10          Q.  After New York Off Lease, where
11  did you work next?
12          A.  Victory Mitsubishi.
13          Q.  Do you recall what year and what
14  month you started working at Victory
15  Mitsubishi?
16          A.  It was around September of 2020.
17          Q.  After Victory Mitsubishi, did
18  you work anywhere else?
19          A.  No.
20          Q.  Let's turn back to the text
21  messages between you and Leticia.  You said
22  that you checked if there were any text
23  messages; did you find any?
24          A.  Yes, we did communicate through
25  text.

Page 19

1  Andris Guzman
2          Q.  Have you produced those text
3  messages to your attorney?
4          A.  Repeat the question.
5          Q.  Have you sent over those text
6  messages to your attorney?
7          A.  Yes, I did show him.
8          MR. KATAEV:  The
9          defendants will be producing
10          those messages shortly.
11          Q.  When did you show those text
12  messages to your attorney?
13          A.  While -- I don't remember the
14  exact time.
15          Q.  Was it this year, last year, or
16  a few years ago?
17          A.  This year, I believe.
18          Q.  Do you recall which month of
19  this year you showed the text messages to
20  your attorney?
21          A.  I don't recall if it was January
22  or February.  I don't have the exact time
23  and date exactly.
24          Q.  Do you know who the defendants
25  are in this case, Mr. Guzman?

Page 20

1  Andris Guzman
2          A.  Yes, I have an idea.
3          Q.  Besides your text messages with
4  Leticia Stidhum, the plaintiff, did you ever
5  have any text messages with any of the
6  defendants?
7          A.  With any other defendants,
8  meaning --
9          MS. TROY:  May the record
10          reflect that Mr. Kataev is
11          muted and somebody is on the
12          video and I don't know --
13          MR. KATAEV:  I moved my
14          screen over to the right so
15          that he could look at it.
16          Q.  What was your response?
17          A.  Repeat the question.
18          Q.  It was a very simple question,
19  the question is; did you text with any of
20  the other defendants?
21          MR. KATAEV:  About
22          anything?
23          MS. TROY:  When you were
24          working at Hillside Auto.
25          MR. KATAEV:  About

Page 21

1  Andris Guzman
2          anything?
3          Q.  Let's start from anything, and
4  then we will narrow it down.
5          A.  Okay.  I mean I used to work,
6  absolutely, and we all communicated.
7          Q.  By text message?
8          A.  Calls or texts.
9          Q.  Did some of the text messages
10  concern Leticia Stidhum?
11          A.  I don't recall, it was awhile
12  back.
13          Q.  When you were talking about how
14  you were checking to see if there were any
15  communications through text messages, did
16  you check to see if you had any text
17  messages, and let's start for instance, with
18  Ishaque Thanwalla?
19          A.  No.  I just checked through, I
20  checked hers and I saw that the information
21  about her, she was the first person that was
22  being involved.  I didn't check anybody
23  else's.
24          MS. TROY:  Let's go off
25          the record.

22–25

| Page 22 |
|---|
| 1  Andris Guzman |
| 2  (A discussion was held off |
| 3  the record) |
| 4  MS. TROY:  Let's mark this |
| 5  as Demand Number 9.  And I |
| 6  will get to that in a moment. |
| 7  Q.  Mr. Guzman, what is your phone |
| 8  number? |
| 9  A.  What is my phone number? |
| 10  Q.  Yes, correct. |
| 11  A.  You want the exact numbers? |
| 12  Q.  Correct. |
| 13  A.  347 749-0633. |
| 14  Q.  Who is your service provider? |
| 15  MR. KATAEV:  Objection as |
| 16  to relevance.  You can |
| 17  answer. |
| 18  MS. TROY:  Emanuel, you're |
| 19  going to have to figure out |
| 20  your sound situation. |
| 21  MR. KATAEV:  I said |
| 22  ''objection as to relevance |
| 23  but, you may answer.'' |
| 24  I just moved the |
| 25  microphone maybe that will be |

| Page 23 |
|---|
| 1  Andris Guzman |
| 2  better. |
| 3  Q.  Please answer the question, who |
| 4  is your service provider? |
| 5  A.  I believe is T-Mobile. |
| 6  Q.  Did you have the same phone from |
| 7  2018 until the present day, the same phone |
| 8  number? |
| 9  A.  Yes. |
| 10  Q.  What type of phone is it, do you |
| 11  have an iPhone? |
| 12  MR. KATAEV:  Objection to |
| 13  the form of the previous |
| 14  question.  You can answer the |
| 15  question. |
| 16  A.  iPhone. |
| 17  Q.  Did you use the iPhone from 2018 |
| 18  to the present day with a different iPhone |
| 19  but it was an iPhone? |
| 20  A.  Did I have different phones? |
| 21  Q.  Yes. |
| 22  A.  Yes, I did have different |
| 23  phones. |
| 24  Q.  Were the different phones all |
| 25  iPhones? |

| Page 24 |
|---|
| 1  Andris Guzman |
| 2  A.  Yes. |
| 3  Q.  During your time at Hillside |
| 4  Auto Outlet, are you familiar with Deana |
| 5  Jennings, the individual who is on the |
| 6  screen? |
| 7  A.  Yes. |
| 8  Q.  During this time, were there |
| 9  ever times when you would text with her? |
| 10  A.  I don't recall.  I don't |
| 11  remember. |
| 12  Q.  During your time working at |
| 13  Hillside Auto, were there times that you |
| 14  would text with Ishaque? |
| 15  A.  Yes. |
| 16  Q.  How about Jory Baron? |
| 17  A.  I don't recall. |
| 18  MS. TROY:  Emanuel, when |
| 19  will you be producing the |
| 20  text messages between Andris |
| 21  Guzman and Leticia Stidhum? |
| 22  MR. KATAEV:  Right this |
| 23  second, actually. |
| 24  Let the record reflect |
| 25  that the defendants have |

| Page 25 |
|---|
| 1  Andris Guzman |
| 2  produced the text messages |
| 3  between the witness and/or |
| 4  the plaintiff, as well as the |
| 5  conversation including the |
| 6  witness and plaintiff and |
| 7  other employees. |
| 8  Let the record also |
| 9  reflect that the defendants |
| 10  produced voluntarily to the |
| 11  plaintiff the text messages |
| 12  between the plaintiff and the |
| 13  witness, as well as a group |
| 14  text message between the |
| 15  witness and the plaintiff and |
| 16  other individuals at the |
| 17  dealership.  I have sent it |
| 18  to you by email. |
| 19  Q.  Mr. Guzman, do you have your |
| 20  phone on you or near you? |
| 21  A.  No. |
| 22  Q.  Where is your iPhone? |
| 23  A.  I actually forgot it on my way |
| 24  here. |
| 25  Q.  By ''forgot it on my way here,'' |

A0363

26–29

Page 26

Andris Guzman

1  what do you mean?
2  
3       A.  I was running because I thought
4  I was going to be late.  So, I forgot it at
5  the house when I left.
6       Q.  Did someone instruct you to
7  leave your phone at home?
8       MR. KATAEV:  Objection to
9       the form.  That is
10      attorney/client privilege.
11      To the extent that any such
12      conversations were held
13      between yourself and myself,
14      I instruct you not to answer
15      that question.
16      Q.  Mr. Guzman, do you understand
17  that you are under oath to tell the truth;
18  is that correct?
19      A.  Correct.
20      Q.  When you said that you ''forgot
21  it,'' on your way here, is that true?
22      A.  Yes.
23      MR. KATAEV:  Objection.
24      Asked and answered.  Please
25      move on.

Page 27

Andris Guzman

1  
2       Q.  Did you intentionally leave your
3  phone at your home?
4       MR. KATAEV:  Objection.
5       You are harassing the witness
6       and I instruct the witness
7       not to answer the question.
8       MS. TROY:  On what basis?
9       MR. KATAEV:  You can call
10      the Judge.  Stop harassing
11      the witness.
12      Q.  Do you know the answer to my
13  question?
14      MR. KATAEV:  Objection.
15      You are harassing the
16      witness, and --
17      MS. TROY:  Harassing the
18      witness is not a valid
19      objection.
20      MR. KATAEV:  Yes, it is
21      under rule 30.  Do you want
22      me to point to the specific
23      provision?  He answered your
24      question.  Move on or call the
25      Judge.  I am instructing him

Page 28

Andris Guzman

1  
2       not to answer.
3       MS. TROY:  We will call
4       the Judge.
5       MR. KATAEV:  That is fine.
6       Let the record also reflect
7       that the defendant Mr.
8       Thanwalla, will be leaving at
9       10:43 a.m.
10      (Mr. Thanwalla left the
11      deposition)
12      (A call was made to the Judge
13      at 10:43 a.m.)
14      MS. TROY:  I will put this
15      on the speaker.
16      (Ms. Troy complies)
17      ''MS. TROY:  Good morning,
18      this is Tiffany Troy, Your
19      Honor.  I have Lynn Luckman,
20      the court reporter with me
21      and Mr. Kataev and his
22      witness, Andris Guzman.  We
23      are doing a deposition right
24      now and he has instructed his
25      witness not to answer a

Page 29

Andris Guzman

1  
2       question on the basis of
3       harassing the witness.  I
4       told him that that was not a
5       valid objection and that he
6       needed to respond.  He then
7       directed his client not to
8       respond.
9       THE COURT:  I'm going to
10      put you on hold for a moment.
11      MS. TROY:  To the
12      reporter, if you don't mind
13      taking this all down, again,
14      we're just going to need to
15      ask the Judge for her
16      permission.  If you don't
17      mind, please do me a favor,
18      Lynn and read back the last
19      question before all of the
20      colloquy.
21      (The court reporter
22      complies).
23      Please note for the record
24      that it is now 10:46.  And
25      then it goes to 10:49 and

30–33

Page 30

Andris Guzman

1
2   that we are on the record
3   waiting for the Judge.
4        THE CLERK:  I'm going to
5   give you the number and the
6   code to get on the line.
7        MS. TROY:  What I'm going
8   to do is that, I'm going to
9   dial and we will just be on
10   speakerphone.
11        MR. KATAEV:  I'm just
12   going to mute myself here,
13   and I'm just going to be on
14   the phone.
15        MS. TROY:  That should be
16   fine.  You will hear it on
17   the speaker?
18        MR. KATAEV:  On the phone,
19   yes.  I'm going to mute
20   myself on the computer in
21   terms of that you are no
22   longer going to be able to
23   hear me.  I'm going to mute
24   my sound so that I don't hear
25   you guys.

Page 31

Andris Guzman

1
2        MS. TROY:  Let's go off
3   the record.
4   (A discussion was held off
5   the record)
6        MS. TROY:  Again, Your
7   Honor, we have the court
8   reporter, Ms. Lynn Luckman on
9   the call and she will be
10   taking down what is being
11   said.
12        THE COURT:  That is fine.
13   I'm still recording this and
14   I'm going to start the sound,
15   and my clerk will note your
16   appearances.
17        I will tell you that
18   this cannot keep happening.
19   You are coming to me with
20   other -- other cases were
21   scheduled, and I will tell
22   you now, this is not going to
23   get you any bonus points
24   calling in every week from a
25   deposition, okay?  You're

Page 32

Andris Guzman

1
2   going to have to figure out
3   how to deal with one another.
4        Just to let you know that
5   this is being recorded.
6        Please tell me the name of
7   the case and state your name
8   for the record.
9        MS. TROY:  Your Honor,
10   this is Tiffany Troy calling
11   from Troy Law.  This is case
12   21-CV-07163.
13        THE COURT:  I am just
14   going to tell you Ms. Troy
15   and Mr. Kataev, let the
16   record reflect that this
17   is not a scheduled
18   conference.  This matter
19   is something that I have
20   been contacted about
21   previously, regarding
22   previous matters in this
23   deposition.  The attorneys
24   have not been able to
25   resolve their disputes.

Page 33

Andris Guzman

1
2        Before we went on the
3   record, I did note that
4   this happened last week,
5   and that again, to have
6   brought a dispute the
7   following week definitely
8   is not scheduled and is
9   unacceptable.  I am not
10   going to continue to
11   babysit two attorneys who
12   can not get their business
13   done.
14        Ms. Troy and Mr.
15   Kataev, that is without being
16   told whose deposition it is
17   or what the problem is.  So,
18   who wants to put on the
19   record why I am being
20   contacted today?
21        MS. TROY:  I would like to
22   put on the record that this
23   is plaintiff's attorney
24   speaking.  We have Andris
25   Guzman as the witness today

34–37

| | |
|---|---|
| Page 34 | Page 35 |

Page 34

1   Andris Guzman
2       at plaintiff's deposition of
3       the defendant.  Andris Guzman
4       is on his phone and he has
5       text messages with Leticia
6       Stidhum, the plaintiff as
7       well as an issue, and not
8       withstanding that as well as
9       potentially other defendants
10      including text messages that
11      cover the period in question.
12      He testified that he left his
13      phone at home.  I asked him
14      why and he said ''I forgot
15      it.''  He stated that he
16      thought he was going to be
17      late and he said, ''I forgot
18      it at the house.''
19          I asked him if someone
20      told him to leave it at home,
21      and Emanuel interposed an
22      objection based on
23      attorney/client privilege to
24      the extent that there is any
25      such communications between

Page 35

1   Andris Guzman
2       himself and his client, and
3       he instructed the witness not
4       to answer.
5           Then, I asked if he said
6       that he forgot it and he
7       answered ''yes.''  I then asked
8       him ''did you intentionally
9       leave your phone at your
10      home?''  Then Mr. Kataev again
11      objected and instructed the
12      witness not to answer the
13      question.
14          I would just like to note
15      as well that in the previous
16      week with Jory Baron, the
17      witness also testified that
18      he forgot his phone at home
19      and that the phone contained
20      text messages that included -
21      -
22          THE COURT:  We can get the
23      business accomplished.  When
24      you were making your
25      Discovery demands of the

Page 36

1   Andris Guzman
2       defendants, did you request
3       any emails or text messages?
4           MS. TROY:  Yes, Your
5       Honor.
6           THE COURT:  Were they
7       produced?
8           MS. TROY:  No.  What
9       happened, Your Honor, was
10      that during the deposition of
11      Ishaque Thanwalla, Mr.
12      Thanwalla testified that he
13      had text messages and that is
14      when the defendant produced
15      the texts messages between
16      Leticia and Thanwalla.
17          Then, last week during
18      the deposition of Jory Baron,
19      Mr. Baron testified in fact
20      that he had text messages
21      with Leticia.  Then, when the
22      defendants produced his text
23      messages with Leticia again
24      today, it's the same issue,
25      which is that I asked the

Page 37

1   Andris Guzman
2       question ''are there any other
3       text messages,'' and then were
4       any produced, and I think he
5       said in January or February.
6       Then Mr. Kataev again just
7       turned over the text messages
8       between Mr. Guzman and
9       Leticia today during the
10      deposition.
11          THE COURT:  Stop talking.
12      Enough.  I got the picture.
13      Mr. Kataev, you're going to
14      subject your client to
15      multiple depositions here by
16      not turning over these text
17      messages before the
18      deposition.  Why is that
19      going to be a good use of an
20      anyone's time or --
21          MR. KATAEV:  That is not
22      accurate.  Multiple
23      representations seem to be --
24          THE COURT:  I want you to
25      answer my question.  Did your

38–41

| Page 38 | Page 39 |
|---|---|
| Andris Guzman | Andris Guzman |
| 1 | 1 |
| 2   client turn over their text | 2   that he said that there are |
| 3   messages? | 3   text messages on that phone |
| 4        MR. KATAEV:  Yes, they | 4   that relate to this case.  Is |
| 5   did.  And there are no | 5   that something that you are |
| 6   requests I have no document | 6   contesting, Mr. Kataev? |
| 7   requests. | 7        MR. KATAEV:  Not exactly |
| 8        THE COURT:  Mr. Kataev, I | 8   Your Honor, I provided -- |
| 9   don't have the document | 9        THE COURT:  What do you |
| 10   request in front of me. | 10   mean by "not exactly?" Is it |
| 11   Certainly Ms. Troy is | 11   yes or no? |
| 12   entitled to any text messages | 12        MR. KATEV:  I'm trying to |
| 13   for the relevant time period. | 13   answer your question.  Please |
| 14        MR. KATAEV:  I -- | 14   allow me to. |
| 15        THE COURT:  Mr. Kataev, I | 15        THE COURT:  I am getting |
| 16   am tired of being interrupted | 16   very close to saying that I'm |
| 17   by you. | 17   not going to accept your |
| 18        MR. KATAEV:  I apologize. | 18   representation; do you |
| 19        THE COURT:  So, the | 19   understand that? |
| 20   dispute right now, as I | 20        MR. KATAEV:  I understand |
| 21   understand from Ms. Troy, | 21   that. |
| 22   that we just went over Mr. | 22        THE COURT:  Mr. Kataev, I |
| 23   Guzman and she spoke about | 23   asked whether or not he has |
| 24   it, but she said Mr. Guzman | 24   text messages on his phone. |
| 25   left his phone at home and | 25   Please answer me, and if the |

| Page 40 | Page 41 |
|---|---|
| Andris Guzman | Andris Guzman |
| 1 | 1 |
| 2   answer is that he did not -- | 2   She did not ask ''did you ever |
| 3        MR. KATAEV:  He answered | 3   have any text messages |
| 4   yes.  They have been produced | 4   provided -- |
| 5   between himself and the | 5        MS. TROY:  I did. |
| 6   plaintiff, and that he has | 6        THE COURT:  Mr. Kataev, |
| 7   voluntarily produced the | 7   did not interrupt you.  Do |
| 8   group text messages, | 8   not interrupt him. |
| 9   including the plaintiff's | 9        MR. KATAEV:  I believe the |
| 10   witness and other witnesses. | 10   fastest way to do this is to |
| 11   She asked, ''do you have text | 11   have the court reporter read |
| 12   messages, for example, with | 12   the record -- |
| 13   Ishaque?'' He said -- | 13        THE COURT:  I am not going |
| 14        THE COURT:  Mr. Kataev -- | 14   to do that, that is |
| 15        MR. KATAEV:  Your Honor, | 15   babysitting two attorneys who |
| 16   may I please finish what I am | 16   cannot get along. |
| 17   saying? I am done | 17        I am not going to indulge |
| 18   interrupting you though, but | 18   the fact that he left the |
| 19   can I finish? | 19   phone at his home.  You were |
| 20        THE COURT:  Go ahead Mr. | 20   saying all of his text |
| 21   Kataev. | 21   messages were produced.  We |
| 22        MR. KATAEV:  While the | 22   are going to have to have |
| 23   issue was that he was asked | 23   that in writing, and I'm |
| 24   ''did you ever have any text | 24   going to resolve it on what |
| 25   messages?'' And he said ''yes.'' | 25   the question and answers |

42–45

| Page 42 | | Page 43 | |
|---|---|---|---|
| 1 | Andris Guzman | 1 | Andris Guzman |
| 2 | were. | 2 | defendant that is called for |
| 3 | As far as asking Mr. | 3 | a deposition left their phone |
| 4 | Guzman, Ms. Troy, whether or | 4 | at home on the day of the |
| 5 | not he left it at home on | 5 | deposition, that would be |
| 6 | purpose or he left it at home | 6 | something that would concern |
| 7 | because he was told to, | 7 | the Court.  Do you understand |
| 8 | please leave that aside.  I | 8 | me, Mr kataev? |
| 9 | really don't care as long as | 9 | MR. KATAEV:  Your Honor, I |
| 10 | you get the information that | 10 | understand.  That is not -- |
| 11 | you need to get this case | 11 | THE COURT:  Mr. Kataev, do |
| 12 | litigated. | 12 | you understand that I have |
| 13 | As far as what the | 13 | other cases and that this |
| 14 | objection was about | 14 | sort of dispute should not be |
| 15 | attorney/client privilege, I | 15 | put to the Court? |
| 16 | told you that we are on a | 16 | MR. KATAEV:  I do |
| 17 | guideline on both sides of | 17 | understand, but I did not -- |
| 18 | this case of overdoing | 18 | THE COURT:  Do you |
| 19 | everything.  I can't imagine, | 19 | understand that part of this |
| 20 | I really can't imagine Mr. | 20 | is because again, that you |
| 21 | Kataev that you told your | 21 | are telling me that he |
| 22 | client to leave their phone | 22 | produced all of his text |
| 23 | at home.  If you did, I will | 23 | messages that have anything |
| 24 | tell you that that is not a | 24 | to do with Ms. Stidhum, and |
| 25 | good idea.  If every | 25 | you're going to be held to |

| Page 44 | | Page 45 | |
|---|---|---|---|
| 1 | Andris Guzman | 1 | Andris Guzman |
| 2 | that, is that your | 2 | additional text messages that |
| 3 | representation? | 3 | have not been produced.  If |
| 4 | MR. KATAEV:  Yes, no -- | 4 | there are, you can make a |
| 5 | THE COURT:  Ms. Troy, is | 5 | Motion to compel where they |
| 6 | there anything, are there any | 6 | should turn them over, and |
| 7 | text messages that they | 7 | you will have what you need |
| 8 | supplied to you but they | 8 | for a second deposition.  I |
| 9 | don't have to stipulate | 9 | will consider that. |
| 10 | between the defendant that | 10 | MS. TROY:  Understood.  We |
| 11 | doesn't concern Ms. Stidhum, | 11 | will do the latter option. |
| 12 | what is your issue with that? | 12 | THE COURT:  The latter |
| 13 | MS. TROY:  I agree with | 13 | option?  You're going to ask |
| 14 | that. | 14 | him whether he turned over |
| 15 | THE COURT:  What are we | 15 | all the text messages that |
| 16 | going to do today?  Do you | 16 | concern Ms. Stidhum? |
| 17 | want me to instruct Mr. | 17 | MS. TROY:  Yes. |
| 18 | Guzman to return home to get | 18 | THE COURT:  I will stay on |
| 19 | his phone so that you can | 19 | the line while you ask the |
| 20 | then look at his text | 20 | question so that I do not get |
| 21 | messages?  Do you want me to | 21 | a call back. |
| 22 | ask him if he has the text | 22 | MS. TROY:  Understood, |
| 23 | messages that they say they | 23 | Your Honor. |
| 24 | produced to him, and you can | 24 | THE COURT:  Now, you can |
| 25 | ask whether there are any | 25 | go back on the record Ms. |

46–49

Page 46

1    Andris Guzman
2         Court reporter.''
3    Q.  Mr. Guzman, are you here?
4    A.  Yes, I am here.
5    Q.  Besides the text messages
6  between you and Ms. Stidhum, as well as the
7  group message that your attorney just
8  emailed to me 30 minutes ago, are there any
9  other additional text messages, meaning
10  between yourself as well as the defendant
11  that concern Ms. Stidhum's employment at
12  Hillside Auto Outlet?
13       A.  No additional text messages.
14       ''THE COURT:  Is there
15       anything else that you need
16       to ask while I am on the
17       record, on the line Ms. Troy?
18       MS. TROY:  No, Your Honor.
19       Thank you for your time.
20       THE COURT:  Mr. Kataev, I
21       will tell you if any other
22       witnesses of yours forget
23       their phone, I will not be
24       pleased to receive a phone
25       call; do you understand?

Page 47

1    Andris Guzman
2       MR. KATAEV:  I just want
3    to put one quick thing on the
4    record, Your Honor.
5       THE COURT:  Yes.
6       MR. KATAEV:  All of the
7    questions that were asked of
8    my witness were answered.
9    When the witness said that he
10    left his phone at home,
11    plaintiff's counsel reminded
12    him that he is under oath and
13    started to badger and harass
14    him.
15       THE COURT:  Oh, please,
16    Mr. Kataev.
17       Look in the mirror when
18    you talk about badgering, the
19    two of you have to get along.
20    How many times do I have to
21    say it?  I don't have time
22    for lawyers that make
23    themselves the center of the
24    litigation.  Do I need to say
25    it to you again?

Page 48

1    Andris Guzman
2       MR. KATAEV:  No.  I'm just
3    representing on the record
4    that there was badgering of
5    the witness and it was
6    completely without any
7    authority.
8       THE COURT:  That's great
9    to hear that Mr. Kataev.  I
10    was in a conference when I
11    was interrupted with this
12    call.  I was on another case
13    and I don't have to speak to
14    you about the other partners
15    at your firm.
16       I am not asking, I'm
17    not saying it's your fault.
18    I'm saying that the toxic mix
19    of you and Ms. Troy is more
20    than the Court can bear.  It
21    is not a good use of
22    resources for the Court to
23    get these calls about these
24    issues.  The parties should
25    be able to resolve these

Page 49

1    Andris Guzman
2    issues.  Ms. Troy, do you
3    understand?
4       MS. TROY:  Yes, Your
5    Honor.  I understand.
6       THE COURT:  Mr. Kataev, do
7    you understand?
8       MR. KATAEV:  Yes, Your
9    honor.
10       THE COURT:  This
11    deposition shall proceed.
12    Thank you.  This matter is
13    now adjourned.  Please note
14    for the record that it is now
15    11:22 a.m.''
16    Q.  Mr. Guzman, during the break,
17  did you discuss your testimony with your
18  attorney; yes or no?
19       A.  No.
20       Q.  Have you ever been a party to
21  any civil proceeding?
22       A.  Explain.
23       Q.  Besides this case, were you a
24  plaintiff or a defendant in any other case?
25       A.  Does a divorce count?  I don't

50–53

Page 50

Andris Guzman

1  know.  That's as close as I think --
2
3      Q.  Besides the divorce, have you
4  ever been a party to any other civil
5  proceeding?
6      A.  Not that I remember.
7      Q.  Have you ever been arrested
8  before?
9      A.  No.
10      Q.  When did you start working for
11  Hillside Auto?
12      A.  Beginning of 2018, I think.
13      Q.  Do you recall which month?
14      A.  The beginning of the year.
15      Q.  Besides the address that you
16  gave at the beginning of this deposition,
17  have you lived anywhere else in the past 5
18  years?
19      A.  No.  That has been my address.
20      Q.  What is your highest level of
21  education?
22      A.  Some college, I did go to the
23  college.
24      Q.  What was your position at
25  Hillside Auto when you began in 2018?

Page 51

Andris Guzman

1
2      A.  Do you mean Hillside Auto
3  Outlet?
4      Q.  Right.  What was your position
5  there?
6      A.  Sales manager.
7      Q.  Did your position ever change
8  from the time you began working until the
9  end date, until the end of your employment
10  at Hillside Auto?
11      A.  I began as the sales manager,
12  then got promoted to general sales manager.
13      Q.  When were you promoted?
14      A.  It's been a few years, I'm
15  trying to remember -- I think it's towards
16  the end of the summer, I will say of the
17  same year, 2018.
18      Q.  What were your responsibilities
19  as the sales manager?
20      A.  What was my responsibilities? Is
21  that the question?
22      Q.  Yes.
23      A.  I was making sure that I was in
24  charge of the sales that were being made at
25  the dealership.  Meaning, I used to make

Page 52

Andris Guzman

1  sure that people bought cars and that they
2  went through the process.
3      Q.  How about when you were the
4  general sales manager?
5      A.  The general sales manager meant
6  that I was also involved in finance.
7      Q.  By "finance," what do you mean?
8      A.  Working with the banks and
9  getting people approved for loans.
10      Q.  Does that include running the
11  credit for the customers?
12      A.  Running the credit for the
13  customers is part of purchasing a vehicle.
14      Q.  Did you run the credit when you
15  were the sales manager?
16      A.  Yes.
17      Q.  You continued running the credit
18  as the general sales manager; is that
19  correct?
20      A.  Every manager at the store has
21  access to running credit, it's part of
22  buying and getting all the stipulations
23  needed to get a loan and purchasing the
24  vehicle, right?
25

Page 53

Andris Guzman

1
2      Q.  Besides what you just described,
3  were there any other additional
4  responsibilities that we have not discussed
5  yet?
6      A.  Aside from being in charge of
7  making sure people bought vehicles, no.
8      Q.  Do you recall how many cars were
9  sold by the dealership on a monthly basis?
10      A.  I don't recall exactly, it's
11  been a few years.
12      Q.  How about a range, let's start
13  from the busier months, how many cars would
14  Hillside Auto Outlet sell?
15      MR. KATAEV:  Objection.
16      Asked and answered, but you
17      can answer the question.
18      A.  I don't remember exactly, the
19  exact number.
20      Q.  Do you recall what the store
21  hours were at Hillside Auto?
22      A.  Not the specific times, no.  It
23  has been a few years, I don't.
24      Q.  Do you recall if the car
25  salespeople were working the same hours as

A0370

Case 1:21-cv-07163-OEM-LB   Document 87-4   Filed 09/01/23   Page 15 of 31 PageID #: 988

54–57

Page 54

Andris Guzman

1  the store hours?
2       A. I do remember that everybody had
3  a schedule. But, I don't remember what the
4  schedule was because it's been a while. I
5  don't -- I don't remember the specifics.
6       Q. Were there times when the car
7  salespeople needed to stay past their
8  scheduled hours in order to complete a deal?
9              MR. KATAEV: Objection as
10             to relevance. You can
11             answer.
12      A. Can you repeat the question for
13  me? I just want to make sure that I
14  understand it correctly.
15             MS. TROY: Ms. Court
16             reporter, if you don't mind
17             reading back the last
18             question.
19             (The reporter read back the
20             last question)
21      A. Yes. You do not get to leave
22  before you complete the sale, I mean, the
23  sale has to get finished. Once the sale gets
24  finished, then you go home.

Page 55

Andris Guzman

1       Q. When the customer comes in, what
2  is the process for them to obtain a vehicle?
3       A. Do you mean how the entire sales
4  process works? Just so that I have a better
5  understanding.
6       Q. Yes. The entire sales process,
7  and around how much time each step of the
8  process takes.
9       A. Everybody -- every individual
10  has different situations. That is the
11  reason that you can never measure how long
12  it's really going to take for each client.
13  But, considering their purchase and car is
14  the second biggest purchase after you buy a
15  house, there is a lot that is involved in
16  getting a vehicle.
17      Initially, the customer would have to
18  decide after they come into the store what
19  vehicle they want to purchase, and that
20  entails checking different options to see
21  what the people like or don't like. You
22  have to see if you have the inventory first,
23  you have to pick out a vehicle. Then, you
24  will get to the next step if they want to

Page 56

Andris Guzman

1  buy the vehicle in cash or finance the
2  vehicle. That is another step that they
3  would have to do.
4       After that, they decide what vehicle
5  they want to take, the next step will be
6  assuming that they either want to buy the
7  vehicle for cash or finance the vehicle. If
8  they decide to go the finance route, then
9  they will have to complete an application, a
10  finance application. After the customer
11  completes the financing application, they
12  will have to provide all their information
13  that is required for us to complete a
14  vehicle purchase and to get them approved
15  with the bank. Of course, they have to go
16  through very different verifications for us
17  to be able to complete everything.
18      So, before we even check their
19  information, we have to verify the license,
20  the banks are requiring the pay stubs, most
21  of the time people don't even have a pay
22  stub with them. They will be told to get
23  their pay stubs for us even after they get a
24  pay stub, we will have to verify to see if

Page 57

Andris Guzman

1  the pay stubs are legitimate. There is a
2  lot of fraud involved, and that is the
3  biggest concern right now that people having
4  different kinds of access and we don't know
5  what is real or not. There's a lot of
6  things that go into it when you come to
7  verify, to make sure that everything is
8  compliant.
9       Anything additional that the bank
10  requires, we will get all of that
11  information. And then, that gets inputted
12  into the system, which is the system that we
13  have so that we can get the approval with
14  the bank. That is when we actually go and
15  check the credit, we check the credit, and
16  we see if there are any additional
17  verifications. There are times that you are
18  going to see, you're going to see more
19  recently, that there are a lot of fraud
20  alerts and if there is a fraud alert, that
21  means that extra verification that we have
22  to do and put that in place.
23      The client will get calls from the bank
24  to make sure that they are the ones

58–61

Page 58

Andris Guzman

1  requesting it, they are the one requesting
2  financing.  It becomes tough when the
3  numbers from the credit does not match the
4  numbers that the customer is giving.  If the
5  number is not the same, they will have to
6  update it in the bureaus, and then it's like
7  TransUnion and that can take 24 to 48 hours
8  to update it.  Plus, they will be able to --
9  they will not be able to buy the vehicle on
10 the spot.  They will have to wait, and if
11 the numbers do match, then the bank still
12 has to call and verify everything with them.
13 There are guidelines, and it's during --
14 even when the bank is closed, they won't be
15 able to buy the vehicle on the spot.
16     We do not control the process; we are
17 not the ones financing the money.  Like I
18 said, there is a lot of variables that comes
19 in when you buy a vehicle.  But, assuming
20 everything goes through and you are able to
21 run the credit, you are able to verify
22 everything, get all the documentation that
23 you need so that you can process the loan.
24 Then, you send everything to the bank and

Page 59

Andris Guzman

1  wait for their approval.  When the approval
2  comes in, then they will let us know if
3  there is any additional information that is
4  required.
5     Once we have the approval from the bank,
6  the customer is supposed to go to the office
7  to speak with the loan officer or the
8  finance manager.  At that point, then the
9  finance manager will let them know the
10 numbers based on the vehicle that they have
11 picked.  If by that point the customer
12 doesn't like the numbers, either if it's too
13 expensive or if they change their opinion,
14 they either have the option to chase the car
15 for a lower payment, they can either decide
16 that they don't want the vehicle anymore and
17 they could even actually walk out because it
18 is not guaranteed during the sale.  It is
19 not guaranteed that the customer is even
20 going to take the vehicle home with them.
21     We haven't even discussed insurance, and
22 everything else that comes after the money.
23 Sometimes they don't even have the money,
24 and they have to wait for Friday to get the

Page 60

Andris Guzman

1  money.  They are not even able to get the
2  car and they have to wait longer for them to
3  be able to get the vehicle.
4     Those things, we don't control, people
5  have, whether people have the money or not,
6  or even if the car -- the credit, it's not
7  even for them to be able to get an auto
8  loan.  They will have to get a co-signer.
9  If they are not able to produce the co-
10 signer the right way, meaning that there are
11 times when the co-signer is not available
12 today and they will come back to the
13 dealership on Friday or next week or next
14 month.  We don't control those things.
15 After they decide that they want to get the
16 car, assuming everything went through the
17 bank, the approval, you look at the numbers
18 and you have to do the insurance.
19     You have to do the insurance, and that
20 is another step as well.  They have to
21 appraise the car and see what the value of
22 the vehicle is and so forth.
23     Then, the DMV part, everything has to be
24 in compliance with the insurance of getting

Page 61

Andris Guzman

1  all the proper documentation so that we can
2  do the registration of the vehicle.  That is
3  also another step that you need in buying a
4  vehicle.
5     After everything gets done, then it's
6  printed and we have to put everything on
7  paper and the people have to sign the
8  contract.
9     The loan officer will go over all of the
10 information and make sure that the customer
11 understands all the numbers.  After they
12 agree, they will sign the document and at
13 the end, they will take possession of the
14 car.
15     But, to answer your question, sometimes
16 it could take 3 hours, 4 hours, 6 hours or
17 days depending on the situation.  We wish
18 the process was quicker, trust me.  But, we
19 are in the business of selling cars and we
20 want to make money.  We want to make sure
21 that everybody makes money at the end of the
22 day and we do not control and we cannot
23 guess or foresee who is going to come
24 through the door and what their situation

62–65

Page 62

Andris Guzman

1   is.

2   Q.   When you were working for
3   Hillside Auto, was Leticia the only female
4   car salesperson on the floor?
5   A.   I don't recall.
6   Q.   Are you familiar with the
7   Dealertrack system?
8   A.   Yes.
9   Q.   While you were the sales manager
10   and before your promotion to general sales
11   manager, did you run Dealertrack?
12   MR. KATAEV:   Objection to
13   form.   You can answer the
14   question.
15   A.   What do you mean by ''running
16   Dealertrack?''
17   Q.   Did you have access to
18   Dealertrack, did you run the credit for the
19   customers on the Dealertrack system?
20   A.   If I had access to Dealertrack
21   at that point?   Yes, I did have access to
22   Dealertrack.
23   Q.   Did you run the credit for the
24   customers on the Dealertrack system?

Page 63

Andris Guzman

1   A.   When you mean ''running the
2   credit,'' do you mean checking the people's
3   information for the purpose of getting a
4   loan?   Is that what you mean?
5   Q.   Correct.
6   A.   Yes.
7   Q.   In other words, you had both
8   Dealertrack access, as well as you checked
9   the customer's information from the
10   beginning of your employment with Hillside
11   Auto, right?
12   A.   I got employed as a manager.
13   So, as the manager, you get Dealertrack
14   access, correct.
15   Q.   Let's walk back for a second.
16   Are you familiar with Hillside Auto Mall?
17   A.   That is the store that is close
18   to ours, that is another store.
19   Q.   During your time as the sales
20   manager, did Ishaque Thanwalla ever tell you
21   that Hillside Auto Outlet employees, that if
22   they had to get a car, that they should try
23   to have the customer choose a car at
24   Hillside Auto Mall if they did not find a

Page 64

Andris Guzman

1   car that they liked at Hillside Auto Outlet?
2   MR. KATAEV:   Objection to
3   the form.   You can answer.
4   A.   We used to sell cars from our
5   lot at Hillside Auto Outlet, and correct me
6   if I am wrong, but you are able to purchase
7   vehicles from other dealerships.   Let's say
8   there is a car that a customer wants, and we
9   don't have the vehicle, we can buy the
10   vehicle from another dealership.   It is
11   allowed by the Department of Motor Vehicles
12   as a dealership.   The dealership can buy a
13   vehicle from different dealerships.
14   Q.   What is your understanding of
15   the relationship between Hillside Auto
16   Outlet and Hillside Auto Mall?
17   A.   My understanding is that maybe
18   there was a guy or two guys that they had in
19   common that owned the place.
20   Q.   Due to that common ownership or
21   partial common ownership, as you called it,
22   is it correct to say that there is a
23   preference that if there is a car that a
24   customer cannot find on your lot at Hillside

Page 65

Andris Guzman

1   Auto Outlet that you try to find it at
2   Hillside Auto Mall?
3   A.   What I am saying is that we can
4   buy any vehicle from any established
5   dealership.   That is allowed by the
6   Department of Motor Vehicles.
7   Q.   Yes, please answer my question.
8   The question was: was there a preference to
9   Hillside Auto Mall, versus the other
10   dealerships close by?
11   A.   We were able to get inventory
12   from other dealerships as long as they
13   provided us with the car.   No preference,
14   ma'am.
15   Q.   Between March and August of
16   2018, how many cars were sold per month at
17   Hillside Auto Outlet?
18   A.   I don't recall.
19   Q.   What about between September of
20   2018 and February of 2019, how many cars
21   were sold per month?
22   MR. KATAEV:   Objection.
23   Asked and answered.   You can
24   answer the question.

Case 1:21-cv-07163-OEM-LB   Document 87-4   Filed 09/01/23   Page 18 of 31 PageID #: 991

66—69

Page 66

Andris Guzman

1  A.  I don't recall.
2  Q.  Are you familiar with Leticia
3  Stidhum?
4  A.  Repeat the question.
5        MS. TROY:  Ms. Court
6        reporter, if you don't mind
7        reading back the question.
8        (The reporter read back the
9        last question)
10  A.  Familiar as if she used to work
11  at Hillside Auto Outlet?
12  Q.  Right.
13  A.  Yes, she used to work at
14  Hillside Auto.
15  Q.  What is your opinion of her as a
16  car salesperson?
17        MR. KATAEV:  Objection.
18        Calls for opinion testimony.
19        You can answer the question.
20  A.  It has been a few years and I
21  don't remember all the details.  But, I
22  think she was good.
23  Q.  Who was the general sales
24  manager before you?

Page 67

Andris Guzman

1  A.  Her name is Jeanique.
2  Q.  Before working at Hillside Auto
3  Outlet, did you work for Ishaque at another
4  dealership?
5  A.  We worked together before, yes.
6  Q.  From when to when?
7        MR. KATAEV:  Objection.
8        You can answer the question.
9  A.  It's been a few years.  It could
10  have been between 8 months to 10 months.
11  Q.  Do you recall what the name of
12  the dealership was that you worked with
13  Ishaque before Hillside?
14  A.  Queens Auto Mall, we used to
15  work together.
16  Q.  At that time, what was his
17  position at Queens Auto Mall?
18  A.  I don't recall the exact title.
19  Q.  Was he the owner or was he the
20  manager?
21  A.  More towards the manager, but I
22  don't recall what his specific role that he
23  played there.  I don't know.
24  Q.  How about yourself, what was

Page 68

Andris Guzman

1  your role that you played there?
2  A.  I used to do sales.
3  Q.  Were you a sales manager or a
4  salesperson?
5  A.  Salesperson, selling cars.
6  Q.  At the time when you were hired,
7  was there a bonus structure in place for the
8  Hillside Auto Outlet employees?
9  A.  I didn't handle the money part.
10  Q.  Who handled the money part at
11  Hillside?
12  A.  General manager.
13  Q.  Who was the general manager?
14  A.  Ishaque.
15  Q.  Who hired you as the sales
16  manager?
17  A.  Ishaque.
18  Q.  As the sales manager, did you
19  have the power to hire employees?
20  A.  The general manager was in
21  charge of hiring employees.
22  Q.  Did you have the power to fire?
23  A.  The general manager had the
24  power to fire.

Page 69

Andris Guzman

1  Q.  Did you have the power to
2  discipline employees?
3  A.  General manager had the power to
4  discipline employees.
5  Q.  As the sales manager, did you
6  ever hire anyone?
7  A.  No.
8  Q.  How about firing anyone?
9  A.  No.
10  Q.  How about disciplining anyone?
11  A.  No.
12  Q.  While you were the sales
13  manager, did the salespeople have a fixed
14  break time?
15        MR. KATAEV:  Objection as
16        to relevance.  You can
17        answer.
18  A.  I don't recall when their break
19  was or what specific times they were -- it's
20  been a few years.
21  Q.  At the time, how were employees
22  times tracked?
23        MR. KATAEV:  Objection as
24        to relevance.  You can

70–73

Page 70

Andris Guzman

1
2  answer.
3      A. I don't remember the exact
4  mechanics of it.
5      Q. Earlier, you mentioned that you
6  may have had texts with Jory Baron. To your
7  knowledge, what was his role at Hillside?
8          MR. KATAEV: Objection to
9          form and assuming facts not
10         in evidence. You can answer.
11     A. Jory Baron, you mentioned, is
12 that right?
13     Q. Yes.
14     A. To my belief, he was one of the
15 owners at Hillside Auto Outlet.
16     Q. How did you know that he was one
17 of the owners?
18     A. I believe he did introduce
19 himself back in the day.
20     Q. He introduced himself as the
21 owner; is that correct?
22     A. I don't recall him specifically
23 directing that he was one of the owners. But
24 I was able to, somewhere along the line, he
25 mentioned that he was the owner. I don't

Page 71

Andris Guzman

1
2  remember if he told me that directly or not.
3      Q. To your knowledge, did Jory
4  Baron have the power to hire employees?
5      A. Ishaque was the general manager
6  of the store. So, I believe Ishaque is the
7  person that has the power of hiring
8  employees.
9      Q. Does Jory, also have the power
10 in addition to Ishaque?
11     A. Ishaque was the person in charge
12 of the dealership.
13     Q. Does Jory also have the power in
14 addition to Ishaque?
15     A. Ishaque was the person in charge
16 of the dealership. Meaning if someone had
17 to get hired, they had to go to Ishaque.
18     Q. My question is: did Jory Baron
19 also have the power to hire?
20         MR. KATAEV: Objection.
21         Asked and answered. You can
22         answer.
23     A. What was the question, if Jory
24 had the power to hire somebody?
25     Q. Yes.

Page 72

Andris Guzman

1
2      A. He was one of the owners.
3      Q. Is that a ''yes?''
4      A. I believe he can, but I believe
5  Ishaque was the person in charge of the
6  dealership.
7      Q. How about the power to fire
8  employees, did he also have the power to
9  fire employees?
10         MR. KATAEV: Objection.
11         You can answer.
12     A. Like I keep mentioning, Ishaque
13 was the person that was running the
14 dealership, and to my knowledge, Jory was
15 one of the owners. But the person that was
16 in charge was Ishaque.
17     Q. Do you believe he could fire
18 employees, Jory?
19     A. He was one of the owners.
20         MR. KATAEV: Objection.
21     A. He was one of the owners and has
22 the power to do so.
23     Q. Do you know Deana Jennings, and
24 if so, how are you familiar with her?
25     A. She was --- she worked at

Page 73

Andris Guzman

1
2  Hillside Auto Outlet.
3      Q. Do you recall when she stopped
4  working for Hillside?
5      A. I don't recall.
6      Q. Did she stop working at Hillside
7  Auto Outlet before you left Hillside or
8  after you left Hillside?
9      A. I don't recall the timeframe
10 either.
11     Q. Do you recall what her position
12 was?
13     A. I believe, if I'm not mistaken,
14 controller.
15     Q. As the controller, what were her
16 responsibilities?
17     A. I am not familiar with the term
18 of responsibilities.
19     Q. Did you have any interaction
20 with her while you were the sales manager
21 and general sales manager at Hillside?
22     A. Very few times we spoke, job-
23 related.
24     Q. Was she at Hillside Auto Outlet
25 on a day-to-day basis?

Page 74

Andris Guzman

1
2       MR. KATAEV:  Objection.
3       Vague, you can answer.
4       A.  I don't recall.
5       Q.  Did she work for both Hillside
6  Auto Outlet and Hillside Auto Mall at the
7  same time?
8       A.  I don't have that information
9  and I'm not able to answer that.
10      Q.  When is your birthday?
11      A.  My birthday?
12      Q.  Yes.
13      A.  You want the day, year, and
14  month, everything?
15      Q.  Correct.
16      A.  ███████████████.
17      Q.  Are you familiar with David
18  Baron?
19      A.  He was -- yes, yes.
20      Q.  How are you familiar with him?
21      A.  David Baron, he used to be one
22  of the owners.
23      Q.  How about Josh Aaronson?
24      A.  Josh Aaronson was one of the
25  owners as well.

Page 75

Andris Guzman

1
2       Q.  To your knowledge, did David
3  Baron have the power to hire employees?
4       A.  I wasn't the person in charge of
5  the dealership when he came to operations,
6  he would be the person to hire that would
7  determine those positions.
8       Q.  But, David Baron who passed
9  away, did he have the power to hire and fire
10  employees?
11      A.  They were one of the owners, you
12  mean?
13      Q.  I mean, how about Josh Aaronson,
14  is your answer the same which is that as one
15  of the owners he had the power to hire and
16  fire employees?
17      MR. KATAEV:  Objection to
18      the form.
19      A.  He was one of the owners also.
20      Q.  Is that a yes?
21      MR. KATAEV:  Objection.
22      You can answer.
23      A.  Yes, yes.
24      Q.  With regard to my previous
25  question about David Baron, is your answer

Page 76

Andris Guzman

1
2  that he did have the power to hire and fire
3  employees, is that also a yes?
4       MR. KATAEV:  Same
5       objection.  You can answer.
6       A.  Yes, he was one of the owners.
7       Q.  While you were working at
8  Hillside, were you frequently at the podium?
9       A.  At the podium?  When you say
10  ''podium,'' is at the podium stage, that you
11  mean which is within the location at the
12  dealership?
13      Q.  Yes.
14      A.  Yes, yes.  I am familiar with
15  the podium.
16      Q.  During your time working at
17  Hillside, have you ever seen Ishaque provide
18  his Dealertrack password to Leticia?
19      A.  No.
20      Q.  Have you ever seen Ishaque train
21  Leticia personally on the Dealertrack
22  system?
23      A.  Repeat that again.  What was the
24  question?
25      MS. TROY:  Ms. Court

Page 77

Andris Guzman

1
2       reporter, if you don't mind
3       reading back the last
4       question.
5       (The reporter read back the
6       last question)
7       A.  No.
8       Q.  At any time, have you seen
9  Leticia use the Dealertrack system to help
10  run the credit for Hillside Auto customers?
11      A.  No.
12      Q.  Were there any other posters at
13  Hillside Auto?
14      A.  What posters, what do you mean
15  by ''posters?''
16      Q.  For instance, are there any
17  posters about the minimum wage?
18      A.  Sure.  I mean every business has
19  it, it's supposed to have a poster of
20  minimum wage.  I don't remember where it
21  was, but I am pretty sure yes, we did.
22      Q.  What type of posters are at the
23  store?
24      A.  I don't know right now.  I've
25  been out of the store a few years, so I

78–81

Page 78

Andris Guzman

1  don't know.
2        Q.  Do you currently work for any of
3  the individually named defendants?
4        A.  If I work for any of them?
5  Right?
6        Q.  Yes.
7        A.  No.
8        Q.  To your knowledge, did Hillside
9  Auto have any written policies regarding
10 discrimination?
11       A.  At that time I believe we did.
12       Q.  What was that policy?
13       A.  That discrimination is not
14 allowed.
15       Q.  Do you recall when Ishaque
16 traveled from the United States to Pakistan
17 in 2018?
18       A.  I don't have the exact dates.
19       Q.  Do you recall if Ishaque
20 continued to work at Hillside Auto, or did
21 he take a break before leaving to Pakistan
22 from the United States?
23       A.  I'm sorry.  What was that?
24 When?

Page 79

Andris Guzman

1       Q.  In 2018.
2       A.  (No response)
3            MR. KATAEV:  Let the
4            record reflect, and that
5            probably was not heard, but
6            the witness said ''I don't
7            understand the question.''
8       Q.  Without revealing the contents
9  of the communications with your attorney,
10 for how long did you speak with your
11 attorney in preparation for today's
12 deposition?
13           MR. KATAEV:  Asked and
14           answered.  You can answer the
15           question. Objection to that.
16      A.  We met a few days ago.
17      Q.  The question is: for how much
18 time?
19      A.  I don't have any specific time.
20 I mean, it could have been 30 minutes, 1
21 hour or 2 hours.  I don't have the specific
22 time.
23      Q.  Have you ever interviewed any
24 prospective employees at Hillside Auto?

Page 80

Andris Guzman

1       A.  Not that I recall, I was not in
2  charge of hiring employees. I was not the
3  general manager.
4       Q.  Are you familiar with a DMV
5  clerk named Lily?
6            MR. KATAEV:  Objection to
7  relevance.  You can answer.
8       A.  I can't recall.  It's been a few
9  years.
10      Q.  Do you recall in 2018 that the
11 DMV clerk Lily left Hillside Auto because
12 she was pregnant?
13      A.  I don't recall.
14      Q.  Do you recall if Ishaque
15 disciplining Lily who was pregnant at the
16 time?
17      A.  I don't recall.
18           MR. KATAEV:  Objection as
19           to relevance to this entire
20           line of questioning.  You can
21           answer.  You already
22           answered.
23      Q.  Do you recall Lily's last name?
24      A.  I don't recall her last name.

Page 81

Andris Guzman

1            MR. KATAEV:  The witness
2            just told me that he needs to
3            use the restroom.
4            MS. TROY:  Sure.  Is 10
5  minutes good for you?
6            THE WITNESS:  Yes.  Just
7            to use the bathroom.
8            MS. TROY:  We can come
9            back at 12:20 and you guys
10           can also move to the
11           conference room.
12           MR. KATAEV:  Thank you.
13 (A recess was taken from
14 12:00 until 12:10 p.m.)
15           MS. TROY:  Ms. Court
16 reporter, can you read back
17 the last question.
18 (The reporter read back the
19 last question)
20           MR. KATAEV:  Are you
21 ready?
22           THE WITNESS:    Yes, I am
23 ready.
24      Q.  Do you recall a robbery that

Case 1:21-cv-07163-OEM-LB   Document 87-4   Filed 09/01/23   Page 22 of 31 PageID #: 995

82–85

| Page 82 | Page 83 |
|---|---|
| Andris Guzman | Andris Guzman |

**Page 82**

1  Andris Guzman
2  took place at Hillside Auto?
3       A.  I don't recall right now.
4       Q.  What was Leticia Stidhum's
5  position, was it a salesperson?
6            MR. KATAEV:  Objection to
7       the form.  You can answer.
8       A.  Yes.
9       Q.  What were her responsibilities
10  as a car salesperson?
11      A.  The responsibility is to sell
12  cars.
13      Q.  Was she ever promised a sales
14  manager position?
15      A.  I have no information of that.
16      Q.  What was the relationship
17  between Ishaque and Leticia?
18      A.  What do you mean by
19  ''relationship?''
20      Q.  Can you describe their working
21  relationship.
22      A.  Ishaque was the supervisor,
23  meaning the manager, the person in charge,
24  and she was an employee.
25      Q.  Did Ishaque ever call Leticia

**Page 83**

1  Andris Guzman
2  his ''daughter?''
3       A.  I don't recall the specifics of
4  that.
5       Q.  Do you recall why you left
6  Hillside?
7       A.  Pursuing better employment
8  opportunities.
9       Q.  Do you recall how much car
10  salespeople were paid?
11      A.  No.  I was not in charge of the
12  money.
13      Q.  Were they paid a wage along with
14  some amount of commission?
15      A.  I don't recall their payment
16  structure.
17      Q.  While you were working at
18  Hillside Auto, was there a board where the
19  car salespeople would tally the number of
20  cars that they sold for the month?
21      A.  I don't recall.
22      Q.  How did Hillside Auto verify the
23  pay for the car salespeople?
24      A.  I don't remember the specifics
25  right now.

**Page 84**

1  Andris Guzman
2       Q.  Do you recall how many cars
3  Leticia sold?
4       A.  I don't recall how many cars she
5  sold.
6       Q.  Did you run the credit for
7  customers back at Queens Auto Mall as well?
8       A.  No.
9       Q.  You began running the credit for
10  the cars, the customers at Hillside Auto; is
11  that correct?
12      A.  When you say run the credit,
13  that means managers having access?
14      Q.  Did --
15      A.  (Continuing) The managers were
16  the ones that could check people's
17  information and profile.
18      Q.  You are talking about managers
19  who can check people's information and
20  profile.  Who were those people at Hillside
21  Auto while you were working there?
22      A.  Are you asking who were the
23  managers back then when I used to work, is
24  that the question?
25      Q.  Yes, let's start from there,

**Page 85**

1  Andris Guzman
2  yes.
3       A.  I remember it was me, there was
4  Ishaque, there was Serge, there was
5  Jeanique.  I don't recall anyone else after
6  that.
7       Q.  Did each of them actually check
8  the customer's information and profile on a
9  day-to-day basis?
10      A.  What I remember is that
11  everybody had access to do so.
12      Q.  How often would you use the
13  Dealertrack system to check customer's
14  information and profiles?
15      A.  How often?
16      Q.  Correct.
17      A.  That was part of the job, it was
18  daily.  It was Dealertrack, it was actually
19  what got used daily, meaning in the
20  dealership.
21      Q.  Did Ishaque use Dealertrack
22  daily?
23      A.  Every manager used Dealertrack
24  daily.
25      Q.  Did Serge use Dealertrack daily?

A0378

86–89

Page 86

Andris Guzman

1
2   A.  Every manager used Dealertrack
3   daily, yes.
4       Q.  What about Jeanique as well,
5   before she left, correct?
6       A.  Correct.
7       Q.  At Hillside Auto, were car
8   salespeople given performance evaluations?
9       A.  I don't understand the question.
10      Q.  Were there performance
11  evaluations given to Hillside Auto car
12  salespeople?
13      A.  I don't recall right now the
14  specifics.
15      Q.  But, to your knowledge, were
16  they ever given?
17      A.  I don't remember a specific time
18  at this moment.
19      Q.  Do you recall if Leticia was a
20  top salesperson at the time?
21          MR. KATAEV:  Objection.
22          Asked and answered.  You can
23          answer the question.
24      A.  I remember she was good, but I
25  just don't recall the specific numbers.

Page 87

Andris Guzman

1
2       Q.  Do you recall why Leticia
3   Stidhum left Hillside Auto?
4       A.  I don't know the specifics of
5   why she left the company.
6       Q.  At the time when she left
7   Hillside Auto, was she pregnant?
8       A.  I have no knowledge that she was
9   pregnant.  I don't recall.
10      Q.  Did she ever bring a sonogram of
11  her pregnancy to the dealership?
12      A.  I don't recall ever seeing a
13  sonogram.
14      Q.  Did she ever tell you that she
15  was pregnant?
16      A.  I don't remember being told that
17  she was pregnant.
18      Q.  Are you familiar with VIN
19  Solutions?
20      A.  That is the tool for customer
21  information, yes.
22      Q.  To your knowledge, does VIN
23  Solutions underreport the number of cars
24  that were sold at Hillside Auto?
25          MR. KATAEV:  Objection to

Page 88

Andris Guzman

1
2   the form.  You can answer.
3       A.  What was the question?
4           MS. TROY:  Ms. Court
5           reporter, if you don't mind
6           reading back the question to
7           the witness.
8           (The reporter read back the
9           last question)
10          MR. KATAEV:  Objection.
11          Assumes facts not in
12          evidence, but you can answer.
13      A.  VIN Solutions, to my knowledge
14  does report customer information, and you
15  will have some record of people that bought
16  vehicles.  On how accurate it is, I'm not
17  sure.  I haven't used VIN Solutions in
18  years.
19      Q.  To your knowledge, does VIN
20  Solutions automatically mark leads as ''lost''
21  after a certain period of time?
22      A.  I don't recall.  I haven't used
23  VIN Solutions in years.
24      Q.  On the sales floor itself while
25  you were working as a general sales manager,

Page 89

Andris Guzman

1
2   was it typically you and Ishaque who put in
3   the customer information into Dealertrack?
4       A.  Do you mean for us to get the
5   customer information and submit it to the
6   bank?
7       Q.  Right.
8       A.  Yes.
9       Q.  Go ahead.  Finish.
10      A.  What I'm saying is the
11  Dealertrack was a manager tool.  So,
12  whatever information that was needed to do
13  the deal, Dealertrack is the salesperson --
14  that will be in that information.
15      Q.  After the salespeople brought
16  the information back, who would enter it
17  into Dealertrack?
18      A.  The managers (indicating) we did
19  come at that time.
20      Q.  Who would be the people who
21  would enter it into Dealertrack?
22      A.  I was one of them or any of the
23  managers, they had access to do so.
24      Q.  Typically, was it you and
25  Ishaque?

90–93

| Page 90 | Page 91 |
|---|---|
| Andris Guzman | Andris Guzman |
| 1 | 1 |
| 2  A.  I would be involved in it a lot | 2  minutes. I'm not sure if we |
| 3 of time, correct, yes. | 3  will make it back on time. |
| 4  Q.  Would Ishaque sometimes use the | 4  MS. TROY:  That is fine. |
| 5 Dealertrack to enter the information brought | 5  So, 1:20 or 1:25 is fine. |
| 6 back by the car salespeople as well? | 6  (A recess was taken from |
| 7  A.  He had the access to do it. | 7  12:40 p.m. until 1:24 p.m.) |
| 8  Q.  Did he use the Dealertrack | 8  Q.  To your knowledge, did Leticia |
| 9 because he had access to it? | 9  help with the license plates, meaning once |
| 10  A.  Yes.  He used Dealertrack, he | 10  the customer got the car there was a license |
| 11 was the person in charge, and as the person | 11  plate registration? |
| 12 in charge, you have access to everything, | 12  A.  In what regard, because part of |
| 13 every tool to do everything. | 13  the sales process is getting -- what's the |
| 14  Q.  Do you recall changing the | 14  meaning of getting the plates?  It has to be |
| 15 password to Dealertrack when Ishaque went | 15  done by the Department of Motor Vehicles. |
| 16 back to Pakistan in 2018? | 16  There was a process that the salesperson was |
| 17  A.  I don't recall.  Also, I just | 17  supposed to do to make sure that their |
| 18 want to add, I didn't even have that access, | 18  customer got plates. |
| 19 you cannot just change people's passwords. | 19  Q.  Do you remember the process? |
| 20  MS. TROY:  Let's take a | 20  A.  Not only I, Leticia, everybody |
| 21 half an hour break and we | 21  was part of the sales process. |
| 22 will come back at 1:10. | 22  Q.  What was the sales manager's |
| 23  MR. KATAEV:  We're going | 23  role in that process for the license plates? |
| 24 to be going out for lunch, | 24  A.  Repeat the question. |
| 25 and it probably will take 45 | 25  Q.  You just described what the job |

| Page 92 | Page 93 |
|---|---|
| Andris Guzman | Andris Guzman |
| 1 | 1 |
| 2 responsibilities are for the salesperson in | 2  Q.  What would the sales managers do |
| 3 obtaining the license plates. | 3 that the car salespeople did not do with |
| 4  My question for you is: what is the | 4 regard to the car registration process? |
| 5 sales manager's responsibility for that | 5  A.  We would make sure that the |
| 6 portion? | 6 process is being done. |
| 7  A.  We just make sure that the | 7  Q.  Are you familiar with Auto |
| 8 vehicles get registered.  One of the things | 8 Funds? |
| 9 gets issued by the Motor Vehicles, of | 9  A.  Auto Funds is -- yes, I have |
| 10 course. | 10 used Auto Funds before.  I have used Auto |
| 11  Q.  Is there a division of labor | 11 Funds before but it's been a few years. |
| 12 between the car salespeople and the sales | 12  Q.  To your knowledge, what is Auto |
| 13 manager with respect to the registration of | 13 Funds? |
| 14 the license plate with the DMV? | 14  A.  Auto Funds is related to the |
| 15  A.  I am not understanding your | 15 website.  It's a management tool for the |
| 16 question. | 16 website, to my knowledge, of course.  I am |
| 17  Q.  What are the responsibilities of | 17 not too familiar with it; I haven't used it |
| 18 the car salespeople versus the sales manager | 18 in years. |
| 19 for the license plate registration with the | 19  Q.  Who has access to Auto Funds at |
| 20 Department of Motor Vehicles? | 20 Hillside Auto? |
| 21  A.  Collectively, we make sure that | 21  A.  I don't recall to what extent we |
| 22 we get all of the information that is | 22 did use it, I don't remember the details. |
| 23 required so that the customer can be able to | 23  Q.  Do you recall if Leticia had |
| 24 purchase the vehicle, I registered the | 24 access to Auto Funds? |
| 25 vehicle that they are purchasing. | 25  A.  I don't recall. |

94–97

Page 94

Andris Guzman

1
2  Q.  Besides texting with Leticia,
3  have you ever emailed her while you were
4  working as the sales manager or the general
5  sales manager at Hillside Auto?
6  A.  I don't recall.
7  Q.  Have you ever called her or has
8  she ever called you?
9  A.  I don't recall any specific
10  conversations.  I mean, we might have spoken
11  about work-related duties during the working
12  hours.  But, I don't remember the specifics
13  of that.
14  MS. TROY:  Demand Number
15  18 will be for the text
16  messages and emails and any
17  other written communications
18  between Andris Guzman and
19  Leticia Stidhum.
20  Demand Number 18 and the
21  period is May of 2018 through
22  January of 2019.
23  Demand Number 18 will be
24  for the call log of Andris
25  Guzman, and specifically the

Page 95

Andris Guzman

1
2  time would be again May of
3  2018 to January of 2019.
4  I'm asking for all of the
5  information other than the
6  calls placed to plaintiff,
7  the named defendants, the
8  named defendants and the
9  corporate representatives of
10  the corporate defendants can
11  be redacted.  With respect to
12  the individual defendants as
13  well as the corporate
14  representatives, all
15  information prior to December
16  of 2018 can also be redacted.
17  Demand umber 19 would be
18  the text messages and email
19  communications between Andris
20  Guzman and any of the named
21  defendants, which includes
22  the corporate representatives
23  of the corporate defendants,
24  and it would be text messages
25  specifically by Leticia

Page 96

Andris Guzman

1
2  Stidhum on or about the terms
3  that were included in the
4  original document production
5  responses.  Certainly,
6  pregnancy discrimination-
7  related text messages.
8  MR. KATAEV:  Please
9  follow-up in writing.  Thank
10  you.
11  Q.  Mr. Guzman, during this
12  deposition, did you look at any notes or
13  papers to assist you in responding to any of
14  my questions?
15  A.  No.
16  Q.  During this deposition, except
17  during on break, did you communicate with
18  your attorney via text message or any other
19  means?
20  A.  I don't have my phone with me.
21  Q.  While you were answering
22  questions, from time to time you would look
23  away from the screen; what were you looking
24  at?
25  MR. KATAEV:  Objection.

Page 97

Andris Guzman

1
2  You can answer the question.
3  A.  Nothing specifically.
4  Q.  During such time, were you
5  looking at any notes or any other written
6  text messages?
7  A.  No.
8  Q.  Do you agree that during the
9  remainder of this deposition, except for the
10  documents that I'll be showing you on the
11  screen, that you will not be reviewing any
12  notes?
13  A.  Reviewing any notes?  No.  I
14  wouldn't, I'm not reviewing any notes
15  whatsoever.
16  MS. TROY:  Ms. Court
17  reporter, let's mark the next
18  exhibit, which should be
19  Plaintiff's Exhibit 16.
20  Let's also mark Plaintiff 17
21  and Plaintiff's 18.  Number
22  18 will be the text messages
23  between Andris Guzman and
24  Leticia Stidhum.  It is
25  Defendants 1908 to 1961.

98−101

Page 98

Andris Guzman

1
2     (Plaintiff's Exhibit 17 and
3     18 marked for
4     identification.)
5     Q. Mr. Guzman, do you recognize
6  what I am showing you on this screen right
7  now?
8     A. Yes.
9     Q. What do you recognize this to
10  be?
11     A. These are conversations through
12  text.
13     Q. You mentioned earlier that you
14  were looking at some messages. Were these
15  included in the text messages that you
16  reviewed?
17     A. Yes.
18     Q. To your knowledge, is it true
19  and accurate?
20     A. What part?
21     Q. Let's start from is this a true
22  and accurate representation of the text
23  messages that you have on your phone between
24  yourself and Leticia?
25     A. Based on what I see on the

Page 99

Andris Guzman

1
2  portion that I am being shown right now,
3  yes. I am not able to see everything, so
4  I'm not able to answer.
5     Q. Is this the first time that you
6  are seeing the text messages in the version
7  that I am showing you on the screen; in
8  other words as an extracted Decipher app?
9     A. You are showing it to me in PDF,
10  if I'm not mistaken?
11     A. Right. The question is from the
12  phone, it's going to look differently. So,
13  my question is: have you ever seen this PDF
14  format before?
15     A. Not that I remember.
16     Q. There are 13 pages to the text
17  message and I'm going to scroll down. I'm
18  asking you to just take a look at it and let
19  me know after reviewing those 13 pages if it
20  is a full and accurate representation of the
21  text messages that you had between yourself
22  and Leticia Stidhum?
23     A. Okay.
24     (The witness peruses)
25     MS. TROY: Let's go off

Page 100

Andris Guzman

1
2  the record.
3     (A discussion was held off
4     the record)
5     MS. TROY: I am showing
6     the witness pages 1 through
7     13 and I'm going to flip
8     through them.
9     Let the record reflect
10     that it is the first 13 pages
11     of this first exhibit Bates
12     stamped D1708 through 2910
13     and I am showing it to the
14     witness right now to review.
15     (The witness peruses)
16     Q. Mr. Guzman, can you just review
17  those 13 pages and when you are done let me
18  know.
19     I'm just asking you, yes or no, does
20  this accurately reflect the text messages
21  between you and Leticia on your phone.
22     A. (The witness peruses)
23  Yes. This reflects the information on the
24  text messages.
25     Q. Now, I am going to turn your

Page 101

Andris Guzman

1
2  attention to page 3 of Plaintiff's Exhibit
3  18 which is also marked as defendant's
4  document production D1910.
5     A. Yes.
6     Q. I'm going to draw your attention
7  to the text message with the date and time
8  of July 19th, 2018 at 11:39 a.m.
9     A. Yes.
10     Q. Does this refresh your
11  recollection about whether Leticia Stidhum
12  had access to Auto Funds?
13     A. I'm not sure if she had access.
14  I know that I never gave anyone access to
15  the management tools.
16     Q. To your knowledge, did she ever
17  have access or obtain access to Auto Funds
18  from you?
19     A. Not from me.
20     Q. How about anyone else?
21     A. I wouldn't know.
22     Q. I'm going to now direct your
23  attention to page 5 which was also marked as
24  defendant's document production D1912.
25  Specifically, the date and time is December

102–105

| Page 102 | Page 103 |
|---|---|
| Andris Guzman | Andris Guzman |

Page 102

1        Andris Guzman
2   23rd of 2018 at 2:35 p.m.  That was the last
3   message on the page.
4        A.  Yes.
5        Q.  It says ''do you want me to run
6   the credit while you finish up my question
7   for you?''  Does it refresh your recollection
8   about whether Leticia ever had access to
9   Dealertrack?
10        A.  I never gave Leticia access to
11   Dealertrack.  I would not give -- I did not
12   have the authority to give any management
13   tools to salespersons, to salespeople.
14        Q.  Isn't it true that Leticia
15   would've had to have access to Dealertrack
16   in order to run the credit of the customer?
17        A.  Run the credit of the customer
18   was part of the sales process of purchasing
19   the vehicle.  Only managers were supposed to
20   have access to Dealertrack.
21        Q.  Is it true that only the
22   managers are supposed to run the credit of
23   the customers through the Dealertrack
24   software?
25        A.  Correct, managers.

Page 103

1        Andris Guzman
2        Q.  Isn't it true that at least for
3   some time while you were working at Hillside
4   Auto Outlet that Leticia was given that
5   ability to run the credit on the Dealertrack
6   software?
7        MR. KATAEV:  Objection.
8        Asked and answered.  You can
9        answer it again.
10        A.  I never gave Leticia access to
11   Dealertrack.
12        Q.  Right, but please focus on my
13   question.  My question is not if you gave
14   Leticia access to Dealertrack personally.
15   My question is if she would've had access to
16   the Dealertrack system, if she had to have
17   access to the DealerTrack system to run the
18   credit of the customer.
19        A.  Not to my knowledge.
20        Q.  At any point, were you part of
21   the announcement that Leticia gave at
22   Hillside Auto announcing her pregnancy on
23   the sales floor?
24        MR. KATAEV:  Objection.
25        Asked and answered, you can

Page 104

1        Andris Guzman
2        answer it again.
3        A.  Can you repeat the question?
4        MS. TROY:  Ms. Court
5        reporter, can you read back
6        the last question.
7        (The reporter read back the
8        last question)
9        A.  I don't recall.  I never recall
10   ever hearing that she was pregnant.
11        Q.  When did you first find out that
12   Leticia was pregnant?
13        MR. KATAEV:  Objection.
14        Asked and answered.  You can
15        answer the question.
16        A.  I never got a confirmation that
17   she was pregnant.
18        Q.  When you say that you ''never got
19   the confirmation,'' what does that mean?
20        A.  You are saying while she was at
21   work, if I ever found out that she was
22   pregnant?  Was that the question?
23        Q.  Let's start from there, correct.
24        A.  That's what I'm saying, I never
25   got that information that she was pregnant.

Page 105

1        Andris Guzman
2        Q.  In other words, during your time
3   at Hillside Auto Outlet you never knew that
4   she was pregnant?
5        A.  Correct, I did not get that
6   information.  If anything, if I would -- it
7   wouldn't have made a difference, I would've
8   given her the same -- I would've given her
9   the same treatment.
10        MR. KATAEV:  When the
11        court reporter asks you to
12        repeat it, she wants just the
13        exact words, not an
14        explanation.
15        Q.  What would you describe your
16   treatment of Leticia Stidhum to be?
17        A.  Like everybody else, fair.
18        Q.  Was there ever a time when you
19   prioritized the other car salespeople's
20   information in terms of the financial
21   information to input it into the Dealertrack
22   system over Leticia's customers?
23        A.  I have always been fair when it
24   comes to distribution and how I approach the
25   customer.  It is first come, first serve

A0383

106–109

Page 106

Andris Guzman

1  basis, no preference.
2         Q.  Was there ever a time when you
3  prioritized other car salespeople's
4  customers over Leticia's?
5         A.  No.
6             MR. KATAEV:  Objection.
7         Asked and answered on that
8             one.
9         Q.  Was there ever a time when you
10 or Leticia were disciplined by Ishaque?
11        A.  Not that I recall.
12        Q.  Was there ever a time when
13 Leticia Stidhum's customers would walk out
14 as a result of a long wait time?
15        A.  I don't recall.
16        Q.  Do you recall if Leticia sold
17 less cars in December and January as a
18 result of the longer wait time?
19        A.  I don't recall the specific
20 numbers.  But, in this line of work, I'm
21 going to add something, in terms of
22 performance, in this line of work --
23            MS. TROY:  Let's just
24            focus on my question, please.

Page 107

Andris Guzman

1         Q.  My question is: between December
2  of 2018 and January of 2019, yes or no, did
3  Leticia Stidhum sell less cars?
4         A.  I don't recall, because people
5  do not sell the same amount of cars every
6  month.  Everything is subject to change such
7  as the holidays, the slower and faster
8  seasons, not everybody sells the same amount
9  of cars every month with the same numbers.
10        Q.  Between December of 2018 and
11 January of 2019, did Ms. Stidhum, Leticia
12 Stidhum constantly call your attention to
13 how long the customers would need to wait?
14        A.  I don't recall, but it was a
15 known fact that everybody had to wait
16 because there is a long waiting process to
17 purchase a vehicle.
18        Q.  At the time, did the car
19 salespeople include David Manrique, David
20 Parsons and Sean or Shane?
21        A.  I remember those names, they did
22 work at Hillside Auto.
23        Q.  Were you ever disciplined by
24 Hillside Auto Outlet?

Page 108

Andris Guzman

1         A.  I was never disciplined, no.  I
2  don't recall, but I used to do my job the
3  right way.  So, I did not.
4         Q.  As part of this litigation
5  process your attorney provided some
6  responses.  We're going to go over some of
7  those responses.
8         Before I do that, I just have a couple
9  of questions for you.  Number 1, did you
10 review the responses to the Interrogatories,
11 both the original and the supplemental
12 Interrogatories before you signed?
13        A.  Yes, I believe I reviewed them
14 with Deana.
15        Q.  When did you review them with
16 Deana?
17        A.  I don't remember the first time.
18        Q.  Was it this year?
19            MR. KATAEV:  Objection.
20            Asked and answered.  You can
21            answer the question.
22        A.  Sometime last year and I don't
23 remember the specific time.  I would be
24 lying to you, I don't remember.

Page 109

Andris Guzman

1         Q.  To your knowledge, is everything
2  in the Interrogatories and supplemental
3  Interrogatories correct?
4         A.  In the litigation documents, if
5  the answers that were provided -- if the
6  answers are correct, is that the question?
7         Q.  Yes.
8         A.  Based on my knowledge, what I
9  reviewed, the answers are correct on the
10 litigation.
11        Q.  Do you have any knowledge about
12 the ownership shares of Hillside Auto Outlet
13 and Hillside Auto Mall?
14        A.  Yes, it was included in the
15 documents.
16        Q.  What is your basis of that
17 knowledge?
18            MR. KATAEV:  Objection to
19            the form.  You can answer.
20        A.  The basis of the knowledge is
21 when the documents were shown to me, it had
22 information related to who were the owners
23 of the company.
24        Q.  In other words, did you review

A0384

110–113

Page 110
Andris Guzman

1 additional documents to ascertain the
2 responses that were given, if they were true
3 and accurate?
4         A. Can you repeat that again?
5             MS. TROY: Ms. Court
6             reporter, can you read back
7             the last question.
8             (The reporter read back the
9             last question)
10        A. If I reviewed any additional
11 documents to make sure that it was accurate,
12 is that your question?
13        Q. Yes.
14        A. There was a lot of documents
15 that I saw, but I am not too specific. I am
16 not too sure of the documents that you might
17 be looking for. I don't know.
18        MS. TROY: Let's mark Plaintiffs 19.
19             (Plaintiffs Exhibit 19 marked
20             for identification)
21        Q. Mr. Guzman, do you recognize
22 this signature as yours?
23        A. Yes.
24        Q. As part of the responses that

Page 111
Andris Guzman

1 were provided, there were additional
2 responses called ''responses to document
3 production requests,'' as well as
4 supplemental responses to document
5 production requests. Did you review those
6 documents as well?
7         A. Yes.
8         Q. Did you review the documents
9 produced as part of the responses to the
10 document production requests?
11            MR. KATAEV: Objection.
12            You can answer the question.
13        A. If I reviewed the documents? I
14 reviewed some documents, yes.
15        Q. As part of the documents that
16 you reviewed, did they include any pay stubs
17 of the plaintiff?
18        A. Pay stubs?
19        Q. Correct.
20        A. I don't recall seeing pay stubs.
21        Q. Do you remember seeing records
22 on a month-to-month basis of the dealerships
23 aggregate number of cars sold as part of the
24 documents?

Page 112
Andris Guzman

1         A. I don't understand your
2 question.
3         Q. So, do you recall that there was
4 a document produced, and my question is: do
5 you recall seeing the aggregate number of
6 cars sold on a monthly basis as part of the
7 documents that were produced; it's a yes or
8 no question?
9         A. No, I don't recall seeing that.
10        Q. How about the VIN Solutions
11 records, meaning the internal records kept
12 by the Business Development Center as well
13 as entered in by the car salespeople with
14 respect to the cars sold at Hillside Auto
15 Outlet; do you recall seeing those
16 documents?
17        A. Not a specific document.
18        Q. Do you recall if Ms. Stidhum was
19 owed any wages at the time when she left
20 Hillside Auto?
21        A. I didn't control payments or the
22 money.
23        MS. TROY: Mr. Guzman,
24        thank you very much for your

Page 113
Andris Guzman

1         time. This deposition stands
2 adjourned.
3 [Time noted: 2:02 p.m.]

A0385

114–117

| | Page 114 |
|---|---|
| 1 | |
| 2 | WITNESS      EXAMINATION BY          PAGE |
| 3 | Mr. Guzman   Ms. Troy |
| | 6 |
| 4 | PLAINTIFF EXHIBITS |
| 5 | Number        Description          PAGE |
| 6 | |
| 7 | Ex 16      Photo I.D.              6 |
| 8 | (Deemed marked) |
| 9 | Ex 17     (Text Messages)         97 |
| 10 | Ex 18     Document Production D1910   101 |
| 11 | Ex 19   Verification- Guzman      110 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 115 |
|---|---|
| 1 | |
| 2 | REQUESTS |
| 3 | Number      Description        PAGE |
| 4 | 18   Demand No. 18 is:              94 |
| 5 | MS. TROY: For the call |
| 6 | log of Andris Guzman, and |
| 7 | specifically the time would |
| 8 | be again May of 2018 to |
| 9 | January of 2019. |
| 10 | I'm asking for all of the |
| 11 | information other than the |
| 12 | calls placed to plaintiff, |
| 13 | the named defendants, |
| 14 | the named defendants and |
| 15 | the corporate representatives |
| 16 | of the corporate defendants |
| 17 | can be redacted.  With respect |
| 18 | to the individual defendants |
| 19 | as well as the corporate |
| 20 | representatives, all |
| 21 | information prior to December |
| 22 | of 2018 can also be redacted. |
| 23 | 19    Demand No. 19 is:             95 |
| 24 | MS. TROY:  The text messages |
| 25 | and email communications |

| | Page 116 |
|---|---|
| 1 | |
| 2 | between Andris Guzman |
| 3 | and any of the named |
| 4 | defendants, which includes |
| 5 | the corporate representatives |
| 6 | of the corporate defendants, |
| 7 | and it would be text messages |
| 8 | specifically by Leticia Stidhum |
| 9 | on or about the terms that were |
| 10 | included in the original |
| 11 | document production responses. |
| 12 | Certainly, pregnancy |
| 13 | discrimination-related |
| 14 | text messages. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 117 |
|---|---|
| 1 | |
| 2 | QUESTIONS MARKED FOR A RULING:    PAGE/LINE |
| 3 | (None) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

118–120

Page 118

```
1
2                    ACKNOWLEDGMENT
3
4       STATE OF NEW YORK  )
5                          )s.s.
6       QUEENS COUNTY      )
7            I, ANDRIS GUZMAN, hereby certify
8       that I have read the transcript of my
9       testimony taken under oath in my deposition
10      of March 09, 2023; that the transcript is a
11      true, complete and correct record of my
12      testimony, and that the answers on the
13      record as given by me are true and correct.
14
15
16            _____
17                 ANDRIS GUZMAN
18
19      Signed and subscribed before me
20      this _____ day of _____, 2023.
21
22
23      _____
24            Notary Public
25
```

Page 119

```
1
2               C E R T I F I C A T E
3       STATE OF NEW YORK   )
4                           )s.s.
5       COUNTY OF NASSAU    )
6
7            I, LYNN LUCKMAN, a Shorthand
8       Reporter and Notary Public within and for
9       the State of New York, do certify that;
10           THAT the witness whose deposition
11      is hereinbefore set forth, was duly sworn by
12      me, and that such deposition is a true
13      record of the testimony given by such
14      witness.
15           I further certify that I am not
16      related to any of the parties to this action
17      by blood or marriage; that I am in no way
18      interested in the outcome of this matter.
19           IN WITNESS WHEREOF, I have
20      hereunto set my hand this 20th day of March,
21      2023.
22                              Lynn Luckman
23      _____
24            LYNN LUCKMAN
25
```

Page 120

```
1    Errata Sheet
2
3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4    DATE OF DEPOSITION: 03/09/2023
5    NAME OF WITNESS: ANDRIS GUZMAN
6    Reason Codes:
7         1. To clarify the record.
8         2. To conform to the facts.
9         3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25        _____
```

A0387

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3          ----------------------------------------X

4          LETICIA FRANCINE STIDHUM,

5                               Plaintiff,

6               -against-        CASE: 21-CV-07163

7          161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
           AUTO OUTLET, and HILLSIDE AUTO MALL INC
8          d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
           JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                              Defendants.

11         ----------------------------------------X

12                              March 03, 2023

13                              10:00 A.M.

14

15              VIRTUAL EXAMINATION BEFORE TRIAL of

16         JORY BARON, via Zoom, a Defendant herein,

17         held at the above-mentioned time and taken

18         before Lynn Luckman, a Notary Public and

19         Shorthand Reporter within and for the State

20         of New York.

21

22

23                    SANDY SAUNDERS REPORTING
                  254 South Main Street, Suite 216
24                    New City, New York 10956
                         (845) 634-7561
25

A0388

2–5

Page 2

1

2       A P P E A R A N C E S:

3

4

5       TROY LAW, PLLC

6       Attorneys for the Plaintiff

7       41-25 Kissena Boulevard, Suite 103

8       Flushing, New York 13555

9       BY: Tiffany Troy, Esq.

10

11      MILMAN, LABUDA LAW GROUP, LLC

12      3000 Marcus Avenue, Suite 3W8

13      Lake Success, New York 11042-1073

14      BY: Emanuel Kataev, Esq

15      emanuel@mllaborlaw.com

16

17

18

19

20

21

22

23

24

25

Page 3

1                        FEDERAL STIPULATIONS

2

3            IT IS HEREBY STIPULATED AND AGREED by

4       and between counsel for the respective parties

5       hereto that all objections except as to the

6       form shall be reserved to the time of trial.

7            IT IS FURTHER STIPULATED AND AGREED

8       that the sealing and filing of this deposition

9       shall be hereby waived.

10           IT IS FURTHER STIPULATED AND AGREED

11      that this examination may be sworn to by the

12      witness being examined before a notary public

13      other than the notary public before whom

14      examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                       Jory Baron

2            BY THE COURT REPORTER:

3            The attorneys participating

4            in this deposition

5            acknowledge that I am not

6            physically present in the

7            deposition room and that I

8            will be reporting this

9            deposition remotely.  They

10           further acknowledge that, in

11           lieu of an oath administered

12           in person, I will administer

13           the oath remotely.  The

14           parties and their counsel

15           consent to this arrangement

16           and waive any objections to

17           this manner of reporting.

18                MS. TROY:  I consent

19                MR. KATAEV:   I

20           consent.

21

22

23                   *    *    *

24

25

Page 5

1       Jory Baron

2            MS. TROY:  Mr. Kataev,

3       will you please have your

4       witness show his ID to me?

5            MR. KATAEV:  Why is this

6       necessary?

7            MS. TROY:  Because, it is

8       acceptable in a video

9       deposition; how else can I

10      know who it is?

11           MR. KATAEV:  I'll

12      represent to you that it is

13      Jory Baron.  Okay, please

14      proceed with your deposition.

15           MS. TROY:  For the record,

16      Mr. Kataev wanted to switch

17      the witnesses, he switched

18      the witness that I had

19      requested for today.  I asked

20      for the ID, and apparently

21      Mr. Kataev was advised that I

22      asked for his ID to be

23      presented today. I made a

24      request for him to bring his

25      ID to the deposition so that

6–9

| | Page 6 | | | Page 7 |
|---|---|---|---|---|
| 1 | Jory Baron | | 1 | Jory Baron |
| 2 | I could confirm who he is. | | 2 | the Court and let's get a |
| 3 | I'm going to make a demand | | 3 | decision on this. |
| 4 | for Mr. Baron's driver's | | 4 | MS. TROY:  All right.  We |
| 5 | license.  We're going to mark | | 5 | are going to do that. |
| 6 | that deemed marked as | | 6 | MR. KATAEV:  This is |
| 7 | Plaintiff's Exhibit 13. | | 7 | harassment. |
| 8 | (Plaintiff's Exhibit 13 was | | 8 | (A phone call was being made |
| 9 | deemed marked for | | 9 | to the Court at 10:03 a.m.) |
| 10 | identification) | | 10 | MS. TROY:  I will put it |
| 11 | MR. KATAEV:  Please | | 11 | on the speaker so that you |
| 12 | follow-up in writing. | | 12 | can all hear. |
| 13 | MS. TROY:  Please have him | | 13 | (A call was made at 10:06 |
| 14 | go to his car to get his ID. | | 14 | a.m.) |
| 15 | MR. KATAEV:  He is not | | 15 | And we are still waiting. |
| 16 | going to go to his car to get | | 16 | I've now put it on speaker |
| 17 | his ID. | | 17 | phone and I'm going to go |
| 18 | MS. TROY:  I need to have | | 18 | mute myself also.  Let's go |
| 19 | his ID to confirm who he is. | | 19 | off the record. |
| 20 | MR. KATAEV:  I'll | | 20 | (A discussion was held off |
| 21 | represent it to you that he | | 21 | the record) |
| 22 | is Jory Baron. | | 22 | ''MS. TROY:  Good morning, |
| 23 | MS. TROY:  Please show me | | 23 | Your Honor.  This is |
| 24 | his ID. | | 24 | plaintiff's counsel, Tiffany |
| 25 | MR. KATAEV:  You can call | | 25 | Troy, and I'm appearing on |

| | Page 8 | | | Page 9 |
|---|---|---|---|---|
| 1 | Jory Baron | | 1 | Jory Baron |
| 2 | behalf of the plaintiff, | | 2 | MS. TROY:  Yes, Your |
| 3 | Leticia Stidhum. | | 3 | Honor. |
| 4 | MR. KATAEV:  Good morning, | | 4 | THE COURT:  Mr. Kataev, |
| 5 | Your Honor.  My name is | | 5 | why won't Mr. Baron produce |
| 6 | Emanuel Kataev and I am with | | 6 | his ID? |
| 7 | the law firm of Milman Labuda | | 7 | MR. KATAEV:  Good morning, |
| 8 | Law Group LLC, for the | | 8 | Your Honor.  The reason why |
| 9 | defendants. | | 9 | Mr. Baron, is not giving his |
| 10 | THE COURT:  Good morning, | | 10 | ID is because I've made a |
| 11 | Ms. Troy and Mr. Kataev.  Let | | 11 | representation to the |
| 12 | the record reflect that this | | 12 | plaintiff that this is in |
| 13 | is not a scheduled | | 13 | fact Jory Baron.  There is no |
| 14 | conference, and you have now | | 14 | issue of mistaken identity or |
| 15 | called at the start of a | | 15 | -- |
| 16 | deposition for the defendant | | 16 | THE COURT:  Why won't he |
| 17 | Jory Baron. | | 17 | produce his ID?  I'm asking |
| 18 | Ms. Troy, I was told by my | | 18 | you the question, and he does |
| 19 | law clerk, and I want to make | | 19 | and Ms. Troy does not have to |
| 20 | the record clear, I got the | | 20 | take your representation. |
| 21 | reason for the call that Mr. | | 21 | Why won't he produce some ID? |
| 22 | Kataev would not have his | | 22 | MR. KATAEV:  I'm objecting |
| 23 | witness produce any | | 23 | to the ID, I have authority |
| 24 | identification; is that | | 24 | on my objection that she has |
| 25 | correct? | | 25 | no right to -- |

10–13

| | Page 10 | | | Page 11 |
|---|---|---|---|---|
| 1 | Jory Baron | | 1 | Jory Baron |
| 2 | THE COURT: I am | | 2 | MR. KATAEV: I understand |
| 3 | overruling your objection, | | 3 | the ruling, but I would still |
| 4 | Mr. Kataev. | | 4 | like to make a record about |
| 5 | MR. KATAEV: Judge -- | | 5 | my objection. |
| 6 | THE COURT: Excuse me, | | 6 | THE COURT: Again, sir, |
| 7 | sir. Please don't interrupt | | 7 | this is a deposition and you |
| 8 | me. If we have to do this | | 8 | need to follow the Magistrate |
| 9 | in-person we will do that. | | 9 | Judge. Your witness does |
| 10 | There is a fight between the | | 10 | have to show that he is who |
| 11 | lawyers at every turn in this | | 11 | he says he is. What is this |
| 12 | case and I will not tolerate | | 12 | about? |
| 13 | that. It is a waste of | | 13 | MR. KATAEV: I will |
| 14 | everyone's time, and I've | | 14 | explain to you if you'll |
| 15 | been asked at the last minute | | 15 | allow me to explain it, I am |
| 16 | to effectuate a substitute, | | 16 | entitled to have an |
| 17 | Mr. Kataev, this morning and | | 17 | opportunity to be heard. This |
| 18 | I granted that wish to you as | | 18 | is a case, a US District |
| 19 | a courtesy to you even though | | 19 | Court case for the Northern |
| 20 | it was objected to. | | 20 | District of New York, CIV No. |
| 21 | I am now telling you Mr. | | 21 | 1:15-CV-727. |
| 22 | Kataev, that he should | | 22 | Ms. Troy is asking for |
| 23 | produce some ID to show that | | 23 | the witness's identification, |
| 24 | he is Jory Baron. That is my | | 24 | and not withstanding that |
| 25 | ruling, do you understand? | | 25 | there will be some numbers in |

| | Page 12 | | | Page 13 |
|---|---|---|---|---|
| 1 | Jory Baron | | 1 | Jory Baron |
| 2 | the Court, notwithstanding, | | 2 | deposition is being recorded |
| 3 | refusal to compel the witness | | 3 | by Zoom, and I just want to |
| 4 | to do so on the grounds of | | 4 | add that the ID can be |
| 5 | privacy, and this is a Zoom | | 5 | produced while the Zoom |
| 6 | deposition. | | 6 | deposition is not being |
| 7 | THE COURT: Excuse me. | | 7 | recorded. |
| 8 | Excuse me, Mr. Kataev, my | | 8 | THE COURT: I'm sorry, I |
| 9 | time is valuable to me and I | | 9 | don't really understand what |
| 10 | am not telling him that he | | 10 | the issue is. I understand |
| 11 | has to produce his social | | 11 | that people are entitled to |
| 12 | security number. He is the | | 12 | privacy about things like |
| 13 | defendant in this case and it | | 13 | social security numbers. |
| 14 | is being conducted by Zoom. | | 14 | What is it that you are |
| 15 | Everything has been done as a | | 15 | trying to protect, Mr. |
| 16 | courtesy to your client, he | | 16 | Kataev? This is a named |
| 17 | can produce the ID. This is | | 17 | defendant, and Ms. Troy is |
| 18 | the Order of the Court. Do | | 18 | just trying to verify that he |
| 19 | you want to go up on Appeal | | 19 | is who he says he is. What |
| 20 | on this issue or do you want | | 20 | is it that you are really |
| 21 | to accept the Ruling of the | | 21 | trying to protect? I don't |
| 22 | court? | | 22 | understand at all. |
| 23 | MR. KATAEV: I will accept | | 23 | MR. KATAEV: The driver's |
| 24 | the Ruling. I have one final | | 24 | license contains information |
| 25 | thing to say that this | | 25 | other than his identity, it |

14–17

| Page 14 | | Page 15 | |
|---|---|---|---|
| 1 | Jory Baron | 1 | Jory Baron |
| 2 | contains his home address, | 2 | even before the deposition, |
| 3 | his driver's license number | 3 | we just asked for a scan of |
| 4 | and contains other | 4 | the ID and Mr. Kataev said |
| 5 | information.  It is not | 5 | that he wasn't going to |
| 6 | appropriate that the | 6 | produce the ID without a |
| 7 | plaintiff is entitled to | 7 | formal demand. Previously at |
| 8 | record that, and it's going | 8 | Friday's deposition last |
| 9 | to be kept in plaintiff's | 9 | week, at Mr. Thanwalla's |
| 10 | counsel's records and it is | 10 | deposition, he agreed to |
| 11 | required to produce.  All I | 11 | produce the ID later in the |
| 12 | ask is that the plaintiff | 12 | day because the witness |
| 13 | stop the recording, he will | 13 | supposedly left his ID in the |
| 14 | give that identification and | 14 | car.  Today, he says the same |
| 15 | represent who it is. | 15 | thing, which is that his |
| 16 | MS. TROY: Fine. | 16 | witness forgot his ID in the |
| 17 | THE COURT:  I will stay on | 17 | car. |
| 18 | the line and I will ask for | 18 | So, we are fine with the |
| 19 | the record in the Zoom | 19 | production of the redacted |
| 20 | deposition to stop. I will | 20 | version of the ID which is |
| 21 | stay on the record while this | 21 | what we asked for all along. |
| 22 | happens. | 22 | MR. KATAEV:  It's not, you |
| 23 | Ms. Troy, is that going to | 23 | never asked for a redacted |
| 24 | be okay for you? | 24 | version. |
| 25 | MS. TROY:  Yes.  In fact, | 25 | THE COURT:  Stop, stop. |

| Page 16 | | Page 17 | |
|---|---|---|---|
| 1 | Jory Baron | 1 | Jory Baron |
| 2 | She is entitled to verify | 2 | had any goodwill between the |
| 3 | that the person she is | 3 | two of you but I will not |
| 4 | deposing is the person that | 4 | tolerate this level that |
| 5 | is identified and you don't | 5 | everything has to be brought |
| 6 | want plaintiff's counsel to | 6 | to the Court.  I will tell |
| 7 | have his driver's license ID | 7 | you that you are doing |
| 8 | number or to have his home | 8 | injustice, you are both doing |
| 9 | address.  That is fine with | 9 | injustice service to your |
| 10 | me. | 10 | client.  Again, Ms. Troy is |
| 11 | But, it is her right to | 11 | entitled to get some |
| 12 | verify that the witness is | 12 | verification of whoever the |
| 13 | who he says he is and she | 13 | witness was by virtue of the |
| 14 | doesn't have to take your | 14 | ID, and as of last week, do |
| 15 | word for it. It's ridiculous | 15 | you understand me? |
| 16 | for you to be citing one | 16 | MR. KATAEV:  I am claiming |
| 17 | reported case as the reason | 17 | a redacted version would be |
| 18 | that you are making that | 18 | fine, but it is -- I need the |
| 19 | call. | 19 | authority for the appropriate |
| 20 | Can I just state that I | 20 | certification that she's |
| 21 | have 5 other cases and this | 21 | entitled to some form of ID. |
| 22 | is not a reason to be | 22 | THE COURT:  I am her |
| 23 | contacting the Federal Court. | 23 | authority and she's entitled |
| 24 | Mr. Kataev and Ms. Troy, I | 24 | to that.  Is that enough for |
| 25 | understand that you have not | 25 | you? |

18–21

| | |
|---|---|
| Page 18 | Page 19 |

**Page 18**

Jory Baron

1
2  MR. KATAEV:  Yes, Your
3  Honor.
4  THE COURT:  Mr. Kataev, if
5  we have to do this on every
6  single point, Mr. Kataev, it
7  will not end up being useful
8  for you or for your client or
9  for Ms. Troy or her client.
10  We need to get through the
11  litigation here and you do
12  not need to raise every
13  single thing as another issue
14  to address the Court about;
15  do you understand?
16  MR. KATAEV:  I understand,
17  Your Honor.
18  THE COURT: Mr. Kataev and
19  Ms.Troy, we stand by that the
20  fact that Mr. Baron is
21  directed to produce his ID.
22  You will then turn off the
23  recording right now and I
24  will stay on the line to make
25  sure that it doesn't become

**Page 19**

Jory Baron

1
2  an issue.
3  MS. TROY:  Recording
4  stopped, Your Honor.
5  MR. KATAEV:  He has
6  already gone downstairs.
7  THE COURT: Well, now we
8  have to waste my time waiting
9  for him to come back to give
10  Ms. Troy his ID so that I
11  don't get interrupted again.
12  MR. KATAEV:  I apologize,
13  Your Honor.
14  THE COURT:  Ms. Troy and
15  Mr. Kataev, please get your
16  focus back on the case and
17  don't make it about both of
18  you.  It will not be a
19  pleasant thing to have
20  lawyers at this pitch, do you
21  understand that?
22  MS. TROY:  Yes, Your
23  Honor.
24  MR. KATAEV:  Understood,
25  Your Honor.

**Page 20**

Jory Baron

1
2  [Time noted is 10:23]
3  THE COURT:  Ms. Troy is
4  being asked not to write down
5  the driver's ID number or the
6  home address. Ms. Troy, I
7  assume that you have no
8  problem with that?
9  MS. TROY:  No, I don't
10  have a problem with that.
11  THE COURT:  Thank you.
12  So, the case does not --
13  there is no reason for
14  someone to prove who they
15  were at a deposition because
16  it was about a social
17  security number.
18  I am convinced that Ms.
19  Troy has no bad intent and
20  she just wants to verify that
21  Mr. Baron is who he says he
22  is, whoever the other witness
23  is.  I believe there will be
24  no further issue on this
25  case. Please make sure that

**Page 21**

Jory Baron

1
2  your witness comes prepared
3  to show ID, okay?
4  MR. KATAEV:  Your Honor, I
5  have to go to my office and
6  it will be one minute.
7  [Time noted: 10:32 a.m.]
8  MR. KATAEV:  I'm going to
9  show the ID.
10  (Ms. Troy peruses.)
11  MS. TROY:  That is
12  satisfactory.
13  THE COURT:  Is that
14  satisfactory?
15  MS. TROY:  Yes, it is.
16  THE COURT:  I don't
17  believe there will be any
18  other matters that needs the
19  Court's intervention?
20  MS. TROY:  No, Your Honor,
21  not from me.
22  MR. KATAEV:  No, Your
23  Honor, not from --
24  MS. TROY:  Not from the
25  plaintiff's side.

22–25

Page 22

Jory Baron

1
2      MR. KATAEV:  Nothing
3   further.
4      THE COURT:  This matter is
5   now adjourned and I am going
6   to advise Ms. Troy and Mr.
7   Kataev to get on with the
8   deposition.  Thank you very
9   much.
10      MS. TROY:  Thank you, Your
11   Honor.
12      MR. KATAEV:  Thank you.
13   (The recording has stopped.)
14   [Time noted: 10:34 a.m.]
15      MS. TROY:  10:35 the
16   recording is back on.  Let's
17   get started.
18   [Time noted: 10:35 a.m.]
19   J-O-R-Y B-A-R-O-N, a Defendant herein,
20   after having been duly sworn by a Notary
21   Public of the State of New York, was
22   examined and testified as follows:
23
24   BY THE REPORTER:
25      Q.  Please state your full name for

Page 23

Jory Baron

1
2   the record.
3      A.  Jory Baron.
4      Q.  Please state your present
5   address for the record.
6      A.  21 Wayside Lane, Huntington, New
7   York 11743.
8   EXAMINATION BY
9   TIFFANY TROY:
10      Q.  Good morning, Mr. Baron.  My
11   name is Tiffany Troy and I represent the
12   plaintiff in this matter, Leticia Stidhum.
13   Before we get started, have you ever been
14   deposed before?
15      A.  No.
16      Q.  In that case, I'm going to
17   explain what a deposition is and lay down
18   some ground rules going forward; do you
19   understand?
20      A.  Yes.
21      Q.  First, this deposition is for me
22   to ask you questions and for you to answer
23   my questions about the subject matter of
24   this lawsuit.  To be clear, this lawsuit
25   is about the pregnancy discrimination claims

Page 24

Jory Baron

1
2   brought by Leticia Stidhum.  There is also a
3   separate State Court Action that is about
4   the wage and hour claim, but we will be
5   addressing the pregnancy discrimination
6   claim today; do you understand?
7      A.  Yes.
8      Q.  Since the court reporter has to
9   take down everything that you say, I ask
10   that you give verbal responses; no shaking
11   or nodding of your head and no gestures; do
12   you understand that?
13      A.  Yes.
14      Q.  For the same reason, please
15   speak loudly and clearly when you answer a
16   question; do you understand?
17      A.  Yes.
18      Q.  The stenographer can only write
19   down one person speaking at a time.
20   Therefore, please do not start to answer one
21   of my questions before I stop asking it,
22   likewise I will not start a new question
23   until you have finished answering my last
24   question; do you understand?
25      A.  Yes.

Page 25

Jory Baron

1
2      Q.  If you need to take a break, for
3   example to get a drink of water or to use
4   the restroom, please let me know and I will
5   call for a break; do you understand?
6      A.  Yes.
7      Q.  The only exception is that there
8   can be no break in between one of my
9   questions and your answer to that question;
10   you must finish answering my question before
11   you ask for a break; do you understand?
12      A.  Yes.
13      Q.  From time to time your attorney
14   may make objections to my questions.
15   Generally, however, unless your attorney
16   tells you not to respond you will still have
17   to respond; do you understand?
18      A.  Yes.
19      Q.  If you don't understand a
20   question, tell me and I will rephrase it so
21   that you can.  If you don't hear a question,
22   tell me and I will repeat it so that you do;
23   do you understand?
24      A.  Yes.
25      Q.  We are here together for facts

A0394

26–29

**Page 26**

Jory Baron

1
2  and not speculation.  If you don't know an
3  answer to a question, say so; do you
4  understand that?
5       A.  Yes.
6       Q.  Do you understand that you have
7  taken an oath to tell the truth today?
8       A.  Yes.
9       Q.  Do you understand that the oath
10  that you have taken to tell the truth
11  carries the same force and effect as if you
12  were testifying in Court before a Judge?
13       A.  Yes.
14       Q.  Are you currently taking any
15  medications that could prevent you from
16  recalling the truth or testifying truthfully
17  today?
18       A.  No.
19       Q.  How about any physical or
20  emotional conditions, are you currently
21  under any condition that could prevent you
22  from recalling the truth or testifying
23  truthfully and completely today?
24       A.  No.
25       Q.  Besides your attorney, have you

**Page 27**

Jory Baron

1
2  spoken with anyone to prepare for today's
3  deposition?
4       A.  No.
5       Q.  Without telling me the contents
6  of your communications with your attorney,
7  did you, yes or no, talk to your attorney to
8  prepare for this deposition?
9       A.  Yes.
10       Q.  Again, without telling me the
11  contents of the communications, for how long
12  did you speak with your attorney?
13       A.  A few hours.
14       Q.  In preparation for today's
15  deposition, did you review any documents?
16       A.  Yes.
17       Q.  What were those documents?
18       A.  All the documents that were
19  provided to me, the allegations set forth in
20  the case, the Interrogatories and other
21  documents that I signed.
22       Q.  Mr. Baron, what is your full
23  name?
24       A.  Jory Philip Baron.
25       Q.  How do you spell Philip?

**Page 28**

Jory Baron

1
2       A.  P-H-I-L-I-P.
3       Q.  Since this is a virtual
4  deposition, when you are on break, do you
5  affirm that you are not going to communicate
6  by email, chat, or instant message on your
7  phone or any other device?
8       A.  No.
9            MR. KATAEV:  Let the
10            record reflect that there is
11            no such device before him.
12       Q.  Do you agree that besides the
13  documents that I will be showing you on the
14  screen as exhibits today that you will not
15  be reviewing any notes on your computer,
16  cell phone or your notepad?
17       A.  Yes.
18            MR. KATAEV:  Same notation
19            for the record.
20       Q.  Have you ever been arrested
21  before?
22       A.  No.
23       Q.  Have you ever been a party to a
24  lawsuit besides this one in a State Court
25  Action?

**Page 29**

Jory Baron

1
2       A.  No.
3       Q.  During this deposition, I'm
4  going to be referring to 161-10 Hillside
5  Auto which is at 161-10 Hillside Avenue as
6  Hillside Auto Outlet; do you understand
7  that?
8            MR. KATAEV:  Objection to
9            the form.  The corporate
10            entity is 161-10 Hillside
11            Auto Ave.  It is Auto Avenue,
12            LLC d/b/a Hillside Auto
13            Outlet.  You can answer the
14            question.
15       A.  Yes.
16       Q.  I'm going to be referring to
17  Hillside Auto Mall, Inc. as Hillside Auto
18  Mall; do you understand?
19       A.  Yes.
20       Q.  Do you own the residence that
21  you gave at the beginning of this deposition
22  today?
23            MR. KATAEV:  Objection to
24            relevance.  You can answer.
25       A.  Yes.

30–33

Page 30

Jory Baron

1
2       Q.  In the past five years, have you
3   lived anywhere else?
4       A.  Yes.
5       Q.  Starting from the most recent,
6   where have you lived prior to your current
7   address?
8       A.  35 Woodland W-O-O-D-L-A-N-D
9   Street in Huntington.
10      Q.  Besides the 35 Woodland Street
11  address, have you lived anywhere else in
12  addition to the address that you gave at the
13  beginning of this deposition within the past
14  5 years?
15      A.  No.
16      Q.  What is your highest level of
17  education?
18      A.  College.
19          MR. KATAEV:  Objection to
20      that.
21      A.  (Continuing) Business
22  Management, Bachelor's of Science.
23      Q.  What school did you attend?
24      A.  Michigan and then Hofstra
25  University.

Page 31

Jory Baron

1
2       Q.  Are you familiar with the
3   company 161-10 Hillside Auto Avenue LLC.?
4       A.  Yes.
5       Q.  How are you familiar with it?
6       A.  I am a member/shareholder.
7       Q.  What is the percentage of shares
8   that you own?
9       A.  I am a 25 percent.
10      Q.  Do you recall when you began as
11  a member, the year and the month?
12      A.  I don't recall specifically, but
13  it was from the beginning of the business
14  when we opened.
15      Q.  How about do you recall when the
16  business opened?
17      A.  Approximately 5 years ago.
18      Q.  What is your role as the
19  member/shareholder at 161-10 Hillside Auto
20  Avenue LLC?
21      A.  My role is very minimal; I sign
22  checks and speak to Ishaque on a weekly
23  basis just to review where we are in the
24  month.
25      Q.  When you had the conversations

Page 32

Jory Baron

1
2   with Ishaque on a weekly basis, would that
3   be you and Isaac only or was it you,
4   Ishaque, and someone else?
5       A.  Typically, Ishaque and myself.
6           MR. KATAEV:  Let the
7       attorney finish her question.
8           THE WITNESS:  I apologize.
9           MR. KATAEV:  It's to make
10          the court reporter's life
11          easier.
12      Q.  When you say that you spoke to
13  Ishaque on a weekly basis, just to review,
14  on a weekly basis, can you describe what
15  kind of information you and Ishaque
16  exchanged during those conversations?
17          MR. KATAEV:  Objection as
18      to relevance. You can answer.
19      A.  It could vary on a weekly basis.
20  Sometimes it could be how many vehicles do
21  we have currently sold for the month?  How
22  was our cash position? Certain general
23  questions just to get a general sense of the
24  health of the dealership at the moment.
25      Q.  Do you still have those weekly

Page 33

Jory Baron

1
2   meetings with Ishaque currently?
3       A.  It can vary.  I can come in
4   weekly, it could be every other week or as-
5   needed.
6       Q.  Let's start from the car sales,
7   did you discuss with Ishaque the number of
8   vehicles sold at Hillside Auto Outlet in
9   2018/2019?
10      A.  On a monthly basis, yes.
11      Q.  In 2018/2019, do you recall how
12  many cars were sold by the dealership on a
13  monthly basis?
14      A.  I cannot recall.
15      Q.  Can you give us a range?
16      A.  I would be guessing from 5 years
17  ago, but I would prefer not to.
18      Q.  Was the number of vehicles sold
19  in 2018 and 2019 more or less than the
20  number of vehicles sold on a monthly basis
21  currently?
22      A.  Again, unfortunately I cannot
23  recall every month, it varied.
24      Q.  How about the revenue generated
25  by the deals on a monthly basis, do you

34–37

Page 34

Jory Baron

1
2  recall that in 2018 and 2019, again, on a
3  monthly basis?
4       A. I cannot recall.
5           MR. KATAEV: Objection to
6       that one.
7       Q. During those meetings, would you
8  ever discuss issues that may arise on the
9  human resources front?
10          MR. KATAEV: Objection to
11      the form. You can answer.
12      A. No, that was not my position as
13  a shareholder at that time.
14      Q. When you say ''at that time'' does
15  that mean in 2018 and 2019?
16      A. Yes.
17      Q. What is your position as a
18  shareholder currently, and I mean regarding
19  perhaps human resources discussed with you
20  currently?
21      A. Ishaque handles the day-to-day
22  of the human resources aspect. If I need to
23  get involved, he will call.
24      Q. When was the most recent time
25  when he called you with respect to a human

Page 35

Jory Baron

1
2  resources issue?
3       A. None.
4           MS. TROY: Emmanuel, can
5       you do me a favor? You
6       usually project pretty well,
7       but if you don't mind moving
8       the microphone closer to the
9       witness.
10          MR. KATAEV: How is it
11      now?
12          MS. TROY: No problem.
13          MR. KATAEV: So the record
14      is clear, there is a shared
15      microphone on the table and
16      we just moved it closer to
17      the witness so that it is
18      clear.
19          MS. TROY: I believe the
20      witness said ''none.'' We can
21      move on.
22          MR. KATAEV: That is
23      correct.
24      Q. From the beginning of the time
25  when you became the shareholder at Hillside

Page 36

Jory Baron

1
2  Auto Outlet five years ago until the present
3  day, has there ever been an occasion when
4  Ishaque called you regarding a human
5  resource issue?
6       A. No.
7       Q. Back in 2018 and 2019 what would
8  be a number of cars sold on a good month?
9       A. I can't give you a specific
10  number.
11      Q. What would be the number?
12          MR. KATAEV: Objection.
13      Asked and answered for that
14      one.
15      Q. How about in a slow month?
16      A. I cannot recall, i can't give
17  you a specific answer.
18      Q. Do you recall if there were
19  months or seasons when the car sales would
20  be slower?
21      A. Yes. The car sales can vary
22  from month-to-month depending on the time of
23  year and other factors.
24      Q. What other factors would car
25  sales would depend on?

Page 37

Jory Baron

1
2       A. It could be holiday times,
3  certain promotions, people know that deals
4  would be going on at the end of the year,
5  different things like that, weather, tax
6  returns, so on and so forth.
7       Q. Let's go to holiday times, what
8  were the major holidays that would affect
9  car sales, and we are still talking about
10  Hillside Auto Outlet?
11      A. Everything within the industry
12  can typically run hand-in-hand. It would be
13  Memorial Day, President's Week, the end of
14  the year, vice-a-versa, major holidays can
15  adversely affect business. Mother's Day,
16  Easter, Christmas. They tend to be slow,
17  but again, it could vary.
18      Q. What are the busier months at
19  Hillside Auto Outlet?
20      A. I cannot recall what would be
21  the busiest months.
22      Q. Are you familiar with Ishaque
23  Thanwalla?
24      A. Yes.
25      Q. How are you familiar with him?

38–41

|  | Page 38 |
|---|---|
| 1 | Jory Baron |
| 2 | A.  He is a partner of mine. |
| 3 | Q.  What is his role and exact title |
| 4 | at Hillside Auto Outlet? |
| 5 | A.  To manage day-to-day aspects of |
| 6 | the dealership throughout. |
| 7 | Q.  Is it fair to say that he has |
| 8 | the power to hire employees? |
| 9 | A.  Yes. |
| 10 | Q.  How about firing? |
| 11 | A.  Yes. |
| 12 | Q.  How about setting their |
| 13 | schedule? |
| 14 | A.  Yes. |
| 15 | Q.  How about setting their pay? |
| 16 | A.  Yes. |
| 17 | Q.  To your knowledge, what was the |
| 18 | work schedule at Hillside Auto Outlet in |
| 19 | 2018/2019? |
| 20 | A.  I don't know. |
| 21 | Q.  How about the store hours, what |
| 22 | were the store hours at Hillside Auto Outlet |
| 23 | in 2018/2019? |
| 24 | A.  I cannot recall. |
| 25 | Q.  Do you, as a shareholder, have |

|  | Page 39 |
|---|---|
| 1 | Jory Baron |
| 2 | the power to hire employees? |
| 3 | A.  That is not my role. |
| 4 | Q.  Please listen carefully to the |
| 5 | question.  The question is: do you have the |
| 6 | power or authority to hire employees? |
| 7 | MR. KATAEV:  Objection. |
| 8 | Asked and answered, but you |
| 9 | can answer the question |
| 10 | again. |
| 11 | A.  Again, it is not my role. |
| 12 | Ishaque is in charge of that aspect. |
| 13 | Q.  Do you have the power to -- |
| 14 | MR. KATAEV:  Objection. |
| 15 | Asked and answered. |
| 16 | MS. TROY:  Mr. Kataev, if |
| 17 | you listened carefully, he |
| 18 | did not actually answer the |
| 19 | question which is why I am |
| 20 | asking the question again. |
| 21 | The question is ''yes or no, |
| 22 | do you have the authority to |
| 23 | hire employees?'' |
| 24 | MR. KATAEV:  My objection |
| 25 | stands, and you can answer |

|  | Page 40 |
|---|---|
| 1 | Jory Baron |
| 2 | the question again. |
| 3 | A.  That's Ishaque's role and I |
| 4 | don't have that power to do that. |
| 5 | Q.  How about to fire employees? |
| 6 | A.  No, that is Ishaque's |
| 7 | responsibility. |
| 8 | Q.  How about setting the schedule? |
| 9 | A.  No, that is not my |
| 10 | responsibility. |
| 11 | Q.  How about setting the pay? |
| 12 | A.  That was not my responsibility. |
| 13 | Q.  Do you know the payment |
| 14 | structure for the car salespeople at |
| 15 | Hillside Auto Outlet? |
| 16 | A.  No. |
| 17 | Q.  During the discussions about the |
| 18 | cash positions, and by discussions, I mean |
| 19 | discussions with Ishaque, did the cash |
| 20 | position involve payroll expenses? |
| 21 | MR. KATAEV:  Objection. |
| 22 | Vague, but you can answer. |
| 23 | A.  No. |
| 24 | Q.  When you talked about the cash |
| 25 | positions, what was being discussed |

|  | Page 41 |
|---|---|
| 1 | Jory Baron |
| 2 | specifically? |
| 3 | MR. KATAEV:  Objection to |
| 4 | relevance.  You can answer. |
| 5 | A.  The amount of money needed to |
| 6 | operate a business successfully; just making |
| 7 | sure that again, there was enough money for |
| 8 | floor plans and different things like that. |
| 9 | Q.  When you discussed the cash |
| 10 | position, would you discuss the income as |
| 11 | well as the expenses? |
| 12 | A.  Can you repeat the question, |
| 13 | please? |
| 14 | MS. TROY:  Sure.  Let's |
| 15 | strike that last question. |
| 16 | Q.  During your discussions with |
| 17 | Ishaque, would you discuss the payroll |
| 18 | expenses at all? |
| 19 | A.  No. |
| 20 | Q.  Would he ever discuss with you |
| 21 | how much he was paying either a specific |
| 22 | employee who was working for Hillside Auto |
| 23 | Outlet or a certain position, for instance, |
| 24 | a car salesperson? |
| 25 | A.  No. |

42–45

Page 42

Jory Baron

1
2    Q. During all of your time as a
3  shareholder at Hillside Auto Outlet, have
4  you ever hired anyone?
5    A. I have trouble hearing you. I'm
6  so sorry. If you could just repeat that one
7  more time.
8    Q. Have you ever hired anyone on
9  behalf of Hillside Auto Outlet?
10   A. No.
11   Q. How about firing people?
12   A. No.
13   Q. Besides 161-10 Hillside Auto
14  Avenue LLC, do you own any other company's?
15   A. No. Oh, I apologize. We do
16  have Hillside Auto Outlet 2 that is down the
17  road.
18       MR. KATAEV: Do you mean
19    the numeral?
20       THE WITNESS: Yes.
21   Q. What is the address of Hillside
22  Auto Outlet 2?
23   A. 179-10, I believe. I would have
24  to double check, but I believe that is the
25  address.

Page 43

Jory Baron

1
2    Q. Does Hillside Auto Outlet 2 also
3  sell cars?
4    A. We store cars there and they can
5  sell them, but it's mostly for service of
6  vehicles.
7    Q. Besides yourself, are there any
8  other shareholders of Hillside Auto Outlet
9  2?
10   A. Yes.
11   Q. Who are they?
12      MR. KATAEV: Objection as
13    to relevance. You can
14    answer.
15   A. The Estate of David Baron and
16  Josh Aaronson, as well as Ishaque.
17   Q. Is it fair to say that you each
18  have a 25 percent share?
19   A. Yes.
20   Q. Turning your attention back to
21  Hillside Auto Outlet, is it fair to say that
22  you and Josh Aaronson and the Estate of
23  David Baron as well as Ishaque, that you
24  each own 25 percent of the shares of the
25  company?

Page 44

Jory Baron

1
2    A. Yes.
3    Q. Are you familiar with Josh
4  Aaronson?
5    A. Yes.
6    Q. How are you familiar with him?
7    A. He is a business partner.
8    Q. Besides 161-10, Hillside Auto
9  Avenue, d/b/a, Hillside Auto Outlet, LLC and
10  Hillside Auto Outlet 2, are you business
11  partners with him and any other
12  corporations?
13   A. Not at the moment.
14   Q. What was his role or
15  responsibility at Hillside Auto Outlet?
16   A. Shareholder.
17   Q. As the shareholder, what did he
18  do?
19   A. I don't know.
20      MR. KATAEV: Who is ''he?''
21      MS. TROY: Josh Aaronson.
22      MR. KATAEV: Go ahead.
23   A. (Continuing) I cannot speak for
24  his responsibilities.
25   Q. Earlier you mentioned that you

Page 45

Jory Baron

1
2  had monthly back and forth in 2018 and 2019
3  and weekly meetings with Ishaque about
4  everything about Hillside Auto Outlet. Would
5  Josh Aaronson ever join the two of you at
6  any of those meetings?
7    A. There were occasions where we
8  might have been on the phone together.
9    Q. During those occasions, were the
10  same types of things discussed or was it
11  something different in those discussions?
12   A. It could vary.
13   Q. Let's turn your attention to the
14  late David Baron for a second. At the time
15  when the company was formed, David Baron was
16  still alive; is that correct?
17   A. Yes.
18   Q. Let's backtrack, do you recall
19  what year and month he passed away?
20   A. It would be 2 years in May.
21   Q. Between 2018 and 2019, what role
22  or responsibilities did he have as the
23  shareholder of 161-10 Hillside Auto Avenue,
24  LLC?
25   A. I cannot recall, nor was I

46–49

Page 46

Jory Baron

1
2   involved.
3           Q.  After 2021 when, essentially the
4   Estate of David Baron was the executor for
5   the late David Baron, what, if any
6   discussions were had between or amongst the
7   shareholders regarding anything related to
8   Hillside Auto Outlet?
9           A.  Can you please repeat that
10  question?
11          Q.  So, sure.  Sort of a similar
12  question that I had asked you with respect
13  to Josh Aaronson, but now we are talking,
14  I'm turning your attention to the Estate of
15  David Baron.
16      Did the Estate of David Baron ever
17  participate in shareholder meetings?
18          A.  I cannot recall, nor do I
19  remember.
20          Q.  When was the last meeting that
21  was attended either by the Estate of David
22  Baron or by the late Mr. Baron?
23          A.  I cannot remember.
24          Q.  Are you familiar with a company
25  called Hillside Auto Mall, Inc?

Page 47

Jory Baron

1
2           A.  If I may ask, familiar in what
3   way?
4           Q.  Do you know of the company?
5           A.  Yes.
6           Q.  How do you know of the company?
7           A.  They are down the block from
8   where we are.
9           Q.  Were there ever occasions from
10  your perspective as a shareholder, were
11  there ever occasions when Hillside Auto
12  Outlet employees would sell cars from
13  Hillside Auto Mall?
14          A.  They are 2 companies, they are 2
15  different businesses.
16          Q.  Let me just turn your attention
17  and focus on the question, which was: were
18  there ever occasions when Hillside Auto
19  Outlet's employees sold cars from Hillside
20  Auto Mall?
21          MR. KATAEV:  Objection.
22          Asked and answered. You can
23          answer the question.
24          A.  Throughout we could have
25  vehicles brought to Hillside Auto Outlet to

Page 48

Jory Baron

1
2   be shown.  But, every vehicle that gets sold
3   would be a Hillside Auto Outlet vehicle.
4   They could again have the vehicle brought to
5   be shown if the customer likes it, Hillside
6   Auto Outlet, we do that with other locations
7   where they can purchase the vehicles from
8   those stores and then try to sell them.
9           Q.  When you mentioned that the
10  vehicles could be brought to Hillside Auto
11  Outlet, I am going to follow-up on that and
12  ask you: were there occasions when the car
13  salespeople would bring customers down the
14  block to Hillside Auto Mall to sell cars at
15  Hillside Auto Mall?
16          A.  No, not that I'm aware of.
17          Q.  Are you familiar with the co-
18  defendant, Andris Guzman?
19          A.  I am familiar with his name,
20  yes.
21          Q.  Do you recall his position with
22  Hillside Auto Outlet?
23          A.  I cannot recall.
24          Q.  Do you recall if he had
25  managerial responsibilities?

Page 49

Jory Baron

1
2           A.  I cannot recall.
3           Q.  Do you recall what the hiring
4   process was like at Hillside Auto Outlet?
5           A.  That was not my responsibility,
6   so I cannot answer that.
7           Q.  To your knowledge, were there
8   any posters regarding Labor Law posted
9   within the store of Hillside Auto Outlet?
10          A.  Yes.
11          Q.  Where were those posters posted?
12          A.  I believe in the lunch area or
13  in the back area.  There is a kitchen,
14  that's where the kitchen is, if I remember
15  correctly.
16          Q.  Do you remember what the
17  contents on the poster was?
18          A.  I cannot remember specifically.
19          Q.  Do you recall if the poster was
20  there back in 2018/2019?
21          A.  Yes.
22          Q.  Do you recall how much in flat
23  commissions per car was given to Hillside
24  Auto Outlet employees?
25          A.  It was not my responsibility.

A0400

50–53

Page 50

Jory Baron

1  So, again, I cannot recall.
2        Q.  Do you know what the bonus
3  structure was at Hillside Auto Outlet?
4        A.  That was not my responsibility,
5  so I was unaware.
6        Q.  Do you know if the bonus
7  structure was fixed or varied from time-to-
8  time at Hillside Auto Outlet?
9        A.  Again, that was not my
10  responsibility.  So, I'm unaware, I could
11  say it is not unusual for structures and
12  bonus structures to vary from time to time.
13        Q.  When you said that, are you
14  speaking generally in the industry?
15        A.  Yes.
16        Q.  Are you familiar with the
17  plaintiff Leticia Stidhum?
18        A.  Yes.
19        Q.  How are you familiar with her?
20        A.  I am familiar with her based on
21  this lawsuit.
22        Q.  Did you know of her prior to
23  this lawsuit?
24        A.  No.

Page 51

Jory Baron

1        Q.  From time to time, did you visit
2  Hillside Auto Outlet as one of the
3  shareholders?
4        A.  I would visit there and it would
5  vary every so often.
6        Q.  Usually what time of day would
7  you visit?
8        A.  It could vary depending on my
9  schedule.
10        Q.  What was the earliest time of
11  the day when you would visit the store?
12        A.  After they opened, typically
13  around 10:30 in the morning would be the
14  earliest.
15        Q.  How about the latest time when
16  you visited?
17        A.  I would want to be out of there
18  by 2 o'clock due to traffic.
19        Q.  Would you visit weekdays as well
20  as on weekend days?
21        A.  Typically it would be within the
22  week.
23        Q.  Meaning Monday through Friday?
24        A.  Yes.

Page 52

Jory Baron

1        Q.  What was Ishaque's title at
2  Hillside Auto Outlet?
3        A.  He was a shareholder/partner,
4  whichever you prefer, as well as the manager
5  of the store.
6        Q.  What are the responsibilities of
7  the finance manager, and specifically we are
8  talking about Hillside Auto Outlet?
9        A.  The finance manager would
10  receive credit, I should say they would
11  receive a folder from the salesperson once a
12  deal is formally agreed upon.  Then, their
13  job would be to run credit and submit credit
14  to the bank and then finalize the paperwork
15  with the customers.
16        Q.  To your knowledge, did any of
17  the car salespeople stay after the store
18  hours in order to finish a deal?
19        A.  It is not uncommon within the
20  industry for people to have to remain past
21  our set hours to complete a deal.
22        Q.  Specifically and typically, how
23  much longer would they stay past the set
24  hours to complete a deal after hours?

Page 53

Jory Baron

1        A.  I cannot tell you that.  It
2  varied.
3        Q.  Can you give me a range?
4        MR. KATAEV:  Objection.
5        Asked and answered.  You can
6        answer the question.
7        A.  It completely varied.
8        Q.  Are you familiar with the
9  Dealertrack system?
10        A.  Yes.
11        Q.  Can you explain what that system
12  is?
13        A.  This is the system, this is our
14  dealer management system.  I call it like
15  the brain function of the store.  It is the
16  database that we use to operate the
17  dealership, they use the main database.
18        Q.  To your knowledge, were any
19  records kept for employee hours, and let's
20  start from the time clock; are you aware if
21  there was a time clock at Hillside Auto
22  Outlet?
23        A.  Not that I know specifically.
24        Q.  How about any written records

54–57

| Page 54 | Page 55 |
|---|---|
| Jory Baron | Jory Baron |

**Page 54**

Jory Baron

1
2   about employee's attendance?
3       A. That is not my responsibility
4   and I cannot answer that.
5       THE WITNESS: Is it okay
6       if I have a sip of my
7       Gatorade?
8       MS. TROY: Okay. For the
9       record, you don't have to ask
10       for a drink.
11       THE WITNESS: I just
12       wanted to make sure.
13       Q. How about a record of the
14   employee's pay; what records, if any, were
15   kept?
16       A. That was not my responsibility
17   and I cannot recall.
18       Q. Earlier you mentioned that you
19   learned of Leticia Stidhum through a
20   lawsuit. Prior to this lawsuit, did you
21   have any communications with Ishaque about
22   Leticia?
23       A. So, to clarify then the first
24   knowledge of this lawsuit was a text message
25   that I received from Leticia. That was the

**Page 55**

Jory Baron

1
2   first contact that I had with her. But, no,
3   I did not have any conversations with
4   Ishaque about Leticia prior to any of the
5   legal ---
6       Q. Did you have conversations with
7   anyone about Leticia prior to this lawsuit?
8       A. Just to clarify, when you say
9   ''prior to this lawsuit,'' upon receiving a
10   text message from her, that is when the
11   conversations began about the matter that
12   day. We did not have conversations until
13   this lawsuit began.
14       Q. To backtrack for a second, the
15   text message that you were referring to, was
16   that the text message that you received from
17   Leticia?
18       A. Yes.
19       MR. KATAEV: Let the
20       record reflect that I
21       produced this morning those
22       text messages.
23       Q. Were those the text messages
24   from January 24th?
25       A. That is correct.

**Page 56**

Jory Baron

1
2       MS. TROY: Let the record
3       reflect that D1905 to D1907,
4       I have however, it appears to
5       me that the text message was
6       cut off. And that there is
7       another page. This does not
8       represent the entirety of the
9       text messages. But, there is
10       a message that was cut off.
11       Emanuel, are you going to
12       produce the full text
13       messages?
14       MR. KATAEV: I'm sorry for
15       this. If we have them, we
16       will produce it. Please make
17       a formal demand. For what
18       it's worth,in my review with
19       the client, we believe that
20       the bottom portion of the
21       text message either says
22       ''thank you for your time'' or
23       ''thank you for your help.''
24       It was one of those two
25       things based on the client's

**Page 57**

Jory Baron

1
2       recollection.
3       I believe we can also
4       represent and confirm, and
5       it's accurate that we can
6       also represent that there are
7       no further text messages
8       after that one; correct?
9       THE WITNESS: That is
10       correct.
11       Q. Let me just backtrack for a
12   second. I will show it on the screen and
13   maybe that will be easier. Just give me one
14   second.
15       I believe it's going to be easier if we
16   just use this same folder and we're just
17   going to name it as the next number.
18       MR. KATAEV: That is fine.
19       But, when you say ''folder,''
20       what do you mean?
21       MS. TROY: We're going to
22       mark this as Exhibit 14.
23       (Plaintiff's Exhibit 14
24       marked for identification)
25       Q. So, I'm going to show you what

58–61

Page 58

Jory Baron

1
2  we have just marked as Plaintiff's Exhibit
3  14, which is also D1905 to D1907.
4  First, what is your cell phone number?
5          MR. KATAEV:  Objection as
6      to relevance.  You can
7      answer.
8      A.  516 840-2524.
9      Q.  Since when have you used this
10  number?
11      A.  I can't remember the specifics,
12  but several years.
13      Q.  Is it fair to say that in 2019
14  you used the number, you were using this
15  number?
16      A.  Yes.
17      Q.  How did you obtain this text
18  message that I'm showing you on the screen
19  today?
20      A.  Leticia texted me.
21      Q.  How did you obtain this
22  screenshot of the text message?
23      A.  I screenshot it.
24      Q.  When did you screenshot it?
25      A.  Upon the allegations brought

Page 59

Jory Baron

1
2  forth, I thought that it may be relevant and
3  I went through my history of conversations.
4  I then screenshotted the text message.
5      Q.  Are you saying that you
6  screenshotted it back in 2019?
7      A.  No, I screenshotted it --
8  honestly, whenever the lawsuit came forth,
9  but I cannot say whether it was 2019 or not.
10      Q.  You did not screenshot that this
11  year or last year, but it was sometime
12  prior; correct?
13      A.  I cannot recall.  Again,
14  whenever the lawsuit was brought forth and
15  it was shortly thereafter.
16      Q.  Do you still use that 516 840-
17  2524 number today?
18      A.  I do.
19      Q.  Do you still have text messages
20  on your phone today?
21      A.  I would have to go back and I
22  don't know if my text messages are now set
23  to delete after a certain time period.  So,
24  I cannot answer.  I may have changed it
25  during the pandemic, the cell phone was

Page 60

Jory Baron

1
2  constantly being used.  I may have changed
3  the setting in terms of how long my text
4  messages were kept.
5      Q.  In other words, you use the same
6  number, and you had those text messages
7  before, but you are not sure if you have it
8  currently because the setting was changed to
9  possibly delete them after a certain period
10  of time?
11      A.  That is correct, I would have to
12  check.
13      Q.  When did you provide those
14  screenshots?
15      A.  I produced those screenshots again
16  shortly after the allegations.
17          MR. KATAEV:  Objection.
18      Asked and answered.
19      Q.  I am now showing you the third
20  page of D1907.  Do you recall what, if
21  anything, followed the last text message
22  that appears to be cut off?
23      A.  From what I was told, I
24  confidentially received the text messages
25  and I took those text messages very

Page 61

Jory Baron

1
2  seriously and had a conversation with
3  Leticia about everything.  I told her that I
4  had to speak with Ishaque to discuss it, and
5  in fact if she was owed anything, if she was
6  owed anything, she would indeed get paid.
7  It showed that she quit, and I wanted to
8  discuss if any money to the penny was owed
9  as well as that was the complaint in the
10  text message.
11      I did then reach out to her again, and,
12  and she was unable to take my call as you
13  can see, she was at work.  I reached out
14  about my availability for the text message
15  and then said to her, sent her a text
16  message and she said, ''Nevermind.  I plan to
17  go a different route.''
18      So, the answer that I promised to call
19  her on the 28th is in fact incorrect as seen
20  based on this message.  There was no contact
21  after this text message and no promise of
22  it.
23      Q.  Let's backtrack for a second.
24  When you said that you took the text message
25  ''very seriously,'' can you take us and walk

A0403

62–65

| | Page 62 |
|---|---|
| | Jory Baron |
| 1 | |
| 2 | us through what specifically the steps were |
| 3 | that were taken after you received this text |
| 4 | message? |
| 5 | A.  In regard to the first text |
| 6 | message, to clarify? |
| 7 | Q.  Right.  You were talking about |
| 8 | how you took it very seriously, et cetera. |
| 9 | Please walk us back to the first page after |
| 10 | you received this text message dated January |
| 11 | 24th, which continues onto the second page. |
| 12 | A.  Yes. |
| 13 | Q.  What did you do? |
| 14 | A.  I called Leticia and I wanted to |
| 15 | speak to her to see what she had to say. I |
| 16 | told her that I would have to speak with |
| 17 | Ishaque again, because I am not there |
| 18 | consistently, and the responsibility, again |
| 19 | it does not fall within my responsibility. |
| 20 | I had to find out from him in fact, if any |
| 21 | monies and so on and so forth was owed.  It |
| 22 | is not my practice to withhold money from |
| 23 | people, and indeed if it was owed to them. |
| 24 | Again, long story short, I just wanted to |
| 25 | speak to her and get her side and verify |

Page 62 / lines:

1
Jory Baron
2  us through what specifically the steps were
3  that were taken after you received this text
4  message?
5      A.  In regard to the first text
6  message, to clarify?
7      Q.  Right.  You were talking about
8  how you took it very seriously, et cetera.
9  Please walk us back to the first page after
10  you received this text message dated January
11  24th, which continues onto the second page.
12      A.  Yes.
13      Q.  What did you do?
14      A.  I called Leticia and I wanted to
15  speak to her to see what she had to say. I
16  told her that I would have to speak with
17  Ishaque again, because I am not there
18  consistently, and the responsibility, again
19  it does not fall within my responsibility.
20  I had to find out from him in fact, if any
21  monies and so on and so forth was owed.  It
22  is not my practice to withhold money from
23  people, and indeed if it was owed to them.
24  Again, long story short, I just wanted to
25  speak to her and get her side and verify

Page 63

1
Jory Baron
2  with Ishaque.
3      Q.  When did you call her?
4      A.  So, I called her, I would say
5  almost immediately after this text message.
6  Shortly after the time stamp on this, and
7  then after speaking with her, I immediately
8  spoke with Ishaque.  Then, as seen by the
9  text, I tried to call her back, and I guess
10  going back an hour or so after our initial
11  conversation in which she then -- you can
12  see her response.
13      Q.  So, after you read the text
14  message, you did not text her back, instead
15  you called her; is that correct?
16      A.  Yes.  It is much easier to speak
17  over-the-phone.
18      Q.  Then, can you walk through with
19  me exactly what transpired during the
20  conversation; in other words, who spoke
21  first, who said what to whom and what was
22  said in response?
23      A.  So, the summary, I cannot recall
24  who spoke first except for the niceties of
25  ''hi, how are you?  I am Jory, I am Jory

Page 64

1
Jory Baron
2  Baron.''
3      Again, I had not spoken or met her
4  prior.  After the niceties are exchanged,
5  there was just an exchange of information in
6  terms of what was going on, what happened
7  ''let me try to get to the bottom of it and I
8  will speak to Ishaque to again see his side
9  of the case, to see if indeed the
10  allegations were correct that were brought
11  forth in her text
12      Again, upon hanging up the phone on that
13  conversation, I would have looked into it
14  and called her back and I spoke to Ishaque,
15  and I did team call her back.
16      Q.  Let's backtrack for a second.
17  What did she say to you during that
18  telephone conversation?
19      A.  That she had quit and they just
20  wanted to make sure if she got the pay for
21  the deals that she believes she was
22  potentially owed on.  That her reason for
23  quitting was due to her pay.
24      Q.  Did she say anything else to you
25  besides what you have already mentioned?

Page 65

1
Jory Baron
2      A.  Anything else?
3      Q.  Yes, during that telephone
4  conversation.
5      A.  In regard to anything else
6  pertaining to the above text, I can't recall
7  any other niceties or former exchanges.
8      Q.  During that conversation, you
9  said that you were going to check with
10  Ishaque.  Did you at that time tell her that
11  you were going to get back to her, call her
12  back or what did you say?
13      A.  Yes, I said ''I would like to
14  speak to Ishaque,'' and then I would call her
15  back.
16      Q.  So, now let's turn to what
17  happened next; what happened next after you
18  hung up with Leticia, how soon thereafter
19  did you call Ishaque?
20      A.  Immediately.
21      Q.  Then, you called Ishaque on his
22  personal phone or did you call him on the
23  Hillside Auto number?
24      MR. KATAEV:  Objection as
25  to relevance. You can answer.

66–69

Page 66

Jory Baron

1
2     MS. TROY:  If he knows.
3     A.  Most likely it would've been on
4  his cell phone but I can't recall
5  specifically. Ishaque's cell phone, yes.
6     Q.  Let's backtrack a second.  The
7  516 840-2524 number, what service provider
8  did you use, and let's start from back in
9  2018/2019?
10     A.  I know that the number -- the
11  carrier was Verizon and it is still Verizon.
12     Q.  From 2018 until the present day,
13  has it always been Verizon?
14     A.  It had been AT&T, but I don't
15  know what time I switched.
16     Q.  Turning your attention back to
17  this period of time which is roughly
18  speaking from 2019 in January, were you in
19  fact using Verizon or was it AT&T?
20     A.  I would again believe it was
21  Verizon.  But, I cannot exactly say.  I
22  can't confirm it exactly.
23     Q.  When you said that you called
24  Ishaque , was it from your 516 840-2524
25  number that you called him?

Page 67

Jory Baron

1
2     A.  Yes.
3     Q.  Just to clarify, the only
4  communications you had with Ishaque on this
5  day, which was January 24th, was by phone;
6  is that correct?
7     A.  I can't recall.  But, I do know
8  that I did speak with him via phone, though.
9     Q.  Let's take a look at the time
10  stamp 10:56 a.m.  Is that when you called
11  Ishaque?
12     A.  Shortly after receiving the text
13  message and after speaking with Leticia.
14     MS. TROY:  Emanuel, what
15        are you talking about with
16        your witness? I see that you
17        are mumbling something.
18     MR. KATAEV:  I didn't
19        mumble anything.  I told him
20        that there was a question
21        pending and to wait for the
22        question.
23     MS. TROY:  If you are
24        going to talk with the
25        witness, it is going to have

Page 68

Jory Baron

1
2        to be part of the record.
3        For instance, if you have any
4        directions, please just
5        project so that the court
6        reporter can write it down,
7        your direction to the witness
8        on the record.  But, there
9        should not be any
10         communications between you
11        and the witness that the
12        court reporter does not take
13        down.
14     MR. KATAEV:  That is fine.
15     Q.  When you called Ishaque, can you
16  walk me through what was said during that
17  telephone conversation?
18     A.  He had indicated as the text
19  message that was received, it indicated, and
20  he then told me that she had quit and that
21  there was no money owed to her at that
22  point.  I did infer to him should we find
23  that there were any deals that we should
24  make sure that she got paid.  He agreed, but
25  at that time to his knowledge, there was no

Page 69

Jory Baron

1
2  money owed to her.  Then, I would then
3  communicate to her after speaking with him
4  that anything that she had, that she
5  would've had to follow-up with Ishaque.
6  But, I had no role in helping resolve any
7  issues.
8     Q.  What specifically did Ishaque
9  say to you besides what you have already
10  mentioned?
11     A.  Nothing that I can recall
12  specifically.  Again, most likely ''how are
13  you?''
14     Q.  When you said that he indicated
15  with regard to the text messages that you
16  received, did you at any point whether prior
17  or after or during the telephone
18  conversation screenshot the text messages
19  and send it to Ishaque?
20     A.  Not that I can recall.
21     Q.  What was the conclusion at the
22  end of the telephone call between you and
23  Ishaque?
24     A.  The conclusion that was most
25  likely no money was owed, but that we would

A0405

70–73

Page 70

Jory Baron

1
2  look into it and do our due diligence.  That
3  I would then call Leticia back, which I did,
4  to let her know the process that would take
5  place.  Again, she was unable to answer my
6  phone call in which she texted me back.  You
7  can see my text message responses, and she
8  no longer wanted to have communications with
9  me post that last attempt.
10       Q.  To clarify, after your one phone
11  call with Leticia, were there any subsequent
12  phone call conversations between you and
13  her?
14       A.  I had my initial phone call and
15  I attempted to call her back.  As I said, I
16  like to try to rectify these situations and
17  her response was even in the text message,
18  she said, I said ''can I call you?'' and I'm
19  paraphrasing a little bit.  I don't have the
20  text message in front of me.  But, that was
21  the last attempt to communicate with her
22  aside from the text message saying that I
23  would be available for about 10 minutes or
24  the following day.  Again, I never shut
25  anyone down if they have issues that they

Page 71

Jory Baron

1
2  want to try to resolve.
3       Q.  Going back to telephone
4  conversations you had with Leticia, did you
5  at any point tell her to ''stop?''
6       A.  To stop what?
7       Q.  Did you say the word ''stop'' at
8  all during that telephone conversation?
9       A.  No.  Most likely not at all.  I
10  like to hear everybody's point and then let
11  them speak.  It's not in my nature to
12  interrupt or tell someone or tell them to
13  ''stop.''
14       Q.  Did you ever tell her to ''stop
15  ranting'' during that telephone conversation?
16       A.  No, I can hardly even remember
17  using the word ''rant'' in my life.
18       Q.  Did you in fact pay any amount
19  that Leticia alleged that she was owed to
20  Leticia?
21       A.  To the best of my ability,
22  Ishaque handled whatever monies were owed to
23  Leticia. That was to the best of my
24  understanding.
25       Q.  To the best of your

Page 72

Jory Baron

1
2  understanding, after the telephone
3  conversation between you and Ishaque, where
4  you both sort of concluded that she was not
5  owed any money, was any money paid to
6  Leticia?
7       A.  I cannot recall, nor confirm.
8  Again, I would just like to state that I had
9  a conversation with Ishaque to look into the
10  matter further and let him make the decision
11  from there.
12       Q.  Between January 24th when you
13  had this telephone conversation with Ishaque
14  until January 28th, did you and Ishaque have
15  any subsequent conversations either by phone
16  or in-person?
17       A.  Not recalling specifically.  I
18  cannot recall.
19       Q.  Subsequent to the January 24th
20  conversation between you and Ishaque that
21  you just mentioned, when was the next
22  conversation that you can recall between you
23  and Ishaque about Leticia?
24       A.  Can you please re-ask the
25  question?

Page 73

Jory Baron

1
2       Q.  Sure.  So, you had a
3  conversation on January 24th with Ishaque
4  about Leticia; is that correct?
5       A.  That is correct.
6       Q.  You said that you could not
7  recall whether subsequent conversations with
8  Ishaque took place.
9       Now, my question for you is: of the
10  conversations that you can recall, when was
11  the next conversation, the date?
12       A.  I can't recall a specific date.
13  But, as my business partner, we obviously
14  did speak at some point after January 24th.
15       Q.  Was that specifically about
16  Leticia?
17       A.  Again, I am sure that we did
18  have a conversation.  I don't know
19  specifically, but that was put into his
20  hands to handle.
21       Q.  Let's backtrack for a second: do
22  you recall besides Leticia Stidhum, if there
23  were any female, any other female car
24  salespersons at Hillside Auto Outlet at the
25  time?

74–77

Page 74

Jory Baron

1
2      A. I was not familiar with the
3  staff at the time. So, I can't answer that
4  properly.
5      Q. Do you know who was the top car
6  salesperson at the time at Hillside Auto
7  Outlet?
8      A. I cannot recall, nor -- I said,
9  nor was I familiar with the staff at that
10  time.
11      Q. Now, turning your attention to
12  Leticia Stidhum, how was she as a car
13  salesperson?
14      A. I cannot speak to that. Again,
15  that was not my responsibility on a daily
16  role.
17      Q. Turning your attention now to
18  again, the text message which was marked as
19  Plaintiff's Exhibit 14, to your knowledge,
20  did she sell 28 to 30 cars a month for
21  Hillside Auto Outlet?
22      A. I cannot answer that question.
23  Again, I was unaware of who sold what during
24  that time.
25      Q. How about the 5 percent on any

Page 75

Jory Baron

1
2  deal made that was over $3,000 or $3,500?
3      A. That was not my responsibility.
4  So, I was unaware of the pay plan.
5      Q. At any time during your
6  conversations with Ishaque, did you at any
7  point mention to Ishaque that Leticia said
8  that she sold 20 to 30 cars a month?
9      A. I cannot specifically recall
10  that, any amount of units that she said she
11  sold.
12      Q. How about that she was number
13  one for sales for a good seven to eight
14  months?
15      A. Again, I cannot remember
16  specifically her status as a salesperson;if
17  it was just in this phone call in relation
18  to the amount of vehicles that she sold.
19      Q. How about that Ishaque refused
20  to pay her her last check that allegedly was
21  addressed during the phone call?
22      A. That allegation was addressed,
23  again, because I take these text messages
24  seriously and I wanted to make sure that
25  there were no issues.

Page 76

Jory Baron

1
2      MR. KATAEV: Can we take a
3  break?
4      MS. TROY: We're going to
5  take a break in five minutes,
6  give or take.
7      MR. KATAEV: I have to use
8  the restroom.
9      Q. How about 5 percent on any deal,
10  did you mention this during your
11  conversation with Ishaque?
12      A. I cannot recall.
13      Q. Did you mention that Leticia was
14  pregnant during your conversation with
15  Ishaque?
16      A. I was unaware that she was until
17  the text message, and I cannot recall if
18  that was discussed.
19      Q. The question is: during the
20  telephone conversation that you had with
21  Ishaque, did you mention just Leticia's
22  paycheck or was it Leticia as well as David
23  Manrique's paycheck?
24      A. I can't recall.
25      Q. How would you describe the tone

Page 77

Jory Baron

1
2  of the conversation, meaning between you and
3  Leticia; what was her tone?
4      A. I can't recall her tone.
5      MS. TROY: Emanuel, do you
6  guys want to take 5 minutes
7  or 10 minutes or we can also
8  take lunch. How much time do
9  you need?
10      MR. KATAEV: Let's come
11  back at noon.
12      MS. TROY: Let's just come
13  back at noon. And the time
14  now is 11:47.
15      We are going to try keep
16  this short, Emanuel.
17      (A recess was taken from
18  11:47 a.m. until 12:00 p.m.)
19      MR. KATAEV: We are ready
20  when you are.
21      MS. TROY: Demand Number 2
22  will be for the calls from
23  516 840-2524; the numbers
24  that were called from and
25  everything other than the

78–81

Page 78

Jory Baron

1
2  calls to Leticia including
3  any representative and
4  parties of this lawsuit,
5  including Ishaque Thanwalla
6  and plaintiff Leticia Stidhum
7  can be redacted.
8      MR. KATAEV:  Please
9      follow-up in writing.  Thank
10     you.
11     Q.  Mr. Baron, do you recall how
12  long the conversation was between you and
13  Leticia?
14     A.  I cannot recall.
15     Q.  Do you recall how long the
16  conversation between you and Ishaque was?
17     A.  I cannot recall.
18     Q.  Earlier during this deposition,
19  you mentioned that you had reviewed the
20  Interrogatories; is that correct?
21     A.  That is correct.
22     Q.  Did you review both the
23  Interrogatories and the Supplemental
24  Interrogatories?
25     A.  Yes.

Page 79

Jory Baron

1
2      Q.  To the best of your knowledge,
3  is everything contained in the
4  Interrogatories and the Supplemental
5  Interrogatories; correct?
6      A.  Yes.
7      Q.  How about for the document
8  production responses and the supplemental
9  document responses; to your knowledge, is
10  the information contained in both of those
11  documents; correct?
12     A.  Yes.
13     Q.  As to the document production
14  responses as well as the supplemental
15  document production responses that had to do
16  with the actual operations, as well as the
17  employment records at Hillside Auto Outlet
18  for that type of response, to the best of
19  your knowledge, did you, yourself have any
20  personal knowledge of that?
21     A.  Can you clarify or repeat the
22  question?
23     MS. TROY:  Sure, Ms.
24     Luckman.  If you don't mind
25     reading back the last

Page 80

Jory Baron

1
2  question.
3      (The reporter read back the
4      last question)
5      A.  I would be lying if I didn't say
6  that.  I was confused by the question.  If
7  you can repeat it one more time.
8      (The reporter read back the
9      requested question again)
10     A.  (continuing) Not -- I would have
11  to guess about the legal language, but I
12  apologize.  To the best of my knowledge that
13  I can recall, again, there were certain
14  things that were not my responsibility and I
15  had to trust the people that provided those
16  said documents.
17     Q.  Who were the said people that
18  provided those documents; to clarify, let's
19  start with the employment records?
20     A.  So, Deana at that time.
21     Q.  How about documents like the
22  sales records, do you, yourself have any
23  personal knowledge about what documents
24  pertain to what response?
25     A.  That was not within my realm of

Page 81

Jory Baron

1
2  responsibility.
3      Q.  For those responses, you
4  basically relied upon Ishaque and Deana to
5  provide the appropriate responses; is that
6  correct?
7      A.  For those records, that is
8  correct.
9      Q.  Are you familiar with who was
10  given access to the Dealertrack system at
11  Hillside Auto Outlets?
12     A.  No.
13     Q.  If I were to show you paperwork
14  from Hillside Auto Outlet car salespeople,
15  would you be able to describe the pay stub
16  for me?
17     A.  I am not familiar with the pay
18  stub, just involved in relation to Hillside.
19     Q.  Do you know how to read a pay
20  stub, but you don't have specific personal
21  knowledge as to how employees were paid at
22  Hillside Auto Outlet; is that correct?
23     A.  Yes, that was not within the
24  realm of my responsibilities.
25     Q.  Are you familiar with a person

A0408

Page 82

Jory Baron

1
2    by the name of Jeanique?
3         A.  I am not familiar with that
4    person.
5         Q.  How many days of the week did
6    Hillside employees work?
7         A.  I'm not sure of employee's
8    schedule.
9         Q.  What is your birthday?
10        A.  My birthday?
11        Q.  Yes.
12        A.  ███████████ .
13        Q.  Are you familiar with David
14   Manrique?
15        A.  I can't recall.
16        Q.  Do you recall when Ishaque
17   traveled to Pakistan at the end of 2018?
18        A.  I can't recall.
19        Q.  Do you recall if employees were
20   provided with a particular break time at
21   Hillside Auto Outlet?
22        A.  I cannot speak to the day-to-day
23   operations within the store.
24        Q.  What, if any, policies were in
25   place at Hillside Auto Outlet with respect

Page 83

Jory Baron

1
2    to discrimination?
3         A.  New York State Labor Law and all
4    of the laws had to be provided, and a poster
5    had to be provided.
6         Q.  Besides the poster, were there
7    any other policies that were in place?
8         A.  I cannot speak to the day-to-
9    day.
10        Q.  Have you ever interviewed any
11   potential hires for Hillside Auto Outlet?
12        A.  No.
13        Q.  How about for Hillside Auto
14   Mall?
15        A.  No.  I have nothing to do with
16   that store.
17        Q.  Are you familiar with an
18   employee by the name of Lily who is a DMV
19   clerk at Hillside Auto Outlet?
20        A.  No, I cannot recall.
21        Q.  Do you recall if said employee
22   made a complaint about losing her job
23   because she was pregnant?
24        A.  That was not part of my day-to-
25   day responsibilities and I cannot speak to

Page 84

Jory Baron

1
2    that.
3         Q.  Do you recall if there was a
4    robbery that took place at Hillside Auto
5    Outlet?
6         A.  I cannot recall.
7         Q.  Earlier you mentioned that you
8    recognize the name Andris Guzman. What is
9    your knowledge as to Andres Guzman's role
10   within Hillside Auto Outlet?
11        A.  I am not familiar with nor was I
12   familiar with his role within the
13   dealership.
14        Q.  Understood.  You don't recognize
15   his name?
16        A.  I recognize it, I saw it in the
17   lawsuit.
18        Q.  So, you are only recognizing his
19   name because he is part of the lawsuit; is
20   that correct?
21        A.  I cannot recall his name prior.
22        Q.  Are you familiar with a program
23   called VIN V-I-N Solutions?
24        A.  Yes, VIN Solutions, I am
25   familiar.

Page 85

Jory Baron

1
2         Q.  To your knowledge, what is that
3    program?
4         A.  It is a program that is
5    predominantly used in the industry.
6              MR. KATAEV:  Let the
7              record reflect that the
8              plaintiff has now joined in
9              this virtual deposition by
10             and through her cell phone.
11             I'm just noting for the
12             record that the, she has just
13             come back onto the record at
14             12:13 p.m.
15        Q.  What is your knowledge of VIN
16   Solutions, is it used within Hillside Auto
17   Outlet?
18        A.  I'm not familiar with the day-
19   to-day usage within the store.
20        Q.  Is it fair to say that VIN
21   Solutions did not log, does not log all the
22   customers because the customers would
23   include walk-in customers?
24        A.  VIN Solutions is reliance on
25   certain salespeople's inputs.

A0409

86–89

Page 86

Jory Baron

1
2   Q.  In other words, VIN Solutions
3   required manual entries by the car
4   salespeople; is that correct?
5       A.  It does require manual entries
6   by the salespeople.
7       Q.  Is it accurate to say that VIN
8   Solutions typically understates the actual
9   number of cars sold?
10          MR. KATAEV:  Objection to
11      the form.  You can answer.
12      A.  There is a discrepancy between
13  the salesperson's input and the connection
14  to the DMS.  It is quite accurate for the
15  DMS.  It could also vary, but it is
16  typically quite accurate due to its
17  connection with the DMS.
18      Q.  What is your knowledge of
19  Leticia's performance at Hillside Auto
20  Outlet?
21      A.  I'm unaware of her sales
22  performance.
23      Q.  To your knowledge, was Leticia
24  ever disciplined?
25      A.  I cannot recall nor speak to

Page 87

Jory Baron

1
2   that.
3       Q.  Do you know if she was ever
4   suspended?
5       A.  Again, I was not involved in the
6   day-to-day, and I cannot speak to that.
7       Q.  During your time as a
8   shareholder of Hillside Auto Outlet, were
9   employees ever given written performance
10  evaluations?
11      A.  I was not responsible for the
12  day-to-day activities and I cannot speak to
13  that.
14      Q.  Are you familiar with an
15  individual by the name of David Parsons?
16      A.  Can you please repeat the last
17  name?
18      Q.  Parsons.
19      A.  I am not familiar with that
20  person.
21      Q.  How about an individual by the
22  name of Sean or Shane, was he ever a car
23  salesperson who worked at Hillside Auto
24  Outlet?
25      A.  No, I cannot recall any

Page 88

Jory Baron

1
2   familiarity with him.
3       Q.  To your knowledge, did Leticia
4   run the credit at Hillside Auto Outlet?
5       A.  I cannot speak to that due to my
6   lack of role in the day-to-day
7   responsibilities.
8       Q.  To your knowledge, besides the
9   January 24th phone call that you described
10  for us earlier, were there any other
11  conversations that you had with Leticia
12  subsequently?
13      A.  Not as shown in the text
14  messages.  She essentially -- she stated
15  that there was no further need to
16  communicate.
17      Q.  Do you recall what the time was
18  for that text message, when was that text
19  message received from Leticia?
20      A.  Which text message? From Leticia
21  to me or from me to Leticia?
22      Q.  From her to you.
23      A.  Everything took place within --
24      Q.  Let me just show you so that we
25  are clear.  We're going to take a lunch

Page 89

Jory Baron

1
2   break shortly and I just ask you to search
3   on your phone if you still have the text
4   messages and please give it to Emanuel and
5   Emanuel will be able to provide the text
6   messages to the office.  There are just some
7   questions with respect to the completeness
8   as well as other questions that are raised
9   with respect to the production in its
10  current form.
11          MR. KATAEV:  Hold on, I
12      have to say something.  The
13      witness will not, does not
14      have his phone with him.  We
15      will ask you to follow-up in
16      a written demand and we will
17      respond.
18      Q.  Mr. Baron, you don't have your
19  phone on you?
20      A.  No.  I did not want to be
21  distracted during today's deposition.
22      Q.  Where is your phone?
23      A.  It is currently at home.
24      Q.  Did someone tell you to leave
25  your phone at home for today's deposition?

A0410

90–93

Page 90

Jory Baron

1
2         A. I have a secondary number that I
3  use for my work purposes, for messages. So,
4  that's the phone that I typically carry.
5         Q. Let's backtrack for a second.
6  So, you said that you have two phones?
7         A. I am now stating yes, but it did
8  not come up before. I have recently gotten
9  a secondary number this year, yes.
10        Q. So, the secondary number is for
11 non-emergencies or emergencies?
12        A. No, it's not emergencies, it's
13 the work phone. So, if I need it for
14 messages or the contact with my wife. And
15 it's okay, not for contacts, just such as
16 for my wife, not customers.
17        Q. Then you also have a work phone;
18 is that correct?
19        A. Yes. I wouldn't designate my
20 work phone, but I use the 840-2524 for work
21 due to privacy.
22        Q. So, you have two phones, and one
23 is the 516 840-2524 phone? That is the
24 phone that you use to text and call Leticia,
25 and you recently obtained a non-work phone,

Page 91

Jory Baron

1
2  which is basically for your family; is that
3  correct?
4         A. Yes. I was receiving calls and
5  texts at all hours of the day and it was
6  becoming quite annoying, to be honest. A
7  secondary number gives me peace.
8         Q. What you brought today is your
9  non-work phone and what you left at home was
10 your work phone?
11        A. I would not designate it as a
12 work phone, I would designate it as a second
13 number, but yes.
14        Q. When did you obtain your non-
15 work phone?
16        A. A few months ago.
17        Q. So, as to any conversations that
18 occurred via the phone with the plaintiff or
19 with any of the co-defendants with respect
20 to the present discrimination claim, the
21 pregnancy discrimination claim, that
22 would've occurred on your other phone and
23 not the phone that you brought today; is
24 that correct?
25        A. That is correct.

Page 92

Jory Baron

1
2         MS. TROY: Demand number 3
3     will be for the full and
4     complete text messages
5     between Jory Baron and
6     Leticia Stidhum. The
7     timeframe will be essentially
8     from January of 2019 to the
9     present day. But,
10        specifically, we are looking
11        for any messages that may
12        have been sent or received
13        after the third page, which
14        was cut off, and produced
15        only this morning.
16        Q. Do you recall when you sent this
17 text message that is on the screen? For the
18 record, we are looking on page 3 of
19 Plaintiff's Exhibit 14. I am talking about
20 the message right after the gray message,
21 which is timestamped Thursday, January 24th
22 at 12:50 p.m. The reply, that message does
23 not have a timestamp.
24        A. So, I can only assume that it
25 was shortly after her 12:50 text.

Page 93

Jory Baron

1
2         Q. How about the message that
3  happened after the gray message that begins
4  ''okay, give me a second to step out.''
5         A. I can again only assume because
6  I was only available for 10 minutes and
7  responded immediately on the same day.
8  Then, as you can see she then wrote her
9  response thereafter.
10        Q. Do you know what was the time
11 between the two gray messages?
12        A. I cannot give you specifics.
13 But, I can tell you that it was not very
14 long.
15        MS. TROY: Let's now just
16     take a quick lunch break from
17     now to what time is good for
18     everyone?
19        MR. KATAEV: We're going
20     to go outside the building.
21     It's probably going to take a
22     little bit longer.
23        Let's come back then at
24     1:15.
25        (A recess was taken from

A0411

94–97

Page 94

Jory Baron

1
2    12:30 p.m. until 1:16 p.m.)
3          MS. TROY:  It is now 1:16
4    and we are back on the
5    record.
6          Q.  Are you familiar with an
7    individual by the name of Ali A-L-I R-A-S-K-
8    E-S-N-I-A?
9          A.  To answer your question, no, I
10   am not familiar with that name.
11         Q.  How about Iris Serrano, S-E-R-R-
12   A-N-O?
13         A.  Iris?  No, I am not familiar
14   with that name.
15         Q.  Let's backtrack for a second.
16   Before the break you mentioned an individual
17   by the name of Jeanique.  For context,
18   Jeanique was the manager at Hillside Auto
19   Outlet, and let me just ask you again: are
20   you familiar with that individual?
21         A.  No, I'm not familiar with that
22   individual.
23         Again, sporadically again, maybe I
24   saw a face, but the name, no.
25         MS. TROY:  Let's mark

Page 95

Jory Baron

1
2    Plaintiffs 15.
3          (Plaintiffs Exhibit 15 marked
4    for identification.)
5          Q.  I am now showing you Plaintiff's
6    Exhibit 15, a Verification.
7          A.  Yes.
8          Q.  Do you recognize your signature
9    on this page?
10         A.  Yes, I do.
11         Q.  Do you recall when you signed
12   this document?
13         A.  I can't give you the exact date.
14   But, it was not too long ago.
15         MR. KATAEV:  I can
16            represent for the record,
17            that it was the day that I
18            emailed to you, I think it
19            was February 3rd, Friday,
20            February 3rd I believe.
21         MS. TROY:  Okay.  For the
22            record, I still have not
23            received the Verification of
24            Deana Jennings and Andris
25            Guzman.

Page 96

Jory Baron

1
2          MR. KATAEV:  I received
3            it, I have not forwarded to
4            you and I should have
5            Guzman's, you should have it
6            on Monday.  Also, maybe I
7            will stay with him today and
8            get his notarized and I'll
9            work on the others as well.
10         MS. TROY:  That is fine.
11            I have no other questions for
12            you.  Thank you for your
13            time.
14            THE WITNESS:  No problem.
15
16       [Time noted: 1:20 p.m.]
17
18
19
20
21
22
23
24
25

Page 97

1
2
3    WITNESS          EXAMINATION BY          PAGE
4    Jory Baron       Ms. Troy                 23
5            PLAINTIFF EXHIBITS
6    Number          Description             PAGE
7
8    EX 13     Mr. Baron's driver's license     6
9        (To be Deemed marked)
10   EX 14     D1905 to D1907                  56
11   EX 15     Verification                    94
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A0412

98–101

```
                                    Page 98          1
 1                                                   2     essentially from January
 2                                                   3     of 2019 to the present day.
 3                  REQUESTS                          4     But, specifically, we are
 4     Number      Description           PAGE         5     looking for any messages
 5       1    MS. TROY:  Demand No. 1 is,      6     6     that may have been sent or
 6            I'm going to make a demand             7     received after the third page,
 7            for Mr. Baron's driver's license.      8     which was cut off, and produced
 8       2    MS. TROY:  Demand No. 2 is,     56     9     only this morning.
 9            Emanuel, are you going to              10
10            produce the full text messages?       11
11       3    MS. TROY:  Demand No. 3 is,     78     12
12            the calls from 516 840-2524.           13
13            The numbers that were called           14
14            from and everything other              15
15            than the calls to Leticia              16
16            including any representative           17
17            and parties of this lawsuit,           18
18            including Ishaque Thanwalla             19
19            and plaintiff Leticia Stidhum          20
20            can be redacted.                       21
21       4    MS. TROY:  Demand No. 4 is,     92     22
22            for the full and complete             23
23            text messages between Jory            24
24            Baron and Leticia Stidhum.            25
25            The timeframe will be
```

Page 99 (right column, line 1): *(blank)*

```
                                   Page 100                                           Page 101
 1                                                   1
 2     QUESTIONS MARKED FOR A RULING:   PAGE/LINE     2                ACKNOWLEDGMENT
 3     (None)                                         3
 4                                                    4     STATE OF NEW YORK  )
 5                                                    5                      )s.s.
 6                                                    6     COUNTY OF SUFFOLK  )
 7                                                    7         I, JORY BARON, hereby certify that
 8                                                    8     I have read the transcript of my testimony
 9                                                    9     taken under oath in my deposition of March
10                                                   10     03, 2023; that the transcript is a true,
11                                                   11     complete and correct record of my
12                                                   12     testimony, and that the answers on the
13                                                   13     record as given by me are true and correct.
14                                                   14
15                                                   15
16                                                   16     _____
17                                                   17              JORY BARON
18                                                   18
19                                                   19     Signed and subscribed before me
20                                                   20     this ____ day of _____, 2023.
21                                                   21
22                                                   22
23                                                   23     _____
24                                                   24           Notary Public
25                                                   25
```

A0413

102–103

Page 102

```
 1            C E R T I F I C A T E
 2
 3    STATE OF NEW YORK    )
 4                        )s.s.
 5    COUNTY OF NASSAU     )
 6
 7         I, LYNN LUCKMAN, a Shorthand
 8    Reporter and Notary Public within and for
 9    the State of New York, do certify that;
10         THAT the witness whose deposition
11    is hereinbefore set forth, was duly sworn by
12    me, and that such deposition is a true
13    record of the testimony given by such
14    witness.
15         I further certify that I am not
16    related to any of the parties to this action
17    by blood or marriage; that I am in no way
18    interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have
20    hereunto set my hand this 20th day of March,
21    2023.
22
23              _____
24              LYNN LUCKMAN
25
```

Page 103

```
 1    Errata Sheet
 2
 3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
 4    DATE OF DEPOSITION: 03/03/2023
 5    NAME OF WITNESS: JORY BARON
 6    Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25              _____
```

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF NEW YORK

3          ----------------------------------------X

4          LETICIA FRANCINE STIDHUM,

5                              Plaintiff,

6             -against-          CASE: 21-CV-07163

7          161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
           AUTO OUTLET, and HILLSIDE AUTO MALL INC
8          d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
           JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                             Defendants.

11         ----------------------------------------X

12                             March 10, 2023

13                             10:00 A.M.

14

15             VIRTUAL EXAMINATION BEFORE TRIAL of

16         DEANA JENNINGS, via Zoom, a 30(b)6 witness

17         herein, held at the above-mentioned time and

18         taken before Lynn Luckman, a Notary Public

19         and Shorthand Reporter within and for the

20         State of New York.

21

22

23                   SANDY SAUNDERS REPORTING
                  254 South Main Street, Suite 216
24                   New City, New York 10956
                        (845) 634-7561

25

A0415

2–5

**Page 2**

```
1
2        A P P E A R A N C E S :
3
4
5        TROY LAW, PLLC
6        Attorneys for the Plaintiff
7        41-25 Kissena Boulevard, Suite 103
8        Flushing, New York 1355
9        BY: Tiffany Troy, Esq.
10
11       MILMAN, LABUDA LAW GROUP, PLLC
12       3000 Marcus Avenue, Suite 3W8
13       Lake Success, New York 11042-1073
14       BY: Emanuel Kataev, Esq
15       emaanuel@milaborlaw.com
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                    FEDERAL STIPULATIONS
2
3            IT IS HEREBY STIPULATED AND AGREED by
   and between counsel for the respective parties
4
5    hereto that all objections except as to the
6    form shall be reserved to the time of trial.
7            IT IS FURTHER STIPULATED AND AGREED
8    that the sealing and filing of this deposition
9    shall be hereby waived.
10           IT IS FURTHER STIPULATED AND AGREED
11   that this examination may be sworn to by the
12   witness being examined before a notary public
13   other than the notary public before whom
14   examination was begun examination was begun.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              Deana Jennings
2              BY THE COURT REPORTER:
3        The attorneys participating
4        in this deposition
5        acknowledge that I am not
6        physically present in the
7        deposition room and that I
8        will be reporting this
9        deposition remotely.  They
10       further acknowledge that, in
11       lieu of an oath administered
12       in person, I will administer
13       the oath remotely.  The
14       parties and their counsel
15       consent to this arrangement
16       and waive any objections to
17       this manner of reporting.
18           MS. TROY:  I consent
19           MR. KATAEV:  I
20       consent.
21
22
23              *    *    *
24
25
```

**Page 5**

```
1                Deana Jennings
2
3        D-E-A-N-A J-E-N-N-I-N-G-S, a
   30(b)6 witness herein, after having been
4
5   duly sworn by a Notary Public of the
6   State of New York, was examined and
7   testified as follows:
8
9   BY THE REPORTER:
10       Q.  Please state your full name
   for the record.
11
12       A.  Deana Jennings.
13       Q.  Please state your present
14   address for the record.
15       A.  49 Staghorn Drive Matawan
16   N.J. 07747.
17   EXAMINATION BY
18   TIFFANY TROY:
19       Q.  Good morning.  Mr. Kataev, for
20   the record, please have your witness show
21   her ID.
22   (The witness complies)
23       That's good.
24           MS. TROY:  Please, Ms.
25   Court reporter mark Exhibit
```

A0416

6–9

Page 6

Deana Jennings

1
2      20 as the ID, deem it marked.
3      (The court reporter
4      complies).
5      Q.  Good morning, have you ever been
6  part of a deposition before?
7      A.  No.
8      Q.  In that case, I'm going to
9  explain what a deposition is and lay down
10  some ground rules going forward.
11      First, this deposition is for me to ask
12  you questions and for you to answer my
13  questions about the subject matter of this
14  lawsuit; do you understand?
15      A.  Yes.
16      Q.  Since the court reporter has to
17  take down everything that you say, I ask
18  that you give verbal responses; no shakes or
19  nodding of your head and no gestures; do you
20  understand?
21      A.  Okay.
22      Q.  For that same reason, please
23  speak loudly and clearly when you answer my
24  question.
25      A.  Okay.

Page 7

Deana Jennings

1
2      Q.  The stenographer can only take
3  down one person speaking at a time.
4  Therefore, please do not start to answer one
5  of my questions before I stop asking it;
6  likewise, I will not start any question
7  until you have finished answering my last
8  question; okay?
9      A.  Okay.
10      Q.  If you have a particularly long
11  answer, please break in between sentences so
12  that the stenographer can note down your
13  responses and then you can continue.
14      A.  Okay.
15      Q.  If you need to take a break for
16  example, to get a drink of water or to use
17  the restroom, please let me know and I will
18  call for a recess.  However, there can be no
19  break in between one of my questions and
20  your answer to that question; do you
21  understand?
22      A.  Yes.
23      Q.  From time to time your attorney
24  may make objections to my questions.
25  Generally, however, unless your attorney

Page 8

Deana Jennings

1
2  tells you not to answer, you will still have
3  to respond; do you understand?
4      A.  Yes.
5      Q.  If you don't understand a
6  question, tell me and I'll rephrase it so
7  that you can.  If you don't hear a question,
8  tell me and I'll repeat it so that you do;
9  do you understand?
10      A.  Yes.
11      Q.  We are here today for facts and
12  not speculation.  Therefore, if you don't
13  know an answer to a question, say so.
14      A.  Okay.
15      Q.  Do you understand that you have
16  taken an oath to tell the truth?
17      A.  Yes.
18      Q.  Do you understand that your oath
19  to tell the truth carries the same force and
20  effect as if you were testifying in court
21  before a Judge?
22      A.  Yes.
23      Q.  Are you currently taking any
24  medications that could prevent you from
25  recalling the truth or testifying truthfully

Page 9

Deana Jennings

1
2  and completely today?
3      A.  No.
4      Q.  Are currently under any physical
5  or emotional condition that could prevent
6  you from recalling the truth or testifying
7  truthfully and completely today?
8      A.  No.
9      Q.  Do you agree that during this
10  deposition, except during on break, you are
11  not going to be communicating with anyone by
12  email, chat or instant message on your phone
13  or any other device?
14      A.  Yes.
15      Q.  Do you agree that besides the
16  documents that I will be showing you on the
17  screen as exhibits today that you will not
18  be reviewing any notes on your computer,
19  cell phone or any other device?
20      A.  Yes.
21      Q.  Do you have a cell phone on you
22  or near you?
23      A.  Not on me.
24      Q.  Where is your cell phone?
25      A.  I left it in the car.

A0417

Case 1:21-cv-07163-OEM-LB   Document 87-6   Filed 09/01/23   Page 4 of 23 PageID #: 1035

10–13

| Page 10 | Page 11 |
|---|---|
| Deana Jennings | Deana Jennings |
| 2 Q. Why did you leave your cell | 2 your deposition today, and the caveat is, |
| 3 phone in the car? | 3 don't tell me anything that you discussed |
| 4 MR. KATAEV: Objection. | 4 with your attorney? |
| 5 You were harassing. You may | 5 A. We went over the |
| 6 answer the question. | 6 Interrogatories, and that is pretty much it, |
| 7 A. I forgot to plug it in and I | 7 that's it. |
| 8 wanted to be on time this morning. | 8 Q. Besides the Interrogatories, did |
| 9 Q. Besides your attorney, did you | 9 you review any other documents in |
| 10 speak with anyone in order to prepare for | 10 preparation for today's deposition? |
| 11 today's deposition? | 11 A. Yes, some of the evidence. |
| 12 A. Yes. | 12 Q. Can you describe what type of |
| 13 Q. With whom did you speak? | 13 evidence you reviewed? |
| 14 A. We had a virtual meeting with | 14 A. Yes, it was the text messages, I |
| 15 the other defendant. | 15 saw some VIN Solutions printouts and a pay |
| 16 Q. Was your attorney present? | 16 stub or 2. That is what I can recall. |
| 17 A. Yes. | 17 Q. Did you review any other |
| 18 Q. For how long did you prepare? | 18 documents? |
| 19 A. I can't remember, it was more | 19 A. I can't recall. |
| 20 than an hour but I honestly can't recall how | 20 Q. You mentioned that you had an |
| 21 long it was. | 21 ''virtual meeting with the other defendant;'' |
| 22 Q. Do you recall when it was? | 22 was that yesterday? |
| 23 A. I can't remember for certain, | 23 A. No. |
| 24 I'm sorry. | 24 Q. By ''other defendants,'' can you |
| 25 Q. What did you do to prepare for | 25 name which are the other defendants that |

| Page 12 | Page 13 |
|---|---|
| Deana Jennings | Deana Jennings |
| 2 were present? | 2 A. No. |
| 3 A. Am I allowed to say it? | 3 MR. KATAEV: Objection as |
| 4 MR. KATAEV: Yes. | 4 to relevance. |
| 5 A. It was Ishaque Thanwalla, Jory | 5 A. (Continuing) No. |
| 6 Baron, Josh Aronson and Andris Guzman. | 6 Q. Besides the address that you |
| 7 Q. During that meeting, were there | 7 gave at the beginning of this deposition, |
| 8 any other documents that you reviewed | 8 have you lived anywhere else in the past 5 |
| 9 besides which you have described for me? | 9 years? |
| 10 MR. KATAEV: Objection. | 10 A. Yes. |
| 11 Asked and answered. You can | 11 Q. Starting from the most recent, |
| 12 answer the question. | 12 where was the address that you lived prior |
| 13 A. From what I can recall, not sure | 13 to the address that you gave at the |
| 14 exactly. | 14 beginning of this deposition? |
| 15 Q. Meaning you are not sure if -- | 15 A. Oh my gosh -- 10, Amber Court |
| 16 A. If there were more documents | 16 Westbury, New York. |
| 17 besides those. | 17 Q. Have you lived anywhere else |
| 18 Q. Please go ahead and complete | 18 within the past 5 years? |
| 19 your response. | 19 A. No. |
| 20 A. That was it. | 20 Q. What is your highest level of |
| 21 Q. Have you ever been arrested | 21 education? |
| 22 before? | 22 A. Some college. |
| 23 A. No. | 23 Q. Are you currently employed? |
| 24 Q. Do you own the residence that you | 24 A. Yes. |
| 25 gave at the beginning of this deposition? | 25 Q. Who is your employer? |

14–17

Page 14

Deana Jennings

1
2      A. Hillside Auto Mall, Inc.
3      Q. Besides Hillside Auto Mall,
4   Inc., do you have any other employer?
5      A. No.
6      Q. Currently how many days do you
7   work for Hillside Auto Mall, Inc.?
8      A. Five.
9      Q. Do you have a set schedule?
10     A. Pretty much 10 to 5.
11     Q. In what year did you begin
12   working for Hillside Auto Mall, Inc.?
13     A. 2008.
14     Q. Have you worked for any other
15   employer at the same time that you worked
16   for Hillside Auto Mall?
17     A. Yes.
18     Q. Can you name that employer for
19   me, please?
20     A. I worked part-time for Hillside
21   Auto Outlet, LLC.
22     Q. Can you tell me what year you
23   began working at Hillside Auto Outlet, LLC?
24     A. 2018.
25     Q. Besides Hillside Auto Mall and

Page 15

Deana Jennings

1
2   Hillside Auto Outlet, LLC, have you worked
3   for any other employer since 2008?
4      A. No.
5      Q. Can you give me the address for
6   Hillside Auto Mall Inc.?
7      A. Hillside Auto Mall is 150-01
8   Hillside Avenue, Jamaica, New York, 11432.
9      Q. How about Hillside Auto Outlet
10   LLC?
11     A. They are located at 161-10
12   Hillside Avenue, Jamaica, New York, 11432.
13     Q. What is your position with
14   Hillside Auto Mall, Inc.?
15     A. I am the controller.
16     Q. As the controller, what are your
17   responsibilities?
18     A. I maintain the books, payroll,
19   bills, sales tax, facts, I do some DMV.
20     Q. What about maintaining the
21   books, specifically what did you mean?
22     A. I do the accounting.
23     Q. Are you a certified public
24   accountant?
25     A. No.

Page 16

Deana Jennings

1
2      Q. Besides which you have already
3   mentioned, do you have any other
4   responsibilities as the controller at
5   Hillside Auto Mall, Inc?
6      A. No.
7      Q. What year did you stop working
8   for Hillside Auto Outlet LLC?
9      A. I think currently, 2020.
10     Q. Who hired you in 2008 at
11   Hillside Auto Mall, Inc?
12     A. Josh Aronson.
13     Q. Was your schedule 5 days a week
14   from 10:00 a.m. to 5:00 p.m. in 2008?
15     A. Which store?
16     Q. Let's start from Hillside Auto
17   Mall Inc.
18     A. Yes, 10 to 5.
19     Q. Was it 5 days per week at the
20   time when you were hired?
21     A. Yes.
22     Q. Is it fair to say that between
23   2008 and 2018 before you were hired by
24   Hillside Auto Outlet, LLC, that you worked 5
25   days a week at Hillside Auto Mall, Inc?

Page 17

Deana Jennings

1
2      A. Yes.
3      Q. Do you recall which month you
4   were hired by Hillside Auto Outlet LLC?
5      A. I can't recall off the top of my
6   head.
7      Q. Who hired you?
8      A. Josh Aronson.
9      Q. Between 2018 and early 2020, how
10   many days would you work for Hillside Auto
11   Mall Inc. and how many days would you work
12   for Hillside Auto Outlet LLC?
13     A. Same time, I usually split up my
14   workload.
15     Q. So, if there were 5 days a week,
16   how many days would you work between 2018
17   and early 2020 at Hillside Auto Mall, Inc?
18     A. Hillside Auto Mall, Inc?
19     Q. Yes.
20     A. Five.
21     Q. So, between 2018 and early 2020,
22   5 days per week, you would be working at
23   Hillside Auto Mall, Inc?
24     A. Yes.
25     Q. During that time, you would also

Page 18

Deana Jennings

1  Deana Jennings
2  maintain the books, payroll ,bills, sales
3  tax and DMV for Hillside Auto LLC as well?
4      A.  For Hillside Auto Outlet LLC,
5  everything mentioned minus the DMV.
6      Q.  Ms. Jennings, what is your
7  birthdate?
8      A.  [redacted].
9      Q.  You are here today as a 30(b)6
10  witness for 161-10 Hillside Auto Avenue LLC,
11  as well as Hillside Auto Mall Inc.  Do you
12  understand that your testimony will be
13  binding as to those corporate defendants?
14      MR. KATAEV:  Objection to
15          the form.  It calls for a
16          legal conclusion, you can
17          answer the question.
18      A.  Can you repeat the question
19  again? I'm sorry.
20      MS. TROY:  Ms. Court
21          reporter, will you please
22          read it back.
23          (The reporter read back the
24          last question)
25      A.  Yes.

Page 19

Deana Jennings

1  Deana Jennings
2      Q.  Earlier when you mentioned
3  Hillside Auto Outlet LLC, is that the same
4  or different from the 161-10 Hillside Auto
5  Avenue LLC?
6      A.  It's the same, it's the D/B/A.
7      Q.  Which one is the D/B/A?
8      A.  It is 161-10.  Hillside Auto
9  Avenue, LLC D/B/A Outlet, If I'm correct.
10      Q.  Would you work on-site for both
11  Hillside Auto Mall Inc. And 161-10 Hillside
12  Auto Avenue LLC?
13      A.  I have been at Hillside Auto
14  Outlet location.
15      Q.  Is that the same between 2018
16  and early 2020?
17      A.  Yes.
18      Q.  Was your position the same at
19  Hillside Auto Outlet as Hillside Auto Mall?
20      A.  Yes.
21      Q.  So, you were the controller for
22  Hillside Auto Outlet and Hillside Auto Mall?
23  The difference is that you would not do the
24  DMV for Hillside Auto Outlet; is that
25  correct?

Page 20

Deana Jennings

1  Deana Jennings
2      A.  Correct.
3      Q.  Besides the two companies that
4  you mentioned, did you work for any other
5  employers since 2008?
6      A.  No.
7      Q.  At the time when you began to do
8  work for Hillside Auto Outlet, in addition
9  to Hillside Auto Mall, what was said to you
10  by Josh Aronson?
11      A.  Can you repeat that again?
12      MS. TROY:  Ms. Reporter,
13          if you don't mind reading it
14          back.
15          (The reporter read back the
16          last question)
17      A.  He was opening up another store
18  and he wanted me to be the controller until
19  they found a full-time person for the
20  position.
21      Q.  Is it fair to say that you were
22  the controller for Hillside Auto Outlet on
23  or around when it began, meaning on or about
24  when it opened in 2018?
25      A.  Yes.

Page 21

Deana Jennings

1  Deana Jennings
2      Q.  You mentioned Josh Aronson.  How
3  are you familiar with him?
4      A.  Josh is a shareholder at
5  Hillside Auto Mall where I am employed, and
6  he is also a member of Hillside Auto Outlet.
7      Q.  While working for Hillside Auto
8  Mall and Hillside Auto Outlet between 2018
9  and early 2020, were there any people
10  working under you or for you?
11      A.  No.
12      Q.  Was there like an assistant,
13  meaning a controller assistant or an office
14  assistant, someone who helped you with the
15  job?
16      A.  At which location?
17      Q.  Let's start from Hillside Auto
18  Mall.
19      A.  No.
20      Q.  How about at Hillside Auto
21  Outlet location?
22      A.  No, not assistant, but they had
23  somebody that did the motor vehicle and a
24  bookkeeper here and there throughout the
25  year.

A0420

22–25

Page 22

Deana Jennings

1
2     Q. You mentioned that you would do
3 the payroll for the Hillside Auto Mall as
4 well as Hillside Auto Outlet. Can you
5 describe how the payroll would be done?
6     A. At Hillside Auto Mall, I would
7 have one of our managers collect the
8 commission sheets and then I would just
9 tally it up. Then, I would submit it to, I
10 believe it was -- I don't know which
11 company, possibly ADP.
12     Q. How about for Hillside Auto
13 Outlet?
14     A. Pretty much the same thing.
15 They would collect commission sheets and I
16 believe they would total everything and I
17 just submitted the information.
18     Q. How would they transmit those
19 sheets; was it by email or in-person?
20     A. Oh, I can't recall.
21     Q. How would they submit those?
22     A. Transmit.
23     Q. Between 2018 and early 2020,
24 were you on the payroll for both companies?
25     A. Yes.

Page 23

Deana Jennings

1
2     Q. Besides hiring you, did Josh
3 Aronson hire anyone else, and let's start
4 from Hillside Auto Mall?
5     A. No.
6     Q. How about for Hillside Auto
7 Outlet?
8     A. If Josh hired people?
9     Q. Other than yourself.
10     The question is: did Josh Aronson hire
11 anyone else besides you for Hillside Auto
12 Outlet?
13     A. No.
14     Q. Did Hillside Auto Outlet own the
15 premises or did it lease it?
16     A. I believe it's leased.
17     Q. How about for Hillside Auto
18 Mall?
19     A. Hillside Auto Mall is leased.
20     Q. With respect to Josh Aronson,
21 what are his job responsibilities as a
22 shareholder for Hillside Auto Mall?
23     MR. KATAEV: Objection as
24     to relevance. You can
25     answer.

Page 24

Deana Jennings

1
2     A. He is the operating member of
3 Hillside Auto.
4     Q. As the operating member, what
5 are his responsibilities?
6     A. Nothing much, Isaac handles all
7 that.
8     Q. How about Hillside Auto Outlet,
9 what are his responsibilities?
10     A. Whose responsibilities?
11     Q. Josh Aronson.
12     A. I thought you were asking me
13 about Hillside Auto Outlet with the previous
14 question. I'm sorry.
15     Q. What are Josh Aronson's
16 responsibilities at Hillside Auto Mall?
17     A. He is our secretary, and he
18 doesn't have any responsibilities within the
19 dealership.
20     Q. Earlier your response pertaining
21 to the operating member of Hillside Auto,
22 you were referring to his responsibilities
23 as related to Hillside Auto Outlet; is that
24 correct?
25     A. Yes.

Page 25

Deana Jennings

1
2     Q. So, Isaac who you saw yesterday
3 on the Zoom, how are you familiar with him?
4     A. He is the general manager and
5 member of Hillside Auto Outlet.
6     Q. Did Josh Aronson have the power
7 to hire and fire for Hillside Auto Mall?
8     A. I would say yes. Since he is an
9 owner, but we have managers that handle
10 those responsibilities within the
11 dealership.
12     Q. How about for Hillside Auto
13 Outlet, did Josh Aronson have the power to
14 hire and fire?
15     A. Again, he is a member, so I
16 would say he would have the ability to, and
17 again, he has a team of people to do that
18 for him.
19     Q. Did you maintain the employee
20 records for Hillside Auto Mall?
21     A. Yes.
22     Q. How about for Hillside Auto
23 Outlet between 2018 and early 2020?
24     A. Yes.
25     Q. Earlier you mentioned the

26–29

|  | Page 26 |
|---|---|
| | Deana Jennings |
| 1 | |
| 2 | commission sheets. How are the commission |
| 3 | sheets kept? |
| 4 | A. At Auto Outlet or Auto Mall? |
| 5 | Q. Let's start from Auto Mall and |
| 6 | then we will move on to Auto Outlet. |
| 7 | A. I would keep them in the |
| 8 | employee file. |
| 9 | Q. That file, is that a paper file |
| 10 | or an electronic file? |
| 11 | A. Paper. |
| 12 | Q. When you say ''employee file,'' |
| 13 | what category of employees are you talking |
| 14 | about? |
| 15 | A. I just had a folder with the |
| 16 | employee's names and I would keep all of |
| 17 | their commission sheets in that folder. |
| 18 | Q. Let me sort of try to clarify my |
| 19 | question. My question is: what type of |
| 20 | employees would have an employee file with |
| 21 | the commission sheets, was that all the |
| 22 | employees or -- |
| 23 | A. Just the sale sales associates. |
| 24 | Q. Would the business development |
| 25 | center people have any employee files as |

|  | Page 27 |
|---|---|
| | Deana Jennings |
| 1 | |
| 2 | well? |
| 3 | A. Yes. |
| 4 | Q. Were employee files kept for |
| 5 | non-commission employees? |
| 6 | A. I have an employee file for |
| 7 | them, yes. |
| 8 | Q. Was that for each employee that |
| 9 | there is a separate file folder? |
| 10 | A. Yes. Whoever is hired, they get |
| 11 | a folder. |
| 12 | Q. For how long are the records |
| 13 | kept? |
| 14 | A. I think I still have them. |
| 15 | Q. Between 2008 and the present |
| 16 | day, did you throw out any of the employee |
| 17 | files? |
| 18 | A. No. |
| 19 | Q. Were any of the employee files |
| 20 | missing or lost that you know of between |
| 21 | 2008 and the present day? |
| 22 | A. Not to my knowledge. |
| 23 | Q. Let's turn our attention to |
| 24 | Hillside Auto Outlet. How are the employee |
| 25 | records kept there? |

|  | Page 28 |
|---|---|
| | Deana Jennings |
| 1 | |
| 2 | A. To the best of my knowledge, |
| 3 | it's the same way. There is an employee |
| 4 | folder. |
| 5 | Q. Let's turn our attention now for |
| 6 | a second to the car salespeople |
| 7 | specifically, what would be in a typical car |
| 8 | salesperson's employee folder? |
| 9 | A. Driver's license, another form |
| 10 | of identification, their social security, |
| 11 | passport, the employee package. That would |
| 12 | be the employee package, and they might have |
| 13 | had a folder for commission sheets, Hillside |
| 14 | Auto Mall had separate at that point. |
| 15 | Q. You are saying that Hillside |
| 16 | Auto Mall would have two folders, if it's |
| 17 | for a car salesperson; one folder is with |
| 18 | the driver's license, ID and the employee |
| 19 | package and another folder is for the |
| 20 | commission sheets? |
| 21 | A. Yes. |
| 22 | Q. To your knowledge, were the |
| 23 | records ever lost or did you guys ever |
| 24 | discard any records between 2018 and the |
| 25 | present day? |

|  | Page 29 |
|---|---|
| | Deana Jennings |
| 1 | |
| 2 | A. No. I think there was a law |
| 3 | that you have to hold documentation for at |
| 4 | least seven years before discarding it or |
| 5 | shredding it. |
| 6 | Q. Let's focus on commission sheets |
| 7 | for a second. The commission sheets are |
| 8 | filled out on a weekly basis; is that |
| 9 | correct? |
| 10 | A. Correct. |
| 11 | Q. The commission sheets that are |
| 12 | filled out on a weekly basis, would that |
| 13 | include what information, can you describe |
| 14 | it for me? |
| 15 | A. For Auto Mall? |
| 16 | Q. Let's start from Auto Mall and |
| 17 | then we will go to Auto Outlet. |
| 18 | A. Okay. For Auto Mall, we have a |
| 19 | sheet with the salesperson's name or the |
| 20 | BDC, rep's name. It would list the amount |
| 21 | of time, it would be the customer's name, |
| 22 | possibly a partial VIN number, VIN number of |
| 23 | the car that they purchased. Sometimes the |
| 24 | date that it was sold. |
| 25 | Q. Any other information that would |

30–33

**Page 30**

1            Deana Jennings
2   be contained?
3        A. That is pretty much it.
4        Q. Would it include the sales price
5   and the commission that the car salesperson
6   would receive?
7        A. Sometimes they would write it on
8   there for me.
9        Q. If it was not written on there
10   for you, what would happen?
11        A. I know their pay plan.
12        Q. What was the pay plan for a
13   Hillside Auto Mall?
14        A. Hillside Auto Mall is 250
15   salary, $250 salary and 100 commission.
16        Q. Would that $100 commission be
17   per car?
18        A. Yes.
19        Q. Was there any bonus structure at
20   Hillside Auto Mall?
21        A. No.
22        Q. When you said that you would
23   tally up the numbers, you would tally the
24   number of cars sold and multiply it by the
25   commission, then add the salary; is that

**Page 31**

1            Deana Jennings
2   correct?
3        A. On the sheet, I would just tally
4   up their commissions, and the salary was
5   just standard.
6        Q. So, when you would tally up the
7   number, that would be the number of cars
8   sold?
9        A. Yes.
10        Q. Once you tallied up the number
11   of cars sold, you would then pass that
12   information to a third party, whether that
13   was ADP or some other company; is that
14   correct?
15        A. Correct.
16        Q. Now let's turn your attention to
17   Hillside Auto Outlet. Are the commission
18   sheets the same or different from that of
19   Hillside Auto Mall?
20        A. It was pretty much the same,
21   although they had a bookkeeper there and I
22   would print out the name and they would tell
23   me who gets paid this per week with the
24   commission, what it was and whatnot.
25           MR. KATAEV: Can you hang

**Page 32**

1            Deana Jennings
2   on one second, Tiffany?
3           MS. TROY: Yes.
4        (A recess was taken from
5   10:41 until 10:43)
6           MS. TROY: Are you ready
7   to continue?
8           MR. KATAEV: Ready to
9   continue. Thank you.
10           MS. TROY: I believe your
11   client was responding --
12           MR. KATAEV: I thought she
13   was done.
14        Q. Did you finish what you were
15   saying?
16        A. Okay. I did not finish my
17   thought.
18        Q. Perfect, go ahead.
19        A. (Continuing) I have a printout
20   of the payroll screen with the employee's
21   names and they would write it for me to make
22   it easier. They did 2 separate entries the
23   same day to make it easier for me.
24        Q. What was the pay plan at
25   Hillside Auto Outlet?

**Page 33**

1            Deana Jennings
2        A. The paid plan for Outlet was, I
3   believe 300 commission, 300 salary and 150
4   commission.
5        Q. Was there a bonus structure of 5
6   percent at any time while you were working
7   as the controller?
8           MR. KATAEV: Objection.
9   Vague. You can answer.
10        A. I believe they did have a bonus
11   structure at Outlet, Hillside Auto Outlet.
12        Q. On the commission sheet for
13   Hillside Auto Outlet salespeople, what would
14   the tally look like?
15        A. I can't recall that far back.
16   It's just should be just the full amount,
17   what the specific salesperson or employee
18   was getting paid that week.
19        Q. To your knowledge, was Leticia's
20   folder like the two folders that you talked
21   about, are they still there at Hillside Auto
22   Outlet?
23        A. I can't recall.
24        Q. You mentioned that Isaac was the
25   manager for Hillside Auto Outlet; as the

Case 1:21-cv-07163-OEM-LB   Document 87-6   Filed 09/01/23   Page 10 of 23 PageID #: 1041

34–37

Page 34

Deana Jennings

1
2  manager, did he have the power to hire and
3  fire?
4        A.  The general manager, yes, he had
5  the ability to hire and fire, yes.
6        Q.  Let's backtrack for second was
7  the pay for Hillside Auto Mall employees
8  only dependent upon the number of cars sold?
9        A.  Can you rephrase your question?
10       Q.  Sure.  How was the pay for
11  Hillside Auto Mall employees computed, and
12  I'm talking specifically about the car
13  salespeople?
14       A.  How was it recorded?
15       Q.  Yes, correct.
16       A.  I don't recall commission
17  sheets, might have had a blackboard in the
18  office, possibly a CRM.
19       Q.  Just so the record is clear,
20  what is an ''crm?''
21       A.  That is the platform and I don't
22  know exactly what it stands for.  But, the
23  platform for specific company, it could be
24  advertising or different companies.
25       Q.  You were talking about the

Page 35

Deana Jennings

1
2  Blackboard in the office, what would that
3  Blackboard contain, what information would
4  it contain?
5        A.  To my knowledge, it could have
6  had the salespeople's names and tally of how
7  many deals and that could be confusing,
8  Hillside Auto Mall.
9        Q.  Did either Hillside Auto Mall or
10  Hillside Outlet have its time clock?
11       A.  Hillside Auto Mall does not have
12  one, and I don't recall if Auto Outlet had a
13  time clock.
14       Q.  Did the salespeople's weekly
15  salary depend on the number of hours that
16  they worked?
17       A.  To the best of my knowledge, no.
18       Q.  Are you familiar with an
19  individual Susan Zhivo Z-H-I-V-O?
20       A.  Yes.
21       Q.  How are you familiar with her?
22       A.  She is the controller at
23  Hillside Auto Outlet.
24       Q.  Was she your successor?
25            MR. KATAEV:  Objection to

Page 36

Deana Jennings

1
2  the form on that one.
3        A.  Yes.
4        Q.  Do you recall when she began
5  working at Hillside Auto Outlet?
6        A.  I believe 2020.
7        Q.  To your knowledge, are her
8  responsibilities the same as yours?
9        A.  To my knowledge, yes.
10       Q.  Are you familiar with David
11  Barron, the late David Barron?
12       A.  Yes.
13       Q.  What were his responsibilities,
14  and let's start at Hillside Auto Mall?
15       A.  He is -- he was the Vice
16  President of Hillside Auto Mall, but no
17  responsibilities within the dealership.
18       Q.  How about at Hillside Auto
19  Outlet?
20       A.  David was a member of Hillside
21  Auto Outlet, same thing, no responsibilities
22  within the dealership.
23       Q.  Are you familiar with Jory
24  Baron?
25       A.  Yes.

Page 37

Deana Jennings

1
2        Q.  What are his responsibilities at
3  Hillside Auto Mall?
4        A.  Hillside Auto Mall?
5        Q.  Correct.
6        A.  Jory is not connected to
7  Hillside Auto Mall.
8        Q.  How about Hillside Auto Outlet?
9        A.  He is also a member.
10       Q.  What are his responsibilities?
11       A.  He would -- he does -- I
12  remember just maybe signing checks weekly,
13  nothing pertaining to like daily activities
14  within the dealership.
15       Q.  Did Isaac also have the power to
16  sign checks at Hillside Auto Outlet?
17       A.  No.
18       Q.  Besides Jory, is there anyone
19  else that has the authority to sign checks
20  for a Hillside Auto Outlet?
21       A.  To the best of my knowledge, I
22  believe Josh Aronson and David Barron.
23       Q.  Are you familiar with Raymond
24  Phelan P-H-E-L-A-N?
25       A.  Yes.

A0424

38–41

Page 38

Deana Jennings

1
2    Q. What are his responsibilities at
3 Hillside Auto Mall?
4    A. Raymond specifically is the
5 treasurer and he is pretty much like the
6 general manager. He is at the dealership
7 every day and he oversees everything and he
8 hires and fires.
9    Q. Does Ray Phelan have any
10 connection with Hillside Auto Outlet?
11    A. No.
12    Q. Is it fair to say that each of
13 the owners, meaning the late David Barron,
14 Josh Aronson, Jory Baron and Isaac Thanwalla
15 had the power to hire and fire at Hillside
16 Auto Outlet?
17    MR. KATAEV: Objection.
18    Compounds and calls for legal
19    conclusion. You can answer
20    the question.
21    A. Can you repeat the names again,
22 please?
23    MS. TROY: Sure. Ms.
24    Court reporter, if you don't
25    mind reading back the last

Page 39

Deana Jennings

1
2 question.
3    (The reporter read back the
4    last question)
5    A. Yes.
6    Q. Is it fair to say that each of
7 the members, meaning Ronald, Baron, Ronald
8 Baron, the late David Baron, Josh Aronson
9 and Raymond Phelan had have or had the power
10 to hire and fire at Hillside Auto Mall?
11    A. Yes.
12    Q. Do you know who signed the lease
13 on behalf of Hillside Auto Outlet?
14    MR. KATAEV: Objection to
15    relevance. You can answer.
16    A. I don't recall.
17    Q. How about for Hillside Auto
18 Mall?
19    A. Do you mean the original lease
20 back in 2008?
21    Q. Yes.
22    A. I wouldn't know that far back.
23    Q. How about the current lease?
24    A. The current lease for Hillside
25 Auto Mall was signed by Josh Aronson.

Page 40

Deana Jennings

1
2    Q. Going to backtrack for a second,
3 who incorporated Hillside Auto Mall, Inc?
4    A. I wouldn't know, I wasn't
5 employed there when they opened up.
6    Q. When was that, was that in 2006
7 or --
8    A. 2005 or 2006.
9    Q. Who filed the articles of
10 incorporation for 161-10 Hillside Auto
11 Avenue LLC?
12    A. Who filed the articles of
13 incorporation?
14    A. I wouldn't know that without my
15 records.
16    Q. Are you familiar with whether
17 Hillside Auto Mall, whether at the time of
18 its incorporation, any attorneys were
19 consulted?
20    A. When they first opened up
21 Hillside Auto Mall?
22    Q. Correct.
23    A. I was not employed at that time,
24 so I wouldn't know.
25    Q. How about for 161-10 Hillside

Page 41

Deana Jennings

1
2 Auto Avenue LLC, at the time when that was
3 formed, did any member consult with an
4 attorney?
5    A. I wouldn't know without my
6 records.
7    Q. Do you know who was the signer
8 for the current lease of Hillside Auto
9 Outlet?
10    A. No.
11    Q. What is the name of the landlord
12 for Hillside Auto Mall?
13    A. Hillside Auto Mall?
14    Q. Right.
15    MR. KATAEV: Objection as
16    to relevance. You can
17    answer.
18    A. Eldee E -L-D-E -E Auto Sales.
19    Q. For Hillside Auto Outlet, who is
20 the landlord?
21    A. I can't think of the name, I
22 believe to the best of my knowledge, the
23 Estate of Ezekiel E-Z-E-K-I-E-L Koeppel. K-O
24 -E-- P -P-E- L. That is when I was employed
25 there and I don't know if they switched

A0425

42–45

Page 42

Deana Jennings

1
2  landlords from 2020 until now.
3        Q.  Who sets the pay plan or the pay
4  structure, and let's start from Hillside
5  Auto Mall?
6        A.  Majority of the time, it is
7  Raymond Phelan.
8        Q.  How about for Hillside Auto
9  Outlet?
10       A.  Isaac.
11       Q.  Were you ever present at sales
12  meetings between Jory Baron and Ishaque
13  Thanwalla?
14       A.  Sales meetings?
15       Q.  Or, like weekly or monthly
16  meetings.
17       A.  No.
18       Q.  To your knowledge, what, if any,
19  posters are posted at Hillside Auto Mall?
20       A.  We have the Labor Law posters,
21  we have the Consumer Affairs poster, we have
22  Covid posters until recently.  That is
23  pretty much what I can think of off the top
24  of my head.
25       Q.  The Labor Law posters, what was

Page 43

Deana Jennings

1
2  the year that it was first posted at
3  Hillside Auto Mall?
4        A.  I wouldn't know, I became
5  employed by Hillside Auto Mall in 2008.  So,
6  maybe 6 years after they opened.
7        Q.  Where is the Labor Law poster
8  posted?
9        A.  On the wall in the main trailer.
10       Q.  What does the Labor Law poster
11  look like?
12       A.  (It's a poster) and I don't know
13  how to describe it.  It has the minimum wage
14  on it, and it is in blue, thus there is a
15  year Asha, there is the minimum wage and it
16  is Spanish and it is it also, and it is
17  laminated.
18       Q.  How about at Hillside Auto
19  Outlet, were there posters?
20       A.  Yes.
21       MR. KATAEV:  For the
22       record, your description was
23       pretty good.  Just joking.
24       Q.  For Hillside Auto Outlet, when
25  was the first time when the poster was

Page 44

Deana Jennings

1
2  posted?
3        A.  I can't recall the date that
4  they hung it up.
5        Q.  Was it the day when you started
6  working or sometime after?
7        A.  I can't recall.
8        Q.  Do you recall where it was
9  posted within the Outlet?
10       A.  If my memory serves me right, on
11  the wall in between the main trailer and the
12  office.  But, if my memory serves me right,
13  they might have moved them.
14       Q.  How many bank accounts did
15  Hillside Auto Mall have?
16       A.  What year?
17       Q.  Let's start from right now.
18       A.  Now, Hillside Auto Mall has 3.
19       Q.  Let's walk back to 2018, how
20  many bank accounts did it have back then?
21       A.  I believe in 2018, I think
22  probably 3 at that point as well, as far as
23  I can recall.
24       Q.  Do you recall at which bank?
25       A.  We have JPMorgan Chase & Co and

Page 45

Deana Jennings

1
2  TD Bank.
3        Q.  How about for Hillside Auto
4  Outlet, how many bank accounts does it have
5  currently?
6        A.  Currently, I wouldn't know.
7        Q.  Right before you left in 2020,
8  how many bank accounts did it have?
9        A.  I believe they had 4, might have
10  been 3 due to fraudulent transactions.
11  Maybe 3 or 4.
12       Q.  Which bank was it --
13       A.  In 2018 to 2020, I believe it
14  was just JPMorgan Chase.
15       Q.  Who had the authority to
16  withdraw money from Hillside Auto Mall's
17  bank account?
18       MR. KATAEV:  Objection as
19       to relevance.  Also, all of
20       these financial questions
21       were decided in the Motion,
22       and I instruct the witness on
23       the basis on that basis not
24       to answer the question.
25       MS. TROY:  The judge

A0426

46–49

Page 46

Deana Jennings

1
2   stated in a very specific
3   reason with respect to
4   discovery and financial
5   information.  If I can have
6   your commitment that because
7   of discovery, and I believe
8   it closes on March 24th, I
9   don't believe that this stage
10  of discovery is now
11  different.  If you are
12  instructing your witness not
13  to answer on the basis of the
14  order of the motion to
15  compel, maybe you are
16  subjecting your witness to a
17  second deposition.
18       MR. KATAEV:  I believe
19  that we should actually do
20  this off the record.
21       MS. TROY:  We can keep it
22  on the record, just this
23  portion.
24       MR. KATAEV:  Okay.  What I
25  think we can do is in the

Page 47

Deana Jennings

1
2   event that the judge decides
3   that the question was proper,
4   I am comfortable submitting
5   interrogatory responses
6   unless the court orders her
7   to come back for another
8   deposition.
9        MS TROY:  That is fine.
10       MR. KATAEV:  Thank you for
11  that.
12       Q.  Who had the authority to
13  withdraw money from Hillside Auto Outlet's
14  bank account?
15       MR. KATAEV:  Same
16  objection and same
17  instruction on that.
18       A.  (No response per her attorney)
19       Q.  Roughly how many cars on-average
20  does Hillside Auto Mall sell?
21       A.  It's a tough industry right now,
22  between maybe 30 and 50, depending on the
23  economy and the market.
24       Q.  Back in 2018 and 2019, how many
25  cars were sold?

Page 48

Deana Jennings

1
2        A.  I wouldn't know off the top of
3   my head without my records.  I'm sorry.
4        Q.  What records, if any, would
5   include the number of cars sold by the
6   dealership?
7        A.  Would it show how many cars were
8   sold by the dealership?
9        Q.  Correct.  For instance, for
10  Hillside Auto Mall, what records would show
11  the number of cars sold back in 2018 and
12  2019?
13       A.  Our computer system.
14       Q.  Is that computer system the same
15  or different from VIN Solutions?
16       A.  It's different.
17       Q.  Can you describe for me the
18  computer system, what type, what kind of
19  data is included?
20       A.  It is our operating system and
21  it has the deals for the vehicles that were
22  sold, that is the accounting and it has
23  vehicle information.
24       Q.  How about for Hillside Auto
25  Outlet, right before you left, how many cars

Page 49

Deana Jennings

1
2   were sold per-month?
3        A.  I wouldn't know offhand without
4   my records. I'm sorry.
5        Q.  Did you review at all the sales
6   records in preparation for today's
7   deposition, and specifically the sales
8   records for Hillside Auto Outlet between
9   2018 and 2019?
10       A.  I believe so.
11       Q.  When you say that you ''believe
12  so,'' do you mean yes, you did?
13       A.  I reviewed a lot of documents
14  and I can't recall if it was specifically
15  her information or her computer sheets.
16       Q.  Did you review her computer
17  sheets in preparation for today's
18  deposition?
19       A.  I can't recall if I saw them in
20  the documents that I reviewed.
21       Q.  On-average, how much would each
22  car sell for?
23       MR. KATAEV:  Objection.
24  Vague, but you can answer.
25       A.  I don't know what she sold the

A0427

50–53

| | Page 50 | | Page 51 |
|---|---|---|---|
| 1 | Deana Jennings | 1 | Deana Jennings |
| 2 | vehicles for, a lot goes into the year, | 2 | Q. Was the schedule the same in |
| 3 | make, model and mileage. | 3 | 2016? |
| 4 | Q. How about on-average? | 4 | A. I can't recall that far back. |
| 5 | A. I would not be able to come up | 5 | Q. How about for Hillside Auto Mall |
| 6 | with a figure for that. | 6 | in 2018, was it also six days a week with |
| 7 | Q. Are you familiar with the | 7 | alternating Sundays off? |
| 8 | working schedule for and let's start from | 8 | A. I can't recall that far back. |
| 9 | Hillside Auto Mall employees? | 9 | Q. What can you recall in terms of |
| 10 | A. Yes. | 10 | the schedule at Hillside Auto Outlet? |
| 11 | Q. What was the working schedule? | 11 | A. Auto Outlet? |
| 12 | A. What year do you mean, going | 12 | Q. Yes. |
| 13 | back to when? | 13 | A. Ishaque handled the scheduling, |
| 14 | Q. Let's start from 2017. | 14 | so I don't know. |
| 15 | A. The employees at Auto Mall | 15 | Q. When was the start time for |
| 16 | usually would work -- the schedule would | 16 | Hillside Auto Mall employees? |
| 17 | always change, but it used to be six days | 17 | A. I wouldn't know, I didn't have |
| 18 | with two days off per week and it would | 18 | anything to do with the scheduling or what |
| 19 | rotate sometimes. Now, we are down to maybe | 19 | time people started. |
| 20 | they do probably five days, one day off, | 20 | Q. What about the end time, are you |
| 21 | rotating on Sundays, possibly and I don't | 21 | familiar with the end time? |
| 22 | really handle scheduling. | 22 | A. No. |
| 23 | Q. Who handled scheduling for | 23 | Q. Are you familiar with start time |
| 24 | Hillside Auto Mall? | 24 | or end time at Hillside Auto Outlet? |
| 25 | A. Raymond Phelan. | 25 | A. For the hours of actual |

| | Page 52 | | Page 53 |
|---|---|---|---|
| 1 | Deana Jennings | 1 | Deana Jennings |
| 2 | operation or the salesperson's start and end | 2 | mentioned, did that bookkeeper change? |
| 3 | time? | 3 | A. Yes. |
| 4 | Q. Let's start from the salesperson | 4 | Q. What are the names of the |
| 5 | start and end time. | 5 | bookkeepers that you still recall the names |
| 6 | A. I don't know how Isaac set their | 6 | for? |
| 7 | schedule up. | 7 | A. All I remember, one name is Asha |
| 8 | Q. Now, let's turn to the hours of | 8 | and the other two I don't know their names |
| 9 | operation; what was the start and end time | 9 | without my records. |
| 10 | for the hours of operation? | 10 | MS. TROY: So, I'm going |
| 11 | A. If my memory serves me | 11 | to leave a blank for the two |
| 12 | correctly, it was 10 to maybe -- maybe 10 to | 12 | names. |
| 13 | 7 or 8. | 13 | |
| 14 | Q. Besides yourself and the | 14 | (Insert) |
| 15 | bookkeeper that you mentioned earlier, was | 15 | |
| 16 | there anyone else who would calculate the | 16 | (Insert) |
| 17 | employee's pay at either Hillside Auto Mall | 17 | Q. Can you give the name that you |
| 18 | or Hillside Auto Outlet? | 18 | recall right now? |
| 19 | A. Hillside Auto Mall was only me, | 19 | A. Asha A-S-H-A. |
| 20 | and Hillside Auto Outlet, I don't know if | 20 | Q. Do you have her last name? |
| 21 | anyone else tallied it up, but the | 21 | A. No. Not without my records. |
| 22 | bookkeeper would give it to me and I would | 22 | MS. TROY: We will leave a |
| 23 | assume she was the one that tallied up the | 23 | blank for you to look into |
| 24 | information in the computers for that week. | 24 | your records and fill in the |
| 25 | Q. Is that bookkeeper that you | 25 | last name. |

A0428

54–57

Page 54

Deana Jennings

1
2
3         (Insert)
4     Q.  How many people work for
5  Hillside Auto Mall at any one time?
6         A.  How many people work at Auto
7  Mall at any one given time? It varies.
8     Q.  Let's take a day, let's say a
9  weekend day, how many people would be there?
10        A.  Oh, I'm sorry.  I thought you
11 meant in general how many people were part
12 of the employment staff. You just mean
13 daily?
14    Q.  Yes.
15        A.  We could have all together the
16 sales people, me, a porter, 5 or 6.  Again,
17 we had more employees throughout the years,
18 some years we had less employees and I can't
19 give you an accurate answer on that one.
20    Q.  How about back in 2006, how many
21 people would be working at Hillside Auto
22 Mall on any given day?
23        A.  Giving an example, maybe 10 or
24 12 or 13.
25    Q.  How about for Hillside Auto

Page 55

Deana Jennings

1
2  Outlet?  And let's start from 2018.
3         A.  I wouldn't know without my
4  records.
5     Q.  How about in 2020, right before
6  you left, how many people would be working
7  at Hillside Auto Outlet on any given day?
8         A.  I wouldn't know without my
9  records.
10    Q.  Besides yourself, did anyone
11 else work between Hillside Auto Outlet and
12 Hillside Auto Mall at the same time?
13        A.  No.
14    Q.  To your knowledge, if a car is
15 not in stock, it is not present at Hillside
16 Auto Outlet lot, would the car salespeople
17 come over to Hillside Auto Mall to show cars
18 there?
19        A.  Very seldom did it happen, but
20 we had a few other car dealerships on
21 Hillside Avenue.  So, we had a variety and
22 we usually, if the customer wanted a
23 specific car, we would look and see who had
24 the car in inventory, Hillside Auto Mall or
25 Hillside Auto Outlet or previous dealerships

Page 56

Deana Jennings

1
2  around, such as auctions or dealerships out
3  of state.
4     Q.  Are you familiar with the
5  plaintiff in this case Leticia Stidhum?
6     A.  Yes.
7     Q.  How are you familiar with her?
8     A.  She was employed at Hillside
9  Auto Outlet.
10    Q.  Do you have any knowledge about
11 her working schedule?
12    A.  I do not.
13    Q.  Do you have any knowledge about
14 her work performance?
15        A.  From what I have heard, she was
16 a very good salesperson, maybe one of the
17 top salespeople, monthly.
18    Q.  Where did you hear that from?
19    A.  Probably Isaac.
20    Q.  To your knowledge, was she ever
21 disciplined?
22        A.  I wouldn't know, I wouldn't be
23 part of that.  So, I can't give you an
24 answer on that one.  I am not part of the
25 disciplinary action department.

Page 57

Deana Jennings

1
2     Q.  Who was part of the
3  ''disciplinary action department?''
4         A.  Isaac handled that.
5         MR. KATAEV:  Objection to
6     the form.
7     Q.  Did Hillside Auto Mall and/or
8  Hillside Auto Outlet have any policies about
9  keeping track of employee performances?
10        A.  I wouldn't know off the top of
11 my head.
12    Q.  Were the employee photos that
13 you previously described for us, was there
14 ever a time there would be a performance
15 evaluation there in that set of records?
16        A.  Hillside Auto Mall, no, Hillside
17 Auto Outlet, I wouldn't know.
18    Q.  Are you familiar with a DMV
19 clerk who worked for Hillside Auto Outlet
20 whose first name is Lily?
21        A.  No.
22    Q.  Do you know that Lily left
23 Hillside Auto Outlet while pregnant and that
24 she believed that she was terminated as a
25 result of her pregnancy?

Case 1:21-cv-07163-OEM-LB   Document 87-6   Filed 09/01/23   Page 16 of 23 PageID #: 1047

58–61

Page 58

Deana Jennings

1
2       MR. KATAEV:  Objection as
3   to relevance and it's a
4   compound question.  You can
5   answer the question.
6       A.  I don't even recall who Lily
7   was.  So, I don't know anything about it,
8   really.
9       MR. KATAEV:  Also
10  objection to that as it calls
11  for a state of mind of
12  another person.
13      MS. TROY:  Let's go off
14  the record.
15      (A discussion was held off
16  the record).
17      Q.  You mentioned that the BDC also
18  had employees folders, was that one folder
19  or two folders at Hillside Auto Outlet?
20      A.  I don't recall.
21      Q.  Is it fair to say that if an
22  individual was at Hillside Auto Outlet that
23  that record would include, their records
24  would be in the employee files?
25      A.  Their employment package and

Page 59

Deana Jennings

1
2   their application would be in there, in that
3   employee file.  I don't recall how they
4   filed commission sheets or how they kept
5   them in the folders or whatnot at Hillside
6   Auto Mall.  There were two separate folders
7   there.
8       Q.  To your knowledge, was there any
9   fixed break time for the employees at either
10  Hillside Auto Outlet or Hillside Auto Mall?
11      A.  No, they could just take a break
12  whenever they wanted.
13      Q.  Could you tell what type of
14  employee a person is by looking at a pay
15  stub and seeing how much that person had
16  made as a base wage as well as the flat
17  commission that you were talking about;
18  specifically, I'm talking about Hillside
19  Auto Outlet.
20      MR. KATAERV:  Objection to
21  the form, as its compound.
22  You can answer.
23      A.  That's a lot of question.  You
24  could see who is more veteran in the sales
25  department, and -- you could tell if

Page 60

Deana Jennings

1
2   somebody just started, the top sales for the
3   company, it tells that, and then you really
4   can't gauge it precisely with numbers.
5       Q.  Were there any car salespeople
6   who were paid a base pay of $350 per week?
7       A.  I can't answer that without my
8   records.
9       Q.  How about a weekly pay of $500.
10      A.  That might have been -- again, I
11  wouldn't know the correct answer without my
12  records.
13      Q.  Are you familiar with an
14  individual known as Andris Guzman?
15      A.  Yes.
16      Q.  How are you familiar with him?
17      A.  He was employed at Hillside Auto
18  Outlet.
19      Q.  What was his performance as a
20  sales manager/or general sales manager at
21  Hillside Auto Outlet?
22      A.  I wouldn't know, but I heard
23  good things about him.
24      Q.  What did you hear?
25      A.  Professional, helping everybody

Page 61

Deana Jennings

1
2   out, jumping in and got the job done.
3       Q.  Were you at Hillside Auto Outlet
4   when Leticia Stidhum brought in a sonogram
5   and announced that she was pregnant?
6       A.  No.
7       MR. KATAEV:  Objection.
8   Assuming facts not in
9   evidence.
10      Q.  When was the first day when you
11  heard that Leticia was pregnant?
12      MR. KATAEV:  Objection.
13  It assumes facts not in
14  evidence.  You can answer the
15  question.
16      A.  I can't recall that long ago.
17      Q.  Do you recall if at the time
18  when you found out that Leticia was
19  pregnant, if she was still employed by
20  Hillside Auto Outlet.
21      MR. KATAEV:  Same
22  objection.  You can answer.
23      A.  I believe she was pregnant and
24  still employed at Hillside Auto Outlet.
25      Q.  How did you find out?

A0430

62—65

**Page 62**

Deana Jennings

1
2    A. About her pregnancy?
3    Q. Correct?
4    A. I can't recall. I don't know if
5    I heard it from her when I was there one
6    day, I don't recall.
7    Q. Besides yourself, who else knew
8    about her pregnancy?
9    MR. KATAEV: Objection.
10    Q. (Continuing) My timing is while
11    she was still employed at Hillside Auto
12    Outlet.
13    MR. KATEV: Objection.
14    Calls for a state of mind of
15    another person. You can
16    answer.
17    A. I don't know exactly who now,
18    who she told.
19    Q. Was Isaac aware?
20    A. I'm sure he was.
21    Q. Why do you say that?
22    MR. KATAEV: Same
23    Objection.
24    A. Because he was the general
25    manager. You just mentioned that she

**Page 63**

Deana Jennings

1
2    brought in the sonogram to the dealership,
3    Isaac worked seven days a week.
4    Q. How about Andris Guzman, did he
5    know of Leticia's pregnancy, to your
6    knowledge?
7    A. I don't know if he was aware
8    when she became pregnant.
9    Q. Did you look at her sales or
10    commissions and compare her sales before and
11    after the pregnancy announcement?
12    A. No.
13    Q. I'm showing you a series of
14    documents, Plaintiff's Exhibit 2. It is
15    page 1251, and it's the 1099 compensation or
16    a week is $2,500. Do you know who this
17    individual is?
18    A. I can't recall.
19    Q. Do you know what position this
20    person is in?
21    MR. KATAEV: Objection as
22    to relevance. You can
23    answer.
24    A. No.
25    Q. We're on page 1252, this

**Page 64**

Deana Jennings

1
2    individual was paid $650 a week. Do you
3    know what position this individual is in?
4    A. No.
5    Q. Now looking at page 1254, number
6    2, is it fair to say, and let's backtrack
7    for a second. My question is: what position
8    did this individual have?
9    A. I can't tell.
10    Q. How about this individual on
11    page 1255?
12    A. I can't tell from the picture.
13    Q. However the individual on page
14    1256 with a base salary of $200?
15    A. Again, I can't tell.
16    Q. The individual on page 1257 with
17    a base salary of 300?
18    A. I can't tell.
19    Q. Is there any individual for whom
20    you can tell which position the individual
21    is in just by looking at the pay stub?
22    A. Just the earnings? I can't tell
23    based on what is shown in the documents.
24    Q. Just for the record, Isaac
25    Thanwalla said during his deposition that he

**Page 65**

Deana Jennings

1
2    was also unable to tell which position the
3    individuals were in, and the redacted
4    records that were produced for the
5    comparator of Leticia Stidhum. At the time,
6    he said that he would ask the accountant and
7    look at that and provide the information to
8    this office. To this day, no information
9    has been provided and we're now doing the
10    30(b)6 witness. It seems like the corporate
11    witness's representative, is also unable to
12    provide the information. But, with respect
13    to the comparators that were employed.
14    MS. TROY: Demand number
15    20 for the employee files of
16    Leticia Stidhum, including
17    the sales commissions sheet
18    that was previously requested
19    or not provided.
20    Demand number 21 is the
21    employee file for the DMV
22    clerk Lily, who was fired at
23    the time that she was
24    pregnant. We don't need all
25    the files, we just need

66–69

Page 66

Deana Jennings

1
2  anyone with information,
3  written documents relating to
4  her discipline as well as her
5  termination that is on file.
6      MR. KATAEV:  Please
7  follow-up in writing.
8      MS. TROY:  Also the last
9  name and her last name and
10  last known address.
11     MS. TROY:  Do you guys
12  want to take a 10 minute
13  break or do you want to take
14  a lunch break?  It's up to
15  you guys.
16     MR. KATAEV:  10 minutes is
17  fine.
18     MS. TROY:  Let's come back
19  in 10 minutes, let's come
20  back at 11:55.
21     (A recess was taken from
22  11:44 a.m. until 11:54 a.m.)
23     MS. TROY:  We are back on
24  the record at 11:54.  Let's
25  continue.

Page 67

Deana Jennings

1
2      Demand number 22 will be
3  the office records pertaining
4  to the number of cars sold at
5  Hillside Auto Outlet, and
6  specifically for Leticia
7  Stidhum and the other car
8  salespeople, and that would
9  be October, 2018 until
10  February of 2019.
11     MR. KATAEV:  Please put
12  those demands in writing.
13  Thank you.
14  Q.  Are you familiar with the
15  Dealertrak system?
16  A.  Yes.
17  Q.  To your knowledge, who has
18  access to the Dealertrak system at Hillside
19  Auto Outlet in 2018?
20  A.  To the best of my knowledge,
21  it's the manager, Isaac, the finance
22  managers, and Andris Guzman, Andris Guzman.
23  Q.  You were working for Hillside
24  Auto Outlet, were there times when you would
25  be present on the sales floor?

Page 68

Deana Jennings

1
2  A.  Passing through from the front
3  door to the office, not lingering or sitting
4  there?
5  Q.  Was there ever a time when you
6  would see Leticia Stidhum running the credit
7  on the Dealertrak system?
8  A.  No, not to my knowledge.
9  Q.  To your knowledge, was she ever
10  given access to Dealertrak by Isaac?
11  A.  I wouldn't know if Isaac gave
12  somebody access.  Again, the managers had --
13  I would say it's highly unlikely.
14  Q.  Did Isaac personally train
15  Leticia on how to run credit on the
16  Dealertrak system?
17  A.  I would have no idea.
18  Q.  The cell phone that you left in
19  your car, is that the same cell phone that
20  you used back in 2018 or 2019?
21  A.  No.
22  Q.  What is the phone that you used
23  back in 2018/2019?
24  A.  I don't know iPhone-something 8,
25  I believe.

Page 69

Deana Jennings

1
2  Q.  Do you use an iPhone currently?
3  A.  Yes, I do.
4  Q.  What is your phone number?
5  A.  732-858-2614.
6  Q.  Is that number back in
7  2018/2019?
8  A.  When did I change my number
9  last?  I believe so, but I can't remember.
10  I don't know exactly when I changed it.
11  Q.  While you were the controller of
12  Hillside Auto Outlet, did you communicate
13  with any of the named defendants or the
14  plaintiff by text?
15  A.  I'm sure I have.
16  Q.  Do you still have any of those
17  text messages?
18  A.  No.
19  Q.  Do you know why not?
20  A.  I don't like a long list of
21  messages on my phone.  I have OCD, and I
22  don't like having all of those names.  I try
23  to keep it to who I spoke to and -- on a
24  daily basis, and the list is short.
25  Q.  Were any of the text messages

A0432

70–73

Page 70

Deana Jennings

1
2  with the named defendants about Leticia
3  Stidhum?
4        A.  Do you mean current day?
5        Q.  Let's start from currently, and
6  then we will work our way back.
7        A.  No.  Possibly like for documents
8  for the case.
9        Q.  How about back in 2018 and 2019?
10       A.  Not that I can recall.  I don't
11 really have interaction with the salespeople
12 like that, usually something -- that's
13 something that the manager can help them if
14 they have a question or something where you
15 ask a manager to help you.
16       Q.  What was your email back then in
17 2018/2019?
18       A.  D-E-E 216456@aol.com.
19       Q.  Through your aol email address,
20 did you ever send emails to or from any of
21 the named defendants about Leticia?
22       A.  No, not back then.  Maybe
23       pertaining to the case.
24       Q.  Do you have a work email as
25 well?

Page 71

Deana Jennings

1
2        A.  No.  We had one, but I don't use
3  it and we didn't continue the subscription
4  for the Gmail account.
5        Q.  Are you familiar with Auto
6  Funds?
7        A.  To an extent.
8        Q.  To your knowledge, what is Auto
9  Funds?
10       A.  I believe it's the company that
11 feeds our inventory to our computer website.
12       Q.  To your knowledge, did Leticia,
13 would Leticia ever be given access to Auto
14 Funds?
15       A.  I wouldn't know the answer to
16 that question.
17       Q.  I'm now showing you on the
18 screen what was marked as Plaintiff's
19 Exhibit 2, and we are on page 2.  I'm going
20 to scroll down.
21            (Ms. Troy complies).
22       You recognize this document on page 2?
23       A.  It looks like maybe VIN
24 Solutions, but I really can't tell.  I don't
25 deal with the leads with respect to the

Page 72

Deana Jennings

1
2  dealership.  It looks like VIN Solutions.
3        Q.  Is it fair to say that VIN
4  Solutions understated the number of cars
5  sold?
6            MR. KATAEV:  Objection as
7            to the form.  There was no
8            evidence --
9        A.  I don't know if it's accurate,
10 but they do keep some of what a total for
11 the interaction of the sales customers with
12 the sales records.
13       Q.  Was the bookkeeper the same as
14 the assistant office manager at Hillside
15 Auto Outlet?
16       A.  I don't know.
17       Q.  Do you have the names?
18       A.  Yes, Asha.
19       Q.  Who else?
20       A.  Just her.  What was her
21 position, is it just bookkeeper?
22       A.  She was the bookkeeper and I
23 don't know If she had the title of office
24 manager.  They are mainly the same thing,
25 just bookkeeper, I would say.

Page 73

Deana Jennings

1
2        Q.  Are you familiar with an
3  individual whose name is Ali A-L-I?
4        A.  Ali used to work at Outlet.
5        Q.  What was his position?
6        A.  I think he was manager of some
7  sort.
8        Q.  Let's backtrack for a second: do
9  you have use of any social media platforms
10 like WhatsApp or Facebook Messenger to
11 checks with any of the named defendants?
12            MR. KATAEV:  Objection to
13            the assent that this was not
14            something that she can answer
15            in her capacity as a 30(b)6
16            witness.
17       A.  I don't really message people on
18 social media, I am more of a texter or
19 calling person.  So, I am pretty sure none
20 of them have -- I don't have social media
21 really, I don't have WhatsApp and I don't
22 keep that up.  Maybe my landlord uses that
23 for me, but that's it.
24       Q.  Did Leticia at any point to tell
25 you personally about her pregnancy?

74–77

Page 74

Deana Jennings

1
2    A. Again, I don't recall how I
3  found out. I think I remember knowing about
4  it and congratulating her, but I don't know
5  how I found out whether it's from her or
6  someone else, being aware that she was
7  pregnant at that time.
8    Q. Do you recall if this was before
9  or after Christmas when you congratulated
10  her?
11    A. I can't recall.
12    Q. How about before or after
13  Thanksgiving?
14    A. I can't recall.
15    Q. Was it before or after New
16  Year's?
17    A. I can't recall.
18    Q. Do you recall when Isaac made
19  his trip to Pakistan in 2018, December?
20    A. I believe it was -- there was a
21  few dates that he went.
22    Q. I'm asking you about December of
23  2018.
24    A. No, I just know it was the end
25  of December. I believe he was gone for a

Page 75

Deana Jennings

1
2  couple of weeks.
3    MS. TROY: Maybe now will
4    be a good time for us to take
5    a quick lunch break. It is
6    now 12:10 and let's come back
7    at 12:55.
8    MR. KATAEV: That should
9    be fine.
10    (A recess was taken from
11    12:10 p.m. until 12:55 p.m.)
12    MS. TROY: We're back on
13    the record at 12:55
14    Q. We are almost done. Let's go
15  back on the record, and Ms. Jennings, can
16  you let me know who the CPA is for Hillside
17  Auto Mall?
18    A. Hillside Auto Mall?
19    Q. Right.
20    MR. KATAEV: Objection.
21    You can answer.
22    A. I would have to check my records
23  depending on the year, who should be the
24  accountant because it fluctuates.
25    Q. How about for Hillside Auto

Page 76

Deana Jennings

1
2  Outlet?
3    A. Pretty much the same thing. It
4  fluctuates depending on the year, which
5  owner decided to go with which company.
6    Q. Do you recall in 2018/2019 who
7  the CPA?
8    A. I can't recall without my
9  records that far back.
10    MS. TROY: Demand number
11    23 will be documents
12    sufficient to establish the
13    name and address of the
14    accountants for Hillside Auto
15    Mall in 2018/ 2019.
16    Demand 24 will be for
17    documents sufficient to
18    identify the CPA for Hillside
19    Auto Outlet for 2018/2019.
20    Q. Ms. Jennings, when were you told
21  to not bring your cellphone to the
22  deposition?
23    MR. KATAEV: Objection.
24    With the caveat that if you
25    had any conversations with

Page 77

Deana Jennings

1
2    your attorney about the
3    subject, I instruct you not
4    to answer.
5    A. (No response.)
6    Q. Did anyone besides your attorney
7  tell you not to bring this cell phone to
8  this deposition today?
9    A. No. I left it charging in my
10  car because I needed the navigation to come
11  here from New Jersey. I did not unplug my
12  phone from my charger.
13    Q. Are you aware that during the
14  break I made a request to your attorney for
15  you to bring your cell phone back to the
16  deposition at or before the end of the lunch
17  break?
18    MR. KATAEV: Objection as
19    to attorney/client privilege.
20    I instruct the witness not to
21    answer the question.
22    MS. TROY: I'm not asking
23    what was said between you and
24    her, I'm asking her if she
25    was aware that there was a

A0434

Case 1:21-cv-07163-OEM-LB   Document 87-6   Filed 09/01/23   Page 21 of 23 PageID #: 1052

78–81

Page 78

Deana Jennings

1
2 demand that was made for the
3 cell phone to be brought back
4 from the car to the
5 deposition.
6     MR. KATAEV:  I'm going to
7 qualify my objection.  If you
8 have any independent
9     knowledge of that, you may
10     answer from your knowledge.
11     If your knowledge is based on
12     my conversations with you,
13     you may not answer.
14     A.  I am confused right now.  I
15 don't recall being notified about anyone's
16 cell phone, it is 30 degrees outside and I'm
17 not walking outside to get it.
18     Q.  Are you familiar with the sales
19 process at Hillside Auto Outlet?
20     A.  To an extent, yes.
21     Q.  What is the sales process, and
22 please break it down into the different
23 components with the approximate time?
24     A.  Well, customer comes in and they
25 proceed and they meet with the salesperson.

Page 79

Deana Jennings

1
2 I don't know how long it takes for them, but
3 they look at a vehicle that they are
4 interested in, and see if it's in their
5 price range. Usually after they land a car,
6 the salesperson gives the sales manager or
7 the manager the corresponding application to
8 submit.  It could take between maybe 15 or
9 20 minutes to maybe 45 minutes to an hour.
10 There is a lot of qualifications and
11 verifications such as pay stubs, identity,
12 Asha, red flags.
13     After that is said and done, then it
14 goes to the finance manager and he will
15 submit everything to the bank.  Then, they
16 will wait for the bank to give them an
17 approval or not.
18     Q.  When you talked about the
19 salesperson would give the sales manager the
20 credit application to submit, is that where
21 the Dealertrak comes in?
22     A.  Yes.
23     Q.  Have you ever seen or do you
24 have knowledge of the fact that other car
25 salespeople's credit applications were

Page 80

Deana Jennings

1
2 prioritized over Leticia Stidhum's customers
3 credit applications?
4     A.  No.
5     Q.  Were you aware of any
6 communications between any of the named
7 defendants with the plaintiff, Leticia
8 Stidhum, about promoting her to a sales
9 manager position?
10     A.  Not that I was made aware of.
11     Q.  Backtracking for a moment, are
12 you familiar with whether customers of
13 Hillside Auto Outlet walked out as a result
14 of the long wait time?
15     A.  No.
16     Q.  Were you aware that Leticia
17 Stidhum complained about the longer wait
18 time?
19     A.  No, not until this case.
20     Q.  Are you a party to any other
21 civil proceeding besides this one?
22     A.  No.
23     MS. TROY:  I have no
24     further questions for you.
25     Thank you, Ms. Jennings.

Page 81

Deana Jennings
[Time noted: 12:54 p.m.]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82–85

| | Page 82 |
|---|---|
| 1 | |
| 2 | WITNESS    EXAMINATION BY         PAGE |
| 3 | Ms. Jennnings    Ms. Troy |
| | 6 |
| 4 | PLAINTIFF EXHIBITS |
| 5 | Number       Description         PAGE |
| 6 | |
| 7 | 20      ID - Deemed marked         6 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 83 |
|---|---|
| 1 | |
| 2 | REQUESTS |
| 3 | Number       Description        PAGE |
| 4 | 22      Demand No. 22 is:       67 |
| 5 | MS. TROY:  Will be |
| 6 | the office records |
| 7 | pertaining to the |
| 8 | number of cars sold |
| 9 | at Hillside Auto Outlet, |
| 10 | and specifically, for |
| 11 | Leticia Stidhum and the |
| 12 | other car salespeople, |
| 13 | and that would be October, |
| 14 | 2018 until February of |
| 15 | 2019. |
| 16 | 23      Demand No. 23 is:       76 |
| 17 | MS. TROY:  Will be |
| 18 | documents sufficient to |
| 19 | establish the name and |
| 20 | address of the accountants |
| 21 | for Hillside Auto Mall in |
| 22 | 2018/2019. |
| 23 | 24      Demand No. 24 is:       76 |
| 24 | MS. TROY:  Will be for |
| 25 | documents sufficient to |

| | Page 84 |
|---|---|
| 1 | |
| 2 | identify the CPA for |
| 3 | Hillside Auto Outlet for |
| 4 | 2018/2019. |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 85 |
|---|---|
| 1 | |
| 2 | QUESTIONS MARKED FOR A RULING:   PAGE/LINE |
| 3 | (None) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

A0436

86–88

Page 86

```
1
2              ACKNOWLEDGMENT
3
4    STATE OF NEW YORK   )
5                        )s.s.
6    COUNTY OF MIDDLESEX )
7         I, DEANA JENNINGS, hereby certify
8    that I have read the transcript of my
9    testimony taken under oath in my deposition
10   of March 10, 2023; that the transcript is a
11   true, complete and correct record of my
12   testimony, and that the answers on the
13   record as given by me are true and correct.
14
15
16        _____
17             DEANA JENNINGS
18
19   Signed and subscribed before me
20   this ____ day of _____, 2023.
21
22
23        _____
24             Notary Public
25
```

Page 87

```
1
2              C E R T I F I C A T E
3
4    STATE OF NEW YORK   )
5                        )s.s.
6    COUNTY OF NASSAU    )
7
8         I, LYNN LUCKMAN, a Shorthand
9    Reporter and Notary Public within and for
10   the State of New York, do certify that;
11        THAT the witness whose deposition
12   is hereinbefore set forth, was duly sworn by
13   me, and that such deposition is a true
14   record of the testimony given by such
15   witness.
16        I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage; that I am in no way
19   interested in the outcome of this matter.
20        IN WITNESS WHEREOF, I have
21   hereunto set my hand this 21st day of March,
22   2023.
23                    Lynn Luckman
24
25                 LYNN LUCKMAN
```

Page 88

```
1    Errata Sheet
2
3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC
4    DATE OF DEPOSITION: 03/10/2023
5    NAME OF WITNESS: DEANA JENNINGS
6    Reason Codes:
7         1. To clarify the record.
8         2. To conform to the facts.
9         3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25             _____
```

A0437

Case: 25-490, 08/06/2025, DktEntry: 46.1, Page 146 of 301

Case 1:21-cv-07163-OEM-LB   Document 87-7   Filed 09/01/23   Page 1 of 3 PageID #: 1055

the call keeps dropping

11/28/2018 8:09 PM

Latisha Outlet (3472560067)

imgoing to call him now

11/28/2018 8:09 PM

iPhone (5) (+16618868012)

Ok

11/30/2018 3:17 PM (Viewed 11/30/2018 3:23 PM)

Latisha Outlet (3472560067)

I am really not feeling well I feel nauseous and I was trying to just hang out but i feel hot and i feel my stomach turning

12/3/2018 11:21 AM (Viewed 12/3/2018 11:22 AM)

Latisha Outlet (3472560067)

Not coming in today?

12/3/2018 11:22 AM

iPhone (5) (+16618868012)

In meeting be. There in 2 hr

12/3/2018 5:16 PM (Viewed 12/3/2018 5:24 PM)

Latisha Outlet (3472560067)

that customers waiting to speak yo uou

12/12/2018 10:26 AM (Viewed 12/12/2018 10:43 AM)

Latisha Outlet (3472560067)



12/12/2018 6:04 PM (Viewed 12/12/2018 6:06 PM)

Latisha Outlet (3472560067)

Im really not feeling well my stomach is turning and i feel extremely nauseous and i keep feeling like i need to puke i cant stay any longer i need to lay down

12/12/2018 6:25 PM

Latisha Outlet (3472560067)

A0438

?

12/12/2018 6:25 PM

iPhone (5) (+16618868012)

No

12/12/2018 6:37 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

Then i guess you are going to have to fire me i been feeling like this since 2 this afternoon ask ali I am not staying so you can let me know if i should be here friday or not. I was just going to leave after i made that deal earlier anyways because you yelling at me cus the customers rushing me saying i cant control my customer but not one of your floor managers came out to help either hearing whats going on and look at that the deal was made anyways

12/12/2018 6:39 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

so it is what is because im
so tired of everyone else getting slack n im here 6 days a week 10 hours a day faithfully maybe 2 or 3 days last month i went home early but other than that i dont even call out n when i do i make up for it unlike everyone else there so like i said you let me know if i should be here friday or not

12/12/2018 6:40 PM

Latisha Outlet (3472560067)

shaun comes 30 mins late everyday francisco dont come till 11 its bullshit

12/12/2018 7:28 PM

iPhone (5) (+16618868012)

You okay

1/7/2019 4:13 PM (Viewed 1/7/2019 4:15 PM)

Latisha Outlet (3472560067)

I left for the day tomorrow we need to talk because this place has been a shit show since you left

1/9/2019 10:17 AM

Latisha Outlet (3472560067)

my commissions sheet is under your keyboards

1/9/2019 10:17 AM

iPhone (5) (+16618868012)



file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs546334684762754... 2/24/2023

A0439

Ok

1/9/2019 10:18 AM (Viewed 1/9/2019 1:01 PM)

Latisha Outlet (3472560067)

mujahid saeed was supposed to be a split between me and Sean but I had took the customer to Transworld and he ended up getting the Transworld insurance the day I was not in and Sean took it upon himself to take the whole hundred so I should be getting paid on that 100%

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

Ashas asking for my commissions

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

u have it

1/10/2019 1:24 PM (Viewed 1/10/2019 1:49 PM)

Latisha Outlet (3472560067)

I just threw up a bunch im feeling very nauseous and this is the type of thing that concerns me
about being in the car business

1/17/2019 8:27 PM (Viewed 1/17/2019 8:29 PM)

Latisha Outlet (3472560067)

You have absolutely no right too take $100 of my
salary money i worked a full week last week and pays one week behind so i should
be receiving another salary check.

1/17/2019 8:30 PM

Latisha Outlet (3472560067)

You fucked me over with my car and i wish you wouldve shown me what you showed me when i bought my car from
you you guys are just a big fucking scam
and for you to call me your daughter and say you love
me and all this bull shit knowing wtf i been going thru this past month you been gone not making shit because your team fucking sucks i work 60 hours a week for 7 months straight no days off n december i slacked because you left and everything went to shit there

You have 90 total messages and 12 total images.

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs546334684762754...   2/24/2023

A0440

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 1 of 64 PageID #: 1058

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2214558 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 05/22/2018 |
|---|---|
| Period Ending: | 05/28/2018 |
| Pay Date: | 06/01/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   1      Tax Override:
State:     1      Federal:
Local:     1      State:
Social Security Number:   XXX-XX-XXXX      Local:

Leticia F Stidhurn
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 300.00 |
| Commission | | | 0.00 | 780.00 |
| Gross Pay | | | $300.00 | $1,080.00 |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | -14.90 | 14.90 |
| Social Security | | -18.60 | 18.60 |
| Medicare | | -4.35 | 4.35 |
| New York State Income | | -5.54 | 5.54 |
| New York Paid Family Leave | | -0.38 | 0.38 |
| New York City R Local | | -4.10 | 4.10 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 0.60 |
| Net Pay | | $251.53 | |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2214558 |
|---|---|
| Pay Date: | 06/01/2018 |

Pay to the
order of:
This amount:

Leticia F Stidhum

TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1187**

A0441

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2214559 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting: 05/22/2018
Period Ending: 05/28/2018
Pay Date: 06/01/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
   Federal: 1        Federal:
   State: 1        State:
   Local: 1        Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 780.00 | 780.00 |
| Gross Pay | | | $780.00 | $1,080.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -71.82 | 86.72 |
| Social Security | -48.36 | 66.96 |
| Medicare | -11.31 | 15.66 |
| New York State Income | -33.14 | 38.68 |
| New York Paid Family Leave | -0.98 | 1.36 |
| New York City R Local | -22.69 | 26.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | | |
|---|---|---|
| | $591.10 | |

Your federal taxable wages this period are $780.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2214559
Pay Date: 06/01/2018

Pay to the order of:   Leticia F Stidhum

This amount:   FIVE HUNDRED NINETY ONE AND 10/100

THIS IS NOT A CHECK

$591.10

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1188**

**A0442**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87QLM 24008135 | 01/200 | 2231441 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 05/29/2018 |
| Period Ending: | 06/04/2018 |
| Pay Date: | 06/08/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1    Tax Override:
State: 1       Federal:
Local: 1       State:
Social Security Number: XXX-XX-XXXX    Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 1205.00 |
| | | | | |
| Gross Pay | | | $300.00 | $1,805.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 101.62 |
| Social Security | -18.60 | 85.56 |
| Medicare | -4.35 | 20.01 |
| New York State Income | -5.54 | 44.22 |
| New York Paid Family Leave | -0.38 | 1.74 |
| New York City R Local | -4.10 | 30.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2231441
Pay Date: 06/08/2018

Pay to the order of:
Leticia F Stidhum

This amount: TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1189**

A0443

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 4 of 64 PageID #: 1061

Company Code    Loc/Dept    Number    Page
RB7QLM 24008135  61200      2231442   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:   05/29/2018
Period Ending:     06/04/2018
Pay Date:          06/08/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
    Federal:    1         Federal:
    State:      1         State:
    Local:      1         Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 425.00 | 1205.00 |
| Gross Pay | | | $425.00 | $1,805.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -29.22 | 130.84 |
| Social Security | -26.35 | 111.91 |
| Medicare | -6.16 | 26.17 |
| New York State Income | -11.33 | 55.55 |
| New York Paid Family Leave | -0.54 | 2.28 |
| New York City R Local | -8.30 | 39.19 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $342.50 |
|---|---|

Your federal taxable wages this period are $425.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2231442
Pay Date:                06/08/2018

Pay to the
order of        Leticia F Stidhum
This amount:    THREE HUNDRED FORTY TWO AND 50/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$342.50



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1190**

A0444

Company Code   Loc/Dept   Number   Page
RB7QLM 24008135   01/200   2243104   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   06/05/2018
Period Ending:   06/11/2018
Pay Date:   06/15/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
   Federal:   1
   State:   1
   Local:   1
Social Security Number:   XXX-XX-XXXX

Tax Override:
   Federal:
   State:
   Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 1505.00 |
| Gross Pay | | | $300.00 | $2,405.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 145.74 |
| Social Security | -18.60 | 130.51 |
| Medicare | -4.35 | 30.52 |
| New York State Income | -5.54 | 61.09 |
| New York Paid Family Leave | -0.38 | 2.66 |
| New York City R Local | -4.10 | 43.29 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2243104
Pay Date:   06/15/2018

Pay to the order of:   Leticia F Stidhum
This amount:   TWO HUNDRED FIFTY ONE AND 53/100

**THIS IS NOT A CHECK**

$251.53

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1191**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2243105 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 06/05/2018 |
|---|---|
| Period Ending: | 06/11/2018 |
| Pay Date: | 06/15/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 1 | Federal: |
| State: 1 | State: |
| Local: 1 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  |  | 0.00 | 900.00 |
| Commission |  | 0.00 | 300.00 | 1505.00 |
| **Gross Pay** |  |  | **$300.00** | **$2,405.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 160.64 |
| Social Security | -18.60 | 149.11 |
| Medicare | -4.35 | 34.87 |
| New York State Income | -5.54 | 66.63 |
| New York Paid Family Leave | -0.38 | 3.04 |
| New York City R Local | -4.10 | 47.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2243105 |
|---|---|
| Pay Date: | 06/15/2018 |

Pay to the order of
This amount

Leticia F Stidhum

TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

$251.53

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1192**

**A0446**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2256576 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 06/12/2018 |
| Period Ending: | 06/18/2018 |
| Pay Date: | 06/22/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   1
State:   1
Local:   1
Social Security Number:   XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1200.00 |
| Commission | | 0.00 | 0.00 | 2165.00 |
| **Gross Pay** | | | **$300.00** | **$3,365.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 175.54 |
| Social Security | -18.60 | 167.71 |
| Medicare | -4.35 | 39.22 |
| New York State Income | -5.54 | 72.17 |
| New York Paid Family Leave | -0.38 | 3.42 |
| New York City R Local | -4.10 | 51.49 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.20 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2256576 |
| Pay Date: | 06/22/2018 |

Pay to the order of:

Leticia F Stidhum

THIS IS NOT A CHECK

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1193**

A0447

**Company Code** RB7QLM 24008135
**Loc/Dept** 01/200
**Number** 2274452
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 06/19/2018
Period Ending: 06/25/2018
Pay Date: 06/29/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
    Federal: 1
    State: 1
    Local: 1
Social Security Number: XXX-XX-XXXX

Tax Override:
    Federal:
    State:
    Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1500.00 |
| Commission | | | 0.00 | 2780.00 |
| Gross Pay | | | $300.00 | $4,280.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 247.86 |
| Social Security | -18.60 | 227.23 |
| Medicare | -4.35 | 53.14 |
| New York State Income | -5.54 | 103.25 |
| New York Paid Family Leave | -0.38 | 4.63 |
| New York City R Local | -4.10 | 73.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 5.40 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2274452
Pay Date: 06/29/2018

Pay to the order of:
Leticia F Stidhum

This amount: TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1194**

A0448

**Company Code** RB7QLM 24008135
**Loc/Dept** 01/200
**Number** 2274453
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 06/19/2018 |
| Period Ending: | 06/25/2018 |
| Pay Date: | 06/29/2018 |

**Business Phone:** 732-979-6956

| Taxable Marital Status: | Single |
| Exemptions/Allowances: | Tax Override: |
| Federal: 1 | Federal: |
| State: 1 | State: |
| Local: 1 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1500.00 |
| Commission | | 0.00 | 615.00 | 2780.00 |
| Gross Pay | | | $615.00 | $4,280.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -52.02 | 299.88 |
| Social Security | -38.13 | 265.36 |
| Medicare | -8.92 | 62.06 |
| New York State Income | -22.69 | 125.94 |
| New York Paid Family Leave | -0.77 | 5.40 |
| New York City R Local | -15.84 | 89.14 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.00 |

| Net Pay | $476.03 |

Your federal taxable wages this period are $615.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2274453 |
| Pay Date: | 06/29/2018 |

**Pay to the order of** Leticia F Stidhum
**This amount:** FOUR HUNDRED SEVENTY SIX AND 03/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$476.03

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1195**

A0449

Company Code   Loc/Dept   Number   Page
RB7QLM 24008135   01/200   2287432   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:   06/26/2018
Period Ending:   07/02/2018
Pay Date:   07/06/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:      Tax Override:
Federal:   1      Federal:
State:   1      State:
Local:   1      Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 1800.00 |
| Commission | | 0.00 | 0.00 | 3435.00 |
| **Gross Pay** | | | **$300.00** | **$5,235.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 314.78 |
| Social Security | -18.60 | 283.96 |
| Medicare | -4.35 | 66.41 |
| New York State Income | -5.54 | 131.48 |
| New York Paid Family Leave | -0.38 | 5.78 |
| New York City R Local | -4.10 | 93.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.60 |

| **Net Pay** | **$251.53** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2287432
Pay Date:   07/06/2018

Pay to the order of:   Leticia F Stidhum
This amount:   TWO HUNDRED FIFTY ONE AND 53/100

$251.53

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1196**

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 11 of 64 PageID #: 1068

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2287433 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 06/26/2018
Period Ending: 07/02/2018
Pay Date: 07/06/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
   Federal:  1                  Federal:
   State:    1                  State:
   Local:    1                  Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1800.00 |
| Commission | | 0.00 | 655.00 | 3435.00 |
| **Gross Pay** | | | **$655.00** | **$5,235.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -56.82 | 371.60 |
| Social Security | -40.61 | 324.57 |
| Medicare | -9.50 | 75.91 |
| New York State Income | -25.22 | 156.70 |
| New York Paid Family Leave | -0.83 | 6.61 |
| New York City R Local | -17.50 | 110.74 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 7.20 |

| Net Pay | $503.92 |
|---|---|

Your federal taxable wages this period are $655.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2287433
Pay Date: 07/06/2018

Pay to the order of:
This amount:

Leticia F Stidhum

FIVE HUNDRED THREE AND 92/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$503.92



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1197**

A0451

| Company Code | Loc/Dept | Number | Page |
| --- | --- | --- | --- |
| RB7QLM 24008135 | 01/200 | 2299782 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 07/03/2018 |
| Period Ending: | 07/09/2018 |
| Pay Date: | 07/13/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
   Federal:   1   Federal:
   State:   1   State:
   Local:   1   Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
| --- | --- | --- | --- | --- |
| Regular | | 0.00 | 300.00 | 2100.00 |
| Commission | | | 0.00 | 3435.00 |
| Gross Pay | | | $300.00 | $5,535.00 |

| Statutory Deductions | this period | year to date |
| --- | --- | --- |
| Federal Income | -14.90 | 386.50 |
| Social Security | -18.60 | 343.17 |
| Medicare | -4.35 | 80.26 |
| New York State Income | -5.54 | 162.24 |
| New York Paid Family Leave | -0.38 | 6.99 |
| New York City R Local | -4.10 | 114.84 |

| Voluntary Deductions | this period | year to date |
| --- | --- | --- |
| New York voluntary disability | -0.60 | 7.80 |

| Net Pay | $251.53 |
| --- | --- |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2299782 |
| Pay Date: | 07/13/2018 |

Pay to the order of:

Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

$251.53

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1198**

A0452

**Earnings Statement**

Company Code: RB7QLM 2400 / 8135
Loc/Dept: 01/200
Number: 2313208
Page: 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 07/10/2018
Period Ending: 07/16/2018
Pay Date: 07/20/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
| | | Tax Override: | |
|---|---|---|---|
| Federal: | 1 | Federal: | |
| State: | 1 | State: | |
| Local: | 1 | Local: | |

Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 300.00 | 2400.00 |
| Commission | 0.00 | 0.00 | 4335.00 |
| **Gross Pay** | | | **$300.00** | **$6,735.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 401.40 |
| Social Security | -18.60 | 361.77 |
| Medicare | -4.35 | 84.61 |
| New York State Income | -5.54 | 167.78 |
| New York Paid Family Leave | -0.38 | 7.37 |
| New York City R Local | -4.10 | 118.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 8.40 |

| **Net Pay** | **$251.53** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2313208
Pay Date: 07/20/2018

Pay to the order of: Leticia F Stidhum
This amount: TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1199**

A0453

Case 1:21-cv-07163-OEM-LB Document 87-8 Filed 09/01/23 Page 14 of 64 PageID #: 1071

Company Code  Loc/Dept  Number  Page
RB7QLM 24008135  01/200  2313209  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting:  07/10/2018
Period Ending:  07/16/2018
Pay Date:  07/20/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  1  Federal:
State:  1  State:
Local:  1  Local:
Social Security Number:  XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 2400.00 |
| Commission | | 0.00 | 900.00 | 4335.00 |
| **Gross Pay** | | | **$900.00** | **$6,735.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -86.70 | 488.10 |
| Social Security | -55.80 | 417.57 |
| Medicare | -13.05 | 97.66 |
| New York State Income | -40.73 | 208.51 |
| New York Paid Family Leave | -1.13 | 8.50 |
| New York City R Local | -27.67 | 146.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.00 |

| **Net Pay** | **$674.32** |
|---|---|

Your federal taxable wages this period are $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2313209
Pay Date:  07/20/2018

Pay to the order of  Leticia F Stidhum

This amount:  SIX HUNDRED SEVENTY FOUR AND 32/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$674.32



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1200**

A0454

Company Code: RB7QLM 24008135
Loc/Dept: 01/200
Number: 2328014
Page: 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 07/17/2018
Period Ending: 07/23/2018
Pay Date: 07/27/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 1
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 2700.00 |
| Commission | | 0.00 | 0.00 | 5735.00 |
| Gross Pay | | | $300.00 | $8,435.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 503.00 |
| Social Security | -18.60 | 436.17 |
| Medicare | -4.35 | 102.01 |
| New York State Income | -5.54 | 214.05 |
| New York Paid Family Leave | -0.38 | 8.88 |
| New York City R Local | -4.10 | 150.71 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.60 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2328014
Pay Date: 07/27/2018

Pay to the order of:
This amount:

Leticia F Stidhum

TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1201**

A0455

**Earnings Statement**

ADP

| Company Code | Loc/Dect | Number | Page |
|---|---|---|---|
| RB7QLM 2400B135 | 01/200 | 2328015 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:  07/17/2018
Period Ending:  07/23/2018
Pay Date:  07/27/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
  Federal:  1
  State:  1
  Local:  1
Social Security Number:  XXX-XX-XXXX

Tax Override:
  Federal:
  State:
  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 2700.00 |
| Commission | | 0.00 | 1400.00 | 5735.00 |
| **Gross Pay** | | | **$1,400.00** | **$8,435.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -196.70 | 699.70 |
| Social Security | -86.80 | 522.97 |
| Medicare | -20.30 | 122.31 |
| New York State Income | -72.38 | 286.43 |
| New York Paid Family Leave | -1.76 | 10.64 |
| New York City R Local | -48.56 | 199.27 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.29 |

| Net Pay | $972.90 |
|---|---|

Your federal taxable wages this period are $1,400.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2328015
Pay Date:  07/27/2018

Pay to the order of:  Leticia F Stidhum
This amount:  NINE HUNDRED SEVENTY TWO AND 90/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$972.90



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1202**

**A0456**

Company Code   Loc/Dept   Number   Page
RB7QLM 24008135   01/200   2344174   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   07/24/2018
Period Ending:   07/30/2018
Pay Date:   08/03/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   1   Federal:
State:   1   State:
Local:   1   Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3000.00 |
| Commission | | 0.00 | 0.00 | 6185.00 |
| **Gross Pay** | | | **$300.00** | **$9,185.00** |

| Statutory Deductions | | | this period | year to date |
|---|---|---|---|---|
| Federal Income | | | -14.90 | 714.60 |
| Social Security | | | -18.60 | 541.57 |
| Medicare | | | -4.35 | 126.66 |
| New York State Income | | | -5.54 | 291.97 |
| New York Paid Family Leave | | | -0.38 | 11.02 |
| New York City R Local | | | -4.10 | 203.37 |

| Voluntary Deductions | | | this period | year to date |
|---|---|---|---|---|
| New York voluntary disability | | | -0.60 | 10.80 |

| **Net Pay** | | | **$251.53** | |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2344174
Pay Date:   08/03/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1203**

A0457

**Company Code** RB7QLM 24008135
**Loc/Dept** 01/200
**Number** 234417S
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 07/24/2018
Period Ending: 07/30/2018
Pay Date: 08/03/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State: 1
  Local: 1
Social Security Number: XXX-XX-XXXX

Tax Override:
  Federal:
  State:
  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3000.00 |
| Commission | | 0.00 | 450.00 | 6185.00 |
| **Gross Pay** | | | **$450.00** | **$9,185.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -32.22 | 746.82 |
| Social Security | -27.90 | 569.47 |
| Medicare | -6.52 | 133.18 |
| New York State Income | -12.79 | 304.76 |
| New York Paid Family Leave | -0.57 | 11.59 |
| New York City R Local | -9.28 | 212.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 11.40 |

| **Net Pay** | **$360.12** |
|---|---|

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2344175
Pay Date: 08/03/2018

Pay to the order of: Leticia F Stidhum
This amount: THREE HUNDRED SIXTY AND 12/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$360.12

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1204**

**A0458**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2356900 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:  07/31/2018
Period Ending:  08/06/2018
Pay Date:  08/10/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  3  Federal:
State:  3  State:
Local:  3  Local:
Social Security Number:  XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3300.00 |
| Commission | | | 0.00 | 6485.00 |
| Gross Pay | | | $300.00 | $9,785.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 588.07 |
| Medicare | -4.35 | 137.53 |
| New York State Income | -4.00 | 308.76 |
| New York Paid Family Leave | -0.38 | 13.97 |
| New York City R Local | -3.00 | 215.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 12.00 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2356900
Pay Date:  08/10/2018

Pay to the
order of:
This amount:  Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1205**

A0459

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 20 of 64 PageID #: 1077

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2356901 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 07/31/2018
Period Ending: 08/06/2018
Pay Date: 08/10/2018

Business Phone: 732-979-6656

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 3   Tax Override:
  State: 3     Federal:
  Local: 3     State:
Social Security Number: XXX-XX-XXXX  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3300.00 |
| Commission | | 0.00 | 300.00 | 6485.00 |
| Gross Pay | | | $300.00 | $9,785.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 606.67 |
| Medicare | -4.35 | 141.88 |
| New York State Income | -4.00 | 312.76 |
| New York Paid Family Leave | -0.38 | 12.35 |
| New York City R Local | -3.00 | 218.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 12.60 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2356901
Pay Date: 08/10/2018

Pay to the order of:
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1206**

A0460

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 21 of 64 PageID #: 1078

Company Code    Loc/Dept    Number    Page
RB7 QLM 24008135   01/200   2384431   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:    08/14/2018
Period Ending:      08/20/2018
Pay Date:           08/24/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:
  Federal:    3        Tax Override:
  State:      3        Federal:
  Local:      3        State:
  Social Security Number:    XXX-XX-XXXX    Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3900.00 |
| Commission | | | 0.00 | 7935.00 |
| Gross Pay | | | $300.00 | $11,835.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 643.87 |
| Medicare | -4.35 | 150.58 |
| New York State Income | -4.00 | 320.76 |
| New York Paid Family Leave | -0.38 | 13.11 |
| New York City R Local | -3.00 | 224.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 13.80 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2384431
Pay Date:                08/24/2018

Pay to the order of:    Leticia F Stidhum

This amount:    TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1207**

A0461

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 22 of 64 PageID #: 1079

Company Code  Loc/Dept  Number  Page
R87 GLM 24008135  012200  2384432  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting:  08/14/2018
Period Ending:  08/20/2018
Pay Date:  08/24/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:  3  Tax Override:
State:  3  Federal:
Local:  3  State:
Social Security Number:  XXX-XX-XXXX  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3900.00 |
| Commission | | 0.00 | 1490.00 | 7935.00 |
| **Gross Pay** | | | **$1,490.00** | **$11,835.00** |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | -172.59 | 919.41 |
| Social Security | | -89.90 | 733.77 |
| Medicare | | -21.03 | 171.61 |
| New York State Income | | -73.13 | 393.87 |
| New York Paid Family Leave | | -1.83 | 14.94 |
| New York City R Local | | -49.05 | 273.70 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 14.40 |

| **Net Pay** | | **$1,041.89** | |

Your federal taxable wages this period are $1,490.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2384432
Pay Date:  08/24/2018

Pay to the
order of  Leticia F Stidhum
This amount:  ONE THOUSAND FORTY ONE AND 89/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$1,041.89

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

This amount  TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

JPMorgan Chase Bank,
N.A.
162 Fifth Avenue
New York, NY 10010

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1208**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2384432 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 08/14/2018
Period Ending: 08/20/2018
Pay Date: 08/24/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3     Tax Override:
State: 3       Federal:
Local: 3       State:
Social Security Number: XXX-XX-XXXX     Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 3900.00 |
| Commission | | 0.00 | 1450.00 | 7935.00 |
| **Gross Pay** | | | **$1,450.00** | **$11,835.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -172.59 | 919.41 |
| Social Security | -89.90 | 733.77 |
| Medicare | -21.03 | 171.61 |
| New York State Income | -73.11 | 393.87 |
| New York Paid Family Leave | -1.83 | 14.94 |
| New York City R Local | -49.05 | 273.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.40 |

| Net Pay | $1,041.89 |
|---|---|

Your federal taxable wages this period are $1,450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

Payroll Check Number: 2384432
Pay Date: 08/24/2018

Pay to the order of:
This amount:

Leticia F Stidhum

ONE THOUSAND FORTY ONE AND 89/100

THIS IS NOT A CHECK

$1,041.89

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1209**

A0463

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87/QLM 24008135 | 01/200 | 2398317 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 08/21/2018 |
|---|---|
| Period Ending: | 08/27/2018 |
| Pay Date: | 08/31/2018 |

Business Phone:   732-979-6856

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4200.00 |
| Commission | | | 0.00 | 9135.00 |
| **Gross Pay** | | | **$300.00** | **$13,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 919.41 |
| Social Security | -18.60 | 752.37 |
| Medicare | -4.35 | 175.96 |
| New York State Income | -4.00 | 397.87 |
| New York Paid Family Leave | -0.38 | 15.32 |
| New York City R Local | -3.00 | 276.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 15.00 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2398317 |
|---|---|
| Pay Date: | 08/31/2018 |

Pay to the order of:
This amount:
Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1210**

A0464

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 25 of 64 PageID #: 1082

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2398318 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

| | |
|---|---|
| Period Starting: | 08/21/2018 |
| Period Ending: | 08/27/2018 |
| Pay Date: | 08/31/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
| | | Tax Override: |
|---|---|---|
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |

Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 4200.00 |
| Commission | | 0.00 | 1200.00 | 9135.00 |
| **Gross Pay** | | | **$1,200.00** | **$13,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -117.59 | 1037.00 |
| Social Security | -74.40 | 826.77 |
| Medicare | -17.40 | 193.36 |
| New York State Income | -57.29 | 455.16 |
| New York Paid Family Leave | -1.51 | 16.83 |
| New York City R Local | -38.52 | 315.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 15.60 |

| Net Pay | $892.69 |
|---|---|

Your federal taxable wages this period are $1,200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2398318
Pay Date: 08/31/2018

Pay to the order of: Leticia F Stidhum

This amount: EIGHT HUNDRED NINETY TWO AND 69/100

THIS IS NOT A CHECK

$892.69

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1211**

A0465

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2411655 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

| | |
|---|---|
| Period Starting: | 08/28/2018 |
| Period Ending: | 09/03/2018 |
| Pay Date: | 09/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
| | | Tax Override: | |
|---|---|---|---|
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4500.00 |
| Commission | | | 0.00 | 9285.00 |
| Gross Pay | | | $300.00 | $13,785.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1037.00 |
| Social Security | -18.60 | 845.37 |
| Medicare | -4.35 | 197.71 |
| New York State Income | -4.00 | 459.16 |
| New York Paid Family Leave | -0.38 | 17.21 |
| New York City R Local | -3.00 | 318.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.20 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

| Payroll Check Number: | 2411655 |
|---|---|
| Pay Date: | 09/07/2018 |

Pay to the order of:
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1212**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2411656 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| Period Starting: | 08/28/2018 |
|---|---|
| Period Ending: | 09/03/2018 |
| Pay Date: | 09/07/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
| | | Tax Override: |
|---|---|---|
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 4500.00 |
| Commission | | 0.00 | 150.00 | 9285.00 |
| Gross Pay | | | $150.00 | $13,785.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1037.00 |
| Social Security | -9.30 | 854.67 |
| Medicare | -2.17 | 199.88 |
| New York State Income | 0.00 | 459.16 |
| New York Paid Family Leave | -0.19 | 17.40 |
| New York City R Local | 0.00 | 118.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.80 |

| Net Pay | $137.74 |
|---|---|

Your federal taxable wages this period are $150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2411656
Pay Date: 09/07/2018

Pay to the order of:
This amount:

Leticia F Stidhum

ONE HUNDRED THIRTY SEVEN AND 74/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$137.74

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1213**

A0467

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2425988 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 09/04/2018 |
|---|---|
| Period Ending: | 09/10/2018 |
| Pay Date: | 09/14/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
| | | Tax Override: |
|---|---|---|
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |

Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4800.00 |
| Commission | | 0.00 | 0.00 | 9735.00 |
| **Gross Pay** | | | **$300.00** | **$14,535.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1037.00 |
| Social Security | -18.60 | 873.27 |
| Medicare | -4.35 | 204.23 |
| New York State Income | -4.00 | 463.16 |
| New York Paid Family Leave | -0.38 | 17.78 |
| New York City R Local | -3.00 | 321.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 17.40 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2425988 |
|---|---|
| Pay Date: | 09/14/2018 |

Pay to the order of:
This amount:   Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1214**

A0468

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 011200 | 2425989 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 09/04/2018 |
|---|---|
| Period Ending: | 09/10/2018 |
| Pay Date: | 09/14/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |  |
|---|---|---|
| Exemptions/Allowances: |  | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |  |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 0.00 | 4800.00 |
| Commission |  | 0.00 | 450.00 | 9735.00 |
| Gross Pay |  |  | $450.00 | $14,535.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1050.94 |
| Social Security | -27.90 | 901.17 |
| Medicare | -6.53 | 210.76 |
| New York State Income | -10.62 | 473.78 |
| New York Paid Family Leave | -0.57 | 18.35 |
| New York City R Local | -7.77 | 328.99 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 18.00 |

| Net Pay |  | $382.07 |
|---|---|---|

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2425989 |
|---|---|
| Pay Date: | 09/14/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   THREE HUNDRED EIGHTY TWO AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$382.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1215**

A0469

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2439114 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 09/11/2018 |
|---|---|
| Period Ending: | 09/17/2018 |
| Pay Date: | 09/21/2018 |

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | Tax Override: | |
|---|---|---|---|
| Exemptions/Allowances: | | Federal: | |
| Federal: | 3 | State: | |
| State: | 3 | Local: | |
| Local: | 3 | | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | $300.00 |
| Commission | | | 0.00 | 10185.00 |
| | | | | |
| **Gross Pay** | | | **$300.00** | **$15,285.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1050.94 |
| Social Security | -18.60 | 919.77 |
| Medicare | -4.35 | 215.11 |
| New York State Income | -4.00 | 477.78 |
| New York Paid Family Leave | -0.38 | 18.73 |
| New York City R Local | -3.00 | 331.99 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 18.60 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2439114 |
|---|---|
| Pay Date: | 09/21/2018 |

Pay to the order of: Leticia F Stidhum

This amount: TWO HUNDRED SIXTY NINE AND 07/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1216**

A0470

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2439115 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 09/11/2018 |
| Period Ending: | 09/17/2018 |
| Pay Date: | 09/21/2018 |

Business Phone:   732-979-6956

| | | |
|---|---|---|
| Taxable Marital Status: | Single | |
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | $100.00 |
| Commission | | 0.00 | 450.00 | 10185.00 |
| Gross Pay | | | $450.00 | $15,285.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1064.88 |
| Social Security | -27.90 | 947.67 |
| Medicare | -6.52 | 221.63 |
| New York State Income | -10.62 | 488.40 |
| New York Paid Family Leave | -0.57 | 19.30 |
| New York City R Local | -7.77 | 339.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 19.20 |

| | |
|---|---|
| Net Pay | $382.08 |

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2439115 |
| Pay Date: | 09/21/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   THREE HUNDRED EIGHTY TWO AND 08/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$382.08

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1217**

A0471

| Company Code | Loc/Dept | Number | Page | Earnings Statement |
|---|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2452874 | 1 of 1 | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 09/18/2018
Period Ending: 09/24/2018
Pay Date: 09/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3       Tax Override:
State: 3         Federal:
Local: 3         State:
Social Security Number: XXX-XX-XXXX   Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | $400.00 |
| Commission | | | 0.00 | 10935.00 |
| Gross Pay | | | $300.00 | $16,335.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1064.88 |
| Social Security | -18.60 | 966.27 |
| Medicare | -4.35 | 225.98 |
| New York State Income | -4.00 | 492.40 |
| New York Paid Family Leave | -0.38 | 19.68 |
| New York City R Local | -3.00 | 342.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 19.80 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

Payroll Check Number: 2452874
Pay Date: 09/28/2018

Pay to the order of: Leticia F Stidhum

This amount: TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1218**

A0472

Case: 25-490, 08/06/2025, DktEntry: 46.1, Page 181 of 301

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2452875 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 09/18/2018 |
| Period Ending: | 09/24/2018 |
| Pay Date: | 09/28/2018 |

Business Phone:    732-979-6958

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | $400.00 |
| Commission | | 0.00 | 750.00 | 10935.00 |
| **Gross Pay** | | | **$750.00** | **$16,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -49.07 | 1113.95 |
| Social Security | -46.50 | 1012.77 |
| Medicare | -10.88 | 236.86 |
| New York State Income | -28.80 | 521.20 |
| New York Paid Family Leave | -0.95 | 20.63 |
| New York City R Local | -19.85 | 362.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 20.40 |

| Net Pay | $593.35 |
|---|---|

Your federal taxable wages this period are $750.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2452875
Pay Date:    09/28/2018

| Pay to the order of | Leticia F Stidhum | |
|---|---|---|
| This amount: | FIVE HUNDRED NINETY THREE AND 35/100 | $593.35 |

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1219**

A0473

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008136 | 01/200 | 2469044 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 09/25/2018 |
| Period Ending: | 10/01/2018 |
| Pay Date: | 10/05/2018 |

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 5700.00 |
| Commission | | | 0.00 | 11685.00 |
| **Gross Pay** | | | **$300.00** | **$17,385.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1113.95 |
| Social Security | -18.60 | 1031.37 |
| Medicare | -4.35 | 241.21 |
| New York State Income | -4.00 | 525.20 |
| New York Paid Family Leave | -0.38 | 21.01 |
| New York City R Local | -3.00 | 365.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 21.00 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2469044 |
|---|---|
| Pay Date: | 10/05/2018 |

Pay to the order of:

Leticia F Stidhum

This amount: TWO HUNDRED SIXTY NINE AND 07/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1220**

A0474

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2469045 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:  09/25/2018
Period Ending:  10/01/2018
Pay Date:  10/05/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:  3
State:  3
Local:  3
Social Security Number:  XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 5700.00 |
| Commission | | 0.00 | 750.00 | 11685.00 |
| Gross Pay | | | $750.00 | $17,385.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -49.07 | 1163.02 |
| Social Security | -46.50 | 1077.87 |
| Medicare | -10.87 | 252.08 |
| New York State Income | -28.80 | 554.00 |
| New York Paid Family Leave | -0.95 | 21.96 |
| New York City R Local | -19.85 | 385.46 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 21.60 |

| Net Pay | $593.36 |
|---|---|

Your federal taxable wages this period are  $750.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2469045
Pay Date:  10/05/2018

Pay to the order of:
This amount:

Leticia F Stidhum

FIVE HUNDRED NINETY THREE AND 36/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$593.36

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1221**

A0475

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87 QLM 24008136 | 01/200 | 2483191 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 10/02/2018
Period Ending: 10/08/2018
Pay Date: 10/12/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3        Tax Override:
State: 3          Federal:
Local: 3          State:
                  Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6000.00 |
| Commission | | | 0.00 | 12585.00 |
| Gross Pay | | | $300.00 | $18,585.00 |

| Statutory Deductions | | | this period | year to date |
|---|---|---|---|---|
| Federal Income | | | 0.00 | 1163.02 |
| Social Security | | | -18.60 | 1096.47 |
| Medicare | | | -4.35 | 256.43 |
| New York State Income | | | -4.00 | 558.00 |
| New York Paid Family Leave | | | -0.38 | 22.34 |
| New York City R Local | | | -3.00 | 388.46 |

| Voluntary Deductions | | | this period | year to date |
|---|---|---|---|---|
| New York voluntary disability | | | -0.60 | 22.20 |

| Net Pay | | | $269.07 | |
|---|---|---|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2483191
Pay Date: 10/12/2018

Pay to the order of: Leticia F Stidhum
This amount: TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1222**

A0476

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2483192 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 10/02/2018 |
|---|---|
| Period Ending: | 10/08/2018 |
| Pay Date: | 10/12/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6000.00 |
| Commission | | 0.00 | 900.00 | 12585.00 |
| Gross Pay | | | $900.00 | $18,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -67.07 | 1230.09 |
| Social Security | -55.80 | 1152.27 |
| Medicare | -13.05 | 269.48 |
| New York State Income | -38.30 | 596.30 |
| New York Paid Family Leave | -1.13 | 23.47 |
| New York City R Local | -26.07 | 414.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.80 |

| Net Pay | $697.98 |
|---|---|

Your federal taxable wages this period are $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2483192 |
|---|---|
| Pay Date: | 10/12/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   SIX HUNDRED NINETY SEVEN AND 98/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$697.98

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1223**

**A0477**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2494294 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 10/09/2018 |
|---|---|
| Period Ending: | 10/15/2018 |
| Pay Date: | 10/19/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 6300.00 |
| Commission | | | 0.00 | 13285.00 |
| Gross Pay | | | $300.00 | $19,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1230.09 |
| Social Security | -18.60 | 1170.87 |
| Medicare | -4.35 | 273.83 |
| New York State Income | -4.00 | 600.30 |
| New York Paid Family Leave | -0.38 | 23.85 |
| New York City R Local | -3.00 | 417.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 23.40 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2494294
Pay Date:   10/19/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1224**

**A0478**

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 39 of 64 PageID #: 1096

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2494295 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 10/09/2018 |
|---|---|
| Period Ending: | 10/15/2018 |
| Pay Date: | 10/19/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:   Tax Override:
  Federal:   3   Federal:
  State:   3   State:
  Local:   3   Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6300.00 |
| Commission | | 0.00 | 700.00 | 13285.00 |
| Gross Pay | | | $700.00 | $19,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -43.07 | 1273.16 |
| Social Security | -43.40 | 1214.27 |
| Medicare | -10.15 | 283.98 |
| New York State Income | -25.64 | 625.94 |
| New York Paid Family Leave | -0.88 | 24.73 |
| New York City R Local | -17.77 | 435.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.00 |

| Net Pay | $558.49 |
|---|---|

Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2494295
Pay Date: 10/19/2018

Pay to the
order of:
This amount:

Leticia F Stidhum

FIVE HUNDRED FIFTY EIGHT AND 49/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$558.49

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1225**

A0479

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 / QLM 24008135 | 01/200 | 2508398 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 10/16/2018
Period Ending: 10/22/2018
Pay Date: 10/26/2018

Business Phone: 732-979-0956

Taxable Marital Status: Single
Exemptions/Allowances:

| | | Tax Override: |
|---|---|---|
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |

Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6600.00 |
| Commission | | | 0.00 | 14085.00 |
| **Gross Pay** | | | **$300.00** | **$20,685.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1273.16 |
| Social Security | -18.60 | 1232.87 |
| Medicare | -4.35 | 288.33 |
| New York State Income | -4.00 | 629.94 |
| New York Paid Family Leave | -0.38 | 25.11 |
| New York City R Local | -3.00 | 438.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.60 |

| **Net Pay** | **$269.07** | |
|---|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2508398
Pay Date: 10/26/2018

Pay to the order of: Leticia F Stidhum

This amount: TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1226**

**A0480**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2508399 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 10/16/2018
Period Ending: 10/22/2018
Pay Date: 10/26/2018

Business Phone: 732-979-6950

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3      Tax Override:
State: 3        Federal:
Local: 3        State:
                Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6600.00 |
| Commission | | 0.00 | 800.00 | 14085.00 |
| Gross Pay | | | $800.00 | $20,685.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -55.07 | 1328.23 |
| Social Security | -49.60 | 1282.47 |
| Medicare | -11.60 | 299.93 |
| New York State Income | -31.97 | 661.91 |
| New York Paid Family Leave | -1.01 | 26.12 |
| New York City R Local | -21.92 | 460.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.20 |

| Net Pay | $628.23 |
|---|---|

Your federal taxable wages this period are $800.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2508399
Pay Date: 10/26/2018

Pay to the order of:   Leticia F Stidhum
This amount:   SIX HUNDRED TWENTY EIGHT AND 23/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$628.23

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1227**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R8 / QLM 24008135 | 01/200 | 2522561 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:  10/23/2018
Period Ending:  10/29/2018
Pay Date:  11/02/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:  3     Tax Override:
State:  3        Federal:
Local:  3        State:
Social Security Number:  XXX-XX-XXXX     Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6900.00 |
| Commission | | | 0.00 | 15135.00 |
| Gross Pay | | | $300.00 | $22,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1328.23 |
| Social Security | -18.60 | 1301.07 |
| Medicare | -4.35 | 304.28 |
| New York State Income | -4.00 | 665.91 |
| New York Paid Family Leave | -0.38 | 26.50 |
| New York City R Local | -3.00 | 463.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.80 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2522561
Pay Date:  11/02/2018

Pay to the
order of:      Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100          $269.07

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1228**

**A0482**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R8 / QLM 24008135 | 01/200 | 2522562 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 10/23/2018 |
| Period Ending: | 10/29/2018 |
| Pay Date: | 11/02/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   3    Tax Override:
State:   3    Federal:
Local:   3    State:
Social Security Number:   XXX-XX-XXXX    Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6900.00 |
| Commission | | 0.00 | 1050.00 | 15135.00 |
| **Gross Pay** | | | **$1,050.00** | **$22,035.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -85.07 | 1413.30 |
| Social Security | -65.10 | 1366.17 |
| Medicare | -15.23 | 319.51 |
| New York State Income | -47.79 | 713.70 |
| New York Paid Family Leave | -1.32 | 27.82 |
| New York City R Local | -32.30 | 495.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 26.40 |

| **Net Pay** | **$802.59** |
|---|---|

Your federal taxable wages this period are $1,050.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2522562 |
| Pay Date: | 11/02/2018 |

THIS IS NOT A CHECK

Pay to the order of:   Leticia F Stidhum
This amount:   EIGHT HUNDRED TWO AND 59/100

$802.59

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1229**

A0483

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 44 of 64 PageID #: 1101

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87 CLM 24008135 | 01/200 | 2535022 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 10/30/2018 |
|---|---|
| Period Ending: | 11/05/2018 |
| Pay Date: | 11/09/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3
State: 3
Local: 3
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 0.00 | 7200.00 |
| Commission |  | 0.00 | 1050.00 | 16185.00 |
| **Gross Pay** |  |  | **$1,050.00** | **$23,385.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -85.07 | 1498.37 |
| Social Security | -65.10 | 1449.87 |
| Medicare | -15.22 | 339.08 |
| New York State Income | -47.79 | 765.49 |
| New York Paid Family Leave | -1.32 | 29.52 |
| New York City R Local | -32.30 | 530.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.60 |

| Net Pay | $802.60 |
|---|---|

Your federal taxable wages this period are $1,050.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2535022
Pay Date: 11/09/2018

Pay to the
order of: Leticia F Stidhum
This amount: EIGHT HUNDRED TWO AND 60/100

THIS IS NOT A CHECK

$802.60

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1230**

A0484

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 / QLM 24008135 | 01/200 | 2548876 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting:   11/06/2018
Period Ending:    11/12/2018
Pay Date:            11/16/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   3        Tax Override:
State:     3           Federal:
Local:     3           State:
Social Security Number:   XXX-XX-XXXX        Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 7500.00 |
| Commission | | | 0.00 | 17085.00 |
| Gross Pay | | | $300.00 | $24,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1498.37 |
| Social Security | -18.60 | 1468.47 |
| Medicare | -4.35 | 343.43 |
| New York State Income | -4.00 | 769.49 |
| New York Paid Family Leave | -0.38 | 29.90 |
| New York City R Local | -3.00 | 533.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.20 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

83-6413/2670

Payroll Check Number:   2548876
Pay Date:                      11/16/2018

Pay to the
order of:
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1231**

A0485

Case 1:21-cv-07163-OEM-LB Document 87-8 Filed 09/01/23 Page 46 of 64 PageID #: 1103

Company Code  Loc/Dept  Number  Page
RB7 QLM 2400B135  01/200  2548877  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting: 11/06/2018
Period Ending: 11/12/2018
Pay Date: 11/16/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:  Tax Override:
Federal: 3  Federal:
State: 3  State:
Local: 3  Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7500.00 |
| Commission | | 0.00 | 900.00 | 17085.00 |
| Gross Pay | | | $900.00 | $24,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -67.07 | 1565.44 |
| Social Security | -55.80 | 1524.27 |
| Medicare | -13.05 | 356.48 |
| New York State Income | -38.30 | 807.79 |
| New York Paid Family Leave | -1.13 | 31.03 |
| New York City R Local | -26.07 | 559.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.80 |

| Net Pay | $697.98 |
|---|---|

Your federal taxable wages this period are $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2548877
Pay Date: 11/16/2018

Pay to the order of:
This amount:

Leticia F Stidhum

SIX HUNDRED NINETY SEVEN AND 98/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE  VOID - NON NEGOTIABLE

$697.98



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1232**

A0486

Company Code    Loc/Dept    Number    Page
R87 QLM 24008135  012260    2562199   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting:    11/13/2018
Period Ending:      11/19/2018
Pay Date:           11/23/2018

Business Phone:     732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:     Tax Override:
Federal:    3           Federal:
State:      3           State:
Local:      3           Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 7800.00 |
| Commission | | | 0.00 | 17085.00 |
| Gross Pay | | | $300.00 | $24,885.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1565.44 |
| Social Security | -18.60 | 1542.87 |
| Medicare | -4.35 | 360.83 |
| New York State Income | -4.00 | 811.79 |
| New York Paid Family Leave | -0.38 | 31.41 |
| New York City R Local | -3.00 | 562.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 29.40 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2562199
Pay Date:                11/23/2018

**THIS IS NOT A CHECK**

Pay to the
order of
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

$269.07

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1233**

A0487

Company Code   Loc/Dept   Number   Page
RB7 QLM 24008135   01/200   2564131   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:   11/13/2018
Period Ending:   11/19/2018
Pay Date:   11/23/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   3   Tax Override:
State:   3   Federal:
Local:   3   State:
Social Security Number:   XXX-XX-XXXX   Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7800.00 |
| Commission | | 0.00 | 1375.00 | 18460.00 |
| Gross Pay | | | $1,375.00 | $26,260.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -156.09 | 1721.53 |
| Social Security | -85.25 | 1628.12 |
| Medicare | -19.94 | 380.77 |
| New York State Income | -68.37 | 830.16 |
| New York Paid Family Leave | -1.73 | 33.14 |
| New York City R Local | -45.86 | 608.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 30.00 |

| Net Pay | $997.16 |
|---|---|

Your federal taxable wages this period are $1,375.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2564131
Pay Date:   11/23/2018

Pay to the
order of

This amount:   Leticia F Stidhum

NINE HUNDRED NINETY SEVEN AND 16/100

$997.16

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1234**

A0488

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 GLM 24008135 | 01/200 | 2576562 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

| | |
|---|---|
| Period Starting: | 11/20/2018 |
| Period Ending: | 11/26/2018 |
| Pay Date: | 11/30/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8100.00 |
| Commission | | | 0.00 | 18910.00 |
| Gross Pay | | | $300.00 | $27,010.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1721.53 |
| Social Security | -18.60 | 1646.72 |
| Medicare | -4.35 | 385.12 |
| New York State Income | -4.00 | 884.16 |
| New York Paid Family Leave | -0.38 | 33.52 |
| New York City R Local | -3.00 | 611.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 30.60 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2576562 |
| Pay Date: | 11/30/2018 |

**Pay to the order of**   Leticia F Stidhum

**This amount**   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1235**

A0489

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2576563 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 11/20/2018 |
|---|---|
| Period Ending: | 11/26/2018 |
| Pay Date: | 11/30/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:            Tax Override:
  Federal:   3                  Federal:
  State:   3                     State:
  Local:   3                     Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8100.00 |
| Commission | | 0.00 | 450.00 | 18910.00 |
| Gross Pay | | | **$450.00** | $27,010.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1735.47 |
| Social Security | -27.90 | 1674.62 |
| Medicare | -6.53 | 391.65 |
| New York State Income | -10.62 | 894.78 |
| New York Paid Family Leave | -0.57 | 34.09 |
| New York City R Local | -7.77 | 619.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 31.20 |

| Net Pay | $382.07 |
|---|---|

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2576563 |
|---|---|
| Pay Date: | 11/30/2018 |

THIS IS NOT A CHECK

Pay to the
order of
This amount:

Leticia F Stidhum

THREE HUNDRED EIGHTY TWO AND 07/100

$382.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1236**

A0490

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 / QLM 24009135 | 01/200 | 2589288 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8400.00 |
| Commission | | | 0.00 | 20510.00 |
| **Gross Pay** | | | **$300.00** | **$28,910.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1735.47 |
| Social Security | -18.60 | 1693.22 |
| Medicare | -4.35 | 396.00 |
| New York State Income | -4.00 | 898.78 |
| New York Paid Family Leave | -0.38 | 34.47 |
| New York City R Local | -3.00 | 622.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 31.80 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

Payroll Check Number:   2589288
Pay Date:   12/07/2018

| Pay to the order of: | Leticia F Stidhum | |
|---|---|---|
| This amount: | TWO HUNDRED SIXTY NINE AND 07/100 | $269.07 |

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1237**

A0491

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87 QLM 24008135 | 01/200 | 2589289 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 8400.00 |
| Commission | | 0.00 | 1600.00 | 20510.00 |
| **Gross Pay** | | | **$1,600.00** | **$28,910.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -205.59 | 1941.06 |
| Social Security | -99.20 | 1792.42 |
| Medicare | -23.20 | 419.20 |
| New York State Income | -82.61 | 981.39 |
| New York Paid Family Leave | -2.02 | 36.49 |
| New York City R Local | -55.42 | 677.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 32.40 |

| Net Pay | $1,131.36 |
|---|---|

Your federal taxable wages this period are $1,600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

| Payroll Check Number: | 2589289 |
|---|---|
| Pay Date: | 12/07/2018 |

THIS IS NOT A CHECK

| Pay to the order of: | Leticia F Stidhum | |
|---|---|---|
| This amount: | ONE THOUSAND ONE HUNDRED THIRTY ONE AND 36/100 | $1,131.36 |

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1238**

A0492

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 53 of 64 PageID #: 1110

Company Code   Loc/Dept   Number   Page
RB7 QLM 24008135   01/200   2603867   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting:   12/04/2018
Period Ending:     12/10/2018
Pay Date:          12/14/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:            Tax Override:
   Federal:   3                      Federal:
   State:     3                      State:
   Local:     3                      Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8700.00 |
| Commission | | | 0.00 | 21335.00 |
| Gross Pay | | | $300.00 | $30,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1941.06 |
| Social Security | -18.60 | 1811.02 |
| Medicare | -4.35 | 423.55 |
| New York State Income | -4.00 | 985.39 |
| New York Paid Family Leave | -0.38 | 36.87 |
| New York City R Local | -3.00 | 680.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.00 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603867
Pay Date:               12/14/2018

Pay to the
order of:
This amount:      Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1239**

A0493

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 54 of 64 PageID #: 1111

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2603868 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3
State: 3
Local: 3
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8700.00 |
| Commission | | 0.00 | 825.00 | 21335.00 |
| Gross Pay | | | $825.00 | $30,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -58.07 | 1999.13 |
| Social Security | -51.15 | 1862.17 |
| Medicare | -11.96 | 435.51 |
| New York State Income | -33.55 | 1018.94 |
| New York Paid Family Leave | -1.04 | 37.91 |
| New York City R Local | -22.96 | 703.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.60 |

| Net Pay | $645.67 |
|---|---|

Your federal taxable wages this period are $825.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2603868
Pay Date: 12/14/2018

Pay to the order of: Leticia F Stidhum

This amount: SIX HUNDRED FORTY FIVE AND 67/100

$645.67

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1240**

A0494

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 55 of 64 PageID #: 1112

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2619266 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3      Tax Override:
State: 3         Federal:
Local: 3         State:
Social Security Number: XXX-XX-XXXX      Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9000.00 |
| Commission | | | 0.00 | 21960.00 |
| Gross Pay | | | $300.00 | $30,960.00 |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | 0.00 | 1999.13 |
| Social Security | | -18.60 | 1880.77 |
| Medicare | | -4.35 | 439.86 |
| New York State Income | | -4.00 | 1022.94 |
| New York Paid Family Leave | | -0.38 | 38.29 |
| New York City R Local | | -3.00 | 706.90 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 34.20 |

| Net Pay | | | $269.07 |
|---|---|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619266
Pay Date: 12/21/2018

Pay to the order of:
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1241**

A0495

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/268 | 2619267 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:
| | | Tax Override: | |
|---|---|---|---|
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |

Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 9000.00 |
| Commission | | 0.00 | 625.00 | 21960.00 |
| Gross Pay | | | $625.00 | $30,960.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.07 | 2033.20 |
| Social Security | -38.75 | 1919.52 |
| Medicare | -9.06 | 448.92 |
| New York State Income | -20.89 | 1043.83 |
| New York Paid Family Leave | -0.79 | 39.08 |
| New York City R Local | -14.68 | 721.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 34.80 |

| Net Pay | $506.16 |
|---|---|

Your federal taxable wages this period are $625.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2619267
Pay Date:    12/21/2018

Pay to the order of:    Leticia F Stidhum
This amount:    FIVE HUNDRED SIX AND 16/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$506.16

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1242**

A0496

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2635596 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/18/2018 |
|---|---|
| Period Ending: | 12/24/2018 |
| Pay Date: | 12/28/2018 |

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | Tax Override: | |
|---|---|---|---|
| Exemptions/Allowances: | | Federal: | |
| Federal: | 3 | State: | |
| State: | 3 | Local: | |
| Local: | 3 | | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9300.00 |
| Commission | | | 0.00 | 22460.00 |
| Gross Pay | | | $300.00 | $31,760.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 2033.20 |
| Social Security | -18.60 | 1938.12 |
| Medicare | -4.35 | 453.27 |
| New York State Income | -4.00 | 1047.83 |
| New York Paid Family Leave | -0.38 | 39.46 |
| New York City R Local | -3.00 | 724.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 35.40 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635596
Pay Date: 12/28/2018

Pay to the order of:
This amount:

Leticia F Stidhum

TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1243**

**A0497**

Company Code   Loc/Dept   Number   Page
RB / QLM 2400B135   01/200   2635597   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting:   12/18/2018
Period Ending:   12/24/2018
Pay Date:   12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
  Federal:   3          Federal:
  State:   3          State:
  Local:   3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9300.00 |
| Commission | | 0.00 | 500.00 | 22460.00 |
| **Gross Pay** | | | **$500.00** | **$31,760.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -19.07 | 2052.27 |
| Social Security | -31.00 | 1969.12 |
| Medicare | -7.25 | 460.52 |
| New York State Income | -11.47 | 1061.30 |
| New York Paid Family Leave | -0.63 | 40.09 |
| New York City R Local | -9.74 | 734.32 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 36.00 |

| **Net Pay** | **$418.24** | |
|---|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-6413/2670

Payroll Check Number:   2635597
Pay Date:   12/28/2018

Pay to the order of:   Leticia F Stidhum
This amount:   FOUR HUNDRED EIGHTEEN AND 24/100          $418.24

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1244**

A0498

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643764 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/25/2018 |
|---|---|
| Period Ending: | 12/31/2018 |
| Pay Date: | 01/04/2019 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | 0.00 | | 350.00 |
| Gross Pay | | | $300.00 | $650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.00 | 4.00 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -3.00 | 3.00 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $268.99 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2643764 |
|---|---|
| Pay Date: | 01/04/2019 |

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY EIGHT AND 99/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$268.99

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1245**

A0499

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643785 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/25/2018 |
|---|---|
| Period Ending: | 12/31/2018 |
| Pay Date: | 01/04/2019 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 300.00 |
| Commission | | 0.00 | 350.00 | 350.00 |
| **Gross Pay** | | | **$350.00** | **$650.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 3.46 |
| Social Security | -21.70 | 40.30 |
| Medicare | -5.08 | 9.43 |
| New York State Income | -6.00 | 10.00 |
| New York Paid Family Leave | -0.54 | 1.00 |
| New York City R Local | -4.48 | 7.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |
| **Net Pay** | **$308.14** | |

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2643785 |
|---|---|
| Pay Date: | 01/04/2019 |

Pay to the order of:
This amount:

Leticia F Stidhum

THREE HUNDRED EIGHT AND 14/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$308.14

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1246**

**A0500**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2660658 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 01/01/2019 |
|---|---|
| Period Ending: | 01/07/2019 |
| Pay Date: | 01/11/2019 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 1175.00 |
| **Gross Pay** | | | **$300.00** | **$1,775.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 3.46 |
| Social Security | -18.60 | 58.90 |
| Medicare | -4.35 | 13.78 |
| New York State Income | -4.00 | 14.00 |
| New York Paid Family Leave | -0.46 | 1.46 |
| New York City R Local | -3.00 | 10.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$268.99** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2660658 |
|---|---|
| Pay Date: | 01/11/2019 |

Pay to the order of   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$268.99

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1247**

A0501

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 62 of 64 PageID #: 1119

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2660659 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 01/01/2019 |
| Period Ending: | 01/07/2019 |
| Pay Date: | 01/11/2019 |

Business Phone: 732-879-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3   Tax Override:
State: 3   Federal:
Local: 3   State:
Social Security Number: XXX-XX-XXXX   Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 600.00 |
| Commission | | 0.00 | 825.00 | 1375.00 |
| Gross Pay | | | $825.00 | $1,775.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -57.42 | 60.88 |
| Social Security | -51.15 | 110.05 |
| Medicare | -11.96 | 25.74 |
| New York State Income | -33.29 | 47.29 |
| New York Paid Family Leave | -1.26 | 2.72 |
| New York City R Local | -22.96 | 33.44 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | | |
|---|---|---|
| | | $646.36 |

Your federal taxable wages this period are $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2660659
Pay Date: 01/11/2019

Pay to the order of: Leticia F Stidhum
This amount: SIX HUNDRED FORTY SIX AND 36/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$646.36

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1248**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671279 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 01/08/2019
Period Ending: 01/14/2019
Pay Date: 01/18/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3       Tax Override:
State: 3         Federal:
Local: 3         State:
Social Security Number: XXX-XX-XXXX   Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 800.00 |
| Commission | | 0.00 | 350.00 | 1525.00 |
| Gross Pay | | | $350.00 | $2,325.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 64.34 |
| Social Security | -21.70 | 144.15 |
| Medicare | -5.07 | 33.71 |
| New York State Income | -6.00 | 53.29 |
| New York Paid Family Leave | -0.54 | 3.57 |
| New York City R Local | -4.48 | 38.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| Net Pay | $308.15 |
|---|---|

Your federal taxable wages this period are $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2671279
Pay Date: 01/18/2019

Pay to the order of:
This amount:

Leticia F Stidhum

THREE HUNDRED EIGHT AND 15/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$308.15

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1249**

Case 1:21-cv-07163-OEM-LB   Document 87-8   Filed 09/01/23   Page 64 of 64 PageID #: 1121

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671278 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 01/08/2019 |
|---|---|
| Period Ending: | 01/14/2019 |
| Pay Date: | 01/18/2019 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 200.00 | 800.00 |
| Commission | | | 0.00 | 1525.00 |
| Gross Pay | | | $200.00 | $2,325.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 60.88 |
| Social Security | -12.40 | 122.45 |
| Medicare | -2.90 | 28.64 |
| New York State Income | 0.00 | 47.29 |
| New York Paid Family Leave | -0.31 | 3.03 |
| New York City R Local | -0.95 | 34.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $182.84 |
|---|---|

Your federal taxable wages this period are $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2671278 |
|---|---|
| Pay Date: | 01/18/2019 |

Pay to the order of:   Leticia F Stidhum

This amount:   ONE HUNDRED EIGHTY TWO AND 84/100

THIS IS NOT A CHECK

$182.84

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1250**

**A0504**

TROY LAW, PLLC
41-25 Kissena Blvd Suite 110
Flushing, NY 11355
Tel: (718) 762-1324
*Attorney for the Plaintiff*
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**                  **Case No. 21-cv-07163**

-------------------------------------------------------------------x

LETICIA FRANCINE STIDHUM                          **PLAINTIFF'S**
                             Plaintiffs,           **SUPPLEMENTAL RESPONSES**
                                                   **TO DEFENDANTS'**
                    v.                             **INTERROGATORIES**

161-10 HILLSIDE AUTO AVE, LLC
      d/b/a Hillside Auto Outlet, and
HILLSIDE AUTO MALL INC
      d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA,
JORY BARON,
RONALD M BARON, and
ANDRIS GUZMAN,
                             Defendants.

------------------------------------------------------------------- X

        Plaintiff LETICIA FRANCINE STIDHUM, by the undersigned counsel, John Troy of
TROY LAW, PLLC, pursuant to Rule 33 and 34 of the Federal Rules of Civil Procedure, hereby
provides the following supplemental responses and objections to Defendants' first set of
interrogatories as follows:

## GENERAL OBJECTIONS

        The permissible number of Interrogatories is controlled by Rule 33(a) which reads in
part, "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party
no more than 25 written interrogatories, including all discrete subparts [.]"

        Parties cannot evade this presumptive limitation through the device of joining as
"subparts" questions that seek information about discrete separate subjects.

## RESPONSES TO INTERROGATORIES

        **INTERROGATORY NO 7**. State whether Plaintiff ever complained to Auto
Outlet about discriminatory conduct and for each complaint, (a) state the content of said
complaint(s); (b) state the date of said complaint(s); (c) state the location at which said
complaints were made; (d) identify persons present when you complained; (e) state whether said
complaints were oral or in writing; and (f) describe what, if anything, was said to you in response
by the person(s) to whom you complained.

A0505

**RESPONSE NO 7** Plaintiff states: Yes. In 2018 over text message to Defendant ISHAQUE THANWALLA about GUZMAN's discriminatory conduct, with no response. On or about January 10, 2019, by phone and then in person to ISHAQUE THANWALLA about GUZMAN's discriminatory conduct. ISHAQUE THANWALLA indicated that I would talk with him further on the phone and in person indicated that he would provide a raise. ISHAQUE THANWALLA failed to provide the promised bonus.

On January 24, 2019, I texted Jory Baron to inform him I had not been paid. Later on January 24, 2019, Jory Baron called me back. I calmly explained how I had been sabotaged, why I had quit, and THANWALLA still owed me money. Jory Baron replied that I should "stop ranting," tell him how much I felt I was owed, and that he would confirm with THANWALLA and call me back the following Monday. Jory Baron did not call me back the following Monday, January 28, 2019, or any time thereafter.

**SUPPLEMENTAL RESPONSE NO 7** In addition to the above conversations, Plaintiff states that in or about December 2018, Plaintiff spoke in person to RONALD BARON in-person at Hillside Auto Outlet. At the time, Plaintiff disclosed her pregnancy and said that she was just a couple of cars away from hitting the 30-car bonus threshold to receive an additional $1,000. RONALD BARON spoke with ISAAC THANWALLA to "give the girl the bonus."

**INTERROGATORY NO 19**. State whether Plaintiff has been involved in any civil or insolvency proceedings in federal, state, local or at an administrative level. If your answer is in the affirmative, please state the caption of the proceeding (including case number and year), the nature of the proceeding, your involvement, and the disposition of the proceeding.

**RESPONSE NO 19** Plaintiff objects to this interrogatories as irrelevant to the pregnancy discrimination claim. To the extent the information is sought for impeachment purposes, only felonies and other convictions for crimes involving a dishonest act or false statement would be relevant (regardless of the date). See Fed. R. Evid. 609(a).

**SUPPLEMENTAL RESPONSE NO 19** Plaintiff interposes the same objections to the above referenced request.

Plaintiff reserves the right to amend, modify or supplement this response.

Dated: Flushing, New York
February 10, 2023

> TROY LAW, PLLC
> *Attorneys for the Plaintiff, proposed FLSA*
> *Collective and potential Rule 23 Class*
> /s/ John Troy
> John Troy

## Certificate of Service

I, John Troy, an attorney duly admitted in the State of New York and in this court, hereby certify:

I have today served the annexed Plaintiff's Responses to Defendants' First Set of Interrogatories to Plaintiff by causing a copy to be sent via first class mail and electronic mail to their attorney of record at the email address below:

Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042
Tel: 5163288899

*Attorneys for Defendants*

Dated:   Flushing, New York
February 10, 2023

TROY LAW, PLLC
/s/ John Troy
John Troy
41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
Tel: (718) 762-1324
troylaw@troypllc.com
*Attorney for Plaintiffs*

A0507

## VERIFICATION

STATE OF NEW YORK    )
                           )
                           ) ss:
                           )
COUNTY OF QUEENS     )

I, Stidhum, Leticia, being duly sworn, states that I am a Plaintiff in this action, that I have read the foregoing Plaintiff's Supplemental Response to Defendants' Interrogatories, and know the contents thereof, and the same are true to my knowledge, information and belief.

Date: _10th_ day of _April_, 20 2 3

_____
Stidhum, Leticia

Sworn to before me on

This _16th_ day of _April_, 20 2 3

_____
NOTARY PUBLIC

JOHN TROY
Notary Public, State of New York
No. 02TR6121824
Qualified in Queens County
Commission Expires April 12, 2025

AARON B. SCHWEITZER
Notary Public, State of New York
No. 02SC6380865
Qualified in Nassau County
Commission Expires September 17, 2026

TIFFANY TROY
Notary Public, State of New York
No. 02TR6419683
Qualified in Queens County
Commission Expires July 12, 2025

A0508

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589288 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |
| Business Phone: | 732-979-6956 |

Taxable Marital Status: Single
Exemptions/Allowances:       Tax Override:
  Federal:   3              Federal:
  State:     3              State:
  Local:     3              Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8400.00 |
| Commission | | | 0.00 | 20510.00 |
| Gross Pay | | | $300.00 | $28,910.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1735.47 |
| Social Security | -18.60 | 1693.22 |
| Medicare | -4.35 | 396.00 |
| New York State Income | -4.00 | 898.78 |
| New York Paid Family Leave | -0.38 | 34.47 |
| New York City R Local | -3.00 | 622.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 31.80 |

| Net Pay | | $269.07 |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2589288 |
|---|---|
| Pay Date: | 12/07/2018 |

Pay to the
order of:        Leticia F S
This amount:    TWO HUNDRED SIXTY NINE AND 07/100                    $269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leti
1240
Coll

**D1253**

**A0509**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 766793 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** — ADP

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:        Tax Override:
      Federal:   2          Federal:
      State:     2          State:
      Local:     2          Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 350.00 | 15350.00 |
| Commission |  | 0.00 | 0.00 | 20995.00 |
| **Gross Pay** |  |  | **$350.00** | **$36,345.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 804.64 |
| Social Security | -21.70 | 2225.49 |
| Medicare | -5.08 | 520.48 |
| New York State Income | -6.35 | 967.44 |
| New York Paid Family Leave | -0.44 | 45.24 |
| New York City R Local | -4.79 | 690.98 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 48.00 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| **Net Pay** | **$311.04** |
|---|---|

**2**

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 311.04 |



Your federal taxable wages this period are  $350.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/07/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 311.04 |

**D1254**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/100 | 766789 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:  11/27/2018
Period Ending:   12/03/2018
Pay Date:        12/07/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:         Tax Override:
  Federal:   1        Federal:
  State:     1        State:
  Local:     1        Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 825.00 | 18150.00 |
| Gross Pay | | | $825.00 | $18,150.00 |

**23**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -77.22 | 1698.84 |
| Social Security | -51.15 | 1125.30 |
| Medicare | -11.97 | 263.18 |
| New York State Income | -35.99 | 791.78 |
| New York Paid Family Leave | -1.04 | 22.88 |
| New York City R Local | -24.55 | 540.10 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 13.20 |

| Net Pay | | |
|---|---|---|
| | $622.48 | |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.48 |

Your federal taxable wages this period are $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/07/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.48 |

**D1255**

**A0511**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 4 of 195 PageID #: 1129



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589275 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:   1          Federal:
  State:     1          State:
  Local:     0          Local:
Social Security Number: XXX-XX-XXXX

7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 3400.00 |
| Commission | | | 0.00 | 3950.00 |
| Gross Pay | | | $200.00 | $7,350.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.90 | 413.04 |
| Social Security | -12.40 | 455.70 |
| Medicare | -2.90 | 106.58 |
| New York State Income | -1.54 | 170.54 |
| New York Paid Family Leave | -0.25 | 9.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.30 |

| Net Pay | $177.41 |
|---|---|

Your federal taxable wages this period are $200.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2589275
Pay Date: 12/07/2018

Pay to the order of:
This amount:  ONE HUNDRED SEVENTY SEVEN AND 41/100                    $177.41

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1256**

A0512

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 5 of 195 PageID #: 1130



**Earnings Statement**

Company Code LocDept Number Page
RB7QLM 24008135 01/200  2589284  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   11/27/2018
Period Ending:     12/03/2018
Pay Date:          12/07/2018

Business Phone:    732-979-6956

Taxable Marital Status:  Married
Exemptions/Allowances:   Tax Override:
    Federal:   2          Federal:
    State:     2          State:
    Local:     2          Local:
Social Security Number:  XXX-XX-XXXX

**24**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6500.00 |
| Commission | | 0.00 | 0.00 | 4800.00 |
| Gross Pay | | | $300.00 | $11,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 65.66 |
| Social Security | -18.60 | 674.56 |
| Medicare | -4.35 | 157.76 |
| New York State Income | -4.35 | 173.13 |
| New York Paid Family Leave | -0.38 | 13.74 |
| New York City R Local | -3.21 | 127.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.95 |

| Net Pay | | $268.51 |

Your federal taxable wages this period are  $300.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2589284
Pay Date:               12/07/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY EIGHT AND 51/100          $268.51

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1257**

**A0513**



| Company Code | Loc/Dept | Number | Page |
| --- | --- | --- | --- |
| RB / QLM 24008135 | 01/200 | 2589280 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
| --- | --- |
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |
| | |
| Business Phone: | 732-979-6956 |

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
   Federal:   1          Federal:
   State:     1          State:
   Local:     1          Local:
Social Security Number:  XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
| --- | --- | --- | --- | --- |
| Regular | | 0.00 | 500.00 | 8900.00 |
| Commission | | | 0.00 | 9235.00 |
| **Gross Pay** | | | **$500.00** | $18,135.00 |

| Statutory Deductions | this period | year to date |
| --- | --- | --- |
| Federal Income | -38.22 | 1584.14 |
| Social Security | -31.00 | 1095.23 |
| Medicare | -7.25 | 256.14 |
| New York State Income | -15.74 | 532.26 |
| New York Paid Family Leave | -0.63 | 22.21 |
| New York City R Local | -11.26 | 383.43 |

| Voluntary Deductions | this period | year to date |
| --- | --- | --- |
| New York voluntary disability | -0.60 | 24.60 |

| **Net Pay** | **$395.30** |
| --- | --- |



Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
| --- | --- |
| Payroll Check Number: | 2589280 |
| Pay Date: | 12/07/2018 |

Pay to the
order of:
This amount:

THREE HUNDRED NINETY FIVE AND 30/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$395.30

**D1258**

A0514



**Company Code**  RB7QLM 24008135  **Loc/Dept** 01/200  **Number** 2589274  **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3   Tax Override:
State: 3   Federal:
Local: 0   State:
Social Security Number: XXX-XX-XXXX   Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 7500.00 |
| Commission | | | 0.00 | 5415.00 |
| **Gross Pay** | | | **$600.00** | $12,915.00 |

**13**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -31.07 | 296.82 |
| Social Security | -37.20 | 800.73 |
| Medicare | -8.70 | 187.27 |
| New York State Income | -19.37 | 274.95 |
| New York Paid Family Leave | -0.76 | 16.36 |
| New York City R Local | -16.02 | 262.59 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 20.90 |

| Net Pay | $486.28 |
|---|---|



Your federal taxable wages this period are $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589274
Pay Date: 12/07/2018

Pay to the order of:
This amount:   FOUR HUNDRED EIGHTY SIX AND 28/100   $486.28

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1259**

A0515



**Earnings Statement**

Company Code: RB / QLM 24008135
Loc/Dept: 01/200
Number: 766791
Page: 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:

| | Tax Override: |
|---|---|
| Federal: 0 | Federal: |
| State: 2 | State: |
| Local: 2 | Local: |

Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 23400.00 |
| Commission | | | 0.00 | 25080.02 |
| **Gross Pay** | | | **$600.00** | **$48,480.02** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 5197.47 |
| Social Security | -37.20 | 2924.85 |
| Medicare | -8.70 | 684.04 |
| New York State Income | -20.53 | 1745.34 |
| New York Paid Family Leave | -0.76 | 59.51 |
| New York City R Local | -14.45 | 1212.57 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 43.70 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| Net Pay | |
|---|---|
| **Net Pay** | **$457.96** |

**3**

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX5638 | | XXXXXXXXX | 457.96 |

Your federal taxable wages this period are $600.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:    12/07/2018

THIS IS NOT A CHECK

| account number | | transit/ABA | amount |
|---|---|---|---|
| XXXXXX5638 | | XXXXXXXXX | 457.96 |

**D1260**

A0516



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/700 | 2589293 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:  0               Federal:
  State:    1               State:
  Local:    1               Local:
Social Security Number: XXX-XX-XXXX

**25**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 9000.00 |
| Gross Pay | | | $500.00 | $9,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.80 | 860.40 |
| Social Security | -31.00 | 558.00 |
| Medicare | -7.25 | 130.50 |
| New York State Income | -15.74 | 283.32 |
| New York Paid Family Leave | -0.63 | 11.34 |
| New York City R Local | -11.26 | 202.68 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.80 |

| Net Pay | $385.72 |
|---|---|

Your federal taxable wages this period are $500.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589293
Pay Date: 12/07/2018

Pay to the order of:
This amount:    THREE HUNDRED EIGHTY FIVE AND 72/100

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

THIS IS NOT A CHECK

$385.72

**D1261**

**A0517**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB 7 QLM 24008135 | 01/200 | 2589278 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

ADP

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:  732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:         Tax Override:
Federal:   3           Federal:
State:   3            State:
Local:   3            Local:
Social Security Number:   XXX-XX-XXXX

17

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3100.00 |
| Commission | | | 0.00 | 2150.00 |
| Gross Pay | | | $300.00 | $5,250.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 138.43 |
| Social Security | -18.60 | 307.52 |
| Medicare | -4.35 | 71.92 |
| New York State Income | -4.00 | 116.42 |
| New York Paid Family Leave | -0.38 | 6.27 |
| New York City R Local | -3.00 | 83.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 7.20 |

| Net Pay | $269.07 |
|---|---|



Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2589278 |
|---|---|
| Pay Date: | 12/07/2018 |

Pay to the order of:
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

**D1262**

A0518



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2589276
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting:  11/27/2018
Period Ending:  12/03/2018
Pay Date:  12/07/2018

Business Phone:  732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:   Tax Override:
  Federal:  1   Federal:
  State:  1   State:
  Local:  1   Local:
Social Security Number:  XXX-XX-XXXX

**26**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 3500.00 |
| Gross Pay | | | $700.00 | $3,500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -40.44 | 202.20 |
| Social Security | -43.40 | 217.00 |
| Medicare | -10.15 | 50.75 |
| New York State Income | -27.40 | 137.00 |
| New York Paid Family Leave | -0.88 | 4.40 |
| New York City R Local | -18.97 | 94.85 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $558.16 |
|---|---|



Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2589276
Pay Date:  12/07/2018

Pay to the order of:
This amount:

FIVE HUNDRED FIFTY EIGHT AND 16/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$558.16

**D1263**

A0519

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589282 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   11/27/2018
Period Ending:    12/03/2018
Pay Date:            12/07/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:            Tax Override:
   Federal:   0                 Federal:
   State:      0                 State:
   Local:      0                 Local:
Social Security Number:   XXX-XX-XXXX

27

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1200.00 |
| Commission | | | 0.00 | 975.00 |
| **Gross Pay** | | | **$300.00** | $2,175.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.80 | 119.38 |
| Social Security | -18.60 | 97.65 |
| Medicare | -4.35 | 22.84 |
| New York State Income | -6.31 | 31.55 |
| New York Paid Family Leave | -0.38 | 1.99 |
| New York City R Local | -4.73 | 23.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.38 |

| Net Pay | |
|---|---|
| | $241.23 |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2589282
Pay Date:                      12/07/2018

Pay to the
order of:
This amount:   TWO HUNDRED FORTY ONE AND 23/100                    $241.23

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1264**

**A0520**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 13 of 195 PageID #: 1138



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2589291 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
    Federal:   4                   Federal:
    State:     4                   State:
    Local:     4                   Local:
Social Security Number: XXX-XX-XXXX

**28**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1000.00 |
| Gross Pay | | | $500.00 | $1,000.00 |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | -10.96 | 21.92 |
| Social Security | | -31.00 | 62.00 |
| Medicare | | -7.25 | 14.50 |
| New York State Income | | -12.33 | 24.66 |
| New York Paid Family Leave | | -0.63 | 1.26 |
| New York City R Local | | -8.98 | 17.96 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 1.20 |

| Net Pay | | $428.25 |
|---|---|---|

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589291
Pay Date: 12/07/2018

Pay to the
order of:
This amount:    FOUR HUNDRED TWENTY EIGHT AND 25/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$428.25

**D1265**

A0521



**Company Code** RB7QLM 24008135 **Loc/Dept** 01/200 **Number** 2589277 **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status:
Exemptions/Allowances:
Federal: 0
State: 0
Local: 0
Social Security Number: XX-XXXXXXX

Tax Override:
Federal:
State:
Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 3203.00 | 4203.00 |
| Gross Pay | | | $3,203.00 | $0.00 |
| Net Pay | | | $3,203.00 | |

29



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589277
Pay Date: 12/07/2018

Pay to the order of:
This amount: THREE THOUSAND TWO HUNDRED THREE AND 00/100

$3,203.00

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1266**

**A0522**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 15 of 195 PageID #: 1140



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589286 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
   Federal:   2        Federal:
   State:   2        State:
   Local:   0        Local:
Social Security Number:   XXX-XX-XXXX

**20**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | **$300.00** | $900.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 29.56 |
| Social Security | -18.60 | 46.50 |
| Medicare | -4.35 | 10.88 |
| New York State Income | -4.77 | 16.42 |
| New York Paid Family Leave | -0.38 | 0.95 |
| New York City R Local | -4.73 | 14.77 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $259.65 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2589286 |
|---|---|
| Pay Date: | 12/07/2018 |

Pay to the
order of:

This amount:   TWO HUNDRED FIFTY NINE AND 65/100        $259.65

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1267**

**A0523**



**Earnings Statement**

Company Code: RB 7 QLM 24008135   Loc/Dept 01/100   Number 766790   Page 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   11/27/2018
Period Ending:   12/03/2018
Pay Date:   12/07/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:      Tax Override:
Federal:   2      Federal:
State:   2      State:
Local:   2      Local:
Social Security Number:   XXX-XX-XXXX

30

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1150.00 | 1150.00 |
| Gross Pay | | | $1,150.00 | $1,150.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -124.14 | 124.14 |
| Social Security | -71.30 | 71.30 |
| Medicare | -16.68 | 16.68 |
| New York State Income | -55.34 | 55.34 |
| New York Paid Family Leave | -1.45 | 1.45 |
| New York City R Local | -37.24 | 37.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $843.25 |
|---|---|

Deposits
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.25 |

Your federal taxable wages this period are  $1,150.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   12/07/2018

THIS IS NOT CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.25 |

**D1268**

A0524

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589289 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
   Federal:   3          Federal:
   State:   3          State:
   Local:   3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8400.00 |
| Commission | | 0.00 | 1600.00 | 20510.00 |
| | | | | |
| Gross Pay | | | $1,600.00 | $28,910.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -205.59 | 1941.06 |
| Social Security | -99.20 | 1792.42 |
| Medicare | -23.20 | 419.20 |
| New York State Income | -82.61 | 981.39 |
| New York Paid Family Leave | -2.02 | 36.49 |
| New York City R Local | -55.42 | 677.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 32.40 |

| Net Pay | |
|---|---|
| | $1,131.36 |

Your federal taxable wages this period are  $1,600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2589289
Pay Date:   12/07/2018

Pay to the order of:   Leticia F S███████

This amount:   ONE THOUSAND ONE HUNDRED THIRTY ONE AND 36/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$1,131.36

Letic█
1240█
Coll█

**D1269**

A0525

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 766794 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:   Tax Override:
Federal:   2       Federal:
State:   2       State:
Local:   2       Local:
Social Security Number:   XXX-XX-XXXX

**2**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 15350.00 |
| Commission | | 0.00 | 450.00 | 20995.00 |
| Gross Pay | | | $450.00 | $36,345.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 388.36 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.83 | 811.47 |
| Social Security | -27.90 | 2253.39 |
| Medicare | -6.52 | 527.00 |
| New York State Income | -11.07 | 978.51 |
| New York Paid Family Leave | -0.57 | 45.81 |
| New York City R Local | -8.15 | 699.13 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 48.60 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | | |
|---|---|---|
| Net Pay | | $388.36 |

Your federal taxable wages this period are  $450.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:      12/07/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 388.36 |

**D1270**

A0526



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589285 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |
| | |
| Business Phone: | 732-979-6956 |

Taxable Marital Status: Married
Exemptions/Allowances:      Tax Override:
Federal:   2      Federal:
State:   2      State:
Local:   2      Local:
Social Security Number: XXX-XX-XXXX

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6500.00 |
| Commission | | 0.00 | 420.00 | 4800.00 |
| | | | | |
| Gross Pay | | | $420.00 | $11,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.83 | 69.49 |
| Social Security | -26.04 | 700.60 |
| Medicare | -6.09 | 163.85 |
| New York State Income | -9.50 | 182.63 |
| New York Paid Family Leave | -0.53 | 14.27 |
| New York City R Local | -7.06 | 134.95 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 23.55 |

| Net Pay | | |
|---|---|---|
| | | $366.35 |

Your federal taxable wages this period are $420.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2589285 |
| Pay Date: | 12/07/2018 |

Pay to the order of:

This amount:      THREE HUNDRED SIXTY SIX AND 35/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$366.35

**D1271**

A0527



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589281 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |
| Business Phone: | 732-979-6956 |

Taxable Marital Status:  Single
Exemptions/Allowances:       Tax Override:
   Federal:    1           Federal:
   State:      1           State:
   Local:      1           Local:
Social Security Number:   XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8900.00 |
| Commission | | 0.00 | 470.00 | 9235.00 |
| | | | | |
| Gross Pay | | | $470.00 | $18,135.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.62 | 1618.76 |
| Social Security | -29.14 | 1124.37 |
| Medicare | -6.82 | 262.96 |
| New York State Income | -13.97 | 546.23 |
| New York Paid Family Leave | -0.59 | 22.80 |
| New York City R Local | -10.07 | 393.50 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.20 |

| Net Pay | |
|---|---|
| | $374.19 |

Your federal taxable wages this period are  $470.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2589281 |
| Pay Date: | 12/07/2018 |

Pay to the
order of:
This amount:       THREE HUNDRED SEVENTY FOUR AND 19/100          $374.19

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1272**

**A0528**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 766792 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
  Federal:   0      Federal:
  State:   2      State:
  Local:   2      Local:
Social Security Number:   XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 23400.00 |
| Commission | | 0.00 | 1305.00 | 25080.02 |
| Gross Pay | | | $1,305.00 | $48,480.02 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -193.36 | 5390.83 |
| Social Security | -80.91 | 3005.76 |
| Medicare | -18.92 | 702.96 |
| New York State Income | -65.15 | 1810.49 |
| New York Paid Family Leave | -1.64 | 61.15 |
| New York City R Local | -43.70 | 1256.27 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 44.30 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| Net Pay | $900.72 |
|---|---|

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX6638 | | XXXXXXXXX | 900.72 |

Your federal taxable wages this period are  $1,305.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/07/2018

THIS IS NOT CHECK

| | account number | transit/ABA | amount |
|---|---|---|---|
| | XXXXXX6638 | XXXXXXXXX | 900.72 |

**D1273**

A0529



**Earnings Statement**

| | | |
|---|---|---|
| Company Code | Loc/Dept | Number | Page |
| RB / QLM 24008135 | 01/200 | 2589279 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
  Federal: 3          Federal:
  State: 3            State:
  Local: 3            Local:
Social Security Number: XXX-XX-XXXX

**17**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3100.00 |
| Commission | | 0.00 | 290.00 | 2150.00 |
| Gross Pay | | | $290.00 | $5,250.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 138.43 |
| Social Security | -17.98 | 325.50 |
| Medicare | -4.21 | 76.13 |
| New York State Income | -3.60 | 120.02 |
| New York Paid Family Leave | -0.37 | 6.64 |
| New York City R Local | -2.79 | 86.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 7.80 |

| Net Pay | $260.45 |
|---|---|

Your federal taxable wages this period are  $290.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589279
Pay Date: 12/07/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY AND 45/100

$260.45

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1274**

**A0530**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2589283 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
  Federal:  0         Federal:
  State:    0         State:
  Local:    0         Local:
Social Security Number: XXX-XX-XXXX

**27**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1200.00 |
| Commission | | 0.00 | 600.00 | 975.00 |
| Gross Pay | | | $600.00 | $2,175.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 179.18 |
| Social Security | -37.20 | 134.85 |
| Medicare | -8.70 | 31.54 |
| New York State Income | -22.96 | 54.51 |
| New York Paid Family Leave | -0.76 | 2.75 |
| New York City R Local | -16.02 | 39.67 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.98 |

| Net Pay | | $453.96 |
|---|---|---|

Your federal taxable wages this period are $600.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589283
Pay Date: 12/07/2018

Pay to the order of:
This amount:     FOUR HUNDRED FIFTY THREE AND 96/100                    $453.96

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1275**

**A0531**

**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2589287
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:   2        Federal:
  State:     2        State:
  Local:     0        Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 150.00 | 300.00 |
| Gross Pay | | | $150.00 | $900.00 |

**20**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 29.56 |
| Social Security | -9.30 | 55.80 |
| Medicare | -2.17 | 13.05 |
| New York State Income | 0.00 | 16.42 |
| New York Paid Family Leave | -0.19 | 1.14 |
| New York City R Local | -1.10 | 15.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | | $136.64 |
|---|---|---|

Your federal taxable wages this period are  $150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2589287
Pay Date: 12/07/2018

Pay to the order of:
This amount:  ONE HUNDRED THIRTY SIX AND 64/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$136.64

**D1276**

**A0532**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2591713 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| | |
|---|---|
| Period Starting: | 11/27/2018 |
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
   Federal:  2          Federal:
   State:  2          State:
   Local:  2          Local:
Social Security Number:   XXX-XX-XXXX

**31**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 450.00 | 3800.00 |
| Commission | | | 0.00 | 2625.00 |
| Gross Pay | | | $450.00 | $6,425.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -22.64 | 168.42 |
| Social Security | -27.90 | 398.35 |
| Medicare | -6.52 | 93.16 |
| New York State Income | -11.65 | 112.24 |
| New York Paid Family Leave | -0.57 | 8.16 |
| New York City R Local | -8.53 | 84.77 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 13.20 |
| Net Pay | $371.59 | |

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2591713 |
| Pay Date: | 12/07/2018 |

Pay to the
order of:
This amount:     THREE HUNDRED SEVENTY ONE AND 59/100                     $371.59

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1277**

A0533





**D1278**

**A0534**



**Company Code**  RB7QLM 24008135  **Loc/Dept** 01/700  **Number** 2603872  **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting:    12/04/2018
Period Ending:     12/10/2018
Pay Date:          12/14/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:    Tax Override:
  Federal:   1        Federal:
  State:     2        State:
  Local:     2        Local:
Social Security Number:   XXX-XX-XXXX

**22**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 650.00 | 27892.00 |
| Commission | | | 0.00 | 900.00 |
| **Gross Pay** | | | **$650.00** | $28,792.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.81 | 1581.29 |
| Social Security | -40.30 | 1785.10 |
| Medicare | -9.42 | 417.48 |
| New York State Income | -23.02 | 1033.45 |
| New York Paid Family Leave | -0.82 | 36.31 |
| New York City R Local | -16.10 | 721.64 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 26.40 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1232.20 |

| Net Pay | $524.93 |
|---|---|

Your federal taxable wages this period are  $650.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603872
Pay Date:               12/14/2018

Pay to the
order of:
This amount:   FIVE HUNDRED TWENTY FOUR AND 93/100        $524.93

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1279**

**A0535**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603867 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
   Federal: 3    Federal:
   State: 3    State:
   Local: 3    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8700.00 |
| Commission | | | 0.00 | 21335.00 |
| Gross Pay | | | $300.00 | $30,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1941.06 |
| Social Security | -18.60 | 1811.02 |
| Medicare | -4.35 | 423.55 |
| New York State Income | -4.00 | 985.39 |
| New York Paid Family Leave | -0.38 | 36.87 |
| New York City R Local | -3.00 | 680.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.00 |

| Net Pay | | |
|---|---|---|
| | | $269.07 |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603867
Pay Date: 12/14/2018

Pay to the order of:   Leticia F S▮▮▮▮▮▮

This amount:   TWO HUNDRED SIXTY NINE AND 07/100    $269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leti▮
124▮
Coll▮

**D1280**

A0536

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 782417 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP®**

| | |
|---|---|
| Period Starting: | 12/04/2018 |
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:          Tax Override:
   Federal:  2          Federal:
   State:  2          State:
   Local:  2          Local:
Social Security Number: XXX-XX-XXXX

**2**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 15700.00 |
| Commission | | | 0.00 | 21445.00 |
| **Gross Pay** | | | **$350.00** | $37,145.00 |

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX0706 | | XXXXXXXXX | 311.04 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 811.47 |
| Social Security | -21.70 | 2275.09 |
| Medicare | -5.08 | 532.08 |
| New York State Income | -6.35 | 984.86 |
| New York Paid Family Leave | -0.44 | 46.25 |
| New York City R Local | -4.79 | 703.92 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 49.20 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | |
|---|---|
| **Net Pay** | **$311.04** |

Your federal taxable wages this period are  $350.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          12/14/2018

THIS IS NOT A CHECK

| | account number | transit/ABA | amount |
|---|---|---|---|
| | XXXXXX0706 | XXXXXXXXX | 311.04 |

**D1281**

**A0537**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/100 | 782413 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
　Federal:　1　　　　Federal:
　State:　1　　　　State:
　Local:　1　　　　Local:
Social Security Number:　XXX-XX-XXXX

23

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 825.00 | 18975.00 |
| Gross Pay | | | $825.00 | $18,975.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -77.22 | 1776.06 |
| Social Security | -51.15 | 1176.45 |
| Medicare | -11.96 | 275.14 |
| New York State Income | -35.99 | 827.77 |
| New York Paid Family Leave | -1.04 | 23.92 |
| New York City R Local | -24.55 | 564.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 13.80 |

| Net Pay | $622.49 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |



Your federal taxable wages this period are $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date: 12/14/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |

D1282

A0538

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603850 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:  1          Federal:
  State:  1          State:
  Local:  0          Local:
Social Security Number: XXX-XX-XXXX



7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 3600.00 |
| Commission | | | 0.00 | 4050.00 |
| Gross Pay | | | $200.00 | $7,650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.90 | 417.94 |
| Social Security | -12.40 | 468.10 |
| Medicare | -2.90 | 109.48 |
| New York State Income | -1.54 | 172.08 |
| New York Paid Family Leave | -0.25 | 9.49 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.90 |

| Net Pay | $177.41 |
|---|---|

Your federal taxable wages this period are $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603850
Pay Date: 12/14/2018

Pay to the order of:
This amount:   ONE HUNDRED SEVENTY SEVEN AND 41/100                    $177.41

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1283**

**A0539**



**Company Code**  RB 7 QLM 24008135 01/200
**Loc/Dept**
**Number** 2603863
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:
  Federal: 2
  State: 2
  Local: 2
Social Security Number: XXX-XX-XXXX

Tax Override:
  Federal:
  State:
  Local:

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6800.00 |
| Commission | | 0.00 | 0.00 | 5015.00 |
| Gross Pay | | | $300.00 | $11,815.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 69.49 |
| Social Security | -18.60 | 719.20 |
| Medicare | -4.35 | 168.20 |
| New York State Income | -4.35 | 186.98 |
| New York Paid Family Leave | -0.38 | 14.65 |
| New York City R Local | -3.21 | 138.16 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.15 |
| Net Pay | $268.51 | |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603863
Pay Date: 12/14/2018

Pay to the order of:
This amount: TWO HUNDRED SIXTY EIGHT AND 51/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$268.51

D1284

A0540

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603857 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
   Federal:   1        Federal:
   State:   1        State:
   Local:   1        Local:
Social Security Number:   XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 9400.00 |
| Commission | | | 0.00 | 9705.00 |
| Gross Pay | | | $500.00 | $19,105.00 |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | -38.22 | 1656.98 |
| Social Security | | -31.00 | 1155.37 |
| Medicare | | -7.25 | 270.21 |
| New York State Income | | -15.74 | 561.97 |
| New York Paid Family Leave | | -0.63 | 23.43 |
| New York City R Local | | -11.26 | 404.76 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 25.80 |

| Net Pay | | $395.30 |
|---|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603857
Pay Date:   12/14/2018

Pay to the
order of:
This amount:   THREE HUNDRED NINETY FIVE AND 30/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$395.30

**D1285**

A0541

Case: 25-490, 08/06/2025, DktEntry: 46.1, Page 250 of 301

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 34 of 195 PageID #: 1159



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2603849
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:       Tax Override:
  Federal:   3            Federal:
  State:     3            State:
  Local:     0            Local:
Social Security Number: XXX-XX-XXXX

**13**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 8100.00 |
| Commission | | | 0.00 | 5415.00 |
| Gross Pay | | | $600.00 | $13,515.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -31.07 | 327.89 |
| Social Security | -37.20 | 837.93 |
| Medicare | -8.70 | 195.97 |
| New York State Income | -19.37 | 294.32 |
| New York Paid Family Leave | -0.76 | 17.12 |
| New York City R Local | -16.02 | 278.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 21.50 |
| Net Pay | $486.28 | |

Your federal taxable wages this period are $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603849
Pay Date: 12/14/2018

Pay to the order of:
This amount:

FOUR HUNDRED EIGHTY SIX AND 28/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$486.28

**D1286**

A0542

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 782415 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
   Federal:   0          Federal:
   State:     2          State:
   Local:     2          Local:
Social Security Number:   XXX-XX-XXXX



3

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 24000.00 |
| Commission | | | 0.00 | 26055.02 |
| **Gross Pay** | | | **$600.00** | $50,055.02 |

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX5638 | | XXXXXXXXX | 457.96 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 5450.63 |
| Social Security | -37.20 | 3042.96 |
| Medicare | -8.70 | 711.66 |
| New York State Income | -20.53 | 1831.02 |
| New York Paid Family Leave | -0.76 | 61.91 |
| New York City R Local | -14.45 | 1270.72 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 44.90 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| Net Pay | $457.96 |
|---|---|

Your federal taxable wages this period are  $600.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          12/14/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5638 | XXXXXXXXX | 457.96 |

**D1287**

A0543



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/700 | 2603873 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**    ADP®

Period Starting:   12/04/2018
Period Ending:   12/10/2018
Pay Date:   12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:      Tax Override:
Federal:   0      Federal:
State:   1      State:
Local:   1      Local:
Social Security Number:   XXX-XX-XXXX

**25**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 9500.00 |
| Gross Pay | | | $500.00 | $9,500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.80 | 908.20 |
| Social Security | -31.00 | 589.00 |
| Medicare | -7.25 | 137.75 |
| New York State Income | -15.74 | 299.06 |
| New York Paid Family Leave | -0.63 | 11.97 |
| New York City R Local | -11.26 | 213.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 11.40 |

| Net Pay | | |
|---|---|---|
| | $385.72 | |



Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603873
Pay Date:   12/14/2018

Pay to the order of:
This amount:   THREE HUNDRED EIGHTY FIVE AND 72/100      $385.72

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1288**

**A0544**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603855 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:  3            Federal:
  State:    3            State:
  Local:    3            Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 300.00 | 3400.00 |
| Commission |  |  | 0.00 | 2595.00 |
| Gross Pay |  |  | $300.00 | $5,995.00 |

**17**

| Statutory Deductions |  | this period | year to date |
|---|---|---|---|
| Federal Income |  | 0.00 | 138.43 |
| Social Security |  | -18.60 | 344.10 |
| Medicare |  | -4.35 | 80.48 |
| New York State Income |  | -4.00 | 124.02 |
| New York Paid Family Leave |  | -0.38 | 7.02 |
| New York City R Local |  | -3.00 | 89.58 |

| Voluntary Deductions |  | this period | year to date |
|---|---|---|---|
| New York voluntary disability |  | -0.60 | 8.40 |

| Net Pay |  | $269.07 |  |
|---|---|---|---|



Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603855
Pay Date: 12/14/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1289**

**A0545**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB 7 QLM 24008135 | 01/200 | 2603852 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/04/2018
Period Ending:   12/10/2018
Pay Date:   12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:        Tax Override:
   Federal:   1      Federal:
   State:   1      State:
   Local:   1      Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 4200.00 |
| Gross Pay | | | $700.00 | $4,200.00 |

**26**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -40.44 | 242.64 |
| Social Security | -43.40 | 260.40 |
| Medicare | -10.15 | 60.90 |
| New York State Income | -27.40 | 164.40 |
| New York Paid Family Leave | -0.88 | 5.28 |
| New York City R Local | -18.97 | 113.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| Net Pay | $558.16 |
|---|---|



Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603852
Pay Date:   12/14/2018

Pay to the
order of:
This amount:   FIVE HUNDRED FIFTY EIGHT AND 16/100

THIS IS NOT A CHECK

$558.16

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1290**

**A0546**

**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2603859
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting:   12/04/2018
Period Ending:    12/10/2018
Pay Date:          12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
  Federal:   0            Federal:
  State:     0            State:
  Local:     0            Local:
Social Security Number:   XXX-XX-XXXX

27

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1500.00 |
| Commission | | | 0.00 | 1575.00 |
| **Gross Pay** | | | **$300.00** | $3,075.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.80 | 202.98 |
| Social Security | -18.60 | 153.45 |
| Medicare | -4.35 | 35.89 |
| New York State Income | -6.31 | 60.82 |
| New York Paid Family Leave | -0.38 | 3.13 |
| New York City R Local | -4.73 | 44.40 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.58 |
| **Net Pay** | **$241.23** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603859
Pay Date:               12/14/2018

Pay to the order of:
This amount:   TWO HUNDRED FORTY ONE AND 23/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$241.23

**D1291**

A0547



**Company Code** RB7QLM 24008135
**Loc/Dept** 01/200
**Number** 2603871
**Page** 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
  Federal:  4       Federal:
  State:    4       State:
  Local:    4       Local:
Social Security Number: XXX-XX-XXXX

**28**

| Earnings | rate | hours/units | this period | year to date |
|----------|------|-------------|-------------|--------------|
| Regular | | 0.00 | 500.00 | 1500.00 |
| **Gross Pay** | | | **$500.00** | **$1,500.00** |

| Statutory Deductions | this period | year to date |
|----------------------|-------------|--------------|
| Federal Income | -10.96 | 32.88 |
| Social Security | -31.00 | 93.00 |
| Medicare | -7.25 | 21.75 |
| New York State Income | -12.33 | 36.99 |
| New York Paid Family Leave | -0.63 | 1.89 |
| New York City R Local | -8.98 | 26.94 |

| Voluntary Deductions | this period | year to date |
|----------------------|-------------|--------------|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$428.25** |
|-------------|-------------|

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603871
Pay Date: 12/14/2018

Pay to the order of:
This amount: FOUR HUNDRED TWENTY EIGHT AND 25/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$428.25

**D1292**

**A0548**



**Earnings Statement**

Company Code RB 7 QLM 24008135
Loc/Dept 01/200
Number 2603854
Page 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status:
Exemptions/Allowances:
Federal: 0
State: 0
Local: 0
Social Security Number: XX-XXXXXXX

Tax Override:
Federal:
State:
Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2641.36 | 6844.36 |
| Gross Pay | | | $2,641.36 | $0.00 |
| Net Pay | | | $2,641.36 | |

29



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2603854
Pay Date: 12/14/2018

63-8413/2670

Pay to the order of:
This amount: TWO THOUSAND SIX HUNDRED FORTY ONE AND 36/100

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$2,641.36

THIS IS NOT A CHECK

**D1293**

**A0549**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603865 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP®

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:      Tax Override:
  Federal:    2        Federal:
  State:      2        State:
  Local:      0        Local:
Social Security Number:  XXX-XX-XXXX

**20**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 525.00 |
| **Gross Pay** | | | **$300.00** | $1,425.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 36.48 |
| Social Security | -18.60 | 74.40 |
| Medicare | -4.35 | 17.40 |
| New York State Income | -4.77 | 21.19 |
| New York Paid Family Leave | -0.38 | 1.52 |
| New York City R Local | -4.73 | 20.60 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |
| **Net Pay** | **$259.65** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2603865 |
|---|---|
| Pay Date: | 12/14/2018 |

Pay to the
order of:
This amount:

TWO HUNDRED FIFTY NINE AND 65/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$259.65

**D1294**



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/100
**Number** 782414
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 2
State: 2
Local: 2
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

13

30

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1150.00 | 2300.00 |
| Gross Pay | | | $1,150.00 | $2,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -124.14 | 248.28 |
| Social Security | -71.30 | 142.60 |
| Medicare | -16.67 | 33.35 |
| New York State Income | -55.34 | 110.68 |
| New York Paid Family Leave | -1.45 | 2.90 |
| New York City R Local | -37.24 | 74.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $843.26 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.26 |



Your federal taxable wages this period are $1,150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:    12/14/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.26 |

**D1295**

A0551



**Company Code** RB 7 QLM 24008135   **Loc/Dept** 01/200   **Number** 782419   **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/04/2018
Period Ending:    12/10/2018
Pay Date:          12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
  Federal:   0          Federal:
  State:     0          State:
  Local:     0          Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1000.00 | 1000.00 |
| Gross Pay | | | $1,000.00 | $1,000.00 |

**32**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -126.26 | 126.26 |
| Social Security | -62.00 | 62.00 |
| Medicare | -14.50 | 14.50 |
| New York State Income | -48.28 | 48.28 |
| New York Paid Family Leave | -1.26 | 1.26 |
| New York City R Local | -32.62 | 32.62 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |
| Net Pay | | $714.48 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 714.48 |



Your federal taxable wages this period are $1,000.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   12/14/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 714.48 |

**D1296**

**A0552**



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2603861
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 2
State: 2
Local: 2
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

**19**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | $300.00 | $600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 6.92 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.77 | 4.77 |
| New York Paid Family Leave | -0.38 | 0.38 |
| New York City R Local | -3.48 | 3.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $260.90 |
|---|---|

Your federal taxable wages this period are $300.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603861
Pay Date: 12/14/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY AND 90/100

$260.90

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1297**

**A0553**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603870 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status:
Exemptions/Allowances:
Federal: 0
State: 0
Local: 0
Social Security Number: XX-XXXXXXX

Tax Override:
Federal:
State:
Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 10235.00 | 206088.10 |
| *1099 reimbursement | | | 0.00 | 7500.00 |
| Gross Pay | | | $10,235.00 | $0.00 |
| Net Pay | | | $10,235.00 | |

21



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603870
Pay Date: 12/14/2018

Pay to the
order of:
This amount:    TEN THOUSAND TWO HUNDRED THIRTY FIVE AND 00/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$10,235.00

**D1298**

A0554

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603868 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP®

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8700.00 |
| Commission | | 0.00 | 825.00 | 21335.00 |
| Gross Pay | | | $825.00 | $30,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -58.07 | 1999.13 |
| Social Security | -51.15 | 1862.17 |
| Medicare | -11.96 | 435.51 |
| New York State Income | -33.55 | 1018.94 |
| New York Paid Family Leave | -1.04 | 37.91 |
| New York City R Local | -22.96 | 703.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.60 |

| Net Pay | | $645.67 |
|---|---|---|

Your federal taxable wages this period are  $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2603868 |
|---|---|
| Pay Date: | 12/14/2018 |

Pay to the order of:   Leticia F S█████

This amount:   SIX HUNDRED FORTY FIVE AND 67/100

$645.67

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leti█
1240█
Coll█

**D1299**

A0555

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 782418 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| | |
|---|---|
| Period Starting: | 12/04/2018 |
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone:   732-979-6956

| | |
|---|---|
| Taxable Marital Status: | Married |
| Exemptions/Allowances: | Tax Override: |
| Federal: 2 | Federal: |
| State: 2 | State: |
| Local: 2 | Local: |
| Social Security Number: | XXX-XX-XXXX |

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 15700.00 |
| Commission | | 0.00 | 450.00 | 21445.00 |
| Gross Pay | | | $450.00 | $37,145.00 |

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX0706 | | XXXXXXXXX | 388.36 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.83 | 818.30 |
| Social Security | -27.90 | 2302.99 |
| Medicare | -6.52 | 538.60 |
| New York State Income | -11.07 | 995.93 |
| New York Paid Family Leave | -0.57 | 46.82 |
| New York City R Local | -8.15 | 712.07 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 49.80 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | $388.36 |
|---|---|

Your federal taxable wages this period are  $450.00
* Excluded from Federal taxable wages



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/14/2018

THIS IS NOT A CHECK

| account number | | transit/ABA | amount |
|---|---|---|---|
| XXXXXX0706 | | XXXXXXXXX | 388.36 |

**D1300**

**A0556**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603851 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

Period Starting:   12/04/2018
Period Ending:    12/10/2018
Pay Date:          12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
    Federal:   1        Federal:
    State:     1        State:
    Local:     0        Local:
Social Security Number:   XXX-XX-XXXX

7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3600.00 |
| Commission | 0.00 | 100.00 | 4050.00 | |
| | | | | |
| Gross Pay | | | $100.00 | $7,650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 417.94 |
| Social Security | -6.20 | 474.30 |
| Medicare | -1.45 | 110.93 |
| New York State Income | 0.00 | 172.08 |
| New York Paid Family Leave | -0.13 | 9.62 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.50 | 15.40 |

| Net Pay | | $91.72 |
|---|---|---|

Your federal taxable wages this period are  $100.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2603851
Pay Date:              12/14/2018

Pay to the
order of:
This amount:       NINETY ONE AND 72/100                                        $91.72

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1301**

A0557



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603864 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 12/04/2018 |
|---|---|
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:    Tax Override:
  Federal: 2    Federal:
  State: 2    State:
  Local: 2    Local:
Social Security Number: XXX-XX-XXXX

**24**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6800.00 |
| Commission | | 0.00 | 215.00 | 5015.00 |
| **Gross Pay** | | | **$215.00** | $11,815.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 69.49 |
| Social Security | -13.33 | 732.53 |
| Medicare | -3.12 | 171.32 |
| New York State Income | -0.95 | 187.93 |
| New York Paid Family Leave | -0.27 | 14.92 |
| New York City R Local | -1.45 | 139.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.75 |
| **Net Pay** | **$195.28** | |

Your federal taxable wages this period are $215.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603864
Pay Date: 12/14/2018

Pay to the order of:
This amount:

ONE HUNDRED NINETY FIVE AND 28/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$195.28

**D1302**

**A0558**



| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9400.00 |
| Commission | | 0.00 | 470.00 | 9705.00 |
| **Gross Pay** | | | **$470.00** | $19,105.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.62 | 1691.60 |
| Social Security | -29.14 | 1184.51 |
| Medicare | -6.81 | 277.02 |
| New York State Income | -13.97 | 575.94 |
| New York Paid Family Leave | -0.59 | 24.02 |
| New York City R Local | -10.07 | 414.83 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 26.40 |
| **Net Pay** | **$374.20** | |

**Company Code** RB7QLM 24008135 **Loc/Dept** 01/200 **Number** 2603858 **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Earnings Statement ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
Federal:   1                    Federal:
State:     1                    State:
Local:     1                    Local:
Social Security Number: XXX-XX-XXXX

4

Your federal taxable wages this period are $470.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

**Payroll Check Number:** 2603858
**Pay Date:** 12/14/2018

Pay to the order of:
This amount: THREE HUNDRED SEVENTY FOUR AND 20/100                    $374.20

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1303**

**A0559**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 782416 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting:   12/04/2018
Period Ending:    12/10/2018
Pay Date:         12/14/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
  Federal:   0      Federal:
  State:     2      State:
  Local:     2      Local:
Social Security Number:   XXX-XX-XXXX

3

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 24000.00 |
| Commission | | 0.00 | 975.00 | 26055.02 |
| Gross Pay | | | $975.00 | $50,055.02 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -120.76 | 5571.39 |
| Social Security | -60.45 | 3103.41 |
| Medicare | -14.14 | 725.80 |
| New York State Income | -44.26 | 1875.28 |
| New York Paid Family Leave | -1.23 | 63.14 |
| New York City R Local | -29.98 | 1300.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 45.50 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| Net Pay | $703.58 |
|---|---|

**Deposits**

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5638 | XXXXXXXXX | 703.58 |

Your federal taxable wages this period are  $975.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   12/14/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5638 | XXXXXXXXX | 703.58 |

**D1304**



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2603856
**Page** 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
Federal:   3      Federal:
State:     3      State:
Local:     3      Local:
Social Security Number: XXX-XX-XXXX

**17**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3400.00 |
| Commission | | 0.00 | 445.00 | 2595.00 |
| Gross Pay | | | $445.00 | $5,995.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.44 | 151.87 |
| Social Security | -27.59 | 371.69 |
| Medicare | -6.45 | 86.93 |
| New York State Income | -10.36 | 134.38 |
| New York Paid Family Leave | -0.56 | 7.58 |
| New York City R Local | -7.57 | 97.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.00 |
| Net Pay | $378.43 | |



Your federal taxable wages this period are $445.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603856
Pay Date: 12/14/2018

Pay to the order of:
This amount:     THREE HUNDRED SEVENTY EIGHT AND 43/100

$378.43

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1305**

A0561



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603860 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
Federal:  0              Federal:
State:    0              State:
Local:    0              Local:
Social Security Number: XXX-XX-XXXX

27

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1500.00 |
| Commission | | 0.00 | 600.00 | 1575.00 |
| Gross Pay | | | $600.00 | $3,075.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 262.78 |
| Social Security | -37.20 | 190.65 |
| Medicare | -8.70 | 44.59 |
| New York State Income | -22.96 | 83.78 |
| New York Paid Family Leave | -0.76 | 3.89 |
| New York City R Local | -16.02 | 60.42 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 5.18 |

| Net Pay | | $453.96 |
|---|---|---|



Your federal taxable wages this period are $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603860
Pay Date: 12/14/2018

Pay to the order of:
This amount:   FOUR HUNDRED FIFTY THREE AND 96/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$453.96

**D1306**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603866 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 12/04/2018 |
| Period Ending: | 12/10/2018 |
| Pay Date: | 12/14/2018 |
| Business Phone: | 732-979-6956 |

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
Federal:    2      Federal:
State:      2      State:
Local:      0      Local:
Social Security Number: XXX-XX-XXXX

**20**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 900.00 |
| Commission | | 0.00 | 225.00 | 525.00 |
| **Gross Pay** | | | **$225.00** | **$1,425.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 36.48 |
| Social Security | -13.95 | 88.35 |
| Medicare | -3.26 | 20.66 |
| New York State Income | -1.77 | 22.96 |
| New York Paid Family Leave | -0.28 | 1.80 |
| New York City R Local | -2.64 | 23.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |
| **Net Pay** | **$202.50** | |

Your federal taxable wages this period are $225.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2603866 |
| Pay Date: | 12/14/2018 |

Pay to the
order of:
This amount:      TWO HUNDRED TWO AND 50/100      $202.50

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1307**

**A0563**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2603862 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:  2          Federal:
  State:    2          State:
  Local:    2          Local:
Social Security Number: XXX-XX-XXXX

**19**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 300.00 | 300.00 |
| Gross Pay | | | $300.00 | $600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 13.84 |
| Social Security | -18.60 | 37.20 |
| Medicare | -4.35 | 8.70 |
| New York State Income | -4.77 | 9.54 |
| New York Paid Family Leave | -0.38 | 0.76 |
| New York City R Local | -3.48 | 6.96 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | | $260.90 |
|---|---|---|

Your federal taxable wages this period are $300.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2603862
Pay Date: 12/14/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY AND 90/100

$260.90

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

THIS IS NOT A CHECK

**D1308**

**A0564**



Company Code    Loc/Dept    Number    Page
RB7QLM 24008135  01/200    2619269   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    12/11/2018
Period Ending:      12/17/2018
Pay Date:           12/21/2018

Business Phone:     732-979-6956

Taxable Marital Status:
Exemptions/Allowances:          Tax Override:
    Federal:    0                   Federal:
    State:      0                   State:
    Local:      0                   Local:
Social Security Number:  XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2500.00 | 208588.10 |
| *1099 reimbursement | | | 0.00 | 7500.00 |
| Gross Pay | | | $2,500.00 | $0.00 |
| Net Pay | | | $2,500.00 | |

**21**



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619269
Pay Date:               12/21/2018

Pay to the
order of:
This amount:    TWO THOUSAND FIVE HUNDRED AND 00/100        $2,500.00

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1309**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/700 | 2619271 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** ADP

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:       Tax Override:
Federal:    1        Federal:
State:      2        State:
Local:      2        Local:
Social Security Number:   XXX-XX-XXXX

**22**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 650.00 | 28542.00 |
| Commission | | | 0.00 | 900.00 |
| | | | | |
| Gross Pay | | | $650.00 | $29,442.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.81 | 1616.10 |
| Social Security | -40.30 | 1825.40 |
| Medicare | -9.43 | 426.91 |
| New York State Income | -23.02 | 1056.47 |
| New York Paid Family Leave | -0.82 | 37.13 |
| New York City R Local | -16.10 | 737.74 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.00 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1232.20 |

| Net Pay | $524.92 |
|---|---|

Your federal taxable wages this period are $650.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619271
Pay Date:               12/21/2018

Pay to the order of:
This amount:    FIVE HUNDRED TWENTY FOUR AND 92/100        $524.92

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1310**

**A0566**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 59 of 195 PageID #: 1184

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619266 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/11/2018 |
|---|---|
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9000.00 |
| Commission | | | 0.00 | 21960.00 |
| Gross Pay | | | $300.00 | $30,960.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1999.13 |
| Social Security | -18.60 | 1880.77 |
| Medicare | -4.35 | 439.86 |
| New York State Income | -4.00 | 1022.94 |
| New York Paid Family Leave | -0.38 | 38.29 |
| New York City R Local | -3.00 | 706.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 34.20 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2619266 |
|---|---|
| Pay Date: | 12/21/2018 |

Pay to the order of:   Leticia F S▮

This amount:   TWO HUNDRED SIXTY NINE AND 07/100                    $269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leti▮
1240▮
Coll▮

**D1311**

A0567

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 800675 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:          Tax Override:
  Federal:   2          Federal:
  State:   2          State:
  Local:   2          Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 16050.00 |
| Commission | | | 0.00 | 22045.00 |
| **Gross Pay** | | | **$350.00** | **$38,095.00** |

**2**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 818.30 |
| Social Security | -21.70 | 2324.69 |
| Medicare | -5.08 | 543.68 |
| New York State Income | -6.35 | 1002.28 |
| New York Paid Family Leave | -0.44 | 47.26 |
| New York City R Local | -4.79 | 716.86 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 50.40 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | |
|---|---|
| **Net Pay** | **$311.04** |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0705 | XXXXXXXXX | 311.04 |

Your federal taxable wages this period are $350.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          12/21/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0705 | XXXXXXXXX | 311.04 |

**D1312**

A0568



**Earnings Statement**

Company Code: RB7QLM 24008135  Loc/Dept 01/100  Number 800671  Page 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   12/11/2018
Period Ending:    12/17/2018
Pay Date:          12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:         Tax Override:
  Federal:  1                    Federal:
  State:    1                    State:
  Local:    1                    Local:
Social Security Number:  XXX-XX-XXXX

**23**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 825.00 | 19800.00 |
| Gross Pay | | | $825.00 | $19,800.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -77.22 | 1853.28 |
| Social Security | -51.15 | 1227.60 |
| Medicare | -11.96 | 287.10 |
| New York State Income | -35.99 | 863.76 |
| New York Paid Family Leave | -1.04 | 24.96 |
| New York City R Local | -24.55 | 589.20 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.40 |

| Net Pay | $622.49 |
|---|---|



Your federal taxable wages this period are $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:    12/21/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |

**D1313**

**A0569**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 62 of 195 PageID #: 1187



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619249 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
  Federal:    1          Federal:
  State:      1          State:
  Local:      0          Local:
Social Security Number:   XXX-XX-XXXX

7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 3800.00 |
| Commission | | | 0.00 | 4250.00 |
| Gross Pay | | | $200.00 | $8,050.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.90 | 422.84 |
| Social Security | -12.40 | 486.70 |
| Medicare | -2.90 | 113.83 |
| New York State Income | -1.54 | 173.62 |
| New York Paid Family Leave | -0.25 | 9.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.00 |

| Net Pay | $177.41 |
|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619249
Pay Date:               12/21/2018

Pay to the order of:

This amount:   ONE HUNDRED SEVENTY SEVEN AND 41/100                    $177.41

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1314**

**A0570**



**Company Code** RB / QLM 24008135 01/200  **Loc/Dept**  **Number** 2619261  **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

ADP

Period Starting:   12/11/2018
Period Ending:   12/17/2018
Pay Date:   12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:
| | | Tax Override: |
|---|---|---|
| Federal: | 2 | Federal: |
| State: | 2 | State: |
| Local: | 2 | Local: |

Social Security Number:   XXX-XX-XXXX

**24**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 7100.00 |
| Commission | | | 0.00 | 5510.00 |
| Gross Pay | | | $300.00 | $12,610.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 69.49 |
| Social Security | -18.60 | 751.13 |
| Medicare | -4.35 | 175.67 |
| New York State Income | -4.35 | 192.28 |
| New York Paid Family Leave | -0.38 | 15.30 |
| New York City R Local | -3.21 | 142.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.35 |

| Net Pay | $268.51 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619261
Pay Date:   12/21/2018

Pay to the order of:

This amount:   TWO HUNDRED SIXTY EIGHT AND 51/100                       $268.51

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

THIS IS NOT A CHECK

**D1315**

**A0571**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619255 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
Federal: 1                      Federal:
State: 1                        State:
Local: 1                        Local:
Social Security Number: XXX-XX-XXXX

**4**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 9900.00 |
| Commission | | | 0.00 | 10420.00 |
| Gross Pay | | | $500.00 | $20,320.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -38.22 | 1729.82 |
| Social Security | -31.00 | 1215.51 |
| Medicare | -7.25 | 284.27 |
| New York State Income | -15.74 | 591.68 |
| New York Paid Family Leave | -0.63 | 24.65 |
| New York City R Local | -11.26 | 426.09 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.00 |

| Net Pay | $395.30 |
|---|---|

Your federal taxable wages this period are $500.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619255
Pay Date: 12/21/2018

Pay to the order of:
This amount: THREE HUNDRED NINETY FIVE AND 30/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$395.30

**D1316**

**A0572**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619248 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  3  Federal:
State:  3  State:
Local:  0  Local:
Social Security Number:  XXX-XX-XXXX

**13**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 8700.00 |
| Commission | | | 0.00 | 5415.00 |
| Gross Pay | | | $600.00 | $14,115.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -31.07 | 358.96 |
| Social Security | -37.20 | 875.13 |
| Medicare | -8.70 | 204.67 |
| New York State Income | -19.37 | 313.69 |
| New York Paid Family Leave | -0.76 | 17.88 |
| New York City R Local | -16.02 | 294.63 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.10 |

| Net Pay | $486.28 |
|---|---|

Your federal taxable wages this period are  $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2619248 |
| Pay Date: | 12/21/2018 |

Pay to the
order of:
This amount:    FOUR HUNDRED EIGHTY SIX AND 28/100

$486.28

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1317**

**A0573**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 800673 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
Federal:    0         Federal:
State:      2         State:
Local:      2         Local:
Social Security Number: XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 24600.00 |
| Commission | | | 0.00 | 27160.02 |
| **Gross Pay** | | | **$600.00** | $51,760.02 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXX5638 | XXXXXXXXX | 457.96 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 5631.19 |
| Social Security | -37.20 | 3140.61 |
| Medicare | -8.70 | 734.50 |
| New York State Income | -20.53 | 1895.81 |
| New York Paid Family Leave | -0.76 | 63.90 |
| New York City R Local | -14.45 | 1315.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 46.10 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| **Net Pay** | **$457.96** |
|---|---|

Your federal taxable wages this period are $600.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:      12/21/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXX5638 | XXXXXXXXX | 457.96 |

**D1318**

A0574

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 67 of 195 PageID #: 1192



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/700 | 2619272 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:  0                     Federal:
  State:    1                     State:
  Local:    1                     Local:
Social Security Number: XXX-XX-XXXX

**25**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 10000.00 |
| Gross Pay | | | $500.00 | $10,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.80 | 956.00 |
| Social Security | -31.00 | 620.00 |
| Medicare | -7.25 | 145.00 |
| New York State Income | -15.74 | 314.80 |
| New York Paid Family Leave | -0.63 | 12.60 |
| New York City R Local | -11.26 | 225.20 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 12.00 |

| Net Pay | $385.72 |
|---|---|

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619272
Pay Date: 12/21/2018

Pay to the order of:
This amount:   THREE HUNDRED EIGHTY FIVE AND 72/100                    $385.72

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1319**

**A0575**



**Company Code** RB / QLM 24008135
**Loc/Dept** 01/200
**Number** 2619253
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
Federal:   3         Federal:
State:     3         State:
Local:     3         Local:
Social Security Number: XXX-XX-XXXX

**17**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3700.00 |
| Commission | | | 0.00 | 2995.00 |
| Gross Pay | | | $300.00 | $6,695.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 151.87 |
| Social Security | -18.60 | 390.29 |
| Medicare | -4.35 | 91.28 |
| New York State Income | -4.00 | 138.38 |
| New York Paid Family Leave | -0.38 | 7.96 |
| New York City R Local | -3.00 | 100.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.60 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619253
Pay Date: 12/21/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY NINE AND 07/100                **$269.07**

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1320**

A0576



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619251 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:          Tax Override:
   Federal:   1          Federal:
   State:     1          State:
   Local:     1          Local:
Social Security Number: XXX-XX-XXXX

**26**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 4900.00 |
| Gross Pay | | | $700.00 | $4,900.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -40.44 | 283.08 |
| Social Security | -43.40 | 303.80 |
| Medicare | -10.15 | 71.05 |
| New York State Income | -27.40 | 191.80 |
| New York Paid Family Leave | -0.88 | 6.16 |
| New York City R Local | -18.97 | 132.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.20 |

| Net Pay | $558.16 |
|---|---|

Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619251
Pay Date: 12/21/2018

Pay to the order of:
This amount:

FIVE HUNDRED FIFTY EIGHT AND 16/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$558.16

**D1321**

**A0577**



Company Code    Loc/Dept    Number    Page
RB / QLM 24008135   01/200   2619257   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**    ADP

Period Starting:    12/11/2018
Period Ending:    12/17/2018
Pay Date:    12/21/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
    Federal:    0        Federal:
    State:    0        State:
    Local:    0        Local:
Social Security Number:    XXX-XX-XXXX

**18**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1800.00 |
| Commission | | | 0.00 | 2450.00 |
| Gross Pay | | | $300.00 | $4,250.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.80 | 286.58 |
| Social Security | -18.60 | 209.25 |
| Medicare | -4.35 | 48.94 |
| New York State Income | -6.31 | 90.09 |
| New York Paid Family Leave | -0.38 | 4.27 |
| New York City R Local | -4.73 | 65.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 5.78 |

| Net Pay | $241.23 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2619257
Pay Date:    12/21/2018

Pay to the
order of:
This amount:    TWO HUNDRED FORTY ONE AND 23/100        $241.23

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1322**

A0578



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2619265 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** ADP

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   0   Federal:
State:   0   State:
Local:   0   Local:
Social Security Number:   XXX-XX-XXXX

**33**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 375.00 | 975.00 |
| Commission | | | 0.00 | 375.00 |
| Gross Pay | | | $375.00 | $1,350.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -32.80 | 113.20 |
| Social Security | -23.25 | 83.70 |
| Medicare | -5.44 | 19.58 |
| New York State Income | -9.71 | 32.04 |
| New York Paid Family Leave | -0.47 | 1.70 |
| New York City R Local | -7.16 | 23.78 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $295.57 |
|---|---|



Your federal taxable wages this period are $375.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619265
Pay Date:   12/21/2018

Pay to the
order of:
This amount:   TWO HUNDRED NINETY FIVE AND 57/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$295.57

**D1323**

**A0579**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2619270 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
      Federal:   4              Federal:
      State:   4                State:
      Local:   4                Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 2000.00 |
| Gross Pay | | | $500.00 | $2,000.00 |

28

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -10.96 | 43.84 |
| Social Security | -31.00 | 124.00 |
| Medicare | -7.25 | 29.00 |
| New York State Income | -12.33 | 49.32 |
| New York Paid Family Leave | -0.63 | 2.52 |
| New York City R Local | -8.98 | 35.92 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $428.25 |
|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2619270 |
|---|---|
| Pay Date: | 12/21/2018 |

Pay to the order of:
This amount:

FOUR HUNDRED TWENTY EIGHT AND 25/100

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

THIS IS NOT A CHECK

$428.25

**D1324**

A0580



Company Code    Loc/Dept   Number   Page
RB7QLM 24008135  01/200   2619252  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/11/2018
Period Ending:    12/17/2018
Pay Date:         12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status:
Exemptions/Allowances:          Tax Override:
    Federal:   0                   Federal:
    State:     0                   State:
    Local:     0                   Local:
Social Security Number:  XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2691.52 | 9535.88 |
| Gross Pay | | | $2,691.52 | $0.00 |
| Net Pay | | | $2,691.52 | |

29



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619252
Pay Date:              12/21/2018

Pay to the
order of:
This amount:   TWO THOUSAND SIX HUNDRED NINETY ONE AND 52/100            $2,691.52

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1325**

A0581

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619263 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:  Tax Override:
Federal:   2     Federal:
State:     2     State:
Local:     0     Local:
Social Security Number:   XXX-XX-XXXX

**20**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 240.00 | 1140.00 |
| Commission | | | 0.00 | 825.00 |
| Gross Pay | | | $240.00 | $1,965.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -0.92 | 37.40 |
| Social Security | -14.88 | 103.23 |
| Medicare | -3.48 | 24.14 |
| New York State Income | -2.37 | 25.33 |
| New York Paid Family Leave | -0.30 | 2.10 |
| New York City R Local | -2.95 | 26.19 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |
| Net Pay | $214.50 | |

Your federal taxable wages this period are $240.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619263
Pay Date: 12/21/2018

Pay to the order of:
This amount:   TWO HUNDRED FOURTEEN AND 50/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$214.50

**D1326**

**A0582**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/100 | 800672 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/11/2018 |
|---|---|
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:  732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
    Federal:    2             Federal:
    State:      2             State:
    Local:      2             Local:
Social Security Number:  XXX-XX-XXXX

13

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1150.00 | 3450.00 |
| Gross Pay | | | $1,150.00 | $3,450.00 |

**30**

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -124.14 | 372.42 |
| Social Security | -71.30 | 213.90 |
| Medicare | -16.68 | 50.03 |
| New York State Income | -55.34 | 166.02 |
| New York Paid Family Leave | -1.45 | 4.35 |
| New York City R Local | -37.24 | 111.72 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $843.25 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.25 |

Your federal taxable wages this period are  $1,150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/21/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.25 |

**D1327**

A0583



**Company Code** RB7 QLM 24008135
**Loc/Dept** 01/200
**Number** 800677
**Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 0
State: 0
Local: 0

Tax Override:
Federal:
State:
Local:

Social Security Number: XXX-XX-XXXX

**32**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1000.00 | 2000.00 |
| Gross Pay | | | $1,000.00 | $2,000.00 |

**Deposits**
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 714.48 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -126.26 | 252.52 |
| Social Security | -62.00 | 124.00 |
| Medicare | -14.50 | 29.00 |
| New York State Income | -48.28 | 96.56 |
| New York Paid Family Leave | -1.26 | 2.52 |
| New York City R Local | -32.62 | 65.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | | $714.48 |
|---|---|---|



Your federal taxable wages this period are $1,000.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:     12/21/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 714.48 |

**D1328**

A0584



**Company Code** RB / QLM 24008135 **Loc/Dept** 01/200 **Number** 2619259 **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

ADP®

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:       Tax Override:
  Federal:  2        Federal:
  State:  2          State:
  Local:  2          Local:
Social Security Number: XXX-XX-XXXX

**19**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | 0.00 | 0.00 | 700.00 |
| **Gross Pay** | | | **$300.00** | $1,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 20.76 |
| Social Security | -18.60 | 55.80 |
| Medicare | -4.35 | 13.05 |
| New York State Income | -4.77 | 14.31 |
| New York Paid Family Leave | -0.38 | 1.14 |
| New York City R Local | -3.48 | 10.44 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$260.90** |
|---|---|

Your federal taxable wages this period are $300.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619259
Pay Date: 12/21/2018

Pay to the order of:
This amount:   TWO HUNDRED SIXTY AND 90/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$260.90

**D1329**

**A0585**



**Company Code** RB7QLM 24008135  **Loc/Dept** 01/200  **Number** 2619268  **Page** 1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

ADP

| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:            Tax Override:
  Federal:   0              Federal:
  State:     0              State:
  Local:     0              Local:
Social Security Number: XXX-XX-XXXX

**34**

| Earnings | rate | hours/units | this period | year to date |
| --- | --- | --- | --- | --- |
| Regular | | 0.00 | 900.00 | 900.00 |
| Gross Pay | | | $900.00 | $900.00 |

| Statutory Deductions | this period | year to date |
| --- | --- | --- |
| Federal Income | -104.26 | 104.26 |
| Social Security | -55.80 | 55.80 |
| Medicare | -13.05 | 13.05 |
| New York State Income | -41.95 | 41.95 |
| New York Paid Family Leave | -1.13 | 1.13 |

| Voluntary Deductions | this period | year to date |
| --- | --- | --- |
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $683.21 |
| --- | --- |

Your federal taxable wages this period are $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619268
Pay Date: 12/21/2018

Pay to the order of:
This amount:      SIX HUNDRED EIGHTY THREE AND 21/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$683.21

**D1330**

**A0586**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619267 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | Tax Override: |
|---|---|---|
| Exemptions/Allowances: | | |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9000.00 |
| Commission | | 0.00 | 625.00 | 21960.00 |
| Gross Pay | | | $625.00 | $30,960.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.07 | 2033.20 |
| Social Security | -38.75 | 1919.52 |
| Medicare | -9.06 | 448.92 |
| New York State Income | -20.89 | 1043.83 |
| New York Paid Family Leave | -0.79 | 39.08 |
| New York City R Local | -14.68 | 721.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 34.80 |

| Net Pay | | $506.16 |
|---|---|---|

Your federal taxable wages this period are $625.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619267
Pay Date: 12/21/2018

Pay to the order of: Leticia F S██████████

This amount: FIVE HUNDRED SIX AND 16/100

$506.16

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leti██
1240██
Coll██

**D1331**

**A0587**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 800676 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:      Tax Override:
    Federal:   2          Federal:
    State:      2          State:
    Local:     2          Local:
Social Security Number:   XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 16050.00 |
| Commission | | 0.00 | 600.00 | 22045.00 |
| Gross Pay | | | $600.00 | $38,095.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXXX | 496.96 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -21.83 | 840.13 |
| Social Security | -37.20 | 2361.89 |
| Medicare | -8.70 | 552.38 |
| New York State Income | -19.88 | 1022.16 |
| New York Paid Family Leave | -0.76 | 48.02 |
| New York City R Local | -14.07 | 730.93 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 51.00 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | $496.96 |
|---|---|

Your federal taxable wages this period are  $600.00
* Excluded from Federal taxable wages



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          12/21/2018

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXXX | 496.96 |

THIS IS NOT A CHECK

D1332

A0588

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619250 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP®

Period Starting:   12/11/2018
Period Ending:   12/17/2018
Pay Date:   12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   1   Federal:
State:   1   State:
Local:   0   Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3800.00 |
| Commission | | 0.00 | 200.00 | 4250.00 |
| Gross Pay | | | $200.00 | $8,050.00 |

7

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.90 | 427.74 |
| Social Security | -12.40 | 499.10 |
| Medicare | -2.90 | 116.73 |
| New York State Income | -1.54 | 175.16 |
| New York Paid Family Leave | -0.25 | 10.12 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.60 |

| Net Pay | $177.41 |
|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619250
Pay Date:   12/21/2018

Pay to the order of:
This amount:   ONE HUNDRED SEVENTY SEVEN AND 41/100   $177.41

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1333**

**A0589**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619262 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| | |
|---|---|
| Period Starting: | 12/11/2018 |
| Period Ending: | 12/17/2018 |
| Pay Date: | 12/21/2018 |

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:     Tax Override:
　　Federal:　2　　　　Federal:
　　State:　2　　　　State:
　　Local:　2　　　　Local:
Social Security Number:　XXX-XX-XXXX

**24**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7100.00 |
| Commission | | 0.00 | 495.00 | 5510.00 |
| Gross Pay | | | $495.00 | $12,610.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -11.33 | 80.82 |
| Social Security | -30.69 | 781.82 |
| Medicare | -7.18 | 182.85 |
| New York State Income | -13.68 | 205.96 |
| New York Paid Family Leave | -0.62 | 15.92 |
| New York City R Local | -9.92 | 152.74 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.95 |
| Net Pay | $420.98 | |

Your federal taxable wages this period are $495.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2619262 |
| Pay Date: | 12/21/2018 |

Pay to the order of:
This amount:     FOUR HUNDRED TWENTY AND 98/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$420.98

**D1334**

**A0590**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619256 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
   Federal:  1     Federal:
   State:  1     State:
   Local:  1     Local:
Social Security Number: XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9900.00 |
| Commission | | 0.00 | 715.00 | 10420.00 |
| Gross Pay | | | $715.00 | $20,320.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -64.02 | 1793.84 |
| Social Security | -44.33 | 1259.84 |
| Medicare | -10.37 | 294.64 |
| New York State Income | -29.02 | 620.70 |
| New York Paid Family Leave | -0.90 | 25.55 |
| New York City R Local | -19.99 | 446.08 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.60 |

| Net Pay | |
|---|---|
| | $545.77 |

Your federal taxable wages this period are  $715.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2619256
Pay Date:  12/21/2018

Pay to the
order of:
This amount:

FIVE HUNDRED FORTY FIVE AND 77/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$545.77

**D1335**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 800674 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/11/2018
Period Ending:    12/17/2018
Pay Date:          12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
    Federal:   0        Federal:
    State:     2        State:
    Local:     2        Local:
Social Security Number:   XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 24600.00 |
| Commission | | 0.00 | 1105.00 | 27160.02 |
| Gross Pay | | | $1,105.00 | $51,760.02 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -149.36 | 5780.55 |
| Social Security | -68.51 | 3209.12 |
| Medicare | -16.02 | 750.52 |
| New York State Income | -52.49 | 1948.30 |
| New York Paid Family Leave | -1.39 | 65.29 |
| New York City R Local | -35.38 | 1350.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 46.70 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| Net Pay | $781.25 |
|---|---|

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX5638 | | XXXXXXXXX | 781.25 |

Your federal taxable wages this period are  $1,105.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/21/2018

THIS IS NOT A CHECK

| | account number | transit/ABA | amount |
|---|---|---|---|
| | XXXXXX5638 | XXXXXXXXX | 781.25 |

**D1336**

**A0592**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2619254 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   ADP

Period Starting:   12/11/2018
Period Ending:    12/17/2018
Pay Date:         12/21/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
  Federal:   3    Federal:
  State:     3    State:
  Local:     3    Local:
Social Security Number:   XXX-XX-XXXX

**17**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  |  | 0.00 | 3700.00 |
| Commission |  | 0.00 | 400.00 | 2995.00 |
| Gross Pay |  |  | $400.00 | $6,695.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -8.94 | 160.81 |
| Social Security | -24.80 | 415.09 |
| Medicare | -5.80 | 97.08 |
| New York State Income | -8.18 | 146.56 |
| New York Paid Family Leave | -0.50 | 8.46 |
| New York City R Local | -6.10 | 106.25 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.20 |

| Net Pay |  | $345.08 |
|---|---|---|



Your federal taxable wages this period are  $400.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619254
Pay Date:                12/21/2018

Pay to the order of:
This amount:   THREE HUNDRED FORTY FIVE AND 08/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$345.08

**D1337**

**A0593**

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 3 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

**Earnings Statement**

**ADP**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2619258 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:   0        Federal:
  State:   0        State:
  Local:   0        Local:
Social Security Number: XXX-XX-XXXX

18

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 1800.00 |
| Commission | | 0.00 | 875.00 | 2450.00 |
| **Gross Pay** | | | **$875.00** | **$4,250.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -98.76 | 385.34 |
| Social Security | -54.25 | 263.50 |
| Medicare | -12.69 | 61.63 |
| New York State Income | -40.37 | 130.46 |
| New York Paid Family Leave | -1.10 | 5.37 |
| New York City R Local | -27.43 | 92.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.38 |

| Net Pay | $639.80 |
|---|---|

Your federal taxable wages this period are $875.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619258
Pay Date: 12/21/2018

Pay to the
order of:

This amount:  SIX HUNDRED THIRTY NINE AND 80/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$639.80

**D1338**

A0594

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2619264 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
  Federal: 2      Federal:
  State: 2      State:
  Local: 0      Local:
Social Security Number: XXX-XX-XXXX

20

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1140.00 |
| Commission | | 0.00 | 300.00 | 825.00 |
| **Gross Pay** | | | **$300.00** | **$1,965.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 44.32 |
| Social Security | -18.60 | 121.83 |
| Medicare | -4.35 | 28.49 |
| New York State Income | -4.77 | 30.10 |
| New York Paid Family Leave | -0.38 | 2.48 |
| New York City R Local | -4.73 | 30.92 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.20 |

| **Net Pay** | **$259.65** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2619264
Pay Date: 12/21/2018

Pay to the
order of:

This amount: TWO HUNDRED FIFTY NINE AND 65/100      $259.65

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1339**

A0595

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2619260 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/11/2018
Period Ending: 12/17/2018
Pay Date: 12/21/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
   Federal: 2     Federal:
   State: 2     State:
   Local: 2     Local:
Social Security Number: XXX-XX-XXXX



19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 600.00 |
| Commission | | 0.00 | 400.00 | 700.00 |
| Gross Pay | | | $400.00 | $1,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -16.92 | 37.68 |
| Social Security | -24.80 | 80.60 |
| Medicare | -5.80 | 18.85 |
| New York State Income | -9.05 | 23.36 |
| New York Paid Family Leave | -0.50 | 1.64 |
| New York City R Local | -6.73 | 17.17 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $335.60 |
|---|---|

Your federal taxable wages this period are $400.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2619260
Pay Date: 12/21/2018

Pay to the order of:

This amount: THREE HUNDRED THIRTY FIVE AND 60/100

$335.60

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1340**

A0596

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | U1/200 | 2635598 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status:
Exemptions/Allowances:        Tax Override:
   Federal:   0                   Federal:
   State:     0                   State:
   Local:     0                   Local:
Social Security Number: XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2500.00 | 211088.10 |
| *1099 reimbursement | | | 0.00 | 7500.00 |
| Gross Pay | | | $2,500.00 | $0.00 |
| Net Pay | | | $2,500.00 | |

21

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635598
Pay Date: 12/28/2018

Pay to the order of:

This amount:   TWO THOUSAND FIVE HUNDRED AND 00/100                $2,500.00

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1341**

A0597

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24000135 | 01/700 | 2635600 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP.

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:          Tax Override:
  Federal:  1                Federal:
  State:    2                State:
  Local:    2                Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 650.00 | 29192.00 | |
| Commission | | 0.00 | 900.00 | |
| **Gross Pay** | | | **$650.00** | **$30,092.00** |

22

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.81 | 1650.91 |
| Social Security | -40.30 | 1865.70 |
| Medicare | -9.42 | 436.33 |
| New York State Income | -23.02 | 1079.49 |
| New York Paid Family Leave | -0.82 | 37.95 |
| New York City R Local | -16.10 | 753.84 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.60 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1232.20 |

| Net Pay | $524.93 |
|---|---|

Your federal taxable wages this period are $650.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635600
Pay Date: 12/28/2018

Pay to the order of:

This amount:   FIVE HUNDRED TWENTY FOUR AND 93/100                                $524.93

THIS IS NOT A CHECK

VOID – NON NEGOTIABLE    VOID – NON NEGOTIABLE

**D1342**

A0598

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 91 of 195 PageID #: 1216

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 2400B135 | 017/200 | 2635596 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting:     12/16/2018
Period Ending:      12/24/2018
Pay Date:           12/28/2018

Business Phone:     732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:      Tax Override:
  Federal:      3            Federal:
  State:        3            State:
  Local:        3            Local:
Social Security Number:     XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9300.00 |
| Commission | | | 0.00 | 22460.00 |
| Gross Pay | | | $300.00 | $31,760.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 2033.20 |
| Social Security | -18.60 | 1938.12 |
| Medicare | -4.35 | 453.27 |
| New York State Income | -4.00 | 1047.83 |
| New York Paid Family Leave | -0.38 | 39.46 |
| New York City R Local | -3.00 | 724.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 35.40 |

| Net Pay | | $269.07 |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635596
Pay Date:               12/28/2018

Pay to the order of:    Leticia F S[  ]

This amount:    TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$269.07

Leti[  ]
124[  ]
Coll[  ]

**D1343**

A0599

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 92 of 195 PageID #: 1217

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | B20008 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:    12/18/2018
Period Ending:      12/24/2018
Pay Date:           12/28/2018

Business Phone:     732-979-6956

Taxable Marital Status:    Married
Exemptions/Allowances:          Tax Override:
    Federal:    2              Federal:
    State:      2              State:
    Local:      2              Local:
Social Security Number:    XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 16400.00 |
| Commission | | | 0.00 | 22195.00 |
| **Gross Pay** | | | **$350.00** | **$38,595.00** |

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX0706 | XXXXXXXXX | 311.05 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 840.13 |
| Social Security | -21.70 | 2383.59 |
| Medicare | -5.07 | 557.45 |
| New York State Income | -6.35 | 1028.51 |
| New York Paid Family Leave | -0.44 | 48.46 |
| New York City R Local | -4.79 | 735.72 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 51.60 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| Net Pay | $311.05 |
|---|---|

Your federal taxable wages this period are  $350.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/28/2018



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 311.05 |

**D1344**

A0600

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 93 of 195 PageID #: 1218

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/100 | 820004 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
Federal: 1          Federal:
State: 1          State:
Local: 1          Local:
Social Security Number: XXX-XX-XXXX

**23**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 825.00 | 20625.00 | |
| Gross Pay | | | $825.00 | $20,625.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -77.22 | 1930.50 |
| Social Security | -51.15 | 1278.75 |
| Medicare | -11.96 | 299.06 |
| New York State Income | -35.99 | 899.75 |
| New York Paid Family Leave | -1.04 | 26.00 |
| New York City R Local | -24.55 | 613.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 15.00 |

| Net Pay | $622.49 |
|---|---|

Deposits
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |

Your federal taxable wages this period are  $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          12/28/2018



THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.49 |

**D1345**

A0601

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 94 of 195 PageID #: 1219

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2635582 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

**ADP**

Period Starting:    12/18/2018
Period Ending:    12/24/2018
Pay Date:    12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:    Tax Override:
  Federal:    1        Federal:
  State:    1        State:
  Local:    0        Local:
Social Security Number:    XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 4000.00 |
| Commission | | | 0.00 | 4250.00 |
| **Gross Pay** | | | **$200.00** | **$8,250.00** |

7

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.90 | 432.64 |
| Social Security | -12.40 | 511.50 |
| Medicare | -2.90 | 119.63 |
| New York State Income | -1.54 | 176.70 |
| New York Paid Family Leave | -0.25 | 10.37 |
| Voluntary Deductions | this period | year to date |
| New York voluntary disability | -0.60 | 17.20 |
| **Net Pay** | **$177.41** | |

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2635582
Pay Date:    12/28/2018

Pay to the
order of:

This amount:    ONE HUNDRED SEVENTY SEVEN AND 41/100        $177.41

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1346**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 95 of 195 PageID #: 1220

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CILM 24008135 | 01/200 | 2635593 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting:    12/18/2018
Period Ending:      12/24/2018
Pay Date:           12/28/2018

Business Phone:     732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:              Tax Override:
    Federal:    2                       Federal:
    State:      2                       State:
    Local:      2                       Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 7400.00 |
| Commission | | | 0.00 | 5770.00 |
| Gross Pay | | | $300.00 | $13,170.00 |

24

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 80.82 |
| Social Security | -18.60 | 800.42 |
| Medicare | -4.35 | 187.20 |
| New York State Income | -4.35 | 210.31 |
| New York Paid Family Leave | -0.38 | 16.30 |
| New York City R Local | -3.21 | 155.95 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 26.55 |

| Net Pay | $268.51 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635593
Pay Date:               12/28/2018

Pay to the order of:

This amount:   TWO HUNDRED SIXTY EIGHT AND 51/100    $268.51

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1347**

A0603

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 96 of 195 PageID #: 1221

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2635587 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:    12/16/2018
Period Ending:      12/24/2018
Pay Date:           12/28/2018

Business Phone:     732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
  Federal:     1                  Federal:
  State:       1                  State:
  Local:       1                  Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 10400.00 |
| Commission | | | 0.00 | 10965.00 |
| Gross Pay | | | $500.00 | $21,365.00 |

4

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -38.22 | 1832.06 |
| Social Security | -31.00 | 1290.84 |
| Medicare | -7.25 | 301.89 |
| New York State Income | -15.74 | 636.44 |
| New York Paid Family Leave | -0.63 | 26.18 |
| New York City R Local | -11.26 | 457.34 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.20 |

| Net Pay | $395.30 |
|---|---|

Your federal taxable wages this period are $500.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2635587
Pay Date:               12/28/2018

Pay to the
order of:

This amount:   THREE HUNDRED NINETY FIVE AND 30/100          $395.30

THIS IS NOT A CHECK

VOID – NON NEGOTIABLE   VOID – NON NEGOTIABLE

**D1348**

A0604

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 97 of 195 PageID #: 1222

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM 24008135 | 01/200 | 2635581 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
    Federal:   3              Federal:
    State:     3              State:
    Local:     0              Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 9300.00 |
| Commission | | | 0.00 | 5415.00 |
| Gross Pay | | | $600.00 | $14,715.00 |

13

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -31.07 | 390.03 |
| Social Security | -37.20 | 912.33 |
| Medicare | -8.70 | 213.37 |
| New York State Income | -19.37 | 333.06 |
| New York Paid Family Leave | -0.76 | 18.64 |
| New York City R Local | -16.02 | 310.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.70 |

| Net Pay | $486.28 |
|---|---|

Your federal taxable wages this period are $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635581
Pay Date: 12/28/2018

Pay to the order of:
This amount: FOUR HUNDRED EIGHTY SIX AND 28/100          $486.28

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1349**

A0605

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 98 of 195 PageID #: 1223

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 820006 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:   12/16/2018
Period Ending:     12/24/2018
Pay Date:          12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
    Federal:   0                        Federal:
    State:     2                        State:
    Local:     2                        Local:
Social Security Number:   XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 25200.00 |
| Commission | | | 0.00 | 27550.02 |
| **Gross Pay** | | | **$600.00** | **$52,750.02** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.80 | 5840.35 |
| Social Security | -37.20 | 3246.32 |
| Medicare | -8.70 | 759.22 |
| New York State Income | -20.53 | 1968.83 |
| New York Paid Family Leave | -0.76 | 66.05 |
| New York City R Local | -14.45 | 1364.98 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 47.30 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| **Net Pay** | | **$457.96** |

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX6638 | XXXXXXXXX | 457.96 |

Your federal taxable wages this period are  $600.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        12/28/2018



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 457.96 |

**D1350**

A0606

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017/00 | 2635601 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   ADP

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
  Federal: 0   Federal:
  State: 1   State:
  Local: 1   Local:
Social Security Number: XXX-XX-XXXX

25

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 500.00 | 500.00 | 10500.00 |
| Gross Pay | | | $500.00 | $10,500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.80 | 1003.80 |
| Social Security | -31.00 | 651.00 |
| Medicare | -7.25 | 152.25 |
| New York State Income | -15.74 | 330.54 |
| New York Paid Family Leave | -0.63 | 13.23 |
| New York City R Local | -11.26 | 236.46 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 12.60 |

| Net Pay | $385.72 |
|---|---|

.

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635601
Pay Date: 12/28/2018

Pay to the order of:

This amount: THREE HUNDRED EIGHTY FIVE AND 72/100         $385.72

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1351**

A0607

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2635585 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   ADP

Period Starting: 12/16/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
Federal:  3          Federal:
State:  3          State:
Local:  3          Local:
Social Security Number: XXX-XX-XXXX

17

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4000.00 |
| Commission | | | 0.00 | 3440.00 |
| **Gross Pay** | | | **$300.00** | **$7,440.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 160.81 |
| Social Security | -18.60 | 433.69 |
| Medicare | -4.35 | 101.43 |
| New York State Income | -4.00 | 150.56 |
| New York Paid Family Leave | -0.38 | 8.84 |
| New York City R Local | -3.00 | 109.25 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.80 |

| **Net Pay** | **$269.07** | |

Your federal taxable wages this period are $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2635585
Pay Date: 12/28/2018

Pay to the order of:

This amount: TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

**D1352**

A0608

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 101 of 195 PageID #: 1226

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2635583 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/18/2018
Period Ending:     12/24/2018
Pay Date:          12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:    Tax Override:
      Federal:    1          Federal:
      State:      1          State:
      Local:      1          Local:
Social Security Number:   XXX-XX-XXXX

26

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 5600.00 |
| Gross Pay | | | $700.00 | $5,600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -40.44 | 323.52 |
| Social Security | -43.40 | 347.20 |
| Medicare | -10.15 | 81.20 |
| New York State Income | -27.40 | 219.20 |
| New York Paid Family Leave | -0.88 | 7.04 |
| New York City R Local | -18.97 | 151.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.80 |

| Net Pay | $558.16 |
|---|---|

Your federal taxable wages this period are  $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635583
Pay Date:               12/28/2018

Pay to the
order of:

This amount:   FIVE HUNDRED FIFTY EIGHT AND 16/100                    $558.16

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1353**

A0609

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 2400B135 | 01/200 | 2635589 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

Period Starting:   12/18/2018
Period Ending:    12/24/2018
Pay Date:            12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
  Federal:    0                              Federal:
  State:       0                              State:
  Local:       0                              Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 300.00 | 2100.00 |
| Commission |  | 0.00 |  | 2575.00 |
| Gross Pay |  |  | $300.00 | $4,675.00 |

18

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.80 | 409.14 |
| Social Security | -18.60 | 282.10 |
| Medicare | -4.35 | 65.98 |
| New York State Income | -6.31 | 136.77 |
| New York Paid Family Leave | -0.38 | 5.75 |
| New York City R Local | -4.73 | 97.31 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.98 |

| Net Pay |  | $241.23 |
|---|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2635589
Pay Date:                        12/28/2018

Pay to the
order of:

This amount:   TWO HUNDRED FORTY ONE AND 23/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$241.23

**D1354**

A0610

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2635599 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

Period Starting:  12/18/2018
Period Ending:    12/24/2018
Pay Date:         12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:          Tax Override:
  Federal:    4               Federal:
  State:      4               State:
  Local:      4               Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 500.00 | 2500.00 |
| Gross Pay |  |  | $500.00 | $2,500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -10.96 | 54.80 |
| Social Security | -31.00 | 155.00 |
| Medicare | -7.25 | 36.25 |
| New York State Income | -12.33 | 61.65 |
| New York Paid Family Leave | -0.63 | 3.15 |
| New York City R Local | -8.98 | 44.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay |  |  |
|---|---|---|
| Net Pay | $428.25 |  |

28

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635599
Pay Date:               12/28/2018

Pay to the order of:
This amount:   FOUR HUNDRED TWENTY EIGHT AND 25/100

THIS IS NOT A CHECK

$428.25

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

D1355

A0611

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2635584 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status:
Exemptions/Allowances:

| | | Tax Override: | |
|---|---|---|---|
| Federal: | 0 | Federal: | |
| State: | 0 | State: | |
| Local: | 0 | Local: | |

Social Security Number: XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 576.32 | 10112.20 |
| Gross Pay | | | $576.32 | $0.00 |
| Net Pay | | | $576.32 | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635584
Pay Date: 12/28/2018

Pay to the order of:

This amount: FIVE HUNDRED SEVENTY SIX AND 32/100

$576.32

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1356**

A0612

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 105 of 195 PageID #: 1230

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/200 | 2635595 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:   Tax Override:
Federal:     2          Federal:
State:       2          State:
Local:       0          Local:
Social Security Number: XXX-XX-XXXX

20

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 240.00 | 1380.00 |
| Commission | | | 0.00 | 825.00 |
| **Gross Pay** | | | **$240.00** | **$2,205.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -0.92 | 45.24 |
| Social Security | -14.88 | 136.71 |
| Medicare | -3.48 | 31.97 |
| New York State Income | -2.37 | 32.47 |
| New York Paid Family Leave | -0.30 | 2.78 |
| New York City R Local | -2.95 | 33.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.80 |

| **Net Pay** | **$214.50** |
|---|---|

Your federal taxable wages this period are $240.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2635595
Pay Date: 12/28/2018

Pay to the
order of:

This amount:   TWO HUNDRED FOURTEEN AND 50/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$214.50

**D1357**

A0613

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 106 of 195 PageID #: 1231

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/100 | 820005 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   **ADP**

Period Starting:   12/18/2018
Period Ending:   12/24/2018
Pay Date:   12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   2   Federal:
State:   2   State:
Local:   2   Local:
Social Security Number:   XXX-XX-XXXX

13

30

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1150.00 | 4600.00 |
| Gross Pay | | | $1,150.00 | $4,600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -124.14 | 496.56 |
| Social Security | -71.30 | 285.20 |
| Medicare | -16.67 | 66.70 |
| New York State Income | -55.34 | 221.36 |
| New York Paid Family Leave | -1.45 | 5.80 |
| New York City R Local | -37.24 | 148.96 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $843.26 |
|---|---|

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX0206 | XXXXXXXXX | 843.26 |

Your federal taxable wages this period are $1,150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   12/28/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 843.26 |



**D1358**

A0614

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 107 of 195 PageID #: 1232

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 820010 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:   12/16/2018
Period Ending:   12/24/2018
Pay Date:   12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   0   Federal:
State:   0   State:
Local:   0   Local:
Social Security Number:   XXX-XX-XXXX

**32**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1000.00 | 3000.00 |
| Gross Pay | | | $1,000.00 | $3,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -126.26 | 378.78 |
| Social Security | -62.00 | 186.00 |
| Medicare | -14.50 | 43.50 |
| New York State Income | -48.28 | 144.84 |
| New York Paid Family Leave | -1.26 | 3.78 |
| New York City R Local | -32.62 | 97.86 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $714.48 |
|---|---|

| Deposits | | | |
|---|---|---|---|
| account number | | transit/ABA | amount |
| XXXXXX5081 | | XXXXXXXXX | 714.48 |

Your federal taxable wages this period are  $1,000.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   12/28/2018

THIS IS NOT A CHECK

| | account number | transit/ABA | amount |
|---|---|---|---|
| | XXXXXX5081 | XXXXXXXXX | 714.48 |

**D1359**

A0615

Case 1:21-cv-07163-OEM-LB  Document 87-10  Filed 09/01/23  Page 108 of 195 PageID #: 1233

**Earnings Statement** 

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2635591 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:    12/18/2018
Period Ending:     12/24/2018
Pay Date:              12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:              Tax Override:
   Federal:    2                          Federal:
   State:       2                          State:
   Local:       2                          Local:
Social Security Number:    XXX-XX-XXXX

**19**

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 900.00 |
| Commission | | | 0.00 | 1075.00 |
| Gross Pay | | | $300.00 | $1,975.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.92 | 44.60 |
| Social Security | -18.60 | 99.20 |
| Medicare | -4.35 | 23.20 |
| New York State Income | -4.77 | 28.13 |
| New York Paid Family Leave | -0.38 | 2.02 |
| New York City R Local | -3.48 | 20.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $260.90 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2635591
Pay Date:                        12/28/2018

Pay to the order of:

This amount:    TWO HUNDRED SIXTY AND 90/100

$260.90

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1360**

A0616

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM 24008135 | 017200 | 2635597 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| | |
|---|---|
| Period Starting: | 12/18/2018 |
| Period Ending: | 12/24/2018 |
| Pay Date: | 12/28/2018 |

Business Phone:   732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
Federal:    3    Federal:
State:    3    State:
Local:    3    Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9300.00 |
| Commission | | 0.00 | 500.00 | 22460.00 |
| Gross Pay | | | $500.00 | $31,760.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -19.07 | 2052.27 |
| Social Security | -31.00 | 1969.12 |
| Medicare | -7.25 | 460.52 |
| New York State Income | -13.47 | 1061.30 |
| New York Paid Family Leave | -0.63 | 40.09 |
| New York City R Local | -9.74 | 734.32 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 36.00 |

| Net Pay | $418.24 |
|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635597
Pay Date:    12/28/2018

Pay to the order of:   Leticia F S

This amount:   FOUR HUNDRED EIGHTEEN AND 24/100

$418.24

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Letic
1240
Coll

**D1361**

A0617

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 110 of 195 PageID #: 1235

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM | 24008135 | 01/200 | 820009 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:  12/18/2018
Period Ending:  12/24/2018
Pay Date:  12/28/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Married
Exemptions/Allowances:  Tax Override:
  Federal:  2    Federal:
  State:  2    State:
  Local:  2    Local:
Social Security Number:  XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 16400.00 |
| Commission | | 0.00 | 150.00 | 22195.00 |
| **Gross Pay** | | | **$150.00** | $38,595.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXXX | 137.61 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 840.13 |
| Social Security | -9.30 | 2392.89 |
| Medicare | -2.18 | 559.63 |
| New York State Income | 0.00 | 1028.51 |
| New York Paid Family Leave | -0.19 | 48.65 |
| New York City R Local | -0.12 | 735.84 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 52.20 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1590.60 |

| **Net Pay** | **$137.61** | |

Your federal taxable wages this period are  $150.00
* Excluded from Federal taxable wages

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:  12/28/2018

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXXX | 137.61 |

**D1362**

A0618

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 111 of 195 PageID #: 1236

| Company Code   Loc/Dept   Number   Page | Earnings Statement | ADP |
|---|---|---|
| RB7QLM 24008135  01/200  2635594  1 of 1 | | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   12/16/2018
Period Ending:    12/24/2018
Pay Date:          12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:      Married
Exemptions/Allowances:          Tax Override:
    Federal:    2         Federal:
    State:      2         State:
    Local:      2         Local:
Social Security Number:   XXX-XX-XXXX

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7400.00 |
| Commission | | 0.00 | 260.00 | 5770.00 |
| Gross Pay | | | $260.00 | $13,170.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 80.82 |
| Social Security | -16.12 | 816.54 |
| Medicare | -3.77 | 190.97 |
| New York State Income | -2.75 | 213.06 |
| New York Paid Family Leave | -0.33 | 16.63 |
| New York City R Local | -2.37 | 158.32 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.15 |

| Net Pay | $234.06 |
|---|---|

Your federal taxable wages this period are $260.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635594
Pay Date:               12/28/2018

Pay to the order of:
This amount:   TWO HUNDRED THIRTY FOUR AND 06/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$234.06

**D1363**

A0619

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 112 of 195 PageID #: 1237

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2635588 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting: 12/18/2018
Period Ending: 12/24/2018
Pay Date: 12/28/2018

Business Phone:   732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
   Federal:    1         Federal:
   State:      1         State:
   Local:      1         Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 10400.00 |
| Commission | | 0.00 | $45.00 | 10965.00 |
| **Gross Pay** | | | **$545.00** | $21,365.00 |

4

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -43.62 | 1875.68 |
| Social Security | -33.79 | 1324.63 |
| Medicare | -7.90 | 309.79 |
| New York State Income | -18.39 | 654.83 |
| New York Paid Family Leave | -0.69 | 26.87 |
| New York City R Local | -13.04 | 470.38 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.80 |

| **Net Pay** | **$426.97** | |

Your federal taxable wages this period are  $545.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2635588
Pay Date:      12/28/2018

Pay to the
order of:
This amount:   FOUR HUNDRED TWENTY SIX AND 97/100

THIS IS NOT A CHECK

$426.97

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

**D1364**

A0620

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 113 of 195 PageID #: 1238

## Earnings Statement

**ADP**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/200 | 820007 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:  12/18/2018
Period Ending:   12/24/2018
Pay Date:        12/28/2018

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:       Tax Override:
  Federal:  0              Federal:
  State:    2              State:
  Local:    2              Local:
Social Security Number:  XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 25200.00 |
| Commission | | 0.00 | 390.00 | 27550.02 |
| **Gross Pay** | | | **$390.00** | **$52,750.02** |

**Deposits**

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 309.47 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.60 | 5874.95 |
| Social Security | -24.18 | 3270.50 |
| Medicare | -5.66 | 764.88 |
| New York State Income | -8.60 | 1977.43 |
| New York Paid Family Leave | -0.49 | 66.54 |
| New York City R Local | -6.40 | 1371.38 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 47.90 |

| Net Pay Adjustments | this period | year to date |
|---|---|---|
| *Misc reimbursement | 0.00 | 1162.86 |

| **Net Pay** | **$309.47** |
|---|---|

Your federal taxable wages this period are  $390.00
* Excluded from Federal taxable wages



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:      12/28/2018

THIS IS NOT CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 309.47 |

**D1365**

A0621

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 114 of 195 PageID #: 1239

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM | 24008135  01/200 | 2635586 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   **ADP**

Period Starting:    12/16/2018
Period Ending:     12/24/2018
Pay Date:             12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:              Tax Override:
  Federal:    3                    Federal:
  State:       3                    State:
  Local:       3                    Local:
Social Security Number:    XXX-XX-XXXX

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 4000.00 |
| Commission | | 0.00 | 445.00 | 3440.00 |
| Gross Pay | | | $445.00 | $7,440.00 |

17

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.44 | 174.25 |
| Social Security | -27.59 | 461.28 |
| Medicare | -6.45 | 107.88 |
| New York State Income | -10.36 | 160.92 |
| New York Paid Family Leave | -0.56 | 9.40 |
| New York City R Local | -7.57 | 116.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 11.40 |

| Net Pay | $378.43 |
|---|---|

Your federal taxable wages this period are $445.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635586
Pay Date:                      12/28/2018

Pay to the
order of:
This amount:    THREE HUNDRED SEVENTY EIGHT AND 43/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$378.43

**D1366**

A0622

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 115 of 195 PageID #: 1240

| Company Code | Loc/Dept. | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/200 | 2635590 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:    12/18/2018
Period Ending:     12/24/2018
Pay Date:              12/28/2018

Business Phone:    732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:              Tax Override:
    Federal:    0              Federal:
    State:    0              State:
    Local:    0              Local:
Social Security Number:    XXX-XX-XXXX

18

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 2100.00 |
| Commission | | 0.00 | 125.00 | 2575.00 |
| **Gross Pay** | | | **$125.00** | **$4,675.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -5.38 | 414.52 |
| Social Security | -7.75 | 289.85 |
| Medicare | -1.81 | 67.79 |
| New York State Income | 0.00 | 136.77 |
| New York Paid Family Leave | -0.16 | 5.91 |
| New York City R Local | -0.59 | 97.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 7.58 |

| **Net Pay** | **$108.71** |
|---|---|

Your federal taxable wages this period are  $125.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2635590
Pay Date:                      12/28/2018

Pay to the
order of:
This amount:        ONE HUNDRED EIGHT AND 71/100                                    $108.71

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1367**

A0623

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 GILM 24008135 | 01/200 | 2635592 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   12/16/2018
Period Ending:   12/24/2018
Pay Date:   12/28/2018

Business Phone:   732-979-6955

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
  Federal:   2        Federal:
  State:   2        State:
  Local:   2        Local:
Social Security Number:   XXX-XX-XXXX

19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 900.00 |
| Commission | | 0.00 | 375.00 | 1075.00 |
| **Gross Pay** | | | **$375.00** | **$1,975.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.42 | 59.02 |
| Social Security | -23.25 | 122.45 |
| Medicare | -5.44 | 28.64 |
| New York State Income | -7.92 | 36.05 |
| New York Paid Family Leave | -0.47 | 2.49 |
| New York City R Local | -5.91 | 26.56 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| **Net Pay** | **$316.99** |
|---|---|

Your federal taxable wages this period are  $375.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2635592
Pay Date:   12/28/2018

Pay to the
order of:
This amount:        THREE HUNDRED SIXTEEN AND 99/100        $316.99

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

## D1368

A0624

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 117 of 195 PageID #: 1242

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643786 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:          01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:
Exemptions/Allowances:
Federal:    0
State:      0
Local:      0
Social Security Number:   XX-XXXXXXX

Tax Override:
Federal:
State:
Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2500.00 | 2500.00 |
| Gross Pay | | | $2,500.00 | $0.00 |
| Net Pay | | | $2,500.00 | |

21

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643786
Pay Date:                01/04/2019

Pay to the order of:
This amount:   TWO THOUSAND FIVE HUNDRED AND 00/100

THIS IS NOT A CHECK

$2,500.00

VOID – NON NEGOTIABLE    VOID – NON NEGOTIABLE

D1369

A0625

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017/00 | 2643787 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP.

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:           01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:         Tax Override:
   Federal:    1         Federal:
   State:      2         State:
   Local:      2         Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 650.00 | 650.00 |
| Gross Pay | | | $650.00 | $650.00 |

22

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.23 | 34.23 |
| Social Security | -40.30 | 40.30 |
| Medicare | -9.43 | 9.43 |
| New York State Income | -22.96 | 22.96 |
| New York Paid Family Leave | -0.99 | 0.99 |
| New York City R Local | -16.10 | 16.10 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $525.39 |
|---|---|

Your federal taxable wages this period are  $650.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2643787
Pay Date:                       01/04/2019

Pay to the order of:

This amount:   FIVE HUNDRED TWENTY FIVE AND 39/100       $525.39

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1370**

A0626

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2643784 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:            01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:         Tax Override:
Federal:   3          Federal:
State:     3          State:
Local:     3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 350.00 |
| **Gross Pay** | | | **$300.00** | **$650.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.00 | 4.00 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -3.00 | 3.00 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| **Net Pay** | **$268.99** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643784
Pay Date:                    01/04/2019

Pay to the order of:      Leticia F S█
This amount:      TWO HUNDRED SIXTY EIGHT AND 99/100                          $268.99

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE      VOID - NON NEGOTIABLE

Leti█
124█
Coll█

**D1371**

A0627

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 120 of 195 PageID #: 1245

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 831269 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:    12/25/2018
Period Ending:    12/31/2018
Pay Date:    01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Married
Exemptions/Allowances:    Tax Override:
  Federal:    2    Federal:
  State:    2    State:
  Local:    2    Local:
Social Security Number:    XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 350.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | $350.00 | $650.00 |

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX0706 | XXXXXXXXX | 310.94 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -21.70 | 21.70 |
| Medicare | -5.08 | 5.08 |
| New York State Income | -6.35 | 6.35 |
| New York Paid Family Leave | -0.54 | 0.54 |
| New York City R Local | -4.79 | 4.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $310.94 |
|---|---|

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:    01/04/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 310.94 |

THIS IS NOT A CHECK

**D1372**

A0628

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 121 of 195 PageID #: 1246

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM Z400B135 | 01/100 | B31264 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement



Period Starting:  12/25/2018
Period Ending:   12/31/2018
Pay Date:        01/04/2019

Business Phone:  732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
  Federal:   1      Federal:
  State:     1      State:
  Local:     1      Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 825.00 | 825.00 |
| | | | | |
| Gross Pay | | | $825.00 | $825.00 |

23

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -76.81 | 76.81 |
| Social Security | -51.15 | 51.15 |
| Medicare | -11.96 | 11.96 |
| New York State Income | -35.68 | 35.68 |
| New York Paid Family Leave | -1.26 | 1.26 |
| New York City R Local | -24.55 | 24.55 |
| | | |
| Voluntary Deductions | this period | year to date |
| New York voluntary disability | -0.60 | 0.60 |
| | | |
| Net Pay | $622.99 | |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.99 |

Your federal taxable wages this period are  $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        01/04/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.99 |

**D1373**

A0629

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2643770 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    12/25/2018
Period Ending:      12/31/2018
Pay Date:           01/04/2019

Business Phone:     732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:              Tax Override:
  Federal:    1                       Federal:
  State:      1                       State:
  Local:      0                       Local:
Social Security Number:    XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 200.00 |
| Gross Pay | | | $200.00 | $200.00 |

7

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.62 | 4.62 |
| Social Security | -12.40 | 12.40 |
| Medicare | -2.90 | 2.90 |
| New York State Income | -1.54 | 1.54 |
| New York Paid Family Leave | -0.31 | 0.31 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | | $177.63 |
|---|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2643770
Pay Date:                01/04/2019

Pay to the
order of:
This amount:    ONE HUNDRED SEVENTY SEVEN AND 63/100                    $177.63

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1374**

A0630

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24D08135 | 01/200 | 2643780 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:      Tax Override:
  Federal:   2     Federal:
  State:    2     State:
  Local:    2     Local:
Social Security Number:   XXX-XX-XXXX

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 345.00 |
| Gross Pay | | | $300.00 | $645.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.35 | 4.35 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -3.21 | 3.21 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | | $268.43 |
|---|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2643780
Pay Date: 01/04/2019

Pay to the order of:

This amount:   TWO HUNDRED SIXTY EIGHT AND 43/100

$268.43

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1375**

A0631

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 124 of 195 PageID #: 1249

**Earnings Statement**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2643774 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:              01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:                    Tax Override:
   Federal:   1                              Federal:
   State:      1                              State:
   Local:      1                              Local:
Social Security Number:    XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 500.00 |
| Gross Pay | | | $500.00 | $1,405.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -37.81 | 37.81 |
| Social Security | -31.00 | 31.00 |
| Medicare | -7.25 | 7.25 |
| New York State Income | -15.74 | 15.74 |
| New York Paid Family Leave | -0.77 | 0.77 |
| New York City R Local | -11.26 | 11.26 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $395.57 |
|---|---|

Your federal taxable wages this period are  $500.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2643774
Pay Date:                          01/04/2019

Pay to the
order of:
This amount:        THREE HUNDRED NINETY FIVE AND 57/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$395.57

**D1376**

A0632

**Company Code**  RB7 CLM Z4008135
**Loc/Dept**  01/200
**Number**  2643769
**Page**  1 of 1

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:  12/25/2018
Period Ending:  12/31/2018
Pay Date:  01/04/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:  3
State:  3
Local:  0
Social Security Number:  XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 600.00 |
| **Gross Pay** | | | **$600.00** | $600.00 |

13

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -30.42 | 30.42 |
| Social Security | -37.20 | 37.20 |
| Medicare | -8.70 | 8.70 |
| New York State Income | -19.37 | 19.37 |
| New York Paid Family Leave | -0.92 | 0.92 |
| New York City R Local | -16.02 | 16.02 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| **Net Pay** | **$486.77** |
|---|---|

Your federal taxable wages this period are  $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2643769
Pay Date:  01/04/2019

Pay to the
order of:
This amount:

FOUR HUNDRED EIGHTY SIX AND 77/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$486.77

**D1377**

A0633

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 831267 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:   0              Federal:
  State:     2              State:
  Local:     2              Local:
Social Security Number: XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 600.00 |
| Commission | | | 0.00 | 1365.00 |
| Gross Pay | | | $600.00 | $1,965.00 |

| Deposits account number | trans/t/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.50 | 59.50 |
| Social Security | -37.20 | 37.20 |
| Medicare | -8.70 | 8.70 |
| New York State Income | -20.52 | 20.52 |
| New York Paid Family Leave | -0.92 | 0.92 |
| New York City R Local | -14.45 | 14.45 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $458.11 | |
|---|---|---|

Your federal taxable wages this period are $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/04/2019

THIS IS NOT A CHECK

| account number | trans/t/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

**D1378**

A0634

Case 1:21-cv-07163-OEM-LB  Document 87-10  Filed 09/01/23  Page 127 of 195 PageID #: 1252

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/700 | 2643788 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   12/25/2018
Period Ending:     12/31/2018
Pay Date:          01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:     Tax Override:
    Federal:    0          Federal:
    State:      1          State:
    Local:      1          Local:
Social Security Number:  XXX-XX-XXXX

25

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 500.00 |
| Gross Pay | | | $500.00 | $500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.50 | 47.50 |
| Social Security | -31.00 | 31.00 |
| Medicare | -7.25 | 7.25 |
| New York State Income | -15.74 | 15.74 |
| New York Paid Family Leave | -0.77 | 0.77 |
| New York City R Local | -11.26 | 11.26 |
| Voluntary Deductions | this period | year to date |
| New York voluntary disability | -0.60 | 0.60 |
| Net Pay | | $385.88 |

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643788
Pay Date:               01/04/2019

Pay to the order of:

This amount:   THREE HUNDRED EIGHTY FIVE AND 88/100          $385.88

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1379**

A0635

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 128 of 195 PageID #: 1253

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643772 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP.

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal: 3          Federal:
  State: 3          State:
  Local: 3          Local:
Social Security Number: XXX-XX-XXXX

17

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | 0.00 | | 700.00 |
| **Gross Pay** | | | **$300.00** | **$1,000.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.00 | 4.00 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -3.00 | 3.00 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| **Net Pay** | **$268.99** |
|---|---|

Your federal taxable wages this period are $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2643772
Pay Date: 01/04/2019

Pay to the order of:
This amount:   TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$268.99

**D1380**

A0636

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 129 of 195 PageID #: 1254

| Company Code | Loc/Dept | Number | Page | Earnings Statement |
|---|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643771 | 1 of 1 | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   12/25/2018
Period Ending:     12/31/2018
Pay Date:          01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:              Tax Override:
    Federal:    1                       Federal:
    State:      1                       State:
    Local:      1                       Local:
Social Security Number:   XXX-XX-XXXX

26

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 700.00 |
| Gross Pay | | | $700.00 | $700.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -39.62 | 39.62 |
| Social Security | -43.40 | 43.40 |
| Medicare | -10.15 | 10.15 |
| New York State Income | -27.26 | 27.26 |
| New York Paid Family Leave | -1.07 | 1.07 |
| New York City R Local | -18.97 | 18.97 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $558.93 |
|---|---|

Your federal taxable wages this period are  $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643771
Pay Date:               01/04/2019

Pay to the
order of:
This amount:    FIVE HUNDRED FIFTY EIGHT AND 93/100

THIS IS NOT A CHECK

$558.93

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1381**

A0637

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 130 of 195 PageID #: 1255

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643776 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** ADP

Period Starting:  12/25/2018
Period Ending:  12/31/2018
Pay Date:  01/04/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  0        Federal:
State:  0        State:
Local:  0        Local:
Social Security Number:  XXX-XX-XXXX



18

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 250.00 | 250.00 |
| Commission | | 0.00 | | 200.00 |
| Gross Pay | | | $250.00 | $450.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -17.69 | 17.69 |
| Social Security | -15.50 | 15.50 |
| Medicare | -3.63 | 3.63 |
| New York State Income | -4.31 | 4.31 |
| New York Paid Family Leave | -0.38 | 0.38 |
| New York City R Local | -3.15 | 3.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $204.74 |
|---|---|

Your federal taxable wages this period are  $250.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2643776
Pay Date:  01/04/2019

Pay to the order of:
This amount:  TWO HUNDRED FOUR AND 74/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$204.74

**D1382**

A0638

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 131 of 195 PageID #: 1256

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 831272 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:   12/25/2018
Period Ending:     12/31/2018
Pay Date:          01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:         Tax Override:
    Federal:   4                 Federal:
    State:     4                 State:
    Local:     4                 Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 500.00 |
| Gross Pay | | | $500.00 | $500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -10.38 | 10.38 |
| Social Security | -31.00 | 31.00 |
| Medicare | -7.25 | 7.25 |
| New York State Income | -12.33 | 12.33 |
| New York Paid Family Leave | -0.77 | 0.77 |
| New York City R Local | -8.98 | 8.98 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | | $428.69 |
|---|---|---|

28

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX9319 | XXXXXXXXX | 428.69 |

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/04/2019



| | account number | transit/ABA | amount |
|---|---|---|---|
| | XXXXXX9319 | XXXXXXXXX | 428.69 |

THIS IS NOT A CHECK

D1383

A0639

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 132 of 195 PageID #: 1257

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01ZOO | B31266 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:     12/25/2018
Period Ending:       12/31/2018
Pay Date:            01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:
Exemptions/Allowances:          Tax Override:
Federal:    0                   Federal:
State:      0                   State:
Local:      0                   Local:
Social Security Number:   XX-XXXXXXX

29

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 642.88 | 642.88 |
| Gross Pay | | | $642.88 | $0.00 |
| Net Pay | | | $642.88 | |

| Deposits | | |
|---|---|---|
| account number | transit/ABA | amount |
| XXXXXX3452 | XXXXXXXXX | 642.88 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:     01/04/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX3452 | XXXXXXXXX | 642.88 |

**D1384**

A0640

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643782 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:  12/25/2018
Period Ending:  12/31/2018
Pay Date:  01/04/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  2  Federal:
State:  2  State:
Local:  0  Local:
Social Security Number:  XXX-XX-XXXX

20

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 500.00 |
| **Gross Pay** | | | **$300.00** | **$800.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.54 | 6.54 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.77 | 4.77 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -4.73 | 4.73 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| **Net Pay** | **$259.95** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2643782
Pay Date:  01/04/2019

Pay to the order of:

This amount:  TWO HUNDRED FIFTY NINE AND 95/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$259.95

**D1385**

A0641

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 134 of 195 PageID #: 1259

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/100 | B31265 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   12/25/2018
Period Ending:     12/31/2018
Pay Date:          01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
  Federal:   2                        Federal:
  State:     2                        State:
  Local:     2                        Local:
Social Security Number:   XXX-XX-XXXX

13

30

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1150.00 | 1150.00 |
| **Gross Pay** | | | **$1,150.00** | **$1,150.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -121.74 | 121.74 |
| Social Security | -71.30 | 71.30 |
| Medicare | -16.68 | 16.68 |
| New York State Income | -54.67 | 54.67 |
| New York Paid Family Leave | -1.76 | 1.76 |
| New York City R Local | -37.24 | 37.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| **Net Pay** | **$846.01** |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 846.01 |

Your federal taxable wages this period are  $1,150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        01/04/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 846.01 |

## D1386

A0642

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 135 of 195 PageID #: 1260

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/200 | 831271 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
Federal: 0    Federal:
State: 0    State:
Local: 0    Local:
Social Security Number: XXX-XX-XXXX

32

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1000.00 | 1000.00 |
| Gross Pay | | | $1,000.00 | $1,000.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 716.73 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -124.28 | 124.28 |
| Social Security | -62.00 | 62.00 |
| Medicare | -14.50 | 14.50 |
| New York State Income | -47.74 | 47.74 |
| New York Paid Family Leave | -1.53 | 1.53 |
| New York City R Local | -32.62 | 32.62 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $716.73 |
|---|---|

Your federal taxable wages this period are $1,000.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:    01/04/2019



THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5081 | XXXXXXXXX | 716.73 |

**D1387**

A0643

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2643778 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| Period Starting: | 12/25/2018 |
|---|---|
| Period Ending: | 12/31/2018 |
| Pay Date: | 01/04/2019 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | Tax Override: | |
|---|---|---|---|
| Exemptions/Allowances: | | | |
| Federal: | 2 | Federal: | |
| State: | 2 | State: | |
| Local: | 2 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | $300.00 | $600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.54 | 6.54 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -4.77 | 4.77 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -3.48 | 3.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $261.20 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2643778 |
|---|---|
| Pay Date: | 01/04/2019 |

Pay to the
order of:

This amount:   TWO HUNDRED SIXTY ONE AND 20/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$261.20

**D1388**

A0644

**Earnings Statement**

**ADP**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM | 24008135   01/200 | 2643785 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
    Federal:    3      Federal:
    State:    3      State:
    Local:    3      Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 350.00 | 350.00 |
| **Gross Pay** | | | **$350.00** | $650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 3.46 |
| Social Security | -21.70 | 40.30 |
| Medicare | -5.08 | 9.43 |
| New York State Income | -6.00 | 10.00 |
| New York Paid Family Leave | -0.54 | 1.00 |
| New York City R Local | -4.48 | 7.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$308.14** |
|---|---|

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2643785
Pay Date: 01/04/2019

Pay to the order of:   Leticia F S███████

This amount:   THREE HUNDRED EIGHT AND 14/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$308.14

Letic███
1240███
Coll███

**D1389**

A0645

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 138 of 195 PageID #: 1263

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 831270 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** ADP.

Period Starting:  12/25/2018
Period Ending:  12/31/2018
Pay Date:  01/04/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Married
Exemptions/Allowances:       Tax Override:
  Federal:  2             Federal:
  State:  2              State:
  Local:  2              Local:
Social Security Number:  XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | | 350.00 |
| Commission | | 0.00 | 300.00 | 300.00 |
| **Gross Pay** | | | **$300.00** | $650.00 |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 268.43 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 40.30 |
| Medicare | -4.35 | 9.43 |
| New York State Income | -4.35 | 10.70 |
| New York Paid Family Leave | -0.46 | 1.00 |
| New York City R Local | -3.21 | 8.00 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$268.43** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:       01/04/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 268.43 |

**D1390**

A0646

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 139 of 195 PageID #: 1264

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2643781 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

**ADP**

Period Starting:   12/25/2018
Period Ending:   12/31/2018
Pay Date:   01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:   Tax Override:
  Federal:   2   Federal:
  State:   2   State:
  Local:   2   Local:
Social Security Number:   XXX-XX-XXXX

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 345.00 | 345.00 |
| Gross Pay | | | $345.00 | $645.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -21.39 | 39.99 |
| Medicare | -5.00 | 9.35 |
| New York State Income | -6.15 | 10.50 |
| New York Paid Family Leave | -0.53 | 0.99 |
| New York City R Local | -4.63 | 7.84 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $306.70 |
|---|---|

Your federal taxable wages this period are  $345.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2643781
Pay Date:   01/04/2019

Pay to the
order of:
This amount:   THREE HUNDRED SIX AND 70/100

THIS IS NOT A CHECK

$306.70

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



**D1391**

A0647

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643775 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
  Federal:   1            Federal:
  State:   1            State:
  Local:   1            Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 905.00 | 1405.00 |
| Gross Pay | | | $905.00 | $1,405.00 |

4

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -86.41 | 124.22 |
| Social Security | -56.11 | 87.11 |
| Medicare | -13.12 | 20.37 |
| New York State Income | -40.65 | 56.39 |
| New York Paid Family Leave | -1.38 | 2.15 |
| New York City R Local | -27.87 | 39.13 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $678.86 |
|---|---|

Your federal taxable wages this period are  $905.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2643775
Pay Date:   01/04/2019

Pay to the order of:

This amount:   SIX HUNDRED SEVENTY EIGHT AND 86/100        $678.86

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1392**

A0648

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 141 of 195 PageID #: 1266

**Earnings Statement** ADP

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 831268 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   12/25/2018
Period Ending:   12/31/2018
Pay Date:   01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:       Tax Override:
 Federal:   0       Federal:
 State:   2       State:
 Local:   2       Local:
Social Security Number:   XXX-XX-XXXX

**3**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | | 600.00 |
| Commission | | 0.00 | 1365.00 | 1365.00 |
| **Gross Pay** | | | **$1,365.00** | **$1,965.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -204.58 | 264.08 |
| Social Security | -84.63 | 121.83 |
| Medicare | -19.79 | 28.49 |
| New York State Income | -68.02 | 88.54 |
| New York Paid Family Leave | -2.09 | 3.01 |
| New York City R Local | -46.25 | 60.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$939.04** |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5638 | XXXXXXXXX | 939.04 |

Your federal taxable wages this period are  $1,365.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   01/04/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5638 | XXXXXXXXX | 939.04 |

**D1393**

A0649

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 142 of 195 PageID #: 1267

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2643773 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:   3          Federal:
  State:     3          State:
  Local:     3          Local:
Social Security Number: XXX-XX-XXXX

**17**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 300.00 |
| Commission | | 0.00 | 700.00 | 700.00 |
| **Gross Pay** | | | **$700.00** | $1,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -42.42 | 42.42 |
| Social Security | -43.40 | 62.00 |
| Medicare | -10.15 | 14.50 |
| New York State Income | -25.53 | 29.53 |
| New York Paid Family Leave | -1.07 | 1.53 |
| New York City R Local | -17.77 | 20.77 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$559.06** |

Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2643773
Pay Date: 01/04/2019

Pay to the order of:

This amount: FIVE HUNDRED FIFTY NINE AND 06/100

THIS IS NOT A CHECK

$559.06

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1394**

**A0650**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 143 of 195 PageID #: 1268

| Company Code   Loc/Dept   Number   Page |
|---|
| RB7QLM 24008135  01/200   2643777  1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:         01/04/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
　　Federal:   0          Federal:
　　State:     0          State:
　　Local:     0          Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  |  | 0.00 | 250.00 |
| Commission |  | 0.00 | 200.00 | 200.00 |
| Gross Pay |  |  | $200.00 | $450.00 |

18

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -12.69 | 30.38 |
| Social Security | -12.40 | 27.90 |
| Medicare | -2.90 | 6.53 |
| New York State Income | -2.31 | 6.62 |
| New York Paid Family Leave | -0.31 | 0.69 |
| New York City R Local | -2.13 | 5.28 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $166.66 |
|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643777
Pay Date:               01/04/2019

Pay to the
order of:
This amount:

ONE HUNDRED SIXTY SIX AND 66/100

THIS IS NOT A CHECK

$166.66

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1395**

A0651

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 144 of 195 PageID #: 1269



**Earnings Statement**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2643783 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
   Federal: 2     Federal:
   State: 2     State:
   Local: 0     Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 500.00 | 500.00 |
| **Gross Pay** | | | **$500.00** | **$800.00** |

20

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -28.12 | 34.66 |
| Social Security | -31.00 | 49.60 |
| Medicare | -7.25 | 11.60 |
| New York State Income | -14.60 | 19.37 |
| New York Paid Family Leave | -0.77 | 1.23 |
| New York City R Local | -12.02 | 16.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$405.64** | |

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2643783
Pay Date: 01/04/2019

Pay to the order of:

This amount:    FOUR HUNDRED FIVE AND 64/100      $405.64

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1396**

A0652

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 145 of 195 PageID #: 1270

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2643779 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:   12/25/2018
Period Ending:    12/31/2018
Pay Date:          01/04/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
  Federal:    2          Federal:
  State:      2          State:
  Local:      2          Local:
Social Security Number:    XXX-XX-XXXX

19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 300.00 | 300.00 |
| Gross Pay | | | $300.00 | $600.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.54 | 13.08 |
| Social Security | -18.60 | 37.20 |
| Medicare | -4.35 | 8.70 |
| New York State Income | -4.77 | 9.54 |
| New York Paid Family Leave | -0.46 | 0.92 |
| New York City R Local | -3.48 | 6.96 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $261.20 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643779
Pay Date:               01/04/2019

Pay to the
order of:

This amount:   TWO HUNDRED SIXTY ONE AND 20/100

THIS IS NOT A CHECK

$261.20

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1397**

A0653

| Company Code    Loc/Dept    Number   Page | Earnings Statement |
|---|---|

Company Code    Loc/Dept    Number   Page
RB7QLM 24008135   017200   2660660  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:     01/07/2019
Pay Date:          01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:
Exemptions/Allowances:          Tax Override:
Federal:    0                   Federal:
State:      0                   State:
Local:      0                   Local:
Social Security Number:   XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2500.00 | 5000.00 |
| Gross Pay | | | $2,500.00 | $0.00 |
| Net Pay | | | $2,500.00 | |

21

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660660
Pay Date:               01/11/2019

Pay to the
order of:
This amount:   TWO THOUSAND FIVE HUNDRED AND 00/100                   $2,500.00

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1398**

A0654

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 147 of 195 PageID #: 1272

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM24008135 | 01/700 | 2660661 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:   01/01/2019
Period Ending:   01/07/2019
Pay Date:   01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:          Tax Override:
  Federal:   1          Federal:
  State:   2          State:
  Local:   2          Local:
Social Security Number:   XXX-XX-XXXX

22

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 650.00 | | 1300.00 |
| | | | | |
| Gross Pay | | | $650.00 | $1,300.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.23 | 68.46 |
| Social Security | -40.30 | 80.60 |
| Medicare | -9.42 | 18.85 |
| New York State Income | -22.96 | 45.92 |
| New York Paid Family Leave | -0.99 | 1.98 |
| New York City R Local | -16.10 | 32.20 |
| | | |
| Voluntary Deductions | this period | year to date |
| New York voluntary disability | -0.60 | 1.20 |
| | | |
| Net Pay | $525.40 | |

Your federal taxable wages this period are  $650.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660661
Pay Date:   01/11/2019

Pay to the
order of:

This amount:   FIVE HUNDRED TWENTY FIVE AND 40/100          $525.40

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

D1399

A0655

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 148 of 195 PageID #: 1273

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2660658 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:    01/07/2019
Pay Date:           01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
　Federal:   3          Federal:
　State:      3          State:
　Local:      3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 1175.00 |
| Gross Pay | | | $300.00 | $1,775.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 3.46 |
| Social Security | -18.60 | 58.90 |
| Medicare | -4.35 | 13.78 |
| New York State Income | -4.00 | 14.00 |
| New York Paid Family Leave | -0.46 | 1.46 |
| New York City R Local | -3.00 | 10.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $268.99 |
|---|---|

Your federal taxable wages this period are $300.00

63-8413/2570

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660658
Pay Date:                     01/11/2019

Pay to the order of:   Leticia F S███████

This amount:   TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$268.99

Leti█
124█
Coll█

**D1400**

A0656

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 149 of 195 PageID #: 1274

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 848873 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement



Period Starting:   01/01/2019
Period Ending:     01/07/2019
Pay Date:          01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:        Tax Override:
    Federal:    2              Federal:
    State:      2              State:
    Local:      2              Local:
Social Security Number:   XXX-XX-XXXX

2

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 700.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | $350.00 | $1,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -21.70 | 62.00 |
| Medicare | -5.07 | 14.50 |
| New York State Income | -6.35 | 17.05 |
| New York Paid Family Leave | -0.54 | 1.54 |
| New York City R Local | -4.79 | 12.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $310.95 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 310.95 |

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/11/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 310.95 |

**D1401**

A0657

Case 1:21-cv-07163-OEM-LB  Document 87-10  Filed 09/01/23  Page 150 of 195 PageID #: 1275

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/100 | 848868 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
　Federal:    1          Federal:
　State:      1          State:
　Local:      1          Local:
Social Security Number: XXX-XX-XXXX

23

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 825.00 | 1650.00 |
| Gross Pay | | | $825.00 | $1,650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -76.81 | 153.62 |
| Social Security | -51.15 | 102.30 |
| Medicare | -11.97 | 23.93 |
| New York State Income | -35.68 | 71.36 |
| New York Paid Family Leave | -1.26 | 2.52 |
| New York City R Local | -24.55 | 49.10 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $622.98 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.98 |

Your federal taxable wages this period are $825.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/11/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.98 |

**D1402**

A0658

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 151 of 195 PageID #: 1276

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2660642 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:    01/07/2019
Pay Date:           01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:      Single
Exemptions/Allowances:                   Tax Override:
        Federal:      1                          Federal:
        State:        1                           State:
        Local:        0                           Local:
Social Security Number:     XXX-XX-XXXX

7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 400.00 |
| Commission | | | 0.00 | 300.00 |
| Gross Pay | | | $200.00 | $700.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.62 | 9.24 |
| Social Security | -12.40 | 24.80 |
| Medicare | -2.90 | 5.80 |
| New York State Income | -1.54 | 3.08 |
| New York Paid Family Leave | -0.31 | 0.62 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $177.63 |
|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660642
Pay Date:                       01/11/2019

Pay to the
order of:

This amount:     ONE HUNDRED SEVENTY SEVEN AND 63/100                          $177.63

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1403**

A0659

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 152 of 195 PageID #:
1277

| Company Code     Loc/Dept     Number   Page | Earnings Statement | ADP |
|---|---|---|
| RB7 QLM 24008135  01/200    2660654  1 of 1 | | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:    01/01/2019
Period Ending:      01/07/2019
Pay Date:           01/11/2019

Business Phone:     732-979-6956

Taxable Marital Status:    Married
Exemptions/Allowances:          Tax Override:
    Federal:    2              Federal:
    State:      2              State:
    Local:      2              Local:
Social Security Number:    XXX-XX-XXXX

24

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 880.00 |
| Gross Pay | | | $300.00 | $1,480.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -18.60 | 58.59 |
| Medicare | -4.35 | 13.70 |
| New York State Income | -4.35 | 14.85 |
| New York Paid Family Leave | -0.46 | 1.45 |
| New York City R Local | -3.21 | 11.05 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $268.43 |
|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660654
Pay Date:               01/11/2019

Pay to the
order of:

This amount:    TWO HUNDRED SIXTY EIGHT AND 43/100                          $268.43

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

**D1404**

A0660

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 153 of 195 PageID #: 1278

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 CLM 24008135 | 01/200 | 2660648 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6966

Taxable Marital Status: Single
Exemptions/Allowances:           Tax Override:
Federal:    1        Federal:
State:    1         State:
Local:    1         Local:
Social Security Number: XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1905.00 |
| Commission | | | 0.00 | 575.00 |
| Gross Pay | | | $500.00 | $2,480.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -37.81 | 162.03 |
| Social Security | -31.00 | 118.11 |
| Medicare | -7.25 | 27.62 |
| New York State Income | -15.74 | 72.13 |
| New York Paid Family Leave | -0.77 | 2.92 |
| New York City R Local | -11.26 | 50.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $395.57 |
|---|---|

Your federal taxable wages this period are $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2660648
Pay Date:  01/11/2019

Pay to the order of:

This amount:  THREE HUNDRED NINETY FIVE AND 57/100

THIS IS NOT A CHECK

$395.57

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1405**

A0661

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM 24008135 | 01/200 | 2660641 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:    01/07/2019
Pay Date:          01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:           Tax Override:
  Federal:   3           Federal:
  State:     3           State:
  Local:     0           Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 1200.00 |
| Gross Pay | | | $600.00 | $1,200.00 |

13

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -30.42 | 60.84 |
| Social Security | -37.20 | 74.40 |
| Medicare | -8.70 | 17.40 |
| New York State Income | -19.37 | 38.74 |
| New York Paid Family Leave | -0.92 | 1.84 |
| New York City R Local | -16.02 | 32.04 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $486.77 |
|---|---|

Your federal taxable wages this period are  $600.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660641
Pay Date:                01/11/2019

Pay to the
order of:

This amount:   FOUR HUNDRED EIGHTY SIX AND 77/100                                    $486.77

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1406**

A0662

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 155 of 195 PageID #: 1280

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 848871 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:    01/01/2019
Period Ending:     01/07/2019
Pay Date:           01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:              Tax Override:
  Federal:    0                Federal:
  State:      2                State:
  Local:      2                Local:
Social Security Number:    XXX-XX-XXXX

3

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 1200.00 |
| Commission | | | 0.00 | 2470.00 |
| Gross Pay | | | $600.00 | $3,670.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.50 | 323.58 |
| Social Security | -37.20 | 159.03 |
| Medicare | -8.70 | 37.19 |
| New York State Income | -20.52 | 109.06 |
| New York Paid Family Leave | -0.92 | 3.93 |
| New York City R Local | -14.45 | 75.15 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $458.11 |
|---|---|

**Deposits**
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

Your federal taxable wages this period are  $600.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        01/11/2019

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

**D1407**

A0663

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 2400B135 | U17/00 | 2660662 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   ADP

Period Starting:   01/01/2019
Period Ending:   01/07/2019
Pay Date:   01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
  Federal:   0                 Federal:
  State:   1                   State:
  Local:   1                   Local:
Social Security Number:   XXX-XX-XXXX

25

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1000.00 |
| Gross Pay | | | $500.00 | $1,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.50 | 95.00 |
| Social Security | -31.00 | 62.00 |
| Medicare | -7.25 | 14.50 |
| New York State Income | -15.74 | 31.48 |
| New York Paid Family Leave | -0.77 | 1.54 |
| New York City R Local | -11.26 | 22.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $385.88 |
|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660662
Pay Date:   01/11/2019

Pay to the order of:

This amount:   THREE HUNDRED EIGHTY FIVE AND 88/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$385.88

**D1408**

A0664

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 157 of 195 PageID #: 1282

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2660646 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:  01/01/2019
Period Ending:    01/07/2019
Pay Date:         01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
  Federal:   3                    Federal:
  State:     3                    State:
  Local:     3                    Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 300.00 | 600.00 |
| Commission |  |  | 0.00 | 1085.00 |
| Gross Pay |  |  | $300.00 | $1,685.00 |

17

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 42.42 |
| Social Security | -18.60 | 80.60 |
| Medicare | -4.35 | 18.85 |
| New York State Income | -4.00 | 33.53 |
| New York Paid Family Leave | -0.46 | 1.99 |
| New York City R Local | -3.00 | 23.77 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $268.99 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660646
Pay Date:               01/11/2019

Pay to the
order of:
This amount:    TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$268.99

D1409

A0665

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 158 of 195 PageID #: 1283

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01200 | 2660644 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:    01/01/2019
Period Ending:      01/07/2019
Pay Date:           01/11/2019

Business Phone:     732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:        Tax Override:
    Federal:   1          Federal:
    State:     1          State:
    Local:     1          Local:
Social Security Number:   XXX-XX-XXXX

26

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 1400.00 |
| Gross Pay | | | $700.00 | $1,400.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -39.62 | 79.24 |
| Social Security | -43.40 | 86.80 |
| Medicare | -10.15 | 20.30 |
| New York State Income | -27.26 | 54.52 |
| New York Paid Family Leave | -1.07 | 2.14 |
| New York City R Local | -18.97 | 37.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $558.93 |
|---|---|

Your federal taxable wages this period are $700.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660644
Pay Date:               01/11/2019

Pay to the order of:
This amount:    FIVE HUNDRED FIFTY EIGHT AND 93/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$558.93

## D1410

A0666

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 159 of 195 PageID #: 1284

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2660650 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:            Tax Override:
   Federal:   0            Federal:
   State:   0            State:
   Local:   0            Local:
Social Security Number:   XXX-XX-XXXX

18

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 350.00 | 600.00 |
| Commission | | 0.00 | | 1375.00 |
| **Gross Pay** | | | **$350.00** | **$1,975.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -29.50 | 59.88 |
| Social Security | -21.70 | 49.60 |
| Medicare | -5.07 | 11.60 |
| New York State Income | -8.53 | 15.15 |
| New York Paid Family Leave | -0.54 | 1.23 |
| New York City R Local | -6.35 | 11.63 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$277.71** | |

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660650
Pay Date:   01/11/2019

Pay to the
order of:
This amount:   TWO HUNDRED SEVENTY SEVEN AND 71/100

THIS IS NOT A CHECK

$277.71

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

D1411

A0667

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 848874 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:    01/07/2019
Pay Date:         01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
    Federal:   4          Federal:
    State:     4          State:
    Local:     4          Local:
Social Security Number:   XXX-XX-XXXX

28

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1000.00 |
| Gross Pay | | | $500.00 | $1,000.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -10.38 | 20.76 |
| Social Security | -31.00 | 62.00 |
| Medicare | -7.25 | 14.50 |
| New York State Income | -12.33 | 24.66 |
| New York Paid Family Leave | -0.77 | 1.54 |
| New York City R Local | -8.98 | 17.96 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $428.69 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX9319 | XXXXXXXXX | 428.69 |

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/11/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX9319 | XXXXXXXXX | 428.69 |

**D1412**

A0668

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 161 of 195 PageID #: 1286

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 848870 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:   01/07/2019
Pay Date:   01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:
Exemptions/Allowances:          Tax Override:
Federal:   0          Federal:
State:   0          State:
Local:   0          Local:
Social Security Number:   XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2418.24 | 3061.12 |
| Gross Pay | | | $2,418.24 | $0.00 |
| Net Pay | | | $2,418.24 | |

29

Deposits
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX3452 | XXXXXXXXX | 2418.24 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/11/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX3452 | XXXXXXXXX | 2418.24 |

**D1413**

A0669

Case 1:21-cv-07163-OEM-LB  Document 87-10  Filed 09/01/23  Page 162 of 195 PageID #: 1287

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2660656 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP®

| | |
|---|---|
| Period Starting: | 01/01/2019 |
| Period Ending: | 01/07/2019 |
| Pay Date: | 01/11/2019 |

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:          Tax Override:
  Federal:    2                   Federal:
  State:       2                   State:
  Local:       0                   Local:
Social Security Number:  XXX-XX-XXXX

20

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 200.00 | 200.00 | 500.00 |
| Commission | | | 0.00 | 650.00 |
| **Gross Pay** | | | **$200.00** | **$1,150.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 34.66 |
| Social Security | -12.40 | 62.00 |
| Medicare | -2.90 | 14.50 |
| New York State Income | -0.77 | 20.14 |
| New York Paid Family Leave | -0.31 | 1.54 |
| New York City R Local | -2.13 | 18.88 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |
| Child support 1 | -108.00 | 108.00 |
| **Net Pay** | **$72.89** | |

Your federal taxable wages this period are $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2660656
Pay Date:  01/11/2019

Pay to the order of:

This amount:  SEVENTY TWO AND 89/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$72.89

D1414

A0670

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 163 of 195 PageID #: 1288

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7CLM 24008135 | 01/100 | 848869 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:   01/07/2019
Pay Date:   01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:     Tax Override:
  Federal:   2     Federal:
  State:   2     State:
  Local:   2     Local:
Social Security Number:   XXX-XX-XXXX

13

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 1200.00 | 2350.00 | |
| | | | | |
| Gross Pay | | | $1,200.00 | $2,350.00 |

30

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -132.74 | 254.48 |
| Social Security | -74.40 | 145.70 |
| Medicare | -17.40 | 34.08 |
| New York State Income | -57.78 | 112.45 |
| New York Paid Family Leave | -1.84 | 3.60 |
| New York City R Local | -39.32 | 76.56 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| Net Pay | $875.92 |
|---|---|

Deposits
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 875.92 |

Your federal taxable wages this period are  $1,200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   01/11/2019



THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 875.92 |

**D1415**

A0671

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 164 of 195 PageID #: 1289

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/Z00 | 2660652 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
  Federal:   2     Federal:
  State:     2     State:
  Local:     2     Local:
Social Security Number:   XXX-XX-XXXX

**19**

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular |  | 0.00 | 300.00 | 600.00 |
| Commission |  |  | 0.00 | 1050.00 |
| **Gross Pay** |  |  | **$300.00** | **$1,650.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.54 | 19.62 |
| Social Security | -18.60 | 55.80 |
| Medicare | -4.35 | 13.05 |
| New York State Income | -4.77 | 14.31 |
| New York Paid Family Leave | -0.46 | 1.38 |
| New York City R Local | -3.48 | 10.44 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $261.20 |
|---|---|

Your federal taxable wages this period are $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2660652
Pay Date: 01/11/2019

Pay to the order of:
This amount:   TWO HUNDRED SIXTY ONE AND 20/100

**THIS IS NOT A CHECK**

VOID – NON NEGOTIABLE    VOID – NON NEGOTIABLE

$261.20

## D1416

A0672

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 165 of 195 PageID #: 1290

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2660645 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    01/01/2019
Period Ending:    01/07/2019
Pay Date:    01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:    Tax Override:
Federal:    0    Federal:
State:    0    State:
Local:    0    Local:
Social Security Number:    XXX-XX-XXXX

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 100.00 | 100.00 |
| Gross Pay | | | $100.00 | $100.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -2.69 | 2.69 |
| Social Security | -6.20 | 6.20 |
| Medicare | -1.45 | 1.45 |
| New York State Income | 0.00 | 0.00 |
| New York Paid Family Leave | -0.15 | 0.15 |
| New York City R Local | -0.08 | 0.08 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.50 | 0.50 |
| Net Pay | $88.93 | |

35

Your federal taxable wages this period are $100.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2660645
Pay Date:    01/11/2019

Pay to the
order of:
This amount:    EIGHTY EIGHT AND 93/100    $88.93

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

D1417

A0673

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 166 of 195 PageID #: 1291

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 017200 | 2660659 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
Federal: 3    Federal:
State: 3    State:
Local: 3    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 825.00 | 1175.00 |
| **Gross Pay** | | | **$825.00** | **$1,775.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -57.42 | 60.88 |
| Social Security | -51.15 | 110.05 |
| Medicare | -11.96 | 25.74 |
| New York State Income | -33.29 | 47.29 |
| New York Paid Family Leave | -1.26 | 2.72 |
| New York City R Local | -22.96 | 33.44 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $646.36 |
|---|---|

Your federal taxable wages this period are $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2660659
Pay Date: 01/11/2019

Pay to the order of:   Leticia F S▮▮▮▮
This amount:   SIX HUNDRED FORTY SIX AND 36/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$646.36

Letic▮
1240▮
Coll▮

**D1418**

A0674

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 167 of 195 PageID #: 1292

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2660643 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:      01/01/2019
Period Ending:        01/07/2019
Pay Date:             01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:          Tax Override:
   Federal:  1                      Federal:
   State:    1                      State:
   Local:    0                      Local:
Social Security Number:   XXX-XX-XXXX

7

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 400.00 |
| Commission | | 0.00 | 300.00 | 300.00 |
| **Gross Pay** | | | **$300.00** | **$700.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.62 | 23.86 |
| Social Security | -18.60 | 43.40 |
| Medicare | -4.35 | 10.15 |
| New York State Income | -5.54 | 8.62 |
| New York Paid Family Leave | -0.46 | 1.08 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$255.83** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660643
Pay Date:               01/11/2019

Pay to the
order of:

This amount:     TWO HUNDRED FIFTY FIVE AND 83/100          **THIS IS NOT A CHECK**          $255.83

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1419**

A0675

**Earnings Statement**

**ADP**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2660655 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:     Tax Override:
   Federal:   2        Federal:
   State:     2        State:
   Local:     2        Local:
Social Security Number: XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 535.00 | 880.00 |
| **Gross Pay** | | | **$535.00** | **$1,480.00** |

24

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.65 | 14.65 |
| Social Security | -33.17 | 91.76 |
| Medicare | -7.76 | 21.46 |
| New York State Income | -16.04 | 30.89 |
| New York Paid Family Leave | -0.82 | 2.27 |
| New York City R Local | -11.50 | 22.55 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$450.46** |
|---|---|

Your federal taxable wages this period are $535.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2660655
Pay Date: 01/11/2019

Pay to the order of:

This amount:  FOUR HUNDRED FIFTY AND 46/100        $450.46

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



**D1420**

A0676

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2660649 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting: 01/01/2019
Period Ending: 01/07/2019
Pay Date: 01/11/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:   1            Federal:
  State:     1            State:
  Local:     1            Local:
Social Security Number:   XXX-XX-XXXX

4

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1905.00 |
| Commission | | 0.00 | 575.00 | 575.00 |
| **Gross Pay** | | | **$575.00** | **$2,480.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -46.81 | 208.84 |
| Social Security | -35.65 | 153.76 |
| Medicare | -8.34 | 35.96 |
| New York State Income | -20.16 | 92.29 |
| New York Paid Family Leave | -0.88 | 3.80 |
| New York City R Local | -14.22 | 64.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$448.34** |
|---|---|

Your federal taxable wages this period are  $575.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660649
Pay Date:   01/11/2019

Pay to the order of:
This amount:       FOUR HUNDRED FORTY EIGHT AND 34/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$448.34

**D1421**

A0677

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 170 of 195 PageID #: 1295

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 848872 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 01/01/2019 |
| Period Ending: | 01/07/2019 |
| Pay Date: | 01/11/2019 |

Business Phone:   732-979-6966

Taxable Marital Status:   Single
Exemptions/Allowances:       Tax Override:
  Federal:   0                          Federal:
  State:      2                          State:
  Local:     2                          Local:
Social Security Number:   XXX-XX-XXXX

3

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1200.00 |
| Commission | | 0.00 | 1105.00 | 2470.00 |
| **Gross Pay** | | | **$1,105.00** | **$3,670.00** |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 783.53 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -147.38 | 470.96 |
| Social Security | -68.51 | 227.54 |
| Medicare | -16.03 | 53.22 |
| New York State Income | -51.88 | 160.94 |
| New York Paid Family Leave | -1.69 | 5.62 |
| New York City R Local | -35.38 | 110.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$783.53** |
|---|---|

Your federal taxable wages this period are  $1,105.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/11/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 783.53 |

**D1422**

A0678

Case 1:21-cv-07163-OEM-LB    Document 87-10    Filed 09/01/23    Page 171 of 195 PageID #: 1296

| Company Code        Loc/Dept    Number Page | Earnings Statement |
|---|---|
| RB7 QLM 24008135  01/200    2660647  1 of 1 | |
| 161-10 Hillside Ave Auto LLC | **ADP** |
| 161-10 Hillside Ave | |
| Jamaica, NY 11432 | |

| | |
|---|---|
| | Period Starting:    01/01/2019 |
| | Period Ending:    01/07/2019 |
| | Pay Date:    01/11/2019 |
| | |
| | Business Phone:    732-979-6956 |

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
    Federal:    3        Federal:
    State:    3        State:
    Local:    3        Local:
Social Security Number:    XXX-XX-XXXX

17

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00    385.00 | | 1085.00 |
| **Gross Pay** | | | **$385.00** | **$1,685.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.96 | 49.38 |
| Social Security | -23.87 | 104.47 |
| Medicare | -5.58 | 24.43 |
| New York State Income | -7.51 | 41.04 |
| New York Paid Family Leave | -0.59 | 2.58 |
| New York City R Local | -5.61 | 29.38 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$334.28** |
|---|---|

Your federal taxable wages this period are  $385.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2660647
Pay Date:    01/11/2019

Pay to the order of:
This amount:    THREE HUNDRED THIRTY FOUR AND 28/100        $334.28

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

D1423

A0679

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 172 of 195 PageID #: 1297

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2660651 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP.

Period Starting:    01/01/2019
Period Ending:     01/07/2019
Pay Date:            01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
   Federal:    0           Federal:
   State:      0           State:
   Local:      0           Local:
Social Security Number:    XXX-XX-XXXX



18

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 1175.00 | 1375.00 |
| **Gross Pay** | | | **$1,175.00** | **$1,975.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -162.78 | 222.66 |
| Social Security | -72.85 | 122.45 |
| Medicare | -17.04 | 28.64 |
| New York State Income | -58.61 | 73.76 |
| New York Paid Family Leave | -1.80 | 3.03 |
| New York City R Local | -39.88 | 51.51 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$821.44** |
|---|---|

Your federal taxable wages this period are  $1,175.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660651
Pay Date:                      01/11/2019



Pay to the
order of:

This amount:   EIGHT HUNDRED TWENTY ONE AND 44/100           $821.44

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1424**

A0680

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 173 of 195 PageID #: 1298

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2660657 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement



Period Starting:   01/01/2019
Period Ending:    01/07/2019
Pay Date:          01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
    Federal:   2                Federal:
    State:     2                State:
    Local:     0                Local:
Social Security Number:   XXX-XX-XXXX

**20**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 500.00 |
| Commission | | 0.00 | 150.00 | 650.00 |
| **Gross Pay** | | | **$150.00** | **$1,150.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 34.66 |
| Social Security | -9.30 | 71.30 |
| Medicare | -2.18 | 16.68 |
| New York State Income | 0.00 | 20.14 |
| New York Paid Family Leave | -0.23 | 1.77 |
| New York City R Local | -1.10 | 19.98 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |
| Child support 1 | 0.00 | 108.00 |

| **Net Pay** | | **$136.59** |

Your federal taxable wages this period are $150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2660657
Pay Date:                01/11/2019

Pay to the order of:
This amount:    ONE HUNDRED THIRTY SIX AND 59/100



THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$136.59

**D1425**

A0681

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 174 of 195 PageID #: 1299

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2660653 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   01/01/2019
Period Ending:   01/07/2019
Pay Date:   01/11/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   2   Federal:
State:   2   State:
Local:   2   Local:
Social Security Number:   XXX-XX-XXXX

19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 600.00 |
| Commission | | 0.00 | 750.00 | 1050.00 |
| **Gross Pay** | | | **$750.00** | **$1,650.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -58.12 | 77.74 |
| Social Security | -46.50 | 102.30 |
| Medicare | -10.88 | 23.93 |
| New York State Income | -29.83 | 44.14 |
| New York Paid Family Leave | -1.15 | 2.53 |
| New York City R Local | -20.64 | 31.08 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$582.28** |
|---|---|

Your federal taxable wages this period are  $750.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2660653
Pay Date:   01/11/2019

Pay to the
order of:

This amount:   FIVE HUNDRED EIGHTY TWO AND 28/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$582.28

**D1426**

A0682

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 175 of 195 PageID #: 1300

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671281 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting:  01/08/2019
Period Ending:  01/14/2019
Pay Date:  01/18/2019

Business Phone:  732-979-6955

Taxable Marital Status:
Exemptions/Allowances:
Federal:  0
State:  0
Local:  0
Social Security Number:  XX-XXXXXXX

Tax Override:
Federal:
State:
Local:

21

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2500.00 | 7500.00 |
| Gross Pay | | | $2,500.00 | $0.00 |
| Net Pay | | | $2,500.00 | |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2671281
Pay Date:  01/18/2019

Pay to the order of:

This amount:  TWO THOUSAND FIVE HUNDRED AND 00/100

THIS IS NOT A CHECK

$2,500.00

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

D1427

A0683

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 176 of 195 PageID #: 1301

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017700 | 2671282 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting:  01/08/2019
Period Ending:   01/14/2019
Pay Date:        01/18/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:              Tax Override:
  Federal:   1                        Federal:
  State:     2                        State:
  Local:     2                        Local:
Social Security Number:   XXX-XX-XXXX

22

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 650.00 | 1950.00 |
| Gross Pay | | | $650.00 | $1,950.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.23 | 102.69 |
| Social Security | -40.30 | 120.90 |
| Medicare | -9.43 | 28.28 |
| New York State Income | -22.96 | 68.88 |
| New York Paid Family Leave | -0.99 | 2.97 |
| New York City R Local | -16.10 | 48.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $525.39 |
|---|---|

Your federal taxable wages this period are $650.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2671282
Pay Date:               01/18/2019

Pay to the
order of:

This amount:   FIVE HUNDRED TWENTY FIVE AND 39/100                        $525.39

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



**D1428**

A0684

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671278 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   01/08/2019
Period Ending:     01/14/2019
Pay Date:          01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
  Federal:   3                   Federal:
  State:     3                   State:
  Local:     3                   Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | 200.00 | 800.00 | |
| Commission | | 0.00 | 1525.00 | |
| | | | | |
| Gross Pay | | | $200.00 | $2,325.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 60.88 |
| Social Security | -12.40 | 122.45 |
| Medicare | -2.90 | 28.64 |
| New York State Income | 0.00 | 47.29 |
| New York Paid Family Leave | -0.31 | 3.03 |
| New York City R Local | -0.95 | 34.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $182.84 |
|---|---|

Your federal taxable wages this period are  $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671278
Pay Date:                01/18/2019

Pay to the order of:   Leticia F S█████████

This amount:   ONE HUNDRED EIGHTY TWO AND 84/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

| $182.84 |
|---|

Leti███
124██
Coll███

**D1429**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 178 of 195 PageID #: 1303

**Earnings Statement**



| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | B62485 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 01/06/2019
Period Ending: 01/14/2019
Pay Date: 01/18/2019

Business Phone: 732-979-6956

Taxable Marital Status: Married
Exemptions/Allowances:
Federal: 2
State: 2
Local: 2
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

2

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 250.00 | 950.00 |
| Commission | | 0.00 | 0.00 | 900.00 |
| Gross Pay | | | $250.00 | $1,850.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 0.00 |
| Social Security | -15.50 | 77.50 |
| Medicare | -3.63 | 18.13 |
| New York State Income | -2.35 | 19.40 |
| New York Paid Family Leave | -0.38 | 1.92 |
| New York City R Local | -2.17 | 14.96 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| Net Pay | $225.37 |
|---|---|

**Deposits**

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 225.37 |

Your federal taxable wages this period are $250.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:   01/18/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0706 | XXXXXXXXX | 225.37 |

**D1430**

A0686

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 179 of 195 PageID #: 1304

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/100 | 882480 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    01/08/2019
Period Ending:     01/14/2019
Pay Date:          01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:           Tax Override:
 Federal:    1                Federal:
 State:     1                State:
 Local:     1                Local:
Social Security Number:    XXX-XX-XXXX

23

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 825.00 | 2475.00 |
| Gross Pay | | | $825.00 | $2,475.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -76.81 | 230.43 |
| Social Security | -51.15 | 153.45 |
| Medicare | -11.96 | 35.89 |
| New York State Income | -35.68 | 107.04 |
| New York Paid Family Leave | -1.26 | 3.78 |
| New York City R Local | -24.55 | 73.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $622.99 |
|---|---|

**Deposits**

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.99 |

Your federal taxable wages this period are  $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        01/18/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX5715 | XXXXXXXXX | 622.99 |

THIS IS NOT A CHECK

D1431

A0687

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2671264 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:  01/08/2019
Period Ending:  01/14/2019
Pay Date:  01/18/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:  Tax Override:
Federal:  1     Federal:
State:  1     State:
Local:  0     Local:
Social Security Number:  XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 600.00 |
| Commission | | | 0.00 | 300.00 |
| **Gross Pay** | | | **$200.00** | **$900.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -4.62 | 28.48 |
| Social Security | -12.40 | 55.80 |
| Medicare | -2.90 | 13.05 |
| New York State Income | -1.54 | 10.16 |
| New York Paid Family Leave | -0.31 | 1.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$177.63** |
|---|---|

7

Your federal taxable wages this period are $200.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:  2671264
Pay Date:  01/18/2019

Pay to the order of:

This amount:   ONE HUNDRED SEVENTY SEVEN AND 63/100         $177.63

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1432**

A0688

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 181 of 195 PageID #: 1306

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017/200 | 2671276 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   01/08/2019
Period Ending:    01/14/2019
Pay Date:             01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Married
Exemptions/Allowances:          Tax Override:
  Federal:    2           Federal:
  State:       2           State:
  Local:       2           Local:
Social Security Number:    XXX-XX-XXXX

24

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | 0.00 | | 1245.00 |
| **Gross Pay** | | | **$300.00** | **$2,145.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 14.65 |
| Social Security | -18.60 | 110.36 |
| Medicare | -4.35 | 25.81 |
| New York State Income | -4.35 | 35.24 |
| New York Paid Family Leave | -0.46 | 2.73 |
| New York City R Local | -3.21 | 25.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$268.43** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671276
Pay Date:                       01/18/2019

Pay to the order of:
This amount:    TWO HUNDRED SIXTY EIGHT AND 43/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$268.43

**D1433**

A0689

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 182 of 195 PageID #:
1307

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671270 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting:   01/08/2019
Period Ending:     01/14/2019
Pay Date:          01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
  Federal:   1        Federal:
  State:     1        State:
  Local:     1        Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 2405.00 |
| Commission | | 0.00 | | 1245.00 |
| **Gross Pay** | | | **$500.00** | **$3,650.00** |

4

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -37.81 | 246.65 |
| Social Security | -31.00 | 184.76 |
| Medicare | -7.25 | 43.21 |
| New York State Income | -15.74 | 108.03 |
| New York Paid Family Leave | -0.77 | 4.57 |
| New York City R Local | -11.26 | 75.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$395.57** |
|---|---|

Your federal taxable wages this period are  $500.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2671270
Pay Date:               01/18/2019

Pay to the
order of:

This amount:   THREE HUNDRED NINETY FIVE AND 57/100                    $395.57

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1434**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2671263 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting:   01/08/2019
Period Ending:    01/14/2019
Pay Date:           01/18/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
   Federal:   3            Federal:
   State:     3            State:
   Local:     0            Local:
Social Security Number:   XXX-XX-XXXX

13

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 1800.00 |
| Gross Pay | | | $600.00 | $1,800.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -30.42 | 91.26 |
| Social Security | -37.20 | 111.60 |
| Medicare | -8.70 | 26.10 |
| New York State Income | -19.37 | 58.11 |
| New York Paid Family Leave | -0.92 | 2.76 |
| New York City R Local | -16.02 | 48.06 |
| Voluntary Deductions | this period | year to date |
| New York voluntary disability | -0.60 | 1.80 |
| Net Pay | $486.77 | |

Your federal taxable wages this period are  $600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671263
Pay Date:                      01/18/2019

Pay to the order of:
This amount:   FOUR HUNDRED EIGHTY SIX AND 77/100   $486.77

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

**D1435**

A0691

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 184 of 195 PageID #: 1309

| Company Code   Loc/Dept   Number   Page | Earnings Statement |  |
|---|---|---|

Company Code   Loc/Dept   Number   Page
RB7QLM 24008135  012D0  862483  1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

Period Starting:    01/08/2019
Period Ending:     01/14/2019
Pay Date:             01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
    Federal:   0                    Federal:
    State:     2                    State:
    Local:     2                    Local:
Social Security Number:  XXX-XX-XXXX

3

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 600.00 | 1800.00 |
| Commission | | 0.00 | | 3710.00 |
| **Gross Pay** | | | **$600.00** | **$5,510.00** |

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -59.50 | 530.46 |
| Social Security | -37.20 | 264.74 |
| Medicare | -8.70 | 61.92 |
| New York State Income | -20.52 | 181.46 |
| New York Paid Family Leave | -0.92 | 6.54 |
| New York City R Local | -14.45 | 124.98 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$458.11** | |

Your federal taxable wages this period are  $600.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/18/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX6638 | XXXXXXXXX | 458.11 |

**D1436**

A0692

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 185 of 195 PageID #: 1310

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/700 | 2671283 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    01/08/2019
Period Ending:     01/14/2019
Pay Date:          01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:        Tax Override:
  Federal:    0          Federal:
  State:    1            State:
  Local:    1            Local:
Social Security Number:   XXX-XX-XXXX

25

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1500.00 |
| Gross Pay | | | $500.00 | $1,500.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -47.50 | 142.50 |
| Social Security | -31.00 | 93.00 |
| Medicare | -7.25 | 21.75 |
| New York State Income | -15.74 | 47.22 |
| New York Paid Family Leave | -0.77 | 2.31 |
| New York City R Local | -11.26 | 33.78 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | | $385.88 |

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671283
Pay Date:              01/18/2019

Pay to the
order of:
This amount:

THREE HUNDRED EIGHTY FIVE AND 88/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$385.88



**D1437**

A0693

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671268 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    01/08/2019
Period Ending:      01/14/2019
Pay Date:           01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:          Tax Override:
    Federal:    3          Federal:
    State:      3          State:
    Local:      3          Local:
Social Security Number:    XXX-XX-XXXX

17

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 1575.00 |
| Gross Pay | | | $300.00 | $2,475.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 49.38 |
| Social Security | -18.60 | 123.07 |
| Medicare | -4.35 | 28.78 |
| New York State Income | -4.00 | 45.04 |
| New York Paid Family Leave | -0.46 | 3.04 |
| New York City R Local | -3.00 | 32.38 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | | $268.99 |
|---|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

53-8413/2670

Payroll Check Number:    2671268
Pay Date:                01/18/2019

Pay to the order of:

This amount:    TWO HUNDRED SIXTY EIGHT AND 99/100          $268.99

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1438**

A0694

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 187 of 195 PageID #: 1312

**Earnings Statement**   ADP

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671265 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:   01/08/2019
Period Ending:   01/14/2019
Pay Date:   01/18/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Married
Exemptions/Allowances:       Tax Override:
   Federal:   1       Federal:
   State:   1       State:
   Local:   1       Local:
Social Security Number:   XXX-XX-XXXX

26

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 700.00 | 2100.00 |
| Gross Pay | | | $700.00 | $2,100.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -39.62 | 118.86 |
| Social Security | -43.40 | 130.20 |
| Medicare | -10.15 | 30.45 |
| New York State Income | -27.26 | 81.78 |
| New York Paid Family Leave | -1.07 | 3.21 |
| New York City R Local | -18.97 | 56.91 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $558.93 |
|---|---|

Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671265
Pay Date:       01/18/2019



Pay to the order of:
This amount:   FIVE HUNDRED FIFTY EIGHT AND 93/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$558.93

**D1439**

A0695

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2671272 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** ADP

Period Starting:   01/08/2019
Period Ending:   01/14/2019
Pay Date:   01/18/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   0   Federal:
State:   0   State:
Local:   0   Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 1900.00 |
| **Gross Pay** | | | **$300.00** | **$2,800.00** |

18

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.50 | 246.16 |
| Social Security | -18.60 | 141.05 |
| Medicare | -4.35 | 32.99 |
| New York State Income | -6.31 | 80.07 |
| New York Paid Family Leave | -0.46 | 3.49 |
| New York City R Local | -4.73 | 56.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$241.45** | |

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2671272
Pay Date:   01/18/2019

Pay to the order of:
This amount:   TWO HUNDRED FORTY ONE AND 45/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$241.45

**D1440**

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 189 of 195 PageID #: 1314

| Company Code | Loc/Dept | Number | Page |
| RB7QLM 24008135 | D12200 | 862487 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 01/08/2019 |
| Period Ending: | 01/14/2019 |
| Pay Date: | 01/18/2019 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
   Federal:   4                Federal:
   State:      4                State:
   Local:      4                Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 500.00 | 1500.00 |
| Gross Pay | | | $500.00 | $1,500.00 |

28

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -10.38 | 31.14 |
| Social Security | -31.00 | 93.00 |
| Medicare | -7.25 | 21.75 |
| New York State Income | -12.33 | 36.99 |
| New York Paid Family Leave | -0.77 | 2.31 |
| New York City R Local | -8.98 | 26.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $428.69 |
|---|---|

| Deposits account number | transit/ABA | amount |
|---|---|---|
| XXXXXX9319 | XXXXXXXXX | 428.69 |

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:          01/18/2019



| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX9319 | XXXXXXXXX | 428.69 |

**D1441**

A0697

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 862482 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 01/08/2019
Period Ending: 01/14/2019
Pay Date: 01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:
Exemptions/Allowances:

| | | Tax Override: | |
|---|---|---|---|
| Federal: | 0 | Federal: | |
| State: | 0 | State: | |
| Local: | 0 | Local: | |

Social Security Number:   XX-XXXXXXX

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| 1099 Compensation | | 0.00 | 2304.46 | 5365.58 |
| Gross Pay | | | $2,304.46 | $0.00 |
| Net Pay | | | $2,304.46 | |

**29**

Deposits

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX3452 | XXXXXXXXX | 2304.46 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:     01/18/2019

THIS IS NOT A CHECK

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX3452 | XXXXXXXXX | 2304.46 |

**D1442**

A0698

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 191 of 195 PageID #: 1316

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/100 | 882481 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting:  01/08/2019
Period Ending:  01/14/2019
Pay Date:  01/18/2019

Business Phone:  732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:         Tax Override:
    Federal:  2          Federal:
    State:  2            State:
    Local:  2            Local:
Social Security Number:  XXX-XX-XXXX

13

30

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 1200.00 | 3550.00 |
| Gross Pay | | | $1,200.00 | $3,550.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -132.74 | 387.22 |
| Social Security | -74.40 | 220.10 |
| Medicare | -17.40 | 51.48 |
| New York State Income | -57.78 | 170.23 |
| New York Paid Family Leave | -1.84 | 5.44 |
| New York City R Local | -39.32 | 115.88 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| Net Pay | $875.92 |
|---|---|

Deposits
| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 875.92 |

Your federal taxable wages this period are  $1,200.00



161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Pay Date:        01/18/2019

| account number | transit/ABA | amount |
|---|---|---|
| XXXXXX0206 | XXXXXXXXX | 875.92 |

THIS IS NOT A CHECK

D1443

A0699

**Earnings Statement**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671274 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 01/08/2019
Period Ending: 01/14/2019
Pay Date: 01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
Federal:   2          Federal:
State:   2          State:
Local:   2          Local:
Social Security Number:   XXX-XX-XXXX

19

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 2025.00 |
| **Gross Pay** | | | **$300.00** | **$2,925.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -6.54 | 84.28 |
| Social Security | -18.60 | 120.90 |
| Medicare | -4.35 | 28.28 |
| New York State Income | -4.77 | 48.91 |
| New York Paid Family Leave | -0.46 | 2.99 |
| New York City R Local | -3.48 | 34.56 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$261.20** |
|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2671274
Pay Date:   01/18/2019

Pay to the order of:
This amount:   TWO HUNDRED SIXTY ONE AND 20/100          $261.20

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

**D1444**

A0700

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 193 of 195 PageID #: 1318

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 017200 | 2671266 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**   **ADP**

Period Starting:   01/08/2019
Period Ending:   01/14/2019
Pay Date:   01/18/2019

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
   Federal:   0   Federal:
   State:   0   State:
   Local:   0   Local:
Social Security Number:   XXX-XX-XXXX

35

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 400.00 |
| Commission | | 0.00 | 0.00 | 10.00 |
| Gross Pay | | | $300.00 | $410.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.50 | 26.19 |
| Social Security | -18.60 | 24.80 |
| Medicare | -4.35 | 5.80 |
| New York State Income | -6.31 | 6.31 |
| New York Paid Family Leave | -0.46 | 0.61 |
| New York City R Local | -4.73 | 4.81 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.10 |

| Net Pay | $241.45 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2671266
Pay Date:   01/18/2019



Pay to the order of:

This amount:   TWO HUNDRED FORTY ONE AND 45/100

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$241.45

**D1445**

A0701

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RBTQLM 24008135 | 01/200 | 2671280 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**  ADP

Period Starting:   01/08/2019
Period Ending:     01/14/2019
Pay Date:          01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
    Federal:   0        Federal:
    State:     0        State:
    Local:     0        Local:
Social Security Number:   XXX-XX-XXXX

| Earnings | rate | hours/Units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Gross Pay | | | $300.00 | 300.00 |

36

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -23.50 | 23.50 |
| Social Security | -18.60 | 18.60 |
| Medicare | -4.35 | 4.35 |
| New York State Income | -6.31 | 6.31 |
| New York Paid Family Leave | -0.46 | 0.46 |
| New York City R Local | -4.73 | 4.73 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 0.60 |

| Net Pay | $241.45 |
|---|---|

Your federal taxable wages this period are $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2671280
Pay Date:               01/18/2019

Pay to the
order of

This amount:   TWO HUNDRED FORTY ONE AND 45/100                    $241.45

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

D1446

A0702

Case 1:21-cv-07163-OEM-LB   Document 87-10   Filed 09/01/23   Page 195 of 195 PageID #: 1320

| Company Code | Loc/Dept | Number | Page | | |
|---|---|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2671279 | 1 of 1 | **Earnings Statement** | ADP |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting:     01/08/2019
Period Ending:      01/14/2019
Pay Date:             01/18/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:              Tax Override:
  Federal:    3                   Federal:
  State:      3                   State:
  Local:      3                   Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 800.00 |
| Commission | | 0.00 | 350.00 | 1525.00 |
| **Gross Pay** | | | **$350.00** | **$2,325.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 64.34 |
| Social Security | -21.70 | 144.15 |
| Medicare | -5.07 | 33.71 |
| New York State Income | -6.00 | 53.29 |
| New York Paid Family Leave | -0.54 | 3.57 |
| New York City R Local | -4.48 | 38.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| **Net Pay** | **$308.15** |
|---|---|

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2671279
Pay Date:                  01/18/2019

Pay to the
order of:        Leticia F S

This amount:     THREE HUNDRED EIGHT AND 15/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$308.15

Leti
124
Coll

**D1447**

A0703

Case 1:21-cv-07163-OEM-LB   Document 87-11   Filed 09/01/23   Page 1 of 4 PageID #: 1321

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

LETICIA FRANCINE STIDHUM,                          Case No.: 1:21-cv-7163 (HG) (LB)

                                    Plaintiff,

                -against-                          **SECOND SUPPLEMENTAL**
                                                   **DECLARATION OF**
161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside       **DEANA JENNINGS**
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                                    Defendants.
----------------------------------------------------------------X

     Deana Jennings declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

     1.    I am the designated corporate representative of Defendants 161-10 Hillside Auto

Ave, LLC d/b/a Hillside Auto Outlet (hereinafter "Hillside Auto Outlet") and Hillside Auto Mall

Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") (Hillside Auto Outlet and Hillside Auto Mall

collectively hereinafter the "Corporate Defendants") in the above-referenced case, and have served

as a part-time controller for Hillside Auto Outlet during the time Plaintiff worked there and have

also served as a controller for Hillside Auto Mall, where I remain employed today.

     2.    As such, I am familiar with all the facts and circumstances heretofore had herein

based upon my personal knowledge and a review of the documents I maintain at Hillside Auto

Mall as well as at Hillside Auto Outlet during my tenure there. I submit this declaration to

supplement my prior declarations dated May 17, 2023 and May 30, 2023.

**Search of Text Messages and Emails**

     3.    As I have previously declared twice, I have conducted a search of my telephone for

all text messages related to the Plaintiff or pregnancy discrimination.

A0704

4.      My search consisted of the following key words using my phone's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

5.      When I initially conducted this search, I omitted the wild cards (*) in search terms (i), (ii), (iii), and (iv), and searched for "women" or "woman" for the search term (xi).

6.      None of these key words returned any text messages related to the Plaintiff or pregnancy discrimination.

7.      Thus, I am not in possession, custody, or control of any responsive text messages.

8.      I also searched my emails and am not in possession, custody, or control of any emails responsive to the requests, i.e., relating to Plaintiff or pregnancy discrimination.

9.      My search consisted of the following key words using my email's search function: (i) pregn*; (ii) sonog*; (iii) expect*; (iv) carry*; (v) "eating for two;" (vi) pea; (vii) bun; (viii) Family; (ix) Leticia; (x) Stidhum; (xi) wom*n; (xii) wife; (xiii) female.

10.      None of these key words returned any emails related to the Plaintiff or pregnancy discrimination.

11.      Thus, I am not in possession, custody, or control of any responsive emails.

12.      As I previously declared, I do not recall exchanging any emails with the Plaintiff, so it makes sense that I did not find any.

13.      I conducted the instant search of text messages and emails together with counsel for the Defendants on June 9, 2023.

14.      We determined together that none of the texts or emails that came up with the foregoing search words related to Plaintiff nor pregnancy discrimination.

2

A0705

Case 1:21-cv-07163-OEM-LB   Document 87-11   Filed 09/06/23   Page 3 of 4 PageID #: 1323

Weekly Sales Logs Search

15.    Similarly, I conducted a search for the weekly sales logs of Hillside Auto Outlet and am unable to find them.

16.    I previously recalled that we moved those and other records to an outside storage facility due to construction at Hillside Auto Mall.

17.    However, upon review, the construction predates the Plaintiff's employment at Hillside Auto Outlet, which indicates that we did not have to move these weekly sales logs to any outside storage facility.

18.    Further, as I previously declared, I searched that outside storage facility for these records on May 9, 2023 after I could not find them at both dealerships, i.e., Hillside Auto Outlet and Hillside Auto Mall.

19.    I was unable to find the records at either dealership nor at the outside storage facility, except I am aware that Defendant Ishaque Thanwalla found some 2019 weekly sales logs at Hillside Auto Outlet's on-site storage facility upon another search at that dealership.

20.    While I am uncertain as to where the May 2018 to January 2019 weekly sales logs may be stored and have no knowledge nor recollection as to where they are kept, I conducted another search in the following places where I keep records.

21.    My most recent search took approximately six (6) hours.

22.    Specifically, there are two offices at Hillside Auto Mall where records are kept.

23.    The first office has about seven boxes consisting of 2022 deal jackets for cars sold in 2022.

24.    I searched this office and all the boxes within it for the weekly sales logs of Hillside Auto Outlet and did not find any.

5

A0706

Case 1:21-cv-07163-OEM-LB   Document 87-11   Filed 09/01/23   Page 4 of 4 PageID #: 1324

25.     The second office has about four boxes contained of 2023 deal jackets for cars sold in 2023 year to date. I searched this office and all the boxes within it for the weekly sales logs of Hillside Auto Outlet and did not find any.

26.     In addition, we have a storage area on-site at Hillside Auto Mall.

27.     Specifically, there is a space under the stairs leading up to our office where we kept records stored in boxes until we moved same to an outside storage facility due to construction being done at Hillside Auto Mall from approximately September 2017 through February 2018, which predates Plaintiff's employment with Hillside Auto Outlet that started in May 2018.

28.     At the time I conducted a search, there were no boxes or documents in this on-site storage area.

29.     I also conducted a thorough search of our off-site storage facility, where we have two rooms that are approximately 10' x 10' each.

30.     The first room in the off-site storage facility has two filing cabinets, four cabinet drawers, and approximately fifty boxes.

31.     The second room in the off-site storage facility has three filing cabinets and approximately sixty boxes.

32.     On June 6, 2023, I conducted another search of the off-site storage facility.

33.     With the help of another employee, I searched every box, filing cabinet, and cabinet drawer, but we did not find any weekly sales logs from May 2018 through January 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June ___, 2023.

Deana Antunes

4

Case 1:21-cv-07163-OEM-LB   Document 88   Filed 09/02/23   Page 1 of 3 PageID #: 1325

# TROY LAW, PLLC

ATTORNEYS / COUNSELORS AT LAW

Tel: (718) 762-1324   troylaw@troypllc.com   Fax: (718) 762-1342

41-25 Kissena Boulevard, Suite 110, Flushing, NY 11355

September 2, 2023

**Via ECF**

Hon. Orelia E. Merchant, U.S.D.J

United States District Court

Eastern District of New York

225 Cadman Plaza East

Brooklyn, NY 11201

Re:   **Plaintiff's Opposition to Defendants'**
**Pre-Motion Conference for Motion for Summary Judgment**
***Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-cv-07163 (PKC) (RLM), (E.D.N.Y.)**

Dear Judge Merchant:

We represent the Plaintiff in the above matter. We write pursuant to Your Honor's Individual Practices and Rules ("IPR") III (C) to respectfully oppose Defendants' Request for a Pre-Motion Conference for their contemplated Motion for Summary Judgment.

In the summary judgment context, the evidence adduced must be construed in the light most favorable to Plaintiff LETICIA STIDHUM, as the non-movant. *See, e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon Defendants as the moving parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Upon such showing, the onus shifts to Stidhum to present evidence sufficient to satisfy every element of the claim. In so doing, Stidhum is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." Id. at 324. But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in Stidhum's favor. *Anderson v. Liberty Lobby, Inc.*, 4777 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In discrimination cases, the merits typically turn upon an employer's intent, necessitating abundant caution in granting summary judgment for the employer. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Naturally, where an employer has acted [*12] with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Here, under Title VII and NYSHRL, summary judgment must be denied because there are material disputes of facts over the additional waiting time of her customers—as compared to the customers of her non-pregnant coworkers—implemented after late December 2018 after

A0708

Leticia Stidhum announced her pregnancy in late November 2018 which led to a commensurate decrease of pay. Stidhum can show that her pregnancy was the motivating factor because Guzman's treatment of Plaintiff after the pregnancy announcement because compared with her non-pregnant coworkers, her customer's wait times increased shortly after she announced her pregnancy and implemented during Ishaque Thanwalla's trip to Pakistan in late December 2018. The uncontroverted evidence shows that that there is a significant decrease of income (30%) and even more significant decrease in commission (40%) as a result of the delays in wait time resulting from Andris Guzman's policy. *See* Plaintiff's 56.1 Counter-Statement 186-187, Response to Defendants' 56.1 Statement 105-109. This is not the first or isolated incidence in which a pregnant woman—while pregnant—is forced to leave the employ of Hillside Anto Outlet. In fact, previously, the DMV clerk Lilly a/k/a Lily was also required to leave. *See* Plaintiff's 56.1 Counter-Statement 202. Under NYCHRL, Plaintiff can similarly show that she is treated less well as compared to her non-pregnant coworkers after late-December 2018 because her customers were made to wait for a longer period of time, resulting in a loss of customers and commissions from sales.

The material facts advanced by Defendants, that the "only reason for" customers' wait time is based on "circumstances outside of the dealership's control" is unavailing, especially in light of Defendants' tall tale of losing all weekly commission sales sheets identifying Plaintiff and her comparators in car sales between November 2018 and January 2019. *See* Troy Dec. Ex. 11 Jennings Jackson Affidavit. In contrast, Plaintiff can show that delays in *putting in* credit applications was drawn solely from Guzman's treatment of Plaintiff after the pregnancy announcement, that she experienced a statistically-significant decrease in the number of car sales made in credit card applications after she announced her pregnancy, that she was the top saleswoman and made the most sales in the store in November 2023 directly preceding the pregnancy announcement, that she became the bottom salesperson in the store in late December 2023 after Guzman took away the credit card application and purposefully delayed the application, and that it was clear as day that it was because Guzman discriminated against her after the pregnancy announcement that she had to quit. *See* Response to 56.1 Statement 87, 113, 114, 199. Thus, in the light most favorable to the Plaintiff, should be considered to be beneficial to the Plaintiff. Said evidence—if it hadn't been "lost" or "destroyed"—would have corroborated Plaintiff's account, which is that business *did not* slow during the subsequent weeks following the implementation of the delayed by Guzman. That is because, relative to her and in fact relative to their own performance, her colleague in fact earned *more commission* while she earned *less*.

Ultimately, the case should go before a jury and the jury should determine whether by a preponderance of the evidence, if Leticia Stidhum shows that a discriminatory policy which severely impacted her pay was placed after her pregnancy announcement, and it was implemented because of the stores/Defendants' animus towards pregnant woman.

Thus, we respectfully request that the Court deny Defendants' Pre-Motion Conference, or alternatively, respectfully request a 30 day time frame to oppose Defendants' Motion for Summary Judgment in light of the voluminous pages of exhibits that were filed in tandem with Defendants' 56.1 Statement.

A0709

Case 1:21-cv-07163-OEM-LB   Document 88   Filed 09/02/23   Page 3 of 3 PageID #: 1327

We thank the court for its time and consideration in this matter.

Respectfully Submitted,

__/s/ John Troy_____
John Troy
*Attorney for Plaintiff*

JT/mh
cc:. (via ECF)

A0710

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 1 of 19 PageID #: 1328

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                     Plaintiff,

       -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                  Defendants.
-------------------------------------------------------------------X

Case No.: 1:21-cv-7163 (OEM) (LB)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
OBJECTIONS TO THE HON. LOIS BLOOM, U.S.M.J.'S REPORT & RECOMMENDATION
DENYING PLAINTIFF'S MOTION TO COMPEL & FOR SANCTIONS**

MILMAN LABUDA LAW GROUP PLLC

Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Defendants*

A0711

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 2 of 19 PageID #: 1329

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS ................................................................. 2

LEGAL STANDARD ...................................................................... 8

ARGUMENT ............................................................................... 9

   I.    THE COURT MAY NOT CONSIDER PLAINTIFF'S NEW EVIDENCE ............... 9

   II.   THE ORDER IS NOT CLEARLY ERRONEOUS ..................................... 10

   III. THE ORDER IS NOT CONTRARY TO LAW ........................................ 14

CONCLUSION ........................................................................... 14

ii

A0712

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 3 of 19 PageID #: 1330

## TABLE OF AUTHORITIES

**Cases**

Ahmed v. T.J. Maxx Corp.,
    103 F. Supp. 3d 343 (E.D.N.Y. 2015) ............................................................................. 9

Black Love Resists In the Rust by and through Soto v. City of Buffalo, N.Y.,
    334 F.R.D. 23 (W.D.N.Y. 2019) ..................................................................................... 13

Carmona v. Wright,
    233 F.R.D. 270 (N.D.N.Y. 2006) ................................................................................... 10

Creighton v. City of New York,
    No. 12-CIV.-7454 (PGG), 2015 WL 8492754 (S.D.N.Y. Dec. 9, 2015) ........................... 9

EM Ltd. v. Republic of Argentina,
    695 F.3d 201 (2d Cir. 2012) ........................................................................................... 13

Kamden-Ouaffo v. Balchem Corp.,
    No. 17-CIV.-2810 (PMH), 2021 WL 1101126 (S.D.N.Y. Mar. 23, 2021) ........................ 9

Khaldei v. Kaspiev,
    961 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................................................. 13

Khatabi v. Bonura,
    No. 10-CIV.-1168 (ER), 2017 WL 10621191 (S.D.N.Y. Apr. 21, 2017) .......................... 9

Leviton Mfg. Co. v. Greenberg Traurig LLP,
    No. 09-CIV.-8083, 2011 WL 2946380 (S.D.N.Y. July 14, 2011) .................................... 10

Moss v. Enlarged City Sch. Dist. of City of Amsterdam,
    166 F. Supp. 2d 668 (N.D.N.Y. 2001) ............................................................................ 10

Pall Corp. v. Entegris, Inc.,
    655 F. Supp. 2d 169 (E.D.N.Y. 2008) ............................................................................. 14

Passlogix, Inc. v. 2FA Tech., LLC,
    708 F. Supp. 2d 378 (S.D.N.Y. 2010) ............................................................................. 13

Richard Green (Fine Paintings) v. McClendon,
    262 F.R.D. 284 (S.D.N.Y. 2009) ..................................................................................... 13

St. Vidas Inc. v. U.S. Liab. Ins. Co.,
    No. 20-CIV-3465 (KAM) (MMH), 2021 WL 4340950 (E.D.N.Y. Sep. 23, 2021) ............. 8

A0713

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 4 of 19 PageID #: 1331

Stidhum v. 161-10 Hillside Auto Ave, LLC,
    No. 1:19-CIV.-5458 (RPK) (VMS), 2021 WL 2634915 (E.D.N.Y. 2021) ............... 11 n. 3

Storms v. United States,
    No. 13-CIV.-811, 2014 WL 3547016 (E.D.N.Y. Jul. 16, 2014) ........................................ 8

Thai Lao Lignite (Thailand) Co., Ltd. v. Government of Lao People's Democratic Republic,
    924 F. Supp. 2d 508 (S.D.N.Y. 2013)................................................................................. 8

Uni-Sys., LLC. v. U.S. Tennis Assn., Inc.,
    No. 17-CIV.-147 (KAM) (CLP), 2020 WL 8266015 (E.D.N.Y. Jul. 6, 2020) ............... 12

United States v. Murphy,
    703 F.3d 182 (2d Cir. 2012)................................................................................................ 8

Utica Mut. Ins. Co. v. Century Indem. Co.,
    No. 13-CIV.-995, 2015 WL 3429116 (N.D.N.Y. May 11, 2015) .................................... 14

Velez v. DNF Assocs., LLC,
    No. 19-CV-11138 (GHW) (SDA), 2020 WL 6946513 (S.D.N.Y. Nov. 25, 2020)............ 9

Weiner v. McKeefery,
    No. 11-CIV.-2254, 2014 WL 2048381 (E.D.N.Y. May 19, 2014).................................... 8

**Statutes**

28 U.S.C. § 636................................................................................................................................. 8

**Rules**

Fed. R. Civ. P. 72 ...................................................................................................... 8, 9, 13, 14

iii

A0714

Case 1:21-cv-07163-OEM-LB    Document 89    Filed 09/11/23    Page 5 of 19 PageID #: 1332

## PRELIMINARY STATEMENT

Defendants submit the instant memorandum of law in opposition to Plaintiff's motion to set aside the Hon. Lois Bloom, U.S.M.J.'s ("Judge Bloom") Memorandum & Order dated June 28, 2023 (the "Order").

In what amounts to a hodgepodge of authority strewn together with conclusory statements, Plaintiff's objections to Judge Bloom's Order are evidently meritless, as they point to no clear error or abuse of discretion.  Plaintiff's conduct is vexatious in that they have multiplied these proceedings many times over for no apparent purpose other than to cause Defendants and their counsel pain and harm.  Defendants have been diligent in their search efforts as set forth in their sworn declarations and as is evidenced by their production of all relevant information in their possession, custody, and control.

As such, there is no basis to disturb Judge Bloom's well-reasoned Order.

Plaintiff's objections to the Order rests on the notion that: (i) her September 2019 litigation hold notice should have prevented documents from being misplaced in early 2019, before the litigation hold took effect; (ii) new evidence, which cannot be considered on a motion to set aside a magistrate judge's Order, establishes that there was a "mistake," (despite the new evidence failing to establish same); and (iii) Judge Bloom's Order is otherwise clearly erroneous or contrary to law.

Defendants respectfully submit that, based on the record and for the reasons set forth below, Plaintiff's arguments are unavailing and must be rejected.

As such, Plaintiff's motion to aside Judge Bloom's Order must be denied in its entirety, as Plaintiff has failed to establish any clear error or abuse of discretion.

A0715

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 6 of 19 PageID #: 1333

### STATEMENT OF FACTS

On September 1, 2022, Plaintiff served discovery demands; the only demands contained therein that relate to communications sought communications between: (i) Defendants and Plaintiff's comparator car salespersons; (ii) Defendants and agents of the United States Equal Employment Opportunity Commission ("EEOC"); (iii) any current or former employees, officers, representatives, attorneys, or agents of Defendants or any third party concerning Plaintiff's EEOC charge. See ECF Docket Entry 33-5 at 17 (Request 34), 25 (Request 58), 26 (Request 60), and 29 (Request 69). Defendants objected, except as to Requests 60 and 69 (to which Defendants stated they did not have any responsive documents). Id.

Plaintiff moved to compel, and the Hon. Roanne L. Mann, U.S.M.J. ("Judge Mann") granted in part and denied in part Plaintiff's motion on December 22, 2022. See ECF Docket Entry 37. In Judge Mann's Order, Defendants were directed to supplement their responses to, *inter alia*, Request Nos. 17, 21, 39, 40, 46, and 47. Id. at 9.   None of those requests related to "communications," and Plaintiff never previously sought any communications between herself and the Defendants.  The parties conducted depositions on: (i) February 17, 2023 for the Plaintiff; (ii) February 24, 2023 for Defendant Ishaque Thanwalla ("Thanwalla"); (iii) March 3, 2023 for Defendant Jory Baron ("Jory"); (iv) March 9, 2023 for Defendant Andris Guzman ("Guzman"); and (v) March 10, 2023 for Deana Jennings ("Jennings"), the Rule 30(b)(6) witness of both corporate Defendants.   Plaintiff produced zero text messages prior to her deposition. On February 24, 2023, Defendants voluntarily produced one page of ten text messages between Thanwalla and Plaintiff, four pages of a complete text message exchange between Thanwalla and Plaintiff on the WhatsApp platform, one page of excerpted text messages between Thanwalla and a non-party named Ali, and an 11-page set of complete text messages to supplement the initial page produced.

2

A0716

Case 1:21-cv-07163-OEM-LB    Document 89    Filed 09/11/23    Page 7 of 19 PageID #: 1334

In total, Defendants voluntarily produced 17 pages of text messages related to Thanwalla. There were no other responsive text messages from Thanwalla.

On March 3, 2023, in advance of the deposition of Jory, Defendants voluntarily produced three (3) pages of a complete set of text messages between the Plaintiff and Jory Bates stamped D1905-D1907. There are no other responsive text messages from Jory.

On March 9, 2023, during the deposition of Guzman, Defendants voluntarily produced fifty-four (54) pages of text messages, consisting of a complete set of text messages between the Plaintiff and Guzman totaling thirteen (13) pages, as well as a complete set of a group text between Guzman, Plaintiff, and others at 161-10 Hillside Auto Ave LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet") totaling forty-one (41) pages, Bates stamped D1908-D1960. There were no other responsive text messages from Guzman.

On March 10, 2023, Deana Jennings appeared as the corporate representative of Defendants Hillside Auto Outlet and Hillside Auto Mall Inc d/b/a Hillside Auto Mall ("Hillside Auto Mall"). She is not in possession, custody, or control of any responsive text messages.

On March 23, 2023, Plaintiff moved to compel Defendants to produce "weekly car commission sales logs" and "text messages." See ECF Docket Entry 58. In support of her request for text messages, Plaintiff sought documents that Judge Mann previously denied. Indeed, Plaintiff filed a blunderbuss omnibus motion to compel discovery, which Judge Mann denied in its entirety except for Request Nos. 17, 21, 39, 40, 46, and 47, none of which have anything to do with text messages. Defendants' objections to Request Nos. 34 and 58, which do deal with messages between Defendants and anyone else concerning Plaintiff, were sustained. In any event, Defendants are not in possession, custody, or control of any other such messages.

3

A0717

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 8 of 19 PageID #: 1335

Indeed, as set forth above, Defendants already voluntarily produced text messages between Thanwalla and one "Ali," a nonparty who poached the Plaintiff to leave to another dealership, which precipitated her decision to quit her employment at Hillside Auto Outlet.

Following depositions in February and March 2023, and despite the fact Judge Bloom stated at a February 1, 2023 conference that no post-deposition discovery is permitted, Plaintiff served her second and third requests for the production of documents on February 26, 2023 and March 14, 2023, respectively. See ECF Docket Entries 57 at 41:5-16,[1] 58-3, and 58-4.

Defendants objected to Plaintiff's post-deposition demands on the ground that Judge Bloom expressly forbid post-deposition discovery. See ECF Docket Entry 67 at 2. Notwithstanding, on April 3, 2023, Judge Bloom entered an Order: (i) requiring production of car sales logs for the relevant time period; and (ii) compelling the production of text messages between parties that pertain to plaintiff or to pregnancy discrimination, i.e., any text messages responsive to plaintiff's second set of document requests, request nos. 3-6 [ECF No. 58-3 at 11], and third set of document requests, request nos. 3-6, 8 [ECF No. 58-4 at 11].

Although these text messages, as well as the complete set of monthly sales logs, had been produced in compliance with the April 3, 2023 Order, Plaintiff filed successive letter motions for sanctions, all of which were denied. See ECF Docket Entries 61 and 66. This prompted Judge Bloom to schedule a conference on May 4, 2023. See Text Only Orders dated April 18, 2023, April 21, 2023, and April 27, 2023.

---

[1] **THE COURT:** Was there anything else today, Ms. Troy, before we adjourn? **MS. TROY:** Yes, Your Honor. So if during the deposition we request for documents, that's not allowed, right? **THE COURT:** No. **MS. TROY:** Right. **THE COURT:** The only thing is if they refer that there was a document during their deposition that they were relying on, but it hasn't been produced, then you could ask them to produce something that they say they were relying on in their testimony. But no, there are no follow-up requests after the depositions. I'm closing out discovery.

A0718

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 9 of 19 PageID #: 1336

At the May 4, 2023 conference, Judge Bloom denied Plaintiff's motions for sanctions and required Defendants to search for and produce weekly sales logs and/or any other text messages and emails or provide a declaration as to the searches conducted by noon on May 17, 2023. See Text Only Order dated May 4, 2023.

Defendants searched for the requested documents but could not find any responsive documents. Defendants timely complied with this Order by providing the declarations of Defendants Thanwalla, Jory, Guzman, Jennings, explaining the scope of the searches and that no responsive documents were found. See ECF Docket Entries 73-1, 73-2, 73-3, and 73-4.

The declarations provide that each Defendant: (i) searched his or her cellular phone for responsive text messages and did not find any other responsive text messages; (ii) searched his or her email inbox for responsive text messages and did not find any responsive emails; and (iii) with respect to the declarations of Thanwalla and Jennings,[2] they both searched for weekly sales logs in multiple locations but were unable to find them.

Upon being provided with these declarations, Plaintiff complained that Jennings' declaration is insufficient and Plaintiff wanted to inquire about the circumstances of how the weekly sales logs were lost or destroyed, and separately raised an issue about the failure to reference the search terms set forth in her second and third requests for the production of documents. In response, on June 2, 2023, Jennings submitted a supplemental declaration. See ECF Docket Entry 73-5. There, she explained that she used the search terms on her cellular phone and her email inbox and found no responsive text messages or emails, and also described in detail how she conducted a search for the weekly sales logs and was unable to find them. Id. at ¶¶ 4-18.

---

[2] Defendants Jory (a partner who is not involved with employees) and Guzman (a former employee) were not responsible for maintaining such records and did not search for them.

5

A0719

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 10 of 19 PageID #: 1337

Upon being provided with this declaration, Plaintiff raised additional concerns that: (i) the remaining Defendants failed to provide a declaration as to whether they used the key words for their searches; (ii) Defendants did not specify whether they searched for text messages or emails related to the Plaintiff or pregnancy discrimination despite the fact Plaintiff provided key words for Defendants to use; and (iii) there was insufficient details concerning the efforts to search for the weekly sales logs. Defendants offered to once more conduct a search as to both the electronic communications and weekly sales logs and provide more detailed declarations.

On June 19, 2023, Defendants submitted the supplemental declarations of Thanwalla, Baron, Guzman, and Jennings outlining their search efforts. See ECF Docket Entry 76 at 7-11 (Thanwalla), 12-14 (Jory), 15-18 (Guzman), and 19-23 (Jennings). As set forth in the supplemental declarations, despite a diligent search, the weekly sales logs could not be found except for one such log, which was produced. In order to confirm full compliance with the Court's Order and Plaintiff's discovery requests, as set forth in the supplemental declarations, on Friday, June 9, 2023, Defendants' counsel met with Thanwalla and Baron to personally oversee another search of their cellular phones for responsive text messages and email inboxes for responsive emails. That same day, Defendants' counsel separately met with Jennings to personally oversee her additional search of her cellular phone for responsive text messages and email inboxes for responsive emails. Finally, on the evening of Monday, June 12, 2023, Defendants' counsel met with Guzman to personally oversee his additional search of his cellular phone for responsive text messages and email inboxes for responsive emails. Defendants submit that the 2018 weekly sales logs were misplaced years ago when Jennings ceased serving as a part-time controller at Hillside Auto Outlet and returned to work full-time at Hillside Auto Mall, two distinct dealerships that are about four (4) blocks away from each other who have two common owners, but operate separately.

6

A0720

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 11 of 19 PageID #: 1338

Thanwalla sent the 2018 logs from Hillside Auto Outlet to Jennings, but Jennings never received them at her office at Hillside Auto Mall. Defendants engaged in a thorough and diligent effort to search, locate, and provide Plaintiff with these weekly sales logs but were only able to locate one weekly sales log pertaining to Plaintiff and produced it to her counsel on June 19, 2023.

As set forth in the declarations of Thanwalla, Thanwalla believed that Jennings kept the records at Hillside Auto Mall when she ceased working part-time at Hillside Auto Outlet. See ECF Docket Entries 73-4 at ¶¶ 7-10 and 76 at 7-11 (Thanwalla). Jennings searched for the records at Hillside Auto Mall and an outside storage facility on May 9, 2023 but was unable to find them. See ECF Docket Entries 73-5 at ¶¶ 13-17 and 76 at 19-23 (Jennings). Plaintiff has not provided any evidence nor a basis to believe that the records sought were lost after she first filed suit in September 2019. Indeed, it appears that the records were lost or misplaced when Jennings ceased working at Hillside Auto Outlet part-time and returned to work full-time at Hillside Auto Mall, which occurred in or about early 2019, well before Plaintiff's September 2019 lawsuit.

On June 28, 2023, Judge Bloom issued the Order denying Plaintiff's motion to compel and for sanctions. See ECF Docket Entry 77. Judge Bloom found that plaintiff makes no argument that defendants had a duty to preserve the logs at the time they were allegedly either misplaced or destroyed, which defendants believe occurred in early 2019 because her complaint was not filed until December 29, 2021, and that Plaintiff does not allege that defendants were on notice of their obligation to preserve documents at any point before that date. Id. at 5. Judge Bloom also found that failure to comply with a state law's duty to preserve records does not impute a duty to preserve records as potential evidence in a federal lawsuit. Id.

Judge Bloom further found that even if there was a duty to preserve, plaintiff has not demonstrated that defendants destroyed such evidence with a 'culpable state of mind. Id. at 5-6.

7

A0721

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 12 of 19 PageID #: 1339

In addition, Judge Bloom found that: (i) defendants have produced monthly sales logs for the relevant period; (ii) diligently searched their offices and storage facilities to locate the handwritten weekly sales logs; (iii) produced the one log they were able to locate; and (iv) produced weekly paystubs of plaintiff's comparators. Judge Bloom therefore held that Plaintiff has not shown how she may be prejudiced by the alleged destruction of the handwritten weekly sales logs, particularly in light of the production of these other documents. Id. at 6.

As a result, Judge Bloom denied Plaintiff's motion for spoliation sanctions because an adverse instruction or monetary sanctions are inappropriate under such circumstances. Id. at 7.

## LEGAL STANDARD

Under Rule 72(a) of the Federal Rules of Civil Procedure (referred to as "Rules" or "Rules"), a district judge reviewing a magistrate judge's order on a non-dispositive motion must "consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." See Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter ... where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law"). Pretrial discovery rulings, such as the one at issue here, are non-dispositive. See St. Vidas Inc. v. U.S. Liab. Ins. Co., No. 20-CIV.-3465 (KAM) (MMH), 2021 WL 4340950, at *3 (E.D.N.Y. Sep. 23, 2021).

An order is "clearly erroneous if, based on all the evidence, a reviewing court 'is left with the definite and firm conviction that a mistake has been committed,'" See Storms v. United States, No. 13-CIV.-811, 2014 WL 3547016, at *4 (E.D.N.Y. Jul. 16, 2014) (quoting United States v. Murphy, 703 F.3d 182, 188 (2d Cir. 2012)), and is 'contrary to law' when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." See Weiner v. McKeefery, No. 11-CIV.-2254, 2014 WL 2048381, at *3 (E.D.N.Y. May 19, 2014) (citation omitted).

8

A0722

"This standard is highly deferential, imposes a heavy burden on the objecting party, and only permits reversal where the magistrate judge abused [his] discretion." See Ahmed v. T.J. Maxx Corp., 103 F. Supp. 3d 343, 350 (E.D.N.Y. 2015) (citations omitted).

If "the [objecting] party makes only frivolous, conclusory or general objections, or simply reiterates [his] original arguments, the Court reviews the report and recommendation only for clear error." See Kamden-Ouaffo v. Balchem Corp., No. 17-CIV.-2810 (PMH), 2021 WL 1101126, at *2 (S.D.N.Y. Mar. 23, 2021) (quoting Velez v. DNF Assocs., LLC, No. 19-CIV.-11138 (GHW) (SDA), 2020 WL 6946513, at *2 (S.D.N.Y. Nov. 25, 2020) (alterations in Kamden-Ouaffo)).

## ARGUMENT

### I.   THE COURT MAY NOT CONSIDER PLAINTIFF'S NEW EVIDENCE

In support of Plaintiff's latest motion, she submits new evidence that was previously available to her and could have been submitted with her earlier motion. This evidence should not be considered, and does not alter the result of Judge Bloom's findings in any event.

"Rule 72(a) precludes the district court from considering factual evidence that was not presented to the magistrate judge," see Thai Lao Lignite (Thailand) Co., Ltd. v. Government of Lao People's Democratic Republic, 924 F. Supp. 2d 508, 512 (S.D.N.Y. 2013), and "[n]ew arguments and factual assertions cannot properly be raised for the first time in objections to [a magistrate's discovery order], and indeed may not be deemed objections at all." See Khatabi v. Bonura, No. 10-CIV.-1168 (ER), 2017 WL 10621191, at *5 (S.D.N.Y. Apr. 21, 2017) (citation omitted) (collecting cases); see also Creighton v. City of New York, No. 12-CIV.- 7454 (PGG), 2015 WL 8492754, at *5 (S.D.N.Y. Dec. 9, 2015) ("Although a district court has the inherent authority to consider further evidence in reviewing rulings on non-dispositive matters, such discretion should rarely be exercised in this context, because the district court functionally operates as an appellate tribunal under Rule 72(a) .... " (internal quotation marks omitted)).

A0723

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 14 of 19 PageID #: 1341

Here, Plaintiff fails to offer any explanation for her failure to earlier submit the evidence she now presents for the first time in the instant motion that shows permits and/or violations for construction work at Hillside Auto Outlet. As such, it should not be considered.

However, even were the Court to consider the new evidence, it does not establish any clear error nor that any mistake has been made. Defendants' declarations are clear that there was construction work at Hillside Auto Mall, not Hillside Auto Outlet. See ECF Docket Entry 76 at 22 ¶ 16 and at 23 ¶ 27 (Jennings). The fact that there may have also been construction work at Hillside Auto Outlet at a different time does not render those statements untrue.

Accordingly, this Court should not consider Plaintiff's improperly submitted evidence.

## II.     THE ORDER IS NOT CLEARLY ERRONEOUS

The "clearly erroneous or contrary to law" standard requires that the magistrate judge "should be afforded substantial deference and may be overturned only if ... an abuse of discretion" is found. See Leviton Mfg. Co. v. Greenberg Traurig LLP, No. 09-CIV.-8083, 2011 WL 2946380, at *1 (S.D.N.Y. July 14, 2011)). And "[a]lthough legal authority may support an objection, the critical inquiry is whether there is legal authority that supports the magistrate's conclusion, in which case there is no abuse of discretion." See Carmona v. Wright, 233 F.R.D. 270, 276 (N.D.N.Y. 2006). "That reasonable minds may differ on the wisdom of a legal conclusion does not mean it is clearly erroneous or contrary to law." Id.; see also Moss v. Enlarged City Sch. Dist. of City of Amsterdam, 166 F. Supp. 2d 668, 670 (N.D.N.Y. 2001) ("[T]hat reasonable minds may differ on the wisdom of granting [a party's] motion does not mean that the decision is clearly erroneous or contrary to law").

As set forth above, Judge Bloom found that Defendants were not on notice of their obligation to preserve documents at any point before December 2021 when the complaint in this case was filed. Id. at 5.

10

A0724

Case 1:21-cv-07163-OEM-LB    Document 89    Filed 09/11/23    Page 15 of 19 PageID #: 1342

Plaintiff argues that Judge Bloom made a mistake because there was an earlier lawsuit filed by the Plaintiff in September 2019.[3]

But the earlier suit, even if Judge Bloom mistakenly did not take note of same due to Plaintiff's wholesale failure to apprise her of it, does not change the result, as Judge Bloom found that Defendants misplaced the records at issue in *early 2019*, well before Plaintiff's initial lawsuit was filed. See Id. at 3-4 ("Although defendants state that they 'believe the 2018 weekly sales logs were misplaced' in early 2019, 'when Jennings ceased working at Hillside Auto Outlet part-time and returned to work full-time at Hillside Auto Mall.' ... Defendants state that Jennings ceased working at Hillside Auto Outlet in early 2019, before plaintiff filed the complaint in this action. ...").

Indeed, Judge Bloom held that Plaintiff makes no argument that defendants had a duty to preserve the logs at the time they were allegedly either misplaced or destroyed, which defendants believe occurred in *early 2019* prior to the commencement of any lawsuit by Plaintiff. See Id. at 5 (emphasis added); see also Id. at 5-6 ("Even if defendants had an obligation to preserve the weekly handwritten sales logs in early 2019, plaintiff has not demonstrated that defendants destroyed such evidence with a 'culpable state of mind'").

Accordingly, any failure by Judge Bloom to not consider Plaintiff's earlier filed case could not have had any bearing on her conclusion .

Judge Bloom further found that even if there was a duty to preserve, plaintiff has not demonstrated that defendants destroyed such evidence with a "culpable state of mind." Id. at 5-6.

---

[3] Plaintiff's prior suit was dismissed by the Hon. Rachel P. Kovner, U.S.D.J., for failure to exhaust administrative remedies. See Stidhum v. 161-10 Hillside Auto Ave, LLC, No. 1:19-CIV.-5458 (RPK) (VMS), 2021 WL 2634915 (E.D.N.Y. 2021).

11

A0725

Case 1:21-cv-07163-OEM-LB   Document 89   Filed 09/11/23   Page 16 of 19 PageID #: 1343

This occurs when evidence is destroyed knowingly or grossly negligently, even if without intent to breach a duty to preserve it, or negligently, which Judge Bloom found that Plaintiff failed to show that Defendants acted with the requisite degree of culpability for the imposition of sanctions. Plaintiff fails to point to any fact or authority for the proposition that Defendants acted with any culpable state of mind when their records were understandably misplaced due to construction work and transferring of documentation between dealerships given Jennings' full-time role at Hillside Auto Mall.

In any event, Judge Bloom found that: (i) defendants have produced monthly sales logs for the relevant period; (ii) diligently searched their offices and storage facilities to locate the handwritten weekly sales logs; (iii) produced the one log they were able to locate; and (iv) produced weekly paystubs of plaintiff's comparators, and – as such – held that Plaintiff has not shown how she may be prejudiced by the alleged destruction of the handwritten weekly sales logs, particularly in light of the production of these other documents.

As such, Plaintiff also fails to establish any prejudice. Indeed, a party cannot produce records that it does not have, and given the diligent search and multiple declarations attesting to the efforts made to find these documents, there is no basis for sanctions. See Uni-Sys., LLC. v. U.S. Tennis Assn., Inc., No. 17-CIV.-147 (KAM) (CLP), 2020 WL 8266015, at *6 (E.D.N.Y. Jul. 6, 2020) ("Given that Hardesty has represented that it does not have the 'missing' documents, the Court cannot order Hardesty to produce what it does not have. The Court Orders Hardesty to submit an affidavit from a records custodian, affirming that Hardesty conducted the ESI search according to the previously-agreed-to search terms and custodians, and that it has produced all responsive documents in its possession, custody and control … At this time, the Court finds no basis on which to impose sanctions, and therefore denies Hardesty's request for sanctions").

12

A0726

Moreover, although Plaintiff purports to need the documents she seeks to establish a disparate impact and/or discriminatory animus, Defendants have already produced Plaintiff's and all other salespersons' paystubs evidencing how much each salesperson earns in salary and commissions, such that the evidence sought here is cumulative. See Richard Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 291 (S.D.N.Y. 2009) (quotation omitted) (rejecting motion for spoliation sanctions where there was no evidence that any of the lost or destroyed documents would have been unfavorable to defendant); see also Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 414 (S.D.N.Y. 2010) (same); Khaldei v. Kaspiev, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions").

As such, none of Judge Bloom's findings were clearly erroneous, and Plaintiff fails to point to any evidence Judge Bloom overlooked such that relief under Rule 72 is warranted.

Judge Bloom's ruling was based upon the record presented, with Judge Bloom reaching a conclusion well within her discretion. See, e.g., Black Love Resists In the Rust by and through Soto v. City of Buffalo, N.Y., 334 F.R.D. 23, 28 (W.D.N.Y., 2019) ("[A]s in all matters relating to discovery, the district court has broad discretion to limit discovery in a prudential and proportionate way") (quoting EM Ltd. v. Republic of Argentina, 695 F.3d 201, 207 (2d Cir. 2012) (brackets in Black Love Resists)).

Under the highly deferential standard applicable to Rule 72 appeals, the Plaintiff has failed to present any abuse of discretion warranting the setting aside of Judge Bloom's Order.

13

A0727

Case 1:21-cv-07163-OEM-LB    Document 89    Filed 09/11/23    Page 18 of 19 PageID #: 1345

## III.    THE ORDER IS NOT CONTRARY TO LAW

"[A] magistrate judge's decision is contrary to law only where it runs counter to controlling authority ... In other words, a magistrate judge's order simply cannot be contrary to law when the law itself is unsettled." See Utica Mut. Ins. Co. v. Century Indem. Co., No. 13-CIV.-995, 2015 WL 3429116, at *2 (N.D.N.Y. May 11, 2015) (quotations omitted) (citing Pall Corp. v. Entegris, Inc., 655 F. Supp. 2d 169, 172 (E.D.N.Y. 2008)).

Judge Bloom found that a failure to comply with a state law's duty to preserve records does not impute a duty to preserve records as potential evidence in a federal lawsuit. See ECF Docket Entry 77 at 5.

Plaintiff fails to submit any authority to show that Judge Bloom applied or misapplied relevant statutes, case law, or rules of procedure in making this legal finding. In fact, Plaintiff fails to address this aspect of Judge Bloom's Order at all.

Instead, Plaintiff argues in conclusory fashion that "disclosure of sales records from outside the period of Plaintiff's employment is no substitute for disclosure of her sales records, or other sales records from her period of employment which can act as comparators for disparate treatment." See ECF Docket Entry 84 at 13.

However, Rule 72 is not a vehicle to reargue points raised and lost.

As such, Plaintiff fails to demonstrate that Judge Bloom's Order is contrary to law.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's motion be denied in its entirety.

14

A0728

Dated: Lake Success, New York
      September 11, 2023

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

*/s/ Emanuel Kataev, Esq.*_____
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 303-1395 (direct dial)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com

*Attorneys for Defendants*

**VIA ECF**
Troy Law, PLLC
Attn: John Troy, Esq.
4125 Kissena Boulevard, Suite 103
Flushing, NY 11355-3101
johntroy@troypllc.com

*Attorneys for Plaintiff*

15

A0729

Case 1:21-cv-07163-OEM-LB   Document 91   Filed 09/25/23   Page 1 of 9 PageID #: 1349

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
LETICIA FRANCINE STIDHUM,

                             Plaintiff,         Case No. 21-cv-07163 (OEM) (LB)

               v.

161-10 HILLSIDE AUTO AVE, LLC,
HILLSIDE AUTO MALL, INC.,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,

                       Defendants.
------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF APPEAL OF MAGISTRATE JUDGE DECISION TO DISTRICT COURT

John Troy, Esq.
TROY LAW, PLLC
41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

A0730

Case 1:21-cv-07163-OEM-LB   Document 91   Filed 09/25/23   Page 2 of 9 PageID #: 1350

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 1

   I.   THE ORDER IS CLEARLY ERRONEOUS ................................................. 1

   II.  THE CASE DOES NOT TURN UPON PLAINTIFF'S DISCOVERY OF

DEFENDANTS' PERJURIOUS STATEMENTS ..................................................... 6

CONCLUSION ....................................................................................................... 7

ii

A0731

### PRELIMINARY STATEMENT

Plaintiff, by and through counsel, hereby submits the following reply memorandum of law in further support of appeal of the Memorandum and Order of Hon. Lois Bloom, U.S.M.J. denying Plaintiff's motion for sanctions for failure to comply with discovery orders and spoliation of documents. *See* Dkt. No. 77 (June 28, 2023).

### ARGUMENT

### I.   THE ORDER IS CLEARLY ERRONEOUS

Here, as described in the opening brief, sanctions is wholly appropriate to remedy the Defendants' deficient preservation efforts to vindicate the trifold aims of (1) deterring future spoliation of evidence; (2) protecting Plaintiff's interests; and (3) remedying the prejudice Plaintiff suffered as a result of Defendants' actions. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999)

In opposition to Plaintiff's Objection to the Magistrate Judge's Memorandum and Order, *see* Docket Entry No. 77, Defendants argue that the Magistrate Judge's Order is not clearly erroneous because she found that "plaintiff makes no argument that defendants had a duty to preserve the logs at the time they were allegedly either misplaced or destroyed, which defendants believe occurred in early 2019." *See i.d.* at *5.

However, that Order is clearly erroneous because Plaintiff's Discovery Dispute Letter and Motion for Sanctions for Spoilation, *see* Docket Entry No. 73, which was limited to three (3) pages per the Magistrate Judge's individual rules at 5A (governing letter motion for discovery, "letter motions may not exceed three pages in length") did argue that Defendants had the duty to preserve. Specifically, Plaintiff's letter motion for sanctions state, in relevant part that:

1

A0732

Case 1:21-cv-07163-OEM-LB   Document 91   Filed 09/25/23   Page 4 of 9 PageID #: 1352

"Defendants' allegation that the sales logs were "misplaced" but not "destroyed or lost" clearly meets the legal standard for spoliation under the "failure to preserve property […] as evidence in pending […] litigation." See West, 167 F.3d at 779. It does not matter that the sales logs were not destroyed. Regardless of Defendant's culpability in the "misplace[ment]" of the evidence, the end result is that the evidence is unavailable for Plaintiff to use in litigation., Defendants knew that they had an obligation to preserve and maintain the records. Therefore, under the rule in Residential Funding Corp., the risk (that the evidence was detrimental) should fall on the Defendants. Specifically, implicit in the argument that Defendants have failed in their duty to preserve property as evidence in pending litigation is clearly an argument that Defendants had duty to preserve."

The standard governing the duty of preserve in the Second Circuit is made clear in *West v. Goodyear Tire & Rubber Co.,* 167 F. 3d 776, 779 (2d Cir. 1999), which state in relevant part that spoliation is "destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *See also* Docket Entry No. 73 at *3 (citing same). Per *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 214 (S.D.N.Y. 2003), Defendants' duty to preserve arose from the time they anticipated litigation, which can be months prior to the filing of the charge with the Equal Employment Commission, not when the Complaint was filed.

Here, it is uncontroverted and the Court is well aware that the charge of discrimination was filed with the Equal Employment Opportunity Commission on or about April 19, 2019, *see* Docket Entry No. 1 at *2 ¶ 6 and further that the previous related case was filed on September 25, 2019, *see i.d.* at *2-3 ¶ 8. This has been pointed out time and again by Defendants' counsel during the successive settlement conferences before both Judge Lois Bloom and Judge Mann. In that regard,

2

A0733

Case 1:21-cv-07163-OEM-LB   Document 91   Filed 09/25/23   Page 5 of 9 PageID #: 1353

the Court is clearly erroneous as to the duty prong of the Memorandum and Decision in *assuming* that Defendants are placed on notice of their duty to preserve for the first time in December 2021, when the present case is filed, and more than 2 years and 8 months after the charge was initially filed and sent to the Defendants. *See* Docket Entry No. 77 at *5.

Defendants "believe" the misplacement or destruction of the relevant weekly sales log occurred in "early 2019," but that is not based on any admissible evidence and is controverted by Jennings' deposition testimony, given under oath, that she worked part time at Hillside Auto Outlet, through 2020. *See also* Docket Entry No. 78 Exhibit 3 Defendants' 56.1 Statement ¶ 155 stating that "From 2018 until 2020, Jennings worked at both Hillside Auto Outlet part-time and Hillside Auto Mall full-time concurrently until a full-time controller was found for Hillside Auto." The cited to Thanwalla Declaration only states that Ms. Jennings was the controller at Hillside Auto Outlet during the entirety of Plaintiff's employment at Hillside Auto Outlet, and does not define a definite time by when she stopped work at Hillside Auto Outlet.

Thus, the Court is clearly erroneous in crediting Defendants' characterization (without admissible evidence to support the same) that the document misplacement and destruction took place prior to their receiving notice of the lawsuit in 2019, as it is also unconverted that Deanna Jennings stopped working at Hillside Auto Outlet, LLC not in 2019 but 2020.

Plaintiff has further demonstrated that Defendants destroyed such evidence with a "culpable state of mind" through a detailed overview of the procedural history and engagement with Defendants' counsel. The Magistrate Judge states in relevant part that "the Court does not condone defendants' counsel's behavior in this litigation—counsel has blatantly disregarded Court ordered deadlines as well as demonstrated a willingness to waste the Court's resources over petty disputes." *See* Docket Entry No. 77 at *6. During the May 17, 2023 conference, the Judge warned

3

A0734

Case 1:21-cv-07163-OEM-LB    Document 91    Filed 09/25/23    Page 6 of 9 PageID #: 1354

Defendants' counsel that "this is not a game of, like – I understand lawyers can parse language, and if you don't use the exact right language—but we're here now. We're looking for weekly. We're <u>not</u> looking for monthly." *See* Docket Entry No. 73 Ex. 7 at \*6. This was referenced to in Plaintiffs' Discovery Motion which states that "Moreover, with regard to both the sales log and the text messages, Defendants have already been threatened by sanctions from the Court—yet they continue to delay discovery by playing affidavit word games. Dkt. 59." *See* Docket Entry No. 73 at \*3.

Defendants further argue that the Court is correct is finding that Plaintiff have failed to show that Plaintiff is prejudiced by the alleged destruction of the sales logs because Defendants have produced other evidence, such as the monthly sales logs after a diligent search, and produced weekly paystubs of the Plaintiff's comparators. However, as set forth below, the Court's ruling is clearly erroneous with respect to that prong as well. The Court has previously found that because of the manner in which the <u>monthly</u> sales logs and paystubs were produced, they were *not* an appropriate substitute for the weekly sales sheets (de-identified without a roster to identify who is who). Specifically, during the May 17, 2023 conference was held as a result of Plaintiff's Fourth Motion to Compel and for Sanctions. In that motion, the Plaintiff set forth that "the sworn testimony of ISHAQUE THANWALLA, ANDRIS GUZMAN, and corporate witness DEANNA JENNINGS (on behalf of both Corporate Defendants) underscores that in fact Defendants have intentionally failed to turn over the weekly commission sales sheets which accurately reflect the number of cars sold, the commissions earned for each individual. Thus far, the only documents produced grossly underestimates the cars sold and by all accounts, including Defendant ISHAQUE THANWALLA, is not an accurate reflection of the cars sold by the dealership or by Plaintiff. It was disclosed by JENNINGS that the files are kept from the time when Hillside Auto Outlet began

4

A0735

business. Defendant's Response to Document production requests 17 and 21 are thus incorrect. Further, Plaintiff's Document Production 15-18 all touch upon information that would have been found on the commissions sheets that defendant withheld from plaintiff."

Unlike the case cited by the Defendant, *Uni-Sys. LLC v. U.S. Tennis Assn., Inc.*, No. 17-CIV-147 (KAM)(CLP), 2020 WL 8266015, at *6 (E.D.N.Y. Jul 6, 2020), where there is no basis to impose sanctions upon affidavits confirming that the conduct of the ESI according to the previously-agreed-to search terms and custodians, here there is evidence that the Defendants submitted perjurious statements to the Court with respect to the timing of the destruction of the evidence in light of the contradiction between Ms. Jennings' deposition testimony and her later statement. Defendants argue for purposes of arguing *against* the motion for sanctions that Ms. Jennings left part time employ at Hillside Auto Outlet in "early 2019" but in *support* of their Motion for Summary Judgment that Ms. Jennings left employ at Hillside Auto Outlet in 2020, after the lawsuit has initiated.

Defendants strenuously argue that the car sales documents are already produced. This was further elaborated upon during the May 17, 2023 conference, during which Plaintiff outlined why the monthly sales log is not an appropriate substitute for the weekly sales log because (1) none of the comparators are actually identified (even by position), and none of the Defendants could tell even which position pertain to which ID and (2) the monthly sales log does not accurately reflect the number of cars sold.

Thus, Plaintiff has pointed to a plethora of evidence that Judge Bloom has overlooked which show that relief under Rule 72 is warranted, even under the highly differential standard applicable to Rule 72. Specifically, Plaintiff has shown that the failure of Defendants to preserve the documents which they initially claimed that they have preserved for all years inclusive but later

5

A0736

change their position and said they lost, create an evidentiary imbalance that is best corrected through an adverse inference to the jury as to the lost evidence.

Further, Defendants argue that the Magistrate Judge's finding that a failure to comply with a state law's duty to preserve records does not impute a duty to preserve records as potential evidence in the federal lawsuit. However, the federal lawsuit covers not only Title VII claims but also NYSHRL and NYCHRL claims for discrimination.

## II.   THE CASE DOES NOT TURN UPON PLAINTIFF'S DISCOVERY OF DEFENDANTS' PERJURIOUS STATEMENTS

Defendants cite to *Thai Lao Lignite (Thailand) Co, Ltd. v. Government of Lao People's Democratic Republic*, 924 F. Supp. 2d 508, 512 (S.D.N.Y. 2013) for the proposition that the Court should not consider the new evidence that could have been submitted with her earlier motion. Plaintiff does not dispute that the Court in deciding on the Motion on Fed. R. Civ. P. 72 need not consider newly-introduced evidence.

However, this particular case has been particularly egregious. Specifically, Plaintiff can show that Defendants perjured themselves in their proffered reasons for the misplacement of the documents. Specifically, as set forth in detail in Plaintiff's opening brief, "Neither any of Ms Jennings' three declarations, nor either of Mr. Thanwalla's declarations, indicated when the logs might have been moved to the third-party storage facility. But it cannot have been related to construction at Hillside Auto Mall. Hillside Auto Mall is located at 150-01 Hillside Avenue, Queens, NY 11432—Queens Block 9706 Lot 98. A search of the New York Department of Buildings' website reveals no actions related to Queens Block 9706 Lot 98 more recent than 1987, and no permits issued for construction on the property." *See* Docket Entry No. 77.

6

A0737

## **CONCLUSION**

For all the reasons set forth above, Plaintiff respectfully requests that the Court reverse Judge Bloom's decision not to issue sanctions, and respectfully request that the Court issue sanctions in the form of an adverse inference to the jury and the fees and costs associated with the multiple rounds of motions to compel, and any other relief that the Court deems fit and proper.

Dated: Flushing, NY
      September 25, 2023

                      TROY LAW, PLLC

                        */s/ John Troy*
                        John Troy, Esq.

/mh

7

A0738

Case 1:21-cv-07163-OEM-LB   Document 99   Filed 03/27/24   Page 1 of 2 PageID #: 1368

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                              Plaintiff,

                -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                            Defendants.
-------------------------------------------------------------------X

Case No.: 1:21-cv-7163 (OEM) (LB)

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, that upon the memorandum of law in support, Local Rule 56.1 Statement of Undisputed Facts, and the Declaration of Emanuel Kataev, Esq. with accompanying exhibits, Defendants 161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE AUTO OUTLET, HILLSIDE AUTO MALL INC d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA, JORY BARON, RONALD M BARON, and ANDRIS GUZMAN, individually, by and through their attorneys MILMAN LABUDA LAW GROUP PLLC, will move this court before the Hon. Orelia E. Merchant, U.S.D.J. ("Judge Merchant"), at the United States District Court for the Eastern District of New York, 225 Cadman Plaza East, Courtroom 6C South, Brooklyn, NY 11201-1804, pursuant to Rule 56 of the Federal Rules of Civil Procedure for an Order granting summary judgment dismissing the Complaint filed by LETICIA FRANCINE STIDHUM, with prejudice.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Judge Merchant's Order dated October 31, 2023, Plaintiff's opposition papers are due on January 2, 2024, and Defendants' reply papers in further support of their motion papers are due on January 16, 2024.

A0739

Case 1:21-cv-07163-OEM-LB    Document 99    Filed 03/27/24    Page 2 of 2 PageID #: 1369

Dated: Lake Success, New York
      December 1, 2023          **MILMAN LABUDA LAW GROUP PLLC**

                          */s/ Emanuel Kataev, Esq.*
                          Joseph M. Labuda, Esq.
                          Emanuel Kataev, Esq.
                          3000 Marcus Avenue, Suite 3W8
                          Lake Success, NY 11042-1073
                          (516) 328-8899 (office)
                          (516) 328-0082 (facsimile)
                          joe@mllaborlaw.com
                          emanuel@mllaborlaw.com

                          *Attorneys for Defendants*

**VIA E-MAIL**
Troy Law, PLLC
<u>Attn</u>: John Troy, Tiffany Troy, and Aaron Schwietzer, Esqs.
4125 Kissena Boulevard, Suite 103
Flushing, NY 11355-3101
johntroy@troypllc.com
tiffanytroy@troypllc.com
troylaw@troypllc.com

*Attorneys for Plaintiff*

A0740

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 1 of 32 PageID #: 1370

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                                                       Case No.: 1:21-cv-7163 (OEM) (LB)

                    Plaintiff,

        -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                    Defendants.
-------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Defendants*

A0741

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 2 of 32 PageID #: 1371

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................. 1

II. STATEMENT OF UNDISPUTED FACTS .......................................................... 2

III. LEGAL STANDARD ............................................................................................ 6

IV. ARGUMENT ............................................................................................................ 7

    A.   Legal Standard for Disparate Treatment Claims Under Title VII, NYSHRL, and NYCHRL ............................................................................................................ 7

    B.   Plaintiff's Title VII Claim for Sex Discrimation and PDA Claim for Pregnancy Discrimination Must be Dismissed ...................................................................... 9

    C.   Plaintiff's NYSHRL Claim for Disability Discrimination Must be Dismissed ......... 16

    D.   Plaintiff's NYSHRL Claim for Sex Discrimination Must be Dismissed ................... 17

    E.   Plaintiff's NYCHRL Claim for Pregnancy Discrimination Must be Dismissed ....... 17

    F.   The Claims Against Hillside Auto Mall Must be Dismissed ........................................ 19

    G.   The Claims Against Baron, Guzman, and Thanwalla Must be Dismissed ................ 20

CONCLUSION ............................................................................................................... 23

ii

A0742

## TABLE OF AUTHORITIES

**Cases**

Abdul-Hakeem v. Parkinson,
    523 Fed. Appx. 19 (2d Cir. 2013) ................................................................................. 13

Albunio v. City of New York,
    16 N.Y.3d 472 (2011) .................................................................................................... 8

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ...................................................................................................... 6

Balk v. N.Y. Inst. of Tech.,
    11-CIV.-509 (SAS), 2015 WL 5518709 (E.D.N.Y. Sept. 16, 2015) .............................. 19

Batchelor v. City of New York,
    No. 11-CIV.-2058, 2014 U.S. Dist. LEXIS 46921 (E.D.N.Y. Feb. 16, 2014) ............... 11

Beharry v. City of New York,
    No. 18-CIV.-2042 (AJN), 2020 WL 6135147 (S.D.N.Y. Oct. 19, 2020) ....................... 12

Brown v. City of Syracuse,
    673 F.3d 141 (2d Cir. 2012) ................................................................................. 10 n. 1

Burlington N. & Santa Fe Ry. Co. v. White,
    548 U.S. 53 (2006) ................................................................................................. 11, 12

Cadet v. Deutsche Bank Sec. Inc.,
    No. 11-CIV.-7964 (CM), 2013 WL 3090690 (S.D.N.Y. June 18, 2013) ....................... 10

Castro v. Cnty. of Nassau,
    739 F. Supp. 2d 153 (E.D.N.Y. 2010) .......................................................................... 7

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .................................................................................................. 6, 7

Cenzon–Decarlo v. Mount Sinai Hosp.,
    101 A.D.3d 924 (2d Dept. 2012) .................................................................................. 9

Chauca v. Abraham,
    841 F.3d 86 (2d Cir. 2016) ........................................................................................... 8

Davis v. Koffee Kup Bakery, Inc.,
    No. 2:15-CIV.-152 (CR), 2016 WL 4411399 (D. Vt. Aug. 18, 2016) ........................... 10

iii

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 4 of 32 PageID #: 1373

Doe v. Bloomberg L.P.,
    167 N.E.3d 454 (2021)................................................................................... 21

EEOC v. Bloomberg L.P.,
    967 F. Supp. 2d 816 (S.D.N.Y. 2013)........................................................... 8

Elaine W. v. Joint Diseases N. Gen. Hosp., Inc.,
    81 N.Y.2d 211 (1993)................................................................................... 8

Ellison v. Chartis Claims, Inc.,
    178 A.D.3d 665 (2d Dept. 2019) .............................................................. 8, 9

Evans v. City of New York,
    No. 00-CIV.-4197, 2003 WL 22339468 (S.D.N.Y. Oct. 9, 2003).................... 11

Everett v. New York City Dept. of Educ.,
    No. 21-CIV.-7043 (JPC), 2023 WL 5629295 (S.D.N.Y. Aug. 31, 2023) ........ 22

Farmer v. Shake Shack Enters.,
    473 F. Supp. 3d 309 (S.D.N.Y. 2020)............................................................ 8

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)......................................................................... 20

Forsythe v. N.Y.C. Dep't of Citywide Admin. Servs.,
    733 F.Supp.2d 392 (S.D.N.Y. 2010)............................................................ 19

Forsythe v. N.Y.C. Dep't of Citywide Admin. Servs.,
    428 Fed. Appx. 40 (2d Cir. 2011)................................................................ 19

Frost v. N.Y.C. Police Dep't,
    980 F.3d 231 (2d Cir. 2020).......................................................................... 6

Goenaga v. March of Dimes Birth Defects Foundation,
    51 F.3d 14 (2d Cir. 1995).............................................................................. 6

Golston–Green v. City of New York,
    184 A.D.3d 24 (2d Dept. 2020) ..................................................................... 9

Griffin v. Sirva, Inc.,
    29 N.Y.3d 174 (2017) .................................................................................. 21

Hai Ming Lu v. Jing Fong Rest., Inc.,
    503 F. Supp. 2d 706 (S.D.N.Y. 2007)........................................................... 12

iv

A0744

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 5 of 32 PageID #: 1374

Harge v. City of New York,
    2021 WL 3855305 (S.D.N.Y. Aug. 26, 2021) .......................................................... 10 n. 1

Henry v. NYC Health Hosp. Corp.,
    18 F. Supp. 3d 396 (S.D.N.Y. 2014) ..................................................................... 10 n. 1

Holcomb v. Iona Coll.,
    521 F.3d 130 (2d Cir. 2008) ................................................................................... 6

Hyek v. Field Support Servs., Inc.,
    461 Fed. Appx. 59 (2d Cir. 2012) .......................................................................... 17

Jaramillo v. Weyerhaeuser Co.,
    536 F.3d 140 (2d Cir. 2008) ................................................................................... 7

Kennebrew v. N.Y. City Hous. Auth.,
    No. 01-CIV.-1654, 2002 WL 265120 (S.D.N.Y. Feb. 26, 2002) ..................................... 16

Kinneary v. City of N.Y.,
    601 F.3d 151 (2d Cir. 2010) ................................................................................... 16 n. 8

Kirkland-Hudson v. Mount Vernon City Sch. Dist.,
    No. 21-CIV.-695, 2023 WL 2691622 (S.D.N.Y. Mar. 29, 2023) ...................................... 8

Krause v. Lancer & Loader Grp.,
    40 Misc. 3d 385 (N.Y. Sup. Ct. 2013) ...................................................................... 8

Kulak v. City of New York,
    88 F.3d 63 (2d Cir. 1996) ..................................................................................... 14

La Grande v. DeCrescente Distrib. Co., Inc.,
    370 Fed. Appx. 206 (2d Cir. 2010) .......................................................................... 11

LaBarbera v. NYU Winthrop Hosp.,
    527 F. Supp. 3d 275 (E.D.N.Y. 2021) ...................................................................... 16

Legg v. Ulster Cnty.,
    820 F.3d 67 (2d Cir. 2016) .................................................................................... 9, 10

Lenzi v. Systemax, Inc.,
    944 F.3d 97 (2d Cir. 2019) .................................................................................... 7

Lima v. Addeco,
    634 F. Supp. 2d 394 (S.D.N.Y. 2009) ...................................................................... 19

v

A0745

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 6 of 32 PageID #: 1375

Loeffler v. Staten Island Univ. Hosp.,
    582 F.3d 268 (2d Cir. 2009)................................................................ 8

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012)................................................. 20

Mandell v. Cnty. of Suffolk,
    316 F.3d 368 (2d Cir. 2003).............................................................. 15

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).......................................................................... 6

McDonnell Douglas v. Green,
    411 U.S. 792 (1973)............................................................... 8, 9, 15

McHenry v. Fox News Network, LLC,
    510 F. Supp. 3d 51 (S.D.N.Y. 2020)................................................. 21

McMyler v. Bank of Utica,
    No. 6:19-CIV.-812 (MAD) (ATB), 2021 WL 2778830 (N.D.N.Y. July 2, 2021) ........... 17

Mihalik v. Credit Agricole Cheuvreux N. Am.,
    715 F.3d 102 (2d Cir. 2013)............................................................... 8

Moise v. Uptown Communications & Elec., Inc.,
    134 A.D.3d 782, 783 (2d Dept. 2015) ............................................... 9

Morse v. JetBlue Airways Corp.,
    941 F. Supp. 2d 274 (E.D.N.Y. 2013) .............................................. 16

Parker v. Equinox Holdings, Inc.,
    No. 20-CIV.-3306 (JPO), 2023 WL 6143546 (S.D.N.Y. Sept. 20, 2023)..................... 15

Patrowich v. Chemical Bank,
    473 N.E.2d 11 (1984)....................................................................... 21

Penberg v. HealthBridge Mgmt.,
    823 F. Supp. 2d 166 (E.D.N.Y. 2011) ....................................... 16 n. 8

Quintero v. Rite Aid of N.Y., Inc.,
    No. 09-CIV-6084, 2011 WL 5529818 (S.D.N.Y. Nov. 10, 2011) ........... 16 n. 8

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)......................................................................... 7

A0746

Regan v. Benchmark Company LLC,
    2012 WL 692056 (S.D.N.Y. Mar. 1, 2012) ....................................................................... 12

Rivera v. Rochester Genesee Reg'l Transp. Auth.,
    743 F.3d 11 (2d Cir. 2014) ............................................................................................. 12

Romero v. St. Vincent's Services, Inc.,
    No. 19-CV-7282(KAM)(ST), 2022 WL 2079648 (E.D.N.Y. June 10, 2022) .................. 17

Romero v. St. Vincent's Services, Inc.,
    No. 22-1476-CV, 2023 WL 3477161 (2d Cir. May 16, 2023) ......................................... 17

Salen v. Blackburn Bldg. Servs., LLC,
    No. 3:14-CIV.-1361 (VAB), 2017 WL 71708 (D. Conn. Jan. 6, 2017) .......................... 10

Sam-Sekur v. Whitmore Grp., Ltd.,
    No. 11-CIV.-4938 (JFB) (GRB), 2012 WL 2244325 (E.D.N.Y. June 15, 2012) ............. 16

Santiago v. Axis Spexialty U.S. Servs., Inc.,
    2021 WL 639527 (S.D.N.Y. Feb. 16, 2021) ................................................................... 18

Saraf v. West Publishing Corp.,
    2018 WL 7107266 (S.D.N.Y. Dec. 20, 2018) ................................................................ 10

Sealy v. State Univ. of New York At Stony Brook,
    408 F. Supp. 3d 218 (E.D.N.Y. 2019) ........................................................................... 11

Singh v. Covenant Aviation Sec., LLC,
    131 A.D.3d 1158 (2d Dept. 2015) .................................................................................... 9

Smith v. New Venture Gear, Inc.,
    320 Fed. Appx. 33 (2d Cir. 2009) ................................................................................. 15

Sokolovsky v. Silver Lake Specialized Care Ctr.,
    No. 21-CV-01598 (MKB), 2023 WL 5977298 (E.D.N.Y. Sept. 14, 2023) ..................... 22

Stanley v. Guardian Security Services, Inc.,
    800 F. Supp. 2d 550 (S.D.N.Y. 2011) ........................................................................... 21

Stratton v. Ernst & Young, LLP,
    No. 15-CIV.-1047 (VEC), 2016 WL 6310772 (S.D.N.Y. Oct. 27, 2016) ....................... 15

Teachout v. New York City Dept. of Educ.,
    No. 04-CIV.-945 (GEL), 2006 WL 452022 (S.D.N.Y. Feb. 22, 2006) ........................... 12

A0747

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 8 of 32 PageID #: 1377

Tepperwien v. Entergy Nuclear Operations, Inc.,
  663 F.3d 556 (2d Cir. 2011)..................................................................................... 12

Tex. Dep't of Cmty. Aff.s v. Burdine,
  450 U.S. 248 (1981)......................................................................................... 9, 15

Thomson v. Odyssey House,
  No. 14-CV-3857, 2015 WL 5561209 (E.D.N.Y. Sept. 21, 2015) ..................................... 16

Tsepenyuk v. Fred Alger & Co., Inc.,
  No. 18-CIV.-7092 (GBD), 2022 WL 912882 (S.D.N.Y. Mar. 29, 2022) .................. 17, 18

Tsepenyuk v. Fred Alger & Co., Inc.,
  2023 WL 6173455 (2d Cir. Sept. 22, 2023) .................................................................. 17

Vengalattore v. Cornell Univ.,
  36 F.4th 87 (2d Cir. 2022) .......................................................................................... 7

Viruet v. City of N.Y.,
  No. 16-CIV.-8327, 2019 WL 1979325 (S.D.N.Y. May 3, 2019)............................... 16 n. 8

Wade v. New York City Dept. of Ed.,
  36 F.4th 87 (2d Cir. 2022) .......................................................................................... 7

Weinstock v. Columbia Univ.,
  224 F.3d 33 (2d Cir. 2000)........................................................................................... 7

Whyte v. New York State Police,
  No. 22-CIV.-5633 (NGG) (CLP), 2023 WL 7413087 (E.D.N.Y. Nov. 9, 2023)............. 20

Williams v. New York City Hous. Auth.,
  No. 03-CIV.-7764, 2008 WL 2695139 (S.D.N.Y. June 29, 2008)................................... 11

Williams v. New York City Hous. Auth.,
  361 Fed. Appx. 220 (2d Cir. 2010)............................................................................... 11

Xiang v. Eagle Enterprises, LLC,
  No. 19-CV-1752 (LJL), 2022 WL 785055 (S.D.N.Y. Mar. 15, 2022)............................ 18

Young v. United Parcel Serv., Inc.,
  575 U.S. 206 (2015)..................................................................................................... 7

A0748

**Statutes**

42 U.S.C. § 2000e-2 ................................................................................................................. 7

New York City Administrative Code § 8-107 ................................................................ 8, 20, 22

New York Executive Law § 292 .................................................................................... 16

New York Executive Law § 296 ............................................................................. 8, 20, 21, 22

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................... 6

Local Civil Rule 56.1 ................................................................................................... 2

A0749

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 10 of 32 PageID #: 1379

## I.   PRELIMINARY STATEMENT

Plaintiff Leticia Francine Stidhum ("Stidhum" or "Plaintiff") cannot meet her burden for establishing a *prima facie* case of discrimination, let alone sustain her ultimate burden of proof, because she suffered no adverse employment action and there are no circumstances giving rise to an inference of discrimination.  Similarly, there exists no evidence that Plaintiff was disabled, due to her pregnancy or otherwise, such that her disability discrimination claim could survive.

Plaintiff worked exclusively for 161-10 Hillside Ave Auto, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet"), a used car dealership, for a mere eight (8) months as an automobile salesperson.  She voluntarily quit her employment in January 2019 purportedly because she perceived Defendant Andris Guzman ("Guzman") started making her wait longer to process customer's vehicle financing applications after she announced her pregnancy to employees at Hillside Auto Outlet in November 2018.

Notwithstanding, and among other things, Plaintiff concedes Guzman made customers wait long before her pregnancy, she does not know nor can she make sense as to why Guzman would make her wait longer, Guzman never made any comments to her about her pregnancy, and that long wait times occurred due to various reasons outside of the dealership's control.  Moreover, Plaintiff's average weekly compensation before her pregnancy and thereafter differed by a mere $19.37, while her average bonus was seven times higher after her pregnancy.

Additionally, Guzman's pay structure was based on the salespersons, including Plaintiff, selling vehicles, so it defies logic that Guzman would implement barriers preventing Plaintiff from consummating sales.

Summary judgment is therefore warranted.

1

A0750

Case 1:21-cv-07163-OEM-LB    Document 100    Filed 03/27/24    Page 11 of 32 PageID #: 1380

## II.    STATEMENT OF UNDISPUTED FACTS

Defendants highlight and summarize the most salient facts below, and respectfully refer this Court to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("SUF") for a complete recitation of the undisputed facts in the record. See ECF Docket Entry 78-3.

Defendant Ishaque Thanwalla ("Thanwalla"), one of four equal members of Hillside Auto Outlet, ran the day-to-day operations at the used car dealership, and served as its general manager. See SUF ¶¶ 1-4. Of the four members, only Thanwalla had the power to hire and fire employees, set their wages and schedules, and to discipline employees. See SUF ¶¶ 5-12, 29.

Guzman was a sales manager and a general sales manager at Hillside Auto Outlet from 2018 through August 2019; he did not have the power to hire, fire, or discipline employees in either role. See SUF ¶¶ 13-14. His pay was commission-based, and tied to sales of vehicles sold by all salespersons. See SUF ¶ 95.

Hillside Auto Mall, Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall") is a separate neighboring used car dealership located a few blocks away from Hillside Auto Outlet, and has some common owners between each other. See SUF ¶¶ 18-20, 141-160. One of its owners, Raymond Phelan ("Phelan"), serves as the general manager at Hillside Auto Mall. See SUF ¶ 21.

Plaintiff worked only at Hillside Auto Outlet from May 22, 2018 through January 2019, when she voluntarily quit. See SUF ¶¶ 22-25, 116. She was supervised by Thanwalla, Jeanique ("Jeanique"), and Guzman throughout her short tenure. See SUF ¶¶ 28, 31.

She received notice of Hillside Auto Outlet's policies against discrimination which prohibited discrimination based on all protected classes, including pregnancy, and required her to lodge any complaints of discrimination to management. See SUF ¶¶ 77-78.

2

A0751

Plaintiff earned a $300.00 weekly salary, a $150.00 flat commission for each car sold, and – from time to time – a bonus of five percent (5%) of the profit from the sale of any vehicle that made in excess of $3,000.00 in profit, as well as other bonuses that continuously varied. See SUF ¶¶ 33-35, 38. Plaintiff recorded her vehicle sales on a form provided to her, and she discarded the forms once she was satisfied that she was properly paid. See SUF ¶ 36. Every vehicle purchase is unique and one can never measure how long it will take for each customer to purchase a vehicle. See SUF ¶¶ 43-44. If a vehicle is to be financed by a bank, which is typically the case, the customer has to complete a credit application and provide all requisite information. See SUF ¶¶ 45.

Salespeople, such as Plaintiff, submitted completed credit applications to managers, and had the option of going to numerous managers -- i.e., Thanwalla, Jeanique, Guzman, or Serge Zanaan ("Zanaan") – to ascertain whether the customer qualified for financing and to perform the financing application process. See SUF ¶¶ 46-47, 51. Plaintiff chose which manager to go to based on who was least busy at each time that a customer needed to apply for financing. See SUF ¶¶ 47-48.

There are invariably delays in obtaining financing approval from banks for innumerable reasons, and even without such delays, there is no guarantee a sale will be made even if a customer qualifies for financing due to various other factors. See SUF ¶¶ 49-50, 62-64. Delays arise due to verification processes such as identity verification, employment verification, credit fraud alerts, and the like. See SUF ¶¶ 52-58, 65. Dealerships do not control the process when it comes to obtaining financing, and the banks are in control of those decisions, who often seek additional documents even after a customer initially qualifies for financing. See SUF ¶¶ 59-61. In addition, insurance and registration issues often arise that prevent sales from being completed quickly. See SUF ¶¶ 65-67. All of the foregoing issues are outside of the dealership's control. See SUF ¶ 68.

3

A0752

Case 1:21-cv-07163-OEM-LB    Document 100    Filed 03/27/24    Page 13 of 32 PageID #: 1382

When these issues arise, the sales managers are required to resolve them in order to work towards a potential sale, and the process takes time. See SUF ¶¶ 54, 62, 70-71. It could take the dealership three (3) to six (6) hours to sell a vehicle, or it could sometimes take days to do so. See SUF ¶ 68. Plaintiff was frequently unable to sell vehicles for reasons unrelated to wait times, for example, a customer purchased a vehicle from another dealership or simply chose to not purchase a vehicle from Plaintiff because of price or otherwise was not ready to buy. See SUF ¶¶ 72-76.

Plaintiff was one of many female salespersons at Hillside Auto Outlet. See SUF ¶ 79. She announced her pregnancy on November 23, 2018 to most of the employees at the dealership. See SUF ¶ 80.

Plaintiff received access to Dealertrack, even though salespersons are not supposed to receive such access, to assist her in processing customer applications for financing. See SUF ¶ 114. Dealertrack is a dealership management system used by Hillside Auto Outlet; it stores customer information that is sensitive, which is why access to it is limited, and serves as a liaison with banks that provide financing for vehicles. See SUF ¶ 40. No salesperson other than Plaintiff ever had access to Dealertrack. See SUF ¶¶ 114-115.

While Thanwalla was on vacation in December 2018, Plaintiff complained to him that Guzman did not provide her with a Dealertrack password, although Guzman had no ability to change the password. See SUF ¶¶ 83-84. She also complained to Thanwalla in or about January 2019 that Guzman suddenly started making her wait longer to process her customers applications, but did not know why he did so. See SUF ¶ 85, 87. She did not tell Thanwalla that she thought Guzman did this due to her pregnancy, and she does not know whether it was something personal or due to her pregnancy. See SUF ¶¶ 85, 87-88. Critically, Guzman frequently kept customers waiting longer than necessary before Plaintiff announced her pregnancy. See SUF ¶ 86.

4

Moreover, prior to her resignation, Plaintiff previously complained to Thanwalla in a text message that Guzman took so long to process applications because he "sucks" and that the dealership was a "shit show" since Thanwalla went on vacation. See SUF ¶ 88. Plaintiff also confronted Guzman at some point between late November 2018 and January 2019 and stated she believed he was making her wait longer due to her pregnancy, but Guzman told her it had nothing to do with her pregnancy and that she has to wait because there are other customers ahead of her customers who were seeking financing. See SUF ¶ 90. Plaintiff previously had two (2) interpersonal conflicts with Guzman prior to her pregnancy, although she could not recall the circumstances. See SUF ¶ 93. Guzman never made any comments to Plaintiff concerning her pregnancy. See SUF ¶ 94.

Guzman would not stall Plaintiff's financing applications because he received a commission for every sale Plaintiff consummated. See SUF ¶ 95. Thus, Guzman would lose commissions if he were intentionally stalling Guzman's applications. Plaintiff was only able to identify two (2) customers who left without purchasing a vehicle because it took too long to qualify for financing such that she lost $300.00 in commissions. See SUF ¶ 96.

Plaintiff's job responsibilities and position always remained the same, as did her compensation, while bonuses fluctuated in the normal course of business. See SUF ¶¶ 102-104. Plaintiff's average weekly pay pre-pregnancy was $710.00, while her average weekly pay post-pregnancy was $690.63, a mere difference of $19.37, attributable to the slow winter season. See SUF ¶¶ 105-110.

When Plaintiff contacted Defendant Jory Baron – one of the owners of Hillside Auto Outlet – after she quit, Plaintiff complained about her pay, not pregnancy discrimination. See SUF ¶¶ 125-129. Plaintiff quickly obtained employment after quitting. See SUF ¶¶ 135-137.

5

A0754

### III.   **LEGAL STANDARD**

Summary judgment shall be granted pursuant to Rule 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact; this burden is satisfied if the moving party can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. See Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995).

A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A fact is material "if it might affect the outcome of the suit under the governing law." See Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. A moving party may indicate the absence of a factual dispute by "showing ... that an adverse party cannot produce admissible evidence to support the fact." See Fed. R. Civ. P. 56(c)(1)(B). Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party has met its burden, "the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." See Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

6

A0755

The nonmoving party is required to "go beyond the pleadings," id., and "may not rest upon mere conclusory allegations or denials[.]" See Castro v. Cnty. of Nassau, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (citation omitted).

Rather, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." See Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008) (citing Celotex Corp., 477 U.S. at 322-23).

The Second Circuit has noted that it "went out of [its] way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact'").

Accordingly, this Court should grant summary judgment in Defendants' favor.

## IV.  ARGUMENT

### A.  Legal Standard for Disparate Treatment Claims Under Title VII, NYSHRL, and NYCHRL

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual on the basis of the individual's race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1); see also Vengalattore v. Cornell Univ., 36 F.4th 87, 103 (2d Cir. 2022).

"The Pregnancy Discrimination Act ["PDA"] makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." See Lenzi v. Systemax, Inc., 944 F.3d 97, 107 (2d Cir. 2019) (quoting Young v. United Parcel Serv., Inc., 575 U.S. 206, 210 (2015)).

A0756

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 17 of 32 PageID #: 1386

The NYSHRL and NYCHRL likewise prohibit discrimination against an employee based on that employee's race, disability, creed, color, sexual orientation, gender identity or expression, sex, or marital status. See N.Y. Exec. Law § 296(1); see also N.Y.C. Admin. Code § 8-107; Kirkland-Hudson v. Mount Vernon City Sch. Dist., No. 21-CIV.-695, 2023 WL 2691622, at *14 (S.D.N.Y. Mar. 29, 2023); EEOC v. Bloomberg L.P., 967 F. Supp. 2d 816, 837 (S.D.N.Y. 2013).

Although neither the NYSHRL nor the NYCHRL explicitly names pregnancy as a type of discrimination, courts have routinely held that pregnancy discrimination falls within the laws' prohibitions. See, e.g., Elaine W. v. Joint Diseases N. Gen. Hosp., Inc., 81 N.Y.2d 211, 216 (1993); see also Krause v. Lancer & Loader Grp., 40 Misc. 3d 385, 392 (N.Y. Sup. Ct. 2013); Chauca v. Abraham, 841 F.3d 86, 89 (2d Cir. 2016).

Although the NYCHRL follows the same general framework as Title VII and the NYSHRL, Farmer v. Shake Shack Enters., 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020), courts are instructed to analyze NYCHRL claims "separately and independently from any federal and state law claims." See Mihalik v. Credit Agricole Cheuvreux N. Am., 715 F.3d 102, 109 (2d Cir. 2013).

The NYCHRL's provisions, however, are to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." See Albunio v. City of New York, 16 N.Y.3d 472, 477–78 (2011); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009).

When analyzing disparate treatment claims under the NYCHRL, the court must use the burden shifting analysis under McDonnell Douglas v. Green, 411 U.S. 792 (1973), as well as a mixed motive analysis which imposes a lesser burden on a plaintiff opposing such a motion. See Ellison v. Chartis Claims, Inc., 178 A.D.3d 665, 668 (2d Dept. 2019).

8

A0757

Under the NYCHRL, a plaintiff must establish that she was "subject to an unfavorable change or treated less well than other employees on the basis of a protected characteristic" See Golston–Green v. City of New York, 184 A.D.3d 24, 38 (2d Dept. 2020). Unlawful discrimination must play "no role" in an employment decision. See Ellison, 178 A.D.3d at 668 (internal quotation marks omitted); see also Singh v. Covenant Aviation Sec., LLC, 131 A.D.3d 1158, 1161 (2d Dept. 2015). A defendant moving for summary judgment must make a *prima facie* showing "that there is no evidentiary route that could allow a jury to believe that discrimination played a role in [the] challenged actions" See Ellison, 178 A.D.3d at 668 (internal quotation marks omitted); see also Moise v. Uptown Communications & Elec., Inc., 134 A.D.3d 782, 783 (2d Dept. 2015); Cenzon–Decarlo v. Mount Sinai Hosp., 101 A.D.3d 924, 927 (2d Dept. 2012).

"A plaintiff may defeat summary judgment by coming forward either with evidence that the defendant's stated reasons were a pretext for discrimination or with evidence that discrimination was one of the motivating factors for the defendant's conduct." See Ellison, 178 A.D.3d at 668.

As set forth below, each of Plaintiff's claims fail and summary judgment must be granted.

**B. Plaintiff's Title VII Claim for Sex Discrimination and PDA Claim for Pregnancy Discrimination Must be Dismissed**

In analyzing Plaintiff's Title VII discrimination claim, courts apply the three-step burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).

First, the plaintiff must establish the elements of a *prima facie* discrimination case. See Tex. Dep't of Cmty. Aff.s v. Burdine, 450 U.S. 248, 252 (1981). If the plaintiff establishes a *prima facie* case, "a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." See Legg v. Ulster Cnty., 820 F.3d 67, 73 (2d Cir. 2016).

9

A0758

Case 1:21-cv-07163-OEM-LB    Document 100    Filed 03/27/24    Page 19 of 32 PageID #: 1388

If the employer proffers such a reason, "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." Id. at 74. "To set forth a *prima facie* case of discrimination, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." See Saraf v. West Publishing Corp., 2018 WL 7107266, at *3 (S.D.N.Y. Dec. 20, 2018). Here, while there is no dispute that Plaintiff is a member of a protected class and was qualified for the position she held, there was no adverse employment nor any circumstances giving rise to an inference of unlawful discrimination. Specifically, Plaintiff herself quit and does not claim that she was constructively discharged. See SUF ¶¶ 116-117. This is fatal to her claim as she does not assert any adverse employment action, as discussed below. See Salen v. Blackburn Bldg. Servs., LLC, No. 3:14-CIV.-1361 (VAB), 2017 WL 71708, at *16 (D. Conn. Jan. 6, 2017) ("While a defendant's termination of an employee would constitute an 'adverse employment action,' a defendant's termination of an employee who has resigned does not") (quoting Davis v. Koffee Kup Bakery, Inc., No. 2:15-CIV.-152 (CR), 2016 WL 4411399, at *6 (D. Vt. Aug. 18, 2016)); Davis, 2016 WL 4411399, at *6 ("Where an employee voluntarily quits, there is no adverse employment action") (citation omitted); see also Cadet v. Deutsche Bank Sec. Inc., No. 11-CIV.-7964 (CM), 2013 WL 3090690, at *11 (S.D.N.Y. June 18, 2013) ("A voluntary resignation does not constitute an adverse employment action").

Plaintiff's anticipated argument that the alleged "increased" wait times constitute an adverse employment allegation[1] provide no shelter against dismissal.

---

[1] "A plaintiff suffers an adverse employment action when [s]he 'endures a materially adverse change in the terms and conditions of employment.'" See Harge v. City of New York, 2021 WL 3855305, at *8 (S.D.N.Y. Aug. 26, 2021) (quoting Brown v. City of Syracuse, 673 F.3d 141, 150

10

A0759

"Wait times" at work are not considered an "adverse employment action" within the meaning of the law. See La Grande v. DeCrescente Distrib. Co., Inc., 370 Fed. Appx. 206, 211 (2d Cir. 2010) (summary order) ("Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII."); see also Sealy v. State Univ. of New York At Stony Brook, 408 F. Supp. 3d 218, 226 (E.D.N.Y. 2019) (dismissing Title VII discrimination claim based on allegations that, *inter alia*, defendant transferred plaintiff to a more remote work location; denied plaintiff a key to supply room; required Plaintiff to wait 45 minutes to access the supply room; assigned plaintiff a vehicle that was frequently in the shop; and denied plaintiff new tools to be insufficient to allege adverse employment action); Batchelor v. City of New York, No. 11-CIV.-2058, 2014 U.S. Dist. LEXIS 46921, at *96-98 (E.D.N.Y. Feb. 16, 2014) (finding four-week wait  for a locker did not constitute an adverse action but a mere inconvenience); Williams v. New York City Hous. Auth., No. 03-CIV.-7764, 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008), aff'd, 361 Fed. Appx. 220 (2d Cir. 2010) ("A delay  in processing paperwork that does not materially change the terms and conditions of a plaintiff's employment is not an adverse employment action"); Evans v. City of New York, No. 00-CIV.-4197, 2003 WL 22339468, at *10–11 (S.D.N.Y. Oct. 9, 2003) (eleven-month delay  in processing salary increase is not an adverse employment action); cf. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth a general civility code for the American workplace") (internal quotations omitted).

---

(2d Cir. 2012)). Adverse employment actions include demotions, loss of wages, and *material* losses of benefits. See Id. at *8–10 (collecting cases); see also Henry v. NYC Health Hosp. Corp., 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (explaining that plaintiff who was "removed from the roll call and sent home" but was not "docked pay on that particular day" did not suffer an adverse employment action).

11

A0760

Indeed, claims of adverse employment action based on these kinds of trivial complaints concerning wait times and similar issues (which, in the cases cited herein, are arguably more egregious) are routinely dismissed because courts have found that they do not constitute adverse employment actions. See Hai Ming Lu v. Jing Fong Rest., Inc., 503 F. Supp. 2d 706, 713 (S.D.N.Y. 2007) (holding that a waiter's assignment to most difficult section of restaurant for two consecutive nights after initiating an employment discrimination action "too trivial" to qualify as an adverse employment action); see also Teachout v. New York City Dept. of Educ., No. 04-CIV.-945 (GEL), 2006 WL 452022, at *10 (S.D.N.Y. Feb. 22, 2006) ("It is doubtful that supplying a mentor for only one month or waiting until after several poor evaluations to provide assistance would qualify as adverse employment actions"); Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 26 (2d Cir. 2014) (allegations that an employee received two disciplinary citations for insubordination over two-year period, was assigned to drive dirty buses, received one late overtime payment, and endured employer's onetime refusal to give him a half-day off for doctor's appointment did not constitute materially adverse employment action); Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011) ("Actions that are trivial harms—i.e., those petty slights or minor annoyances that often take place at work and that all employees experience—are not materially adverse") (internal quotation marks omitted) (quoting Burlington, 548 U.S. at 68).

Accordingly, Plaintiff's Title VII claim must be dismissed because there was no materially adverse employment action taken against her. See Beharry v. City of New York, No. 18-CIV.-2042 (AJN), 2020 WL 6135147, at *8 (S.D.N.Y. Oct. 19, 2020) (requiring materially adverse employment action to survive summary judgment). Even if Plaintiff somehow jumps this hurdle (which she cannot do), there is no evidence supporting an inference of discrimination.

An inference of discrimination may be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group." See Abdul-Hakeem v. Parkinson, 523 Fed. Appx. 19, 20 (2d Cir. 2013).

Plaintiff's claim that Guzman discriminated against her by making her wait longer to process customer applications after he learned of her pregnancy is utterly belied by the record and establishes that there can be no inference of discrimination, which instead establishes that:

(i) Guzman took too long to process credit applications *before her pregnancy*;[2]

(ii) Guzman took the same time to process credit applications for all salespeople so Plaintiff was treated no differently;[3]

(iii) any delays in processing credit applications was not attributable to Defendants but, rather, the response times from financial institutions or other third parties involved in the verification process;[4]

(iv) Plaintiff was able to continue making sales with other customers while credit applications were being processed;

(v) there were multiple other reasons unrelated to Guzman taking too long to process credit applications why a customer could walk out before and after being qualified for financing;

(vi) Plaintiff's best week in commissions and bonuses immediately followed the alleged announcement of her pregnancy;[5]

---

[2] See SUF ¶ 86.

[3] See SUF ¶ 91-92.

[4] See SUF ¶¶ 49-50, 52-61, 65-69.

[5] See SUF ¶ 110.

13

A0762

(vii) Plaintiff does not know why Guzman made her wait longer to process her applications, and was unsure as to whether he did so due to "something personal" or her pregnancy;[6] and

(viii) shortly before she quit, Plaintiff sent the general manager at the dealership text messages while he was out on vacation complaining that his team "sucks" and that dealership has been a "shit show" ever since the general manager left for vacation without referencing unequal treatment due to her pregnancy.[7]

In addition, the undisputed evidence also establishes the process of purchasing a vehicle could take hours, including the qualification process, because of the number of verifications that are required to be done before any paperwork is submitted to a bank to obtain approval for a loan. There are also portions of the process that are completely out of the dealership's control which affect the time it takes to process applications.

Moreover, Plaintiff testified that she had two (2) interpersonal conflicts with Guzman before her pregnancy.

Thus, Plaintiff's evidence of discrimination consists of nothing more than petty slights, and, at most, *de minimis* interferences with her work based on nothing more than speculation that such was pregnancy-based, which is insufficient to overcome a motion for summary judgment. See Wade v. New York City Dept. of Ed., No. 11-CIV.-05278 (LGS), 2014 WL 941754, at *5 (S.D.N.Y. Mar. 10, 2014) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment") (citing Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).

---

[6] See SUF ¶ 85.

[7] See SUF ¶ 88.

14

A0763

Case 1:21-cv-07163-OEM-LB  Document 100  Filed 03/27/24  Page 24 of 32 PageID #: 1393

In addition, Plaintiff cannot escape that she was treated more favorably than all other salespersons because she received access to Dealertrack when all other salespersons did not. Burdine, 450 U.S. 248, 258–59 (1981) ("McDonnell Douglas teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally"); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated *in all material respects* to the individuals with whom she seeks to compare herself." (internal quotation marks omitted) (emphasis added)); Stratton v. Ernst & Young, LLP, No. 15-CIV.-1047 (VEC), 2016 WL 6310772, at *5 (S.D.N.Y. Oct. 27, 2016) ("Stratton has not put forth any evidence of any similarly situated applicant who fared better in the EY Referral Program. By failing to show any comparator who was treated better, Stratton cannot rely on this theory to prove an inference of discrimination") (citing Smith v. New Venture Gear, Inc., 320 Fed. Appx. 33, 35-36 (2d Cir. 2009) (district court was correct to grant summary judgment to defendants on a disparate treatment claim where plaintiff did not show that similarly situated white employees received better treatment)); Parker v. Equinox Holdings, Inc., No. 20-CIV.-3306 (JPO), 2023 WL 6143546, at *4 (S.D.N.Y. Sept. 20, 2023) (analyzing plaintiff's failure to adduce evidence as to alleged comparator).

Lastly, Plaintiff's average commission for the 26 weeks before she announced her pregnancy was $710.00 per week, while her average commission for the eight (8) weeks after she announced her pregnancy was $690.63 per week. This meager $19.37 weekly differential between her average commissions before and after her pregnancy is solely attributed to the fact that September through March is the slow season for car dealerships. Similarly, Plaintiff's average bonus before her pregnancy was $23.46, while her average bonus after her pregnancy was $165.63, as she was availed of more bonuses by management, indicating a lack of discrimination.

15

A0764

Critically, Plaintiff's best week in commissions and bonuses immediately followed the alleged announcement of her pregnancy.  As such, there is no evidence of any discriminatory conduct. Accordingly, Plaintiff's Title VII and PDA claims must be dismissed.

### C.  Plaintiff's NYSHRL Claim for Disability Discrimination Must be Dismissed

Under the NYSHRL, the term disability "means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques ..." See N.Y. Exec. Law § 292(21).

The facts adduced in discovery have not provided any evidence that Plaintiff was disabled in any way, and courts in the Second Circuit[8] generally find that pregnancy itself is not necessarily a disability requiring accommodation. See, e.g., LaBarbera v. NYU Winthrop Hosp., 527 F. Supp. 3d 275, 303 (E.D.N.Y. 2021), appeal dismissed (2d Cir. July 7, 2021) ("[P]regnancy itself is not a statutory 'pregnancy-related condition.'"); Sam-Sekur v. Whitmore Grp., Ltd., No. 11-CIV.-4938 (JFB) (GRB), 2012 WL 2244325, at *7 (E.D.N.Y. June 15, 2012) (collecting cases).

While the NYSHRL generally has a broader definition of the term "disability" than the ADA, cases interpreting the NYSHRL have found that pregnancy alone is insufficient to establish a disability. See Kennebrew v. N.Y. City Hous. Auth., No. 01-CIV.-1654, 2002 WL 265120, *19 n.33 (S.D.N.Y. Feb. 26, 2002) (collecting cases); Thomson v. Odyssey House, No. 14-CIV.-3857, 2015 WL 5561209, *18 (E.D.N.Y. Sept. 21, 2015).

---

[8] "The same legal standards apply to claims of disability-discrimination under the ADA and the NYSHRL." See Morse v. JetBlue Airways Corp., 941 F. Supp. 2d 274, 292 (E.D.N.Y. 2013); Viruet v. City of N.Y., No. 16-CIV.-8327, 2019 WL 1979325, *13 (S.D.N.Y. May 3, 2019) (citing Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 181 (E.D.N.Y. 2011)); Quintero v. Rite Aid of N.Y., Inc., No. 09-CIV.-6084, 2011 WL 5529818, *6 (S.D.N.Y. Nov. 10, 2011) (citing Kinneary v. City of N.Y., 601 F.3d 151, 158 (2d Cir. 2010)).

A0765

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 26 of 32 PageID #: 1395

As a result, Plaintiff's disability discrimination claim under the NYSHRL must be dismissed. See McMyler v. Bank of Utica, No. 6:19-CIV.-812 (MAD) (ATB), 2021 WL 2778830, at *3 (N.D.N.Y. July 2, 2021) ("it is well established that pregnancy alone does not constitute a disability").

**D. Plaintiff's NYSHRL Claim for Sex Discrimination Must be Dismissed**

"Claims brought under the NYSHRL are analyzed identically and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under ... Title VII." See Hyek v. Field Support Servs., Inc., 461 Fed. Appx. 59, 60 (2d Cir. 2012).

As such, Plaintiff's sex discrimination claims under the NYSHRL must be dismissed for the same reasons argued concerning her Title VII claim.

**E. Plaintiff's NYCHRL Claim for Pregnancy Discrimination Must be Dismissed**

The NYCHRL is not a general civility code, and petty slights or trivial inconveniences ... are not actionable. The burden remains on the plaintiff to show that the conduct is caused by a discriminatory motive." See Tsepenyuk v. Fred Alger & Co., Inc., No. 18-CIV.-7092 (GBD), 2022 WL 912882, at *5 (S.D.N.Y. Mar. 29, 2022), aff'd, 2023 WL 6173455 (2d Cir. Sept. 22, 2023).

The evidence on this record shows that discrimination played no role in Plaintiff's wait times, especially in light of Plaintiff's pre-pregnancy interpersonal conflicts with Guzman and the plethora of evidence for why there are longer wait times for customers outside of the dealership's control which wait times apply to all employees, including non-pregnant and male employees.

Courts routinely dismiss NYCHRL claims under these circumstances. See Romero v. St. Vincent's Services, Inc., No. 19-CIV.-7282(KAM)(ST), 2022 WL 2079648, at *9 (E.D.N.Y. June 10, 2022), aff'd, No. 22-1476-CV, 2023 WL 3477161 (2d Cir. May 16, 2023) ("Even under the broader construction required by the NYCHRL, Plaintiff cannot make out a *prima facie* case of

17

A0766

discrimination because she has not presented evidence from which a reasonable jury could conclude that her pregnancy played a role in her termination. As discussed above, Plaintiff has failed to adduce any evidence, direct or indirect, indicating that HSVS had knowledge of Plaintiff's protected status prior to terminating her. Because no reasonable jury could conclude that HSVS discriminated against Plaintiff based on her protected pregnancy status that was unknown to HSVS, summary judgment on Plaintiff's NYCHRL pregnancy discrimination claim is granted"); see also Tsepenyuk, 2022 WL 912882, at *6 ("there is no evidence that any pregnant employees were treated less well than non-pregnant women. Moreover, her claims lack specificity—it is unclear how often and when, in relation to her pregnancy announcement, that Morrello yelled at Plaintiff, failed to hold the door for her, or criticized her work. Even in the aggregate, without more detail, Morrello's actions lean towards "petty slights or trivial inconveniences." Finally, the only evidence of discriminatory intent is that Morrello's attitude towards Plaintiff changed after he found out she was pregnant and that allegation lacks specificity because, again, it is unclear how soon after Plaintiff's pregnancy announcement that Morrello's attitude changed. Without that temporal proximity, Morrello's attitude and actions have no correlation to pregnancy contempt. Plaintiff fails to establish a claim under NYCHRL").

Moreover, Plaintiff concedes Guzman never made any comments about her pregnancy. "Even under the more liberal standards of the NYCHRL, the plaintiff must still present some evidence of discriminatory animus." See Xiang v. Eagle Enterprises, LLC, No. 19-CIV.-1752 (LJL), 2022 WL 785055, at *19 (S.D.N.Y. Mar. 15, 2022) ("Plaintiff has not put forth 'a single comment or incident suggesting that discriminatory motives caused' Defendants to delay … processing [her] maternity leave …") (citing Santiago v. Axis Spexialty U.S. Servs., Inc., 2021 WL 639527, at *6 (S.D.N.Y. Feb. 16, 2021)).

18

A0767

Accordingly, Plaintiff's NYCHRL claims for pregnancy discrimination must also be dismissed.

### F. The Claims Against Hillside Auto Mall Must be Dismissed

Where more than one potential employer exists, "liability may be found when separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly." See Forsythe v. N.Y.C. Dep't of Citywide Admin. Servs., 733 F.Supp.2d 392, 397 (S.D.N.Y. 2010), aff'd, 428 Fed. Appx. 40 (2d Cir. 2011). "In evaluating whether entities constitute joint employers, courts look at commonality of hiring, firing, discipline, pay, insurance, records, and supervision." See Balk v. N.Y. Inst. of Tech., 11-CIV.-509 (SAS), 2015 WL 5518709, at *5 (E.D.N.Y. Sept. 16, 2015) (internal quotation marks omitted).

"Even where two companies are deemed a joint employer, however, it is not necessarily the case that both are liable for discriminatory conduct in violation of Title VII." See Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009). "[C]ourts have found that even when a plaintiff establishes an entity's status as a joint employer, the plaintiff must still show that the joint employer knew or should have known of the discriminatory conduct and failed to take corrective measures within its control." Id. (internal quotation marks and alteration omitted).

Here, the evidence adduced in discovery demonstrates that all claims against Hillside Auto Mall must be dismissed due to its complete lack of involvement in Plaintiff's employment at Hillside Auto Outlet. Plaintiff concedes that she only worked for Hillside Auto Outlet and never worked at Hillside Auto Mall. See SUF ¶ 22.

Further, while the two (2) dealerships have some common owners, they are managed by two different people. See SUF ¶¶ 145-146, 148-149. Crucially, Hillside Auto Mall had no control over Plaintiff's daily employment activities. See SUF ¶ 147.

19

A0768

Accordingly, Hillside Auto Mall cannot be found to be a joint employer of Plaintiff and all claims against Hillside Auto Mall must be dismissed.

### G.  The Claims Against Baron, Guzman, and Thanwalla Must be Dismissed

Plaintiff also pursues claims against Baron, Guzman, and Thanwalla individually under the NYSHRL and the NYCHRL.  The NYSHRL provides for individual liability for discriminatory practices under two theories: (i) if the individual qualifies as the plaintiff's "employer," see N.Y. Exec. Law § 296(1); or (ii) if the individual aided and abetted the unlawful discriminatory acts of others covered by the NYSHRL, id. § 296(6).  See Whyte v. New York State Police, No. 22-CIV.-5633 (NGG) (CLP), 2023 WL 7413087, at *12 (E.D.N.Y. Nov. 9, 2023).  The language of both statutes concerning individual liability is identical: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." See N.Y.C. Admin. Code § 8-107(6); Exec. Law § 296(6).  Individuals may be held liable under the NYSHRL, but they "must have 'actually participated in the conduct giving rise to the claim'" to face liability. See Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (quoting Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)).

"The NYCHRL's § 8-107(6) also supports claims for aiding and abetting, which are 'susceptible to the same standard as under the NYSHRL, as language of the two laws is virtually identical.'" Id. (citation omitted). "An individual may be held liable for aiding and abetting violations of NYCHRL ... if he participates directly in discriminatory acts alleged by the Plaintiff. A finding of participation in the alleged discriminatory conduct 'requires a showing of direct, purposeful participation.'" See Regan v. Benchmark Company LLC, 2012 WL 692056, at *14 (S.D.N.Y. Mar. 1, 2012) (citations omitted).

20

A0769

"The aider and abettor need not have had an employer-employee or supervisory relationship with the plaintiff" under either statute." See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020); see also Griffin v. Sirva, Inc., 29 N.Y.3d 174, 187 (2017) (citation omitted) ("Section 296(6) extends liability to persons and entities beyond joint employers, and this provision should be construed broadly. Section 296(6) applies to any 'person.' ... [N]othing in the statutory language or legislative history limits the reach of this provision to employers."); Stanley v. Guardian Security Services, Inc., 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011).

The New York Court of Appeals addressed the scope of individual liability under the NYSHRL and NYCHRL. See Doe v. Bloomberg L.P., 167 N.E.3d 454 (2021). In Doe, the court clarified a previous case, Patrowich v. Chemical Bank, 473 N.E.2d 11 (1984) (per curiam), holding that Patrowich stands for the proposition that NYSHRL "does not render employees liable as individual employers." Doe, 167 N.E.3d at 459.

Critically, the Doe court ultimately held that the NYCHRL should be interpreted like the NYSHRL: "[W]here a plaintiff's employer is a business entity, the ... employees of that entity are not employers within the meaning of the [NYCHRL]. Rather, those individuals may incur liability only *for their own discriminatory conduct, for aiding and abetting such conduct by others*, or for retaliation against protected conduct." See 167 N.E.3d at 460. Additionally, the court observed that the NYCHRL "specifically imposes primary liability on employees for some discriminatory acts," such as discriminating based on gender, "but conspicuously does not impose vicarious liability on these individuals." Id.

Here, evidence of discriminatory conduct is scant as against each of the individually named Defendants such that the claims against them must also be dismissed.

21

A0770

Baron is a mere owner of Hillside Auto Outlet who handled financial affairs at the dealership but did not run its day-to-day affairs and had no power to hire or fire employees, nor did he set any employees' schedules or compensation. See SUF ¶¶ 3-5, 9-11.

Guzman was a sales manager and a general sales manager whose primary responsibility was to ensure all deals were processed, and who similarly had no power to hire or fire employees, nor did he set any employees' schedules or compensation. See SUF ¶¶ 13-15.

As such both Baron and Guzman cannot qualify as "employers" under the NYSHRL or NYCHRL. See Everett v. New York City Dept. of Educ., No. 21-CIV.-7043 (JPC), 2023 WL 5629295, at *12 (S.D.N.Y. Aug. 31, 2023) (holding that "a corporate employee, even if she holds the title of manager or supervisor, is not subject to suit for discrimination under the NYSHRL" and that, as a result, "Liso, Yesnick, and Diaz-Lens are therefore not subject to direct individual liability"). With respect to Thanwalla, although he did manage Plaintiff's employment, there is no evidence that he participated in nor aided and abetted any discriminatory conduct. In fact, the record shows Thanwalla treated Plaintiff better than any other salesperson. As such, all claims against Thanwalla must similarly be dismissed. See Everett, 2023 WL 5629295, at *13 (dismissing aider-and-abetter claims where there is no evidence that any action taken against Plaintiff by the individual defendant were motivated by Plaintiff's protected class).

Finally, because Plaintiff's claims against Hillside Auto Outlet, the primary employer here, fail for the reasons set forth above, she cannot establish any claims against Thanwalla individually. Sokolovsky v. Silver Lake Specialized Care Ctr., No. 21-CIV.-01598 (MKB), 2023 WL 5977298, at *22 (E.D.N.Y. Sept. 14, 2023) ("In order for a defendant to be held liable as an aider and abettor under N.Y. Exec. Law § 296(6) and N.Y.C. Admin Code § 8-107(6), a plaintiff must first establish the existence of a primary violation of the NYSHRL or NYCHRL by an employer or principal").

22

A0771

Case 1:21-cv-07163-OEM-LB   Document 100   Filed 03/27/24   Page 32 of 32 PageID #: 1401

Accordingly, all claims against the individually named Defendants must be dismissed.

**V.     CONCLUSION**

Based on the foregoing, Defendants are entitled to summary judgment dismissing the complaint in its entirety.

Dated: Lake Success, New York
      December 1, 2023

                **MILMAN LABUDA LAW GROUP PLLC**

                */s/ Emanuel Kataev, Esq.*
                Joseph M. Labuda, Esq.
                Emanuel Kataev, Esq.
                3000 Marcus Avenue, Suite 3W8
                Lake Success, NY 11042-1073
                (516) 328-8899 (office)
                (516) 328-0082 (facsimile)
                joe@mllaborlaw.com
                emanuel@mllaborlaw.com

                *Attorneys for Defendants*

A0772

Case 1:21-cv-07163-OEM-LB   Document 102   Filed 03/27/24   Page 1 of 3 PageID #: 1427

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                                  Plaintiff,

              -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                                Defendants.
-------------------------------------------------------------------X

Case No.: 1:21-cv-7163 (OEM) (LB)

**DECLARATION OF
EMANUEL KATAEV, ESQ.
IN SUPPORT OF
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

      **EMANUEL KATAEV, ESQ.**, declares, pursuant to 28 U.S.C. § 1746, under penalty of

perjury, that the following is true and correct:

      1.      I am admitted to practice before this Court and I am a partner of Milman Labuda

Law Group PLLC, attorneys for the Defendants in this case.

      2.      I respectfully submit this declaration in support of Defendants' motion for summary

judgment (the "Motion"), and to supply this Court with exhibits relevant to its determination of

the Motion consistent with this Court's Individual Practices & Rules.

      3.      Attached hereto as **Exhibit A** is a true and correct copy of entity information for

defendant 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet from the New York State

Department of State's Division of Corporations, a publicly available document.

      4.      Attached hereto as **Exhibit B** is a true and correct copy of Defendants'

Supplemental Responses to Plaintiff's First Set of Interrogatories dated March 7, 2023.

A0773

Case 1:21-cv-07163-OEM-LB   Document 102   Filed 03/27/24   Page 2 of 3 PageID #: 1428

5.    Attached hereto as **Exhibit C** is a true and correct copy of entity information for Defendant Hillside Auto Mall Inc. d/b/a Hillside Auto Mall from the New York State Department of State's Division of Corporations, a publicly available document.

6.    Attached hereto as **Exhibit D** is a true and correct copy of text messages between Plaintiff and others at Hillside Auto Outlet.

7.    Attached hereto as **Exhibit E** is a true and correct copy of Plaintiff's complaint dated December 29, 2021.

8.    Attached hereto as **Exhibit F** is a true and correct copy of Plaintiff's payroll records Bates stamped D1186-D1250.

9.    Attached hereto as **Exhibit G** is a true and correct copy of Plaintiff's criminal record related to uttering forged instruments.

10.    Attached hereto as **Exhibit H** is a true and correct copy of a transcript of the Deposition of Deanna Jennings, a corporate representative of 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet and Hillside Auto Mall Inc d/b/a Hillside Auto Mall, dated March 10, 2023.

11.    Attached hereto as **Exhibit I** is a true and correct copy of the transcript of the Deposition of Ishaque Thanwalla, dated February 24, 2023.

12.    Attached hereto as **Exhibit J** is a true and correct copy of the transcript of the Deposition of Andris Guzman, dated March 9, 2023.

13.    Attached hereto as **Exhibit K** is a true and correct copy of the transcript of the Deposition of Leticia Francine Stidhum, dated February 17, 2023.

14.    Attached hereto as **Exhibit L** is a true and correct copy of the transcript of the Deposition of Jory Baron, dated March 3, 2023.

A0774

Case 1:21-cv-07163-OEM-LB   Document 102   Filed 03/27/24   Page 3 of 3 PageID #: 1429

15.     Attached hereto as **Exhibit M** is a true and correct copy of the Declaration of Serge

Zanaan dated October 10, 2022.

Dated: Lake Success, New York
          December 1, 2023

          */s/ Emanuel Kataev, Esq.*
          **EMANUEL KATAEV, ESQ.**

A0775

# Department of State
### Division of Corporations

## Entity Information

[ Return to Results ]   [ Return to Search ]

Entity Details                                                                                             ^

**ENTITY NAME:** 161-10 HILLSIDE AVE AUTO, LLC

**FOREIGN LEGAL NAME:**

**ENTITY TYPE:** DOMESTIC LIMITED LIABILITY COMPANY

**SECTIONOF LAW:** 203 LLC - LIMITED LIABILITY COMPANY LAW

**DATE OF INITIAL DOS FILING:** 06/12/2017

**EFFECTIVE DATE INITIAL FILING:** 06/12/2017

**FOREIGN FORMATION DATE:**

**COUNTY:** NASSAU

**JURISDICTION:** NEW YORK, UNITED STATES

**DOS ID:** 5152969

**FICTITIOUS NAME:**

**DURATION DATE/LATEST DATE OF DISSOLUTION:**

**ENTITY STATUS:** ACTIVE

**REASON FOR STATUS:**

**INACTIVE DATE:**

**STATEMENT STATUS:** CURRENT

**NEXT STATEMENT DUE DATE:** 06/30/2025

**NFP CATEGORY:**

**ENTITY DISPLAY**   NAME HISTORY   FILING HISTORY   MERGER HISTORY   ASSUMED NAME HISTORY

Service of Process on the Secretary of State as Agent

**The Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery:**

> **Name:** 161-10 HILLSIDE AVE AUTO, LLC
>
> **Address:** 161-10 HILLSIDE AVE, JAMAICA, NY, UNITED STATES, 11432

**Electronic Service of Process on the Secretary of State as agent: Not Permitted**

Chief Executive Officer's Name and Address

> **Name:**
>
> **Address:**

Principal Executive Office Address

> **Address:**

Registered Agent Name and Address

> **Name:**
>
> **Address:**

Entity Primary Location Name and Address

> **Name:**
>
> **Address:**

A0776

Case 1:21-cv-07163-OEM-LB   Document 102-1   Filed 03/27/24   Page 2 of 2 PageID #: 1431

Farmcorpflag

**Is The Entity A Farm Corporation:** NO

Stock Information

| Share Value | Number Of Shares | Value Per Share |
|---|---|---|
| | | |

A0777

Case 1:21-cv-07163-OEM-LB   Document 102-3   Filed 03/27/24   Page 1 of 2 PageID #: 1439

# Department of State
## Division of Corporations

## Entity Information

Return to Results    Return to Search

Entity Details ^

**ENTITY NAME:** HILLSIDE AUTO MALL INC.
**FOREIGN LEGAL NAME:**
**ENTITY TYPE:** DOMESTIC BUSINESS CORPORATION
**SECTIONOF LAW:** 402 BCL - BUSINESS CORPORATION LAW
**DATE OF INITIAL DOS FILING:** 04/25/1995
**EFFECTIVE DATE INITIAL FILING:** 04/25/1995
**FOREIGN FORMATION DATE:**
**COUNTY:** QUEENS
**JURISDICTION:** NEW YORK, UNITED STATES

**DOS ID:** 1916013
**FICTITIOUS NAME:**
**DURATION DATE/LATEST DATE OF DISSOLUTION:**
**ENTITY STATUS:** INACTIVE
**REASON FOR STATUS:** DISSOLVED BY PROCLAMATION
**INACTIVE DATE:** 12/27/2000
**STATEMENT STATUS:** NOT REQUIRED
**NEXT STATEMENT DUE DATE:** 04/30/1997
**NFP CATEGORY:**

**ENTITY DISPLAY**    NAME HISTORY    FILING HISTORY    MERGER HISTORY    ASSUMED NAME HISTORY

Service of Process on the Secretary of State as Agent

**The Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery:**

**Name:** THE CORPORATION

**Address:** 160-14 HILLSIDE AVE., JAMAICA, NY, UNITED STATES, 14432

**Electronic Service of Process on the Secretary of State as agent: Not Permitted**

Chief Executive Officer's Name and Address

**Name:**
**Address:**

Principal Executive Office Address

**Address:**

Registered Agent Name and Address

**Name:**
**Address:**

Entity Primary Location Name and Address

**Name:**
**Address:**

A0778

Case 1:21-cv-07163-OEM-LB   Document 102-3   Filed 03/27/24   Page 2 of 2 PageID #: 1440

Farmcorpflag

**Is The Entity A Farm Corporation:** NO

Stock Information

| Share Value | Number Of Shares | Value Per Share |
|---|---|---|
| NO PAR VALUE | 200 | $0.00000 |

A0779



Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 1 of 74 PageID #: 1441

**1:17**                                      LTE

**+1 (347) 256-0067**

iMessage
Thu, Jan 24, 10:56 AM

Hi Mr.Baron my name is Leticia I was a sales rep. at Hillside Auto Outlet up until last week. Im sure you remember who I am I was the only sales woman there most of my 9 months working there. Also was #1 in sales for a good 7/8 months doing anywhere from 20-30 cars a month minimum 20 though. Im sure this isn't much of your concern but I did just want to let you know I will be taking legal actions again Hillside Auto Outlet as well as Ishaque Thanawalla being that he is refusing to pay me my last check. Also we were promised 5% on any deal we made that grossed over $3500 which we were paid up until Jay the old GSM left which was about 5/6 months ago. Isaac called me his daughter and always showed me a lot of love and for

Text Message



D1905

A0780



Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 2 of 74 PageID #: 1412

1:17    .ıll LTE 🔋

+1 (347) 256-0067 >

check. Also we were promised 5% on any deal we made that grossed over $3500 which we were paid up until Jay the old GSM left which was about 5/6 months ago. Isaac called me his daughter and always showed me a lot of love and for him to screw me over in my biggest time of need being that I am pregnant is very unfair and he will not get away with this. I tried to give Isaac the opportunity to pay us ((David Manrique & myself) We actually quit the same day for the same reason)) I waited a week and he still is refusing to pay us and all we asked for was our last salary check because payrolls always a week behind and he said we are owes nothing. With that being said I would like to go back to all of our deals and be paid what I was promised upon being hired.

Thu, Jan 24, 12:50 PM



Text Message

D1906

A0781



Case 1:21-cv-07163-OEM-LB  Document 102-4  Filed 03/27/24  Page 3 of 74 PageID #: 1443

1:17      LTE

+1 (347) 256-0067 >

nothing. With that being said I would like to go back to all of our deals and be paid what I was promised upon being hired.

Thu, Jan 24, 12:50 PM

I am at work right now can i give you a call in a bit?

I will be available for about the next 10 minutes or so otherwise I can be reached tomorrow

Delivered

Okay give me a sec to step out

Never mind I will just take the route I already planned on taking. They told me I should reach out to you and see if you'd do anything for me but I rather be sure to get everything I worked hard for. We aren't 100% on the same page so Thank you anyways for your

Text Message



D1907

A0782

Conversation between Guzman (2) (+1 347 749-0633) and Leticia (hillside Auto Outlet) (3472560067)

5/22/2018 2:09 PM

Guzman (2) (+1 347 749-0633)

Andris guzman hillside auto outlet

5/24/2018 1:33 PM (Viewed 5/24/2018 5:08 PM)

Leticia (hillside Auto Outlet) (3472560067)

hey its leticia where did you put the credit ap for emonnie that came last night?

5/28/2018 8:42 PM

Guzman (2) (+1 347 749-0633)

Found it?

5/28/2018 8:43 PM

Leticia (hillside Auto Outlet) (3472560067)

yes

5/28/2018 8:43 PM

Guzman (2) (+1 347 749-0633)

Great

5/30/2018 10:35 AM

Guzman (2) (+1 347 749-0633)

Hey u coming today?

5/30/2018 10:36 AM (Viewed 5/30/2018 10:40 AM)

Leticia (hillside Auto Outlet) (3472560067)

yeah ill be there around 11 i had to see my po i told jay because today was supposed to be my day off but those two customers will be there today

5/30/2018 10:40 AM

Guzman (2) (+1 347 749-0633)

Ok Make it happen

6/2/2018 11:28 AM

Guzman (2) (+1 347 749-0633)

(917) 650-1034 - Carl

6/3/2018 12:42 PM (Viewed 6/3/2018 12:52 PM)

Leticia (hillside Auto Outlet) (3472560067)

**D1908**

she got 15k cash and she wants the mini but shes trynna negotiate

6/22/2018 12:05 PM

Leticia (hillside Auto Outlet) (3472560067)



6/22/2018 5:13 PM

Guzman (2) (+1 (347) 749-0633)



6/22/2018 5:13 PM

Guzman (2) (+1 (347) 749-0633)

Azshan

6/26/2018 3:53 PM (Viewed 6/26/2018 3:55 PM)

Leticia (hillside Auto Outlet) (3472560067)



6/26/2018 3:53 PM (Viewed 6/26/2018 3:55 PM)

Leticia (hillside Auto Outlet) (3472560067)



7/2/2018 7:24 PM

Leticia (hillside Auto Outlet) (3472560067)



**D1909**

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 6 of 74 PageID #: 1446

7/7/2018 3:09 PM (Viewed 7/7/2018 3:20 PM)

Leticia (hillside Auto Outlet) (3472560067)

Take 2,900 from jefferey

7/7/2018 3:09 PM (Viewed 7/7/2018 3:20 PM)

Leticia (hillside Auto Outlet) (3472560067)

already starting registration

7/19/2018 11:39 AM (Viewed 7/19/2018 11:50 AM)

Leticia (hillside Auto Outlet) (3472560067)

What is the auto funds password and username

7/21/2018 4:03 PM (Viewed 7/21/2018 4:04 PM)

Leticia (hillside Auto Outlet) (3472560067)



8/13/2018 11:55 AM (Viewed 8/13/2018 12:01 PM)

Leticia (hillside Auto Outlet) (3472560067)

can u have walter inspect civix

8/13/2018 11:55 AM (Viewed 8/13/2018 12:01 PM)

Leticia (hillside Auto Outlet) (3472560067)

I mean accrod

8/13/2018 11:55 AM (Viewed 8/13/2018 12:01 PM)

Leticia (hillside Auto Outlet) (3472560067)

the black 17

8/13/2018 11:55 AM (Viewed 8/13/2018 12:01 PM)

Leticia (hillside Auto Outlet) (3472560067)



8/13/2018 12:01 PM

**D1910**

A0785

Guzman (2) (+1 (347) 749-0633)



8/25/2018 2:00 PM

Guzman (2) (+1 (347) 749-0633)

When you get a chance

8/25/2018 2:00 PM

Guzman (2) (+1 (347) 749-0633)

Go get our money

8/25/2018 2:00 PM (Viewed 8/25/2018 2:12 PM)

Leticia (hillside Auto Outlet) (3472560067)

Already did Papa

8/27/2018 3:00 PM (Viewed 8/27/2018 3:01 PM)

Leticia (hillside Auto Outlet) (3472560067)



9/4/2018 12:11 PM (Viewed 9/4/2018 12:16 PM)

Leticia (hillside Auto Outlet) (3472560067)

620675

9/4/2018 12:16 PM

Leticia (hillside Auto Outlet) (3472560067)

Emphasized "620675"

9/4/2018 12:24 PM

Guzman (2) (+1 (347) 749-0633)

It's good to go

9/18/2018 1:18 PM (Viewed 9/18/2018 1:30 PM)

Leticia (hillside Auto Outlet) (3472560067)



**D1911**

A0786

9/18/2018 1:32 PM

Guzman (2) (+1 (347) 749-0633)

Let her know that she's good to go

9/18/2018 1:32 PM

Guzman (2) (+1 (347) 749-0633)

She just gotta come in

9/18/2018 2:04 PM

Guzman (2) (+1 (347) 749-0633)

Where u at?

9/19/2018 5:52 PM

Leticia (hillside Auto Outlet) (3472560067)

are u printing him?

9/19/2018 5:52 PM

Guzman (2) (+1 (347) 749-0633)

Yes I'm getting everything ready

9/19/2018 5:52 PM (Viewed 9/19/2018 5:53 PM)

Leticia (hillside Auto Outlet) (3472560067)

okay cus he wants to sign n pick up tomorrow

9/19/2018 5:53 PM

Guzman (2) (+1 (347) 749-0633)

Ok no problem

9/23/2018 2:00 PM (Viewed 9/23/2018 2:07 PM)

Leticia (hillside Auto Outlet) (3472560067)

ima run to rite aid for a drink real quick

9/23/2018 2:35 PM (Viewed 9/23/2018 2:49 PM)

Leticia (hillside Auto Outlet) (3472560067)

want me to run their credit while u finish up?

**D1912**

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 9 of 74 PageID #: 1449

9/23/2018 2:35 PM (Viewed 9/23/2018 2:49 PM)

Leticia (hillside Auto Outlet) (3472560067)

this is a get me done capital one 0 down though

10/2/2018 4:28 PM

Leticia (hillside Auto Outlet) (3472560067)

crv picking up tmm the suspension still isnt off he said by tmm it should clear

10/2/2018 4:52 PM

Guzman (2) (+1 (347) 749-0633)

Ok

10/2/2018 5:00 PM

Guzman (2) (+1 (347) 749-0633)

Follow up with the Benz deal

10/2/2018 5:00 PM

Guzman (2) (+1 (347) 749-0633)

Make sure they bring me the tittle

10/16/2018 7:24 PM (Viewed 10/16/2018 7:25 PM)

Leticia (hillside Auto Outlet) (3472560067)

can i leave my tooth hurts so bad all day

10/16/2018 7:24 PM (Viewed 10/16/2018 7:25 PM)

Leticia (hillside Auto Outlet) (3472560067)

isaac told me to ask you but the two times i have asked you you've said no

10/16/2018 7:25 PM

Guzman (2) (+1 (347) 749-0633)

Leave then

10/22/2018 9:54 AM (Viewed 10/22/2018 10:02 AM)

Leticia (hillside Auto Outlet) (3472560067)

ima be like 20 mins late i woke up late

10/22/2018 10:02 AM

Guzman (2) (+1 (347) 749-0633)

Ok hurry up

**D1913**

A0788

10/25/2018 10:04 AM (Viewed 10/25/2018 10:43 AM)

Leticia (hillside Auto Outlet) (3472560067)

I have to take the day off i woke up throwing up and I think i have a stomach virus or something

10/30/2018 6:39 PM (Viewed 10/30/2018 6:52 PM)

Leticia (hillside Auto Outlet) (3472560067)

you gotta talk to this guy

10/30/2018 6:40 PM (Viewed 10/30/2018 6:52 PM)

Leticia (hillside Auto Outlet) (3472560067)

he wants to return the camry

10/30/2018 6:40 PM (Viewed 10/30/2018 6:52 PM)

Leticia (hillside Auto Outlet) (3472560067)

befor isaac finds out about transworld

10/31/2018 3:22 PM

Leticia (hillside Auto Outlet) (3472560067)

let isaac know seans getting the challanger ready for us

10/31/2018 3:22 PM

Guzman (2) (+1 (347) 749-0633)

10/31/2018 3:24 PM

Leticia (hillside Auto Outlet) (3472560067)

did he come back with the 5k he was going to the bank

10/31/2018 3:24 PM

Guzman (2) (+1 (347) 749-0633)



Oo ok not yet. Did you follow up with him?

10/31/2018 3:25 PM (Viewed 10/31/2018 3:26 PM)

Leticia (hillside Auto Outlet) (3472560067)

No when I get back i will im having an issue right now i had to come pick up a paper for this traffic hearing tomorrow and turns out my officer got firea

10/31/2018 3:25 PM (Viewed 10/31/2018 3:26 PM)

Leticia (hillside Auto Outlet) (3472560067)



**D1914**

fired

11/7/2018 10:38 AM

Guzman (2) (+1 (347) 749-0633)

You coming today?
We found the key for the civic, call your customer

11/7/2018 2:31 PM (Viewed 11/7/2018 3:36 PM)

Leticia (hillside Auto Outlet) (3472560067)

theyre going to go around 6

11/7/2018 2:31 PM (Viewed 11/7/2018 3:36 PM)

Leticia (hillside Auto Outlet) (3472560067)

they got the insurance

11/7/2018 3:56 PM

Guzman (2) (+1 (347) 749-0633)

Ok

11/7/2018 3:56 PM

Guzman (2) (+1 (347) 749-0633)

Forward me the insurance

11/7/2018 3:56 PM

Guzman (2) (+1 (347) 749-0633)

Thanks

11/7/2018 3:58 PM (Viewed 11/7/2018 4:19 PM)

Leticia (hillside Auto Outlet) (3472560067)

there going to bring it they went through their own broker

11/7/2018 3:59 PM (Viewed 11/7/2018 4:19 PM)

Leticia (hillside Auto Outlet) (3472560067)

what bank is it to make sure ?

11/7/2018 4:19 PM

Guzman (2) (+1 (347) 749-0633)


Cap one

11/8/2018 10:21 AM (Viewed 11/8/2018 10:59 AM)

Leticia (hillside Auto Outlet) (3472560067)

**D1915**

A0790

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 12 of 74 PageID #: 1452

are they picking up civic today?

11/8/2018 11:00 AM

Guzman (2) (+1 (347) 749-0633)

Hey they didn't show up yesterday. Follow up with them to see when they want to pick up

11/8/2018 2:22 PM (Viewed 11/8/2018 2:25 PM)

Leticia (hillside Auto Outlet) (3472560067)

Liked "Hey they didn't show up yesterday. Follow up with them to see when they want to pick up"

11/10/2018 9:19 AM (Delivered 11/10/2018 9:22 AM)

Guzman (2) (+1 (347) 749-0633)

Gm where r u?

11/11/2018 10:56 AM (Viewed 11/11/2018 10:57 AM)

Leticia (hillside Auto Outlet) (3472560067)

Gm Donde estas

11/11/2018 10:57 AM

Guzman (2) (+1 (347) 749-0633)

2 blocks away

11/11/2018 10:57 AM

Guzman (2) (+1 (347) 749-0633)

U here?

11/11/2018 10:57 AM

Leticia (hillside Auto Outlet) (3472560067)

yes cus i have a customer who wants a altima

11/11/2018 10:57 AM

Leticia (hillside Auto Outlet) (3472560067)

n then im leaving

11/11/2018 11:38 AM

Leticia (hillside Auto Outlet) (3472560067)



**D1916**

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs1179435471035802...   3/6/2023

A0791

Page 10 of 13

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 13 of 74 PageID #: 1453



11/17/2018 10:55 AM (Viewed 11/17/2018 11:05 AM)

Leticia (hillside Auto Outlet) (3472560067)



11/28/2018 3:19 PM

Guzman (2) (+1 (347) 749-0633)

Forward me the insurance for mollek

11/28/2018 3:20 PM

Guzman (2) (+1 (347) 749-0633)

It's not inside the folder for some reason. Go to ur email & forward it to me, thanks

11/28/2018 3:21 PM

Leticia (hillside Auto Outlet) (3472560067)



he never sent ne ur

11/28/2018 3:21 PM

Leticia (hillside Auto Outlet) (3472560067)



11/28/2018 3:21 PM (Viewed 11/28/2018 3:28 PM)

Leticia (hillside Auto Outlet) (3472560067)

it was paid for but went fir review then he said he got it n hed forward it n never did

12/19/2018 1:00 PM (Viewed 12/19/2018 1:07 PM)

Leticia (hillside Auto Outlet) (3472560067)



**D1917**

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 14 of 74 PageID #: 1454

12/19/2018 1:00 PM (Viewed 12/19/2018 1:07 PM)

Leticia (hillside Auto Outlet) (3472560067)



12/19/2018 7:39 PM (Viewed 12/19/2018 7:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

After they leave im going to
leave because im having tooth pains again i need my meds asap

12/19/2018 7:42 PM

Guzman (2) (+1 (347) 749-0633)

Ok no problem

12/20/2018 3:35 PM (Viewed 12/20/2018 3:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

shes waiting for u

12/22/2018 5:41 PM

Leticia (hillside Auto Outlet) (3472560067)



12/22/2018 5:41 PM

Leticia (hillside Auto Outlet) (3472560067)

 fake ?

12/22/2018 5:41 PM

Guzman (2) (+1 (347) 749-0633)

License is expired

12/22/2018 5:42 PM

Guzman (2) (+1 (347) 749-0633)

This doc is no good

**D1918**

A0793

12/27/2018 5:41 PM (Viewed 12/27/2018 6:17 PM)

Leticia (hillside Auto Outlet) (3472560067)

so what am i supposed to do ?

1/2/2019 12:00 PM

Guzman (2) (+1 (347) 749-0633)

Where r ur commission sheet

1/2/2019 12:00 PM

Guzman (2) (+1 (347) 749-0633)

We are doing payroll

1/7/2019 2:04 PM (Viewed 1/7/2019 2:07 PM)

Leticia (hillside Auto Outlet) (3472560067)

So is shaun still getting half my deal after he took thewhole 100 of MY insurance money

1/8/2019 5:27 PM

Leticia (hillside Auto Outlet) (3472560067)

You still gave shaun half my deal?

1/8/2019 7:34 PM (Viewed 1/8/2019 7:35 PM)

Leticia (hillside Auto Outlet) (3472560067)

can i go

1/8/2019 7:35 PM (Delivered 1/8/2019 7:38 PM)

Guzman (2) (+1 (347) 749-0633)

Yes when you deliver the car go home

1/10/2019 1:39 PM (Viewed 1/10/2019 1:44 PM)

Leticia (hillside Auto Outlet) (3472560067)

i may have to go home i just threw up i feel nauseous i cant do this right now i told isaac he hasnt replied i tried to get someone to come cover but no one wanna come in but theres only 4 appointments n doesn't look like it'll get to busy

1/12/2019 4:44 PM (Viewed 1/12/2019 4:56 PM)

Leticia (hillside Auto Outlet) (3472560067)

shes cap 1

1/13/2019 1:44 PM

Leticia (hillside Auto Outlet) (3472560067)

**D1919**

A0794

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 16 of 74 PageID #: 1456

I have a customer going in he bought an Ultima from auto Mall only owes about nine grand on it when I met with him last time we got the payoff and gave him some general information and he just called me to see if I was there I told him I wasn't but so whoever gets him let them know it's split

1/13/2019 1:44 PM

Leticia (hillside Auto Outlet) (3472560067)

His names charles

1/13/2019 1:45 PM

Guzman (2) (+1 (347) 749-0633)

 Ok

You have 108 total messages and 13 total images.

**D1920**

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 17 of 74 PageID #: 1457

<u>Conversation between Guzman (2) (+1 (347) 749-0633) and Group Chat: David (Global Auto)</u>
<u>(3472315194), Leticia (hillside Auto Outlet) (3472560067), 6463023503, Brianna (HAO) (3478458686),</u>
<u>Shawn (HAO) (3476768392), Alli (HAO) (6317417411), David (hillside Auto Outlet) Parsons</u>
<u>(3475810180), Tifany (HAO) (6315042565)</u>

12/8/2018 6:43 PM

Tifany (HAO) (6315042565)



12/8/2018 6:43 PM

Leticia (hillside Auto Outlet) (3472560067)

this chats not cool im out

12/8/2018 11:01 PM (Viewed 12/8/2018 11:10 PM)

Alli (HAO) (6317417411)



12/10/2018 12:17 AM (Viewed 12/10/2018 12:40 AM)

Alli (HAO) (6317417411)

https://youtu.be/oEVnq6LIKOM

12/10/2018 12:34 AM (Viewed 12/10/2018 12:40 AM)

Alli (HAO) (6317417411)



12/10/2018 12:34 AM (Viewed 12/10/2018 12:40 AM)

Alli (HAO) (6317417411)



**D1921**

12/10/2018 12:03 PM

Alli (HAO) (6317417411)

If anyone ever has an issue in this building I NEED TO KNOW. If I don't know what the issue is I can't fix it. If anyone has a problem or misunderstanding or anything need to know so I can rectify the problem. I don't want animosity or friction between anyone. We all work together and eat together here. Whatever happened happened. It's been handled. Let's move on and put it behind us. We only move forward from here

12/10/2018 12:04 PM

Tifany (HAO) (6315042565)



12/10/2018 12:05 PM (Viewed 12/10/2018 12:09 PM)

David (Global Auto) (3472315194)



12/10/2018 12:14 PM (Viewed 12/10/2018 12:15 PM)

Shawn (HAO) (3476768392)

We need to all have a sit down when the time is clever

12/10/2018 12:15 PM

Shawn (HAO) (3476768392)

And yes let's all have a great day today so our best, and let's sale sale sale ! Cars

12/10/2018 12:15 PM

Tifany (HAO) (6315042565)

I dont think thats necessary

12/10/2018 12:15 PM

Alli (HAO) (6317417411)

No sit down needed. We put this past us and we move on. Nothing needs to be said

12/10/2018 12:16 PM

Alli (HAO) (6317417411)

this is not a democracy

12/10/2018 12:16 PM

Brianna (HAO) (3478458686)

Liked "No sit down needed. We put this past us and we move on. Nothing needs to be said "

# D1922

A0797

12/10/2018 12:16 PM

Guzman (2) (+1 (347) 749-0633)

Liked "this is not a democracy."

12/10/2018 12:16 PM

Tifany (HAO) (6315042565)

Lets make this moneyyy

12/10/2018 12:16 PM

Alli (HAO) (6317417411)

Liked "Lets make this moneyyy"

12/10/2018 12:21 PM (Viewed 12/10/2018 12:22 PM)

Brianna (HAO) (3478458686)

Liked "Lets make this moneyyy"

12/10/2018 1:22 PM

Alli (HAO) (6317417411)

https://youtu.be/elho2S0Zahl

12/11/2018 10:07 AM (Viewed 12/11/2018 10:09 AM)

Alli (HAO) (6317417411)

Where's everyone?

12/11/2018 10:08 AM (Viewed 12/11/2018 10:09 AM)

Shawn (HAO) (3476768392)

Stuck in ave traffic

12/11/2018 10:09 AM

Alli (HAO) (6317417411)

Okay

12/11/2018 10:09 AM

Brianna (HAO) (3478458686)

In the back

12/11/2018 10:09 AM

Shawn (HAO) (3476768392)

Right here tho

**D1923**

12/11/2018 10:10 AM

Alli (HAO) (6317417411)

Liked "In the back     "

12/11/2018 10:18 AM (Viewed 12/11/2018 10:22 AM)

David (Global Auto) (3472315194)

Lol...Pricks!!!

12/11/2018 10:19 AM (Viewed 12/11/2018 10:22 AM)

Alli (HAO) (6317417411)



Good morning Dave

12/11/2018 10:20 AM (Viewed 12/11/2018 10:22 AM)

David (Global Auto) (3472315194)

Good morning

12/11/2018 12:46 PM (Viewed 12/11/2018 1:18 PM)

Alli (HAO) (6317417411)



12/11/2018 2:10 PM

Alli (HAO) (6317417411)

https://www.facebook.com/LADbible/videos/424108774927171716/

12/11/2018 2:10 PM

Shawn (HAO) (3476768392)

Wow lol that's cool lol

12/11/2018 2:11 PM

Shawn (HAO) (3476768392)

Need to find that dog

## D1924

A0799

12/11/2018 2:12 PM

Alli (HAO) (6317417411)



12/11/2018 2:14 PM (Viewed 12/11/2018 2:43 PM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked an image

12/11/2018 2:15 PM (Viewed 12/11/2018 2:43 PM)

Alli (HAO) (6317417411)



12/11/2018 2:17 PM (Viewed 12/11/2018 2:43 PM)

Leticia (hillside Auto Outlet) (3472560067)

Laughed at an image

12/11/2018 2:29 PM (Viewed 12/11/2018 2:43 PM)

Shawn (HAO) (3476768392)

I'm out here looking for customers under cars

12/11/2018 2:29 PM (Viewed 12/11/2018 2:43 PM)

Shawn (HAO) (3476768392)

Wish I had business cards to hand out

12/11/2018 2:35 PM (Viewed 12/11/2018 2:43 PM)

Alli (HAO) (6317417411)

Call back your previous customers. Let's see if we can put some deals together on different cars and switch cash buyers to finance

12/11/2018 2:37 PM (Viewed 12/11/2018 2:43 PM)

Shawn (HAO) (3476768392)



**D1925**

12/11/2018 3:15 PM (Viewed 12/11/2018 3:38 PM)

Tifany (HAO) (6315042565)

Yesss lets do it!

12/11/2018 3:15 PM (Viewed 12/11/2018 3:38 PM)

Alli (HAO) (6317417411)

Liked "Yesss lets do it"

12/11/2018 3:15 PM (Viewed 12/11/2018 3:38 PM)

David (Global Auto) (3472315194)

Give me a break I'm trying to sleep LOL

12/11/2018 3:17 PM (Viewed 12/11/2018 3:38 PM)

David (Global Auto) (3472315194)

Pricks!

12/11/2018 3:18 PM (Viewed 12/11/2018 3:38 PM)

Leticia (hillside Auto Outlet) (3472560067)

LMFAOO

12/11/2018 3:18 PM (Viewed 12/11/2018 3:38 PM)

Alli (HAO) (6317417411)



12/11/2018 3:19 PM (Viewed 12/11/2018 3:38 PM)

Shawn (HAO) (3476768392)

Laughed at "Pricks!"

12/11/2018 3:20 PM (Viewed 12/11/2018 3:38 PM)

Alli (HAO) (6317417411)



12/11/2018 5:04 PM

**D1926**

A0801

Alli (HAO) (6317417411)



12/12/2018 10:08 AM (Viewed 12/12/2018 10:42 AM)

Alli (HAO) (6317417411)

I drove for two hours this morning and got here before 10. Coming from Suffolk county. You got people taking trains and buses that get here at 930. Get to work on time if you're supposed to be here at 10

12/12/2018 10:22 AM (Viewed 12/12/2018 10:42 AM)

Shawn (HAO) (3476768392)

Some ppl have kids and sick family members be mindful

12/12/2018 10:22 AM (Viewed 12/12/2018 10:42 AM)

Shawn (HAO) (3476768392)

Work is important to all that's how we feed the family.

12/12/2018 10:22 AM (Viewed 12/12/2018 10:42 AM)

Alli (HAO) (6317417411)

Exactly. Take care of work so you can take care of your home

12/12/2018 10:23 AM (Viewed 12/12/2018 10:42 AM)

Alli (HAO) (6317417411)

If you have issues tell me the night before

12/12/2018 7:06 PM (Viewed 12/12/2018 7:43 PM)

Alli (HAO) (6317417411)



12/12/2018 8:37 PM (Viewed 12/12/2018 8:40 PM)

Alli (HAO) (6317417411)



**D1927**

A0802

I just ate raw cookie dough wrapped in Romaine lettuce while listening to Baby It's Cold Outside. I like living life on the edge.

12/13/2018 4:53 PM (Viewed 12/13/2018 4:57 PM)

Alli (HAO) (6317417411)

https://www.facebook.com/185663292218010/posts/339234813527523/

12/13/2018 4:56 PM (Viewed 12/13/2018 4:57 PM)

Brianna (HAO) (3478458686)

Disliked an image

12/13/2018 11:54 PM (Viewed 12/14/2018 8:16 AM)

Alli (HAO) (6317417411)



12/14/2018 12:49 PM (Viewed 12/14/2018 12:51 PM)

Tifany (HAO) (6315042585)

So tomorrow we are going to pick names out for secret Santa for anyone that wants to be involved we're going to have an amount of 25 to $30 to spend lets spread some holiday cheer

12/14/2018 12:50 PM (Viewed 12/14/2018 12:51 PM)

Alli (HAO) (6317417411)



12/14/2018 12:50 PM (Viewed 12/14/2018 12:51 PM)

Tifany (HAO) (6315042565)

So I was thinking about putting the gifts under the tree write the person's name on top of the gifts and on the 22nd which will be on a Saturday is when we will open the gifts before or after the meeting

12/14/2018 12:51 PM

Alli (HAO) (6317417411)

I'm with it

**D1928**

12/14/2018 12:51 PM

Tifany (HAO) (6315042565)

Gooodd

12/14/2018 12:54 PM (Viewed 12/14/2018 12:56 PM)

Brianna (HAO) (3478458686)

Liked "So tomorrow we are going to pick names out for secret Santa for anyone that wants to be involved we're going to have an amount of 25 to $30 to spend lets spread some holiday cheer"

12/14/2018 12:54 PM (Viewed 12/14/2018 12:56 PM)

Brianna (HAO) (3478458686)

Liked "So I was thinking about putting the gifts under the tree write the person's name on top of the gifts and on the 22nd which will be on a Saturday is when we will open the gifts before or after the meeting"

12/14/2018 6:42 PM (Viewed 12/14/2018 6:55 PM)

Alli (HAO) (6317417411)

Sales and bdc meeting 930,

12/14/2018 6:42 PM (Viewed 12/14/2018 6:55 PM)

Brianna (HAO) (3478458686)

Got it

12/14/2018 6:42 PM (Viewed 12/14/2018 6:55 PM)

Tifany (HAO) (6315042565)

K

12/14/2018 6:54 PM (Viewed 12/14/2018 6:55 PM)

Shawn (HAO) (3476768392)

Okie dokie

12/14/2018 6:56 PM (Viewed 12/14/2018 7:03 PM)

David (Global Auto) (3472315194)

Prick

12/14/2018 6:56 PM (Viewed 12/14/2018 7:03 PM)

Alli (HAO) (6317417411)

12/14/2018 6:57 PM (Viewed 12/14/2018 7:03 PM)

**D1929**

A0804

Shawn (HAO) (3476768392)

Laughed at "Prick"

12/14/2018 7:55 PM

Leticia (hillside Auto Outlet) (3472560067)

Liked "Sales and bdc meeting 930. "

12/14/2018 7:55 PM

Alli (HAO) (6317417411)

She's alive

12/14/2018 7:56 PM (Viewed 12/14/2018 8:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

Laughed at "She's alive "

12/14/2018 7:56 PM (Viewed 12/14/2018 8:42 PM)

Brianna (HAO) (3478458686)

Yayyyy

12/14/2018 7:57 PM (Viewed 12/14/2018 8:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

I only    for 9:30 rather then 9

12/14/2018 7:57 PM (Viewed 12/14/2018 8:42 PM)

Alli (HAO) (6317417411)

Liked "i only    for 9:30 rather then 9"

12/15/2018 9:19 AM (Viewed 12/15/2018 9:35 AM)

Shawn (HAO) (3476768392)

Morning see you guys soon !

12/15/2018 9:21 AM (Viewed 12/15/2018 9:35 AM)

Alli (HAO) (6317417411)

Liked "Morning see you guys soon ! "

12/15/2018 9:21 AM (Viewed 12/15/2018 9:35 AM)

Alli (HAO) (6317417411)

Good morning everyone

12/15/2018 9:30 AM (Viewed 12/15/2018 9:35 AM)

Shawn (HAO) (3476768392)

# D1930

A0805

Walking

12/15/2018 9:30 AM (Viewed 12/15/2018 9:35 AM)

Shawn (HAO) (3476768392)
Be there 3 mins

12/15/2018 9:30 AM (Viewed 12/15/2018 9:35 AM)

Alli (HAO) (6317417411)
Where is everyone

12/15/2018 12:15 PM

Alli (HAO) (6317417411)



12/15/2018 12:16 PM

Leticia (hillside Auto Outlet) (3472560067)
It is that

12/15/2018 12:16 PM

Leticia (hillside Auto Outlet) (3472560067)
Disliked an image

12/15/2018 12:21 PM (Viewed 12/15/2018 12:24 PM)

Alli (HAO) (6317417411)



12/15/2018 12:24 PM

Leticia (hillside Auto Outlet) (3472560067)
how do i get put of this

12/15/2018 12:24 PM

Alli (HAO) (6317417411)
You can't

**D1931**

A0806

12/15/2018 12:24 PM

Leticia (hillside Auto Outlet) (3472560067)



12/16/2018 11:02 AM

Alli (HAO) (6317417411)



12/16/2018 11:02 AM

Alli (HAO) (6317417411)



12/17/2018 9:33 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)



12/17/2018 9:34 AM (Viewed 12/17/2018 10:13 AM)

Leticia (hillside Auto Outlet) (3472560067)



12/17/2018 9:35 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)



12/17/2018 9:36 AM (Viewed 12/17/2018 10:13 AM)

Leticia (hillside Auto Outlet) (3472560067)

## D1932

A0807

Disliked an image

12/17/2018 9:36 AM (Viewed 12/17/2018 10:13 AM)

Tifany (HAO) (6315042565)

Morninggg

12/17/2018 9:57 AM (Viewed 12/17/2018 10:13 AM)

Shawn (HAO) (3476768392)

Good morning everyone ! Let's have a great day today ! I think we can close every deal today, let's make it happen !

12/17/2018 9:58 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)

Liked "Good morning everyone ! Let's have a great day today ! I think we can close every deal today, let's make it happen !"

12/17/2018 9:59 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)

Let's not get Carried away and get unrealistic

12/17/2018 9:59 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)

By let's have a good

12/17/2018 10:01 AM (Viewed 12/17/2018 10:13 AM)

6463023503

Its better to shoot for the stars then go in with doubts. Lets get to the money! GM all & great mindset Shaun

12/17/2018 10:10 AM (Viewed 12/17/2018 10:13 AM)

Shawn (HAO) (3476768392)

Thanks

12/17/2018 10:10 AM (Viewed 12/17/2018 10:13 AM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "Let's not get Carried away and get unrealistic "

12/17/2018 10:11 AM (Viewed 12/17/2018 10:13 AM)

Alli (HAO) (6317417411)

Liked "Its better to shoot for the stars then go in with doubts. Lets get to the money! GM all & great mindset Shaun          "

**D1933**

12/18/2018 8:41 PM (Viewed 12/18/2018 11:07 PM)

Alli (HAO) (6317417411)

Who ever had Daryl's number make sure he understands if he wants to visit and
hangout he can visit you outside of work. He's not to step foot in the building again.

12/18/2018 8:43 PM (Viewed 12/18/2018 11:07 PM)

Shawn (HAO) (3476768392)

Emphasized "Who ever had Daryl's number make sure he understands if he wants to
visit and hangout he can visit you outside of work. He's not to step foot in the building
again."

12/18/2018 8:45 PM (Viewed 12/18/2018 11:07 PM)

Alli (HAO) (6317417411)

I don't want any ex employees hanging out in the back specially in the accounting
office

12/18/2018 8:46 PM (Viewed 12/18/2018 11:07 PM)

Shawn (HAO) (3476768392)

Agreed ! Safety and just distraction purposes

12/18/2018 8:46 PM (Viewed 12/18/2018 11:07 PM)

Alli (HAO) (6317417411)

Liked "Agreed ! Safety and just distraction purposes "

12/18/2018 8:50 PM (Viewed 12/18/2018 11:07 PM)

David (Global Auto) (3472315194)

12/18/2018 8:51 PM (Viewed 12/18/2018 11:07 PM)

Alli (HAO) (6317417411)

Or I'll have the cops show up with his P.O cause I'm that asshole

12/18/2018 8:52 PM (Viewed 12/18/2018 11:07 PM)

6463023503

12/18/2018 8:59 PM (Viewed 12/18/2018 11:07 PM)

Shawn (HAO) (3476768392)

LMFAO

12/18/2018 9:00 PM (Viewed 12/18/2018 11:07 PM)

**D1934**

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 31 of 74 PageID #: 1471

Alli (HAO) (6317417411)



Just so you all understand I told him to get out and he pretended to be a customer there for a registration problem. He worked for me at Trilaser Automall last year for a while week while he was doing construction. His girl Geraldine was my bfs while I was there and he wanted to play stupid. Wether he truly doesn't remember me or not is irrelevant. All I'm saying next time he or any one walks in the back that shouldn't be there meaning they don't work for us or are not seeing them they should be told they're not allowed in. End of the story.

12/18/2018 9:01 PM (Viewed 12/18/2018 11:07 PM)

Brianna (HAO) (3478458686)

No problem !!!

12/18/2018 9:02 PM (Viewed 12/18/2018 11:07 PM)

Alli (HAO) (6317417411)

Told you guys on Saturday about my level of commitment. Now welcome to the show.

12/18/2018 9:03 PM (Viewed 12/18/2018 11:07 PM)

Brianna (HAO) (3478458686)

No problem Ali, I'm out of work so have a great night

12/19/2018 2:22 PM (Viewed 12/19/2018 2:26 PM)

Alli (HAO) (6317417411)



12/19/2018 2:22 PM (Viewed 12/19/2018 2:26 PM)

Alli (HAO) (6317417411)



12/19/2018 2:22 PM (Viewed 12/19/2018 2:26 PM)

Alli (HAO) (6317417411)



**D1935**



12/19/2018 2:23 PM (Viewed 12/19/2018 2:26 PM)

Tifany (HAO) (6315042565)



12/19/2018 2:26 PM

Leticia (hillside Auto Outlet) (3472560067)



12/19/2018 2:26 PM

Alli (HAO) (6317417411)



12/19/2018 2:26 PM

Alli (HAO) (6317417411)



12/19/2018 2:39 PM (Viewed 12/19/2018 3:07 PM)

Shawn (HAO) (3476768392)



12/19/2018 7:05 PM (Viewed 12/19/2018 7:07 PM)

Alli (HAO) (6317417411)



12/19/2018 7:15 PM

# D1936

A0811

Shawn (HAO) (3476768392)

Smfh lmaooo

12/19/2018 7:15 PM (Viewed 12/19/2018 7:16 PM)

Shawn (HAO) (3476768392)

Look how happy the mom looks          smh Lml

12/19/2018 10:06 PM

Guzman (2) (+1 (347) 749-0633)

Got busy at the end, good job guys. We ended up spotting two cars

12/19/2018 10:06 PM

Guzman (2) (+1 (347) 749-0633)



12/19/2018 10:06 PM

Guzman (2) (+1 (347) 749-0633)

Plus one deposit

12/19/2018 10:07 PM

Alli (HAO) (6317417411)



12/19/2018 10:07 PM

Brianna (HAO) (3478458686)

Nice!

12/19/2018 10:10 PM (Viewed 12/19/2018 10:13 PM)

Alli (HAO) (6317417411)

we're heading into the rough part of the year. This is where we shine and make something out of nothing. Let's keep it going

12/19/2018 10:11 PM (Viewed 12/19/2018 10:13 PM)

6463023503

Jenaé & Shaun save the day

12/19/2018 10:13 PM

Alli (HAO) (6317417411)

Liked "Jenaé & Shaun save the day          "

12/19/2018 10:13 PM

**D1937**

Shawn (HAO) (3476768392)

Liked "Jenaé & Shaun save the day      "

12/19/2018 10:14 PM

Shawn (HAO) (3476768392)

We had a great day today everyone !

12/19/2018 10:15 PM

Alli (HAO) (6317417411)

If you think about it. At this pace 70 is far fetched this month

12/19/2018 10:15 PM

Alli (HAO) (6317417411)

We need a great month

12/19/2018 10:17 PM (Viewed 12/19/2018 10:19 PM)

Shawn (HAO) (3476768392)

We will have one !

12/19/2018 10:18 PM (Viewed 12/19/2018 10:19 PM)

Shawn (HAO) (3476768392)

And thanks nael! And Guzman ! Appreciate it we all handled today very well

12/20/2018 6:44 AM (Viewed 12/20/2018 8:18 AM)

Tifany (HAO) (6315042565)

Good morning proud of you guys! No matter what we make it happen and couldnt ask for a better team

12/20/2018 7:30 AM (Viewed 12/20/2018 8:18 AM)

Alli (HAO) (6317417411)

Liked "Good morning proud of you guys! No matter what we make it happen and couldnt ask for a better team "

12/20/2018 7:31 AM (Viewed 12/20/2018 8:18 AM)

David (Global Auto) (3472315194)

To early pricks

12/20/2018 7:32 AM (Viewed 12/20/2018 8:18 AM)

Leticia (hillside Auto Outlet) (3472560067)

RIGHT ! Lets make this a 9-9 chat ONLY     Appreciate it goodnight now

# D1938

A0813

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 35 of 74 PageID #: 1475

12/20/2018 7:32 AM (Viewed 12/20/2018 8:18 AM)

Leticia (hillside Auto Outlet) (3472560067)

Emphasized "To early pricks"

12/20/2018 7:33 AM (Viewed 12/20/2018 8:18 AM)

Tiffany (HAO) (6315042565)

Agreed

12/20/2018 7:38 AM (Viewed 12/20/2018 8:18 AM)

Brianna (HAO) (3478458686)

Agreed to the 9-9. As well as Tiff is right Everyone makes it happen!

12/20/2018 7:38 AM (Viewed 12/20/2018 8:18 AM)

David (Global Auto) (3472315194)

Shut the fuck up already

12/20/2018 7:43 AM (Viewed 12/20/2018 8:18 AM)

Leticia (hillside Auto Outlet) (3472560067)

Laughed at "Shut the fuck up already"

12/20/2018 7:44 AM (Viewed 12/20/2018 8:18 AM)

David (Global Auto) (3472315194)

I'm trying to sleep you stupid motherfucker shut up already!

12/20/2018 8:04 AM (Viewed 12/20/2018 8:18 AM)

Alli (HAO) (6317417411)



12/20/2018 11:08 AM (Viewed 12/20/2018 11:15 AM)

Alli (HAO) (6317417411)



Cause M in the morning

**D1939**

A0814

12/20/2018 8:50 PM (Viewed 12/20/2018 9:19 PM)

Alli (HAO) (6317417411)

Whoever lives in queens I need you to bring in the most recent utility bill you have. Water electric cable. Doesn't matter.

12/20/2018 8:51 PM (Viewed 12/20/2018 9:19 PM)

Alli (HAO) (6317417411)

If you can take a picture and text it to me tonight

12/20/2018 8:51 PM (Viewed 12/20/2018 9:19 PM)

Alli (HAO) (6317417411)

Thanks in advance

12/21/2018 5:40 PM (Viewed 12/21/2018 5:51 PM)

Alli (HAO) (6317417411)

930 meeting starts. Be here early.

12/21/2018 5:40 PM (Viewed 12/21/2018 5:51 PM)

Alli (HAO) (6317417411)

Don't be late

12/21/2018 6:12 PM (Viewed 12/21/2018 6:33 PM)

Shawn (HAO) (3476768392)

Emphasized "930 meeting starts. Be here early. "

12/21/2018 10:00 PM (Viewed 12/21/2018 11:12 PM)

Alli (HAO) (6317417411)

https://www.facebook.com/VT/videos/1401480286660476/
I know I know it's past 9 but this is all of us

12/22/2018 9:15 AM (Viewed 12/22/2018 9:26 AM)

Alli (HAO) (6317417411)

How's everyone's commute? I hope you're close

12/22/2018 9:15 AM (Viewed 12/22/2018 9:26 AM)

6463023503

Down the block

12/22/2018 9:15 AM (Viewed 12/22/2018 9:26 AM)

Alli (HAO) (6317417411)



**D1940**



12/22/2018 9:22 AM (Viewed 12/22/2018 9:26 AM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "How's everyone's commute? I hope you're close "

12/22/2018 12:14 PM (Viewed 12/22/2018 12:16 PM)

Alli (HAO) (6317417411)

Arturo is free

12/22/2018 12:14 PM (Viewed 12/22/2018 12:16 PM)

Alli (HAO) (6317417411)

Come on

12/22/2018 12:32 PM (Viewed 12/22/2018 12:34 PM)

Alli (HAO) (6317417411)

Customers in the lot

12/24/2018 11:32 AM (Viewed 12/24/2018 11:39 AM)

Alli (HAO) (6317417411)



12/24/2018 11:32 AM (Viewed 12/24/2018 11:39 AM)

6463023503



12/24/2018 12:16 PM

Shawn (HAO) (3476766392)

Lmaoooooo

12/24/2018 12:16 PM

Shawn (HAO) (3476768392)

Cute

12/24/2018 1:21 PM (Viewed 12/24/2018 1:37 PM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked an image

# D1941

A0816

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 38 of 74 PageID #: 1478

12/24/2018 4:45 PM (Viewed 12/24/2018 4:48 PM)

David (hillside Auto Outlet) Parsons (3475810180)

Customers in the lot

12/24/2018 6:33 PM (Viewed 12/24/2018 6:56 PM)

Alli (HAO) (6317417411)

Merry Christmas everyone. Enjoy your day and families... see you Wednesday

12/24/2018 6:34 PM (Viewed 12/24/2018 6:56 PM)

David (Global Auto) (3472315194)

Thanks #BAL you too. I'm sorry I had to drive to the Bronx love ya

12/24/2018 6:40 PM (Viewed 12/24/2018 6:56 PM)

Alli (HAO) (6317417411)



12/24/2018 6:47 PM (Viewed 12/24/2018 6:56 PM)

David (Global Auto) (3472315194)



12/27/2018 10:02 AM (Viewed 12/27/2018 10:38 AM)

Alli (HAO) (6317417411)

Where the fuck is everyone???

12/27/2018 11:39 AM

Leticia (hillside Auto Outlet) (3472560067)

 sleeping

12/27/2018 11:43 AM (Viewed 12/27/2018 11:55 AM)

David (Global Auto) (3472315194)

Smoking

12/27/2018 11:46 AM (Viewed 12/27/2018 11:55 AM)

Leticia (hillside Auto Outlet) (3472560067)

IM CALLING THE F'ING COPS

12/27/2018 11:46 AM (Viewed 12/27/2018 11:55 AM)

**D1942**

A0817

Leticia (hillside Auto Outlet) (3472560067)

(sent with Echo)

12/27/2018 11:47 AM (Viewed 12/27/2018 11:55 AM)

Alli (HAO) (6317417411)

Look who's embracing the group chat all of a sudden_

12/27/2018 12:13 PM (Viewed 12/27/2018 12:25 PM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "Look who's embracing the group chat all of a sudden "

12/28/2018 11:40 AM (Viewed 12/28/2018 11:54 AM)

Alli (HAO) (6317417411)



12/28/2018 1:42 PM

Shawn (HAO) (3476768392)

Laughed at an image

12/28/2018 5:17 PM (Viewed 12/28/2018 5:18 PM)

Alli (HAO) (6317417411)

930 meeting tomorrow please please please be on time.

12/28/2018 5:19 PM (Viewed 12/28/2018 5:20 PM)

Leticia (hillside Auto Outlet) (3472560067)

Im Sleeping ☐ shhhh

12/28/2018 5:19 PM (Viewed 12/28/2018 5:20 PM)

Shawn (HAO) (3476768392)

Yes yes I

12/28/2018 5:19 PM (Viewed 12/28/2018 5:20 PM)

Shawn (HAO) (3476768392)

Laughed at "Im Sleeping ☐ shhhh".

12/28/2018 5:19 PM (Viewed 12/28/2018 5:20 PM)

Shawn (HAO) (3476768392)

**D1943**

Emphasized "930 meeting tomorrow please please please be on time."

12/28/2018 5:19 PM (Viewed 12/28/2018 5:20 PM)

Alli (HAO) (6317417411)



12/28/2018 5:34 PM (Viewed 12/28/2018 5:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

Laughed at an image

12/28/2018 6:17 PM

Shawn (HAO) (3476768392)

Laughed at an image

12/29/2018 7:27 AM (Viewed 12/29/2018 9:18 AM)

Alli (HAO) (6317417411)



12/29/2018 7:29 AM (Viewed 12/29/2018 9:18 AM)

Alli (HAO) (6317417411)

Good Morning everybody

12/29/2018 8:01 AM (Viewed 12/29/2018 9:18 AM)

Leticia (hillside Auto Outlet) (3472560067)

oh hell no

12/29/2018 8:30 AM (Viewed 12/29/2018 9:18 AM)

Tifany (HAO) (6315042565)

Good morning

12/29/2018 9:24 AM (Viewed 12/29/2018 9:54 AM)

Shawn (HAO) (3476768392)

Morning see u guys soon

# D1944

A0819

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 41 of 74 PageID #: 1481

12/29/2018 2:07 PM (Viewed 12/29/2018 2:08 PM)

Alli (HAO) (6317417411)

So Guzman when are you ordering the pizza since you were the last one in

12/29/2018 2:08 PM

Shawn (HAO) (3476768392)

Yes yes yes lol I

12/29/2018 2:08 PM

Shawn (HAO) (3476768392)

Liked "So Guzman when are you ordering the pizza since you were the last one in "

12/29/2018 2:08 PM

Alli (HAO) (6317417411)

12/29/2018 2:11 PM (Viewed 12/29/2018 2:14 PM)

6463023503

Guzman your loyal hard working employees are starving ▢  ▢  Feed us!.

12/29/2018 2:12 PM (Viewed 12/29/2018 2:14 PM)

Brianna (HAO) (3478458686)

Liked "Guzman your loyal hard working employees are starving      Feed us!".

12/29/2018 2:12 PM (Viewed 12/29/2018 2:14 PM)

David (Global Auto) (3472315194)

12/29/2018 2:12 PM (Viewed 12/29/2018 2:14 PM)

Alli (HAO) (6317417411)

Liked "Guzman your loyal hard working employees are starving      Feed us!".

12/29/2018 2:13 PM (Viewed 12/29/2018 2:14 PM)

Alli (HAO) (6317417411)

Come on poppy

12/29/2018 2:13 PM (Viewed 12/29/2018 2:14 PM)

Alli (HAO) (6317417411)

Don't be a welebicho

**D1945**

12/29/2018 2:14 PM

Alli (HAO) (6317417411)

(Puerto Ricardo definition)

12/29/2018 2:14 PM

Alli (HAO) (6317417411)

Rican

12/29/2018 2:14 PM

Alli (HAO) (6317417411)

12/29/2018 2:14 PM

Brianna (HAO) (3478458686)

Is he ordering or what? Cause we all hungry

12/29/2018 2:15 PM (Viewed 12/29/2018 2:25 PM)

David (Global Auto) (3472315194)

Please papa

12/29/2018 2:16 PM (Viewed 12/29/2018 2:25 PM)

6463023503

that old man emoji has me dead

12/29/2018 2:16 PM (Viewed 12/29/2018 2:25 PM)

Shawn (HAO) (3476768392)

Laughed at "Please papa     "

12/29/2018 2:18 PM (Viewed 12/29/2018 2:25 PM)

Shawn (HAO) (3476768392)

Laughed at "Is he ordering or what? Cause we all hungry "

12/29/2018 2:18 PM (Viewed 12/29/2018 2:25 PM)

Shawn (HAO) (3476768392)

Lmfaooo at BRI and Jenaé hahahah

12/29/2018 2:23 PM (Viewed 12/29/2018 2:25 PM)

6463023503

SUCCESS guys Guzman gave up the goods!     OTW 🙂 🙂 🙂 🙂

# D1946

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 43 of 74 PageID #: 1483

12/29/2018 2:26 PM (Viewed 12/29/2018 2:42 PM)

Brianna (HAO) (3478458686)

Just ordered the Pizza! THANKS LIL GUZ

12/29/2018 2:28 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

Liked "Just ordered the Pizza! THANKS LIL GUZ   "

12/29/2018 2:28 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

Liked "SUCCESS guys Guzman gave up the goods!        OTW 🔫 🔫 🔫 🔫      "

12/29/2018 2:33 PM (Viewed 12/29/2018 2:42 PM)

Shawn (HAO) (3476768392)

Laughed at "SUCCESS guys Guzman gave up the goods!        OTW 🔫 🔫 🔫 🔫      "

12/29/2018 2:33 PM (Viewed 12/29/2018 2:42 PM)

Shawn (HAO) (3476768392)

Lmfaooo brats

12/29/2018 2:37 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)

12/29/2018 2:37 PM (Viewed 12/29/2018 2:42 PM)

6463023503

No brat zone

12/29/2018 2:37 PM (Viewed 12/29/2018 2:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

Its lil guzzi * get it right

12/29/2018 2:37 PM (Viewed 12/29/2018 2:42 PM)

6463023503

We just greedy on this side

12/29/2018 2:38 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

Jenaó got yo man in shape here

**D1947**

12/29/2018 2:38 PM (Viewed 12/29/2018 2:42 PM)

6463023503

lll guzzi tho

12/29/2018 2:38 PM (Viewed 12/29/2018 2:42 PM)

6463023503

Huh?

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

He's your homeboy

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

David (Global Auto) (3472315194)

Sausage pizza is mine..No homo!

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Shawn (HAO) (3476768392)

How is this man even texting all this with a office full of ppl

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)

Made extraaa

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Shawn (HAO) (3476768392)

PAY ATTENTION TO CUSTOMERS !!! Thanks !!

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Brianna (HAO) (3478458686)

Laughed at "
How is this man even texting all this with a office full of ppl "

12/29/2018 2:39 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)



**D1948**

Mad

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Shawn (HAO) (3476768392)

And lmaooo Ali

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Brianna (HAO) (3478458686)

LETS GET BACK TO WORK NOW EVERYONE !!!

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

I don't like your attitude

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Tifany (HAO) (6315042565)

Im.dead....

12/29/2018 2:40 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

Emphasized "LETS GET BACK TO WORK NOW EVERYONE !!! "

12/29/2018 2:41 PM (Viewed 12/29/2018 2:42 PM)

Leticia (hillside Auto Outlet) (3472560067)

VWHAT ZHE FACK IS HAPPENING !

12/29/2018 2:41 PM (Viewed 12/29/2018 2:42 PM)

Alli (HAO) (6317417411)

12/29/2018 2:42 PM (Viewed 12/29/2018 2:51 PM)

6463023503

Yes let's plz        All off his rocker rn because he's hungry lol

12/29/2018 2:43 PM (Viewed 12/29/2018 2:51 PM)

Alli (HAO) (6317417411)

**D1949**

A0824

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 46 of 74 PageID #: 1486



*You're goddamn right.*

12/29/2018 2:43 PM (Viewed 12/29/2018 2:51 PM)

Leticia (hillside Auto Outlet) (3472560067)

GOT DAMN JENAE I HEARD U FROM HERE

12/29/2018 2:44 PM (Viewed 12/29/2018 2:51 PM)

Shawn (HAO) (3476768392)

Loved "LETS GET BACK TO WORK NOW EVERYONE !!! "

12/29/2018 2:44 PM (Viewed 12/29/2018 2:51 PM)

Shawn (HAO) (3476768392)

Laughed at "VWHAT ZHE FACK IS HAPPENING ! "

12/29/2018 2:44 PM (Viewed 12/29/2018 2:51 PM)

Tifany (HAO) (6315042585)

Yeah lets stop so my bdc can focus

12/29/2018 2:44 PM (Viewed 12/29/2018 2:51 PM)

Shawn (HAO) (3476768392)

Agreed with tiff !!!

12/29/2018 2:44 PM (Viewed 12/29/2018 2:51 PM)

Shawn (HAO) (3476768392)

Lol

12/29/2018 2:45 PM (Viewed 12/29/2018 2:51 PM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "Yeah lets stop so my bdc can focus"

12/29/2018 2:45 PM (Viewed 12/29/2018 2:51 PM)

Leticia (hillside Auto Outlet) (3472560067)

BOOOO PARTTY POOOPER

12/29/2018 2:45 PM (Viewed 12/29/2018 2:51 PM)

Alli (HAO) (6317417411)



## D1950

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs7231642629939536...   3/6/2023



12/29/2018 2:46 PM (Viewed 12/29/2018 2:51 PM)

Tifany (HAO) (6315042565)

U want deals?

12/29/2018 2:46 PM (Viewed 12/29/2018 2:51 PM)

Alli (HAO) (6317417411)



12/29/2018 2:47 PM (Viewed 12/29/2018 2:51 PM)

Shawn (HAO) (3476768392)

Laughed at "BOOOO PARTTY POOOPER"

12/29/2018 2:51 PM

Leticia (hillside Auto Outlet) (3472560067)

Vwhat is the tude!!!

12/29/2018 2:52 PM (Viewed 12/29/2018 3:52 PM)

Leticia (hillside Auto Outlet) (3472560067)



12/30/2018 10:56 AM (Viewed 12/30/2018 10:57 AM)

Alli (HAO) (6317417411)

Its 10:56 gahas are down and no one is here. We all depend on each other to make a living here. 6 appointments did not go on the deal log yesterday. That's 6 people your bde people would not have gotten paid on while they're working their asses off and dealing while the pressure that I put on there to go above and beyond to generate more traffic for us. Please get to work on these. I'm not gonna keep dealing with this. I'll just quit and go somewhere else. I want back from you what I put in. If

# D1951

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs7231642629939536...   3/6/2023

A0826

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 48 of 74 PageID #: 1488

you can't give me that just let me know and I'll go work somewhere else because I'm only as good as the people I surround myself with.

12/30/2018 4:05 PM (Viewed 12/30/2018 4:16 PM)

Alli (HAO) (6317417411)

https://youtu.be/8_mQ6n5mwMU

12/30/2018 4:40 PM

Alli (HAO) (6317417411)



12/30/2018 4:41 PM (Viewed 12/30/2018 4:42 PM)

6463023503

Is tga

12/30/2018 4:43 PM (Viewed 12/30/2018 4:46 PM)

6463023503

Is that a real fact?

12/30/2018 4:43 PM (Viewed 12/30/2018 4:46 PM)

Alli (HAO) (6317417411)

Yes

12/30/2018 4:43 PM (Viewed 12/30/2018 4:46 PM)

Alli (HAO) (6317417411)

Google it

12/30/2018 4:44 PM (Viewed 12/30/2018 4:46 PM)

6463023503

Interesting    I will

12/30/2018 4:55 PM (Viewed 12/30/2018 4:56 PM)

Shawn (HAO) (3476768392)

Emphasized an image

12/30/2018 4:55 PM (Viewed 12/30/2018 4:56 PM)

Shawn (HAO) (3476768392)

**D1952**

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs7231642629939536...    3/6/2023

A0827

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 49 of 74 PageID #: 1489

Laughed at "Interesting    I will ".

12/30/2018 4:55 PM (Viewed 12/30/2018 4:56 PM)

Shawn (HAO) (3476766392)

Emphasized "Interesting    I will "

12/30/2018 4:56 PM

Shawn (HAO) (3476766392)

Very !!

12/30/2018 9:02 PM (Viewed 12/30/2018 10:02 PM)

Alli (HAO) (6317417411)

We're open normal time tomorrow... we'll probably close earlier

12/30/2018 9:02 PM (Viewed 12/30/2018 10:02 PM)

Alli (HAO) (6317417411)

Tuesday we're opening at 12

12/31/2018 10:03 AM (Viewed 12/31/2018 10:34 AM)

Shawn (HAO) (3476766392)

Morning everyone happy New Year's Eve see y'all soon let's have a great one !
Finish strong

12/31/2018 10:36 AM (Viewed 12/31/2018 11:19 AM)

Alli (HAO) (6317417411)



12/31/2018 10:41 AM (Viewed 12/31/2018 11:19 AM)

Alli (HAO) (6317417411)



12/31/2018 10:42 AM (Viewed 12/31/2018 11:19 AM)

Alli (HAO) (6317417411)



**D1953**



12/31/2018 10:52 AM (Viewed 12/31/2018 11:19 AM)

Shawn (HAO) (3476768392)

Laughed at an image

12/31/2018 10:52 AM (Viewed 12/31/2018 11:19 AM)

Shawn (HAO) (3476768392)

Lmfaooooo

12/31/2018 12:51 PM (Viewed 12/31/2018 12:52 PM)

Alli (HAO) (6317417411)



12/31/2018 12:51 PM (Viewed 12/31/2018 12:52 PM)

Alli (HAO) (6317417411)



12/31/2018 8:32 PM (Viewed 12/31/2018 8:33 PM)

Alli (HAO) (6317417411)

Good job this month. Let's do it all over again in the new year. Have a great one and be safe tonight

12/31/2018 8:49 PM (Viewed 12/31/2018 8:50 PM)

Brianna (HAO) (3478458686)

Liked "Good job this month. Let's do it all over again in the new year. Have a great one and be safe tonight   "

12/31/2018 8:50 PM

Brianna (HAO) (3478458686)

# D1954

A0829

Thank you! Good job everyone! Happy New Years!

12/31/2018 8:52 PM (Viewed 12/31/2018 9:08 PM)

Alli (HAO) (6317417411)

Liked "Thank you! Good job everyone! Happy New Years!"

1/1/2019 9:14 AM (Viewed 1/1/2019 1:00 PM)

Tifany (HAO) (6315042565)

Happy new year

1/1/2019 9:17 AM (Viewed 1/1/2019 1:00 PM)

Alli (HAO) (6317417411)

Liked "Happy new year"

1/1/2019 9:30 AM (Viewed 1/1/2019 1:00 PM)

Alli (HAO) (6317417411)



1/1/2019 12:17 PM (Viewed 1/1/2019 1:00 PM)

Shawn (HAO) (3476768392)

Happy New Years see y'all in couple min

1/1/2019 12:17 PM (Viewed 1/1/2019 1:00 PM)

Shawn (HAO) (3476768392)

Loved "Liked "Happy new year""

1/1/2019 12:18 PM (Viewed 1/1/2019 1:00 PM)

Shawn (HAO) (3476768392)

Loved "Happy new year"

1/1/2019 12:18 PM (Viewed 1/1/2019 1:00 PM)

Shawn (HAO) (3476768392)

Emphasized "Good job this month. Let's do it all over again in the new year. Have a great one and be safe tonight    "

1/1/2019 8:58 PM

Alli (HAO) (6317417411)

**D1955**

A0830



1/1/2019 8:58 PM

Alli (HAO) (6317417411)



1/1/2019 8:59 PM

Alli (HAO) (6317417411)



1/1/2019 8:59 PM (Viewed 1/1/2019 11:55 PM)

Alli (HAO) (6317417411)



1/1/2019 8:59 PM (Viewed 1/1/2019 11:55 PM)

Alli (HAO) (6317417411)



1/2/2019 10:14 AM (Viewed 1/2/2019 10:15 AM)

Tifany (HAO) (6315042565)

So where is everyone?

1/2/2019 10:18 AM (Viewed 1/2/2019 10:24 AM)

**D1956**

Leticia (hillside Auto Outlet) (3472560067)

Sleeping

1/2/2019 10:18 AM (Viewed 1/2/2019 10:24 AM)

Tifany (HAO) (6315042565)

Lol must be nice

1/2/2019 10:19 AM (Viewed 1/2/2019 10:24 AM)

Alli (HAO) (6317417411)

Wakey wakey

1/2/2019 10:30 AM (Viewed 1/2/2019 10:52 AM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "Wakey wakey"

1/3/2019 10:05 AM (Viewed 1/3/2019 10:42 AM)

Leticia (hillside Auto Outlet) (3472560067)

Where tf is everyone!?

1/3/2019 10:08 AM (Viewed 1/3/2019 10:42 AM)

David (Global Auto) (3472315194)

Yeah what the fuck?

1/3/2019 10:09 AM (Viewed 1/3/2019 10:42 AM)

Leticia (hillside Auto Outlet) (3472560067)

Emphasized "Yeah what the fuck?"

1/3/2019 10:11 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

5 minutes away. You haven't seen me take a day off yet so

1/3/2019 10:12 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

Second day in row Ali come on body gotta be responsible 

1/3/2019 10:12 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

That's not an excuse

1/3/2019 10:12 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

**D1957**

A0832

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 54 of 74 PageID #: 1494

Buddy*

1/3/2019 10:12 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

Why don't you go home

1/3/2019 10:12 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

Who the fuck are you

1/3/2019 10:13 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

⊓ ⊓

1/3/2019 10:14 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

You and I need to have a talk about what happened yesterday.

1/3/2019 10:14 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

I'm late because I've been up since 4a.m. Thinking about it

1/3/2019 10:15 AM (Viewed 1/3/2019 10:42 AM)

Alli (HAO) (6317417411)

Until 4

1/3/2019 10:16 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

If u and I need have a talk why u texting group chat

1/3/2019 10:17 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

Idk who u talking bout

1/3/2019 10:17 AM (Viewed 1/3/2019 10:42 AM)

Shawn (HAO) (3476768392)

Or what

1/4/2019 7:54 PM (Viewed 1/4/2019 8:11 PM)

Alli (HAO) (6317417411)

930 tomorrow

# D1958

1/4/2019 7:55 PM (Viewed 1/4/2019 8:11 PM)

Shawn (HAO) (3476768392)

Yes yes !

1/4/2019 7:56 PM (Viewed 1/4/2019 8:11 PM)

Shawn (HAO) (3476768392)

Get home safe everyone ! Great job today dav

1/4/2019 9:11 PM

Guzman (2) (+1 (347) 749-0633)

MEETING 9:30 AM SHARP. LETS HAVE A GREAT WEEKEND

1/4/2019 9:13 PM

Alli (HAO) (6317417411)



1/4/2019 9:13 PM

Alli (HAO) (6317417411)

Blu blu

1/4/2019 9:28 PM (Viewed 1/4/2019 9:38 PM)

Shawn (HAO) (3476768392)

LoL

1/4/2019 9:28 PM (Viewed 1/4/2019 9:38 PM)

Shawn (HAO) (3476768392)

Laughed at "Blu blu "

1/4/2019 9:43 PM (Viewed 1/4/2019 9:55 PM)

Leticia (hillside Auto Outlet) (3472560067)

Disliked "Blu blu "

1/5/2019 6:22 PM

Alli (HAO) (6317417411)

Very Sorry I wasn't myself today. I'll be back to normal tomorrow. Just having a day.

1/5/2019 6:23 PM (Viewed 1/5/2019 6:36 PM)

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 56 of 74 PageID #: 1496

Alli (HAO) (6317417411)

Don't stress yourselves about today either. We'll have a good month

1/5/2019 6:24 PM (Viewed 1/5/2019 6:36 PM)

6463023503

No worries! We all have our moments. Feeling back on top and getting to the money tomorrow!

1/5/2019 6:39 PM

David (Global Auto) (3472315194)



1/5/2019 7:48 PM (Viewed 1/5/2019 7:49 PM)

Shawn (HAO) (3476768392)

Emphasized "Very Sorry I wasn't myself today. I'll be back to normal tomorrow. Just having a day "

1/5/2019 7:49 PM

Shawn (HAO) (3476768392)

It happens we're human plus you've be working nonstop

1/5/2019 7:49 PM

Shawn (HAO) (3476768392)

Loved "No worries! We all have our moments. Feeling back on top and getting to the money tomorrow! "

1/5/2019 7:49 PM (Viewed 1/5/2019 7:50 PM)

Shawn (HAO) (3476768392)

Loved " "

1/6/2019 10:28 AM (Viewed 1/6/2019 10:46 AM)

Alli (HAO) (6317417411)

Anyone at work yet?

1/6/2019 10:29 AM (Viewed 1/6/2019 10:46 AM)

Brianna (HAO) (3478458686)

Nope

1/6/2019 10:29 AM (Viewed 1/6/2019 10:46 AM)

Alli (HAO) (6317417411)

Why is the gate half way open?

**D1960**

1/6/2019 10:30 AM (Viewed 1/6/2019 10:46 AM)

Alli (HAO) (6317417411)



1/6/2019 10:30 AM (Viewed 1/6/2019 10:46 AM)

Brianna (HAO) (3478458686)

No clue, I'm still home

1/6/2019 10:31 AM (Viewed 1/6/2019 10:46 AM)

Alli (HAO) (6317417411)

Nvm found Richie

1/7/2019 9:31 AM (Viewed 1/7/2019 9:48 AM)

Alli (HAO) (6317417411)



1/7/2019 10:09 AM (Viewed 1/7/2019 10:22 AM)

Shawn (HAO) (3476768392)

Coming up block sick as a dog might wanna stay away from me

1/7/2019 10:09 AM (Viewed 1/7/2019 10:22 AM)

Shawn (HAO) (3476768392)

Blu Blu Blu !

You have 360 total messages and 50 total images.





cv-07163-OEM-LB  Document 102-4  Filed 03/27/24  Page 59 of 74 Pag

**11:11**  •❚❙ 5G⊌ 🔋

‹ ④  📷

**+1 (347) 256-0067** ›

check because payrolls always a week behind and he said we are owes nothing. With that being said I would like to go back to all of our deals and be paid what I was promised upon being hired.

Jan 24, 2019 at 5:50 PM

I am at work right now can i give you a call in a bit?

I will be available for about the next 10 minutes or so otherwise I can be reached tomorrow

Delivered

Okay give me a sec to step out

Never mind I will just take the route I already planned on taking. They told me I should reach out to you and see if you'd do anything for me but I rather be sure to get everything I worked hard for. We aren't 100% on the same page so Thank you anyways for your time.



Text Message 🎤

**D2231**

A0838

Conversation between iPhone (5) (+16618868012) and Latisha Outlet (3472560067)

10/9/2018 11:03 AM (Viewed 10/9/2018 11:04 AM)

Latisha Outlet (3472560067)

Q40 customer is coming with a check and his and insurance!

10/9/2018 11:04 AM

iPhone (5) (+16618868012)

Ok

10/9/2018 11:06 AM (Viewed 10/9/2018 11:43 AM)

Latisha Outlet (3472560067)

Kaswayne Bailey is the name

10/9/2018 11:43 AM (Delivered 10/9/2018 11:45 AM)

iPhone (5) (+16618868012)

You're friend is nice

10/9/2018 11:46 AM (Viewed 10/9/2018 11:48 AM)

Latisha Outlet (3472560067)

Yea yeah everyone is nice when they want a job lol

10/9/2018 11:48 AM

iPhone (5) (+16618868012)



10/11/2018 2:16 PM (Viewed 10/11/2018 2:28 PM)

Latisha Outlet (3472560067)

a go for glk

10/25/2018 9:10 AM (Viewed 10/25/2018 10:43 AM)

Latisha Outlet (3472560067)

I have to take the day off i woke up throwing up and I think i have a stomach virus or something

10/30/2018 12:05 PM

Latisha Outlet (3472560067)

i want u to talk to these people

10/30/2018 12:06 PM

iPhone (5) (+16618868012)

D3286

A0839

Ok

10/30/2018 2:59 PM (Viewed 10/30/2018 3:02 PM)

Lalisha Outlet (3472560067)

cannot loose this deal check out credit

10/30/2018 3:02 PM

iPhone (5) (+16618868012)

Ok

11/5/2018 5:01 PM (Viewed 11/5/2018 5:02 PM)

Lalisha Outlet (3472560067)

2,290?

11/5/2018 5:02 PM (Viewed 11/5/2018 5:08 PM)

Lalisha Outlet (3472560067)

she said since she gotta pay taxes and dmv if we can take 100 off

11/6/2018 7:35 PM (Viewed 11/6/2018 8:00 PM)

Lalisha Outlet (3472560067)

Im going to make a couple interview appointments i got a bunch of emails coming in

11/6/2018 8:00 PM

iPhone (5) (+16618868012)

Ok

11/7/2018 6:45 AM (Viewed 11/7/2018 10:16 AM)

Lalisha Outlet (3472560067)

isaac i cannot come in its not an excuse its not to hang out im not going in with the way my face looks right now its a long story but i have a busted lip im running on no sleep and i just am dealing with more than i can handle

11/7/2018 6:46 AM (Viewed 11/7/2018 10:16 AM)

Lalisha Outlet (3472560067)

i actually am gonna come in ready to show you my face and make my honda civic deal

11/8/2018 1:34 PM (Viewed 11/8/2018 4:00 PM)

Lalisha Outlet (3472560067)

has no fenders

11/9/2018 6:19 PM (Viewed 11/9/2018 6:33 PM)

Latisha Outlet (3472560067)

Can i go home its the last night my bestfriends here

11/9/2018 6:27 PM (Viewed 11/9/2018 6:33 PM)

Latisha Outlet (3472560067)

Emphasized "Can i go home its the last night my bestfriends here "

11/9/2018 6:33 PM

iPhone (5) (+16618868012)

Sure

11/9/2018 6:34 PM (Viewed 11/9/2018 6:35 PM)

Latisha Outlet (3472560067)

thank you 😊

11/10/2018 12:22 PM

Latisha Outlet (3472560067)

they want numbers on journey

11/10/2018 12:22 PM

iPhone (5) (+16618868012)

Ok

11/10/2018 12:22 PM

Latisha Outlet (3472560067)

speaking to someone

11/10/2018 12:22 PM

iPhone (5) (+16618868012)

Ok

11/10/2018 2:43 PM

iPhone (5) (+16618868012)

What model is this Murano

11/10/2018 2:44 PM (Viewed 11/10/2018 4:20 PM)

Latisha Outlet (3472560067)

fully loaded

11/10/2018 2:44 PM (Viewed 11/10/2018 4:20 PM)

Latisha Outlet (3472560067)

D3288

file:///C:/Users/Kyle/AppData/Roaming/Decipher%20Media/dtm_msgs546334684762754...   2/24/2023

A0841

sv

11/11/2018 10:55 AM (Viewed 11/11/2018 10:58 AM)

Latisha Outlet (3472560067)

im here with a customer and no one else is here

11/12/2018 7:12 PM (Viewed 11/12/2018 7:20 PM)

Latisha Outlet (3472560067)

can i go home its dead

11/12/2018 7:20 PM

iPhone (5) (+16618868012)

Can you come in my office please

11/13/2018 3:25 PM (Viewed 11/13/2018 7:15 PM)

Latisha Outlet (3472560067)

i got a cap one preapproval he wants $300 monthly payments on any minivan even willing to take the 18 as is

11/13/2018 7:29 PM (Viewed 11/13/2018 8:00 PM)

Latisha Outlet (3472560067)

349

11/14/2018 3:18 PM (Viewed 11/14/2018 4:11 PM)

Latisha Outlet (3472560067)

danise said she sent it out yesterday but maureen said she never received it

11/15/2018 10:08 AM (Viewed 11/15/2018 10:34 AM)

Latisha Outlet (3472560067)

I am stuck in traffic on the Grand Central I don't know what's going on be there in a few minutes

11/16/2018 7:53 PM (Viewed 11/16/2018 8:15 PM)

Latisha Outlet (3472560067)

D3289
2/24/2023

A0842



11/16/2018 7:53 PM (Viewed 11/16/2018 8:15 PM)

Latisha Outlet (3472560067)

she didnt sign it before sending thats why we didnt get paid

11/17/2018 11:55 AM (Viewed 11/17/2018 11:56 AM)

Latisha Outlet (3472560067)

i ask guzman to show serge to print 45 minutes ago for this girl and serge is telling me he doesnt know where to print

11/19/2018 11:15 AM

Latisha Outlet (3472560067)

finally got us funded for henry reyes!:)

11/19/2018 11:15 AM (Delivered 11/19/2018 11:16 AM)

iPhone (5) (+16618868012)

Great

11/19/2018 4:17 PM

iPhone (5) (+16618868012)



11/19/2018 4:18 PM

iPhone (5) (+16618868012)



11/19/2018 4:35 PM

iPhone (5) (+16618868012)



D3290

A0843



11/20/2018 4:07 PM

Latisha Outlet (3472560067)

i gotta talk to you about something before it's blown up

11/20/2018 4:08 PM

iPhone (5) (+10618868012)

You and your blowup

11/20/2018 4:08 PM

Latisha Outlet (3472560067)

LMAO not me

11/20/2018 4:08 PM

Latisha Outlet (3472560067)

its about brianna something she told me that i dont want it to be blown out of proportion

11/20/2018 4:08 PM

Latisha Outlet (3472560067)

with anthony

11/20/2018 4:08 PM

iPhone (5) (+16618868012)

Ok

11/20/2018 5:40 PM (Viewed 11/20/2018 5:41 PM)

Latisha Outlet (3472560067)

can i go home i have really bad cramps n i can barely move why do you think i was sitting in the back all day

11/20/2018 6:13 PM

Latisha Outlet (3472560067)

Emphasized "can i go home i have really bad cramps n i can barely move why do you think i was sitting in the back all day"

11/20/2018 6:14 PM

D3291

A0844

Laisha Outlet (3472560067)

Questioned "can i go home i have really bad cramps n i can barely move why do you think i was sitting in the back all day"

11/22/2018 10:31 AM

iPhone (5) (+16618868012)

I wanted to wish you and your family a Happy Thanksgiving.

11/22/2018 12:10 PM (Viewed 11/22/2018 12:32 PM)

Laisha Outlet (3472560067)

Same to you! Hope you enjoy your day

11/23/2018 12:10 PM

iPhone (5) (+16618868012)



11/24/2018 4:28 PM

iPhone (5) (+16618868012)



11/24/2018 5:33 PM

iPhone (5) (+16618868012)



11/24/2018 5:42 PM

iPhone (5) (+16618868012)



Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 67 of 74 PageID #: 1907



11/24/2018 5:47 PM

iPhone (5) (+16618868012)



11/24/2018 5:47 PM

iPhone (5) (+16618868012)



11/25/2018 3:59 PM

Latisha Outlet (3472560067)

I have so many solid deals and its just taking so long for no reason

11/25/2018 3:59 PM

Latisha Outlet (3472560067)

i have one 5,000 down QX60 the other 2,000 down laredo all 600+ credit

11/25/2018 4:00 PM

iPhone (5) (+16618868012)

Ok I am not there At seven every dealership work except me

11/28/2018 8:07 PM

Latisha Outlet (3472560067)

whats up i was in the shower when u called

11/28/2018 8:09 PM

Latisha Outlet (3472560067)

Case 1:21-cv-07163-OEM-LB   Document 102-4   Filed 03/27/24   Page 68 of 74 PageID #: 1508

the call keeps dropping

11/28/2018 8:09 PM

Latisha Outlet (3472560067)

imgoing to call him now

11/28/2018 8:09 PM

iPhone (5) (+16618868012)

Ok

11/30/2018 3:17 PM (Viewed 11/30/2018 3:23 PM)

Latisha Outlet (3472560067)

I am really not feeling well I feel nauseous and I was trying to just hang out but I feel hot and i feel my stomach turning

12/3/2018 11:21 AM (Viewed 12/3/2018 11:22 AM)

Latisha Outlet (3472560067)

Not coming in today?

12/3/2018 11:22 AM

iPhone (5) (+16618868012)

In meeting be. There in 2 hr

12/3/2018 5:16 PM (Viewed 12/3/2018 5:24 PM)

Latisha Outlet (3472560067)

that customers waiting to speak yo uou

12/12/2018 10:26 AM (Viewed 12/12/2018 10:43 AM)

Latisha Outlet (3472560067)



12/12/2018 6:04 PM (Viewed 12/12/2018 6:06 PM)

Latisha Outlet (3472560067)

Im really not feeling well my stomach is turning and i feel extremely nauseous and i keep feeling like i need to puke i cant stay any longer i need to lay down

12/12/2018 6:25 PM

Latisha Outlet (3472560067)

D3294

A0847



12/12/2018 6:25 PM

iPhone (5) (+16618868012)

No

12/12/2018 6:37 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

Then i guess you are going to have to fire me i been feeling like this since 2 this afternoon ask all i am not staying so you can let me know if i should be here friday or not. I was just going to leave after i made that deal earlier anyways because you yelling at me cus the customers rushing me saying i cant control my customer but not one of your door managers came out to help either hearing whats going on and look at that the deal was made anyways

12/12/2018 6:39 PM (Viewed 12/12/2018 6:40 PM)

Latisha Outlet (3472560067)

so it is what is because im
so tired of everyone else getting slack n im here 6 days a week 10 hours a day faithfully maybe 2 or 3 days last month i went home early but other than that i dont even call out n when i do i make up for it unlike everyone else there so like i said you let me know if i should be here friday or not

12/12/2018 6:40 PM

Latisha Outlet (3472560067)

shaun comes 30 mins late everyday francisco dont come till 11 its bullshit

12/12/2018 7:28 PM

iPhone (5) (+16618868012)

You okay

1/7/2019 4:13 PM (Viewed 1/7/2019 4:15 PM)

Latisha Outlet (3472560067)

I left for the day tomorrow we need to talk because this place has been a shit show since you left

1/9/2019 10:17 AM

Latisha Outlet (3472560067)

my commissions sheet is under your keyboards

1/9/2019 10:17 AM

iPhone (5) (+16618868012)



D3295

Ok

1/9/2019 10:18 AM (Viewed 1/9/2019 1:01 PM)

Latisha Outlet (3472560067)

mujahid saeed was supposed to be a split between me and Sean but I had took the
customer to Transworld and he ended up getting the Transworld insurance the day I
was not in and Sean took it upon himself to take the whole hundred so I should be
getting paid on that 100%

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

Ashas asking for my
commissions

1/9/2019 1:33 PM

Latisha Outlet (3472560067)

u have it

1/10/2019 1:24 PM (Viewed 1/10/2019 1:49 PM)

Latisha Outlet (3472560067)

I just threw up a bunch im feeling very nauseous and this is the type of thing that
concerns me
about being in the car business

1/17/2019 8:27 PM (Viewed 1/17/2019 8:29 PM)

Latisha Outlet (3472560067)

You have absolutely no right too take $100 of my
salary money i worked a full week last week and pays one week behind so i should
be receiving another salary check.

1/17/2019 8:30 PM

Latisha Outlet (3472560067)

You fucked me over with my car and i wish you wouldve shown me what you showed
me when i bought my car from
you you guys are just a big fucking scam
and for you to call me your daughter and say you love
me and all this bull shit knowing wtf i been going thru this past month you been gone
not making shit because your team fucking sucks i work 60 hours a week for 7
months straight no days off n december i slacked because you left and everything
went to shit there

You have 90 total messages and 12 total images.

D3296
2/24/2023

A0849

Decipher Chat Conversation with Latisha Outlet                    Page 1 of 4

## Conversation with Latisha Outlet

(13472560067@s.whatsapp.net)

Latisha Outlet (13472560067)
12/20/2018 10:37 AM
  ISAAAC!!! ☺ We miss you! How was your flight?

Latisha Outlet (13472560067)
12/20/2018 10:37 AM
  Awwww i love that picture 😂😂

                                        Isaac Ibrahim (16618868012)
                                        12/20/2018 10:44 AM
                                        (sent, delivered, and opened)

                                                                How are you kid

Latisha Outlet (13472560067)
12/20/2018 10:49 AM
  Good how about yourself?

                                        Isaac Ibrahim (16618868012)
                                        12/20/2018 10:49 AM
                                        (sent, delivered, and opened)

                                                                        Great

Latisha Outlet (13472560067)
12/20/2018 10:50 AM
  Good, Well everything is good we got 2 out yesterday and a dip

Latisha Outlet (13472560067)
12/20/2018 10:51 AM
  Tiffs having a heart attack because Ray was here yesterday and she
  wanted to know if you're aware

                                        Isaac Ibrahim (16518868012)
                                        12/20/2018 10:51 AM
                                        (sent, delivered, and opened)

                                                                         Yes

Latisha Outlet (13472560067)
12/20/2018 10:53 AM
  Oh okay

Latisha Outlet (13472560067)
12/20/2018 10:53 AM
  How is it over there?

                                        Isaac Ibrahim (16618868012)
                                        12/20/2018 10:53 AM
                                        Status is: 5

                                          (display:///C:\Users\Kyle\AppData\Roaming\Apple  ▶ 

                                          Computer\MobileSync\Backup\ba095dbc4494b69ec0fe671d38b21d20054c4e12
                                                    \91\91872ecf24e8f2f4f13b8993d031d6f2e0366455)

Latisha Outlet (13472560067)
12/20/2018 10:56 AM
  Lol well enjoy! Well keep you posted and you can message me now

D3297
2/24/2023

A0850

Isaac Ibrahim (16618868012)
12/20/2018 10:58 AM
(sent, delivered, and opened)

Okay enjoy yourself and sell a lot of cars today

Latisha Outlet (13472560067)
12/20/2018 10:58 AM
I WILL!!

Latisha Outlet (13472560067)
12/24/2018 12:46 PM
HAPPY HOLIDAYS ISAAC!!

Isaac Ibrahim (16618868012)
12/25/2018 12:27 AM
(sent, delivered, and opened)

Happy holidays to you and your family

Latisha Outlet (13472560087)
12/25/2018 8:46 AM
Thank you same to you guys!!

Latisha Outlet (13472560067)
12/27/2018 8:30 PM
Over hearing Guzman talk pisses me off because its bullshit he acta like he
does so much when ali stormed out today cus he wasnt doing shit

Latisha Outlet (13472560067)
12/27/2018 8:32 PM
David was trying to deliver a car and goes to give the stuff to dmv n he
shuts him out and tels him theyre too busy when the guy was waiting an
hour n was sent to dmv for new license then I got this customer looking to
pay cash wants 4 carfax and we have no paper guzman wasnt doing
anything that he couldnt go get us paper but when he did go it literally took
him an hr and a half thats when ali called him like what you doing bro get
over here

Isaac Ibrahim (16618868012)
1/1/2019 5:43 AM
(sent, delivered, and opened)

Happy new year

Latisha Outlet (13472560067)
1/1/2019 8:45 AM
Happy New Year!

Latisha Outlet (13472560067)
1/1/2019 5:27 PM
I love Ali lol Ali should just do finance hes really bomb at it overhearing him
makes me confident we got a deal not much traffic today but 4 out of 7
bought one is tomorrow pick up cus the broker was closed but super solid
deal .. starting the month strongggg 😬 2 are mine 😬

Isaac Ibrahim (16618868012)
1/2/2019 1:41 AM
(sent, delivered, and opened)

Great job kid I will be there in few days

Latisha Outlet (13472560067)
1/3/2019 2:49 PM
(display:///C:\Users\Kyle\AppData\Roaming\Apple
Computer\MobileSync\Backup\ba095dbc4494b69ec0fe671d38b21d20054c4e12
\02\02499727b15e62d471b242c75fefe86410ab8538)

D3298
2/24/2023

A0851



**Latisha Outlet (13472560067)**
1/3/2019 2:49 PM

we're trying to do this for the site

**Latisha Outlet (13472560067)**
1/3/2019 2:49 PM

for tax season

**Latisha Outlet (13472560067)**
1/3/2019 2:50 PM

davids asking what exactly should we write as a disclaimer

**Isaac Ibrahim (16618868012)**
1/3/2019 3:12 PM
(sent, delivered, and opened)

Ask Ali or for weight now copy for hillside auto mall

**Latisha Outlet (13472560067)**
1/5/2019 2:21 PM

 (display:///C:\Users\Kyle\AppData\Roaming\Apple

Computer\MobileSync\Backup\ba095dbc4494b69ec0fe671d38b21d20054c4e12
\e8\e8698bff245177ba7785d7a4168b16cec7bf3a49)

**Isaac Ibrahim (16618868012)**
1/5/2019 2:22 PM
(sent, delivered, and opened)

Nice

**Latisha Outlet (13472560067)**
1/6/2019 12:12 PM

Were you aware that Guzman took the X6 & Then the Range rover last night?

**Isaac Ibrahim (16618868012)**
1/6/2019 12:15 PM
(sent, delivered, and opened)

Yes

**Latisha Outlet (13472560067)**
1/7/2019 10:28 AM

Isaac are you back yet? Can you give me a call?

**Latisha Outlet (13472560067)**
1/7/2019 3:52 PM

I left for the day tomorrow we need to talk because this place has been a shit show since you left.

**Isaac Ibrahim (16618868012)**
1/7/2019 4:04 PM
(sent, delivered, and opened)

Ok

Decipher Chat Conversation with Latisha Outlet                                                                    Page 4 of 4

Latisha Outlet (13472560067)
1/7/2019 4:05 PM
 and you do know that he quit today right and is offering us all a position
 where he's going

                        Isaac Ibrahim (16618868012)
                        1/7/2019 4:06 PM
                        (sent, delivered, and opened)

                                                                                    Who quit

Latisha Outlet (13472560067)
1/7/2019 4:06 PM
 all

                        Isaac Ibrahim (16618868012)
                        1/7/2019 4:07 PM
                        (sent, delivered, and opened)

                                                                                    Why

                        Isaac Ibrahim (16618868012)
                        1/7/2019 4:08 PM
                        (sent, delivered, and opened)

                                                  I just got home from a long flight will talk tomorrow

Latisha Outlet (13472560067)
1/7/2019 4:08 PM
 like I said it's been a shit show

Latisha Outlet (13472560067)
1/7/2019 4:08 PM
 okay see you tmm

D3300
2/24/2023

A0853

Case 1:21-cv-07163-EK-CLP   Document 162-5   Filed 03/29/24   Page 1 of 16 PageID #: 1515

TROY LAW, PLLC
41-25 Kissena Blvd., Suite 103
Flushing, NY 11355
Tel: (718) 762-1324
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
LETICIA FRANCINE STIDHUM,

                                    Plaintiff,

                                                        Case No: 21-cv-07163

            v.                                          **COMPLAINT**

161-10 HILLSIDE AUTO AVE, LLC
        d/b/a Hillside Auto Outlet, and
HILLSIDE AUTO MALL INC
        d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA,
JORY BARON,
RONALD M BARON, and
ANDRIS GUZMAN,
                                    Defendants.
------------------------------------------------------------------x

Plaintiff LETICIA FRANCINE STIDHUM (hereafter referred to as "Plaintiff" or

"STIDHUM"), on behalf of herself and others similarly situated, by and through her attorney, Troy

Law, PLLC, hereby brings this complaint against Defendants 161-10 HILLSIDE AUTO AVE,

LLC d/b/a Hillside Auto Outlet (hereinafter referred to as "Hillside Auto Outlet"); and HILLSIDE

AUTO MALL INC d/b/a Hillside Auto Mall (hereinafter referred to as "Hillside Auto Mall");

ISHAQUE THANWALLA (hereinafter referred to as "THANWALLA"), JORY BARON

(hereinafter referred to as "J. BARON"), RONALD M BARON (hereinafter referred to as R.

BARON), and ANDRIS GUZMAN (hereinafter referred to as "GUZMAN") (hereinafter

collectively referred to as "Defendants"), and alleges as follows:

TTroy                                    1

A0854

## INTRODUCTION

1.      This action is brought to remedy claims of employment discrimination on the basis of sex, pursuant to the Pregnancy Discrimination Act ("PDA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. 2000e *et seq.*; New York State Human Rights Law ("NYSHRL"), NY Exec. § 290 *et seq.*; and New York City Human Rights Law ("NYCHRL") NYC Admin. § 8-107(22), *et seq.* ("NYC Pregnancy Worker Fairness Act").

2.      STIDHUM seeks injunctive and declaratory relief, compensatory and liquidated damages, punitive damages, attorneys' fees, and other appropriate relief.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred in the Eastern District of New York and because Defendants reside in the Eastern District of New York.

4.      This Court has supplemental jurisdiction over STIDHUM's state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c), because a substantial portion of the events giving rise to STIDHUM's claims occurred in the district and the Defendants regularly do business within the district.

## PROCEDURAL HISTORY

6.      STIDHUM filed a timely charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on or about April 19, 2019 (EEOC Charge No. 520-2019-04747).

7.      The EEOC issued a Notice of Right to Sue for STIDHUM on July 19, 2019.

8.      On September 25, 2019, STIDHUM filed her employment discrimination lawsuit

TTrey                                          2

A0855

in the Eastern District of New York challenging Defendants' discriminatory employment practices in violation of Title VII, 42 U.S.C. § 2000e *et seq*. She additionally raised claims under the New York State Human Rights Law ("NYSHRL"), NY Exec. § 290 *et seq.*; and New York City Human Rights Law ("NYCHRL") NYC Admin. § 8-107(22), *et seq.* ("NYC Pregnancy Worker Fairness Act"), E.D.N.Y. 19-cv-5458 (RPK)(VMS).

9.    On June 25, 2021, Judge Kovner issued a Memorandum and Order dismissing the case without prejudice with leave to refile the Complaint "once the EEOC either (i) dismisses her charge and issues her a proper notice of right to sue, or (ii) processes her charge for an additional eighty-nine days and issues her a proper notice of right to sue." *See* Docket Entry No. 30 (Jun. 25, 2021).

10.    On September 30, 2021, 97 days after the dismissal of the case without prejudice, the EEOC issued Plaintiff a Notice of Dismissal and Right to Sue.

## PLAINTIFF

11.    STIDHUM is an adult female resident of the State of New York.

12.    STIDHUM was a successful car salesperson who worked for a little over three (3) months at Hillside Auto.

13.    At all the times relevant to the Complaint, Plaintiff was an "employee" within the meaning of Title VII, and a "person" under both the NYS Huamn Rights Law and the NYC Pregnancy Worker Fairness Act.

## DEFENDANTS

*Corporate Defendant*

14.    Hillside Auto Outlet is a domestic business corporation organized under the laws

A0856

of the State of New York with a principal address at 161-10 Hillside Avenue, Jamaica NY 11432.

15.　　Hillside Auto Mall is a domestic business corporation organized under the laws of the State of New York with a principal address at 150-01 Hillside Avenue, Jamaica, NY 11432.

16.　　At all relevant times, Hillside Auto Outlet and Hillside Auto Mall employed between fifteen (15) and one hundred (100) total employees.

17.　　Hillside Auto Outlet and Hillside Auto Mall are engaged in the business of selling cars, many of which are produced and purchased from outside of New York and sold to customers who are not domiciled in New York.

18.　　Hillside Auto Outlet and Hillside Auto Mall were and are "employers" within the meaning of Title VII and N.Y. Exec. Law § 292(5).

19.　　Hillside Auto Outlet and Hillside Auto Mall are about four blocks away from each other, shared common owners and managers, and shared inventory within the period relevant to this lawsuit.

20.　　Hillside Auto Outlet and Hillside Auto Mall formed a single enterprise (hereinafter referred to as "Hillside Auto"), or alternatively were joint employers of STIDHUM.

*Owner/ Operator Defendants*

21.　　THANWALLA was a part-owner of Hillside Auto Outlet and Hillside Auto Mall, and one of STIDHUM's supervisors at Hillside Auto Outlet.

22.　　J. BARON was a part-owner of Hillside Auto Outlet and Hillside Auto Mall.

23.　　R. BARON was a part-owner of Hillside Auto Outlet and Hillside Auto Mall.

24.　　GUZMAN, as explained more fully below, was a worker in the Finance Department of Hillside Auto Outlet and later a General Manager at Hillside Auto Outlet and a supervisor of

TTroy

4

A0857

STIDHUM at Hillside Auto Outlet.

## STATEMENT OF FACTS

*Discrimination Claims*

25.     On or about May 20, 2018, STIDHUM was interviewed by THANWALLA and non-party General Manager "Jyanique" before being hired by Hillside Auto to work as a car salesperson at Hillside Auto Outlet.

26.     Soon after the interview, STIDHUM commenced employment with Hillside Auto on or about May 20, 2018 as a car salesperson.

27.     At the time she was hired, STIDHUM was promised pay on the following basis:

    a.      Three hundred dollars ($300.00) per week in salary;

    b.      One hundred fifty dollars ($150.00) per car sold in bonus; and

    c.      Five percent (5%) of the price of any car sold which had a price in excess of three thousand five hundred dollars ($3,500.00) in commission.

28.     STIDHUM was supervised by "Jyanique" from on or about May 20, 2018 through on or about August 24, 2018.

29.     On or about August 25, 2018, "Jyanique" was replaced as General Manager by Andris Guzman (hereinafter "Guzman").

30.     Prior to on or about August 25, 2018, Guzman had worked in the Finance Department of Hillside Auto, and continued to work in the Finance Department after becoming General Manager.

31.     In the Finance Department, Guzman reported to non-party Finance Manager "Serge" and THANWALLA.

32.     STIDHUM was supervised by Guzman from on or about August 25, 2018 through

TTroy

5

A0858

on or about January 14, 2019.

33.    STIDHUM received her salary, bonus, and commission from on or about May 20, 2018 through on or about August 24, 2018.

34.    STIDHUM received her salary and bonus, but was denied her commission, from on or about August 25, 2018 through on or about January 14, 2019.

35.    STIDHUM performed her work in an exemplary manner, selling between twenty-five (25) and thirty-one (31) cars per typical month before December 2018.

36.    Indeed, prior to December 2018, STIDHUM was given special trust on the basis of her exemplary work performance.

37.    Specifically, THANWALLA gave STIDHUM his password to the "Dealertrack" program used by Hillside Auto so that she could help run the credit histories of Hillside Auto customers and pre-fill their automobile purchase financing applications.

38.    This became necessary because Guzman, whose job in the Finance Department which was running the credit histories of Hillside Auto customers and pre-filling their automobile purchase financing applications, would frequently keep customers waiting longer than necessary, creating poor customer impressions of Hillside Auto's service.

39.    THANWALLA did not give his "Dealertrack" password to any other salesperson besides STIDHUM.

40.    THANWALLA believed that STIDHUM was a superior worker.

41.    STIDHUM was not warned or disciplined for any reason regarding her work performance or conduct prior to the discrimination described below.

42.    On or about November 23, 2018, STIDHUM learned that she was pregnant.

43.    On or about December 1, 2018, STIDHUM informed THANWALLA, Guzman,

TTroy

6

A0859

and several of her co-workers—including non-party David Mauique and several female employees in the Business Development Center—that she was pregnant.

44. On that day, Plaintiff brought a sonogram image of her baby that she showed to the managers and her coworkers.

45. From on or about early December, 2018 through on or about January 9, 2019, THANWALLA went on vacation.

46. While THANWALLA was on vacation, Guzman was put in charge of the Finance Department.

47. Before STIDHUM announced her pregnancy on or about December 1, 2018, the wait time for Hillside Auto Outlet to speak with the Finance Department was roughly twenty (20) minutes.

48. STIDHUM's wait time was slightly shorter than her coworkers' because rather than making the Finance Department do it, she ran the credit histories of the customers she served and pre-filled their automobile purchase financing applications herself. The only thing the Finance Department had to do for the customers STIDHUM served was to submit their applications to the bank.

49. After she announced her pregnancy, Guzman started making STIDHUM's customers wait for anywhere between forty (40) minutes to sixty (60) minutes.

50. As a result of the longer wait times, the majority of her customers would walk out of Hillside Auto Outlet rather than complete their purchases.

51. Due to Guzman's sabotage, Plaintiff only sold eight (8) to ten (10) cars from on or about December 1, 2018 and through January 14, 2019, her last day of employment.

52. As a result, the STIDHUM's bonus for the weeks from on or about December 1,

A0860

2018 and through January 14, 2019, which was based on the number of cars she sold, dropped significantly. During this time, STIDHUM was also denied her commission.

53. From on or about December 1, 2018 and through January 14, 2019, Plaintiff would constantly call Guzman to ask how long the customers would have to wait for the Finance Department, and when they would be able to speak to somebody at the Finance Department.

54. Guzman would reply that everybody had to wait, or that the process took time.

55. However, the wait time for customers attended to by other salespeople at Hillside Auto Outlet—of whom there were approximately four (4) working at any one time, including David Manique, David Parsons, and "Shaun," each of whom was male and never pregnant—remained about twenty (20) minutes from on or about December 1, 2018 through on or about January 14, 2019.

56. On or about January 10, 2019, the morning of his return from vacation, STIDHUM explained to THANWALLA how Guzman had sabotaged her while he was gone.

57. THANWALLA said he would give STIDHUM a "little bonus" of two hundred dollars ($200.00) and thought that would cure everything.

58. THANWALLA took no action to discipline Guzman or to restore STIDHUM's usual wait times.

59. From January 10, 2019 through January 14, 2019, STIDHUM's wait times did not improve, but rather remained at about forty (40) to sixty (60) minutes.

60. Accordingly, on January 14, 2019, STIDHUM quit.

61. THANWALLA did not give STIDHUM her promised "little bonus" of two hundred dollars ($200.00).

62. Accordingly, on January 24, 2019, STIDHUM texted Jory Baron to inform him she

TTroy

8

A0861

had not been paid.

63.     Later on January 24, 2019, Jory Baron called STIDHUM back. STIDHUM calmly explained how she had been sabotaged, why she had quit, and how THANWALLA still owed her money. Jory Baron replied that STIDHUM should "stop ranting," tell him how much STIDHUM felt she was owed, and that he would confirm with THANWALLA and call STIDHUM back the following Monday.

64.     Jory Baron did not call STIDHUM back the following Monday, January 28, 2019, or any time thereafter.

65.     There are no other pregnant workers at Hillside Auto.

## STATEMENT OF CLAIMS

### COUNT I.
### [Discrimination on the Basis of Sex in Violation of Title VII and the PDA
### Brought against Hillside Auto Outlet and Hillside Auto Mall]

66.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

67.     Title VII as codified within 42 U.S.C. § 2000e-2 prohibits discrimination based upon sex. Further, the PDA as codified at 42 U.S.C. § 2000e(k), explicitly prohibits discrimination based on pregnancy, childbirth, and related medical conditions.

68.     Defendants discriminated against Plaintiff because of her pregnancy in violation of the PDA and Title VII.

69.     As a proximate result of the discrimination described herein, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings and other employment benefits.

70.     As a proximate result of the discrimination described herein, Plaintiff has suffered

TTroy

9

A0862

and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages in an amount to be determined at trial.

71. The conduct described herein was done in conscious disregard of Plaintiff's rights.

72. Hillside Auto Outlet and Hillside Auto Mall are vicariously liable for the conduct of GUZMAN inasmuch as his conduct was in the character of a supervisor and was endorsed or ignored by the owners, who also ignored and failed to take corrective action with respect to Plaintiff's complaints.

73. Accordingly, Plaintiff is entitled to economic, compensatory and punitive damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

<div align="center">

**COUNT II.**
**[Discrimination on the Basis of Disability in Violation of the NYSHRL**
**Brought against Defendants]**

</div>

74. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

75. Section 296 of the NYSHRL prohibits unlawful discriminatory employment practices on the basis of disability.

76. Plaintiff suffered from a disability as defined by the NYSHRL.

77. Defendants violated the NYSHRL by discriminating against the Plaintiff by taking adverse actions against her based on her disability or perceived disability.

78. As a result of Defendants' intentional and willful disability discrimination, Plaintiff has suffered substantial emotional and financial harm.

79. Accordingly, Plaintiff is entitled to economic and compensatory damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

A0863

Case: 25-490, 08/06/2025, DktEntry: 47.1, Page 272 of 277

## COUNT III.
### [Discrimination on the Basis of Sex in Violation of the NYSHRL
### Brought against Defendants]

80.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

81.    Section 296 of the NYSHRL prohibits unlawful discriminatory employment practices based on sex which includes pregnancy and medical conditions relating to pregnancy.

82.    By the acts and practices described above, Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of pregnancy in violation of the Executive Law.

83.    Defendants have unlawfully discriminated against the Plaintiff on the basis of her sex in violation of NYSHRL § 296.

84.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered loss of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, embarrassment and humiliation.

85.    Accordingly, Plaintiff is entitled to economic and compensatory damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

## COUNT IV.
### [Discrimination on the Basis of Pregnancy in Violation of NYCHRL
### Brought against Defendants]

86.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87.    By the acts and practices described above, Defendant discriminated against Plaintiff in the terms and conditions of her employment on the basis of pregnancy in violation of Discrimination on the Basis of Pregnancy, Local Law No. 78 (2013) and N.Y.C. Admin Code §8-107(2).

TTroy

11

A0864

88.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered loss of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, embarrassment and humiliation.

89.     Accordingly, Plaintiff is entitled to economic and compensatory damages in an amount to be determined at trial, in addition to interest, reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

90.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on the behalf of the Collective Plaintiffs, respectfully requests that this Court enter a judgment providing the following relief:

a.     A declaratory judgment that the practices complained of herein are unlawful under Title VII, the NYSHRL, and the NYCHRL;

b.     An injunction against Corporate Defendants, its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of unlawful practices and policies set forth herein;

c.     An award of back pay, front pay, and attorneys' fees to Plaintiff and other benefits they would have received but for Defendants' unlawful conduct;

d.     An award of compensatory damages to Plaintiff for mental anguish, pain and suffering, and humiliation;

e.     An award of punitive damages to Plaintiff under the PDA and Title VII;

A0865

f.       A judgment against Defendant for compensatory damages for retaliation under the ADEA, with liquidated damages in an amount equal to the compensatory damages awarded;

g.       An award of costs and expenses of this action together with reasonable attorneys' and expert fees;

h.       An award of prejudgment and post-judgment fees; and

i.       Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated: Flushing, New York
       December 29, 2021

TROY LAW, PLLC
*Attorneys for the Plaintiff*
 /s/ John Troy
John Troy
Aaron Schweitzer
Tiffany Troy
41-25 Kissena Boulevard, Suite 103
Flushing, NY 11355
Tel: (718) 762-1324
Email: johntroy@troypllc.com

13

A0866

## DOCUMENT PRESERVATION DEMAND

Plaintiff(s) hereby demands that defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

/s/ John Troy
John Troy
TROY LAW, PLLC
41-25 Kissena Boulevard, Suite 119
Flushing, NY 11355
Tel: (718) 762-1324
Email: johntroy@troypllc.com

A0867

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for ONE THIRD (1/3) or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

/s/ John Troy
John Troy
TROY LAW, PLLC
41-25 Kissena Boulevard, Suite 119
Flushing, NY 11355
Tel: (718) 762-1324
Email: johntroy@troypllc.com

A0868



Under Title VII, taking **adverse actions** (firing and demoting, stalking and harassing) against **Plaintiff(s)** in retaliation for having brought this Complaint is **ILLEGAL** and **PUNISHABLE BY LAW.**

# Consult your attorney.

A0869

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 4 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 1 of 65 PageID #: 1531

# Terminate employee - Leticia Stidhum



**Hire date**

05/22/2018

**Length of service**
7 months 23 days

**Status**

Terminated

**Termination date** *

01/14/2019

**Last day worked**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2214558 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

Period Starting: 05/22/2018
Period Ending: 05/28/2018
Pay Date: 06/01/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:     Tax Override:
Federal:    1              Federal:
State:      1              State:
Local:      1              Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 780.00 |
| **Gross Pay** | | | **$300.00** | **$1,080.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | −14.90 | 14.90 |
| Social Security | −18.60 | 18.60 |
| Medicare | −4.35 | 4.35 |
| New York State Income | −5.54 | 5.54 |
| New York Paid Family Leave | −0.38 | 0.38 |
| New York City R Local | −4.10 | 4.10 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | −0.60 | 0.60 |

| **Net Pay** | **$251.53** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2214558
Pay Date:               06/01/2018

Pay to the
order of:     Leticia F Stidhum
This amount:  TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1187**

A0871

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2214559 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 05/22/2018
Period Ending: 05/28/2018
Pay Date: 06/01/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances: Tax Override:
Federal: 1 Federal:
State: 1 State:
Local: 1 Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 780.00 | 780.00 |
| **Gross Pay** | | | **$780.00** | **$1,080.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -71.82 | 86.72 |
| Social Security | -48.36 | 66.96 |
| Medicare | -11.31 | 15.66 |
| New York State Income | -33.14 | 38.68 |
| New York Paid Family Leave | -0.98 | 1.36 |
| New York City R Local | -22.69 | 26.79 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.20 |

| **Net Pay** | **$591.10** | |
|---|---|---|

Your federal taxable wages this period are $780.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2214559
Pay Date: 06/01/2018

Pay to the order of: **Leticia F Stidhum**

This amount: FIVE HUNDRED NINETY ONE AND 10/100

THIS IS NOT A CHECK

$591.10

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1188**

**A0872**

Case 1:21-cv-07163-OEM-LB Document 102-6 Filed 03/27/24 Page 4 of 65 PageID #: 1534

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2231441 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 05/29/2018
Period Ending: 06/04/2018
Pay Date: 06/08/2018

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 1 | Federal: | |
| State: | 1 | State: | |
| Local: | 1 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 0.00 | | 300.00 | 600.00 |
| Commission | | | 0.00 | 1205.00 |
| **Gross Pay** | | | **$300.00** | **$1,805.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 101.62 |
| Social Security | -18.60 | 85.56 |
| Medicare | -4.35 | 20.01 |
| New York State Income | -5.54 | 44.22 |
| New York Paid Family Leave | -0.38 | 1.74 |
| New York City R Local | -4.10 | 30.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |

| **Net Pay** | **$251.53** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2231441
Pay Date: 06/08/2018

Pay to the order of: Leticia F Stidhum

This amount: TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1189**

A0873

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2231442 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:   05/29/2018
Period Ending:     06/04/2018
Pay Date:          06/08/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:         Tax Override:
  Federal:   1        Federal:
  State:     1        State:
  Local:     1        Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 425.00 | 1205.00 |
| **Gross Pay** | | | **$425.00** | **$1,805.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -29.22 | 130.84 |
| Social Security | -26.35 | 111.91 |
| Medicare | -6.16 | 26.17 |
| New York State Income | -11.33 | 55.55 |
| New York Paid Family Leave | -0.54 | 2.28 |
| New York City R Local | -8.30 | 39.19 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$342.50** | |

Your federal taxable wages this period are  $425.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2231442
Pay Date:              06/08/2018

Pay to the
order of:      Leticia F Stidhum

This amount:   THREE HUNDRED FORTY TWO AND 50/100                    $342.50

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1190**

**A0874**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2243104 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:   06/05/2018
Period Ending:    06/11/2018
Pay Date:         06/15/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
   Federal:   1                    Federal:
   State:     1                    State:
   Local:     1                    Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 900.00 |
| Commission | | | 0.00 | 1505.00 |
| Gross Pay | | | $300.00 | $2,405.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 145.74 |
| Social Security | -18.60 | 130.51 |
| Medicare | -4.35 | 30.52 |
| New York State Income | -5.54 | 61.09 |
| New York Paid Family Leave | -0.38 | 2.66 |
| New York City R Local | -4.10 | 43.29 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2243104
Pay Date:               06/15/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1191**

**Earnings Statement** 

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2243105 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Period Starting: 06/05/2018
Period Ending: 06/11/2018
Pay Date: 06/15/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:      Tax Override:
   Federal:     1          Federal:
   State:        1          State:
   Local:    .  1          Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 900.00 |
| Commission | | 0.00 | 300.00 | 1505.00 |
| **Gross Pay** | | | **$300.00** | **$2,405.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 160.64 |
| Social Security | -18.60 | 149.11 |
| Medicare | -4.35 | 34.87 |
| New York State Income | -5.54 | 66.63 |
| New York Paid Family Leave | -0.38 | 3.04 |
| New York City R Local | -4.10 | 47.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |
| **Net Pay** | **$251.53** | |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2243105
Pay Date: 06/15/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$251.53

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1192**

A0876

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2256576 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| Period Starting: | 06/12/2018 |
|---|---|
| Period Ending: | 06/18/2018 |
| Pay Date: | 06/22/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
  Federal:   1       Federal:
  State:   1       State:
  Local:   1       Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1200.00 |
| Commission | | | 0.00 | 2165.00 |
| **Gross Pay** | | | **$300.00** | **$3,365.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 175.54 |
| Social Security | -18.60 | 167.71 |
| Medicare | -4.35 | 39.22 |
| New York State Income | -5.54 | 72.17 |
| New York Paid Family Leave | -0.38 | 3.42 |
| New York City R Local | -4.10 | 51.49 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 4.20 |

| **Net Pay** | **$251.53** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2256576
Pay Date:   06/22/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK
VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1193**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2274452 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

ADP

Period Starting: 06/19/2018
Period Ending: 06/25/2018
Pay Date: 06/29/2018

Business Phone: 732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:      Tax Override:
  Federal:    1      Federal:
  State:      1      State:
  Local:      1      Local:
Social Security Number:     XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1500.00 |
| Commission | | | 0.00 | 2780.00 |
| | | | | |
| Gross Pay | | | $300.00 | $4,280.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 247.86 |
| Social Security | -18.60 | 227.23 |
| Medicare | -4.35 | 53.14 |
| New York State Income | -5.54 | 103.25 |
| New York Paid Family Leave | -0.38 | 4.63 |
| New York City R Local | -4.10 | 73.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 5.40 |

| Net Pay | $251.53 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2274452
Pay Date:              06/29/2018

Pay to the
order of:   Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100                    $251.53

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1194**

A0878

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 10 of 65 PageID #: 1540

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2274453 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 06/19/2018
Period Ending: 06/25/2018
Pay Date: 06/29/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:    Tax Override:
Federal: 1    Federal:
State: 1    State:
Local: 1    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 1500.00 |
| Commission | | 0.00 | 615.00 | 2780.00 |
| **Gross Pay** | | | **$615.00** | **$4,280.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -52.02 | 299.88 |
| Social Security | -38.13 | 265.36 |
| Medicare | -8.92 | 62.06 |
| New York State Income | -22.69 | 125.94 |
| New York Paid Family Leave | -0.77 | 5.40 |
| New York City R Local | -15.84 | 89.14 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.00 |

| **Net Pay** | **$476.03** |
|---|---|

Your federal taxable wages this period are $615.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2274453
Pay Date: 06/29/2018

Pay to the order of:   Leticia F Stidhum

This amount:   FOUR HUNDRED SEVENTY SIX AND 03/100

THIS IS NOT A CHECK

$476.03

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1195**

**A0879**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2287432 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 06/26/2018 |
| Period Ending: | 07/02/2018 |
| Pay Date: | 07/06/2018 |

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:          Tax Override:
  Federal:    1          Federal:
  State:    1          State:
  Local:    1          Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 1800.00 |
| Commission | | | 0.00 | 3435.00 |
| **Gross Pay** | | | **$300.00** | **$5,235.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 314.78 |
| Social Security | -18.60 | 283.96 |
| Medicare | -4.35 | 66.41 |
| New York State Income | -5.54 | 131.48 |
| New York Paid Family Leave | -0.38 | 5.78 |
| New York City R Local | -4.10 | 93.24 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 6.60 |

| **Net Pay** | **$251.53** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2287432 |
| Pay Date: | 07/06/2018 |

Pay to the
order of:    Leticia F Stidhum
This amount:    TWO HUNDRED FIFTY ONE AND 53/100

**THIS IS NOT A CHECK**

$251.53

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1196**

**Company Code** **Loc/Dept** **Number** **Page**
RB7QLM 24008135 01/200  2287433 1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

# Earnings Statement

ADP

Period Starting:  06/26/2018
Period Ending:   07/02/2018
Pay Date:     07/06/2018

Business Phone:   732-979-6956

Taxable Marital Status:  Single
Exemptions/Allowances:   Tax Override:
  Federal:  1      Federal:
  State:   1      State:
  Local:   1      Local:
Social Security Number:  XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|----------|------|-------------|-------------|--------------|
| Regular | | | 0.00 | 1800.00 |
| Commission | | 0.00 | 655.00 | 3435.00 |
| **Gross Pay** | | | **$655.00** | **$5,235.00** |

| Statutory Deductions | this period | year to date |
|----------------------|-------------|--------------|
| Federal Income | -56.82 | 371.60 |
| Social Security | -40.61 | 324.57 |
| Medicare | -9.50 | 75.91 |
| New York State Income | -25.22 | 156.70 |
| New York Paid Family Leave | -0.83 | 6.61 |
| New York City R Local | -17.50 | 110.74 |

| Voluntary Deductions | this period | year to date |
|----------------------|-------------|--------------|
| New York voluntary disability | -0.60 | 7.20 |

| Net Pay | $503.92 |
|---------|---------|

Your federal taxable wages this period are $655.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2287433
Pay Date:      07/06/2018

Pay to the order of:
**Leticia F Stidhum**

This amount:  FIVE HUNDRED THREE AND 92/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$503.92



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1197**

A0881

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 13 of 65 PageID #: 1543

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2299782 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 07/03/2018 |
|---|---|
| Period Ending: | 07/09/2018 |
| Pay Date: | 07/13/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | Tax Override: | |
|---|---|---|---|
| Exemptions/Allowances: | | | |
| Federal: | 1 | Federal: | |
| State: | 1 | State: | |
| Local: | 1 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 2100.00 |
| Commission | | | 0.00 | 3435.00 |
| **Gross Pay** | | | **$300.00** | **$5,535.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 386.50 |
| Social Security | -18.60 | 343.17 |
| Medicare | -4.35 | 80.26 |
| New York State Income | -5.54 | 162.24 |
| New York Paid Family Leave | -0.38 | 6.99 |
| New York City R Local | -4.10 | 114.84 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 7.80 |

| **Net Pay** | **$251.53** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2299782 |
|---|---|
| Pay Date: | 07/13/2018 |

Pay to the
order of:      Leticia F Stidhum

This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1198**

A0882

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2313208 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 07/10/2018 |
| Period Ending: | 07/16/2018 |
| Pay Date: | 07/20/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
   Federal:   1        Federal:
   State:   1        State:
   Local:   1        Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 2400.00 |
| Commission | | | 0.00 | 4335.00 |
| **Gross Pay** | | | **$300.00** | **$6,735.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 401.40 |
| Social Security | -18.60 | 361.77 |
| Medicare | -4.35 | 84.61 |
| New York State Income | -5.54 | 167.78 |
| New York Paid Family Leave | -0.38 | 7.37 |
| New York City R Local | -4.10 | 118.94 |
| **Voluntary Deductions** | **this period** | **year to date** |
| New York voluntary disability | -0.60 | 8.40 |
| **Net Pay** | **$251.53** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2313208
Pay Date:   07/20/2018

Pay to the
order of:        Leticia F Stidhum
This amount:

TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

$251.53

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1199**

**A0883**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2313209 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

ADP

| | |
|---|---|
| Period Starting: | 07/10/2018 |
| Period Ending: | 07/16/2018 |
| Pay Date: | 07/20/2018 |

Business Phone:   732-979-6956

| | | |
|---|---|---|
| Taxable Marital Status: | Single | |
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 1 | Federal: |
| State: | 1 | State: |
| Local: | 1 | Local: |
| Social Security Number: | | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 2400.00 |
| Commission | | 0.00 | 900.00 | 4335.00 |
| **Gross Pay** | | | **$900.00** | **$6,735.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -86.70 | 488.10 |
| Social Security | -55.80 | 417.57 |
| Medicare | -13.05 | 97.66 |
| New York State Income | -40.73 | 208.51 |
| New York Paid Family Leave | -1.13 | 8.50 |
| New York City R Local | -27.67 | 146.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.00 |

| **Net Pay** | **$674.32** |
|---|---|

Your federal taxable wages this period are $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

| | | |
|---|---|---|
| Payroll Check Number: | 2313209 | |
| Pay Date: | 07/20/2018 | |

63-8413/2670

Pay to the
order of:     Leticia F Stidhum

This amount:   SIX HUNDRED SEVENTY FOUR AND 32/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$674.32



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1200**

A0884

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 16 of 65 PageID #: 1546

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2328014 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

Period Starting:    07/17/2018
Period Ending:     07/23/2018
Pay Date:             07/27/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:      Tax Override:
  Federal:    1            Federal:
  State:       1            State:
  Local:       1            Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 2700.00 |
| Commission | | | 0.00 | 5735.00 |
| **Gross Pay** | | | **$300.00** | **$8,435.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 503.00 |
| Social Security | -18.60 | 436.17 |
| Medicare | -4.35 | 102.01 |
| New York State Income | -5.54 | 214.05 |
| New York Paid Family Leave | -0.38 | 8.88 |
| New York City R Local | -4.10 | 150.71 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 9.60 |

| **Net Pay** | **$251.53** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2328014
Pay Date:                      07/27/2018

Pay to the order of:    Leticia F Stidhum
This amount:    TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

$251.53

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1201**

A0885

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 17 of 65 PageID #: 1547

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2328015 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**



Period Starting: 07/17/2018
Period Ending: 07/23/2018
Pay Date: 07/27/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:       Tax Override:
    Federal:   1           Federal:
    State:     1           State:
    Local:     1           Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular |  |  | 0.00 | 2700.00 |
| Commission |  | 0.00 | 1400.00 | 5735.00 |
| **Gross Pay** |  |  | **$1,400.00** | **$8,435.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -196.70 | 699.70 |
| Social Security | -86.80 | 522.97 |
| Medicare | -20.30 | 122.31 |
| New York State Income | -72.38 | 286.43 |
| New York Paid Family Leave | -1.76 | 10.64 |
| New York City R Local | -48.56 | 199.27 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.20 |

| **Net Pay** | **$972.90** |
|---|---|

Your federal taxable wages this period are $1,400.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2328015
Pay Date: 07/27/2018

Pay to the order of:     Leticia F Stidhum

This amount:     NINE HUNDRED SEVENTY TWO AND 90/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$972.90



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1202**

A0886

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2344174 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 07/24/2018 |
|---|---|
| Period Ending: | 07/30/2018 |
| Pay Date: | 08/03/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:        Tax Override:
   Federal:   1              Federal:
   State:      1              State:
   Local:      1              Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3000.00 |
| Commission | | | 0.00 | 6185.00 |
| **Gross Pay** | | | **$300.00** | **$9,185.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -14.90 | 714.60 |
| Social Security | -18.60 | 541.57 |
| Medicare | -4.35 | 126.66 |
| New York State Income | -5.54 | 291.97 |
| New York Paid Family Leave | -0.38 | 11.02 |
| New York City R Local | -4.10 | 203.37 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 10.80 |

| **Net Pay** | **$251.53** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2344174 |
|---|---|
| Pay Date: | 08/03/2018 |

Pay to the
order of:   Leticia F Stidhum
This amount:   TWO HUNDRED FIFTY ONE AND 53/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$251.53



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1203**

A0887

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2344175 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement



Period Starting:       07/24/2018
Period Ending:        07/30/2018
Pay Date:                 08/03/2018

Business Phone:      732-979-6956

Taxable Marital Status:      Single
Exemptions/Allowances:         Tax Override:
   Federal:      1              Federal:
   State:         1              State:
   Local:         1              Local:
Social Security Number:       XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3000.00 |
| Commission | | 0.00 | 450.00 | 6185.00 |
| **Gross Pay** | | | **$450.00** | **$9,185.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -32.22 | 746.82 |
| Social Security | -27.90 | 569.47 |
| Medicare | -6.52 | 133.18 |
| New York State Income | -12.79 | 304.76 |
| New York Paid Family Leave | -0.57 | 11.59 |
| New York City R Local | -9.28 | 212.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 11.40 |

| **Net Pay** | **$360.12** |
|---|---|

Your federal taxable wages this period are  $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:      2344175
Pay Date:                           08/03/2018

Pay to the
order of:        Leticia F Stidhum
This amount:    THREE HUNDRED SIXTY AND 12/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$360.12



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

### D1204

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2356900 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting: 07/31/2018
Period Ending: 08/06/2018
Pay Date: 08/10/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:   3        Federal:
  State:     3        State:
  Local:     3        Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3300.00 |
| Commission | | | 0.00 | 6485.00 |
| Gross Pay | | | $300.00 | $9,785.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 588.07 |
| Medicare | -4.35 | 137.53 |
| New York State Income | -4.00 | 308.76 |
| New York Paid Family Leave | -0.38 | 11.97 |
| New York City R Local | -3.00 | 215.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 12.00 |

| Net Pay | $269.07 |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2356900
Pay Date: 08/10/2018

Pay to the order of: Leticia F Stidhum
This amount: TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1205**

A0889

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2356901 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 07/31/2018 |
| Period Ending: | 08/06/2018 |
| Pay Date: | 08/10/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:          Tax Override:
Federal:     3              Federal:
State:       3              State:
Local:       3              Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3300.00 |
| Commission | | 0.00 | 300.00 | 6485.00 |
| **Gross Pay** | | | **$300.00** | **$9,785.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 606.67 |
| Medicare | -4.35 | 141.88 |
| New York State Income | -4.00 | 312.76 |
| New York Paid Family Leave | -0.38 | 12.35 |
| New York City R Local | -3.00 | 218.65 |
| **Voluntary Deductions** | **this period** | **year to date** |
| New York voluntary disability | -0.60 | 12.60 |
| **Net Pay** | **$269.07** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2356901 |
| Pay Date: | 08/10/2018 |

Pay to the
order of:     Leticia F Stidhum
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1206**

A0890

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7/QLM 24008135 | 01/200 | 2384431 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 08/14/2018
Period Ending: 08/20/2018
Pay Date: 08/24/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3
State: 3
Local: 3
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 3900.00 |
| Commission | | | 0.00 | 7935.00 |
| **Gross Pay** | | | **$300.00** | **$11,835.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 746.82 |
| Social Security | -18.60 | 643.87 |
| Medicare | -4.35 | 150.58 |
| New York State Income | -4.00 | 320.76 |
| New York Paid Family Leave | -0.38 | 13.11 |
| New York City R Local | -3.00 | 224.65 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 13.80 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2384431
Pay Date: 08/24/2018

Pay to the order of: Leticia F Stidhum
This amount: TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1207**

A0891

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 23 of 65 PageID #: 1553

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R87 CLM 24008135 | 01/200 | 2384432 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 08/14/2018 |
|---|---|
| Period Ending: | 08/20/2018 |
| Pay Date: | 08/24/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
| | | Tax Override: | |
|---|---|---|---|
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |

Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | | 3900.00 |
| Commission | | 0.00 | 1450.00 | 7935.00 |
| **Gross Pay** | | | **$1,450.00** | **$11,835.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -172.59 | 919.41 |
| Social Security | -89.90 | 733.77 |
| Medicare | -21.03 | 171.61 |
| New York State Income | -73.11 | 393.87 |
| New York Paid Family Leave | -1.83 | 14.94 |
| New York City R Local | -49.05 | 273.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.40 |

| **Net Pay** | **$1,041.89** |
|---|---|

Your federal taxable wages this period are  $1,450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2384432
Pay Date:   08/24/2018

Pay to the
order of:      Leticia F Stidhum
This amount:   ONE THOUSAND FORTY ONE AND 89/100

THIS IS NOT A CHECK

$1,041.89

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

order of:
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

JPMorgan Chase Bank,
N.A.
162 Fifth Avenue
New York, NY 10010

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1208**

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 24 of 65 PageID #: 1554

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2384432 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

| Period Starting: | 08/14/2018 |
|---|---|
| Period Ending: | 08/20/2018 |
| Pay Date: | 08/24/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 3900.00 |
| Commission | | 0.00 | 1450.00 | 7935.00 |
| **Gross Pay** | | | **$1,450.00** | **$11,835.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -172.59 | 919.41 |
| Social Security | -89.90 | 733.77 |
| Medicare | -21.03 | 171.61 |
| New York State Income | -73.11 | 393.87 |
| New York Paid Family Leave | -1.83 | 14.94 |
| New York City R Local | -49.05 | 273.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 14.40 |

| **Net Pay** | **$1,041.89** |
|---|---|

Your federal taxable wages this period are  $1,450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2384432 |
|---|---|
| Pay Date: | 08/24/2018 |

Pay to the order of:  Leticia F Stidhum

This amount:  ONE THOUSAND FORTY ONE AND 89/100

**THIS IS NOT A CHECK**

$1,041.89

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1209**

A0893

Case 1:21-cv-07163-OEM-LB  Document 102-6  Filed 03/27/24  Page 25 of 65 PageID #: 1555

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2398317 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 08/21/2018 |
| Period Ending: | 08/27/2018 |
| Pay Date: | 08/31/2018 |

Business Phone:  732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4200.00 |
| Commission | | | 0.00 | 9135.00 |
| **Gross Pay** | | | **$300.00** | **$13,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 919.41 |
| Social Security | -18.60 | 752.37 |
| Medicare | -4.35 | 175.96 |
| New York State Income | -4.00 | 397.87 |
| New York Paid Family Leave | -0.38 | 15.32 |
| New York City R Local | -3.00 | 276.70 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 15.00 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

| Payroll Check Number: | 2398317 |
|---|---|
| Pay Date: | 08/31/2018 |

Pay to the order of:  Leticia F Stidhum

This amount:  TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1210**

A0894

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 26 of 65 PageID #: 1556

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2398318 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| Period Starting: | 08/21/2018 |
|---|---|
| Period Ending: | 08/27/2018 |
| Pay Date: | 08/31/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | Tax Override: | |
|---|---|---|---|
| Exemptions/Allowances: | | | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 4200.00 |
| Commission | | 0.00 | 1200.00 | 9135.00 |
| **Gross Pay** | | | **$1,200.00** | **$13,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -117.59 | 1037.00 |
| Social Security | -74.40 | 826.77 |
| Medicare | -17.40 | 193.36 |
| New York State Income | -57.29 | 455.16 |
| New York Paid Family Leave | -1.51 | 16.83 |
| New York City R Local | -38.52 | 315.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 15.60 |

| **Net Pay** | **$892.69** | |
|---|---|---|

Your federal taxable wages this period are  $1,200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2398318 |
|---|---|
| Pay Date: | 08/31/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   EIGHT HUNDRED NINETY TWO AND 69/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$892.69



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1211**

A0895

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2411655 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 08/28/2018
Period Ending: 09/03/2018
Pay Date: 09/07/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:   Tax Override:
Federal:   3   Federal:
State:   3   State:
Local:   3   Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4500.00 |
| Commission | | | 0.00 | 9285.00 |
| **Gross Pay** | | | **$300.00** | **$13,785.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1037.00 |
| Social Security | -18.60 | 845.37 |
| Medicare | -4.35 | 197.71 |
| New York State Income | -4.00 | 459.16 |
| New York Paid Family Leave | -0.38 | 17.21 |
| New York City R Local | -3.00 | 318.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.20 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:   2411655
Pay Date:   09/07/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1212**

A0896

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 28 of 65 PageID #: 1558

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2411656 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:   08/28/2018
Period Ending:   09/03/2018
Pay Date:   09/07/2018

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
  Federal:   3     Tax Override:
  State:   3     Federal:
  Local:   3     State:
Social Security Number:   XXX-XX-XXXX     Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 4500.00 |
| Commission | | 0.00 | 150.00 | 9285.00 |
| **Gross Pay** | | | **$150.00** | **$13,785.00** |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | 0.00 | 1037.00 |
| Social Security | | -9.30 | 854.67 |
| Medicare | | -2.17 | 199.88 |
| New York State Income | | 0.00 | 459.16 |
| New York Paid Family Leave | | -0.19 | 17.40 |
| New York City R Local | | 0.00 | 318.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 16.80 |

| **Net Pay** | **$137.74** | |
|---|---|---|

Your federal taxable wages this period are  $150.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2411656
Pay Date:   09/07/2018

Pay to the order of:   Leticia F Stidhum
This amount:   ONE HUNDRED THIRTY SEVEN AND 74/100

THIS IS NOT A CHECK

$137.74

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

D1213

A0897

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2425988 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting: 09/04/2018
Period Ending: 09/10/2018
Pay Date: 09/14/2018

Business Phone: 732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 4800.00 |
| Commission | | | 0.00 | 9735.00 |
| **Gross Pay** | | | **$300.00** | **$14,535.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1037.00 |
| Social Security | -18.60 | 873.27 |
| Medicare | -4.35 | 204.23 |
| New York State Income | -4.00 | 463.16 |
| New York Paid Family Leave | -0.38 | 17.78 |
| New York City R Local | -3.00 | 321.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 17.40 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2425988
Pay Date: 09/14/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1214**

A0898

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2425989 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 09/04/2018
Period Ending: 09/10/2018
Pay Date: 09/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3
State: 3
Local: 3
Social Security Number: XXX-XX-XXXX

Tax Override:
Federal:
State:
Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 4800.00 |
| Commission | | 0.00 | 450.00 | 9735.00 |
| **Gross Pay** | | | **$450.00** | **$14,535.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1050.94 |
| Social Security | -27.90 | 901.17 |
| Medicare | -6.53 | 210.76 |
| New York State Income | -10.62 | 473.78 |
| New York Paid Family Leave | -0.57 | 18.35 |
| New York City R Local | -7.77 | 328.99 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 18.00 |

| **Net Pay** | **$382.07** |
|---|---|

Your federal taxable wages this period are $450.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2425989
Pay Date: 09/14/2018

Pay to the order of: Leticia F Stidhum

This amount: THREE HUNDRED EIGHTY TWO AND 07/100

$382.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1215**

A0899

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2439114 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 09/11/2018 |
| Period Ending: | 09/17/2018 |
| Pay Date: | 09/21/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | $100.00 |
| Commission | | | 0.00 | 10185.00 |
| **Gross Pay** | | | **$300.00** | **$15,285.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1050.94 |
| Social Security | -18.60 | 919.77 |
| Medicare | -4.35 | 215.11 |
| New York State Income | -4.00 | 477.78 |
| New York Paid Family Leave | -0.38 | 18.73 |
| New York City R Local | -3.00 | 331.99 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 18.60 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2439114 |
|---|---|
| Pay Date: | 09/21/2018 |

Pay to the order of:    Leticia F Stidhum

This amount:    TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1216**

A0900

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2439115 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:   09/11/2018
Period Ending:   09/17/2018
Pay Date:   09/21/2018

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | $100.00 |
| Commission | | 0.00 | 450.00 | 10185.00 |
| **Gross Pay** | | | **$450.00** | **$15,285.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1064.88 |
| Social Security | -27.90 | 947.67 |
| Medicare | -6.52 | 221.63 |
| New York State Income | -10.62 | 488.40 |
| New York Paid Family Leave | -0.57 | 19.30 |
| New York City R Local | -7.77 | 339.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 19.20 |

| **Net Pay** | **$382.08** |
|---|---|

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2439115
Pay Date:   09/21/2018

Pay to the order of:   Leticia F Stidhum

This amount:   THREE HUNDRED EIGHTY TWO AND 08/100

$382.08

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1217**

**A0901**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2452874 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting: 09/18/2018
Period Ending: 09/24/2018
Pay Date: 09/28/2018

Business Phone: 732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 5400.00 |
| Commission | | | 0.00 | 10935.00 |
| **Gross Pay** | | | **$300.00** | **$16,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1064.88 |
| Social Security | -18.60 | 966.27 |
| Medicare | -4.35 | 225.98 |
| New York State Income | -4.00 | 492.40 |
| New York Paid Family Leave | -0.38 | 19.68 |
| New York City R Local | -3.00 | 342.76 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 19.80 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:  2452874
Pay Date:  09/28/2018

Pay to the order of:  Leticia F Stidhum

This amount:  TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1218**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2452875 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

# Earnings Statement



| | |
|---|---|
| Period Starting: | 09/18/2018 |
| Period Ending: | 09/24/2018 |
| Pay Date: | 09/28/2018 |

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:              Tax Override:
   Federal:   3          Federal:
   State:      3          State:
   Local:      3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 5400.00 |
| Commission | | 0.00 | 750.00 | 10935.00 |
| **Gross Pay** | | | **$750.00** | **$16,335.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -49.07 | 1113.95 |
| Social Security | -46.50 | 1012.77 |
| Medicare | -10.88 | 236.86 |
| New York State Income | -28.80 | 521.20 |
| New York Paid Family Leave | -0.95 | 20.63 |
| New York City R Local | -19.85 | 362.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 20.40 |

| **Net Pay** | **$593.35** | |
|---|---|---|

Your federal taxable wages this period are  $750.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2452875 |
|---|---|
| Pay Date: | 09/28/2018 |

Pay to the order of:      Leticia F Stidhum

This amount:   FIVE HUNDRED NINETY THREE AND 35/100

**THIS IS NOT A CHECK**

$593.35

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1219**

**A0903**

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 35 of 65 PageID #: 1565

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2469044 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement 

| | |
|---|---|
| Period Starting: | 09/25/2018 |
| Period Ending: | 10/01/2018 |
| Pay Date: | 10/05/2018 |

Business Phone:     732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:          Tax Override:
Federal:     3          Federal:
State:     3          State:
Local:     3          Local:
Social Security Number:     XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 5700.00 |
| Commission | | | 0.00 | 11685.00 |
| **Gross Pay** | | | **$300.00** | **$17,385.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1113.95 |
| Social Security | -18.60 | 1031.37 |
| Medicare | -4.35 | 241.21 |
| New York State Income | -4.00 | 525.20 |
| New York Paid Family Leave | -0.38 | 21.01 |
| New York City R Local | -3.00 | 365.61 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 21.00 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| | |
|---|---|
| Payroll Check Number: | 2469044 |
| Pay Date: | 10/05/2018 |

THIS IS NOT A CHECK

Pay to the order of:     Leticia F Stidhum
This amount:     TWO HUNDRED SIXTY NINE AND 07/100

$269.07

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1220**

A0904

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2469045 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting:     09/25/2018
Period Ending:      10/01/2018
Pay Date:           10/05/2018

Business Phone:     732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:    Tax Override:
Federal:     3         Federal:
State:       3         State:
Local:       3         Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 5700.00 |
| Commission | | 0.00 | 750.00 | 11685.00 |
| **Gross Pay** | | | **$750.00** | $17,385.00 |

| Statutory Deductions | | | this period | year to date |
|---|---|---|---|---|
| Federal Income | | | -49.07 | 1163.02 |
| Social Security | | | -46.50 | 1077.87 |
| Medicare | | | -10.87 | 252.08 |
| New York State Income | | | -28.80 | 554.00 |
| New York Paid Family Leave | | | -0.95 | 21.96 |
| New York City R Local | | | -19.85 | 385.46 |

| Voluntary Deductions | | | this period | year to date |
|---|---|---|---|---|
| New York voluntary disability | | | -0.60 | 21.60 |

| **Net Pay** | | | **$593.36** | |

Your federal taxable wages this period are  $750.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2469045
Pay Date:              10/05/2018

Pay to the
order of:        Leticia F Stidhum
This amount:     FIVE HUNDRED NINETY THREE AND 36/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$593.36

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356



**D1221**

A0905

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2483191 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 10/02/2018
Period Ending: 10/08/2018
Pay Date: 10/12/2018

Business Phone: 732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6000.00 |
| Commission | | | 0.00 | 12585.00 |
| **Gross Pay** | | | **$300.00** | **$18,585.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1163.02 |
| Social Security | -18.60 | 1096.47 |
| Medicare | -4.35 | 256.43 |
| New York State Income | -4.00 | 558.00 |
| New York Paid Family Leave | -0.38 | 22.34 |
| New York City R Local | -3.00 | 388.46 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.20 |

| **Net Pay** | | **$269.07** |
|---|---|---|

Your federal taxable wages this period are $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2483191
Pay Date: 10/12/2018

Pay to the order of: Leticia F Stidhum

This amount: TWO HUNDRED SIXTY NINE AND 07/100

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

THIS IS NOT A CHECK



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1222**

A0906

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 38 of 65 PageID #: 1568

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2483192 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

### Earnings Statement

Period Starting: 10/02/2018
Period Ending: 10/08/2018
Pay Date: 10/12/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
Federal:   3              Federal:
State:     3              State:
Local:     3              Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6000.00 |
| Commission | | 0.00 | 900.00 | 12585.00 |
| **Gross Pay** | | | **$900.00** | **$18,585.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -67.07 | 1230.09 |
| Social Security | -55.80 | 1152.27 |
| Medicare | -13.05 | 269.48 |
| New York State Income | -38.30 | 596.30 |
| New York Paid Family Leave | -1.13 | 23.47 |
| New York City R Local | -26.07 | 414.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 22.80 |

| **Net Pay** | **$697.98** |
|---|---|

Your federal taxable wages this period are  $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2483192
Pay Date: 10/12/2018

Pay to the order of:      Leticia F Stidhum

This amount:   SIX HUNDRED NINETY SEVEN AND 98/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE      VOID - NON NEGOTIABLE

$697.98



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1223**

A0907

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 39 of 65 PageID #: 1569

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2494294 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

Period Starting: 10/09/2018
Period Ending: 10/15/2018
Pay Date: 10/19/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:        Tax Override:
  Federal:    3        Federal:
  State:    3        State:
  Local:    3        Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6300.00 |
| Commission | | | 0.00 | 13285.00 |
| **Gross Pay** | | | **$300.00** | **$19,585.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1230.09 |
| Social Security | -18.60 | 1170.87 |
| Medicare | -4.35 | 273.83 |
| New York State Income | -4.00 | 600.30 |
| New York Paid Family Leave | -0.38 | 23.85 |
| New York City R Local | -3.00 | 417.53 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 23.40 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2494294
Pay Date: 10/19/2018

Pay to the
order of:        Leticia F Stidhum
This amount:     TWO HUNDRED SIXTY NINE AND 07/100

**THIS IS NOT A CHECK**

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1224**

**A0908**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2494295 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting:      10/09/2018
Period Ending:       10/15/2018
Pay Date:               10/19/2018

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:            Tax Override:
  Federal:    3          Federal:
  State:       3          State:
  Local:       3          Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6300.00 |
| Commission | | 0.00 | 700.00 | 13285.00 |
| Gross Pay | | | $700.00 | $19,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -43.07 | 1273.16 |
| Social Security | -43.40 | 1214.27 |
| Medicare | -10.15 | 283.98 |
| New York State Income | -25.64 | 625.94 |
| New York Paid Family Leave | -0.88 | 24.73 |
| New York City R Local | -17.77 | 435.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.00 |

| Net Pay | $558.49 | |
|---|---|---|

Your federal taxable wages this period are $700.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2494295
Pay Date:                        10/19/2018

Pay to the
order of:      Leticia F Stidhum

This amount:   FIVE HUNDRED FIFTY EIGHT AND 49/100

THIS IS NOT A CHECK

$558.49

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1225**

A0909

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2508398 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 10/16/2018
Period Ending: 10/22/2018
Pay Date: 10/26/2018

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6600.00 |
| Commission | | 0.00 | 0.00 | 14085.00 |
| **Gross Pay** | | | **$300.00** | $20,685.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1273.16 |
| Social Security | -18.60 | 1232.87 |
| Medicare | -4.35 | 288.33 |
| New York State Income | -4.00 | 629.94 |
| New York Paid Family Leave | -0.38 | 25.11 |
| New York City R Local | -3.00 | 438.30 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 24.60 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2508398
Pay Date:                10/26/2018

Pay to the order of:   Leticia F Stidhum
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1226**

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 42 of 65 PageID #: 1572

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2508399 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

# Earnings Statement



Period Starting: 10/16/2018
Period Ending: 10/22/2018
Pay Date: 10/26/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3        Tax Override:
State: 3             Federal:
Local: 3             State:
Social Security Number: XXX-XX-XXXX        Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 6600.00 |
| Commission | | 0.00 | 800.00 | 14085.00 |
| Gross Pay | | | $800.00 | $20,685.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -55.07 | 1328.23 |
| Social Security | -49.60 | 1282.47 |
| Medicare | -11.60 | 299.93 |
| New York State Income | -31.97 | 661.91 |
| New York Paid Family Leave | -1.01 | 26.12 |
| New York City R Local | -21.92 | 460.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.20 |

| Net Pay | $628.23 |
|---|---|

Your federal taxable wages this period are $800.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2508399
Pay Date: 10/26/2018

Pay to the order of:    Leticia F Stidhum

This amount:    SIX HUNDRED TWENTY EIGHT AND 23/100

$628.23

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1227**

A0911

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 43 of 65 PageID #: 1573

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2522561 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

**ADP**

Period Starting: 10/23/2018
Period Ending: 10/29/2018
Pay Date: 11/02/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:       Tax Override:
    Federal:    3          Federal:
    State:      3          State:
    Local:      3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 6900.00 |
| Commission | | | 0.00 | 15135.00 |
| **Gross Pay** | | | **$300.00** | **$22,035.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1328.23 |
| Social Security | -18.60 | 1301.07 |
| Medicare | -4.35 | 304.28 |
| New York State Income | -4.00 | 665.91 |
| New York Paid Family Leave | -0.38 | 26.50 |
| New York City R Local | -3.00 | 463.22 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 25.80 |

| **Net Pay** | **$269.07** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2522561
Pay Date:   11/02/2018

Pay to the
order of:        Leticia F Stidhum
This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356



**D1228**

A0912

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 44 of 65 PageID #: 1574

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 2400 | B135 01/200 | 2522562 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 10/23/2018 |
| Period Ending: | 10/29/2018 |
| Pay Date: | 11/02/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:      Tax Override:
   Federal:   3          Federal:
   State:   3            State:
   Local:   3            Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 6900.00 |
| Commission | | 0.00 | 1050.00 | 15135.00 |
| **Gross Pay** | | | **$1,050.00** | $22,035.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -85.07 | 1413.30 |
| Social Security | -65.10 | 1366.17 |
| Medicare | -15.23 | 319.51 |
| New York State Income | -47.79 | 713.70 |
| New York Paid Family Leave | -1.32 | 27.82 |
| New York City R Local | -32.30 | 495.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 26.40 |

| **Net Pay** | **$802.59** |
|---|---|

Your federal taxable wages this period are  $1,050.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2522562 |
|---|---|
| Pay Date: | 11/02/2018 |

Pay to the
order of:      Leticia F Stidhum

This amount:   EIGHT HUNDRED TWO AND 59/100

**THIS IS NOT A CHECK**

$802.59

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1229**

A0913

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 45 of 65 PageID #: 1575

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2535022 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



Period Starting: 10/30/2018
Period Ending: 11/05/2018
Pay Date: 11/09/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Tax Override:
Federal: 3    Federal:
State: 3    State:
Local: 3    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7200.00 |
| Commission | | 0.00 | 1050.00 | 16185.00 |
| Gross Pay | | | $1,050.00 | $23,385.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -85.07 | 1498.37 |
| Social Security | -65.10 | 1449.87 |
| Medicare | -15.22 | 339.08 |
| New York State Income | -47.79 | 765.49 |
| New York Paid Family Leave | -1.32 | 29.52 |
| New York City R Local | -32.30 | 530.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 27.60 |

| Net Pay | $802.60 |
|---|---|

Your federal taxable wages this period are $1,050.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2535022
Pay Date: 11/09/2018

Pay to the order of: Leticia F Stidhum

This amount: EIGHT HUNDRED TWO AND 60/100

$802.60

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

THIS IS NOT A CHECK



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1230**

A0914

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2548876 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement** 

| | |
|---|---|
| Period Starting: | 11/06/2018 |
| Period Ending: | 11/12/2018 |
| Pay Date: | 11/16/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 7500.00 |
| Commission | | | 0.00 | 17085.00 |
| **Gross Pay** | | | **$300.00** | **$24,585.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1498.37 |
| Social Security | -18.60 | 1468.47 |
| Medicare | -4.35 | 343.43 |
| New York State Income | -4.00 | 769.49 |
| New York Paid Family Leave | -0.38 | 29.90 |
| New York City R Local | -3.00 | 533.82 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.20 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2548876
Pay Date:   11/16/2018

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1231**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2548877 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 11/06/2018 |
| Period Ending: | 11/12/2018 |
| Pay Date: | 11/16/2018 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
| | | Tax Override: | |
|---|---|---|---|
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |

Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7500.00 |
| Commission | | 0.00 | 900.00 | 17085.00 |
| **Gross Pay** | | | **$900.00** | $24,585.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -67.07 | 1565.44 |
| Social Security | -55.80 | 1524.27 |
| Medicare | -13.05 | 356.48 |
| New York State Income | -38.30 | 807.79 |
| New York Paid Family Leave | -1.13 | 31.03 |
| New York City R Local | -26.07 | 559.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 28.80 |

| Net Pay | $697.98 |
|---|---|

Your federal taxable wages this period are  $900.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2548877 |
|---|---|
| Pay Date: | 11/16/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   SIX HUNDRED NINETY SEVEN AND 98/100

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$697.98



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1232**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2562199 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 11/13/2018 |
|---|---|
| Period Ending: | 11/19/2018 |
| Pay Date: | 11/23/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single | | |
|---|---|---|---|
| Exemptions/Allowances: | | Tax Override: | |
| Federal: | 3 | Federal: | |
| State: | 3 | State: | |
| Local: | 3 | Local: | |
| Social Security Number: | XXX-XX-XXXX | | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 7800.00 |
| Commission | | | 0.00 | 17085.00 |
| **Gross Pay** | | | **$300.00** | **$24,885.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1565.44 |
| Social Security | -18.60 | 1542.87 |
| Medicare | -4.35 | 360.83 |
| New York State Income | -4.00 | 811.79 |
| New York Paid Family Leave | -0.38 | 31.41 |
| New York City R Local | -3.00 | 562.89 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 29.40 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2562199 |
|---|---|
| Pay Date: | 11/23/2018 |

| Pay to the order of: | Leticia F Stidhum | | |
|---|---|---|---|
| This amount: | TWO HUNDRED SIXTY NINE AND 07/100 | | |

**THIS IS NOT A CHECK**

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1233**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2564131 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**Period Starting:** 11/13/2018
**Period Ending:** 11/19/2018
**Pay Date:** 11/23/2018

**Business Phone:** 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 3
  State: 3
  Local: 3
Social Security Number: XXX-XX-XXXX

Tax Override:
  Federal:
  State:
  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 7800.00 |
| Commission | | 0.00 | 1375.00 | 18460.00 |
| **Gross Pay** | | | **$1,375.00** | **$26,260.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -156.09 | 1721.53 |
| Social Security | -85.25 | 1628.12 |
| Medicare | -19.94 | 380.77 |
| New York State Income | -68.37 | 880.16 |
| New York Paid Family Leave | -1.73 | 33.14 |
| New York City R Local | -45.86 | 608.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 30.00 |

| **Net Pay** | **$997.16** |
|---|---|

Your federal taxable wages this period are $1,375.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

**Payroll Check Number:** 2564131
**Pay Date:** 11/23/2018

Pay to the order of: Leticia F Stidhum

This amount: NINE HUNDRED NINETY SEVEN AND 16/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$997.16

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1234**

**A0918**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7 QLM 24008135 | 01/200 | 2576562 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 11/20/2018 |
|---|---|
| Period Ending: | 11/26/2018 |
| Pay Date: | 11/30/2018 |

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:
 Federal:   3
 State:   3
 Local:   3
Social Security Number:   XXX-XX-XXXX

Tax Override:
 Federal:
 State:
 Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8100.00 |
| Commission | | | 0.00 | 18910.00 |
| **Gross Pay** | | | **$300.00** | **$27,010.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1721.53 |
| Social Security | -18.60 | 1646.72 |
| Medicare | -4.35 | 385.12 |
| New York State Income | -4.00 | 884.16 |
| New York Paid Family Leave | -0.38 | 33.52 |
| New York City R Local | -3.00 | 611.75 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 30.60 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2576562
Pay Date:   11/30/2018

Pay to the
order of:          Leticia F Stidhum

This amount:    TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1235**

Case 1:21-cv-07163-OEM-LB Document 102-6 Filed 03/27/24 Page 51 of 65 PageID #: 1581

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2576563 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**Period Starting:** 11/20/2018
**Period Ending:** 11/26/2018
**Pay Date:** 11/30/2018

**Business Phone:** 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 3   Tax Override:
  State: 3      Federal:
  Local: 3      State:
Social Security Number: XXX-XX-XXXX
  Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8100.00 |
| Commission | | 0.00 | 450.00 | 18910.00 |
| **Gross Pay** | | | **$450.00** | **$27,010.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -13.94 | 1735.47 |
| Social Security | -27.90 | 1674.62 |
| Medicare | -6.53 | 391.65 |
| New York State Income | -10.62 | 894.78 |
| New York Paid Family Leave | -0.57 | 34.09 |
| New York City R Local | -7.77 | 619.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 31.20 |

| **Net Pay** | **$382.07** |
|---|---|

Your federal taxable wages this period are $450.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

**Payroll Check Number:** 2576563
**Pay Date:** 11/30/2018

Pay to the order of: Leticia F Stidhum

This amount: THREE HUNDRED EIGHTY TWO AND 07/100

$382.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1236**

A0920

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589288 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| Period Starting: | 11/27/2018 |
|---|---|
| Period Ending: | 12/03/2018 |
| Pay Date: | 12/07/2018 |

Business Phone:   732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8400.00 |
| Commission | | | 0.00 | 20510.00 |
| **Gross Pay** | | | **$300.00** | **$28,910.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1735.47 |
| Social Security | -18.60 | 1693.22 |
| Medicare | -4.35 | 396.00 |
| New York State Income | -4.00 | 898.78 |
| New York Paid Family Leave | -0.38 | 34.47 |
| New York City R Local | -3.00 | 622.52 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 31.80 |

| **Net Pay** | | **$269.07** |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2589288 |
|---|---|
| Pay Date: | 12/07/2018 |

Pay to the order of:   Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

$269.07

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1237**

A0921

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 53 of 65 PageID #: 1583

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2589289 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

# Earnings Statement

Period Starting: 11/27/2018
Period Ending: 12/03/2018
Pay Date: 12/07/2018

Business Phone: 732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:         Tax Override:
    Federal:    3         Federal:
    State:    3            State:
    Local:    3            Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 8400.00 |
| Commission | | 0.00 | 1600.00 | 20510.00 |
| **Gross Pay** | | | **$1,600.00** | **$28,910.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -205.59 | 1941.06 |
| Social Security | -99.20 | 1792.42 |
| Medicare | -23.20 | 419.20 |
| New York State Income | -82.61 | 981.39 |
| New York Paid Family Leave | -2.02 | 36.49 |
| New York City R Local | -55.42 | 677.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 32.40 |

| **Net Pay** | **$1,131.36** | |
|---|---|---|

Your federal taxable wages this period are  $1,600.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2589289
Pay Date:   12/07/2018

Pay to the order of:   Leticia F Stidhum

This amount:   ONE THOUSAND ONE HUNDRED THIRTY ONE AND 36/100

$1,131.36

THIS IS NOT A CHECK

*VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1238**

A0922

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603867 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 12/04/2018
Period Ending: 12/10/2018
Pay Date: 12/14/2018

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 3      Tax Override:
State: 3        Federal:
Local: 3        State:
Social Security Number: XXX-XX-XXXX      Local:

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 8700.00 |
| Commission | | | 0.00 | 21335.00 |
| **Gross Pay** | | | **$300.00** | **$30,035.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1941.06 |
| Social Security | -18.60 | 1811.02 |
| Medicare | -4.35 | 423.55 |
| New York State Income | -4.00 | 985.39 |
| New York Paid Family Leave | -0.38 | 36.87 |
| New York City R Local | -3.00 | 680.94 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.00 |

| **Net Pay** | **$269.07** | |
|---|---|---|

Your federal taxable wages this period are  $300.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number: 2603867
Pay Date: 12/14/2018

Pay to the
order of:      Leticia F Stidhum

This amount:   TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

$269.07

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1239**

A0923

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2603868 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting:     12/04/2018
Period Ending:      12/10/2018
Pay Date:             12/14/2018

Business Phone:     732-979-6956

Taxable Marital Status:     Single
Exemptions/Allowances:              Tax Override:
Federal:     3                        Federal:
State:       3                        State:
Local:       3                        Local:
Social Security Number:     XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 0.00 | 8700.00 |
| Commission | | 0.00 | 825.00 | 21335.00 |
| **Gross Pay** | | | **$825.00** | **$30,035.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -58.07 | 1999.13 |
| Social Security | -51.15 | 1862.17 |
| Medicare | -11.96 | 435.51 |
| New York State Income | -33.55 | 1018.94 |
| New York Paid Family Leave | -1.04 | 37.91 |
| New York City R Local | -22.96 | 703.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 33.60 |

| **Net Pay** | **$645.67** |
|---|---|

Your federal taxable wages this period are  $825.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:     2603868
Pay Date:                        12/14/2018

Pay to the
order of:        Leticia F Stidhum
This amount:     SIX HUNDRED FORTY FIVE AND 67/100

$645.67

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1240**

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 56 of 65 PageID #: 1586

**Company Code** **Loc/Dept** **Number** **Page**
RB / QLM 24008135   01/200   2619266   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:   12/11/2018
Period Ending:     12/17/2018
Pay Date:          12/21/2018

Business Phone:    732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:          Tax Override:
Federal:   3          Federal:
State:     3          State:
Local:     3          Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9000.00 |
| Commission | | | 0.00 | 21960.00 |
| **Gross Pay** | | | **$300.00** | **$30,960.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 1999.13 |
| Social Security | -18.60 | 1880.77 |
| Medicare | -4.35 | 439.86 |
| New York State Income | -4.00 | 1022.94 |
| New York Paid Family Leave | -0.38 | 38.29 |
| New York City R Local | -3.00 | 706.90 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 34.20 |

| **Net Pay** | **$269.07** |
|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2619266
Pay Date:               12/21/2018

Pay to the
order of:       Leticia F Stidhum
This amount:    TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$269.07



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1241**

A0925

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| R8 / QLM 24008135 | 01/200 | 2619267 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting:    12/11/2018
Period Ending:     12/17/2018
Pay Date:          12/21/2018

Business Phone:    732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | XXX-XX-XXXX | |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9000.00 |
| Commission | | 0.00 | 625.00 | 21960.00 |
| **Gross Pay** | | | **$625.00** | **$30,960.00** |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | -34.07 | 2033.20 |
| Social Security | | -38.75 | 1919.52 |
| Medicare | | -9.06 | 448.92 |
| New York State Income | | -20.89 | 1043.83 |
| New York Paid Family Leave | | -0.79 | 39.08 |
| New York City R Local | | -14.68 | 721.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 34.80 |

| **Net Pay** | **$506.16** |
|---|---|

Your federal taxable wages this period are  $625.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2619267
Pay Date:                12/21/2018

Pay to the order of:    Leticia F Stidhum

This amount:    FIVE HUNDRED SIX AND 16/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$506.16

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1242**



A0926

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2635596 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**Period Starting:** 12/18/2018
**Period Ending:** 12/24/2018
**Pay Date:** 12/28/2018

**Business Phone:** 732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 9300.00 |
| Commission | | | 0.00 | 22460.00 |
| **Gross Pay** | | | **$300.00** | **$31,760.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 2033.20 |
| Social Security | -18.60 | 1938.12 |
| Medicare | -4.35 | 453.27 |
| New York State Income | -4.00 | 1047.83 |
| New York Paid Family Leave | -0.38 | 39.46 |
| New York City R Local | -3.00 | 724.58 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 35.40 |

| **Net Pay** | | **$269.07** |
|---|---|---|

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

**Payroll Check Number:** 2635596
**Pay Date:** 12/28/2018

Pay to the
order of:     Leticia F Stidhum

This amount:     TWO HUNDRED SIXTY NINE AND 07/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE     VOID - NON NEGOTIABLE

$269.07



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1243**

A0927

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2635597 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| Period Starting: | 12/18/2018 |
|---|---|
| Period Ending: | 12/24/2018 |
| Pay Date: | 12/28/2018 |

Business Phone:    732-979-6956

| Taxable Marital Status: | Single |
|---|---|
| Exemptions/Allowances: | Tax Override: |
| Federal: 3 | Federal: |
| State: 3 | State: |
| Local: 3 | Local: |
| Social Security Number: | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 9300.00 |
| Commission | | 0.00 | 500.00 | 22460.00 |
| **Gross Pay** | | | **$500.00** | **$31,760.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | −19.07 | 2052.27 |
| Social Security | −31.00 | 1969.12 |
| Medicare | −7.25 | 460.52 |
| New York State Income | −13.47 | 1061.30 |
| New York Paid Family Leave | −0.63 | 40.09 |
| New York City R Local | −9.74 | 734.32 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | −0.60 | 36.00 |

| **Net Pay** | **$418.24** |
|---|---|

Your federal taxable wages this period are  $500.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

| Payroll Check Number: | 2635597 |
|---|---|
| Pay Date: | 12/28/2018 |

Pay to the order of:    Leticia F Stidhum

This amount:    FOUR HUNDRED EIGHTEEN AND 24/100

THIS IS NOT A CHECK

*VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$418.24



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1244**

A0928

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 60 of 65 PageID #: 1590

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2643784 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

Period Starting: 12/25/2018
Period Ending: 12/31/2018
Pay Date: 01/04/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances: Tax Override:
Federal: 3    Federal:
State: 3    State:
Local: 3    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 300.00 |
| Commission | | | 0.00 | 350.00 |
| **Gross Pay** | | | **$300.00** | **$650.00** |

| Statutory Deductions | | this period | year to date |
|---|---|---|---|
| Federal Income | | 0.00 | 0.00 |
| Social Security | | -18.60 | 18.60 |
| Medicare | | -4.35 | 4.35 |
| New York State Income | | -4.00 | 4.00 |
| New York Paid Family Leave | | -0.46 | 0.46 |
| New York City R Local | | -3.00 | 3.00 |

| Voluntary Deductions | | this period | year to date |
|---|---|---|---|
| New York voluntary disability | | -0.60 | 0.60 |
| **Net Pay** | | **$268.99** | |

Your federal taxable wages this period are $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2643784
Pay Date: 01/04/2019

Pay to the order of: Leticia F Stidhum
This amount: TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

$268.99

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1245**

A0929

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 61 of 65 PageID #: 1591

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2643785 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

**Earnings Statement**

ADP

| | |
|---|---|
| Period Starting: | 12/25/2018 |
| Period Ending: | 12/31/2018 |
| Pay Date: | 01/04/2019 |

Business Phone:   732-979-6956

Taxable Marital Status:   Single
Exemptions/Allowances:   Tax Override:
Federal:   3   Federal:
State:   3   State:
Local:   3   Local:
Social Security Number:   XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 300.00 |
| Commission | | 0.00 | 350.00 | 350.00 |
| **Gross Pay** | | | **$350.00** | $650.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 3.46 |
| Social Security | -21.70 | 40.30 |
| Medicare | -5.08 | 9.43 |
| New York State Income | -6.00 | 10.00 |
| New York Paid Family Leave | -0.54 | 1.00 |
| New York City R Local | -4.48 | 7.48 |
| **Voluntary Deductions** | **this period** | **year to date** |
| New York voluntary disability | -0.60 | 1.20 |
| **Net Pay** | **$308.14** | |

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:   2643785
Pay Date:   01/04/2019

Pay to the order of:   Leticia F Stidhum
This amount:   THREE HUNDRED EIGHT AND 14/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE   VOID - NON NEGOTIABLE

$308.14

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356



**D1246**

A0930

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB / QLM 24008135 | 01/200 | 2660658 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

**ADP**

| | |
|---|---|
| Period Starting: | 01/01/2019 |
| Period Ending: | 01/07/2019 |
| Pay Date: | 01/11/2019 |

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:    Tax Override:
Federal:    3    Federal:
State:    3    State:
Local:    3    Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 300.00 | 600.00 |
| Commission | | | 0.00 | 1175.00 |
| **Gross Pay** | | | **$300.00** | **$1,775.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 3.46 |
| Social Security | -18.60 | 58.90 |
| Medicare | -4.35 | 13.78 |
| New York State Income | -4.00 | 14.00 |
| New York Paid Family Leave | -0.46 | 1.46 |
| New York City R Local | -3.00 | 10.48 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 1.80 |
| **Net Pay** | **$268.99** | |

Your federal taxable wages this period are  $300.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2660658
Pay Date:    01/11/2019

Pay to the
order of:    Leticia F Stidhum
This amount:    TWO HUNDRED SIXTY EIGHT AND 99/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$268.99



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1247**

**Company Code**   **Loc/Dept**   **Number**   **Page**
RB7QLM 24008135   01/200   2660659   1 of 1
161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

# Earnings Statement



Period Starting:    01/01/2019
Period Ending:    01/07/2019
Pay Date:    01/11/2019

Business Phone:    732-979-6956

Taxable Marital Status:    Single
Exemptions/Allowances:    Tax Override:
  Federal:    3    Federal:
  State:    3    State:
  Local:    3    Local:
Social Security Number:    XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 600.00 |
| Commission | | 0.00 | 825.00 | 1175.00 |
| **Gross Pay** | | | **$825.00** | **$1,775.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -57.42 | 60.88 |
| Social Security | -51.15 | 110.05 |
| Medicare | -11.96 | 25.74 |
| New York State Income | -33.29 | 47.29 |
| New York Paid Family Leave | -1.26 | 2.72 |
| New York City R Local | -22.96 | 33.44 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 2.40 |

| **Net Pay** | **$646.36** | |
|---|---|---|

Your federal taxable wages this period are  $825.00

63-8413/2670

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

Payroll Check Number:    2660659
Pay Date:    01/11/2019

Pay to the
order of:    Leticia F Stidhum
This amount:    SIX HUNDRED FORTY SIX AND 36/100

**$646.36**

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1248**

A0932

Case 1:21-cv-07163-OEM-LB   Document 102-6   Filed 03/27/24   Page 64 of 65 PageID #: 1594

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671279 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement



| | |
|---|---|
| Period Starting: | 01/08/2019 |
| Period Ending: | 01/14/2019 |
| Pay Date: | 01/18/2019 |

Business Phone:    732-979-6956

| Taxable Marital Status: | Single | |
|---|---|---|
| Exemptions/Allowances: | | Tax Override: |
| Federal: | 3 | Federal: |
| State: | 3 | State: |
| Local: | 3 | Local: |
| Social Security Number: | | XXX-XX-XXXX |

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | | 0.00 | 800.00 |
| Commission | | 0.00 | 350.00 | 1525.00 |
| **Gross Pay** | | | **$350.00** | **$2,325.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -3.46 | 64.34 |
| Social Security | -21.70 | 144.15 |
| Medicare | -5.07 | 33.71 |
| New York State Income | -6.00 | 53.29 |
| New York Paid Family Leave | -0.54 | 3.57 |
| New York City R Local | -4.48 | 38.87 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.60 |

| **Net Pay** | **$308.15** | |
|---|---|---|

Your federal taxable wages this period are  $350.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number:    2671279
Pay Date:    01/18/2019

Pay to the
order of:      Leticia F Stidhum
This amount:  THREE HUNDRED EIGHT AND 15/100

THIS IS NOT A CHECK

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE

$308.15



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1249**

**A0933**

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RB7QLM 24008135 | 01/200 | 2671278 | 1 of 1 |

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

## Earnings Statement

Period Starting: 01/08/2019
Period Ending: 01/14/2019
Pay Date: 01/18/2019

Business Phone: 732-979-6956

Taxable Marital Status: Single
Exemptions/Allowances:   Tax Override:
Federal: 3    Federal:
State: 3    State:
Local: 3    Local:
Social Security Number: XXX-XX-XXXX

Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | | 0.00 | 200.00 | 800.00 |
| Commission | | | 0.00 | 1525.00 |
| **Gross Pay** | | | **$200.00** | **$2,325.00** |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | 0.00 | 60.88 |
| Social Security | -12.40 | 122.45 |
| Medicare | -2.90 | 28.64 |
| New York State Income | 0.00 | 47.29 |
| New York Paid Family Leave | -0.31 | 3.03 |
| New York City R Local | -0.95 | 34.39 |

| Voluntary Deductions | this period | year to date |
|---|---|---|
| New York voluntary disability | -0.60 | 3.00 |

| **Net Pay** | **$182.84** | |

Your federal taxable wages this period are $200.00

161-10 Hillside Ave Auto LLC
161-10 Hillside Ave
Jamaica, NY 11432

63-8413/2670

Payroll Check Number: 2671278
Pay Date: 01/18/2019

Pay to the order of:   Leticia F Stidhum

This amount:   ONE HUNDRED EIGHTY TWO AND 84/100

**THIS IS NOT A CHECK**

$182.84

VOID - NON NEGOTIABLE    VOID - NON NEGOTIABLE



Leticia F Stidhum
12406 13 Ave
College Point, NY 11356

**D1250**

A0934

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 1 of 100 PageID #: 1598

```
 1        UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF NEW YORK          COPY

 3        -----------------------------------------X

 4        LETICIA FRANCINE STIDHUM,

 5                         Plaintiff,

 6             -against-          CASE: 21-CV-07163

 7        161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
          AUTO OUTLET, and HILLSIDE AUTO MALL INC
 8        d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
          JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,
 9

10                         Defendants.

11        -----------------------------------------X

12                         March 10, 2023

13                         10:00 A.M.

14

15             VIRTUAL EXAMINATION BEFORE TRIAL of

16        DEANA JENNINGS, via Zoom, a 30(b)6 witness

17        herein, held at the above-mentioned time and

18        taken before Lynn Luckman, a Notary Public

19        and Shorthand Reporter within and for the

20        State of New York.

21

22

23                  SANDY SAUNDERS REPORTING
                 254 South Main Street, Suite 216
24                   New City, New York 10956
                        (845) 634-7561
25
```

2

```
 1

 2          A P P E A R A N C E S:

 3

 4

 5          TROY LAW, PLLC

 6          Attorneys for the Plaintiff

 7          41-25 Kissena Boulevard, Suite 103

 8          Flushing, New York 1355

 9          BY: Tiffany Troy, Esq.

10

11          MILMAN, LABUDA LAW GROUP, PLLC

12          3000 Marcus Avenue, Suite 3W8

13          Lake Success, New York 11042-1073

14          BY: Emanuel Kataev, Esq

15          emaanuel@milaborlaw.com

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    FEDERAL STIPULATIONS

 2

 3              IT IS HEREBY STIPULATED AND AGREED by

 4         and between counsel for the respective parties

 5         hereto that all objections except as to the

 6         form shall be reserved to the time of trial.

 7                  IT IS FURTHER STIPULATED AND AGREED

 8         that the sealing and filing of this deposition

 9         shall be hereby waived.

10                  IT IS FURTHER STIPULATED AND AGREED

11         that this examination may be sworn to by the

12         witness being examined before a notary public

13         other than the notary public before whom

14         examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    Deana Jennings
 2                 BY THE COURT REPORTER:
 3               The attorneys participating
 4               in this deposition
 5               acknowledge that I am not
 6               physically present in the
 7               deposition room and that I
 8               will be reporting this
 9               deposition remotely.  They
10               further acknowledge that, in
11               lieu of an oath administered
12               in person, I will administer
13               the oath remotely.  The
14               parties and their counsel
15               consent to this arrangement
16               and waive any objections to
17               this manner of reporting.
18                      MS. TROY:  I consent
19                      MR. KATAEV:     I
20               consent.
21
22
23                      *     *     *
24
25
```

5

```
 1                      Deana Jennings

 2

 3              D-E-A-N-A J-E-N-N-I-N-G-S, a

 4       30(b)6 witness herein, after having been

 5       duly sworn by a Notary Public of the

 6       State of New York, was examined and

 7       testified as follows:

 8

 9       BY THE REPORTER:

10              Q.  Please state your full name

11       for the record.

12              A.  Deana Jennings.

13              Q.  Please state your present

14       address for the record.

15              A.  49 Staghorn Drive Matawan

16       N.J. 07747.

17       EXAMINATION BY

18       TIFFANY TROY:

19              Q.  Good morning.  Mr. Kataev, for

20       the record, please have your witness show

21       her ID.

22       (The witness complies)

23          That's good.

24                      MS. TROY:  Please, Ms.

25                  Court reporter mark Exhibit
```

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 6 of 100 PageID #: 1603

6

```
 1                    Deana Jennings
 2              20 as the ID, deem it marked.
 3              (The court reporter
 4               complies).
 5              Q.  Good morning, have you ever been
 6       part of a deposition before?
 7              A.  No.
 8              Q.  In that case, I'm going to
 9       explain what a deposition is and lay down
10       some ground rules going forward.
11          First, this deposition is for me to ask
12       you questions and for you to answer my
13       questions about the subject matter of this
14       lawsuit; do you understand?
15              A.  Yes.
16              Q.  Since the court reporter has to
17       take down everything that you say, I ask
18       that you give verbal responses; no shakes or
19       nodding of your head and no gestures; do you
20       understand?
21              A.  Okay.
22              Q.  For that same reason, please
23       speak loudly and clearly when you answer my
24       question.
25              A.  Okay.
```

7

```
 1                      Deana Jennings
 2              Q.  The stenographer can only take
 3       down one person speaking at a time.
 4       Therefore, please do not start to answer one
 5       of my questions before I stop asking it;
 6       likewise, I will not start any question
 7       until you have finished answering my last
 8       question; okay?
 9              A.  Okay.
10              Q.  If you have a particularly long
11       answer, please break in between sentences so
12       that the stenographer can note down your
13       responses and then you can continue.
14              A.  Okay.
15              Q.  If you need to take a break for
16       example, to get a drink of water or to use
17       the restroom, please let me know and I will
18       call for a recess.  However, there can be no
19       break in between one of my questions and
20       your answer to that question; do you
21       understand?
22              A.  Yes.
23              Q.  From time to time your attorney
24       may make objections to my questions.
25       Generally, however, unless your attorney
```

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 8 of 100 PageID #: 1605

8

```
 1                    Deana Jennings
 2        tells you not to answer, you will still have
 3        to respond; do you understand?
 4                    A.  Yes.
 5                    Q.  If you don't understand a
 6        question, tell me and I'll rephrase it so
 7        that you can.  If you don't hear a question,
 8        tell me and I'll repeat it so that you do;
 9        do you understand?
10                    A.  Yes.
11                    Q.  We are here today for facts and
12        not speculation.  Therefore, if you don't
13        know an answer to a question, say so.
14                    A.  Okay.
15                    Q.  Do you understand that you have
16        taken an oath to tell the truth?
17                    A.  Yes.
18                    Q.  Do you understand that your oath
19        to tell the truth carries the same force and
20        effect as if you were testifying in court
21        before a Judge?
22                    A.  Yes.
23                    Q.  Are you currently taking any
24        medications that could prevent you from
25        recalling the truth or testifying truthfully
```

9

```
 1                        Deana Jennings
 2            and completely today?
 3                        A.  No.
 4                        Q.  Are currently under any physical
 5            or emotional condition that could prevent
 6            you from recalling the truth or testifying
 7            truthfully and completely today?
 8                        A.  No.
 9                        Q.  Do you agree that during this
10            deposition, except during on break, you are
11            not going to be communicating with anyone by
12            email, chat or instant message on your phone
13            or any other device?
14                        A.  Yes.
15                        Q.  Do you agree that besides the
16            documents that I will be showing you on the
17            screen as exhibits today that you will not
18            be reviewing any notes on your computer,
19            cell phone or any other device?
20                        A.  Yes.
21                        Q.  Do you have a cell phone on you
22            or near you?
23                        A.  Not on me.
24                        Q.  Where is your cell phone?
25                        A.  I left it in the car.
```

(983 of 1960), Page 983 of 1960

10

```
 1                        Deana Jennings
 2                    Q.  Why did you leave your cell
 3        phone in the car?
 4                        MR. KATAEV:  Objection.
 5                        You were harassing.  You may
 6                        answer the question.
 7                    A.  I forgot to plug it in and I
 8        wanted to be on time this morning.
 9                    Q.  Besides your attorney, did you
10        speak with anyone in order to prepare for
11        today's deposition?
12                    A.  Yes.
13                    Q.  With whom did you speak?
14                    A.  We had a virtual meeting with
15        the other defendant.
16                    Q.  Was your attorney present?
17                    A.  Yes.
18                    Q.  For how long did you prepare?
19                    A.  I can't remember, it was more
20        than an hour but I honestly can't recall how
21        long it was.
22                    Q.  Do you recall when it was?
23                    A.  I can't remember for certain,
24        I'm sorry.
25                    Q.  What did you do to prepare for
```

11

```
 1                    Deana Jennings
 2          your deposition today, and the caveat is,
 3          don't tell me anything that you discussed
 4          with your attorney?
 5                    A.  We went over the
 6          Interrogatories, and that is pretty much it,
 7          that's it.
 8                    Q.  Besides the Interrogatories, did
 9          you review any other documents in
10          preparation for today's deposition?
11                    A.  Yes, some of the evidence.
12                    Q.  Can you describe what type of
13          evidence you reviewed?
14                    A.  Yes, it was the text messages, I
15          saw some VIN Solutions printouts and a pay
16          stub or 2.  That is what I can recall.
17                    Q.  Did you review any other
18          documents?
19                    A.  I can't recall.
20                    Q.  You mentioned that you had an
21          ''virtual meeting with the other defendant;''
22          was that yesterday?
23                    A.  No.
24                    Q.  By ''other defendants,'' can you
25          name which are the other defendants that
```

12

```
 1                        Deana Jennings
 2            were present?
 3                      A.  Am I allowed to say it?
 4                           MR. KATAEV:  Yes.
 5                      A.  It was Ishaque Thanwalla, Jory
 6            Baron, Josh Aronson and Andris Guzman.
 7                      Q.  During that meeting, were there
 8            any other documents that you reviewed
 9            besides which you have described for me?
10                           MR. KATAEV:  Objection.
11                            Asked and answered.  You can
12                            answer the question.
13                      A.  From what I can recall, not sure
14            exactly.
15                      Q.  Meaning you are not sure if --
16                      A.  If there were more documents
17            besides those.
18                      Q.  Please go ahead and complete
19            your response.
20                      A.  That was it.
21                      Q.  Have you ever been arrested
22            before?
23                      A.  No.
24                  Q.  Do you own the residence that you
25            gave at the beginning of this deposition?
```

13

```
 1                      Deana Jennings
 2              A.  No.
 3                      MR. KATAEV:  Objection as
 4                  to relevance.
 5              A.  (Continuing) No.
 6              Q.  Besides the address that you
 7         gave at the beginning of this deposition,
 8         have you lived anywhere else in the past 5
 9         years?
10              A.  Yes.
11              Q.  Starting from the most recent,
12         where was the address that you lived prior
13         to the address that you gave at the
14         beginning of this deposition?
15              A.  Oh my gosh -- 10, Amber Court
16         Westbury, New York.
17              Q.  Have you lived anywhere else
18         within the past 5 years?
19              A.  No.
20              Q.  What is your highest level of
21         education?
22              A.  Some college.
23              Q.  Are you currently employed?
24              A.  Yes.
25              Q.  Who is your employer?
```

14

```
 1                         Deana Jennings
 2                    A.   Hillside Auto Mall, Inc.
 3                    Q.   Besides Hillside Auto Mall,
 4         Inc., do you have any other employer?
 5                    A.   No.
 6                    Q.   Currently how many days do you
 7         work for Hillside Auto Mall, Inc.?
 8                    A.   Five.
 9                    Q.   Do you have a set schedule?
10                    A.   Pretty much 10 to 5.
11                    Q.   In what year did you begin
12         working for Hillside Auto Mall, Inc.?
13                    A.   2008.
14                    Q.   Have you worked for any other
15         employer at the same time that you worked
16         for Hillside Auto Mall?
17                    A.   Yes.
18                    Q.   Can you name that employer for
19         me, please?
20                    A.   I worked part-time for Hillside
21         Auto Outlet, LLC.
22                    Q.   Can you tell me what year you
23         began working at Hillside Auto Outlet, LLC?
24                    A.   2018.
25                    Q.   Besides Hillside Auto Mall and
```

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 15 of 100 PageID #:
1612

15

```
 1                        Deana Jennings

 2            Hillside Auto Outlet, LLC, have you worked

 3            for any other employer since 2008?

 4                  A.  No.

 5                  Q.  Can you give me the address for

 6            Hillside Auto Mall Inc.?

 7                  A.  Hillside Auto Mall is 150-01

 8            Hillside Avenue, Jamaica, New York, 11432.

 9                  Q.  How about Hillside Auto Outlet

10            LLC?

11                  A.  They are located at 161-10

12            Hillside Avenue, Jamaica, New York, 11432.

13                  Q.  What is your position with

14            Hillside Auto Mall, Inc.?

15                  A.  I am the controller.

16                  Q.  As the controller, what are your

17            responsibilities?

18                  A.  I maintain the books, payroll,

19            bills, sales tax, facts, I do some DMV.

20                  Q.  What about maintaining the

21            books, specifically what did you mean?

22                  A.  I do the accounting.

23                  Q.  Are you a certified public

24            accountant?

25                  A.  No.
```

16

```
 1                    Deana Jennings
 2              Q.  Besides which you have already
 3       mentioned, do you have any other
 4       responsibilities as the controller at
 5       Hillside Auto Mall, Inc?
 6              A.  No.
 7              Q.  What year did you stop working
 8       for Hillside Auto Outlet LLC?
 9              A.  I think currently, 2020.
10              Q.  Who hired you in 2008 at
11       Hillside Auto Mall, Inc?
12              A.  Josh Aronson.
13              Q.  Was your schedule 5 days a week
14       from 10:00 a.m. to 5:00 p.m. in 2008?
15              A.  Which store?
16              Q.  Let's start from Hillside Auto
17       Mall Inc.
18              A.  Yes, 10 to 5.
19              Q.  Was it 5 days per week at the
20       time when you were hired?
21              A.  Yes.
22              Q.  Is it fair to say that between
23       2008 and 2018 before you were hired by
24       Hillside Auto Outlet, LLC, that you worked 5
25       days a week at Hillside Auto Mall, Inc?
```

17

```
 1                        Deana Jennings
 2              A.   Yes.
 3              Q.   Do you recall which month you
 4         were hired by Hillside Auto Outlet LLC?
 5              A.   I can't recall off the top of my
 6         head.
 7              Q.   Who hired you?
 8              A.   Josh Aronson.
 9              Q.   Between 2018 and early 2020, how
10         many days would you work for Hillside Auto
11         Mall Inc. and how many days would you work
12         for Hillside Auto Outlet LLC?
13              A.   Same time, I usually split up my
14         workload.
15              Q.   So, if there were 5 days a week,
16         how many days would you work between 2018
17         and early 2020 at Hillside Auto Mall, Inc?
18              A.   Hillside Auto Mall, Inc?
19              Q.   Yes.
20              A.   Five.
21              Q.   So, between 2018 and early 2020,
22         5 days per week, you would be working at
23         Hillside Auto Mall, Inc?
24              A.   Yes.
25              Q.   During that time, you would also
```

18

```
 1                        Deana Jennings

 2         maintain the books, payroll ,bills, sales

 3         tax and DMV for Hillside Auto LLC as well?

 4                   A.  For Hillside Auto Outlet LLC,

 5         everything mentioned minus the DMV.

 6                   Q.  Ms. Jennings, what is your

 7         birthdate?

 8                   A.  February 16th, 1979.

 9                   Q.  You are here today as a 30(b)6

10         witness for 161-10 Hillside Auto Avenue LLC,

11         as well as Hillside Auto Mall Inc.  Do you

12         understand that your testimony will be

13         binding as to those corporate defendants?

14                        MR. KATAEV:  Objection to

15                        the form.  It calls for a

16                        legal conclusion, you can

17                        answer the question.

18                   A.  Can you repeat the question

19         again? I'm sorry.

20                        MS. TROY:  Ms. Court

21                        reporter, will you please

22                        read it back.

23                        (The reporter read back the

24                        last question)

25                   A.  Yes.
```

A0952

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 19 of 100 PageID #: 1616

19

```
 1                        Deana Jennings
 2                Q.  Earlier when you mentioned
 3        Hillside Auto Outlet LLC, is that the same
 4        or different from the 161-10 Hillside Auto
 5        Avenue LLC?
 6                A.  It's the same, it's the D/B/A.
 7                Q.  Which one is the D/B/A?
 8                A.  It is 161-10.  Hillside Auto
 9        Avenue, LLC D/B/A Outlet, If I'm correct.
10                Q.  Would you work on-site for both
11        Hillside Auto Mall Inc. And 161-10 Hillside
12        Auto Avenue LLC?
13                A.  I have been at Hillside Auto
14        Outlet location.
15                Q.  Is that the same between 2018
16        and early 2020?
17                A.  Yes.
18                Q.  Was your position the same at
19        Hillside Auto Outlet as Hillside Auto Mall?
20                A.  Yes.
21                Q.  So, you were the controller for
22        Hillside Auto Outlet and Hillside Auto Mall?
23        The difference is that you would not do the
24        DMV for Hillside Auto Outlet; is that
25        correct?
```

A0953

20

```
 1                        Deana Jennings
 2                A.   Correct.
 3                Q.   Besides the two companies that
 4          you mentioned, did you work for any other
 5          employers since 2008?
 6                A.   No.
 7                Q.   At the time when you began to do
 8          work for Hillside Auto Outlet, in addition
 9          to Hillside Auto Mall, what was said to you
10          by Josh Aronson?
11                A.   Can you repeat that again?
12                     MS. TROY:  Ms. Reporter,
13                        if you don't mind reading it
14                        back.
15                     (The reporter read back the
16                        last question)
17                A.   He was opening up another store
18          and he wanted me to be the controller until
19          they found a full-time person for the
20          position.
21                Q.   Is it fair to say that you were
22          the controller for Hillside Auto Outlet on
23          or around when it began, meaning on or about
24          when it opened in 2018?
25                A.   Yes.
```

21

Deana Jennings

1

2      Q.   You mentioned Josh Aronson.  How

3  are you familiar with him?

4      A.   Josh is a shareholder at

5  Hillside Auto Mall where I am employed, and

6  he is also a member of Hillside Auto Outlet.

7      Q.   While working for Hillside Auto

8  Mall and Hillside Auto Outlet between 2018

9  and early 2020, were there any people

10  working under you or for you?

11      A.   No.

12      Q.   Was there like an assistant,

13  meaning a controller assistant or an office

14  assistant, someone who helped you with the

15  job?

16      A.   At which location?

17      Q.   Let's start from Hillside Auto

18  Mall.

19      A.   No.

20      Q.   How about at Hillside Auto

21  Outlet location?

22      A.   No, not assistant, but they had

23  somebody that did the motor vehicle and a

24  bookkeeper here and there throughout the

25  year.

22

```
 1                         Deana Jennings
 2                    Q.   You mentioned that you would do
 3           the payroll for the Hillside Auto Mall as
 4           well as Hillside Auto Outlet.  Can you
 5           describe how the payroll would be done?
 6                    A.   At Hillside Auto Mall, I would
 7           have one of our managers collect the
 8           commission sheets and then I would just
 9           tally it up.  Then, I would submit it to, I
10           believe it was -- I don't know which
11           company, possibly ADP.
12                    Q.   How about for Hillside Auto
13           Outlet?
14                    A.   Pretty much the same thing.
15           They would collect commission sheets and I
16           believe they would total everything and I
17           just submitted the information.
18                    Q.   How would they transmit those
19           sheets; was it by email or in-person?
20                    A.   Oh, I can't recall.
21                    Q.   How would they submit those?
22                    A.   Transmit.
23                    Q.   Between 2018 and early 2020,
24           were you on the payroll for both companies?
25                    A.   Yes.
```

23

```
 1                    Deana Jennings
 2              Q.  Besides hiring you, did Josh
 3        Aronson hire anyone else, and let's start
 4        from Hillside Auto Mall?
 5              A.  No.
 6              Q.  How about for Hillside Auto
 7        Outlet?
 8              A.  If Josh hired people?
 9              Q.  Other than yourself.
10            The question is: did Josh Aronson hire
11        anyone else besides you for Hillside Auto
12        Outlet?
13              A.  No.
14              Q.  Did Hillside Auto Outlet own the
15        premises or did it lease it?
16              A.  I believe it's leased.
17              Q.  How about for Hillside Auto
18        Mall?
19              A.  Hillside Auto Mall is leased.
20              Q.  With respect to Josh Aronson,
21        what are his job responsibilities as a
22        shareholder for Hillside Auto Mall?
23                    MR. KATAEV:  Objection as
24                    to relevance.  You can
25                    answer.
```

24

```
 1                     Deana Jennings
 2               A.  He is the operating member of
 3       Hillside Auto.
 4               Q.  As the operating member, what
 5       are his responsibilities?
 6               A.  Nothing much, Isaac handles all
 7       that.
 8               Q.  How about Hillside Auto Outlet,
 9       what are his responsibilities?
10               A.  Whose responsibilities?
11               Q.  Josh Aronson.
12               A.  I thought you were asking me
13       about Hillside Auto Outlet with the previous
14       question.  I'm sorry.
15               Q.  What are Josh Aronson's
16       responsibilities at Hillside Auto Mall?
17               A.  He is our secretary, and he
18       doesn't have any responsibilities within the
19       dealership.
20               Q.  Earlier your response pertaining
21       to the operating member of Hillside Auto,
22       you were referring to his responsibilities
23       as related to Hillside Auto Outlet; is that
24       correct?
25               A.  Yes.
```

25

```
 1                       Deana Jennings
 2                  Q.  So, Isaac who you saw yesterday
 3            on the Zoom, how are you familiar with him?
 4                  A.  He is the general manager and
 5            member of Hillside Auto Outlet.
 6                  Q.  Did Josh Aronson have the power
 7            to hire and fire for Hillside Auto Mall?
 8                  A.  I would say yes.  Since he is an
 9            owner, but we have managers that handle
10            those responsibilities within the
11            dealership.
12                  Q.  How about for Hillside Auto
13            Outlet, did Josh Aronson have the power to
14            hire and fire?
15                  A.  Again, he is a member, so I
16            would say he would have the ability to, and
17            again, he has a team of people to do that
18            for him.
19                  Q.  Did you maintain the employee
20            records for Hillside Auto Mall?
21                  A.  Yes.
22                  Q.  How about for Hillside Auto
23            Outlet between 2018 and early 2020?
24                  A.  Yes.
25                  Q.  Earlier you mentioned the
```

26

```
 1                          Deana Jennings

 2         commission sheets. How are the commission

 3         sheets kept?

 4                    A.  At Auto Outlet or Auto Mall?

 5                    Q.  Let's start from Auto Mall and

 6         then we will move on to Auto Outlet.

 7                    A.  I would keep them in the

 8         employee file.

 9                    Q.  That file, is that a paper file

10         or an electronic file?

11                    A.  Paper.

12                    Q.  When you say ''employee file,''

13         what category of employees are you talking

14         about?

15                    A.  I just had a folder with the

16         employee's names and I would keep all of

17         their commission sheets in that folder.

18                    Q.  Let me sort of try to clarify my

19         question.  My question is: what type of

20         employees would have an employee file with

21         the commission sheets, was that all the

22         employees or --

23                    A.  Just the sale sales associates.

24                    Q.  Would the business development

25         center people have any employee files as
```

27

```
 1                    Deana Jennings

 2          well?

 3                    A.  Yes.

 4                    Q.  Were employee files kept for

 5          non-commission employees?

 6                    A.  I have an employee file for

 7          them, yes.

 8                    Q.  Was that for each employee that

 9          there is a separate file folder?

10                    A.  Yes.  Whoever is hired, they get

11          a folder.

12                    Q.  For how long are the records

13          kept?

14                    A.  I think I still have them.

15                    Q.  Between 2008 and the present

16          day, did you throw out any of the employee

17          files?

18                    A.  No.

19                    Q.  Were any of the employee files

20          missing or lost that you know of between

21          2008 and the present day?

22                    A.  Not to my knowledge.

23                    Q.  Let's turn our attention to

24          Hillside Auto Outlet. How are the employee

25          records kept there?
```

28

```
 1                        Deana Jennings
 2                   A.   To the best of my knowledge,
 3            it's the same way.   There is an employee
 4            folder.
 5                   Q.   Let's turn our attention now for
 6            a second to the car salespeople
 7            specifically, what would be in a typical car
 8            salesperson's employee folder?
 9                   A.   Driver's license, another form
10            of identification, their social security,
11            passport, the employee package.   That would
12            be the employee package, and they might have
13            had a folder for commission sheets, Hillside
14            Auto Mall had separate at that point.
15                   Q.   You are saying that Hillside
16            Auto Mall would have two folders, if it's
17            for a car salesperson; one folder is with
18            the driver's license, ID and the employee
19            package and another folder is for the
20            commission sheets?
21                   A.   Yes.
22                   Q.   To your knowledge, were the
23            records ever lost or did you guys ever
24            discard any records between 2018 and the
25            present day?
```

A0962

29

```
 1                      Deana Jennings
 2                 A.   No.  I think there was a law
 3            that you have to hold documentation for at
 4            least seven years before discarding it or
 5            shredding it.
 6                 Q.   Let's focus on commission sheets
 7            for a second.  The commission sheets are
 8            filled out on a weekly basis; is that
 9            correct?
10                 A.   Correct.
11                 Q.   The commission sheets that are
12            filled out on a weekly basis, would that
13            include what information, can you describe
14            it for me?
15                 A.   For Auto Mall?
16                 Q.   Let's start from Auto Mall and
17            then we will go to Auto Outlet.
18                 A.   Okay.  For Auto Mall, we have a
19            sheet with the salesperson's name or the
20            BDC, rep's name.  It would list the amount
21            of time, it would be the customer's name,
22            possibly a partial VIN number, VIN number of
23            the car that they purchased. Sometimes the
24            date that it was sold.
25                 Q.   Any other information that would
```

A0963

30

```
 1                        Deana Jennings
 2           be contained?
 3                    A.  That is pretty much it.
 4                    Q.  Would it include the sales price
 5           and the commission that the car salesperson
 6           would receive?
 7                    A.  Sometimes they would write it on
 8           there for me.
 9                    Q.  If it was not written on there
10           for you, what would happen?
11                    A.  I know their pay plan.
12                    Q.  What was the pay plan for a
13           Hillside Auto Mall?
14                    A.  Hillside Auto Mall is 250
15           salary, $250 salary and 100 commission.
16                    Q.  Would that $100 commission be
17           per car?
18                    A.  Yes.
19                    Q.  Was there any bonus structure at
20           Hillside Auto Mall?
21                    A.  No.
22                    Q.  When you said that you would
23           tally up the numbers, you would tally the
24           number of cars sold and multiply it by the
25           commission, then add the salary; is that
```

A0964

31

```
 1                          Deana Jennings
 2           correct?
 3                   A.  On the sheet, I would just tally
 4           up their commissions, and the salary was
 5           just standard.
 6                   Q.  So, when you would tally up the
 7           number, that would be the number of cars
 8           sold?
 9                   A.  Yes.
10                   Q.  Once you tallied up the number
11           of cars sold, you would then pass that
12           information to a third party, whether that
13           was ADP or some other company; is that
14           correct?
15                   A.  Correct.
16                   Q.  Now let's turn your attention to
17           Hillside Auto Outlet.  Are the commission
18           sheets the same or different from that of
19           Hillside Auto Mall?
20                   A.  It was pretty much the same,
21           although they had a bookkeeper there and I
22           would print out the name and they would tell
23           me who gets paid this per week with the
24           commission, what it was and whatnot.
25                            MR. KATAEV:  Can you hang
```

A0965

32

```
 1                    Deana Jennings
 2                on one second, Tiffany?
 3                    MS. TROY:  Yes.
 4                (A recess was taken from
 5                10:41 until 10:43)
 6                    MS. TROY:  Are you ready
 7                to continue?
 8                    MR. KATAEV:  Ready to
 9                continue. Thank you.
10                    MS. TROY:  I believe your
11                client was responding --
12                    MR. KATAEV:  I thought she
13                was done.
14            Q.  Did you finish what you were
15        saying?
16            A.  Okay.  I did not finish my
17        thought.
18            Q.  Perfect, go ahead.
19            A.  (Continuing) I have a printout
20        of the payroll screen with the employee's
21        names and they would write it for me to make
22        it easier.  They did 2 separate entries the
23        same day to make it easier for me.
24            Q.  What was the pay plan at
25        Hillside Auto Outlet?
```

33

```
1                        Deana Jennings
2              A.   The paid plan for Outlet was, I
3         believe 300 commission, 300 salary and 150
4         commission.
5              Q.   Was there a bonus structure of 5
6         percent at any time while you were working
7         as the controller?
8                   MR. KATAEV:  Objection.
9                   Vague.  You can answer.
10             A.   I believe they did have a bonus
11        structure at Outlet, Hillside Auto Outlet.
12             Q.   On the commission sheet for
13        Hillside Auto Outlet salespeople, what would
14        the tally look like?
15             A.   I can't recall that far back.
16        It's just should be just the full amount,
17        what the specific salesperson or employee
18        was getting paid that week.
19             Q.   To your knowledge, was Leticia's
20        folder like the two folders that you talked
21        about, are they still there at Hillside Auto
22        Outlet?
23             A.   I can't recall.
24             Q.   You mentioned that Isaac was the
25        manager for Hillside Auto Outlet; as the
```

34

```
 1                      Deana Jennings
 2          manager, did he have the power to hire and
 3          fire?
 4                   A.  The general manager, yes, he had
 5          the ability to hire and fire, yes.
 6                   Q.  Let's backtrack for second was
 7          the pay for Hillside Auto Mall employees
 8          only dependent upon the number of cars sold?
 9                   A.  Can you rephrase your question?
10                   Q.  Sure.  How was the pay for
11          Hillside Auto Mall employees computed, and
12          I'm talking specifically about the car
13          salespeople?
14                   A.  How was it recorded?
15                   Q.  Yes, correct.
16                   A.  I don't recall commission
17          sheets, might have had a blackboard in the
18          office, possibly a CRM.
19                   Q.  Just so the record is clear,
20          what is an ''crm?''
21                   A.  That is the platform and I don't
22          know exactly what it stands for.  But, the
23          platform for specific company, it could be
24          advertising or different companies.
25                   Q.  You were talking about the
```

35

```
 1                          Deana Jennings
 2            Blackboard in the office, what would that
 3            Blackboard contain, what information would
 4            it contain?
 5                      A.  To my knowledge, it could have
 6            had the salespeople's names and tally of how
 7            many deals and that could be confusing,
 8            Hillside Auto Mall.
 9                      Q.  Did either Hillside Auto Mall or
10            Hillside Outlet have its time clock?
11                      A.  Hillside Auto Mall does not have
12            one, and I don't recall if Auto Outlet had a
13            time clock.
14                      Q.  Did the salespeople's weekly
15            salary depend on the number of hours that
16            they worked?
17                      A.  To the best of my knowledge, no.
18                      Q.  Are you familiar with an
19            individual Susan Zhivo Z-H-I-V-O?
20                      A.  Yes.
21                      Q.  How are you familiar with her?
22                      A.  She is the controller at
23            Hillside Auto Outlet.
24                      Q.  Was she your successor?
25                      MR. KATAEV:  Objection to
```

A0969

36

```
 1                      Deana Jennings
 2                 the form on that one.
 3                 A.   Yes.
 4                 Q.   Do you recall when she began
 5       working at Hillside Auto Outlet?
 6                 A.   I believe 2020.
 7                 Q.   To your knowledge, are her
 8       responsibilities the same as yours?
 9                 A.   To my knowledge, yes.
10                 Q.   Are you familiar with David
11       Barron, the late David Barron?
12                 A.   Yes.
13                 Q.   What were his responsibilities,
14       and let's start at Hillside Auto Mall?
15                 A.   He is -- he was the Vice
16       President of Hillside Auto Mall, but no
17       responsibilities within the dealership.
18                 Q.   How about at Hillside Auto
19       Outlet?
20                 A.   David was a member of Hillside
21       Auto Outlet, same thing, no responsibilities
22       within the dealership.
23                 Q.   Are you familiar with Jory
24       Baron?
25                 A.   Yes.
```

                                                                    37

```
 1                        Deana Jennings
 2                   Q.   What are his responsibilities at
 3          Hillside Auto Mall?
 4                   A.   Hillside Auto Mall?
 5                   Q.   Correct.
 6                   A.   Jory is not connected to
 7          Hillside Auto Mall.
 8                   Q.   How about Hillside Auto Outlet?
 9                   A.   He is also a member.
10                   Q.   What are his responsibilities?
11                   A.   He would -- he does -- I
12          remember just maybe signing checks weekly,
13          nothing pertaining to like daily activities
14          within the dealership.
15                   Q.   Did Isaac also have the power to
16          sign checks at Hillside Auto Outlet?
17                   A.   No.
18                   Q.   Besides Jory, is there anyone
19          else that has the authority to sign checks
20          for a Hillside Auto Outlet?
21                   A.   To the best of my knowledge, I
22          believe Josh Aronson and David Barron.
23                   Q.   Are you familiar with Raymond
24          Phelan P-H-E-L-A-N?
25                   A.   Yes.
```

38

```
 1                          Deana Jennings
 2                 Q.  What are his responsibilities at
 3        Hillside Auto Mall?
 4                 A.  Raymond specifically is the
 5        treasurer and he is pretty much like the
 6        general manager.  He is at the dealership
 7        every day and he oversees everything and he
 8        hires and fires.
 9                 Q.  Does Ray Phelan have any
10        connection with Hillside Auto Outlet?
11                 A.  No.
12                 Q.  Is it fair to say that each of
13        the owners, meaning the late David Barron,
14        Josh Aronson, Jory Baron and Isaac Thanwalla
15        had the power to hire and fire at Hillside
16        Auto Outlet?
17                        MR. KATAEV:  Objection.
18                        Compounds and calls for legal
19                        conclusion.  You can answer
20                        the question.
21                 A.  Can you repeat the names again,
22        please?
23                        MS. TROY:  Sure.  Ms.
24                        Court reporter, if you don't
25                        mind reading back the last
```

39

```
 1                          Deana Jennings
 2                          question.
 3                              (The reporter read back the
 4                              last question)
 5                  A.   Yes.
 6                  Q.   Is it fair to say that each of
 7          the members, meaning Ronald, Baron, Ronald
 8          Baron, the late David Baron, Josh Aronson
 9          and Raymond Phelan had have or had the power
10          to hire and fire at Hillside Auto Mall?
11                  A.   Yes.
12                  Q.   Do you know who signed the lease
13          on behalf of Hillside Auto Outlet?
14                              MR. KATAEV:  Objection to
15                              relevance.  You can answer.
16                  A.   I don't recall.
17                  Q.   How about for Hillside Auto
18          Mall?
19                  A.   Do you mean the original lease
20          back in 2008?
21                  Q.   Yes.
22                  A.   I wouldn't know that far back.
23                  Q.   How about the current lease?
24                  A.   The current lease for Hillside
25          Auto Mall was signed by Josh Aronson.
```

A0973

40

```
 1                        Deana Jennings
 2                  Q.  Going to backtrack for a second,
 3          who incorporated Hillside Auto Mall, Inc?
 4                  A.  I wouldn't know, I wasn't
 5          employed there when they opened up.
 6                  Q.  When was that, was that in 2006
 7          or --
 8                  A.  2005 or 2006.
 9                  Q.  Who filed the articles of
10          incorporation for 161-10 Hillside Auto
11          Avenue LLC?
12                  A.  Who filed the articles of
13          incorporation?
14                  A.  I wouldn't know that without my
15          records.
16                  Q.  Are you familiar with whether
17          Hillside Auto Mall, whether at the time of
18          its incorporation, any attorneys were
19          consulted?
20                  A.  When they first opened up
21          Hillside Auto Mall?
22                  Q.  Correct.
23                  A.  I was not employed at that time,
24          so I wouldn't know.
25                  Q.  How about for 161-10 Hillside
```

41

```
 1                    Deana Jennings

 2          Auto Avenue LLC, at the time when that was

 3          formed, did any member consult with an

 4          attorney?

 5                    A.  I wouldn't know without my

 6          records.

 7                    Q.  Do you know who was the signer

 8          for the current lease of Hillside Auto

 9          Outlet?

10                    A.  No.

11                    Q.  What is the name of the landlord

12          for Hillside Auto Mall?

13                    A.  Hillside Auto Mall?

14                    Q.  Right.

15                        MR. KATAEV:  Objection as

16                          to relevance.  You can

17                          answer.

18                    A.  Eldee E -L-D-E -E Auto Sales.

19                    Q.  For Hillside Auto Outlet, who is

20          the landlord?

21                    A.  I can't think of the name, I

22          believe to the best of my knowledge, the

23          Estate of Ezekiel E-Z-E-K-I-E-L Koeppel. K-O

24          -E-- P -P-E- L. That is when I was employed

25          there and I don't know if they switched
```

A0975

42

```
 1                      Deana Jennings
 2         landlords from 2020 until now.
 3                 Q.  Who sets the pay plan or the pay
 4         structure, and let's start from Hillside
 5         Auto Mall?
 6                 A.  Majority of the time, it is
 7         Raymond Phelan.
 8                 Q.  How about for Hillside Auto
 9         Outlet?
10                 A.  Isaac.
11                 Q.  Were you ever present at sales
12         meetings between Jory Baron and Ishaque
13         Thanwalla?
14                 A.  Sales meetings?
15                 Q.  Or, like weekly or monthly
16         meetings.
17                 A.  No.
18                 Q.  To your knowledge, what, if any,
19         posters are posted at Hillside Auto Mall?
20                 A.  We have the Labor Law posters,
21         we have the Consumer Affairs poster, we have
22         Covid posters until recently.  That is
23         pretty much what I can think of off the top
24         of my head.
25                 Q.  The Labor Law posters, what was
```

43

```
 1                      Deana Jennings
 2          the year that it was first posted at
 3          Hillside Auto Mall?
 4                      A.  I wouldn't know, I became
 5          employed by Hillside Auto Mall in 2008.  So,
 6          maybe 6 years after they opened.
 7                      Q.  Where is the Labor Law poster
 8          posted?
 9                      A.  On the wall in the main trailer.
10                      Q.  What does the Labor Law poster
11          look like?
12                      A.  (It's a poster) and I don't know
13          how to describe it. It has the minimum wage
14          on it, and it is in blue, thus there is a
15          year Asha, there is the minimum wage and it
16          is Spanish and it is it also, and it is
17          laminated.
18                      Q.  How about at Hillside Auto
19          Outlet, were there posters?
20                      A.  Yes.
21                      MR. KATAEV:  For the
22                          record, your description was
23                          pretty good.  Just joking.
24                      Q.  For Hillside Auto Outlet, when
25          was the first time when the poster was
```

A0977

44

```
 1                        Deana Jennings
 2          posted?
 3                   A.  I can't recall the date that
 4          they hung it up.
 5                   Q.  Was it the day when you started
 6          working or sometime after?
 7                   A.  I can't recall.
 8                   Q.  Do you recall where it was
 9          posted within the Outlet?
10                   A.  If my memory serves me right, on
11          the wall in between the main trailer and the
12          office.  But, if my memory serves me right,
13          they might have moved them.
14                   Q.  How many bank accounts did
15          Hillside Auto Mall have?
16                   A.  What year?
17                   Q.  Let's start from right now.
18                   A.  Now, Hillside Auto Mall has 3.
19                   Q.  Let's walk back to 2018, how
20          many bank accounts did it have back then?
21                   A.  I believe in 2018, I think
22          probably 3 at that point as well, as far as
23          I can recall.
24                   Q.  Do you recall at which bank?
25                   A.  We have JPMorgan Chase & Co and
```

A0978

45

```
 1                     Deana Jennings
 2         TD Bank.
 3                   Q.  How about for Hillside Auto
 4         Outlet, how many bank accounts does it have
 5         currently?
 6                   A.  Currently, I wouldn't know.
 7                   Q.  Right before you left in 2020,
 8         how many bank accounts did it have?
 9                   A.  I believe they had 4, might have
10         been 3 due to fraudulent transactions.
11         Maybe 3 or 4.
12                   Q.  Which bank was it --
13                   A.  In 2018 to 2020, I believe it
14         was just JPMorgan Chase.
15                   Q.  Who had the authority to
16         withdraw money from Hillside Auto Mall's
17         bank account?
18                       MR. KATAEV:  Objection as
19                          to relevance.  Also, all of
20                          these financial questions
21                          were decided in the Motion,
22                          and I instruct the witness on
23                          the basis on that basis not
24                          to answer the question.
25                       MS. TROY:  The judge
```

```
 1                    Deana Jennings

 2                    stated in a very specific

 3                    reason with respect to

 4                    discovery and financial

 5                    information.  If I can have

 6                    your commitment that because

 7                    of discovery, and I believe

 8                    it closes on March 24th, I

 9                    don't believe that this stage

10                    of discovery is now

11                    different.  If you are

12                    instructing your witness not

13                    to answer on the basis of the

14                    order of the motion to

15                    compel, maybe you are

16                    subjecting your witness to a

17                    second deposition.

18                         MR. KATAEV:  I believe

19                    that we should actually do

20                    this off the record.

21                         MS. TROY:  We can keep it

22                    on the record, just this

23                    portion.

24                         MR. KATAEV:  Okay.  What I

25                    think we can do is in the
```

A0980

47

```
 1                    Deana Jennings
 2                    event that the judge decides
 3                    that the question was proper,
 4                    I am comfortable submitting
 5                    interrogatory responses
 6                    unless the court orders her
 7                    to come back for another
 8                    deposition.
 9               MS TROY:  That is fine.
10               MR. KATAEV:  Thank you for
11                    that.
12          Q.  Who had the authority to
13     withdraw money from Hillside Auto Outlet's
14     bank account?
15               MR. KATAEV:  Same
16                    objection and same
17                    instruction on that.
18          A.  (No response per her attorney)
19          Q.  Roughly how many cars on-average
20     does Hillside Auto Mall sell?
21          A.  It's a tough industry right now,
22     between maybe 30 and 50, depending on the
23     economy and the market.
24          Q.  Back in 2018 and 2019, how many
25     cars were sold?
```

48

```
 1                         Deana Jennings
 2              A.   I wouldn't know off the top of
 3         my head without my records.  I'm sorry.
 4              Q.   What records, if any, would
 5         include the number of cars sold by the
 6         dealership?
 7              A.   Would it show how many cars were
 8         sold by the dealership?
 9              Q.   Correct.  For instance, for
10         Hillside Auto Mall, what records would show
11         the number of cars sold back in 2018 and
12         2019?
13              A.   Our computer system.
14              Q.   Is that computer system the same
15         or different from VIN Solutions?
16              A.   It's different.
17              Q.   Can you describe for me the
18         computer system, what type, what kind of
19         data is included?
20              A.   It is our operating system and
21         it has the deals for the vehicles that were
22         sold, that is the accounting and it has
23         vehicle information.
24              Q.   How about for Hillside Auto
25         Outlet, right before you left, how many cars
```

49

```
 1                      Deana Jennings

 2        were sold per-month?

 3                A.  I wouldn't know offhand without

 4        my records. I'm sorry.

 5                Q.  Did you review at all the sales

 6        records in preparation for today's

 7        deposition, and specifically the sales

 8        records for Hillside Auto Outlet between

 9        2018 and 2019?

10                A.  I believe so.

11                Q.  When you say that you ''believe

12        so,'' do you mean yes, you did?

13                A.  I reviewed a lot of documents

14        and I can't recall if it was specifically

15        her information or her computer sheets.

16                Q.  Did you review her computer

17        sheets in preparation for today's

18        deposition?

19                A.  I can't recall if I saw them in

20        the documents that I reviewed.

21                Q.  On-average, how much would each

22                car sell for?

23                     MR. KATAEV:  Objection.

24                     Vague, but you can answer.

25                A.  I don't know what she sold the
```

50

```
 1                        Deana Jennings
 2            vehicles for, a lot goes into the year,
 3            make, model and mileage.
 4                      Q.  How about on-average?
 5                      A.  I would not be able to come up
 6            with a figure for that.
 7                      Q.  Are you familiar with the
 8            working schedule for and let's start from
 9            Hillside Auto Mall employees?
10                      A.  Yes.
11                      Q.  What was the working schedule?
12                      A.  What year do you mean, going
13            back to when?
14                      Q.  Let's start from 2017.
15                      A.  The employees at Auto Mall
16            usually would work -- the schedule would
17            always change, but it used to be six days
18            with two days off per week and it would
19            rotate sometimes.  Now, we are down to maybe
20            they do probably five days, one day off,
21            rotating on Sundays, possibly and I don't
22            really handle scheduling.
23                      Q.  Who handled scheduling for
24            Hillside Auto Mall?
25                      A.  Raymond Phelan.
```

51

```
 1                          Deana Jennings
 2                     Q.   Was the schedule the same in
 3          2016?
 4                     A.   I can't recall that far back.
 5                     Q.   How about for Hillside Auto Mall
 6          in 2018, was it also six days a week with
 7          alternating Sundays off?
 8                     A.   I can't recall that far back.
 9                     Q.   What can you recall in terms of
10          the schedule at Hillside Auto Outlet?
11                     A.   Auto Outlet?
12                     Q.   Yes.
13                     A.   Ishaque handled the scheduling,
14          so I don't know.
15                     Q.   When was the start time for
16          Hillside Auto Mall employees?
17                     A.   I wouldn't know, I didn't have
18          anything to do with the scheduling or what
19          time people started.
20                     Q.   What about the end time, are you
21          familiar with the end time?
22                     A.   No.
23                     Q.   Are you familiar with start time
24          or end time at Hillside Auto Outlet?
25                     A.   For the hours of actual
```

52

```
 1                        Deana Jennings
 2          operation or the salesperson's start and end
 3          time?
 4                    Q.  Let's start from the salesperson
 5          start and end time.
 6                    A.  I don't know how Isaac set their
 7          schedule up.
 8                    Q.  Now, let's turn to the hours of
 9          operation; what was the start and end time
10          for the hours of operation?
11                    A.  If my memory serves me
12          correctly, it was 10 to maybe -- maybe 10 to
13          7 or 8.
14                    Q.  Besides yourself and the
15          bookkeeper that you mentioned earlier, was
16          there anyone else who would calculate the
17          employee's pay at either Hillside Auto Mall
18          or Hillside Auto Outlet?
19                    A.  Hillside Auto Mall was only me,
20          and Hillside Auto Outlet, I don't know if
21          anyone else tallied it up, but the
22          bookkeeper would give it to me and I would
23          assume she was the one that tallied up the
24          information in the computers for that week.
25                    Q.  Is that bookkeeper that you
```

53

```
 1                     Deana Jennings
 2       mentioned, did that bookkeeper change?
 3                 A.  Yes.
 4                 Q.  What are the names of the
 5       bookkeepers that you still recall the names
 6       for?
 7                 A.  All I remember, one name is Asha
 8       and the other two I don't know their names
 9       without my records.
10                     MS. TROY:  So, I'm going
11                       to leave a blank for the two
12                       names.
13
14                       (Insert)
15
16                       (Insert)
17                 Q.  Can you give the name that you
18       recall right now?
19                 A.  Asha A-S-H-A.
20                 Q.  Do you have her last name?
21                 A.  No.  Not without my records.
22                     MS. TROY:  We will leave a
23                       blank for you to look into
24                       your records and fill in the
25                       last name.
```

54

```
 1                        Deana Jennings

 2

 3                        (Insert)

 4              Q.  How many people work for

 5        Hillside Auto Mall at any one time?

 6              A.  How many people work at Auto

 7        Mall at any one given time? It varies.

 8              Q.  Let's take a day, let's say a

 9        weekend day, how many people would be there?

10              A.  Oh, I'm sorry.  I thought you

11        meant in general how many people were part

12        of the employment staff. You just mean

13        daily?

14              Q.  Yes.

15              A.  We could have all together the

16        sales people, me, a porter, 5 or 6.  Again,

17        we had more employees throughout the years,

18        some years we had less employees and I can't

19        give you an accurate answer on that one.

20              Q.  How about back in 2006, how many

21        people would be working at Hillside Auto

22        Mall on any given day?

23              A.  Giving an example, maybe 10 or

24        12 or 13.

25              Q.  How about for Hillside Auto
```

A0988

55

```
 1                      Deana Jennings
 2         Outlet?  And let's start from 2018.
 3                   A.  I wouldn't know without my
 4         records.
 5                   Q.  How about in 2020, right before
 6         you left, how many people would be working
 7         at Hillside Auto Outlet on any given day?
 8                   A.  I wouldn't know without my
 9         records.
10                   Q.  Besides yourself, did anyone
11         else work between Hillside Auto Outlet and
12         Hillside Auto Mall at the same time?
13                   A.  No.
14                   Q.  To your knowledge, if a car is
15         not in stock, it is not present at Hillside
16         Auto Outlet lot, would the car salespeople
17         come over to Hillside Auto Mall to show cars
18         there?
19                   A.  Very seldom did it happen, but
20         we had a few other car dealerships on
21         Hillside Avenue.  So, we had a variety and
22         we usually, if the customer wanted a
23         specific car, we would look and see who had
24         the car in inventory, Hillside Auto Mall or
25         Hillside Auto Outlet or previous dealerships
```

A0989

56

```
 1                       Deana Jennings
 2           around, such as auctions or dealerships out
 3           of state.
 4                       Q.  Are you familiar with the
 5           plaintiff in this case Leticia Stidhum?
 6                       A.  Yes.
 7                       Q.  How are you familiar with her?
 8                       A.  She was employed at Hillside
 9           Auto Outlet.
10                       Q.  Do you have any knowledge about
11           her working schedule?
12                       A.  I do not.
13                       Q.  Do you have any knowledge about
14           her work performance?
15                       A.  From what I have heard, she was
16           a very good salesperson, maybe one of the
17           top salespeople, monthly.
18                       Q.  Where did you hear that from?
19                       A.  Probably Isaac.
20                       Q.  To your knowledge, was she ever
21           disciplined?
22                       A.  I wouldn't know, I wouldn't be
23           part of that.  So, I can't give you an
24           answer on that one.  I am not part of the
25           disciplinary action department.
```

57

```
 1                    Deana Jennings
 2             Q.  Who was part of the
 3        ``disciplinary action department?''
 4                  A.  Isaac handled that.
 5                       MR. KATAEV:  Objection to
 6                    the form.
 7             Q.  Did Hillside Auto Mall and/or
 8        Hillside Auto Outlet have any policies about
 9        keeping track of employee performances?
10                  A.  I wouldn't know off the top of
11        my head.
12                  Q.  Were the employee photos that
13        you previously described for us, was there
14        ever a time there would be a performance
15        evaluation there in that set of records?
16                  A.  Hillside Auto Mall, no, Hillside
17        Auto Outlet, I wouldn't know.
18                  Q.  Are you familiar with a DMV
19        clerk who worked for Hillside Auto Outlet
20        whose first name is Lily?
21                  A.  No.
22                  Q.  Do you know that Lily left
23        Hillside Auto Outlet while pregnant and that
24        she believed that she was terminated as a
25        result of her pregnancy?
```

58

```
 1                          Deana Jennings
 2                          MR. KATAEV:  Objection as
 3                          to relevance and it's a
 4                          compound question.  You can
 5                          answer the question.
 6              A.  I don't even recall who Lily
 7       was.  So, I don't know anything about it,
 8       really.
 9                          MR. KATAEV:  Also
10                          objection to that as it calls
11                          for a state of mind of
12                          another person.
13                          MS. TROY:  Let's go off
14                          the record.
15                          (A discussion was held off
16                          the record).
17              Q.  You mentioned that the BDC also
18       had employees folders, was that one folder
19       or two folders at Hillside Auto Outlet?
20              A.  I don't recall.
21              Q.  Is it fair to say that if an
22       individual was at Hillside Auto Outlet that
23       that record would include, their records
24       would be in the employee files?
25              A.  Their employment package and
```

(1032 of 1960), Page 1032 of 1960 Case 25-490, 08/06/2025, DktEntry: 48.1, Page 125 of 301

59

```
 1                         Deana Jennings
 2         their application would be in there, in that
 3         employee file.  I don't recall how they
 4         filed commission sheets or how they kept
 5         them in the folders or whatnot at Hillside
 6         Auto Mall.  There were two separate folders
 7         there.
 8                   Q.  To your knowledge, was there any
 9         fixed break time for the employees at either
10         Hillside Auto Outlet or Hillside Auto Mall?
11                   A.  No, they could just take a break
12         whenever they wanted.
13                   Q.  Could you tell what type of
14         employee a person is by looking at a pay
15         stub and seeing how much that person had
16         made as a base wage as well as the flat
17         commission that you were talking about;
18         specifically, I'm talking about Hillside
19         Auto Outlet.
20                        MR. KATAERV:  Objection to
21                        the form, as its compound.
22                        You can answer.
23                   A.  That's a lot of question.  You
24         could see who is more veteran in the sales
25         department, and -- you could tell if
```

A0993

60

```
 1                        Deana Jennings
 2           somebody just started, the top sales for the
 3           company, it tells that, and then you really
 4           can't gauge it precisely with numbers.
 5                        Q.  Were there any car salespeople
 6           who were paid a base pay of $350 per week?
 7                        A.  I can't answer that without my
 8           records.
 9                        Q.  How about a weekly pay of $500.
10                        A.  That might have been -- again, I
11           wouldn't know the correct answer without my
12           records.
13                        Q.  Are you familiar with an
14           individual known as Andris Guzman?
15                        A.  Yes.
16                        Q.  How are you familiar with him?
17                        A.  He was employed at Hillside Auto
18           Outlet.
19                        Q.  What was his performance as a
20           sales manager/or general sales manager at
21           Hillside Auto Outlet?
22                        A.  I wouldn't know, but I heard
23           good things about him.
24                        Q.  What did you hear?
25                        A.  Professional, helping everybody
```

61

```
 1                        Deana Jennings
 2          out, jumping in and got the job done.
 3                     Q.  Were you at Hillside Auto Outlet
 4          when Leticia Stidhum brought in a sonogram
 5          and announced that she was pregnant?
 6                     A.  No.
 7                         MR. KATAEV:  Objection.
 8                         Assuming facts not in
 9                         evidence.
10                     Q.  When was the first day when you
11          heard that Leticia was pregnant?
12                         MR. KATAEV:  Objection.
13                         It assumes facts not in
14                         evidence.  You can answer the
15                         question.
16                     A.  I can't recall that long ago.
17                     Q.  Do you recall if at the time
18          when you found out that Leticia was
19          pregnant, if she was still employed by
20          Hillside Auto Outlet.
21                         MR. KATAEV:  Same
22                         objection.  You can answer.
23                     A.  I believe she was pregnant and
24          still employed at Hillside Auto Outlet.
25                     Q.  How did you find out?
```

62

```
 1                        Deana Jennings
 2                 A.   About her pregnancy?
 3                 Q.   Correct?
 4                 A.   I can't recall.  I don't know if
 5          I heard it from her when I was there one
 6          day, I don't recall.
 7                      Q.   Besides yourself, who else knew
 8          about her pregnancy?
 9                           MR. KATAEV:  Objection.
10                      Q.   (Continuing) My timing is while
11          she was still employed at Hillside Auto
12          Outlet.
13                           MR. KATEV:  Objection.
14                           Calls for a state of mind of
15                           another person.  You can
16                           answer.
17                 A.   I don't know exactly who now,
18          who she told.
19                 Q.   Was Isaac aware?
20                 A.   I'm sure he was.
21                 Q.   Why do you say that?
22                      MR. KATAEV:  Same
23                      Objection.
24                 A.   Because he was the general
25          manager.  You just mentioned that she
```

63

```
 1                        Deana Jennings
 2          brought in the sonogram to the dealership,
 3          Isaac worked seven days a week.
 4                  Q.  How about Andris Guzman, did he
 5          know of Leticia's pregnancy, to your
 6          knowledge?
 7                  A.  I don't know if he was aware
 8          when she became pregnant.
 9                  Q.  Did you look at her sales or
10          commissions and compare her sales before and
11          after the pregnancy announcement?
12                  A.  No.
13                  Q.  I'm showing you a series of
14          documents, Plaintiff's Exhibit 2.  It is
15          page 1251, and it's the 1099 compensation or
16          a week is $2,500.  Do you know who this
17          individual is?
18                  A.  I can't recall.
19                  Q.  Do you know what position this
20          person is in?
21                      MR. KATAEV:  Objection as
22                       to relevance.  You can
23                       answer.
24                  A.  No.
25                  Q.  We're on page 1252, this
```

A0997

64

Deana Jennings

1    individual was paid $650 a week.  Do you

2    know what position this individual is in?

3            A.  No.

4            Q.  Now looking at page 1254, number

5    2, is it fair to say, and let's backtrack

6    for a second.  My question is: what position

7    did this individual have?

8            A.  I can't tell.

9            Q.  How about this individual on

10   page 1255?

11           A.  I can't tell from the picture.

12           Q.  However the individual on page

13   1256 with a base salary of $200?

14           A.  Again, I can't tell.

15           Q.  The individual on page 1257 with

16   a base salary of 300?

17           A.  I can't tell.

18           Q.  Is there any individual for whom

19   you can tell which position the individual

20   is in just by looking at the pay stub?

21           A.  Just the earnings?  I can't tell

22   based on what is shown in the documents.

23           Q.  Just for the record, Isaac

24   Thanwalla said during his deposition that he

25

A0998

```
1                        Deana Jennings
2          was also unable to tell which position the
3          individuals were in, and the redacted
4          records that were produced for the
5          comparator of Leticia Stidhum.  At the time,
6          he said that he would ask the accountant and
7          look at that and provide the information to
8          this office.  To this day, no information
9          has been provided and we're now doing the
10         30(b)6 witness.  It seems like the corporate
11         witness's representative, is also unable to
12         provide the information.  But, with respect
13         to the comparators that were employed.
14                        MS. TROY:  Demand number
15                    20 for the employee files of
16                    Leticia Stidhum, including
17                    the sales commissions sheet
18                    that was previously requested
19                    or not provided.
20                        Demand number 21 is the
21                    employee file for the DMV
22                    clerk Lily, who was fired at
23                    the time that she was
24                    pregnant.  We don't need all
25                    the files, we just need
```

A0999

66

```
 1                  Deana Jennings

 2             anyone with information,

 3             written documents relating to

 4             her discipline as well as her

 5             termination that is on file.

 6                  MR. KATAEV:  Please

 7             follow-up in writing.

 8                  MS. TROY:  Also the last

 9             name and her last name and

10             last known address.

11                  MS. TROY:  Do you guys

12             want to take a 10 minute

13             break or do you want to take

14             a lunch break?  It's up to

15             you guys.

16                  MR. KATAEV:  10 minutes is

17             fine.

18                  MS. TROY:  Let's come back

19             in 10 minutes, let's come

20             back at 11:55.

21             (A recess was taken from

22             11:44 a.m. until 11:54 a.m.)

23                  MS. TROY:  We are back on

24             the record at 11:54.  Let's

25             continue.
```

67

                              Deana Jennings

1                                     Demand number 22 will be

2                            the office records pertaining

3                            to the number of cars sold at

4                            Hillside Auto Outlet, and

5                            specifically for Leticia

6                            Stidhum and the other car

7                            salespeople, and that would

8                            be October, 2018 until

9                            February of 2019.

10                                    MR. KATAEV:  Please put

11                           those demands in writing.

12                           Thank you.

13                 Q.  Are you familiar with the

14        Dealertrak system?

15                 A.  Yes.

16                 Q.  To your knowledge, who has

17        access to the Dealertrak system at Hillside

18        Auto Outlet in 2018?

19                 A.  To the best of my knowledge,

20        it's the manager, Isaac, the finance

21        managers, and Andris Guzman, Andris Guzman.

22                 Q.  You were working for Hillside

23        Auto Outlet, were there times when you would

24        be present on the sales floor?

Case 1:21-cv-07163-OEM-LB   Document 102-8   Filed 03/27/24   Page 68 of 100 PageID #: 1665

68

```
1                        Deana Jennings
2               A.  Passing through from the front
3         door to the office, not lingering or sitting
4         there?
5               Q.  Was there ever a time when you
6         would see Leticia Stidhum running the credit
7         on the Dealertrak system?
8               A.  No, not to my knowledge.
9               Q.  To your knowledge, was she ever
10        given access to Dealertrak by Isaac?
11              A.  I wouldn't know if Isaac gave
12        somebody access.  Again, the managers had --
13        I would say it's highly unlikely.
14              Q.  Did Isaac personally train
15        Leticia on how to run credit on the
16        Dealertrak system?
17              A.  I would have no idea.
18              Q.  The cell phone that you left in
19        your car, is that the same cell phone that
20        you used back in 2018 or 2019?
21              A.  No.
22              Q.  What is the phone that you used
23        back in 2018/2019?
24              A.  I don't know iPhone-something 8,
25        I believe.
```

69

```
 1                        Deana Jennings
 2              Q.  Do you use an iPhone currently?
 3              A.  Yes, I do.
 4              Q.  What is your phone number?
 5              A.  732-858-2614.
 6              Q.  Is that number back in
 7         2018/2019?
 8              A.  When did I change my number
 9         last?  I believe so, but I can't remember.
10         I don't know exactly when I changed it.
11              Q.  While you were the controller of
12         Hillside Auto Outlet, did you communicate
13         with any of the named defendants or the
14         plaintiff by text?
15              A.  I'm sure I have.
16              Q.  Do you still have any of those
17         text messages?
18              A.  No.
19              Q.  Do you know why not?
20              A.  I don't like a long list of
21         messages on my phone.  I have OCD, and I
22         don't like having all of those names.  I try
23         to keep it to who I spoke to and -- on a
24         daily basis, and the list is short.
25              Q.  Were any of the text messages
```

70

```
 1                          Deana Jennings
 2              with the named defendants about Leticia
 3              Stidhum?
 4                       A.  Do you mean current day?
 5                       Q.  Let's start from currently, and
 6              then we will work our way back.
 7                       A.  No.  Possibly like for documents
 8              for the case.
 9                       Q.  How about back in 2018 and 2019?
10                       A.  Not that I can recall.  I don't
11              really have interaction with the salespeople
12              like that, usually something -- that's
13              something that the manager can help them if
14              they have a question or something where you
15              ask a manager to help you.
16                       Q.  What was your email back then in
17              2018/2019?
18                       A.  D-E-E 216456@aol.com.
19                       Q.  Through your aol email address,
20              did you ever send emails to or from any of
21              the named defendants about Leticia?
22                       A.  No, not back then.  Maybe
23                           pertaining to the case.
24                       Q.  Do you have a work email as
25              well?
```

71

```
 1                      Deana Jennings
 2              A.  No.  We had one, but I don't use
 3         it and we didn't continue the subscription
 4         for the Gmail account.
 5              Q.  Are you familiar with Auto
 6         Funds?
 7              A.  To an extent.
 8              Q.  To your knowledge, what is Auto
 9         Funds?
10              A.  I believe it's the company that
11         feeds our inventory to our computer website.
12              Q.  To your knowledge, did Leticia,
13         would Leticia ever be given access to Auto
14         Funds?
15              A.  I wouldn't know the answer to
16         that question.
17              Q.  I'm now showing you on the
18         screen what was marked as Plaintiff's
19         Exhibit 2, and we are on page 2.  I'm going
20         to scroll down.
21                   (Ms. Troy complies).
22            You recognize this document on page 2?
23              A.  It looks like maybe VIN
24         Solutions, but I really can't tell.  I don't
25         deal with the leads with respect to the
```

72

```
1                    Deana Jennings

2        dealership.  It looks like VIN Solutions.

3                    Q.  Is it fair to say that VIN

4        Solutions understated the number of cars

5        sold?

6                        MR. KATAEV:  Objection as

7                            to the form.  There was no

8                            evidence --

9                    A.  I don't know if it's accurate,

10       but they do keep some of what a total for

11       the interaction of the sales customers with

12       the sales records.

13                   Q.  Was the bookkeeper the same as

14       the assistant office manager at Hillside

15       Auto Outlet?

16                   A.  I don't know.

17                   Q.  Do you have the names?

18                   A.  Yes, Asha.

19                   Q.  Who else?

20                   A.  Just her.  What was her

21       position, is it just bookkeeper?

22                       A.  She was the bookkeeper and I

23       don't know If she had the title of office

24       manager.  They are mainly the same thing,

25       just bookkeeper, I would say.
```

73

```
 1                    Deana Jennings

 2               Q.  Are you familiar with an

 3          individual whose name is Ali A-L-I?

 4               A.  Ali used to work at Outlet.

 5               Q.  What was his position?

 6               A.  I think he was manager of some

 7          sort.

 8               Q.  Let's backtrack for a second: do

 9          you have use of any social media platforms

10          like WhatsApp or Facebook Messenger to

11          checks with any of the named defendants?

12                    MR. KATAEV:  Objection to

13                    the assent that this was not

14                    something that she can answer

15                    in her capacity as a 30(b)6

16                    witness.

17               A.  I don't really message people on

18          social media, I am more of a texter or

19          calling person.  So, I am pretty sure none

20          of them have -- I don't have social media

21          really, I don't have WhatsApp and I don't

22          keep that up.  Maybe my landlord uses that

23          for me, but that's it.

24               Q.  Did Leticia at any point to tell

25          you personally about her pregnancy?
```

74

```
 1                    Deana Jennings
 2              A.   Again, I don't recall how I
 3         found out.  I think I remember knowing about
 4         it and congratulating her, but I don't know
 5         how I found out whether it's from her or
 6         someone else, being aware that she was
 7         pregnant at that time.
 8              Q.   Do you recall if this was before
 9         or after Christmas when you congratulated
10         her?
11              A.   I can't recall.
12              Q.   How about before or after
13         Thanksgiving?
14              A.   I can't recall.
15              Q.   Was it before or after New
16         Year's?
17              A.   I can't recall.
18              Q.   Do you recall when Isaac made
19         his trip to Pakistan in 2018, December?
20              A.   I believe it was -- there was a
21         few dates that he went.
22              Q.   I'm asking you about December of
23         2018.
24              A.   No, I just know it was the end
25         of December.  I believe he was gone for a
```

A1008

75

```
 1                          Deana Jennings
 2           couple of weeks.
 3                          MS. TROY:  Maybe now will
 4                          be a good time for us to take
 5                          a quick lunch break.  It is
 6                          now 12:10 and let's come back
 7                          at 12:55.
 8                          MR. KATAEV:  That should
 9                          be fine.
10                          (A recess was taken from
11                          12:10 p.m. until 12:55 p.m.)
12                          MS. TROY:  We're back on
13                          the record at 12:55
14                  Q.  We are almost done.  Let's go
15           back on the record, and Ms. Jennings, can
16           you let me know who the CPA is for Hillside
17           Auto Mall?
18                  A.  Hillside Auto Mall?
19                  Q.  Right.
20                          MR. KATAEV:  Objection.
21                      You can answer.
22                  A.  I would have to check my records
23           depending on the year, who should be the
24           accountant because it fluctuates.
25                  Q.  How about for Hillside Auto
```

76

```
 1                    Deana Jennings

 2        Outlet?

 3                 A.  Pretty much the same thing. It

 4        fluctuates depending on the year, which

 5        owner decided to go with which company.

 6                 Q.  Do you recall in 2018/2019 who

 7        the CPA?

 8                 A.  I can't recall without my

 9        records that far back.

10                        MS. TROY:  Demand number

11                        23 will be documents

12                        sufficient to establish the

13                        name and address of the

14                        accountants for Hillside Auto

15                        Mall in 2018/ 2019.

16                        Demand 24 will be for

17                        documents sufficient to

18                        identify the CPA for Hillside

19                        Auto Outlet for 2018/2019.

20                 Q.  Ms. Jennings, when were you told

21        to not bring your cellphone to the

22        deposition?

23                        MR. KATAEV:  Objection.

24                        With the caveat that if you

25                        had any conversations with
```

77

```
 1                      Deana Jennings
 2                 your attorney about the
 3                 subject, I instruct you not
 4                 to answer.
 5           A.  (No response).
 6           Q.  Did anyone besides your attorney
 7      tell you not to bring this cell phone to
 8      this deposition today?
 9           A.  No.  I left it charging in my
10      car because I needed the navigation to come
11      here from New Jersey.  I did not unplug my
12      phone from my charger.
13           Q.  Are you aware that during the
14      break I made a request to your attorney for
15      you to bring your cell phone back to the
16      deposition at or before the end of the lunch
17      break?
18                 MR. KATAEV:  Objection as
19                 to attorney/client privilege.
20                 I instruct the witness not to
21                 answer the question.
22                 MS. TROY:  I'm not asking
23                 what was said between you and
24                 her, I'm asking her if she
25                 was aware that there was a
```

78

```
 1                    Deana Jennings
 2               demand that was made for the
 3               cell phone to be brought back
 4               from the car to the
 5               deposition.
 6                    MR. KATAEV:  I'm going to
 7               qualify my objection.  If you
 8               have any independent
 9               knowledge of that, you may
10               answer from your knowledge.
11               If your knowledge is based on
12               my conversations with you,
13               you may not answer.
14               A.  I am confused right now.  I
15         don't recall being notified about anyone's
16         cell phone, it is 30 degrees outside and I'm
17         not walking outside to get it.
18               Q.  Are you familiar with the sales
19         process at Hillside Auto Outlet?
20               A.  To an extent, yes.
21               Q.  What is the sales process, and
22         please break it down into the different
23         components with the approximate time?
24               A.  Well, customer comes in and they
25         proceed and they meet with the salesperson.
```

(1052 of 1960), Page 1052 of 1960 Case: 25-490, 08/06/2025, DktEntry: 48.1, Page 145 of 301

79

```
 1                    Deana Jennings
 2        I don't know how long it takes for them, but
 3        they look at a vehicle that they are
 4        interested in, and see if it's in their
 5        price range. Usually after they land a car,
 6        the salesperson gives the sales manager or
 7        the manager the corresponding application to
 8        submit.  It could take between maybe 15 or
 9        20 minutes to maybe 45 minutes to an hour.
10        There is a lot of qualifications and
11        verifications such as pay stubs, identity,
12        Asha, red flags.
13             After that is said and done, then it
14        goes to the finance manager and he will
15        submit everything to the bank.  Then, they
16        will wait for the bank to give them an
17        approval or not.
18                  Q.  When you talked about the
19        salesperson would give the sales manager the
20        credit application to submit, is that where
21        the Dealertrak comes in?
22                  A.  Yes.
23                  Q.  Have you ever seen or do you
24        have knowledge of the fact that other car
25        salespeople's credit applications were
```

A1013

80

```
 1                    Deana Jennings

 2          prioritized over Leticia Stidhum's customers

 3          credit applications?

 4                    A.  No.

 5                    Q.  Were you aware of any

 6          communications between any of the named

 7          defendants with the plaintiff, Leticia

 8          Stidhum, about promoting her to a sales

 9          manager position?

10                    A.  Not that I was made aware of.

11                    Q.  Backtracking for a moment, are

12          you familiar with whether customers of

13          Hillside Auto Outlet walked out as a result

14          of the long wait time?

15                    A.  No.

16                    Q.  Were you aware that Leticia

17          Stidhum complained about the longer wait

18          time?

19                    A.  No, not until this case.

20                    Q.  Are you a party to any other

21          civil proceeding besides this one?

22                    A.  No.

23                    MS. TROY:  I have no

24                        further questions for you.

25                        Thank you, Ms. Jennings.
```

A1014

81

```
 1                       Deana Jennings

 2            [Time noted: 12:54 p.m.]

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

82

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Ms. Jennnings | Ms. Troy | |
| | | 6 |

PLAINTIFF EXHIBITS

| Number | Description | PAGE |
|--------|-------------|------|
| | | |
| 20 | ID - Deemed marked | 6 |

A1016

83

```
 1
 2                        REQUESTS
 3      Number           Description            PAGE
 4    22           Demand No. 22 is:                 67
 5                 MS. TROY:  Will be
 6                 the office records
 7                 pertaining to the
 8                 number of cars sold
 9                 at Hillside Auto Outlet,
10                 and specifically, for
11                 Leticia Stidhum and the
12                 other car salespeople,
13                 and that would be October,
14                 2018 until February of
15                 2019.
16    23           Demand No. 23 is:                 76
17                 MS. TROY:  Will be
18                 documents sufficient to
19                 establish the name and
20                 address of the accountants
21                 for Hillside Auto Mall in
22                 2018/2019.
23    24           Demand No. 24 is:                 76
24                 MS. TROY:  Will be for
25                 documents sufficient to
```

84

```
 1
 2                    identify the CPA for
 3              Hillside Auto Outlet for
 4              2018/2019.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

A1018

85

1

2          QUESTIONS MARKED FOR A RULING:      PAGE/LINE

3          (None)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A1019

86

```
 1                         ACKNOWLEDEGMENT

 2

 3

 4      STATE OF NEW YORK    )

 5                           )s.s.

 6      COUNTY OF MIDDLESEX  )

 7            I, DEANA JENNINGS, hereby certify

 8      that I have read the transcript of my

 9      testimony taken under oath in my deposition

10      of March 10, 2023; that the transcript is a

11      true, complete and correct record of my

12      testimony, and that the answers on the

13      record as given by me are true and correct.

14

15

16      _____

17                      DEANA JENNINGS

18

19      Signed and subscribed before me

20      this ____ day of _____, 2023.

21

22

23      _____

24            Notary Public

25
```

87

```
 1                      C E R T I F I C A T E

 2

 3

 4       STATE OF NEW YORK      )

 5                              )s.s.

 6       COUNTY OF NASSAU       )

 7

 8                 I, LYNN LUCKMAN, a Shorthand

 9       Reporter and Notary Public within and for

10       the State of New York, do certify that;

11                 THAT the witness whose deposition

12       is hereinbefore set forth, was duly sworn by

13       me, and that such deposition is a true

14       record of the testimony given by such

15       witness.

16                 I further certify that I am not

17       related to any of the parties to this action

18       by blood or marriage; that I am in no way

19       interested in the outcome of this matter.

20                 IN WITNESS WHEREOF, I have

21       hereunto set my hand this 21st day of March,

22       2023.

23

24                      _____

25                             LYNN LUCKMAN
```

1  Errata Sheet

2

3  NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC

4  DATE OF DEPOSITION: 03/10/2023

5  NAME OF WITNESS: DEANA JENNINGS

6  Reason Codes:

7       1. To clarify the record.

8       2. To conform to the facts.

9       3. To correct transcription errors.

10 Page _____ Line _____ Reason _____

11 From _____ to _____

12 Page _____ Line _____ Reason _____

13 From _____ to _____

14 Page _____ Line _____ Reason _____

15 From _____ to _____

16 Page _____ Line _____ Reason _____

17 From _____ to _____

18 Page _____ Line _____ Reason _____

19 From _____ to _____

20 Page _____ Line _____ Reason _____

21 From _____ to _____

22 Page _____ Line _____ Reason _____

23 From _____ to _____

24

25                     _____

**$**

**$100** 30:16
**$2,500** 63:16
**$200** 64:14
**$250** 30:15
**$350** 60:6
**$500** 60:9
**$650** 64:2

**-**

**-E** 41:18
**-E--** 41:24
**-L-D-E** 41:18
**-P-E-** 41:24

**0**

**07747** 5:16

**1**

**10** 13:15 14:10
16:18 52:12 54:23
66:12,16,19 86:10
**100** 30:15
**1099** 63:15
**10:00** 16:14
**10:41** 32:5
**10:43** 32:5
**11432** 15:8,12
**11:44** 66:22
**11:54** 66:22,24
**11:55** 66:20
**12** 54:24
**1251** 63:15
**1252** 63:25
**1254** 64:5
**1255** 64:11
**1256** 64:14

**1257** 64:16
**12:10** 75:6,11
**12:54** 81:2
**12:55** 75:7,11,13
**13** 54:24
**15** 79:8
**150** 33:3
**150-01** 15:7
**161-10** 15:11
18:10 19:4,8,11
40:10,25
**16th** 18:8
**1979** 18:8

**2**

**2** 11:16 32:22
63:14 64:6 71:19,
22
**20** 6:2 65:15 79:9
82:7
**2005** 40:8
**2006** 40:6,8 54:20
**2008** 14:13 15:3
16:10,14,23 20:5
27:15,21 39:20
43:5
**2016** 51:3
**2017** 50:14
**2018** 14:24 16:23
17:9,16,21 19:15
20:24 21:8 22:23
25:23 28:24 44:19,
21 45:13 47:24
48:11 49:9 51:6
55:2 67:9,19 68:20
70:9 74:19,23
76:15 83:14
**2018/2019** 68:23
69:7 70:17 76:6,19
83:22 84:4
**2019** 47:24 48:12
49:9 67:10 68:20
70:9 76:15 83:15
**2020** 16:9 17:9,17,
21 19:16 21:9
22:23 25:23 36:6

42:2 45:7,13 55:5
**2023** 86:10,20
**21** 65:20
**216456@aol.com**
70:18
**22** 67:2 83:4
**23** 76:11 83:16
**24** 76:16 83:23
**24th** 46:8
**250** 30:14

**3**

**3** 44:18,22 45:10,
11
**30** 47:22 78:16
**30(b)6** 5:4 18:9
65:10 73:15
**300** 33:3 64:17

**4**

**4** 45:9,11
**45** 79:9
**49** 5:15

**5**

**5** 13:8,18 14:10
16:13,18,19,24
17:15,22 33:5
54:16
**50** 47:22
**5:00** 16:14

**6**

**6** 43:6 54:16 82:7
**67** 83:4

**7**

**7** 52:13
**732-858-2614**
69:5

**76** 83:16,23

**8**

**8** 52:13 68:24

**A**

**A** 32:4 58:15 66:21
75:10
**A-L-I** 73:3
**A-S-H-A** 53:19
**a.m.** 16:14 66:22
**ability** 25:16 34:5
**able** 50:5
**access** 67:18
68:10,12 71:13
**account** 45:17
47:14 71:4
**accountant** 15:24
65:6 75:24
**accountants**
76:14 83:20
**accounting** 15:22
48:22
**accounts** 44:14,
20 45:4,8
**accurate** 54:19
72:9
**ACKNOWLEDEG
MENT** 86:2
**action** 56:25 57:3
**activities** 37:13
**actual** 51:25
**actually** 46:19
**add** 30:25
**addition** 20:8
**address** 5:14
13:6,12,13 15:5
66:10 70:19 76:13
83:20
**ADP** 22:11 31:13
**advertising** 34:24
**Affairs** 42:21

**after** 5:4 43:6 44:6
63:11 74:9,12,15
79:5,13
**again** 18:19 20:11
25:15,17 38:21
54:16 60:10 64:15
68:12 74:2
**ago** 61:16
**agree** 9:9,15
**ahead** 12:18
32:18
**Ali** 73:3,4
**all** 24:6 26:16,21
45:19 49:5 53:7
54:15 65:24 69:22
**allowed** 12:3
**almost** 75:14
**already** 16:2
**also** 17:25 21:6
37:9,15 43:16
45:19 51:6 58:9,17
65:2,11 66:8
**alternating** 51:7
**although** 31:21
**always** 50:17
**am** 12:3 15:15
21:5 47:4 56:24
73:18,19 78:14
**Amber** 13:15
**amount** 29:20
33:16
**an** 8:13,16 10:20
11:20 21:12,13
25:8 26:10,20 27:6
28:3 34:20 35:18
41:3 54:19,23
56:23 58:21 60:13
69:2 71:7 73:2
78:20 79:9,16
**and/or** 57:7
**Andris** 12:6 60:14
63:4 67:22
**announced** 61:5
**announcement**
63:11
**another** 20:17

A1023

28:9,19 47:7 58:12 62:15

**answer** 6:12,23 7:4,11,20 8:2,13 10:6 12:12 18:17 23:25 33:9 38:19 39:15 41:17 45:24 46:13 49:24 54:19 56:24 58:5 59:22 60:7,11 61:14,22 62:16 63:23 71:15 73:14 75:21 77:4, 21 78:10,13

**answered** 12:11

**answering** 7:7

**answers** 86:12

**any** 7:6 8:23 9:4, 13,18,19 11:9,17 12:8 14:4,14 15:3 16:3 20:4 21:9 24:18 26:25 27:16, 19 28:24 29:25 30:19 33:6 38:9 40:18 41:3 42:18 48:4 54:5,7,22 55:7 56:10,13 57:8 59:8 60:5 64:19 69:13,16,25 70:20 73:9,11,24 76:25 78:8 80:5,6,20

**anyone** 9:11 10:10 23:3,11 37:18 52:16,21 55:10 66:2 77:6

**anyone's** 78:15

**anything** 11:3 51:18 58:7

**anywhere** 13:8, 17

**aol** 70:19

**application** 59:2 79:7,20

**applications** 79:25 80:3

**approval** 79:17

**approximate** 78:23

**Aronson** 12:6 16:12 17:8 20:10 21:2 23:3,10,20

24:11 25:6,13 37:22 38:14 39:8, 25

**Aronson's** 24:15

**around** 20:23 56:2

**arrested** 12:21

**articles** 40:9,12

**Asha** 43:15 53:7, 19 72:18 79:12

**ask** 6:11,17 65:6 70:15

**Asked** 12:11

**asking** 7:5 24:12 74:22 77:22,24

**assent** 73:13

**assistant** 21:12, 13,14,22 72:14

**associates** 26:23

**assume** 52:23

**assumes** 61:13

**Assuming** 61:8

**at** 7:3 12:25 13:7, 13 14:15,23 15:11 16:4,10,19,25 17:17,22 19:13,18 20:7 21:4,16,20 22:6 24:16 26:4 28:14 29:3 30:19 32:24 33:6,11,21 35:22 36:5,14,18 37:2,16 38:2,6,15 39:10 40:17,23 41:2 42:11,19 43:2,18 44:22,24 49:5 50:15 51:10, 24 52:17 54:5,6,7, 21 55:7,12,15 56:8 58:19,22 59:5,9,14 60:17,20 61:3,17, 24 62:11 63:9 64:5,21 65:5,7,22 66:20,24 67:4,18 72:14 73:4,24 74:7 75:7,13 77:16 78:19 79:3 83:9

**attention** 27:23 28:5 31:16

**attorney** 7:23,25

10:9,16 11:4 41:4 47:18 77:2,6,14

**attorney/client** 77:19

**attorneys** 40:18

**auctions** 56:2

**authority** 37:19 45:15 47:12

**Auto** 14:2,3,7,12, 16,21,23,25 15:2, 6,7,9,14 16:5,8,11, 16,24,25 17:4,10, 12,17,18,23 18:3, 4,10,11 19:3,4,8, 11,12,13,19,22,24 20:8,9,22 21:5,6,7, 8,17,20 22:3,4,6, 12 23:4,6,11,14, 17,19,22 24:3,8, 13,16,21,23 25:5, 6 27:24 28:14,16 29:15,16,17,18 30:13,14,20 31:17, 19 32:25 33:11,13, 21,25 34:7,11 35:8,9,11,12,23 36:5,14,16,18,21 37:3,4,7,8,16,20 38:3,10,16 39:10, 13,17,25 40:3,10, 17,21 41:2,8,12, 13,18,19 42:5,8,19 43:3,5,18,24 44:15,18 45:3,16 47:13,20 48:10,24 49:8 50:9,15,24 51:5,10,11,16,24 52:17,18,19,20 54:5,6,21,25 55:7, 11,12,16,17,24,25 56:9 57:7,8,16,17, 19,23 58:19,22 59:6,10,19 60:17, 21 61:3,20,24 62:11 67:5,19,24 69:12 71:5,8,13 72:15 75:17,18,25 76:14,19 78:19 80:13 83:9,21 84:3

**Avenue** 15:8,12 18:10 19:5,9,12 40:11 41:2 55:21

**aware** 62:19 63:7

74:6 77:13,25 80:5,10,16

──────
**B**
──────

**back** 18:22,23 20:14,15 33:15 38:25 39:3,20,22 44:19,20 47:7,24 48:11 50:13 51:4,8 54:20 66:18,20,23 68:20,23 69:6 70:6,9,16,22 75:6, 12,15 76:9 77:15 78:3

**backtrack** 34:6 40:2 64:6 73:8

**Backtracking** 80:11

**bank** 44:14,20,24 45:2,4,8,12,17 47:14 79:15,16

**Baron** 12:6 36:24 38:14 39:7,8 42:12

**Barron** 36:11 37:22 38:13

**base** 59:16 60:6 64:14,17

**based** 64:23 78:11

**basis** 29:8,12 45:23 46:13 69:24

**BDC** 29:20 58:17

**became** 43:4 63:8

**because** 46:6 62:24 75:24 77:10

**been** 5:4 6:5 12:21 19:13 45:10 60:10 65:9

**before** 6:6 7:5 8:21 12:22 16:23 29:4 45:7 48:25 55:5 63:10 74:8, 12,15 77:16 86:19

**began** 14:23 20:7, 23 36:4

**begin** 14:11

**beginning** 12:25 13:7,14

**behalf** 39:13

**being** 74:6 78:15

**believe** 22:10,16 23:16 32:10 33:3, 10 36:6 37:22 41:22 44:21 45:9, 13 46:7,9,18 49:10,11 61:23 68:25 69:9 71:10 74:20,25

**believed** 57:24

**besides** 9:15 10:9 11:8 12:9,17 13:6 14:3,25 16:2 20:3 23:2,11 37:18 52:14 55:10 62:7 77:6 80:21

**best** 28:2 35:17 37:21 41:22 67:20

**between** 7:11,19 16:22 17:9,16,21 19:15 21:8 22:23 25:23 27:15,20 28:24 42:12 44:11 47:22 49:8 55:11 77:23 79:8 80:6

**bills** 15:19 18:2

**binding** 18:13

**birthdate** 18:7

**blackboard** 34:17 35:2,3

**blank** 53:11,23

**blue** 43:14

**bonus** 30:19 33:5, 10

**bookkeeper** 21:24 31:21 52:15, 22,25 53:2 72:13, 21,22,25

**bookkeepers** 53:5

**books** 15:18,21 18:2

**both** 19:10 22:24

**break** 7:11,15,19 9:10 59:9,11 66:13,14 75:5 77:14,17 78:22

A1024

**bring** 76:21 77:7, 15

**brought** 61:4 63:2 78:3

**business** 26:24

**but** 10:20 21:22 25:9 34:22 36:16 44:12 49:24 50:17 52:21 55:19 60:22 65:12 69:9 71:2,24 72:10 73:23 74:4 79:2

**C**

**calculate** 52:16

**call** 7:18

**calling** 73:19

**calls** 18:15 38:18 58:10 62:14

**can** 7:2,12,13,18 8:7 11:12,16,24 12:11,13 14:18,22 15:5 18:16,18 20:11 22:4 23:24 29:13 31:25 33:9 34:9 38:19,21 39:15 41:16 42:23 44:23 46:5,21,25 48:17 49:24 51:9 53:17 58:4 59:22 61:14,22 62:15 63:22 64:20 70:10, 13 73:14 75:15,21

**can't** 10:19,20,23 11:19 17:5 22:20 33:15,23 41:21 44:3,7 49:14,19 51:4,8 54:18 56:23 60:4,7 61:16 62:4 63:18 64:9,12,15, 18,22 69:9 71:24 74:11,14,17 76:8

**capacity** 73:15

**car** 9:25 10:3 28:6, 7,17 29:23 30:5,17 34:12 49:22 55:14, 16,20,23,24 60:5 67:7 68:19 77:10 78:4 79:5,24 83:12

**carries** 8:19

**cars** 30:24 31:7,11 34:8 47:19,25 48:5,7,11,25 55:17 67:4 72:4 83:8

**case** 6:8 56:5 70:8,23 80:19

**category** 26:13

**caveat** 11:2 76:24

**cell** 9:19,21,24 10:2 68:18,19 77:7,15 78:3,16

**cellphone** 76:21

**center** 26:25

**certain** 10:23

**certified** 15:23

**certify** 86:7

**change** 50:17 53:2 69:8

**changed** 69:10

**charger** 77:12

**charging** 77:9

**Chase** 44:25 45:14

**chat** 9:12

**check** 75:22

**checks** 37:12,16, 19 73:11

**Christmas** 74:9

**civil** 80:21

**clarify** 26:18

**clear** 34:19

**clearly** 6:23

**clerk** 57:19 65:22

**client** 32:11

**clock** 35:10,13

**closes** 46:8

**Co** 44:25

**collect** 22:7,15

**college** 13:22

**come** 47:7 50:5 55:17 66:18,19 75:6 77:10

**comes** 78:24 79:21

**comfortable** 47:4

**commission** 22:8,15 26:2,17,21 28:13,20 29:6,7,11 30:5,15,16,25 31:17,24 33:3,4,12 34:16 59:4,17

**commissions** 31:4 63:10 65:17

**commitment** 46:6

**communicate** 69:12

**communicating** 9:11

**communications** 80:6

**companies** 20:3 22:24 34:24

**company** 22:11 31:13 34:23 60:3 71:10 76:5

**comparator** 65:5

**comparators** 65:13

**compare** 63:10

**compel** 46:15

**compensation** 63:15

**complained** 80:17

**complete** 12:18 86:11

**completely** 9:2,7

**complies** 5:22 6:4 71:21

**components** 78:23

**compound** 58:4 59:21

**Compounds** 38:18

**computed** 34:11

**computer** 9:18 48:13,14,18 49:15, 16 71:11

**computers** 52:24

**conclusion** 18:16 38:19

**condition** 9:5

**confused** 78:14

**confusing** 35:7

**congratulated** 74:9

**congratulating** 74:4

**connected** 37:6

**connection** 38:10

**consult** 41:3

**consulted** 40:19

**Consumer** 42:21

**contain** 35:3,4

**contained** 30:2

**continue** 7:13 32:7,9 66:25 71:3

**Continuing** 13:5 32:19 62:10

**controller** 15:15, 16 16:4 19:21 20:18,22 21:13 33:7 35:22 69:11

**conversations** 76:25 78:12

**corporate** 18:13 65:10

**correct** 19:9,25 20:2 24:24 29:9,10 31:2,14,15 34:15 37:5 40:22 48:9 60:11 62:3 86:11, 13

**correctly** 52:12

**corresponding** 79:7

**could** 8:24 9:5 34:23 35:5,7 54:15 59:11,13,24,25 79:8

**COUNTY** 86:6

**couple** 75:2

**court** 5:25 6:3,16 8:20 13:15 18:20 38:24 47:6

**Covid** 42:22

**CPA** 75:16 76:7, 18 84:2

**credit** 68:6,15 79:20,25 80:3

**crm** 34:18,20

**current** 39:23,24 41:8 70:4

**currently** 8:23 9:4 13:23 14:6 16:9 45:5,6 69:2 70:5

**customer** 55:22 78:24

**customer's** 29:21

**customers** 72:11 80:2,12

**D**

**D-E-A-N-A** 5:3

**D-E-E** 70:18

**D/b/a** 19:6,7,9

**daily** 37:13 54:13 69:24

**data** 48:19

**date** 29:24 44:3

**dates** 74:21

**David** 36:10,11,20 37:22 38:13 39:8

**day** 27:16,21 28:25 32:23 38:7 44:5 50:20 54:8,9, 22 55:7 61:10 62:6 65:8 70:4 86:20

**days** 14:6 16:13, 19,25 17:10,11,15, 16,22 50:17,18,20 51:6 63:3

**deal** 71:25

**dealership** 24:19 25:11 36:17,22

37:14 38:6 48:6,8 63:2 72:2

**dealerships** 55:20,25 56:2

**Dealertrak** 67:15, 18 68:7,10,16 79:21

**deals** 35:7 48:21

**Deana** 5:1,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 86:7,17

**December** 74:19, 22,25

**decided** 45:21 76:5

**decides** 47:2

**deem** 6:2

**Deemed** 82:7

**defendant** 10:15 11:21

**defendants** 11:24,25 18:13 69:13 70:2,21 73:11 80:7

**degrees** 78:16

**demand** 65:14,20 67:2 76:10,16 78:2 83:4,16,23

**demands** 67:12

**department** 56:25 57:3 59:25

**depend** 35:15

**dependent** 34:8

**depending** 47:22 75:23 76:4

**deposition** 6:6,9, 11 9:10 10:11 11:2,10 12:25 13:7,14 46:17 47:8 49:7,18 64:25 76:22 77:8,16 78:5 86:9

**describe** 11:12 22:5 29:13 43:13 48:17

**described** 12:9 57:13

**description** 43:22 82:5 83:3

**development** 26:24

**device** 9:13,19

**didn't** 51:17 71:3

**difference** 19:23

**different** 19:4 31:18 34:24 46:11 48:15,16 78:22

**discard** 28:24

**discarding** 29:4

**disciplinary** 56:25 57:3

**discipline** 66:4

**disciplined** 56:21

**discovery** 46:4,7, 10

**discussed** 11:3

**discussion** 58:15

**DMV** 15:19 18:3,5 19:24 57:18 65:21

**document** 71:22

**documentation** 29:3

**documents** 9:16 11:9,18 12:8,16 49:13,20 63:14 64:23 66:3 70:7 76:11,17 83:18,25

**does** 35:11 37:11 38:9 43:10 45:4 47:20

**doesn't** 24:18

**doing** 65:9

**don't** 8:5,7,12 11:3 20:13 22:10 34:16,21 35:12 38:24 39:16 41:25 43:12 46:9 49:25 50:21 51:14 52:6, 20 53:8 58:6,7,20 59:3 62:4,6,17 63:7 65:24 69:10, 20,22 70:10 71:2, 24 72:9,16,23 73:17,20,21 74:2,4 78:15 79:2

**done** 22:5 32:13 61:2 75:14 79:13

**don't** 68:24

**door** 68:3

**down** 6:9,17 7:3, 12 50:19 71:20 78:22

**drink** 7:16

**Drive** 5:15

**driver's** 28:9,18

**due** 45:10

**duly** 5:5

**during** 9:9,10 12:7 17:25 64:25 77:13

**E**

**E-Z-E-K-I-E-L** 41:23

**each** 27:8 38:12 39:6 49:21

**earlier** 19:2 24:20 25:25 52:15

**early** 17:9,17,21

19:16 21:9 22:23 25:23

**earnings** 64:22

**easier** 32:22,23

**economy** 47:23

**education** 13:21

**effect** 8:20

**either** 35:9 52:17 59:9

**Eldee** 41:18

**electronic** 26:10

**else** 13:8,17 23:3, 11 37:19 52:16,21 55:11 62:7 72:19 74:6

**email** 9:12 22:19 70:16,19,24

**emails** 70:20

**emotional** 9:5

**employed** 13:23 21:5 40:5,23 41:24 43:5 56:8 60:17 61:19,24 62:11 65:13

**employee** 25:19 26:8,12,20,25 27:4,6,8,16,19,24 28:3,8,11,12,18 33:17 57:9,12 58:24 59:3,14 65:15,21

**employee's** 26:16 32:20 52:17

**employees** 26:13,20,22 27:5 34:7,11 50:9,15 51:16 54:17,18 58:18 59:9

**employer** 13:25 14:4,15,18 15:3

**employers** 20:5

**employment** 54:12 58:25

**end** 51:20,21,24 52:2,5,9 74:24 77:16

**entries** 32:22

**establish** 76:12 83:19

**Estate** 41:23

**evaluation** 57:15

**even** 58:6

**event** 47:2

**ever** 6:5 12:21 28:23 42:11 56:20 57:14 68:5,9 70:20 71:13 79:23

**every** 38:7

**everybody** 60:25

**everything** 6:17 18:5 22:16 38:7 79:15

**evidence** 11:11, 13 61:9,14 72:8

**exactly** 12:14 34:22 62:17 69:10

**EXAMINATION** 5:17 82:2

**examined** 5:6

**example** 7:16 54:23

**except** 9:10

**Exhibit** 5:25 63:14 71:19

**exhibits** 9:17 82:4

**explain** 6:9

**extent** 71:7 78:20

**Ezekiel** 41:23

**F**

**Facebook** 73:10

**fact** 79:24

**facts** 8:11 15:19 61:8,13

**fair** 16:22 20:21 38:12 39:6 58:21 64:6 72:3

**familiar** 21:3 25:3 35:18,21 36:10,23 37:23 40:16 50:7

93Index: far–how

51:21,23 56:4,7 57:18 60:13,16 67:14 71:5 73:2 78:18 80:12

**far** 33:15 39:22 44:22 51:4,8 76:9

**February** 18:8 67:10 83:14

**feeds** 71:11

**few** 55:20 74:21

**figure** 50:6

**file** 26:8,9,10,12, 20 27:6,9 59:3 65:21 66:5

**filed** 40:9,12 59:4

**files** 26:25 27:4, 17,19 58:24 65:15, 25

**fill** 53:24

**filled** 29:8,12

**finance** 67:21 79:14

**financial** 45:20 46:4

**find** 61:25

**fine** 47:9 66:17 75:9

**finish** 32:14,16

**finished** 7:7

**fire** 25:7,14 34:3,5 38:15 39:10

**fired** 65:22

**fires** 38:8

**first** 6:11 40:20 43:2,25 57:20 61:10

**five** 14:8 17:20 50:20

**fixed** 59:9

**flags** 79:12

**flat** 59:16

**floor** 67:25

**fluctuates** 75:24 76:4

**focus** 29:6

**folder** 26:15,17 27:9,11 28:4,8,13, 17,19 33:20 58:18

**folders** 28:16 33:20 58:18,19 59:5,6

**follow-up** 66:7

**follows** 5:7

**force** 8:19

**forgot** 10:7

**form** 18:15 28:9 36:2 57:6 59:21 72:7

**formed** 41:3

**forward** 6:10

**found** 20:19 61:18 74:3,5

**fraudulent** 45:10

**from** 7:23 8:24 9:6 12:13 13:11 16:14, 16 19:4 21:17 23:4 26:5 29:16 31:18 32:4 42:2,4 44:17 45:16 47:13 48:15 50:8,14 52:4 55:2 56:15,18 62:5 64:12 66:21 68:2 70:5,20 74:5 75:10 77:11,12 78:4,10

**front** 68:2

**full** 5:10 33:16

**full-time** 20:19

**Funds** 71:6,9,14

**further** 80:24

**G**

**gauge** 60:4

**gave** 12:25 13:7, 13 68:11

**general** 25:4 34:4 38:6 54:11 60:20 62:24

**Generally** 7:25

**gestures** 6:19

**get** 7:16 27:10 78:17

**gets** 31:23

**getting** 33:18

**give** 6:18 15:5 52:22 53:17 54:19 56:23 79:16,19

**given** 54:7,22 55:7 68:10 71:13 86:13

**gives** 79:6

**Giving** 54:23

**Gmail** 71:4

**go** 12:18 29:17 32:18 58:13 75:14 76:5

**goes** 50:2 79:14

**going** 6:8,10 9:11 40:2 50:12 53:10 71:19 78:6

**gone** 74:25

**good** 5:19,23 6:5 43:23 56:16 60:23 75:4

**gosh** 13:15

**got** 61:2

**ground** 6:10

**guys** 28:23 66:11, 15

**Guzman** 12:6 60:14 63:4 67:22

**H**

**handle** 25:9 50:22

**handled** 50:23 51:13 57:4

**handles** 24:6

**hang** 31:25

**happen** 30:10 55:19

**harassing** 10:5

**has** 6:16 25:17 37:19 43:13 44:18 48:21,22 65:9

67:17

**having** 5:4 69:22

**he** 20:17,18 21:6 24:2,17 25:4,8,15, 16,17 34:2,4 36:15 37:9,11 38:5,6,7 60:17 62:20,24 63:4,7 64:25 65:6 73:6 74:21,25 79:14

**head** 6:19 17:6 42:24 48:3 57:11

**hear** 8:7 56:18 60:24

**heard** 56:15 60:22 61:11 62:5

**held** 58:15

**help** 70:13,15

**helped** 21:14

**helping** 60:25

**her** 5:21 35:21 36:7 47:6,18 49:15,16 53:20 56:7,11,14 57:25 62:2,5,8 63:9,10 66:4,9 72:20 73:15,25 74:4,5,10 77:24 80:8

**here** 8:11 18:9 21:24 77:11

**hereby** 86:7

**herein** 5:4

**highest** 13:20

**highly** 68:13

**Hillside** 14:2,3,7, 12,16,20,23,25 15:2,6,7,8,9,12,14 16:5,8,11,16,24,25 17:4,10,12,17,18, 23 18:3,4,10,11 19:3,4,8,11,13,19, 22,24 20:8,9,22 21:5,6,7,8,17,20 22:3,4,6,12 23:4,6, 11,14,17,19,22 24:3,8,13,16,21,23 25:5,7,12,20,22 27:24 28:13,15 30:13,14,20 31:17, 19 32:25 33:11,13,

21,25 34:7,11 35:8,9,10,11,23 36:5,14,16,18,20 37:3,4,7,8,16,20 38:3,10,15 39:10, 13,17,24 40:3,10, 17,21,25 41:8,12, 13,19 42:4,8,19 43:3,5,18,24 44:15,18 45:3,16 47:13,20 48:10,24 49:8 50:9,24 51:5, 10,16,24 52:17,18, 19,20 54:5,21,25 55:7,11,12,15,17, 21,24,25 56:8 57:7,8,16,19,23 58:19,22 59:5,10, 18 60:17,21 61:3, 20,24 62:11 67:5, 18,23 69:12 72:14 75:16,18,25 76:14, 18 78:19 80:13 83:9,21 84:3

**him** 21:3 25:3,18 60:16,23

**hire** 23:3,10 25:7, 14 34:2,5 38:15 39:10

**hired** 16:10,20,23 17:4,7 23:8 27:10

**hires** 38:8

**hiring** 23:2

**his** 33:21 24:5,9, 22 36:13 37:2,10 38:2 60:19 64:25 73:5 74:19

**hold** 29:3

**honestly** 10:20

**hour** 10:20 79:9

**hours** 35:15 51:25 52:8,10

**how** 10:18,20 14:6 15:9 17:9,11,16 21:2,20 22:5,12, 18,21 23:6,17 24:8 25:3,12,22 26:2 27:12,24 34:10,14 35:6,21 36:18 37:8 39:17,23 40:25 42:8 43:13,18 44:14,19 45:3,4,8

A1027

47:19,24 48:7,24, 25 49:21 50:4 51:5 52:6 54:4,6,9,11, 20,25 55:5,6 56:7 59:3,4,15 60:9,16 61:25 63:4 64:10 68:15 70:9 74:2,5, 12 75:25 79:2

**however** 7:18,25 64:13

**hung** 44:4

---

**I**

**I'LL** 8:6,8

**ID** 5:21 6:2 28:18 82:7

**idea** 68:17

**identification** 28:10

**identify** 76:18 84:2

**identity** 79:11

**in-person** 22:19

**Inc** 14:2,4,7,12 15:6,14 16:5,11, 17,25 17:11,17,18, 23 18:11 19:11 40:3

**include** 29:13 30:4 48:5 58:23

**included** 48:19

**including** 65:16

**incorporated** 40:3

**incorporation** 40:10,13,18

**independent** 78:8

**individual** 35:19 58:22 60:14 63:17 64:2,3,8,10,13,16, 19,20 73:3

**individuals** 65:3

**industry** 47:21

**information** 22:17 29:13,25

---

31:12 35:3 46:5 48:23 49:15 52:24 65:7,8,12 66:2

**Insert** 53:14,16 54:3

**instance** 48:9

**instant** 9:12

**instruct** 45:22 77:3,20

**instructing** 46:12

**instruction** 47:17

**interaction** 70:11 72:1

**interested** 79:4

**Interrogatories** 11:6,8

**interrogatory** 47:5

**into** 50:2 53:23 78:22

**inventory** 55:24 71:11

**iphone** 69:2

**iphone-something** 68:24

**Isaac** 24:6 25:2 33:24 37:15 38:14 42:10 52:6 56:19 57:4 62:19 63:3 64:24 67:21 68:10, 11,14 74:18

**Ishaque** 12:5 42:12 51:13

**its** 35:10 40:18 59:21

---

**J**

**J-E-N-N-I-N-G-S** 5:3

**Jamaica** 15:8,12

**Jennings** 5:1,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,6 19:1 20:1 21:1

---

22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1,15 76:1,20 77:1 78:1 79:1 80:1,25 81:1 86:7,17

**Jennnings** 82:3

**Jersey** 77:11

**job** 21:15 23:21 61:2

**joking** 43:23

**Jory** 12:5 36:23 37:6,18 38:14 42:12

**Josh** 12:6 16:12 17:8 20:10 21:2,4 23:2,8,10,20 24:11,15 25:6,13 37:22 38:14 39:8, 25

**JPMORGAN** 44:25 45:14

**judge** 8:21 45:25 47:2

**jumping** 61:2

**just** 22:8,17 26:15, 23 31:3,5 33:16 34:19 37:12 43:23 45:14 46:22 54:12 59:11 60:2 62:25 64:21,22,24 65:25 72:20,21,25 74:24

---

**K**

**K-O** 41:23

---

**KATAERV** 59:20

**Kataev** 5:19 10:4 12:4,10 13:3 18:14 23:23 31:25 32:8, 12 33:8 35:25 38:17 39:14 41:15 43:21 45:18 46:18, 24 47:10,15 49:23 57:5 58:2,9 61:7, 12,21 62:9,22 63:21 66:6,16 67:11 72:6 73:12 75:8,20 76:23 77:18 78:6

**KATEV** 62:13

**keep** 26:7,16 46:21 69:23 72:10 73:22

**keeping** 57:9

**kept** 26:3 27:4,13, 25 59:4

**kind** 48:18

**knew** 62:7

**know** 7:17 8:13 22:10 27:20 30:11 34:22 39:12,22 40:4,14,24 41:5,7, 25 43:4,12 45:6 48:2 49:3,25 51:14,17 52:6,20 53:8 55:3,8 56:22 57:10,17,22 58:7 60:11,22 62:4,17 63:5,7,16,19 64:3 68:11,24 69:10,19 71:15 72:9,16,23 74:4,24 75:16 79:2

**knowing** 74:3

**knowledge** 27:22 28:2,22 33:19 35:5,17 36:7,9 37:21 41:22 42:18 55:14 56:10,13,20 59:8 63:6 67:17,20 68:8,9 71:8,12 78:9,10,11 79:24

**known** 60:14 66:10

**Koeppel** 41:23

---

**L**

**Labor** 42:20,25 43:7,10

**laminated** 43:17

**land** 79:5

**landlord** 41:11,20 73:22

**landlords** 42:2

**last** 7:7 18:24 20:16 38:25 39:4 53:20,25 66:8,9,10 69:9

**late** 36:11 38:13 39:8

**law** 29:2 42:20,25 43:7,10

**lawsuit** 6:14

**lay** 6:9

**leads** 71:25

**lease** 23:15 39:12, 19,23,24 41:8

**leased** 23:16,19

**least** 29:4

**leave** 10:2 53:11, 22

**left** 9:25 45:7 48:25 55:6 57:22 68:18 77:9

**legal** 18:16 38:18

**less** 54:18

**let** 7:17 26:18 75:16

**let's** 16:16 21:17 23:3 26:5 27:23 28:5 29:6,16 31:16 34:6 36:14 42:4 44:17,19 50:8,14 52:4,8 54:8 55:2 58:13 64:6 66:18, 19,24 70:5 73:8 75:6,14

**Leticia** 56:5 61:4, 11,18 65:5,16 67:6 68:6,15 70:2,21 71:12,13 73:24

80:2,7,16 83:11

**Leticia's** 33:19 63:5

**level** 13:20

**license** 28:9,18

**like** 21:12 33:14, 20 37:13 38:5 42:15 43:11 65:10 69:20,22 70:7,12 71:23 72:2 73:10

**likewise** 7:6

**Lily** 57:20,22 58:6 65:22

**lingering** 68:3

**list** 29:20 69:20,24

**lived** 13:8,12,17

**LLC** 14:21,23 15:2,10 16:8,24 17:4,12 18:3,4,10 19:3,5,9,12 40:11 41:2

**located** 15:11

**location** 19:14 21:16,21

**long** 7:10 10:18, 21 27:12 61:16 69:20 79:2 80:14

**longer** 80:17

**look** 33:14 43:11 53:23 55:23 63:9 65:7 79:3

**looking** 59:14 64:5,21

**looks** 71:23 72:2

**lost** 27:20 28:23

**lot** 49:13 50:2 55:16 59:23 79:10

**loudly** 6:23

**lunch** 66:14 75:5 77:16

---

**M**

**made** 59:16 74:18 77:14 78:2 80:10

**main** 43:9 44:11

**mainly** 72:24

**maintain** 15:18 18:2 25:19

**maintaining** 15:20

**Majority** 42:6

**make** 7:24 32:21, 23 50:3

**Mall** 14:2,3,7,12, 16,25 15:6,7,14 16:5,11,17,25 17:11,17,18,23 18:11 19:11,19,22 20:9 21:5,8,18 22:3,6 23:4,18,19, 22 24:16 25:7,20 26:4,5 28:14,16 29:15,16,18 30:13, 14,20 31:19 34:7, 11 35:8,9,11 36:14,16 37:3,4,7 38:3 39:10,18,25 40:3,17,21 41:12, 13 42:5,19 43:3,5 44:15,18 47:20 48:10 50:9,15,24 51:5,16 52:17,19 54:5,7,22 55:12, 17,24 57:7,16 59:6,10 75:17,18 76:15 83:21

**Mall's** 45:16

**manager** 25:4 33:25 34:2,4 38:6 60:20 62:25 67:21 70:13,15 72:14,24 73:6 79:6,7,14,19 80:9

**manager/or** 60:20

**managers** 22:7 25:9 67:22 68:12

**many** 14:6 17:10, 11,16 35:7 44:14, 20 45:4,8 47:19,24 48:7,25 54:4,6,9, 11,20 55:6

**March** 46:8 86:10

**mark** 5:25

**marked** 6:2 71:18 82:7 85:2

**market** 47:23

**Matawan** 5:15

**matter** 6:13

**may** 7:24 10:5 78:9,13

**maybe** 37:12 43:6 45:11 46:15 47:22 50:19 52:12 54:23 56:16 70:22 71:23 73:22 75:3 79:8,9

**me** 6:11 7:17 8:6,8 9:23 11:3 12:9 14:19,22 15:5 20:18 24:12 26:18 29:14 30:8 31:23 32:21,23 44:10,12 48:17 52:11,19,22 54:16 73:23 75:16 86:13,19

**mean** 15:21 39:19 49:12 50:12 54:12 70:4

**meaning** 12:15 20:23 21:13 38:13 39:7

**meant** 54:11

**media** 73:9,18,20

**medications** 8:24

**meet** 78:25

**meeting** 10:14 11:21 12:7

**meetings** 42:12, 14,16

**member** 21:6 24:2,4,21 25:5,15 36:20 37:9 41:3

**members** 39:7

**memory** 44:10,12 52:11

**mentioned** 11:20 16:3 18:5 19:2 20:4 21:2 22:2 25:25 33:24 52:15 53:2 58:17 62:25

**message** 9:12 73:17

**messages** 11:14 69:17,21,25

**Messenger** 73:10

**MIDDLESEX** 86:6

**might** 28:12 34:17 44:13 45:9 60:10

**mileage** 50:3

**mind** 20:13 38:25 58:11 62:14

**minimum** 43:13, 15

**minus** 18:5

**minute** 66:12

**minutes** 66:16,19 79:9

**missing** 27:20

**model** 50:3

**moment** 80:11

**money** 45:16 47:13

**month** 17:3

**monthly** 42:15 56:17

**more** 10:19 12:16 54:17 59:24 73:18

**morning** 5:19 6:5 10:8

**most** 13:11

**motion** 45:21 46:14

**motor** 21:23

**move** 26:6

**moved** 44:13

**Mr** 5:19 10:4 12:4, 10 13:3 18:14 23:23 31:25 32:8, 12 33:8 35:25 38:17 39:14 41:15 43:21 45:18 46:18, 24 47:10,15 49:23 57:5 58:2,9 59:20 61:7,12,21 62:9, 13,22 63:21 66:6, 16 67:11 72:6 73:12 75:8,20 76:23 77:18 78:6

**ms** 5:24 18:6,20 20:12 32:3,6,10 38:23 45:25 46:21 47:9 53:10,22 58:13 65:14 66:8, 11,18,23 71:21 75:3,12,15 76:10, 20 77:22 80:23,25 82:3 83:5,17,24

**much** 11:6 14:10 22:14 24:6 30:3 31:20 38:5 42:23 49:21 59:15 76:3

**multiply** 30:24

**my** 6:12,23 7:5,7, 19,24 13:15 17:5, 13 26:18,19 27:22 28:2 32:16 35:5,17 36:9 37:21 40:14 41:5,22 42:24 44:10,12 48:3 49:4 52:11 53:9,21 55:3,8 57:11 60:7, 11 62:10 64:7 67:20 68:8 69:8,21 73:22 75:22 76:8 77:9,11,12 78:7,12 86:8,9,11

---

**N**

**N.J.** 5:16

**name** 5:10 11:25 14:18 29:19,20,21 31:22 41:11,21 53:7,17,20,25 57:20 66:9 73:3 76:13 83:19

**named** 69:13 70:2,21 73:11 80:6

**names** 26:16 32:21 35:6 38:21 53:4,5,8,12 69:22 72:17

**navigation** 77:10

**near** 9:22

**need** 7:15 65:24, 25

**needed** 77:10

**New** 5:6 13:16 15:8,12 74:15

A1029

96Index: no–plan

77:11 86:4

**no** 6:7,18,19 7:18 9:3,8 11:23 12:23 13:2,5,19 14:5 15:4,25 16:6 20:6 21:11,19,22 23:5, 13 27:18 29:2 30:21 35:17 36:16, 21 37:17 38:11 41:10 42:17 47:18 51:22 53:21 55:13 57:16,21 59:11 61:6 63:12,24 64:4 65:8 68:8,17,21 69:18 70:7,22 71:2 72:7 74:24 77:5,9 80:4,15,19,22,23 83:4,16,23

**nodding** 6:19

**non-commission** 27:5

**none** 73:19 85:3

**not** 7:4,6 8:2,12 9:11,17,23 12:13, 15 19:23 21:22 27:22 30:9 32:16 35:11 37:6 40:23 45:23 46:12 50:5 53:21 55:15 56:12, 24 61:8,13 65:19 68:3,8 69:19 70:10,22 73:13 76:21 77:3,7,11, 20,22 78:13,17 79:17 80:10,19

**Notary** 5:5 86:24

**note** 7:12

**noted** 81:2

**notes** 9:18

**nothing** 24:6 37:13

**notified** 78:15

**now** 28:5 31:16 42:4 44:17,18 46:10 47:21 50:19 52:8 53:18 62:17 64:5 65:9 71:17 75:3,6 78:14

**number** 29:22 30:24 31:7,10 34:8 35:15 48:5,11 64:5

65:14,20 67:2,4 69:4,6,8 72:4 76:10 82:5 83:3,8

**numbers** 30:23 60:4

---

**O**

**oath** 8:16,18 86:9

**objection** 10:4 12:10 13:3 18:14 23:23 33:8 35:25 38:17 39:14 41:15 45:18 47:16 49:23 57:5 58:2,10 59:20 61:7,12,22 62:9, 13,23 63:21 72:6 73:12 75:20 76:23 77:18 78:7

**objections** 7:24

**OCD** 69:21

**October** 67:9 83:13

**off** 17:5 42:23 46:20 48:2 50:18, 20 51:7 57:10 58:13,15

**offhand** 49:3

**office** 21:13 34:18 35:2 44:12 65:8 67:3 68:3 72:14,23 83:6

**Oh** 13:15 22:20 54:10

**okay** 6:21,25 7:8, 9,14 8:14 29:18 32:16 46:24

**on** 9:10,12,16,18, 21,23 10:8 20:22, 23 22:24 25:3 26:6 29:6,8,12 30:7,9 31:3 32:2 33:12 35:15 36:2 39:13 43:9,14 44:10 45:22,23 46:8,13, 22 47:17,22 50:21 54:19,22 55:7,20 56:24 63:25 64:10, 13,16,23 66:5,23 67:25 68:7,15 69:21,23 71:17,19,

22 73:17 75:12,15, 23 76:4 78:11 86:12

**on-average** 47:19 49:21 50:4

**on-site** 19:10

**Once** 31:10

**one** 7:3,4,19 19:7 22:7 28:17 32:2 35:12 36:2 50:20 52:23 53:7 54:5,7, 19 56:16,24 58:18 62:5 71:2 80:21

**only** 7:2 34:8 52:19

**opened** 20:24 40:5,20 43:6

**opening** 20:17

**operating** 24:2,4, 21 48:20

**operation** 52:2,9, 10

**order** 10:10 46:14

**orders** 47:6

**original** 39:19

**other** 9:13,19 10:15 11:9,17,21, 24,25 12:8 14:4,14 15:3 16:3 20:4 23:9 29:25 31:13 53:8 55:20 67:7 79:24 80:20 83:12

**our** 22:7 24:17 27:23 28:5 48:13, 20 70:6 71:11

**out** 27:16 29:8,12 31:22 56:2 61:2, 18,25 74:3,5 80:13

**Outlet** 14:21,23 15:2,9 16:8,24 17:4,12 18:4 19:3, 9,14,19,22,24 20:8,22 21:6,8,21 22:4,13 23:7,12,14 24:8,13,23 25:5, 13,23 26:4,6 27:24 29:17 31:17 32:25 33:2,11,13,22,25 35:10,12,23 36:5, 19,21 37:8,16,20

38:10,16 39:13 41:9,19 42:9 43:19,24 44:9 45:4 48:25 49:8 51:10, 11,24 52:18,20 55:2,7,11,16,25 56:9 57:8,17,19,23 58:19,22 59:10,19 60:18,21 61:3,20, 24 62:12 67:5,19, 24 69:12 72:15 73:4 76:2,19 78:19 80:13 83:9 84:3

**Outlet's** 47:13

**outside** 78:16,17

**over** 11:5 55:17 80:2

**oversees** 38:7

**own** 12:24 23:14

**owner** 25:9 76:5

**owners** 38:13

---

**P**

**P-H-E-L-A-N** 37:24

**p.m.** 16:14 75:11 81:2

**package** 28:11, 12,19 58:25

**page** 63:15,25 64:5,11,13,16 71:19,22 82:2,5 83:3

**PAGE/LINE** 85:2

**paid** 31:23 33:2,18 60:6 64:2

**Pakistan** 74:19

**paper** 26:9,11

**part** 6:6 54:11 56:23,24 57:2

**part-time** 14:20

**partial** 29:22

**particularly** 7:10

**party** 31:12 80:20

**pass** 31:11

**Passing** 68:2

**passport** 28:11

**past** 13:8,18

**pay** 11:15 30:11, 12 32:24 34:7,10 42:3 52:17 59:14 60:6,9 64:21 79:11

**payroll** 15:18 18:2 22:3,5,24 32:20

**people** 21:9 23:8 25:17 26:25 51:19 54:4,6,9,11,16,21 55:6 73:17

**per** 16:19 17:22 30:17 31:23 47:18 50:18 60:6

**per-month** 49:2

**percent** 33:6

**Perfect** 32:18

**performance** 56:14 57:14 60:19

**performances** 57:9

**person** 7:3 20:19 58:12 59:14,15 62:15 63:20 73:19

**personally** 68:14 73:25

**pertaining** 24:20 37:13 67:3 70:23 83:7

**Phelan** 37:24 38:9 39:9 42:7 50:25

**phone** 9:12,19,21, 24 10:3 68:18,19, 22 69:4,21 77:7, 12,15 78:3,16

**photos** 57:12

**physical** 9:4

**picture** 64:12

**plaintiff** 56:5 69:14 80:7 82:4

**Plaintiff's** 63:14 71:18

**plan** 30:11,12 32:24 33:2 42:3

97Index: platform–salespeople's

**platform** 34:21,23

**platforms** 73:9

**please** 5:10,13, 20,24 6:22 7:4,11, 17 12:18 14:19 18:21 38:22 66:6 67:11 78:22

**plug** 10:7

**point** 28:14 44:22 73:24

**policies** 57:8

**porter** 54:16

**portion** 46:23

**position** 15:13 19:18 20:20 63:19 64:3,7,20 65:2 72:21 73:5 80:9

**possibly** 22:11 29:22 34:18 50:21 70:7

**posted** 42:19 43:2,8 44:2,9

**poster** 42:21 43:7, 10,12,25

**posters** 42:19,20, 22,25 43:19

**power** 25:6,13 34:2 37:15 38:15 39:9

**precisely** 60:4

**pregnancy** 57:25 62:2,8 63:5,11 73:25

**pregnant** 57:23 61:5,11,19,23 63:8 65:24 74:7

**premises** 23:15

**preparation** 11:10 49:6,17

**prepare** 10:10,18, 25

**present** 5:13 10:16 12:2 27:15, 21 28:25 42:11 55:15 67:25

**President** 36:16

**pretty** 11:6 14:10 22:14 30:3 31:20 38:5 42:23 43:23 73:19 76:3

**prevent** 8:24 9:5

**previous** 24:13 55:25

**previously** 57:13 65:18

**price** 30:4 79:5

**print** 31:22

**printout** 32:19

**printouts** 11:15

**prior** 13:12

**prioritized** 80:2

**privilege** 77:19

**probably** 44:22 50:20 56:19

**proceed** 78:25

**proceeding** 80:21

**process** 78:19,21

**produced** 65:4

**Professional** 60:25

**promoting** 80:8

**proper** 47:3

**provide** 65:7,12

**provided** 65:9,19

**public** 5:5 15:23 86:24

**purchased** 29:23

**put** 67:11

### Q

**qualifications** 79:10

**qualify** 78:7

**question** 6:24 7:6,8,20 8:6,7,13 10:6 12:12 18:17, 18,24 20:16 23:10 24:14 26:19 34:9

**38:20 39:2,4 45:24 47:3 58:4,5 59:23 61:15 64:7 70:14 71:16 77:21

**questions** 6:12, 13 7:5,19,24 45:20 80:24 85:2

**quick** 75:5

### R

**range** 79:5

**Ray** 38:9

**Raymond** 37:23 38:4 39:9 42:7 50:25

**read** 18:22,23 20:15 39:3 86:8

**reading** 20:13 38:25

**ready** 32:6,8

**really** 50:22 58:8 60:3 70:11 71:24 73:17,21

**reason** 6:22 46:3

**recall** 10:20,22 11:16,19 12:13 17:3,5 22:20 33:15,23 34:16 35:12 36:4 39:16 44:3,7,8,23,24 49:14,19 51:4,8,9 53:5,18 58:6,20 59:3 61:16,17 62:4,6 63:18 70:10 74:2,8,11,14,17,18 76:6,8 78:15

**recalling** 8:25 9:6

**receive** 30:6

**recent** 13:11

**recently** 42:22

**recess** 7:18 32:4 66:21 75:10

**recognize** 71:22

**record** 5:11,14,20 34:19 43:22 46:20, 22 58:14,16,23 64:24 66:24 75:13,

15 86:11,13

**recorded** 34:14

**records** 25:20 27:12,25 28:23,24 40:15 41:6 48:3,4, 10 49:4,6,8 53:9, 21,24 55:4,9 57:15 58:23 60:8,12 65:4 67:3 72:12 75:22 76:9 83:6

**red** 79:12

**redacted** 65:3

**referring** 24:22

**related** 24:23

**relating** 66:3

**relevance** 13:4 23:24 39:15 41:16 45:19 58:3 63:22

**remember** 10:19, 23 37:12 53:7 69:9 74:3

**rep's** 29:20

**repeat** 8:8 18:18 20:11 38:21

**rephrase** 8:6 34:9

**reporter** 5:9,25 6:3,16 18:21,23 20:12,15 38:24 39:3

**representative** 65:11

**request** 77:14

**requested** 65:18

**REQUESTS** 83:2

**residence** 12:24

**respect** 23:20 46:3 65:12 71:25

**respond** 8:3

**responding** 32:11

**response** 12:19 24:20 47:18 77:5

**responses** 6:18 7:13 47:5

**responsibilities**

15:17 16:4 23:21 24:5,9,10,16,18,22 25:10 36:8,13,17, 21 37:2,10 38:2

**restroom** 7:17

**result** 57:25 80:13

**review** 11:9,17 49:5,16

**reviewed** 11:13 12:8 49:13,20

**reviewing** 9:18

**right** 41:14 44:10, 12,17 45:7 47:21 48:25 53:18 55:5 75:19 78:14

**Ronald** 39:7

**rotate** 50:19

**rotating** 50:21

**Roughly** 47:19

**rules** 6:10

**RULING** 85:2

**run** 68:15

**running** 68:6

### S

**said** 20:9 30:22 64:25 65:6 77:23 79:13

**salary** 30:15,25 31:4 33:3 35:15 64:14,17

**sale** 26:23

**sales** 15:19 18:2 26:23 30:4 41:18 42:11,14 49:5,7 54:16 59:24 60:2, 20 63:9,10 65:17 67:25 72:11,12 78:18,21 79:6,19 80:8

**salespeople** 28:6 33:13 34:13 55:16 56:17 60:5 67:8 70:11 83:12

**salespeople's** 35:6,14 79:25

**A1031**

98Index: salesperson–testimony

**salesperson** 28:17 30:5 33:17 52:4 54:16 78:25 79:6,19

**salesperson's** 28:8 29:19 52:2

**same** 6:22 8:19 14:15 17:13 19:3, 6,15,18 22:14 28:3 31:18,20 32:23 36:8,21 47:15,16 48:14 51:2 55:12 61:21 62:22 68:19 72:13,24 76:3

**saw** 11:15 25:2 49:19

**say** 6:17 8:13 12:3 16:22 20:21 25:8, 16 26:12 38:12 39:6 49:11 54:8 58:21 62:21 64:6 68:13 72:3,25

**saying** 28:15 32:15

**schedule** 14:9 16:13 50:8,11,16 51:2,10 52:7 56:11

**scheduling** 50:22,23 51:13,18

**screen** 9:17 32:20 71:18

**scroll** 71:20

**second** 28:6 29:7 32:2 34:6 40:2 46:17 64:7 73:8

**secretary** 24:17

**security** 28:10

**see** 55:23 59:24 68:6 79:4

**seeing** 59:15

**seems** 65:10

**seen** 79:23

**seldom** 55:19

**sell** 47:20 49:22

**send** 70:20

**sentences** 7:11

**separate** 27:9 28:14 32:22 59:6

**series** 63:13

**serves** 44:10,12 52:11

**set** 14:9 52:6 57:15

**sets** 42:3

**seven** 29:4 63:3

**shakes** 6:18

**shareholder** 21:4 23:22

**she** 32:12 35:22, 24 36:4 49:25 52:23 56:8,15,20 57:24 61:5,19,23 62:11,18,25 63:8 65:23 68:9 72:22, 23 73:14 74:6 77:24

**sheet** 29:19 31:3 33:12 65:17

**sheets** 22:8,15,19 26:2,3,17,21 28:13,20 29:6,7,11 31:18 34:17 49:15, 17 59:4

**short** 69:24

**should** 33:16 46:19 75:8,23

**show** 5:20 48:7,10 55:17

**showing** 9:16 63:13 71:17

**shown** 64:23

**shredding** 29:5

**sign** 37:16,19

**signed** 39:12,25 86:19

**signer** 41:7

**signing** 37:12

**since** 6:16 15:3 20:5 25:8

**sitting** 68:3

**six** 50:17 51:6

**social** 28:10 73:9, 18,20

**sold** 29:24 30:24 31:8,11 34:8 47:25 48:5,8,11,22 49:2, 25 67:4 72:5 83:8

**Solutions** 11:15 48:15 71:24 72:2,4

**some** 6:10 11:11, 15 13:22 15:19 31:13 54:18 72:10 73:6

**somebody** 21:23 60:2 68:12

**someone** 21:14 74:6

**something** 70:12, 13,14 73:14

**sometime** 44:6

**sometimes** 29:23 30:7 50:19

**sonogram** 61:4 63:2

**sorry** 10:24 18:19 24:14 48:3 49:4 54:10

**sort** 26:18 73:7

**Spanish** 43:16

**speak** 6:23 10:10, 13

**speaking** 7:3

**specific** 33:17 34:23 46:2 55:23

**specifically** 15:21 28:7 34:12 38:4 49:7,14 59:18 67:6 83:10

**speculation** 8:12

**split** 17:13

**spoke** 69:23

**staff** 54:12

**stage** 46:9

**Staghorn** 5:15

**standard** 31:5

**stands** 34:22

**start** 7:4,6 16:16 21:17 23:3 26:5 29:16 36:14 42:4 44:17 50:8,14 51:15,23 52:2,4,5, 9 55:2 70:5

**started** 44:5 51:19 60:2

**Starting** 13:11

**state** 5:6,10,13 56:3 58:11 62:14 86:4

**stated** 46:2

**stenographer** 7:2,12

**Stidhum** 56:5 61:4 65:5,16 67:7 68:6 70:3 80:8,17 83:11

**Stidhum's** 80:2

**still** 8:2 27:14 33:21 53:5 61:19, 24 62:11 69:16

**stock** 55:15

**stop** 7:5 16:7

**store** 16:15 20:17

**structure** 30:19 33:5,11 42:4

**stub** 11:16 59:15 64:21

**stubs** 79:11

**subject** 6:13 77:3

**subjecting** 46:16

**submit** 22:9,21 79:8,15,20

**submitted** 22:17

**submitting** 47:4

**subscribed** 86:19

**subscription** 71:3

**successor** 35:24

**such** 56:2 79:11

**sufficient** 76:12, 17 83:18,25

**Sundays** 50:21 51:7

**sure** 12:13,15 34:10 38:23 62:20 69:15 73:19

**Susan** 35:19

**switched** 41:25

**sworn** 5:5

**system** 48:13,14, 18,20 67:15,18 68:7,16

**T**

**take** 6:17 7:2,15 54:8 59:11 66:12, 13 75:4 79:8

**taken** 8:16 32:4 66:21 75:10 86:9

**takes** 79:2

**taking** 8:23

**talked** 33:20 79:18

**talking** 26:13 34:12,25 59:17,18

**tallied** 31:10 52:21,23

**tally** 22:9 30:23 31:3,6 33:14 35:6

**tax** 15:19 18:3

**TD** 45:2

**team** 25:17

**tell** 8:6,8,16,19 11:3 14:22 31:22 59:13,25 64:9,12, 15,18,20,22 65:2 71:24 73:24 77:7

**tells** 8:2 60:3

**terminated** 57:24

**termination** 66:5

**terms** 51:9

**testified** 5:7

**testifying** 8:20,25 9:6

**testimony** 18:12

A1032

99Index: text–what

86:9,12

**text** 11:14 69:14, 17,25

**texter** 73:18

**than** 10:20 23:9

**Thank** 32:9 47:10 67:13 80:25

**Thanksgiving** 74:13

**Thanwalla** 12:5 38:14 42:13 64:25

**that's** 11:7 59:23 70:12 73:23

**That's** 5:23

**their** 26:17 28:10 30:11 31:4 52:6 53:8 58:23,25 59:2 79:4

**them** 26:7 27:7,14 44:13 49:19 59:5 70:13 73:20 79:2, 16

**then** 7:13 22:8,9 26:6 29:17 30:25 31:11 44:20 60:3 70:6,16,22 79:13, 15

**there** 7:18 12:7,16 17:15 21:9,12,24 27:9,25 28:3 29:2 30:8,9,19 31:21 33:5,21 37:18 40:5 41:25 43:14,15,19 52:16 54:9 55:18 57:13,14,15 59:2, 6,7,8 60:5 62:5 64:19 67:24 68:4,5 72:7 74:20 77:25 79:10

**Therefore** 7:4 8:12

**these** 45:20

**they** 15:11 20:19 21:22 22:15,16,18, 21 27:10 28:12 29:23 30:7 31:21, 22 32:21,22 33:10, 21 35:16 40:5,20 41:25 43:6 44:4,13 45:9 50:20 59:3,4,

11,12 70:14 72:10, 24 78:24,25 79:3, 5,15

**thing** 22:14 36:21 72:24 76:3

**things** 60:23

**think** 16:9 27:14 29:2 41:21 42:23 44:21 46:25 73:6 74:3

**third** 31:12

**those** 12:17 18:13 22:18,21 25:10 67:12 69:16,22

**thought** 24:12 32:12,17 54:10

**through** 68:2 70:19

**throughout** 21:24 54:17

**throw** 27:16

**thus** 43:14

**Tiffany** 5:18 32:2

**time** 7:3,23 10:8 14:15 16:20 17:13, 25 20:7 29:21 33:6 35:10,13 40:17,23 41:2 42:6 43:25 51:15,19,20,21,23, 24 52:3,5,9 54:5,7 55:12 57:14 59:9 61:17 65:5,23 68:5 74:7 75:4 78:23 80:14,18 81:2

**times** 67:24

**timing** 62:10

**title** 72:23

**today** 8:11 9:2,7, 17 11:2 18:9 77:8

**today's** 10:11 11:10 49:6,17

**together** 54:15

**told** 62:18 76:20

**top** 17:5 42:23 48:2 56:17 57:10 60:2

**total** 22:16 72:10

**tough** 47:21

**track** 57:9

**trailer** 43:9 44:11

**train** 68:14

**transactions** 45:10

**transcript** 86:8, 10

**transmit** 22:18,22

**treasurer** 38:5

**trip** 74:19

**Troy** 5:18,24 18:20 20:12 32:3, 6,10 38:23 45:25 46:21 47:9 53:10, 22 58:13 65:14 66:8,11,18,23 71:21 75:3,12 76:10 77:22 80:23 82:3 83:5,17,24

**true** 86:11,13

**truth** 8:16,19,25 9:6

**truthfully** 8:25 9:7

**try** 26:18 69:22

**turn** 27:23 28:5 31:16 52:8

**two** 20:3 28:16 33:20 50:18 53:8, 11 58:19 59:6

**type** 11:12 26:19 48:18 59:13

**typical** 28:7

───────────

**U**

**unable** 65:2,11

**under** 9:4 21:10 86:9

**understand** 6:14, 20 7:21 8:3,5,9,15, 18 18:12

**understated** 72:4

**unless** 7:25 47:6

**unlikely** 68:13

**unplug** 77:11

**until** 7:7 20:18 32:5 42:2,22 66:22 67:9 75:11 80:19 83:14

**up** 17:13 20:17 22:9 30:23 31:4,6, 10 40:5,20 44:4 50:5 52:7,21,23 66:14 73:22

**upon** 34:8

**use** 7:16 69:2 71:2 73:9

**used** 50:17 68:20, 22 73:4

**uses** 73:22

**usually** 17:13 50:16 55:22 70:12 79:5

───────────

**V**

**Vague** 33:9 49:24

**varies** 54:7

**variety** 55:21

**vehicle** 21:23 48:23 79:3

**vehicles** 48:21 50:2

**verbal** 6:18

**verifications** 79:11

**very** 46:2 55:19 56:16

**veteran** 59:24

**Vice** 36:15

**VIN** 11:15 29:22 48:15 71:23 72:2,3

**virtual** 10:14 11:21

───────────

**W**

**wage** 43:13,15 59:16

**wait** 79:16 80:14, 17

**walk** 44:19

**walked** 80:13

**walking** 78:17

**wall** 43:9 44:11

**want** 66:12,13

**wanted** 10:8 20:18 55:22 59:12

**wasn't** 40:4

**water** 7:16

**way** 28:3 70:6

**we're** 63:25 65:9 75:12

**website** 71:11

**week** 16:13,19,25 17:15,22 31:23 33:18 50:18 51:6 52:24 60:6 63:3,16 64:2

**weekend** 54:9

**weekly** 29:8,12 35:14 37:12 42:15 60:9

**weeks** 75:2

**well** 18:3,11 22:4 27:2 44:22 59:16 66:4 70:25 78:24

**went** 11:5 74:21

**were** 8:20 10:5 12:2,7,16 16:20,23 17:4,15 19:21 20:21 21:9 22:24 24:12,22 27:4,19 28:22 32:14 33:6 34:25 36:13 40:18 42:11 43:19 45:21 47:25 48:7,21 49:2 54:11 57:12 59:6, 17 60:5,6 61:3 65:3,4,13 67:23,24 69:11,25 76:20 79:25 80:5,16

**Westbury** 13:16

**what** 6:9 10:25 11:12,16 12:13 13:20 14:11,22

A1033

100Index: whatnot–Zoom

15:13,16,20,21
16:7 18:6 20:9
23:21 24:4,9,15
26:13,19 28:7
29:13 30:10,12
31:24 32:14,24
33:13,17 34:20,22
35:2,3 36:13 37:2,
10 38:2 41:11
42:18,23,25 43:10
44:16 46:24 48:4,
10,18 49:25 50:11,
12 51:9,18,20 52:9
53:4 56:15 59:13
60:19,24 63:19
64:3,7,23 68:22
69:4 70:16 71:8,18
72:10,20 73:5
77:23 78:21

**whatnot** 31:24
59:5

**Whatsapp** 73:10,
21

**when** 6:23 10:22
16:20 19:2 20:7,
23,24 26:12 30:22
31:6 36:4 40:5,6,
20 41:2,24 43:24,
25 44:5 49:11
50:13 51:15 61:4,
10,18 62:5 63:8
67:24 68:5 69:8,10
74:9,18 76:20
79:18

**whenever** 59:12

**where** 9:24 13:12
21:5 43:7 44:8
56:18 70:14 79:20

**whether** 31:12
40:16,17 74:5
80:12

**which** 11:25 12:9
16:2,15 17:3 19:7
21:16 22:10 44:24
45:12 64:20 65:2
76:4,5

**while** 21:7 33:6
57:23 62:10 69:11

**who** 13:25 16:10
17:7 21:14 25:2
31:23 39:12 40:3,
9,12 41:7,19 42:3
45:15 47:12 50:23

52:16 55:23 57:2,
19 58:6 59:24 60:6
62:7,17,18 63:16
65:22 67:17 69:23
72:19 75:16,23
76:6

**Whoever** 27:10

**whom** 10:13
64:19

**whose** 24:10
57:20 73:3

**why** 10:2 62:21
69:19

**with** 9:11 10:10,
13,14 11:4,21
15:13 21:3,14
23:20 24:13 25:3
26:15,20 28:17
29:19 31:23 32:20
35:18,21 36:10,23
37:23 38:10 40:16
41:3 46:3 50:6,7,
18 51:6,18,21,23
56:4,7 57:18 60:4,
13,16 64:14,16
65:12 66:2 67:14
69:13 70:2,11
71:5,25 72:11
73:2,11 76:5,24,25
78:12,18,23,25
80:7,12

**withdraw** 45:16
47:13

**within** 13:18
24:18 25:10 36:17,
22 37:14 44:9

**without** 40:14
41:5 48:3 49:3
53:9,21 55:3,8
60:7,11 76:8

**witness** 5:4,20,22
18:10 45:22 46:12,
16 65:10 73:16
77:20 82:2

**witness's** 65:11

**work** 14:7 17:10,
11,16 19:10 20:4,8
50:16 54:4,6 55:11
56:14 70:6,24 73:4

**worked** 14:14,15,
20 15:2 16:24
35:16 57:19 63:3

**working** 14:12,23
16:7 17:22 21:7,10
33:6 36:5 44:6
50:8,11 54:21 55:6
56:11 67:23

**workload** 17:14

**would** 17:10,11,
16,22,25 19:10,23
22:2,5,6,8,9,15,16,
18,21 25:8,16
26:7,16,20,24
28:7,11,16 29:12,
20,21,25 30:4,6,7,
10,16,22,23 31:3,
6,7,11,22 32:21
33:13 35:2,3 37:11
48:4,7,10 49:21
50:5,16,18 52:16,
22 54:9,21 55:6,
16,23 57:14 58:23,
24 59:2 65:6 67:8,
24 68:6,13,17
71:13 72:25 75:22
79:19 83:13

**wouldn't** 39:22
40:4,14,24 41:5
43:4 45:6 48:2
49:3 51:17 55:3,8
56:22 57:10,17
60:11,22 68:11
71:15

**write** 30:7 32:21

**writing** 66:7 67:12

**written** 30:9 66:3

---

### Y

**year** 14:11,22 16:7
21:25 43:2,15
44:16 50:2,12
75:23 76:4

**Year's** 74:16

**years** 13:9,18
29:4 43:6 54:17,18

**yes** 6:15 7:22 8:4,
10,17,22 9:14,20
10:12,17 11:11,14
12:4 13:10,24
14:17 16:18,21
17:2,19,24 18:25
19:17,20 20:25
22:25 24:25 25:8,

21,24 27:3,7,10
28:21 30:18 31:9
32:3 34:4,5,15
35:20 36:3,9,12,25
37:25 39:5,11,21
43:20 49:12 50:10
51:12 53:3 54:14
56:6 60:15 67:16
69:3 72:18 78:20
79:22

**yesterday** 11:22
25:2

**York** 5:6 13:16
15:8,12 86:4

**your** 5:10,13,20
6:19 7:12,20,23,25
8:18 9:12,18,24
10:2,9,16 11:2,4
12:19 13:20,25
15:13,16 16:13
18:6,12 19:18
24:20 28:22 31:16
32:10 33:19 34:9
35:24 36:7 42:18
43:22 46:6,12,16
53:24 55:14 56:20
59:8 63:5 67:17
68:9,19 69:4
70:16,19 71:8,12
76:21 77:2,6,14,15
78:10,11

**yours** 36:8

**yourself** 23:9
52:14 55:10 62:7

---

### Z

**Z-H-I-V-O** 35:19

**Zhivo** 35:19

**Zoom** 25:3

A1034

```
1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF NEW YORK          COPY

3            ----------------------------------------X

4            LETICIA FRANCINE STIDHUM,

5                              Plaintiff,

6                 -against-            CASE: 21-CV-07163

7            161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
             AUTO OUTLET, and HILLSIDE AUTO MALL INC
8            d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
             JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,
9

10                             Defendants.

11           ----------------------------------------X

12                             February 24, 2023

13                             10:00 A.M.

14

15             VIRTUAL EXAMINATION BEFORE TRIAL of

16           ISHAQUE THANWALLA, via Zoom, a Defendant

17           herein, held at the above-mentioned time and

18           taken before Lynn Luckman, a Notary Public

19           and Shorthand Reporter within and for the

20           State of New York.

21

22

23                    SANDY SAUNDERS REPORTING
                  254 South Main Street, Suite 216
24                     New City, New York 10956
                         (845) 634-7561
25
```

A1035

2

```
 1              A P P E A R A N C E S:

 2

 3

 4         TROY LAW, PLLC

 5         Attorneys for the Plaintiff

 6         41-25 Kissena Boulevard, Suite 103

 7         Flushing, NY 13555

 8         BY: Tiffany Troy, Esq.

 9

10         MILMAN LABUDA LAW GROUP, PLLC

11         3000 Marcus Avenue, Suite 3W8

12         Lake Success, NY 11042-1073

13         BY: Emanuel Kataev, Esq

14         emanuel@millaborlaw.com

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              FEDERAL STIPULATIONS

 2

 3          IT IS HEREBY STIPULATED AND AGREED by

 4     and between counsel for the respective parties

 5     hereto that all objections except as to the

 6     form shall be reserved to the time of trial.

 7              IT IS FURTHER STIPULATED AND AGREED

 8     that the sealing and filing of this deposition

 9     shall be hereby waived.

10              IT IS FURTHER STIPULATED AND AGREED

11     that this examination may be sworn to by the

12     witness being examined before a notary public

13     other than the notary public before whom

14     examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1                    Ishaque Thanwalla
2                        BY THE COURT REPORTER:
3                    The attorneys participating
4                    in this deposition
5                    acknowledge that I am not
6                    physically present in the
7                    deposition room and that I
8                    will be reporting this
9                    deposition remotely.  They
10                   further acknowledge that, in
11                   lieu of an oath administered
12                   in person, I will administer
13                   the oath remotely.  The
14                   parties and their counsel
15                   consent to this arrangement
16                   and waive any objections to
17                   this manner of reporting.
18                        MS. TROY:  I consent
19                        MR. KATAEV: I consent.
20
21
22                        *    *    *
23
24
25
```

Case 1:21-cv-07163-OEM-LB  Document 102-9  Filed 03/27/24  Page 5 of 278 PageID #: 1702

5

```
 1                    Ishaque Thanwalla
 2                    I-S-H-A-Q-U-E T-H-A-N-W-A-L-L-A,
 3           a Defendant herein, after having been
 4           duly sworn by a Notary Public of the
 5           State of New York, was examined and
 6           testified as follows:
 7
 8      BY THE REPORTER:
 9                    Q.  Please state your full name
10           for the record.
11                    A.  Ishaque Thanwalla.
12                    Q.  Please state your present
13           address for the record.
14                    A.  Business address:  161-10
15           Hillside Avenue Jamaica, New York 11432.
16           Home address:  7 Poplar Court, Great
17           Neck, New York 11024.
18                            THE COURT REPORTER:
19                            Counsel, Mr. Kataev, will you
20                            be purchasing a copy of this
21                            transcript?
22                            MR. KATAEV:  I will let
23                            you know.  I will speak to my
24                            client.
25                            MS. TROY:  Let's deem
```

6

```
 1                    Ishaque Thanwalla
 2                         marked Plaintiff's Exhibit 1.
 3                         (Plaintiff's Exhibit 1 deemed
 4                         marked for identification).
 5       EXAMINATION BY
 6       TIFFANY TROY:
 7                    Q.  Mr. Thanwalla, was that your
 8       business address or your home address?
 9                    A.  That is my business address.
10                    Q.  Can you state your residence for
11       me as well?
12                    A.  7 Poplar Court, Great Neck, New
13       York 11024.
14            Welcome today.
15                    Q.  Thank you for welcoming me
16       today.  Have you ever been part of a
17       deposition before?
18                         MR. KATAEV:  Objection to
19                         the form.  You can answer.
20                    A.  Yes.
21                    Q.  Do you know what a deposition
22       is?
23                    A.  A deposition is when you ask
24       questions and I answer the questions.
25                    Q.  Correct.  When was the last time
```

7

```
 1                      Ishaque Thanwalla
 2         that you had a deposition; you just
 3         mentioned that you participated in a
 4         deposition before?
 5                      MR. KATAEV:  Objection to
 6                  the form.  You can answer.
 7                  A.  That was over 15 years ago.
 8                  Q.  Do you recall for what?
 9                  A.  Not really, I can't recall.
10                  Q.  Were you a party to a civil
11         action or was that something else?
12                  A.  I don't understand that
13         question.  What do you mean by ''civil
14         action?''  I don't understand the law.
15                  Q.  By that, I mean was there a
16         plaintiff bringing an action against the
17         defendant, and if you were either a
18         plaintiff or a defendant in a civil action
19         as opposed to a criminal matter.
20                      MR. KATAEV:  Objection to
21                  the form.
22                  Q.  Do you recall what the lawsuit
23         was about?
24                  A.  I can't, it was so long ago.
25                  Q.  Since that is the case, I'm
```

8

```
 1                      Ishaque Thanwalla
 2          going to briefly explain what a deposition
 3          is and lay some ground rules going forward.
 4                      A.  Okay.
 5                      Q.  First, this deposition is for me
 6          to ask you questions and for you to answer
 7          my questions about the subject matter of
 8          that lawsuit.  There is a separate action
 9          covering the wage and hours, and today we're
10          only going to focus mostly on the pregnancy
11          discrimination lawsuit; do you understand
12          that?
13                      A.  Yes, I understand.
14                      Q.  Since the court reporter has to
15          take down everything that you say, I ask
16          that you give only verbal responses, so no
17          shaking or nodding or any hand motions, no
18          gestures; do you understand that?
19                      A.  I represent to you that I have a
20          habit, and I may do it as this is just a
21          habit, but, I might shake my head back and
22          forth. (Indicating).
23                      Q.  That is not a problem as long as
24          there is a verbal response together with the
25          shaking or nodding of your head; there is no
```

Case 1:21-cv-07163-OEM-LB   Document 102-9   Filed 03/27/24   Page 9 of 278 PageID #: 1706

9

                              Ishaque Thanwalla
1
2      problem.
3                      A.  Okay.
4                      Q.  For the same reason, please
5      speak loudly and clearly when you answer a
6      question; do you understand?
7                      A.  Yes.
8                      Q.  The stenographer can only write
9      one person down speaking at a time.
10     Therefore, please do not start to answer a
11     question of mine before I finish asking that
12     question; likewise, I will not start a new
13     question until you have finished answering
14     my last question; do you understand?
15                     A.  Yes.
16                     Q.  If you need to take a break, for
17     example to get a drink of water or to use
18     the restroom, please let me know and I will
19     call for a recess; do you understand?
20                     A.  Yes.
21                     Q.  However, there can be no break
22     between one of my questions and your answer
23     to that question; do you understand that?
24                     A.  I don't understand the question.
25                     Q.  Let me repeat it.  Even if you

A1043

10

```
 1                    Ishaque Thanwalla
 2        are taking a break at any time, there is an
 3        assumption that you will not be calling for
 4        a break between one of my questions and
 5        before you answer that question; do you
 6        understand that?
 7                    A.  I understand -- you mean if I
 8        ask to take a break and there is a question,
 9        that I have to complete an answer before I
10        ask for that break?
11                    Q.  Correct.
12                    A.  Right, correct.
13                    Q.  From time to time your attorney
14        may make objections to my question.
15        Generally, unless your attorney tells you
16        not to answer, you will still have to
17        respond; do you understand?
18                    A.  Not really.  That's why I have
19        an attorney.
20                    Q.  Let me backtrack for a second.
21        From time to time as we are going along in
22        the deposition, your attorney may make some
23        objections to my questions saying
24        ``objection'' for blah blah blah reasons.''
25                    A.  Right.
```

11

```
 1                    Ishaque Thanwalla
 2                    Q.  Generally unless your attorney
 3        directs you not to answer, you still need to
 4        respond; do you understand that instruction?
 5                    A.  Not to answer?  What's the
 6        reason for him telling me not to answer a
 7        question?
 8                         MR. KATAEV:  She is saying
 9                              that if I tell you not to
10                              answer, then we will deal
11                              with that later.
12                         THE WITNESS:  Yes.
13                    Q.  Do you understand?
14                    A.  Yes.
15                    Q.  If you don't understand a
16        question, tell me and I will rephrase it so
17        that you can; do you understand that?
18                    A.  Yes.
19                    Q.  If you do not hear a question,
20        tell me and I will repeat it so that you
21        can; do you understand?
22                    A.  Yes.
23                    Q.  We are here together for facts
24        and not speculation.  If you don't know the
25        answer to a question, say so; do you
```

12

```
 1                      Ishaque Thanwalla

 2              understand that?

 3                      A.  Yes.

 4                      Q.  Before the deposition, you

 5              mentioned that a deposition took place 15

 6              years ago.  Were you ever deposed at any

 7              other time?

 8                      A.  No.

 9                      Q.  Do you understand that you have

10              taken an oath to tell the truth?

11                      A.  Yes.

12                      Q.  Do you understand that your oath

13              to tell the truth carries the same force and

14              effect as if you are testifying in Court

15              before a Judge?

16                      A.  Yes.

17                      Q.  Are you currently taking any

18              medications that could prevent you from

19              recalling the truth or testifying truthfully

20              today?

21                      A.  Not to my knowledge.  I do take

22              a Sudafed for my sinuses.

23                      Q.  To your knowledge, it would not

24              affect your ability to tell the truth or

25              recall truthfully?
```

13

```
 1                     Ishaque Thanwalla
 2                A.  Best of my ability, I don't
 3          think so, I don't think it's going to
 4          affect.
 5                     MS. TROY:  Please zoom in
 6                     a little bit for the court
 7                     reporter.
 8                     THE WITNESS:  Okay.
 9                     MR. KATAEV:  Let the
10                     record reflect that the
11                     plaintiff is present
12                     virtually.
13                Q.  Mr. Thanwalla, are you currently
14          under any physical or emotional condition
15          that could prevent you from recalling the
16          truth or testifying truthfully today?
17                A.  No.
18                Q.  Do you have a cell phone on or
19          near you?
20                A.  Yes.
21                Q.  Do you agree that during this
22          deposition today, except during the break,
23          you will not be using your cell phone?
24                A.  Yes.  That's why I just turned
25          it off.
```

14

```
 1              Ishaque Thanwalla
 2              Q.  Do you understand that except
 3         for the documents that I will be showing you
 4         on the Zoom screen today, that you will not
 5         be reviewing any other documents?
 6              A.  I will not be reviewing any
 7         other documents.  The only ones are the
 8         documents that you provide, is that what you
 9         are saying?
10              Q.  Correct.
11              A.  Okay.
12              Q.  I see that you have a notepad on
13         the desk.  I ask that during the pendency of
14         this deposition that you do not use that
15         notepad.
16                   MR. KATAEV:  It was just
17                        there, we are moving it.
18                   (Indicating)
19              A.  Yes.
20              Q.  During this deposition, to make
21         things easier for ourselves, I'm going to be
22         referring to the company 161-10 Hillside
23         Auto Avenue, LLC, which is doing business as
24         Hillside Auto Outlet as Hillside Auto
25         Outlet; do you understand that?
```

15

1                        Ishaque Thanwalla

2                        A.  Yes.

3                        Q.  In the same vein, I'm going to

4            be referring to the corporate defendant

5            Hillside Auto Mall Inc., which is doing

6            business as Hillside Auto Mall; do you

7            understand that?

8                        A.  Yes.

9                        Q.  Do you own the residence that

10           you gave at the beginning of this

11           deposition?

12                            MR. KATAEV:  Objection as

13                        to relevancy. You can answer.

14                        A.  No.

15                        Q.  Have you lived anywhere else

16           within the past five years?

17                        A.  Yes.

18                        Q.  Starting from the most recent,

19           where have you lived besides the residence

20           that you gave at the beginning of this

21           deposition?

22                        A.  In Bayside.

23                        Q.  Prior to that, was that over 10

24           years?

25                            MR. KATAEV:  Objection as

16

```
 1                    Ishaque Thanwalla

 2                         to relevancy on that

 3                         question.  The witness can

 4                         answer.

 5              Q.   Do you know?

 6              A.   (No response)

 7              Q.   Do you have the Bayside address?

 8              A.   Correct.

 9              Q.   Can you give that to me?

10              A.   1578 Waters Edge Drive,

11      Apartment 1, Bayside, NY 11360.

12              Q.   What is your highest level of

13      education?

14              A.   High school.

15              Q.   What school did you attend?

16              A.   Baf.  B-A-F High school

17              Q.   Was that in the United States?

18              A.   No.

19              Q.   Where did you attend that high

20      school?

21              A.   That was in my country, which

22      was Pakistan that I was born in.

23              Q.   What year did you come to the

24      United States?

25              A.   I would say in the 80s, early
```

17

```
 1                    Ishaque Thanwalla
 2         80s, but I can't recall the year.
 3                   Q.  Are you familiar with the
 4         Hillside Auto Outlet?
 5                        MR. KATAEV:  Objection to
 6                    the form.  You can answer.
 7                   A.  Yes.
 8                   Q.  How are you familiar with that
 9         company?
10                   A.  I run the place and I own 25
11         percentage in that company.
12                   Q.  Since when have you run the
13         place?
14                   A.  From the day we started.
15                   Q.  What year?
16                   A.  It was -- I can't -- I would say
17         2018, if I'm not wrong.
18                   Q.  You mentioned that you owned
19         shares in the company, what percentage did
20         you own?
21                   Q.  What was the question again?
22                        MS. TROY:  Ms. Court
23                    reporter, can you please read
24                    back the last question?
25                        (The reporter read back the
```

18

```
 1                    Ishaque Thanwalla
 2                       last question)
 3               A.  I own 25 percent.
 4               Q.  Besides that, did that
 5      percentage ever change?
 6               A.  I don't understand your
 7      question.
 8               Q.  Did that 25 percent, was that
 9      the same percent from 2018 to the present
10      day?
11               A.  Yes.
12               Q.  Who else owns shares of Hillside
13      Auto Outlet?
14               A.  It is Jory, Josh and David.
15               Q.  By Josh, do you mean Josh
16      Aaronson.
17               A.  Yes.
18               Q.  By Jory, do you mean Jory Baron?
19               A.  Yes.
20               Q.  By David, do you mean David
21      Baron?
22               A.  Yes.
23               Q.  When did David Baron pass away?
24               A.  I think it was two years ago.
25                    MR. KATAEV:  Objection.
```

19

```
 1                    Ishaque Thanwalla
 2                         You are talking about facts
 3                         not in evidence, but he
 4                         answered.
 5                             THE COURT REPORTER:  A lot
 6                         of times I even asked him he
 7                         said it's fine, I asked him
 8                         ''do you want me to put in the
 9                         objection before he answers
10                         or after he answers'' and he
11                         kept saying leave it alone.
12                         So, he objects after the
13                         question it answered.
14             Q.  What percentage did Jory Baron
15        own in Hillside Auto Outlet?
16                             MR. KATAEV:  Objection to
17                         the form.  You can answer.
18             A.  Twenty five percent.
19             Q.  How about Josh Aaronson?
20                             MR. KATAEV:  Same
21                         objection.  You can answer.
22             A.  Twenty five percent.
23             Q.  David Baron own the remaining 25
24        percent; is that correct?
25             A.  Yes.
```

20

```
 1                     Ishaque Thanwalla
 2                Q.  Was that the same from the start
 3        of the company from 2018 to the present day?
 4                A.  Didn't you already ask me that
 5        and I answered?
 6                     MR. KATAEV:  Objection as
 7                          to asked and answered. You
 8                          may answer again.
 9                A.  Yes.
10                Q.  Specifically, I mean just not
11        your own shares, but the other people's
12        shares also represented 25 percent from 2018
13        to the present day; is that correct?
14                A.  Yes.
15                Q.  Are you currently employed?
16                A.  Well, what exactly do you mean,
17        do you mean if I own shares of my company
18        and I run the company?
19                Q.  I mean --
20                A.  So, what exactly do you mean,
21        define employed.  I am running my own
22        company that I own 25 percent of, is that
23        what you are referring to?
24                     MS. TROY:  I will rephrase
25                          the last question.
```

21

```
 1                    Ishaque Thanwalla
 2                    A.  Please.
 3                    Q.  Besides Hillside Auto Outlet, do
 4           you currently run any other company?
 5                    A.  No.
 6                    Q.  Are you familiar with a company
 7           Hillside Auto Mall?
 8                    A.  I am.  Oh, what was the question
 9           again?  Am I aware of a company called
10           Hillside Auto Mall?
11                    Q.  Familiar.
12                    A.  Yes, I am familiar with it.
13                    Q.  How are you familiar with it?
14                    A.  The way I am familiar with that
15           is my partners may have a shareholder on
16           that company.
17                    Q.  By that, do you mean Ronald
18           Baron, Josh Aaronson and Raymond Phelan.  P-
19           H-E-L-A-N?
20                    A.  Yes, possibly.
21                        MR. KATAEV:  Objection to
22                        the form of that question.
23                    Q.  Do you have the address for
24           Hillside Auto Mall?
25                    A.  The Mall?  I can't remember
```

22

```
 1                    Ishaque Thanwalla
 2          their address.
 3                    Q.  How about do you know how far it
 4          is from Hillside Auto Outlet?
 5                         MR. KATAEV:  Objection to
 6                    the form as to relevancy, you
 7                    can answer.
 8                    A.  Approximately 10 or 11 blocks.
 9                    Q.  Are you familiar with Shylet S-
10          H-Y-L-E-T Motors?
11                    A.  Yes.
12                    Q.  How are you familiar with them?
13                    A.  Yes, they are across the street
14          from me.
15                    Q.  ``By me'' do you mean Hillside
16          Auto Outlet; correct?
17                    A.  Yes.
18                    Q.  How about Gateway Car
19          Dealership?
20                    A.  They are on the -- they're close
21          to Hillside Auto Mall.
22                    Q.  How about Best Auto Outlet?
23                    A.  I'm confused with these
24          questions and why you are asking --
25                    Q.  Please don't, please just answer
```

A1056

23

```
 1                    Ishaque Thanwalla

 2          my questions, don't question my question.

 3                         MR. KATAEV:  Objection as

 4                         to relevancy.  You can answer

 5                         the question.

 6                    A.  Best Auto Outlet is I think in

 7          Suffolk County.

 8                    Q.  Did Hillside Auto Outlet

 9          employees, meaning the car salespeople ever

10          sell cars from nearby auto outlets or

11          dealerships?

12                    A.  Can you clarify that question?

13                    Q.  The question is a yes or no

14          question.  My question is: have Hillside

15          Auto Outlet car salespeople ever sold cars

16          from other dealerships during their

17          employment with Hillside Auto Outlet?

18                    A.  In our business, yes, you

19          mentioned a lot of dealerships names.  So,

20          the customer, so if a customer comes to us

21          and we don't have a car in our stock, so we

22          look at the sales, we look at anywhere if

23          they have a car available, and we call them

24          and request them and we can buy their car to

25          sell to our client.  Does that answer your
```

24

```
 1                  Ishaque Thanwalla
 2          question?
 3                  Q.  To your knowledge, do any of
 4          your partners own shares in Shylet Motors?
 5                  A.  Not that I know of.
 6                  Q.  How about Gateway Car
 7          Dealership?
 8                  A.  Not that I know of.
 9                  Q.  Have you ever spoken with
10          Hillside Auto Outlet employees concerning
11          where they should take the customers if the
12          customers did not like any cars in the lots
13          of Hillside Auto Outlet?
14                  A.  Are you asking me -- let me
15          understand this question correctly.  Did I
16          ask if a car is not in stock, if we can go
17          to the car dealer across the street, did I
18          ask my salespeople to show them a car, is
19          that what you are asking?
20                      MS. TROY:  You can answer
21                      my question first based on
22                      your understanding and then I
23                      will follow-up with more
24                      questions.
25                  A.  That's what my understanding is,
```

25

```
 1                        Ishaque Thanwalla
 2              that's what you are asking me, and I don't
 3              know the right way or the wrong way to
 4              answer the question.
 5                        Q.  Again, I'm asking you to answer
 6              the questions based on your understanding of
 7              the question.
 8                        A.  This is my understanding --
 9                             MR. KATAEV:  Let me just
10                             say this to help both of you
11                             out.  You have to answer the
12                             question, you cannot ask her
13                             questions. But, if in your
14                             question it is based on your
15                             understanding --
16                             THE WITNESS:  My
17                             understanding is that she's
18                             mentioning if I don't have a
19                             car, my salespeople can go
20                             across the street and bring
21                             the car to my lot and then
22                             sell it?  Is that right?
23                        Q.  Have you ever told any Hillside
24              Auto Outlet employees that you better not
25              sell the car from the other dealerships,
```

26

```
 1                      Ishaque Thanwalla
 2           mostly you should do so and sell the car
 3           from Hillside Auto Mall?
 4                      A.  Are you saying don't sell anyone
 5           the car from the dealership across the
 6           street but Hillside Auto Mall, is that what
 7           you are asking me?
 8                      Q.  Yes.
 9                      A.  No.  Why would I hurt my own
10           sales?
11                      Q.  Have you ever informed them
12           because Hillside Auto Mall is owned in part
13           by your partners, Hillside Auto Outlet, they
14           did not have the cars available that you
15           preferred, your preference was for them to
16           go to the Hillside Auto Mall?
17                      A.  No.  We look for the inventory
18           wherever it's available and that's why we
19           sell the cars.  That is we pick up the car
20           and bring the car and sell it on our lot.
21                      Q.  Have you ever told Hillside Auto
22           employees, Hillside Outlet Auto employees,
23           that you have a preference for them to sell
24           cars if a car is not available at Hillside
25           Auto Outlet for them to go to Hillside Auto
```

27

```
 1                    Ishaque Thanwalla
 2          Mall?
 3                         MR. KATAEV:  Objection to
 4                    the form. Asked and answered,
 5                    you can answer again.
 6                    A.  No.
 7                    Q.  What are your responsibilities
 8          as the owner, part-owner of Hillside Auto
 9          Outlet?
10                    A.  My title is general manager.
11          That consists of a lot of responsibilities:
12          hiring the employees, firing the employees,
13          making sure that the deals are done the
14          right way, making sure that the deals are
15          funded, making sure it is running smoothly,
16          the operations are running smoothly, making
17          sure the inventory is serviced, making sure
18          everything with the DMV is done correctly
19          and on time.  If it's not done correctly and
20          on time, I have to make sure that I have to
21          discipline the people who are in that
22          department.
23                    I have to look into every department
24          and make sure everything is running smoothly
25          and in a timely fashion where it does not
```

28

1                    Ishaque Thanwalla

2          affect the business licenses and compliance

3          as well.

4                    Q.  You mentioned that part of your

5          responsibilities were to hire employees.  Do

6          you recall hiring Leticia Stidhum?

7                    A.  Yes, very well.

8                    Q.  Can you describe what the hiring

9          process was like?

10                    A.  She came for an interview and

11         she sent a resume to Craig's list, if I can

12         recall that and she came in and interviewed

13         with me.  I like to give people an

14         opportunity when anyone walks in, if it's a

15         candidate that is intelligent enough to hold

16         a conversation right away, and then I hire

17         them.

18                    Q.  Do you recall when you hired

19         her, the date?

20                    A.  I can't recall that.

21                    Q.  During that conversation, during

22         that hiring process that you just described,

23         did you tell her what her pay was going to

24         be?

25                    A.  Yes, well, yes.  She is a

29

1                     Ishaque Thanwalla

2          commission salesperson and her compensation

3          consisted of approximately $300 a week

4          salary, plus $150 commission, plus bonus,

5          also, if there was any individual car that

6          had a bonus.  We have many bonuses, we have

7          weekly bonuses, we have daily bonuses,

8          certain cars, it's old age and we have a

9          bonus.

10                    Q.  To clarify, when you said plus

11         $150 commission, is that $150 per car

12         commission?

13                    A.  It's called a flat commission

14         rate, yes.  Plus the salary, plus the

15         bonuses if there are any changes.

16                    Q.  Can you describe for me what the

17         differences are between the monthly, weekly,

18         and daily bonuses?

19                    A.  Okay, very simple.  Let's take

20         one step at a time.  So, you have a salary

21         as a side salary, correct?  If they sell a

22         car, they have $150 flat commission, and

23         let's putting that aside for a second.

24              Now, let me explain what the bonuses

25         are, so certain cars are old age, and as an

A1063

30

```
1                      Ishaque Thanwalla

2           example, in this industry, if we have a car

3           for over 60 days we like to get rid of it as

4           fast as possible because it is costing us

5           and it is depreciating, the money is

6           depreciating.  So, we may add another $20 or

7           $25 as a bonus.

8                 Sometimes the car is 90 days old, it's a

9           90-day old unit, and we may put $50 or even

10          5 percent additional commission on that,

11          depending on the day.

12                     Q.   Specifically, when we were

13          talking about Leticia, what was the bonuses

14          that were promised to her?

15                          MR. KATAEV:  Objection to

16                     the form.  You can answer.

17                     A.   There is no promises to begin

18          with, only thing we would tell you our

19          bonuses, our bonus structure changes daily,

20          weekly, and monthly.  So, whatever was in

21          that week, that is the bonus that she got.

22          If there's a 5 percent or $25 additional or

23          $50 additional, or maybe $500.  I can't

24          answer that question 100 percent.  To the

25          best of my ability, I have given you the
```

A1064

31

```
 1                    Ishaque Thanwalla

 2        complete structure.  It could be 5 percent,

 3        25 percent, it could be $5 -- I'm sorry, it

 4        could be $50.  Maybe a bigger bonus for that

 5        week based on the day, based on the time.

 6        Every day they have new bonuses, not exactly

 7        every day, but let's say on a Saturday just

 8        to give you an example, you sell three cars

 9        and deliver those cars.  You get additional

10        $100 bonus.  So, which we provide bonuses or

11        we will say ''it's three cars,'' and we're

12        going to ''give you additional 5 percent.''

13        It all depends.

14                    Q.  So, let's break down the

15        conversation that happened during hiring;

16        did you talk at all about the schedule,

17        meaning the work schedule that Leticia would

18        be given as a commission salesperson?

19                    A.  Yes.  She was to get a 40-hour

20        schedule.

21                    Q.  Can you tell me what that

22        schedule is?

23                    A.  How can I tell you?  I don't

24        have a schedule in front of me.

25                    Q.  Did she regularly work a certain
```

32

1                      Ishaque Thanwalla

2          number of days or did that change from week-

3          to-week?

4                      A.   Some days she worked five days,

5          most of the time, but she usually would have

6          weekdays, Thursday, Tuesday, depending on

7          your schedule off, you would have a Sunday.

8          All of the schedules changed every week,

9          every industry, you have to come in the

10         beginning of a week, and you get the

11         schedule.

12                     Q.   Can you tell me what time she

13         would be expected to arrive at work?

14                     A.   About 10 o'clock.

15                     Q.   How about what time would she be

16         expected to leave work?

17                     A.   The work time would be our

18         business hours are between 10:00 and 7:00 or

19         10:00 to 8:00.  It also depends, if it's

20         wintertime or summertime.

21                     Q.   Let's start from the wintertime,

22         what would that time be?

23                     A.   About 10:00 to 7:00.

24                     Q.   How about the summertime?

25                     A.   Mostly it's 10 to 8:00 is the

33

```
 1                    Ishaque Thanwalla
 2          schedule or the dealership opens hours, not
 3          the schedule hours.  But the dealership is
 4          open through 10:00 and 8:00.  So, maybe
 5          Leticia would start at 12:00 to 8:00 or
 6          10:00 to 6:00, something like that.  It all
 7          depends.
 8                    Q.  How would you describe the foot
 9          traffic at Hillside Auto Outlet, and in
10          terms of the timeframe, you can say
11          generally, or specifically, but I'm asking
12          about 2019.
13                    A.  When you say ''foot traffic,'' can
14          you give me a little more elaboration?
15                    Q.  Sure.  Would you describe your
16          store as a busy store and the timeframe is
17          2019?
18                    A.  Which timeframe?
19                    Q.  The year 2019.
20                    A.  It is too long for me to
21          describe that.  Our business changes based
22          on the season.
23                    Q.  So, why don't you just describe
24          for me generally what the business was like
25          based on the season.
```

A1067

34

```
 1                    Ishaque Thanwalla
 2              A.  Okay.  Giving you an example, it
 3         would be busy traffic after March, it would
 4         be busy; April, May, June, July August,
 5         starting to go down; September goes down;
 6         October, November is slow and December is
 7         very slow, and January is slow.  February is
 8         slow and in March it starts to pick up.
 9              Q.  So, you would describe March
10         through August as the busy months?
11              A.  Correct.
12              Q.  September through February as
13         less than busy?
14              A.  Less busy, you got it right.
15              Q.  How many cars would Hillside
16         Auto Outlet sell on a monthly or weekly
17         basis, on a monthly or weekly basis between
18         March and August?
19                    MR. KATAEV:  Objection as
20                      to compound.  You can answer
21                      the question.
22              A.  March would be a busy month and
23         I can't really give you a number.  So, I
24         would say 72 or 75 cars in March and April,
25         and somewhere around that neighborhood and
```

35

```
 1                    Ishaque Thanwalla
 2          October and November and December would slow
 3          down to 30 or 50 cars a month.
 4          It's not only our -- my dealership, it's 90
 5          percent of the dealerships.
 6                    Q.  Has Leticia ever worked a mixed
 7          schedule, meaning a schedule that was not
 8          fixed during her time at Hillside Auto?
 9                    A.  What do you mean by ''mixed
10          schedule?''  It's confusing to me.
11                         MS. TROY:  Let me
12                              rephrase it.
13                         THE WITNESS:  Thank you.
14                    Q.  When Leticia worked for Hillside
15          Auto Mall, she always reported to work at
16          10:00 a.m.?
17                    A.  She never worked for Auto Mall.
18                    Q.  I mean Hillside Outlet.
19                    A.  That is Outlet, not the Mall.
20          You just said ''Mall,'' that is why she has
21          never worked for the mall.  She worked for
22          only Hillside Auto outlet.
23                    Q.  My question is: when Leticia
24          worked for Hillside Auto Outlet, did she
25          always start working at 10:00 a.m.?
```

A1069

36

```
 1              Ishaque Thanwalla
 2              A.  No, some days she worked late
 3      and some days she was off. I think she chose
 4      -- how can she be if she always started at
 5      10:00 a.m.?
 6              A.  Is it fair to say that on days
 7      that she worked, she would start working at
 8      10:00?
 9              A.  I can't -- you are repeating
10      yourself on this question which is as I
11      said, based on her schedule. If her shift
12      started, let's say she started late, if her
13      shift started at 10 o'clock, she would start
14      at 10 o'clock and her shift says she was
15      supposed to start at 11:00 or 12:00, she
16      would start at 11:00 or 12:00.
17                  MR. KATAEV:  Objection to
18                      that.  It was asked and
19                      answered already.
20              Q.  Are you saying that there is a
21      10:00 a.m. shift and 11:00 a.m. shift and a
22      12:00 p.m. shift?
23                  MR. KATAEV:  Objection to
24                      form. You can answer.
25              A.  Correct.
```

A1070

37

```
 1                    Ishaque Thanwalla
 2                    Q.  Regardless of what time Leticia
 3          started, what time would she end work?
 4                    A.  She would end work when the
 5          shift is finished.
 6                    Q.  When would the shift be
 7          finished; let's start from the 10:00 a.m.
 8          shift?
 9                    A.  When I gave you the answer for
10          my question, what time the operating hours
11          are, the hours are 7 in the wintertime and 8
12          in the summertime.
13                         MR. KATAEV:  Objection.
14                         Asked and answered.
15                    Q.  During the workday, would she
16          have any break time?
17                    A.  Sure she did, she went out for
18          the break, always did. Her and David
19          Manrique.
20                    Q.  Was there a fixed time for
21          break?
22                    A.  Fixed time for break?  This is
23          how the break works.  It's an eight-hour
24          shift and they can either take a whole hour
25          or they can take two different breaks, 25 or
```

38

Ishaque Thanwalla

1   15 minute breaks and one and one half hour

2   break. It depends on them.

3       Q.  Is that every workday?

4       A.  Every workday. Why would it be

5   different?

6       Q.  During that, and let's talk

7   about that for a second, is there a time

8   clock at Hillside Auto?

9       A.  No.

10      Q.  Was there a method by Hillside

11  Auto to keep track of the employee's

12  attendance?

13      A.  We used to keep track, yes. That

14  is how they got paid.

15      Q.  Can you describe how the

16  employee's time was kept track of?

17      A.  They came and signed-in and when

18  they went out for a break, they signed out

19  at the desk.

20      Q.  Do you still have those records?

21      A.  Unfortunately, we had a robbery.

22  There were a lot of records that were

23  missing, that was missing.

24      Q.  When did the robbery take place?

39

```
 1                    Ishaque Thanwalla
 2               A.  I can't recall the exact date.
 3               Q.  Do you recall the year?
 4               A.  Yes, it was 2019 or 2018.  I
 5          have no idea, I have to look.
 6               Q.  Was a police report filed in
 7          conjunction with the robbery?
 8               A.  Yes.
 9               Q.  Besides the employee's
10          attendance records, what else was taken?
11               A.  Quite a few files that I can't
12          remember exactly what it was.
13               Q.  Are you familiar with an
14          individual by the name of Deana Jennings?
15               A.  Yes.
16               Q.  How are you familiar with her?
17               A.  She was the controller at the
18          time.
19               Q.  What is her role now?
20               A.  To make sure the payroll is
21          done, making sure the deals were funded,
22          making sure the accountings were good.
23               Q.  Was her role in 2018 and 2019
24          the same as her role is now?
25               A.  She's no longer working with me;
```

A1073

40

```
 1                       Ishaque Thanwalla
 2            I have a new controller and her name is
 3            Susan.
 4                       Q.  When did Deana Jennings leave
 5            work at Hillside Outlet?
 6                       A.  I can't recall the exact date.
 7                       Q.  What was Deana Jennings'
 8            position before she left?
 9                       A.  I don't understand your
10            question.
11                       Q.  Did she have a title, like for
12            instance, you are the general manager,
13            right?  Did she have a title?
14                       A.  Yes, I answered that question to
15            you as her title was controller.
16                       Q.  Was she employed by Hillside
17            Auto Outlet?
18                       A.  Yes.
19                       Q.  Was she also employed at the
20            same time at Hillside Auto Mall?
21                            MR. KATAEV:  Objection to
22                       the form.  You can answer.
23                       A.  Yes.
24                       Q.  What was her title at Hillside
25            Auto Mall?
```

41

```
 1                    Ishaque Thanwalla
 2              A.  I can't answer that question
 3         because I don't know.  Anybody can have two
 4         jobs, it's certainly not my place.  Certain
 5         hours at my place and certain hours -- I
 6         can't answer that, what she did over there.
 7              Q.  To your knowledge, was she also
 8         in charge of billing at Hillside Auto Mall?
 9                    MR. KATAEV:  Objection to the
10                    form. You can answer.
11              A.  I can't answer that question., I
12         don't know.  I don't go there for me to see
13         what she does.
14              Q.  Right now you've stated that you
15         have a new controller and the name is Susan.
16         Do you have Susan's last name?
17              A.  Her last name is -- I can't
18         pronounce it, but I call her Susan ''Z''.   I
19         can get the name for you; she has been with
20         me since a long time.
21              Q.  Do you know how to spell her
22         last name even if you can't pronounce it.
23              A.  I can't, I will make a phone
24         call when you give me a break.
25                    MS. TROY:  Understood.  We
```

42

```
 1                    Ishaque Thanwalla

 2                         will leave a blank space in

 3                         the record for the last name

 4                         for you to fill in

 5                         subsequently.  Thank you for

 6                         being helpful.

 7

 8                    (insert)

 9                         THE WITNESS:  You're

10                         always welcome.

11               Q.  Does she also work for Hillside

12      Auto Mall currently?

13               A.  No.

14               Q.  How do you know?

15               A.  How do I know?  Because she was

16      working for me full-time.

17               Q.  Are you telling me that Deana

18      Jennings did not work for you full-time

19      before?

20               A.  Not full-time.

21               Q.  What was her schedule?

22               A.  I can't recall.

23               Q.  Why did she leave work?

24               A.  I answered that question prior,

25      I can't recall.
```

43

```
 1                    Ishaque Thanwalla

 2                         MR. KATAEV:  Objection.

 3                    Asked and answered.

 4                         MR. KATAEV:  Can we take a

 5                    quick break so that I can

 6                    stop coughing so much?  We

 7                    can take that break whenever

 8                    you want.

 9                         MS. TROY:  We can take

10                    that five-minute break right

11                    now and come back at 10:51,

12                    if that sounds good to you.

13                         MR. KATAEV:  10:50 is

14                    fine.

15                    (A recess was taken from

16                    10:47 a.m. until 10:51 a.m.)

17               Q.   Mr. Thanwalla, when is your

18          birthday?

19               A.   My birthday is 5-11-1963.

20               Q.   What are the last four digits of

21          your social security number?

22               A.   Why do you need my social

23          security?

24               Q.   For identification purposes.

25               A.   You have -- you will get a copy
```

44

```
 1                    Ishaque Thanwalla
 2         of my driver's license.  That is my privacy
 3         and I don't like to give it out while the
 4         plaintiff is present on the iPhone.
 5                         MR. KATAEV:  I'm going to
 6                         object to this ongoing
 7                         embarrassment and for the
 8                         latest items, under Rule 50.
 9              Q.  Do you have it?
10              A.  Do I have what?
11              Q.  Do you have your social security
12         number?
13             I just need the last four and we can
14         agree that is not going to be -- that it's
15         going to be marked it's not going to be
16         prejudicial and it's going to be marked as
17         confidential.
18                         THE WITNESS:  I don't
19                         remember it right now.
20                         MS. TROY:  Fine, just
21                         please fill it out
22                         subsequently, and we agree
23                         again, we will be marking
24                         this as personal and
25                         confidential in the
```

45

```
 1                    Ishaque Thanwalla
 2                         transcript.
 3
 4                         (insert)
 5                Q.  Back on the record now, Mr.
 6         Thanwalla, did the pay structure that you
 7         mentioned earlier ever change for Leticia
 8         Stidhum?
 9                A.  I answered that question, it's
10         bonuses and things that we give.  So, it's a
11         yes, it changes not just for Leticia, for
12         everyone.  It's based on the daily bonuses,
13         the weekly bonuses and the monthly bonuses.
14         I have answered your question more than
15         once.
16                        MR. KATAEV:  Objection.
17                        Asked and answered.
18                Q.  How about the $300 weekly plus
19         the $150 flat commission, did that ever
20         change?
21                A.  Not to my knowledge.
22                Q.  Were all of your car salesmen
23         paid $300 base weekly pay or did some get
24         more or less than that amount?
25                        MR. KATAEV:  Objection
```

46

```
 1                   Ishaque Thanwalla
 2                     irrelevant. You can answer.
 3              A.  Everybody is different, most of
 4         them got paid $300.
 5              Q.  Did anyone, during Leticia's
 6         employment, get paid $350 a week?
 7              A.  I can't remember, possible based
 8         on seniority.
 9              Q.  How about $200 per week?
10              A.  I can't answer that question, I
11         don't think so, but ---
12              Q.  How about $500 per week?
13              A.  You are repeating the question
14         again and again.  I said ''no,'' numerous
15         times. How many times do I have to say ''no?''
16              Q.  By ''no'' do you mean that you did
17         not pay anyone $500 base weekly salary?
18                   MR. KATAEV:  Objection as
19                     asked and answered.
20                   MS. TROY:  I am on the
21                     last question in that line,
22                     please answer to the best of
23                     your ability.
24              A.  I can't recall.
25              Q.  How about $600 per week in base
```

47

```
 1                    Ishaque Thanwalla
 2          weekly salary; did anyone during Leticia's
 3          employment get paid that amount?
 4                    A.  I think the managers did.
 5                    Q.  The managers got paid that base
 6          weekly salary plus a commission; is that
 7          correct?
 8                    A.  Yes.
 9                         MR. KATAEV:  Objection as
10                    to relevance. You can answer.
11                    Q.  You also mentioned the weekly
12          schedule, did the weekly schedule ever
13          change for Leticia between the start of her
14          employment until the end of her employment?
15                    A.  I answered that question
16          previously, every week or every two weeks
17          the schedule changed for everyone.
18                         MR. KATAEV:  Objection as
19                    to asked and answered.
20                    Q.  What were the store hours for
21          Hillside Outlet and the timeframe is 2018
22          and 2019?
23                         MR. KATAEV:  Objection.
24                    Asked and answered.  You can
25                    answer.
```

48

```
1                    Ishaque Thanwalla
2              A.  I have answered that question
3       previously to you that the winter hours,
4       about the winter hours and the summer hours.
5                    MS. TROY:  You can answer
6              it again.
7              A.  It is 10:00 to 7:00 in the
8       winter and the summertime mostly it is 10:00
9       to 8:00.
10             Q.  If a customer came in before the
11      store closed, would the car salespeople have
12      to serve the customer even if it's around
13      the store closing time?
14             A.  It's mostly the finance manager
15      would have to serve.  The salesmen did not -
16      - they did their jobs and they could leave
17      it to the finance manager, he stays because
18      they are managers and they have to finish
19      the job.
20             Q.  Were there ever times when
21      Hillside Auto Outlet salespeople had to stay
22      after the store closing time?
23             A.  Not have to stay, but they
24      stayed on their time. It was goodwill if
25      they wanted to, it's their choice to stay
```

49

```
 1                    Ishaque Thanwalla
 2          because it's their deal. If they want to
 3          stay, they're welcome to stay, if they
 4          weren't staying, they didn't have to stay.
 5          We made sure that they got compensated.
 6                    Q.   Typically, how long would they
 7          stay after if there was a customer that came
 8          in before the closing time?
 9                    A.   What do you mean by ''before the
10          closing time?'' Right at closing time or
11          hours before closing time or two hours?  It
12          all depends on the deal, how long it takes
13          for the bank to reply back and give us an
14          answer.  You can stay between 30 to 70
15          minutes to reply back and sometimes it may
16          take longer than that.  It all depends, and
17          that's my answer for that question.  It's my
18          answer because it is industry -- it's the
19          auto industry and it works differently than
20          most of the other industries.
21             We cannot answer when the bank is going
22          to reply back and give us approval on the
23          documents.  All the documents on there are
24          there and there is a lot of puzzles that
25          need to be put together before we can say
```

A1083

```
 1                    Ishaque Thanwalla
 2         that they're going to stay longer or the
 3         customer is going to come back tomorrow.
 4         Does that answer your question?
 5                    Q.   Why don't you walk me through
 6         the different pieces of the puzzle that need
 7         to be put together?
 8                         MR. KATAEV:  Objection to
 9                    the form. You can answer.
10                    A.   The puzzle, to put it together,
11         the customer walks in and the salesman
12         approaches them and greets them, correct?
13         Show them a car, then they take a credit
14         application.  Once they take the credit
15         application, we will ask to have some
16         documentation, and we run the credit before
17         we have any documentation, meaning pay
18         stubs, bank statements, and utility bills.
19         It all depends, so we run the credit based
20         on that.  We will ask the salesman to get --
21         to collect all the documentation and they
22         try to get that, and it could take between
23         30 and 40 minutes.
24            From there, we put the deal into
25         finance, and once the papers are all
```

51

```
 1                      Ishaque Thanwalla
 2           together, sometimes we don't have the
 3           paperwork together and we try to do it so
 4           that we can upload the documentation.
 5           Later, when the salesman is trying to get
 6           that, they get the price, and then 40 or 50
 7           minutes later, whatever time it takes.
 8                So, once you get approval, we search the
 9           numbers and give the numbers to the
10           customer, the sales price, the car payments,
11           if they want to buy any accessories.  Once
12           that is all done, the finance manager will
13           get the approval, the finance manager will
14           sign the contract and the guy would deliver
15           the car.
16                      Q.  If the customer came in right
17           before the closing time, would sometimes
18           Hillside Auto Outlet car salespeople have to
19           stay until 9:00, 10:00 or 11 o'clock to
20           finish the deal?
21                      MR. KATAEV:  Objection.
22                           Asked and answered.  You can
23                           answer that again.
24                      A.  You have asked me that question
25           already.  When you say ''have to stay,'' I
```

52

```
 1                      Ishaque Thanwalla

 2          answered that question.  No, I said no.

 3          Based on the salesperson, if they want to

 4          stay on their own goodwill.  Are you going

 5          to be repeating the same question a second

 6          time?

 7                          MR. KATAEV:  Please answer

 8                      the question.

 9                          MS. TROY:  Please just

10                      answer my questions, and

11                      again, I appreciate your

12                      various comments.  But, this

13                      is not your deposition.  So,

14                      please stop giving me

15                      directions and just answer my

16                      questions so that we can get

17                      this done as soon as

18                      possible.

19                          MR. KATAEV:  How long?

20                          MS. TROY:  Let's go off

21                      the record.

22                      (A discussion was held off

23                      the record)

24                  Q.  Were there times when Leticia

25          Stidhum stayed until 9:00 or 10 o'clock or
```

53

```
 1                    Ishaque Thanwalla
 2        11 o'clock on her ''own goodwill'' as you put
 3        it?
 4              A.  Would not even know, my store
 5        was open 9:00 or 10:00 or 11:00, we may have
 6        stayed to 8:00, or maybe 9 o'clock.
 7              Q.  How about during the summertime,
 8        were there times when Leticia had to stay
 9        until 9:00 or 10:00 or 11:00 p.m.?
10              A.  I answered that question for the
11        summertime.  I said 8 o'clock up to 9
12        o'clock.  I did not say 7 to 8 o'clock.
13              Q.  How would you describe Leticia
14        as a car saleswoman at Hillside Auto Outlet?
15                    MR. KATAEV:  Objection.
16                    Vague, but you can answer.
17              A.  I hired her, I trained her. She
18        was a very good salesperson.
19              Q.  Do you recall of the 70 to 75
20        cars that Hillside Auto Outlet sold overall
21        for the months, how many cars would Leticia
22        sell when she was employed?
23              A.  I answered that, but I would say
24        between 20 and 25, sometimes 15.  It
25        depended on her month and her ability.
```

54

```
 1                    Ishaque Thanwalla
 2               Q.  How about for the months of
 3         September through February, obviously she
 4         did not work there until February during the
 5         less busy months, as you called it, how many
 6         of the 40 to 50 cars that would be sold by
 7         Hillside Auto Outlet overall would be sold
 8         by Leticia?
 9               A.  I answered that question.
10         Between 15 and 25.
11               Q.  Are you familiar with the
12         software called DealerTrak?
13               A.  (No response)
14                    MR. KATAEV:  If you can
15                    answer the question.
16               A.  Yes.
17               Q.  How are you familiar with it?
18               A.  It's a dealer deal management
19         system.
20               Q.  At Hillside Auto Outlet between
21         2018 and 2019, who had the username of the
22         DealerTrak system?
23               A.  To the best of my knowledge, it
24         was me, it was Jeanique J-E-A-N-I-Q-U-E.  I
25         believe that was -- also, Serge, and I would
```

55

```
 1                     Ishaque Thanwalla
 2          say Louis.
 3                    Q.  Who is Jeanique?
 4                    A.  Jeanique was my manager.
 5                    Q.  From what date to what date?
 6                    A.  I can't recall. I don't know
 7          exactly.
 8                    Q.  Who is Serge?
 9                    A.  Finance manager.
10                    Q.  Again, from what date to what
11          date?
12                    A.  He's still working and I don't
13          know when he started.
14                    Q.  Who is Louis?
15                    A.  Finance manager.
16                    Q.  Between 2018 and 2019, did
17          anyone else have a username in the
18          DealerTrak system?
19                    A.  Maybe we can run the DealerTrak
20          and find out.
21                    Q.  Do you know an individual by the
22          name of Andris Guzman?
23                    A.  Yes.
24                    Q.  Who is he?
25                    A.  Manager.
```

56

```
 1                     Ishaque Thanwalla
 2                Q.  When did he start working for
 3       Hillside Auto Outlet?
 4                A.  I can't recall the date that he
 5       started, neither can I recall the date that
 6       he finished.
 7                Q.  Do you recall the year?
 8                A.  2018/2019/maybe 2020.  I don't
 9       know when he left.
10                Q.  When you say 2018/2019 or 2020,
11       do you mean the year he started or finished
12       or both?
13                A.  I said 2018/2019 or 2020.  I
14       don't know when he left, started in 2018.
15                Q.  When he started in 2018, was he
16       the manager?
17                A.  He was my assistant.
18                Q.  When did he become the manager?
19                A.  He was my assistant manager,
20       that's what I meant.
21                Q.  Did his position ever change
22       from the time when he began in 2018 as the
23       assistant manager?
24                A.  Not that I can recall.
25                Q.  Earlier you mentioned that you
```

57

                      Ishaque Thanwalla

1

2      do not recall when Jeanique left Hillside

3      Auto Outlet; do you recall what year?

4              A.  It was 2018, if I'm not wrong.

5              Q.  Do you recall what month?

6              A.  No.

7              Q.  Was there a point when Andris

8      Guzman was employed as assistant manager to

9      Jeanique's position?

10             A.  Not that I can recall, Jeanique

11     was assistant too because I have to have two

12     managers because of the hourly schedule.

13     So, one had to cover the time in the

14     afternoon, and it was me who put out the

15     hours from the morning until late, again.

16     I'm going to -- I go in as early as possible

17     and I come out mostly the last person.

18             Q.  Is it fair to say that Andris

19     Guzman took Jeanique's position after she

20     left Hillside Auto Outlet?

21             A.  No.  He had the same rank as

22     Jeanique.  How can he take her place? They

23     were both my assistants.

24             Q.  Before Jeanique left Hillside

25     Auto Outlet, were car salesmen promised

58

1                    Ishaque Thanwalla

2        commissions on top of the amount that you

3        just mentioned, the 300 weekly plus the $150

4        flat rate.

5                    A.  When you say ''on top of,'' let me

6        just answer your question.  I have answered

7        that question, that nobody was promised, and

8        every day there is a different bonus up to 5

9        percent on a car.  That can change daily, on

10       a daily basis on a car on a weekly or a

11       monthly basis.  So, yes there were bonuses

12       that we put out and nobody was promised

13       anything but $150.

14                    MR. KATAEV:  Objection to

15                       the form of that.

16                    Q.  Do you agree that 5 percent of

17       the $3,000 is 150?

18                    A.  Do I agree mathematically?  I

19       agree, but I don't know why you are asking

20       this question, who you are asking this

21       question to.

22                    Q.  Between 2018 and when Leticia

23       began working at Hillside Auto Outlet until

24       in or around July or August of 2018, was

25       there in fact an incentive structure in

59

```
1                    Ishaque Thanwalla
2          place whereby the car salesman were promised
3          a 5 percent for the sales made in excess of
4          $3,000?
5                    A.  When you go back to your
6          question, please stop saying ''promise,''
7          because I have not promised anything.  I
8          have answered that question numerous times.
9          So, it is a little bit annoying, forgive me
10         to say that, but you say ''promise, promise,''
11         there is no promise.  I answered that
12         question maybe 7 times prior to that we have
13         a bonus structure in place.
14            You understand that or are you going to
15         go back and ask me the same question again
16         and again?  ''Promise, promise,'' I never
17         promised any of my employees.  We do a bonus
18         program that we do every day and sometimes
19         we don't have it, sometimes we do.  Yes,
20         there is no promise, but there is a bonus
21         structure depending on the day and the month
22         and the week. Did that completely answer
23         your question?
24                    Q.  In fact, did the bonus structure
25         stay the same in or around July or August --
```

A1093

60

```
1                    Ishaque Thanwalla
2                 A.  It still stays the same.
3                 Q.  Did Hillside Auto Outlet in fact
4       pay a 5 percent bonus for sales done in
5       excess of $3,000 between 2018 and in or
6       around July or August of 2018?
7                 A.  Let me answer your question.
8       You are asking me if they were paid beyond
9       above 5 percent over $3,000?
10            Let me answer that question as to no,
11      based on the bonus, sometimes we did and
12      sometimes we did not.  Does that answer your
13      question?
14                Q.  By that, let's go a step
15      further: between 2018 and July or August of
16      2019, did Hillside Auto Outlet in fact pay 5
17      percent that we were just mentioning?
18                A.  The answer is no, 5 percent was
19      the bonus subject to the car, subject to the
20      day, subject to the week, and it changed.
21      There was sometimes there was not until
22      today's date the same plan or structure.
23                Q.  Is it fair to say that when
24      Jeanique left, the 5 percent was no longer
25      paid to the car salespeople at Hillside Auto
```

61

```
 1                    Ishaque Thanwalla

 2        Outlet?

 3                    A.  Jeanique had nothing to do with

 4        taking the 5 percent.  It was my bonus and I

 5        used to give it based again on the day and

 6        the car and the week and the month.  It all

 7        depended, so Jeanique had no power to give

 8        anybody anything, nor could she promise

 9        anything.  No, it was me who did, who ran

10        the dealership if that answers your question

11        again.

12                    Q.  What was David Baron's position

13        at Hillside Auto Outlet?

14                    A.  I answered that question

15        previously, he was a percentage owner.

16                    Q.  What were his job

17        responsibilities at Hillside Auto Outlet.

18                         MR. KATAEV:  Objection to

19                    the form.  You can answer.

20                    A.  He had no responsibilities.

21                    Q.  How about Jory Baron, what were

22        his responsibilities as a percentage owner?

23                         MR. KATAEV:  Objection to

24                    the form.  You can answer.

25                    A.  No responsibilities.
```

62

```
 1                    Ishaque Thanwalla
 2              Q.   How about Josh Aaronson?
 3              A.   No responsibilities.
 4              Q.   We were talking about the
 5         DealerTrak system; did you at any time
 6         provide your username and password to
 7         Leticia Stidhum?
 8              A.   No, and I never will to any
 9         employee.
10              Q.   Did you write a username and
11         password on a Post-It note and pass it on to
12         Leticia?
13                    MR. KATAEV:  Objection
14                        Asked and answered, but you
15                        can answer.
16              A.   No.
17              Q.   Have you ever personally trained
18         Leticia on the DealerTrak system?
19              A.   No.
20              Q.   Did Andris Guzman have an
21         account in the DealerTrak system?
22              A.   Yes.
23              Q.   When Andris Guzman had left
24         Hillside Auto Outlet, was there a time when
25         you told Leticia Stidhum that as the top
```

63

```
 1                    Ishaque Thanwalla
 2          saleswoman, you would prefer her to run the
 3          DealerTrak system with her customers first?
 4                    A.  No.
 5                    Q.  Does Hillside Auto Outlet have
 6          any written policies regarding
 7          discrimination?
 8                    A.  Whatever policy we have, we take
 9          a policy from corporate, and from the EDD we
10          have it posted for the people, equal
11          opportunity employment posters, the EDD
12          employment.  So, we do have posters posted
13          in the lunchroom where we eat lunch.
14                    Q.  By ''corporate,'' what do you
15          mean?
16                    A.  Meaning that we have posters for
17          the employment for them to read and know
18          what their rights are.
19                    Q.  You said you had written
20          policies from corporate?
21                    A.  Yes.  That is what corporate
22          gives us, and things, they were payroll
23          company is what I meant, actually.  Payroll
24          company provides ADP for us with all the
25          posters and everything.  Any updates come
```

64

```
 1                    Ishaque Thanwalla
 2          in, we get it.
 3                    Q.  Have you ever traveled outside
 4          the country in December of 2018?
 5                    A.  Yes.
 6                    Q.  Where did you travel to?
 7                    A.  Back home, Pakistan.
 8                    Q.  When did you travel outside of
 9          the United States?
10                    A.  In 2018; is that your question?
11                    Q.  Correct.
12                    A.  It's between, if I can recall, I
13          usually leave on the 20th or the 21st or the
14          22nd of December, and I usually come back
15          between the 5th or the 7th.  That is my
16          usual trip every year except last year.
17                    Q.  Earlier you mentioned that the
18          posters would be posted in the lunchroom.
19          Can you describe where that was?
20                    A.  Posted, I have described to you
21          the posters are posted in the lunchroom.
22          What don't you understand?
23                    Q.  Where is the lunchroom within
24          Hillside Auto Outlet?
25                    A.  There is a lunchroom right next
```

65

```
 1                    Ishaque Thanwalla
 2        to the finance office, my office and the
 3        hallway right outside there was a lunchroom.
 4        They can sit down, there are tables and
 5        stools and they can sit and eat their lunch
 6        and the microwave.
 7                    Q.  Specifically in 2018, when did
 8        you travel to Pakistan?
 9                    A.  I gave you an approximate which
10        I mentioned to you earlier. I gave you an
11        answer that it was about the 20th, the 21st,
12        and probably back by the 6th or 7th, the
13        5th, 6th or 7th. I am usually back then and
14        I can't recall the exact date. But I can
15        look into it and I can answer that question
16        specifically.
17                         MR. KATAEV:  Can we take a
18                         five-minute break whenever
19                         you like?
20                         MS. TROY:  We just took a
21                         break. If you don't mind, I'm
22                         going to go for a little bit
23                         and then we will take that
24                         break if it's not a problem.
25                         MR. KATAEV:  Okay.
```

66

```
 1                    Ishaque Thanwalla
 2              Q.  Did you speak with anyone in
 3       preparation for today's deposition?
 4              A.  Do you mean about the case?
 5       Emmanuel, my attorney.
 6              Q.  Besides your attorney, did you
 7       speak with anyone else?
 8              A.  No.
 9                   MS. TROY:  I'm going to
10                   ask the reporter to leave a
11                   blank space in the transcript
12                   for the date when Mr.
13                   Thanwalla traveled outside of
14                   the United States as well as
15                   a blank for the date when he
16                   returned to the United
17                   States.
18
19                   (insert)
20
21                   (insert)
22              Q.  Mr. Thanwalla, you traveled to
23       Pakistan; was that with a passport?
24              A.  How else could I travel?
25              Q.  In the weeks prior to your
```

67

```
 1                    Ishaque Thanwalla
 2           traveling, were you out of Hillside Auto
 3           Outlet?
 4                    A.  Can you repeat your question one
 5           more time, please?  I didn't hear it right.
 6                    Q.  Sure.  I'm asking you if the
 7           week before you traveled physically outside
 8           of the United States, if you worked outside
 9           of Hillside Auto Outlet, where you are not
10           working at Hillside Auto Outlet during the
11           week before.
12                    A.  I worked until the last day
13           before I leave.  So, the answer to that is
14           no, I was working until the last day before
15           I left.
16                    Q.  Until the last day before you
17           left, were you there from the start of the
18           day until the end of the day, every day, in
19           Hillside Auto Outlet?
20                    A.  Before I left, was that the
21           question?
22                    Q.  Right, before you left.
23                    A.  Let's say if I left on a
24           Saturday, correct?  Yes, I would be working
25           Friday from the morning until evening, to
```

68

```
 1                        Ishaque Thanwalla
 2           give you a complete understanding.  So, if I
 3           was supposed to be leaving around on a
 4           Saturday, yes, I would work Wednesday,
 5           Thursday, Friday, and through the morning of
 6           the day until Friday until Saturday, not for
 7           the afternoon.  So, I would not come to work
 8           on that day.  Does that answer your
 9           question?
10                   Q.  Was it your practice to
11           interview every single employee for Hillside
12           Auto Outlet?
13                   A.  In my what?
14                   Q.  In your practice.
15                   A.  I do try my best to interview
16           everyone because I am the one who is hiring
17           and I am the only one who is firing.
18                   Q.  I'm going to show you a document
19           on the screen.
20                       MS. TROY:  Ms. Court
21                          reporter, can you mark this
22                          as Plaintiff's Exhibit 2?
23                          (Plaintiff's Exhibit 2 marked
24                          for identification)
25                       The entire document will just be
```

69

```
 1              Ishaque Thanwalla

 2              marked as Plaintiff's Exhibit 2 and I

 3              will be referring to different pages

 4              when I speak to  Mr. Thanwalla.

 5                   Q.  Mr. Thanwalla, do you see a

 6         document that was Defendant's Document

 7         Production, D1186.  On it, it says the hire

 8         date was May 22nd of 2018, and the

 9         termination date was January 14th, 2019.

10         Does this refresh your recollection as to

11         when Leticia started?

12                   A.  If the document says it, I am

13         looking at it most likely, yes.

14                   Q.  How about the end date?

15                   A.  The end date may be a little --

16         it says again, to the best of my

17         recollection, it looks like Leticia quit her

18         job, left to the other company.

19                   Q.  Just to clarify, the document

20         says January 14th, of 2019. You are saying -

21         -

22                   A.  Best of my ability.  I said I

23         can't  recall, I still can't recall.  She

24         came to my office and she said she's going

25         to go with Ali to the other dealership and
```

70

```
 1                      Ishaque Thanwalla
 2           that was in the afternoon time when she
 3           left.
 4                         MS. TROY:  We can now take
 5                         a short break for five
 6                         minutes and come back at
 7                         11:35.  It is now 11:30 per
 8                         Manuel's request.
 9                         (A recess was taken from
10                         11:30 a.m. until 11:35 a.m.)
11                         THE WITNESS:  Welcome
12                         back.
13                         MS. TROY:  No need to
14                         welcome me back.  When we are
15                         doing the deposition, if you
16                         don't mind, please don't talk
17                         to me.  The Troy's are
18                         straightshooters and we don't
19                         do that to anyone, we don't
20                         welcome back anyone, we just
21                         do our jobs.
22                  Q.  Are you familiar with an
23           employee for Hillside Auto Outlet whose name
24           is Lilly?
25                  A.  Yes.
```

71

```
 1                     Ishaque Thanwalla
 2               Q.  How are you familiar with her?
 3               A.  She was my DMV clerk.
 4               Q.  Do you remember from what date
 5          to whay date she worked for Hillside Auto
 6          Outlet?
 7               A.  I cannot.
 8               Q.  Do you recall from what year she
 9          began working at Hillside Auto Outlet?
10               A.  Can you repeat the question one
11          more time?
12               Q.  Sure.  Do you recall what year
13          she began working at Hillside Auto Outlet?
14               A.  I believe it's 2018, if I'm not
15          wrong, but I may be wrong.
16               Q.  At the time when Lilly left
17          Hillside Auto Outlet, was she pregnant?
18               A.  Was she pregnant when she worked
19          for me?  She was pregnant when she left, she
20          was pregnant.
21               Q.  Did she quit or did she get
22          fired from Hillside Auto Outlet?
23               A.  Well, let me answer this
24          question in a way where everybody can
25          understand what happened.  When she left,
```

72

                    Ishaque Thanwalla

1

2    she was doing the DMV paperwork, and the DMV

3    is a crucial business.  We have to register

4    the car within 5 days and it was a couple of

5    deals that were not registered.  I

6    disciplined her to say ''why aren't these

7    registered? There was no registration that

8    was performed.  What is the reason behind

9    it?''  She didn't like me disciplining her

10   because I don't want to lose my license to

11   do business.  So, she didn't like my

12   disciplining her and she left.

13            Q.  When she left, did she say

14   anything to you at the dealership?

15            A.  Not really, not that I can

16   recall.

17            Q.  Did Lilly leave upset?

18            A.  I cannot answer that question

19   because I don't--- I can't recall.  You

20   can't have anyone jeopardizing your license

21   in  your industry.  I won't have anybody

22   jeopardizing my license.  So, if I

23   discipline someone to tell them how to

24   perform their job the right way, how to

25   finish the job, it's nothing wrong with

73

```
 1                      Ishaque Thanwalla
 2          that.  I will tell them that they needed to
 3          finish this for us to have our license in
 4          place.  If they're not going to do that,
 5          it's not fair to me.
 6                      Q.  Did Lilly complain that she was
 7          getting fired because she was pregnant?
 8                      A.  Never.
 9                      Q.  Do you know how many months'
10          pregnant she was when she left?
11                      A.  When she started, when I
12          answered the question, she was pregnant.
13          When she left, she was pregnant and I can't
14          answer that question.
15                          MR. KATAEV:  Objection as
16                              to relevance and to this
17                              entire line of questioning.
18                              She is not a plaintiff in
19                              this case.
20                      Q.  What is Lilly's last name?
21                      A.  I can't recall because you can
22          see I can't remember Jeanique's last name
23          and I can't remember a lot of people's last
24          name.  I don't even remember Leticia's last
25          name.
```

74

```
                          Ishaque Thanwalla
 1
 2                                MS. TROY:  I'm going to
 3                         leave a blank in the
 4                         transcript for you to fill
 5                         that in.
 6
 7                         (insert).
 8                A.    --
 9                                MR. KATAEV:  There is no
10                         question pending.
11                Q.  At the time of her termination,
12         what was Lilly's schedule?
13                                MR. KATAEV:  Objection as
14                         to relevance. You can answer.
15                A.  She was a part-timer, she worked
16         part-time for the DMV work.
17                Q.  At the time that she was fired,
18         how many months had she worked for Hillside
19         Auto Outlet?
20                                MR. KATAEV:  Objection,
21                         same objection.
22                A.  She was not fired, she quit on
23         her own.
24                Q.  At that time, how many months
25         had she worked for Hillside Auto Outlet?
```

75

```
1                    Ishaque Thanwalla
2                    A.  I can't answer that question, I
3          cannot recall.  When she started, like I
4          said, she was pregnant and she left, she was
5          pregnant.
6                    Q.  You mentioned disciplining her;
7          are there any records?
8                    A.  There should be a record, like I
9          said, we had a robbery.
10                   Q.  Your contention is that the
11         records were stolen?
12                   A.  I am not -- I cannot answer that
13         question.
14                   Q.  You cannot answer the question
15         because you don't know?
16                   A.  I don't know.  Thank you.
17                   Q.  Just to be clear, we are talking
18         about one robbery or multiple robberies?
19                   A.  One robbery.
20                   Q.  During that robbery, were any
21         electronics stolen?
22                   A.  I think so, but I'm not sure.
23                   Q.  In addition to the electronics,
24         were a few hundred dollars also stolen?
25                   A.  I think so, but I'm not sure.  A
```

76

```
 1                    Ishaque Thanwalla
 2          lot of paperwork was gone and scattered.
 3                    Q.  At the time of the robbery or
 4          soon thereafter, did you and Leticia
 5          together review the surveillance?
 6                    A.  Yes.
 7                    Q.  Did Leticia identify the robber
 8          as someone who worked for you?
 9                    A.  Yes.
10                    Q.  Do you recall if the
11          surveillance video showed the robber taking
12          any documents?
13                    A.  Robbers taking -- the robber,
14          the way I can describe it is when he was
15          inside, he did not get the caption that's
16          what he said when he was going out.
17                    Q.  Do you still have surveillance
18          video?
19                    A.  I think so, but I'm not sure.
20          Maybe, maybe, but I can't answer that
21          question.  I don't know if our surveillance
22          goes that far back.  I think you only keep
23          the records for 30 days,
24                    Q.  At the time when you and Leticia
25          were reviewing the surveillance video, did
```

77

```
 1                    Ishaque Thanwalla
 2          you send a copy of that video to your
 3          attorney?
 4                    A.  I think that she sent it to me,
 5          probably.
 6                    Q.  What phone were you using at the
 7          time; was it an iPhone, an Android, what was
 8          it?
 9                    A.  A different phone than this
10          iPhone, yes.
11                    Q.  You mentioned different phones,
12          how many times have you changed your phone
13          since the robbery?
14                    A.  One or two times, if I can
15          recall.
16                    Q.  Each time did you change to
17          another iPhone?
18                    A.  Yes.
19                    Q.  Did you back up your data using
20          the iCloud?
21                    A.  I have no idea how to do that.
22                    Q.  Did someone back it up for you?
23                    A.  I can't answer that question
24          because I don't know.
25                    Q.  Do you still have any text
```

78

```
 1                      Ishaque Thanwalla
 2          messages that you had with Leticia?
 3                      A.   Yes.
 4                      Q.   Just to be clear, the text
 5          messages that you have with her, was that on
 6          a regular text message or was it on another
 7          app?
 8                      A.   There were multiple apps, one
 9          was the regular text message and one was
10          WhatsApp.
11                      Q.   You texted with her on both the
12          regular text message, as well as the
13          WhatsApp?
14                      A.   Yes.  When I am back home in
15          Pakistan, when I left, like I said the 20th
16          or the 21st of 2018 and I came back on
17          January 5th and 7th, she frequently texted
18          me on WhatsApp, I had communications with
19          her, as well as other employees on the
20          WhatsApp channel.
21                      Q.   You don't have those text
22          messages?
23                      A.   Yes, I do.
24                      Q.   In addition to the regular text
25          messages and WhatsApp, do you have any other
```

79

```
 1                    Ishaque Thanwalla
 2           records of your communications with Leticia
 3           Stidhum?
 4                    A.  May be available on my email. I
 5           can't recall. 100 percent.
 6                         MS. TROY:  Demand number 1
 7                         is for the text messages
 8                         between Ishaque Thanwalla and
 9                         Stidhum.
10                         Demand number 2 is for the
11                         WhatsApp messages between
12                         Thanwalla and Leticia.
13                         Demand number 3 is for
14                         the email exchanges between
15                         Ishaque Thanwalla and
16                         Stidhum.  The timeframe is
17                         between September of 2018 --
18                         actually, let's backtrack.
19                         It's from November of 2018
20                         through January of 2019.
21                    Q.  Mr. Thanwalla, what was your
22           phone number at the time?
23                    A.  Same number as today. It is 661-
24           886-8012.
25                    Q.  Who is your service provider?
```

80

```
 1                    Ishaque Thanwalla
 2              A.   Verizon.
 3              Q.   What'sApp, did you sign up using
 4         your phone number?
 5              A.   Correct.
 6              Q.   The emails that you mentioned,
 7         is that your work email or is that some
 8         other email address?
 9              A.   My work email.  To be clear, I
10         do have a Hillside Auto Outlet computer, and
11         it's I-S-H-A-Q-U-E@hillsideautooutlet.com.
12              Q.   Please if you don't mind, just
13         confirming that that is the correct email
14         address?
15                    (The witness complies)
16                    MR. KATAEV:  Let the
17                    record reflect that
18                    plaintiff's counsel typed in
19                    I-S-H-A-Q-
20                    E@hillsideoutlet.com on the
21                    chat.
22                    THE WITNESS:  Yes.
23              Q.   Besides using your work email,
24         did you communicate with Leticia using any
25         other email?
```

```
 1                    Ishaque Thanwalla
 2               A.  No.
 3               Q.  In the video that we were
 4          talking about earlier, was that sent to you
 5          from Leticia using text message, WhatsApp or
 6          email?
 7               A.  I can't answer that, I don't
 8          recall that.  That's why I can't answer that
 9          question.
10                    MS. TROY:  Demand number 4
11                    for the surveillance footage.
12                    Demand number 5 is for the
13                    police report, both of which
14                    concerns the robbery that
15                    took place at Hillside Auto
16                    Outlet.  The witness does not
17                    recall the timeframe, but the
18                    year should be in the year of
19                    2018.
20                    MR. KATAEV:  Please
21                    follow-up in writing with all
22                    of your requests.  Thank you.
23               Q.  Before the break I showed you a
24          WhatsApp and the start date and the end date
25          of Leticia Stidhum.  What was Leticia
```

82

```
 1                     Ishaque Thanwalla
 2          Stidhum's position at Hillside Auto Outlet?
 3                     A.  Her position was commission
 4          salesperson.
 5                     Q.  As the commission salesperson,
 6          what were her responsibilities?
 7                     A.  I answered that question prior,
 8          but I will answer it again for you.  To show
 9          customers the car, meet and greet, show them
10          the car and take a credit application and
11          take documentation.  That was her
12          responsibility.
13                     Q.  Did she ever run the credit
14          herself?
15                     A.  No.
16                     Q.  Earlier you mentioned that you
17          trained her, what did you train her in?
18                     A.  How to sell cars; how to meet
19          and greet; how to show them a car; how to
20          take a credit application; how to use a V-I-
21          N Solution.
22                     Q.  Can you describe for me what you
23          mean by how to take credit?
24                     A.  How to take a credit
25          application, you take the application
```

A1116

83

```
1                        Ishaque Thanwalla
2         whether it's manual or you are welcome to
3         take an application on the Vin V-I-N
4         solutions that they did that sometimes.
5         Sometimes they do not, but if you take a
6         manual application, you use the block
7         letters so that you could read it and it's
8         legible.
9              So, you have first name, last name,
10        driver's license of customer to make sure
11        you are correctly doing it the right way,
12        date of birth, social security and their
13        employment information, their resident
14        information.  You take a simple credit
15        application and make sure that they sign the
16        credit application.
17                   Q.  Was Leticia ever given
18        additional responsibilities apart from her
19        position as a commission salesperson?
20                   A.  No.
21                   Q.  Did you, at any point during
22        Leticia's employment with Hillside Auto
23        Outlet, did you ever talk to her about
24        promoting her to a sales manager position?
25                   A.  Never.
```

84

```
 1              Ishaque Thanwalla
 2              Q.  Did you promise her any
 3      promotion?
 4              A.  Never.
 5              Q.  Did you ever tell her that you
 6      were traveling to Pakistan, so the
 7      discussion about the promotion will wait
 8      until you came back to the United States?
 9              A.  I never discussed with her any
10      promotions.  What I can recall in her
11      deposition, she mentioned that I promised
12      her a promotion.  She had no right, maybe it
13      was at Ali, maybe he was playing with her
14      head.  No right to promotion, so that he
15      could recruit her if he had another job,
16      which he did.  You can see on the WhatsApp
17      she was going with Ali after the job, but I
18      never did.  He was playing with her mind.
19              Q.  Did Leticia ever complain to you
20      about her pay?
21              A.  Never.  She mentioned that she
22      always made more money than she ever made in
23      her life, so she was very happy.  You can
24      see the text messages and you would see the
25      WhatsApp messages.
```

85

```
 1                    Ishaque Thanwalla
 2             Q.  How would you describe your
 3     relationship with Leticia during her
 4     employment at Hillside Auto Outlet?
 5             A.  I treated every employee like my
 6     family.  Like she mentioned, the dad of
 7     Hillside Auto Outlet.  I was the dad of
 8     Hillside Auto Outlet, she respected me and I
 9     respected her.
10             Q.  Would it be fair to say that
11     your relationship was quite close?
12             A.  I have close relationships with
13     all my employees.  I am a very caring person
14     and I respect and I love.  That's the only
15     way that I treat my employees.
16             Q.  Earlier you mentioned that Ali
17     was promising her a promotion.  What do you
18     mean, can you describe exactly what you were
19     talking about?
20             A.  When Emanuel (indicating) was
21     taking the deposition from Leticia, she is
22     the one who answered that Ali promised her
23     the promotion, not me.  I never did, she
24     wasn't there to be promoted.  She needed a
25     lot more experience to be promoted as a
```

86

```
 1                    Ishaque Thanwalla
 2          sales manager, assistant sales manager to
 3          me.  Although, she was a good salesperson
 4          and that's the best I can tell you.
 5                    Q.  What is the difference between
 6          an assistant manager and a sales manager, or
 7          was that the same position?
 8                    A.  It was the same position.  It is
 9          the same to me, my sales manager, because
10          the general manager to me, they are my
11          assistants.  One thing I learned, I kept my
12          office right next to my manager so that I
13          could hear what was going on.
14                    Q.  To be clear, did you also
15          consider the finance manager as an assistant
16          manager?
17                    A.  Finance manager is my assistant
18          manager.  But, they are recognized as the
19          ''finance manager'' because they are the ones
20          who are dealing with the banks.
21                    Q.  When you talked earlier that you
22          had two assistant managers, did you mean two
23          sales managers or one sales manager and one
24          finance manager?
25                    A.  Let me just answer that question
```

87

```
 1                    Ishaque Thanwalla
 2         the right way.  That's so you do not re-
 3         question me again.  I had Jeanique as my
 4         assistant manager, and I had Guzman as my
 5         assistant manager, I had Serge as my finance
 6         manager, and I have Louis as my finance
 7         manager.  Do you understand clearly?
 8                    Q.  Do you not consider the finance
 9         manager as the assistant manager?
10                    A.  They are assistants, it's --
11         they are different divisions, but they are
12         still assistants to me.
13                    Q.  Is it fair to say that Leticia
14         has left Hillside Auto Outlet, she left in
15         November of 2018, December of 2018, in that
16         timeframe?
17                    A.  I can't recall so I cannot
18         answer that question.
19                    Q.  You were saying that Ali
20         promised her the promotion.  Was that
21         promotion at Hillside Auto Outlet?
22                    A.  You asked me, and it was in her
23         deposition that she said it.  I am only
24         repeating what she answered the question
25         that Emanuel asked her that question.  I am
```

88

                    Ishaque Thanwalla

1    just going and referring to that.  I am not

2    referring to anything else.  Do you

3    understand?

4           Q.  So, you don't have any personal

5    knowledge about any promotions whatsoever;

6    is that correct?

7           A.  The last time that Emanuel was

8    taking the deposition from her.

9           Q.  Have you ever been arrested for

10   any reason before?

11          A.  Yes.

12          Q.  What were you convicted of

13   before?

14          A.  I was mixed up and it was

15   cleared and it was expunged.  It was over 15

16   years ago.

17          Q.  You mentioned it was over 15

18   years ago, was that the same as the

19   immigration case or different?

20          A.  I can't recall honestly, I

21   cannot recall.

22          Q.  Do you have any other names

23   besides Ishaque?

24          A.  I use Isaac or Abraham, Isaac I-

89

```
 1                    Ishaque Thanwalla
 2        S-A-A-C or Ivraham I-V-R-A-H-A-M.  I use
 3        Abraham A-B-R-A-H-A-M on my business cards
 4        just to clarify.
 5                    Q.  Is Abraham the last name or is
 6        that part of the first name?
 7                    A.  I used Abraham, that was my
 8        father's first name.  I don't have a middle
 9        initial except it's just Thanwalla.
10                    Q.  Please take a look at the screen
11        again and we're going to look at the sales
12        log.
13                         THE WITNESS:  This is --
14                         MR. KATAEV:  There is no
15                    question pending.
16                    Q.  Mr. Thanwalla, on the screen
17        here we are still on Plaintiff's Exhibit 2.
18        Do you see documents identified as D002 to
19        D067; is that the sales log, if you
20        recognize this document?
21                    A.  Yes.
22                    Q.  Were you the one who created
23        this report?
24                    A.  This was created -- this report,
25        yes.
```

90

```
 1                    Ishaque Thanwalla
 2                    Q.  To your knowledge, let's start
 3          from page 1, to your knowledge, are the
 4          number of cars sold on the sold log
 5          accurate?
 6                    A.  Not to the best of my ability,
 7          no.
 8                    Q.  To your knowledge, does this
 9          understate the number of cars sold by the
10          company?
11                    MR. KATAEV:  Objection to
12                       the form.  You can answer.
13                    A.  Sometimes they are correct and
14          sometimes they are not correct, because that
15          is called an ''manual entry.''  So, if my
16          assistant has manually entered it or my
17          salesperson like Leticia had entered it as
18          sold, she had permission in her own name.
19          I just want to add to my answer because the
20          only person that is salesperson is only
21          allowed to see her or his records only.
22          They cannot see anybody else's.  If they put
23          it in the -- if the customer came in, they
24          could say that ''the customer came in and is
25          present on the lot.  The customer sold -
                            -''
```

91

```
 1                   Ishaque Thanwalla
 2         they can push the button inside and say
 3         ''sold.''  It's a salesperson can do that as
 4         well as my assistant managers can do that,
 5         which is my sales managers.
 6               Q.  I'm going to show you a
 7         different month for the sold log.  It is on
 8         the screen.  My question for you remains the
 9         same which is: whether or not the sold log
10         understates for each of the months that I
11         show you the true number of cars sold.
12             We're going to start from May of 2018
13         and we are still on page 2 of the exhibit
14         which also corresponds to defendant's
15         production 32. This is from May of 2018.
16         The car sold are listed as 46.
17               A.  My answer is the same exact, and
18         I can't answer that.  It looks like 100
19         percent understated, that means 4 or 6 may
20         be understated or maybe it's incorrect.
21         Maybe it was sold, I can't answer based on
22         these records.
23               Q.  I am now showing you page 10 for
24         June of 2018; is your answer the same?
25               A.  Yes.
```

92

```
 1                    Ishaque Thanwalla
 2               Q.  For the record, we are on page
 3      10, which corresponds to defendant's
 4      document production 10.
 5          Now we are on page 19 which corresponds
 6      to defendant's document production number
 7      19.  Same question for you, this shows the
 8      sold log for the month of July of 2018. Same
 9      question.
10               A.  I would say so, yes. Whatever I
11      answered previously, this is the exact
12      number.  It could be more or less, it all
13      depends.  These were on this log and the
14      salesman can do it as well as the assistant
15      manager can do it.  That's why they are not
16      100 percent.
17               Q.  Now we are on page 28 of exhibit
18      2 which corresponds to defendant's
19      production 28.  My question for you is the
20      same, and it's for the month of August of
21      2018.
22               A.  My answer is the same.
23               Q.  We are on page 37 which
24      corresponds to defendant's document
25      production 37.  It is for the month of
```

93

```
1                    Ishaque Thanwalla
2          September of 2018, is your answer the same?
3                    A.  Yes.
4                    Q.  Page 45 now, which corresponds
5          to defendant's document production 45.  Is
6          your answer that it covers the month of
7          October of 2018, is your answer the same?
8                    A.  Yes.
9                    Q.  Page 52, which corresponds to
10         defendant's document production 52 and
11         covers the month of November of 2018; is
12         your answer the same answer?
13                   A.  Yes.
14                   Q.  We are on now page 62 which
15         covers the month of December of 2018.  It
16         also corresponds with defendant's document
17         production 62; is your answer the same?
18                   A.  Yes.
19                   Q.  Next, I'm going to show you
20         starting from page 1251 which is a list of
21         comparatorS.  C-O-M-P-A-R-A-T-O-R-S.
22             We are on page 1251 which corresponds
23         with defendant's document production 1251.
24         My question to you is, can you describe for
25         me what the department code means?
```

94

```
 1                    Ishaque Thanwalla
 2                    A.  Department codes are the
 3          department codes.
 4                    Q.  I'm asking about right here, the
 5          ''department codes.''
 6                    A.  Okay.
 7                    Q.  For the record, I am just
 8          highlighting the L-O-C/D-E-P-T.
 9                    A.  That is the department code, the
10          company code.  The company code may be
11          provided by an ADP company, local
12          department.
13                    Q.  Do you know who this individual
14          is that is identified as individual 21?
15                    A.  I don't know.  I don't
16          understand your question.  Please repeat it.
17                    Q.  Do you know this individual that
18          was paid $2,500 per week, do you know who
19          that is?
20                    A.  Who is paid LOC department, I
21          can't answer that because I can't recall who
22          it was.
23                    Q.  Is it fair to say that no car
24          salesperson was paid $2,500 a week?
25                    A.  No.
```

95

Ishaque Thanwalla

1          MS. TROY:  Can you read
2      back the last question and
3      answer?
4          (The reporter read back the
5      last question and answer)
6      A.  The question is no, yes.  The
7  question is fair.
8          Q.  We are now on page 1252 which
9  corresponds with defendant's document
10  production 1252.  I am going forward with
11  the page numbers and they correspond with
12  defendant's document production numbers.
13  So this individual has a department code of
14  7.  Do you know what that means?
15          A.  No.
16          Q.  This person was paid $650 on a
17  weekly basis, correct?
18          A.  I can't answer that question.
19  It could be anybody else and I can't answer
20  that.  I don't know the codes, and that is
21  what is paid, the payroll is paid to whom.
22          Q.  Is it fair to say that this
23  individual is not a car salesperson?
24          A.  I can't answer that question

(1169 of 1960), Page 1169 of 1960 Case 25-490, 08/06/2025, DktEntry: 48.1, Page 262 of 301

96

```
 1                      Ishaque Thanwalla
 2           because I don't know.
 3                      Q.  For the record, there is an
 4           individual number 22 on page 1254.  I will
 5           note for the record that the ''loc department
 6           is 200,'' for the L-O-C/department, and there
 7           is no individual that is regularly receiving
 8           $350.  Do you know if this person is a car
 9           salesperson?
10                      A.  I can't answer that question, I
11           don't know.
12                      Q.  Besides car salespeople, were
13           there any other individuals --
14                      A.  Yes.
15                      MS. TROY:  I did not
16                         finish my question.
17                      MR. KATAEV:  Please let
18                         Ms. Troy finish her question
19                         before you answer.
20                      Q.  (Continuing) ---within the
21           Hillside Auto Outlet who were paid
22           commissions?
23                      A.  Like I said, anybody else was
24           paid commissions besides the salesperson, is
25           that your question?
```

A1130

97

```
 1                    Ishaque Thanwalla
 2              Q.   Correct.
 3              A.   I don't understand your
 4      question.
 5              Q.   Were there any other positions
 6      or individuals who were paid commission in
 7      addition to the car salespeople?
 8              A.   The finance manager, which is my
 9      assistant, the sales manager, which is my
10      assistant, yes.
11              Q.   Anyone else?
12              A.   Not that I know, not to my
13      knowledge.
14              Q.   Were the porters paid any
15      commission?
16              A.   They got bonuses, but not --
17              Q.   How about the BDC employees did
18      they receive a commission?
19              A.   This is the Business Development
20      Center, is that's what you're referring to?
21              Q.   Yes, did they receive a
22      commission?
23              A.   BDC, the Business Development
24      Center, if that's what you are referring to?
25              Q.   Right.  Did they receive a
```

98

```
 1                    Ishaque Thanwalla

 2          commission?

 3                    A.  Yes.

 4                    Q.  Did anyone else,  did the

 5          finance and sales managers and members of

 6          the BDC receive a commission?

 7                    A.  I cannot answer that because I

 8          don't remember everything, that is why.

 9                    Q.  Were the BDC employees' base pay

10          similar to that of the salespeople meaning

11          300, around $300 base pay weekly salary plus

12          the commission or something else?

13                    A.  I understand that every

14          department has a manager, every department

15          has salespeople and they were all

16          commissioned salespersons.  One was a

17          salesperson, one was a telephone

18          salesperson.  The BDC, they answered the

19          phone and they worked the BDC phone, the

20          salespeople.  They brought the people in and

21          they got paid accordingly too.

22                    Q.  Are they also paid a $300 weekly

23          salary plus a flat commission, the 150 per

24          car, or was that arrangement different in

25          that department?
```

99

```
 1                    Ishaque Thanwalla
 2                    A.  To my knowledge, the arrangement
 3            was different, to the best of my ability and
 4            the best of my knowledge.
 5                    Q.  So, the individual identified as
 6            2, he was paid $350 flat weekly for the
 7            regular pay.  What position did this
 8            individual have?
 9                    A.  I can't answer that because I
10            don't know.  It could be sales or it could
11            be the BDC or finance, I can't answer that
12            question.
13                    Q.  We are now on page 1255 and the
14            individual is identified as number 23.  The
15            department as listed as 100.  Is it fair to
16            say that this individual does not work in
17            sales?
18                    A.  I cannot answer that question.
19            How would I know?  How would I know by
20            looking at the pay stub?
21                    Q.  Who directed the production of
22            these earning statements?
23                    A.  What do you mean by that
24            exactly? Please elaborate on the question.
25                    Q.  Earlier when I asked you if you
```

100

```
 1                      Ishaque Thanwalla
 2          had a role in the preparation of this log
 3          you mentioned that you directed that this
 4          log be produced.  My question is similar,
 5          but do you know who directed the production
 6          of the earning statements?
 7                      A.  I'm still confused by the
 8          question.  Let me understand this -- can you
 9          tell me differently?  You were telling me
10          who made people's salary when they were
11          going to get paid, is that your question?
12                      Q.  Who had the earning statements
13          produced, meaning who asked for the earning
14          statements to be compiled and produced to us
15          and for the Judge?
16              Who requested it to be printed and
17          provided to the Judge and to us within the
18          Hillside Auto Outlet Company?
19                      A.  I did.
20                      Q.  When you asked for the earning
21          statements to be produced, did you list them
22          by position or did you have the earning
23          statements for all employees implemented?
24                      A.  To the best of my ability, I
25          think all employees.
```

A1134

101

```
 1                    Ishaque Thanwalla
 2                         MR. KATAEV:  I will just
 3                    represent for the record that
 4                    I believe following June 20
 5                    of '21 the initial conference
 6                    before Magistrate Judge Mann,
 7                    these are items were
 8                    requested for settlement
 9                    purposes as this was a
10                    settlement conference.  I can
11                    represent to you that we
12                    worked off of the transcript
13                    in order to prepare the
14                    production.
15                Q.  To clarify, Mr. Thanwalla,
16           during the conference it was asked for, the
17           comparator to Ms. Stidhum, correct?
18               To the best of your knowledge, were the
19           earnings records of only the sales
20           department produced or was it for all the
21           employees just so that we can get it clear
22           on the record?
23                         MR. KATAEV:  Objection.
24                    Asked and answered, but you
25                    can answer the question.
```

102

```
 1              Ishaque Thanwalla
 2              A.  If I am not wrong, I think to
 3         the best of my ability,y it was all the
 4         employees.
 5              Q.  Looking at individual 23, it is
 6         listed for $1,825 and the year to date for
 7         2018 $150, is it accurate to say that no
 8         cars salesperson worked at Hillside Auto
 9         Outlet and did not receive a commission?
10              A.  I don't understand your
11         question.  Please, can you make it a little
12         bit more simple for me?
13              Q.  Sure.  Are there any non-
14         commission car salespeople at Hillside Auto
15         Outlet?
16              A.  No, there is nobody having to do
17         with the sales department -- all of the
18         people having to do with the sales
19         department have commission.
20              Q.  Is it accurate to say to the
21         extent that the pay stub reflected that this
22         individual did not receive any commission,
23         that that individual was not a car
24         salesperson?
25              A.  I can't answer that question.
```

103

```
 1                    Ishaque Thanwalla
 2               Q.  Do you know who could?
 3               A.  We have to look into it.
 4               Q.  Who would you ask?
 5               A.  You would ask the controller to
 6          figure that out and ask them, the accountant
 7          to look at it.
 8               Q.  Turning your intention to
 9          individual 7 on page 1256, it says that the
10          ''Reg'' is $200.  Do you know what position
11          that person was in?
12               A.  I don't know.
13               Q.  How about this individual
14          (indicating)
15               A.  Do not know.
16               Q.  That was page 1257 individual
17          number 24.
18             Besides the car salespeople, who else
19          was paid 2 paychecks by Hillside Auto Outlet
20          on a weekly basis?
21                    MR. KATAEV:  Objection to
22                    the form.  You can answer.
23               A.  I can't recall.  Maybe BDC and
24          finance, and the managers possibly.
25               Q.  In other words, all of the
```

104

```
 1                    Ishaque Thanwalla
 2          commission employees received 2 paychecks;
 3          is that correct?
 4                    A.  Correct, and some got paid once
 5          a month commission.
 6                    Q.  Is it fair to say that any
 7          employees who did not receive two paychecks
 8          were not car salespeople?
 9                    A.  Again, I don't understand your
10          question.  Can you repeat it one more time?
11                        MS. TROY:  Sure.  Ms.
12                        Reporter, can you read back
13                        the last question for the
14                        witness.
15                        (The reporter read back the
16                        last question)
17                    A.  I cannot answer that question
18          because I don't know.  I can't recall,
19          actually.
20                    Q.  The same question for the
21          individual on page 1258.  The REG wage
22          straight is set at $500.  Do you know who
23          this person is or what this person's
24          position is?
25                        A.  I can't recall.
```

105

```
 1                    Ishaque Thanwalla
 2              Q.   Page 1259, individual 13.  The
 3         regular weekly wage rate is $600; who is
 4         this individual or what was this
 5         individual's position?
 6              A.   I can't recall.  I don't know
 7         who.
 8              Q.   Is there any individual for whom
 9         you can tell what the position is by looking
10         at the pay stubs?
11              A.   No.  Everybody has a different
12         structure.
13              Q.   We're going to go through a
14         couple of other pages and my question for
15         you remains the same: that is, are you able
16         to identify the individual based on the pay
17         stub, what that individual's name is or
18         their position?
19            We are on page 1260 for individual 3 and
20         the regular rate is listed at $600.
21              A.   I can't answer that question
22         because I can't recall who that would be.
23         Same thing, same pay stub you are showing me
24         and I would say the same.
25                    MS. TROY:  For the record,
```

A1139

106

```
 1                    Ishaque Thanwalla
 2                         that was page 1261 individual
 3                         25.
 4                    Q.  We are now on page 1262
 5         individual 17.  Do you recognize this
 6         individual or this person's position?
 7                    A.  No.
 8                    Q.  Did you say ''no'' for the last
 9         question?
10                    A.  I did.
11                    Q.  Now we are on 1263, individual
12         number 26.  Do you recognize this individual
13         or this individual's position based on the
14         pay stub?
15                    A.  No.
16                    Q.  Page 1264 individual number 27,
17         do you recognize this individual or this
18         individual's position based upon the pay
19         stub?
20                    A.  No.
21                    Q.  There is an individual 28 on
22         page 1265, same question.
23                    A.  No.
24                    Q.  Page 1266 individual number 29,
25         same question.
```

107

```
 1                    Ishaque Thanwalla

 2               A.   No.

 3               Q.   Individual 20 on page 1267, same

 4        question.

 5               A.   No.

 6               Q.   Individual 30 on page 1268, same

 7        question.

 8               A.   No.

 9                    MR. KATAEV:  Please let me

10                    know when you are done with

11                    this line of questioning so

12                    we can take a break.

13               Q.   We are now on page 1277 and the

14        individual is 31.  Do you recognize this

15        individual or this person's position based

16        upon the pay stub?

17               A.   No.

18               Q.   We are on 1296 individual number

19        32, do you recognize this individual based

20        upon the pay stub?  For the record, it

21        appears that this individual was hired on

22        December 4th of 2018 and then paid $1,000

23        per week with no commission.

24               A.   No.

25               Q.   Was anyone paid $1,000 per week
```

108

```
 1                    Ishaque Thanwalla
 2         salary in the month of December of 2018?
 3                 A.  Its same, it may be a draw, that
 4         may be a draw, possibly.  It may be a draw
 5         against commission, maybe, but I can't
 6         recall.  I don't know who it is.
 7                 Q.  Did you hire anyone in December
 8         of 2018?
 9                 A.  I hired a lot of people and I
10         can't answer who I hired.  I cannot say
11         anything.
12                 Q.  Who was paid $1,000 per week
13         upon hire with no commission at Hillside
14         Auto Outlet?
15                     MR. KATAEV:  Objection as
16                     to relevance.  You can
17                     answer.
18                 A.  I answered ''no.  I don't know.
19         I cannot recall.''
20                 Q.  We are now on page 1320 for
21         individual number 34.  This individual was a
22         newly hired person in December of 2018 and
23         this individual was paid a regular weekly
24         rate of $900.  Do you know who this
25         individual is?
```

109

```
 1              Ishaque Thanwalla
 2              A.  By me looking at the pay stubs,
 3         I can't recall who it is, what it is or what
 4         department, even though you are showing me
 5         the loc and department.  I don't know the
 6         local department.  So, no.
 7              Q.  We are now on page 3038 for
 8         individual 18.  Do you know who this
 9         individual is and what that person's
10         position is?
11              A.  No.
12              Q.  Would you be able to find out?
13              A.  I have to refer to my office and
14         find out, sure.
15              Q.  Would you be able to tell me
16         what that person's position is?
17              A.  When I look into it, I will be
18         able to answer the question.
19                   MS. TROY:  All right.
20                   Demand number 6 will be for
21                   the name as well as the
22                   position for each of the
23                   individuals who the witness
24                   identified as numbers 21, 22,
25                   2, 23, 24, 4, 13, 3, 25, 17,
```

```
 1                    Ishaque Thanwalla

 2                         26, 27, 28, 29, 20, 30, 31,

 3                         32, 33, 34, 18, 19, 35, 36,

 4                         38, 39, and 37.

 5                             I know that they are out of

 6                         order, but that is the order in

 7                         which the documents presented

 8                         themselves.  My request is for

 9                         the positions as well as the

10                         name for each of the individuals

11                         that are listed here that you

12                         produced, apparently as

13                         comparator to the plaintiff.

14                             MR. KATAEV:  Please put

15                         all of your requests in

16                         writing.  We object to any

17                         characterization.

18                             MS. TROY:  Manuel, based

19                         upon your characterization of

20                         the record -- let's just

21                         continue.

22                    Q.   Going to page 1269, Mr.

23         Thanwalla, do you see on page 69 for the

24         period of November 27th of 2018 through

25         December 3rd of 2018 there is a commission
```

111

```
 1                  Ishaque Thanwalla

 2            listed for $1,600?

 3                  A.  Okay.

 4                  Q.  Based on that $1,600 figure, how

 5            many cars were sold?

 6                        MR. KATAEV:  Objection.

 7                  You can answer the question.

 8                  A.  150 divided by 1600.  Do you

 9            have a calculator?

10                  Q.  The formula is sufficient. Thank

11            you.

12                  To your knowledge, is that always an

13            exact number?

14                  A.  Like I said previously, there is

15            a flat rate commission and I answered that

16            prior.  I said there is a bonus, and the

17            bonus and commission.  So, maybe there is a

18            commission, there is a bonus in there, 5

19            percent bonus, it may be $50 bonus or $200

20            bonus.  I cannot answer that question

21            because the commission plus the weekly

22            bonus, a monthly bonus, I have no idea what

23            is involved.

24                  Q.  What was the flat rate

25            commission, meaning the $150 per car versus
```

112

```
1                    Ishaque Thanwalla
2       what the bonus was at Hillside Auto Outlet?
3                A.  You can take 15, whatever the is
4       amount is, let's take 10 cars would be
5       $1,500.  Am I right?  It would be plus a
6       dollar bonus on top of that, and maybe that
7       was only 8 cars and the rest was bonus.  I
8       can't answer that.
9                Q.  My question is different.  My
10      question is: were there records kept as to
11      what portion of the commission is the flat
12      rate commission versus the bonus that you
13      were talking about?
14                    MR. KATAEV:  Objection.
15                    Asked and answered again.
16                A.  May be a portion, possible, but
17      I can't answer that
18                Q.  When you say that it ''may be a
19      portion,'' what did you mean?
20                A.  It may be possible, I may have a
21      record or I may not have a record.  That's
22      what I'm saying exactly.
23                Q.  Does Hillside Auto Outlet have
24      an obligation to keep all of the sales
25      records for a period of time pertaining to
```

```
 1                      Ishaque Thanwalla
 2          the Government regulations as to each car
 3          sold?
 4                            MR. KATAEV:  Objection.
 5                            It calls for a legal
 6                            conclusion, but you can
 7                            answer.
 8                            MS. TROY:  Answer as to
 9                            the facts.
10                  A.  As long as they paid minimum
11              wage, yes.
12                            MR. KATAEV:  Objection to
13                            the form of that last
14                            question.
15                  Q.  Were there records kept for each
16          car sold in terms of the prior that was
17          sold, the commission for each car?
18                            MR. KATAEV:  Objection.
19                            Asked and answered, but you
20                            can answer it again.
21                            MS. TROY:  He did not
22                            answer the question, and
23                            that's why I had to ask it
24                            again.
25                  A.  I can answer the question, yes.
```

114

```
 1                    Ishaque Thanwalla
 2         There is probably a way to look at it.
 3              Q.  In other words there is a way to
 4         assert the answer to the commission and the
 5         wages that were given to car salespeople,
 6         including Leticia Stidhum that would be more
 7         precise than what we see on the pay stub
 8         component, is that correct?
 9              A.  Yes.  We have to calculate it to
10         make sure that at the end of the month to
11         finish the month, they paid more than the
12         minimum wage, we would have to be in
13         compliance.
14              Q.  Where are those records now?
15              A.  Probably at the dealership,
16         probably missing but I can't answer that due
17         to the robbery.
18              Q.  Those records that we we're
19         talking about in terms of the commissions,
20         the bonuses and the flat rate, is that kept
21         on paper or on the computer?
22              A.  It was kept on the paper.
23              Q.  Was it ever scanned onto the
24         computer?
25              A.  Not to my knowledge.
```

115

```
 1                   Ishaque Thanwalla
 2              Q.  Was it kept on the paper from
 3         2018 to the present day; in other words, was
 4         there ever a change to the electronic
 5         system?
 6              A.  No, we have not changed, we have
 7         not updated to the electronic system.
 8              Q.  Can you describe for me what
 9         those records look like on the paper; what
10         type of information is contained therein?
11              A.   It would be a salesperson would
12         fill out the amounts of the cars that they
13         sold, the first name and last name of the
14         customer, as well as they would write down
15         how much bonus they have achieved, and they
16         kept a copy.  And we have a copy.  That copy
17         that would be made, so we verify, we make
18         sure that the bonuses were correct, make
19         sure that the deals were funded and we make
20         sure that everything was to the open ''T'' the
21         right way so that we can take care of the
22         employees that we have by looking at the pay
23         stubs.
24              Q.  Was that the same or different
25         from the triplicate copy that you were
```

116

```
 1                    Ishaque Thanwalla

 2        talking about?

 3               A.  I don't understand the question,

 4        please.

 5               Q.  You mentioned that the paper

 6        that you described with the salesperson

 7        would fill out, the number of cars, the

 8        customer information and the bonuses

 9        achieved, et cetera, is that the same or

10        different than the documents that were in

11        triplicate that you mentioned before?

12                         MR. KATAEV:  I am

13                    confused.  Triplicate? What

14                    does that mean?

15                         MS. TROY:  Three copies.

16               A.  You're talking about 1 copy, 2

17        copies, one is for them and one was for us.

18               Q.  Is that filled out on a weekly

19        basis or per-car sold?

20               A.  Weekly basis by the salesperson.

21               Q.  Who would verify if the

22        information is correct?

23               A.  The office manager.

24               Q.  Who was the office manager at

25        the time?
```

```
 1                    Ishaque Thanwalla
 2                    A.  Deana was the controller and we
 3          called the office manager or maybe Asha.  A-
 4          S-H-A.
 5                    Q.  Who is Asha?
 6                    A.  Asha is the assistant to Deana.
 7                    Q.  Back for a second to the
 8          controller, the office manager, is that the
 9          same title?
10                    A.  Correct, basically.
11                    Q.  What was Asha's title?
12                    A.  Asha would give paperwork when
13          it was done, give it to Deana so that Deana
14          could process it and she verified and Deana
15          verified it.
16                    Q.  Is she the assistant office
17          manager, was she?
18                    A.  Yes, you could call her
19          assistant office manager.
20                    Q.  When you said that the documents
21          would be processed, what information would
22          be coded in from the paperwork?
23                    A.  What do you mean by ``coded in''?
24                    Q.  You said that the documents
25          would be processed, what did you mean?
```

118

```
 1                    Ishaque Thanwalla
 2              A.   Meaning when she goes through to
 3         make sure, to verify that the commission is
 4         the same, that is the process.  The
 5         commission is not coded in.  I said if you
 6         write down the name and 150 flat, and then
 7         there was any bonus on this, the customer on
 8         this car, you write down the bonus and then
 9         she verifies it and she processed it.
10              Q.   When she processed it in order
11         for the amount to become an ATM check
12         amount, did she key in anything on the
13         computer?
14              A.   I don't know that.  I can't
15         answer that question.
16                   MS. TROY:  The next demand
17                   is going to be demand number
18                   7.
19                   Before I get to that
20                   actually, hold on. Mr.
21                   Thanwall.
22              Q.   Besides what you just
23         described to me, were there any other
24         documents kept as to the number of cars
25           sold, what the commission is, what
```

119

```
 1                    Ishaque Thanwalla
 2          the bonus is, et cetera for the car
 3          salespeople at Hillside Auto Outlet?
 4                    A.  Let me understand this question
 5          correctly.  You are saying did we have any
 6          bonus structure?
 7                    Q.  No.
 8                    A.  What is the question?  I'm
 9          confused by your question.
10                    Q.  You mentioned that there was a
11          paper that Deana would process.  Besides
12          that paper that Deana would process, were
13          there any other written records of the
14          number of cars sold and the bonus or
15          commissions earned by the car salespeople at
16          Hillside Auto Outlet?
17                    A.  I don't think so.
18                         MS. TROY:  Demand number 7
19                         is for the written documents
20                         containing the cars sold, the
21                         name of the customer, the
22                         bonus and commissions
23                         received.  It is for the car
24                         salespeople at Hillside Auto
25                         Outlet, and the timeframe is
```

120

```
1                    Ishaque Thanwalla

2                    going to be from October of

3                    2018 through February of

4                    2019, and that includes,

5                    obviously, the plaintiff as

6                    well.

7                        MR. KATAEV:  Please

8                    follow-up in writing.

9                        MS. TROY:  Just to be

10                   clear, I believe these

11                   documents were asked for and

12                   directed to be produced by

13                   the Court.  To the extent

14                   that the defendants state

15                   that they don't have the

16                   documents or that they are

17                   looking for them, it's not

18                   really so, just so that we

19                   are clear.

20                       Demand number 8 will be

21                   for any electronic files or

22                   inputs by the office manager

23                   or her assistant regarding

24                   the same.

25                       MR. KATAEV:  Please
```

121

```
 1                        Ishaque Thanwalla
 2                              follow-up in writing.
 3                              Currently note whether it has
 4                              been previously required to
 5                              produce.
 6                                   MS. TROY:  We can now take
 7                              that lunch break.  Is 30
 8                              minutes good for everyone?
 9                                   MR. KATAEV:  45 minutes
10                              would be fine.
11                                   MS. TROY:  Fine, let's
12                              come back at 1:25.
13                              (A recess was taken from
14                              12:50 p.m. until 1:33 p.m.)
15                         Q.  Mr. Thanwalla, do you have your
16              phone with you?
17                         A.  Yes.
18                         Q.  Could you go to your text
19              messages that you had with Miss Stidhum?
20                         A.  Can I go to those text messages?
21              It's in another office, a different office.
22                                   MR. KATAEV:  I will get
23                              it.
24                              (Mr. Manuel Kataev left the
25                              room and handed documents to
```

122

```
 1                    Ishaque Thanwalla

 2                        the witness)

 3                        MS. TROY:  Just pull up

 4                    the text messages that you

 5                    have with Leticia Stidhum.

 6                    (The plaintiff Leticia

 7                    Stidhum stated on the record

 8                    that she is back on the

 9                    record)

10                        MS. TROY:  Please mark

11                    this as Plaintiff's Exhibit

12                    3.

13                    (Plaintiff's Exhibit 3 marked

14                    for identification.)

15               Q.  Mr. Thanwalla, please read the

16          timestamp on the message.

17               A.  The message, it is October 9th,

18          of 2018 and it is 11:03 a.m.  It says ''Q40

19          customer is coming with a check and his

20          insurance.''

21               Q.  Was that from Leticia to you?

22               A.  Yes.

23               Q.  What comes after that?

24               A.  I said ''okay.''

25               Q.  Then, what happened after that?
```

123

```
 1                    Ishaque Thanwalla
 2          A.   I am not a good reader.
 3                    MS. TROY:  Mr. Kataev do
 4               you want to read?
 5                    MR. KATAEV:  We are in the
 6               process of producing the text
 7               messages to you.  We may not
 8               be able to produce them
 9               during the deposition.  If
10               you want to take a break, I
11               will be able to produce it to
12               you so that it is easiest for
13               everyone.
14                    MS. TROY:  That sounds
15               good to me. How much time do
16               you need?
17                    MR. KATAEV:  10 or 15
18               minutes, and we will work as
19               quickly as possible.
20                    MS. TROY:  Okay, that
21               sounds good.  That way we
22               don't have to read it into
23               the record.  I agree.
24                    It is 1:50, when do you want
25               to come back?
```

124

```
 1                      Ishaque Thanwalla
 2                           MR. KATAEV:  Let's come
 3                      back at 1:45.
 4                      (A discussion held off the
 5                      record)
 6                           MS. TROY:  The time is now
 7                      2:00 p.m. and we are back on
 8                      the record.  Actually, it is
 9                      2:07.
10                 Q.  The text message that was just
11            sent to me by Emanuel Kataev is a document
12            that I'm going to mark as a PDF file and I'm
13            going to mark that as Plaintiffs 4.
14                           MS. TROY:  Please mark
15                      that as Plaintiffs 4.
16                      (Plaintiffs Exhibit 4 marked
17                      for identification)
18                           Plaintiffs 3 is going to
19                      be text messages, plaintiffs
20                      3 and then the PDFs that's
21                      the WhatsApp, which we marked
22                      as Plaintiff's Exhibit 4.
23                 Q.  We were talking about the text
24            message before our break.  It's probably
25            going to be easier if we go in that order.
```

125

```
 1                    Ishaque Thanwalla
 2              Q.  I'm going to show you
 3      Plaintiff's Exhibit 3 first, which is what
 4      counsel just sent to me. Can you describe
 5      how you obtained this photograph; did you
 6      just use another phone and take a picture of
 7      your phone?
 8              A.  Correct.
 9              Q.  How about the second page which
10      does not appear to be a text message, what
11      is that?
12              A.  This is a text message.  If it's
13      WhatsApp, I have no idea.  You have two
14      separate files, one is WhatsApp and one is
15      text messages.
16              Q.  Looking and drawing your
17      attention to page 2 of the text message
18      file, this --
19              A.  Looking at the text message
20      file, this is all from a single person, this
21      is from Leticia.
22              Q.  When you say ''Q40 customer is
23      coming with a check and his insurance,'' were
24      you the one who said ''okay?''
25              A.  Correct.
```

126

```
 1                    Ishaque Thanwalla
 2                    Q.  Do you know where on your phone
 3         it itemizes who is speaking when there is a
 4         blue bubble versus the white bubble, what
 5         that means?
 6                    A.  I have no idea.
 7                    Q.  The next line says ''Kaswayne K-
 8         A-S-W-A-Y-N-E Bailey is the name,'' is that
 9         correct?
10                    A.  Correct.
11                    Q.  Who is that from?
12                    A.  That is from her.
13                    Q.  Then, the next line says ''your
14         friend is nice.''  Is that from you?
15                    A.  Yes.
16                    Q.  Then it says ''yeah, yeah,
17         everyone is nice when they want a job lol.''
18         Who is Leticia referring to?
19                    A.  I have no idea.
20                    Q.  When do you speak next on this
21         text message?
22                    A.  I would have to have my phone to
23         give that answer to that question.
24                    MR. KATAEV:  We can't do
25                         that because we are using
```

A1160

127

```
 1                    Ishaque Thanwalla
 2                        this export.
 3                           MS. TROY:  It does not
 4                        appear that page 23, 2
 5                        through 23, it does not
 6                        appear to me to be
 7                        screenshots of the iPhone
 8                        text messages.  It looks like
 9                        something else, but I'm not
10                        sure.
11                           THE WITNESS:  If it's a
12                        screenshot, when you push on
13                        the side, this goes into a
14                        PDF.
15                   Q.  I believe it just doesn't have
16             who is speaking.
17                   A.  I spoke very little, mostly
18             communications are by her and I answered
19             very little.
20                   Q.  Then, what your attorney is
21             talking about, it doesn't have the date or
22             the time, correct?
23                   A.  Right.
24                           MS. TROY:  Emanuel, are
25                        you working on the text
```

128

```
 1                      Ishaque Thanwalla
 2                           messages to get the dates?
 3                                MR. KATAEV:  That is
 4                           correct.
 5                                MS. TROY:  You are also
 6                           working on the WhatsApp too?
 7                                MR. KATAEV:  Right now we
 8                           are focusing on WhatsApp.
 9                                MS. TROY:  Fine, how about
10                           we come back to this in a
11                           little bit. I'm going to ask
12                           you a couple of questions
13                           that do not require the text
14                           messages. When your
15                           attorney's office is finished
16                           processing the messages with
17                           the date stamp and time, we
18                           will come back to it.
19                                MR. KATAEV:  That is fine.
20                      Q.  Mr. Thanwalla, did you at any
21             point in time find out that Ms. Stidhum was
22             pregnant?
23                      A.  No.
24                      Q.  Were you aware that she
25             announced her pregnancy at Hillside Auto
```

(1202 of 1960), Page 1202 of 1960 Case 25-490, 08/06/2025, DktEntry: 48.1, Page 295 of 301

129

```
 1                      Ishaque Thanwalla
 2           Outlet?
 3                      A.  To my knowledge, she never
 4           announced it.
 5                      Q.  Did she at any time tell you
 6           personally about her pregnancy?
 7                      A.  No.
 8                      Q.  Did she bring a sonogram to
 9           Hillside Auto Outlet?
10                      A.  No.
11                      Q.  Do you recall which day she
12           brought the sonogram to Hillside Auto
13           Outlet?
14                      A.  I answered my question
15           previously, no. She did not bring it, not to
16           my knowledge,'' ever in front of me.
17                      Q.  Were other Hillside Auto Outlet
18           employees aware that Ms. Stidhum was
19           pregnant, to your knowledge?
20                      A.  To the best of my knowledge,
21           when I learned when I was in Pakistan. Mr.
22           Ali on WhatsApp said ''your daughter is
23           pregnant,'' which is on the WhatsApp app.
24           That was December 27th, if I recall, because
25           I just went there and why I recognized that
```

A1163

130

```
 1                    Ishaque Thanwalla
 2        date, I said ''which one?''  Because I call
 3        every one of them my ''daughter.''  I treated
 4        them like one.
 5             My answer to you was I was the last
 6        person to know, and that was my answer.
 7        That was December 27th, according to my
 8        knowledge, and she never announced it.
 9        Never brought anything to the dealership.  I
10        don't think anyone was aware, maybe she got
11        close to Ali, so she may have told him.  She
12        may have told him about the pregnancy.
13                    Q.  At that time was Ali at Hillside
14        Auto Outlet?
15                    A.  I don't understand your
16        question.
17                    Q.  At the time was Ali at Hillside
18        Auto Outlet?
19                    A.  ''At the time?''  What do you mean
20        by ''at the time''?
21                    Q.  At the time, during December,
22        December 27th of 2018, when you supposedly
23        received the text messages, on WhatsApp, was
24        he --
25                    A.  Yes, he was working as my
```

131

```
1                    Ishaque Thanwalla
2         assistant.
3                         MR. KATAEV:  Objection to
4                    the form of that question.
5              Q.  Due to the fact that you have
6         multiple assistants, can you clarify whether
7         it was the sales manager, the office manager
8         or the finance manager; what is it?
9              A.  He was a sales manager and
10        Guzman as well as Guzman, because I always
11        needed two people to cover the hours.
12             Q.  When was Ali hired as your sales
13        manager?
14             A.  To the best of my knowledge, I
15        can recall that it was in December.
16             Q.  Was he hired in preparation for
17        your departure to Pakistan?
18             A.  No.  He was hired because I
19        needed help.
20             Q.  Besides Ali, did anyone else
21        communicate whether by text, verbal
22        communication or personal telephone to you
23        about Leticia's pregnancy?
24             A.  No.
25             Q.  To your knowledge, did Leticia
```

132

```
 1                    Ishaque Thanwalla
 2          get along well with the other Hillside Auto
 3          Outlets?
 4                    A.  To the best of my ability, yes.
 5                    Q.  How about with yourself?
 6                    A.  Well, she did very well, yes.  I
 7          treated her like my family.
 8                    Q.  In or around the month of
 9          November of 2018, did you congratulate her
10          for selling many cars for the Hillside Auto
11          Outlet?
12                    A.  I probably did, because she
13          probably did a good job.
14                    Q.  At that time, did you discuss
15          potentially promoting her to the sales
16          manager position?
17                    A.  Like I answered previously, no.
18          And, my answer is still no, and it still
19          remains no.
20                    Q.  What was your reaction when you
21          found out that Leticia was pregnant?
22                    A.  My reaction was the way that I
23          found out, I was in Pakistan when Ali texted
24          me -- not texting me, the WhatsApp,
25          WhatsApped me.  This was the only time I got
```

133

```
 1                        Ishaque Thanwalla
 2          that news.
 3                     Q.  Do you recall what your response
 4          to Ali was?
 5                     A.  I mentioned my response to you,
 6          ''I was the last one to know.''
 7                            MS. TROY:  Can we have
 8                         your office please provide
 9                         the WhatsApp between Ali and
10                         Ishaque Thanwalla?
11                            MR. KATAEV:  No problem.
12                            MS. TROY:  So we don't
13                         need him to read it into the
14                         record.
15                     Q.  To be clear Mr. Thanwalla, did
16          you communicate with Ali about Leticia on
17          What'sApp or also on text message?
18                     A.  I know I never talked to him on
19          text message, only on WhatsApp.  I wasn't in
20          the country, and that's the only way you can
21          communicate over the WhatsApp.  It's an
22          international channel.
23                     Q.  Let's go back for a second to
24          Plaintiff's Exhibit 2 that I am sharing on
25          the screen with you.  Please bear with me
```

134

```
 1                        Ishaque Thanwalla
 2            for one moment.
 3                          MS TROY:  For the record,
 4                          Plaintiff's Exhibit 2, pages
 5                          75 to 1179 are customer
 6                          dashboard logs that were
 7                          provided to us on the part of
 8                          the defendant's document
 9                          production.  We are now on
10                          page 812 which corresponds to
11                          defendant's document
12                          production number 812.
13                    Q.  My question for you, is as
14            follows: once you reviewed the document,
15            please tell me to slow down if necessary and
16            I will scroll through it.
17                          (Ms. Troy is scrolling down)
18                 Can you explain to me why this was
19            marked as "lost?"
20                    A.  Jacquelyn Cleary was the first
21            BD agent, the second rep was Mikiael M-I-K-
22            I-A-E-L- and Andris Guzman.  If it was
23            Capital One source of the lead, when we do a
24            Capital One, mailer, it came in, and we
25            created, it just came in on 12/29 2018 at
```

A1168

135

```
1                     Ishaque Thanwalla
2         11:28 a.m.  There is also a serial number.
3         Please scroll down.
4         (Ms. Troy complies.)
5                   A.   (Continuing) It says the
6         customer name, Ofelia O-F-E-L-I-A Fuentes F-
7         U-E-N-T-E-S.  Then, the second person took
8         on over, another BD agent ''changed from
9         Heewattie Prashad to Mikiael.
10            It always gives you all the information,
11        what day the lead came in. Can you scroll
12        back up to 1229?
13                  (Ms. Troy complies)
14                  A.   (Continuing) So, when you see
15        the dates, and please scroll back down to
16        520 of 2019, there was -- the deal was
17        closed because we couldn't get hold of the
18        customer.  It comes out of the system, and
19        after 90 days, that is when it comes out of
20        the system.
21                  Q.   Is that the track system?
22                  A.   That is what it says here, I
23        think we are both saying the same thing.
24        (The reporter speaks to Ms. Troy on the
25        record)
```

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN
*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 5 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

136

```
 1                    Ishaque Thanwalla
 2                         MS. TROY:  Ms. Luckman has
 3                    a great point which is in
 4                    order for us to have a clear
 5                    record, please just wait
 6                    until I finish asking you the
 7                    question.  Then, you can jump
 8                    right in.
 9                         THE WITNESS:  I apologize
10                    if I jumped in.
11                         MS. TROY:  That is
12                    perfectly fine.
13               Q.  My question for you is, because
14          the lead is marked as ''lost,'' is it possible
15          that for instance that this deal in fact
16          went through?
17               A.  I don't understand your
18          question.
19               Q.  Because this lead is
20          ''automatically marked as lost,'' after 90
21          days, is it possible that this lead went
22          through, meaning there was a sale on the
23          vehicle?
24               A.  When I can answer that question,
25          is maybe possible because the car was sold,
```

137

```
1                    Ishaque Thanwalla
2        and Leticia or Mikiael or anybody did not
3        manually put ''sold.''  There's a possible
4        chance yes, that that can happen.
5                    Q.  Could it possibly be true that
6        sometimes lead was lost, but was not entered
7        into the system properly?
8                    A.  Yes, it can be possible.
9                    Q.  Is it generally the case that
10       customers who did not come through the BDC
11       with the amount, that those log-in customers
12       are generally speaking, not logged into the
13       system?
14                   A.  They were logged into the system
15       by the salesperson as well as one of the
16       assistant managers.
17                   Q.  Were there cases where they were
18       not logged in?
19                   A.  It happens, it's like -- you get
20       a salesperson who is not doing his or her
21       job.  The manager is not doing their job,
22       and I can't keep up with everything.
23                   Q.  You mentioned that there was a
24       system, what system was it?
25                   A.  Vin V-I-N Solutions.
```

A1171

138

```
 1                 Ishaque Thanwalla
 2                 Q.  When you talked about Vin
 3        Solutions, was the salesperson paid the
 4        effective amount of bonuses?  In other
 5        words, if the car was not logged into the
 6        system, would they still get the bonus or
 7        the commission, I'm sorry, on the car sold?
 8                 A.  Let me understand your question
 9        correctly. If the Vin Solutions does not
10        have any effect on their bonus over there,
11        that answer is no bonus, they got paid on
12        what they sold.  We have a complete file of
13        the customer and the salesperson provides a
14        commission sheet, like I mentioned in my
15        previous question that you asked me.  They
16        would write down the name of the customer,
17        and if the car had any bonus to it.  If it
18        could be a bonus of 25, $50 or 5 percent,
19        any kind of bonus.  They would write it down
20        because I have a different kind of bonus
21        structure, every -- it's different, every
22        time, it's is different every day.  So, no
23        salesperson would ever not get paid on a
24        deal that they delivered a car.
25                 Q.  Now we are looking at
```

139

```
 1                    Ishaque Thanwalla
 2          defendant's document production 249 and we
 3          are still on that same set of documents,
 4          with the customer dashboard log.  Page 249
 5          of Plaintiff's Exhibit 2 corresponds to
 6          defendant's document production 249.
 7              I'm going to turn your attention to a
 8          specific section on this particular log
 9          pertaining to an individual Franklin Yanes
10          Y-A-N-E-S.
11              Specifically I'm going to turn your
12          intention to defendant's production 252 that
13          corresponds to page 252 of Plaintiff's
14          Exhibit 2.
15              Please turn your attention to the amount
16          of time that the showroom visit lasted.  Can
17          you explain that to me and can you tell me
18          what that shows?
19                        MR. KATAEV:  Objection to
20                    the form.  You can answer.
21              A.  It's a very simple answer.
22          Leticia herself gave the answer for this
23          particular line at the last time at the
24          deposition.  You can look into it on her
25          deposition.  It was marked as an ''visit,''
```

140

```
 1                        Ishaque Thanwalla
 2          but nobody marked it until it was the second
 3          day.  The customer was not sitting there for
 4          22 hours, it is impossible, we are not even
 5          open 22 hours straight.
 6                    Q.  Is it accurate to say that in
 7          fact the amount of time is the amount of
 8          time it takes the BDC employee to log, for
 9          instance the showroom visit as opposed to an
10          actual waiting time?
11                    A.  Mostly it is done by the
12          salesperson person.  What happens when the
13          salesperson does not do it, what happens is
14          that BDC person finds out, and they put the
15          visit in.  Like I said, that is controlled
16          by everybody, so they can do either a visit,
17          they can put it next to the sold, it's not
18          the final record for the sale or for the
19          visit.
20                        MS. TROY:  Let's go off
21                          the record.
22                        (A discussion was held off
23                          the record)
24                    Q.  In terms of the wait time, can
25          you describe to me once the customer comes
```

141

```
 1                         Ishaque Thanwalla
 2           in, what do they need to wait for, what are
 3           the different things that they need to wait
 4           for in order to walk out with the car or
 5           walk out without the car, for instance?
 6                         A.  So, your question is how long it
 7           takes to sell a car, is that what your
 8           question is?
 9                         Q.  Yes, with different components
10           broken down.
11                         A.  Different components broken
12           down, every situation is a different
13           situation.  Meaning when I say ''situation,''
14           that means I have customers and every deal
15           is different one next to the other.
16                         Q.  I'm going to follow-up for a
17           second.  If the customer does not require
18           any mortgage, what would the situation be?
19                             MR. KATAEV:  Objection to
20                         the form.
21                         A.  If it's a cash deal, it still
22           takes time, I still have to go through the
23           process of printing the paper, it's still a
24           process, for the DMV.  Sometimes in our
25           locations, our internet is not the greatest,
```

142

Ishaque Thanwalla

2     and it can take a while.  Maybe the printer

3     is not working, maybe the DMV printer which

4     is a Dealer Track Management printer, you

5     have to look up for security purposes, it

6     sometimes does not go on.  Maybe the

7     customer has to wait 45 minutes for us to

8     print it because of the internet issues,

9     even in a cash deal, it can take time based

10    on that.  Then, once the process is

11    finished, if they can process it with the

12    Department of Motor Vehicles, we do all the

13    DMV in-house.

14         At that time, we are required to make

15    sure that our customer, the consumers have

16    the insurance and have a scanned copy, that

17    way we can scan it into the Department of

18    Motor Vehicles.

19         Everything is time consuming because it

20    is not a washing machine, where you just pay

21    a quarter and you put the washing machine

22    on.  You don't just walk out the door This

23    is an automobile, there are legalities which

24    have a lot of crossing your ''T's'' and

25    dotting your ''I's,'' because the Department

143

```
 1                      Ishaque Thanwalla
 2              of Motor Vehicle, it's a Government
 3              department.  It takes time and we want to do
 4              it the right way, not the wrong way, so we
 5              have problems.
 6                      Q.  You mentioned doing it the
 7              ''right way'' with the DMV, how long does it
 8              take, roughly?
 9                      A.  Let me just say, when you say
10              ''the right way,'' we try our best to do the
11              right way.  I'm not sure if you get my
12              answer, we try our best.
13                      Q.  My question is: how long does it
14              take?
15                      A.  It can take between 30 minutes
16              to 2 hours or 3 hours.  I can't answer that
17              question 100 percent.
18                      Q.  Let's talk about the different
19              types of customers, one that is essentially
20              the cash deal, the one you have to run the
21              credit score, how much additional time with
22              that additional factor that you just
23              described for me?
24                      A.  It is different, it could be
25              between 1 hour to another 2 hours or 3hours.
```

144

```
 1                    Ishaque Thanwalla
 2               Q.  That 1 to 2 hours, is that all
 3          for the customers so that he gets to walk
 4          away with the car or --
 5               A.  It could be, but it could not
 6          be, because we are still waiting for the
 7          bank to answer, for that answer.  Then, we
 8          have to get the insurance and sometimes they
 9          have no insurance, you have to have multiple
10          processes in the auto industry.  To give you
11          an example, there are some online seminars
12          from the FTC, the Federal Trade Commission,
13          and they are saying that if it requires that
14          long to sell a car, they even recognized it
15          because so many processes are involved.  It
16          can take between 2 hours to 6 hours and I
17          can't tell you how often.
18               Q.  On-average, how much time does
19          it take for customers to walk out with the
20          car; let's start with customers that are
21          doing a cash deal?
22                    MR. KATAEV:  Objection.
23                    Asked and answered but you
24                    can answer again.
25               Q.  Between 2 and 4 hours.
```

145

```
 1                     Ishaque Thanwalla
 2                     Q.   How about the customer that
 3           requires some form of credit.
 4                     A.   Like I said, 2 to 4 hours, 6
 5           hours maybe.
 6                     Q.   Can you describe how the
 7           DealerTrak system works?
 8                     A.   The DealerTrak system, we put
 9           the consumer's information, and that is what
10           we don't give a login and a password.
11           Everyone and anyone, we don't give it to
12           them, it's only the service people have it,
13           certain people.
14               You can put in consumer information in
15           there, then you send it to the bank.
16           Because we are a -- because we have a bank
17           hookup directly to the Dealertrak it goes to
18           the banker and notwithstanding, the analysts
19           will look at it, at the application.  It
20           depends on the bank how busy they are and
21           what kind of credit structure that is.  And,
22           if they have to calculate the LTD, which is
23           the loan to debt.
24               Have to make sure that they verify the
25           employment of whatever the requirement on
```

146

```
 1                        Ishaque Thanwalla
 2           the analyst's side is sometimes they give
 3           the answer in half an hour and sometimes it
 4           can take three hours.  Sometimes it comes
 5           back and asks for more paperwork.
 6                They ask to come back maybe in half an
 7           hour and we say ``okay.''  It may require on
 8           this guy, maybe once you give the pay stub,
 9           they provide me with the truth, with the
10           proof of the address, we are going to go
11           back to the consumer, and scan it.  It's a
12           different case, different thing. Every time
13           is different, no 2 cases in your business
14           are the same.  That's the same thing with
15           us, there are no 2 customers that are the
16           same, everyone is different.
17                One takes 3 years to close the case and
18           one takes 3 months to close the case.  It's
19           like in your business.
20                     Q.  Let's backtrack for a moment, in
21           November of 2018 who was running the dealer
22           log, who was running that?
23                          MR. KATAEV:  Objection to
24                     the form.  You can answer.
25                     A.  I myself, and whoever was my
```

Case 1:21-cv-07163-OEM-LB   Document 102-9   Filed 03/27/24   Page 147 of 278 PageID #: 1844

147

```
 1                    Ishaque Thanwalla

 2          assistant.

 3                    Q.  Who would that be?

 4                    A.  I don't know who it may be, it

 5          may be Guzman, it may be Jeanique.  I don't

 6          know who was there, I can't recall who was

 7          there at the time.

 8                    Q.  How about right before you left

 9          for Pakistan, who was running the DealerTrak

10          system?

11                    A.  Ali.

12                    Q.  Besides Ali, anyone else?

13                    A.  Yes, Guzman.

14                    Q.  Anyone else?

15                    A.  Serge has the power, he is the

16          finance manager and Louis had the power, he

17          is a finance manager.  That's about it,

18          that's what I can recall.  Maybe somebody

19          else, but I don't know.  I can't recall.

20                    Q.  Is it accurate to say that Serge

21          and Louis were typically running the

22          DealerTrak for the customers just usually,

23          and would it be the sales manager who did it

24          as well?

25                    A.  It's not typical.  It's not
```

Case 1:21-cv-07163-OEM-LB   Document 102-9   Filed 03/27/24   Page 148 of 278 PageID #: 1845

148

```
 1                        Ishaque Thanwalla
 2           typically.  I can't 100 percent answer that
 3           to give you an example, let's just say it
 4           was one day and Guzman is off and Ali is on
 5           the shift, correct?  So what happens is Ali
 6           has one file and the other salesman has
 7           another customer.  Ali would say ''take this
 8           to service to run the credit,'' or take it to
 9           Louis to run the credit.  That typically
10           happens.
11                        Q.  When you were out in Pakistan,
12           you usually did not run the DealerTrak
13           system, correct?
14                        A.  Correct.  But, I have it on the
15           DealerTrack from back home.  I can look up,
16           I can look it up because I look at my
17           reports and I look at my things almost every
18           day.
19                I am hands-on, either when I was in the
20           country or either if I am out of the
21           country, either if on I'm vacation, even if
22           I'm not on vacation.  I am very hands on.
23           That's the only thing I have to say, this is
24           my baby and I work very hard all my life to
25           have something.
```

A1182

149

```
 1                    Ishaque Thanwalla
 2              Q.   Understood.  The DealerTrak,
 3         does it log out when the user logs in, as
 4         well as the ICU location?
 5              A.   It tracks the ICU location,
 6         correct, as well as what not to allow if
 7         they look at the credit, but I can run the
 8         credit.
 9              Q.   In other words you can tell who
10         was logging in where at what time using your
11         account and password?
12              A.   Yes.  Nobody else should get on
13         my log on password, nobody has it unless
14         somebody stole it.
15              Q.   We're going to go now back to
16         Plaintiff's Exhibit 2 for identification and
17         specifically, I'm going to have you take a
18         look at page 1281, which again corresponds
19         to defendant's documents production 1281 for
20         an individual that was identified as ''2.''
21           Mr. Thanwalla, you don't know the
22         individual, is it fair to say that each of
23         the pay stubs that were demarcated with an
24         ''2'' pertaining to an individual, the same
25         individual was marked as 2?
```

150

```
 1                    Ishaque Thanwalla
 2                        MR. KATAEV:  Objection to
 3                    the form.  You may answer.
 4               A.  I don't know.  I can't answer
 5          that question because I don't know what 2
 6          is.
 7                        MR. KATAEV:  I'm making
 8                    the representation to counsel
 9                    that I made an identification
10                    marker on there, wherever 2
11                    is listed by the ID number,
12                    it's the same person.
13               Q.  Okay.  My follow-up question to
14          that is, for each of the different numbers
15          that were placed on the earnings statement,
16          those numbers for instance that say ''35,''
17          would they pertain to the individual 35?
18                        MR. KATAEV:  If the
19                    question is for the documents
20                    labeled 35, it refers to the
21                    same person and the answer is
22                    yes.  I'll make the
23                    representation that I made
24                    the markers on this.
25                        THE WITNESS:  I was aware
```

151

```
 1                    Ishaque Thanwalla
 2                         of it.
 3                         MS. TROY:  That you were
 4                    aware?
 5                         THE WITNESS:  I was.
 6                         MS. TROY:  Can you
 7                    possibly move the speaker
 8                    closer to you?
 9                    (The witness complies)
10                         MS. TROY:  So that it is
11                    clear. Emanuel, please do
12                    that.
13                    (A discussion was held off
14                    the record)
15                         MS. TROY:  We are back on
16                    the record at 2:46.
17              Q.  Are you alleging now that
18         someone that had unauthorized access to
19         DealerTrak?
20              A.  I never alleged that, I never
21         said that.
22              Q.  Did you --
23                         THE WITNESS:  I am not
24                    done with my answer.
25                         MS. TROY:  I'm sorry.  Go
```

152

```
 1                    Ishaque Thanwalla
 2                       ahead.
 3              A.   I said ''maybe somebody stole my
 4         DealerTrak ID and password.''  I'm not aware
 5         of that, just letting you know, just telling
 6         you that I never alleged anybody having it,
 7         no.  I wasn't giving it out, It's too much
 8         of a privacy issue.
 9              Q.   Let's backtrack for a moment to
10         the robbery, who was the robber?
11              A.   It was an employee we hired and
12         that was him.  I don't know.  He got caught
13         and he got punished for it.
14              Q.   Was that employee's name
15         Anthony?
16              A.   I think so, not 100 percent
17         recalling everything.
18              Q.   Did Andris Guzman have any
19         authority to discipline employees?
20              A.   Andris Guzman only takes orders
21         from me when I ask him to do.
22              Q.   So, please answer my question;
23         it's a yes or no question, did he have the
24         authority to discipline employees?
25              A.   Did he have any authority to
```

153

```
 1                    Ishaque Thanwalla
 2       discipline employees?  His job was to run
 3       credit and make sure everything was
 4       organized, not to my knowledge, he had
 5       authority to discipline, no.  To my
 6       knowledge, he had no authority to discipline
 7       unless he came to me and I disciplined.
 8                 Q.  Has he ever come to you for you
 9       to discipline an employee?
10                 A.  Not really.  I never had issues
11       at my dealership, we run a good and happy
12       family, that's the way we work, that is the
13       way that I still work.  You can see by my
14       persona that's the way that I am, I'm very
15       happy and very loving and very caring.  I
16       will give the shirt off my back to my
17       people.
18                 Q.  Did Andris Guzman have the
19       authority to hire employees?
20                 A.  No.
21                 Q.  How about firing employees?
22                 A.  No.
23                 Q.  How about to set schedules?
24                 A.  Set the schedule? Yes.
25                 Q.  Did Ali generally --
```

A1187

154

```
 1                    Ishaque Thanwalla

 2                    A.  Ali, did all of that, the people

 3          to get you the right answer, complete

 4          answer.  All of the people, do you mean all

 5          the sales managers?

 6                    Q.  The sales managers.

 7                    A.  Sales managers yes, not my

 8          finance manager.

 9                    Q.  Did he set the schedule for the

10          salespeople only or for everyone?

11                    A.  When you say open ''salespeople

12          only,'' and everyone, when you say

13          ''everyone,'' I wouldn't say everyone because

14          he ran his -- his title was sales manager

15          and his department was sales.  So, he only

16          managed the salespeople.

17                    Q.  Who decided which salesperson

18          should go to whom to run the credit through

19          the DealerTrak system?

20                    A.  Can you repeat your question?

21                    Q.  I --

22                    A.  Can you ask your question in a

23          different form, maybe where I can completely

24          answer it and comprehend it?

25                    MS TROY:  I'm going to
```

155

```
 1                    Ishaque Thanwalla
 2                         have the court reporter read
 3                         the question back.  Let me
 4                         know if you understand it, if
 5                         not, I will rephrase it.
 6                         (The reporter reads back the
 7                         last question)
 8                    A.  Let me understand this question,
 9         which salesperson decided which salesperson
10         can go to which manager, is that the
11         question?
12                    Q.  To run the credit, yes.
13                    A.  It is based upon any salesperson
14         can go to any manager who is available at
15         the time.  There is no preference, there is
16         no term, anyone can walk up to any manager.
17                    Q.  During Leticia's employment with
18         Hillside Auto Outlet, did she have you run
19         the credit from time to time?
20                    A.  The answer to that question is
21         yes, I ran credit, Guzman ran credit,
22         Jeanique ran credit, Ali ran the credit, and
23         sometimes we were all busy and she went to a
24         finance manager and read the credit.  Did
25         that answer your question completely?
```

156

```
 1              Ishaque Thanwalla
 2              Q.  Did there come a time when
 3      Andris Guzman was new and he was learning
 4      how to run the credit?
 5              A.  Guzman was my manager since a
 6      very long time.
 7              Q.  I understand.  When did he start
 8      running the credit for Hillside Auto Outlet?
 9              A.  The day he started to work with
10      me.
11              Q.  To be clear, what was that date?
12              A.  I can't recall.  I don't know.
13      I can't remember, but he knew it before he
14      came to work for me because he worked with
15      me at a previous location.
16              Q.  Where was that previous
17      location?
18              A.  Is that relevant?
19                  MR. KATAEV:  You have to
20                  answer.  Objection to
21                  relevance, but you have to
22                  answer.
23              A.  Queens Auto Mall.
24              Q.  You are saying that he ran the
25      credit at Queens Auto Mall also?
```

157

```
 1                    Ishaque Thanwalla
 2              A.  He worked for me over there,
 3         yes, he did things for me, yes.
 4              Q.  The question specifically is:
 5         did he run the credit at Queens Auto Mall?
 6              A.  Yes.
 7              Q.  Again, just as a reminder, it's
 8         the same idea, nothing personal, please just
 9         wait until I finish asking the question
10         before you jump in.  That way we don't need
11         you to repeat yourself, understood?
12              A.  Yes, understood, perfect.
13              Q.  During Leticia's employment with
14         Hillside Auto Outlet, was she a dependable
15         employee?
16                    MR. KATAEV:  Objection,
17                    but, you can answer.
18              A.  When you say ''dependable
19         employee,'' can you elaborate?  Do you mean
20         was she on time every day, is that what you
21         are asking me?
22              Q.  Let's start with that.
23              A.  Yes.  Sometimes she came late
24         and sometimes on time, she was dependable.
25         At times she went early, she left early.
```

A1191

158

```
 1                      Ishaque Thanwalla
 2            That was when she wasn't feeling well or had
 3            something else to do based on her ability
 4            because she sold a lot of -- she spent a lot
 5            of time, and I gave her leeway that she
 6            needed.
 7                      Q.  Would you say that she was an
 8            excellent employee?
 9                      A.  She was an excellent
10            salesperson.
11                      Q.  At any point during her
12            employment, was she ever disciplined?
13                      A.  I think maybe once, but I can't
14            recall what the reason was.
15                      Q.  I know you cannot recall the
16            incident, do you recall maybe when that
17            happened?
18                      A.  I cannot answer that, I really
19            can't remember, honestly.
20                      Q.  At any point during her
21            employment with Hillside Auto Outlet, was
22            Leticia ever suspended?
23                      A.  From Hillside Auto Outlet?
24                      Q.  Correct.
25                      A.  I don't think so.
```

159

```
 1                    Ishaque Thanwalla
 2                    Q.  Let's backtrack for a second,
 3          were any car salespeople ever given a
 4          written evaluation at any point between 2018
 5          and 2019?
 6                    A.  They were given an evaluation
 7          every month based on her or his sales.
 8                    Q.  That evaluation is the same or
 9          different from the amounts of money that
10          they got?
11                    A.  The amounts of money correlates,
12          the sales, equal amount of money.
13             The more sales that you make, you make a
14          lot of money, if you don't make a lot of
15          money -- if you don't make a lot of sales,
16          you don't make a lot of money.
17                    Q.  I understand.  I just want to
18          know the written evaluation every month was
19          based on his or her sales; what form is that
20          report kept?
21                    A.  I answered your question.  We
22          did evaluations, but not in writing.  I said
23          we did evaluations based on the sales that
24          they did, a good or great job.  We sat down
25          with them, ''good, now let's move on and do a
```

160

```
 1                    Ishaque Thanwalla
 2          better job, you did a great job.  Next time
 3          do a better job.''  We say ''are you going to
 4          make another 20 sales this month?''  We're
 5          going to do this extra so that we can make
 6          more deals so that you can make more money.
 7          We get more done for the bonuses, whatever
 8          the bonuses were.
 9                    Q.  To be clear, was one of the ways
10          in which the number of cars sold per
11          salesperson tracked on a board with a name
12          and a tally?
13                    A.  You got that right, yes.  We
14          used to have a board, but we don't any
15          longer have the board.
16                    Q.  Is it accurate to say that when
17          you left for Pakistan that Leticia was
18          leading the board, meaning she was the top
19          saleswoman based on the tally?
20                    A.  I can't answer that, I can't
21          recall that in my memory.
22               She was always first or second or third
23          in position.  So, there were three top
24          people at the time, one was Leticia, one was
25          -- I have a person Sean, and he was always
```

161

```
1                        Ishaque Thanwalla

2              on top.  Or it was one was one month, one

3              was the second month and one was the third

4              month.  She was always first or second or

5              third on the position.  So, there were three

6              top people, one was Leticia, one was David

7              Parsons and the other one was Shane.  They

8              were always on the top of each other,

9              meaning one was one month, one the second

10             month, and one the third month.  They were

11             always first, second and third position,

12             usually.

13                      Q.  When you talked about Shane,

14             what was Shane's last name?

15                      A.  I can't remember his name, it's

16             an Arabic name and I can't pronounce it.

17                      Q.  Is it Shane or Sean?

18                      A.  Shane.  When I called him

19             ''Sean,'' he said ''don't call me Sean.''  He

20             said it is ''Shane.''

21                      Q.  Do you recall Leticia being the

22             first, second or third; do you recall if she

23             was actually always the first before you

24             left for Pakistan?

25                      Q.  Always the first one putting on
```

A1195

162

```
 1                    Ishaque Thanwalla
 2           the board, I said it was between the first,
 3           second and third, all of them.
 4                    A.  Do you recall how many cars were
 5           sold on-average by David Parsons?
 6              They all averaged between 15 and 25 one
 7           month, one is 15 the other, the other is 20,
 8           22 or 25.  One did the next month 25 and the
 9           other did 15.  It always varied, it's a
10           variable number in between those numbers.
11                    Q.  When did David start to work at
12           Hillside Auto Outlets, do you remember the
13           month?
14                    A.  I can't remember, but the year
15           would be 2018.  But, the month, I can't
16           answer that.
17                    Q.  Do you recall what his base pay
18           was?
19                    A.  I can't recall.
20                    Q.  How about Shane, when did he
21           start working at Hillside Auto?
22                    A.  The same year, 2018. He is still
23           there.
24                    Q.  When did David Parsons end
25           working at Hillside Auto?
```

163

```
1                    Ishaque Thanwalla
2              A.   I can't recall.
3              Q.   Was the Shane that we were
4       talking about an African-American
5       individual?
6              A.   Shane is Arabic, Middle-Eastern,
7       I would say.
8              Q.   Was that the Middle Eastern
9       individual that you were talking about
10      working for Hillside Auto Outlet, was that
11      at the same time that Leticia was working
12      there?
13             A.   The same time as Leticia was
14      working there?
15             Q.   Correct.
16             A.   Yes.  Supposedly.  So, if that
17      person was working there, he would appear on
18      the earnings statement that were provided by
19      you to your attorney; is that correct?
20             A.   You have all of the documents.
21                  MS. TROY:  Cutting to the
22                  chase, if you could just
23                  provide the unredacted
24                  version of the documents,
25                  because there is clearly some
```

164

```
 1                    Ishaque Thanwalla
 2                         confusion as to who and what
 3                         or even if Mr. Parsons
 4                         actually was there.
 5                         MR. KATAEV:  Follow-up in
 6                         writing and we will respond
 7                         accordingly.
 8              Q.  I'm going to turn your attention
 9         to Leticia's pay stub Mr. Thanwalla.  We are
10         on page 1187, which corresponds with
11         defendant's document production 1187.
12              Mr. Thanwalla, does this comport with
13         your understanding in terms of the regular
14         wage rate that was provided to Ms. Stidhum
15         while she was a commissioned salesperson,
16         the regular $300 salary plus the commission?
17              A.  Yes.  That is people on this pay
18         stub, $1,080, but I don't understand minimum
19         wage.
20              Q.  Going to the next page we are
21         now on page 1188 which corresponds to
22         defendant's document production 1188.  Does
23         the $780 figure, the commission, meaning the
24         flat commission $150 per car sold plus a 5
25         percent bonus?
```

165

```
 1                 Ishaque Thanwalla
 2                 A.  It can represent numerous
 3        things.  Like, you can have 5 cars plus a
 4        bonus car, or 5 cars plus maybe 1 car, 5
 5        percent, 5 cars plus the weekend bonus.
 6        There are a lot of -- there can be
 7        variations here, this is not an exact thing
 8        like I mentioned to you previously numerous
 9        times, that we have different bonus
10        structures and that is why we cannot say
11        flat.
12                 Q.  That bonus structure is sort of
13        laid out in the weekly deposits that I
14        demanded today, correct? That was filled out
15        by each car salesperson on a weekly basis?
16                     MR. KATAEV:  Objection to
17                     the form.  You can answer.
18                 A.  I guess, yes.
19                 Q.  Was that ever turned over by you
20        to us?
21                     MR. KATAEV:  Objection to
22                     the form.  You can answer.
23                 A.  I have no idea.
24                     MR. KATAEV:  If you want
25                     to take a look, we can try to
```

A1199

166

```
 1                    Ishaque Thanwalla
 2                    look and see if we can pull
 3                    that text.
 4                        MS. TROY:  That's fine.
 5                    The time is now 3:06 p.m. and
 6                    we will come back on the
 7                    record at 3:20.
 8                        MR. KATAEV:  Yes, 3:20.
 9                        MS. TROY:  You need that
10                    much time?
11                        MR. KATAEV:  Yes, to get
12                    it printed and scanned.
13                        MS. TROY:  Fine.  Let's
14                    take that break.
15                    (A recess was taken from 3:06
16                    p.m. until 3:24 p.m.)
17                        MR. KATAEV:  I represent
18                    to you, Tiffany, that I have
19                    sent you the WhatsApp
20                    messages for the entire
21                    meeting of Leticia's exchange
22                    with the witness.  But, the
23                    ones between Ali, that is
24                    only for the relevant period
25                    because the entirety of the
```

167

```
1              Ishaque Thanwalla
2                  other messages have very
3                  sensitive financial
4                  information that we object to
5                  producing.  So, if we need to
6                  deal with that objection, we
7                  will deal with it with the
8                  Court.
9                     I'm just making a
10                 representation to counsel
11                 that nowhere else in the 18
12                 pages of messages is Leticia
13                 referenced or anything
14                 related to this case. It is
15                 mostly all financial
16                 information and information
17                 related to particular sales.
18                    MS. TROY:  Is the message
19                 pertaining to particular
20                 sales related to sales that
21                 Leticia may have done while
22                 she was working at Hillside
23                 Auto Outlet?
24                    MR. KATAEV:  There is no
25                 way to tell, I don't think
```

A1201

168

```
1                    Ishaque Thanwalla
2                         so.  But, I don't know, the
3                         final thing I want to say is
4                         that you have the complete
5                         regular text messages
6                         exchanged between the witness
7                         and your client, the
8                         plaintiff.  That is in the
9                         final email that I just sent.
10                        I believe it says ''Leticia's
11                        text messages.''  We will
12                        Bate's stamp that when it is
13                        time so that we don't have to
14                        waste time and you can
15                        proceed with the deposition.
16                             MS. TROY:  Let's go off
17                        the record.
18                        (A discussion was held off
19                        the record)
20                             MS. TROY:  It is now 3:40
21                        p. m. and I will review the
22                        documents.
23                             I'm going to mark the
24                        exhibit, the document that
25                        was sent again, text messages
```

169

```
1                    Ishaque Thanwalla
2                         I believe using a Decipher
3                    App, between Mr. Thanwalla
4                    and Leticia that we're going
5                    to mark now as Exhibit 5.
6                    (Plaintiff's Exhibit 5 marked
7                    for identification).
8                         Exhibit 6 is his decipher
9                    chat between Leticia and Mr.
10                   Thanwalla on the WhatsApp
11                   chat.  Then, exhibit 7 is
12                   decipher chat conversations
13                   page 5 of 18 between Mr.
14                   Thanwalla and Ali.
15                   (Plaintiff's Exhibit 6, and 7
16                   now marked for
17                   identification.)
18              Q.  I'm going to show you various
19         exhibits and ask you a couple of questions.
20         We are now looking at exhibit 3 and my
21         question for you is: when were these
22         photographs taken?
23              A.  I think yesterday or the day
24         before yesterday.
25              Q.  Why were these photographs
```

170

```
 1                    Ishaque Thanwalla
 2          taken?
 3                    A.  Because I was messaging and I
 4          wanted to put them into a file.
 5                    Q.  You believe that you may have
 6          done it on Wednesday or Thursday, and you
 7          were just putting a photograph of the text
 8          message, correct?
 9                    A.  That's the only way that I knew
10          how to do it.
11                    Q.  You took it on your phone or
12          some other person's phone?
13                    A.  It's my second phone.
14                    Q.  Did you text at all with Laticia
15          on your second phone, meaning the phone that
16          you used to take the pictures?
17                    A.  I never texted to her, this is a
18          form, because too many customers were
19          calling or texting in the middle of the
20          night and I required a phone a few months
21          back and that is the phone.
22                    Q.  Did you represent to me that
23          these messages were between you and Leticia;
24          if so, you are on the blue and Leticia on
25          the white, actually, on the gray?
```

171

```
 1                      Ishaque Thanwalla

 2                      A.  Yes.

 3                      Q.  Is this an accurate

 4          representation of the text messages just

 5          that you sent and you received from Leticia?

 6                      A.  It's on the phone, that's

 7          accurate on the phone that you are showing

 8          me, yes.

 9                      Q.  Is that the same for the

10          entirety of the text messages, meaning all

11          23 pages that I am showing you on the screen

12          right now, is that accurate as far as you

13          can tell?

14                      A.  Yes.

15                      Q.  Next we're going to turn our

16          attention to exhibit 4, same question for

17          which is: when was the photograph of the

18          phone taken?

19                      A.  Either yesterday or the day

20          before yesterday.

21                      Q.  Why did you take these

22          photographs?

23                      A.  I wanted to put in the

24          communications, the contents in the file,

25          our communications.
```

172

```
 1                    Ishaque Thanwalla
 2               Q.  To the best of your knowledge,
 3          does the photograph accurately represent the
 4          text messages that were from you to Leticia
 5          and from Leticia to you?
 6               A.  Yes.
 7               Q.  I'm now going to scroll through
 8          the 37 pages.  To be clear, the green
 9          represents you and the white represents
10          Leticia, each bubble; is that correct?
11               A.  Yes.
12               Q.  Now, I'm showing you what your
13          attorney has provided to us which are
14          conversations between you and Leticia.
15          Again, the text messages, did you have a
16          chance to review the documents, those 11
17          pages.
18               A.  Yes.
19               Q.  To the best of your knowledge,
20          do the documents accurately represent the
21          text messages that you have sent to Leticia
22          and that you have received from Leticia?
23               A.  So far, to the best of my
24          knowledge.
25               Q.  Did you have a chance to compare
```

173

```
 1                    Ishaque Thanwalla
 2           this with your phone?
 3                    A.  No.
 4                    Q.  On the next break, please take
 5           some time and compare it on your phone, and
 6           the question after the break will be: Does
 7           it accurately reflect what you see on your
 8           phone?  I will also have some specific
 9           questions about this exhibit.
10                    A.  Go right ahead.
11                    Q.  We are now on page 6, and I am
12           pointing to your attention to the text
13           message from November 20th of 2018 at
14           approximately 4:07 p.m.
15              This is a text message from Leticia that
16           says ''I got to talk to you about something
17           before it's blown up.''
18              Your response is ''you and your blowup.''
19           Can you explain what you meant by that, if
20           you know?
21                    A.  Maybe she was talking to the
22           customers unprofessionally.
23                    Q.  Drawing your attention to the
24           text message that is dated November 20th,
25           2018 at 5:40 p.m.  It says, from Leticia
```

A1207

174

```
 1                    Ishaque Thanwalla
 2          ``can I go home I have really bad cramps and
 3          I can barely move why do you think I was
 4          sitting in the back all day?''
 5                Were you aware that Leticia at that time
 6          was pregnant?
 7                         A.  No.
 8                         Q.  Let's go now to page 8.
 9                         A.  Okay.
10                         Q.  Turning your attention between
11          pages seven and 8l.
12                         Obviously we see the paper
13          format with the PDF in a black and white
14          photo. My question for you is: do you have
15          the actual video that is printed on the PDF?
16                         A.  I don't think so. Everything is
17          printed, the only thing we are looking at,
18          that's what I have on my phone and I
19          provided 100 percent of what is in my phone.
20          100 percent, not 98 percent, 100 percent of
21          what I have.
22                         Q.  If you could just turn your
23          attention to this video, 11-24-2018 at 5:47
24          p.m., my question is quite simple: are you
25          able to check on your phone and see an
```

175

```
 1                        Ishaque Thanwalla
 2            actual video or what is that?
 3                    A.   I can't answer that question,
 4            because I haven't looked at it.  I gave them
 5            to my attorney and he downloaded everything
 6            and he gave it to you.
 7                            MS. TROY:  Mr. Kataev, it
 8                        appears that this is the
 9                        Decipher app, and it's a
10                        black and white photograph of
11                        the actual video.  My
12                        question is, can you get me
13                        the actual video?
14                            MR. KATAEV:  I will see, I
15                        will speak with my client and
16                        you can make a request in
17                        writing, please.
18                    Q.   Do you have your phone with you,
19            Mr. Thanwalla?
20                    A.   Yes.
21                    Q.   Can you check your November
22            24th, 2018 conversation with Leticia
23            Stidhum, and there was a video, to see if
24            there is a video.
25                            MR. KATAEV:  Let's go off
```

Case 1:21-cv-07163-OEM-LB   Document 102-9   Filed 03/27/24   Page 176 of 278 PageID #: 1873

176

```
 1                     Ishaque Thanwalla
 2                     the record.
 3                     (A discussion was held off
 4                     the record)
 5                        Let the record reflect
 6                     that I'm looking at November
 7                     24th of 2018, message at 5:47
 8                     p.m., and I'm looking at the
 9                     image.  I see that this is a
10                     picture, but there's no way
11                     to play a video.  In fact, on
12                     the bottom I don't see it on
13                     here, on the bottom of this
14                     you can see there was like a
15                     timestamp, and there is a
16                     play button.  When you press
17                     the play button, it's just an
18                     image, and it is not capable
19                     of being played back.
20                        MS TROY:  If the image is
21                     black and white or in color -
22                     -
23                        MR. KATAEV:  It's in
24                     color.  I will reprint it in
25                     color and reproduce the color
```

177

```
 1                    Ishaque Thanwalla
 2                    print.  We ran out of toner
 3                    and we could not print it.
 4                         MS. TROY:  That's fine.
 5                    When you look on it, does it
 6                    appear bigger or is it
 7                    smaller?
 8                         MR. KATAEV:  It's bigger.
 9                         THE WITNESS:  It is bigger
10                    in the sense that you take
11                    the image, it takes up the
12                    full screen instead of just
13                    showing you a portion. It's a
14                    thumbnail, and --
15                         MS TROY:  Can you provide
16                    the thumbnail to me?
17                         MR. KATAEV:  No problem.
18                         MS. TROY:  Just produce
19                    that to me at some point
20                    during this deposition.
21                    We're not going to waste any
22                    more time on this.
23                         MS. TROY:  I'm going to
24                    ask you to print it out or
25                    send it to me, whichever.
```

178

```
 1                   Ishaque Thanwalla
 2              Q.  I'm now going to turn your
 3         attention to the message that follows here,
 4         this is the message from November 25th of
 5         2018 at 3:59 p.m.  ''I have so many solid
 6         deals and it's just taking so long for no
 7         reason.''
 8            At that time first of all, to your
 9         knowledge, did you become aware of Leticia's
10         pregnancy.?
11              A.  I can't recall.  I don't think
12         so, but I don't think she ever mentioned it,
13         somebody else mentioned it to me.
14              Q.  At that time had Leticia already
15         announced her pregnancy to either yourself
16         or other individuals at Hillside Auto
17         Outlet?
18              A.  I don't remember, nor can I say
19         that she ever told me.
20              Q.  Now, we are on exhibit 5 and I
21         will turn your attention to the message
22         dated November 25th of 2018 at 4:00 p.m.
23              A.  Okay.
24              Q.  It says ''okay I am not there at
25         7:00 every dealership work except me.''  What
```

179

```
 1                    Ishaque Thanwalla
 2           did you mean by that?
 3                    A.  That I am not there at 7:00,
 4           every dealership -- I'm confused.  This is
 5           Leticia writing -- no, it's --
 6                    Q.  Does this appear to be you
 7           writing to her?
 8                    A.  I have to see the whole thing
 9           for me to answer that question.
10                    Q.  Then, on November 25th at 4:00
11           p.m. it says ''I have one 5,000 down QX60 the
12           other 2000 down Laredo, all 600+ credit.''
13                    A.  Okay, I'm there.
14                    Q.  Let me scroll up for you. This
15           is the entire thread.  Please read it and
16           let me know when you are ready to answer my
17           question.
18                    A.  ''Okay.  I am not there at 7:00
19           every dealership work except me.''  I don't
20           write well, and maybe I was answering her
21           differently.  I am not there, and I said at
22           7 o'clock.  When I read, I don't read well,
23           and you can see why I write very limited.  I
24           have -- I am dyslexic when I am writing.
25                    Q.  Is it fair to say that the
```

180

```
1                    Ishaque Thanwalla
2            November 25th, 2018, 359 message from
3            Leticia to you is a complaint?
4                    A.  Where does it say "complaint?"
5                    Q.  Sir, you can answer yes or no.
6                    A.  I don't see a complaint at all,
7            no.
8                    Q.  Turning your attention again on
9            page 8, November 25th, 2018 at 8:07 p.m.
10           text message, Leticia writes ''what's up I
11           was in the shower when you called.''
12                        THE REPORTER:  I didn't
13                    hear that answer.
14                        MS. TROY:  Can you repeat
15                    your answer?
16                    A.  Can you repeat the question?
17           (The reporter read back the last question)
18                    Q.  Can you describe the text
19           message for me, and then the court reporter
20           can just take down his answer.  I want him
21           to read back the question.
22                        MR. KATAEV:  I don't
23                    understand.  Instead of
24                    having him redo his whole
25                    answer, have him continue
```

181

```
 1                    Ishaque Thanwalla
 2                       answering.
 3              A.   What? You didn't ask me a
 4         question.
 5              Q.   Please relax, I will re-ask the
 6         question. We were talking about the text
 7         message at 8:07 p.m.  My question is: is
 8         that when you usually called Leticia?
 9              A.   Yes, if she had a customer that
10         she was not there, she called and said that
11         she would come in late, I would call to see
12         what was going on with the customer so that
13         I could handle the customer appropriately
14         for her.
15            She didn't lose her commission, I could
16         help her make the deal, she would get paid.
17         I was very generous with my employees, like
18         I said.
19              Q.   Is it fair to say that you
20         called Leticia more frequently than you
21         texted her?
22              A.   I can't answer.  I have called
23         every employee if they are not there, if I
24         have a customer, I call them, yes.
25              Q.   Earlier before we were cut off
```

182

```
1                    Ishaque Thanwalla
2         by your attorney, didn't you say that you
3         called more frequently than you texted
4         Leticia Stidhum?
5                    A.  That is not -- I said that I
6         called more frequently, everyone because I
7         don't text well.  You can see that I don't
8         make sense on my own wording.
9                    Q.  Turning to the bottom of page 8,
10        the beginning of page 9 it is dated November
11        28th of 2018 at 8:09 p.m.  It says ''the call
12        keeps dropping.  I am going to call him
13        now.''
14             Is it fair to say that Leticia is
15        working outside of business hours?
16                   A.  If it's her customer and she is
17        not at work, it's likely she did not show up
18        to work, not her day off.  If she could no
19        longer show up, I would call her, to call
20        the customer and she was supposed to be
21        there, and I would say ''you should show up
22        too.''
23                   Q.  Is it fair to say that at the
24        time when she texted you at 8:09 p.m.,
25        during that time, that she called the
```

A1216

183

```
 1                    Ishaque Thanwalla
 2        customer, that it was after store hours?
 3              A.  Because she probably was
 4        supposed to say that she is going to call
 5        him, probably confirming.  It was probably
 6        that if she says that she was going to go
 7        home, it's a hard deal for her, why should
 8        she lose money if she was going to call her
 9        -- I probably said ``call him to remind her,
10        and there's nothing wrong with that.  I am
11        aggressive, and she is aggressive enough to
12        make every deal.  That's why I loved her,
13        she was a very good salesperson.
14              Q.  You are emphasizing that she was
15        a good salesperson as opposed to a good
16        employee.  To you, what is the difference?
17              A.  A good salesperson, she was my
18        employee.
19              Q.  What part of the employee role
20        did she play as a salesperson so that she
21        was a great salesperson --
22              A.  Meaning that she was a good
23        employee, simply put.
24              Q.  Let's take a look at the text
25        message on page 9 where it is dated November
```

184

```
 1                    Ishaque Thanwalla
 2         30th, of 2018 at 3:17 p.m.  Leticia says ''I
 3         am really not feeling well I feel nauseous
 4         and I was trying to just hang out but I feel
 5         hot and I feel my stomach turning.''
 6              Is it fair to say that at this time you
 7         knew about the pregnancy?
 8                   A.  Maybe not, I can't recall.  If
 9         she was pregnant she would've texted someone
10         anyway, and if I saw any sales, if I saw
11         anything that's said that she was nauseous
12         ''I am pregnant,'' though I did not.  Nowhere
13         in her conversations have I ever seen her or
14         seen any messages that show, it says ''I am
15         nauseous because I am pregnant.''  She is
16         nauseous, and she has done that numerous
17         times.  I can't recall if she told me or she
18         did not tell me whether she was pregnant.
19                   Q.  She did not tell you in person
20         that she was pregnant?
21                   A.  I cannot recall that because I
22         don't think so.  I don't think she told me,
23         but I got awareness of this from somebody
24         else and I can't exactly recall it at this
25         time who told me.  Maybe her friend Joanna,
```

A1218

185

```
 1                     Ishaque Thanwalla
 2            but I don't know.
 3                     Q.  Please turn your attention to
 4            page 9, the text message dated December 3rd
 5            of 2018 at um 11:21 a.m.  Then that shows
 6            your response at 11:22 a.m.
 7                     A.  Okay.
 8                     Q.  When you said that ''in meeting
 9            be there in 2 hours,'' where were you
10            meeting; was at Hillside Auto or somewhere
11            else?
12                     A.  Maybe a meeting with my
13            partners.
14                     Q.  By ''partners,'' do you mean 3
15            other individuals who you mentioned were
16            also shareholders?
17                     A.  Yes.  Or, I could be in a
18            meeting with -- someone for a personal
19            meeting or maybe I am in a -- in my doctor's
20            office. I can't answer that question
21            exactly.
22                     Q.  How often would you have
23            meetings with your partners?
24                     A.  Once or twice a month.
25                     Q.  What would those meetings touch
```

186

```
 1                    Ishaque Thanwalla
 2         upon?
 3                    A.  Sales, how are we doing in
 4         sales, because it's my job to make sure that
 5         they are up-to-date about what is going on
 6         there and my business.
 7                    Q.  As the general manager, did you
 8         receive a salary?
 9                    A.  I received percentage, yes.
10                    Q.  Meaning that you received a
11         percentage of the profits; is that correct?
12                    A.  Yes.
13                    Q.  Is that percentage the same or
14         different from 25 percent?
15                    A.  25 percent is my partnership.
16                    Q.  The question is how about for
17         the profits?
18                    A.  It's my percentage, it's my
19         privacy not to answer that question,
20         Emanuel.
21                    MR. KATAEV:  We are going
22                        to object on the grounds of
23                        confidentiality under Rule
24                        30.  The plaintiff has
25                        previously requested all
```

A1220

187

```
1                    Ishaque Thanwalla

2                         matters of financial

3                         information, and the Judge

4                         refused to comply with the

5                         production of that

6                         information.  So, I am

7                         directing the witness not to

8                         answer that question.

9                             MS. TROY:  I am not asking

10                        for financial information.  I

11                        am asking for the percentage

12                        of profits that were given to

13                        him.  I am not asking about

14                        the sales at Hillside Auto.

15                            MR. KATAEV:  Objection

16                        Asked and answered. You can

17                        answer as to the percentage.

18                    A.  I can't recall what the

19            percentage is, I was getting -- it's the

20            same percentage that I was getting today,

21            there is no difference between that day and

22            today's date.

23                    Q.  Turning your attention to the

24            text message dated December 12th, 2018 at

25            6:04 p.m.
```

188

```
1                    Ishaque Thanwalla
2            ''I am really not feeling well.  My
3       stomach is turning and I feel extremely
4       nauseous and I keep feeling like I need to
5       puke I can't stay any longer I need to lay
6       down.''
7                    A.  You can see in her question that
8       she probably left because she is sitting
9       right in front of my window.  I said
10      probably ''go.''  But, anyway, you see no
11      mention of pregnancy.
12                   Q.  Is it fair to say that at that
13      point you knew of Leticia's pregnancy?
14                   A.  I cannot answer that question
15      because I don't recall anything she is
16      mentioning.  If she would've mentioned it,
17      she would've mentioned it in the text.  You
18      can see that she likes to turn everything --
19      put everything in writing, and she should
20      have mentioned something somewhere.
21          You can see from page 1 to whatever the
22      last page is, whatever you have 37 or 27,
23      you don't see anywhere in her conversations
24      that she is saying that she is pregnant.
25      So, no, I did not know if she had mentioned
```

189

```
 1                    Ishaque Thanwalla
 2         it, I don't recall.
 3                    Q.  Is it your understanding, and
 4         don't take this the wrong way, but is it
 5         your understanding that a pregnant woman
 6         needs to remind you of her pregnancy through
 7         text?
 8                    MR. KATAEV:  Objection as
 9                         to argumentative.  You can
10                         answer the question.
11                    A.  She at least one minute -- once
12         she was pregnant, she never did say, so she
13         didn't need to remind me.  I don't think I
14         remember her mentioning to me that she was
15         pregnant.
16                    Q.  Now let's turn our attention to
17         page 10 and take a look at the text message
18         dated December 12th, 2018 at 6:37 p.m.
19         Please read it and let me know when you are
20         done.  Please read it to yourself.
21         (The witness peruses).
22                    MR. KATAEV:  The witness
23                         has requested that I read the
24                         message to him.
25                         (Mr. Kataev read the text
```

190

```
 1                    Ishaque Thanwalla
 2                         message as requested to the
 3                         witness)
 4              Q.   There is also a text message on
 5          12-12- 2018 at 6:39 p.m.
 6                         MR. KATAEV:  Let the
 7                         record reflect that I have
 8                         read the first text message
 9                         and let the record also
10                         reflect that I am now reading
11                         the second text message to
12                         the witness.
13              A.   I --
14                         MR. KATAEV:  There is no
15                         question pending.
16                         (The attorney reads it to the
17                         witness.)
18              Q.   What is your response?
19              A.   Probably brought into my office
20          and said that I wanted to talk to her about
21          what seemed to be the trouble and then we
22          communicated.
23              Q.   Do you recall what that
24          conversation was like?
25              A.   I can't recall.  The only thing I
```

191

```
1                    Ishaque Thanwalla

2         can see from the content is it says that the

3         customer is rushing her, the customer or she

4         is  rushing the customer or the customer is

5         rushing her.  I said ''slow down the

6         customer.''  ''If you want to make the deal,

7         you have to slow down the customer.''  Then,

8         I wanted her to make the deal, to slow the

9         customer down and she said ''no rush.''

10        Everything is okay.  What happened, when you

11        do it fast, you cut corners and you make

12        mistakes.

13             Maybe I brought her into my office and

14        I told her, I disciplined her, like I

15        mentioned maybe one or two times I guess

16        that was one of the times that I disciplined

17        her. I told her ''you need to slow down the

18        customer, slow down yourself to make it the

19        right way of making the deal instead of

20        losing a deal.''

21             Q.  Is it correct that the

22        particular deal that was referenced in the

23        first text message went through?

24             A.  Yes.  I read that because I

25        disciplined her and told her to slow down
```

192

```
 1                    Ishaque Thanwalla
 2          the customer.
 3                    Q.  To your knowledge, did that
 4          happen before or after the pregnancy
 5          announcement, the alleged pregnancy
 6          announcement?
 7                    A.  I don't recall her pregnancy
 8          announcement, so I can't allege anything.
 9                    Q.  Besides telling her to slow the
10          customer down, do you recall what else was
11          said during that night on December 12th,
12          2018?
13                    A.  I don't recall.
14                    Q.  Turning your attention now to
15          the text message dated January 7th of 2019
16          at 4:13 p.m.  Leticia writes ''I left for the
17          day tomorrow we need to talk because this
18          place has been a shit show since you left.''
19          Your response to her at 10:17 a.m. which is
20          on page 10 continuing onto page 11 is
21          ''okay.''
22                    A.  She asked me a question on the
23          7th, and I was probably into the flight or
24          getting out of the flight.  When you come
25          off of a 24-hour long flight, you sleep.
```

193

```
 1                    Ishaque Thanwalla
 2          You have jet lag, maybe my phone was shut
 3          off.  And I can't answer that, I can't
 4          recall everything.
 5                    Q.  Let's scroll down now to page
 6          11.  I'm going to now draw your attention to
 7          the text message from January 10th, 2019 at
 8          1:24 p.m.  Please read it and let me know
 9          when you are finished reading it.
10                              (The witness peruses and
11                              says, ''she's telling me that
12                              she threw up and she can't
13                              take the pressure in the car
14                              business'')
15                              MS. TROY:  Please read
16                              back the question again.
17                              (The reporter read back the
18                              last question.)
19                    A.  Okay.
20                    Q.  Now that you have finished
21          reading it --
22                              MR. KATAEV:  Do not
23                              interrupt me.
24                              MS. TROY:  What did you
25                              say to the witness?
```

A1227

194

```
 1              Ishaque Thanwalla
 2                   MR. KATAEV:  Please let
 3                   the record reflect that my
 4                   instruction to the witness
 5                   was to listen to the
 6                   question, and if a question
 7                   is pending, to answer that
 8                   question.  If there is no
 9                   question, there is nothing to
10                   be said.  Please proceed.
11         Q.  The question is: when you
12    received this text message from Leticia,
13    were you aware of her pregnancy?
14         A.  Like I said, I can't recall
15    that, I can't answer that question.  Nowhere
16    in that is mentioned that she was pregnant.
17    Maybe she mentioned it to me, and it went in
18    one ear and came out the other.  She was
19    probably talking while she was pregnant to
20    me, maybe I was really busy doing something
21    else when she mentioned it to me.  I can't
22    answer that question.
23         Q.  Please read the text message
24    from January 17th, of 2019 at 8:27 p.m. and
25    let me know when you are done.
```

195

```
 1              Ishaque Thanwalla
 2         A.  You want me to read it?
 3         Q.  You can read it to yourself.
 4         A.  What was the question?
 5         Q.  Let me know when you are done
 6    and I will ask you a question.
 7              MR. KATAEV:  Please read
 8              it and tell her when you are
 9              done reading it.
10              THE WITNESS:  Okay, I read
11              it.  What's your question?
12         Q.  Was that a complaint for $100 in
13    old wages?
14              MR. KATAEV:  Objection.
15              It assumes facts not in
16              evidence.  You can answer.
17         A.  Let me answer a complete answer.
18    We never hold a week's pay to begin with,
19    and according to my records, she left on the
20    10th.  Yes, it shows the date of the last
21    pay date was the 14th on ADP records,
22    according to my records, she left on the
23    10th and there was $300 salary that she was
24    supposed to get for the whole three.  She
25    did not work the whole week, so there was
```

196

```
 1                     Ishaque Thanwalla
 2        $100 short on her pay because we had an
 3        employee that said how many days, they
 4        worked and how much pay she was supposed to
 5        get.  Based on that, it shows in her own
 6        writing on my text message that we only took
 7        $100 owed to her, a hundred back and we did
 8        not.  Does that answer your question?
 9              Q.  Please read the message from
10        January 17th of 2018 at 8:30 p.m. and let me
11        know when you are done.
12                  (The witness peruses).
13              A.  Okay. It can't be -- it looks
14        like somebody coached her, it wasn't 1-17 at
15        8:30 p.m.  She bought a car for me, not
16        herself, her grandmother bought a car.  She
17        did not give me the complete documents.  We
18        didn't make any money because she didn't
19        give me any down payment.  She gave a down
20        payment, but not a complete down payment,
21        that's what I meant.  So, it looks like
22        somebody coached her, 60 hours and 7 days?
23        Whatever you can see, how many days she
24        called in sick or left early and had her
25        days off.
```

197

```
1                    Ishaque Thanwalla
2              Q.  Is it true that on days that she
3         would take off, she would make them up?
4              A.  I can't recall, she hardly did.
5              Q.  In other words, the question is,
6         if she took off for a day, would she make it
7         up on her free days and come to work at
8         Hillside Auto Outlet?
9              A.  She worked 7 days, which she
10        never did, she said she worked 7 days, but
11        she worked five days a week. Sometimes she
12        came to deliver a car to a customer, that
13        was on her prerogative because she was a
14        commissioned salesperson.
15             Q.  To be clear, the text message
16        that you are looking at does not say for
17        ''seven days,'' it says ''for seven months.''
18             A.  Whatever.  I told you that I am
19        dyslexic when I read.
20             Q.  That's okay.  We will either
21        have myself or Emanuel read it out for you,
22        how about that?
23             A.  Okay.
24             Q.  I'm going to show you
25        Plaintiff's Exhibit 7 which is the Decipher
```

198

```
1                    Ishaque Thanwalla
2        chat conversation with Ali.  First, can you
3        tell me, to the best of your knowledge if
4        this comports with your understanding in
5        terms of it being an accurate representation
6        of the WhatsApp conversation you've had with
7        Ali?
8                   A.  Yes.
9                   Q.  I'm going to show you
10       Plaintiff's Exhibit 7 which is the Decipher
11       chat conversation with Ali.  First, can you
12       tell me to the best of your knowledge, if
13       this comports with your understanding in
14       terms of it being an accurate representation
15       of the WhatsApp conversation you had with
16       Ali?
17                  A.  Yes.
18                  Q.  If you turn your attention to
19       this specific exchange, and I will read it
20       for you, this is from December 27th of 2018
21       at 11:05 a.m.  Ali texted ''your baby is
22       having a daughter,'' with two emojis. Then,
23       you text him back ''which one?''  Then, he
24       texted you at 12:13 p.m. on 12-27 saying
25       ''Leticia.''  You texted him back saying ''I
```

199

```
 1                    Ishaque Thanwalla
 2          know.''
 3               Do you recall this exchange having
 4          happened, and it's a yes or no question?
 5                    A.  Yes.  May I give you a complete
 6          answer?
 7                         MR. KATAEV:  Yes, you may
 8                    go ahead.
 9                         MS. TROY:  It is --.
10                         MR. KATAEV:  He wants to
11                    complete his answer.
12                         MS. TROY:  It's a yes or
13                    no question. He completed his
14                    answer.
15                         MR. KATAEV:  The answer is
16                    not a yes or no.
17                         MS. TROY:  You can follow
18                    up with your direct.
19                         THE WITNESS:  My complete
20                    answer would be --
21                         MS. TROY:  Fine, go ahead.
22                    A.  (Continuing) My complete answer.
23          I told you that somebody mentioned that she
24          was on the call and said ''your daughter is
25          pregnant.''  Yes, at that time and then I
```

200

```
 1                    Ishaque Thanwalla
 2           probably followed up with it.
 3                        MS. TROY:  I appreciate
 4                        that additional content.
 5                        Just so that we are clear, it
 6                        is a courtesy to let you add
 7                        whatever you want to add.  If
 8                        it's a yes or no question, it
 9                        is complete when you say ''yes
10                        or no,'' anyway. It's not that
11                        big of a deal.  Let's take a
12                        look now at Plaintiff's
13                        Exhibit 6.
14           This one is the WhatsApp conversation
15      you've had with Leticia.  Can you just
16      confirm to the best of your knowledge if it
17      comports with your understanding that it is
18      true and accurate copy of your conversations
19      with Leticia on WhatsApp before the 4 pages?
20                 A.  Four pages? Correct.
21                        MS. TROY:  I believe your
22                        attorney will read it and I
23                        will scroll through it.
24                        MR. KATAEV:  That will
25                        help him answer the question,
```

201

```
 1                    Ishaque Thanwalla
 2                         he has four pages in front of
 3                         him.
 4                            Please take a look through
 5                         the whole thing and see if it
 6                         is comports with your
 7                         conversation.
 8                         (The witness complies and
 9                         peruses)
10                            THE WITNESS:  Nothing.
11                            MR. KATAEV:  I said that
12                         the witness is reviewing a
13                         hard copy of the exhibit.
14             Q.  The question that is pending is
15         whether, to your understanding, this is an
16         accurate and complete representation?
17             A.  As to my ability, yes.
18             Q.  The question is whether it's an
19         accurate and complete representation of the
20         WhatsApp conversation that you had on your
21         phone.
22             A.  To the best of my ability, yes.
23             Q.  Is it fair to say that you and
24         Leticia have the WhatsApp conversation
25         because you were in Pakistan?
```

202

```
 1                    Ishaque Thanwalla
 2                    A.  I would say yes, I guess
 3         December 20th.
 4                    Q.  I am now going to turn your
 5         attention to page 2, specifically to the
 6         text message that is from December 27th of
 7         2018 at 8:30 p.m.  If you want, you can have
 8         your attorney read it for you also as well.
 9                         THE WITNESS:  Emanuel?
10                         MR. KATAEV:  Let the
11                         record reflect that I am
12                         reading this message to the
13                         witness.
14                         MS. TROY:  It's not this
15                         part, it's the highlighted
16                         part.
17                         MR. KATAEV:  Let the
18                         record reflect that I will be
19                         reading the message time
20                         stamped at 8:30 and 8:32 p.m.
21                         to the witness, to Ishaque.
22                         (The attorney complies)
23                    Q.  The question for you is: does
24         this refresh your recollection about
25         Guzman's treatment of Leticia while you were
```

A1236

203

```
 1                    Ishaque Thanwalla
 2         out?
 3                    A.  This is a conversation about
 4         Leticia, this is Leticia because Guzman,
 5         there is no conversation that Leticia had a
 6         problem with Guzman.  It looks like he was
 7         talking about David, like she was
 8         complaining about that.
 9                    Q.  The question for you is: does
10         this refresh your recollection about
11         Guzman's treatment of Leticia while you are
12         out?
13                    A.  There is no conversation about
14         Leticia.  This is Leticia, previously,
15         because Guzman, there is no conversation
16         that Leticia had a problem with Guzman.
17         It's David, it looks like she talked about
18         David, like she's complaining about this.
19         About why Guzman took the Range Rover, and
20         maybe she didn't like that, that Guzman --
21         since Ali started, they probably -- I can't
22         answer that question.  Ali probably changed
23         her mind now and she is again Guzman, she
24         doesn't like that, and that is Guzman is
25         trying to do his job, it looks like that to
```

204

```
 1                      Ishaque Thanwalla
 2          me because the one who had gotten the paper,
 3          Ali should have gone and given it in order
 4          for him, because he had seniority.  He's
 5          trying to get everything organized and Ali
 6          is sitting and she is just complaining.
 7          That's what I understand in this message.
 8                   Q.   When you received this message,
 9          did you respond or call Leticia?
10                   A.   I have no idea.  I can't recall.
11                   Q.   If you did call her, would it be
12          reflected on the WhatsApp?
13                   A.   Yes, the chat room.  I don't
14          know if I called her because I was back home
15          and I probably didn't even see this message
16          until a day later.  I can't answer that
17          question.
18                   Q.   Is it fair to say that this text
19          message that was just read aloud to you did
20          not just concern David but it concerned the
21          deal that Leticia had as well?
22                        MR. KATAEV:  Objection.
23                        You can answer.
24                   A.   Does not look like it, it was
25          David's deal and he was trying to do the DMV
```

205

```
 1                    Ishaque Thanwalla
 2          and the DMV takes time, as I mentioned
 3          previously to you.  Then, they ran the
 4          Carfax and I don't know what you call that
 5          paper.  There is a lot addressed like I
 6          said, nothing goes perfectly.  If you have
 7          an internet, is if it's not up or it's slow,
 8          maybe the DMV internet is down. Happens all
 9          the time.
10                    Q.  Did David Enrique from time to
11          time partner with Leticia?
12                    A.  Sure, they went out and smoked
13          weed all the time. That's the problem that I
14          had with --
15                    Q.  I don't mean partner in that
16          sense but I appreciate your answer.
17               Let's backtrack for a second, and when
18          the deposition is over and then after the
19          case is over, then we can talk about
20          whatever you want to talk about.
21               Right now, please focus on the question.
22          I mean partner in the sense of was he ever
23          partnered with Leticia in terms of any car
24          sales at Hillside Auto Outlet during her
25          employment with Hillside Auto Outlet?
```

206

```
1                    Ishaque Thanwalla
2                    A.  Let me understand this
3         correctly. You are telling me that Leticia
4         would give half of her commission to David,
5         is that what you are asking me?
6                    Q.  No.  I'm not asking you that.
7         I'm asking you, were there times when two
8         car salesmen would partner to sell a car;
9         it's a yes or no question.
10                   A.  It's not a yes or no question.
11        No, they would not partner up, sometimes on
12        occasion Leticia would give a complete
13        answer and sometimes in the situation, they
14        would deliver, Leticia's car and Leticia
15        would deliver David's car on his days off or
16        on her days off.  They would do each other a
17        favor, not partner-up, they would do each
18        other a favor.
19                   Q.  Let's focus then on the part of
20        the text message where it says ''I got this
21        customer looking to pay cash for the number
22        4 Carfax and we have no paper.''
23                   Is it accurate to say that you
24        understood that portion of the text message
25        when you received it to be that Leticia had
```

207

```
 1                    Ishaque Thanwalla

 2          her own customer that was looking to pay

 3          cash; it's a yes or no question?

 4                    A.   It's not a yes or no question.

 5          We may have ran (sic) out of paper and

 6          Leticia was the salesperson she could have

 7          opened the screen and showed the Carfax on

 8          the computer screen and showed it to let the

 9          customer see it while the customer was

10          looking at it.   Somebody could have gone and

11          gotten the paper.   It appears that the

12          customer had to go out and get the paper.

13                    Q.   When you talked about

14          partnering, was there a time when Leticia

15          would run the credit or David would run the

16          credit?

17                    A.   How can they run the credit when

18          they had no access to run the credit, nor

19          was she authorized to run the credit?   It is

20          the manager's job, management's job which is

21          Guzman and Ali.   Supposing if we could show

22          that Leticia did run the credit for David,

23          it's the customer I guess.

24                    Q.   Is it fair to say that on

25          December 27th of 2018 you were not in the
```

208

```
 1                    Ishaque Thanwalla

 2          country?

 3                    A.   What?

 4                    Q.   In 2018, December 27th of 2018,

 5          the same date as the text message.

 6                    A.   Yes, I wasn't in the country.

 7                    Q.   Is it fair to say that David

 8          could not have run his own credit without

 9          the help of Guzman or some other individual

10          who had the authority to access the

11          DealerTrak system?

12                    A.   Your question is could David

13          have run his credit?  David could never run

14          a customer's credit, nor could Leticia, nor

15          could any other sales person could run a

16          credit.  It is the manager's job, and I

17          would have more than two available -- if

18          they are not available, I'm going to take

19          the name Ali and Guzman.  If they're both

20          busy or somehow for any reason, there is no

21          finance manager, they would have the

22          authority to do that.  Does that answer your

23          question?

24                         MR. KATAEV:  Let's go off

25                         the record.
```

209

```
 1                    Ishaque Thanwalla
 2                         (A discussion was held off
 3                    the record).
 4                              We are back on the record
 5                    at 4:39 p.m.
 6               Q.   Let's mark. Plaintiff's Exhibit
 7      8.
 8                         (Plaintiff's exhibit 8 marked
 9                    for identification)
10                         MS. TROY:  Plaintiff's
11                    Exhibit 8 will be the
12                    Verification of Ishaque
13                    Thanwalla.
14               Q.   I am going to show it on the
15      screen, Plaintiff's 8 for identification.
16                         MR. KATAEV:  I'm going to
17                    print it.
18                         MS. TROY:  While you are
19                    at it, you might as well
20                    print the other stuff as
21                    well. The responses to the
22                    document request.
23                         MR. KATAEV:  Okay.
24                         MS. TROY:  Let's mark
25                    plaintiff's 9 and 10 as well.
```

210

```
 1                    Ishaque Thanwalla
 2                         (Plaintiff's Exhibit 9 and 10
 3                         marked for identification)
 4                         MS. TROY:  Plaintiff's 9
 5                         is the Verified Response to
 6                         Interrogatories, the regular
 7                         Interrogatories.  Plaintiff's
 8                         10 is the final Supplemental
 9                         Responses.
10                    Q.   While your attorney is doing
11      that, I'm just going to ask you some other
12      questions about Serge meaning Serge Zanan,
13      correct?
14                    A.   Yes, something like that.
15                    Q.   Back on Plaintiff's Exhibit 2,
16          this is the Declaration of Serge Zanan,
17          plaintiffs 2 and then on page 72, which is
18          the same as defendant's document production
19          72.
20          I'm going to ask you to read paragraph
21          one and ask you if this refreshes your
22          recollection as to when he started working
23          at Hillside Auto Outlet.
24                    MR. KATAEV:  Just for the
25                         record, I printed this and
```

211

```
 1                    Ishaque Thanwalla
 2                         I'm going to give all of this
 3                    to the witness so that he has
 4                    the full set so that he can
 5                    read the whole thing.
 6                         Let the record reflect
 7                    that I have given the witness
 8                    the Declaration of Serge
 9                    Zanan, and I'm asking if he
10                    could read the whole thing.
11                         MS. TROY:  Let me know
12                    when you are done reading it.
13                    (The witness peruses)
14                         MR. KATAEV:  I'm
15                    confirming to him to read
16                    everything that is stapled
17                    here, all 4 of the boxes to
18                    the Interrogatories and
19                    document requests are in
20                    front of the witness.
21                         Do you want to repeat your
22                    question? What was your
23                    question?
24               Q.  My question is, however,
25          paragraph 1 of the Declaration, does it
```

212

```
 1                    Ishaque Thanwalla
 2         refresh your recollection as to when Serge
 3         started to work at Hillside Auto was at the
 4         end of 2018?
 5                    A.   Probably started in 2018.
 6                    Q.   Is that accurate to the best of
 7         your knowledge?
 8                    A.   I can't answer, but it says so,
 9         maybe it's accurate.
10                    Q.   Was he a finance manager or a
11         finance and insurance representative?
12                    A.   The finance manager which we
13         call finance and insurance because they do
14         sell warranties and that is why they call it
15         ''finance and insurance.''
16                    Q.   So, finance and insurance
17         representative is the same as a finance
18         manager or is it different?
19                    A.   Yes, the same.
20                    Q.   When was your last contact with
21         Guzman?
22                    A.   A couple of weeks ago.
23                    Q.   During that contact, did you
24         talk at all about this case, the present
25         case?
```

213

```
 1                    Ishaque Thanwalla
 2                         MR. KATAEV:  Objection
 3                    based on attorney/client
 4                    privilege.
 5                         MS. TROY:  How is it
 6                    attorney/client privilege if
 7                    it is between him and Andris
 8                    Guzman?
 9                         MR. KATAEV:  He learned --
10                    if you didn't interrupt, you
11                    would've heard me say that I
12                    was present during that
13                    conversation.  I am
14                    instructing the witness not
15                    to answer that question.
16                    Please proceed.
17              Q.  When was the last contact you
18       had with Andris Guzman without your attorney
19       being present?
20              A.  Without my attorney being
21       present? I didn't have any -- I didn't have
22       any contact with him in a long time.
23              Q.  How about with Ronald M. Baron?
24              A.  A year-and-a-half ago or a year
25       ago.
```

214

```
 1                    Ishaque Thanwalla
 2              Q.  How about Jory Baron?
 3              A.  I saw him about two or three
 4       weeks ago.
 5              Q.  Was that in the presence of your
 6       attorney or outside the presence of your
 7       attorney?
 8              A.  He is my partner.
 9              Q.  The question is yes or no, was
10       it with your attorney or not with your
11       attorney?
12              A.  Not with my attorney, not with
13       Jory.
14              Q.  What did you talk to him about?
15                    MR. KATAEV:  Objection,
16                    asserting a common interest
17                    prejudice objection.  Jory
18                    Baron is one of the
19                    witnesses, one of the
20                    defendants in this case, and
21                    if you discussed anything
22                    about this case I am
23                    instructing the witness not
24                    to answer that question.
25                    MS. TROY:  You can answer
```

A1248

215

```
 1                   Ishaque Thanwalla
 2                        that question subject to that
 3                        objection.
 4                           MR. KATAEV:  In other
 5                        words, if you talked about
 6                        this case, don't answer.  If
 7                        you talked about something
 8                        else, you can answer.
 9               A.  We talked about something else,
10          we did not talk about this case.
11               Q.  What did you talk about?
12               A.  Business.
13               Q.  When you say ''business,'' do you
14          mean Hillside Auto Outlet specifically?
15               A.  Correct.  That is the only
16          business he owns with me.
17               Q.  I'm showing you on the screen
18          the Verification to the Interrogatories, the
19          Supplemental Interrogatories which your
20          attorney has printed for you.  Let me know
21          when to scroll down, it is one page.
22          (The witness peruses)
23                           THE WITNESS:  Okay.
24                        Please back up a little bit.
25                           MS. TROY:  Okay.
```

216

```
 1                    Ishaque Thanwalla
 2                         THE WITNESS:  That is
 3               good.
 4                    Q.  The question I have for you is:
 5          do you recognize your signature?
 6                    A.  Yes.
 7                    Q.  To the best of your knowledge,
 8          is everything contained in the
 9          Interrogatories and the Supplemental
10          Interrogatories correct and true?
11                    A.  Yes.
12                    Q.  When was this document signed?
13                    A.  I don't remember the date.  It
14          says ''February of 2023.''
15                         MR. KATAEV:  I will make
16                    the representation that it
17                    was on the same day that you
18                    received it.
19                    Q.  Prior to signing it, did you
20          review the Interrogatory Responses?
21                    A.  Yes.
22                    Q.  Did you have a conversation with
23          Deana Jennings?
24                    A.  Right.
25                    Q.  Did you have a conversation with
```

217

```
 1                    Ishaque Thanwalla

 2          her?

 3                    A.  Yes.

 4                    Q.  How long was that conversation?

 5                    A.  I can't recall.

 6                    Q.  When did that conversation take

 7          place?

 8                    A.  I don't remember her ever asking

 9          me to have a conversation.

10                    Q.  I understand that your attorney

11          asked you to have the conversation.  My

12          question is when?

13                    A.  Before signing of the paper.

14                    Q.  You had the conversation with

15          whom, with your attorney or with Deana

16          Jennings?

17                    A.  Your question was about

18          conversations with Deana Jennings and I said

19          ''yes.''

20                    Q.  You had a conversation with her

21          right before you signed or when?

22                    A.  Right before.

23                    Q.  What was the content of that

24          conversation?

25                            MR. KATAEV:  Objection.
```

218

```
 1                    Ishaque Thanwalla

 2                         Based on the same objection,

 3                         the common interest privilege

 4                         objection.  To the extent

 5                         that you and Deana Jennings

 6                         discussed this case, I

 7                         instruct you not to answer

 8                         the question.  If you

 9                         discussed something else, you

10                         may answer.

11              A.   We discussed the case.

12              Q.   Is it fair to say that any of

13         the Responses pertaining to Hillside Auto

14         Mall that you don't have personal knowledge

15         about that?

16              A.   This is a separate company, I am

17         not part of Hillside Auto Mall.  So I don't

18         know what goes on there, it's not my

19         business.

20              Q.   I understand that your

21         Interrogatories had information about

22         Hillside Auto Mall.  My question is: to the

23         extent that your answers included

24         information about Hillside Auto Mall, are

25         you saying that you did not have personal
```

Case 1:21-cv-07163-OEM-LB   Document 102-9   Filed 03/27/24   Page 219 of 278 PageID #: 1916

219

```
 1                    Ishaque Thanwalla
 2          knowledge with respect to those?
 3                    A.  I have no interest in Hillside
 4          Auto Mall, so I had no conversations on
 5          Hillside Auto Mall.  My business is Hillside
 6          Auto Outlet.  Anything pertaining to
 7          Hillside Outlet is part of my answer.
 8                    Q.  Who is Susan Zhivo Z-H-I-V-O.
 9                    A.  She is my controller.
10                    Q.  Susan Zhivo Z-H-I-V-O, is that
11          the Susan that you mentioned earlier that
12          you didn't remember her last name?
13                    A.  Yes.  I call her Susan ''Z.''
14                    Q.  Besides yourself, are there any
15          other individuals who are responsible for
16          determining the pay and the hours of
17          Hillside Auto employees?
18                    A.  Hillside Auto or Hillside
19          Outlet?
20                    Q.  We can do Hillside Auto Outlet
21          employees.
22                    A.  Okay, what was your question
23          again?
24                    Q.  Besides yourself, was anyone
25          else responsible for determining
```

A1253

220

```
 1                    Ishaque Thanwalla
 2         compensation or hours?
 3                         MR. KATAEV:  At Hillside
 4                    Auto Outlet?
 5                         MS. TROY:  We can start
 6                    from there.
 7              A.  Hillside Auto Outlet, Susan is
 8         my controller and she does the payroll.
 9         Then, before Susan it was Deana and before
10         Susan, Deana Jennings, yes.
11              Q.  During the plaintiff's
12         employment with Hillside Auto Outlet, you
13         were saying that in addition to yourself,
14         Deana and Jeanique also determined the
15         compensation and hours?
16              A.  And Asha A-S-H-A as well.
17              Q.  Asha is the assistant office
18         manager, right?
19              A.  Correct.
20              Q.  In terms of the amount of time
21         it takes for Hillside Auto salespeople to
22         hear back from the lender once an
23         application was submitted, how long would
24         that timeframe be?
25              A.  Now you are questioning -- it's
```

221

```
 1                    Ishaque Thanwalla
 2          actually a different thing, you were talking
 3          about do we play a role, are you asking
 4          about the bank?
 5                    Q.  Yes.
 6                    A.  You changed subjects, I just
 7          want to make sure we stay on the same path.
 8          Your question was how long it takes for the
 9          bank to reply back, is that your question?
10                    Q.  Right, how much time?
11                    A.  It all depends.
12                    Q.  Do you have a range?
13                    A.  The range is between 20 minutes
14          to an hour, hour-and-a-half or maybe two.
15                    Q.  Is it true that most of your
16          customers do not have excellent credit?
17                    A.  Most of our geographic location,
18          we do not have the greatest credit.
19                    Q.  Do you recall your attorney
20          asking my client a question about racial
21          profiling of the customers; did that happen
22          at Hillside Auto Outlet?
23                    A.  What do you mean by ''racial
24          profiling?''
25                    Q.  Let's try to do this and address
```

222

```
 1                    Ishaque Thanwalla
 2          it in the shortest way we can.  In terms of
 3          the person who does not have good credit or
 4          that person has good credit that happens on
 5          your watch.
 6                    Let's look at it this way the
 7          person that person does not have good credit
 8          or that person has good credit, that happens
 9          under your watch, right?
10                    A.  Let me put it this way. I have a
11          very extensive training in the car business.
12          One thing about me, I don't judge a book by
13          its cover.  We do not judge.  You can be any
14          color, any race, any religion, and we treat
15          them equally.  We don't have one -- only one
16          identity that we look at.
17                    Q.  Is it true that you hold them to
18          the same standard?
19                    A.  Yes, I do.  We only have one
20          identity.  I am very strong about that.
21                    Q.  In terms of credit, no one is
22          just turned away because they look a certain
23          way, the credit has to be run, correct?
24                    A.  Correct, the credit has to be
25          run if they want to buy on credit, if they
```

223

```
 1                    Ishaque Thanwalla
 2         want to pay cash, we don't have to run it.
 3         But, we still need to get the social
 4         security for the tax form, but no.
 5                    Q.  You mentioned in your
 6         Supplemental Interrogatories that you have a
 7         secondhand dealer's license and certificate
 8         of authority; is that correct?
 9                    A.  Secondhand dealer license, yes.
10                    Q.  Do you also have a certificate
11         of authority?
12                    A.  Authority for what?
13                    Q.  I don't know, that's what you
14         wrote.
15                    A.  An authority to issue DMV, yes.
16                       MS. TROY:  Demand number
17                       9, it will be the secondhand
18                       dealer license and
19                       certificate of authority for
20                       161-10 Hillside Auto Avenue,
21                       or for you personally.
22                       MR. KATAEV:  I am going to
23                       place that response in front
24                       of the witness.
25                       MS. TROY:  That is fine.
```

224

```
 1                    Ishaque Thanwalla
 2                         I am also asking or
 3                         requesting the Declaration of
 4                         Serge.
 5                              MR. KATAEV:  Should I read
 6                         this --
 7                              MS. TROY:  Not all
 8                         questions require him to read
 9                         that, but he can read it if
10                         it helps him.
11                              MR. KATAEV:  This is the
12                         Supplemental Response and
13                         Interrogatory number 9?
14                              MS. TROY:  Correct.  You
15                         can read it to him and let me
16                         know when you are done
17                         reading it.
18                         (The witness peruses)
19                              THE WITNESS:  Okay.
20                    Q.  I am asking you if you
21           identified these documents, they have not
22           been turned over yet, please turn it over.
23           That is another demand.
24                              MR. KATAEV:  Documents are
25                         being requested.
```

225

```
 1                    Ishaque Thanwalla
 2                         MS. TROY:  The secondhand
 3                    dealer license and the
 4                    certificate of authority that
 5                    was mentioned and referred to
 6                    was never produced.
 7                         MR. KATAEV:  You never
 8                    made a demand for it,
 9                         MS. TROY:  I'm making a
10                    post-demand request for it.
11                         MR. KATAEV:  Put it in
12                    writing and we will respond.
13                    Q.  Mr. Thanwalla, can you just take
14             a quick look at the two other documents that
15             your attorney has printed for you, which is
16             the documents, it's document request
17             responses and the supplemental responses.
18             Please just take a look at the document and
19             can you just confirm for me that it is
20             accurate and complete to the best of your
21             knowledge.
22                    A.  I've been through this document
23             previously, it's the same document, yes.
24                    Q.  Just to confirm that both
25             document requests and responses as well as
```

226

```
 1                    Ishaque Thanwalla
 2          the supplemental responses, there were two
 3          documents that you looked at, correct?
 4                         MR. KATAEV:  Let's go off
 5                    the record.
 6                    (A discussion was held off
 7                    the record)
 8                    A.  Okay, looking at the same
 9          thing that I looked at yes.
10                    Q.  Just to be clear, the document
11          production responses are the 38 page
12          document, that, and let's start with that,
13          you said that you reviewed the document and
14          it is complete, it is accurate to the best
15          of your knowledge, correct?
16                    A.  To the best of my ability, yes.
17                    Q.  Then, do you see the five-page
18          document?
19                    A.  Yes.
20                    Q.  Could you say the same for that
21          5-page document that it is true and complete
22          to the best of your knowledge?
23                    A.  To the best of my knowledge,
24          yes.
25                    Q.  Now, I'm going to show you this
```

227

```
 1                    Ishaque Thanwalla
 2          on the screen, and we are looking at
 3          Plaintiff's Exhibit 10 for identification.
 4                    Q.  We are looking at plaintiff's
 5          Exhibit 10 for identification.  I'm just
 6          going to point your attention to a couple of
 7          different sections and I will have a couple
 8          of questions after I point your attention to
 9          that section, okay?
10                    A.  Okay.
11                    Q.  Let's take a look, and if you
12          are looking on the paper it is page 3.
13          there's specific demand responses and we are
14          at number one.  Let me know when you are
15          finished reading demand number 17 and his
16          response.
17                         MR. KATAEV:  It is cut off
18                    on the screen.  I'm going to
19                    ask him to read this.
20                         MS. TROY:  Let me know
21                    when you guys are done.
22                    (The witness peruses the
23                    document).
24                         THE WITNESS:  What is your
25                    question?
```

228

```
 1              Ishaque Thanwalla
 2              Q.  The question is: is it accurate
 3         to say that the weekly sales records were
 4         not turned over as part of the Supplemental
 5         Response?
 6              A.  The weekly sales records were
 7         not part of this part of the record.
 8              Q.  Let me backtrack for a moment.
 9         Do you recall earlier today that you
10         mentioned that there was a weekly record of
11         the sales of the cars as well as the
12         commission, and the bonuses, et cetera for
13         each car's salesman at Hillside Auto?
14              A.  Yes, yes.
15              Q.  The question was: was that
16         record  provided as part of the Responses
17         that are in 17, again, it's a yes or no
18         question?
19                   MR. KATAEV:  Objection to
20                   the form.  You can answer.
21              A.  Yes.
22              Q.  You are saying it was turned
23         over?
24              A.  Yes.
25                   MS. TROY:  Please just
```

229

```
 1                    Ishaque Thanwalla

 2                    turn that over.

 3                         MR. KATAEV:  Put it in

 4                    writing and I will respond.

 5              Q.  Turning your attention to

 6         question 21, a similar process.  Please read

 7         over the question with your counsel, read

 8         over the question and the response and let

 9         me know when you are done because I will

10         have a question for you.

11                         MS. TROY:  Does he want on

12                    the screen or on the paper?

13                         THE WITNESS:  I would like

14                    it on the screen better.

15                         MS. TROY:  Perfect, tell

16                    me when I should scroll down.

17              A.  Okay.

18              Q.  If you don't mind, just read 39

19         and let me know when you are done with the

20         question and the response.

21              A.  Okay.

22              Q.  Is number 39, correct to the

23         best of your knowledge?

24              A.  Yes.

25              Q.  Read the request number 40, and
```

A1263

230

```
 1                    Ishaque Thanwalla
 2          let me know when you are done, the request
 3          and the response.
 4                    A.  Okay.  What's your question?
 5                    Q.  My question is, is it correct to
 6          say that there are no complaints for unpaid
 7          wages from anyone, including your employees?
 8                    A.  You are telling me unpaid wages
 9          that I am not paying someone, they have a
10          complaint?
11                    Q.  Correct.
12                    A.  I can't remember -- I have never
13          paid anyone lost wages, people I mostly paid
14          people.
15                    Q.  The question is not about the
16          underlying facts, but the fact that the
17          complaint has the name, whether that was a
18          formal complaint in the Court or a non-
19          informal complaint.
20             My question is: did you turn over all of
21          the documents that you have in your
22          possession pertaining to any such
23          complaints?
24                    A.  Yes, I have.
25                    Q.  Earlier when you mentioned, when
```

231

```
 1                    Ishaque Thanwalla

 2          I asked you if you were a party to any

 3          Action, do you recall that there was a New

 4          York State Court Action against you for

 5          wages?

 6                    A.  You bring that up, I respect

 7          that you saw that, I only owed her a hundred

 8          bucks.  A hundred bucks in wages.

 9                    Q.  My question is: as part of the

10          State Law Action, did you receive any

11          documents?

12                    A.  Yes, probably, but I can't

13          recall 100 percent.

14                    Q.  Let me just scroll down to

15          number 46. Please read that request and

16          answer and let me know when you are done.

17                    A.  47?

18                    Q.  46, I said.

19                    A.  46?  Okay, what's your question

20          on this.

21                    Q.  Besides Leticia, who else was a

22          female car salesperson at Hillside Auto

23          Outlet?

24                    A.  There was a lot of female

25          salespersons that worked for me in time, but
```

232

```
 1                    Ishaque Thanwalla
 2           I can't recall everybody's name.
 3                    Q.  Now, when Leticia was working,
 4           Leticia was a female person --
 5                    A.  There was more than one, more
 6           than one, but I can't recall everybody's
 7           name. I can't recall.
 8                    Q.  Do you recall receiving a
 9           Complaint for sexual or pregnancy
10           discrimination from Lilly or anyone else?
11                    A.  Never received anything from
12           Lilly.
13                    Q.  How about overall in general
14           from anyone?
15                    A.  Received it from Leticia and I
16           was stunned.  After she left, I generally --
17           in July and August we received some kind of
18           pregnancy discrimination, hourly rate, and I
19           was stunned, I was highly stunned.  She was
20           treated like family and she left because she
21           got a better job opportunity elsewhere.  I
22           really took it to heart, because I tried to
23           treat her as my own.  You can see that on
24           the text messages, 90 percent, close to
25           that, I have treated her like my family
```

233

```
 1                     Ishaque Thanwalla
 2          until she left, and she changed colors.  She
 3          was coerced.  I don't know.
 4               Maybe somebody did that coaching, the
 5          only person, her parents or her mother or
 6          her father.  They both were in the lawsuit,
 7          maybe she was coached to do that, but I have
 8          no idea.
 9                          MS. TROY:  Let's refrain
10                          from personal attacks of
11                          anyone's father or mother.
12                          Let's just try to finish
13                          this.
14                          THE WITNESS:  I am saying
15                          that they are both lawsuit
16                          happy.
17                          MS. TROY:  I appreciate
18                          that, but --
19                          THE WITNESS:  She's trying
20                          now.
21                          MS. TROY:  I appreciate
22                          your feedback. Let's focus
23                          for a second on the topic.
24          A.  Yes.
25          Q.  So, question 47 and the
```

A1267

234

```
 1                    Ishaque Thanwalla
 2          response, can you read that question and
 3          answer and let me know when you are done.
 4                    A.  Okay.
 5                    Q.  The question is, whether any
 6          other investigations occurred after Leticia
 7          complained, made the complaint?
 8                    A.  Not that I know of.
 9                    Q.  I'm going to turn your attention
10          to this portion that is highlighted in the
11          Response.  This portion of the Response says
12          that documents ''were previously withheld
13          solely for requests number 21, 34 43, 44, 45
14          (Angris Guzman only), 58, 75, 79, 80, 85,
15          89, 90, 91, and 92.''  Is that a correct
16          statement to the best of your knowledge?
17                    A.  Is that what you requested
18          earlier?
19                    Q.  Please focus on my question.
20          The question is: does this statement, is it
21          true to the best of your knowledge, the one
22          that I have highlighted?
23                    A.  I can't answer that question yes
24          or no.  I can't, I don't think the question
25          is so in reality, and I am dyslexic.  Can
```

235

```
 1                    Ishaque Thanwalla
 2          you elaborate the question and I will answer
 3          your question?
 4                    Q.  Sure.  So your attorney
 5          mentioned that some of the Responses, some
 6          of the other Responses, that there are
 7          various objections, and the Judge, the
 8          defendant, clarified that with respect to
 9          some of the Responses.  This statement says
10          that there are documents that were not
11          provided because of the objections and then
12          listed the numbers.
13               So, my question for you is, is that
14          correct to the best of your knowledge?  If
15          you don't know, just say that you don't
16          know.
17                    A.  I don't know.
18                         MS. TROY:  So, if you
19                    don't mind, just find out and
20                    let me know when you have had
21                    a chance to do so.  That
22                    would be great.
23                         I'm going to ask the
24                    reporter to leave a blank
25                    space in the transcript for
```

236

```
 1                    Ishaque Thanwalla
 2                         that information.
 3
 4                         (Insert)
 5                         MS. TROY:  That is the
 6                    last question, those are all
 7                    the questions I have for you
 8                    today, Mr. Thanwalla.  Thank
 9                    you.  I appreciate your time.
10
11                    [Time noted 5:19 p.m)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

237

```
 1                        Ishaque Thanwalla

 2     WITNESS           EXAMINATION BY              PAGE

 3      Mr. Thanwalla     Mr. Troy                    6

 4                      PLAINTIFF EXHIBITS

 5      Number            Description                PAGE

 6

 7       1        ID (to be Deemed marked)            6

 8       2        Termination letter                 68

 9       3        Text messages                      122

10       4       What'sApp                           124

11       5        Text messages sent using           169

12                 Decipher App

13       6        Decipher chat on What'sApp         169

14       7        Decipher chat conversations        169

15       8        Verification of Ishaque            209

16                 Thanwalla

17       9        Final Verified response to         210

18                 Interrogatories

19      10       Final Supplemental Response         210

20

21

22

23

24

25
```

238

```
1                    Ishaque Thanwalla

2                         REQUESTS

3      Number            Description              PAGE

4       1     MS. TROY:  Demand No 1              79

5               Is: Provide the text

6               messages between Ishaque

7               Thanwalla and Stidhum.

8       2     MS. TROY:  Demand No 2 is:          79

9            Provide WhatsApp messages

10           between Thanwalla and Leticia.

11      3     MS. TROY: Demand No 3 is:           79

12           Provide email exchanges

13           between Ishaque Thanwalla and

14           Stidhum.

15      4     MS. TROY:  Demand No 4 is:          81

16           Provide the surveillance

17           footage.

18      5     MS. TROY:  Demand No 5 is:          81

19           Provide police report, both

20           of which concerns the robbery

21           that took place at Hillside Auto

22           Outlet.

23      6     MS. TROY: Demand No 6 is:           118

24          provide the name as well

25          as the position for each of
```

239

```
 1              Ishaque Thanwalla
 2         the individuals who the
 3         witness identified as numbers
 4         21,22,2,23,24,4,13,3,25,17,26
 5         27,28,29,20,30,31,32,33,34,19,
 6         35,36,38,39 and 37.
 7    7    MS. TROY:  Demand No. 7 is:         119
 8         Provide written documents
 9         containing the cars sold,
10         the name of the customer,
11         the bonus and commissions
12         received.
13    8    MS.  TROY: Demand No 8 is:          120
14           provide any electronic files
15           or inputs by the office
16           manager or her assistant
17           regarding the same.
18    9    MS. TROY:  Demand No 9             223
19           is: Provide the unredacted
20           version of the documents,
21           because there is clearly some
22           confusion as to who and what
23           or even if Mr. Parsons
24           actually was there.
25    10   MS. TROY:  Demand No 10 is:        163
```

240

```
 1                    Ishaque Thanwalla
 2              Cutting to the chase,
 3              if you could just provide
 4              the unredacted version of
 5              the documents, because there
 6              is clearly some confusion as
 7              to who and what or even if
 8              Mr. Parsons actually was there.
 9       11   MS. TROY:  Demand No 11 is:          175
10              Mr. Kataev, it appears that
11              this is the Decipher app,
12              and it's a black and white
13              photograph of the actual video.
14              My question is, can you get me
15              the actual video?
16       12    MS. TROY:  Demand No 12 is:         224
17              The secondhand dealer license
18              and the certificate of authority
19              that was mentioned and referred
20              to was never produced. I'm making
21              a post-demand request for it.
22       13    MS. TROY:  Demand No 13 is:          42
23              (Insert)
24       14    MS. TROY:  Demand No 14 is:          66
25              (Insert)
```

241

```
 1                      Ishaque Thanwalla

 2        15   MS. TROY:  Demand No 15 is:          66

 3             (Insert)

 4        16   MS. TROY:  Demand No 16 is:          74

 5             (Insert)

 6        17   MS. TROY:  Demand No 17 is:          236

 7             (Insert)

 8

 9

10

11

12

13        QUESTIONS MARKED FOR A RULING:     PAGE/LINE

14        (None)

15

16

17

18

19

20

21

22

23

24

25
```

242

```
 1
 2                      ACKNOWLEDEGMENT
 3
 4      STATE OF NEW YORK )
 5                       )s.s.
 6      COUNTY OF NASSAU  )
 7            I, Ishaque Thanwalla, hereby
 8      certify that I have read the transcript of
 9      my testimony taken under oath in my
10      deposition of February 24, 2023; that the
11      transcript is a true, complete and correct
12      record of my testimony, and that the
13      answers on the record as given by me are
14      true and correct.
15
16                 _____
17                      ISHAQUE THANWALLA
18
19      Signed and subscribed before me
20      this _____ day of _____, 2023.
21
22
23      _____
24            Notary Public
25
```

243

```
1                   C E R T I F I C A T E

2        STATE OF NEW YORK      )

3                                )s.s.

4        COUNTY OF NASSAU        )

5

6                   I, LYNN LUCKMAN, a Shorthand

7        Reporter and Notary Public within and for

8        the State of New York, do certify that;

9                   THAT the witness whose deposition

10       is hereinbefore set forth, was duly sworn by

11       me, and that such deposition is a true

12       record of the testimony given by such

13       witness.

14                  I further certify that I am not

15       related to any of the parties to this action

16       by blood or marriage; that I am in no way

17       interested in the outcome of this matter.

18                  IN WITNESS WHEREOF, I have

19       hereunto set my hand this 8th day of

20       March, 2023.

21                        Lynn Luckman

22                        _____

23                             LYNN LUCKMAN

24

25
```

A1277

244

```
 1  Errata Sheet

 2

 3  NAME OF CASE: LETICIA FRANCINE STIDHUM -against- HILLSIDE AUTO AVE, LLC

 4  DATE OF DEPOSITION: 02/24/2023

 5  NAME OF WITNESS: ISHAQUE  THANWALLA

 6  Reason Codes:

 7       1. To clarify the record.

 8       2. To conform to the facts.

 9       3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                    _____
```

A1278

245Index: $1,000—20th

**$**

**$1,000** 107:22,25 108:12

**$1,080** 164:18

**$1,500** 112:5

**$1,600** 111:2,4

**$1,825** 102:6

**$100** 31:10 195:12 196:2,7

**$150** 29:4,11,22 45:19 58:3,13 102:7 111:25 164:24

**$2,500** 94:18,24

**$20** 30:6

**$200** 46:9 103:10 111:19

**$25** 30:7,22

**$3,000** 58:17 59:4 60:5,9

**$300** 29:3 45:18, 23 46:4 98:11,22 164:16 195:23

**$350** 46:6 96:8 99:6

**$5** 31:3

**$50** 30:9,23 31:4 111:19 138:18

**$500** 30:23 46:12, 17 104:22

**$600** 46:25 105:3, 20

**$650** 95:17

**$780** 164:23

**$900** 108:24

**-**

**---within** 96:20

**1**

**1** 6:2,3 16:11 79:6 90:3 116:16

143:25 144:2 165:4 188:21 211:25 237:7 238:4

**1-17** 196:14

**10** 15:23 22:8 32:14,25 36:13,14 52:25 91:23 92:3,4 112:4 123:17 189:17 192:20 209:25 210:2,8 227:3,5 237:19 239:25

**100** 30:24 79:5 91:18 92:16 99:15 143:17 148:2 152:16 174:19,20 231:13

**10:00** 32:18,19,23 33:4,6 35:16,25 36:5,8,21 37:7 48:7,8 51:19 53:5, 9

**10:17** 192:19

**10:47** 43:16

**10:50** 43:13

**10:51** 43:11,16

**10th** 193:7 195:20, 23

**11** 22:8 51:19 53:2 172:16 192:20 193:6 240:9

**11-24-2018** 174:23

**11024** 5:17 6:13

**11360** 16:11

**11432** 5:15

**1179** 134:5

**118** 238:23

**1187** 164:10,11

**1188** 164:21,22

**119** 239:7

**11:00** 36:15,16,21 53:5,9

**11:03** 122:18

**11:05** 198:21

**11:21** 185:5

**11:22** 185:6

**11:28** 135:2

**11:30** 70:7,10

**11:35** 70:7,10

**12** 240:16

**12-12-** 190:5

**12-27** 198:24

**12/29** 134:25

**120** 239:13

**122** 237:9

**1229** 135:12

**124** 237:10

**1251** 93:20,22,23

**1252** 95:9,11

**1254** 96:4

**1255** 99:13

**1256** 103:9

**1257** 103:16

**1258** 104:21

**1259** 105:2

**1260** 105:19

**1261** 106:2

**1262** 106:4

**1263** 106:11

**1264** 106:16

**1265** 106:22

**1266** 106:24

**1267** 107:3

**1268** 107:6

**1269** 110:22

**1277** 107:13

**1281** 149:18,19

**1296** 107:18

**12:00** 33:5 36:15, 16,22

**12:13** 198:24

**12:50** 121:14

**12th** 187:24 189:18 192:11

**13** 105:2 109:25 240:22

**1320** 108:20

**14** 240:24

**14th** 69:9,20 195:21

**15** 7:7 12:5 38:2 53:24 54:10 88:16, 18 112:3 123:17 162:6,7,9

**150** 58:17 98:23 111:8 118:6

**1578** 16:10

**1600** 111:8

**161-10** 5:14 14:22 223:20

**163** 239:25

**169** 237:11,13,14

**17** 106:5 109:25 227:15 228:17

**175** 240:9

**17th** 194:24 196:10

**18** 109:8 110:3 167:11 169:13

**19** 92:5,7 110:3

**1:24** 193:8

**1:25** 121:12

**1:33** 121:14

**1:45** 124:3

**1:50** 123:24

**2**

**2** 68:22,23 69:2 79:10 89:17 91:13 92:18 99:6 103:19 104:2 109:25 116:16 125:17 127:4 133:24 134:4 139:5,14 143:16,25 144:2, 16,25 145:4 146:13,15 149:16,

20,24,25 150:5,10 185:9 202:5 210:15,17 237:8 238:8

**20** 53:24 101:4 107:3 110:2 160:4 162:7 221:13

**200** 96:6

**2000** 179:12

**2018** 17:17 18:9 20:3,12 39:4,23 47:21 54:21 55:16 56:14,15,22 57:4 58:22,24 60:5,6,15 64:4,10 65:7 69:8 71:14 78:16 79:17, 19 81:19 87:15 91:12,15,24 92:8, 21 93:2,7,11,15 102:7 107:22 108:2,8,22 110:24, 25 115:3 120:3 122:18 130:22 132:9 134:25 146:21 159:4 162:15,22 173:13, 25 175:22 176:7 178:5,22 180:2,9 182:11 184:2 185:5 187:24 189:18 190:5 192:12 196:10 198:20 202:7 207:25 208:4 212:4,5

**2018/2019** 56:10, 13

**2018/2019/ maybe** 56:8

**2019** 33:12,17,19 39:4,23 47:22 54:21 55:16 60:16 69:9,20 79:20 120:4 135:16 159:5 192:15 193:7 194:24

**2020** 56:8,10,13

**2023** 216:14

**209** 237:15

**20th** 64:13 65:11 78:15 173:13,24 202:3

246Index: 21–9th

**21** 94:14 101:5 109:24 229:6 234:13

**21,22,2,23,24,4, 13,3,25,17,26** 239:4

**210** 237:17,19

**21st** 64:13 65:11 78:16

**22** 96:4 109:24 140:4,5 162:8

**223** 239:18

**224** 240:16

**22nd** 64:14 69:8

**23** 99:14 102:5 109:25 127:4,5 171:11

**24** 103:17 109:25

**24-hour** 192:25

**249** 139:2,4,6

**24th** 175:22 176:7

**25** 17:10 18:3,8 19:23 20:12,22 31:3 37:25 53:24 54:10 106:3 109:25 138:18 162:6,8 186:14,15

**252** 139:12,13

**25th** 178:4,22 179:10 180:2,9

**26** 106:12 110:2

**27** 106:16 110:2 188:22

**27,28,29,20,30, 31,32,33,34,19** 239:5

**27th** 110:24 129:24 130:7,22 198:20 202:6 207:25 208:4

**28** 92:17,19 106:21 110:2

**28th** 182:11

**29** 106:24 110:2

**2:00** 124:7

**2:07** 124:9

**2:46** 151:16

---

**3**

**3** 79:13 105:19 109:25 122:12,13 124:18,20 125:3 143:16 146:17,18 169:20 185:14 227:12 237:9 238:11

**30** 35:3 49:14 50:23 76:23 107:6 110:2 121:7 143:15 186:24

**300** 58:3 98:11

**3038** 109:7

**30th** 184:2

**31** 107:14 110:2

**32** 91:15 107:19 110:3

**33** 110:3

**34** 108:21 110:3 234:13

**35** 110:3 150:16, 17,20

**35,36,38,39** 239:6

**359** 180:2

**36** 110:3

**37** 92:23,25 110:4 172:8 188:22 239:6

**38** 110:4 226:11

**39** 110:4 229:18, 22

**3:06** 166:5,15

**3:17** 184:2

**3:20** 166:7,8

**3:24** 166:16

**3:40** 168:20

**3:59** 178:5

**3hours** 143:25

**3rd** 110:25 185:4

---

**4**

**4** 81:10 91:19 109:25 124:13,15, 16,22 144:25 145:4 171:16 200:19 206:22 211:17 237:10 238:15

**40** 50:23 51:6 54:6 229:25

**40-hour** 31:19

**42** 240:22

**43** 234:13

**44** 234:13

**45** 93:4,5 121:9 142:7 234:13

**46** 91:16 231:15, 18,19

**47** 231:17 233:25

**4:00** 178:22 179:10

**4:07** 173:14

**4:13** 192:16

**4:39** 209:5

**4th** 107:22

---

**5**

**5** 30:10,22 31:2,12 58:8,16 59:3 60:4, 9,16,18,24 61:4 72:4 81:12 111:18 138:18 164:24 165:3,4,5 169:5,6, 13 178:20 237:11 238:18

**5,000** 179:11

**5-11-1963** 43:19

**5-page** 226:21

**50** 35:3 44:8 51:6 54:6

**52** 93:9,10

**520** 135:16

**58** 234:14

---

**5:19** 236:11

**5:40** 173:25

**5:47** 174:23 176:7

**5th** 64:15 65:13 78:17

---

**6**

**6** 91:19 109:20 144:16 145:4 169:8,15 173:11 200:13 237:3,7,13 238:23

**60** 30:3 196:22

**600+** 179:12

**62** 93:14,17

**66** 240:24

**661-** 79:23

**68** 237:8

**69** 110:23

**6:00** 33:6

**6:04** 187:25

**6:37** 189:18

**6:39** 190:5

**6th** 65:12,13

---

**7**

**7** 5:16 6:12 37:11 53:12 59:12 95:15 103:9 118:18 119:18 169:11,15 179:22 196:22 197:9,10,25 198:10 237:14 239:7

**70** 49:14 53:19

**72** 34:24 210:17, 19

**75** 34:24 53:19 134:5 234:14

**79** 234:14 238:4,8, 11

**7:00** 32:18,23 48:7 178:25 179:3,18

---

**7th** 64:15 65:12,13 78:17 192:15,23

---

**8**

**8** 37:11 53:11,12 112:7 120:20 174:8 180:9 182:9 209:7,8,11,15 237:15 239:13

**80** 234:14

**80s** 16:25 17:2

**81** 238:15,18

**812** 134:10,12

**85** 234:14

**886-8012** 79:24

**89** 234:15

**8:00** 32:19,25 33:4,5 48:9 53:6

**8:07** 180:9 181:7

**8:09** 182:11,24

**8:27** 194:24

**8:30** 196:10,15 202:7,20

**8:32** 202:20

**8l** 174:11

---

**9**

**9** 53:6,11 182:10 183:25 185:4 209:25 210:2,4 223:17 224:13 237:17 239:18

**90** 30:8 35:4 135:19 136:20 232:24 234:15

**90-day** 30:9

**91** 234:15

**92** 234:15

**98** 174:20

**9:00** 51:19 52:25 53:5,9

**9th** 122:17

247Index: A–Andris

**A**

**A** 43:15 52:22 70:9
121:13 124:4
140:22 151:13
166:15 168:18
176:3 209:2 226:6

**A-** 117:3

**A-B-R-A-H-A-M**
89:3

**A-S-H-A** 220:16

**A-S-W-A-Y-N-E**
126:8

**a.m.** 35:16,25
36:5,21 37:7 43:16
70:10 122:18
135:2 185:5,6
192:19 198:21

**Aaronson** 18:16
19:19 21:18 62:2

**ability** 12:24 13:2
30:25 46:23 53:25
69:22 90:6 99:3
100:24 132:4
158:3 201:17,22
226:16

**ability,y** 102:3

**able** 105:15
109:12,15,18
123:8,11 174:25

**above** 60:9

**Abraham** 88:25
89:3,5,7

**access** 151:18
207:18 208:10

**accessories**
51:11

**according** 130:7
195:19,22

**accordingly**
98:21 164:7

**account** 62:21
149:11

**accountant** 103:6

**accountings**
39:22

**accurate** 90:5
102:7,20 140:6
147:20 160:16
171:3,7,12 198:5,
14 200:18 201:16,
19 206:23 212:6,9
225:20 226:14
228:2

**accurately** 172:3,
20 173:7

**achieved** 115:15
116:9

**across** 22:13
24:17 25:20 26:5

**action** 7:11,14,16,
18 8:8 231:3,4,10

**actual** 140:10
174:15 175:2,11,
13 240:13,15

**actually** 63:23
79:18 104:19
118:20 124:8
161:23 164:4
170:25 221:2
239:24 240:8

**add** 30:6 90:19
200:6,7

**addition** 75:23
78:24 97:7 220:13

**additional** 30:10,
22,23 31:9,12
83:18 143:21,22
200:4

**address** 5:13,14,
16 6:8,9 16:7
21:23 22:2 80:8,14
146:10 221:25

**addressed** 205:5

**ADP** 63:24 94:11
195:21

**affect** 12:24 13:4
28:2

**African-
american** 163:4

**after** 5:3 19:10,12
34:3 48:22 49:7
57:19 84:17
122:23,25 135:19
136:20 173:6
183:2 192:4

205:18 227:8
232:16 234:6

**afternoon** 57:14
68:7 70:2

**again** 17:21 20:8
21:9 25:5 27:5
44:23 46:14 48:6
51:23 52:11 55:10
57:15 59:15,16
61:5,11 69:16 82:8
87:3 89:11 104:9
112:15 113:20,24
144:24 149:18
157:7 168:25
172:15 180:8
193:16 203:23
219:23 228:17

**against** 7:16
108:5 231:4

**age** 29:8,25

**agent** 134:21
135:8

**aggressive**
183:11

**ago** 7:7,24 12:6
18:24 88:17,19
212:22 213:24,25
214:4

**agree** 13:21
44:14,22 58:16,18,
19 123:23

**ahead** 152:2
173:10 199:8,21

**Ali** 69:25 84:13,17
85:16,22 87:19
129:22 130:11,13,
17 131:12,20
132:23 133:4,9,16
147:11,12 148:4,5,
7 153:25 154:2
155:22 166:23
169:14 198:2,7,11,
16,21 203:21,22
204:3,5 207:21
208:19

**all** 31:13,16 32:8
33:6 45:22 49:12,
16,23 50:19,21,25
51:12 61:6 63:24
81:21 85:13 92:12
98:15 100:23,25
101:20 102:3,17

103:25 109:19
110:15 112:24
125:20 135:10
142:12 144:2
148:24 154:2,4
155:23 162:3,6
163:20 167:15
170:14 171:10
174:4 178:8
179:12 180:6
186:25 205:8,13
211:2,17 212:24
221:11 224:7
230:20 236:6

**allege** 192:8

**alleged** 151:20
152:6 192:5

**alleging** 151:17

**allow** 149:6

**allowed** 90:21

**almost** 148:17

**alone** 19:11

**along** 10:21

**aloud** 204:19

**already** 20:4
36:19 51:25
178:14

**also** 20:12 29:5
32:19 40:19 41:7
42:11 47:11 54:25
75:24 86:14 91:14
93:16 98:22 128:5
133:17 135:2
156:25 173:8
185:16 190:4,9
202:8 220:14
223:10 224:2

**Although** 86:3

**always** 35:15,25
36:4 37:18 42:10
84:22 111:12
131:10 135:10
160:22,25 161:4,8,
11,23,25 162:9

**am** 20:21 21:8,9,
12,14 46:20 65:13
68:16,17 69:12
75:12 78:14 85:13
87:23,25 88:2
91:23 94:7 95:11
102:2 112:5

116:12 123:2
133:24 148:19,20,
22 151:23 153:14
171:11 173:11
178:24 179:3,18,
21,24 182:12
183:10 184:3,12,
14,15 185:19
187:6,9,11,13
188:2 190:10
197:18 202:4,11
209:14 213:13
214:22 218:16
222:20 223:22
224:2,20 230:9
233:14 234:25

**amount** 45:24
47:3 58:2 112:4
118:11,12 137:11
138:4 139:15
140:7 159:12
220:20

**amounts** 115:12
159:9,11

**an** 7:16 10:2,9,19
12:10 28:10,13
29:25 31:8 34:2
37:23 39:13 49:13
55:21 58:25 62:20
65:9,10 70:22 77:7
83:3 86:6,15 90:15
94:11 96:3 106:21
111:12 112:24
118:11 133:21
139:9,25 140:9
142:23 144:11
146:3,6 148:3
149:20,23,24
150:9 152:11
153:9 158:7,9
159:6 161:16
163:4 165:7 171:3
174:25 176:17
196:2 198:5,14
201:15,18 205:7
220:22 221:14
223:15

**analyst's** 146:2

**analysts** 145:18

**Andris** 55:22
57:7,18 62:20,23
134:22 152:18,20
153:18 156:3
213:7,18

248Index: Android–at

**Android** 77:7

**angris** 234:14

**announced** 128:25 129:4 130:8 178:15

**announcement** 192:5,6,8

**annoying** 59:9

**another** 30:6 77:17 78:6 84:15 121:21 125:6 135:8 143:25 148:7 160:4 224:23

**answer** 6:19,24 7:6 8:6 9:5,10,22 10:5,9,16 11:3,5,6, 10,25 15:13 16:4 17:6 19:17,21 20:8 22:7,25 23:4,25 24:20 25:4,5,11 27:5 30:16,24 34:20 36:24 37:9 40:22 41:2,6,10,11 46:2,10,22 47:10, 25 48:5 49:14,17, 18,21 50:4,9 51:23 52:7,10,15 53:16 54:15 58:6 59:22 60:7,10,12,18 61:19,24 62:15 65:11,15 67:13 68:8 71:23 72:18 73:14 74:14 75:2, 12,14 76:20 77:23 81:7,8 82:8 86:25 87:18 90:12,19 91:17,18,21,24 92:22 93:2,6,7,12, 17 94:21 95:4,6, 19,20,25 96:10,19 98:7 99:9,11,18 101:25 102:25 103:22 104:17 105:21 108:10,17 109:18 111:7,20 112:8,17 113:7,8, 20,22,25 114:4,16 118:15 126:23 130:5,6 132:18 136:24 138:11 139:20,21,22 143:12,16 144:7, 24 146:3,24 148:2 150:3,4,21 151:24

152:22 154:3,4,24 155:20,25 156:20, 22 157:17 158:18 160:20 162:16 165:17,22 175:3 179:9,16 180:5,13, 15,20,25 181:22 185:20 186:19 187:8,17 188:14 189:10 193:3 194:7,15,22 195:16,17 196:8 199:6,11,14,15,20, 22 200:25 203:22 204:16,23 205:16 206:13 208:22 212:8 213:15 214:24,25 215:6,8 218:7,10 219:7 228:20 231:16 234:3,23 235:2

**answered** 19:4, 13 20:5,7 27:4 36:19 37:14 40:14 42:24 43:3 45:9, 14,17 46:19 47:15, 19,24 48:2 51:22 52:2 53:10,23 54:9 58:6 59:8,11 61:14 62:14 73:12 82:7 85:22 87:24 92:11 98:18 101:24 108:18 111:15 112:15 113:19 127:18 129:14 132:17 144:23 159:21 187:16

**answering** 9:13 179:20 181:2

**answers** 19:9,10 61:10 218:23

**Anthony** 152:15

**any** 8:17 10:2 12:6,17 13:14 14:5,6 21:4 24:3, 12 25:23 29:5,15 37:16 50:17 51:11 59:17 62:5,8 63:6, 25 75:7,20 76:12 77:25 78:25 80:24 83:21 84:2,9 88:5, 6,11,23 96:13 97:5,14 102:13,22 104:6 105:8 110:16 118:7,23

119:5,13 120:21 128:20 129:5 138:10,17,19 141:18 152:18,25 155:13,14,16 158:11,20 159:3,4 160:14 177:21 184:10,14 188:5 196:18,19 205:23 208:15,20 213:21, 22 218:12 219:14 222:13,14 230:22 231:2,10 234:5 239:14

**anybody** 41:3 61:8 72:21 90:22 95:20 96:23 137:2 152:6

**anyone** 26:4 28:14 46:5,17 47:2 55:17 66:2,7 70:19,20 72:20 97:11 98:4 107:25 108:7 130:10 131:20 145:11 147:12,14 155:16 219:24 230:7,13 232:10,14

**anyone's** 233:11

**anything** 58:13 59:7 61:8,9 72:14 88:3 108:11 118:12 130:9 167:13 184:11 188:15 192:8 214:21 219:6 232:11

**anyway** 184:10 188:10 200:10

**anywhere** 15:15 23:22 188:23

**apart** 83:18

**Apartment** 16:11

**apologize** 136:9

**app** 78:7 129:23 169:3 175:9 237:12 240:11

**apparently** 110:12

**appear** 125:10 127:4,6 163:17 177:6 179:6

**appears** 107:21 175:8 207:11 240:10

**application** 50:14,15 82:10,20, 25 83:3,6,15,16 145:19 220:23

**appreciate** 52:11 200:3 205:16 233:17,21 236:9

**approaches** 50:12

**appropriately** 181:13

**approval** 49:22 51:8,13

**approximate** 65:9

**approximately** 22:8 29:3 173:14

**apps** 78:8

**April** 34:4,24

**Arabic** 161:16 163:6

**aren't** 72:6

**argumentative** 189:9

**around** 34:25 48:12 58:24 59:25 60:6 68:3 98:11 132:8

**arrangement** 98:24 99:2

**arrested** 88:10

**arrive** 32:13

**Asha** 117:3,5,6,12 220:16,17

**Asha's** 117:11

**aside** 29:23

**ask** 6:23 8:6,15 10:8,10 14:13 20:4 24:16,18 25:12 50:15,20 59:15 66:10 103:4,5,6 113:23 128:11 146:6 152:21 154:22 169:19

177:24 181:3 195:6 210:11,20, 21 227:19 235:23

**asked** 19:6,7 20:7 27:4 36:18 37:14 43:3 45:17 46:19 47:19,24 51:22,24 62:14 87:22,25 99:25 100:13,20 101:16,24 112:15 113:19 120:11 138:15 144:23 187:16 192:22 217:11 231:2

**asking** 9:11 22:24 24:14,19 25:2,5 26:7 33:11 58:19, 20 60:8 67:6 94:4 136:6 157:9,21 187:9,11,13 206:5, 6,7 211:9 217:8 221:3,20 224:2,20

**asks** 146:5

**assert** 114:4

**asserting** 214:16

**assistant** 56:17, 19,23 57:8,11 86:2,6,15,17,22 87:4,5,9 90:16 91:4 92:14 97:9,10 117:6,16,19 120:23 131:2 137:16 147:2 220:17 239:16

**assistants** 57:23 86:11 87:10,12 131:6

**assumes** 195:15

**assumption** 10:3

**at** 9:9 10:2 12:6 15:10,20 23:22 26:24 29:20 31:16 32:13 33:5,9 35:8, 15,25 36:4,7,13, 14,15,16 38:9,20 39:17 40:5,19,20, 24 41:5,8 43:11 49:10 53:14 54:20 58:23 60:25 61:13, 17 62:5 67:10 69:13 70:6 71:9, 13,16 72:14 74:11, 17,24 76:3,24 77:6

249Index: ATM–before

79:22 81:15 82:2 83:21 84:13 85:4 87:21 89:10,11 99:20 102:5,8,14 103:7 104:22 105:10,20 108:13 109:2 112:2 114:2, 10,15 115:22 116:24 119:3,15, 24 121:12 124:3 125:19 128:20,25 129:5 130:13,17, 19,20,21 132:14 134:25 138:25 139:23 142:14 145:19 147:7 148:16,17 149:7, 10,18 151:16 153:11 155:14 156:15,25 157:5, 25 158:11,20 159:4 160:24 162:11,21,25 163:11 166:7 167:22 169:20 170:14 173:13,25 174:5,17,23 175:4 176:6,7,8 177:19 178:5,8,14,16,22, 24 179:3,10,18,21 180:6,9 181:7 182:11,17,23,24 183:24 184:2,6,24 185:5,6,10 187:14, 24 188:12 189:11, 17,18 190:5 192:16,19 193:7 194:24 196:10,14 197:7,16 198:21, 24 199:25 200:12 202:7,20 205:24 207:10 209:5,19 210:23 212:3,24 220:3 221:22 222:6,16 225:14, 18 226:3,8,9 227:2,4,14 228:13 231:22 238:21

**ATM** 118:11

**attacks** 233:10

**attend** 16:15,19

**attendance** 38:13 39:10

**attention** 125:17 139:7,15 164:8

171:16 173:12,23 174:10,23 178:3, 21 180:8 185:3 187:23 189:16 192:14 193:6 198:18 202:5 227:6,8 229:5 234:9

**attorney** 10:13, 15,19,22 11:2 66:5,6 77:3 127:20 163:19 172:13 175:5 182:2 190:16 200:22 202:8,22 210:10 213:18,20 214:6,7, 10,11,12 215:20 217:10,15 221:19 225:15 235:4

**attorney's** 128:15

**attorney/client** 213:3,6

**August** 34:4,10, 18 58:24 59:25 60:6,15 92:20 232:17

**authority** 152:19, 24,25 153:5,6,19 208:10,22 223:8, 11,12,15,19 225:4 240:18

**authorized** 207:19

**auto** 14:23,24 15:5,6 17:4 18:13 19:15 21:3,7,10,24 22:4,16,21,22 23:6,8,10,15,17 24:10,13 25:24 26:3,6,12,13,16, 21,22,25 27:8 33:9 34:16 35:8,15,17, 22,24 38:9,12 40:17,20,25 41:8 42:12 48:21 49:19 51:18 53:14,20 54:7,20 56:3 57:3, 20,25 58:23 60:3, 16,25 61:13,17 62:24 63:5 64:24 67:2,9,10,19 68:12 70:23 71:5,9,13, 17,22 74:19,25 80:10 81:15 82:2

83:22 85:4,7,8 87:14,21 96:21 100:18 102:8,14 103:19 108:14 112:2,23 119:3,16, 24 128:25 129:9, 12,17 130:14,18 132:2,10 144:10 155:18 156:8,23, 25 157:5,14 158:21,23 162:12, 21,25 163:10 167:23 178:16 185:10 187:14 197:8 205:24,25 210:23 212:3 215:14 218:13,17, 22,24 219:4,5,6, 17,18,20 220:4,7, 12,21 221:22 223:20 228:13 231:22 238:21

**automatically** 136:20

**automobile** 142:23

**available** 23:23 26:14,18,24 79:4 155:14 208:17,18

**Avenue** 5:15 14:23 223:20

**averaged** 162:6

**aware** 21:9 128:24 129:18 130:10 150:25 151:4 152:4 174:5 178:9 194:13

**awareness** 184:23

**away** 18:23 28:16 144:4 222:22

—————

**B**

**B-A-F** 16:16

**baby** 148:24 198:21

**back** 8:21 17:24, 25 43:11 45:5 49:13,15,22 50:3 59:5,15 64:7,14 65:12,13 70:6,12,

14,20 76:22 77:19, 22 78:14,16 84:8 95:3,5 104:12,15 117:7 121:12 122:8 123:25 124:3,7 128:10,18 133:23 135:12,15 146:5,6,11 148:15 149:15 151:15 153:16 155:3,6 166:6 170:21 174:4 176:19 180:17,21 193:16, 17 196:7 198:23, 25 204:14 209:4 210:15 215:24 220:22 221:9

**backtrack** 10:20 79:18 146:20 152:9 159:2 205:17 228:8

**bad** 174:2

**Baf** 16:16

**Bailey** 126:8

**bank** 49:13,21 50:18 144:7 145:15,16,20 221:4,9

**banker** 145:18

**banks** 86:20

**barely** 174:3

**Baron** 18:18,21, 23 19:14,23 21:18 61:21 213:23 214:2,18

**Baron's** 61:12

**base** 45:23 46:17, 25 47:5 98:9,11 162:17

**based** 24:21 25:6, 14 31:5 33:21,25 36:11 45:12 46:7 50:19 52:3 60:11 61:5 91:21 105:16 106:13,18 107:15, 19 110:18 111:4 142:9 155:13 158:3 159:7,19,23 160:19 196:5 213:3 218:2

**basically** 117:10

**basis** 34:17 58:10, 11 95:18 103:20 116:19,20 165:15

**Bate's** 168:12

**Bayside** 15:22 16:7,11

**BD** 134:21 135:8

**BDC** 97:17,23 98:6,9,18,19 99:11 103:23 137:10 140:8,14

**bear** 133:25

**because** 26:12 30:4 41:3 42:15 48:17 49:2,18 57:11,12 59:7 68:16 72:10,19 73:7,21 75:15 77:24 86:9,19 90:14,19 94:21 96:2 98:7 99:9 104:18 105:22 111:21 126:25 129:24 130:2 131:10,18 132:12 135:17 136:13,19, 25 138:20 142:8, 19,25 144:6,15 145:16 148:16 150:5 154:13 156:14 158:4 163:25 166:25 170:3,18 175:4 182:6 183:3 184:15,21 186:4 188:8,15 191:24 192:17 196:2,18 197:13 201:25 203:4,15 204:2,4, 14 212:13 222:22 229:9 232:20,22 235:11 239:21 240:5

**become** 56:18 118:11 178:9

**been** 5:3 6:16 41:19 88:10 121:4 192:18 224:22 225:22

**before** 6:17 7:4 9:11 10:5,9 12:4, 15 19:9 40:8 42:19 48:10 49:8,9,11,25

50:16 51:17 57:24 67:7,11,13,14,16, 20,22 81:23 88:11, 14 96:19 101:6 116:11 118:19 124:24 147:8 156:13 157:10 161:23 169:24 171:20 173:17 181:25 192:4 200:19 217:13,21, 22 220:9

**began** 56:22 58:23 71:9,13

**begin** 30:17 195:18

**beginning** 15:10, 20 32:10 182:10

**behind** 72:8

**being** 42:6 161:21 176:19 198:5,14 213:19,20 224:25

**believe** 54:25 71:14 101:4 120:10 127:15 168:10 169:2 170:5 200:21

**besides** 15:19 18:4 21:3 39:9 66:6 80:23 88:24 96:12,24 103:18 118:22 119:11 131:20 147:12 192:9 219:14,24 231:21

**best** 13:2 22:22 23:6 30:25 46:22 54:23 68:15 69:16, 22 86:4 90:6 99:3, 4 100:24 101:18 102:3 129:20 131:14 132:4 143:10,12 172:2, 19,23 198:3,12 200:16 201:22 212:6 216:7 225:20 226:14,16, 22,23 229:23 234:16,21 235:14

**better** 25:24 160:2,3 229:14 232:21

**between** 9:22 10:4 29:17 32:18 34:17 47:13 49:14 50:22 53:24 54:10, 20 55:16 58:22 60:5,15 64:12,15 79:8,11,14,17 86:5 133:9 143:15,25 144:16,25 159:4 162:2,6,10 166:23 168:6 169:3,9,13 170:23 172:14 174:10 187:21 213:7 221:13 238:6,10,13

**beyond** 60:8

**big** 200:11

**bigger** 31:4 177:6, 8,9

**billing** 41:8

**bills** 50:18

**birth** 83:12

**birthday** 43:18,19

**bit** 13:6 59:9 65:22 102:12 128:11 215:24

**black** 174:13 175:10 176:21 240:12

**blah** 10:24

**blank** 42:2 66:11, 15 74:3 235:24

**block** 83:6

**blocks** 22:8

**blown** 173:17

**blowup** 173:18

**blue** 126:4 170:24

**board** 160:11,14, 15,18 162:2

**bonus** 29:4,6,9 30:7,19,21 31:4,10 58:8 59:13,17,20, 24 60:4,11,19 61:4 111:16,17,18,19, 20,22 112:2,6,7,12 115:15 118:7,8 119:2,6,14,22 138:6,10,11,17,18,

19,20 164:25 165:4,5,9,12 239:11

**bonuses** 29:6,7, 15,18,24 30:13,19 31:6,10 45:10,12, 13 58:11 97:16 114:20 115:18 116:8 138:4 160:7, 8 228:12

**book** 222:12

**born** 16:22

**both** 25:10 56:12 57:23 78:11 81:13 135:23 208:19 225:24 233:6,15 238:19

**bottom** 176:12,13 182:9

**bought** 196:15,16

**boxes** 211:17

**break** 9:16,21 10:2,4,8,10 13:22 31:14 37:16,18,21, 22,23 38:3,19 41:24 43:5,7,10 65:18,21,24 70:5 81:23 107:12 121:7 123:10 124:24 166:14 173:4,6

**breaks** 37:25 38:2

**briefly** 8:2

**bring** 25:20 26:20 129:8,15 231:6

**bringing** 7:16

**broken** 141:10,11

**brought** 98:20 129:12 130:9 190:19 191:13

**bubble** 126:4 172:10

**bucks** 231:8

**business** 5:14 6:8,9 14:23 15:6 23:18 28:2 32:18 33:21,24 72:3,11 89:3 97:19,23 146:13,19 182:15

186:6 193:14 215:12,13,16 218:19 219:5 222:11

**busy** 33:16 34:3,4, 10,13,14,22 54:5 145:20 155:23 194:20 208:20

**but** 8:21 17:2 19:3 20:11 25:13 26:6 31:7 32:5 33:3,11 41:18 46:11 48:23 52:12 53:16,23 58:13,19 59:10,20 62:14 65:14 71:15 75:22,25 76:19,20 81:17 82:8 83:5 84:17 86:18 87:11 97:16 100:5 101:24 108:5 110:6 112:16 113:6,19 114:16 127:9 137:6 140:2 144:5,23 147:19 148:14 149:7 156:13,21 157:17 158:13 159:22 160:14 162:14,15 164:18 166:22 168:2 176:10 178:12 184:4,23 185:2 188:10 189:4 196:20 197:10 204:20 205:16 212:8 223:3,4 224:9 230:16 231:12,25 232:6 233:7,18

**button** 91:2 176:16,17

**buy** 23:24 51:11 222:25

───────────

**C**

**C-O-M-P-A-R-A-T-O-R-S** 93:21

**calculate** 114:9 145:22

**calculator** 111:9

**call** 9:19 23:23 41:18,24 117:18 130:2 161:19

181:11,24 182:11, 12,19 183:4,8,9 199:24 204:9,11 205:4 212:13,14 219:13

**called** 21:9 29:13 54:5,12 90:15 117:3 161:18 180:11 181:8,10, 20,22 182:3,6,25 196:24 204:14

**calling** 10:3 170:19

**calls** 113:5

**came** 28:10,12 38:18 48:10 49:7 51:16 69:24 78:16 84:8 90:23,24 134:24,25 135:11 153:7 156:14 157:23 194:18 197:12

**can** 6:10,19 7:6 9:8,21 11:17,21 15:13 16:3,9 17:6, 23 19:17,21 22:7 23:4,12,24 24:16, 20 25:19 27:5 28:8,11 29:16 30:16 31:21,23 32:12 33:10,13 34:20 36:4,24 37:24,25 38:16 40:22 41:3,10,19 43:4,5,7,9 44:13 46:2 47:10,24 48:5 49:14,25 50:9 51:4,22 52:16 53:16 54:14 55:19 56:5,24 57:10,22 58:9 61:19,24 62:15 64:12,19 65:4,5,14,15,17 67:4 68:21 70:4 71:10,24 72:15 73:21 74:14 76:14 77:14 82:22 84:10, 16,23 85:18 86:4 90:12 91:2,3,4 92:14,15 93:24 95:2 100:8 101:10, 21,25 102:11 103:22 104:10,12 105:9 107:12 108:16 111:7

251Index: can't–commission

112:3 113:6,20,25 115:8,21 121:6,20 125:4 131:6,15 133:7,20 134:18 135:11 136:7,24 137:4,8 139:16,17,20,24 140:16,17,24 142:2,9,11,17 143:15 144:16,24 145:6,14 146:4,24 147:18 148:15,16 149:7,9 151:6 153:13 154:20,22,23 155:10,14,16 157:17,19 160:5,6 165:2,3,6,17,22,25 166:2 168:14 171:13 173:19 174:2,3 175:12,16,21 176:14 177:15 178:18 179:23 180:5,14,16,18,20 182:7 187:16 188:7,18,21 189:9 191:2 195:3,16 196:23 198:2,11 199:17 200:15 202:7 204:23 205:19 207:17 211:4 214:25 215:8 219:20 220:5 222:2,13 224:9,15 225:13,19 228:20 232:23 234:2,25 240:14

**can't** 7:9,24 17:2,16 21:25 28:20 30:23 34:23 36:9 39:2,11 40:6 41:2,6,11,17,22,23 42:22,25 46:7,10,24 55:6 56:4 65:14 69:23 72:19,20 73:13,21,22,23 75:2 76:20 77:23 79:5 81:7,8 87:17 88:21 91:18,21 94:21 95:19,20,25 96:10 99:9,11 102:25 103:23 104:18,25 105:6,21,22 108:5,10 109:3 112:8,17 114:16 118:14 126:24 137:22 143:16 144:17 147:6,19 148:2

150:4 156:12,13 158:13,19 160:20 161:15,16 162:14,15,19 163:2 175:3 178:11 181:22 184:8,17,24 185:20 187:18 188:5 190:25 192:8 193:3,12 194:14,15,21 196:13 197:4 203:21 204:10,16 212:8 217:5 230:12 231:12 232:2,6,7 234:23,24

**candidate** 28:15

**cannot** 25:12 49:21 71:7 72:18 75:3,12,14 87:17 88:22 90:22 98:7 99:18 104:17 108:10,19 111:20 158:15,18 165:10 184:21 188:14

**can't** 69:23

**capable** 176:18

**Capital** 134:23,24

**caption** 76:15

**car** 22:18 23:9,15,21,23,24 24:6,16,17,18 25:19,21,25 26:2,5,19,20,24 29:5,11,22 30:2,8 45:22 48:11 50:13 51:10,15,18 53:14 57:25 58:9,10 59:2 60:19,25 61:6 72:4 82:9,10,19 91:16 94:23 95:24 96:8,12 97:7 98:24 102:14,23 103:18 104:8 111:25 113:2,16,17 114:5 118:8 119:2,15,23 136:25 138:5,7,17,24 141:4,5,7 144:4,14,20 159:3 164:24 165:4,15 193:13 196:15,16 197:12 205:23 206:8,14,15 222:11 231:22

**car's** 228:13

**cards** 89:3

**care** 115:21

**Carfax** 205:4 206:22 207:7

**caring** 85:13 153:15

**carries** 12:13

**cars** 23:10,15 24:12 26:14,19,24 29:8,25 31:8,9,11 34:15,24 35:3 53:20,21 54:6 82:18 90:4,9 91:11 102:8 111:5 112:4,7 115:12 116:7 118:24 119:14,20 132:10 160:10 162:4 165:3,4,5 228:11 239:9

**case** 7:25 66:4 73:19 88:20 137:9 146:12,17,18 167:14 205:19 212:24,25 214:20,22 215:6,10 218:6,11

**cases** 137:17 146:13

**cash** 141:21 142:9 143:20 144:21 206:21 207:3 223:2

**caught** 152:12

**cell** 13:18,23

**Center** 97:20,24

**certain** 29:8,25 31:25 41:4,5 145:13 222:22

**certainly** 41:4

**certificate** 223:7,10,19 225:4 240:18

**cetera** 116:9 119:2 228:12

**chance** 137:4 172:16,25 235:21

**change** 18:5 32:2

45:7,20 47:13 56:21 58:9 77:16 115:4

**changed** 32:8 47:17 60:20 77:12 115:6 135:8 203:22 221:6 233:2

**changes** 29:15 30:19 33:21 45:11

**channel** 78:20 133:22

**characterization** 110:17,19

**charge** 41:8

**chase** 163:22 240:2

**chat** 80:21 169:9,11,12 198:2,11 204:13 237:13,14

**check** 118:11 122:19 125:23 174:25 175:21

**choice** 48:25

**chose** 36:3

**civil** 7:10,13,18

**clarified** 235:8

**clarify** 23:12 29:10 69:19 89:4 101:15 131:6

**clear** 75:17 78:4 80:9 86:14 101:21 120:10,19 133:15 136:4 151:11 156:11 160:9 172:8 197:15 200:5 226:10

**cleared** 88:16

**clearly** 9:5 87:7 163:25 239:21 240:6

**Cleary** 134:20

**clerk** 71:3

**client** 5:24 23:25 168:7 175:15 221:20

**clock** 38:9

**close** 22:20 85:11,12 130:11 146:17,18 232:24

**closed** 48:11 135:17

**closer** 151:8

**closing** 48:13,22 49:8,10,11 51:17

**coached** 196:14,22 233:7

**coaching** 233:4

**code** 93:25 94:9,10 95:14

**coded** 117:22,23 118:5

**codes** 94:2,3,5 95:21

**coerced** 233:3

**collect** 50:21

**color** 176:21,24,25 222:14

**colors** 233:2

**come** 16:23 32:9 43:11 50:3 57:17 63:25 64:14 68:7 70:6 121:12 123:25 124:2 128:10,18 137:10 146:6 153:8 156:2 166:6 181:11 192:24 197:7

**comes** 23:20 122:23 135:18,19 140:25 146:4

**coming** 122:19 125:23

**comments** 52:12

**commission** 29:2,4,11,12,13,22 30:10 31:18 45:19 47:6 82:3,5 83:19 97:6,15,18,22 98:2,6,12,23 102:9,14,19,22 104:2,5 107:23 108:5,13 110:25 111:15,17,18,21,25 112:11,12 113:17 114:4

118:3,5,25 138:7,
14 144:12 164:16,
23,24 181:15
206:4 228:12

**commissioned**
98:16 164:15
197:14

**commissions**
58:2 96:22,24
114:19 119:15,22
239:11

**common** 214:16
218:3

**communicate**
80:24 131:21
133:16,21

**communicated**
190:22

**communication**
131:22

**communications**
78:18 79:2 127:18
171:24,25

**company** 14:22
17:9,11,19 20:3,
17,18,22 21:4,6,9,
16 63:23,24 69:18
90:10 94:10,11
100:18 218:16

**comparator**
101:17 110:13

**comparators**
93:21

**compare** 172:25
173:5

**compensated**
49:5

**compensation**
29:2 220:2,15

**compiled** 100:14

**complain** 73:6
84:19

**complained**
234:7

**complaining**
203:8,18 204:6

**complaint** 180:3,
4,6 195:12 230:10,

17,18,19 232:9
234:7

**complaints**
230:6,23

**complete** 10:9
31:2 68:2 138:12
154:3 168:4
195:17 196:17,20
199:5,11,19,22
200:9 201:16,19
206:12 225:20
226:14,21

**completed**
199:13

**completely** 59:22
154:23 155:25

**compliance** 28:2
114:13

**complies** 80:15
135:4,13 151:9
201:8 202:22

**comply** 187:4

**component**
114:8

**components**
141:9,11

**comport** 164:12

**comports** 198:4,
13 200:17 201:6

**compound** 34:20

**comprehend**
154:24

**computer** 80:10
114:21,24 118:13
207:8

**concern** 204:20

**concerned**
204:20

**concerning**
24:10

**concerns** 81:14
238:20

**conclusion** 113:6

**condition** 13:14

**conference**
101:5,10,16

**confidential**
44:17,25

**confidentiality**
186:23

**confirm** 200:16
225:19,24

**confirming** 80:13
183:5 211:15

**confused** 22:23
100:7 116:13
119:9 179:4

**confusing** 35:10

**confusion** 164:2
239:22 240:6

**congratulate**
132:9

**conjunction** 39:7

**consider** 86:15
87:8

**consisted** 29:3

**consists** 27:11

**consumer** 145:14
146:11

**consumer's**
145:9

**consumers**
142:15

**consuming**
142:19

**contact** 212:20,23
213:17,22

**contained** 115:10
216:8

**containing**
119:20 239:9

**content** 191:2
200:4 217:23

**contention** 75:10

**contents** 171:24

**continue** 110:21
180:25

**continuing** 96:20
135:5,14 192:20
199:22

**contract** 51:14

**controlled** 140:15

**controller** 39:17
40:2,15 41:15
103:5 117:2,8
219:9 220:8

**conversation**
28:16,21 31:15
175:22 190:24
198:2,6,11,15
200:14 201:7,20,
24 203:3,5,13,15
213:13 216:22,25
217:4,6,9,11,14,
20,24

**conversations**
169:12 172:14
184:13 188:23
200:18 217:18
219:4 237:14

**convicted** 88:13

**copies** 116:15,17

**copy** 5:20 43:25
77:2 115:16,25
116:16 142:16
200:18 201:13

**corners** 191:11

**corporate** 15:4
63:9,14,20,21

**correct** 6:25
10:11,12 14:10
16:8 19:24 20:13
22:16 29:21 34:11
36:25 47:7 50:12
64:11 67:24 80:5,
13 88:7 90:13,14
95:18 97:2 101:17
104:3,4 114:8
115:18 116:22
117:10 125:8,25
126:9,10 127:22
128:4 148:5,13,14
149:6 158:24
163:15,19 165:14
170:8 172:10
186:11 191:21
200:20 210:13
215:15 216:10
220:19 222:23,24
223:8 224:14
226:3,15 229:22
230:5,11 234:15
235:14

**correctly** 24:15
27:18,19 83:11
119:5 138:9 206:3

**correlates** 159:11

**correspond**
95:12

**corresponds**
91:14 92:3,5,18,24
93:4,9,16,22 95:10
134:10 139:5,13
149:18 164:10,21

**costing** 30:4

**coughing** 43:6

**could** 12:18 13:15
31:2,3,4 48:16
50:22 61:8 66:24
83:7 84:15 86:13
90:24 92:12 95:20
99:10 103:2
117:14,18 121:18
137:5 138:18
143:24 144:5
163:22 174:22
177:3 181:13,15
182:18 185:17
207:6,10,21 208:8,
12,13,14,15
211:10 226:20
240:3

**couldn't** 135:17

**counsel** 5:19
80:18 125:4 150:8
167:10 229:7

**country** 16:21
64:4 133:20
148:20,21 208:2,6

**County** 23:7

**couple** 72:4
105:14 128:12
169:19 212:22
227:6,7

**court** 5:16,18 6:12
8:14 12:14 13:6
17:22 19:5 68:20
120:13 155:2
167:8 180:19
230:18 231:4

**courtesy** 200:6

**cover** 57:13
131:11 222:13

253Index: covering–describe

**covering** 8:9

**covers** 93:6,11,15

**Craig's** 28:11

**cramps** 174:2

**created** 89:22,24 134:25

**credit** 50:13,14, 16,19 82:10,13,20, 23,24 83:14,16 143:21 145:3,21 148:8,9 149:7,8 153:3 154:18 155:12,19,21,22, 24 156:4,8,25 157:5 179:12 207:15,16,17,18, 19,22 208:8,13,14, 16 221:16,18 222:3,4,7,8,21,23, 24,25

**criminal** 7:19

**crossing** 142:24

**crucial** 72:3

**currently** 12:17 13:13 20:15 21:4 42:12 121:3

**customer** 23:20 48:10,12 49:7 50:3,11 51:10,16 83:10 90:23,24,25 115:14 116:8 118:7 119:21 122:19 125:22 134:5 135:6,18 138:13,16 139:4 140:3,25 141:17 142:7,15 145:2 148:7 181:9,12,13, 24 182:16,20 183:2 191:3,4,6,7, 9,18 192:2,10 197:12 206:21 207:2,9,12,23 239:10

**customer's** 208:14

**customers** 24:11, 12 63:3 82:9 137:10,11 141:14 143:19 144:3,19, 20 146:15 147:22 170:18 173:22

221:16,21

**cut** 181:25 191:11 227:17

**Cutting** 163:21 240:2

---

**D**

**D002** 89:18

**D067** 89:19

**D1186** 69:7

**dad** 85:6,7

**daily** 29:7,18 30:19 45:12 58:9, 10

**dashboard** 134:6 139:4

**data** 77:19

**date** 28:19 39:2 40:6 55:5,10,11 56:4,5 60:22 65:14 66:12,15 69:8,9, 14,15 71:4,5 81:24 83:12 102:6 127:21 128:17 130:2 156:11 187:22 195:20,21 208:5 216:13

**dated** 173:24 178:22 182:10 183:25 185:4 187:24 189:18 192:15

**dates** 128:2 135:15

**daughter** 129:22 130:3 198:22 199:24

**David** 18:14,20,23 19:23 37:18 61:12 161:6 162:5,11,24 203:7,17,18 204:20 205:10 206:4 207:15,22 208:7,12,13

**David's** 204:25 206:15

**day** 17:14 18:10 20:3,13 30:11

31:5,6,7 58:8 59:18,21 60:20 61:5 67:12,14,16, 18 68:6,8 115:3 129:11 135:11 138:22 140:3 148:4,18 156:9 157:20 169:23 171:19 174:4 182:18 187:21 192:17 197:6 204:16 216:17

**days** 30:3,8 32:2,4 36:2,3,6 72:4 76:23 135:19 136:21 196:3,22, 23,25 197:2,7,9, 10,11,17 206:15, 16

**deal** 11:10 49:2,12 50:24 51:20 54:18 135:16 136:15 138:24 141:14,21 142:9 143:20 144:21 167:6,7 181:16 183:7,12 191:6,8,19,20,22 200:11 204:21,25

**dealer** 24:17 54:18 142:4 146:21 223:9,18 225:3 240:17

**dealer's** 223:7

**dealership** 22:19 24:7 26:5 33:2,3 35:4 61:10 69:25 72:14 114:15 130:9 153:11 178:25 179:4,19

**dealerships** 23:11,16,19 25:25 35:5

**Dealertrack** 148:15

**Dealertrak** 54:12, 22 55:18,19 62:5, 18,21 63:3 145:7, 8,17 147:9,22 148:12 149:2 151:19 152:4 154:19 208:11

**dealing** 86:20

**deals** 27:13,14 39:21 72:5 115:19 160:6 178:6

**Deana** 39:14 40:4, 7 42:17 117:2,6, 13,14 119:11,12 216:23 217:15,18 218:5 220:9,10,14

**debt** 145:23

**December** 34:6 35:2 64:4,14 87:15 93:15 107:22 108:2,7,22 110:25 129:24 130:7,21, 22 131:15 185:4 187:24 189:18 192:11 198:20 202:3,6 207:25 208:4

**decided** 154:17 155:9

**decipher** 169:2,8, 12 175:9 197:25 198:10 237:12,13, 14 240:11

**Declaration** 210:16 211:8,25 224:3

**deem** 5:25

**deemed** 6:3 237:7

**defendant** 5:3 7:17,18 15:4 235:8

**defendant's** 69:6 91:14 92:3,6,18,24 93:5,10,16,23 95:10,13 134:11 139:2,6,12 149:19 164:11,22 210:18

**defendants** 120:14 214:20

**defendant's** 134:8

**define** 20:21

**deliver** 31:9 51:14 197:12 206:14,15

**delivered** 138:24

**demand** 79:6,10, 13 81:10,12 109:20 118:16,17 119:18 120:20

223:16 224:23 225:8 227:13,15 238:4,8,11,15,18, 23 239:7,13,18,25 240:9,16,22,24

**demanded** 165:14

**demarcated** 149:23

**department** 27:22,23 93:25 94:2,3,5,9,12,20 95:14 96:5 98:14, 25 99:15 101:20 102:17,19 109:4,5, 6 142:12,17,25 143:3 154:15

**departure** 131:17

**dependable** 157:14,18,24

**depended** 53:25 61:7

**depending** 30:11 32:6 59:21

**depends** 31:13 32:19 33:7 38:3 49:12,16 50:19 92:13 145:20 221:11

**deposed** 12:6

**deposition** 6:17, 21,23 7:2,4 8:2,5 10:22 12:4,5 13:22 14:14,20 15:11,21 52:13 66:3 70:15 84:11 85:21 87:23 88:9 123:9 139:24, 25 168:15 177:20 205:18

**deposits** 165:13

**depreciating** 30:5,6

**describe** 28:8 29:16 33:8,15,21, 23 34:9 38:16 53:13 64:19 76:14 82:22 85:2,18 93:24 115:8 125:4 140:25 145:6 180:18

254Index: described–easier

**described** 28:22 64:20 116:6 118:23 143:23

**Description** 237:5 238:3

**desk** 14:13 38:20

**determined** 220:14

**determining** 219:16,25

**Development** 97:19,23

**didn't** 20:4 49:4 67:5 72:9,11 180:12 181:3,15 182:2 189:13 196:18 203:20 204:15 213:10,21 219:12

**difference** 86:5 183:16 187:21

**differences** 29:17

**different** 37:25 38:6 46:3 50:6 58:8 69:3 77:9,11 87:11 88:20 91:7 98:24 99:3 105:11 112:9 115:24 116:10 121:21 138:20,21,22 141:3,9,11,12,15 143:18,24 146:12, 13,16 150:14 154:23 159:9 165:9 186:14 212:18 221:2 227:7

**differently** 49:19 100:9 179:21

**digits** 43:20

**direct** 199:18

**directed** 99:21 100:3,5 120:12

**directing** 187:7

**directions** 52:15

**directly** 145:17

**directs** 11:3

**discipline** 27:21

72:23 152:19,24 153:2,5,6,9

**disciplined** 72:6 153:7 158:12 191:14,16,25

**disciplining** 72:9, 12 75:6

**discrimination** 8:11 63:7 232:10, 18

**discuss** 132:14

**discussed** 84:9 214:21 218:6,9,11

**discussion** 52:22 84:7 124:4 140:22 151:13 168:18 176:3 209:2 226:6

**divided** 111:8

**divisions** 87:11

**DMV** 27:18 71:3 72:2 74:16 141:24 142:3,13 143:7 204:25 205:2,8 223:15

**doctor's** 185:19

**document** 68:18, 25 69:6,12,19 89:20 92:4,6,24 93:5,10,16,23 95:10,13 124:11 134:8,11,14 139:2, 6 164:11,22 168:24 209:22 210:18 211:19 216:12 225:16,18, 22,23,25 226:10, 12,13,18,21 227:23

**documentation** 50:16,17,21 51:4 82:11

**documents** 14:3, 5,7,8 49:23 76:12 89:18 110:7 116:10 117:20,24 118:24 119:19 120:11,16 121:25 139:3 149:19 150:19 163:20,24 168:22 172:16,20 196:17 224:21,24

225:14,16 226:3 230:21 231:11 234:12 235:10 239:8,20 240:5

**does** 23:25 27:25 41:13 42:11 50:4 60:12 63:5 68:8 69:10 81:16 90:8 99:16 112:23 116:14 125:10 127:3,5 138:9 140:13 141:17 142:6 143:7,13 144:18 149:3 164:12,22 172:3 173:6 177:5 179:6 180:4 196:8 197:16 202:23 203:9 204:24 208:22 211:25 220:8 222:3,7 229:11 234:20

**doesn't** 127:15,21 203:24

**doing** 14:23 15:5 70:15 72:2 83:11 137:20,21 143:6 144:21 186:3 194:20 210:10

**dollar** 112:6

**dollars** 75:24

**don't** 7:12,14 9:24 11:15,24 13:2,3 18:6 22:25 23:2,21 25:2,18 26:4 31:23 33:23 40:9 41:3,12 44:3,18 46:11 50:5 51:2 55:6,12 56:8, 14 58:19 59:19 64:22 65:21 70:16, 18,19 72:10 73:24 75:15,16 76:21 77:24 78:21 80:12 81:7 88:5 89:8 94:15 95:21 96:2, 11 97:3 98:8 99:10 102:10 103:12 104:9,18 105:6 108:6,18 109:5 116:3 118:14 119:17 120:15 123:22 130:10,15 133:12 136:17 142:22 145:10,11 147:4,5,19 149:21

150:4,5 152:12 156:12 157:10 158:25 159:14,15, 16 160:14 161:19 164:18 167:25 168:2,13 174:16 176:12 178:11,12, 18 179:19,22 180:6,22 182:7 184:22 185:2 188:15,23 189:2,4, 13 192:7,13 204:13 205:4,15 215:6 216:13 217:8 218:14,17 222:12,15 223:2, 13 229:18 233:3 234:24 235:15,17, 19

**don't---** 72:19

**done** 27:13,18,19 39:21 51:12 52:17 60:4 107:10 117:13 140:11 151:24 160:7 167:21 170:6 184:16 189:20 194:25 195:5,9 196:11 211:12 224:16 227:21 229:9,19 230:2 231:16 234:3

**door** 142:22

**dotting** 142:25

**down** 8:15 9:9 31:14 34:5 35:3 65:4 115:14 118:6, 8 134:15,17 135:3, 15 138:16,19 141:10,12 159:24 179:11,12 180:20 188:6 191:5,7,9, 17,18,25 192:10 193:5 196:19,20 205:8 215:21 229:16 231:14

**downloaded** 175:5

**draw** 108:3,4 193:6

**drawing** 125:16 173:23

**drink** 9:17

**Drive** 16:10

**driver's** 44:2 83:10

**dropping** 182:12

**due** 114:16 131:5

**duly** 5:4

**during** 13:21,22 14:13,20 23:16 28:21 31:15 35:8 37:15 38:7 46:5 47:2 53:7 54:4 67:10 75:20 83:21 85:3 101:16 123:9 130:21 155:17 157:13 158:11,20 177:20 182:25 192:11 205:24 212:23 213:12 220:11

**dyslexic** 179:24 197:19 234:25

**E**

**E@hillsideoutlet. com** 80:20

**each** 77:16 91:10 109:22 110:10 113:2,15,17 149:22 150:14 161:8 165:15 172:10 206:16,17 228:13 238:25

**ear** 194:18

**earlier** 45:7 56:25 64:17 65:10 81:4 82:16 85:16 86:21 99:25 181:25 219:11 228:9 230:25 234:18

**early** 16:25 57:16 157:25 196:24

**earned** 119:15

**earning** 99:22 100:6,12,13,20,22

**earnings** 101:19 150:15 163:18

**easier** 14:21 124:25

A1288

**easiest** 123:12

**Eastern** 163:8

**eat** 63:13 65:5

**EDD** 63:9,11

**Edge** 16:10

**education** 16:13

**effect** 12:14 138:10

**effective** 138:4

**eight-hour** 37:23

**either** 7:17 37:24 140:16 148:19,20, 21 171:19 178:15 197:20

**elaborate** 99:24 157:19 235:2

**elaboration** 33:14

**electronic** 115:4, 7 120:21 239:14

**electronics** 75:21,23

**else** 7:11 15:15 18:12 39:10 55:17 66:7,24 88:3 95:20 96:23 97:11 98:4, 12 103:18 127:9 131:20 147:12,14, 19 149:12 158:3 167:11 178:13 184:24 185:11 192:10 194:21 215:8,9 218:9 219:25 231:21 232:10

**else's** 90:22

**elsewhere** 232:21

**email** 79:4,14 80:7,8,9,13,23,25 81:6 168:9 238:12

**emails** 80:6

**Emanuel** 85:20 87:25 88:8 124:11 127:24 151:11 186:20 197:21 202:9

**embarrassment**

44:7

**Emmanuel** 66:5

**emojis** 198:22

**emotional** 13:14

**emphasizing** 183:14

**employed** 20:15, 21 40:16,19 53:22 57:8

**employee** 62:9 68:11 70:23 85:5 140:8 152:11 153:9 157:15,19 158:8 181:23 183:16,18,19,23 196:3

**employee's** 38:12,17 39:9 152:14

**employees** 23:9 24:10 25:24 26:22 27:12 28:5 59:17 78:19 85:13,15 97:17 98:9 100:23, 25 101:21 102:4 104:2,7 115:22 129:18 152:19,24 153:2,19,21 181:17 219:17,21 230:7

**employment** 23:17 46:6 47:3,14 63:11,12,17 83:13, 22 85:4 145:25 155:17 157:13 158:12,21 205:25 220:12

**end** 37:3,4 47:14 67:18 69:14,15 81:24 114:10 162:24 212:4

**enough** 28:15 183:11

**Enrique** 205:10

**entered** 90:16,17 137:6

**entire** 68:25 73:17 166:20 179:15

**entirety** 166:25 171:10

**entry** 90:15

**equal** 63:10 159:12

**equally** 222:15

**essentially** 143:19

**et** 116:9 119:2 228:12

**evaluation** 159:4, 6,8,18

**evaluations** 159:22,23

**even** 9:25 19:6 30:9 41:22 48:12 53:4 73:24 109:4 140:4 142:9 144:14 148:21 164:3 204:15 239:23 240:7

**evening** 67:25

**ever** 6:16 12:6 18:5 23:9,15 24:9 25:23 26:11,21 35:6 45:7,19 47:12 48:20 56:21 62:17 64:3 82:13 83:17, 23 84:5,19,22 88:10 114:23 115:4 129:16 138:23 153:8 158:12,22 159:3 165:19 178:12,19 184:13 205:22 217:8

**every** 27:23 31:6, 7 32:8,9 38:4,5 47:16 58:8 59:18 64:16 67:18 68:11 85:5 98:13,14 130:3 138:21,22 141:12,14 146:12 148:17 157:20 159:7,18 178:25 179:4,19 181:23 183:12

**everybody** 46:3 71:24 105:11 140:16

**everybody's** 232:2,6

**everyone** 45:12

47:17 68:16 121:8 123:13 126:17 145:11 146:16 154:10,12,13 182:6

**everything** 8:15 27:18,24 63:25 98:8 115:20 137:22 142:19 152:17 153:3 174:16 175:5 188:18,19 191:10 193:4 204:5 211:16 216:8

**evidence** 19:3 195:16

**exact** 39:2 40:6 65:14 91:17 92:11 111:13 165:7

**exactly** 20:16,20 31:6 39:12 55:7 85:18 99:24 112:22 184:24 185:21

**EXAMINATION** 6:5 237:2

**examined** 5:5

**example** 9:17 30:2 31:8 34:2 144:11 148:3

**excellent** 158:8,9 221:16

**except** 13:22 14:2 64:16 89:9 178:25 179:19

**excess** 59:3 60:5

**exchange** 166:21 198:19 199:3

**exchanged** 168:6

**exchanges** 79:14 238:12

**exhibit** 6:2,3 68:22,23 69:2 89:17 91:13 92:17 122:11,13 124:16, 22 125:3 133:24 134:4 139:5,14 149:16 168:24 169:5,6,8,11,15,20 171:16 173:9 178:20 197:25

198:10 200:13 201:13 209:6,8,11 210:2,15 227:3,5

**exhibits** 169:19 237:4

**expected** 32:13, 16

**experience** 85:25

**explain** 8:2 29:24 134:18 139:17 173:19

**export** 127:2

**expunged** 88:16

**extensive** 222:11

**extent** 102:21 120:13 218:4,23

**extra** 160:5

**extremely** 188:3

---

**F**

**F-** 135:6

**fact** 58:25 59:24 60:3,16 131:5 136:15 140:7 176:11 230:16

**factor** 143:22

**facts** 11:23 19:2 113:9 195:15 230:16

**fair** 36:6 57:18 60:23 73:5 85:10 87:13 94:23 95:8, 23 99:15 104:6 149:22 179:25 181:19 182:14,23 184:6 188:12 201:23 204:18 207:24 208:7 218:12

**familiar** 17:3,8 21:6,11,12,13,14 22:9,12 39:13,16 54:11,17 70:22 71:2

**family** 85:6 132:7 153:12 232:20,25

**far** 22:3 76:22

(1330 of 1960), Page 1330 of 1960    Case 1:21-cv-07163-OEM-LB    Document 102-9    Filed 03/27/24    Page 256 of 278 PageID #: 1953

Case: 25-490, 08/06/2025, DktEntry: 49.1, Page 122 of 279

256Index: fashion–go

171:12 172:23

**fashion** 27:25

**fast** 30:4 191:11

**father** 233:6,11

**father's** 89:8

**favor** 206:17,18

**February** 34:7,12
54:3,4 120:3
216:14

**Federal** 144:12

**feedback** 233:22

**feel** 184:3,4,5
188:3

**feeling** 158:2
184:3 188:2,4

**female** 231:22,24
232:4

**few** 39:11 75:24
170:20

**figure** 103:6 111:4
164:23

**file** 124:12 125:18,
20 138:12 148:6
170:4 171:24

**filed** 39:6

**files** 39:11 120:21
125:14 239:14

**fill** 42:4 44:21 74:4
115:12 116:7

**filled** 116:18
165:14

**final** 140:18 168:3,
9 210:8 237:17,19

**finance** 48:14,17
50:25 51:12,13
55:9,15 65:2
86:15,17,19,24
87:5,6,8 97:8 98:5
99:11 103:24
131:8 147:16,17
154:8 155:24
208:21 212:10,11,
12,13,15,16,17

**financial** 167:3,15
187:2,10

**find** 55:20 109:12,

14 128:21 235:19

**finds** 140:14

**fine** 19:7 43:14
44:20 121:10,11
128:9,19 136:12
166:4,13 177:4
199:21 223:25

**finish** 9:11 48:18
51:20 72:25 73:3
96:16,18 114:11
136:6 157:9
233:12

**finished** 9:13
37:5,7 56:6,11
128:15 142:11
193:9,20 227:15

**fired** 71:22 73:7
74:17,22

**firing** 27:12 68:17
153:21

**first** 8:5 24:21
63:3 83:9 89:6,8
115:13 125:3
134:20 160:22
161:4,11,22,23,25
162:2 178:8 190:8
191:23 198:2,11

**five** 15:16 19:18,
22 32:4 70:5
197:11

**five-minute** 43:10
65:18

**five-page** 226:17

**fixed** 35:8 37:20,
22

**flat** 29:13,22 45:19
58:4 98:23 99:6
111:15,24 112:11
114:20 118:6
164:24 165:11

**flight** 192:23,24,
25

**focus** 8:10 205:21
206:19 233:22
234:19

**focusing** 128:8

**follow** 199:17

**follow-up** 24:23
81:21 120:8 121:2

141:16 150:13
164:5

**followed** 200:2

**following** 101:4

**follows** 5:6
134:14 178:3

**foot** 33:8,13

**footage** 81:11
238:17

**force** 12:13

**forgive** 59:9

**form** 6:19 7:6,21
17:6 19:17 21:22
22:6 27:4 30:16
36:24 40:22 41:10
50:9 58:15 61:19,
24 90:12 103:22
113:13 131:4
139:20 141:20
145:3 146:24
150:3 154:23
159:19 165:17,22
170:18 223:4
228:20

**formal** 230:18

**format** 174:13

**formula** 111:10

**forth** 8:22

**forward** 8:3 95:11

**found** 132:21,23

**four** 43:20 44:13
200:20 201:2

**Franklin** 139:9

**free** 197:7

**frequently** 78:17
181:20 182:3,6

**Friday** 67:25 68:5,
6

**friend** 126:14
184:25

**from** 10:13,21
12:18 13:15 15:18
17:14 18:9 20:2,3,
12 22:4,14 23:10,
16 25:25 26:3,5
32:2,21 37:7 43:15
50:24 55:5,10

56:22 57:15 63:9,
20 67:17,25 70:9
71:4,8,22 79:19
81:5 83:18 85:21
88:9 90:3 91:12,15
93:20 115:2,25
117:22 120:2
121:13 122:21
125:20,21 126:11,
12,14 135:8
144:12 148:15
152:21 155:19
158:23 159:9
166:15 171:5
172:4,5,22 173:13,
15,25 178:4 180:2
184:23 186:14
188:21 191:2
193:7 194:12,24
196:9 198:20
202:6 205:10
220:6,22 230:7
232:10,11,14,15
233:10

**front** 31:24 129:16
188:9 201:2
211:20 223:23

**FTC** 144:12

**Fuentes** 135:6

**full** 5:9 177:12
211:4

**full-time** 42:16,
18,20

**funded** 27:15
39:21 115:19

**further** 60:15

— — — —

**G**

**Gateway** 22:18
24:6

**gave** 15:10,20
37:9 65:9,10
139:22 158:5
175:4,6 196:19

**general** 27:10
40:12 86:10 186:7
232:13

**generally** 10:15
11:2 33:11,24
137:9,12 153:25
232:16

**generous** 181:17

**geographic**
221:17

**gestures** 8:18

**get** 9:17 30:3 31:9,
19 32:10 41:19
43:25 45:23 46:6
47:3 50:20,22
51:5,6,8,13 52:16
64:2 71:21 76:15
100:11 101:21
118:19 121:22
128:2 135:17
137:19 138:6,23
143:11 144:8
149:12 154:3
160:7 166:11
175:12 181:16
195:24 196:5
204:5 207:12
223:3 240:14

**get along** 132:2

**gets** 144:3

**getting** 73:7
187:19,20 192:24

**give** 8:16 16:9
28:13 31:8,12
33:14 34:23 41:24
44:3 45:10 49:13,
22 51:9 61:5,7
68:2 117:12,13
126:23 144:10
145:10,11 146:2,8
148:3 153:16
196:17,19 199:5
206:4,12 211:2

**given** 30:25 31:18
83:17 114:5 159:3,
6 187:12 204:3
211:7

**gives** 63:22
135:10

**giving** 34:2 52:14
152:7

**go** 24:16 25:19
26:16,25 34:5
41:12 52:20 57:16
59:5,15 60:14
65:22 69:25
105:13 121:18,20
124:25 133:23
140:20 141:22

A1290

257Index: goes–Hillside

142:6 146:10
149:15 151:25
154:18 155:10,14
168:16 173:10
174:2,8 175:25
183:6 188:10
199:8,21 207:12
208:24 226:4

**goes**  34:5 76:22
118:2 127:13
145:17 205:6
218:18

**going**  8:2,3,10
10:21 13:3 14:21
15:3 28:23 31:12
44:5,14,15,16
49:21 50:2,3 52:4
57:16 59:14 65:22
66:9 68:18 69:24
73:4 74:2 76:16
84:17 86:13 88:2
89:11 91:6,12
93:19 95:11
100:11 105:13
110:22 118:17
120:2 124:12,13,
18,25 125:2
128:11 139:7,11
141:16 146:10
149:15,17 154:25
160:3,5 164:8,20
168:23 169:4,18
171:15 172:7
177:21,23 178:2
181:12 182:12
183:4,6,8 186:5,21
193:6 197:24
198:9 202:4
208:18 209:14,16
210:11,20 211:2
223:22 226:25
227:6,18 234:9
235:23

**gone**  76:2 204:3
207:10

**good**  39:22 43:12
53:18 86:3 121:8
123:2,15,21
132:13 153:11
159:24,25 183:13,
15,17,22 216:3
222:3,4,7,8

**goodwill**  48:24
52:4 53:2

**got**  30:21 34:14
38:15 46:4 47:5
49:5 97:16 98:21
104:4 130:10
132:25 138:11
152:12,13 159:10
160:13 173:16
184:23 206:20
232:21

**gotten**  204:2
207:11

**Government**
113:2 143:2

**grandmother**
196:16

**gray**  170:25

**great**  5:16 6:12
136:3 159:24
160:2 183:21
235:22

**greatest**  141:25
221:18

**green**  172:8

**greet**  82:9,19

**greets**  50:12

**ground**  8:3

**grounds**  186:22

**guess**  165:18
191:15 202:2
207:23

**guy**  51:14 146:8

**guys**  227:21

**Guzman**  55:22
57:8,19 62:20,23
87:4 131:10
134:22 147:5,13
148:4 152:18,20
153:18 155:21
156:3,5 203:4,6,
15,16,19,20,23,24
207:21 208:9,19
212:21 213:8,18
234:14

**Guzman's**  202:25
203:11

**H**

**H-E-L-A-N**  21:19

**H-Y-L-E-T**  22:10

**habit**  8:20,21

**half**  38:2 146:3,6
206:4

**hallway**  65:3

**hand**  8:17

**handed**  121:25

**handle**  181:13

**hands**  148:22

**hands-on**  148:19

**hang**  184:4

**happen**  137:4
192:4 221:21

**happened**  31:15
71:25 122:25
158:17 191:10
199:4

**happens**  137:19
140:12,13 148:5,
10 205:8 222:4,8

**happy**  84:23
153:11,15 233:16

**hard**  148:24 183:7
201:13

**hardly**  197:4

**has**  8:14 35:6,20
41:19 87:14 90:16
95:14 98:14,15
105:11 121:3
136:2 142:7
147:15 148:6
149:13 153:8
172:13 184:16
186:24 189:23
192:18 201:2
211:3 215:20
222:4,8,23,24
225:15 230:17

**haven't**  175:4

**having**  5:3
102:16,18 152:6
180:24 198:22
199:3

**he**  19:3,6,9,10,12
48:17 55:13,24
56:2,4,6,9,11,14,
15,17,18,19,22
57:21,22 61:15,20

66:15 76:14,15,16
84:13,14,15,16,18
99:6 113:21
130:24,25 131:9,
16,18 144:3
147:15,16 152:12,
13,23,25 153:4,6,
7,8 154:9,14,15
156:3,7,9,13,14,24
157:2,3,5 160:25
161:19 162:20,22
163:17 175:5,6
198:23 199:10,13
201:2 203:6 204:4,
25 205:22 210:22
211:3,4,9 212:10
213:9 214:8
215:16 224:9
229:11

**He's**  55:12 204:4

**head**  8:21,25
84:14

**hear**  11:19 67:5
86:13 180:13
220:22

**heard**  213:11

**heart**  232:22

**Heewattie**  135:9

**held**  52:22 124:4
140:22 151:13
168:18 176:3
209:2 226:6

**help**  25:10 131:19
181:16 200:25
208:9

**helpful**  42:6

**helps**  224:10

**her**  25:12 28:19,23
29:2 30:14 35:8
36:11,12,14 37:18
39:16,19,23,24
40:2,15,24 41:17,
18,21 42:21 47:13,
14 53:2,17,25
57:22 63:2,3 69:17
71:2 72:6,9,12
74:11,23 75:6
78:5,11,19 82:3,6,
11,17 83:18,23,24
84:2,5,9,10,12,13,
15,18,20,23 85:3,
9,17,22 87:20,22,

25 88:9 90:18,21
96:18 117:18
120:23 126:12
127:18 128:25
129:6 132:7,9,15
137:20 139:24
158:3,5,11,20
159:7,19 170:17
178:15 179:7,20
181:14,15,16,21
182:16,18,19
183:7,8,9,12
184:13,25 188:7,
23 189:6,14
190:20 191:3,5,8,
13,14,17,25 192:7,
9,19 194:13 195:8
196:2,5,7,14,16,
22,24 197:7,13
203:23 204:11,14
205:24 206:4,16
207:2 217:2,8,20
219:12,13 231:7
232:23,25 233:5,6
239:16

**here**  11:23 89:17
94:4 110:11
135:22 165:7
176:13 178:3
211:17

**herein**  5:3

**herself**  82:14
139:22 196:16

**high**  16:14,16,19

**highest**  16:12

**highlighted**
202:15 234:10,22

**highlighting**  94:8

**highly**  232:19

**Hillside**  5:15
14:22,24 15:5,6
17:4 18:12 19:15
21:3,7,10,24 22:4,
15,21 23:8,14,17
24:10,13 25:23
26:3,6,12,13,16,
21,22,24,25 27:8
33:9 34:15 35:8,
14,18,22,24 38:9,
11 40:5,16,20,24
41:8 42:11 47:21
48:21 51:18 53:14,
20 54:7,20 56:3

258Index: him–Interrogatory

57:2,20,24 58:23 60:3,16,25 61:13, 17 62:24 63:5 64:24 67:2,9,10,19 68:11 70:23 71:5, 9,13,17,22 74:18, 25 80:10 81:15 82:2 83:22 85:4,7, 8 87:14,21 96:21 100:18 102:8,14 103:19 108:13 112:2,23 119:3,16, 24 128:25 129:9, 12,17 130:13,17 132:2,10 155:18 156:8 157:14 158:21,23 162:12, 21,25 163:10 167:22 178:16 185:10 187:14 197:8 205:24,25 210:23 212:3 215:14 218:13,17, 22,24 219:3,5,7, 17,18,20 220:3,7, 12,21 221:22 223:20 228:13 231:22 238:21

**him** 11:6 19:6,7 130:11,12 133:13, 18 152:12,21 161:18 180:20,24, 25 182:12 183:5,9 187:13 189:24 198:23,25 200:25 201:3 204:4 211:15 213:7,22 214:3,14 224:8,10, 15 227:19

**hire** 28:5,16 69:7 108:7,13 153:19

**hired** 28:18 53:17 107:21 108:9,10, 22 131:12,16,18 152:11

**hiring** 27:12 28:6, 8,22 31:15 68:16

**his** 56:21 61:16,22 90:21 122:19 125:23 137:20 153:2 154:14,15 159:7,19 161:15 162:17 169:8 180:20,24 199:11, 13 203:25 206:15

208:8,13 227:15

**hold** 28:15 118:20 135:17 195:18 222:17

**home** 5:16 6:8 64:7 78:14 148:15 174:2 183:7 204:14

**honestly** 88:21 158:19

**hookup** 145:17

**hot** 184:5

**hour** 37:24 38:2 143:25 146:3,7 221:14

**hour-and-a-half** 221:14

**hourly** 57:12 232:18

**hours** 8:9 32:18 33:2,3 37:10,11 41:5 47:20 48:3,4 49:11 57:15 131:11 140:4,5 143:16,25 144:2, 16,25 145:4,5 146:4 182:15 183:2 185:9 196:22 219:16 220:2,15

**how** 17:8 19:19 21:13 22:3,12,18, 22 24:6 31:23 32:15,24 33:8 34:15 36:4 37:23 38:15,16 39:16 41:21 42:14,15 45:18 46:9,12,15, 25 49:6,12 52:19 53:7,13,21 54:2,5, 17 57:22 61:21 62:2 66:24 69:14 71:2 72:23,24 73:9 74:18,24 77:12,21 82:18,19,20,23,24 85:2 97:17 99:19 103:13 111:4 115:15 123:15 125:5,9 128:9 132:5 141:6 143:7, 13,21 144:17,18 145:2,6,20 147:8 153:21,23 156:4

162:4,20 170:10 185:22 186:3,16 196:3,4,23 197:22 207:17 213:5,23 214:2 217:4 220:23 221:8,10 232:13

**however** 9:21 211:24

**hundred** 75:24 196:7 231:7,8

**hurt** 26:9

**I**

**I'LL** 150:22

**I's** 142:25

**I'VE** 225:22

**I-** 88:25

**I-A-E-L-** 134:22

**I-S-H-A-Q-** 80:19

**I-S-H-A-Q-U-E** 5:2

**I-s-h-a-q-u-e@ hillsideautooutle t.com.** 80:11

**I-V-R-A-H-A-M** 89:2

**icloud** 77:20

**ICU** 149:4,5

**ID** 150:11 152:4 237:7

**idea** 39:5 77:21 111:22 125:13 126:6,19 157:8 165:23 204:10 233:8

**identification** 6:4 43:24 68:24 122:14 124:17 149:16 150:9 169:7,17 209:9,15 210:3 227:3,5

**identified** 89:18 94:14 99:5,14 109:24 149:20 224:21 239:3

**identify** 76:7 105:16

**identity** 222:16,20

**image** 176:9,18, 20 177:11

**immigration** 88:20

**implemented** 100:23

**impossible** 140:4

**in-house** 142:13

**Inc** 15:5

**incentive** 58:25

**incident** 158:16

**included** 218:23

**includes** 120:4

**including** 114:6 230:7

**incorrect** 91:20

**indicating** 8:22 14:18 85:20 103:14

**individual** 29:5 39:14 55:21 94:13, 14,17 95:14,24 96:4,7 99:5,8,14, 16 102:5,22,23 103:9,13,16 104:21 105:2,4,8, 16,19 106:2,5,6, 11,12,16,17,21,24 107:3,6,14,15,18, 19,21 108:21,23, 25 109:8,9 139:9 149:20,22,24,25 150:17 163:5,9 208:9

**individual's** 105:5,17 106:13, 18

**individuals** 96:13 97:6 109:23 110:10 178:16 185:15 219:15 239:2

**industries** 49:20

**industry** 30:2 32:9 49:18,19

72:21 144:10

**informal** 230:19

**information** 83:13,14 115:10 116:8,22 117:21 135:10 145:9,14 167:4,16 187:3,6, 10 218:21,24 236:2

**informed** 26:11

**initial** 89:9 101:5

**inputs** 120:22 239:15

**insert** 42:8 45:4 66:19,21 74:7 236:4 240:23,25

**inside** 76:15 91:2

**instance** 40:12 136:15 140:9 141:5 150:16

**instead** 177:12 180:23 191:19

**instruct** 218:7

**instructing** 213:14 214:23

**instruction** 11:4 194:4

**insurance** 122:20 125:23 142:16 144:8,9 212:11,13, 15,16

**intelligent** 28:15

**intention** 103:8 139:12

**interest** 214:16 218:3 219:3

**international** 133:22

**internet** 141:25 142:8 205:7,8

**Interrogatories** 210:6,7 211:18 215:18,19 216:9, 10 218:21 223:6 237:18

**Interrogatory** 216:20 224:13

**interrupt** 193:23 213:10

**interview** 28:10 68:11,15

**interviewed** 28:12

**into** 27:23 50:24 65:15 103:3 109:17 123:22 127:13 133:13 137:7,12,14 138:5 139:24 142:17 170:4 190:19 191:13 192:23

**inventory** 26:17 27:17

**investigations** 234:6

**involved** 111:23 144:15

**iphone** 44:4 77:7, 10,17 127:7

**irrelevant** 46:2

**Isaac** 88:25

**Ishaque** 5:1,11 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,8,15 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,24 89:1

90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1,10 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1, 21 203:1 204:1 205:1 206:1 207:1 208:1 209:1,12 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1,15 238:1,6, 13 239:1 240:1

**issue** 152:8 223:15

**issues** 142:8 153:10

**itemizes** 126:3

**items** 44:8 101:7

**its** 108:3 222:13

**Ivraham** 89:2

—— **J** ——

**J-E-A-N-I-Q-U-E** 54:24

**Jacquelyn** 134:20

**Jamaica** 5:15

**January** 34:7 69:9,20 78:17 79:20 192:15 193:7 194:24 196:10

**Jeanique** 54:24 55:3,4 57:2,10,22, 24 60:24 61:3,7 87:3 147:5 155:22 220:14

**Jeanique's** 57:9, 19 73:22

**Jennings** 39:14 40:4,7 42:18 216:23 217:16,18 218:5 220:10

**jeopardizing** 72:20,22

**jet** 193:2

**Joanna** 184:25

**job** 48:19 61:16 69:18 72:24,25 84:15,17 126:17 132:13 137:21 153:2 159:24 160:2,3 186:4 203:25 207:20 208:16 232:21

**jobs** 41:4 48:16 70:21

**Jory** 18:14,18 19:14 61:21 214:2, 13,17

**Josh** 18:14,15 19:19 21:18 62:2

**judge** 12:15

100:15,17 101:6 187:3 222:12,13 235:7

**July** 34:4 58:24 59:25 60:6,15 92:8 232:17

**jump** 136:7 157:10

**jumped** 136:10

**June** 34:4 91:24 101:4

**just** 7:2 8:20 13:24 14:16 20:10 22:25 25:9 28:22 31:7 33:23 35:20 44:13, 20 45:11 52:9,15 58:3,6 60:17 65:20 68:25 69:19 70:20 75:17 78:4 80:12 86:25 88:2 89:4,9 90:19 94:7 101:2, 21 110:20 118:22 120:9,18 122:3 124:10 125:4,6 127:15 129:25 134:25 136:5 142:20,22 143:9, 22 147:22 148:3 152:5 157:7,8 159:17 163:22 167:9 168:9 170:7 171:4 174:22 176:17 177:12,18 178:6 180:20 184:4 200:5,15 204:6,19,20 210:11,24 221:6 222:22 225:13,18, 19,24 226:10 227:5 228:25 229:18 231:14 233:12 235:15,19 240:3

—— **K** ——

**K-** 126:7

**Kaswayne** 126:7

**Kataev** 5:19,22 6:18 7:5,20 11:8 13:9 14:16 15:12, 25 17:5 18:25 19:16,20 20:6

21:21 22:5 23:3 25:9 27:3 30:15 34:19 36:17,23 37:13 40:21 41:9 43:2,4,13 44:5 45:16,25 46:18 47:9,18,23 50:8 51:21 52:7,19 53:15 54:14 58:14 61:18,23 62:13 65:17,25 73:15 74:9,13,20 80:16 81:20 89:14 90:11 96:17 101:2,23 103:21 107:9 108:15 110:14 111:6 112:14 113:4,12,18 116:12 120:7,25 121:9,22,24 123:3, 5,17 124:2,11 126:24 128:3,7,19 131:3 133:11 139:19 141:19 144:22 146:23 150:2,7,18 156:19 157:16 164:5 165:16,21,24 166:8,11,17 167:24 175:7,14, 25 176:23 177:8, 17 180:22 186:21 187:15 189:8,22, 25 190:6,14 193:22 194:2 195:7,14 199:7,10, 15 200:24 201:11 202:10,17 204:22 208:24 209:16,23 210:24 211:14 213:2,9 214:15 215:4 216:15 217:25 220:3 223:22 224:5,11, 24 225:7,11 226:4 227:17 228:19 229:3 240:10

**keep** 38:12,14 76:22 112:24 137:22 188:4

**keeps** 182:12

**kept** 19:11 38:17 86:11 112:10 113:15 114:20,22 115:2,16 118:24 159:20

260 Index: key–little

**key** 118:12

**kind** 138:19,20 145:21 232:17

**knew** 156:13 170:9 184:7 188:13

**know** 5:23 6:21 9:18 11:24 16:5 22:3 24:5,8 25:3 41:3,12,21 42:14, 15 53:4 55:6,13,21 56:9,14 58:19 63:17 73:9 75:15, 16 76:21 77:24 94:13,15,17,18 95:15,21 96:2,8,11 97:12 99:10,19 100:5 103:2,10,12, 15 104:18,22 105:6 107:10 108:6,18,24 109:5, 8 110:5 118:14 126:2 130:6 133:6, 18 147:4,6,19 149:21 150:4,5 152:5,12 155:4 156:12 158:15 159:18 168:2 173:20 179:16 185:2 188:25 189:19 193:8 194:25 195:5 196:11 199:2 204:14 205:4 211:11 215:20 218:18 223:13 224:16 227:14,20 229:9,19 230:2 231:16 233:3 234:3,8 235:15,16, 17,20

**knowledge** 12:21,23 24:3 41:7 45:21 54:23 88:6 90:2,3,8 97:13 99:2,4 101:18 111:12 114:25 129:3,16,19,20 130:8 131:14,25 153:4,6 172:2,19, 24 178:9 192:3 198:3,12 200:16 212:7 216:7 218:14 219:2 225:21 226:15,22, 23 229:23 234:16,

21 235:14

---

**L**

**L-O-C/D-E-P-T** 94:8

**L-O-C/ DEPARTMENT** 96:6

**labeled** 150:20

**lag** 193:2

**laid** 165:13

**Laredo** 179:12

**last** 6:25 9:14 17:24 18:2 20:25 41:16,17,22 42:3 43:20 44:13 46:21 57:17 64:16 67:12, 14,16 73:20,22,23, 24 83:9 88:8 89:5 95:3,6 104:13,16 106:8 113:13 115:13 130:5 133:6 139:23 155:7 161:14 180:17 188:22 193:18 195:20 212:20 213:17 219:12 236:6

**lasted** 139:16

**late** 36:2,12 57:15 157:23 181:11

**later** 11:11 51:5,7 204:16

**latest** 44:8

**Laticia** 170:14

**law** 7:14 231:10

**lawsuit** 7:22 8:8, 11 233:6,15

**lay** 8:3 188:5

**lead** 134:23 135:11 136:14,19, 21 137:6

**leading** 160:18

**learned** 86:11 129:21 213:9

**learning** 156:3

**least** 189:11

**leave** 19:11 32:16 40:4 42:2,23 48:16 64:13 66:10 67:13 72:17 74:3 235:24

**leaving** 68:3

**leeway** 158:5

**left** 40:8 56:9,14 57:2,20,24 60:24 62:23 67:15,17,20, 22,23 69:18 70:3 71:16,19,25 72:12, 13 73:10,13 75:4 78:15 87:14 121:24 147:8 157:25 160:17 161:24 188:8 192:16,18 195:19, 22 196:24 232:16, 20 233:2

**legal** 113:5

**legalities** 142:23

**legible** 83:8

**lender** 220:22

**less** 34:13,14 45:24 54:5 92:12

**let** 5:22 9:18,25 10:20 13:9 24:14 25:9 29:24 35:11 58:5 60:7,10 71:23 80:16 86:25 96:17 100:8 107:9 119:4 138:8 143:9 155:3, 8 176:5 179:14,16 189:19 190:6,9 193:8 194:2,25 195:5,17 196:10 200:6 202:10,17 206:2 207:8 211:6, 11 215:20 222:10 224:15 227:14,20 228:8 229:8,19 230:2 231:14,16 234:3 235:20

**let's** 5:25 29:19,23 31:7,14 32:21 36:12 37:7 38:7 52:20 60:14 67:23 79:18 90:2 110:20 112:4 121:11 124:2 133:23 140:20 143:18

144:20 146:20 148:3 152:9 157:22 159:2,25 166:13 168:16 174:8 175:25 183:24 189:16 193:5 200:11 205:17 206:19 208:24 209:6,24 221:25 222:6 226:4,12 227:11 233:9,12,22

**Leticia** 28:6 30:13 31:17 33:5 35:6, 14,23 37:2 45:7,11 47:13 52:24 53:8, 13,21 54:8 58:22 62:7,12,18,25 69:11,17 76:4,7,24 78:2 79:2,12 80:24 81:5,25 83:17 84:19 85:3,21 87:13 90:17 114:6 122:5,6,21 125:21 126:18 131:25 132:21 133:16 137:2 139:22 158:22 160:17,24 161:6,21 163:11, 13 167:12,21 169:4,9 170:23,24 171:5 172:4,5,10, 14,21,22 173:15, 25 174:5 175:22 178:14 179:5 180:3,10 181:8,20 182:4,14 184:2 192:16 194:12 198:25 200:15,19 201:24 202:25 203:4,5,11,14,16 204:9,21 205:11, 23 206:3,12,14,25 207:6,14,22 208:14 231:21 232:3,4,15 234:6 238:10

**Leticia's** 46:5 47:2 73:24 83:22 131:23 155:17 157:13 164:9 166:21 168:10 178:9 188:13 206:14

**letter** 237:8

**letters** 83:7

**letting** 152:5

**level** 16:12

**license** 44:2 72:10,20,22 73:3 83:10 223:7,9,18 225:3 240:17

**licenses** 28:2

**life** 84:23 148:24

**like** 24:12 28:9,13 30:3 33:6,24 40:11 44:3 65:19 69:17 72:9,11 75:3,8 78:15 85:5,6 90:17 91:18 96:23 111:14 115:9 127:8 130:4 132:7, 17 137:19 138:14 140:15 145:4 146:19 165:3,8 176:14 181:17 188:4 190:24 191:14 194:14 196:14,21 203:6,7, 17,18,20,24,25 204:24 205:5 210:14 229:13 232:20,25

**likely** 69:13 182:17

**likes** 188:18

**likewise** 9:12

**Lilly** 70:24 71:16 72:17 73:6 232:10, 12

**Lilly's** 73:20 74:12

**limited** 179:23

**line** 46:21 73:17 107:11 126:7,13 139:23

**list** 28:11 93:20 100:21

**listed** 91:16 99:15 102:6 105:20 110:11 111:2 150:11 235:12

**listen** 194:5

**little** 13:6 33:14 59:9 65:22 69:15

261Index: lived–me

102:11 127:17,19
128:11 215:24

**lived** 15:15,19

**LLC** 14:23

**loan** 145:23

**loc** 94:20 96:5
109:5

**local** 94:11 109:6

**location** 149:4,5
156:15,17 221:17

**locations** 141:25

**log** 89:12,19 90:4
91:7,9 92:8,13
100:2,4 139:4,8
140:8 146:22
149:3,13

**log-in** 137:11

**logged** 137:12,14,
18 138:5

**logging** 149:10

**login** 145:10

**logs** 134:6 149:3

**lol** 126:17

**long** 7:24 8:23
33:20 41:20 49:6,
12 52:19 113:10
141:6 143:7,13
144:14 156:6
178:6 192:25
213:22 217:4
220:23 221:8

**longer** 39:25
49:16 50:2 60:24
160:15 182:19
188:5

**look** 23:22 26:17
27:23 39:5 65:15
89:10,11 103:3,7
109:17 114:2
115:9 139:24
142:5 145:19
148:15,16,17
149:7,18 165:25
166:2 177:5
183:24 189:17
200:12 201:4
204:24 222:6,16,
22 225:14,18
227:11

**looked** 175:4
226:3,9

**looking** 69:13
99:20 102:5 105:9
109:2 115:22
120:17 125:16,19
138:25 169:20
174:17 176:6,8
197:16 206:21
207:2,10 226:8
227:2,4,12

**looks** 69:17 91:18
127:8 196:13,21
203:6,17,25

**lose** 72:10 181:15
183:8

**losing** 191:20

**lost** 134:19
136:14,20 137:6
230:13

**lot** 19:5 23:19
25:21 26:20 27:11
38:23 49:24 73:23
76:2 85:25 90:25
108:9 142:24
158:4 159:14,15,
16 165:6 205:5
231:24

**lots** 24:12

**loudly** 9:5

**Louis** 55:2,14
87:6 147:16,21
148:9

**love** 85:14

**loved** 183:12

**loving** 153:15

**LTD** 145:22

**Luckman** 136:2

**lunch** 63:13 65:5
121:7

**lunchroom** 63:13
64:18,21,23,25
65:3

---

**M**

**M-I-K-** 134:21

**machine** 142:20,

21

**made** 49:5 59:3
84:22 100:10
115:17 150:9,23
225:8 234:7

**Magistrate** 101:6

**mailer** 134:24

**make** 10:14,22
14:20 27:20,24
39:20 41:23 83:10,
15 102:11 114:10
115:17,18,19
118:3 142:14
145:24 150:22
153:3 159:13,14,
15,16 160:4,5,6
175:16 181:16
182:8 183:12
186:4 191:6,8,11,
18 196:18 197:3,6
216:15 221:7

**making** 27:13,14,
15,16,17 39:21,22
150:7 167:9
191:19 225:9
240:20

**mall** 15:5,6 21:7,
10,24,25 22:21
26:3,6,12,16 27:2
35:15,17,19,20,21
40:20,25 41:8
42:12 156:23,25
157:5 218:14,17,
22,24 219:4,5

**managed** 154:16

**management**
54:18 142:4

**management's**
207:20

**manager** 27:10
40:12 48:14,17
51:12,13 55:4,9,
15,25 56:16,18,19,
23 57:8 83:24
86:2,6,9,10,12,15,
16,17,18,19,23,24
87:4,5,6,7,9 92:15
97:8,9 98:14
116:23,24 117:3,8,
17,19 120:22
131:7,8,9,13
132:16 137:21
147:16,17,23

**154:8,14 155:10,
14,16,24 156:5
186:7 208:21
212:10,12,18
220:18 239:16

**manager's**
207:20 208:16

**managers** 47:4,5
48:18 57:12 86:22,
23 91:4,5 98:5
103:24 137:16
154:5,6,7

**Mann** 101:6

**Manrique** 37:19

**manual** 83:2,6
90:15

**manually** 90:16
137:3

**Manuel** 110:18
121:24

**Manuel's** 70:8

**many** 29:6 34:15
46:15 53:21 54:5
73:9 74:18,24
77:12 111:5
132:10 144:15
162:4 170:18
178:5 196:3,23

**March** 34:3,8,9,
18,22,24

**mark** 68:21
122:10 124:12,13,
14 168:23 169:5
209:6,24

**marked** 6:2,4
44:15,16 68:23
69:2 122:13
124:16,21 134:19
136:14,20 139:25
140:2 149:25
169:6,16 209:8
210:3 237:7

**marker** 150:10

**markers** 150:24

**marking** 44:23

**mathematically**
58:18

**matter** 7:19 8:7

**matters** 187:2

**may** 8:20 10:14,22
20:8 21:15 30:6,9
34:4 49:15 53:5
69:8,15 71:15 79:4
91:12,15,19 94:10
108:3,4 111:19
112:16,18,20,21
123:7 130:11,12
146:7 147:4,5
150:3 167:21
170:5 199:5,7
207:5 218:10

**maybe** 30:23 31:1
33:4 53:6 55:19
59:12 76:20 84:12,
13 91:20,21
103:23 108:5
111:17 112:6
117:3 130:10
136:25 142:2,3,6
145:5 146:6,8
147:18 152:3
154:23 158:13,16
165:4 173:21
179:20 184:8,25
185:12,19 191:13,
15 193:2 194:17,
20 203:20 205:8
212:9 221:14
233:4,7

**me** 6:11,15 8:5
9:18,25 10:20
11:6,16,20 16:9
19:8 20:4 22:14,15
24:14 25:2,9 26:7
28:13 29:16,24
31:21,24 32:12
33:14,20,24 35:10,
11 39:25 41:12,20,
24 42:16,17 50:5
51:24 52:14 54:24
57:14 58:5 59:9,15
60:7,8,10 61:9
70:14,17 71:19,23
72:9 73:5 77:4
78:18 82:22 85:8,
23 86:3,9,10,25
87:3,12,22 93:25
100:8,9 102:12
105:23 107:9
109:2,4,15 115:8
118:23 119:4
123:15 124:11
125:4 127:6
129:16 132:24,25

262Index: mean–ms

133:25 134:15,18 138:8,15 139:17 140:25 143:9,23 146:9 152:21 153:7 155:3,8 156:10,14,15 157:2,3,21 161:19 170:22 171:8 175:12 177:16,19, 25 178:13,19,25 179:9,14,16,19 180:19 181:3 184:17,18,22,25 189:13,14,19 192:22 193:8,11, 23 194:17,20,21, 25 195:2,5,17 196:10,15,17,19 198:3,12 204:2 206:2,3,5 211:11 213:11 215:16,20 217:9 222:10,12 224:15 225:19 227:14,20 228:8 229:9,16,19 230:2, 8 231:14,16,25 234:3 235:20 240:14

**mean** 7:13,15 10:7 18:15,18,20 20:10,16,17,19,20 21:17 22:15 35:9, 18 46:16 49:9 56:11 63:15 66:4 82:23 85:18 86:22 99:23 112:19 116:14 117:23,25 130:19 154:4 157:19 179:2 185:14 205:15,22 215:14 221:23

**meaning** 23:9 31:17 35:7 50:17 63:16 98:10 100:13 111:25 118:2 136:22 141:13 160:18 161:9 164:23 170:15 171:10 183:22 186:10 210:12

**means** 91:19 93:25 95:15 126:5 141:14

**meant** 56:20 63:23 173:19

196:21

**medications** 12:18

**meet** 82:9,18

**meeting** 166:21 185:8,10,12,18,19

**meetings** 185:23, 25

**members** 98:5

**memory** 160:21

**mention** 188:11

**mentioned** 7:3 12:5 17:18 23:19 28:4 45:7 47:11 56:25 58:3 64:17 65:10 75:6 77:11 80:6 82:16 84:11, 21 85:6,16 88:18 100:3 116:5,11 119:10 133:5 137:23 138:14 143:6 165:8 178:12,13 185:15 188:16,17,20,25 191:15 194:16,17, 21 199:23 205:2 219:11 223:5 225:5 228:10 230:25 235:5 240:19

**mentioning** 25:18 60:17 188:16 189:14

**message** 78:6,9, 12 81:5 122:16,17 124:10,24 125:10, 12,17,19 126:21 133:17,19 167:18 170:8 173:13,15, 24 176:7 178:3,4, 21 180:2,10,19 181:7 183:25 185:4 187:24 189:17,24 190:2,4, 8,11 191:23 192:15 193:7 194:12,23 196:6,9 197:15 202:6,12, 19 204:7,8,15,19 206:20,24 208:5

**messages** 78:2,5, 22,25 79:7,11

84:24,25 121:19, 20 122:4 123:7 124:19 125:15 127:8 128:2,14,16 130:23 166:20 167:2,12 168:5,11, 25 170:23 171:4, 10 172:4,15,21 184:14 232:24 237:9,11 238:6,9

**messaging** 170:3

**method** 38:11

**microwave** 65:6

**middle** 89:8 163:8 170:19

**Middle-eastern** 163:6

**might** 8:21 209:19

**Mikiael** 134:21 135:9 137:2

**mind** 65:21 70:16 80:12 84:18 203:23 229:18 235:19

**mine** 9:11

**minimum** 113:10 114:12 164:18

**minute** 38:2 189:11

**minutes** 49:15 50:23 51:7 70:6 121:8,9 123:18 142:7 143:15 221:13

**Miss** 121:19

**missing** 38:24 114:16

**mistakes** 191:12

**mixed** 35:6,9 88:15

**moment** 134:2 146:20 152:9 228:8

**money** 30:5 84:22 159:9,11,12,14,15, 16 160:6 183:8 196:18

**month** 34:22 35:3 53:25 57:5 59:21 61:6 91:7 92:8,20, 25 93:6,11,15 104:5 108:2 114:10,11 132:8 159:7,18 160:4 161:2,3,4,9,10 162:7,8,13,15 185:24

**monthly** 29:17 30:20 34:16,17 45:13 58:11 111:22

**months** 34:10 53:21 54:2,5 73:9 74:18,24 91:10 146:18 170:20 197:17

**more** 24:23 33:14 45:14,24 67:5 71:11 84:22 85:25 92:12 102:12 104:10 114:6,11 146:5 159:13 160:6,7 177:22 181:20 182:3,6 208:17 232:5

**morning** 57:15 67:25 68:5

**mortgage** 141:18

**most** 15:18 32:5 46:3 49:20 69:13 221:15,17

**mostly** 8:10 26:2 32:25 48:8,14 57:17 127:17 140:11 167:15 230:13

**mother** 233:5,11

**motions** 8:17

**Motor** 142:12,18 143:2

**Motors** 22:10 24:4

**move** 151:7 159:25 174:3

**moving** 14:17

**mr** 5:19,22 6:7,18 7:5,20 11:8 13:9, 13 14:16 15:12,25 17:5 18:25 19:16,

20 20:6 21:21 22:5 23:3 25:9 27:3 30:15 34:19 36:17, 23 37:13 40:21 41:9 43:2,4,13,17 44:5 45:5,16,25 46:18 47:9,18,23 50:8 51:21 52:7,19 53:15 54:14 58:14 61:18,23 62:13 65:17,25 66:12,22 69:4,5 73:15 74:9, 13,20 79:21 80:16 81:20 89:14,16 90:11 96:17 101:2, 15,23 103:21 107:9 108:15 110:14,22 111:6 112:14 113:4,12, 18 116:12 118:20 120:7,25 121:9,15, 22,24 122:15 123:3,5,17 124:2 126:24 128:3,7,19, 20 129:21 131:3 133:11,15 139:19 141:19 144:22 146:23 149:21 150:2,7,18 156:19 157:16 164:3,5,9, 12 165:16,21,24 166:8,11,17 167:24 169:3,9,13 175:7,14,19,25 176:23 177:8,17 180:22 186:21 187:15 189:8,22, 25 190:6,14 193:22 194:2 195:7,14 199:7,10, 15 200:24 201:11 202:10,17 204:22 208:24 209:16,23 210:24 211:14 213:2,9 214:15 215:4 216:15 217:25 220:3 223:22 224:5,11, 24 225:7,11,13 226:4 227:17 228:19 229:3 236:8 237:3 239:23 240:8,10

**ms** 5:25 13:5 17:22 20:24 24:20 35:11 41:25 43:9 44:20 46:20 48:5

A1296

52:9,20 65:20 66:9
68:20 70:4,13 74:2
79:6 81:10 95:2
96:15,18 101:17
104:11 105:25
109:19 110:18
113:8,21 116:15
118:16 119:18
120:9 121:6,11
122:3,10 123:3,14,
20 124:6,14 127:3,
24 128:5,9,21
129:18 133:7,12
134:3,17 135:4,13,
24 136:2,11
140:20 151:3,6,10,
15,25 154:25
163:21 164:14
166:4,9,13 167:18
168:16,20 175:7
176:20 177:4,15,
18,23 180:14
187:9 193:15,24
199:9,12,17,21
200:3,21 202:14
209:10,18,24
210:4 211:11
213:5 214:25
215:25 220:5
223:16,25 224:7,
14 225:2,9 227:20
228:25 229:11,15
233:9,17,21
235:18 236:5
238:4,8,11,15,18,
23 239:7,13,18,25
240:9,16,22,24

**much** 43:6 115:15
123:15 143:21
144:18 152:7
166:10 196:4
221:10

**multiple** 75:18
78:8 131:6 144:9

**my** 5:23 6:9 8:7,21
9:14,22 10:4,14,23
12:21,22 13:2
16:21 20:17,21
21:15 23:2,14
24:18,21,25 25:8,
16,19,21 26:9
27:10 30:25 35:4,
23 37:10 41:4,5
43:19,22 44:2
45:21 49:17 52:10,
15 53:4 54:23 55:4

56:17,19 57:23
59:17 61:4 64:15
65:2 66:5 68:13,15
69:16,22,24 71:3
72:10,11,22 79:4
80:9 85:5,13,15
86:9,10,11,12,17
87:3,4,5,6 89:3,7
90:6,15,16,19
91:4,5,8,17 92:19,
22 93:24 96:16
97:8,9,12 99:2,3,4
100:4,24 102:3
105:14 109:13
110:8 112:9
114:25 126:22
129:3,14,16,20
130:3,5,6,7,25
131:14 132:4,7,18,
22 133:5 134:13
136:13 138:14
143:11,13 146:25
148:16,17,24
149:13 150:13
151:24 152:3,22
153:4,5,11,13,16
154:7 156:5
160:21 169:20
170:13 172:23
174:14,18,19,24
175:5,11,15
179:16 181:7,17
182:8 183:17
184:5 185:12,19
186:4,6,15,18
188:2,9 190:19
191:13 193:2
194:3 195:19,22
196:6 199:19,22
201:17,22 211:24
213:20 214:8,12
217:11 218:18,22
219:5,7,9 220:8
221:20 226:16,23
230:5,20 231:9
232:23,25 234:19
235:13 240:14

**myself** 146:25
197:21

---

**N**

**name** 5:9 39:14
40:2 41:15,16,17,
19,22 42:3 55:22
70:23 73:20,22,24,
25 83:9 89:5,6,8

90:18 105:17
109:21 110:10
115:13 118:6
119:21 126:8
135:6 138:16
152:14 160:11
161:14,15,16
208:19 219:12
230:17 232:2,7
238:24 239:10

**names** 23:19
88:23

**nauseous** 184:3,
11,15,16 188:4

**near** 13:19

**nearby** 23:10

**necessary**
134:15

**Neck** 5:17 6:12

**need** 9:16 11:3
43:22 44:13 49:25
50:6 70:13 123:16
133:13 141:2,3
157:10 166:9
167:5 188:4,5
189:13 191:17
192:17 223:3

**needed** 73:2
85:24 131:11,19
158:6

**needs** 189:6

**neighborhood**
34:25

**neither** 56:5

**never** 35:17,21
59:16 62:8 73:8
83:25 84:4,9,18,21
85:23 129:3 130:8,
9 133:18 151:20
152:6 153:10
170:17 189:12
195:18 197:10
208:13 225:6,7
230:12 232:11
240:20

**new** 5:5,15,17
6:12 9:12 31:6
40:2 41:15 156:3
231:3

**newly** 108:22

**news** 133:2

**next** 64:25 86:12
93:19 118:16
126:7,13,20
140:17 141:15
160:2 162:8
164:20 171:15
173:4

**nice** 126:14,17

**night** 170:20
192:11

**no** 8:16,17,25 9:21
12:8 13:17 15:14
16:6,18 21:5 23:13
26:9,17 27:6 30:17
36:2 38:10 39:5,25
42:13 46:14,15,16
52:2 54:13 57:6,21
59:11,20 60:10,18,
24 61:7,9,20,25
62:3,8,16,19 63:4
66:8 67:14 70:13
72:7 74:9 77:21
81:2 82:15 83:20
84:12,14 89:14
90:7 94:23,25
95:7,16 96:7
102:7,16 105:11
106:7,8,15,20,23
107:2,5,8,17,23,24
108:13,18 109:6,
11 111:22 115:6
119:7 125:13
126:6,19 128:23
129:7,10,15
131:18,24 132:17,
18,19 133:11
138:11,22 144:9
146:13,15 152:7,
23 153:5,6,20,22
155:15,16 165:23
167:24 173:3
174:7 176:10
177:17 178:6
179:5 180:5,7
182:18 187:21
188:10,25 190:14
191:9 194:8 199:4,
13,16 200:8,10
203:5,13,15
204:10 206:6,9,10,
11,22 207:3,4,18
208:20 214:9
219:3,4 222:21
223:4 228:17
230:6 233:8

234:24 238:4,8,11,
15,18,23 239:7,13,
18,25 240:9,16,22,
24

**nobody** 58:7,12
102:16 140:2
149:12,13

**nodding** 8:17,25

**non-** 102:13
230:18

**nor** 61:8 178:18
207:18 208:14

**not** 7:9 8:23 9:10,
12 10:3,16,18
11:3,5,6,9,19,24
12:21,23 13:23
14:4,6,14 17:17
19:3 20:10 24:5,8,
12,16 25:24 26:14,
24 27:19,25 31:6
33:2 35:4,7,19
41:4 42:18,20
44:14,15 45:11,21
46:17 48:15,23
52:13 53:4,12 54:4
56:24 57:2,4,10
59:7 60:12,21
65:24 67:9 68:6,7
71:14 72:5,15
73:4,5,18 74:22
75:12,22,25 76:15,
19 81:16 83:5
85:23 87:2,8 88:2
90:6,14 91:9 92:15
95:24 96:15 97:12,
16 99:16 102:2,9,
22,23 103:15
104:7,8 112:21
113:21 114:25
115:6,7 118:5
120:17 123:2,7
125:10 127:3,5,9
128:13 129:15
132:24 137:2,6,10,
12,18,20,21 138:5,
9,23 140:3,4,13,17
141:17,25 142:3,6,
20 143:4,11 144:5
147:25 148:12,22
149:6 151:23
152:4,16 153:4,10
154:7 155:5
159:22 165:7
174:20 176:18
177:3,21 178:24

179:3,18,21
181:10,23 182:5,
17,18 184:3,8,12,
18,19 186:19
187:7,9,13 188:2,
25 193:22 195:15,
25 196:8,15,17,20
197:16 199:16
200:10 202:14
204:20,24 205:7
206:6,10,11,17
207:4,25 208:8,18
213:14 214:10,12,
23 215:10 218:7,
17,18,25 221:16,
18 222:3,7,13
224:7,21 228:4,7
230:9,15 234:8
235:10

**Notary** 5:4

**note** 62:11 96:5
121:3

**noted** 236:11

**notepad** 14:12,15

**nothing** 61:3
72:25 157:8
183:10 194:9
201:10 205:6

**notwithstanding**
145:18

**November** 34:6
35:2 79:19 87:15
93:11 110:24
132:9 146:21
173:13,24 175:21
176:6 178:4,22
179:10 180:2,9
182:10 183:25

**now** 29:24 39:19,
24 41:14 43:11
44:19 45:5 70:4,7
91:23 92:5,17
93:4,14 95:9 99:13
106:4,11 107:13
108:20 109:7
114:14 121:6
124:6 128:7 134:9
138:25 149:15
151:17 159:25
164:21 166:5
168:20 169:5,16,
20 171:12 172:7,
12 173:11 174:8
178:2,20 182:13

189:16 190:10
192:14 193:5,6,20
200:12 202:4
203:23 205:21
220:25 226:25
232:3 233:20

**nowhere** 167:11
184:12 194:15

**number** 32:2
34:23 43:21 44:12
79:6,10,13,22,23
80:4 81:10,12
90:4,9 91:11 92:6,
12 96:4 99:14
103:17 106:12,16,
24 107:18 108:21
109:20 111:13
116:7 118:17,24
119:14,18 120:20
134:12 135:2
150:11 160:10
162:10 206:21
223:16 224:13
227:14,15 229:22,
25 231:15 234:13
237:5 238:3

**numbers** 51:9
95:12,13 109:24
150:14,16 162:10
235:12 239:3

**numerous** 46:14
59:8 165:2,8
184:16

**NY** 16:11

―――――――
**O**

**o'clock** 32:14
36:13,14 51:19
52:25 53:2,6,11,12
179:22

**O-F-E-L-I-A** 135:6

**oath** 12:10,12

**object** 44:6
110:16 167:4
186:22

**objection** 6:18
7:5,20 10:24
15:12,25 17:5
18:25 19:9,16,21
20:6 21:21 22:5
23:3 27:3 30:15

34:19 36:17,23
37:13 40:21 41:9
43:2 45:16,25
46:18 47:9,18,23
50:8 51:21 53:15
58:14 61:18,23
62:13 73:15 74:13,
20,21 90:11
101:23 103:21
108:15 111:6
112:14 113:4,12,
18 131:3 139:19
141:19 144:22
146:23 150:2
156:20 157:16
165:16,21 167:6
187:15 189:8
195:14 204:22
213:2 214:15,17
215:3 217:25
218:2,4 228:19

**objections** 10:14,
23 235:7,11

**objects** 19:12

**obligation** 112:24

**obtained** 125:5

**obviously** 54:3
120:5 174:12

**occasion** 206:12

**occurred** 234:6

**October** 34:6 35:2
93:7 120:2 122:17

**Ofelia** 135:6

**off** 13:25 32:7 36:3
52:20,22 101:12
124:4 140:20,22
148:4 151:13
153:16 168:16,18
175:25 176:3
181:25 182:18
192:25 193:3
196:25 197:3,6
206:15,16 208:24
209:2 226:4,6
227:17

**office** 65:2 69:24
86:12 109:13
116:23,24 117:3,8,
16,19 120:22
121:21 128:15
131:7 133:8
185:20 190:19

191:13 220:17
239:15

**often** 144:17
185:22

**Oh** 21:8

**okay** 8:4 9:3 13:8
14:11 29:19 34:2
65:25 94:6 111:3
122:24 123:20
125:24 146:7
150:13 174:9
178:23,24 179:13,
18 185:7 191:10
192:21 193:19
195:10 196:13
197:20,23 209:23
215:23,25 219:22
224:19 226:8
227:9,10 229:17,
21 230:4 231:19
234:4

**old** 29:8,25 30:8,9
195:13

**on** 8:10 13:18
14:4,12 16:2 21:15
22:20 24:21 25:6,
14 26:20 27:19,20
30:10,11 31:5,7
32:6 33:22,25
34:16,17 36:6,10,
11 38:3 44:4 45:5,
12 46:8,20 48:24
49:12,22,23 50:20
52:3,4 53:2,25
58:2,5,9,10 59:21
60:11 61:5 62:11,
18 64:13 67:23
68:3,8,19 69:7
74:22 78:5,6,11,
16,18,19 79:4
80:20 83:3 84:16
86:13 89:3,16,17
90:4,25 91:7,13,21
92:2,5,13,17,23
93:14,22 95:9,17
96:4 99:13,24
101:22 103:9,20
104:21 105:16,19
106:4,11,13,21
107:3,6,13,18,21
108:20 109:7
110:23 111:4
112:6 114:7,21,22
115:2,9 116:18
118:7,12,20 122:7,

8,16 124:7 126:2,
20 127:12,25
128:6,8 129:22,23
130:23 133:16,17,
18,19,24 134:7,9,
25 135:8,24
136:22 138:7,10,
11,23 139:3,8,24
142:6,10,22
145:20,25 146:7
148:4,14,21,22
149:12,13 150:10,
15,24 151:15
157:20,24 158:3
159:7,19,23,25
160:11,19 161:2,5,
8,25 163:17
164:10,17,21
165:15 166:6
169:10 170:6,11,
15,24,25 171:6,7,
11 173:4,5,7,11
174:15,18,25
176:11,12,13
177:5,22 178:20
179:10 180:8
181:12 182:8
183:25 186:5,22
190:4 192:11,20,
22 195:19,21,22
196:2,5,6 197:2,7,
13 198:24 199:24
200:19 201:20
204:12 205:21
206:11,15,16,19
207:7,24 209:4,14
210:15,17 213:3
215:17 216:17
218:2,18 219:4
221:7 222:4,25
227:2,12,18
229:11,12,14
231:20 232:23
233:23 234:19
237:13

**on-average**
144:18 162:5

**once** 45:15 50:14,
25 51:8,11 104:4
134:14 140:25
142:10 146:8
158:13 185:24
189:11 220:22

**one** 9:9,22 10:4
29:20 38:2 57:13
67:4 68:16,17

265Index: ones–partner-up

71:10 75:18,19 77:14 78:8,9 85:22 86:11,23 89:22 98:16,17 104:10 116:17 125:14,24 130:2,3,4 133:6 134:2,23,24 137:15 141:15 143:19,20 146:17, 18 148:4,6 160:9, 24 161:2,3,6,7,9, 10,25 162:6,7,8 179:11 189:11 191:15,16 194:18 198:23 200:14 204:2 210:21 214:18,19 215:21 222:12,15,19,21 227:14 232:5,6 234:21

**ones** 14:7 86:19 166:23

**ongoing** 44:6

**online** 144:11

**only** 8:10,16 9:8 14:7 30:18 35:4,22 68:17 76:22 85:14 87:23 90:20,21 101:19 112:7 132:25 133:19,20 145:12 148:23 152:20 154:10,12, 15 166:24 170:9 174:17 190:25 196:6 215:15 222:15,19 231:7 233:5 234:14

**onto** 114:23 192:20

**open** 33:4 53:5 115:20 140:5 154:11

**opened** 207:7

**opens** 33:2

**operating** 37:10

**operations** 27:16

**opportunity** 28:14 63:11 232:21

**opposed** 7:19 140:9 183:15

**order** 101:13 110:6 118:10 124:25 136:4 141:4 204:3

**orders** 152:20

**organized** 153:4 204:5

**other** 12:7 14:5,7 20:11 21:4 23:16 25:25 49:20 69:18, 25 78:19,25 80:8, 25 88:23 96:13 97:5 103:25 105:14 114:3 115:3 118:23 119:13 129:17 132:2 138:4 141:15 148:6 149:9 161:7,8 162:7,9 167:2 170:12 178:16 179:12 185:15 194:18 197:5 206:16,18 208:9, 15 209:20 210:11 215:4 219:15 225:14 234:6 235:6

**our** 23:18,21,25 26:20 30:18,19 32:17 33:21 35:4 70:21 73:3 76:21 124:24 141:24,25 142:15 143:10,12 171:15,25 189:16 221:17

**ourselves** 14:21

**out** 25:11 37:17 38:19 44:3,21 55:20 57:14,17 58:12 67:2 76:16 103:6 109:12,14 110:5 115:12 116:7,18 128:21 132:21,23 135:18, 19 140:14 141:4,5 142:22 144:19 148:11,20 149:3 152:7 165:13,14 177:2,24 184:4 192:24 194:18 197:21 203:2,12 205:12 207:5,12 235:19

**outlet** 14:24,25 17:4 18:13 19:15 21:3 22:4,16,22 23:6,8,15,17 24:10,13 25:24 26:13,22,25 27:9 33:9 34:16 35:18, 19,22,24 40:5,17 47:21 48:21 51:18 53:14,20 54:7,20 56:3 57:3,20,25 58:23 60:3,16 61:2,13,17 62:24 63:5 64:24 67:3,9, 10,19 68:12 70:23 71:6,9,13,17,22 74:19,25 80:10 81:16 82:2 83:23 85:4,7,8 87:14,21 96:21 100:18 102:9,15 103:19 108:14 112:2,23 119:3,16,25 129:2, 9,13,17 130:14,18 132:11 155:18 156:8 157:14 158:21,23 163:10 167:23 178:17 197:8 205:24,25 210:23 215:14 219:6,7,19,20 220:4,7,12 221:22 231:23 238:22

**outlets** 23:10 132:3 162:12

**outside** 64:3,8 65:3 66:13 67:7,8 182:15 214:6

**over** 7:7 15:23 30:3 41:6 60:9 88:16,18 133:21 135:8 138:10 157:2 165:19 205:18,19 224:22 228:4,23 229:2,7,8 230:20

**overall** 53:20 54:7 232:13

**owed** 196:7 231:7

**own** 15:9 17:10,20 18:3 19:15,23 20:11,17,21,22 24:4 26:9 52:4 53:2 74:23 90:18 182:8 196:5 207:2

208:8 232:23

**owned** 17:18 26:12

**owner** 27:8 61:15, 22

**owns** 18:12 215:16

———

**P**

**P-** 21:18

**p.m** 236:11

**p.m.** 36:22 53:9 121:14 124:7 166:5,16 173:14, 25 174:24 176:8 178:5,22 179:11 180:9 181:7 182:11,24 184:2 187:25 189:18 190:5 192:16 193:8 194:24 196:10,15 198:24 202:7,20 209:5

**page** 90:3 91:13, 23 92:2,5,17,23 93:4,9,14,20,22 95:9,12 96:4 99:13 103:9,16 104:21 105:2,19 106:2,4, 16,22,24 107:3,6, 13 108:20 109:7 110:22,23 125:9, 17 127:4 134:10 139:4,13 149:18 164:10,20,21 169:13 173:11 174:8 180:9 182:9, 10 183:25 185:4 188:21,22 189:17 192:20 193:5 202:5 210:17 215:21 226:11 227:12 237:2,5 238:3

**pages** 69:3 105:14 134:4 167:12 171:11 172:8,17 174:11 200:19,20 201:2

**paid** 38:15 45:23 46:4,6 47:3,5 60:8, 25 94:18,20,24

95:17,22 96:21,24 97:6,14 98:21,22 99:6 100:11 103:19 104:4 107:22,25 108:12, 23 113:10 114:11 138:3,11,23 181:16 230:13

**Pakistan** 16:22 64:7 65:8 66:23 78:15 84:6 129:21 131:17 132:23 147:9 148:11 160:17 161:24 201:25

**paper** 114:21,22 115:2,9 116:5 119:11,12 141:23 174:12 204:2 205:5 206:22 207:5,11,12 217:13 227:12 229:12

**papers** 50:25

**paperwork** 51:3 72:2 76:2 117:12, 22 146:5

**paragraph** 210:20 211:25

**parents** 233:5

**Parsons** 161:7 162:5,24 164:3 239:23 240:8

**part** 6:16 26:12 28:4 89:6 134:7 183:19 202:15,16 206:19 218:17 219:7 228:4,7,16 231:9

**part-owner** 27:8

**part-time** 74:16

**part-timer** 74:15

**participated** 7:3

**particular** 139:8, 23 167:17,19 191:22

**partner** 205:11, 15,22 206:8,11 214:8

**partner-up**

266Index: partnered–posted

206:17

**partnered** 205:23

**partnering** 207:14

**partners** 21:15 24:4 26:13 185:13, 14,23

**partnership** 186:15

**party** 7:10 231:2

**pass** 18:23 62:11

**passport** 66:23

**password** 62:6, 11 145:10 149:11, 13 152:4

**past** 15:16

**path** 221:7

**pay** 28:23 45:6,23 46:17 50:17 60:4, 16 84:20 98:9,11 99:7,20 102:21 105:10,16,23 106:14,18 107:16, 20 109:2 114:7 115:22 142:20 146:8 149:23 162:17 164:9,17 195:18,21 196:2,4 206:21 207:2 219:16 223:2

**paychecks** 103:19 104:2,7

**paying** 230:9

**payment** 196:19, 20

**payments** 51:10

**payroll** 39:20 63:22,23 95:22 220:8

**PDF** 124:12 127:14 174:13,15

**PDFS** 124:20

**pendency** 14:13

**pending** 74:10 89:15 190:15 194:7 201:14

**people** 27:21 28:13 63:10 98:20 102:18 108:9 131:11 145:12,13 153:17 154:2,4 160:24 161:6 164:17 230:13,14

**people's** 20:11 73:23 100:10

**per** 29:11 46:9,12, 25 70:7 94:18 98:23 107:23,25 108:12 111:25 160:10 164:24

**per-car** 116:19

**percent** 18:3,8,9 19:18,22,24 20:12, 22 30:10,22,24 31:2,3,12 35:5 58:9,16 59:3 60:4, 9,17,18,24 61:4 79:5 91:19 92:16 111:19 138:18 143:17 148:2 152:16 164:25 165:5 174:19,20 186:14,15 231:13 232:24

**percentage** 17:11,19 18:5 19:14 61:15,22 186:9,11,13,18 187:11,17,19,20

**perfect** 157:12 229:15

**perfectly** 136:12 205:6

**perform** 72:24

**performed** 72:8

**period** 110:24 112:25 166:24

**permission** 90:18

**person** 9:9 57:17 85:13 90:20 95:17 96:8 103:11 104:23 108:22 125:20 130:6 135:7 140:12,14 150:12,21 160:25 163:17 184:19 208:15 222:3,4,7,8 232:4 233:5

**person's** 104:23 106:6 107:15 109:9,16 170:12

**persona** 153:14

**personal** 44:24 88:5 131:22 157:8 185:18 218:14,25 233:10

**personally** 62:17 129:6 223:21

**pertain** 150:17

**pertaining** 112:25 139:9 149:24 167:19 218:13 219:6 230:22

**peruses** 189:21 193:10 196:12 201:9 211:13 215:22 224:18 227:22

**Phelan** 21:18

**phone** 13:18,23 41:23 77:6,9,12 79:22 80:4 98:19 121:16 125:6,7 126:2,22 170:11, 12,13,15,20,21 171:6,7,18 173:2, 5,8 174:18,19,25 175:18 193:2 201:21

**phones** 77:11

**photo** 174:14

**photograph** 125:5 170:7 171:17 172:3 175:10 240:13

**photographs** 169:22,25 171:22

**physical** 13:14

**physically** 67:7

**pick** 26:19 34:8

**picture** 125:6 176:10

**pictures** 170:16

**pieces** 50:6

**place** 12:5 17:10, 13 38:25 41:4,5

57:22 59:2,13 73:4 81:15 192:18 217:7 223:23 238:21

**placed** 150:15

**plaintiff** 7:16,18 13:11 44:4 73:18 110:13 120:5 122:6 168:8 186:24 237:4

**plaintiff's** 6:2,3 68:22,23 69:2 80:18 89:17 122:11,13 124:22 125:3 133:24 134:4 139:5,13 149:16 169:6 197:25 198:10 200:12 209:6,8,10, 15,25 210:2,4,7,15 220:11 227:3,4

**plaintiffs** 124:13, 15,16,18,19 210:17

**plaintiff's** 169:15

**plan** 60:22

**play** 176:11,16,17 183:20 221:3

**played** 176:19

**playing** 84:13,18

**please** 5:9,12 9:4, 10,18 13:5 17:23 21:2 22:25 44:21 46:22 52:7,9,14 59:6 67:5 70:16 80:12 81:20 89:10 94:16 96:17 99:24 102:11 107:9 110:14 116:4 120:7,25 122:10, 15 124:14 133:8, 25 134:15 135:3, 15 136:5 139:15 151:11 152:22 157:8 173:4 175:17 179:15 181:5 185:3 189:19,20 193:8, 15 194:2,10,23 195:7 196:9 201:4 205:21 213:16 215:24 224:22 225:18 228:25

229:6 231:15 234:19

**plus** 29:4,10,14 45:18 47:6 58:3 98:11,23 111:21 112:5 164:16,24 165:3,4,5

**point** 57:7 83:21 128:21 136:3 158:11,20 159:4 177:19 188:13 227:6,8

**pointing** 173:12

**police** 39:6 81:13 238:19

**policies** 63:6,20

**policy** 63:8,9

**Poplar** 5:16 6:12

**porters** 97:14

**portion** 112:11, 16,19 177:13 206:24 234:10,11

**position** 40:8 56:21 57:9,19 61:12 82:2,3 83:19,24 86:7,8 99:7 100:22 103:10 104:24 105:5,9,18 106:6, 13,18 107:15 109:10,16,22 132:16 160:23 161:5,11 238:25

**positions** 97:5 110:9

**possession** 230:22

**possible** 30:4 46:7 52:18 57:16 112:16,20 123:19 136:14,21,25 137:3,8

**possibly** 21:20 103:24 108:4 137:5 151:7

**post-demand** 225:10 240:21

**Post-it** 62:11

**posted** 63:10,12

267Index: posters–question

64:18,20,21

**posters** 63:11,12, 16,25 64:18,21

**potentially** 132:15

**power** 61:7 147:15,16

**practice** 68:10,14

**Prashad** 135:9

**precise** 114:7

**prefer** 63:2

**preference** 26:15,23 155:15

**preferred** 26:15

**pregnancy** 8:10 128:25 129:6 130:12 131:23 178:10,15 184:7 188:11,13 189:6 192:4,5,7 194:13 232:9,18

**pregnant** 71:17, 18,19,20 73:7,10, 12,13 75:4,5 128:22 129:19,23 132:21 174:6 184:9,12,15,18,20 188:24 189:5,12, 15 194:16,19 199:25

**prejudice** 214:17

**prejudicial** 44:16

**preparation** 66:3 100:2 131:16

**prepare** 101:13

**prerogative** 197:13

**presence** 214:5,6

**present** 5:12 13:11 18:9 20:3,13 44:4 90:25 115:3 212:24 213:12,19, 21

**presented** 110:7

**press** 176:16

**pressure** 193:13

**prevent** 12:18 13:15

**previous** 138:15 156:15,16

**previously** 47:16 48:3 61:15 92:11 111:14 121:4 129:15 132:17 165:8 186:25 203:14 205:3 225:23 234:12

**price** 51:6,10

**print** 142:8 177:2, 3,24 209:17,20

**printed** 100:16 166:12 174:15,17 210:25 215:20 225:15

**printer** 142:2,3,4

**printing** 141:23

**prior** 15:23 42:24 59:12 66:25 82:7 111:16 113:16 216:19

**privacy** 44:2 152:8 186:19

**privilege** 213:4,6 218:3

**probably** 65:12 77:5 114:2,15,16 124:24 132:12,13 183:3,5,9 188:8,10 190:19 192:23 194:19 200:2 203:21,22 204:15 212:5 231:12

**problem** 8:23 9:2 65:24 133:11 177:17 203:6,16 205:13

**problems** 143:5

**proceed** 168:15 194:10 213:16

**process** 28:9,22 117:14 118:4 119:11,12 123:6 141:23,24 142:10, 11 229:6

**processed** 117:21,25 118:9,

10

**processes** 144:10,15

**processing** 128:16

**produce** 121:5 123:8,11 177:18

**produced** 100:4, 13,14,21 101:20 110:12 120:12 225:6 240:20

**producing** 123:6 167:5

**production** 69:7 91:15 92:4,6,19,25 93:5,10,17,23 95:11,13 99:21 100:5 101:14 134:9,12 139:2,6, 12 149:19 164:11, 22 187:5 210:18 226:11

**profiling** 221:21, 24

**profits** 186:11,17 187:12

**program** 59:18

**promise** 59:6,10, 11,16,20 61:8 84:2

**promised** 30:14 57:25 58:7,12 59:2,7,17 84:11 85:22 87:20

**promises** 30:17

**promising** 85:17

**promoted** 85:24, 25

**promoting** 83:24 132:15

**promotion** 84:3, 7,12,14 85:17,23 87:20,21

**promotions** 84:10 88:6

**pronounce** 41:18,22 161:16

**proof** 146:10

**properly** 137:7

**provide** 14:8 31:10 62:6 133:8 146:9 163:23 177:15 238:5,9,12, 16,19,24 239:8,14, 19 240:3

**provided** 94:11 100:17 134:7 163:18 164:14 172:13 174:19 228:16 235:11

**provider** 79:25

**provides** 63:24 138:13

**Public** 5:4

**puke** 188:5

**pull** 122:3 166:2

**punished** 152:13

**purchasing** 5:20

**purposes** 43:24 101:9 142:5

**push** 91:2 127:12

**put** 19:8 30:9 49:25 50:7,10,24 53:2 57:14 58:12 90:22 110:14 137:3 140:14,17 142:21 145:8,14 170:4 171:23 183:23 188:19 222:10 225:11 229:3

**putting** 29:23 161:25 170:7

**puzzle** 50:6,10

**puzzles** 49:24

---

**Q**

**Q40** 122:18 125:22

**quarter** 142:21

**Queens** 156:23, 25 157:5

**question** 7:13 9:6,11,12,13,14, 23,24 10:5,8,14

11:7,16,19,25 16:3 17:21,24 18:2,7 19:13 20:25 21:8, 22 23:2,5,12,13,14 24:2,15,21 25:4,7, 12,14 30:24 34:21 35:23 36:10 37:10 40:10,14 41:2,11 42:24 45:9,14 46:10,13,21 47:15 48:2 49:17 50:4 51:24 52:2,5,8 53:10 54:9,15 58:6,7,20,21 59:6, 8,12,15,23 60:7, 10,13 61:10,14 64:10 65:15 67:4, 21 68:9 71:10,24 72:18 73:12,14 74:10 75:2,13,14 76:21 77:23 81:9 82:7 86:25 87:3, 18,24,25 89:15 91:8 92:7,9,19 93:24 94:16 95:3, 6,7,8,19,25 96:10, 16,18,25 97:4 99:12,18,24 100:4, 8,11 101:25 102:11,25 104:10, 13,16,17,20 105:14,21 106:9, 22,25 107:4,7 109:18 111:7,20 112:9,10 113:14, 22,25 116:3 118:15 119:4,8,9 126:23 129:14 130:16 131:4 134:13 136:7,13, 18,24 138:8,15 141:6,8 143:13,17 150:5,13,19 152:22,23 154:20, 22 155:3,7,8,11, 20,25 157:4,9 159:21 169:21 171:16 173:6 174:14,24 175:3, 12 179:9,17 180:16,17,21 181:4,6,7 185:20 186:16,19 187:8 188:7,14 189:7 190:15 192:22 193:16,18 194:6,8, 9,11,15,22 195:4, 6,11 196:8 197:5

A1301

268  Index: questioning–repeat

199:4,13 200:8,25 201:14,18 202:23 203:9,22 204:17 205:21 206:9,10 207:3,4 208:12,23 211:22,23,24 213:15 214:9,24 215:2 216:4 217:12,17 218:8,22 219:22 221:8,9,20 227:25 228:2,15,18 229:6,7,8,10,20 230:4,5,15,20 231:9,19 233:25 234:2,5,19,20,23,24 235:2,3,13 236:6 240:14

**questioning** 73:17 107:11 220:25

**questions** 6:24 8:6,7 9:22 10:4,23 22:24 23:2 24:24 25:6,13 52:10,16 128:12 169:19 173:9 210:12 224:8 227:8 236:7

**quick** 43:5 225:14

**quickly** 123:19

**quit** 69:17 71:21 74:22

**quite** 39:11 85:11 174:24

**QX60** 179:11

**R**

**race** 222:14

**racial** 221:20,23

**ran** 61:9 154:14 155:21,22 156:24 177:2 205:3 207:5

**range** 203:19 221:12,13

**rank** 57:21

**rate** 29:14 58:4 105:3,20 108:24 111:15,24 112:12 114:20 164:14 232:18

**Raymond** 21:18

**re-** 87:2

**re-ask** 181:5

**reaction** 132:20,22

**read** 17:23,25 63:17 83:7 95:2,5 104:12,15 122:15 123:4,22 133:13 155:2,24 179:15,22 180:17,21 189:19,20,23,25 190:8 191:24 193:8,15,17 194:23 195:2,3,7,10 196:9 197:19,21 198:19 200:22 202:8 204:19 210:20 211:5,10,15 224:5,8,9,15 227:19 229:6,7,18,25 231:15 234:2

**reader** 123:2

**reading** 190:10 193:9,21 195:9 202:12,19 211:12 224:17 227:15

**reads** 155:6 190:16

**ready** 179:16

**reality** 234:25

**really** 7:9 10:18 34:23 72:15 120:18 153:10 158:18 174:2 184:3 188:2 194:20 232:22

**reason** 9:4 11:6 72:8 88:11 158:14 178:7 208:20

**reasons** 10:24

**recall** 7:8,9,22 12:25 17:2 28:6,12,18,20 39:2,3 40:6 42:22,25 46:24 53:19 55:6 56:4,5,7,24 57:2,3,5,10 64:12 65:14 69:23 71:8,12 72:16,19 73:21 75:3 76:10 77:15

79:5 81:8,17 84:10 87:17 88:21,22 94:21 103:23 104:18,25 105:6,22 108:6,19 109:3 129:11,24 131:15 133:3 147:6,18,19 156:12 158:14,15,16 160:21 161:21,22 162:4,17,19 163:2 178:11 184:8,17,21,24 187:18 188:15 189:2 190:23,25 192:7,10,13 193:4 194:14 197:4 199:3 204:10 217:5 221:19 228:9 231:3,13 232:2,6,7,8

**recalling** 12:19 13:15 152:17

**receive** 97:18,21,25 98:6 102:9,22 104:7 186:8 231:10

**received** 104:2 119:23 130:23 171:5 172:22 186:9,10 194:12 204:8 206:25 216:18 232:11,15,17 239:12

**receiving** 96:7 232:8

**recent** 15:18

**recess** 9:19 43:15 70:9 121:13 166:15

**recognize** 89:20 106:5,12,17 107:14,19 216:5

**recognized** 86:18 129:25 144:14

**recollection** 69:10,17 202:24 203:10 210:22 212:2

**record** 5:10,13 13:10 42:3 45:5 52:21,23 75:8 80:17 92:2 94:7 96:3,5 101:3,22

105:25 107:20 110:20 112:21 122:7,9 123:23 124:5,8 133:14 134:3 135:25 136:5 140:18,21,23 151:14,16 166:7 168:17,19 176:2,4,5 190:7,9 194:3 202:11,18 208:25 209:3,4 210:25 211:6 226:5,7 228:7,10,16

**records** 38:21,23 39:10 75:7,11 76:23 79:2 90:21 91:22 101:19 112:10,25 113:15 114:14,18 115:9 119:13 195:19,21,22 228:3,6

**recruit** 84:15

**redo** 180:24

**refer** 109:13

**referenced** 167:13 191:22

**referred** 225:5 240:19

**referring** 14:22 15:4 20:23 69:3 88:2,3 97:20,24 126:18

**refers** 150:20

**reflect** 13:10 80:17 173:7 176:5 190:7,10 194:3 202:11,18 211:6

**reflected** 102:21 204:12

**refrain** 233:9

**refresh** 69:10 202:24 203:10 212:2

**refreshes** 210:21

**refused** 187:4

**Reg** 103:10 104:21

**regarding** 63:6 120:23 239:17

**Regardless** 37:2

**register** 72:3

**registered** 72:5,7

**registration** 72:7

**regular** 78:6,9,12,24 99:7 105:3,20 108:23 164:13,16 168:5 210:6

**regularly** 31:25 96:7

**regulations** 113:2

**related** 167:14,17,20

**relationship** 85:3,11

**relationships** 85:12

**relax** 181:5

**relevance** 47:10 73:16 74:14 108:16 156:21

**relevancy** 15:13 16:2 22:6 23:4

**relevant** 156:18 166:24

**religion** 222:14

**remaining** 19:23

**remains** 91:8 105:15 132:19

**remember** 21:25 39:12 44:19 46:7 71:4 73:22,23,24 98:8 156:13 158:19 161:15 162:12,14 178:18 189:14 216:13 217:8 219:12 230:12

**remind** 183:9 189:6,13

**reminder** 157:7

**rep** 134:21

**repeat** 9:25 11:20 67:4 71:10 94:16 104:10 154:20 157:11 180:14,16

269Index: repeating–same

211:21

**repeating** 36:9 46:13 52:5 87:24

**rephrase** 11:16 20:24 35:12 155:5

**reply** 49:13,15,22 221:9

**report** 39:6 81:13 89:23,24 159:20 238:19

**reported** 35:15

**reporter** 5:8,18 8:14 13:7 17:23,25 19:5 66:10 68:21 95:5 104:12,15 135:24 155:2,6 180:12,17,19 193:17 235:24

**reports** 148:17

**represent** 8:19 101:3,11 165:2 166:17 170:22 172:3,20

**representation** 150:8,23 167:10 171:4 198:5,14 201:16,19 216:16

**representative** 212:11,17

**represented** 20:12

**represents** 172:9

**reprint** 176:24

**reproduce** 176:25

**request** 23:24 70:8 110:8 175:16 209:22 225:10,16 229:25 230:2 231:15 240:21

**requested** 100:16 101:8 186:25 189:23 190:2 224:25 234:17

**requesting** 224:3

**requests** 81:22 110:15 211:19 225:25 234:13

238:2

**require** 128:13 141:17 146:7 224:8

**required** 121:4 142:14 170:20

**requirement** 145:25

**requires** 144:13 145:3

**residence** 6:10 15:9,19

**resident** 83:13

**respect** 85:14 219:2 231:6 235:8

**respected** 85:8,9

**respond** 10:17 11:4 164:6 204:9 225:12 229:4

**response** 8:24 16:6 54:13 133:3,5 173:18 185:6 190:18 192:19 210:5 223:23 224:12 227:16 228:5 229:8,20 230:3 234:2,11 237:17,19

**responses** 8:16 209:21 210:9 216:20 218:13 225:17,25 226:2, 11 227:13 228:16 235:5,6,9

**responsibilities** 27:7,11 28:5 61:17,20,22,25 62:3 82:6 83:18

**responsibility** 82:12

**responsible** 219:15,25

**rest** 112:7

**restroom** 9:18

**resume** 28:11

**returned** 66:16

**review** 76:5 168:21 172:16

216:20

**reviewed** 134:14 226:13

**reviewing** 14:5,6 76:25 201:12

**rid** 30:3

**right** 10:12,25 25:3,22 27:14 28:16 34:14 40:13 41:14 43:10 44:19 49:10 51:16 64:25 65:3 67:5,22 72:24 83:11 84:12,14 86:12 87:2 94:4 97:25 109:19 112:5 115:21 127:23 128:7 136:8 143:4,7,10, 11 147:8 154:3 160:13 171:12 173:10 188:9 191:19 205:21 216:24 217:21,22 220:18 221:10 222:9

**rights** 63:18

**robber** 76:7,11,13 152:10

**robberies** 75:18

**Robbers** 76:13

**robbery** 38:22,25 39:7 75:9,18,19,20 76:3 77:13 81:14 114:17 152:10 238:20

**role** 39:19,23,24 100:2 183:19 221:3

**Ronald** 21:17 213:23

**room** 121:25 204:13

**roughly** 143:8

**Rover** 203:19

**Rule** 44:8 186:23

**rules** 8:3

**run** 17:10,12 20:18 21:4 50:16, 19 55:19 63:2

82:13 143:20 148:8,9,12 149:7 153:2,11 154:18 155:12,18 156:4 157:5 207:15,17, 18,19,22 208:8,13, 15 222:23,25 223:2

**running** 20:21 27:15,16,24 146:21,22 147:9, 21 156:8

**rush** 191:9

**rushing** 191:3,4,5

———————

**S**

**S-** 22:9

**S-A-A-C** 89:2

**S-H-A** 117:4

**said** 19:7 29:10 35:20 36:11 46:14 52:2 53:11 56:13 63:19 69:22,24 75:4,9 76:16 78:15 87:23 96:23 111:14,16 117:20, 24 118:5 122:24 125:24 129:22 130:2 140:15 145:4 151:21 152:3 159:22 161:19,20 162:2 179:21 181:10,18 182:5 183:9 184:11 185:8 188:9 190:20 191:5,9 192:11 194:10,14 196:3 197:10 199:24 201:11 205:6 217:18 226:13 231:18

**salary** 29:4,14,20, 21 46:17 47:2,6 98:11,23 100:10 108:2 164:16 186:8 195:23

**sale** 136:22 140:18

**sales** 23:22 26:10 51:10 59:3 60:4

83:24 86:2,6,9,23 89:11,19 91:5 97:9 98:5 99:10,17 101:19 102:17,18 112:24 131:7,9,12 132:15 147:23 154:5,6,7,14,15 159:7,12,13,15,19, 23 160:4 167:17, 20 184:10 186:3,4 187:14 205:24 208:15 228:3,6,11

**salesman** 50:11, 20 51:5 59:2 92:14 148:6 228:13

**salesmen** 45:22 48:15 57:25 206:8

**salespeople** 23:9,15 24:18 25:19 48:11,21 51:18 60:25 96:12 97:7 98:10,15,20 102:14 103:18 104:8 114:5 119:3, 15,24 154:10,11, 16 159:3 220:21

**salesperson** 29:2 31:18 52:3 53:18 82:4,5 83:19 86:3 90:17,20 91:3 94:24 95:24 96:9, 24 98:17,18 102:8, 24 115:11 116:6, 20 137:15,20 138:3,13,23 140:12,13 154:17 155:9,13 158:10 160:11 164:15 165:15 183:13,15, 17,20,21 197:14 207:6 231:22

**salespersons** 98:16 231:25

**saleswoman** 53:14 63:2 160:19

**same** 9:4 12:13 15:3 18:9 19:20 20:2 39:24 40:20 52:5 57:21 59:15, 25 60:2,22 74:21 79:23 86:7,8,9 88:19 91:9,17,24 92:7,8,20,22 93:2, 7,12,17 104:20

270 Index: sat–she

105:15,23,24
106:22,25 107:3,6
108:3 115:24
116:9 117:9 118:4
120:24 135:23
139:3 146:14,16
149:24 150:12,21
157:8 159:8
162:22 163:11,13
171:9,16 186:13
187:20 208:5
210:18 212:17,19
216:17 218:2
221:7 222:18
225:23 226:8,20
239:17

**sat** 159:24

**Saturday** 31:7
67:24 68:4,6

**saw** 184:10 214:3
231:7

**say** 8:15 11:25
16:25 17:16 25:10
31:7,11 33:10,13
34:24 36:6,12
46:15 49:25 51:25
53:12,23 55:2
56:10 57:18 58:5
59:10 60:23 67:23
72:6,13 85:10
87:13 90:24 91:2
92:10 94:23 95:23
99:16 102:7,20
104:6 105:24
106:8 108:10
112:18 125:22
140:6 141:13
143:9 146:7
147:20 148:3,7,23
149:22 150:16
154:11,12,13
157:18 158:7
160:3,16 163:7
165:10 168:3
178:18 179:25
180:4 181:19
182:2,14,21,23
183:4 184:6
188:12 189:12
193:25 197:16
200:9 201:23
202:2 204:18
206:23 207:24
208:7 213:11
215:13 218:12
226:20 228:3

230:6 235:15

**saying** 10:23 11:8
14:9 19:11 26:4
36:20 59:6 69:20
87:19 112:22
119:5 135:23
144:13 156:24
188:24 198:24,25
218:25 220:13
228:22 233:14

**says** 36:14 69:7,
12,16,20 103:9
122:18 126:7,13,
16 135:5,22
168:10 173:16,25
178:24 179:11
182:11 183:6
184:2,14 191:2
193:11 197:17
206:20 212:8
216:14 234:11
235:9

**scan** 142:17
146:11

**scanned** 114:23
142:16 166:12

**scattered** 76:2

**schedule** 31:16,
17,20,22,24 32:7,
11 33:2,3 35:7,10
36:11 42:21 47:12,
17 57:12 74:12
153:24 154:9

**schedules** 32:8
153:23

**school** 16:14,15,
16,20

**score** 143:21

**screen** 14:4 68:19
89:10,16 91:8
133:25 171:11
177:12 207:7,8
209:15 215:17
227:2,18 229:12,
14

**screenshot**
127:12

**screenshots**
127:7

**scroll** 134:16
135:3,11,15 172:7

179:14 193:5
200:23 215:21
229:16 231:14

**scrolling** 134:17

**Sean** 160:25
161:17,19

**search** 51:8

**season** 33:22,25

**second** 10:20
29:23 38:8 52:5
117:7 125:9
133:23 134:21
135:7 140:2
141:17 159:2
160:22 161:3,4,9,
11,22 162:3
170:13,15 190:11
205:17 233:23

**secondhand**
223:7,9,17 225:2
240:17

**section** 139:8
227:9

**sections** 227:7

**security** 43:21,23
44:11 83:12 142:5
223:4

**see** 14:12 41:12
69:5 73:22 84:16,
24 89:18 90:21,22
110:23 114:7
135:14 153:13
166:2 173:7
174:12,25 175:14,
23 176:9,12,14
179:8,23 180:6
181:11 182:7
188:7,10,18,21,23
191:2 196:23
201:5 204:15
207:9 226:17
232:23

**seemed** 190:21

**seen** 184:13,14

**sell** 23:10,25
25:22,25 26:2,4,
19,20,23 29:21
31:8 34:16 53:22
82:18 141:7
144:14 206:14
212:14

**selling** 132:10

**seminars** 144:11

**send** 77:2 145:15
177:25

**seniority** 46:8
204:4

**sense** 177:10
182:8 205:16,22

**sensitive** 167:3

**sent** 28:11 77:4
81:4 124:11 125:4
166:19 168:9,25
171:5 172:21
237:11

**separate** 8:8
125:14 218:16

**September** 34:5,
12 54:3 79:17 93:2

**Serge** 54:25 55:8
87:5 147:15,20
210:12,16 211:8
212:2 224:4

**serial** 135:2

**serve** 48:12,15

**service** 79:25
145:12 148:8

**serviced** 27:17

**set** 104:22 139:3
153:23,24 154:9
211:4

**settlement** 101:8,
10

**seven** 174:11
197:17

**sexual** 232:9

**shake** 8:21

**shaking** 8:17,25

**Shane** 161:7,13,
17,18,20 162:20
163:3,6

**Shane's** 161:14

**shareholder**
21:15

**shareholders**
185:16

**shares** 17:19
18:12 20:11,12,17
24:4

**sharing** 133:24

**she** 11:8 28:10,11,
12,25 30:21 31:19,
25 32:4,5,12,15
35:15,17,20,21,24
36:2,3,4,7,12,13,
14,15 37:3,4,15,17
39:17 40:8,11,13,
16,19 41:6,7,13,19
42:11,15,23 53:17,
22 54:3 57:19 61:8
69:23,24 70:2
71:3,5,8,13,17,18,
19,21,25 72:2,9,
11,12,13 73:6,7,
10,11,12,13,18
74:15,17,18,22,25
75:3,4 77:4 78:17
82:13 84:11,12,17,
21,22,23 85:6,8,
21,23,24 86:3
87:14,23,24 90:18
117:14,16,17
118:2,9,10,12
122:8 128:24
129:3,5,8,11,15
130:8,10,11 132:6,
12 155:18,23
157:14,20,23,24,
25 158:2,4,5,7,9,
12 160:18,22
161:4,22 164:15
167:22 173:21
178:12,19 181:9,
10,11,15,16
182:16,17,18,20,
24,25 183:3,4,6,8,
11,13,14,17,20,22
184:9,11,15,16,17,
18,19,20,22 188:8,
15,16,17,18,19,24,
25 189:11,12,14
191:3,9 192:22
193:12 194:16,17,
18,19,21 195:19,
22,23,24 196:4,15,
16,18,19,23 197:2,
3,4,6,9,10,11,13
199:23 203:7,17,
20,23 204:6 207:6,
19 219:9 220:8
232:16,19,20
233:2,7

271Index: she's–stolen

**she's** 25:17 39:25 69:24 193:11 203:18 233:19

**sheet** 138:14

**shift** 36:11,13,14, 21,22 37:5,6,8,24 148:5

**shirt** 153:16

**shit** 192:18

**short** 70:5 196:2

**shortest** 222:2

**should** 24:11 26:2 75:8 81:18 149:12 154:18 182:21 183:7 188:19 204:3 224:5 229:16

**show** 24:18 50:13 68:18 82:8,9,19 91:6,11 93:19 125:2 169:18 182:17,19,21 184:14 192:18 197:24 198:9 207:21 209:14 226:25

**showed** 76:11 81:23 207:7,8

**shower** 180:11

**showing** 14:3 91:23 105:23 109:4 171:7,11 172:12 177:13 215:17

**showroom** 139:16 140:9

**shows** 92:7 139:18 185:5 195:20 196:5

**shut** 193:2

**Shylet** 22:9 24:4

**sic** 207:5

**sick** 196:24

**side** 29:21 127:13 146:2

**sign** 51:14 80:3 83:15

**signature** 216:5

**signed** 38:19 216:12 217:21

**signed-in** 38:18

**signing** 216:19 217:13

**similar** 98:10 100:4 229:6

**simple** 29:19 83:14 102:12 139:21 174:24

**simply** 183:23

**since** 7:25 8:14 17:12 41:20 77:13 156:5 192:18 203:21

**single** 68:11 125:20

**sinuses** 12:22

**Sir** 180:5

**sit** 65:4,5

**sitting** 140:3 174:4 188:8 204:6

**situation** 141:12, 13,18 206:13

**sleep** 192:25

**slow** 34:6,7,8 35:2 134:15 191:5,7,8, 17,18,25 192:9 205:7

**smaller** 177:7

**smoked** 205:12

**smoothly** 27:15, 16,24

**social** 43:21,22 44:11 83:12 223:3

**software** 54:12

**sold** 23:15 53:20 54:6,7 90:4,9,18, 25 91:3,7,9,11,16, 21 92:8 111:5 113:3,16,17 115:13 116:19 118:25 119:14,20 136:25 137:3 138:7,12 140:17 158:4 160:10

162:5 164:24 239:9

**solely** 234:13

**solid** 178:5

**Solution** 82:21

**solutions** 83:4 137:25 138:3,9

**some** 8:3 10:22 32:4 36:2,3 45:23 50:15 80:7 104:4 144:11 145:3 163:25 170:12 173:5,8 177:19 208:9 210:11 232:17 235:5,9 239:21 240:6

**somebody** 147:18 149:14 152:3 178:13 184:23 196:14,22 199:23 207:10 233:4

**somehow** 208:20

**someone** 72:23 76:8 77:22 151:18 184:9 185:18 230:9

**something** 7:11 33:6 98:12 127:9 148:25 158:3 173:16 188:20 194:20 210:14 215:7,9 218:9

**sometimes** 30:8 49:15 51:2,17 53:24 59:18,19 60:11,12,21 83:4,5 90:13,14 137:6 141:24 142:6 144:8 146:2,3,4 155:23 157:23,24 197:11 206:11,13

**somewhere** 34:25 185:10 188:20

**sonogram** 129:8, 12

**soon** 52:17 76:4

**sorry** 31:3 138:7 151:25

**sort** 165:12

**sounds** 43:12 123:14,21

**source** 134:23

**space** 42:2 66:11 235:25

**speak** 5:23 9:5 66:2,7 69:4 126:20 175:15

**speaker** 151:7

**speaking** 9:9 126:3 127:16 137:12

**speaks** 135:24

**specific** 139:8 173:8 198:19 227:13

**specifically** 20:10 30:12 33:11 65:7,16 139:11 149:17 157:4 202:5 215:14

**speculation** 11:24

**spell** 41:21

**spent** 158:4

**spoke** 127:17

**spoken** 24:9

**stamp** 128:17 168:12

**stamped** 202:20

**standard** 222:18

**stapled** 211:16

**start** 9:10,12 20:2 32:21 33:5 35:25 36:7,13,15,16 37:7 47:13 56:2 67:17 81:24 90:2 91:12 144:20 156:7 157:22 162:11,21 220:5 226:12

**started** 17:14 36:4,12,13 37:3 55:13 56:5,11,14, 15 69:11 73:11 75:3 156:9 203:21 210:22 212:3,5

**starting** 15:18 34:5 93:20

**starts** 34:8

**state** 5:5,9,12 6:10 120:14 231:4,10

**stated** 41:14 122:7

**statement** 150:15 163:18 234:16,20 235:9

**statements** 50:18 99:22 100:6,12,14, 21,23

**States** 16:17,24 64:9 66:14,17 67:8 84:8

**stay** 48:21,23,25 49:3,4,7,14 50:2 51:19,25 52:4 53:8 59:25 188:5 221:7

**stayed** 48:24 52:25 53:6

**staying** 49:4

**stays** 48:17 60:2

**stenographer** 9:8

**step** 29:20 60:14

**Stidhum** 28:6 45:8 52:25 62:7,25 79:3,9,16 81:25 101:17 114:6 121:19 122:5,7 128:21 129:18 164:14 175:23 182:4 238:7,14

**Stidhum's** 82:2

**still** 10:16 11:3 38:21 55:12 60:2 69:23 76:17 77:25 87:12 89:17 91:13 100:7 132:18 138:6 139:3 141:21,22,23 144:6 153:13 162:22 223:3

**stock** 23:21 24:16

**stole** 149:14 152:3

**stolen** 75:11,21,

24

**stomach** 184:5 188:3

**stools** 65:5

**stop** 43:6 52:14 59:6

**store** 33:16 47:20 48:11,13,22 53:4 183:2

**straight** 104:22 140:5

**straightshooters** 70:18

**street** 22:13 24:17 25:20 26:6

**strong** 222:20

**structure** 30:19 31:2 45:6 58:25 59:13,21,24 60:22 105:12 119:6 138:21 145:21 165:12

**structures** 165:10

**stub** 99:20 102:21 105:17,23 106:14, 19 107:16,20 114:7 146:8 164:9, 18

**stubs** 50:18 105:10 109:2 115:23 149:23

**stuff** 209:20

**stunned** 232:16, 19

**subject** 8:7 60:19, 20 215:2

**subjects** 221:6

**submitted** 220:23

**subsequently** 42:5 44:22

**such** 230:22

**Sudafed** 12:22

**sufficient** 111:10

**Suffolk** 23:7

**summer** 48:4

**summertime** 32:20,24 37:12 48:8 53:7,11

**Sunday** 32:7

**supplemental** 210:8 215:19 216:9 223:6 224:12 225:17 226:2 228:4 237:19

**supposed** 36:15 68:3 182:20 183:4 195:24 196:4

**supposedly** 130:22 163:16

**Supposing** 207:21

**sure** 27:13,14,15, 17,20,24 33:15 37:17 39:20,21,22 49:5 67:6 71:12 75:22,25 76:19 83:10,15 102:13 104:11 109:14 114:10 115:18,19, 20 118:3 127:10 142:15 143:11 145:24 153:3 186:4 205:12 221:7 235:4

**surveillance** 76:5,11,17,21,25 81:11 238:16

**Susan** 40:3 41:15, 18 219:8,10,11,13 220:7,9,10

**Susan's** 41:16

**suspended** 158:22

**sworn** 5:4

**system** 54:19,22 55:18 62:5,18,21 63:3 115:5,7 135:18,20,21 137:7,13,14,24 138:6 145:7,8 147:10 148:13 154:19 208:11

**T**

**T's** 142:24

**T-H-A-N-W-A-L-L-A** 5:2

**tables** 65:4

**take** 8:15 9:16 10:8 12:21 24:11 29:19 37:24,25 38:25 43:4,7,9 49:16 50:13,14,22 57:22 63:8 65:17, 23 70:4 82:10,11, 20,23,24,25 83:3, 5,14 89:10 107:12 112:3,4 115:21 121:6 123:10 125:6 142:2,9 143:8,14,15 144:16,19 146:4 148:7,8 149:17 165:25 166:14 170:16 171:21 173:4 177:10 180:20 183:24 189:4,17 193:13 197:3 200:11 201:4 208:18 217:6 225:13,18 227:11

**taken** 12:10 39:10 43:15 70:9 121:13 166:15 169:22 170:2 171:18

**takes** 49:12 51:7 140:8 141:7,22 143:3 146:17,18 152:20 177:11 205:2 220:21 221:8

**taking** 10:2 12:17 61:4 76:11,13 85:21 88:9 178:6

**talk** 31:16 38:7 70:16 83:23 143:18 173:16 190:20 192:17 205:19,20 212:24 214:14 215:10,11

**talked** 86:21 133:18 138:2 161:13 203:17

207:13 215:5,7,9

**talking** 19:2 30:13 62:4 75:17 81:4 85:19 112:13 114:19 116:2,16 124:23 127:21 163:4,9 173:21 181:6 194:19 203:7 221:2

**tally** 160:12,19

**tax** 223:4

**telephone** 98:17 131:22

**tell** 11:9,16,20 12:10,13,24 28:23 30:18 31:21,23 32:12 72:23 73:2 84:5 86:4 100:9 105:9 109:15 129:5 134:15 139:17 144:17 149:9 167:25 171:13 184:18,19 195:8 198:3,12 229:15

**telling** 11:6 42:17 100:9 152:5 192:9 193:11 206:3 230:8

**tells** 10:15

**term** 155:16

**termination** 69:9 74:11 237:8

**terms** 33:10 113:16 114:19 140:24 164:13 198:5,14 205:23 220:20 222:2,21

**testified** 5:6

**testifying** 12:14, 19 13:16

**text** 77:25 78:4,6, 9,12,21,24 79:7 81:5 84:24 121:18, 20 122:4 123:6 124:10,19,23 125:10,12,15,17, 19 126:21 127:8, 25 128:13 130:23 131:21 133:17,19 166:3 168:5,11,25

170:7,14 171:4,10 172:4,15,21 173:12,15,24 180:10,18 181:6 182:7 183:24 185:4 187:24 188:17 189:7,17, 25 190:4,8,11 191:23 192:15 193:7 194:12,23 196:6 197:15 198:23 202:6 204:18 206:20,24 208:5 232:24 237:9,11 238:5

**texted** 78:11,17 132:23 170:17 181:21 182:3,24 184:9 198:21,24, 25

**texting** 132:24 170:19

**than** 34:13 45:14, 24 49:16,19 77:9 84:22 114:7,11 116:10 181:20 182:3 208:17 232:5,6

**Thank** 6:15 35:13 42:5 75:16 81:22 111:10 236:8

**Thanwall** 118:21

**Thanwalla** 5:1,11 6:1,7 7:1 8:1 9:1 10:1 11:1 12:1 13:1,13 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,17 44:1 45:1, 6 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,13, 22 67:1 68:1 69:1, 4,5 70:1 71:1 72:1

73:1 74:1 75:1 76:1 77:1 78:1 79:1,8,12,15,21 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1,9,16 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1,15 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,23 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,15 122:1,15 123:1 124:1 125:1 126:1 127:1 128:1,20 129:1 130:1 131:1 132:1 133:1,10,15 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1,21 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,9,12 165:1 166:1 167:1 168:1 169:1,3,10,14 170:1 171:1 172:1 173:1 174:1 175:1,19 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,13 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,13 226:1 227:1 228:1 229:1 230:1 231:1

**232:**1 233:1 234:1 235:1 236:1,8 237:1,3,16 238:1,7,10,13 239:1 240:1

**that's** 10:18 13:24 24:25 25:2 26:18 49:17 56:20 76:15 81:8 85:14 86:4 87:2 92:15 97:20,24 112:21 113:23 124:20 133:20 146:14 147:17,18 148:23 153:12,14 166:4 170:9 171:6 174:18 177:4 183:12 184:11 196:21 197:20 204:7 205:13 223:13

**their** 22:2 23:16,24 48:16,24,25 49:2 52:4 63:18 65:5 72:24 83:12,13 105:18 137:21 138:10

**them** 22:12 23:23,24 24:18 26:11,15,23,25 28:17 38:3 46:4 50:12,13 63:17 72:23 73:2 82:9,19 100:21 103:6 116:17 120:17 123:8 130:3,4 145:12 159:25 162:3 170:4 175:4 181:24 197:3 222:15,17

**themselves** 110:8

**then** 11:10 24:22 25:21 28:16 50:13 51:6 65:13,23 107:22 118:6,8 122:25 124:20 126:13,16 127:20 135:7 136:7 142:10 144:7 145:15 169:11 179:10 180:19 185:5 190:21 191:7 198:22,23 199:25 205:3,18,19 206:19 210:17

220:9 226:17 235:11

**there** 7:15 8:8,24,25 9:21 10:2,8 14:17 29:5,15 30:17 36:20 37:20 38:8,11,23 41:6,12 48:20 49:7,23,24 50:24 52:24 53:8 54:4 57:7 58:8,11,25 59:11,20 60:21 62:24 64:25 65:3,4 67:17 72:7 74:9 75:7,8 78:8 85:24 89:14 96:3,6,13 97:5 102:13,16 105:8 106:21 110:25 111:14,16,17,18 112:10 113:15 114:2,3 115:4 118:7,23 119:10,13 126:3 129:25 135:2,16 136:22 137:17,23 138:10 140:3 142:23 144:11 145:15 146:15 147:6,7 150:10 155:15 156:2 157:2 160:23 161:5 162:23 163:12,14,17,25 164:4 165:6 167:24 175:23,24 176:14,15 178:24 179:3,13,18,21 181:10,23 182:21 185:9 186:6 187:21 190:4,14 194:8,9 195:23,25 203:5,13,15 205:5 206:7 207:14 208:20 218:18 219:14 220:6 226:2 228:10 230:6 231:3,24 232:5 235:6,10 239:21,24 240:5,8

**there's** 30:22 137:3 176:10 183:10 227:13

**thereafter** 76:4

**Therefore** 9:10

**therein** 115:10

**these** 22:23 72:6 91:22 92:13 99:22 101:7 120:10 169:21,25 170:23 171:21 224:21

**they** 22:13,20 23:23 24:11 26:13 29:21,22 31:6 37:24,25 38:15,18,19 48:16,18,23,25 49:2,3,4,5,6 50:13,14,21 51:6,11 52:3 57:22 60:8 63:22 65:4,5 73:2 83:4,5,15 86:10,18,19 87:10,11 90:13,14,22,23 91:2 92:15 95:12 97:16,18,21,25 98:15,18,19,20,21,22 100:10 110:5 113:10 114:11 115:12,14,15 120:15,16 126:17 137:14,17 138:6,11,12,15,19,24 140:14,16,17 141:2,3 142:11 144:8,13,14 145:20,22,24 146:2,6,9 149:7 150:17 159:6,10,24 161:7,10 162:6 181:23 186:5 196:3 203:21 205:3,12 206:11,13,16,17 207:17,18 208:18,21 212:13,14 222:22,25 224:21 230:9 233:6,15

**they're** 22:20 49:3 50:2 73:4 208:19

**thing** 30:18 86:11 105:23 135:23 146:12,14 148:23 165:7 168:3 174:17 179:8 190:25 201:5 211:5,10 221:2 222:12 226:9

**things** 14:21 45:10 63:22 141:3 148:17 157:3 165:3

**think** 13:3 18:24

23:6 36:3 46:11 47:4 75:22,25 76:19,22 77:4 100:25 102:2 119:17 130:10 135:23 152:16 158:13,25 167:25 169:23 174:3,16 178:11,12 184:22 189:13 234:24

**third** 160:22 161:3,5,10,11,22 162:3

**those** 31:9 38:21 78:21 114:14,18 115:9 121:20 137:11 150:16 162:10 172:16 185:25 219:2 236:6

**though** 109:4 184:12

**thread** 179:15

**three** 31:8,11 116:15 146:4 160:23 161:5 195:24 214:3

**threw** 193:12

**through** 33:4 34:10,12 50:5 54:3 68:5 79:20 105:13 110:24 118:2 120:3 127:5 134:16 136:16,22 137:10 141:22 154:18 172:7 189:6 191:23 200:23 201:4 225:22

**thumbnail** 177:14,16

**Thursday** 32:6 68:5 170:6

**Tiffany** 6:6 166:18

**time** 6:25 9:9 10:2,13,21 12:7 27:19,20 29:20 31:5 32:5,12,15,17,22 35:8 37:2,3,10,16,20,22 38:8,17 39:18 40:20 41:20 48:13,22,24 49:8,

274Index: timeframe–unless

10,11 51:7,17 52:6
56:22 57:13 62:5,
24 67:5 70:2
71:11,16 74:11,17,
24 76:3,24 77:7,16
79:22 88:8 104:10
112:25 116:25
123:15 124:6
127:22 128:17,21
129:5 130:13,17,
19,20,21 132:14,
25 138:22 139:16,
23 140:7,8,10,24
141:22 142:9,14,
19 143:3,21
144:18 146:12
147:7 149:10
155:15,19 156:2,6
157:20,24 158:5
160:2,24 163:11,
13 166:5,10
168:13,14 173:5
174:5 177:22
178:8,14 182:24,
25 184:6,25
199:25 202:19
205:2,9,10,11,13
207:14 213:22
220:20 221:10
231:25 236:9,11

**timeframe** 33:10,
16,18 47:21 79:16
81:17 87:16
119:25 220:24

**timely** 27:25

**times** 19:6 46:15
48:20 52:24 53:8
59:8,12 77:12,14
157:25 165:9
184:17 191:15,16
206:7

**timestamp**
122:16 176:15

**title** 27:10 40:11,
13,15,24 117:9,11
154:14

**to-week** 32:3

**today** 6:14,16 8:9
12:20 13:16,22
14:4 79:23 165:14
187:20 228:9
236:8

**today's** 60:22
66:3 187:22

**together** 8:24
11:23 49:25 50:7,
10 51:2,3 76:5

**told** 25:23 26:21
62:25 130:11,12
178:19 184:17,22,
25 191:14,17,25
197:18 199:23

**tomorrow** 50:3
192:17

**toner** 177:2

**too** 33:20 57:11
98:21 128:6 152:7
170:18 182:22

**took** 12:5 57:19
65:20 81:15 135:7
170:11 196:6
197:6 203:19
232:22 238:21

**top** 58:2,5 62:25
112:6 160:18,23
161:2,6,8

**topic** 233:23

**touch** 185:25

**track** 38:12,14,17
135:21 142:4

**tracked** 160:11

**tracks** 149:5

**Trade** 144:12

**traffic** 33:9,13
34:3

**train** 82:17

**trained** 53:17
62:17 82:17

**training** 222:11

**transcript** 5:21
45:2 66:11 74:4
101:12 235:25

**travel** 64:6,8 65:8
66:24

**traveled** 64:3
66:13,22 67:7

**traveling** 67:2
84:6

**treat** 85:15 222:14
232:23

**treated** 85:5 130:3
132:7 232:20,25

**treatment** 202:25
203:11

**tried** 232:22

**trip** 64:16

**triplicate** 115:25
116:11,13

**trouble** 190:21

**Troy** 5:25 6:6 13:5
17:22 20:24 24:20
35:11 41:25 43:9
44:20 46:20 48:5
52:9,20 65:20 66:9
68:20 70:4,13 74:2
79:6 81:10 95:2
96:15,18 104:11
105:25 109:19
110:18 113:8,21
116:15 118:16
119:18 120:9
121:6,11 122:3,10
123:3,14,20 124:6,
14 127:3,24 128:5,
9 133:7,12 134:3,
17 135:4,13,24
136:2,11 140:20
151:3,6,10,15,25
154:25 163:21
166:4,9,13 167:18
168:16,20 175:7
176:20 177:4,15,
18,23 180:14
187:9 193:15,24
199:9,12,17,21
200:3,21 202:14
209:10,18,24
210:4 211:11
213:5 214:25
215:25 220:5
223:16,25 224:7,
14 225:2,9 227:20
228:25 229:11,15
233:9,17,21
235:18 236:5
237:3 238:4,8,11,
15,18,23 239:7,13,
18,25 240:9,16,22,
24

**Troy's** 70:17

**true** 91:11 137:5
197:2 200:18
216:10 221:15
222:17 226:21

234:21

**truth** 12:10,13,19,
24 13:16 146:9

**truthfully** 12:19,
25 13:16

**try** 50:22 51:3
68:15 143:10,12
165:25 221:25
233:12

**trying** 51:5 184:4
203:25 204:5,25
233:19

**Tuesday** 32:6

**turn** 139:7,11,15
164:8 171:15
174:22 178:2,21
185:3 188:18
189:16 198:18
202:4 224:22
229:2 230:20
234:9

**turned** 13:24
165:19 222:22
224:22 228:4,22

**turning** 103:8
174:10 180:8
182:9 184:5
187:23 188:3
192:14 229:5

**Twenty** 19:18,22

**twice** 185:24

**two** 18:24 37:25
41:3 47:16 49:11
57:11 77:14 86:22
104:7 125:13
131:11 191:15
198:22 206:7
208:17 214:3
221:14 225:14
226:2

**type** 115:10

**typed** 80:18

**types** 143:19

**typical** 147:25

**typically** 49:6
147:21 148:2,9

## U

**U-E-N-T-E-S**
135:7

**um** 185:5

**unauthorized**
151:18

**under** 13:14 44:8
186:23 222:9

**underlying**
230:16

**understand** 7:12,
14 8:11,13,18 9:6,
14,19,23,24 10:6,
7,17 11:4,13,15,
17,21 12:2,9,12
14:2,25 15:7 18:6
24:15 40:9 59:14
64:22 71:25 87:7
88:4 94:16 97:3
98:13 100:8
102:10 104:9
116:3 119:4
130:15 136:17
138:8 155:4,8
156:7 159:17
164:18 180:23
204:7 206:2
217:10 218:20

**understanding**
24:22,25 25:6,8,
15,17 68:2 164:13
189:3,5 198:4,13
200:17 201:15

**understate** 90:9

**understated**
91:19,20

**understates**
91:10

**understood**
41:25 149:2
157:11,12 206:24

**Unfortunately**
38:22

**unit** 30:9

**United** 16:17,24
64:9 66:14,16 67:8
84:8

**unless** 10:15 11:2

A1308

149:13 153:7

**unpaid** 230:6,8

**unprofessionally** 173:22

**unredacted** 163:23 239:19 240:4

**until** 9:13 43:16 47:14 51:19 52:25 53:9 54:4 57:15 58:23 60:21 67:12, 14,16,18,25 68:6 70:10 84:8 121:14 136:6 140:2 157:9 166:16 204:16 233:2

**up** 26:19 34:8 53:11 58:8 77:19, 22 80:3 88:15 122:3 135:12 137:22 142:5 148:15,16 155:16 173:17 177:11 179:14 180:10 182:17,19,21 193:12 197:3,7 199:18 200:2 205:7 206:11 215:24 231:6

**up-to-date** 186:5

**updated** 115:7

**updates** 63:25

**upload** 51:4

**upon** 106:18 107:16,20 108:13 110:19 155:13 186:2

**upset** 72:17

**use** 9:17 14:14 82:20 83:6 88:25 89:2 125:6

**used** 38:14 61:5 89:7 160:14 170:16

**user** 149:3

**username** 54:21 55:17 62:6,10

**using** 13:23 77:6, 19 80:3,23,24 81:5 126:25 149:10

169:2 237:11

**usual** 64:16

**usually** 32:5 64:13,14 65:13 147:22 148:12 161:12 181:8

**utility** 50:18

---

**V**

**V-I-** 82:20

**V-I-N** 83:3 137:25

**vacation** 148:21, 22

**Vague** 53:16

**variable** 162:10

**variations** 165:7

**varied** 162:9

**various** 52:12 169:18 235:7

**vehicle** 136:23 143:2

**Vehicles** 142:12, 18

**vein** 15:3

**verbal** 8:16,24 131:21

**Verification** 209:12 215:18 237:15

**verified** 117:14,15 210:5 237:17

**verifies** 118:9

**verify** 115:17 116:21 118:3 145:24

**Verizon** 80:2

**version** 163:24 239:20 240:4

**versus** 111:25 112:12 126:4

**very** 28:7 29:19 34:7 53:18 84:23 85:13 127:17,19 132:6 139:21 148:22,24 153:14,

15 156:6 167:2 179:23 181:17 183:13 222:11,20

**video** 76:11,18,25 77:2 81:3 174:15, 23 175:2,11,13,23, 24 176:11 240:13, 15

**Vin** 83:3 137:25 138:2,9

**virtually** 13:12

**visit** 139:16,25 140:9,15,16,19

---

**W**

**wage** 8:9 104:21 105:3 113:11 114:12 164:14,19

**wages** 114:5 195:13 230:7,8,13 231:5,8

**wait** 84:7 136:5 140:24 141:2,3 142:7 157:9

**waiting** 140:10 144:6

**walk** 50:5 141:4,5 142:22 144:3,19 155:16

**walks** 28:14 50:11

**want** 19:8 43:8 49:2 51:11 52:3 72:10 90:19 123:4, 10,24 126:17 143:3 159:17 165:24 168:3 180:20 191:6 195:2 200:7 202:7 205:20 211:21 221:7 222:25 223:2 229:11

**wanted** 48:25 170:4 171:23 190:20 191:8

**wants** 199:10

**warranties** 212:14

**washing** 142:20, 21

**wasn't** 85:24 133:19 152:7 158:2 196:14 208:6

**waste** 168:14 177:21

**watch** 222:5,9

**water** 9:17

**Waters** 16:10

**way** 21:14 25:3 27:14 71:24 72:24 76:14 83:11 85:15 87:2 114:2,3 115:21 123:21 132:22 133:20 142:17 143:4,7,10, 11 153:12,13,14 157:10 167:25 170:9 176:10 189:4 191:19 222:2,6,10,23

**ways** 160:9

**we're** 8:9 31:11 89:11 91:12 105:13 149:15 160:4 169:4 171:15 177:21

**Wednesday** 68:4 170:6

**weed** 205:13

**week** 29:3 30:21 31:5 32:8,10 46:6, 9,12,25 47:16 59:22 60:20 61:6 67:7,11 94:18,24 107:23,25 108:12 195:25 197:11

**week's** 195:18

**week-** 32:2

**weekdays** 32:6

**weekend** 165:5

**weekly** 29:7,17 30:20 34:16,17 45:13,18,23 46:17 47:2,6,11,12 58:3, 10 95:18 98:11,22 99:6 103:20 105:3 108:23 111:21 116:18,20 165:13, 15 228:3,6,10

**weeks** 47:16 66:25 212:22 214:4

**welcome** 6:14 42:10 49:3 70:11, 14,20 83:2

**welcoming** 6:15

**well** 6:11 20:16 28:3,7,25 66:14 71:23 78:12,19 91:4 92:14 109:21 110:9 115:14 120:6 131:10 132:2,6 137:15 147:24 149:4,6 158:2 179:20,22 182:7 184:3 188:2 202:8 204:21 209:19,21,25 220:16 225:25 228:11 238:24

**went** 37:17 38:19 129:25 136:16,21 155:23 157:25 191:23 194:17 205:12

**were** 7:10,17 12:6 28:5 30:12,14 38:23 39:21,22 45:22 47:20 48:20 52:24 53:8 57:23, 25 58:11 59:2 60:8,17 61:16,21 62:4 63:22 67:2,17 72:5 75:11,20,24 76:25 77:6 78:8 81:3 82:6 84:6 85:18 87:19 88:13 89:22 92:13 96:12, 21 97:5,6,14 98:9, 15 100:9,10 101:7, 18 104:8 111:5 112:10,13 113:15 114:5 115:18,19, 25 116:10 118:23 119:12 120:11 124:23 125:23 128:24 129:17 134:6 137:14,17 147:21 148:11 149:23 150:15 151:3 155:23 159:3,6 160:8,23 161:5,8,10 162:4 163:3,9,18 169:21,

276Index: weren't–with

25 170:7,18,23
172:4 174:5 181:6,
25 185:9,15
187:12 194:13
201:25 202:25
206:7 207:25
220:13 221:2
226:2 228:3,6
231:2 233:6
234:12 235:10

**weren't** 49:4

**we're** 114:18

**what** 6:21 7:8,13,
22 8:2 14:8 16:12,
15,23 17:15,19,21
19:14 20:16,20,23
21:8 24:19,25 25:2
26:6 27:7 28:8,23
29:16,24 30:13
31:21 32:12,15,22
33:24 35:9 37:2,3,
10 39:10,12,19
40:7,24 41:6,13
42:21 43:20 44:10
47:20 49:9 55:5,10
56:20 57:3,5
61:12,16,21 63:14,
18,21,23 64:22
68:13 71:4,8,12,25
72:8 73:20 74:12
76:16 77:6,7 79:21
81:25 82:6,17,22
84:10 85:17,18
86:5,13 87:24
88:13 93:25 95:15,
22 97:20,24 99:7,
23 103:10 104:23
105:4,9,17 109:3,
9,16 111:22,24
112:2,11,19,22
114:7 115:8,9
116:13 117:11,21,
23,25 118:22,25
119:8 122:23,25
125:3,10 126:4
127:20 130:19
131:8 132:20
133:3 135:11,22
137:24 138:12
139:18 140:12,13
141:2,7,18 145:9,
21 147:18 148:5
149:6,10 150:5
156:11 157:20
158:14 159:19
161:14 162:17

164:2 172:12
173:7,19 174:18,
19,21 175:2
178:25 181:3,12
183:16,19 185:25
186:5 187:18
190:18,21,23
191:10 192:10
193:24 195:4
196:21 204:7
205:4 206:5 208:3
211:22 214:14
215:11 217:23
218:18 219:22
221:23 223:12,13
227:24 234:17
239:22 240:7

**what's** 11:5
180:10 195:11
230:4 231:19

**What'sapp** 80:3
133:17

**whatever** 30:20
51:7 63:8 92:10
112:3 145:25
160:7 188:21,22
196:23 197:18
200:7 205:20

**Whatsapp** 78:10,
13,18,20,25 79:11
81:5,24 84:16,25
124:21 125:13,14
128:6,8 129:22,23
130:23 132:24
133:9,19,21
166:19 169:10
198:6,15 200:14,
19 201:20,24
204:12 238:9

**Whatsapped**
132:25

**whatsoever** 88:6

**What'sapp**
237:10,13

**whay** 71:5

**when** 6:23,25 9:5
17:12 18:23 28:14,
18 29:10 30:12
33:13 35:14,23
37:4,6,9 38:18,25
40:4 41:24 43:17
48:20 49:21 51:5,
25 52:24 53:8,22

55:13 56:2,9,10,
14,15,18,22 57:2,7
58:5,22 59:5 60:23
62:23,24 64:8 65:7
66:12,15 69:4,11
70:2,14 71:16,18,
19,25 72:13 73:10,
11,13 75:3 76:14,
16,24 78:14,15
85:20 86:21 99:25
100:10,20 107:10
109:17 112:18
117:12,20 118:2,
10 123:24 125:22
126:3,17,20
127:12 128:14
129:21 130:22
131:12 132:20,23
134:23 135:14,19
136:24 138:2
140:12 141:13
143:9 148:11,19
149:3 152:21
154:11,12 156:2,7
157:18 158:2,16
160:16 161:13,18
162:11,20,24
168:12 169:21
171:17 176:16
177:5 179:16,22,
24 180:11 181:8
182:24 185:8
189:19 191:10
192:24 193:9
194:11,21,25
195:5,8 196:11
197:19 200:9
204:8 205:17
206:7,25 207:13,
14,17 210:22
211:12 212:2,20
213:17 215:13,21
216:12 217:6,12,
21 224:16 227:14,
21 229:9,16,19
230:2,25 231:16
232:3 234:3
235:20

**whenever** 43:7
65:18

**where** 15:19
16:19 24:11 27:25
63:13 64:6,19,23
67:9 71:24 114:14
126:2 137:17
142:20 149:10
154:23 156:16

180:4 183:25
185:9 206:20

**whereby** 59:2

**wherever** 26:18
150:10

**whether** 83:2 91:9
121:3 131:6,21
184:18 201:15,18
230:17 234:5

**which** 14:23 15:5
16:21 31:10 33:18
36:10 65:9 81:13
84:16 91:5,9,14
92:3,5,18,23 93:4,
9,14,20,22 95:9
97:8,9 110:7
124:21 125:3,9
129:11,23 130:2
134:10 136:3
142:3,23 145:22
149:18 154:17
155:9,10 160:10
164:10,21 171:17
172:13 192:19
197:9,25 198:10,
23 207:20 210:17
212:12 215:19
225:15 238:20

**whichever**
177:25

**while** 44:3 142:2
164:15 167:21
194:19 202:25
203:11 207:9
209:18 210:10

**white** 126:4
170:25 172:9
174:13 175:10
176:21 240:12

**who** 18:12 27:21
54:21 55:3,8,14,24
57:14 58:20 61:9
68:16,17 76:8
79:25 85:22 86:20
89:22 94:13,18,20,
21 96:21 97:6
99:21 100:5,10,12,
13,16 103:2,4,18
104:7,22 105:3,7,
22 108:6,10,12,24
109:3,8,23 116:21,
24 117:5 125:24
126:3,11,18
127:16 137:10,20

146:21,22 147:3,4,
6,9,23 149:9
152:10 154:17
155:14 164:2
184:25 185:15
204:2 208:10
219:8,15 222:3
231:21 239:2,22
240:7

**whoever** 146:25

**whole** 37:24 179:8
180:24 195:24,25
201:5 211:5,10

**whom** 95:22
105:8 154:18
217:15

**whose** 70:23

**why** 10:18 13:24
22:24 26:9,18
33:23 35:20 38:5
42:23 43:22 50:5
58:19 72:6 81:8
92:15 98:8 113:23
129:25 134:18
165:10 169:25
171:21 174:3
179:23 183:7,12
203:19 212:14

**window** 188:9

**winter** 48:3,4,8

**wintertime** 32:20,
21 37:11

**with** 8:24 11:11
17:3,8 21:6,12,13,
14 22:9,12,23
23:17 24:9,23
27:18 28:13 30:18
39:7,13,16,25
41:19 54:11,17
61:3 63:3,24 66:2,
7,23 69:25 70:22
71:2 72:25 78:2,5,
11,18 79:2 80:24
81:21 83:22 84:9,
13,17,18 85:3,12
86:20 93:16,23
95:10,11,12
102:17,18 107:10,
23 108:13 116:6
121:16,19 122:5,
19 125:23 128:16
132:2,5 133:16,25
137:11,22 139:4

277Index: withheld–your

141:4,9 142:11 143:7,21 144:4,19, 20 146:9,14 149:23 151:24 155:17 156:9,14 157:13,22 158:21 159:25 160:11 164:10,12 166:22 167:6,7 168:15 170:14 173:2 174:13 175:15,18, 22 181:12,17 183:10 185:12,18, 23 187:4 195:18 198:2,4,6,11,13, 15,22 199:18 200:2,15,17,19 201:6 203:6,16 205:11,14,23,25 212:20 213:18,22, 23 214:10,12 215:16 216:22,25 217:14,15,18,20 219:2 220:12 226:12 229:7,19 235:8

**withheld** 234:12

**within** 15:16 64:23 72:4 100:17

**without** 141:5 208:8 213:18,20

**witness** 11:12 13:8 16:3 25:16 35:13 42:9 44:18 70:11 80:15,22 81:16 89:13 104:14 109:23 122:2 127:11 136:9 150:25 151:5,9,23 166:22 168:6 177:9 187:7 189:21,22 190:3, 12,17 193:10,25 194:4 195:10 196:12 199:19 201:8,10,12 202:9, 13,21 211:3,7,13, 20 213:14 214:23 215:22,23 216:2 223:24 224:18,19 227:22,24 229:13 233:14,19 237:2 239:3

**witnesses** 214:19

**woman** 189:5

**won't** 72:21

**wording** 182:8

**words** 103:25 114:3 115:3 138:5 149:9 197:5 215:5

**work** 31:17,25 32:13,16,17 35:15 37:3,4 40:5 42:11, 18,23 54:4 68:4,7 74:16 80:7,9,23 99:16 123:18 148:24 153:12,13 156:9,14 162:11 178:25 179:19 182:17,18 195:25 197:7 212:3

**workday** 37:15 38:4,5

**worked** 32:4 35:6, 14,17,21,24 36:2,7 67:8,12 71:5,18 74:15,18,25 76:8 98:19 101:12 102:8 156:14 157:2 196:4 197:9, 10,11 231:25

**working** 35:25 36:7 39:25 42:16 55:12 56:2 58:23 67:10,14,24 71:9, 13 127:25 128:6 130:25 142:3 162:21,25 163:10, 11,14,17 167:22 182:15 210:22 232:3

**works** 37:23 49:19 145:7

**would** 12:23 16:25 17:16 26:9 30:18 31:17 32:5, 7,13,15,17,22 33:5,8,15 34:3,9, 15,22,24 35:2 36:7,13,16 37:3,4, 6,15 38:5 48:11,15 49:6 51:14,17 53:4,13,21,23 54:6,7,25 63:2 64:18 67:24 68:4,7 84:24 85:2,10 92:10 99:19 103:4,

5 105:22,24 109:12,15 112:4,5 114:6,12 115:11, 14,17 116:7,21 117:12,21,25 119:11,12 121:10 126:22 138:6,16, 19,23 141:18 147:3,23 148:7 150:17 158:7 162:15 163:7,17 181:11,16 182:19, 21 185:22,25 197:3,6 199:20 202:2 204:11 206:4,8,11,12,14, 15,16,17 207:15 208:17,21 220:23 229:13 235:22

**would've** 184:9 188:16,17 213:11

**wouldn't** 154:13

**write** 9:8 62:10 115:14 118:6,8 138:16,19 179:20, 23

**writes** 180:10 192:16

**writing** 81:21 110:16 120:8 121:2 159:22 164:6 175:17 179:5,7,24 188:19 196:6 225:12 229:4

**written** 63:6,19 119:13,19 159:4, 18 239:8

**wrong** 17:17 25:3 57:4 71:15 72:25 102:2 143:4 183:10 189:4

**wrote** 223:14

_____

**Y**

**Y-A-N-E-S** 139:10

**Yanes** 139:9

**yeah** 126:16

**year** 16:23 17:2,15 33:19 39:3 56:7,11

57:3 64:16 71:8,12 81:18 102:6 162:14,22 213:24

**year-and-a-half** 213:24

**years** 7:7 12:6 15:16,24 18:24 88:17,19 146:17

**yes** 6:20 8:13 9:7, 15,20 11:12,14,18, 22 12:3,11,16 13:20,24 14:19 15:2,8,17 17:7 18:11,17,19,22 19:25 20:9,14 21:12,20 22:11,13, 17 23:13,18 26:8 28:7,25 29:14 31:19 38:14 39:4, 8,15 40:14,18,23 45:11 47:8 54:16 55:23 58:11 59:19 62:22 63:21 64:5 67:24 68:4 69:13 70:25 76:6,9 77:10,18 78:3,14, 23 80:22 88:12 89:21,25 91:25 92:10 93:3,8,13,18 95:7 96:14 97:10, 21 98:3 113:11,25 114:9 117:18 121:17 122:22 126:15 130:25 132:4,6 137:4,8 141:9 147:13 149:12 150:22 152:23 153:24 154:7 155:12,21 157:3,6,12,23 160:13 163:16 164:17 165:18 166:8,11 171:2,8, 14 172:6,11,18 175:20 180:5 181:9,24 185:17 186:9,12 191:24 195:20 198:8,17 199:4,5,7,12,16,25 200:8,9 201:17,22 202:2 204:13 206:9,10 207:3,4 208:6 210:14 212:19 214:9 216:6,11,21 217:3, 19 219:13 220:10

221:5 222:19 223:9,15 225:23 226:9,16,19,24 228:14,17,21,24 229:24 230:24 231:12 233:24 234:23

**yesterday** 169:23,24 171:19, 20

**yet** 224:22

**York** 5:5,15,17 6:13 231:4

**you're** 42:9 97:20 116:16

**you've** 41:14 198:6 200:15

**your** 5:9,12 6:7,8, 10 8:25 9:22 10:13,15,22 11:2 12:12,23,24 13:23 16:12 18:6 20:11 23:25 24:3,4,22 25:6,13,14 26:13, 15 27:7 28:4 32:7 33:15 40:9 41:7 43:17,21 44:11 45:14,22 46:23 50:4 52:11,13 58:6 59:5,23 60:7,12 61:10 62:6 64:10 66:6,25 67:4 68:8, 10,14 69:10 72:20, 21 75:10 77:2,12, 19 79:2,21,25 80:4,7,23 81:22 85:2,11 90:2,3,8 91:24 93:2,6,7,12, 17 94:16 96:25 97:3 100:11 101:18 102:10 103:8 104:9 110:15,19 111:12 119:9 121:15,18 125:7,16 126:2,13 127:20 128:14 129:19,22 130:15 131:12,17,25 132:20 133:3,8 136:17 138:8 139:7,11,15 141:6, 7 142:24,25 146:13,19 149:10 154:20,22 155:25 159:21 163:19

164:8,13 168:7
170:11,15 172:2,
12,19 173:2,5,7,
12,18,23 174:10,
22,25 175:18,21
178:2,8,21 180:8,
15 182:2 185:3,6,
23 187:23 189:3,5
190:18 192:3,14,
19 193:6 195:11
196:8 198:3,4,12,
13,18,21 199:18,
24 200:16,17,18,
21 201:6,15,20
202:4,8,24 203:10
205:16 208:12,22
210:10,21 211:21,
22 212:2,7,20
213:18 214:5,6,10
215:19 216:5,7
217:10,15,17
218:20,23 219:22
221:8,9,15,19
222:5,9 223:5
225:15,20 226:15,
22 227:6,8,24
229:5,7,23 230:4,
7,21 231:19
233:22 234:9,16,
21 235:3,4,14
236:9

**yourself** 36:10
132:5 157:11
178:15 189:20
191:18 195:3
219:14,24 220:13

---

**Z**

**Z-H-I-V-O** 219:8,
10

**Zanan** 210:12,16
211:9

**Zhivo** 219:8,10

**zoom** 13:5 14:4

```
1              UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF NEW YORK        COPY

3         ----------------------------------------X

4         LETICIA FRANCINE STIDHUM,

5                             Plaintiff,

6              -against-          CASE: 21-CV-07163

7         161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
          AUTO OUTLET, and HILLSIDE AUTO MALL INC
8         d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
          JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

9

10                            Defendants.

11        ----------------------------------------X

12                            March 09, 2023

13                            10:08 A.M.

14

15             VIRTUAL EXAMINATION BEFORE TRIAL of

16        ANDRIS GUZMAN, via Zoom, a Defendant herein,

17        held at the above-mentioned time and taken

18        before Lynn Luckman, a Notary Public and

19        Shorthand Reporter within and for the State

20        of New York.

21

22

23                   SANDY SAUNDERS REPORTING
                   254 South Main Street, Suite 216
24                    New City, New York 10956
                          (845) 634-7561
25
```

A1313

```
                                                        2
 1          A P P E A R A N C E S:

 2

 3

 4          TROY LAW, PLLC

 5          Attorneys for the Plaintiff

 6          41-25 Kissena Boulevard, Suite 103

 7          Flushing, New York 11355

 8          BY: Tiffany Troy, Esq.

 9

10          MILMAN, LABUDA LAW GROUP, PLLC

11          3000 Marcus Avenue, Suite 3W8

12          Lake Success, New York 11042-1073

13          BY: Emanuel Kataev, Esq

14          emaanuel@milaborlaw.com

15

16          ALSO PRESENT:  Deana Jennings, Leticia

17          Stidhum and Ishaque Thanwalla (for one hour

18          only).

19

20

21

22

23

24

25
```

3

```
 1              FEDERAL STIPULATIONS

 2

 3              IT IS HEREBY STIPULATED AND AGREED by

 4         and between counsel for the respective parties

 5         hereto that all objections except as to the

 6         form shall be reserved to the time of trial.

 7              IT IS FURTHER STIPULATED AND AGREED

 8         that the sealing and filing of this deposition

 9         shall be hereby waived.

10              IT IS FURTHER STIPULATED AND AGREED

11         that this examination may be sworn to by the

12         witness being examined before a notary public

13         other than the notary public before whom

14         examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              Andris Guzman
 2                   BY THE COURT REPORTER:
 3              The attorneys participating
 4              in this deposition
 5              acknowledge that I am not
 6              physically present in the
 7              deposition room and that I
 8              will be reporting this
 9              deposition remotely.  They
10              further acknowledge that, in
11              lieu of an oath administered
12              in person, I will administer
13              the oath remotely.  The
14              parties and their counsel
15              consent to this arrangement
16              and waive any objections to
17              this manner of reporting.
18                   MS. TROY:  I consent
19                   MR. KATAEV:  So
20              stipulated.
21
22
23                   *    *    *
24
25
```

5

```
 1                      Andris Guzman

 2                      A-N-D-R-I-S G-U-Z-M-A-N, a

 3            Defendant herein, after having been duly

 4            sworn by a Notary Public of the State of

 5            New York, was examined and testified as

 6            follows:

 7

 8            BY THE REPORTER:

 9                      Q.  Please state your full name

10            for the record.

11                      A.  Andris Guzman.

12                      Q.  Please state your present

13            address for the record.

14                      A.  161-10 Hillside Avenue

15            Jamaica N.Y. 11432

16                      Home address is 1230 30th Drive

17            Astoria, N.Y. 11102.

18

19                              MS. TROY:  We are

20                         going to for the record, we

21                         are going to pause the record

22                         and the witness is going to

23                         show his ID.  Then we're

24                         going to mark that as Exhibit

25                         16.
```

6

```
 1                    Andris Guzman
 2                        (Plaintiff's Exhibit 16
 3                        deemed marked for
 4                        identification)
 5                            MS. TROY:  The witness
 6                        will show his ID as per the
 7                        Judge's Order.
 8                        (The witness complies and
 9                        shows his ID).
10                            MS. TROY:  That is fine.
11                        [Time noted is 10:10 a.m.]
12                        The recording is going back
13                        on now.
14        EXAMINATION BY
15        TIFFANY TROY:
16                    Q.  Mr. Guzman, the address that you
17        stated to the court reporter, is that your
18        business address?
19                    A.  I'm sorry?
20                    Q.  Was the address that you stated
21        your business address?
22                            MS. TROY:  Emanuel, if you
23                        don't mind adjusting the
24                        volume so that we can hear.
25                            MR. KATAEV:  I will put it
```

7

```
 1                    Andris Guzman

 2                        all the way up.

 3                    A.  Yes, it is Hillside Auto Outlet.

 4                    Q.  Can you give me your residential

 5          address as well?

 6                    A.  Sure.  1230 30th Drive, Astoria,

 7          New York, 11102.

 8                    Q.  Have you ever been part of a

 9          deposition before?

10                    A.  No.

11                        MR. KATAEV:  Let's go off

12                        the record.

13                        (A discussion was held off

14                        the record)

15                        MR. KATAEV:  Note for the

16                        record that the plaintiff is

17                        attending virtually.

18                    Q.  In that case, I am going to

19          explain what a deposition is and lay down

20          some ground rules going forward; do you

21          understand?

22                    A.  Yes.

23                    Q.  First, this deposition is for me

24          to ask you questions and for you to answer

25          my questions about the subject matter of
```

8

```
 1                    Andris Guzman
 2          this lawsuit; do you understand?
 3                    A.  Yes.
 4                    Q.  Specifically, we are talking
 5          about the pregnancy discrimination case
 6          today and my questions will be focused on
 7          the pregnancy discrimination case.  Also,
 8          there is another separate wage rate and hour
 9          case, but that is separate, do you
10          understand that?
11                    A.  Yes.
12                    Q.  Since the court reporter has to
13          take down everything that you say, I ask
14          that you give verbal responses, no shaking
15          or nodding of your head and no gestures; do
16          you understand that?
17                    A.  Yes.
18                    Q.  For the same reason, please
19          speak clearly and loudly when you answer a
20          question; do you understand?
21                    A.  Yes.
22                    Q.  The court stenographer can only
23          write down when one person is speaking at a
24          time.  Therefore, please don't start
25          answering one of my questions before I stop
```

9

```
 1                          Andris Guzman
 2             asking it.  Likewise, I will not start a new
 3             question until you have finished answering
 4             my last question; do you understand that?
 5                          A.  Yes.
 6                          Q.  If you need a break, for
 7             example, to get a drink of water or to use
 8             the restroom, please feel free to tell me
 9             and I will call for a recess.  However,
10             there can be no break between one of my
11             questions and your answer to that question;
12             do you understand that?
13                          A.  Yes.
14                          Q.  From time to time, your attorney
15             may make objections to my questions.
16             Generally, however, unless your attorney
17             tells you not to respond, you will still
18             have to respond; do you understand that?
19                          A.  Yes.
20                          Q.  If you don't understand a
21             question, tell me and I'll rephrase it so
22             that you can.  If you don't hear a question,
23             tell me and I'll repeat it so that you do;
24             do you understand that?
25                          A.  Yes.
```

10

```
 1                    Andris Guzman
 2              Q.  We are here today to gather
 3         facts and not speculation.  If you don't
 4         know the answer to a question, say so; do
 5         you understand?
 6              A.  Yes.
 7              Q.  Do you understand that you have
 8         taken an oath to tell the truth?
 9              A.  Yes.
10              Q.  Do you understand that your oath
11         to tell the truth carries the same force and
12         effect as if you were testifying in Court
13         before a Judge?
14              A.  Yes.
15              Q.  Are you currently taking any
16         medications that could prevent you from
17         recalling the truth or testifying truthfully
18         today?
19              A.  No medications.
20              Q.  How about any physical or
21         emotional conditions, are you currently
22         under any physical or emotional conditions
23         that could prevent you from recalling the
24         truth or testifying truthfully today?
25              A.  No, no such conditions.
```

11

```
 1                    Andris Guzman
 2              Q.  Besides your attorney, did you
 3         speak with anyone in order to prepare for
 4         today's deposition?
 5              A.  I spoke with my attorney.
 6              Q.  Now, please listen to my
 7         question carefully.  The question is:
 8         besides talking with your attorney, did you
 9         speak with anyone else in order to prepare
10         for today's deposition?
11              A.  No.
12                    MR. KATAEV:  The
13                    defendants object to the
14                    plaintiff appearing without
15                    going on the video.  We are
16                    okay with the fact that she's
17                    on the video, but if she
18                    doesn't want to, then she has
19                    to leave.
20                    MS. TROY:  The witness has
21                    a right to appear at the
22                    deposition.  I am fine with
23                    her showing her face to
24                    verify that she is the only
25                    person in the room.
```

12

```
 1              Andris Guzman

 2                   MR. KATAEV:  That is fine.

 3                   MS. TROY:  The witness is

 4              allowed to be present in the

 5              deposition.

 6                   Are you telling me that

 7              you are asking her to leave

 8              even though she is the

 9              plaintiff?

10                   MR. KATAEV:  We have asked

11              her to leave only if she

12              refuses to remain on the

13              video for the duration of the

14              deposition.  She can remain

15              on mute, but the video has to

16              be on.  Obviously, if she's

17              not, if she is busy with

18              something else and she has to

19              step out, that is fine.  But,

20              the video has to remain on.

21                   MS. TROY:  Ms. Stidhum,

22              are you there?  Can you just

23              open your video feed and

24              maybe just make sure that you

25              are who you say you are.  You
```

13

```
 1                    Andris Guzman
 2                    can do that and then you can
 3                    turn off the video.
 4                        This can also be off the
 5                    record.
 6                        MR. KATAEV:  On the
 7                    record, while we are waiting
 8                    for the plaintiff to join the
 9                    video, we have Deana
10                    Jennings, the corporate
11                    representative joining us.
12                        Deana, if you can just
13                    identify yourself and keep
14                    the volume turned down.  That
15                    would be great.
16                        MS. JENNINGS:  That is
17                    fine.
18                        MR. KATAEV:  We have a
19                    third party joining.  Let the
20                    record reflect that Deana
21                    Jennings is joining us by
22                    video.  We are now waiting
23                    for the plaintiff to join by
24                    video and then we can resume.
25                        Let's go off the record.
```

A1325

14

```
 1                    Andris Guzman
 2                    (A discussion held was held
 3                    off the record)
 4         Q.   Let's go back on the record.
 5                    MS. TROY:  The time now is
 6                    10:29 and the record should
 7                    reflect the attendance of
 8                    Deana Jennings, who is the
 9                    corporate representative for
10                    the two corporate defendants.
11                         Ms. Jennings, I am
12                    just confirming that there
13                    was no one else in the room
14                    with you.
15                    MS. JENNINGS:  No, no one
16                    else, just me.
17                    MS. TROY:  Can you confirm
18                    that throughout the duration
19                    of this deposition, except
20                    during on break, that there
21                    will be no one else in the
22                    room with you, Ms. Jennings?
23                    MS. JENNINGS:  Yes.
24                    MS. TROY:  We are now
25                    ready to proceed.
```

15

```
 1                    Andris Guzman
 2              Q.  Without telling me the contents
 3         of your communications, did you, yes or no,
 4         talk to your attorney to prepare for today's
 5         deposition.
 6              A.  Yes.
 7              Q.  Did you review any documents in
 8         preparation for today's deposition?
 9              A.  Yes.
10              Q.  What were those documents, can
11         you describe them for me?
12              A.  I don't remember specifically
13         the details of it.  But, I knew that it had
14         to do--- had to do with the situation at
15         hand.
16              Q.  Can you describe the type of
17         documents even if you don't recall the
18         specific details?
19              A.  Papers about the case.
20              Q.  ''By papers about the case,'' do
21         you mean the written documents that were
22         exchanged between the parties?
23              A.  Yes.
24              Q.  Did you review any documents
25         about the pay that Leticia Stidhum received?
```

16

```
 1                    Andris Guzman

 2                    A.  No.

 3                    Q.  How about the pay that other car

 4        salespeople received, did the documents that

 5        you reviewed include such documents?

 6                    A.  No.

 7                    Q.  Did the documents that you

 8        reviewed include any documents pertaining to

 9        the sales of Hillside Auto Outlet?

10                    A.  No.

11                    Q.  Did you review any text messages

12        or phone records?

13                    A.  At some point, yes.

14                    Q.  Can you describe the text

15        messages for me?

16                    A. I don't know how off the top of

17        my head.

18                    Q.  Do you recall who were the

19        parties in the text messages; in other

20        words, who sent text messages to whom in the

21        text messages that you did review?

22                    A.  Repeat the question for me,

23        please.

24                    Q.  Sure.  You said that you don't

25        know off the top of your head, you could not
```

17

```
1                    Andris Guzman

2          give a description of the text messages.

3              I am now asking you: do you recall

4          between which two people or which parties

5          the text messages were sent to and from?

6                    A.  I was checking to see if there

7          was any communications to text messages,

8          through text message.

9                         MR. KATAEV:  The question

10                       was with whom, right Tiffany?

11                   Q.  Specifically, did you have any

12         communications, and let's start from the

13         plaintiff; did you have any text message

14         communications with Leticia?

15                   A.  Before, yes, when I used to work

16         at the dealership.  I meant when I used to

17         work at the dealership.

18                   Q.  When did you stop working at the

19         dealership?

20                   A.  Few years ago.

21                   Q.  Do you recall which year?

22                   A.  In 2019.

23                   Q.  Do you recall which month in

24         2019?

25                   A.  The summer, I believe, August, I
```

Case 1:21-cv-07163-OEM-LB   Document 102-10   Filed 03/27/24   Page 18 of 135 PageID #: 1993

18

```
 1                    Andris Guzman
 2          would say.
 3                    Q.  Right after Hillside Auto, where
 4          did you work next?
 5                    A.  I worked at another dealership.
 6                    Q.  What was the name of that
 7          dealership?
 8                    A.  That was on Long Island, New
 9          York Off Lease.
10                    Q.  After New York Off Lease, where
11          did you work next?
12                    A.  Victory Mitsubishi.
13                    Q.  Do you recall what year and what
14          month you started working at Victory
15          Mitsubishi?
16                    A.  It was around September of 2020.
17                    Q.  After Victory Mitsubishi, did
18          you work anywhere else?
19                    A.  No.
20                    Q.  Let's turn back to the text
21          messages between you and Leticia.  You said
22          that you checked if there were any text
23          messages; did you find any?
24                    A.  Yes, we did communicate through
25          text.
```

19

```
 1                    Andris Guzman
 2                    Q.  Have you produced those text
 3          messages to your attorney?
 4                    A.  Repeat the question.
 5                    Q.  Have you sent over those text
 6          messages to your attorney?
 7                    A.  Yes, I did show him.
 8                         MR. KATAEV:  The
 9                         defendants will be producing
10                         those messages shortly.
11                    Q.  When did you show those text
12          messages to your attorney?
13                    A.  While -- I don't remember the
14          exact time.
15                    Q.  Was it this year, last year, or
16          a few years ago?
17                    A.  This year, I believe.
18                    Q.  Do you recall which month of
19          this year you showed the text messages to
20          your attorney?
21                    A.  I don't recall if it was January
22          or February.  I don't have the exact time
23          and date exactly.
24                    Q.  Do you know who the defendants
25          are in this case, Mr. Guzman?
```

20

```
 1                    Andris Guzman

 2                    A.  Yes, I have an idea.

 3                    Q.  Besides your text messages with

 4          Leticia Stidhum, the plaintiff, did you ever

 5          have any text messages with any of the

 6          defendants?

 7                    A.  With any other defendants,

 8          meaning --

 9                         MS. TROY:  May the record

10                         reflect that Mr. Kataev is

11                         muted and somebody is on the

12                         video and I don't know --

13                         MR. KATAEV:  I moved my

14                         screen over to the right so

15                         that he could look at it.

16                    Q.  What was your response?

17                    A.  Repeat the question.

18                    Q.  It was a very simple question,

19          the question is; did you text with any of

20          the other defendants?

21                         MR. KATAEV:  About

22                         anything?

23                         MS. TROY:  When you were

24                         working at Hillside Auto.

25                         MR. KATAEV:  About
```

21

```
1                    Andris Guzman
2                      anything?
3              Q.  Let's start from anything, and
4         then we will narrow it down.
5              A.  Okay.  I mean I used to work,
6         absolutely, and we all communicated.
7              Q.  By text message?
8              A.  Calls or texts.
9              Q.  Did some of the text messages
10        concern Leticia Stidhum?
11             A.  I don't recall, it was awhile
12        back.
13             Q.  When you were talking about how
14        you were checking to see if there were any
15        communications through text messages, did
16        you check to see if you had any text
17        messages, and let's start for instance, with
18        Ishaque Thanwalla?
19             A.  No.  I just checked through, I
20        checked hers and I saw that the information
21        about her, she was the first person that was
22        being involved.  I didn't check anybody
23        else's.
24                    MS. TROY:  Let's go off
25                      the record.
```

22

```
 1                    Andris Guzman

 2                        (A discussion was held off

 3                    the record)

 4                        MS. TROY:  Let's mark this

 5                    as Demand Number 9.  And I

 6                    will get to that in a moment.

 7                Q.  Mr. Guzman, what is your phone

 8    number?

 9                A.  What is my phone number?

10                Q.  Yes, correct.

11                A.  You want the exact numbers?

12                Q.  Correct.

13                A.  347 749-0633.

14                Q.  Who is your service provider?

15                    MR. KATAEV:  Objection as

16                    to relevance.  You can

17                    answer.

18                    MS. TROY:  Emanuel, you're

19                    going to have to figure out

20                    your sound situation.

21                    MR. KATAEV:  I said

22                    ``objection as to relevance

23                    but, you may answer.''

24                        I just moved the

25                    microphone maybe that will be
```

23

```
 1                    Andris Guzman

 2                         better.

 3                    Q.  Please answer the question, who

 4          is your service provider?

 5                    A.  I believe is T-Mobile.

 6                    Q.  Did you have the same phone from

 7          2018 until the present day, the same phone

 8          number?

 9                    A.  Yes.

10                    Q.  What type of phone is it, do you

11          have an iPhone?

12                         MR. KATAEV:  Objection to

13                         the form of the previous

14                         question.  You can answer the

15                         question.

16                    A.  iPhone.

17                    Q.  Did you use the iPhone from 2018

18          to the present day with a different iPhone

19          but it was an iPhone?

20                    A.  Did I have different phones?

21                    Q.  Yes.

22                    A.  Yes, I did have different

23          phones.

24                    Q.  Were the different phones all

25          iPhones?
```

24

```
 1                    Andris Guzman

 2                    A.   Yes.

 3                    Q.   During your time at Hillside

 4         Auto Outlet, are you familiar with Deana

 5         Jennings, the individual who is on the

 6         screen?

 7                    A.   Yes.

 8                    Q.   During this time, were there

 9         ever times when you would text with her?

10                    A.   I don't recall.  I don't

11         remember.

12                    Q.   During your time working at

13         Hillside Auto, were there times that you

14         would text with Ishaque?

15                    A.   Yes.

16                    Q.   How about Jory Baron?

17                    A.   I don't recall.

18                         MS. TROY:  Emanuel, when

19                         will you be producing the

20                         text messages between Andris

21                         Guzman and Leticia Stidhum?

22                         MR. KATAEV:  Right this

23                         second, actually.

24                         Let the record reflect

25                         that the defendants have
```

25

```
 1                    Andris Guzman
 2                          produced the text messages
 3                          between the witness and/or
 4                          the plaintiff, as well as the
 5                          conversation including the
 6                          witness and plaintiff and
 7                          other employees.
 8                             Let the record also
 9                          reflect that the defendants
10                          produced voluntarily to the
11                          plaintiff the text messages
12                          between the plaintiff and the
13                          witness, as well as a group
14                          text message between the
15                          witness and the plaintiff and
16                          other individuals at the
17                          dealership.  I have sent it
18                          to you by email.
19                   Q.  Mr. Guzman, do you have your
20          phone on you or near you?
21                   A.  No.
22                   Q.  Where is your iPhone?
23                   A.  I actually forgot it on my way
24          here.
25                   Q.  By ''forgot it on my way here,''
```

26

```
 1                    Andris Guzman
 2          what do you mean?
 3                    A.  I was running because I thought
 4          I was going to be late.  So, I forgot it at
 5          the house when I left.
 6                    Q.  Did someone instruct you to
 7          leave your phone at home?
 8                         MR. KATAEV:  Objection to
 9                         the form.  That is
10                         attorney/client privilege.
11                         To the extent that any such
12                         conversations were held
13                         between yourself and myself,
14                         I instruct you not to answer
15                         that question.
16                    Q.  Mr. Guzman, do you understand
17          that you are under oath to tell the truth;
18          is that correct?
19                    A.  Correct.
20                    Q.  When you said that you ''forgot
21          it,'' on your way here, is that true?
22                    A.  Yes.
23                         MR. KATAEV:  Objection.
24                         Asked and answered.  Please
25                         move on.
```

27

```
 1                      Andris Guzman
 2                 Q.  Did you intentionally leave your
 3          phone at your home?
 4                      MR. KATAEV:  Objection.
 5                      You are harassing the witness
 6                      and I instruct the witness
 7                      not to answer the question.
 8                      MS. TROY:  On what basis?
 9                      MR. KATAEV:  You can call
10                      the Judge.  Stop harassing
11                      the witness.
12                 Q.  Do you know the answer to my
13          question?
14                      MR. KATAEV:  Objection.
15                      You are harassing the
16                      witness, and --
17                      MS. TROY:  Harassing the
18                      witness is not a valid
19                      objection.
20                      MR. KATAEV:  Yes, it is
21                      under rule 30.  Do you want
22                      me to point to the specific
23                      provision?  He answered your
24                      question. Move on or call the
25                      Judge.  I am instructing him
```

28

```
 1                    Andris Guzman

 2               not to answer.

 3                    MS. TROY:  We will call

 4               the Judge.

 5                    MR. KATAEV:  That is fine.

 6               Let the record also reflect

 7               that the defendant Mr.

 8               Thanwalla, will be leaving at

 9               10:43 a.m.

10               (Mr. Thanwalla left the

11               deposition)

12               (A call was made to the Judge

13               at 10:43 a.m.)

14                    MS. TROY:  I will put this

15               on the speaker.

16               (Ms. Troy complies)

17                    ''MS. TROY:  Good morning,

18               this is Tiffany Troy, Your

19               Honor.  I have Lynn Luckman,

20               the court reporter with me

21               and Mr. Kataev and his

22               witness, Andris Guzman.  We

23               are doing a deposition right

24               now and he has instructed his

25               witness not to answer a
```

29

```
 1              Andris Guzman

 2                   question on the basis of

 3                   harassing the witness.  I

 4                   told him that that was not a

 5                   valid objection and that he

 6                   needed to respond.  He then

 7                   directed his client not to

 8                   respond.

 9                        THE COURT:  I'm going to

10                   put you on hold for a moment.

11                        MS. TROY:  To the

12                   reporter, if you don't mind

13                   taking this all down, again,

14                   we're just going to need to

15                   ask the Judge for her

16                   permission.  If you don't

17                   mind, please do me a favor,

18                   Lynn and read back the last

19                   question before all of the

20                   colloquy.

21                        (The court reporter

22                   complies).

23                    Please note for the record

24                   that it is now 10:46. And

25                   then it goes to 10:49 and
```

30

```
 1                    Andris Guzman

 2                    that we are on the record

 3                    waiting for the Judge.

 4                         THE CLERK:  I'm going to

 5                    give you the number and the

 6                    code to get on the line.

 7                         MS. TROY:  What I'm going

 8                    to do is that, I'm going to

 9                    dial and we will just be on

10                    speakerphone.

11                         MR. KATAEV:  I'm just

12                    going to mute myself here,

13                    and I'm just going to be on

14                    the phone.

15                         MS. TROY:  That should be

16                    fine.  You will hear it on

17                    the speaker?

18                         MR. KATAEV:  On the phone,

19                    yes.  I'm going to mute

20                    myself on the computer in

21                    terms of that you are no

22                    longer going to be able to

23                    hear me.  I'm going to mute

24                    my sound so that I don't hear

25                    you guys.
```

31

```
 1                   Andris Guzman
 2                        MS. TROY:  Let's go off
 3                   the record.
 4                   (A discussion was held off
 5                   the record)
 6                        MS. TROY:  Again, Your
 7                   Honor, we have the court
 8                   reporter, Ms. Lynn Luckman on
 9                   the call and she will be
10                   taking down what is being
11                   said.
12                        THE COURT:  That is fine.
13                   I'm still recording this and
14                   I'm going to start the sound,
15                   and my clerk will note your
16                   appearances.
17                        I will tell you that
18                   this cannot keep happening.
19                   You are coming to me with
20                   other -- other cases were
21                   scheduled, and I will tell
22                   you now, this is not going to
23                   get you any bonus points
24                   calling in every week from a
25                   deposition, okay?  You're
```

32

```
 1              Andris Guzman

 2                    going to have to figure out

 3                    how to deal with one another.

 4                       Just to let you know that

 5                    this is being recorded.

 6                     Please tell me the name of

 7                    the case and state your name

 8                    for the record.

 9                       MS. TROY:  Your Honor,

10                    this is Tiffany Troy calling

11                    from Troy Law.  This is case

12                    21-CV-07163.

13                          THE COURT:  I am just

14                       going to tell you Ms. Troy

15                       and Mr. Kataev, let the

16                       record reflect that this

17                       is not a scheduled

18                       conference.  This matter

19                       is something that I have

20                       been contacted about

21                       previously, regarding

22                       previous matters in this

23                       deposition.  The attorneys

24                       have not been able to

25                       resolve their disputes.
```

A1344

33

```
1              Andris Guzman

2                        Before we went on the

3              record, I did note that

4              this happened last week,

5              and that again, to have

6              brought a dispute the

7              following week definitely

8              is not scheduled and is

9              unacceptable.  I am not

10             going to continue to

11             babysit two attorneys who

12             can not get their business

13             done.

14                       Ms. Troy and Mr.

15             Kataev, that is without being

16             told whose deposition it is

17             or what the problem is.  So,

18             who wants to put on the

19             record why I am being

20             contacted today?

21                       MS. TROY:  I would like to

22             put on the record that this

23             is plaintiff's attorney

24             speaking.  We have Andris

25             Guzman as the witness today
```

34

```
 1                    Andris Guzman

 2                         at plaintiff's deposition of

 3                         the defendant.  Andris Guzman

 4                         is on his phone and he has

 5                         text messages with Leticia

 6                         Stidhum, the plaintiff as

 7                         well as an issue, and not

 8                         withstanding that as well as

 9                         potentially other defendants

10                         including text messages that

11                         cover the period in question.

12                         He testified that he left his

13                         phone at home.  I asked him

14                         why and he said ''I forgot

15                         it.''  He stated that he

16                         thought he was going to be

17                         late and he said, ''I forgot

18                         it at the house.''

19                            I asked him if someone

20                         told him to leave it at home,

21                         and Emanuel interposed an

22                         objection based on

23                         attorney/client privilege to

24                         the extent that there is any

25                         such communications between
```

35

```
 1                  Andris Guzman
 2                  himself and his client, and
 3                  he instructed the witness not
 4                  to answer.
 5                      Then, I asked if he said
 6                  that he forgot it and he
 7                  answered ''yes.''  I then asked
 8                  him ''did you intentionally
 9                  leave your phone at your
10                  home?''  Then Mr. Kataev again
11                  objected and instructed the
12                  witness not to answer the
13                  question.
14                      I would just like to note
15                  as well that in the previous
16                  week with Jory Baron, the
17                  witness also testified that
18                  he forgot his phone at home
19                  and that the phone contained
20                  text messages that included -
21                  -
22                      THE COURT:  We can get the
23                  business accomplished.  When
24                  you were making your
25                  Discovery demands of the
```

36

```
 1              Andris Guzman
 2                   defendants, did you request
 3                   any emails or text messages?
 4                        MS. TROY:  Yes, Your
 5                   Honor.
 6                        THE COURT:  Were they
 7                   produced?
 8                        MS. TROY:  No.  What
 9                   happened, Your Honor, was
10                   that during the deposition of
11                   Ishaque Thanwalla, Mr.
12                   Thanwalla testified that he
13                   had text messages and that is
14                   when the defendant produced
15                   the texts messages between
16                   Leticia and Thanwalla.
17                        Then, last week during
18                   the deposition of Jory Baron,
19                   Mr. Baron testified in fact
20                   that he had text messages
21                   with Leticia.  Then, when the
22                   defendants produced his text
23                   messages with Leticia again
24                   today, it's the same issue,
25                   which is that I asked the
```

A1348

37

```
 1              Andris Guzman
 2                   question ''are there any other
 3                   text messages,'' and then were
 4                   any produced, and I think he
 5                   said in January or February.
 6                   Then Mr. Kataev again just
 7                   turned over the text messages
 8                   between Mr. Guzman and
 9                   Leticia today during the
10                   deposition.
11                        THE COURT:  Stop talking.
12                   Enough. I got the picture.
13                   Mr. Kataev, you're going to
14                   subject your client to
15                   multiple depositions here by
16                   not turning over these text
17                   messages before the
18                   deposition.  Why is that
19                   going to be a good use of an
20                   anyone's time or --
21                        MR. KATAEV:  That is not
22                   accurate.  Multiple
23                   representations seem to be --
24                        THE COURT:  I want you to
25                   answer my question.  Did your
```

38

```
 1                    Andris Guzman

 2                         client turn over their text

 3                         messages?

 4                              MR. KATAEV:  Yes, they

 5                         did.  And there are no

 6                         requests I have no document

 7                         requests.

 8                              THE COURT:  Mr. Kataev, I

 9                         don't have the document

10                         request in front of me.

11                         Certainly Ms. Troy is

12                         entitled to any text messages

13                         for the relevant time period.

14                              MR. KATAEV:  I --

15                              THE COURT:  Mr. Kataev, I

16                         am tired of being interrupted

17                         by you.

18                              MR. KATAEV:  I apologize.

19                              THE COURT:  So, the

20                         dispute right now, as I

21                         understand from Ms. Troy,

22                         that we just went over Mr.

23                         Guzman and she spoke about

24                         it, but she said Mr. Guzman

25                         left his phone at home and
```

39

```
 1                    Andris Guzman

 2                     that he said that there are

 3                     text messages on that phone

 4                     that relate to this case.  Is

 5                     that something that you are

 6                     contesting, Mr. Kataev?

 7                         MR. KATAEV:  Not exactly

 8                     Your Honor, I provided --

 9                         THE COURT:  What do you

10                     mean by "not exactly?" Is it

11                     yes or no?

12                         MR. KATEV:  I'm trying to

13                     answer your question.  Please

14                     allow me to.

15                         THE COURT:  I am getting

16                     very close to saying that I'm

17                     not going to accept your

18                     representation; do you

19                     understand that?

20                         MR. KATAEV:  I understand

21                     that.

22                         THE COURT:  Mr. Kataev, I

23                     asked whether or not he has

24                     text messages on his phone.

25                     Please answer me, and if the
```

40

```
 1                    Andris Guzman
 2                answer is that he did not --
 3                    MR. KATAEV:   He answered
 4                yes.  They have been produced
 5                between himself and the
 6                plaintiff, and that he has
 7                voluntarily produced the
 8                group text messages,
 9                including the plaintiff's
10                witness and other witnesses.
11                She asked, ''do you have text
12                messages, for example, with
13                Ishaque?''  He said --
14                    THE COURT:  Mr. Kataev --
15                    MR. KATAEV:  Your Honor,
16                may I please finish what I am
17                saying?  I am done
18                interrupting you though, but
19                can I finish?
20                    THE COURT:  Go ahead Mr.
21                Kataev.
22                    MR. KATAEV:  While the
23                issue was that he was asked
24                ''did you ever have any text
25                messages?'' And he said ''yes.''
```

41

```
 1                    Andris Guzman
 2              She did not ask ''did you ever
 3              have any text messages
 4              provided --
 5                    MS. TROY:  I did.
 6                    THE COURT:  Mr. Kataev,
 7              did not interrupt you.  Do
 8              not interrupt him.
 9                    MR. KATAEV:  I believe the
10              fastest way to do this is to
11              have the court reporter read
12              the record --
13                    THE COURT:  I am not going
14              to do that, that is
15              babysitting two attorneys who
16              cannot get along.
17                    I am not going to indulge
18              the fact that he left the
19              phone at his home.  You were
20              saying all of his text
21              messages were produced.  We
22              are going to have to have
23              that in writing, and I'm
24              going to resolve it on what
25              the question and answers
```

42

```
 1                    Andris Guzman
 2                    were.
 3                              As far as asking Mr.
 4                    Guzman, Ms. Troy, whether or
 5                    not he left it at home on
 6                    purpose or he left it at home
 7                    because he was told to,
 8                    please leave that aside.  I
 9                    really don't care as long as
10                    you get the information that
11                    you need to get this case
12                    litigated.
13                         As far as what the
14                    objection was about
15                    attorney/client privilege, I
16                    told you that we are on a
17                    guideline on both sides of
18                    this case of overdoing
19                    everything.  I can't imagine,
20                    I really can't imagine Mr.
21                    Kataev that you told your
22                    client to leave their phone
23                    at home.  If you did, I will
24                    tell you that that is not a
25                    good idea.  If every
```

43

```
 1                   Andris Guzman

 2                       defendant that is called for

 3                       a deposition left their phone

 4                       at home on the day of the

 5                       deposition, that would be

 6                       something that would concern

 7                       the Court.  Do you understand

 8                       me, Mr kataev?

 9                        MR. KATAEV:  Your Honor, I

10                       understand.  That is not --

11                        THE COURT:  Mr. Kataev, do

12                       you understand that I have

13                       other cases and that this

14                       sort of dispute should not be

15                       put to the Court?

16                        MR. KATAEV:  I do

17                       understand, but I did not --

18                        THE COURT:  Do you

19                       understand that part of this

20                       is because again, that you

21                       are telling me that he

22                       produced all of his text

23                       messages that have anything

24                       to do with Ms. Stidhum, and

25                       you're going to be held to
```

44

```
1                    Andris Guzman
2                    that, is that your
3                    representation?
4               MR. KATAEV:  Yes, no --
5               THE COURT:  Ms. Troy, is
6                    there anything, are there any
7                    text messages that they
8                    supplied to you but they
9                    don't have to stipulate
10                   between the defendant that
11                   doesn't concern Ms. Stidhum,
12                   what is your issue with that?
13              MS. TROY:  I agree with
14                   that.
15              THE COURT:  What are we
16                   going to do today?  Do you
17                   want me to instruct Mr.
18                   Guzman to return home to get
19                   his phone so that you can
20                   then look at his text
21                   messages?  Do you want me to
22                   ask him if he has the text
23                   messages that they say they
24                   produced to him, and you can
25                   ask whether there are any
```

45

```
 1                    Andris Guzman

 2                         additional text messages that

 3                         have not been produced.  If

 4                         there are, you can make a

 5                         Motion to compel where they

 6                         should turn them over, and

 7                         you will have what you need

 8                         for a second deposition.  I

 9                         will consider that.

10                              MS. TROY:  Understood.  We

11                         will do the latter option.

12                              THE COURT:  The latter

13                         option?  You're going to ask

14                         him whether he turned over

15                         all the text messages that

16                         concern Ms. Stidhum?

17                              MS. TROY:  Yes.

18                              THE COURT:  I will stay on

19                         the line while you ask the

20                         question so that I do not get

21                         a call back.

22                              MS. TROY:  Understood,

23                         Your Honor.

24                              THE COURT:  Now, you can

25                         go back on the record Ms.
```

46

```
 1                    Andris Guzman

 2                      Court reporter.''

 3            Q.  Mr. Guzman, are you here?

 4            A.  Yes, I am here.

 5            Q.  Besides the text messages

 6     between you and Ms. Stidhum, as well as the

 7     group message that your attorney just

 8     emailed to me 30 minutes ago, are there any

 9     other additional text messages, meaning

10     between yourself as well as the defendant

11     that concern Ms. Stidhum's employment at

12     Hillside Auto Outlet?

13            A.  No additional text messages.

14                    ''THE COURT:  Is there

15                    anything else that you need

16                    to ask while I am on the

17                    record, on the line Ms. Troy?

18                    MS. TROY:  No, Your Honor.

19                    Thank you for your time.

20                    THE COURT:  Mr. Kataev, I

21                    will tell you if any other

22                    witnesses of yours forget

23                    their phone, I will not be

24                    pleased to receive a phone

25                    call; do you understand?
```

47

```
 1              Andris Guzman
 2                   MR. KATAEV:  I just want
 3              to put one quick thing on the
 4              record, Your Honor.
 5                   THE COURT:  Yes.
 6                   MR. KATAEV:  All of the
 7              questions that were asked of
 8              my witness were answered.
 9              When the witness said that he
10              left his phone at home,
11              plaintiff's counsel reminded
12              him that he is under oath and
13              started to badger and harass
14              him.
15                   THE COURT:  Oh, please,
16              Mr. Kataev.
17                   Look in the mirror when
18              you talk about badgering, the
19              two of you have to get along.
20              How many times do I have to
21              say it?  I don't have time
22              for lawyers that make
23              themselves the center of the
24              litigation.  Do I need to say
25              it to you again?
```

48

1              Andris Guzman

2                      MR. KATAEV:  No.  I'm just

3                  representing on the record

4                  that there was badgering of

5                  the witness and it was

6                  completely without any

7                  authority.

8                      THE COURT:  That's great

9                  to hear that Mr. Kataev.  I

10                 was in a conference when I

11                 was interrupted with this

12                 call.  I was on another case

13                 and I don't have to speak to

14                 you about the other partners

15                 at your firm.

16                     I am not asking, I'm

17                 not saying it's your fault.

18                 I'm saying that the toxic mix

19                 of you and Ms. Troy is more

20                 than the Court can bear.  It

21                 is not a good use of

22                 resources for the Court to

23                 get these calls about these

24                 issues.  The parties should

25                 be able to resolve these

49

```
 1                    Andris Guzman

 2                         issues. Ms. Troy, do you

 3                         understand?

 4                              MS. TROY:  Yes, Your

 5                         Honor.  I understand.

 6                              THE COURT:  Mr. Kataev, do

 7                         you understand?

 8                              MR. KATAEV:  Yes, Your

 9                         honor.

10                              THE COURT:  This

11                         deposition shall proceed.

12                         Thank you.  This matter is

13                         now adjourned.  Please note

14                         for the record that it is now

15                         11:22 a.m.''

16                    Q.  Mr. Guzman, during the break,

17              did you discuss your testimony with your

18              attorney; yes or no?

19                    A.  No.

20                    Q.  Have you ever been a party to

21              any civil proceeding?

22                    A.  Explain.

23                    Q.  Besides this case, were you a

24              plaintiff or a defendant in any other case?

25                    A.  Does a divorce count? I don't
```

50

```
 1                    Andris Guzman
 2          know.  That's as close as I think --
 3                    Q.  Besides the divorce, have you
 4          ever been a party to any other civil
 5          proceeding?
 6                    A.  Not that I remember.
 7                    Q.  Have you ever been arrested
 8          before?
 9                    A.  No.
10                    Q.  When did you start working for
11          Hillside Auto?
12                    A.  Beginning of 2018, I think.
13                    Q.  Do you recall which month?
14                    A.  The beginning of the year.
15                    Q.  Besides the address that you
16          gave at the beginning of this deposition,
17          have you lived anywhere else in the past 5
18          years?
19                    A.  No.  That has been my address.
20                    Q.  What is your highest level of
21          education?
22                    A.  Some college, I did go to the
23          college.
24                    Q.  What was your position at
25          Hillside Auto when you began in 2018?
```

51

```
 1                    Andris Guzman
 2                    A.  Do you mean Hillside Auto
 3        Outlet?
 4                    Q.  Right.  What was your position
 5        there?
 6                    A.  Sales manager.
 7                    Q.  Did your position ever change
 8        from the time you began working until the
 9        end date, until the end of your employment
10        at Hillside Auto?
11                    A.  I began as the sales manager,
12        then got promoted to general sales manager.
13                    Q.  When were you promoted?
14                    A.  It's been a few years, I'm
15        trying to remember -- I think it's towards
16        the end of the summer, I will say of the
17        same year, 2018.
18                    Q.  What were your responsibilities
19        as the sales manager?
20                    A.  What was my responsibilities? Is
21        that the question?
22                    Q.  Yes.
23                    A.  I was making sure that I was in
24        charge of the sales that were being made at
25        the dealership.  Meaning, I used to make
```

A1363

52

```
 1                    Andris Guzman

 2           sure that people bought cars and that they

 3           went through the process.

 4                    Q.   How about when you were the

 5           general sales manager?

 6                    A.   The general sales manager meant

 7           that I was also involved in finance.

 8                    Q.   By ''finance,'' what do you mean?

 9                    A.   Working with the banks and

10           getting people approved for loans.

11                    Q.   Does that include running the

12           credit for the customers?

13                    A.   Running the credit for the

14           customers is part of purchasing a vehicle.

15                    Q.   Did you run the credit when you

16           were the sales manager?

17                    A.   Yes.

18                    Q.   You continued running the credit

19           as the general sales manager; is that

20           correct?

21                    A.   Every manager at the store has

22           access to running credit, it's part of

23           buying and getting all the stipulations

24           needed to get a loan and purchasing the

25           vehicle, right?
```

53

```
 1                    Andris Guzman
 2              Q.   Besides what you just described,
 3         were there any other additional
 4         responsibilities that we have not discussed
 5         yet?
 6              A.   Aside from being in charge of
 7         making sure people bought vehicles, no.
 8              Q.   Do you recall how many cars were
 9         sold by the dealership on a monthly basis?
10              A.   I don't recall exactly, it's
11         been a few years.
12              Q.   How about a range, let's start
13         from the busier months, how many cars would
14         Hillside Auto Outlet sell?
15                    MR. KATAEV:  Objection.
16                      Asked and answered, but you
17                      can answer the question.
18              A.   I don't remember exactly, the
19         exact number.
20              Q.   Do you recall what the store
21         hours were at Hillside Auto?
22              A.   Not the specific times, no.  It
23         has been a few years, I don't.
24              Q.   Do you recall if the car
25         salespeople were working the same hours as
```

54

```
 1                    Andris Guzman

 2           the store hours?

 3                    A.  I do remember that everybody had

 4           a schedule.  But, I don't remember what the

 5           schedule was because it's been a while.  I

 6           don't -- I don't remember the specifics.

 7                    Q.  Were there times when the car

 8           salespeople needed to stay past their

 9           scheduled hours in order to complete a deal?

10                        MR. KATAEV:  Objection as

11                        to relevance.  You can

12                        answer.

13                    A.  Can you repeat the question for

14           me?  I just want to make sure that I

15           understand it correctly.

16                        MS. TROY:  Ms. Court

17                        reporter, if you don't mind

18                        reading back the last

19                        question.

20                        (The reporter read back the

21                        last question)

22                    A.  Yes.  You do not get to leave

23           before you complete the sale, I mean, the

24           sale has to get finished. Once the sale gets

25           finished, then you go home.
```

55

```
 1                    Andris Guzman
 2              Q.  When the customer comes in, what
 3         is the process for them to obtain a vehicle?
 4              A.  Do you mean how the entire sales
 5         process works?  Just so that I have a better
 6         understanding.
 7              Q.  Yes.  The entire sales process,
 8         and around how much time each step of the
 9         process takes.
10              A.  Everybody -- every individual
11         has different situations.  That is the
12         reason that you can never measure how long
13         it's really going to take for each client.
14         But, considering their purchase and car is
15         the second biggest purchase after you buy a
16         house, there is a lot that is involved in
17         getting a vehicle.
18              Initially, the customer would have to
19         decide after they come into the store what
20         vehicle they want to purchase, and that
21         entails checking different options to see
22         what the people like or don't like.  You
23         have to see if you have the inventory first,
24         you have to pick out a vehicle.  Then, you
25         will get to the next step if they want to
```

56

```
 1              Andris Guzman
 2       buy the vehicle in cash or finance the
 3       vehicle.  That is another step that they
 4       would have to do.
 5            After that, they decide what vehicle
 6       they want to take, the next step will be
 7       assuming that they either want to buy the
 8       vehicle for cash or finance the vehicle.  If
 9       they decide to go the finance route, then
10       they will have to complete an application, a
11       finance application.  After the customer
12       completes the financing application, they
13       will have to provide all their information
14       that is required for us to complete a
15       vehicle purchase and to get them approved
16       with the bank.  Of course, they have to go
17       through very different verifications for us
18       to be able to complete everything.
19            So, before we even check their
20       information, we have to verify the license,
21       the banks are requiring the pay stubs, most
22       of the time people don't even have a pay
23       stub with them.  They will be told to get
24       their pay stubs for us even after they get a
25       pay stub, we will have to verify to see if
```

57

1              Andris Guzman

2      the pay stubs are legitimate.  There is a

3      lot of fraud involved, and that is the

4      biggest concern right now that people having

5      different kinds of access and we don't know

6      what is real or not.  There's a lot of

7      things that go into it when you come to

8      verify, to make sure that everything is

9      compliant.

10         Anything additional that the bank

11     requires, we will get all of that

12     information.  And then, that gets inputted

13     into the system, which is the system that we

14     have so that we can get the approval with

15     the bank.  That is when we actually go and

16     check the credit, we check the credit, and

17     we see if there are any additional

18     verifications.  There are times that you are

19     going to see, you're going to see more

20     recently, that there are a lot of fraud

21     alerts and if there is a fraud alert, that

22     means that extra verification that we have

23     to do and put that in place.

24         The client will get calls from the bank

25     to make sure that they are the ones

A1369

58

```
 1                    Andris Guzman
 2            requesting it, they are the one requesting
 3            financing.  It becomes tough when the
 4            numbers from the credit does not match the
 5            numbers that the customer is giving.  If the
 6            number is not the same, they will have to
 7            update it in the bureaus, and then it's like
 8            TransUnion and that can take 24 to 48 hours
 9            to update it.  Plus, they will be able to --
10            they will not be able to buy the vehicle on
11            the spot.  They will have to wait, and if
12            the numbers do match, then the bank still
13            has to call and verify everything with them.
14            There are guidelines, and it's during --
15            even when the bank is closed, they won't be
16            able to buy the vehicle on the spot.
17                We do not control the process; we are
18            not the ones financing the money. Like I
19            said, there is a lot of variables that comes
20            in when you buy a vehicle.  But, assuming
21            everything goes through and you are able to
22            run the credit, you are able to verify
23            everything, get all the documentation that
24            you need so that you can process the loan.
25            Then, you send everything to the bank and
```

59

```
 1                  Andris Guzman

 2         wait for their approval.  When the approval

 3         comes in, then they will let us know if

 4         there is any additional information that is

 5         required.

 6             Once we have the approval from the bank,

 7         the customer is supposed to go to the office

 8         to speak with the loan officer or the

 9         finance manager.  At that point, then the

10         finance manager will let them know the

11         numbers based on the vehicle that they have

12         picked.  If by that point the customer

13         doesn't like the numbers, either if it's too

14         expensive or if they change their opinion,

15         they either have the option to chase the car

16         for a lower payment, they can either decide

17         that they don't want the vehicle anymore and

18         they could even actually walk out because it

19         is not guaranteed during the sale.  It is

20         not guaranteed that the customer is even

21         going to take the vehicle home with them.

22             We haven't even discussed insurance, and

23         everything else that comes after the money.

24         Sometimes they don't even have the money,

25         and they have to wait for Friday to get the
```

60

                        Andris Guzman

1
2          money.  They are not even able to get the
3          car and they have to wait longer for them to
4          be able to get the vehicle.
5               Those things, we don't control, people
6          have, whether people have the money or not,
7          or even if the car -- the credit, it's not
8          even for them to be able to get an auto
9          loan.  They will have to get a co-signer.
10         If they are not able to produce the co-
11         signer the right way, meaning that there are
12         times when the co-signer is not available
13         today and they will come back to the
14         dealership on Friday or next week or next
15         month.  We don't control those things.
16         After they decide that they want to get the
17         car, assuming everything went through the
18         bank, the approval, you look at the numbers
19         and you have to do the insurance.
20              You have to do the insurance, and that
21         is another step as well.  They have to
22         appraise the car and see what the value of
23         the vehicle is and so forth.
24              Then, the DMV part, everything has to be
25         in compliance with the insurance of getting

61

```
 1                    Andris Guzman

 2        all the proper documentation so that we can

 3        do the registration of the vehicle.  That is

 4        also another step that you need in buying a

 5        vehicle.

 6            After everything gets done, then it's

 7        printed and we have to put everything on

 8        paper and the people have to sign the

 9        contract.

10            The loan officer will go over all of the

11        information and make sure that the customer

12        understands all the numbers.  After they

13        agree, they will sign the document and at

14        the end, they will take possession of the

15        car.

16            But, to answer your question, sometimes

17        it could take 3 hours, 4 hours, 6 hours or

18        days depending on the situation.  We wish

19        the process was quicker, trust me.  But, we

20        are in the business of selling cars and we

21        want to make money.  We want to make sure

22        that everybody makes money at the end of the

23        day and we do not control and we cannot

24        guess or foresee who is going to come

25        through the door and what their situation
```

62

```
 1                    Andris Guzman
 2         is.
 3                    Q.  When you were working for
 4         Hillside Auto, was Leticia the only female
 5         car salesperson on the floor?
 6                    A.  I don't recall.
 7                    Q.  Are you familiar with the
 8         Dealertrack system?
 9                    A.  Yes.
10                    Q.  While you were the sales manager
11         and before your promotion to general sales
12         manager, did you run Dealertrack?
13                         MR. KATAEV:  Objection to
14                         form.  You can answer the
15                         question.
16                    A.  What do you mean by ''running
17         Dealertrack?''
18                    Q.  Did you have access to
19         Dealertrack, did you run the credit for the
20         customers on the Dealertrack system?
21                    A.  If I had access to Dealertrack
22         at that point?  Yes, I did have access to
23         Dealertrack.
24                    Q.  Did you run the credit for the
25         customers on the Dealertrack system?
```

63

```
 1                   Andris Guzman
 2              A.  When you mean ''running the
 3        credit,'' do you mean checking the people's
 4        information for the purpose of getting a
 5        loan?  Is that what you mean?
 6              Q.  Correct.
 7              A.  Yes.
 8              Q.  In other words, you had both
 9        Dealertrack access, as well as you checked
10        the customer's information from the
11        beginning of your employment with Hillside
12        Auto, right?
13              A.  I got employed as a manager.
14        So, as the manager, you get Dealertrack
15        access, correct.
16              Q.  Let's walk back for a second.
17        Are you familiar with Hillside Auto Mall?
18              A.  That is the store that is close
19        to ours, that is another store.
20              Q.  During your time as the sales
21        manager, did Ishaque Thanwalla ever tell you
22        that Hillside Auto Outlet employees, that if
23        they had to get a car, that they should try
24        to have the customer choose a car at
25        Hillside Auto Mall if they did not find a
```

64

```
 1                    Andris Guzman

 2         car that they liked at Hillside Auto Outlet?

 3                         MR. KATAEV:  Objection to

 4                    the form.  You can answer.

 5                    A.  We used to sell cars from our

 6         lot at Hillside Auto Outlet, and correct me

 7         if I am wrong, but you are able to purchase

 8         vehicles from other dealerships.  Let's say

 9         there is a car that a customer wants, and we

10         don't have the vehicle, we can buy the

11         vehicle from another dealership.  It is

12         allowed by the Department of Motor Vehicles

13         as a dealership.  The dealership can buy a

14         vehicle from different dealerships.

15                    Q.  What is your understanding of

16         the relationship between Hillside Auto

17         Outlet and Hillside Auto Mall?

18                    A.  My understanding is that maybe

19         there was a guy or two guys that they had in

20         common that owned the place.

21                    Q.  Due to that common ownership or

22         partial common ownership, as you called it,

23         is it correct to say that there is a

24         preference that if there is a car that a

25         customer cannot find on your lot at Hillside
```

65

```
 1                    Andris Guzman
 2        Auto Outlet that you try to find it at
 3        Hillside Auto Mall?
 4                    A.   What I am saying is that we can
 5        buy any vehicle from any established
 6        dealership.  That is allowed by the
 7        Department of Motor Vehicles.
 8                    Q.   Yes, please answer my question.
 9        The question was: was there a preference to
10        Hillside Auto Mall, versus the other
11        dealerships close by?
12                    A.   We were able to get inventory
13        from other dealerships as long as they
14        provided us with the car.  No preference,
15        ma'am.
16                    Q.   Between March and August of
17        2018, how many cars were sold per month at
18        Hillside Auto Outlet?
19                    A.   I don't recall.
20                    Q.   What about between September of
21        2018 and February of 2019, how many cars
22        were sold per month?
23                    MR. KATAEV:   Objection.
24                    Asked and answered.  You can
25                    answer the question.
```

A1377

66

```
 1                    Andris Guzman
 2              A.  I don't recall.
 3              Q.  Are you familiar with Leticia
 4    Stidhum?
 5              A.  Repeat the question.
 6                    MS. TROY:  Ms. Court
 7                    reporter, if you don't mind
 8                    reading back the question.
 9                    (The reporter read back the
10                    last question)
11              A.  Familiar as if she used to work
12    at Hillside Auto Outlet?
13              Q.  Right.
14              A.  Yes, she used to work at
15    Hillside Auto.
16              Q.  What is your opinion of her as a
17    car salesperson?
18                    MR. KATAEV:  Objection.
19                    Calls for opinion testimony.
20                    You can answer the question.
21              A.  It has been a few years and I
22    don't remember all the details.  But, I
23    think she was good.
24              Q.  Who was the general sales
25    manager before you?
```

67

```
 1                    Andris Guzman
 2                    A.   Her name is Jeanique.
 3                    Q.   Before working at Hillside Auto
 4        Outlet, did you work for Ishaque at another
 5        dealership?
 6                    A.   We worked together before, yes.
 7                    Q.   From when to when?
 8                         MR. KATAEV:   Objection.
 9                         You can answer the question.
10                    A.   It's been a few years.   It could
11        have been between 8 months to 10 months.
12                    Q.   Do you recall what the name of
13        the dealership was that you worked with
14        Ishaque before Hillside?
15                    A.   Queens Auto Mall, we used to
16        work together.
17                    Q.   At that time, what was his
18        position at Queens Auto Mall?
19                    A.   I don't recall the exact title.
20                    Q.   Was he the owner or was he the
21        manager?
22                    A.   More towards the manager, but I
23        don't recall what his specific role that he
24        played there was.   I don't know.
25                    Q.   How about yourself, what was
```

68

```
 1                    Andris Guzman
 2          your role that you played there?
 3                    A.   I used to do sales.
 4                    Q.   Were you a sales manager or a
 5          salesperson?
 6                    A.   Salesperson, selling cars.
 7                    Q.   At the time when you were hired,
 8          was there a bonus structure in place for the
 9          Hillside Auto Outlet employees?
10                    A.   I didn't handle the money part.
11                    Q.   Who handled the money part at
12          Hillside?
13                    A.   General manager.
14                    Q.   Who was the general manager?
15                    A.   Ishaque.
16                    Q.   Who hired you as the sales
17          manager?
18                    A.   Ishaque.
19                    Q.   As the sales manager, did you
20          have the power to hire employees?
21                    A.   The general manager was in
22          charge of hiring employees.
23                    Q.   Did you have the power to fire?
24                    A.   The general manager had the
25          power to fire.
```

A1380

69

```
 1                    Andris Guzman
 2              Q.  Did you have the power to
 3       discipline employees?
 4              A.  General manager had the power to
 5       discipline employees.
 6              Q.  As the sales manager, did you
 7       ever hire anyone?
 8              A.  No.
 9              Q.  How about firing anyone?
10              A.  No.
11              Q.  How about disciplining anyone?
12              A.  No.
13              Q.  While you were the sales
14       manager, did the salespeople have a fixed
15       break time?
16                    MR. KATAEV:  Objection as
17                       to relevance.  You can
18                       answer.
19              A.  I don't recall when their break
20       was or what specific times they were -- it's
21       been a few years.
22              Q.  At the time, how were employees
23       times tracked?
24                    MR. KATAEV:  Objection as
25                       to relevance.  You can
```

70

```
 1                    Andris Guzman
 2                       answer.
 3            A.   I don't remember the exact
 4       mechanics of it.
 5            Q.   Earlier, you mentioned that you
 6       may have had texts with Jory Baron.  To your
 7       knowledge, what was his role at Hillside?
 8                    MR. KATAEV:  Objection to
 9                    form and assuming facts not
10                    in evidence.  You can answer.
11            A.   Jory Baron, you mentioned, is
12       that right?
13            Q.   Yes.
14            A.   To my belief, he was one of the
15       owners at Hillside Auto Outlet.
16            Q.   How did you know that he was one
17       of the owners?
18            A.   I believe he did introduce
19       himself back in the day.
20            Q.   He introduced himself as the
21       owner; is that correct?
22            A.   I don't recall him specifically
23       directing that he was one of the owners. But
24       I was able to, somewhere along the line, he
25       mentioned that he was the owner.  I don't
```

71

```
 1                    Andris Guzman
 2         remember if he told me that directly or not.
 3                    Q.  To your knowledge, did Jory
 4         Baron have the power to hire employees?
 5                    A.  Ishaque was the general manager
 6         of the store.  So, I believe Ishaque is the
 7         person that has the power of hiring
 8         employees.
 9                    Q.  Does Jory, also have the power
10         in addition to Ishaque?
11                    A.  Ishaque was the person in charge
12         of the dealership.
13                    Q.  Does Jory also have the power in
14         addition to Ishaque?
15                    A.  Ishaque was the person in charge
16         of the dealership.  Meaning if someone had
17         to get hired, they had to go to Ishaque.
18                    Q.  My question is: did Jory Baron
19         also have the power to hire?
20                         MR. KATAEV:  Objection.
21                           Asked and answered.  You can
22                           answer.
23                    A.  What was the question, if Jory
24         had the power to hire somebody?
25                    Q.  Yes.
```

72

```
 1                    Andris Guzman

 2              A.  He was one of the owners.

 3              Q.  Is that a ''yes?''

 4              A.  I believe he can, but I believe

 5         Ishaque was the person in charge of the

 6         dealership.

 7                    Q.  How about the power to fire

 8         employees, did he also have the power to

 9         fire employees?

10                         MR. KATAEV:  Objection.

11                         You can answer.

12              A.  Like I keep mentioning, Ishaque

13         was the person that was running the

14         dealership, and to my knowledge, Jory was

15         one of the owners.  But the person that was

16         in charge was Ishaque.

17                    Q.  Do you believe he could fire

18         employees, Jory?

19              A.  He was one of the owners.

20                         MR. KATAEV:  Objection.

21              A.  He was one of the owners and has

22         the power to do so.

23                    Q.  Do you know Deana Jennings, and

24         if so, how are you familiar with her?

25                    A.  She was --- she worked at
```

73

```
 1                    Andris Guzman
 2          Hillside Auto Outlet.
 3                    Q.  Do you recall when she stopped
 4          working for Hillside?
 5                    A.  I don't recall.
 6                    Q.  Did she stop working at Hillside
 7          Auto Outlet before you left Hillside or
 8          after you left Hillside?
 9                    A.  I don't recall the timeframe
10          either.
11                    Q.  Do you recall what her position
12          was?
13                    A.  I believe, if I'm not mistaken,
14          controller.
15                    Q.  As the controller, what were her
16          responsibilities?
17                    A.  I am not familiar with the term
18          of responsibilities.
19                    Q.  Did you have any interaction
20          with her while you were the sales manager
21          and general sales manager at Hillside?
22                    A.  Very few times we spoke, job-
23          related.
24                    Q.  Was she at Hillside Auto Outlet
25          on a day-to-day basis?
```

74

```
 1                    Andris Guzman

 2                         MR. KATAEV:  Objection.

 3                    Vague, you can answer.

 4              A.  I don't recall.

 5              Q.  Did she work for both Hillside

 6         Auto Outlet and Hillside Auto Mall at the

 7         same time?

 8              A.  I don't have that information

 9         and I'm not able to answer that.

10              Q.  When is your birthday?

11              A.  My birthday?

12              Q.  Yes.

13              A.  You want the day, year, and

14         month, everything?

15              Q.  Correct.

16              A.  07, which is July 25th, 1993.

17              Q.  Are you familiar with David

18         Baron?

19              A.  He was -- yes, yes.

20              Q.  How are you familiar with him?

21              A.  David Baron, he used to be one

22         of the owners.

23              Q.  How about Josh Aaronson?

24              A.  Josh Aaronson was one of the

25         owners as well.
```

75

```
 1                    Andris Guzman
 2               Q.  To your knowledge, did David
 3          Baron have the power to hire employees?
 4               A.  I wasn't the person in charge of
 5          the dealership when he came to operations,
 6          he would be the person to hire that would
 7          determine those positions.
 8               Q.  But, David Baron who passed
 9          away, did he have the power to hire and fire
10          employees?
11               A.  They were one of the owners, you
12          mean?
13               Q.  I mean, how about Josh Aaronson,
14          is your answer the same which is that as one
15          of the owners he had the power to hire and
16          fire employees?
17                    MR. KATAEV:  Objection to
18                      the form.
19               A.  He was one of the owners also.
20               Q.  Is that a yes?
21                    MR. KATAEV:  Objection.
22                  You can answer.
23               A.  Yes, yes.
24               Q.  With regard to my previous
25          question about David Baron, is your answer
```

A1387

76

```
 1                    Andris Guzman
 2         that he did have the power to hire and fire
 3         employees, is that also a yes?
 4                         MR. KATAEV:  Same
 5                    objection.  You can answer.
 6                    A.  Yes, he was one of the owners.
 7                    Q.  While you were working at
 8         Hillside, were you frequently at the podium?
 9                    A.  At the podium?  When you say
10         ''podium,'' is at the podium stage, that you
11         mean which is within the location at the
12         dealership?
13                    Q.  Yes.
14                    A.  Yes, yes.  I am familiar with
15         the podium.
16                    Q.  During your time working at
17         Hillside, have you ever seen Ishaque provide
18         his Dealertrack password to Leticia?
19                    A.  No.
20                    Q.  Have you ever seen Ishaque train
21         Leticia personally on the Dealertrack
22         system?
23                    A.  Repeat that again.  What was the
24         question?
25                         MS. TROY:  Ms. Court
```

77

```
 1                    Andris Guzman

 2                         reporter, if you don't mind

 3                         reading back the last

 4                         question.

 5                         (The reporter read back the

 6                         last question)

 7              A.  No.

 8              Q.  At any time, have you seen

 9    Leticia use the Dealertrack system to help

10    run the credit for Hillside Auto customers?

11              A.  No.

12              Q.  Were there any other posters at

13    Hillside Auto?

14              A.  What posters, what do you mean

15    by ''posters?''

16              Q.  For instance, are there any

17    posters about the minimum wage?

18              A.  Sure.  I mean every business has

19    it, it's supposed to have a poster of

20    minimum wage.  I don't remember where it

21    was, but I am pretty sure yes, we did.

22              Q.  What type of posters are at the

23    store?

24              A.  I don't know right now.  I've

25    been out of the store a few years, so I
```

78

```
 1                    Andris Guzman

 2           don't know.

 3                    Q.  Do you currently work for any of

 4           the individually named defendants?

 5                    A.  If I work for any of them?

 6           Right?

 7                    Q.  Yes.

 8                    A.  No.

 9                    Q.  To your knowledge, did Hillside

10           Auto have any written policies regarding

11           discrimination?

12                    A.  At that time I believe we did.

13                    Q.  What was that policy?

14                    A.  That discrimination is not

15           allowed.

16                    Q.  Do you recall when Ishaque

17           traveled from the United States to Pakistan

18           in 2018?

19                    A.  I don't have the exact dates.

20                    Q.  Do you recall if Ishaque

21           continued to work at Hillside Auto, or did

22           he take a break before leaving to Pakistan

23           from the United States?

24                    A.  I'm sorry.  What was that?

25           When?
```

79

```
 1              Andris Guzman

 2         Q.   In 2018.

 3         A.   (No response)

 4              MR. KATAEV:  Let the

 5                  record reflect, and that

 6                  probably was not heard, but

 7                  the witness said ''I don't

 8                  understand the question.''

 9         Q.   Without revealing the contents

10    of the communications with your attorney,

11    for how long did you speak with your

12    attorney in preparation for today's

13    deposition?

14              MR. KATAEV:  Asked and

15                  answered.  You can answer the

16                  question. Objection to that.

17         A.   We met a few days ago.

18         Q.   The question is: for how much

19    time?

20         A.   I don't have any specific time.

21    I mean, it could have been 30 minutes, 1

22    hour or 2 hours.  I don't have the specific

23    time.

24         Q.   Have you ever interviewed any

25    prospective employees at Hillside Auto?
```

80

```
 1                    Andris Guzman
 2              A.  Not that I recall, I was not in
 3         charge of hiring employees. I was not the
 4         general manager.
 5              Q.  Are you familiar with a DMV
 6         clerk named Lily?
 7                    MR. KATAEV:  Objection to
 8                    relevance.  You can answer.
 9              A.  I can't recall.  It's been a few
10         years.
11              Q.  Do you recall in 2018 that the
12         DMV clerk Lily left Hillside Auto because
13         she was pregnant?
14              A.  I don't recall.
15              Q.  Do you recall Ishaque
16         disciplining Lily who was pregnant at the
17         time?
18              A.  I don't recall.
19                    MR. KATAEV:  Objection as
20                    to relevance to this entire
21                    line of questioning.  You can
22                    answer.  You already
23                    answered.
24              Q.  Do you recall Lily's last name?
25              A.  I don't recall her last name.
```

81

```
 1                    Andris Guzman

 2                         MR. KATAEV:  The witness

 3                    just told me that he needs to

 4                    use the restroom.

 5                         MS. TROY:  Sure.  Is 10

 6                    minutes good for you?

 7                         THE WITNESS:  Yes.  Just

 8                    to use the bathroom.

 9                         MS. TROY:  We can come

10                    back at 12:20 and you guys

11                    can also move to the

12                    conference room.

13                         MR. KATAEV:  Thank you.

14                    (A recess was taken from

15                    12:00 until 12:10 p.m.)

16                         MS. TROY:  Ms. Court

17                    reporter, can you read back

18                    the last question.

19                    (The reporter read back the

20                    last question)

21                         MR. KATAEV:  Are you

22                    ready?

23                         THE WITNESS:    Yes, I am

24                    ready.

25               Q.  Do you recall a robbery that
```

82

```
 1                    Andris Guzman

 2         took place at Hillside Auto?

 3                    A.  I don't recall right now.

 4                    Q.  What was Leticia Stidhum's

 5         position, was it a salesperson?

 6                         MR. KATAEV:  Objection to

 7                    the form.  You can answer.

 8                    A.  Yes.

 9                    Q.  What were her responsibilities

10         as a car salesperson?

11                    A.  The responsibility is to sell

12         cars.

13                    Q.  Was she ever promised a sales

14         manager position?

15                    A.  I have no information of that.

16                    Q.  What was the relationship

17         between Ishaque and Leticia?

18                    A.  What do you mean by

19         ``relationship?''

20                    Q.  Can you describe their working

21         relationship.

22                    A.  Ishaque was the supervisor,

23         meaning the manager, the person in charge,

24         and she was an employee.

25                    Q.  Did Ishaque ever call Leticia
```

83

```
 1                    Andris Guzman
 2          his ''daughter?''
 3                    A.  I don't recall the specifics of
 4          that.
 5                    Q.  Do you recall why you left
 6          Hillside?
 7                    A.  Pursuing better employment
 8          opportunities.
 9                    Q.  Do you recall how much car
10          salespeople were paid?
11                    A.  No.  I was not in charge of the
12          money.
13                    Q.  Were they paid a wage along with
14          some amount of commission?
15                    A.  I don't recall their payment
16          structure.
17                    Q.  While you were working at
18          Hillside Auto, was there a board where the
19          car salespeople would tally the number of
20          cars that they sold for the month?
21                    A.  I don't recall.
22                    Q.  How did Hillside Auto verify the
23          pay for the car salespeople?
24                    A.  I don't remember the specifics
25          right now.
```

84

```
 1                    Andris Guzman
 2              Q.  Do you recall how many cars
 3         Leticia sold?
 4              A.  I don't recall how many cars she
 5         sold.
 6              Q.  Did you run the credit for
 7         customers back at Queens Auto Mall as well?
 8              A.  No.
 9              Q.  You began running the credit for
10         the cars, the customers at Hillside Auto; is
11         that correct?
12              A.  When you say run the credit,
13         that means managers having access?
14              Q.  Did --
15              A.  (Continuing) The managers were
16         the ones that could check people's
17         information and profile.
18              Q.  You are talking about managers
19         who can check people's information and
20         profile.  Who were those people at Hillside
21         Auto while you were working there?
22              A.  Are you asking who were the
23         managers back then when I used to work, is
24         that the question?
25              Q.  Yes, let's start from there,
```

85

```
 1                    Andris Guzman
 2        yes.
 3                    A.  I remember it was me, there was
 4        Ishaque, there was Serge, there was
 5        Jeanique.  I don't recall anyone else after
 6        that.
 7                    Q.  Did each of them actually check
 8        the customer's information and profile on a
 9        day-to-day basis?
10                    A.  What I remember is that
11        everybody had access to do so.
12                    Q.  How often would you use the
13        Dealertrack system to check customer's
14        information and profiles?
15                    A.  How often?
16                    Q.  Correct.
17                    A.  That was part of the job, it was
18        daily.  It was Dealertrack, it was actually
19        what got used daily, meaning in the
20        dealership.
21                    Q.  Did Ishaque use Dealertrack
22        daily?
23                    A.  Every manager used Dealertrack
24        daily.
25                    Q.  Did Serge use Dealertrack daily?
```

86

```
 1                    Andris Guzman
 2              A.  Every manager used Dealertrack
 3         daily, yes.
 4              Q.  What about Jeanique as well,
 5         before she left, correct?
 6              A.  Correct.
 7              Q.  At Hillside Auto, were car
 8         salespeople given performance evaluations?
 9              A.  I don't understand the question.
10              Q.  Were there performance
11         evaluations given to Hillside Auto car
12         salespeople?
13              A.  I don't recall right now the
14         specifics.
15              Q.  But, to your knowledge, were
16         they ever given?
17              A.  I don't remember a specific time
18         at this moment.
19              Q.  Do you recall if Leticia was a
20         top salesperson at the time?
21                    MR. KATAEV:  Objection.
22                    Asked and answered.  You can
23                    answer the question.
24              A.  I remember she was good, but I
25         just don't recall the specific numbers.
```

A1398

87

```
 1                    Andris Guzman
 2              Q.  Do you recall why Leticia
 3    Stidhum left Hillside Auto?
 4              A.  I don't know the specifics of
 5    why she left the company.
 6              Q.  At the time when she left
 7    Hillside Auto, was she pregnant?
 8              A.  I have no knowledge that she was
 9    pregnant.  I don't recall.
10              Q.  Did she ever bring a sonogram of
11    her pregnancy to the dealership?
12              A.  I don't recall ever seeing a
13    sonogram.
14              Q.  Did she ever tell you that she
15    was pregnant?
16              A.  I don't remember being told that
17    she was pregnant.
18              Q.  Are you familiar with VIN
19    Solutions?
20              A.  That is the tool for customer
21    information, yes.
22              Q.  To your knowledge, does VIN
23    Solutions underreport the number of cars
24    that were sold at Hillside Auto?
25                    MR. KATAEV:  Objection to
```

Case 1:21-cv-07163-OEM-LB   Document 102-10   Filed 03/27/24   Page 88 of 135 PageID #: 2063

88

```
 1                    Andris Guzman

 2               the form.  You can answer.

 3          A.  What was the question?

 4                    MS. TROY:  Ms. Court

 5               reporter, if you don't mind

 6               reading back the question to

 7               the witness.

 8               (The reporter read back the

 9               last question)

10                    MR. KATAEV:  Objection.

11               Assumes facts not in

12               evidence, but you can answer.

13          A.  VIN Solutions, to my knowledge

14     does report customer information, and you

15     will have some record of people that bought

16     vehicles.  On how accurate it is, I'm not

17     sure.  I haven't used VIN Solutions in

18     years.

19          Q.  To your knowledge, does VIN

20     Solutions automatically mark leads as ``lost''

21     after a certain period of time?

22          A.  I don't recall.  I haven't used

23     VIN Solutions in years.

24          Q.  On the sales floor itself while

25     you were working as a general sales manager,
```

89

```
1                    Andris Guzman
2        was it typically you and Ishaque who put in
3        the customer information into Dealertrack?
4                    A.  Do you mean for us to get the
5        customer information and submit it to the
6        bank?
7                    Q.  Right.
8                    A.  Yes.
9                    Q.  Go ahead.  Finish.
10                   A.  What I'm saying is the
11       Dealertrack was a manager tool.  So,
12       whatever information that was needed to do
13       the deal, Dealertrack is the salesperson --
14       that will be in that information.
15                   Q.  After the salespeople brought
16       the information back, who would enter it
17       into Dealertrack?
18                   A.  The managers (indicating) we did
19       come at that time.
20                   Q.  Who would be the people who
21       would enter it into Dealertrack?
22                   A.  I was one of them or any of the
23       managers, they had access to do so.
24                   Q.  Typically, was it you and
25       Ishaque?
```

90

                    Andris Guzman

1

2          A.  I would be involved in it a lot

3     of time, correct, yes.

4          Q.  Would Ishaque sometimes use the

5     Dealertrack to enter the information brought

6     back by the car salespeople as well?

7          A.  He had the access to do it.

8          Q.  Did he use the Dealertrack

9     because he had access to it?

10         A.  Yes.  He used Dealertrack, he

11    was the person in charge, and as the person

12    in charge, you have access to everything,

13    every tool to do everything.

14         Q.  Do you recall changing the

15    password to Dealertrack when Ishaque went

16    back to Pakistan in 2018?

17         A.  I don't recall.  Also, I just

18    want to add, I didn't even have that access,

19    you cannot just change people's passwords.

20              MS. TROY:  Let's take a

21                  half an hour break and we

22                  will come back at 1:10.

23              MR. KATAEV:  We're going

24                  to be going out for lunch,

25                  and it probably will take 45

91

```
 1                    Andris Guzman

 2                    minutes. I'm not sure if we

 3                    will make it back on time.

 4                         MS. TROY:  That is fine.

 5                    So, 1:20 or 1:25 is fine.

 6                    (A recess was taken from

 7                    12:40 p.m. until 1:24 p.m.)

 8              Q.  To your knowledge, did Leticia

 9         help with the license plates, meaning once

10         the customer got the car there was a license

11         plate registration?

12              A.  In what regard, because part of

13         the sales process is getting -- what's the

14         meaning of getting the plates?  It has to be

15         done by the Department of Motor Vehicles.

16         There was a process that the salesperson was

17         supposed to do to make sure that their

18         customer got plates.

19              Q.  Do you remember the process?

20              A.  Not only I, Leticia, everybody

21         was part of the sales process.

22              Q.  What was the sales manager's

23         role in that process for the license plates?

24              A.  Repeat the question.

25              Q.  You just described what the job
```

A1403

92

```
1              Andris Guzman
2      responsibilities are for the salesperson in
3      obtaining the license plates.
4          My question for you is: what is the
5      sales manager's responsibility for that
6      portion?
7              A.  We just make sure that the
8      vehicles get registered.  One of the things
9      gets issued by the Motor Vehicles, of
10     course.
11             Q.  Is there a division of labor
12     between the car salespeople and the sales
13     manager with respect to the registration of
14     the license plate with the DMV?
15             A.  I am not understanding your
16     question.
17             Q.  What are the responsibilities of
18     the car salespeople versus the sales manager
19     for the license plate registration with the
20     Department of Motor Vehicles?
21             A.  Collectively, we make sure that
22     we get all of the information that is
23     required so that the customer can be able to
24     purchase the vehicle, I registered the
25     vehicle that they are purchasing.
```

Case 1:21-cv-07163-OEM-LB   Document 102-10   Filed 03/27/24   Page 93 of 135 PageID #: 2068

93

```
 1                        Andris Guzman
 2                  Q.   What would the sales managers do
 3            that the car salespeople did not do with
 4            regard to the car registration process?
 5                  A.   We would make sure that the
 6            process is being done.
 7                  Q.   Are you familiar with Auto
 8            Funds?
 9                  A.   Auto Funds is -- yes, I have
10            used Auto Funds before.  I have used Auto
11            Funds before but it's been a few years.
12                  Q.   To your knowledge, what is Auto
13            Funds?
14                  A.   Auto Funds is related to the
15            website.  It's a management tool for the
16            website, to my knowledge, of course.  I am
17            not too familiar with it; I haven't used it
18            in years.
19                  Q.   Who has access to Auto Funds at
20            Hillside Auto?
21                  A.   I don't recall to what extent we
22            did use it, I don't remember the details.
23                  Q.   Do you recall if Leticia had
24            access to Auto Funds?
25                  A.   I don't recall.
```

A1405

94

```
 1                    Andris Guzman
 2              Q.   Besides texting with Leticia,
 3         have you ever emailed her while you were
 4         working as the sales manager or the general
 5         sales manager at Hillside Auto?
 6              A.   I don't recall.
 7              Q.   Have you ever called her or has
 8         she ever called you?
 9              A.   I don't recall any specific
10         conversations.  I mean, we might have spoken
11         about work-related duties during the working
12         hours.  But, I don't remember the specifics
13         of that.
14                    MS. TROY:  Demand Number
15                    18 will be for the text
16                    messages and emails and any
17                    other written communications
18                    between Andris Guzman and
19                    Leticia Stidhum.
20                    Demand Number 18 and the
21                    period is May of 2018 through
22                    January of 2019.
23                    Demand Number 18 will be
24                    for the call log of Andris
25                    Guzman, and specifically the
```

95

```
1              Andris Guzman
2                   time would be again May of
3                   2018 to January of 2019.
4                       I'm asking for all of the
5                   information other than the
6                   calls placed to plaintiff,
7                   the named defendants, the
8                   named defendants and the
9                   corporate representatives of
10                  the corporate defendants can
11                  be redacted.  With respect to
12                  the individual defendants as
13                  well as the corporate
14                  representatives, all
15                  information prior to December
16                  of 2018 can also be redacted.
17                      Demand umber 19 would be
18                  the text messages and email
19                  communications between Andris
20                  Guzman and any of the named
21                  defendants, which includes
22                  the corporate representatives
23                  of the corporate defendants,
24                  and it would be text messages
25                  specifically by Leticia
```

A1407

96

Andris Guzman

1          Stidhum on or about the terms

2          that were included in the

3          original document production

4          responses.  Certainly,

5          pregnancy discrimination-

6          related text messages.

7               MR. KATAEV:  Please

8          follow-up in writing. Thank

9          you.

10     Q.  Mr. Guzman, during this

11 deposition, did you look at any notes or

12 papers to assist you in responding to any of

13 my questions?

14     A.  No.

15     Q.  During this deposition, except

16 during on break, did you communicate with

17 your attorney via text message or any other

18 means?

19     A.  I don't have my phone with me.

20     Q.  While you were answering

21 questions, from time to time you would look

22 away from the screen; what were you looking

23 at?

24          MR. KATAEV:  Objection.

97

```
 1                    Andris Guzman
 2               You can answer the question.
 3          A.  Nothing specifically.
 4          Q.  During such time, were you
 5     looking at any notes or any other written
 6     text messages?
 7          A.  No.
 8          Q.  Do you agree that during the
 9     remainder of this deposition, except for the
10     documents that I'll be showing you on the
11     screen, that you will not be reviewing any
12     notes?
13          A.  Reviewing any notes?  No.  I
14     wouldn't, I'm not reviewing any notes
15     whatsoever.
16               MS. TROY:  Ms. Court
17                    reporter, let's mark the next
18                    exhibit, which should be
19                    Plaintiff's Exhibit 16.
20                    Let's also mark Plaintiff 17
21                    and Plaintiff's 18.  Number
22                    18 will be the text messages
23                    between Andris Guzman and
24                    Leticia Stidhum.  It is
25                    Defendants 1908 to 1961.
```

98

```
 1                    Andris Guzman

 2                         (Plaintiff's Exhibit 17 and

 3                         18 marked for

 4                         identification.)

 5                    Q.  Mr. Guzman, do you recognize

 6         what I am showing you on this screen right

 7         now?

 8                    A.  Yes.

 9                    Q.  What do you recognize this to

10         be?

11                    A.  These are conversations through

12         text.

13                    Q.  You mentioned earlier that you

14         were looking at some messages.  Were these

15         included in the text messages that you

16         reviewed?

17                    A.  Yes.

18                    Q.  To your knowledge, is it true

19         and accurate?

20                    A.  What part?

21                    Q.  Let's start from is this a true

22         and accurate representation of the text

23         messages that you have on your phone between

24         yourself and Leticia?

25                    A.  Based on what I see on the
```

Case 1:21-cv-07163-OEM-LB   Document 102-10   Filed 03/27/24   Page 99 of 135 PageID #: 2074

99

```
 1                    Andris Guzman

 2          portion that I am being shown right now,

 3          yes.  I am not able to see everything, so

 4          I'm not able to answer.

 5                    Q.  Is this the first time that you

 6          are seeing the text messages in the version

 7          that I am showing you on the screen; in

 8          other words as an extracted Decipher app?

 9                    A.  You are showing it to me in PDF,

10          if I'm not mistaken?

11                    A.  Right.  The question is from the

12          phone, it's going to look differently.  So,

13          my question is: have you ever seen this PDF

14          format before?

15                    A.  Not that I remember.

16                    Q.  There are 13 pages to the text

17          message and I'm going to scroll down.  I'm

18          asking you to just take a look at it and let

19          me know after reviewing those 13 pages if it

20          is a full and accurate representation of the

21          text messages that you had between yourself

22          and Leticia Stidhum?

23                    A.  Okay.

24                    (The witness peruses)

25                    MS. TROY:  Let's go off
```

100

```
 1                    Andris Guzman

 2                    the record.

 3                    (A discussion was held off

 4                    the record)

 5                       MS. TROY:  I am showing

 6                    the witness pages 1 through

 7                    13 and I'm going to flip

 8                    through them.

 9                       Let the record reflect

10                    that it is the first 13 pages

11                    of this first exhibit Bates

12                    stamped D1708 through 2910

13                    and I am showing it to the

14                    witness right now to review.

15                    (The witness peruses)

16              Q.  Mr. Guzman, can you just review

17         those 13 pages and when you are done let me

18         know.

19              I'm just asking you, yes or no, does

20         this accurately reflect the text messages

21         between you and Leticia on your phone.

22                    A. (The witness peruses)

23         Yes. This reflects the information on the

24         text messages.

25                    Q.  Now, I am going to turn your
```

101

```
 1                    Andris Guzman

 2           attention to page 3 of Plaintiff's Exhibit

 3           18 which is also marked as defendant's

 4           document production D1910.

 5                    A.  Yes.

 6                    Q.  I'm going to draw your attention

 7           to the text message with the date and time

 8           of July 19th, 2018 at 11:39 a.m.

 9                    A.  Yes.

10                    Q.  Does this refresh your

11           recollection about whether Leticia Stidhum

12           had access to Auto Funds?

13                    A.  I'm not sure if she had access.

14           I know that I never gave anyone access to

15           the management tools.

16                    Q.  To your knowledge, did she ever

17           have access or obtain access to Auto Funds

18           from you?

19                    A.  Not from me.

20                    Q.  How about anyone else?

21                    A.  I wouldn't know.

22                    Q.  I'm going to now direct your

23           attention to page 5 which was also marked as

24           defendant's document production D1912.

25           Specifically, the date and time is December
```

102

```
 1                    Andris Guzman

 2          23rd of 2018 at 2:35 p.m.  That was the last

 3          message on the page.

 4                    A.  Yes.

 5                    Q.  It says ''do you want me to run

 6          the credit while you finish up my question

 7          for you?''  Does it refresh your recollection

 8          about whether Leticia ever had access to

 9          Dealertrack?

10                    A.  I never gave Leticia access to

11          Dealertrack.  I would not give -- I did not

12          have the authority to give any management

13          tools to salespersons, to salespeople.

14                    Q.  Isn't it true that Leticia

15          would've had to have access to Dealertrack

16          in order to run the credit of the customer?

17                    A.  Run the credit of the customer

18          was part of the sales process of purchasing

19          the vehicle.  Only managers were supposed to

20          have access to Dealertrack.

21                    Q.  Is it true that only the

22          managers are supposed to run the credit of

23          the customers through the Dealertrack

24          software?

25                    A.  Correct, managers.
```

103

```
 1                    Andris Guzman
 2              Q.   Isn't it true that at least for
 3         some time while you were working at Hillside
 4         Auto Outlet that Leticia was given that
 5         ability to run the credit on the Dealertrack
 6         software?
 7                        MR. KATAEV:  Objection.
 8                        Asked and answered.  You can
 9                        answer it again.
10              A.   I never gave Leticia access to
11         Dealertrack.
12              Q.   Right, but please focus on my
13         question.  My question is not if you gave
14         Leticia access to Dealertrack personally.
15         My question is if she would've had access to
16         the Dealertrack system, if she had to have
17         access to the DealerTrack system to run the
18         credit of the customer.
19              A.   Not to my knowledge.
20              Q.   At any point, were you part of
21         the announcement that Leticia gave at
22         Hillside Auto announcing her pregnancy on
23         the sales floor?
24                        MR. KATAEV:  Objection.
25                        Asked and answered, you can
```

104

```
 1                   Andris Guzman
 2                 answer it again.
 3         A.  Can you repeat the question?
 4                   MS. TROY:  Ms. Court
 5                 reporter, can you read back
 6                 the last question.
 7                 (The reporter read back the
 8                 last question)
 9         A.  I don't recall.  I never recall
10    ever hearing that she was pregnant.
11         Q.  When did you first find out that
12    Leticia was pregnant?
13                   MR. KATAEV:  Objection.
14                 Asked and answered.  You can
15                 answer the question.
16         A.  I never got a confirmation that
17    she was pregnant.
18         Q.  When you say that you ''never got
19    the confirmation,'' what does that mean?
20         A.  You are saying while she was at
21    work, if I ever found out that she was
22    pregnant?  Was that the question?
23         Q.  Let's start from there, correct.
24         A.  That's what I'm saying, I never
25    got that information that she was pregnant.
```

Case 1:21-cv-07163-OEM-LB Document 102-10 Filed 03/27/24 Page 105 of 135 PageID #: 2080

105

```
 1                    Andris Guzman
 2              Q.  In other words, during your time
 3       at Hillside Auto Outlet you never knew that
 4       she was pregnant?
 5              A.  Correct, I did not get that
 6       information.  If anything, if I would -- it
 7       wouldn't have made a difference, I would've
 8       given her the same -- I would've given her
 9       the same treatment.
10                    MR. KATAEV:  When the
11                    court reporter asks you to
12                    repeat it, she wants just the
13                    exact words, not an
14                    explanation.
15              Q.  What would you describe your
16       treatment of Leticia Stidhum to be?
17              A.  Like everybody else, fair.
18              Q.  Was there ever a time when you
19       prioritized the other car salespeople's
20       information in terms of the financial
21       information to input it into the Dealertrack
22       system over Leticia's customers?
23              A.  I have always been fair when it
24       comes to distribution and how I approach the
25       customer.  It is first come, first serve
```

106

```
 1                    Andris Guzman
 2          basis, no preference.
 3                    Q.  Was there ever a time when you
 4          prioritized other car salespeople's
 5          customers over Leticia's?
 6                    A.  No.
 7                         MR. KATAEV:  Objection.
 8                         Asked and answered on that
 9                         one.
10                    Q.  Was there ever a time when you
11          or Leticia were disciplined by Ishaque?
12                    A.  Not that I recall.
13                    Q.  Was there ever a time when
14          Leticia Stidhum's customers would walk out
15          as a result of a long wait time?
16                    A.  I don't recall.
17                    Q.  Do you recall if Leticia sold
18          less cars in December and January as a
19          result of the longer wait time?
20                    A.  I don't recall the specific
21          numbers.  But, in this line of work, I'm
22          going to add something, in terms of
23          performance, in this line of work --
24                         MS. TROY:  Let's just
25                         focus on my question, please.
```

107

```
1              Andris Guzman
2              Q.  My question is: between December
3      of 2018 and January of 2019, yes or no, did
4      Leticia Stidhum sell less cars?
5              A.  I don't recall, because people
6      do not sell the same amount of cars every
7      month.  Everything is subject to change such
8      as the holidays, the slower and faster
9      seasons, not everybody sells the same amount
10     of cars every month with the same numbers.
11             Q.  Between December of 2018 and
12     January of 2019, did Ms. Stidhum, Leticia
13     Stidhum constantly call your attention to
14     how long the customers would need to wait?
15             A.  I don't recall, but it was a
16     known fact that everybody had to wait
17     because there is a long waiting process to
18     purchase a vehicle.
19             Q.  At the time, did the car
20     salespeople include David Manrique, David
21     Parsons and Sean or Shane?
22             A.  I remember those names, they did
23     work at Hillside Auto.
24             Q.  Were you ever disciplined by
25     Hillside Auto Outlet?
```

108

```
 1                    Andris Guzman

 2            A.  I was never disciplined, no.  I

 3     don't recall, but I used to do my job the

 4     right way.  So, I did not.

 5            Q.  As part of this litigation

 6     process your attorney provided some

 7     responses.  We're going to go over some of

 8     those responses.

 9         Before I do that, I just have a couple

10     of questions for you.  Number 1, did you

11     review the responses to the Interrogatories,

12     both the original and the supplemental

13     Interrogatories before you signed?

14            A.  Yes, I believe I reviewed them

15     with Deana.

16            Q.  When did you review them with

17     Deana?

18            A.  I don't remember the first time.

19            Q.  Was it this year?

20                   MR. KATAEV:  Objection.

21                    Asked and answered.  You can

22                     answer the question.

23            A.  Sometime last year and I don't

24     remember the specific time.  I would be

25     lying to you, I don't remember.
```

109

```
 1                    Andris Guzman

 2              Q.  To your knowledge, is everything

 3         in the Interrogatories and supplemental

 4         Interrogatories correct?

 5              A.  In the litigation documents, if

 6         the answers that were provided -- if the

 7         answers are correct, is that the question?

 8              Q.  Yes.

 9              A.  Based on my knowledge, what I

10         reviewed, the answers are correct on the

11         litigation.

12              Q.  Do you have any knowledge about

13         the ownership shares of Hillside Auto Outlet

14         and Hillside Auto Mall?

15              A.  Yes, it was included in the

16         documents.

17              Q.  What is your basis of that

18         knowledge?

19                    MR. KATAEV:  Objection to

20                    the form.  You can answer.

21              A.  The basis of the knowledge is

22         when the documents were shown to me, it had

23         information related to who were the owners

24         of the company.

25              Q.  In other words, did you review
```

110

```
 1                    Andris Guzman
 2        additional documents to ascertain the
 3        responses that were given, if they were true
 4        and accurate?
 5                    A.  Can you repeat that again?
 6                         MS. TROY:  Ms. Court
 7                         reporter, can you read back
 8                         the last question.
 9                         (The reporter read back the
10                         last question)
11                    A.  If I reviewed any additional
12        documents to make sure that it was accurate,
13        is that your question?
14                    Q.  Yes.
15                    A.  There was a lot of documents
16        that I saw, but I am not too specific.  I am
17        not too sure of the documents that you might
18        be looking for.  I don't know.
19             MS. TROY:  Let's mark Plaintiffs 19.
20                         (Plaintiffs Exhibit 19 marked
21                         for identification)
22                    Q.  Mr. Guzman, do you recognize
23        this signature as yours?
24                    A.  Yes.
25                    Q.  As part of the responses that
```

```
1                    Andris Guzman
2        were provided, there were additional
3        responses called ``responses to document
4        production requests,'' as well as
5        supplemental responses to document
6        production requests. Did you review those
7        documents as well?
8                    A.  Yes.
9                    Q.  Did you review the documents
10       produced as part of the responses to the
11       document production requests?
12                        MR. KATAEV:  Objection.
13                    You can answer the question.
14                    A.  If I reviewed the documents?  I
15       reviewed some documents, yes.
16                    Q.  As part of the documents that
17       you reviewed, did they include any pay stubs
18       of the plaintiff?
19                    A.  Pay stubs?
20                    Q.  Correct.
21                    A.  I don't recall seeing pay stubs.
22                    Q.  Do you remember seeing records
23       on a month-to-month basis of the dealerships
24       aggregate number of cars sold as part of the
25       documents?
```

112

```
 1              Andris Guzman
 2              A.  I don't understand your
 3     question.
 4              Q.  So, do you recall that there was
 5     a document produced, and my question is: do
 6     you recall seeing the aggregate number of
 7     cars sold on a monthly basis as part of the
 8     documents that were produced; it's a yes or
 9     no question?
10              A.  No, I don't recall seeing that.
11              Q.  How about the VIN Solutions
12     records, meaning the internal records kept
13     by the Business Development Center as well
14     as entered in by the car salespeople with
15     respect to the cars sold at Hillside Auto
16     Outlet; do you recall seeing those
17     documents?
18              A.  Not a specific document.
19              Q.  Do you recall if Ms. Stidhum was
20     owed any wages at the time when she left
21     Hillside Auto?
22              A.  I didn't control payments or the
23     money.
24              MS. TROY:  Mr. Guzman,
25                  thank you very much for your
```

113

```
 1                    Andris Guzman

 2                        time.  This deposition stands

 3                        adjourned.

 4          [Time noted: 2:02 p.m.]

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

114

```
1

2     WITNESS           EXAMINATION BY              PAGE

3      Mr. Guzman     Ms. Troy
                                                     6
4                       PLAINTIFF EXHIBITS

5      Number              Description              PAGE

6

7      Ex 16          Photo I.D.                     6

8                  (Deemed marked)

9      Ex 17         (Text Messages)                 97

10     Ex 18          Document Production D1910      101

11     Ex 19        Verification- Guzman             110

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

115

```
 1
 2                      REQUESTS
 3      Number          Description          PAGE
 4      18        Demand No. 18 is:               94
 5                MS. TROY: For the call
 6                log of Andris Guzman, and
 7                specifically the time would
 8                be again May of 2018 to
 9                January of 2019.
10                I'm asking for all of the
11                information other than the
12                calls placed to plaintiff,
13                the named defendants,
14                the named defendants and
15                the corporate representatives
16                of the corporate defendants
17                can be redacted.  With respect
18                to the individual defendants
19                as well as the corporate
20                representatives, all
21                information prior to December
22                of 2018 can also be redacted.
23      19        Demand No. 19 is:               95
24  MS. TROY:  The text messages
25                and email communications
```

A1427

116

```
1

2              between Andris Guzman

3              and any of the named

4              defendants, which includes

5              the corporate representatives

6              of the corporate defendants,

7              and it would be text messages

8              specifically by Leticia Stidhum

9              on or about the terms that were

10             included in the original

11             document production responses.

12             Certainly, pregnancy

13             discrimination-related

14             text messages.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2        QUESTIONS MARKED FOR A RULING:     PAGE/LINE

 3      (None)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

118

```
 1                        ACKNOWLEDEGMENT
 2

 3

 4        STATE OF NEW YORK  )

 5                          )s.s.

 6        QUEENS COUNTY       )

 7             I, ANDRIS GUZMAN, hereby certify

 8        that I have read the transcript of my

 9        testimony taken under oath in my deposition

10        of March 09, 2023; that the transcript is a

11        true, complete and correct record of my

12        testimony, and that the answers on the

13        record as given by me are true and correct.

14

15

16              _____

17                        ANDRIS GUZMAN

18

19        Signed and subscribed before me

20        this _____ day of _____, 2023.

21

22

23        _____

24              Notary Public

25
```

119

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF NEW YORK      )

 4                           )s.s.

 5    COUNTY OF NASSAU       )

 6

 7             I, LYNN LUCKMAN, a Shorthand

 8    Reporter and Notary Public within and for

 9    the State of New York, do certify that;

10             THAT the witness whose deposition

11    is hereinbefore set forth, was duly sworn by

12    me, and that such deposition is a true

13    record of the testimony given by such

14    witness.

15             I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage; that I am in no way

18    interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have

20    hereunto set my hand this 20th day of March,

21    2023.

22

23    _____

24             LYNN LUCKMAN

25
```

120

1   Errata Sheet

2

3   NAME OF CASE: LETICIA FRANCINE STIDHUM -against- CASE: 21- 161-10 HILLSIDE AUTO AVE

4   DATE OF DEPOSITION: 03/09/2023

5   NAME OF WITNESS: ANDRIS GUZMAN

6   Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                  _____

A1432

121Index: 07–Andris

**Exhibits**

**Ex 18 -**
**Andris Guzman**
**Text Messages**
101:2,3

**0**

**07** 74:16

**1**

**1** 79:21 100:6
108:10
**10** 67:11 81:5
**10:10** 6:11
**10:29** 14:6
**10:43** 28:9,13
**10:46** 29:24
**10:49** 29:25
**11102** 5:17 7:7
**11432** 5:15
**11:22** 49:15
**11:39** 101:8
**1230** 5:16 7:6
**12:00** 81:15
**12:10** 81:15
**12:20** 81:10
**12:40** 91:7
**13** 99:16,19 100:7,
10,17
**16** 5:25 6:2 97:19
**161-10** 5:14
**17** 97:20 98:2
**18** 94:15,20,23
97:21,22 98:3
101:3
**19** 95:17 110:19,
20
**1908** 97:25
**1961** 97:25

**1993** 74:16
**19th** 101:8
**1:10** 90:22
**1:20** 91:5
**1:24** 91:7
**1:25** 91:5

**2**

**2** 79:22
**2018** 23:7,17
50:12,25 51:17
65:17,21 78:18
79:2 80:11 90:16
94:21 95:3,16
101:8 102:2 107:3,
11
**2019** 17:22,24
65:21 94:22 95:3
107:3,12
**2020** 18:16
**21-CV-07163**
32:12
**23rd** 102:2
**24** 58:8
**25th** 74:16
**2910** 100:12
**2:02** 113:4
**2:35** 102:2

**3**

**3** 61:17 101:2
**30** 27:21 46:8
79:21
**30th** 5:16 7:6
**347** 22:13

**4**

**4** 61:17
**45** 90:25
**48** 58:8

**5**

**5** 50:17 101:23

**6**

**6** 61:17

**7**

**749-0633** 22:13

**8**

**8** 67:11

**9**

**9** 22:5

**A**

**A** 7:13 14:2 22:2
28:12 31:4 81:14
91:6 100:3
**A-N-D-R-I-S** 5:2
**a.m.** 6:11 28:9,13
49:15 101:8
**Aaronson** 74:23,
24 75:13
**ability** 103:5
**able** 30:22 32:24
48:25 56:18 58:9,
10,16,21,22 60:2,
4,8,10 64:7 65:12
70:24 74:9 92:23
99:3,4
**absolutely** 21:6
**accept** 39:17
**access** 52:22 57:5
62:18,21,22 63:9,
15 84:13 85:11
89:23 90:7,9,12,18
93:19,24 101:12,
13,14,17 102:8,10,
15,20 103:10,14,
15,17
**accomplished**

35:23
**accurate** 37:22
88:16 98:19,22
99:20 110:4,12
**accurately**
100:20
**actually** 24:23
25:23 57:15 59:18
85:7,18
**add** 90:18 106:22
**addition** 71:10,14
**additional** 45:2
46:9,13 53:3
57:10,17 59:4
110:2,11 111:2
**address** 5:13,16
6:16,18,20,21 7:5
50:15,19
**adjourned** 49:13
113:3
**adjusting** 6:23
**after** 5:3 18:3,10,
17 55:15,19 56:5,
11,24 59:23 60:16
61:6,12 73:8 85:5
88:21 89:15 99:19
**again** 29:13 31:6
33:5 35:10 36:23
37:6 43:20 47:25
76:23 95:2 103:9
104:2 110:5
**aggregate** 111:24
112:6
**ago** 17:20 19:16
46:8 79:17
**agree** 44:13 61:13
97:8
**ahead** 40:20 89:9
**alert** 57:21
**alerts** 57:21
**all** 7:2 21:6 23:24
29:13,19 41:20
43:22 45:15 47:6
52:23 56:13 61:2,
10,12 66:22 95:4,
14
**allow** 39:14

**allowed** 12:4
64:12 65:6 78:15
**along** 70:24 83:13
**already** 80:22
**also** 8:7 13:4 25:8
28:6 35:17 52:7
61:4 71:9,13,19
72:8 75:19 76:3
81:11 90:17 95:16
97:20 101:3,23
**always** 105:23
**am** 7:18 11:22
14:11 17:3 27:25
32:13 33:9,19
38:16 39:15 40:16,
17 41:13,17 46:4,
16 48:16 64:7 65:4
73:17 76:14 77:21
81:23 92:15 93:16
98:6 99:2,3,7
100:5,13,25
110:16
**amount** 83:14
107:6,9
**an** 10:8 20:2
23:11,19 34:7,21
37:19 56:10 60:8
82:24 90:21 99:8
105:13
**and/or** 25:3
**Andris** 5:1,11 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1,20 25:1
26:1 27:1 28:1,22
29:1 30:1 31:1
32:1 33:1,24 34:1,
3 35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1

74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,18, 24 95:1,19 96:1 97:1,23 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1

**announcement** 103:21

**announcing** 103:22

**another** 8:8 18:5 32:3 48:12 56:3 60:21 61:4 63:19 64:11 67:4

**answer** 7:24 8:19 9:11 10:4 22:17,23 23:3,14 26:14 27:7,12 28:2,25 35:4,12 37:25 39:13,25 40:2 53:17 54:12 61:16 62:14 64:4 65:8,25 66:20 67:9 69:18 70:2,10 71:22 72:11 74:3,9 75:14,22,25 76:5 79:15 80:8,22 82:7 86:23 88:2,12 97:2 99:4 103:9 104:2, 15 108:22 109:20 111:13

**answered** 26:24 27:23 35:7 40:3 47:8 53:16 65:24 71:21 79:15 80:23 86:22 103:8,25 104:14 106:8 108:21

**answering** 8:25 9:3 96:21

**answers** 41:25 109:6,7,10

**any** 10:15,20,22 15:7,24 16:8,11 17:7,11,13 18:22, 23 20:5,7,19

21:14,16 26:11 31:23 34:24 36:3 37:2,4 38:12 40:24 41:3 44:6,25 46:8, 21 48:6 49:21,24 50:4 53:3 57:17 59:4 65:5 73:19 77:8,12,16 78:3,5, 10 79:20,24 89:22 94:9,16 95:20 96:12,13,18 97:5, 11,13,14 102:12 103:20 109:12 110:11 111:17 112:20

**anybody** 21:22

**anymore** 59:17

**anyone** 11:3,9 69:7,9,11 85:5 101:14,20

**anyone's** 37:20

**anything** 20:22 21:2,3 43:23 44:6 46:15 57:10 105:6

**anywhere** 18:18 50:17

**apologize** 38:18

**app** 99:8

**appear** 11:21

**appearances** 31:16

**appearing** 11:14

**application** 56:10,11,12

**appraise** 60:22

**approach** 105:24

**approval** 57:14 59:2,6 60:18

**approved** 52:10 56:15

**around** 18:16 55:8

**arrested** 50:7

**ascertain** 110:2

**aside** 42:8 53:6

**ask** 7:24 8:13 29:15 41:2 44:22,

25 45:13,19 46:16

**asked** 12:10 26:24 34:13,19 35:5,7 36:25 39:23 40:11, 23 47:7 53:16 65:24 71:21 79:14 86:22 103:8,25 104:14 106:8 108:21

**asking** 9:2 12:7 17:3 42:3 48:16 84:22 95:4 99:18 100:19

**asks** 105:11

**assist** 96:13

**Assumes** 88:11

**assuming** 56:7 58:20 60:17 70:9

**Astoria** 5:17 7:6

**at** 8:23 11:21 15:14 16:13 17:16, 17,18 18:5,14 20:15,24 24:3,12 25:16 26:4,7 27:3 28:8,13 34:2,13, 18,20 35:9,18 38:25 41:19 42:5, 6,23 43:4 44:20 46:11 47:10 48:15 50:16,24 51:10,24 52:21 53:21 59:9 60:18 61:13,22 62:22 63:24 64:2, 6,25 65:2,17 66:12,14 67:3,4, 17,18 68:7,11 69:22 70:7,15 72:25 73:6,21,24 74:6 76:7,8,9,10, 11,16 77:8,12,22 78:12,21 79:25 80:16 81:10 82:2 83:17 84:7,10,20 86:7,18,20 87:6,24 89:19 90:22 93:19 94:5 96:12,24 97:5 98:14 99:18 101:8 102:2 103:2,3,20, 21 104:20 105:3 107:19,23 112:15, 20

**attendance** 14:7

**attending** 7:17

**attention** 101:2,6, 23 107:13

**attorney** 9:14,16 11:2,5,8 15:4 19:3, 6,12,20 33:23 46:7 49:18 79:10,12 96:18 108:6

**attorney/client** 26:10 34:23 42:15

**attorneys** 32:23 33:11 41:15

**August** 17:25 65:16

**authority** 48:7 102:12

**auto** 7:3 16:9 18:3 20:24 24:4,13 46:12 50:11,25 51:2,10 53:14,21 60:8 62:4 63:12, 17,22,25 64:2,6, 16,17 65:2,3,10,18 66:12,15 67:3,15, 18 68:9 70:15 73:2,7,24 74:6 77:10,13 78:10,21 79:25 80:12 82:2 83:18,22 84:7,10, 21 86:7,11 87:3,7, 24 93:7,9,10,12, 14,19,20,24 94:5 101:12,17 103:4, 22 105:3 107:23, 25 109:13,14 112:15,21

**automatically** 88:20

**available** 60:12

**Avenue** 5:14

**away** 75:9 96:23

**awhile** 21:11

**B**

**babysit** 33:11

**babysitting** 41:15

**back** 6:12 14:4 18:20 21:12 29:18 45:21,25 54:18,20

60:13 63:16 66:8,9 70:19 77:3,5 81:10,17,19 84:7, 23 88:6,8 89:16 90:6,16,22 91:3 104:5,7 110:7,9

**badger** 47:13

**badgering** 47:18 48:4

**bank** 56:16 57:10, 15,24 58:12,15,25 59:6 60:18 89:6

**banks** 52:9 56:21

**Baron** 24:16 35:16 36:18,19 70:6,11 71:4,18 74:18,21 75:3,8,25

**based** 34:22 59:11 98:25 109:9

**basis** 27:8 29:2 53:9 73:25 85:9 106:2 109:17,21 111:23 112:7

**Bates** 100:11

**bathroom** 81:8

**bear** 48:20

**because** 26:3 42:7 43:20 54:5 59:18 80:12 90:9 91:12 107:5,17

**becomes** 58:3

**been** 5:3 7:8 32:20,24 40:4 45:3 49:20 50:4,7,19 51:14 53:11,23 54:5 66:21 67:10, 11 69:21 77:25 79:21 80:9 93:11 105:23

**before** 7:9 8:25 10:13 17:15 29:19 33:2 37:17 50:8 54:23 56:19 62:11 66:25 67:3,6,14 73:7 78:22 86:5 93:10,11 99:14 108:9,13

**began** 50:25 51:8, 11 84:9

123Index: beginning–control

**beginning** 50:12, 14,16 63:11

**being** 21:22 31:10 32:5 33:15,19 38:16 51:24 53:6 87:16 93:6 99:2

**belief** 70:14

**believe** 17:25 19:17 23:5 41:9 70:18 71:6 72:4,17 73:13 78:12 108:14

**besides** 11:2,8 20:3 46:5 49:23 50:3,15 53:2 94:2

**better** 23:2 55:5 83:7

**between** 9:10 15:22 17:4 18:21 24:20 25:3,12,14 26:13 34:25 36:15 37:8 40:5 44:10 46:6,10 64:16 65:16,20 67:11 82:17 92:12 94:18 95:19 97:23 98:23 99:21 100:21 107:2,11

**biggest** 55:15 57:4

**birthday** 74:10,11

**board** 83:18

**bonus** 31:23 68:8

**both** 42:17 63:8 74:5 108:12

**bought** 52:2 53:7 88:15

**break** 9:6,10 14:20 49:16 69:15, 19 78:22 90:21 96:17

**bring** 87:10

**brought** 33:6 89:15 90:5

**bureaus** 58:7

**busier** 53:13

**business** 6:18,21 33:12 35:23 61:20

77:18 112:13

**busy** 12:17

**but** 8:9 11:17 12:15,19 15:13 22:23 23:19 38:24 40:18 43:17 44:8 53:16 54:4 55:14 58:20 61:16,19 64:7 66:22 67:22 70:23 72:4,15 75:8 77:21 79:6 86:15, 24 88:12 93:11 94:12 103:12 106:21 107:15 108:3 110:16

**buy** 55:15 56:2,7 58:10,16,20 64:10, 13 65:3

**buying** 52:23 61:4

———

**C**

**call** 9:9 27:9,24 28:3,12 31:9 45:21 46:25 48:12 58:13 82:25 94:24 107:13

**called** 43:2 64:22 94:7,8 111:3

**calling** 31:24 32:10

**calls** 21:8 48:23 57:24 66:19 95:6

**came** 75:5

**can** 6:24 7:4 8:22 9:10,22 12:14,22 13:2,4,12,24 14:17 15:10,16 16:14 22:16 23:14 27:9 33:12 35:22 40:19 44:19,24 45:4,24 48:20 53:17 54:11, 13 55:12 57:14 58:8,24 59:16 61:2 62:14 64:4,10,13 65:4,24 66:20 67:9 69:17,25 70:10 71:21 72:4,11 74:3 75:22 76:5 79:15 80:8,21 81:9,11,17 82:7,20 84:19 86:22 88:2,12

92:23 95:10,16 97:2 100:16 103:8, 25 104:3,5,14 108:21 109:20 110:5,7 111:13

**can't** 42:19,20 80:9

**cannot** 31:18 41:16 61:23 64:25 90:19

**car** 16:3 53:24 54:7 55:14 59:15 60:3,7,17,22 61:15 62:5 63:23,24 64:2,9,24 65:14 66:17 82:10 83:9, 19,23 86:7,11 90:6 91:10 92:12,18 93:3,4 105:19 106:4 107:19 112:14

**care** 42:9

**carefully** 11:7

**carries** 10:11

**cars** 52:2 53:8,13 61:20 64:5 65:17, 21 68:6 82:12 83:20 84:2,4,10 87:23 106:18 107:4,6,10 111:24 112:7,15

**case** 7:18 8:5,7,9 15:19,20 19:25 32:7,11 39:4 42:11,18 48:12 49:23,24

**cases** 31:20 43:13

**cash** 56:2,8

**center** 47:23 112:13

**certain** 88:21

**Certainly** 38:11 96:5

**change** 51:7 59:14 90:19 107:7

**changing** 90:14

**charge** 51:24 53:6 68:22 71:11,15 72:5,16 75:4 80:3 82:23 83:11 90:11,

12

**chase** 59:15

**check** 21:16,22 56:19 57:16 84:16, 19 85:7,13

**checked** 18:22 21:19,20 63:9

**checking** 17:6 21:14 55:21 63:3

**choose** 63:24

**civil** 49:21 50:4

**clearly** 8:19

**clerk** 30:4 31:15 80:6,12

**client** 29:7 35:2 37:14 38:2 42:22 55:13 57:24

**close** 39:16 50:2 63:18 65:11

**closed** 58:15

**co-** 60:10

**co-signer** 60:9,12

**code** 30:6

**Collectively** 92:21

**college** 50:22,23

**colloquy** 29:20

**come** 55:19 57:7 60:13 61:24 81:9 89:19 90:22 105:25

**comes** 55:2 58:19 59:3,23 105:24

**coming** 31:19

**commission** 83:14

**common** 64:20, 21,22

**communicate** 18:24 96:17

**communicated** 21:6

**communications** 15:3 17:7,12,14 21:15 34:25 79:10

94:17 95:19

**company** 87:5 109:24

**compel** 45:5

**complete** 54:9,23 56:10,14,18

**completely** 48:6

**completes** 56:12

**compliance** 60:25

**compliant** 57:9

**complies** 6:8 28:16 29:22

**computer** 30:20

**concern** 21:10 43:6 44:11 45:16 46:11 57:4

**conditions** 10:21, 22,25

**conference** 32:18 48:10 81:12

**confirm** 14:17

**confirmation** 104:16,19

**confirming** 14:12

**consider** 45:9

**considering** 55:14

**constantly** 107:13

**contacted** 32:20 33:20

**contained** 35:19

**contents** 15:2 79:9

**contesting** 39:6

**continue** 33:10

**continued** 52:18 78:21

**Continuing** 84:15

**contract** 61:9

**control** 58:17 60:5,15 61:23 112:22

124Index: controller–don't

**controller** 73:14, 15

**conversation** 25:5

**conversations** 26:12 94:10 98:11

**corporate** 13:10 14:9,10 95:9,10, 13,22,23

**correct** 22:10,12 26:18,19 52:20 63:6,15 64:6,23 70:21 74:15 84:11 85:16 86:5,6 90:3 102:25 104:23 105:5 109:4,7,10 111:20

**correctly** 54:15

**could** 10:16,23 16:25 20:15 59:18 61:17 67:10 72:17 79:21 84:16

**counsel** 47:11

**count** 49:25

**couple** 108:9

**course** 56:16 92:10 93:16

**court** 6:17 8:12,22 10:12 28:20 29:9, 21 31:7,12 32:13 35:22 36:6 37:11, 24 38:8,15,19 39:9,15,22 40:14, 20 41:6,11,13 43:7,11,15,18 44:5,15 45:12,18, 24 46:2,14,20 47:5,15 48:8,20,22 49:6,10 54:16 66:6 76:25 81:16 88:4 97:16 104:4 105:11 110:6

**cover** 34:11

**credit** 52:12,13, 15,18,22 57:16 58:4,22 60:7 62:19,24 63:3 77:10 84:6,9,12 102:6,16,17,22 103:5,18

**currently** 10:15, 21 78:3

**customer** 55:2,18 56:11 58:5 59:7, 12,20 61:11 63:24 64:9,25 87:20 88:14 89:3,5 91:10,18 92:23 102:16,17 103:18 105:25

**customer's** 63:10 85:8,13

**customers** 52:12, 14 62:20,25 77:10 84:7,10 102:23 105:22 106:5,14 107:14

**D**

**D1708** 100:12

**D1910** 101:4

**D1912** 101:24

**daily** 85:18,19,22, 24,25 86:3

**date** 19:23 51:9 101:7,25

**dates** 78:19

**daughter** 83:2

**David** 74:17,21 75:2,8,25 107:20

**day** 23:7,18 43:4 61:23 70:19 74:13

**day-to-day** 73:25 85:9

**days** 61:18 79:17

**deal** 32:3 54:9 89:13

**dealership** 17:16, 17,19 18:5,7 25:17 51:25 53:9 60:14 64:11,13 65:6 67:5,13 71:12,16 72:6,14 75:5 76:12 85:20 87:11

**dealerships** 64:8, 14 65:11,13 111:23

**Dealertrack** 62:8, 12,17,19,20,21,23, 25 63:9,14 76:18, 21 77:9 85:13,18, 21,23,25 86:2 89:3,11,13,17,21 90:5,8,10,15 102:9,11,15,20,23 103:5,11,14,16,17 105:21

**Deana** 13:9,12,20 14:8 24:4 72:23 108:15,17

**December** 95:15 101:25 106:18 107:2,11

**decide** 55:19 56:5,9 59:16 60:16

**Decipher** 99:8

**deemed** 6:3

**defendant** 5:3 28:7 34:3 36:14 43:2 44:10 46:10 49:24

**defendant's** 101:3,24

**defendants** 11:13 14:10 19:9,24 20:6,7,20 24:25 25:9 34:9 36:2,22 78:4 95:7,8,10,12, 21,23 97:25

**definitely** 33:7

**Demand** 22:5 94:14,20,23 95:17

**demands** 35:25

**Department** 64:12 65:7 91:15 92:20

**depending** 61:18

**deposition** 7:9, 19,23 11:4,10,22 12:5,14 14:19 15:5,8 28:11,23 31:25 32:23 33:16 34:2 36:10,18 37:10,18 43:5 45:8 49:11 50:16 79:13 96:12,16 97:9 113:2

**depositions** 37:15

**describe** 15:11, 16 16:14 82:20 105:15

**described** 53:2 91:25

**description** 17:2

**details** 15:13,18 66:22 93:22

**determine** 75:7

**Development** 112:13

**dial** 30:9

**didn't** 21:22 68:10 90:18 112:22

**difference** 105:7

**different** 23:18, 20,22,24 55:11,21 56:17 57:5 64:14

**differently** 99:12

**direct** 101:22

**directed** 29:7

**directing** 70:23

**directly** 71:2

**discipline** 69:3,5

**disciplined** 106:11 107:24 108:2

**disciplining** 69:11 80:16

**Discovery** 35:25

**discrimination** 8:5,7 78:11,14

**discrimination-** 96:6

**discuss** 49:17

**discussed** 53:4 59:22

**discussion** 7:13 14:2 22:2 31:4 100:3

**dispute** 33:6 38:20 43:14

**disputes** 32:25

**distribution** 105:24

**division** 92:11

**divorce** 49:25 50:3

**DMV** 60:24 80:5, 12 92:14

**do---** 15:14

**document** 38:6,9 61:13 96:4 101:4, 24 111:3,5,11 112:5,18

**documentation** 58:23 61:2

**documents** 15:7, 10,17,21,24 16:4, 5,7,8 97:10 109:5, 16,22 110:2,12,15, 17 111:7,9,14,15, 16,25 112:8,17

**does** 49:25 52:11 58:4 71:9,13 87:22 88:14,19 100:19 101:10 102:7 104:19

**doesn't** 11:18 44:11 59:13

**doing** 28:23

**don't** 6:23 8:24 9:20,22 10:3 15:12,17 16:16,24 19:13,21,22 20:12 21:11 24:10,17 29:12,16 30:24 38:9 42:9 44:9 47:21 48:13 49:25 53:10,18,23 54:4, 6,17 55:22 56:22 57:5 59:17,24 60:5,15 62:6 64:10 65:19 66:2,7,22 67:19,23,24 69:19 70:3,22,25 73:5,9 74:4,8 77:2,20,24 78:2,19 79:7,20,22 80:14,18,25 82:3 83:3,15,21,24 84:4 85:5 86:9,13,17,25 87:4,9,12,16 88:5, 22 90:17 93:21,22, 25 94:6,9,12 96:20

125Index: done–G-U-Z-M-A-N

104:9 106:16,20 107:5,15 108:3,18, 23,25 110:18 111:21 112:2,10

**done** 33:13 40:17 61:6 91:15 93:6 100:17

**door** 61:25

**down** 7:19 8:13, 23 13:14 21:4 29:13 31:10 99:17

**draw** 101:6

**drink** 9:7

**Drive** 5:16 7:6

**Due** 64:21

**duly** 5:3

**duration** 12:13 14:18

**during** 14:20 24:3,8,12 36:10,17 37:9 49:16 58:14 59:19 63:20 76:16 94:11 96:11,16,17 97:4,8 105:2

**duties** 94:11

— — —

**E**

**each** 55:8,13 85:7

**earlier** 70:5 98:13

**education** 50:21

**effect** 10:12

**either** 56:7 59:13, 15,16 73:10

**else** 11:9 12:18 14:13,16,21 18:18 46:15 50:17 59:23 85:5 101:20 105:17

**else's** 21:23

**email** 25:18 95:18

**emailed** 46:8 94:3

**emails** 36:3 94:16

**Emanuel** 6:22 22:18 24:18 34:21

**emotional** 10:21, 22

**employed** 63:13

**employee** 82:24

**employees** 25:7 63:22 68:9,20,22 69:3,5,22 71:4,8 72:8,9,18 75:3,10, 16 76:3 79:25 80:3

**employment** 46:11 51:9 63:11 83:7

**end** 51:9,16 61:14, 22

**Enough** 37:12

**entails** 55:21

**enter** 89:16,21 90:5

**entered** 112:14

**entire** 55:4,7 80:20

**entitled** 38:12

**established** 65:5

**evaluations** 86:8, 11

**even** 12:8 15:17 56:19,22,24 58:15 59:18,20,22,24 60:2,7,8 90:18

**ever** 7:8 20:4 24:9 40:24 41:2 49:20 50:4,7 51:7 63:21 69:7 76:17,20 79:24 82:13,25 86:16 87:10,12,14 94:3,7,8 99:13 101:16 102:8 104:10,21 105:18 106:3,10,13 107:24

**every** 31:24 42:25 52:21 55:10 77:18 85:23 86:2 90:13 107:6,10

**everybody** 54:3 55:10 61:22 85:11 91:20 105:17 107:9,16

**everything** 8:13 42:19 56:18 57:8 58:13,21,23,25 59:23 60:17,24 61:6,7 74:14 90:12,13 99:3 107:7 109:2

**evidence** 70:10 88:12

**exact** 19:14,22 22:11 53:19 67:19 70:3 78:19 105:13

**exactly** 19:23 39:7,10 53:10,18

**EXAMINATION** 6:14

**examined** 5:5

**example** 9:7 40:12

**except** 14:19 96:16 97:9

**exchanged** 15:22

**exhibit** 5:24 6:2 97:18,19 98:2 100:11 101:2 110:20

**expensive** 59:14

**explain** 7:19 49:22

**explanation** 105:14

**extent** 26:11 34:24 93:21

**extra** 57:22

**extracted** 99:8

— — —

**F**

**face** 11:23

**fact** 11:16 36:19 41:18 107:16

**facts** 10:3 70:9 88:11

**fair** 105:17,23

**familiar** 24:4 62:7 63:17 66:3,11 72:24 73:17 74:17,

20 76:14 80:5 87:18 93:7,17

**far** 42:3,13

**faster** 107:8

**fastest** 41:10

**fault** 48:17

**favor** 29:17

**February** 19:22 37:5 65:21

**feed** 12:23

**feel** 9:8

**female** 62:4

**few** 17:20 19:16 51:14 53:11,23 66:21 67:10 69:21 73:22 77:25 79:17 80:9 93:11

**figure** 22:19 32:2

**finance** 52:7,8 56:2,8,9,11 59:9, 10

**financial** 105:20

**financing** 56:12 58:3,18

**find** 18:23 63:25 64:25 65:2 104:11

**fine** 6:10 11:22 12:2,19 13:17 28:5 30:16 31:12 91:4,5

**finish** 40:16,19 89:9 102:6

**finished** 9:3 54:24,25

**fire** 68:23,25 72:7, 9,17 75:9,16 76:2

**firing** 69:9

**firm** 48:15

**first** 7:23 21:21 55:23 99:5 100:10, 11 104:11 105:25 108:18

**fixed** 69:14

**flip** 100:7

**floor** 62:5 88:24 103:23

**focus** 103:12 106:25

**focused** 8:6

**follow-up** 96:9

**following** 33:7

**follows** 5:6

**force** 10:11

**foresee** 61:24

**forget** 46:22

**forgot** 25:23,25 26:4,20 34:14,17 35:6,18

**form** 23:13 26:9 62:14 64:4 70:9 75:18 82:7 88:2 109:20

**format** 99:14

**forth** 60:23

**forward** 7:20

**found** 104:21

**fraud** 57:3,20,21

**free** 9:8

**frequently** 76:8

**Friday** 59:25 60:14

**from** 9:14 10:16, 23 17:5,12 21:3 23:6,17 31:24 32:11 38:21 51:8 53:6,13 57:24 58:4 59:6 63:10 64:5,8, 11,14 65:5,13 67:7 78:17,23 81:14 84:25 91:6 96:22, 23 98:21 99:11 101:18,19 104:23

**front** 38:10

**full** 5:9 99:20

**Funds** 93:8,9,10, 11,13,14,19,24 101:12,17

— — —

**G**

**G-U-Z-M-A-N** 5:2

126Index: gather–I'LL

**gather** 10:2

**gave** 50:16 101:14 102:10 103:10,13, 21

**general** 51:12 52:5,6,19 62:11 66:24 68:13,14,21, 24 69:4 71:5 73:21 80:4 88:25 94:4

**Generally** 9:16

**gestures** 8:15

**get** 9:7 22:6 30:6 31:23 33:12 35:22 42:10,11 44:18 45:20 48:23 52:24 54:22,24 55:25 56:15,23,24 57:14, 24 59:25 60:2,4,8, 9,16 63:14,23 65:12 71:17 89:4 92:8 105:5

**get all** 57:11 58:23 92:22

**get along** 41:16 47:19

**gets** 54:24 57:12 61:6 92:9

**getting** 39:15 52:10,23 55:17 60:25 63:4 91:13, 14

**give** 7:4 8:14 17:2 30:5 102:11,12

**given** 86:8,11,16 103:4 105:8 110:3

**giving** 58:5

**go** 7:11 13:25 14:4 21:24 31:2 40:20 45:25 50:22 54:25 56:9,16 57:7,15 59:7 61:10 71:17 89:9 99:25 108:7

**goes** 29:25 58:21

**going** 5:20,21,22, 24 6:12 7:18,20 11:15 22:19 26:4 29:9,14 30:4,7,8, 12,13,19,22,23 31:14,22 32:2,14 33:10 34:16 37:13,

19 39:17 41:13,17, 22,24 43:25 44:16 45:13 55:13 57:19 59:21 61:24 90:23, 24 99:12,17 100:7, 25 101:6,22 106:22 108:7

**good** 28:17 37:19 42:25 48:21 66:23 81:6 86:24

**got** 37:12 51:12 63:13 85:19 91:10, 18 104:16,18,25

**great** 13:15 48:8

**ground** 7:20

**group** 25:13 40:8 46:7

**guaranteed** 59:19,20

**guess** 61:24

**guideline** 42:17

**guidelines** 58:14

**guy** 64:19

**guys** 30:25 64:19 81:10

**Guzman** 5:1,11 6:1,16 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1,25 20:1 21:1 22:1,7 23:1 24:1, 21 25:1,19 26:1,16 27:1 28:1,22 29:1 30:1 31:1 32:1 33:1,25 34:1,3 35:1 36:1 37:1,8 38:1,23,24 39:1 40:1 41:1 42:1,4 43:1 44:1,18 45:1 46:1,3 47:1 48:1 49:1,16 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1

82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,18,25 95:1,20 96:1,11 97:1,23 98:1,5 99:1 100:1, 16 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,22 111:1 112:1,24 113:1

**H**

**half** 90:21

**hand** 15:15

**handle** 68:10

**handled** 68:11

**happened** 33:4 36:9

**happening** 31:18

**harass** 47:13

**harassing** 27:5, 10,15,17 29:3

**has** 8:12 11:18,20 12:15,18,20 28:24 34:4 39:23 40:6 44:22 50:19 52:21 53:23 54:24 55:11 58:13 60:24 66:21 71:7 72:21 77:18 91:14 93:19 94:7

**haven't** 59:22 88:17,22 93:17

**having** 5:3 57:4 84:13

**he** 20:15 27:23 28:24 29:5,6 34:4, 12,14,15,16,17 35:3,5,6,18 36:12, 20 37:4 39:2,23 40:2,3,6,13,23,25 41:18 42:5,6,7 43:21 44:22 45:14 47:9,12 67:20,23 70:14,16,18,20,23, 24,25 71:2 72:2,4, 8,17,19,21 74:19, 21 75:5,6,9,15,19

76:2,6 78:22 81:3 90:7,8,9,10

**head** 8:15 16:17, 25

**hear** 6:24 9:22 30:16,23,24 48:9

**heard** 79:6

**hearing** 104:10

**held** 7:13 14:2 22:2 26:12 31:4 43:25 100:3

**help** 77:9 91:9

**her** 11:23 12:7,11 21:21 24:9 29:15 66:16 67:2 72:24 73:11,15,20 80:25 82:9 87:11 94:3,7 103:22 105:8

**here** 10:2 25:24, 25 26:21 30:12 37:15 46:3,4

**herein** 5:3

**hers** 21:20

**highest** 50:20

**Hillside** 5:14 7:3 16:9 18:3 20:24 24:3,13 46:12 50:11,25 51:2,10 53:14,21 62:4 63:11,17,22,25 64:2,6,16,17,25 65:3,10,18 66:12, 15 67:3,14 68:9,12 70:7,15 73:2,4,6,7, 8,21,24 74:5,6 76:8,17 77:10,13 78:9,21 79:25 80:12 82:2 83:6, 18,22 84:10,20 86:7,11 87:3,7,24 93:20 94:5 103:3, 22 105:3 107:23, 25 109:13,14 112:15,21

**him** 19:7 27:25 29:4 34:13,19,20 35:8 41:8 44:22,24 45:14 47:12,14 70:22 74:20

**himself** 35:2 40:5 70:19,20

**hire** 68:20 69:7 71:4,19,24 75:3,6, 9,15 76:2

**hired** 68:7,16 71:17

**hiring** 68:22 71:7 80:3

**his** 5:23 6:6,9 28:21,24 29:7 34:4,12 35:2,18 36:22 38:25 39:24 41:19,20 43:22 44:19,20 47:10 67:17,23 70:7 76:18 83:2

**hold** 29:10

**holidays** 107:8

**home** 5:16 26:7 27:3 34:13,20 35:10,18 38:25 41:19 42:5,6,23 43:4 44:18 47:10 54:25 59:21

**honor** 28:19 31:7 32:9 36:5,9 39:8 40:15 43:9 45:23 46:18 47:4 49:5,9

**hour** 8:8 79:22 90:21

**hours** 53:21,25 54:2,9 58:8 61:17 79:22 94:12

**house** 26:5 34:18 55:16

**how** 10:20 16:3,16 21:13 24:16 32:3 47:20 52:4 53:8, 12,13 55:4,8,12 65:17,21 67:25 69:9,11,22 70:16 72:7,24 74:20,23 75:13 79:11,18 83:9,22 84:2,4 85:12,15 88:16 101:20 105:24 107:14 112:11

**however** 9:9,16

**I**

**I'LL** 9:21,23 97:10

127Index: I'VE–Leticia

**I'VE** 77:24

**ID** 5:23 6:6,9

**idea** 20:2 42:25

**identification** 6:4 98:4 110:21

**identify** 13:13

**imagine** 42:19,20

**include** 16:5,8 52:11 107:20 111:17

**included** 35:20 96:3 98:15 109:15

**includes** 95:21

**including** 25:5 34:10 40:9

**indicating** 89:18

**individual** 24:5 55:10 95:12

**individually** 78:4

**individuals** 25:16

**indulge** 41:17

**information** 21:20 42:10 56:13, 20 57:12 59:4 61:11 63:4,10 74:8 82:15 84:17,19 85:8,14 87:21 88:14 89:3,5,12, 14,16 90:5 92:22 95:5,15 100:23 104:25 105:6,20, 21 109:23

**Initially** 55:18

**input** 105:21

**inputted** 57:12

**instance** 21:17 77:16

**instruct** 26:6,14 27:6 44:17

**instructed** 28:24 35:3,11

**instructing** 27:25

**insurance** 59:22 60:19,20,25

**intentionally**

27:2 35:8

**interaction** 73:19

**internal** 112:12

**interposed** 34:21

**Interrogatories** 108:11,13 109:3,4

**interrupt** 41:7,8

**interrupted** 38:16 48:11

**interrupting** 40:18

**interviewed** 79:24

**into** 55:19 57:7,13 89:3,17,21 105:21

**introduce** 70:18

**introduced** 70:20

**inventory** 55:23 65:12

**involved** 21:22 52:7 55:16 57:3 90:2

**iphone** 23:11,16, 17,18,19 25:22

**iphones** 23:25

**Ishaque** 21:18 24:14 36:11 40:13 63:21 67:4,14 68:15,18 71:5,6, 10,11,14,15,17 72:5,12,16 76:17, 20 78:16,20 80:15 82:17,22,25 85:4, 21 89:2,25 90:4,15 106:11

**Island** 18:8

**Isn't** 102:14 103:2

**issue** 34:7 36:24 40:23 44:12

**issued** 92:9

**issues** 48:24 49:2

**itself** 88:24

---

**J**

**Jamaica** 5:15

**January** 19:21 37:5 94:22 95:3 106:18 107:3,12

**Jeanique** 67:2 85:5 86:4

**Jennings** 13:10, 16,21 14:8,11,15, 22,23 24:5 72:23

**job** 85:17 91:25 108:3

**job-** 73:22

**join** 13:8,23

**joining** 13:11,19, 21

**Jory** 24:16 35:16 36:18 70:6,11 71:3,9,13,18,23 72:14,18

**Josh** 74:23,24 75:13

**Judge** 10:13 27:10,25 28:4,12 29:15 30:3

**Judge's** 6:7

**July** 74:16 101:8

**just** 12:22,24 13:12 14:12,16 21:19 22:24 29:14 30:9,11,13 32:4,13 35:14 37:6 38:22 46:7 47:2 48:2 53:2 54:14 55:5 81:3,7 86:25 90:17,19 91:25 92:7 99:18 100:16, 19 105:12 106:24 108:9

---

**K**

**kataev** 6:25 7:11, 15 11:12 12:2,10 13:6,18 17:9 19:8 20:10,13,21,25 22:15,21 23:12 24:22 26:8,23 27:4,9,14,20 28:5, 21 30:11,18 32:15 33:15 35:10 37:6, 13,21 38:4,8,14, 15,18 39:6,7,20,22

40:3,14,15,21,22 41:6,9 42:21 43:8, 9,11,16 44:4 46:20 47:2,6,16 48:2,9 49:6,8 53:15 54:10 62:13 64:3 65:23 66:18 67:8 69:16, 24 70:8 71:20 72:10,20 74:2 75:17,21 76:4 79:4,14 80:7,19 81:2,13,21 82:6 86:21 87:25 88:10 90:23 96:8,25 103:7,24 104:13 105:10 106:7 108:20 109:19 111:12

**KATEV** 39:12

**keep** 13:13 31:18 72:12

**kept** 112:12

**kinds** 57:5

**knew** 15:13 105:3

**know** 10:4 16:16, 25 19:24 20:12 27:12 32:4 50:2 57:5 59:3,10 67:24 70:16 72:23 77:24 78:2 87:4 99:19 100:18 101:14,21 110:18

**knowledge** 70:7 71:3 72:14 75:2 78:9 86:15 87:8,22 88:13,19 91:8 93:12,16 98:18 101:16 103:19 109:2,9,12,18,21

**known** 107:16

---

**L**

**labor** 92:11

**last** 9:4 19:15 29:18 33:4 36:17 54:18,21 66:10 77:3,6 80:24,25 81:18,20 88:9 102:2 104:6,8 108:23 110:8,10

**late** 26:4 34:17

**latter** 45:11,12

**Law** 32:11

**lawsuit** 8:2

**lawyers** 47:22

**lay** 7:19

**leads** 88:20

**Lease** 18:9,10

**least** 103:2

**leave** 11:19 12:7, 11 26:7 27:2 34:20 35:9 42:8,22 54:22

**leaving** 28:8 78:22

**left** 26:5 28:10 34:12 38:25 41:18 42:5,6 43:3 47:10 73:7,8 80:12 83:5 86:5 87:3,5,6 112:20

**legitimate** 57:2

**less** 106:18 107:4

**let** 13:19 24:24 25:8 28:6 32:4,15 59:3,10 79:4 99:18 100:9,17

**let's** 7:11 13:25 14:4 17:12 18:20 21:3,17,24 22:4 31:2 53:12 63:16 64:8 84:25 90:20 97:17,20 98:21 99:25 104:23 106:24 110:19

**Leticia** 15:25 17:14 18:21 20:4 21:10 24:21 34:5 36:16,21,23 37:9 62:4 66:3 76:18,21 77:9 82:4,17,25 84:3 86:19 87:2 91:8,20 93:23 94:2,19 95:25 97:24 98:24 99:22 100:21 101:11 102:8,10,14 103:4, 10,14,21 104:12 105:16 106:11,14, 17 107:4,12

A1439

128Index: Leticia's–ms

**Leticia's** 105:22 106:5

**level** 50:20

**license** 56:20 91:9,10,23 92:3, 14,19

**like** 33:21 35:14 55:22 58:7,18 59:13 72:12 105:17

**liked** 64:2

**Likewise** 9:2

**Lily** 80:6,12,16

**Lily's** 80:24

**line** 30:6 45:19 46:17 70:24 80:21 106:21,23

**listen** 11:6

**litigated** 42:12

**litigation** 47:24 108:5 109:5,11

**lived** 50:17

**loan** 52:24 58:24 59:8 60:9 61:10 63:5

**loans** 52:10

**location** 76:11

**log** 94:24

**long** 18:8 42:9 55:12 65:13 79:11 106:15 107:14,17

**longer** 30:22 60:3 106:19

**look** 20:15 44:20 47:17 60:18 96:12, 22 99:12,18

**looking** 96:23 97:5 98:14 110:18

**lost** 88:20

**lot** 55:16 57:3,6,20 58:19 64:6,25 90:2 110:15

**loudly** 8:19

**lower** 59:16

**Luckman** 28:19 31:8

**lunch** 90:24

**lying** 108:25

**Lynn** 28:19 29:18 31:8

**M**

**ma'am** 65:15

**made** 28:12 51:24 105:7

**make** 9:15 12:24 45:4 47:22 51:25 54:14 57:8,25 61:11,21 91:3,17 92:7,21 93:5 110:12

**makes** 61:22

**making** 35:24 51:23 53:7

**Mall** 63:17,25 64:17 65:3,10 67:15,18 74:6 84:7 109:14

**management** 93:15 101:15 102:12

**manager** 51:6,11, 12,19 52:5,6,16, 19,21 59:9,10 62:10,12 63:13,14, 21 66:25 67:21,22 68:4,13,14,17,19, 21,24 69:4,6,14 71:5 73:20,21 80:4 82:14,23 85:23 86:2 88:25 89:11 92:13,18 94:4,5

**manager's** 91:22 92:5

**managers** 84:13, 15,18,23 89:18,23 93:2 102:19,22,25

**Manrique** 107:20

**many** 47:20 53:8, 13 65:17,21 84:2,4

**March** 65:16

**mark** 5:24 22:4 88:20 97:17,20 110:19

**marked** 6:3 98:3 101:3,23 110:20

**match** 58:4,12

**matter** 7:25 32:18 49:12

**matters** 32:22

**may** 9:15 20:9 22:23 40:16 70:6 94:21 95:2

**maybe** 12:24 22:25 64:18

**me** 7:4,23 9:8,21, 23 12:6 14:16 15:2,11 16:15,22 27:22 28:20 29:17 30:23 31:19 32:6 38:10 39:14,25 43:8,21 44:17,21 46:8 54:14 61:19 64:6 71:2 81:3 85:3 96:20 99:9,19 100:17 101:19 102:5 109:22

**mean** 15:21 21:5 26:2 39:10 51:2 52:8 54:23 55:4 62:16 63:2,3,5 75:12,13 76:11 77:14,18 79:21 82:18 89:4 94:10 104:19

**meaning** 20:8 46:9 51:25 60:11 71:16 82:23 85:19 91:9,14 112:12

**means** 57:22 84:13 96:19

**meant** 17:16 52:6

**measure** 55:12

**mechanics** 70:4

**medications** 10:16,19

**mentioned** 70:5, 11,25 98:13

**mentioning** 72:12

**message** 17:8,13 21:7 25:14 46:7 96:18 99:17 101:7 102:3

**messages** 16:11, 15,19,20,21 17:2, 5,7 18:21,23 19:3, 6,10,12,19 20:3,5 21:9,15,17 24:20 25:2,11 34:5,10 35:20 36:3,13,15, 20,23 37:3,7,17 38:3,12 39:3,24 40:8,12,25 41:3,21 43:23 44:7,21,23 45:2,15 46:5,9,13 94:16 95:18,24 96:7 97:6,22 98:14,15,23 99:6, 21 100:20,24

**met** 79:17

**microphone** 22:25

**might** 94:10 110:17

**mind** 6:23 29:12, 17 54:17 66:7 77:2 88:5

**minimum** 77:17, 20

**minutes** 46:8 79:21 81:6 91:2

**mirror** 47:17

**mistaken** 73:13 99:10

**Mitsubishi** 18:12, 15,17

**mix** 48:18

**moment** 22:6 29:10 86:18

**money** 58:18 59:23,24 60:2,6 61:21,22 68:10,11 83:12 112:23

**month** 17:23 18:14 19:18 50:13 60:15 65:17,22 74:14 83:20 107:7, 10

**month-to-month** 111:23

**monthly** 53:9 112:7

**months** 53:13 67:11

**more** 48:19 57:19 67:22

**morning** 28:17

**most** 56:21

**Motion** 45:5

**Motor** 64:12 65:7 91:15 92:9,20

**move** 26:25 27:24 81:11

**moved** 20:13 22:24

**mr** 6:16,25 7:11,15 11:12 12:2,10 13:6,18 17:9 19:8, 25 20:10,13,21,25 22:7,15,21 23:12 24:22 25:19 26:8, 16,23 27:4,9,14,20 28:5,7,10,21 30:11,18 32:15 33:14 35:10 36:11, 19 37:6,8,13,21 38:4,8,14,15,18, 22,24 39:6,7,12, 20,22 40:3,14,15, 20,22 41:6,9 42:3, 20 43:8,9,11,16 44:4,17 46:3,20 47:2,6,16 48:2,9 49:6,8,16 53:15 54:10 62:13 64:3 65:23 66:18 67:8 69:16,24 70:8 71:20 72:10,20 74:2 75:17,21 76:4 79:4,14 80:7,19 81:2,13,21 82:6 86:21 87:25 88:10 90:23 96:8,11,25 98:5 100:16 103:7, 24 104:13 105:10 106:7 108:20 109:19 110:22 111:12 112:24

**ms** 5:19 6:5,10,22 11:20 12:3,21 13:16 14:5,11,15,

129Index: much–over

17,22,23,24 20:9, 23 21:24 22:4,18 24:18 27:8,17 28:3,14,16,17 29:11 30:7,15 31:2,6,8 32:9,14 33:14,21 36:4,8 38:11,21 41:5 42:4 43:24 44:5,11,13 45:10,16,17,22,25 46:6,11,17,18 48:19 49:2,4 54:16 66:6 76:25 81:5,9, 16 88:4 90:20 91:4 94:14 97:16 99:25 100:5 104:4 106:24 107:12 110:6,19 112:19, 24

**much** 55:8 79:18 83:9 112:25

**multiple** 37:15,22

**mute** 12:15 30:12, 19,23

**muted** 20:11

**my** 7:25 8:6,25 9:4,10,15 11:5,6 16:17 20:13 22:9 25:23,25 27:12 30:24 31:15 37:25 47:8 50:19 51:20 64:18 65:8 70:14 71:18 72:14 74:11 75:24 88:13 92:4 93:16 96:14,20 99:13 102:6 103:12,13,15,19 106:25 107:2 108:3 109:9 112:5

**myself** 26:13 30:12,20

—————

**N**

**N.Y.** 5:15,17

**name** 5:9 18:6 32:6,7 67:2,12 80:24,25

**named** 78:4 80:6 95:7,8,20

**names** 107:22

**narrow** 21:4

**near** 25:20

**need** 9:6 29:14 42:11 45:7 46:15 47:24 58:24 61:4 107:14

**needed** 29:6 52:24 54:8 89:12

**needs** 81:3

**never** 55:12 101:14 102:10 103:10 104:9,16, 18,24 105:3 108:2

**new** 5:5 7:7 9:2 18:8,10

**next** 18:4,11 55:25 56:6 60:14 97:17

**no** 7:10 8:14,15 9:10 10:19,25 11:11 14:13,15,21 15:3 16:2,6,10 18:19 21:19 25:21 30:21 36:8 38:5,6 39:11 44:4 46:13, 18 48:2 49:18,19 50:9,19 53:7,22 65:14 69:8,10,12 76:19 77:7,11 78:8 79:3 82:15 83:11 84:8 87:8 96:15 97:7,13 100:19 106:2,6 107:3 108:2 112:9,10

**nodding** 8:15

**not** 9:2,17 10:3 12:17 16:25 26:14 27:7,18 28:2,25 29:4,7 31:22 32:17,24 33:8,9,12 34:7 35:3,12 37:16,21 39:7,10, 17,23 40:2 41:2,7, 8,13,17 42:5,24 43:10,14,17 45:3, 20 46:23 48:16,17, 21 50:6 53:4,22 54:22 57:6 58:4,6, 10,17,18 59:19,20 60:2,6,7,10,12 61:23 63:25 70:9 71:2 73:13,17 74:9 78:14 79:6 80:2,3 83:11 88:11,16

**number** 22:5,8,9 23:8 30:5 53:19 58:6 83:19 87:23 94:14,20,23 97:21 108:10 111:24 112:6

**numbers** 22:11 58:4,5,12 59:11,13 60:18 61:12 86:25 106:21 107:10

—————

**O**

**oath** 10:8,10 26:17 47:12

**object** 11:13

**objected** 35:11

**objection** 22:15, 22 23:12 26:8,23 27:4,14,19 29:5 34:22 42:14 53:15 54:10 62:13 64:3 65:23 66:18 67:8 69:16,24 70:8 71:20 72:10,20 74:2 75:17,21 76:5 79:16 80:7,19 82:6

91:2,20 92:15 93:3,17 97:11,14 99:3,4,10,15 101:13,19 102:11 103:13,19 105:5, 13 106:12 107:6,9 108:4 110:16,17 112:18

**Notary** 5:4

**note** 7:15 29:23 31:15 33:3 35:14 49:13

**noted** 6:11 113:4

**notes** 96:12 97:5, 12,13,14

**Nothing** 97:3

**now** 6:13 11:6 13:22 14:5,24 17:3 28:24 29:24 31:22 38:20 45:24 49:13, 14 57:4 77:24 82:3 83:25 86:13 98:7 99:2 100:14,25 101:22

**number** 22:5,8,9 23:8 30:5 53:19 58:6 83:19 87:23 94:14,20,23 97:21 108:10 111:24 112:6

**numbers** 22:11 58:4,5,12 59:11,13 60:18 61:12 86:25 106:21 107:10

86:21 87:25 88:10 96:25 103:7,24 104:13 106:7 108:20 109:19 111:12

**objections** 9:15

**obtain** 55:3 101:17

**obtaining** 92:3

**Obviously** 12:16

**off** 7:11,13 13:3,4, 25 14:3 16:16,25 18:9,10 21:24 22:2 31:2,4 99:25 100:3

**office** 59:7

**officer** 59:8 61:10

**often** 85:12,15

**Oh** 47:15

**okay** 11:16 21:5 31:25 99:23

**on** 6:13 8:6 11:15, 17 12:12,15,16,20 13:6 14:4,20 18:8 20:11 24:5 25:20, 23,25 26:21,25 27:8,24 28:15 29:2,10 30:2,6,9, 13,16,18,20 31:8 33:2,18,22 34:4,22 39:3,24 41:24 42:5,16,17 43:4 45:18,25 46:16,17 47:3 48:3,12 53:9 58:10,16 59:11 60:14 61:7,18 62:5,20,25 64:25 73:25 76:21 85:8 88:16,24 91:3 96:2,17 97:10 98:6,23,25 99:7 100:21,23 102:3 103:5,12,22 106:8, 25 109:9,10 111:23 112:7

**once** 54:24 59:6 91:9

**one** 8:23,25 9:10 14:13,15,21 32:3 47:3 58:2 70:14, 16,23 72:2,15,19, 21 74:21,24 75:11,

14,19 76:6 89:22 92:8 106:9

**ones** 57:25 58:18 84:16

**only** 8:22 11:24 12:11 62:4 91:20 102:19,21

**open** 12:23

**operations** 75:5

**opinion** 59:14 66:16,19

**opportunities** 83:8

**option** 45:11,13 59:15

**options** 55:21

**order** 6:7 11:3,9 54:9 102:16

**original** 96:4 108:12

**other** 16:3,19 20:7,20 25:7,16 31:20 34:9 37:2 40:10 43:13 46:9, 21 48:14 49:24 50:4 53:3 63:8 64:8 65:10,13 77:12 94:17 95:5 96:18 97:5 99:8 105:2,19 106:4 109:25

**our** 64:5

**ours** 63:19

**out** 12:19 22:19 32:2 55:24 59:18 77:25 90:24 104:11,21 106:14

**Outlet** 7:3 16:9 24:4 46:12 51:3 53:14 63:22 64:2, 6,17 65:2,18 66:12 67:4 68:9 70:15 73:2,7,24 74:6 103:4 105:3 107:25 109:13 112:16

**over** 19:5 20:14 37:7,16 38:2,22 45:6,14 61:10 105:22 106:5

130Index: overdoing–Queens

108:7

**overdoing** 42:18

**owed** 112:20

**owned** 64:20

**owner** 67:20 70:21,25

**owners** 70:15,17, 23 72:2,15,19,21 74:22,25 75:11,15, 19 76:6 109:23

**ownership** 64:21, 22 109:13

**P**

**p.m.** 81:15 91:7 102:2 113:4

**page** 101:2,23 102:3

**pages** 99:16,19 100:6,10,17

**paid** 83:10,13

**Pakistan** 78:17, 22 90:16

**paper** 61:8

**papers** 15:19,20 96:13

**Parsons** 107:21

**part** 7:8 43:19 52:14,22 60:24 68:10,11 85:17 91:12,21 98:20 102:18 103:20 108:5 110:25 111:10,16,24 112:7

**partial** 64:22

**parties** 15:22 16:19 17:4 48:24

**partners** 48:14

**party** 13:19 49:20 50:4

**passed** 75:8

**password** 76:18 90:15

**passwords** 90:19

**past** 50:17 54:8

**pause** 5:21

**pay** 15:25 16:3 56:21,22,24,25 57:2 83:23 111:17, 19,21

**payment** 59:16 83:15

**payments** 112:22

**PDF** 99:9,13

**people** 17:4 52:2, 10 53:7 55:22 56:22 57:4 60:5,6 61:8 84:20 88:15 89:20 107:5

**people's** 63:3 84:16,19 90:19

**per** 6:6 65:17,22

**performance** 86:8,10 106:23

**period** 34:11 38:13 88:21 94:21

**permission** 29:16

**person** 8:23 11:25 21:21 71:7,11,15 72:5,13,15 75:4,6 82:23 90:11

**personally** 76:21 103:14

**pertaining** 16:8

**peruses** 99:24 100:15,22

**phone** 16:12 22:7, 9 23:6,7,10 25:20 26:7 27:3 30:14,18 34:4,13 35:9,18,19 38:25 39:3,24 41:19 42:22 43:3 44:19 46:23,24 47:10 96:20 98:23 99:12 100:21

**phones** 23:20,23, 24

**physical** 10:20,22

**pick** 55:24

**picked** 59:12

**picture** 37:12

**place** 57:23 64:20 68:8 82:2

**placed** 95:6

**plaintiff** 7:16 11:14 12:9 13:8,23 17:13 20:4 25:4,6, 11,12,15 34:6 40:6 49:24 95:6 97:20 111:18

**plaintiff's** 6:2 33:23 34:2 40:9 47:11 97:19,21 98:2 101:2

**plaintiffs** 110:19, 20

**plate** 91:11 92:14, 19

**plates** 91:9,14,18, 23 92:3

**played** 67:24 68:2

**please** 5:9,12 8:18,24 9:8 11:6 16:23 23:3 26:24 29:17,23 32:6 39:13,25 40:16 42:8 47:15 49:13 65:8 96:8 103:12 106:25

**pleased** 46:24

**Plus** 58:9

**podium** 76:8,9, 10,15

**point** 16:13 27:22 59:9,12 62:22 103:20

**points** 31:23

**policies** 78:10

**policy** 78:13

**portion** 92:6 99:2

**position** 50:24 51:4,7 67:18 73:11 82:5,14

**positions** 75:7

**possession** 61:14

**poster** 77:19

**posters** 77:12,14, 15,17,22

**potentially** 34:9

**power** 68:20,23, 25 69:2,4 71:4,7,9, 13,19,24 72:7,8,22 75:3,9,15 76:2

**preference** 64:24 65:9,14 106:2

**pregnancy** 8:5,7 87:11 96:6 103:22

**pregnant** 80:13, 16 87:7,9,15,17 104:10,12,17,22, 25 105:4

**preparation** 15:8 79:12

**prepare** 11:3,9 15:4

**present** 5:12 12:4 23:7,18

**pretty** 77:21

**prevent** 10:16,23

**previous** 23:13 32:22 35:15 75:24

**previously** 32:21

**printed** 61:7

**prior** 95:15

**prioritized** 105:19 106:4

**privilege** 26:10 34:23 42:15

**probably** 79:6 90:25

**problem** 33:17

**proceed** 14:25 49:11

**proceeding** 49:21 50:5

**process** 52:3 55:3,5,7,9 58:17, 24 61:19 91:13,16, 19,21,23 93:4,6 102:18 107:17 108:6

**produce** 60:10

**produced** 19:2 25:2,10 36:7,14,22 37:4 40:4,7 41:21 43:22 44:24 45:3 111:10 112:5,8

**producing** 19:9 24:19

**production** 96:4 101:4,24 111:4,6, 11

**profile** 84:17,20 85:8

**profiles** 85:14

**promised** 82:13

**promoted** 51:12, 13

**promotion** 62:11

**proper** 61:2

**prospective** 79:25

**provide** 56:13 76:17

**provided** 39:8 41:4 65:14 108:6 109:6 111:2

**provider** 22:14 23:4

**provision** 27:23

**Public** 5:4

**purchase** 55:14, 15,20 56:15 64:7 92:24 107:18

**purchasing** 52:14,24 92:25 102:18

**purpose** 42:6 63:4

**Pursuing** 83:7

**put** 6:25 28:14 29:10 33:18,22 43:15 47:3 57:23 61:7 89:2

**Q**

**Queens** 67:15,18

A1442

84:7

**question** 8:20 9:3,4,11,21,22 10:4 11:7 16:22 17:9 19:4 20:17, 18,19 23:3,14,15 26:15 27:7,13,24 29:2,19 34:11 35:13 37:2,25 39:13 41:25 45:20 51:21 53:17 54:13, 19,21 61:16 62:15 65:8,9,25 66:5,8, 10,20 67:9 71:18, 23 75:25 76:24 77:4,6 79:8,16,18 81:18,20 84:24 86:9,23 88:3,6,9 91:24 92:4,16 97:2 99:11,13 102:6 103:13,15 104:3,6, 8,15,22 106:25 107:2 108:22 109:7 110:8,10,13 111:13 112:3,5,9

**questioning** 80:21

**questions** 7:24, 25 8:6,25 9:11,15 47:7 96:14,22 108:10

**quick** 47:3

**quicker** 61:19

──────────

**R**

──────────

**range** 53:12

**rate** 8:8

**read** 29:18 41:11 54:20 66:9 77:5 81:17,19 88:8 104:5,7 110:7,9

**reading** 54:18 66:8 77:3 88:6

**ready** 14:25 81:22,24

**real** 57:6

**really** 42:9,20 55:13

**reason** 8:18 55:12

**recall** 15:17 16:18 17:3,21,23 18:13 19:18,21 21:11 24:10,17 50:13 53:8,10,20,24 62:6 65:19 66:2 67:12, 19,23 69:19 70:22 73:3,5,9,11 74:4 78:16,20 80:2,9, 11,14,15,18,24,25 81:25 82:3 83:3,5, 9,15,21 84:2,4 85:5 86:13,19,25 87:2,9,12 88:22 90:14,17 93:21,23, 25 94:6,9 104:9 106:12,16,17,20 107:5,15 108:3 111:21 112:4,6,10, 16,19

**recalling** 10:17, 23

**receive** 46:24

**received** 15:25 16:4

**recently** 57:20

**recess** 9:9 81:14 91:6

**recognize** 98:5,9 110:22

**recollection** 101:11 102:7

**record** 5:10,13, 20,21 7:12,14,16 13:5,7,20,25 14:3, 4,6 20:9 21:25 22:3 24:24 25:8 28:6 29:23 30:2 31:3,5 32:8,16 33:3,19,22 41:12 45:25 46:17 47:4 48:3 49:14 79:5 88:15 100:2,4,9

**recorded** 32:5

**recording** 6:12 31:13

**records** 16:12 111:22 112:12

**redacted** 95:11, 16

**reflect** 13:20 14:7

20:10 24:24 25:9 28:6 32:16 79:5 100:9,20

**reflects** 100:23

**refresh** 101:10 102:7

**refuses** 12:12

**regard** 75:24 91:12 93:4

**regarding** 32:21 78:10

**registered** 92:8, 24

**registration** 61:3 91:11 92:13,19 93:4

**relate** 39:4

**related** 73:23 93:14 96:7 109:23

**relationship** 64:16 82:16,19,21

**relevance** 22:16, 22 54:11 69:17,25 80:8,20

**relevant** 38:13

**remain** 12:12,14, 20

**remainder** 97:9

**remember** 15:12 19:13 24:11 50:6 51:15 53:18 54:3, 4,6 66:22 70:3 71:2 77:20 83:24 85:3,10 86:17,24 87:16 91:19 93:22 94:12 99:15 107:22 108:18,24, 25 111:22

**reminded** 47:11

**repeat** 9:23 16:22 19:4 20:17 54:13 66:5 76:23 91:24 104:3 105:12 110:5

**rephrase** 9:21

**report** 88:14

**reporter** 5:8 6:17

8:12 28:20 29:12, 21 31:8 41:11 46:2 54:17,20 66:7,9 77:2,5 81:17,19 88:5,8 97:17 104:5,7 105:11 110:7,9

**representation** 39:18 44:3 98:22 99:20

**representations** 37:23

**representative** 13:11 14:9

**representatives** 95:9,14,22

**representing** 48:3

**request** 36:2 38:10

**requesting** 58:2

**requests** 38:6,7 111:4,6,11

**required** 56:14 59:5 92:23

**requires** 57:11

**requiring** 56:21

**residential** 7:4

**resolve** 32:25 41:24 48:25

**resources** 48:22

**respect** 92:13 95:11 112:15

**respond** 9:17,18 29:6,8

**responding** 96:13

**response** 20:16 79:3

**responses** 8:14 96:5 108:7,8,11 110:3,25 111:3,5, 10

**responsibilities** 51:18,20 53:4 73:16,18 82:9 92:2,17

**responsibility** 82:11 92:5

**restroom** 9:8 81:4

**result** 106:15,19

**resume** 13:24

**return** 44:18

**revealing** 79:9

**review** 15:7,24 16:11,21 100:14, 16 108:11,16 109:25 111:6,9

**reviewed** 16:5,8 98:16 108:14 109:10 110:11 111:14,15,17

**reviewing** 97:11, 13,14 99:19

**right** 11:21 17:10 18:3 20:14 24:22 28:23 38:20 51:4 52:25 57:4 60:11 63:12 66:13 70:12 77:24 78:6 82:3 83:25 86:13 89:7 98:6 99:2,11 100:14 103:12 108:4

**robbery** 81:25

**role** 67:23 68:2 70:7 91:23

**room** 11:25 14:13, 22 81:12

**route** 56:9

**rule** 27:21

**rules** 7:20

**run** 52:15 58:22 62:12,19,24 77:10 84:6,12 102:5,16, 17,22 103:5,17

**running** 26:3 52:11,13,18,22 62:16 63:2 72:13 84:9

──────────

**S**

──────────

**said** 16:24 18:21 22:21 26:20 31:11

A1443

132Index: sale–summer

34:14,17 35:5 37:5 38:24 39:2 40:13, 25 47:9 58:19 79:7

**sale** 54:23,24 59:19

**sales** 16:9 51:6, 11,12,19,24 52:5, 6,16,19 55:4,7 62:10,11 63:20 66:24 68:3,4,16,19 69:6,13 73:20,21 82:13 88:24,25 91:13,21,22 92:5, 12,18 93:2 94:4,5 102:18 103:23

**salespeople** 16:4 53:25 54:8 69:14 83:10,19,23 86:8, 12 89:15 90:6 92:12,18 93:3 102:13 107:20 112:14

**salespeople's** 105:19 106:4

**salesperson** 62:5 66:17 68:5,6 82:5, 10 86:20 89:13 91:16 92:2

**salespersons** 102:13

**same** 8:18 10:11 23:6,7 36:24 51:17 53:25 58:6 74:7 75:14 76:4 105:8,9 107:6,9,10

**saw** 21:20 110:16

**say** 8:13 10:4 12:25 18:2 44:23 47:21,24 51:16 64:8,23 76:9 84:12 104:18

**saying** 39:16 40:17 41:20 48:17, 18 65:4 89:10 104:20,24

**says** 102:5

**schedule** 54:4,5

**scheduled** 31:21 32:17 33:8 54:9

**screen** 20:14 24:6 96:23 97:11 98:6

99:7

**scroll** 99:17

**Sean** 107:21

**seasons** 107:9

**second** 24:23 45:8 55:15 63:16

**see** 17:6 21:14,16 55:21,23 56:25 57:17,19 60:22 98:25 99:3

**seeing** 87:12 99:6 111:21,22 112:6, 10,16

**seem** 37:23

**seen** 76:17,20 77:8 99:13

**sell** 53:14 64:5 82:11 107:4,6

**selling** 61:20 68:6

**sells** 107:9

**send** 58:25

**sent** 16:20 17:5 19:5 25:17

**separate** 8:8,9

**September** 18:16 65:20

**Serge** 85:4,25

**serve** 105:25

**service** 22:14 23:4

**shaking** 8:14

**shall** 49:11

**Shane** 107:21

**shares** 109:13

**she** 11:17,18,24 12:8,11,14,17,18 21:21 31:9 38:23, 24 40:11 41:2 66:11,14,23 72:25 73:3,6,24 74:5 80:13 82:13,24 84:4 86:5,24 87:5, 6,7,8,10,14,17 94:8 101:13,16 103:15,16 104:10, 17,20,21,25 105:4,

12 112:20

**she's** 11:16 12:16

**shortly** 19:10

**should** 14:6 30:15 43:14 45:6 48:24 63:23 97:18

**show** 5:23 6:6 19:7,11

**showed** 19:19

**showing** 11:23 97:10 98:6 99:7,9 100:5,13

**shown** 99:2 109:22

**shows** 6:9

**sides** 42:17

**sign** 61:8,13

**signature** 110:23

**signed** 108:13

**signer** 60:11

**simple** 20:18

**Since** 8:12

**situation** 15:14 22:20 61:18,25

**situations** 55:11

**slower** 107:8

**software** 102:24 103:6

**sold** 53:9 65:17,22 83:20 84:3,5 87:24 106:17 111:24 112:7,15

**Solutions** 87:19, 23 88:13,17,20,23 112:11

**some** 7:20 16:13 21:9 50:22 83:14 88:15 98:14 103:3 108:6,7 111:15

**somebody** 20:11 71:24

**someone** 26:6 34:19 71:16

**something** 12:18 32:19 39:5 43:6

106:22

**Sometime** 108:23

**sometimes** 59:24 61:16 90:4

**somewhere** 70:24

**sonogram** 87:10, 13

**sorry** 6:19 78:24

**sort** 43:14

**sound** 22:20 30:24 31:14

**speak** 8:19 11:3,9 48:13 59:8 79:11

**speaker** 28:15 30:17

**speakerphone** 30:10

**speaking** 8:23 33:24

**specific** 15:18 27:22 53:22 67:23 69:20 79:20,22 86:17,25 94:9 106:20 108:24 110:16 112:18

**specifically** 8:4 15:12 17:11 70:22 94:25 95:25 97:3 101:25

**specifics** 54:6 83:3,24 86:14 87:4 94:12

**speculation** 10:3

**spoke** 11:5 38:23 73:22

**spoken** 94:10

**spot** 58:11,16

**stage** 76:10

**stamped** 100:12

**stands** 113:2

**start** 8:24 9:2 17:12 21:3,17 31:14 50:10 53:12 84:25 98:21 104:23

**started** 18:14 47:13

**state** 5:4,9,12 32:7

**stated** 6:17,20 34:15

**States** 78:17,23

**stay** 45:18 54:8

**stenographer** 8:22

**step** 12:19 55:8,25 56:3,6 60:21 61:4

**Stidhum** 12:21 15:25 20:4 21:10 24:21 34:6 43:24 44:11 45:16 46:6 66:4 87:3 94:19 96:2 97:24 99:22 101:11 105:16 107:4,12,13 112:19

**Stidhum's** 46:11 82:4 106:14

**still** 9:17 31:13 58:12

**stipulate** 44:9

**stipulations** 52:23

**stop** 8:25 17:18 27:10 37:11 73:6

**stopped** 73:3

**store** 52:21 53:20 54:2 55:19 63:18, 19 71:6 77:23,25

**structure** 68:8 83:16

**stub** 56:23,25

**stubs** 56:21,24 57:2 111:17,19,21

**subject** 7:25 37:14 107:7

**submit** 89:5

**such** 10:25 16:5 26:11 34:25 97:4 107:7

**summer** 17:25 51:16

A1444

133Index: supervisor–truthfully

**supervisor** 82:22

**supplemental** 108:12 109:3 111:5

**supplied** 44:8

**supposed** 59:7 77:19 91:17 102:19,22

**sure** 7:6 12:24 16:24 51:23 52:2 53:7 54:14 57:8,25 61:11,21 77:18,21 81:5 88:17 91:2,17 92:7,21 93:5 101:13 110:12,17

**sworn** 5:4

**system** 57:13 62:8,20,25 76:22 77:9 85:13 103:16, 17 105:22

**T**

**T-MOBILE** 23:5

**take** 8:13 55:13 56:6 58:8 59:21 61:14,17 78:22 90:20,25 99:18

**taken** 10:8 81:14 91:6

**takes** 55:9

**taking** 10:15 29:13 31:10

**talk** 15:4 47:18

**talking** 8:4 11:8 21:13 37:11 84:18

**tally** 83:19

**tell** 9:8,21,23 10:8, 11 26:17 31:17,21 32:6,14 42:24 46:21 63:21 87:14

**telling** 12:6 15:2 43:21

**tells** 9:17

**term** 73:17

**terms** 30:21 96:2 105:20 106:22

**testified** 5:5 34:12 35:17 36:12,19

**testifying** 10:12, 17,24

**testimony** 49:17 66:19

**text** 16:11,14,19, 20,21 17:2,5,7,8, 13 18:20,22,25 19:2,5,11,19 20:3, 5,19 21:7,9,15,16 24:9,14,20 25:2, 11,14 34:5,10 35:20 36:3,13,20, 22 37:3,7,16 38:2, 12 39:3,24 40:8, 11,24 41:3,20 43:22 44:7,20,22 45:2,15 46:5,9,13 94:15 95:18,24 96:7,18 97:6,22 98:12,15,22 99:6, 16,21 100:20,24 101:7

**texting** 94:2

**texts** 21:8 36:15 70:6

**than** 48:20 95:5

**thank** 46:19 49:12 81:13 96:9 112:25

**Thanwalla** 21:18 28:8,10 36:11,12, 16 63:21

**That's** 48:8 50:2 104:24

**their** 32:25 33:12 38:2 42:22 43:3 46:23 54:8 55:14 56:13,19,24 59:2, 14 61:25 69:19 82:20 83:15 91:17

**them** 15:11 45:6 55:3 56:15,23 58:13 59:10,21 60:3,8 78:5 85:7 89:22 100:8 108:14,16

**themselves** 47:23

**then** 5:23 11:18 13:2,24 21:4 29:6,

25 35:5,7,10 36:17,21 37:3,6 44:20 51:12 54:25 55:24 56:9 57:12 58:7,12,25 59:3,9 60:24 61:6 84:23

**there** 8:8 9:10 12:22 14:12,20 17:6 18:22 21:14 24:8,13 34:24 37:2 38:5 39:2 44:6,25 45:4 46:8,14 48:4 51:5 53:3 54:7 55:16 57:2,17,18, 20,21 58:14,19 59:4 60:11 64:9, 19,23,24 65:9 67:24 68:2,8 77:12,16 83:18 84:21,25 85:3,4 86:10 91:10,16 92:11 99:16 104:23 105:18 106:3,10,13 107:17 110:15 111:2 112:4

**There's** 57:6

**Therefore** 8:24

**these** 37:16 48:23,25 98:11,14

**they** 36:6 38:4 40:4 44:7,8,23 45:5 52:2 55:19, 20,25 56:3,5,6,7,9, 10,12,16,23,24 57:25 58:2,6,9,10, 11,15 59:3,11,14, 15,16,17,18,24,25 60:2,3,9,10,13,16, 21 61:12,13,14 63:23,25 64:2,19 65:13 69:20 71:17 75:11 83:13,20 86:16 89:23 92:25 107:22 110:3 111:17

**thing** 47:3

**things** 57:7 60:5, 15 92:8

**think** 37:4 50:2,12 51:15 66:23

**third** 13:19

**those** 15:10 19:2, 5,10,11 60:5,15 75:7 84:20 99:19 100:17 107:22 108:8 111:6 112:16

**though** 12:8 40:18

**thought** 26:3 34:16

**through** 17:8 18:24 21:15,19 52:3 56:17 58:21 60:17 61:25 94:21 98:11 100:6,8,12 102:23

**throughout** 14:18

**Tiffany** 6:15 17:10 28:18 32:10

**time** 6:11 8:24 9:14 14:5 19:14,22 24:3,8,12 37:20 38:13 46:19 47:21 51:8 55:8 56:22 63:20 67:17 68:7 69:15,22 74:7 76:16 77:8 78:12 79:19,20,23 80:17 86:17,20 87:6 88:21 89:19 90:3 91:3 95:2 96:22 97:4 99:5 101:7,25 103:3 105:2,18 106:3,10,13,15,19 107:19 108:18,24 112:20 113:2,4

**timeframe** 73:9

**times** 24:9,13 47:20 53:22 54:7 57:18 60:12 69:20, 23 73:22

**tired** 38:16

**title** 67:19

**today** 8:6 10:2,18, 24 33:20,25 36:24 37:9 44:16 60:13

**today's** 11:4,10 15:4,8 79:12

**together** 67:6,16

**told** 29:4 33:16 34:20 42:7,16,21

56:23 71:2 81:3 87:16

**too** 59:13 93:17 110:16,17

**took** 82:2

**tool** 87:20 89:11 90:13 93:15

**tools** 101:15 102:13

**top** 16:16,25 86:20

**tough** 58:3

**towards** 51:15 67:22

**toxic** 48:18

**tracked** 69:23

**train** 76:20

**Transunion** 58:8

**traveled** 78:17

**treatment** 105:9, 16

**Troy** 5:19 6:5,10, 15,22 11:20 12:3, 21 14:5,17,24 20:9,23 21:24 22:4,18 24:18 27:8,17 28:3,14, 16,17,18 29:11 30:7,15 31:2,6 32:9,10,11,14 33:14,21 36:4,8 38:11,21 41:5 42:4 44:5,13 45:10,17, 22 46:17,18 48:19 49:2,4 54:16 66:6 76:25 81:5,9,16 88:4 90:20 91:4 94:14 97:16 99:25 100:5 104:4 106:24 110:6,19 112:24

**true** 26:21 98:18, 21 102:14,21 103:2 110:3

**trust** 61:19

**truth** 10:8,11,17, 24 26:17

**truthfully** 10:17, 24

A1445

134Index: try–with

**try** 63:23 65:2

**trying** 39:12 51:15

**turn** 13:3 18:20 38:2 45:6 100:25

**turned** 13:14 37:7 45:14

**turning** 37:16

**two** 14:10 17:4 33:11 41:15 47:19 64:19

**type** 15:16 23:10 77:22

**typically** 89:2,24

**U**

**umber** 95:17

**unacceptable** 33:9

**under** 10:22 26:17 27:21 47:12

**underreport** 87:23

**understand** 7:21 8:2,10,16,20 9:4, 12,18,20,24 10:5, 7,10 26:16 38:21 39:19,20 43:7,10, 12,17,19 46:25 49:3,5,7 54:15 79:8 86:9 112:2

**understanding** 55:6 64:15,18 92:15

**understands** 61:12

**Understood** 45:10,22

**United** 78:17,23

**unless** 9:16

**until** 9:3 23:7 51:8,9 81:15 91:7

**up** 7:2 102:6

**update** 58:7,9

**use** 9:7 23:17 37:19 48:21 77:9 81:4,8 85:12,21,25 90:4,8 93:22

**used** 17:15,16 21:5 51:25 64:5 66:11,14 67:15 68:3 74:21 84:23 85:19,23 86:2 88:17,22 90:10 93:10,17 108:3

**V**

**Vague** 74:3

**valid** 27:18 29:5

**value** 60:22

**variables** 58:19

**vehicle** 52:14,25 55:3,17,20,24 56:2,3,5,8,15 58:10,16,20 59:11, 17,21 60:4,23 61:3,5 64:10,11,14 65:5 92:24,25 102:19 107:18

**vehicles** 53:7 64:8,12 65:7 88:16 91:15 92:8,9,20

**verbal** 8:14

**verification** 57:22

**verifications** 56:17 57:18

**verify** 11:24 56:20,25 57:8 58:13,22 83:22

**version** 99:6

**versus** 65:10 92:18

**very** 20:18 39:16 56:17 73:22 112:25

**via** 96:18

**Victory** 18:12,14, 17

**video** 11:15,17 12:13,15,20,23 13:3,9,22,24 20:12

**VIN** 87:18,22 88:13,17,19,23 112:11

**virtually** 7:17

**volume** 6:24 13:14

**voluntarily** 25:10 40:7

**W**

**wage** 8:8 77:17,20 83:13

**wages** 112:20

**wait** 58:11 59:2,25 60:3 106:15,19 107:14,16

**waiting** 13:7,22 30:3 107:17

**walk** 59:18 63:16 106:14

**want** 11:18 22:11 27:21 37:24 44:17, 21 47:2 54:14 55:20,25 56:6,7 59:17 60:16 61:21 74:13 90:18 102:5

**wants** 33:18 64:9 105:12

**wasn't** 75:4

**water** 9:7

**way** 7:2 25:23,25 26:21 41:10 60:11 108:4

**we're** 5:23 29:14 90:23 108:7

**website** 93:15,16

**week** 31:24 33:4,7 35:16 36:17 60:14

**well** 7:5 25:4,13 34:7,8 35:15 46:6, 10 60:21 63:9 74:25 84:7 86:4 90:6 95:13 111:4,7 112:13

**went** 33:2 38:22 52:3 60:17 90:15

**were** 10:12 15:10, 21 16:18 17:5 18:22 20:23 21:13, 14 23:24 24:8,13

26:12 31:20 35:24 36:6 37:3 41:19,21 42:2 47:7,8 49:23 51:13,18,24 52:4, 16 53:3,8,21,25 54:7 62:3,10 65:12,17,22 68:4,7 69:13,20,22 73:15, 20 75:11 76:7,8 77:12 82:9 83:10, 13,17 84:15,20,21, 22 86:7,10,15 87:24 88:25 94:3 96:3,21,23 97:4 98:14 102:19 103:3,20 106:11 107:24 109:6,22, 23 110:3 111:2 112:8

**what** 7:19 15:10 18:6,13 20:16 22:7,9 23:10 26:2 27:8 30:7 31:10 33:17 36:8 39:9 40:16 41:24 42:13 44:12,15 45:7 50:20,24 51:4,18, 20 52:8 53:2,20 54:4 55:2,19,22 56:5 57:6 60:22 61:25 62:16 63:5 64:15 65:4,20 66:16 67:12,17,23, 25 69:20 70:7 71:23 73:11,15 76:23 77:14,22 78:13,24 82:4,9, 16,18 85:10,19 86:4 88:3 89:10 91:12,22,25 92:4, 17 93:2,12,21 96:23 98:6,9,20,25 104:19,24 105:15 109:9,17

**what's** 91:13

**whatever** 89:12

**whatsoever** 97:15

**when** 8:19,23 17:15,16,18 19:11 20:23 21:13 24:9, 18 26:5,20 35:23 36:14,21 47:9,17 48:10 50:10,25 51:13 52:4,15 54:7

55:2 57:7,15 58:3, 15,20 59:2 60:12 62:3 63:2 67:7 68:7 69:19 73:3 74:10 75:5 76:9 78:16,25 84:12,23 87:6 90:15 100:17 104:11,18 105:10, 18,23 106:3,10,13 108:16 109:22 112:20

**where** 18:3,10 25:22 45:5 77:20 83:18

**whether** 39:23 42:4 44:25 45:14 60:6 101:11 102:8

**which** 17:4,21,23 19:18 36:25 50:13 57:13 74:16 75:14 76:11 95:21 97:18 101:3,23

**while** 13:7 19:13 40:22 45:19 46:16 54:5 62:10 69:13 73:20 76:7 83:17 84:21 88:24 94:3 96:21 102:6 103:3 104:20

**who** 12:25 14:8 16:18,20 19:24 22:14 23:3 24:5 33:11,18 41:15 61:24 66:24 68:11, 14,16 75:8 80:16 84:19,20,22 89:2, 16,20 93:19 109:23

**whom** 16:20 17:10

**whose** 33:16

**why** 33:19 34:14 37:18 83:5 87:2,5

**wish** 61:18

**with** 11:3,5,8,9,16, 22 12:17 14:14,22 15:14 17:10,14 20:3,5,7,19 21:17 23:18 24:4,9,14 28:20 31:19 32:3 34:5 35:16 36:21, 23 40:12 43:24 44:12,13 48:11

A1446

135Index: within–yourself

49:17 52:9 56:16, 23 57:14 58:13 59:8,21 60:25 62:7 63:11,17 65:14 66:3 67:13 70:6 72:24 73:17,20 74:17,20 75:24 76:14 79:10,11 80:5 83:13 87:18 91:9 92:13,14,19 93:3,7,17 94:2 95:11 96:17,20 101:7 107:10 108:15,16 112:14

**within** 76:11

**without** 11:14 15:2 33:15 48:6 79:9

**withstanding** 34:8

**witness** 5:22 6:5, 8 11:20 12:3 25:3, 6,13,15 27:5,6,11, 16,18 28:22,25 29:3 33:25 35:3, 12,17 40:10 47:8,9 48:5 79:7 81:2,7, 23 88:7 99:24 100:6,14,15,22

**witnesses** 40:10 46:22

**won't** 58:15

**words** 16:20 63:8 99:8 105:2,13 109:25

**work** 17:15,17 18:4,11,18 21:5 66:11,14 67:4,16 74:5 78:3,5,21 84:23 104:21 106:21,23 107:23

**work-related** 94:11

**worked** 18:5 67:6, 13 72:25

**working** 17:18 18:14 20:24 24:12 50:10 51:8 52:9 53:25 62:3 67:3 73:4,6 76:7,16 82:20 83:17 84:21 88:25 94:4,11

103:3

**works** 55:5

**would** 13:15 18:2 24:9,14 33:21 35:14 43:5,6 53:13 55:18 56:4 75:6 83:19 85:12 89:16, 20,21 90:2,4 93:2, 5 95:2,17,24 96:22 102:11 105:6,15 106:14 107:14 108:24

**would've** 102:15 103:15 105:7,8

**wouldn't** 97:14 101:21 105:7

**write** 8:23

**writing** 41:23 96:9

**written** 15:21 78:10 94:17 97:5

**wrong** 64:7

───────────────

Y

**year** 17:21 18:13 19:15,17,19 50:14 51:17 74:13 108:19,23

**years** 17:20 19:16 50:18 51:14 53:11, 23 66:21 67:10 69:21 77:25 80:10 88:18,23 93:11,18

**yes** 7:3,22 8:3,11, 17,21 9:5,13,19,25 10:6,9,14 14:23 15:3,6,9,23 16:13 17:15 18:24 19:7 20:2 22:10 23:9, 21,22 24:2,7,15 26:22 27:20 30:19 35:7 36:4 38:4 39:11 40:4,25 44:4 45:17 46:4 47:5 49:4,8,18 51:22 52:17 54:22 55:7 62:9,22 63:7 65:8 66:14 67:6 70:13 71:25 72:3 74:12, 19 75:20,23 76:3, 6,13,14 77:21 78:7 81:7,23 82:8 84:25

85:2 86:3 87:21 89:8 90:3,10 93:9 98:8,17 99:3 100:19,23 101:5,9 102:4 107:3 108:14 109:8,15 110:14,24 111:8, 15 112:8

**yet** 53:5

**York** 5:5 7:7 18:9, 10

**you're** 22:18 31:25 37:13 43:25 45:13 57:19

**your** 5:9,12 6:17, 21 7:4 8:15 9:11, 14,16 10:10 11:2,8 12:23 15:3,4 16:25 19:3,6,12,20 20:3, 16 22:7,14,20 23:4 24:3,12 25:19,22 26:7,21 27:2,3,23 28:18 31:6,15 32:7,9 35:9,24 36:4,9 37:14,25 39:8,13,17 40:15 42:21 43:9 44:2,12 45:23 46:7,18,19 47:4 48:15,17 49:4,8,17 50:20,24 51:4,7,9,18 61:16 62:11 63:11,20 64:15,25 66:16 68:2 70:6 71:3 74:10 75:2,14,25 76:16 78:9 79:10, 11 86:15 87:22 88:19 91:8 92:15 93:12 96:18 98:18, 23 100:21,25 101:6,10,16,22 102:7 105:2,15 107:13 108:6 109:2,17 110:13 112:2,25

**yours** 46:22 110:23

**yourself** 13:13 26:13 46:10 67:25 98:24 99:21

A1447

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN
*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 6 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

# In the Matter of

Case No.: 1:21-cv-7163 (HG)(LB)

STIDHUM

v.

161-10 HILLSIDE AUTO AVE, LLC, et al.

---

## Examination of Leticia Francine Stidhum

*Friday, February 17, 2023*

---



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

A1448

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Case No.: 1:21-cv-7163 (HG)(LB)
----------------------------------------X

LETICIA FRANCINE STIDHUM,

                         Plaintiff,

          -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
Hillside Auto Outlet, HILLSIDE AUTO
MALL INC. d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON,
RONALD M. BARON, and ANDRIS GUZMAN,

                         Defendants.
----------------------------------------X

                    February 17, 2023
                    9:23 a.m.


         Examination before Trial of PLAINTIFF,

    LETICIA FRANCINE STIDHUM, held pursuant to

    Notice, held via Zoom conference, before

    Ruthayn Shalom, a Notary Public of the State of

    New York.

Case 1:21-cv-07163-OEM-LB  Document 102-11  Filed 03/27/24  Page 3 of 294 PageID #: 2113

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                                    2

 2        A P P E A R A N C E S :

 3                    TROY LAW, PLLC
                      Attorneys for Plaintiff
 4                    4125 Kissena Boulevard, Suite 103
                      Flushing, New York 11355
 5                    BY: TIFFANY TROY, ESQ.
                      troylaw2troypllc.com
 6

 7

 8                    MILMAN LABUDA LAW GROUP, PLLC
                      Attorneys for Defendants
 9                    3000 Marcus Avenue, Suite 3W8
                      Lake Success, New York 11042
10                    BY: EMANUEL KATAEV, ESQ.
                      emanuel@mllaborlaw.com
11

12

          ALSO PRESENT:
13        Ishaque Thanwalla

14

15

16

17

18

19

20

21

22

23

24

25
```

A1450

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

3

2              IT IS HEREBY STIPULATED AND AGREED, by

3        and between the attorneys for the respective

4        parties hereto, that this examination may be

5        sworn to before any Notary Public.

6

7              IT IS FURTHER STIPULATED AND AGREED that

8        the sealing and filing of the said examination

9        shall be waived.

10

11             IT IS FURTHER STIPULATED AND AGREED that

12        all objections to questions except as to form

13        shall be reserved for trial.

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-07163-OEM-LB Document 102-11 Filed 03/27/24 Page 5 of 294 PageID #: 2115

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

4

1                          L. Stidhum

2          L E T I C I A   F R A N C I N E   S T I D H U M,

3       a Plaintiff, having been first duly sworn by

4       Ruthayn Shalom, a Notary Public of the State of

5       New York, and stating her address as 2815 Murray

6       Street, Flushing, New York, 11354, was examined

7       and testified as follows:

8               MR. KATAEV:  Before we begin, Counsel, we

9           are going to agree to the usual federal stips;

10          is that right?

11              MS. TROY:  Agreed.

12              MR. KATAEV:  For the record that is

13          filing, seal and certification is waived.

14          Objections except as to form are reserved for

15          trial.  The examination may be sworn to before

16          any notary public.  A copy of the transcript

17          will be sent to the attorney representing the

18          witness, correct?

19              MS. TROY:  Correct.  So we are clear,

20          pursuant to Federal Rules of Civil Procedure

21          30E, I'm going to ask that you provide a copy

22          of the transcript to review it and list any

23          changes to be made.

24              MR. KATAEV:  No problem.

25       EXAMINATION BY

A1452

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 6 of 294 PageID #: 2116

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

5

1                    L. Stidhum

2     MR. KATAEV:

3          Q    Good morning.  My name is Emanuel Kataev.

4     I'm the attorney for the Defendants in this case

5     which are 161-10 Hillside Auto Ave., LLC, Hillside

6     Auto Mall, Inc., Ishaque Thanwalla, Andris Guzman,

7     Jory Baron, and Ronald M. Baron.  From here on in I

8     will refer to 161-10 Hillside Auto Ave. as Hillside

9     Auto Outlet, okay?  I need a yes or no, please.

10         A    Yes.

11         Q    I will refer to Hillside Auto Mall, Inc.

12    as Hillside Auto Mall, okay?

13         A    Yes.

14              MS. TROY:  If you're referring to the

15         corporation as the corporate entity, if you

16         could say the entire name so there is no

17         confusion.

18              MR. KATAEV:  No, that's exactly what I'm

19         not doing.  I will be referring to it according

20         to the short name that I provided.

21              MS. TROY:  To the extent that the witness

22         has any confusion, I suggest that, you know,

23         you read out the whole name.

24              MR. KATAEV:  You will have that with Rule

25         30E so you will be good to go.  Hillside Auto

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 7 of 294 PageID #: 2117

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

6

```
 1                    L. Stidhum
 2          Outlet is 161-10, Hillside Auto Mall is
 3          Hillside Auto Mall.  I will decide how I ask
 4          the questions.
 5   BY MR. KATAEV:
 6          Q    Jory Baron, I will refer to him as Jory,
 7   okay?
 8          A    Yes.
 9          Q    Ishaque Thanwalla I will refer to as
10   Isaac, okay?
11          A    Yes.
12          Q    Andris Guzman I will refer to as Andris,
13   okay?
14          A    Yes.
15          Q    Ronald M. Baron I will refer to as
16   Mr. Baron or Ronald, okay?
17          A    Yes.
18          MS. TROY:  Excuse me, if both Jory and
19          Ronald are Mr. Barons, I would suggest that you
20          use the full name and not Mr. Baron.
21          MR. KATAEV:  I will primarily use Ronald.
22          I will decide how I ask the question.
23   BY MR. KATAEV:
24          Q    I will be asking you and you will be
25   answering questions today about yourself, the
```

A1454

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 8 of 294 PageID #: 2118

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

7

```
 1                        L. Stidhum
 2      Defendants, your complaint and other related
 3      subjects; do you understand?
 4           A    Yes.
 5           Q    Your testimony today is subject to the
 6      same oath and the same penalty of perjury as if you
 7      were testifying in court; do you understand that?
 8           A    Yes.
 9           Q    We are here today concerning your
10      discrimination case, today?
11           A    Correct.
12           Q    You filed a separate wage and hour action
13      as well, correct?
14           A    Yes.
15           MR. KATAEV:  To the extent that any
16           questions are asked or overlap into the other
17           case, Defendants are nonetheless -- reserve the
18           right to conduct a separate deposition in that
19           actions.
20      BY MR. KATAEV:
21           Q    Have you ever been deposed before,
22      Ms. Stidhum?
23           A    No.
24           Q    This is your first time?
25           A    Yes.
```

A1455

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

8

L. Stidhum

1

2      Q    I'm going to go over some of the basic

3      ground rules for a deposition so we can have a

4      smooth and easygoing deposition, okay?

5      A    Okay.

6      Q    First, keep your voice loud and clear for

7      the court reporter.  Second, please answer in words.

8      The court reporter cannot take down body gestures or

9      mumbling.  Third, allow me to complete my question

10     before you answer and I will give you the same

11     courtesy so as to help the court reporter to not

12     have to write down what two people are saying at the

13     same time.  Do you understand these ground rules so

14     far?

15     A    Yes.

16     Q    Fourth, if you don't understand a question

17     tell me and I will rephrase it.  However, if you

18     answer I will assume that you understood the

19     question, okay?

20     A    Okay, yes.

21     Q    I'm looking for your best recollection of

22     events today.  I realize we are going to be speaking

23     about events that occurred in May of 2018 through

24     January of '19 and sometimes beyond.  I don't want

25     you to guess at answers, however, I'm still entitled

A1456

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

9

                            L. Stidhum

1    to your best recollection of events, okay?

2    A    Okay.

3    Q    You can take a break any time for any

4    reason except if there is a question pending.  You

5    need to answer that question before we take the

6    break, okay?

7    A    Okay.

8    Q    Do you understand these ground rules?

9    A    Yes.

10   Q    Have you consumed any drugs, alcohol or

11   medication within the last 24 hours that would

12   affect your ability to provide truthful testimony

13   today?

14   A    No.

15   Q    Is there any reason you can think of as to

16   why you cannot provide truthful answers to my

17   questions today?

18   A    No.

19   Q    Did you prepare for today's deposition?

20   A    Yes.

21   Q    How did you prepare?

22   MS. TROY:  Objection to the extent that it

23   calls for any attorney/client communication.

24   Q    Don't tell me anything that you said to

A1457

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                      10
 1                        L. Stidhum
 2      your attorney or anything that your attorney said to
 3      you, but the fact of the conversation is
 4      permissible.  You can tell me you did speak without
 5      telling me what you said.
 6                      How did you prepare for the
 7      deposition with that qualification?
 8           A    Last week we met for two to three hours.
 9           Q    In person?
10           A    Yes.
11           Q    Other than meeting in person for two to
12      three hours, did you prepare in any way for your
13      deposition?
14           A    No.
15           Q    During your meeting last week, did you
16      review my documents?
17           A    Yes.
18           Q    Which documents did you review, and again
19      same qualification, don't tell me anything that you
20      said or anything that your attorney said to you.
21           A    The documents you provided pretty much and
22      like a spread of what was -- what I was -- the
23      decrease in pay, I should say.
24           Q    The damage calculation, correct?
25           A    Yes.
```

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 12 of 294 PageID #: 2122

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

11

                              L. Stidhum

1
2         Q    And also the almost 2,000 pages of

3    documents mostly consisting of leads information,

4    right?

5         A    Yes.

6         Q    Other than those two sets of documents,

7    did you review anything else?

8         A    No.

9         Q    Did you review the complaint?

10        A    I'm sorry?

11        Q    Did you review the complaint in

12   preparation for the deposition?

13        A    No.

14        Q    Did you ever sign any affidavit,

15   statement, declaration or any other document under

16   oath or affirmation concerning your employment with

17   the dealership Hillside Auto Outlet?

18             MS. TROY:  Which case are you talking

19        about?

20             MR. KATAEV:  This case.

21        A    Yes.

22        Q    Do you recall what that was?

23        A    The interrogatories.

24        Q    Okay.  Other than that, do you remember

25   signing anything else?

A1459

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 13 of 294 PageID #: 2123

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                12

1                          L. Stidhum

2          A     No.

3          Q     Did you speak with or obtain statements

4     from any other employees at Hillside Auto Outlet?

5               MS. TROY:  Which case are you talking

6          about?

7               MR. KATAEV:  Any case.

8          A     No.

9          Q     Same question for Hillside Auto Mall?

10              MS. TROY:  Again, now you're trying to

11         split up the two companies.  Both companies are

12         sued.

13              MR. KATAEV:  I'm not trying to split up

14         anything.  I'm asking a question.

15    BY MR. KATAEV:

16         Q     The question is and I will repeat it:  Did

17    you speak to or obtain any statements from any

18    employees at Hillside Auto Mall?

19              MS. TROY:  Does that include coworkers

20         meaning the coplaintiff in the State court

21         case?

22              MR. KATAEV:  I don't know.  She has to

23         tell me.

24              MS. TROY:  You need to be clear in your

25         question.

A1460

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                        13
 1                      L. Stidhum
 2              MR. KATAEV:  I think you need to look at
 3          Rule 30 and read it carefully.  It says all you
 4          do is say, Objection, and the grounds therefor.
 5          If you continue with the speaking objections --
 6              MS. TROY:  Objection.  Ambiguous.
 7              MR. KATAEV:  -- I'm going to call the
 8          court and I don't want to do that.  I'm going
 9          to repeat the question.
10      BY MR. KATAEV:
11          Q    Did you speak to or obtain statements from
12      any other employees at Hillside Auto Mall?
13          A    Yes.
14          Q    Who did you obtain statements from?
15          A    David, I mean -- but are we talking about
16      Hillside Auto Outlet and Auto Mall as one?  It's
17      kind of confusing.
18              MS. TROY:  I'm going to ask that you use
19          the full name of the company, sir.  I think
20          it's getting confusing.
21              MR. KATAEV:  It's not confusing.
22                  161-10 is Hillside Auto Outlet.
23      Hillside Auto Mall is Hillside Auto Mall.  Please
24      stop violating Rule 30.
25
```

A1461

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

14

                              L. Stidhum

1

2    BY MR. KATAEV:

3         Q    The question is:  Who is David?

4         A    David Manrique.

5         Q    Are you saying that David Manrique is an

6    employee of Hillside Auto Mall?

7         A    No.

8         Q    You can clarify.  Go ahead.

9         A    So if we are talking about Hillside Auto

10   Mall specifically, then no.

11        Q    When I asked you earlier, did you obtain

12   any statements from other employees at Hillside Auto

13   Outlet, do you want to clarify your answer?

14        A    David Manrique.

15        Q    Other than David Manrique, did anyone else

16   provide any statements?

17        A    No.

18        Q    What statement did David Manrique provide

19   you?

20        A    It's not a statement.  It was more a

21   conversation we had.

22        Q    Was it written down in any way?

23        A    No.

24        Q    Was it a text message or email?

25        A    No.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

15

                            L. Stidhum

1

2       Q    He didn't sign something swearing under

3    penalty of perjury, XYZ?

4       A    No.

5       Q    What did you and David discuss?

6       A    Just, like, the status of the case.

7       Q    That's because David Manrique is a

8    coplaintiff with you in a State court wage and hour

9    action, correct?

10      A    Correct.

11      Q    Against the same defendants here, correct?

12      A    Right.

13      Q    Other than your attorney, did you speak

14   with anyone else about your deposition today?

15      A    No.

16      Q    Did you tell anyone you would be doing a

17   deposition today?

18      A    No.

19      Q    You said you didn't review the complaint

20   in preparation for the deposition.  Did you review

21   the complaint in general ever?

22      A    Yes.  When it was first submitted.  It was

23   quite some time ago.

24      Q    You verified its contents before it was

25   filed, correct?

A1463

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

16

                              L. Stidhum

1

2        A    Yes.

3        Q    Have you had any conversations with anyone

4    other than your attorneys in preparation for during

5    your deposition?

6        A    No.

7        Q    Have you had any conversation with anybody

8    else other than your attorneys and David Manrique

9    about your case against the dealership?

10       A    No.

11       Q    What is every name that you ever used or

12   gone by, other than Leticia Francine Stidhum?

13       A    Letty.

14       Q    L-e-t-t-y?

15       A    Yes.

16       Q    Any other names?

17       A    No.

18       Q    The current address that you provided at

19   the beginning of the deposition, do you rent or own?

20       A    Rent.

21       Q    Who do you live with?

22       A    My mother and stepfather and my two

23   children.

24       Q    How old are your children?

25       A    One and three.

(1506 of 1960), Page 1506 of 1880

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

17

L. Stidhum

1

2       Q     What is your birthdate?

3       A     My birthdate?

4       Q     Correct.

5       A     XX-XX-1998.

6             MS. TROY:  I'm going to ask that

7       everything except the birth year be marked as

8       confidential.

9             MR. KATAEV:  We have a confidentiality

10      agreement in this case?

11            MS. TROY:  I don't believe so, but I'm

12      going ask that any filings to court have her --

13      again, everything other than her birth year

14      redacted consistent with the local rules of the

15      Eastern District of New York and on the

16      transcript itself, everything other than the

17      birth year be marked as confidential.

18            MR. KATAEV:  I don't believe that's the

19      way it works.  The rule provides if you file

20      something publicly, you redact that

21      information.  It doesn't entitle you to mark it

22      confidential, it just gets redacted.  We will

23      follow the rule.

24   BY MR. KATAEV:

25      Q    Were you born in the United States,

A1465

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

18

                          L. Stidhum

1                    Ms. Stidhum?

3          A     Yes.

4          Q     When is the last time you left the

5    country?

6          A     September of 2020.

7          Q     Prior to that time and focusing on the

8    timeframe of March 2018 until January of '19, did

9    you leave the United States of America?

10         A     No.

11         Q     Same question, did you leave the State of

12   New York?

13         A     Could you clarify the timeframe again?

14         Q     Sure, no problem.  The timeframe again,

15   May 2018 through January of '19.

16         A     I don't believe so.  Again, it was a long

17   time ago so I don't want to answer dishonestly.

18         Q     Are you currently married?

19         A     No.

20         Q     Were you ever married?

21         A     No.

22         Q     Your children currently live with you?

23         A     Yes.

24         Q     You've lived in New York all your life?

25         A     No.

A1466

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

19

                         L. Stidhum

1

2        Q    Where did you live prior to living in

3    New York?

4             MS. TROY:  Objection as to timeframe.

5        Could you clarify what timeframe you're talking

6        about.

7             MR. KATAEV:  Her whole life, her whole

8        life.

9        A    Florida.

10       Q    Were you born in Florida?

11       A    Yes.

12       Q    When did you move to New York?

13       A    I have been back and forth pretty much my

14   whole life.  I did some school there, some school

15   here.  So it's kind of a hard question.

16       Q    Understood.  When is the last time you

17   went to Florida and came back to New York,

18   timeframe?

19       A    Like to live?

20       Q    Yes.

21       A    I want to say June of 2018 or -- no, June

22   of 2017.

23       Q    Is when you left to Florida?

24       A    When I came back to New York.

25       Q    After returning from Florida in June of

A1467

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 21 of 294 PageID #: 2131

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

20

                            L. Stidhum

1

2       '17, when is the next time you went back to Florida,

3       if ever?

4              A     For vacation only pretty much.

5              Q     When was that?

6              A     I don't remember exactly.

7              Q     Month and year?

8              A     I have gone back quite a couple of times.

9       Honestly, I don't remember.

10             MR. KATAEV:  We will follow up in writing

11             with an interrogatory about -- to the extent

12             you were in Florida at any point in time for

13             the period of May 2018 until January of '19, we

14             would want to know what dates you were in

15             Florida, but we will follow up in writing.  You

16             don't have to answer now.

17                   (Counsel Request.)

18             A     These times I didn't go to Florida.

19             Q     You know that for a fact?

20             A     Yes, almost positive.

21             Q     Have you ever been arrested before?

22             A     Yes.

23             Q     Have you ever been convicted of a crime?

24             A     Yes.

25             Q     When did that happen?

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 22 of 294 PageID #: 2132

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

21

```
 1                        L. Stidhum

 2          A     Some time in 2017.

 3          Q     Without going into too much detail, do you

 4     remember the charges against you?

 5          A     Not specifically.  It was for marijuana.

 6     I don't know exactly the actual charge name, but it

 7     was for marijuana.

 8          Q     Were you charged with anything to do with

 9     truthfulness?

10          A     No.

11          Q     Other than that, are there any other

12     charges or convictions for you?

13          A     No.

14               MR. KATAEV:  I'm going to present you with

15               a document we will mark as Defendant's

16               Exhibit A.

17     (Defendant's Exhibit A, Marked for Identification.)

18     BY MR. KATAEV:

19          Q     I will represent to you this is a matter

20     of public record.  It's a document from the

21     Kissimmee Police Department.

22               MS. TROY:  I'm going to object to this

23               document.  I have never been presented this

24               document prior to this deposition.

25               MR. KATAEV:  You never asked for this.
```

A1469

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 23 of 294 PageID #: 2133

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

22

                            L. Stidhum

1

2        It's a public document.

3        Q    At the top of the exhibit --

4             MS. TROY:  Sir, I have never been -- I

5        have never seen this document.  Could you email

6        this document to me?

7             MR. KATAEV:  Sure, no problem.  I will

8        email it to you, not that I have to do so

9        during the deposition, but as a matter of

10       courtesy.

11                 Let the record reflect that I sent

12   the record.

13   BY MR. KATAEV:

14       Q    Putting the exhibit back up, I have some

15   questions about it.

16            MS. TROY:  We are going to ask for a quick

17       break.  I have not seen the document before.  I

18       ask that I review the document before you ask

19       questions.

20            MR. KATAEV:  You have no right to the

21       document before, you didn't ask for it in

22       discovery.  We are going to ask some questions

23       and then you can take your break.

24   BY MR. KATAEV:

25       Q    At the top it says, Description uttering

A1470

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

23

```
 1                       L. Stidhum
 2     forged instruments.  What does it mean to your mind
 3     uttering forged instruments?
 4              MS. TROY:  Objections.  Calls for a legal
 5         conclusion.  The witness can answer to the
 6         extent she knows the answer to the question.
 7         Q    You can answer the question, go ahead.
 8         A    I'm sorry, repeat your question again.
 9         Q    You told me that you were arrested for a
10     marijuana-related offense, correct?
11         A    Right.
12         Q    In 2017, correct?
13         A    Right.
14         Q    This document, which is a public record,
15     says on December 8th of 2017, you were arrested for
16     uttering forged instruments; do you see that?
17         A    Yes.
18         Q    My question to you is:  What is this
19     about?
20              MS. TROY:  Objection.  Calls for
21         self-incrimination.  I'm going to direct her
22         not to answer to the extent you're asking about
23         the questions underlying the facts of the case.
24              MR. KATAEV:  Are you pleading the Fifth?
25              MS. TROY:  Correct.
```

A1471

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

24

L. Stidhum

1
2          MR. KATAEV:  Let the record reflect the
3          Plaintiff has pled the Fifth.
4     BY MR. KATAEV:
5          Q    To clarify, though, is this one in the
6     same arrest and conviction or is this a separate
7     arrest and conviction from the marijuana?
8          A    So honestly, this was a long time ago.  I
9     was really not sure.  I was kind of pushed into that
10    charge so I don't know how to answer that.
11         Q    We will take you're pleading the Fifth.
12         MR. KATAEV:  Do you still want to take
13         your break now, Counselor?
14         MS. TROY:  Yes.
15         MR. KATAEV:  Go ahead.  Take your break.
16         Let's meet at 10:05.
17         Let the record reflect that Plaintiff's
18         counsel and Plaintiff left without confirming
19         when we are returning.  We are meeting back at
20         10:05.
21         (Whereupon, a short recess was taken.)
22         MR. KATAEV:  We are back on at 10:05.
23         MS. TROY:  Emanuel, I'm going to caution
24         you that the document production request calls
25         for all documents you intend to use.  To the

A1472

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

25

                        L. Stidhum

1

2      extent that you did not produce a document that

3      is part of the document production request, I

4      don't think you're entitled to use it.

5          MR. KATAEV:  You're wrong.  I objected and

6      you didn't follow up in a motion to compel and

7      you were denied your motion to compel in that

8      regard.

9          Can we proceed?

10         MS. TROY:  I understand that you're trying

11     to --

12         MR. KATAEV:  We are not here to discuss

13     your objections.  This is my deposition.  I

14     want to move on.  Can we move on?

15         MS. TROY:  I understand.  I'm going to

16     make a quick record.  I'm going to make it

17     clear to the record that I requested this as

18     part of the document request.  Mr. Kataev did

19     not produce the document as part of the

20     document production request.

21         MR. KATAEV:  That's correct.  I objected

22     and you failed to follow up in a motion to

23     compel and you already lost your motion to

24     compel in that regard.  We are moving on.

25         MS. TROY:  That is incorrect.

A1473

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                    26
1                    L. Stidhum
2            MR. KATAEV:  You can take it up with the
3        court.  I'm going to proceed with my
4        deposition.
5    BY MR. KATAEV:
6        Q    Ms. Stidhum, other than this lawsuit and a
7    State court wage and hour lawsuit with Mr. Manrique,
8    have you ever been a party to any other lawsuit as a
9    plaintiff or defendant?
10       A    No.
11       Q    These are the only two lawsuits you have
12   ever been a part of?
13       A    Yes.
14       Q    Have you ever filed a complaint against
15   any of your employers with any administrative agency
16   ever?
17       A    Yes.
18       Q    Which agency did you file a complaint
19   with?
20           MS. TROY:  If she knows.
21           MR. KATAEV:  Don't coach the witness.  You
22       either say, Objection, and the grounds they are
23       for or nothing.  Do not say, If she knows.
24       You're coaching her to say, I don't know, I
25       don't abide by that.  I'm going to call the

A1474

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

27

                          L. Stidhum

1
2       court.  It's not proper conduct.
3    BY MR. KATAEV:
4       Q    Please answer the question.
5       A    If I'm not mistaken, the EEOC.
6       Q    Other than the EEOC, did you ever file a
7    complaint with any other administrative agency?
8       A    No.
9       Q    Thank you.  Just for the record, the
10   complaint you filed with the EEOC relates to the
11   same defendants here, correct?
12      A    Yes.
13           MS. TROY:  Objection.  It's not a
14      complaint.
15           MR. KATAEV:  It's just, Objection to form.
16      You don't say, It's not a complaint.  Stop with
17      the speaking objections, okay?
18   BY MR. KATAEV:
19      Q    Have you ever filed for unemployment?
20      A    Yes.
21      Q    Against which employer did you file an
22   unemployment claim for?
23      A    Luxury Motor Club.
24      Q    That's after your left your employment
25   with the defendants, correct?

A1475

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 29 of 294 PageID #: 2139

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

28

L. Stidhum

1

2       A    Right.

3       Q    Have you ever filed a claim for workers'

4    compensation?

5       A    No.

6       Q    Have you ever applied for food stamps?

7       A    Yes.

8       Q    When was the most recent time?

9       A    Currently I have them.

10      Q    For the record, to apply for food stamps,

11   you have to provide information about your income,

12   correct?

13      A    Correct.

14      Q    You provided that information about your

15   income, correct?

16      A    Right.

17      Q    Did you ever apply for Medicare or

18   Medicaid?

19      A    Yes.

20      Q    You currently have that as well, right?

21      A    Right.

22      Q    In order to obtain Medicare/Medicaid, you

23   also have to provide information about your income,

24   correct?

25      A    Yes.

A1476

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 30 of 294 PageID #: 2140

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                    29
 1                         L. Stidhum
 2          Q    You did provide that information, correct?
 3          A    Yes.
 4          Q    Have you ever applied for childcare
 5     assistance?
 6          A    I'm not sure.
 7               MR. KATAEV:  We will follow up in writing.
 8                    (Counsel Request.)
 9     BY MR. KATAEV:
10          Q    What about housing assistance?
11          A    Yes.
12          Q    You currently have that as well?
13          A    Yes.
14          Q    Again, you have to provide information
15     about your income for that, right?
16          A    Yes.
17          Q    You did provide that information, correct?
18          A    Correct.
19          Q    To the extent that food assistance is
20     different from food stamps, did you ever apply for
21     that benefit?
22          A    I don't think so.
23          Q    What about educational assistance?
24          A    No, I don't think so.
25          Q    Did you attend high school?
```

A1477

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                     30
 1                     L. Stidhum
 2         A    Yes.
 3         Q    Where?
 4         A    Florida.
 5         Q    Name?
 6         A    Gateway High School, but that's not where
 7    I graduated from.
 8         Q    Where did you graduate?
 9         A    Alco.  I got my GED.
10         Q    Which schools, if any, did you attend here
11    in New York for high school?
12         A    Flushing High School and Benjamin Cardozo.
13         Q    You didn't get a high school diploma, you
14    got a GED, correct?
15         A    Correct.
16         Q    Did you ever attend any college?
17         A    No.
18         Q    Did you have gap in your education during
19    high school?
20         A    No.
21         Q    There is no graduate or professional
22    school, correct?
23         A    No.
24         Q    What about vocational school?
25         A    No.
```

A1478

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 32 of 294 PageID #: 2142

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

31

L. Stidhum

1
2      Q    Are you familiar with dealership
3    certification programs?
4      A    Not really.
5      Q    Are you aware, for example, that if you
6    sell Ford vehicles that Ford offers certification
7    programs for salespeople?
8      A    Yes.
9      Q    Have you ever taken any of those kind of
10   courses?
11     A    No.
12     Q    Were those offered to you at any of the
13   dealerships you worked for?
14     A    No, I mostly worked for used car lots.
15     Q    Used car lots generally don't offer those?
16     A    No.
17     Q    After you got your GED in Florida, is that
18   the first time you started working?
19     A    I'm not sure.
20     Q    Do you recall whether you ever worked
21   during high school?
22     A    I don't believe so.  No, I didn't.
23     Q    After you got your GED, where was the
24   first place you remember working?
25     A    McDonald's.

A1479

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 33 of 294 PageID #: 2143

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              32

                                 L. Stidhum

1

2       Q    Do you remember the month and year you

3    started there?

4       A    No idea.

5       Q    After you worked at McDonald's, where did

6    you work?

7       A    I can't remember that far back.  I want to

8    say it might have been Dollar Tree.

9       Q    The McDonald's that you worked at, was it

10   in Florida or New York?

11      A    Florida.

12      Q    What about Dollar Tree?

13      A    New York.

14      Q    Do you remember the month and year you

15   started at Dollar Tree?

16      A    I don't.

17      Q    Did you get fired from McDonald's?

18      A    No, I quit.

19      Q    Why?

20      A    I was being young and stupid kind of.

21      Q    Understood.  What about Dollar Tree?

22      A    I quit there too actually.

23      Q    Where did you work after Dollar Tree?

24      A    That's when I got the interview with Isaac

25   after that.  No, I'm sorry, that's not true.  I

A1480

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 34 of 294 PageID #: 2144

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

33

```
 1                      L. Stidhum
 2       actually worked at Marco LaGuardia Hotel.
 3            Q    Hotel?
 4            A    Yes.
 5            Q    What position did you work?
 6            A    Housekeeping.
 7            Q    That was at the airport?
 8            A    No.  That's right here off of Main Street,
 9       Northern Boulevard.
10            Q    Is that close to where you lived at the
11       time?
12            A    Yes.
13            Q    Is that close to where you live now?
14            A    Pretty much.  Ten-minute drive.
15            Q    Do you remember the month and year you
16       started working at the hotel?
17            A    I don't.  I didn't stay there very long.
18            Q    After the hotel is when you first started
19       working for Hillside Auto Outlet, correct?
20            A    Correct.
21            Q    You started working at Hillside Auto
22       Outlet in May of '18, correct?
23            A    Yes.
24            Q    Hillside Auto Outlet was the first -- was
25       the first automobile business that you ever worked
```

A1481

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

34

                          L. Stidhum

1
2        in, correct?

3             A     Yes.

4             Q     Therefore, you had no experience in the

5        automobile industry prior to that time, correct?

6             A     Correct.

7             Q     You worked at Hillside Auto Outlet from

8        May of '18 until January of '19, correct?

9             A     Right.

10            Q     Although you are also suing Hillside Auto

11       Mall, you never directly worked at Hillside Auto

12       Mall as an employee, correct?

13            A     I kind of need that question clarified

14       because I have sold cars at Hillside Auto Mall.

15            Q     Let me try.  I'm going to give you a very

16       long question of what I understand to be the case

17       and you will confirm what's accurate and what's not,

18       okay?

19            A     Okay.

20            Q     You came to work as a salesperson for

21       Hillside Auto Outlet and worked at Hillside Auto

22       Outlet and was paid by Hillside Auto Outlet from May

23       of '18 until January of '19.  However, during the

24       time that you worked at Hillside Auto Outlet, you

25       sometimes sold vehicles that were kept or maintained

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

35

                              L. Stidhum

1    by Hillside Auto Mall; is that correct?

2

3         A     Yes.

4         Q     During the time you worked at Hillside

5    Auto Outlet, you sometimes sold vehicles located at

6    other dealerships unrelated to Hillside Auto Outlet

7    or Hillside Auto Mall, correct?

8         A     Yes.

9         Q     You're not alleging that those other

10   dealerships that you sold vehicles for are also an

11   employer here, correct?

12        A     Right, because from my understanding

13   Hillside Auto Outlet and Mall were kind of run by

14   the same people.

15        Q     That's the reason you included Hillside

16   Auto Mall in this case, correct?

17        A     Right.

18        Q     Because, as your understanding, they are

19   what we call in legal parlance, joint employers,

20   correct?

21        A     I'm sorry, one more time.

22              MR. KATAEV:  Read it back.

23   (Whereupon, the referred to question was read back

24                  by the reporter.)

25              MS. TROY:  Objection to the extent it

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

36

L. Stidhum

1
2      calls for a legal conclusion.
3   BY MR. KATAEV:
4      Q    You can answer.  Go ahead.
5      A    I'm not sure.
6      Q    Okay, that's fine.  Your employment with
7   Hillside Auto Outlet ended in January of '19,
8   correct?
9      A    Correct.
10      Q    That's because you quit, correct?
11      A    Yes.
12      Q    During the time you worked at Hillside
13   Auto Outlet, your sole position or job title was
14   salesperson, correct?
15      A    Right.
16      Q    Your primary responsibility was selling
17   cars, correct?
18      A    Right.
19      Q    Any other responsibilities that you had?
20      A    Um, not necessarily responsibilities, no.
21      Q    Who were your supervisors while you worked
22   at Hillside Auto Outlet?
23      A    Isaac was one, Jay or Jenneque, she was
24   another for a short period of time, a couple of
25   months.  Andris Guzman and that was about it as far

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

37

                         L. Stidhum

1
2     as supervisors, yes.
3         Q    Can you describe basically what your
4     compensation structure was there?
5         A    So in the beginning when I was first hired
6     after interviewing with Isaac and speaking with
7     Jenneque, I was told I would be paid $300 weekly,
8     $150 flat, and after anything over $3,000 I would
9     receive 5 percent, and it is reflected on my
10    paystubs for the first couple of months up until Jay
11    was fired or quit.  I don't know what happened in
12    that situation.  Then, I started just receiving the
13    $150 flat.
14        Q    Let's say the schedule that you worked was
15    generally Monday to Friday, correct?
16        A    No.
17        Q    What was your schedule like?
18        A    So I had Wednesdays off and we would work
19    alternating Sundays.
20        Q    You either worked five days a week or six
21    days?
22        A    Correct.
23        Q    And so do you know what the actual work
24    week was?  Did they do it Monday through Sunday or
25    did they do it Saturday through Friday?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

38

                          L. Stidhum

1

2      A    I have no idea.  I know that I received my

3   check Thursdays.

4      Q    The check that you received on Thursdays

5   was for the entire prior week, correct, whatever the

6   week was?

7      A    Yes.

8      Q    How did you go about verifying that you

9   got paid properly on any given week?

10     A    So weekly we would get a form that has

11  like three pieces together, so -- for copies, and we

12  would have to turn it into the sales manager and

13  they would give it to the girl who does the payroll.

14     Q    Who was that?

15     A    There was a couple.  From the beginning,

16  it was -- I can't remember who it was in the

17  beginning.  I know it ended with Denise doing my

18  payroll, Denise and Iris.  There was a couple of

19  people in between.

20     Q    Does Dianna Jennings ring a bell?

21     A    No.

22     Q    Dina Jennings?

23     A    Dina, I didn't really meet because she was

24  hardly ever there.  I've probably seen her three or

25  four times.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

39

                              L. Stidhum

1

2        Q    Let's break down the compensation.  $300 a

3    week is the flat $300 a week, right?

4        A    Salary.

5        Q    The $150 per car is for every car you

6    sold, correct?

7        A    Yes.

8        Q    In order for the car to be considered

9    sold, it had to be delivered, right?

10        A    Right.

11        Q    Which means the customer took possession

12    of the vehicle and all the funds had been received

13    from the bank and all of that, right?

14        A    I mean yes and no because there would be

15    times that I would still get paid on all the cars

16    even if it was not funded.  It's a yes-and-no

17    answer.

18        Q    In terms of getting paid for vehicles that

19    were not funded, did it sometimes happen that you

20    did not get paid on a vehicle that hasn't been

21    funded yet?

22        A    One more time.

23        Q    Was it sometimes the case that a vehicle

24    was not funded and you didn't get paid on it?

25        A    Yes.  That happened a couple of times but

A1487

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                    40
                             L. Stidhum

1          relatively quickly with the funding, they would do a

2

3          pretty good job of that.

4               Q    They would like to take care of you while

5          you worked there, correct?

6                    MS. TROY:  Objection to form.

7               Q    You can answer.

8               A    I guess.

9               Q    When they paid you for a vehicle that

10         hasn't been funded yet, they did so in their

11         discretion, correct?

12              A    It would be something that I wasn't aware

13         of.  It might have happened, it might have happened.

14         I'm not sure.  I'm not looking at the back end of

15         the dealership.

16              Q    You don't care whether it's funded or not,

17         you want to get your commission, right?

18              A    Of course.

19              Q    How would you keep track of the vehicles

20         that you sold in any given week?

21              A    With that same form.  I would do that

22         monthly.

23              Q    Did you ever take pictures of that form on

24         your cellphone?

25              A    No, because I would have the copies so it

A1488

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 42 of 294 PageID #: 2152

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                    41
                              L. Stidhum
 1
 2      wasn't something that I really needed to take
 3      pictures of.
 4           Q    Have you produced those copies in this
 5      case?
 6           A    No, because I don't think anybody plans to
 7      be mistreated or anything like that to hold on to
 8      stuff like that.
 9           Q    What you're saying is you never held on to
10      those documents?
11           A    No.  After I would get paid, I would
12      discard them.
13           Q    The reason you discarded them was because
14      you were satisfied that you were properly paid,
15      correct?
16           A    I don't know how to answer that question.
17           Q    Answer to the best of your ability.
18           A    I mean, if I'm getting paid on the deal
19      there is no reason for me to hold on to it.
20           Q    You threw it out because you were
21      satisfied that you were properly paid, right?
22                MS. TROY:  Objection.  Argumentative.
23           Q    You can answer.
24                MS. TROY:  Objection.  Asked and answered.
25           Q    I would like to hear the answer.
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

42

                      L. Stidhum

1
2         MS. TROY:  Because you don't like the
3      answer doesn't mean you can ask it again.  The
4      witness can answer again.
5   BY MR. KATAEV:
6         Q    Go ahead.
7         A    I'm sorry.
8         Q    The reason why you threw out the document
9   was because you were satisfied that you were paid
10  properly, correct?
11        A    Yes, up until I was owed money.  Up until
12  I was shorted on my commissions.
13        Q    How did you come to be aware that you were
14  owed money or that you were short on the
15  commissions?
16        A    Because I know what I'm owed to start.  I
17  would know how many cars I would sell weekly and
18  what I'm owed weekly.  Again, I was getting paid
19  that $150 flat so it wasn't something that -- it
20  wasn't a mystery to solve.  Of course I know what
21  I'm looking forward to expecting especially upon
22  leaving somewhere.
23        Q    Going through the 5 percent bonus, can you
24  explain that in your own words?
25        A    It wasn't a 5 percent bonus.  It was

A1490

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

43

L. Stidhum

1
2    anything paid over -- any deal that made over $3,000
3    because at 5 percent, $3,000 would be $150.
4    Anything that made over that, I was receiving that
5    extra compensation up until Jay was fired and it
6    does reflect it on my paystubs.
7         Q    Jay is the person that you referred to as
8    Jenneque, correct?
9         A    Yes.
10        Q    So when you say $3,000, you're saying
11   that's what the vehicle sold for?
12        A    No.  That's what the deal made.
13        Q    The gross profit?
14        A    Right.
15        Q    When is it that Jay was no longer at the
16   company?
17        A    I'm not quite sure.  It had to be at the
18   end of July or sometime in August.  It was sometime
19   in the summer I remember.
20        Q    At some point after July or August of
21   2018, you no longer got that 5 percent, correct?
22        A    Correct.
23        Q    You continued your employment with the
24   dealership, correct?
25        A    Yes.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

44

                              L. Stidhum

1

2        Q    Did anyone inform you they are no longer

3     offering the 5 percent in July or August?

4        A    No.

5        Q    Did you come to anyone and say, What

6     happened to the 5 percent?

7        A    I did mention it and it was kind of

8     brushed off.

9        Q    Who did you mention it to?

10       A    Isaac.

11       Q    What did Isaac say to you?

12       A    I don't recall.

13            MR. KATAEV:  Off the record.

14     (Whereupon, an off-the-record discussion was held.)

15     BY MR. KATAEV:

16       Q    You testified that you quit in January of

17     '19, right?

18       A    Correct.

19       Q    What was the reason that you quit?

20       A    It was a combination of things between the

21     pregnancy discrimination, being owed money and not

22     paid it.  It was a couple of things.  Also, I was

23     promised a position that I guess I wasn't receiving

24     due to my pregnancy, so like I said, it was a

25     combination of things.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

45

L. Stidhum

1

2      Q    We are going to get into the pregnancy

3    discrimination position you talked about a little

4    later.  I want to focus on the compensation aspect

5    and I have some more granular questions about your

6    decision to quit related to those financial aspects

7    so I'm going to focus in on that for now.

8      A    Okay.

9      Q    Did you quit because you stopped receiving

10    the 5 percent?

11      A    No.

12      Q    Did you quit because of waiting times?

13      A    Yes.  That's what one of the factors.

14      Q    Tell me about the waiting times?

15      A    So like I mentioned a couple of times, I

16    did have my own access to Dealertrack and once Isaac

17    did go on vacation, the password was changed and

18    Guzman was the supervising manager at the time and

19    he refused to give it to me.  So that did increase

20    my waiting times because I was not able to qualify

21    my customers on my own and they would leave.

22      Q    Assuming you were able to qualify your

23    customers, that doesn't necessarily mean you would

24    make the sale, correct?

25      A    Right.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

46

                          L. Stidhum

1

2      Q    It only increased the chances of making

3  the sale, correct?

4      A    Not necessarily increases it, but it gives

5  me the opportunity to see who I'm wasting time on

6  and who I'm not wasting time on.  We were in Jamaica

7  so we would get a lot of customers that did not

8  qualify.

9           Me having my own access to Isaac's

10  Dealertrack would give me the ability to qualify my

11  customers on my own rather than waste time on

12  somebody and wait on Andris or Isaac or whoever to

13  check the credit.

14           MR. KATAEV:  Can I have the last question

15      and answer read back?

16  (Whereupon, the referred to testimony was read back

17              by the reporter.)

18  BY MR. KATAEV:

19      Q    You acknowledge, however, that you were

20  the only salesperson that had access to Dealertrack

21  to qualify individuals, correct?

22      A    Yes.

23      Q    All the other salespeople did not have

24  that ability that you did for some time, correct?

25      A    That I know of at least.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

47

                          L. Stidhum

1

2      Q    Generally, it was the responsibility of an

3    F&I manager or someone else in the dealership, other

4    than a salesperson, to qualify individuals, correct?

5      A    Not just an F&I.  The general manager or

6    sales manager, I don't know their titles exactly,

7    but they have access as well.

8      Q    Those individuals are not salespeople,

9    correct?

10     A    Right.

11     Q    You say that you obtained access to

12   Dealertrack, right?

13     A    I was given it, yes.

14     Q    Who gave it to you?

15     A    Isaac.

16     Q    How did he give it to you?

17     A    Honestly, I don't remember because, like I

18   said, the password would be changed after a certain

19   period of time because it's sensitive information.

20   They would change the password, but he would put it

21   on a sticky note or he would come to my desk and

22   type in the password himself.  He was the only one

23   giving me the password.

24     Q    The username for the Dealertrack account,

25   whose was it?

A1495

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

48

1                          L. Stidhum

2          A     It was Isaac's.  I never had anybody

3      else's.

4          Q     You didn't have your own, correct?

5          A     I did not.

6          Q     After you quit working at Hillside Auto

7      Outlet, where did you work next?

8          A     NYC Motor Cars.

9          Q     Where is that?

10         A     Queens Boulevard.

11         Q     Did you start working there in January of

12     '19 or some other point?

13         A     I'm not sure if I waited until the start

14     of February or not, so I'm not 100 percent sure.  It

15     was definitely early that year.

16         Q     In January or February of '19, correct?

17         A     Probably more towards the end of January

18     or beginning of February.

19         Q     In order to begin a job there, you had to

20     fill out an employment application?

21         A     I actually did not.

22         Q     1,000 percent sure you didn't?

23         A     An application?

24               MS. TROY:  Objection as to form.

25         Q     You can answer.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

49

                              L. Stidhum

1

2              MS. TROY:  What do you mean by

3        1,000 percent sure?  Objection to form.

4              MR. KATAEV:  I'm not going to qualify that

5        with a response.  You can answer the question.

6              MS. TROY:  Rephrase your question, sir.

7   BY MR. KATAEV:

8        Q    Please answer the question as asked.

9        A    Repeat it.

10       Q    Are you 1,000 percent sure you did not

11  fill out any employment application at NYC Motor

12  Cars?

13       A    I don't remember filling one out.  I was

14  brought there by a sales manager that Isaac had

15  working with him.

16       Q    Who was that?

17       A    Ali.

18       Q    When you say you can't remember, you can't

19  remember one way or the other, correct?

20       A    What do you mean?

21       Q    You can't remember whether you did fill

22  out an employment application or not?

23       A    Right.  I was brought there by someone

24  else.  He was kind of like, You don't have to be

25  interviewed, you don't have to do this, just come.

A1497

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 51 of 294 PageID #: 2161

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

50

L. Stidhum

1

2     Q    Do you know Ali's full name?

3     A    I'm not sure how to spell it.  Ali

4     Raskesnia, something like that.

5     Q    When you started working at NYC Motor

6     Cars, it was a new dealership?

7     A    Not that I know of.

8     Q    Was your compensation structure there the

9     same as it was at Hillside Auto Outlet?

10    A    No.

11    Q    What was the compensation structure there?

12    A    The commission was doubled.

13    Q    In other words, it was $300 per car?

14    A    Yes.

15    Q    It was the same $300 weekly draw?

16    A    Yes.  Not draw, it was salary.

17    Q    Thank you for clarifying.  There was no

18    5 percent bonus?

19    A    No, but I did have a monthly bonus

20    structure.

21    Q    Based on volume, correct?

22    A    Correct.

23    Q    When did you stop working at NYC Motor

24    Cars?

25    A    When I gave birth.

A1498

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 52 of 294 PageID #: 2162

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

51

                        L. Stidhum

1

2       Q    When was that?

3       A    In July.  I stayed, like, a week up until

4   I gave birth so maybe July of 20-something.

5       Q    2020?

6       A    2019.

7       Q    I see what you're saying.  20-something

8   meaning the day?

9       A    Yes.

10       Q    Congratulations by the way.

11       A    Thanks.

12       Q    You were there at NYC Motor Cars for

13   approximately six months, correct?

14       A    Right, and I did go back.

15       Q    When did you return?

16       A    I want to say like October, September,

17   October around there.

18       Q    Are you still employed there?

19       A    No, I'm not.

20       Q    When did you cease working there?

21       A    About a month or two after I actually left

22   because the store was completely different,

23   employees were different, it was not doing the

24   volume it was and I became a BDC manager at Luxury

25   Motor Club.

A1499

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 53 of 294 PageID #:
2163

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    52

                              L. Stidhum

1

2         Q    Business development center?

3         A    Yes.

4         Q    You ceased working at NYC Motor Cars in or

5    about November or December of 2019, correct?

6         A    Yes.

7         Q    You quit?

8         A    I'm sorry?

9         Q    You quit?

10        A    Yes, I did.

11        Q    You went to Luxury?

12        A    Motor Club.

13        Q    Where is that?

14        A    In Franklin Square.

15        Q    How did you obtain the position there?

16        A    Probably on Indeed or something.  Some

17   type of employment ad.

18        Q    When did you start there?

19        A    Mid November of 2019.

20        Q    Are you still working there?

21        A    No, I'm not.

22        Q    When did you stop working there?

23        A    When Covid hit.  March, early March.  I

24   got Covid really bad.  I decided to leave and not

25   get my kids sick.

A1500

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 54 of 294 PageID #: 2164

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

53

                         L. Stidhum

1
2      Q    Did you return to the workforce after
3    March 2020?
4      A    I did.
5      Q    When was that?
6      A    Actually, the owner of NYC Motor Cars
7    called me that he was opening a new store so I don't
8    remember the exact time, but he told me he was
9    opening a new store and he wanted me to run the
10   store that I worked at on Queens Boulevard.  I don't
11   remember the exact month and date.
12     Q    If I understand correctly, the owner of
13   NYC Motor Cars was opening a new store and needed
14   your help with his existing store at NYC Motor Cars?
15     A    Correct.
16     Q    Did you go back to NYC Motor Cars?
17     A    I did as a sales manager.
18     Q    Do you remember what month in 2020 it was?
19     A    I don't.  It was probably maybe late
20   April, early May, around there.
21     Q    That's fine.  Are you still there?
22     A    No, I'm not.
23     Q    When did you stop work there?
24     A    I don't remember the exact timeframe.  I'm
25   not sure.  I was trying to think.

A1501

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

54

1                         L. Stidhum

2         Q    Where are you working now?

3         A    I'm not working.

4         Q    When did you stop working?

5         A    I gave birth last year.  I took off pretty

6    much since January of last year.

7         Q    January of 2022?

8         A    Right.  I did work at a dealership for a

9    couple of weeks.  It didn't work out.  It was super

10   slow.

11        Q    Which dealership was that?

12        A    Great Neck Motor Sports.

13        Q    Is that on Great Neck Road?

14        A    Yes.

15             MR. KATAEV:  Off the record.

16   (Whereupon, an off-the-record discussion was held.)

17   BY MR. KATAEV:

18        Q    Other than the last job at NYC Motor Cars

19   as a sales manager and the job at Great Neck Motor

20   Sports, did you work anywhere else after April of

21   2020?

22        A    Yes, I did.  NY Luxury Motors, but again

23   it was a bad situation there.  It was in a bad spot

24   and the dealership wasn't getting any traffic at

25   all, so I decided to leave and look for other

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 56 of 294 PageID #: 2166

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

55

1                          L. Stidhum

2       employment elsewhere.

3            Q    Were you fired from any of these jobs we

4       talked about today?

5            A    No, I was not.

6            Q    At any of these jobs, did you ever fill

7       out any employment application?

8            A    For Luxury Motor Club, I definitely did.

9       Great Neck, I definitely did.  The only one I can't

10      recall is NYC Motor Cars because Ali was the one who

11      brought me there, I don't remember.  Everywhere else

12      I did fill out an employment application.

13           Q    Whenever you filled out an employment

14      application, you did list Hillside Auto Outlet as a

15      past experience, correct?

16           A    Of course.

17           Q    The only reason there are gaps in your

18      work experience is because of the birth of your two

19      children, correct?

20           A    Right, and Covid.

21           Q    When you applied for a position at

22      Hillside Auto Outlet it was for a salesperson,

23      correct?

24           A    Right.

25           Q    How was it you learned about the position?

A1503

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

56

                              L. Stidhum

1

2        A    I believe it was Craigslist and I got a

3    call the next day.

4        Q    You called based on the Craigslist ad?

5        A    No.  I sent in my application and got a

6    phonecall the next day.  Not my application, my

7    resume.

8        Q    When you got the call the next day, do you

9    remember who it was?

10       A    Isaac.

11       Q    To the best of your recollection, how did

12   the conversation go?

13       A    I don't remember.  He told me to come in,

14   if I can come in the same day and I was kind of

15   bummed about losing my job -- not losing my job,

16   leaving my job at the hotel and I wanted to get a

17   job so bad, so I went the same day that he called

18   and got the job.

19       Q    You met with Isaac in person that day?

20       A    Yes.

21       Q    What do you recall about your conversation

22   with Isaac in person that day?

23       A    Honestly, I don't remember.  I remember

24   him saying that he was willing to give me a shot and

25   to wait for his partner and then I spoke with Jay.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 58 of 294 PageID #: 2168

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

57

                        L. Stidhum

1

2        Q    When you refer to his partner, that was

3    Jenneque?

4        A    Yes.

5        Q    You also spoke with Jenneque that day?

6        A    Yes, I did.

7        Q    You got the job the same day?

8        A    Right.

9        Q    An interview took place at the dealership,

10   correct?

11       A    Yes.

12       Q    At Hillside Auto Outlet, correct?

13       A    Yes.

14       Q    What is your understanding as to the basis

15   for which you got hired?

16       A    What do you mean by that?

17       Q    Why do you believe you were hired?

18       A    I'm not sure.

19       Q    As far as you understood it, Isaac and/or

20   Jenneque together made a decision to hire you,

21   correct?

22       A    I mean, Isaac already told me he was

23   willing to give me a shot and it was more like a

24   meeting Jay type of thing.

25       Q    At the time you were hired, Andris Guzman

A1505

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

58

                              L. Stidhum

1
2      was not an employee of the dealership yet, correct?
3              A    He was.
4              Q    He did not participate in the decision to
5      hire you, as far as you know, correct?
6              A    No, he did not.
7              Q    You know that for a fact or it's as far as
8      you know?
9              A    It's as far as I know.
10             Q    He did not interview you, correct?
11             A    No.
12             Q    At the time that you were hired, Jory did
13     not participate in the decision to hire you,
14     correct?
15             A    No.
16             Q    Jory was not present daily at the
17     dealership, correct?
18             A    Yes.
19             Q    Was Jory ever present at the dealership?
20             A    He was.  He would pop in a couple of times
21     a month.
22             Q    Same question for Ron:  As far as you
23     know, he did not participate in the decision to hire
24     you, correct?
25             A    No.

A1506

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    59

1                            L. Stidhum

2           Q     Was Ronald ever present at the dealership?

3           A     Again, same thing.  Yes, here and there.

4           Q     During the times that Jory and/or Ron

5     would visit the dealership, did you interact with

6     either of them?

7           A     Yes.

8           Q     What was the nature of your interaction

9     with them?

10          A     It was more of how we were doing, how

11    things were going.

12          Q     Pleasantries?

13          A     Pretty much.

14          Q     Do you recall receiving a written offer of

15    employment when you were hired?

16          A     No, I did not.

17          Q     Did you start work the same day you were

18    hired?

19          A     I'm not 100 percent sure.  I want to say

20    yes, but I'm not sure.

21          Q     To whom did you report as soon as you

22    started working?

23          A     What do you mean to who did I report?

24          Q     As a salesperson, you reported to someone

25    higher, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

60

L. Stidhum

1
2       A    Right.  Mostly I would go to Isaac or Jay,
3   when I first started there at least.
4       Q    You did not report to Andris Guzman at the
5   time, correct?
6       A    Not that I can really recall.  Up until
7   Jay leaving, he didn't do too much.
8       Q    Jay left in July or August of?
9       A    2018.
10      Q    After July or August of 2018 is when you
11  started reporting to Andris Guzman; is that right?
12      A    Correct.
13      Q    You never reported to Jory, correct?
14      A    Not on that aspect.  Only when there was
15  an issue.
16      Q    Give me an example.
17      A    Like, when I was missing some of my car
18  pay, I did reach out to him, I called him and sent
19  him a text message as well.
20      Q    That was in January of '19 before you
21  quit, correct?
22      A    Correct.
23      Q    Other than that --
24      A    No, I'm sorry.  It was probably after I
25  quit, once I didn't receive the compensation after

A1508

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 62 of 294 PageID #: 2172

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

61

                         L. Stidhum

1

2      telling Isaac.

3           Q     In January of '19, correct?

4           A     Right.

5           Q     Other than that, you never interacted with

6      him other than pleasantries, correct?

7           A     For Jory, yes, that's pretty much it.

8           Q     What about Ronald, you never reported to

9      him, correct?

10          A     Right.

11          Q     You had no interactions with him other

12     than pleasantries, correct?

13          A     And about the bonus situation.

14          Q     When did you reach out to Ron about the

15     bonus situation?

16          A     I didn't reach out to him.  He was in the

17     store.  He came in, asked how everyone was doing, he

18     looked really happy.  I mentioned -- I don't know

19     how I worded it, but I mentioned I was pissed

20     because I didn't get the bonus and I was only a

21     couple of cars away, and that I was really hoping to

22     get it because I was pregnant and stuff.  That's

23     when whatever conversation happened between him and

24     Isaac happened.  I don't know what happened after

25     that.

A1509

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              62

                                   L. Stidhum

1

2         Q    Do you remember when that was, month and

3     year?

4         A    Early December or the last two days of

5     November, something like that.  It had to be the end

6     of November or early December.

7         Q    After Jenneque left, you started reporting

8     to Andris Guzman.  What was the nature of the

9     working relationship?  What did you report to him

10    on?

11        A    So up until I got my own access --

12    actually, I feel like it was right about the same

13    time because Jay was pretty quick with what she

14    would do.  For the first couple of days, I had to go

15    to him, give him the application, have him run the

16    credit and let me know if the customer qualified or

17    whatever the case may be.  That was pretty much it

18    up until I got my own access, then we really didn't

19    have to do too much communicating.

20        Q    From the first time you started working at

21    the dealership initially in order to get financing,

22    you would have to go to Jay in order to run credit

23    and apply for financing, correct?

24        A    Right.  I mean, I was new to the business

25    so I don't know much about those things up until I

A1510

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 64 of 294 PageID #: 2174

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

63

                           L. Stidhum

1        was taught it.

2        Q    Fair enough.  When Jay left, you continued

3   doing that with Andris, correct?

4   Q    Fair enough.  When Jay left, you continued

5   doing that with Andris, correct?

6        A    Right.

7        Q    Let's set aside for now the Dealertrack.

8   I have some questions about this process before you

9   got the Dealertrack access.

10            When you worked with Jay to get these

11  financing applications in, was Jay the exclusive,

12  only person that did this?

13       A    No.

14       Q    Sometimes you worked with others, correct?

15       A    Yes.  Isaac would do it as well.

16       Q    Other than Isaac and Jay, was there anyone

17  else that did it?

18       A    Later on there was a finance manager hired

19  after Jay left.

20       Q    Who was that?

21       A    Serge.

22       Q    Serge came on after?

23       A    Yes.

24       Q    After Jay left?

25       A    Yes.

         Q    In the beginning, it was Isaac or Jay and

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 65 of 294 PageID #: 2175

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

64

                         L. Stidhum
1
2    that's it, correct?
3         A    Correct.
4         Q    How did you go about deciding who to go
5    to?
6         A    Whoever was less busy.  I was always
7    trying to grab whoever I could.  Whoever was less
8    busy is who I would go it.
9         Q    After Jay left, you had the option of
10   Andris or Isaac, correct?
11        A    Right, and I would choose Isaac more of
12   the time because he was quicker.  Andris was getting
13   trained to do that part.  Once Jay left, he was kind
14   of taking over her position.
15        Q    Jay left in August or July of '18.  Do you
16   remember in relation to that when Serge started?
17        A    It had to be like end of August because I
18   remember there was a couple of people that came to
19   interview and stuff so it had to be after but I'm
20   not sure exact dates.
21        Q    Whenever you went to Isaac or Jay in the
22   beginning to run financing applications for
23   customers of the dealership, prospective customers
24   of the dealership, there would sometimes be delays
25   caused because the banks wanted more information,

A1512

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

65

1                        L. Stidhum

2    correct?

3         A    Yes and no.

4         Q    Explain.

5         A    I mean, when it comes to any delays in

6    banks, it would be because of a document that they

7    needed, but for the most part, you would have all

8    the documents.  It was in our sales procedure to get

9    ID, the most recent two paystubs and that proof of

10   address if needed.  It's kind of hard to answer that

11   question because, for the most part, they would have

12   everything needed.

13        Q    To the extent a customer did not have

14   something that was needed, that would delay the

15   process, correct?

16        A    Yes.

17        Q    Is it not true that sometimes individuals

18   are self-employed and don't necessarily have things

19   like paystubs?

20        A    Of course.

21             MS. TROY:  Objection.  Argumentive.

22        Q    You can answer.

23        A    I mean, yeah.

24        Q    In those situations when you submit the

25   applications there would be a delay, correct?

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 67 of 294 PageID #: 2177

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

66

L. Stidhum

1

2          A     Yes.

3          Q     The only way to prevent the delay from

4    being further delayed is to obtain whatever the

5    document is and submit it to the bank, correct?

6                MS. TROY:  Objection to form.

7          Q     You can answer.

8          A     One more time, your question.

9                MR. KATAEV:  Read it back.

10   (Whereupon, the referred to question was read back

11                    by the reporter.)

12         A     Yes.

13         Q     Sometimes the customer would not have that

14   information handy the same day, correct?

15         A     Yes.

16         Q     Sometimes the customer would never return

17   with the information at all, correct?

18         A     Correct.

19         Q     This rings true from the beginning when

20   you worked with Jay and Isaac, to the end when you

21   were working with Andris, Isaac and Serge, correct?

22         A     Right.

23         Q     Towards the end of your employment

24   relationship with Hillside Auto Outlet, you had the

25   ability to go to either Isaac, Andris or Serge to

A1514

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 68 of 294 PageID #: 2178

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

67

```
                              L. Stidhum
1
2       run financing applications, correct?

3              A    Correct.

4              Q    You're telling me that Andris was the

5       individual who caused you purposefully to wait

6       longer than everyone else, correct?

7              A    I'm sorry.  I got to run back a little

8       bit.  Serge would not run credit.  He would if he

9       was not busy, but for the most part, it was the

10      sales manager or the general manager's job to run

11      the credit and follow up with the customer prior to

12      giving it to the finance manager to not waste his

13      time.

14                    So, yeah, Serge did not run the

15      credit.  It was mostly up to Isaac and Guzman to run

16      the credit because Serge would really just submit

17      the deal to the banks.

18             Q    Understood.  What you're saying generally

19      is that, in terms of who you could go to after Jay

20      left, it was really just Isaac and/or Andris,

21      correct?

22             A    Yes.

23             Q    It was very rare that Serge would run the

24      credit?

25             A    Yes.
```

A1515

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 69 of 294 PageID #:
2179

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

68

1               L. Stidhum

2      Q    Okay.

3           MR. KATAEV:  Can we have the original

4      question read back?

5           MS. TROY:  For the record, Mr. Kataev has

6      been coughing throughout this morning.

7           MR. KATAEV:  It's a moot point.  You don't

8      need to make these stupid things on the record.

9           MS. TROY:  I don't appreciate you calling

10     my stuff stupid.

11          MR. KATAEV:  You achieved what you wanted.

12     We are in a remote deposition.  What is the

13     point?  Don't interrupt the deposition.

14          MS. TROY:  I was concerned for my client

15     and my health, and it was perfectly valid

16     because you told me you'd be asymptomatic by

17     Friday.

18          MR. KATAEV:  I said other than a minor

19     cough, but it's a moot point.  Please don't

20     interrupt my deposition.

21  (Whereupon, the referred to question was read back

22              by the reporter.)

23     A    Yes.  Isaac left probably the first week

24     of December, something like that so yes, that's

25     partially the reason why I had extended wait times

A1516

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

69

                                L. Stidhum
 1
 2      because he did not want to give me the access I had
 3      before.
 4              Q    Isaac never caused you to wait longer like
 5      Andris did, correct?
 6              A    Correct.
 7              Q    Neither did Serge in the rare circumstance
 8      when you would go to him, correct?
 9              A    Correct.
10              Q    Your complaint says that the only
11      reason -- withdrawn.
12                   Your complaint says that Andris only
13      caused you to wait longer to run the financing
14      applications after you had disclosed to him and
15      others that you were pregnant, correct?
16              A    That's how it seemed, yes.
17              Q    When you disclosed to individuals that you
18      were pregnant, you did so at the dealership,
19      correct?
20              A    Yes.
21              Q    Who was present when you told everyone the
22      great news?
23              A    I mean, all the salespeople were present.
24      I was a few minutes late, I remember that because I
25      came in and everyone was there and I was waving my

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 71 of 294 PageID #: 2181

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

70

L. Stidhum

1

2    sonogram picture around.  I don't remember if Isaac

3    was there when I got there and said it or not, but I

4    know definitely Guzman was there and I did tell

5    Isaac later that day when he came in for sure.

6         Q    I want to understand.  When you first said

7    it, who was immediately in your circle or presence?

8         A    Guzman was there because he would sit at

9    the podium so he was front and center.  David was

10   there, I remember Sean being there, he was another

11   salesperson, the other David, I don't remember his

12   last name, I believe it starts with a P.  I don't

13   believe Serge was there just yet.  He usually came a

14   little later.  I'm not sure if Isaac was there yet

15   but I know that same day I did show him the

16   sonogram.

17        Q    When you made that announcement, did

18   Andris say anything to you?

19        A    I don't recall.

20        Q    Do you recall him saying congratulations?

21        A    I don't.

22        Q    Do you recall anyone else saying

23   congratulations?

24        A    Yes.  The other salespeople were looking

25   at it together.  Everybody was, like, excited for

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 72 of 294 PageID #: 2182

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

71

L. Stidhum

1  me, I guess I could say.

2  

3      Q    Did Andris make any statements at all

4  during that conversation?

5      A    I honestly don't think so.  He didn't have

6  much personality, I want to say.  I don't feel like

7  he said anything to me.

8      Q    Prior to the time that you announced your

9  pregnancy to him and to the others, did you and

10  Andris have any interpersonal conflicts with each

11  other?

12      A    Honestly, yes, we did, but it was -- we

13  kept it professional.  We worked in a professional

14  environment.  We kept it professional.

15      Q    What was the nature of the interpersonal

16  conflict that you had?

17      A    Honestly, I don't remember.

18      Q    It was all work-related, of course?

19      A    Yes.

20      Q    Maybe you had some disagreement or

21  argument about something relating to a sale,

22  correct?

23      A    Yes, definitely work-related.  Nothing

24  personal, I don't think.

25      Q    Did any of your interpersonal conflicts

with each other rise to a level at any point before you announced your pregnancy where someone else had to get involved and mediate you two?

A Not that I recall, no.

Q Whatever happened between you two, you sort of water-under-the-bridge type of thing?

A Pretty much.

Q How many times did that happen prior to the time that you announced your pregnancy?

MS. TROY: Objection to form. Ambiguous.

Q You can answer the question.

A Honestly, I don't remember. It's probably once or twice. Nothing like crazy where we hated each other and couldn't speak. It was nothing like that.

Q You had two little squibbles here and there?

A Yes.

Q Do you recall whether those two incidents were close in time to the time that you learned were pregnant?

A I don't remember, no.

Q It could have been at the beginning, it could have been at the middle, or it could have been

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

73

L. Stidhum

1       towards the end when you learned you were pregnant?

2

3       A    As far as after my pregnancy announcement,

4    I definitely remember what transpired.  In those

5    little hiccups we had, I don't remember when, no.

6       Q    Andris was one who never directly made any

7    comments to you about your pregnancy, correct?

8       A    Not that I remember, no.

9       Q    In terms of the two incidents you had

10   prior to the time you learned you were pregnant, did

11   you have similar incidents after the fact?

12           MS. TROY:  Objection.  Ambiguous.

13      Q    You can answer.

14      A    I don't recall.

15      Q    One way or the other, correct?

16           MS. TROY:  Objection.  Ambiguous.

17      Q    You can answer.

18      A    I don't know what you mean by, One way or

19   the other.

20      Q    It could have happened that you two had a

21   little argument or it could not have happened, you

22   don't remember either way?

23      A    Honestly after announcing my pregnancy,

24   there wasn't much arguing.  It was more like I was

25   doing a lot of crying and upset, so I can't really

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

74

L. Stidhum

1       say that yes one way or the other.

2            Q    When you say you cried, did you cry

3       physically in front of Guzman?

4            A    Absolutely.  Multiple times, and in front

5       of Isaac as well.

6            Q    When you cried in front of Guzman, what

7       happened?

8            A    Nothing, absolutely nothing.  He would

9       have no emotion.

10           Q    Did he ask why you were crying?

11           A    No.

12           Q    Your job responsibilities at the

13      dealership never changed, correct?

14           A    No.

15           Q    Are you currently living with the father

16      of your children?

17           A    No.

18           Q    The father of your children is not in any

19      way related to Hillside Auto Outlet, correct?

20           A    No.

21           MS. TROY:  We are going to strike any

22           irrelevant questions and answers after the

23           deposition.

24           MR. KATAEV:  Feel free to make that motion

A1522

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 76 of 294 PageID #: 2186

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

75

1            L. Stidhum

2         whenever you're ready, but don't do it during

3         the deposition.

4    BY MR. KATAEV:

5         Q    You never had any relationship with Andris

6    Guzman outside of work, correct?

7         A    Absolutely not.

8         Q    The compensation rate that you had, other

9    than the 5 percent bonus after Jay left, remained

10   the same, correct?

11        A    I'm sorry, what was that?

12        Q    The compensation structure that you

13   outlined to me, other than the 5 percent bonus going

14   away after Jay left, remained the same, correct?

15        A    Yes.

16        Q    You sold a car, you got an extra $150,

17   correct?

18        A    Yes.

19        Q    That bonus was not discretionary, correct?

20        A    No.  It took me months to get it.

21             MS. TROY:  I don't think she understood

22        your question honestly.

23        Q    When you say it took you months to get it,

24   what did you mean?

25        A    It took me months to get a bonus in

A1523

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

76

                            L. Stidhum

1

2     general.

3          Q    Right.  The 5 percent type of bonus,

4     right?

5          A    No.  That wasn't a bonus.  That was

6     something promised upon being hired.  The bonus was

7     something that came of the blue because I was, like,

8     at 20 cars in the middle of the month and he was

9     like, If you hit 30, I will give you an extra

10    thousand.

11         Q    When you say it took you months to get it,

12    you mean it was only offered to you after working

13    months at the dealership?

14         A    Correct.

15         Q    Your duties remained the same from May of

16    '18 until January of '19, correct?

17         A    Yes.

18         Q    Your pay remained the same except for the

19    5 percent issue from May of '18 to January of '19,

20    correct?

21              MS. TROY:  Objection.  Asked and answered.

22         She may answer again.

23         A    Yes.

24         Q    The 5 percent change occurred prior to

25    your pregnancy, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

77

L. Stidhum

1
2      A    Yes.

3      Q    Your position remained the same from May
4  of '18 until January of '19, correct?

5           MS. TROY:  Objection to form.  Asked and
6           answered twice, but she may answer again.

7      A    Yes.

8      Q    Were you ever disciplined at Hillside Auto
9  Outlet for any work-related issue?

10      A    No, not that I recall.

11      Q    Were you ever suspended from work?

12      A    No, I was not.

13      Q    Did you ever receive a performance
14  evaluation?

15      A    No.

16      Q    What was the most number of cars that you
17  sold in a given week?

18      A    I want to say like seven to -- honestly, I
19  don't recall but the records will show exactly, but
20  I know it was definitely more than seven.

21      Q    In your understanding, were you in any way
22  the top salesperson at the dealership?

23      A    I was.

24      Q    At all times?

25      A    Yes, up until December of 2018.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 79 of 294 PageID #: 2189

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

78

L. Stidhum

1

2      Q     When Andris started making you wait longer

3      in December of '18, did you confront him about it?

4      A     Yes, I did.  I did ask him why is he

5      making my customers wait longer.  I would constantly

6      press the issue of, What's going on with this

7      customer, or he would constantly tell me, You have

8      to wait, you have to wait, there's other people

9      here, and I'm like, it wasn't like this.  These

10     people are getting antsy and it happened on multiple

11     occasions that I would have these conversations with

12     him.

13     Q     He never said anything to you about your

14     pregnancy during those conversations, correct?

15     A     I mean, not that I can recall.  What is

16     there to say?

17     Q     To your knowledge, is Andris Guzman

18     married?

19     A     I have no idea.

20     Q     To your knowledge, does Andris Guzman have

21     children?

22     A     No clue.

23     Q     What basis do you have to believe that

24     Andris Guzman made you wait longer solely because of

25     your pregnancy?

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 80 of 294 PageID #: 2190

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

79

L. Stidhum

1

2      A    It happened only right after I announced

3      my pregnancy, that would be the first reason why,

4      and not to mention, like I said before, he was my

5      point of contact once Jay was fired so I can tell

6      the difference in, you know, from that time and

7      after I announced my pregnancy.

8              It wasn't -- I had customers waiting

9      so long after Jay quit.  From that time after my

10     pregnancy, I know it's clear as day that that's what

11     was going on.  I was a top saleswoman at a point and

12     I went from being the top salesperson to being the

13     one with the least cars out.  It doesn't add up.

14     Q    Isn't it true that December is a slow time

15     of the month for selling cars because it's cold out?

16     A    I wouldn't say because it's cold out.  I

17     honestly believe we sold a lot of cars, anywhere

18     between 45 to 60 cars a month.  Sometimes even

19     exceeded 65 cars, so it's kind of hard to say

20     because if I'm not mistaken, yes, November we sold

21     the most cars but the month prior to that we

22     probably sold the same amount of cars in that store

23     as December.

24     Q    How would you know or keep track of the

25     number of cars sold in total through the dealership?

A1527

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

80

L. Stidhum

1

2          A    We had a board in Serge's office that we

3     would keep track of how many sales everybody had.

4     So each salesperson's name would be up there and we

5     would put like a tally mark and keep track of all

6     the sales.  I always wanted to make sure I was

7     number one so I would always be the one keeping

8     track of that board.

9          Q    It's true, isn't it, that prior to your

10    pregnancy, Andris Guzman would frequently keep

11    customers waiting longer than necessary, correct?

12         A    I don't believe that to be correct.  Isaac

13    was every involved and it felt like it was something

14    he did once he saw that Isaac wasn't looking over.

15    He would always be very active in our daily routine.

16    He would ask us, What's going on with this customer,

17    greet the customers and do things like that.  I

18    can't say that that's entirely true, no.

19         Q    I will place up on the screen what will be

20    marked as Defendant's Exhibit 2.  I will represent

21    to you, Ms. Stidhum, that this is the complaint that

22    was filed in this case.  I'm going to scroll up to

23    show the header of page six for your esteemed

24    counsel's edification.

25    (Defendant's Exhibit B, Marked for Identification.)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                              81
 1                          L. Stidhum

 2       BY MR. KATAEV:

 3            Q    I want to focus your attention on the

 4       following paragraphs.

 5            A    Can I review the entirety of the document

 6       before answering anything?

 7            Q    You know what, we can take a break for you

 8       to do it.  Your esteemed lawyer has a copy of the

 9       complaint, I'm sure.  So we are going to take a

10       quick break.  It's 11:14.  We will get back on at

11       11:30.

12            A    Okay.

13            Q    That way you will be ready to answer any

14       questions.  I will tell you that my questions, for

15       the record, are solely at this point related to

16       paragraphs 35 through 38, okay?

17            A    All right.

18            Q    I will leave it up on the screen for you.

19            MR. KATAEV:  We are going to take a break.

20       Off the record.  Back at 11:30.

21       (Whereupon, an off-the-record discussion was held.)

22       BY MR. KATAEV:

23            Q    Back on the record.  Ms. Stidhum, welcome

24       back.  I want to ask you before we get back into the

25       questions, during the break, did you have an
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

82

L. Stidhum

1    opportunity to review the complaint in full?

2         A    Not in full.  I skimmed through it.

3         Q    During this break and the break before

4    that, without divulging any of the actual

5    conversations you had, did you discuss your

6    testimony with your counsel?

7         A    No.

8         Q    Okay.  My question was:  Isn't it true

9    that even prior to the time that you disclosed your

10   pregnancy, Andris Guzman would take a long time with

11   prefilling financing applications for customers?

12        A    So yes, that is partially true, that's why

13   I said that before.  He was just getting into Jay's

14   role at the dealership so he was still kind learning

15   the ropes so that's why Isaac saw I was pretty fast

16   with the computer.  He sat down with me in his

17   office and showed me how to run credit.

18              You're transferring information from

19   paper to the computer, so he did give me my access

20   at that point, but of course over time, we are

21   talking four months later that we went back to this.

22   Of course over time, Guzman learned how to navigate

23   through it a little quicker but at the time I

24   announced my pregnancy, it doesn't make sense why he

A1530

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 84 of 294 PageID #: 2194

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

83

L. Stidhum

1  would backtrack, if you get what I'm saying.

2

3       Q    I understand that.  That's a fair

4  explanation.  It's true, is it not, that throughout

5  the time once Guzman learned how to do everything

6  properly, he generally would take 20 minutes to

7  handle these applications?

8       A    More or less.

9       Q    Your complaint is that after you disclosed

10  your pregnancy, it would take anywhere from 40 to 60

11  minutes, correct?

12       A    Right or longer.

13       Q    You allege in your complaint that as a

14  result of the longer wait times that we just

15  discussed, most of your customers would walk out and

16  not complete their purchase, correct?

17       A    Yes.

18       Q    How do you know that it's because of the

19  wait times that they decided to walk out?

20       A    Generally, we are the ones who would go

21  back to them and tell them, You don't qualify, or

22  You need X amount of dollars down or you can't get

23  this car, you would need that car.  It would be a

24  conversation between the sales manager and the

25  salesperson.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

84

L. Stidhum

1

2        They wouldn't really want to jump

3    into the deal unless they had to, so it's like, I

4    wouldn't get to speak to my sales manager or if I'm

5    like, Hey, hold on, my sales manager got something,

6    at this point, they are frustrated, they are walking

7    out the door.

8        Q    Did any customers actually tell you, We

9    don't want to purchase anything from you because it

10   took you to long to get back to us?

11       A    Yes, it happened a couple of times.

12       Q    Do you remember the names of any of those

13   individuals?

14       A    I don't.  I have gone through hundreds,

15   maybe thousands of customers, I don't.

16       Q    Are you familiar with the lead management

17   system at the dealership?

18       A    Lead management system?  The CRM that was

19   used?

20       Q    CRM meaning customer relationship

21   management, right?

22       A    Yes.

23       Q    You're familiar with that program?

24       A    Yes.

25       Q    That program is used to track every single

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 86 of 294 PageID #: 2196

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

85

L. Stidhum

1      potential customer that comes in and whether or not

2      it results in a sale, correct?

3

4          A    Not necessarily correct.  The business

5      development center would focus on their appointments

6      because that's what they're paid on.  They are not

7      paid on walk-in customers, so any walk-in customers

8      are not all accounted for.  I can't say that's

9      completely true.

10         Q    How many walk-in customers in a month do

11     you think come in that are not accounted for?

12         A    Honestly, Saturdays or the weekend were

13     our busiest time because we on a main strip,

14     Hillside has a bunch of dealerships.  I would say

15     it's like a 40/60 or 50/50 because that weekend

16     volume is equivalent to the whole week's worth of

17     volume.  I can't really say how many customers.

18              It was almost equal because of where

19     we were.  Location is everything in this business.

20     We had dealerships in front of us, beside us, down

21     the street from us.  We would have customers leaving

22     one spot to come to us that didn't have an

23     appointment.  I can't put a number on it.

24         Q    Your testimony today is that walk-ins were

25     not accounted for in the CRM system?

A1533

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 87 of 294 PageID #: 2197

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

86

L. Stidhum

1

2    A    Not every single one.  Sometimes they

3    would log them in, sometimes I would not see them

4    logged in.

5    Q    What be the reason for not logging someone

6    in versus logging them in?

7    A    I can't say.  I didn't work in that

8    department.  I would say it's laziness.

9    Q    Are you speaking from your subsequent

10   experience as a BDC manager?

11   A    Yes.

12   Q    Paragraph 53 of the complaint, you said in

13   December and January of '18 and '19, you would

14   constantly call Guzman to ask how long customers

15   would wait; do you see that?

16   A    Yes.

17   Q    When you say call, do you mean physically

18   with the cellphone?

19   A    No.  I mean call over to him.  He was at a

20   podium.  Our desks were diagonal from each other.

21   Q    What would happen when you would ask

22   Guzman how long?

23   A    He would tell me I would have to wait,

24   that there are other customers here.

25   Q    Did you observe at the same time that this

A1534

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 88 of 294 PageID #: 2198

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

87

1            L. Stidhum

2    was happening that Andris Guzman would help a

3    different salespeople out and provide information?

4         A    Yes.  There was multiple occasions where I

5    would see that a customer came in after my customer

6    and he still hasn't touched the application or the

7    folder was still sitting up top.

8         Q    With which salespeople did that occur with

9    that you can recall?

10        A    It happened with Sean because me and Sean

11   were kind of, I wouldn't say on the same level.  He

12   was a little bit of my competition at a point.  And

13   David Parsons, and David Manrique also witnessed it

14   because he was selling more cars than me, and he was

15   kind of not the best salesperson, I would say.  He

16   was always second-to-last or last.  It was something

17   that everybody kind of witnessed.

18        Q    During this time, Isaac was out on a

19   month-long vacation?

20        A    Correct.

21        Q    That's the reason why you couldn't go to

22   Isaac to assist you with certain applications,

23   correct?

24        A    Yes.

25        Q    Did you attempt to go to Serge to run

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

88

L. Stidhum

1       applications instead of with Andris Guzman?

2

3       A    Yes, I did.  It's -- kind of plays each

4       other hand in hand because Guzman's job was to run

5       the credit and if Serge was overwhelmed, he would

6       submit the application.  So whatever credit that

7       Guzman did run was already at Serge, and he's like,

8       I'm busy, I can't do this right now, you have to

9       give it to Guzman, you have to wait on Guzman, so

10      that's what I had to do.

11      Q    Whenever a sale was made, you would

12      receive a commission, correct?

13      A    Yes.

14      Q    To your knowledge, similarly, Serge would

15      also receive a commission, right?

16      A    Yes.

17      Q    To your knowledge, what about Guzman, was

18      he not also entitled to a commission?

19      A    He was.

20      Q    Is it your testimony that Andris Guzman

21      purposely made you wait such that he suffered and

22      didn't get commissions on sales?

23           MS. TROY:  Objection.  Argumentative.

24      Q    You can answer.

25      A    Honestly, it's hard to answer that because

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

89

L. Stidhum

1   it's, like, I can't really understand why he would

2   put himself in that position either because one

3   person wins, we all win.  He didn't really care.  He

4   took on whoever he felt he wanted to take on first.

5       Q    Do you believe that he prioritized other

6   salespeople over yours because he felt that those

7   customers that those salespeople had were more

8   qualified?

9       A    It's hard to answer that question.  There

10  is no way to qualify a customer by looking at them.

11  If he's not running my credit, how is he going to

12  make that argument?

13      Q    Isn't it true that sometimes people who

14  work at dealerships stereotype customers and make

15  assumptions about their creditworthiness by looking

16  at them?

17      A    As being in a sales manager position, I

18  learned that that's not the way to properly manage.

19  I have seen people come in raggedy with 800 credit

20  scores and $10,000 to put down on a car, and some

21  people that dressed flashy and don't have anything

22  or don't even have a piece of credit.  I can't make

23  that argument because, as a sales manager in

24  previous dealerships, I would never do that.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 91 of 294 PageID #: 2201

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

90

                              L. Stidhum

1

2        Q    You have seen other people make those

3   stereotypes, correct?

4        A    Again, I can't really say yes or no.

5        Q    Fair enough.  You spoke with Isaac when he

6   returned from vacation in January of '19?

7        A    Yes.

8        Q    What was your conversation with him?  What

9   did you say to him and what did he say to you?

10        A    I told him what was going on.  I showed

11   him the amounts of cars I have out and he didn't

12   really understand what was going on either.  And I

13   was promised that when he would return that I was

14   going to be promoted to sales manager, so I was

15   trying to hang in there.

16              So when he came, I did ask him, I was

17   like, Look, if you have no desire promoting me as

18   sales manager, then I don't really feel that I want

19   to work here anymore unless you're going to give me

20   more of my commission and not put me as a sales

21   manager, and he kind of didn't have any answer for

22   it, he said we would talk about it later.

23              At that point, I was tired of being

24   given the runaround and not making money.  As a

25   pregnant woman and being 19 years old, it's hard to

A1538

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

91

L. Stidhum

1
2       be put in that position and not be scared.  Like, I
3       was 19 years old having my first kid and I'm getting
4       played at this place I thought I was going to grow
5       with.  I can't really -- it didn't make sense for me
6       to stay there any longer at that point.
7            Q    To your knowledge, is Andris Guzman still
8       employed at this dealership?
9            A    I have no idea.  I don't speak to them.
10           Q    To clarify, your testimony as to the basis
11      for your belief that Andris Guzman made you wait
12      longer solely because of your pregnancy was just
13      because it happened that you waited longer after you
14      disclosed your pregnancy than before, correct?
15           A    I'm sorry, one more time.
16           MR. KATAEV:  Read it back, please.
17      (Whereupon, the referred to question was read back
18                   by the reporter.)
19           MS. TROY:  Objection to form.
20      BY MR. KATAEV:
21           Q    You can answer.
22           A    That's not correct.  There is more to it.
23      It wasn't just the longer wait period.  He obviously
24      had Isaac's access to Dealertrack as well and he
25      refused to give me the password.  Like, he didn't

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

92

L. Stidhum

1    feel the need to, and not to mention the decrease in

2    my sales played a part in Isaac not wanting to

3    promote me to sales manager as well.  It goes hand

4    in hand as to why I believe it was pregnancy

5    discrimination.

6    

7         Q    You're alleging, as far as I understand,

8    that Andris Guzman was the only person who

9    discriminated against you based on your pregnancy,

10   correct?

11             MS. TROY:  Objection.  Calls for a legal

12        conclusion.

13        A    Not really.  I do believe Isaac kind of

14   discriminated against me as well by not promoting

15   me.  It is what it is at that point, but he did not

16   do anything to fix the issue.  He did not -- the

17   promotion can be taken away from anyone so I can't

18   hold it to that, but I do believe it had something

19   to do with my pregnancy as well because it was

20   something I was promised and was working towards

21   getting.

22             I texted him while he was on

23   vacation.  He responded but told me he would handle

24   it at a later time which I get it, you're on

25   vacation with your family.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 94 of 294 PageID #: 2204

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

93

                            L. Stidhum

1

2      Q    With respect to the promotion, when was

3   the first time that was a discussion?

4      A    It was sometime in November.  We were

5   talking about it because he was preparing for us for

6   his vacation for a month.  He was kind of the dad of

7   the dealership so he was watching over everything,

8   he made sure everything stayed afloat.

9           It was definitely sometime in

10  November and he told me when he got back, we would

11  discuss it and go over what exactly was going to

12  happen at that point, but this is way before the

13  pregnancy discrimination and everything.

14     Q    This is before the pregnancy announcement?

15     A    Right.

16     Q    Who was the sales manager at that time?

17     A    It was -- at that time, it was kind of

18  weird because Guzman was the sales manager slash

19  finance or whatever, he was kind of doing both.

20  It's a hard question to answer because then he

21  brought in Ali while he was gone.  It was just a

22  mess.  I can't really answer that question

23  truthfully.  It was Guzman and Ali for a short

24  period of time.

25     Q    And so the discussion was that when Isaac

A1541

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

94

                         L. Stidhum

1
2      returned in January of '19, there would be

3      discussion about who is going to fill the role of

4      sales manager, correct?

5           A    Pretty much.

6           Q    Was the discussion that you would

7      definitely become sales manager?

8           A    Yes.  It wasn't a discussion of who would

9      fill the role.  It was him telling me he was going

10     to make me the sales manager and that was pretty

11     much his purpose of showing me how to run credit and

12     read credit because he was the one that told me how

13     to do both.  It's a whole bunch of numbers and

14     lines.  It's not something that you can understand.

15          Q    When Isaac returned in January of '19,

16     what was the next discussion had about the sales

17     manager position?

18          A    I told him if he had no desire to promote

19     me, then I wanted a raise or I would leave because I

20     was offered that position by Ali making double the

21     commission.

22          Q    What did he say in response?

23          A    I don't recall.  I remember him saying we

24     will talk about more at a later time.  I was fed up

25     at that point because how much more time do you want

A1542

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 96 of 294 PageID #: 2206

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

95

                          L. Stidhum

1

2    me to waste not making money.

3         Q    The truth is you didn't wait for a

4    decision, correct?

5         A    It felt like his answer was kind of clear

6    as day.  If he wanted to give me that position, he

7    would have given it to me at that point.

8         Q    He didn't expressly tell you, I'm not

9    giving you the position, correct?

10        A    I don't recall.

11             MR. KATAEV:  Off the record.

12   (Whereupon, an off-the-record discussion was held.)

13   BY MR. KATAEV:

14        Q    We are going to continue.

15             Andris Guzman did not have any

16   authority to discipline you in any way, correct?

17        A    Not that I know of.

18        Q    Andris Guzman did not have the power to

19   fire you, correct?

20        A    Not that I know of.

21        Q    Andris Guzman did not have the power to

22   change your pay, correct?

23        A    No.

24        Q    Andris Guzman did not have the power to

25   change the terms and conditions of your employment,

A1543

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

96

1                         L. Stidhum
2       correct?
3            A    No.
4            Q    Okay.  Did you ever tell Andris Guzman, I
5       think you're doing this because I'm pregnant?
6            A    I want to say yes, if I'm remembering
7       correctly.  I do believe I made that statement, yes.
8            Q    What was his response?
9            A    Honestly, he was a very unemotional
10      person.  Like, he would look at you with blank eyes.
11      I don't believe I got any response out of him.
12           Q    That's the way he was towards everybody,
13      correct?
14           A    Yes, for the most part.
15           Q    Was anyone else present when you
16      confronted him?
17           A    I don't recall.
18           Q    Did you confront him at the podium?
19           A    Most likely.
20           Q    Did you complain to Isaac that you felt
21      that the actions being taken against you were
22      because of your pregnancy?
23           A    I'm not sure if I used the words to my
24      pregnancy, but I told him that ever since I
25      announced it, that this -- XY and Z has been

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              97
                              L. Stidhum
1    happening.

2        Q    What was his response?

3        A    Honestly, I don't remember.  I feel like

4    it was more of, We will talk when I get back, and no

5    talk happened.

6        Q    What about the fact that you had to wait

7    longer for applications to be done makes you believe

8    it was discriminatory?

9        A    I'm sorry, one more time.

10       Q    What about the fact that you had to wait

11   longer for certain customer applications made you

12   believe it was discriminatory?

13       A    Like I said before, I worked with him for

14   months now and I have seen, you know, his growth in

15   the business, I have seen when he was not very good

16   and very, very slow.  Like, I watched him grow in

17   the business so for him to backtrack after my

18   announcement it doesn't really make any sense.

19       Q    Did anyone at Hillside Auto Outlet make

20   any statements to you that you believe suggest

21   discrimination?

22       A    Yes.  Ali and David and actually, I did

23   have somebody working there at the time who was a

24   friend of mine who would always try to calm me down

A1545

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

98

L. Stidhum

1
2    when I would get upset or cry about the situation.
3    And she was like, Yeah, ever since this happened and
4    ever since you announced your pregnancy, this has
5    been going on.
6        Q    What is that person's name?
7        A    Brianna.
8        Q    What did Ali say to you that made you
9    believe it was a suggestion of discrimination?
10       A    He was kind of telling me about this
11   position he was offering so I didn't have to deal
12   with this.
13       Q    Other than that, anything else?
14       A    Not that I can recall.  It was more him
15   telling me that I wouldn't have to deal with these
16   types of things.
17       Q    What about David Manrique?
18       A    He told me that it's clear, because I
19   mean, his numbers were where my numbers usually were
20   so it's clear what was going on.  He actually
21   thought that it may be a strategy to get me out
22   sooner because they knew I would not be able to work
23   at a certain point.
24       Q    Why do you believe the dealership cared
25   that you wouldn't be able to work at a certain

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

99

L. Stidhum

1    point?

2    

3        A    I was bringing in the most numbers.  We

4    hit milestones that they never hit before me working

5    there.  They sold more cars than they sold prior to

6    me working there.

7        Q    As a business, wouldn't the dealership

8    want to maximize the amount of sales before you

9    left?

10           MS. TROY:  Objection.  Argumentative.

11       Q    You can answer.

12           MS. TROY:  Rephrase your question.

13       Q    I'm not rephrasing.  You can answer.

14       A    One more time.

15           MR. KATAEV:  Read it back.

16   (Whereupon, the referred to question was read back

17                by the reporter.)

18       A    Of course.  I would believe that too but

19   again, it's not something that was done by the whole

20   dealership.  It was something done by an individual,

21   so I mean, it was more of a personal thing against

22   me while being pregnant.

23       Q    And personal on whose part, Andris

24   Guzman's, right?

25       A    Right, and also not to mention there was

A1547

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 101 of 294 PageID #: 2211

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        100

                                L. Stidhum

1
2     somebody who was working there that was pregnant in
3     the DMV department and she was pregnant and she was
4     probably there not even a week after -- let me
5     rephrase that.
6                   She left maybe a week or even sooner
7     than a week of me working there, after me working
8     there, and I remember her storming out upset, so I
9     have reason to believe this might be a strategy used
10    to get out pregnant women.
11         Q    What was that employee's name?
12         A    Lily.  I don't remember her last name.
13         Q    What about Brianna, did she make any
14    statements that you believe suggested
15    discrimination?
16         A    Brianna was more a comforting friend,
17    like, I think this is going on because you're
18    pregnant.  Maybe they want to get somebody else in
19    to fill your place and stuff like that.
20         Q    You realize that one you gave birth and
21    went out on leave, the dealership would hire a
22    salesperson to take your place during that time?
23         A    Of course.  That's why it doesn't make
24    sense to me why things would go this way.
25         Q    You're saying that Andris Guzman was

A1548

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 102 of 294 PageID #: 2212

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              101

```
 1                          L. Stidhum
 2      behind all of this?
 3            A     Yes, and partially Isaac as well.
 4            Q     Are there any documents that you believe
 5      suggest discrimination?
 6            A     I mean, it's more verbal so I can't say
 7      documents besides my paystub that show the decrease
 8      in pay of four to $500 a week.
 9            Q     Any other documents?
10            A     Not that I can think of.
11            Q     Why do you believe the paystubs suggest
12      discrimination?
13            A     It shows a drastic decrease in my pay.
14            Q     You're saying that your paystubs show
15      consistent amounts and they don't fluctuate up and
16      down?
17            A     Not necessarily consistent, that's not
18      what I said.  It's within those timeframes I did --
19      my pay did drop.  Of course the first couple of
20      months I was still getting the hang of things and
21      learning the ropes.  In between that time, I was
22      capitalizing at being a salesperson.  It was most
23      money I ever made at that time.
24            Q     We are going to get into the paystubs.
25                  Was there any other event or
```

A1549

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                     102

                                    L. Stidhum

 1

 2      circumstance that you believe was discriminatory?

 3           A    There was more than one instance where I

 4      had to say something to Guzman about my customers'

 5      waiting and stuff like that.  This is years ago, so

 6      I can't say word for word.

 7           Q    I understand.  Other than what you

 8      testified about so far, can you identify all the

 9      other times that you claim you were discriminated

10      against?

11               MS. TROY:  Excuse me, sorry.

12               MR. KATAEV:  Read it back, please.

13      (Whereupon, the referred to question was read back

14                    by the reporter.)

15           A    Again, it wasn't something -- it was more

16      work-related than anything.  The longer wait times

17      is not something that I can pinpoint.

18           Q    Is it fair to say that the complaint lists

19      all instances of discrimination against you?

20           A    No.

21           Q    Same question with respect to your

22      interrogatory responses?

23           A    I'm sorry.

24           Q    Fair to say that your interrogatory

25      responses list all instances of discrimination

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

103

                              L. Stidhum

1

2    against you?

3         A     No, because I mean, it's a general period

4    so I can't say that everything is written there.

5         Q     Do you believe that you were treated less

6    favorably than other employees?

7         A     At that point, yes.

8         Q     That's even though you were given special

9    access to Dealertrack that no other salesperson was?

10             MS. TROY:  Objection.  Argumentative.

11        Q     You can answer.

12        A     Repeat the question.

13   (Whereupon, the referred to question was read back

14                    by the reporter.)

15        A     So I mean, of course up until my

16   announcement, yes.  It's not just that Dealertrack

17   was taken away.  It was the decrease in my pay.

18             MR. KATAEV:  Let the record reflect that

19        every time Plaintiff's counsel has objected, I

20        observe a lot of glances towards the screen and

21        other indications that there is something going

22        on.

23             MS. TROY:  Objection to that whole line.

24             MR. KATAEV:  If it's found that

25        Plaintiff's counsel is coaching the witness by

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

104

```
1                      L. Stidhum
2       typing instructions or answers on the screen
3       during the deposition, an appropriate motion
4       will be made to sanction Plaintiff and her
5       counsel.  I'm warning you if that's what you're
6       doing, please stop.  I will obtain the forensic
7       evidence to prove it.
8             MS. TROY:  I'm going to object to that
9       whole line of instruction.  Completely
10      inappropriate.
11            MR. KATAEV:  I will be making an
12      appropriate application for forensic evidence.
13      The judge will not be pleased by what is found
14      on that computer because nothing you delete
15      from there is actually deleted.  I'm just
16      letting you know.
17            MS. TROY:  Again, I object to that whole
18      line.
19            MR. KATAEV:  Okay.
20               My client has observed this multiple
21   times and has noted it in notes to me, and I have
22   observed it myself just now.  I'm warning you,
23   Counsel, if you're typing notes to her on the
24   screen, stop doing that.  It's not allowed.
25            MS. TROY:  I'm not doing that.
```

A1552

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

105

L. Stidhum

1      MR. KATAEV:  Good.

2           Read back the last question.

3      (Whereupon, the referred to question was read back

4                 by the reporter.)

5  BY MR. KATAEV:

6           Q    You admit, however, that when you were

7      provided access to Dealertrack you were the only

8      salesperson that was provided that, correct?

9           A    Yes.

10          Q    In that regard, you were treated more

11     favorably, correct?

12          A    Right.

13          Q    Can you identify any other ways in which

14     you were treated more favorably at the dealership

15     while you worked there?

16          A    I mean, I guess the fact of me getting the

17     $1,000 bonus and no one received any bonus.

18          Q    Can you identify all the employees that

19     you believe were treated more favorably than you?

20          A    I mean, are we speaking after my

21     announcement or prior to my announcement?

22          Q    After the announcement.

23          A    After the announcement, I can't really say

24     anybody was treated more favorably.  I can say that

A1553

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

106

L. Stidhum

1    they were taken -- their customers were taken or

2    tended to a little more promptly.  I can't say

3    favorably because still nobody did get Dealertrack

4    access or bonuses or anything like that.

5        Q    With respect to that answer, that's solely

6    in relation to Andris Guzman processing the

7    financing application, correct?

8        A    Right.

9        Q    It's not the case with Serge, after

10   disclosing your pregnancy, Serge processed all the

11   applications whether it came from you or someone

12   else the same way, correct?

13       A    Pretty much.  He took them as they went.

14       Q    Was there anyone else that took longer to

15   process the financing applications with you than

16   with anyone else?

17       A    No.

18       Q    That's the only way any employee was

19   treated more favorably than you, correct?

20       A    Yes.

21       Q    What is your understanding as to why all

22   the other employees were being treated more

23   favorably than you?

24       A    Again, I didn't say I was being treated

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

107

L. Stidhum

1    favorably.  I said that he would take them or tend

2

3    to them more promptly.

4         Q    Why do you believe he did that?

5         A    Again, because I don't know if it had

6    something to do personal or if it was with my

7    pregnancy.  It's not something that I can really

8    answer.  I don't know why he would do that.  If one

9    of us makes a sale, we all get a commission.  It's

10   not something I can really understand either.  I

11   don't know if he wanted me out of the store because

12   I pregnant.  I don't know.

13        Q    Fair enough.  Do you know the educational

14   background of Andris Guzman?

15        A    No.  I don't know anything personal.

16        Q    Do you know Andris Guzman's work

17   experience with dealerships?

18        A    No, I do not.

19        Q    Do you know if he had any work experience

20   working for any other dealership?

21        A    I remember being told he worked at Major

22   World or something.  That's about it.

23        Q    Do you have any knowledge about Hillside

24   Auto Outlet's policy against discrimination?

25        A    No.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

108

L. Stidhum

1

2      Q    Did you ever sign any document

3    acknowledging receipt of a policy against

4    discrimination?

5      A    I believe so.  We had an employee packet.

6    I'm pretty sure it was in there somewhere that I

7    didn't really see.

8      Q    Do you still have a copy of it?

9      A    No, we weren't given a copy of it.

10     Q    Fair to say that when you had a

11   conversation with Isaac about the fact that you felt

12   your pregnancy was playing a role in what was going

13   on, you never really followed up and you decided to

14   quit, correct?

15          MS. TROY:  Objection to form.

16     Q    You can answer.

17     A    The question one more time.

18   (Whereupon, the referred to question was read back

19              by the reporter.)

20     A    I mean, at that point I wouldn't think I

21   had to follow up with something when somebody tells

22   me, We are going to speak about this later or, Come

23   Monday, we are going to have a conversation.  It

24   wasn't something I felt the need to follow up on.

25   No, I did not follow up with it.  I only asked later

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                      109

                              L. Stidhum

1

2      on about my commission I was owed on cars that I did

3      not get paid on.

4          Q    Understood.  Your complaint alleges that

5      you were discriminated against on the basis of your

6      sex or gender, correct?

7              MS. TROY:  Objection.  She can answer if

8          she understand.

9          A    Yes, I don't get it.

10         Q    In your complaint, you say you were

11     discriminated against, right?

12         A    Yes.

13         Q    What is the basis upon which you're saying

14     you were discriminated against, on what grounds?

15         A    My pregnancy.

16         Q    Are you also saying you were discriminated

17     against because of your sex or gender?

18         A    I mean, doesn't that play hand in hand

19     that only women can get pregnant?

20         Q    I'm asking you:  Is that reason why you're

21     saying you were discriminated against?

22             MS. TROY:  Objection.  She can answer.

23         A    I guess.

24         Q    Are you also alleging that you were

25     discriminated against based on disability?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                              110
                          L. Stidhum

1

2        A    I don't think being pregnant is a

3    disability, is it?

4             MS. TROY:  Objection.  Also calls for

5        legal conclusion.

6        Q    I can't answer your question, Ms. Stidhum,

7    but I will take the answer from what you provided,

8    okay?

9        A    Okay.

10       Q    Do you claim that you were discriminated

11   against on any other basis?

12       A    No.

13       Q    At the time you left, with respect to your

14   pregnancy, were you showing?

15       A    No.  I was not even three months, I

16   believe.

17       Q    You acknowledge that Andris Guzman was not

18   a decision-maker at the dealership, correct?

19       A    Yes and no.  I mean, he played a part in

20   making decisions at some points.

21       Q    The question is how?

22       A    I mean, it was kind of -- it's kind of

23   hard to say.  It was a team effort.  It would be

24   something that was a conversation between whoever it

25   was between, whether it was just management, he

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              111
                              L. Stidhum
1         would definitely be involved in those decisions.
2         For the most part, yes, Isaac was the one who made
3         decisions.
4              Q    In your complaint, you seek damages of an
5         amount over two million dollars, right?
6              A    Yes.
7              MS. TROY:  Objection.
8              Q    You're generally seeking over two million
9         dollars for this case, correct?
10             A    Yes.
11             Q    What is the basis for you seeking those
12        damages?
13             A    I'm not sure.  That's something to discuss
14        with my attorney.
15             Q    Can you describe any injuries that you
16        sustained as a result of any unlawful
17        discrimination?
18             A    I mean, besides being depressed, upset,
19        stressed, scared even because I mean -- this is
20        something that Isaac told me that stuck with me when
21        I told him I was leaving.  He told me the grass
22        wasn't always greener on the other side.  For the
23        first couple of months it wasn't and I was
24        definitely scared.  Those are some of the feelings I

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

112

                            L. Stidhum

1
2      felt.
3          Q    Other than being depressed, upset,
4      stressed and scared, did you suffer any other
5      emotional injuries as a result of any
6      discrimination?
7          A    No, not that I can think of.
8          Q    Would you say you suffered any
9      psychological injuries as a result of the alleged
10     discrimination?
11         A    I'm not sure, but I did experience a lot
12     of anxiety.  I don't want to say one hundred percent
13     it was from this.  It could have been a combination
14     of being pregnant and worried, but I did suffer from
15     a lot of anxiety.
16         Q    Did you suffer any physical injuries as a
17     result of the alleged discrimination?
18         A    No.
19         Q    For the emotional injuries that we had
20     just discussed, what were your symptoms, if any?
21         A    I'm sorry?
22         Q    What were your symptoms, if any, for the
23     emotional injuries we just discussed?
24         A    The same ones; stress, depressed, scared.
25         Q    Did you seek any medical treatment or

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          113

1                        L. Stidhum

2        other healthcare for any of these injuries?

3            A    No.

4            Q    Were you ever hospitalized for these

5        injuries?

6            A    No.

7            Q    Did you ever take any medication for any

8        of these injuries?

9            A    Being pregnant I can't so, no.

10           Q    How are you now?

11               MS. TROY:  Objection.  How is this

12           relevant?  She can answer the question.  It's

13           not relevant and it's going against your seven

14           hours.

15               MR. KATAEV:  Just say, Objection,

16           relevance.

17       BY MR. KATAEV:

18           Q    Please answer the question.

19           A    How am I now?

20           Q    Correct.

21           A    What does that mean?

22           Q    How are you now in terms of your emotional

23       state and the injuries you just talked about?

24           A    Based on that it's been years now, of

25       course I have recovered.  It's been years, I got to

A1561

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

114

1              L. Stidhum

2    experience a lot of great positions.  Everything

3    happens for good reasons.

4         Q    Okay.  Is fair to say that whatever the

5    symptoms or injuries we talked about have now been

6    resolved?

7         A    Yes.

8         Q    None of these symptoms or injuries that we

9    discussed prevented you from working or seeking

10   work?

11        A    Partially.  Even though I was able to get

12   a job immediately after, it wasn't all peaches and

13   cream in the beginning.  I was very stressed out, I

14   was very worried about what's going to happen and

15   like I said, the grass wasn't greener in the

16   beginning but of course they got better.

17        Q    They got better after a few months?

18        A    Maybe a few months, we will say.

19        Q    What made it better after a couple of

20   months?

21             MS. TROY:  Objection as to form.

22        A    Volume, of course, that was my main thing.

23   This whole thing started from my decrease in pay.  I

24   was stressed out about money, I had bills to pay.

25   The volume of the dealership increased definitely

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

115

1                        L. Stidhum

2      helped me deal with everything that was going on.

3           Q    When you refer to volume you mean money,

4      correct?

5           A    The volume of customers and cars sold,

6      yes.

7           Q    The fact that you made more money

8      alleviated the emotional injuries, correct?

9                MS. TROY:  Objection.  Argumentative.  You

10          can answer.

11          A    Yes.  I wouldn't say that making money, it

12     was a weight off my back not having to worry about

13     how I was going to provide for this child I was

14     bringing into this world, yes, but I wouldn't say

15     alleviated everything, no.

16          Q    Do you receive child support?

17          A    No.

18          Q    Have you taken any steps to obtain child

19     support?

20          A    No.

21               MS. TROY:  Objection.  How is that

22          relevant?

23               MR. KATAEV:  It's relevant.

24               MS. TROY:  It's not relevant.

25               MR. KATAEV:  Are you instructing her not

A1563

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                        116
                              L. Stidhum
 1
 2        to answer?
 3               MS. TROY:  She may answer.
 4               MR. KATAEV:  Your objection is noted.
 5        BY MR. KATAEV:
 6          Q    What was the answer to have you taken any
 7        steps to obtain child support?
 8               MS. TROY:  She said, No.
 9          A    No.
10          Q    Why is that?
11          A    Because I --
12               MS. TROY:  Objection as to relevance.  She
13        may answer.
14          A    I haven't felt the need to.  My child's
15        father helps.
16          Q    How does your child's father help?
17          A    He does what he has to do for our child.
18          Q    He provides financially for the child,
19        correct?
20          A    Yes.
21          Q    Okay.  I understand now.
22                    Prior to you working at Hillside Auto
23        Outlet, have you ever sought any treatment from any
24        mental healthcare professionals?
25          A    No.
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

117

```
                              L. Stidhum

 1

 2         Q    Prior to your working at Hillside Auto

 3    Outlet, have you ever experienced any depression,

 4    being upset, stressed or being scared or having

 5    anxiety?

 6         A    No.

 7         Q    Do you use any social media websites?

 8         A    Yes.

 9         Q    Do you use Facebook?

10         A    Not anymore.

11         Q    What about Instagram?

12         A    Yes.

13         Q    What about LinkedIn?

14         A    I have an account but I don't really use

15    it.

16         Q    Twitter?

17         A    No.

18         Q    Snapchat?

19         A    Yes.

20         Q    With respect to these websites, have you

21    ever posted anything about this lawsuit on any of

22    those four websites that you use; Facebook,

23    Instagram, LinkedIn or Snapchat?

24         A    I don't want to say no because I might

25    have early on.
```

A1565

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

118

```
1                         L. Stidhum

2         Q    What is an example of something you may

3    have posted on any of those websites?

4         A    Or maybe I haven't.  Honestly, I'm not

5    sure.

6         Q    Did you ever post anything on Facebook

7    about the fact that you are available to sell

8    someone a car at Hillside Auto Outlet?

9              MS. TROY:  Again, sorry.

10             MR. KATAEV:  Read it back.

11   (Whereupon, the referred to question was read back

12                 by the reporter.)

13        A    Are we talking after or prior to me

14   leaving?

15        Q    During the time you worked there.

16        A    Probably.  I would always try to advertise

17   as best I could.

18        Q    After you left, did you ever post anything

19   about your working experience at Hillside Auto on

20   any of those sites?

21        A    I don't believe so.

22        Q    Isn't it true you made a Facebook post

23   about the fact that you're seeking two million

24   dollars against Hillside Auto on Facebook?

25             MS. TROY:  Objection.  Argumentative.  She
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                      119
                              L. Stidhum
 1
 2          may answer.
 3              A    I don't recall.
 4              Q    Isn't it true that you posted something
 5          like that and later deleted it?
 6              A    Can you give me a timeframe?
 7              Q    Some time after you left and filed the
 8          original lawsuit?
 9              A    Are we talking closer to the time we left
10          or recent?
11              Q    I'm not sure.  Any time after you left?
12              A    I don't recall.
13              Q    One way or the other, correct?
14              MS. TROY:  Sorry?
15              Q    You don't recall one way or the other,
16          correct?
17              A    No.
18              Q    Are you claiming that you're entitled to
19          backpay in this case?
20              MS. TROY:  Objection.  Calls for a legal
21          conclusion.  She can answer if she understands.
22              MR. KATAEV:  Please don't coach the
23          witness with, If she understands.  This is the
24          second time you have done that.
25

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

120

                              L. Stidhum
1
2        BY MR. KATAEV:
3            Q    You can answer the question.
4            A    Honestly, I'm not sure.  I don't know if
5        it was recorded, the customers that I knew that I
6        didn't get paid on, I don't remember.  This is going
7        years back now.
8            Q    I'm going to explain what backpay is in
9        order to help you understand the question so you can
10       answer it, okay?
11           A    Uh-huh.
12           Q    Backpay is an amount of money that you
13       would be entitled to if you continued working at
14       Hillside Auto and didn't have to leave.  It is
15       something that you get to claim, but it's subject to
16       mitigation if your new job that you worked at right
17       after you started paid less than what you received
18       at Hillside.
19                  With that basic explanation --
20                MS. TROY:  The explanation is incorrect.
21           Q    With that basic explanation and subject to
22       any objection that she puts, are you claiming
23       backpay in this case; yes or no?
24                MS. TROY:  Objection.  The instruction as
25           to backpay is incorrect.  She can answer based

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              121

                                  L. Stidhum

1              on your incorrect definition.

2       BY MR. KATAEV:

3          Q    Subject to that objection, you can answer.

4          A    Honestly, I'm not entirely sure because

5       you did say if I was making less at my next job?

6          Q    Correct.

7          A    I don't understand.

8          Q    After you left Hillside Auto Outlet, you

9       went to work at NYC Motor Cars; yes or no?

10         A    Yes.

11         Q    The money that you made at NYC Motor Cars,

12      at least for the first few months, was less than

13      what you were making at Hillside Auto Outlet,

14      correct?

15         A    Yes.

16         Q    Are you claiming the difference for

17      backpay in this case?

18         A    I'm not sure.

19         Q    Is it true that you made less money at NYC

20      Motor Cars initially than when you worked at

21      Hillside Auto Outlet?

22         A    The first couple of weeks, yes.

23         Q    After the first couple of weeks you made

24      more than you ever made at Hillside Auto Outlet,

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                         122
1                         L. Stidhum
2        correct?
3              A     Yes.
4              Q     Did there come a time when you didn't make
5        as much as you made at Hillside Auto Outlet after
6        that?
7              A     I mean, up until Covid.
8              Q     When Covid hit, you weren't making
9        anything for some time, right?
10             A     Right.
11             Q     That was because of Covid?
12             A     Right.
13             Q     After you went back in the workforce after
14       Covid, did you ever make less money than you made at
15       Hillside Auto Outlet again?
16             A     No.  Roughly the same or more.
17             Q     Were there any benefits that you had at
18       Hillside Auto Outlet that you didn't have at any of
19       the subsequent dealerships you worked at?
20             A     No.
21             Q     Had everything worked out with Hillside
22       Auto Outlet and you would have continued working
23       there, how long did you assume you would stay at
24       that job?
25                   MS. TROY:  Objection.  Purely

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

123

                        L. Stidhum

1
2        hypothetical.

3            Q    You can answer.

4            A    Realistically, prior to Isaac leaving, I
5        was pretty happy so who knows.  I probably would
6        have been there until this day.  I probably would
7        have been a finance manager, who knows.

8            Q    What was the longest time period you ever
9        held any prior job?

10               MS. TROY:  Do you have a timeframe,
11           Counselor?

12           Q    Ever in your whole life?

13           A    I want to say two-and-a-half years.

14           Q    That was with?

15           A    NYC Motor Cars.

16           Q    You're saying two-and-a-half years based
17       on your experience initially at Motor Cars and when
18       you returned?

19           A    Yes.

20           Q    You're combining those, right?

21           A    Yes, right.

22           Q    Sometime when you left your prior
23       employment that we discussed earlier in your
24       testimony, you would explain that you sort of saw
25       the writing on the wall with respect to something

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 125 of 294 PageID #: 2235

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        124

                              L. Stidhum

1

2       and you would leave as a result of that, correct?

3                   MS. TROY:  Objection.  Ambiguous.  I have

4              no idea what you're talking about.

5                   MR. KATAEV:  Just, Objection and

6              ambiguous.  The rest is superfluous.

7       BY MR. KATAEV:

8              Q    You can answer the question.

9              A    Can you repeat it?

10             Q    You testified before about sometimes you

11      would be leaving a job because you saw the writing

12      on the wall with respect to something.  For example,

13      at Luxury Motor Cars, you saw there was really no

14      business and you left; do you remember that

15      testimony?

16             A    Yes.

17             Q    With respect to Hillside Auto Outlet in

18      January of 2019, did you see any such circumstances?

19                  MS. TROY:  Objection to the term, Writing

20             on the wall.

21                  MR. KATAEV:  That term is not in this

22             question.

23      BY MR. KATAEV:

24             Q    You can answer the question.

25             A    Again.  It's not -- the question is not

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              125

                            L. Stidhum

1       clear.  Can you rephrase it?  I'm sorry.

2       Q    I'll start with an example.  In January of

4       2019, prior to making your decision to quit, did you

5       notice, for example, there was less business like

6       you noticed at Luxury Motor Cars?

7       A    No, because there wasn't less business.

8       Q    Using that as an example, were there any

9       other circumstances at that time that led to your

10      decision to quit other than what we already

11      discussed?

12      A    No.

13      Q    It's fair to say that all the jobs you had

14      after you left Hillside Auto Outlet, at those jobs

15      you obtained income, correct?

16      A    Yes.

17      Q    What other income from any other source

18      did you obtain other than from those jobs that we

19      discussed?

20          MS. TROY:  Objection.  Ambiguous.

21      Q    You can answer.

22      A    Besides that employment, working -- I did

23      start doing -- being a broker but that was very

24      short-lived.

25      Q    Real estate broker?

A1573

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

126

                          L. Stidhum
1          A    No, automobile broker.
2          Q    Did you earn any income as an automobile
3     broker?
4          A    Nothing but a couple of thousand.
5          Q    Why was it short-lived?
6          A    It was during Covid.  It was trial and
7     error, definitely error.
8          Q    You decided to stop working in that area?
9          A    Yes.  It wasn't paying my bills.
10         Q    Any other source of income?
11              MS. TROY:  Can we have one second?  I will
12         bring her water.
13              MR. KATAEV:  Yes, of course.  Off the
14         record.
15    (Whereupon, an off-the-record discussion was held.)
16    BY MR. KATAEV:
17         Q    You testified that you're no longer
18    employed as of right now, correct?
19         A    Yes.
20         Q    That's because of the birth of your second
21    child, correct?
22         A    More or less.
23         Q    Have you made any effort since the birth
24    of your second child to enter back into the


A1574

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

127

L. Stidhum

1      workforce?

2            A      I have.

3            Q      What efforts did you make?

4            MS. TROY:   Irrelevant.   She can answer.

5            A      That was one of the places that I had

6      mentioned.   I went to NYC Motor Cars -- I'm sorry,

7      NY Luxury Motors.   It didn't work out.   They had no

8      business at all, like not a single soul would walk

9      in for weeks at a time.

10            Q      Other than working there and giving that a

11      go, did you work anywhere else?

12            A      Another place I mentioned, Great Neck

13      Motors Sports.

14            Q      No other employers other than those two,

15      right?

16            A      No.

17            Q      Those are places where you worked.   What

18      about places were you applied for a job?

19            A      I mean, there is quite a few.   Whether or

20      not I would go on the interview is a different story

21      after doing my research about the places.   Really

22      the only job offer that I turned down was Audi of

23      Queens, Queens Auto Mall, and I was also offered a

24      position at Baron Auto Emporium.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

128

L. Stidhum

1

2      Q    With respect to each of these positions

3    that you were offered, why is it that you were --

4    withdrawn.

5              Why is it that you rejected the offer

6    of employment?  Let's start with Audi of Queens.

7      A    It was going to be definitely a different

8    change of environment.  New car stores is a lot

9    tougher.  I sat there for a couple of hours and I

10    didn't see anybody come in.  Coming from places that

11    have walk in traffic, that's alarming to me.

12              You spoke about those certifications.

13    There was going to be a whole lot of certifications

14    so I wouldn't have got to sell a car for a month or

15    two months until I completed those certifications.

16    In those luxury high-end stores, you have to

17    complete everything before you grab your first

18    customer.  That's the reason I didn't take that job.

19              Queens Auto Mall didn't offer enough

20    money.  I went in there for a BDC manager position

21    and the pay was super low, so I wasn't going to do

22    that.  Baron Auto Emporium, I was in fear that I was

23    going to lose my job because it had the name Baron

24    in it.  I don't know who the owners are.  I was

25    offered the position multiple times and declined

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

129

                           L. Stidhum

1

2      because I didn't want to get fired later on.

3           Q     Who offered you the position at Baron?

4           A     I want to say Freddie, the GM.  David was

5      the one who told me about Freddie, they were

6      friends.  Prior to him telling me about it, I had

7      already went on the interview and he offered me the

8      position two or three times.  I just didn't want to

9      deal with having to get fired for any reason because

10     that did happen to David in the past.

11          Q     Where did that happen to David?

12          A     When he was working at North Shore Motors.

13     They ending up firing him after finding out about

14     this case.

15          Q     How do you know that?

16          A     That's what he told me.

17          Q     Do you know how he knows that?

18          A     Honestly, I didn't bother to ask.

19          Q     When was the last time you spoke to David?

20          A     Probably a couple of weeks ago.

21          Q     What is the nature of your relationship

22     with him?

23          A     We are -- I wouldn't say we are close, but

24     we are friends.

25          Q     Other than Audi of Queens, Queens Auto

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

130

L. Stidhum

1    Mall and Baron Auto Emporium did you submit your

2    resume or job applications for any other positions

3    elsewhere?

4

5         A    Yes.  A ton of places.

6         Q    Is there a centralized location from which

7    you did that on the internet or elsewhere?

8         A    Indeed.

9         Q    Is it only Indeed?

10        A    For the most part.  I might have submitted

11   a resume or two off the Craigslist, but pretty much

12   Indeed is the only place.

13        Q    Whenever you submitted something on Indeed

14   or Craigslist, you did that with the same email

15   address, correct?

16        A    More or less.

17        Q    What is the email address that you used

18   for Indeed?

19        A    Lsticia3@Gmail.

20        Q    That's the same email address you used for

21   Craigslist?

22        A    Yes.  I would say so, yes.

23        Q    You never looked into recruiters or

24   anything like that, right?

25        A    I don't think so, no.

A1578

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                131
                                L. Stidhum

1

2          Q     How much time have you spent on your job

3    search each day since you were ready to return to

4    work following the birth of your second child?

5                MS. TROY:  Objection as to relevance.  She

6          can answer.

7          A     When I get a few minutes, I will look and

8    see if there is anything intriguing.  I'm a numbers

9    person.  If it doesn't make sense, I would rather be

10   home with my children.  I can't put a timeframe on

11   it.

12         Q     How are you supporting yourself while

13   you're unemployed?

14         A     Right now, my mom is currently pretty much

15   supporting me and my kids.

16         Q     What does she do?

17         A     My mom, she sells Auto Trader.

18         Q     Was she involved in the automobile

19   business before you got involved with Hillside Auto

20   Outlet?

21         A     No.

22         Q     What did she do before Auto Trader?

23         A     She worked for Spectrum Communications.

24   She was a territory manager.

25         Q     She no longer works there?

A1579

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

132

                    L. Stidhum
1
2        A    No.
3        Q    You testified about taking some time off
4    for a vacation in September of 2020.  Do you recall
5    that?
6        A    Of 2020?
7        Q    I believe so.
8             MS. TROY:  Mischaracterizes witness
9         testimony but she can answer.
10       A    Are we talking when I said I went out of
11   the country?
12       Q    Yes.
13       A    That was actually of 2022, not of 2020.  I
14   went out of the country.  I went on a boat, on a
15   cruise to Bermuda.
16       Q    Since September of 2020 until now, have
17   you taken any vacations?
18       A    No.
19       Q    Prior to September of 2022, when did you
20   take your vacation prior to that time?
21            MS. TROY:  Objection as to relevance.  She
22        can answer.
23       A    I went to Florida in August.
24       Q    How long?
25       A    About two weeks.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 134 of 294 PageID #: 2244

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

133

L. Stidhum

1

2      Q    Prior to that?

3      A    I think before that it would have been

4    like 2021.

5      Q    Do you remember what month?

6      A    I went to Puerto Rico in May for Mother's

7    Day.

8      Q    Prior to that?

9      A    Actually, in June of 2021 -- was it 2021?

10   Yes, in June of 2021, I went to California and also

11   in May of 2021, I went to Florida again.

12     Q    In May and June of 2021, you visited

13   Puerto Rico?

14     A    Yes.

15     Q    Florida and California, correct?

16     A    Yes.

17     Q    What part of California was it?

18          MS. TROY:  Objection as to relevance.

19   Where are we going with this?  She can answer.

20   BY MR. KATAEV:

21     Q    Go on.

22     A    We stayed in Los Angeles.

23     Q    Prior to those vacations in May and June

24   of 2021, when was your last vacation?

25          MS. TROY:  Objection as to relevance.  She

A1581

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              134

                              L. Stidhum

1        can answer.

2            A    Honestly, I don't remember.  I know I went

3        on another cruise but I don't remember the

4        timeframe.

5            Q    Did you travel during Covid between March

6        and December of 2020?

7            A    No.

8            Q    There was one other cruise prior to that

9        May or June of 2021 set of vacations.  During any of

10       those vacations, all of them, did you ever do job

11       search activity while on vacations?

12               MS. TROY:  Objection as to relevance.

13           Q    You can answer.

14           A    I don't remember honestly.

15           Q    Were you unavailable to work since the

16       termination of your employment, other than for the

17       birth of your second child?

18           A    One more time.

19           Q    Were you unavailable to work since you

20       left Hillside Auto Outlet, other than due to the

21       birth of your second child?

22           A    No.

23           Q    And first child.

24               Are you currently attending any

Case 1:21-cv-07163-OEM-LB  Document 102-11  Filed 03/27/24  Page 136 of 294 PageID #: 2246

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

135

L. Stidhum

1
2    school or taking any classes?
3         A    No.
4         Q    Have you taken on any training courses or
5    anything like that?
6         A    No.
7         Q    Have you ever been self-employed?
8         A    Yes.
9         Q    Can you explain?
10        A    That's when I was doing the broker thing.
11        Q    Have you ever received any long-term or
12   short-term disability insurance benefits?
13        A    No.
14        Q    Did you apply after you gave birth for
15   short-term disability?
16        A    Is that the same thing as the paid family
17   leave or is that different?
18        Q    It's different, but tell me about that.
19        A    I received a paid family leave after my
20   first child was born.
21        Q    Did you apply for that after your second
22   child was born?
23        A    I did not.
24        Q    When you applied for it the first time,
25   when your first child was born, did you have to

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              136

                                    L. Stidhum

1        provide information about your income?

2             A    That was all done by the dealership, by

3        Luxury Motor Cars.  I'm not sure exactly.  They

4        filled out everything and sent it in.

5             Q    Other than paid family leave, do you

6        recall whether short-term disability benefits were

7        applied for?

8             A    I don't believe so.

9             Q    You received paid family leave for

10       approximately 12 weeks, right?

11            A    I think so.

12            Q    It was a percentage of your actual income

13       at the dealership, correct?

14            A    I believe it was capped at $700.

15            Q    You received the full cap, right?

16            A    Yes.

17            Q    Have you received any Social Security

18       benefits including Social Security disability

19       insurance benefits since your termination?

20            A    No.

21            Q    Have you received any workers' comp.

22       benefits?

23            A    No.

24            MS. TROY:  Asked and answered.

25

A1584

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 138 of 294 PageID #: 2248

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

137

L. Stidhum

1          MR. KATAEV:  No, I didn't ask her if she
2      received benefits.  I asked her if she applied
3      for benefits, not if she received benefits.
4    BY MR. KATAEV:
5          Q    You testified that you received
6    unemployment insurance benefits, correct?
7          A    Yes.
8          Q    You only applied for unemployment
9    insurance benefits once, correct?
10          MS. TROY:  Timeframe?
11          Q    In your whole life.
12          A    No.
13          Q    With respect to the testimony that you
14    previously provided about applying for unemployment
15    insurance benefits, what employer did you apply for
16    that from after being let go?
17          A    Luxury Motor Club was the first one.
18          Q    Okay.
19          A    Great Neck Motor Sports.  I was there
20    while I was pregnant.
21          Q    Were those the only two?
22          A    If I'm not mistaken, yes.  Wait, actually,
23    I believe NYC Motor Cars was in there too because
24    that was during the period of Covid.  I'm not

A1585

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

138

L. Stidhum

1    100 percent sure but it might have been.

2         Q    Understood.  Had you received an offer of

3    reinstatement from Hillside Auto Outlet, would you

4    have returned?

5         A    Possibly.

6         Q    Why would you return?

7              MS. TROY:  Timeframe, but she can answer

8         the question.

9         A    Read it back.

10   (Whereupon, the referred to question was read back

11                   by the reporter.)

12        A    If would all depend on the circumstances,

13   of course.  If the offer was presented and it was a

14   decent one, possibly.

15        Q    You are aware that an offer of

16   reinstatement was made, correct?

17        A    When we were at the conference?

18        Q    That's correct.

19        A    Okay.  I didn't completely understand the

20   question.  I thought you meant at the time being.

21   At this point, yes, I would not accept it, but if it

22   was at the time of everything going on, possibly,

23   yes.

24        Q    You rejected the offer of reinstatement at

A1586

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 140 of 294 PageID #: 2250

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

139

```
 1                    L. Stidhum
 2        the conference, correct?
 3             A    Yes.
 4             Q    The conference that you attended with your
 5        counsel, is that the first time you entered a
 6        federal courtroom?
 7             A    Yes.
 8             Q    You testified previously that Ali, David
 9        and Brianna made statements to you concerning the
10        alleged discrimination; do you recall that
11        testimony?
12             A    Yes.
13             Q    Other than those three individuals, did
14        you discuss the alleged discrimination with anyone
15        else?
16             A    Um, yes.
17             Q    Who?
18             A    Iris, which is Jay's sister.  Are we
19        talking about the dealership or in general?
20             Q    In general anyone.
21             A    Family.
22             Q    Such as who?
23             A    My mother, my grandmother, my children's
24        father.
25             Q    Anyone else?
```

A1587

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                        140
                            L. Stidhum
 1
 2          A    Not that I can recall.
 3          Q    No one else at the dealership other than
 4     Iris and the three people we discussed, right?
 5          A    Yes, pretty much.
 6          Q    What did you discuss with Iris?
 7          A    I would kind of complain about what's
 8     going on.
 9          Q    Would it be fair to say you were venting
10     to her?
11          A    Yes.
12               MS. TROY:  Objection to that
13          characterization.
14          Q    When did that discussion happen; month and
15     year?
16          A    I don't recall.  It must have been around
17     December of 2018.
18          Q    Was that discussion held in person, by
19     phone or otherwise?
20          A    At the dealership.
21          Q    At the dealership in person, correct?
22          A    At the dealership in person.
23          Q    What did she say after you complained to
24     her about what happened?
25          A    I don't recall.  I wouldn't put any words
```

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 142 of 294 PageID #: 2252

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

141

L. Stidhum

1    in anyone's mouth and I don't remember.

2

3        Q    That's fine.  Do you have any notes or

4    written records about any of the discussions that we

5    just talked about or in general about the alleged

6    discrimination?

7        A    No.

8        Q    Do you keep a journal or diary?

9        A    No.

10       Q    Did you write anything about the alleged

11   discrimination at all?

12       A    No.

13       Q    Did you email or text anyone about the

14   alleged discrimination?

15       A    Not that I kept records of.

16       Q    So you recall sending texts or emails but

17   you didn't keep them?

18       A    Right.

19       Q    When did you dispose of the emails or the

20   texts?

21       A    It wasn't so much as disposing them.  I do

22   get new phones pretty often, I like to have the

23   newest phone.  It probably just got deleted from

24   changing phones or whatever the case may be.  I

25   don't know.

A1589

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

142

                            L. Stidhum

1

2          Q    When was the last time you replaced your

3     phone?

4          A    Actually this past December.  I got

5     upgraded for Christmas.

6          Q    Someone gave it to you as a gift or you

7     bought it?

8          A    My mother got it for me as a gift.

9          Q    Who do you recall sending text messages or

10    emails to about the alleged discrimination?

11         A    Again, the same three people.  Those were

12    pretty much the only people that I spoke to about

13    the situation in general.

14         Q    Do you have any other notes or writings in

15    any format documenting the alleged discrimination?

16         A    No.

17              MR. KATAEV:  This is a good time for us to

18         stop and take lunch.  We will come back at 1:30

19         and we will start by doing exhibits, and I

20         think -- I'm hoping we will be done by 3:00,

21         but I can't promise.  That's my guesstimate,

22         okay.  I have -- I will have the exhibits

23         mostly up on the screen.

24              MS. TROY:  Whatever that has multiple

25         pages just send it to us, it may be easier so

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

143

1                       L. Stidhum

2          we don't have to waste time.

3               MR. KATAEV:  I will try to work on that.

4          I will put them in the same Dropbox as the

5          settlement production and can you work off that

6          and I send you the link again.

7               MS. TROY:  Fine.

8               MR. KATAEV:  We are off the record.

9

10              (Luncheon recess:  12:58 p.m)

11                         ***

12              (Afternoon session: 1:51 p.m.)

13

14      L E T I C I A   F R A N C I N E   S T I D H U M,

15      resumed, having been previously duly sworn, was

16      examined and testified further as follows:

17      EXAMINATION BY

18      MR. KATAEV: (Continued)

19      (Defendant's Exhibit C, Marked for Identification.)

20          Q    Defendant's Exhibit C.  This is

21      Plaintiff's Initial Disclosures.  I will represent

22      to you, Ms. Stidhum, that these were sent to us on

23      June 21st, 2022.  Do you recognize this document?

24          A    Yes.

25          Q    To your knowledge, what is this document?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

144

L. Stidhum

1

2      A    There is a couple.  So honestly, when you
3      scroll down a little bit, I will be able to...
4      Q    I will represent to you in this document,
5      among other things, you identify witnesses; do you
6      see that?
7      A    Yes.
8      Q    You identify yourself, all employees,
9      David Manrique and the four individual Defendants,
10     right?
11     A    Yes.
12     Q    Why did you not list as witnesses the
13     other three people we discussed; Brianna, Iris and
14     Ali?
15     A    Honestly, those were conversations that
16     were brief and, you know, about the situation at the
17     time so I didn't really think that it would be very
18     useful just because there was no evidence behind it,
19     I guess you can say.
20          MS. TROY:  We will amend initial
21          disclosures and sned it to you.
22          MR. KATAEV:  Okay.
23     BY MR. KATAEV:
24     Q    In here, you identify no documents that
25     are relevant to the case, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    145

                              L. Stidhum

1

2         A    Right, I didn't have anything.

3         Q    In terms of producing documents, you

4    reproduced the paystubs we produced to you and some

5    information about your sonogram, correct?

6         A    Right.

7         Q    At the end of this, you state that a

8    damage calculation will be provided, correct?

9         A    I'm sorry.

10        Q    At the end of this, you state a

11   computation of the damages will be provided,

12   correct?

13        A    Right.

14        Q    During the lunch break, without divulging

15   the actual conversation you had, did you discuss

16   your testimony with your attorney?

17        A    No.

18        Q    We were talking before about your

19   cellphone and how you like to have the latest model

20   and you most recently got one?

21        A    Right.

22            MS. TROY:  Um, objection.

23        Mischaracterizes witness testimony but fine.

24   BY MR. KATAEV:

25        Q    Whenever you obtained a new phone, you use

A1593

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

146

L. Stidhum

1

2      iCloud to restore the backup from your prior phone,

3      right?

4          A      Sometimes.  Once you lose certain access

5      or if you have a two-factor identification, you

6      can't get into the same iCloud account so that's

7      pretty much what happened to me.  I actually just

8      made a new one again.

9          Q      You still have the old phone in your

10     possession, correct?

11         A      No, I do not.

12         Q      What did you do with the old phone?

13         A      Honestly, I can't tell you what I did with

14     if.  I don't know if that's the one I gave to my

15     great-grandmother.  I'm not sure.

16         Q      We talked earlier about a Facebook post

17     and I asked you questions about whether you posted

18     anything about securing or obtaining millions of

19     dollars in a lawsuit, correct?

20         A      Right.

21         Q      That post was not about your lawsuit

22     against Hillside Auto Outlet, that post was about

23     your mother's lawsuit, correct?

24         A      No, my stepfather.  If this -- I'm not

25     sure.  I don't know what post we are talking about

Case 1:21-cv-07163-OEM-LB Document 102-11 Filed 03/27/24 Page 148 of 294 PageID #: 2258

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum --- February 17, 2023

147

L. Stidhum

1       specifically.  Yes, my stepfather did obtain a
2       couple of million dollars working for the Department
3       of Sanitation.
4           Q    Were the attorneys representing your
5       father in that lawsuit the same attorneys
6       representing you here?
7           A    No.
8           Q    Was your mother ever involved in any
9       lawsuit?
10          A    No.
11          Q    Your mother didn't have any lawsuit
12      against Spectrum or Charter?
13          A    No.
14          MS. TROY:  Objection as to relevance.
15          Q    To your knowledge, did your mother ever
16      make any claim without filing a lawsuit against
17      Charter or Spectrum?
18          A    I don't believe so.
19          Q    Did the attorneys that -- did she hire
20      attorneys to pursue that claim?
21          A    She ended up not pursuing it.
22          Q    Did the attorneys that she consult with
23      include the current attorneys that you are utilizing
24      for this lawsuit?

A1595

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                           148

 1                        L. Stidhum

 2             MS. TROY:  Objection as to relevance.  You

 3        may answer.

 4        A    I believe she had a conference with them

 5   just to see if there was anything, but I'm not sure.

 6             MS. TROY:  Objection to the extent you're

 7        prying into attorney/client privilege.

 8        Q    Did you learn about this law firm through

 9   your mother?

10        A    No.

11        Q    How did you learn about Troy Law?

12        A    Google.

13        Q    What did you search for?

14        A    I don't know.

15             MS. TROY:  Objection to form as to

16        relevance.  She may answer.

17        A    I don't remember honestly.  Attorneys near

18   me maybe.  There were a mile and a half away.

19        Q    You chose them because they were close by?

20        A    They were the first people I spoke to and

21   they made me feel comfortable.

22        Q    I'm going to place up on the screen what

23   has been marked as Defendant's Exhibit D.

24   (Defendant's Exhibit D, Marked for Identification.)

25

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

149

                              L. Stidhum

1                   L. Stidhum

2        BY MR. KATAEV:

3            Q    I will represent to you these are damage

4        calculations that were produced on January 30, 2023.

5        Do you recognize this document?

6            A    Yes.

7            Q    At the top left, your law firm's name and

8        address is listed, correct?

9            A    Yes.

10           Q    It's titled, Damages Calculations,

11       correct?

12           A    Yes.

13           Q    After that, there is a box where the case

14       name, case number and the forum that it's in is

15       listed, correct?

16               MS. TROY:  Objection.  The document speaks

17           for itself.  You don't need to waste time over

18           this.

19       BY MR. KATAEV:

20           Q    You can answer.

21               MS. TROY:  She can answer the question.

22           You're just wasting time.  Go ahead, answer the

23           question.

24           A    What is the question?  If I see it?  Yes,

25       I see it.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

150

L. Stidhum

1

2        Q    It lists the case name and case number,

3    correct?

4        A    Yes.

5        Q    After that, it shows the time period of

6    December 1st of '18 through January 14th of '19,

7    correct?

8        A    Yes.

9        Q    The calculated total number of weeks for

10   that time period is listed as 6.43, right?

11       A    Yes.

12       Q    What you're saying is your total weekly

13   pay prior to any discrimination averaged $1,238.64,

14   correct?

15       A    Yes.

16       Q    That's based the on actual paystubs which

17   are listed below, which show all of your paystubs

18   from May of '18 until January of '19, correct?

19       A    Yes.

20       Q    Right here is the calculation of that

21   average and before you announced your pregnancy,

22   correct?

23       A    Yes.

24       Q    After that is the calculation of your

25   average after you announced your pregnancy, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                    151
                           L. Stidhum

1            A     Yes.

2            Q     So taking the difference between those two

3     numbers, you came up --

4            MS. TROY:  Emanuel, this is not an

5            arithmetic test.

6            MR. KATAEV:   Tiffany, stop interrupting.

7            MS. TROY:  You're like, A minus B, is that

8            equal to C?

9            MR. KATAEV:  Stop interrupting my

10           deposition.  Stop.  All you have to say is

11           objection and grounds, that's it.

12           MS. TROY:  Objection.

13           MR. KATAEV:  Your objection is noted for

14           the record.  I'm going to proceed with my

15           deposition.

16    BY MR. KATAEV:

17           Q     The difference of $428.64 is what you

18    obtained when you subtract this $1,238.64 number

19    from the 810 number, correct?

20           MS. TROY:  Objection.  My client is not

21           going to be subject to an arithmetic test.  If

22           she knows how to do it by her brain --

23           MR. KATAEV:  I'm calling the court.  I'm

24           not dealing with this.  We are going to put

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                    152

```
 1                        L. Stidhum
 2           everything you said on the record and we are
 3           calling the court.  You will not interrupt my
 4           deposition.
 5                  MS. TROY:  You can tell the court that you
 6           asked her --
 7                  MR. KATAEV:  You can tell the court
 8           whatever you want.  This is ridiculous.
 9                  MS. TROY:  I will make the objections that
10           I need to make but I'm not going to interrupt
11           your deposition.  That's it.
12                  MR. KATAEV:  Good.  Please don't do it
13           again.  Say, Objection, and the basis and move
14           on unless you're instructing her not to answer.
15      BY MR. KATAEV:
16           Q    Ms. Stidhum, the difference between
17      $1,238.64 and $810 is calculated as $428.64,
18      correct?
19           A    Yes.
20           Q    What happened is you take the $428.64, you
21      multiple that by the 6.43 weeks and you get a
22      shortfall of $2,755.54, correct?
23           A    Yes.
24           Q    You went over this chart with your
25      attorneys, correct?
```

A1600

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

153

L. Stidhum

1

2    A    Yes.

3    Q    You listed this as your economic damages

4    in this place, this place and this place, correct?

5         MS. TROY:  Objection.  She did not herself

6    list it.

7    Q    By and through you, correct?

8    A    Yes.

9    Q    Now you have here $100,000 under the

10   compensatory damages; do you see that?

11   A    Yes.

12   Q    Unlike the damages that we just went over,

13   there is not calculation for the $100,000, correct?

14   A    Yes.

15   Q    Where is the calculation for the $100,000;

16   where is that number coming from?

17   A    Honestly, that's something that has to be

18   discussed with my attorney.

19   Q    The answer is you don't know?

20   A    I don't.

21   Q    Same question for the punitive damages,

22   two million dollars in these three places; do you

23   see that?

24   A    Yes.

25   Q    Where is that number coming from?

A1601

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

154

L. Stidhum

1
2      A    That's something to discuss with my
3    attorney.
4      Q    You don't know the answer, correct?
5      A    No.
6      Q    I'm placing up on the screen what will be
7    marked as Defendant's Exhibit E.  It's the Responses
8    to Defendants' Interrogatories.  Are you familiar
9    with this document?
10   (Defendant's Exhibit E, Marked for Identification.)
11          MS. TROY:  Scroll through the doc.
12     A    Yes.
13          MS. TROY:  Make it slightly bigger.  We
14       are having a hard time seeing it.  Too big.
15          MR. KATAEV:  I don't need commentary.
16       Thank you.
17   BY MR. KATAEV:
18     Q    In the first interrogatory that was asked
19   of you, we asked, Set forth with detail and with
20   specific numerical calculation all categories of
21   damages asserted by Plaintiff, correct?
22     A    Yes.
23     Q    In response, you directed us to the
24   damages calculations that we just reviewed, correct?
25     A    Right.

A1602

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

155

1                        L. Stidhum

2        Q    But as we just went over, there are no

3    calculations for the compensatory damages or the

4    punitive damages, right?

5        A    Right.

6             MS. TROY:  Emanuel, that's factually

7             incorrect.

8             MR. KATAEV:  We can take it up after the

9             deposition.  Please don't interrupt unless you

10            have an objection.  Thank you.

11   BY MR. KATAEV:

12       Q    You identify over here, Ali in response to

13   Interrogatory Number 2 which requests the identity

14   of witnesses Ali Raskesnia.  R-a-s-k-e-s-n-i-a.

15             Do you see that?

16       A    Yes.

17       Q    This is the Ali with whom you went to NYC

18   Motor Cars, correct?

19       A    Correct.

20       Q    Iris Serrano is the Iris we discussed

21   earlier today, correct?

22       A    Yes.

23       Q    You say here that her address and phone

24   number are unknown.  Do you not maintain telephone

25   contact with this individual?

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 157 of 294 PageID #: 2267

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

156

                            L. Stidhum

1

2      A    No.

3      Q    The last time you spoke to Iris was at the

4  dealership, correct?

5      A    Not at the dealership.  I do have her on

6  Snapchat so we spoke here and there but not much.

7      Q    On Snapchat you discussed this case?

8      A    No.  The only thing I did ask regarding

9  this case was if she knew the last name of Lily.

10     Q    Understood.  Did she give you the answer?

11     A    No, she wasn't sure what her last name

12  was.

13     Q    In response to Interrogatory Number 7,

14  which asks whether you ever complained to Hillside

15  Auto Outlet about discriminatory conduct and to

16  provide information about each such complaint.  Your

17  answer only provides information about your

18  conversation with Isaac and Jory, correct?

19     A    I'm sorry, one more time.

20  (Whereupon, the referred to question was read back

21              by the reporter.)

22     A    Right.

23     Q    You did not provide any information about

24  your alleged discussion with Ronald, correct?

25     A    Well, that wasn't a discussion about the

A1604

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

157

L. Stidhum

1    discrimination -- the pregnancy discrimination.

2    That was more about me telling him about the bonus.

3

4         Q    Is it fair to say that the bonus has

5    nothing to do with your pregnancy?

6         A    No, because the bonus kind of played a

7    part in it.  My pregnancy was the reason for me kind

8    of pushing to get this bonus to begin with.

9         Q    Why did you not list your conversation

10   with Ronald in this response?

11        A    Honestly, it must have slipped my mind.

12   Like I said, it was more of a conversation about the

13   bonus and receiving that money for doing x amount of

14   cars rather than the initial complaint of what was

15   going on about the pregnancy discrimination.

16            MR. KATAEV:  I'm going to call for the

17        Plaintiff to supplement her response to

18        Interrogatory Number 7, and we will follow up

19        in writing.

20                  (Counsel Request.)

21   BY MR. KATAEV:

22        Q    For clarification, some of the dealerships

23   that you worked at after Hillside Auto both had the

24   name Luxury in them but they were two separate

25   dealerships, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            158

                              L. Stidhum
1
2        A    Correct.
3        Q    They are two different locations?
4        A    Yes.  Two different locations, different
5    owners.
6        Q    In response to Interrogatory 19, you only
7    identify Queens Auto Mall incorrectly typed here as
8    hall.  You failed to include the other two that you
9    denied positions for, correct?
10       A    Right, because honestly, it wasn't fresh
11   in my mind.
12            MR. KATAEV:  We are going to call for
13       Plaintiff to supplement her response to this
14       interrogatory and we will follow up in writing.
15                 (Counsel Request.)
16   BY MR. KATAEV:
17       Q    With respect to every position identified
18   in response to Interrogatory Number 14, is it
19   accurate to state that the pay you received at each
20   of these dealerships was better than what you
21   received at Hillside Auto Outlet?
22       A    Yes.
23       Q    If you have to give your best estimate as
24   to the annual amount of money you would earn at
25   Hillside Auto Outlet, how much would you say that

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 160 of 294 PageID #: 2270

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

159

1                    L. Stidhum

2    was?

3         A    Maybe like 60 or 70,000.  I'm not sure.  I

4    didn't work there a full year.

5         Q    When you applied for unemployment both

6    times, did you receive the unemployment for the full

7    six-month period both times?

8         A    I believe so.

9         Q    Do you recall whether it was the capped

10   amount?

11        A    I'm sorry.

12        Q    Do you recall whether it was the capped

13   amount?

14        A    The first time I received it, yes.  The

15   other two times, it was not.

16        Q    Has any injury or disability prevented you

17   from working during any period of time?

18        A    No.

19        Q    Have you ever filed for bankruptcy?

20        A    No.

21        Q    As far as you know, you were never

22   terminated from any job?

23        A    Correct.

24        Q    During the time that you worked at

25   Hillside Auto Outlet, there came a point in time

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 161 of 294 PageID #: 2271

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

160

1                            L. Stidhum

2       when you purchased a vehicle from the dealership,

3       correct?

4            A    One more time.

5            Q    When you worked at Hillside Auto Outlet,

6       you purchased a vehicle from the dealership,

7       correct?

8            A    Correct.

9            Q    What car did you purchase?

10           A    Infiniti Q50.

11           Q    Do you still have that car?

12           A    No, I do not.

13           Q    What did you do with the car?

14               MS. TROY:  Objection as to relevance.  She

15           can answer.

16           A    It got totaled.  I was rear-ended.

17           Q    I'm sorry.

18                  Did you obtain the vehicle from

19       Hillside Auto Outlet on favorable terms?

20           A    On favorable terms, as in -- what do you

21       mean by that?

22               MS. TROY:  Objection to form.

23           Q    By whatever favorable terms means to you?

24           A    No.  After receiving the discovery, I was

25       charged like every other customer.  They made a

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 162 of 294 PageID #: 2272

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          161

                                  L. Stidhum
1
2        couple of grand off of me.
3               Q     How much did you purchase the vehicle for?
4               A     I don't remember.
5               Q     Did you do financing?
6               A     Yes, I did.
7               Q     It was a used vehicle, correct?
8               A     Yes.
9               MS. TROY:  Objection as to relevance.
10              Q     Isn't it true that you complained to Isaac
11       that the reason why Andris took so long to process
12       employment applications -- I'm sorry, financing
13       applications for customers is because he sucks?
14              A     I don't remember.  This is --
15              MS. TROY:  Objection.  Argumentative.  She
16          can answer.
17              MR. KATAEV:  Please don't interrupt her
18          while she's answering.
19       BY MR. KATAEV:
20              Q     Repeat your answer.
21              A     I don't remember.
22              MR. KATAEV:  Let the record reflect that
23          the witness laughed at the question.
24              I have placed up on the screen what will
25          be marked as Defendants' Exhibit F.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    162

 1                          L. Stidhum

 2         (Defendant's Exhibit F, Marked for Identification.)

 3         BY MR. KATAEV:

 4              Q    For the record, these are monthly sheets

 5         as to cars sold at the dealership using the CRM

 6         system.  It's Bates-stamped D2 through D9.  This

 7         particular set is for May of 2018.

 8                    Ms. Stidhum, do you recognize this

 9         document?

10              MS. TROY:  Scroll through whatever pages

11              you're talking about.

12              MR. KATAEV:  Sure.  Let the record reflect

13              that these activities are designed to waste

14              time, to run the clock, as the Plaintiff has

15              repeatedly make reference to the time of the

16              deposition.

17              MS. TROY:  If you want to play it that

18              way, let the record reflect you said you wanted

19              to start at 9:00, you started at 9:30.  You

20              said you wanted a 30-minute lunch break, you

21              took a 45-minute lunch break.  You're asking

22              questions that are irrelevant to this case.

23              MR. KATAEV:  Anything else?

24              MS. TROY:  That's it for now.

25              MR. KATAEV:  Let the record reflect that,

A1610

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

163

L. Stidhum

1          at Plaintiff's request and insistence, we

2          scrolled through D2 through D9.

3     BY MR. KATAEV:

4          Q    Are you ready to answer some questions

5     about this exhibit?

6              MS. TROY:  Go back to the second page.

7          Okay.

8     BY MR. KATAEV:

9          Q    Ms. Stidhum, other than due to this

10    lawsuit and in the course of discovery, have you

11    ever seen this document while working at the

12    dealership?

13         A    No.

14         Q    Did you have access to the sold log

15    through the CRM system while you worked at the

16    dealership?

17         A    I'm not sure.  I didn't really use the

18    CRM.

19         Q    In this sheet, it says that you sold a car

20    to an individual named Robert Gantt on May 27, 2018;

21    do you see that?

22         A    Yes.

23         Q    It says it was sold for $12,600 and at the

24    front, it says negative 586 and at the back is 2011;

A1611

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 165 of 294 PageID #: 2275

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

164

1                            L. Stidhum
2        do you see that?
3              A    Yes.
4              Q    By the front, that refers to the gross
5        commissionable profit on the front end of the sale
6        for the actual vehicle, correct?
7              A    Yes.
8              Q    On the back, that refers to any
9        aftermarket items sold, whether it's something for
10       the car or something like insurance or protection or
11       warranty and stuff like that, correct?
12             A    Yes.
13             Q    On this particular deal, it was sold at a
14       loss, correct?
15             A    Yes.
16             Q    You received $150 for selling this car,
17       correct?
18             A    Yes.
19             Q    But you didn't receive any bonus for this
20       particular car, correct?
21             A    When you say bonus, I'm not sure what you
22       mean by bonus.
23             Q    If I understand correctly for you to
24       receive that 5 percent bonus, this number on the
25       front end has to be $3,000 or $3,500 or more,

A1612

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

165

1                      L. Stidhum

2      correct?

3             MS. TROY:  Objection.  Mischaracterizes

4          witness testimony.

5          A    The total between the front and back would

6      have to equal that, yes.

7          Q    You have to add the two, correct?

8          A    Yes.

9          Q    The next car that's listed as sold by you

10     in May of 2018 is a vehicle sold to one Darell

11     Thomas on May 25th of 2018; do you see that?

12         A    Yes.

13         Q    But there is no information here about the

14     front or back or the sold amount, correct?

15         A    Right.

16         Q    The third vehicle listed that's sold by

17     you is to one John Collado, correct?

18         A    Yes.

19         Q    There was May 24th of 2018, correct?

20         A    Yes.

21         Q    On this particular sale the front and the

22     back had a profit of $1,628 and $1,857 respectively,

23     correct?

24         A    Yes.

25         Q    With the calculator I have on the screen

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 167 of 294 PageID #: 2277

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

166

                         L. Stidhum

1    calculating the total between the two, that comes

2    out to $3,485, correct?

3         A    Right.

4         Q    What you're saying is your bonus would be

5    5 percent of that amount for a total of $174.25; is

6    that right?

7         A    Right.  It wouldn't be a bonus to the

8    $150.  It was just that $174.25 total.

9         Q    It would be $150 for making the sale plus

10   $174.25?

11        A    No.  That's what I'm trying to clarify.

12   It would be the $174.25.

13        Q    Whenever you made more, you get 5 percent

14   in lieu of the actual $150 commission?

15        A    Right.  If you do $3,000, that's

16   5 percent, it would be $150.

17        Q    For this particular deal, you do receive

18   $174.25 instead of $150, correct?

19        A    Yes.

20        Q    You know that because you referred to a

21   sheet that was given to you in triplicate and you

22   threw that sheet out after you confirmed that you

23   were paid the right amount, correct?

24        A    That's false actually.  I wouldn't receive

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 168 of 294 PageID #: 2278

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        167

                                   L. Stidhum

1    anything that showed the actual pay for the

2    5 percent.  It was just -- it would reflect on my

3    paystub.

4         Q    I see.  On that sheet, would it list the

5    front and back end gross commissionable profit?

6         A    No.  It would reflect on my paystub.

7         Q    How would you know whether you would be

8    entitled to a 5 percent bonus on top of -- in lieu

9    of $150 -- higher than $150?

10        A    I just started in the business so I kind

11   of took their word for it.  Jay was very honest with

12   us.  She would make sure that we were paid correctly

13   all the time.  After that, it's obvious -- you can

14   tell the difference between being paid $174.25 and

15   the flat $150.

16        Q    I see.  Could it be possible you didn't

17   sell any vehicles at a profit?

18        A    No, that's impossible because I remember

19   on multiple occasions where Serge would be excited

20   that I did a ten-pounder, which is a $10,000 deal

21   and I would still receive $150 flat.  That's

22   impossible.

23        Q    We just scrolled through all of the May of

24   2018 and they were only three or four cars sold.  Is

A1615

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

168

1                            L. Stidhum

2       it accurate that you only sold four cars in May of

3       '18?

4            A    I don't believe that's accurate, but then

5       again, I did just start that month so it's a

6       possibility.  I know that this document I've looked

7       over it, I went and checked how many cars it showed

8       that I sold and it's not accurate at all.

9            Q    What makes you say it's not accurate?

10           A    Because even the amounts of cars sold is

11      not the right number.  None of it is the right

12      numbers.  If you look back at when I first received

13      the 1,000 pages, I went -- I calculated based on my

14      paystubs without the 5 percent how many cars did I

15      sell for each month and how many cars it shows on

16      that document you just showed me, which is only

17      input by BDC and it definitely is not accurate.

18           Q    At the top of page D2 next to the word,

19      Sold log, it has in parenthesis the number 46; do

20      you see that?

21           A    Yes.

22           Q    My understanding is this is listing the

23      total amount of cars sold in May of 2018, correct?

24           A    Correct.

25           Q    You're saying that this number is not

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

169

L. Stidhum

1  accurate?

2        A    I can't say for May of 2018 because I just

3  started that month and it was towards the middle of

4  the month and I was not there for the full month,

5  but I can confirm that months moving on, those

6  numbers do not add up to the numbers I have based on

7  my paystubs.  Even in the mediation that we had, you

8  said that this might not be everything, so I know

9  for sure it is not.

10       Q    To your knowledge, how did the dealership

11  keep track of the total vehicles sold every month?

12       A    Like I stated before, we had a board in

13  the finance room where we would have the list of all

14  the salespeople and they would tally every time they

15  sold a car, and that's how we kept track of how many

16  cars we had for the month.  There was never a set

17  log that was written down by anyone or nothing like

18  that.

19       Q    At the end of the month before starting a

20  new month chart before erasing all the data for the

21  month, did anyone ever take a picture of the board?

22       A    Not to my knowledge.

23       Q    I'm going to mark what will be Defendant's

24  Exhibit G.

25

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 171 of 294 PageID #: 2281

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

170

1        L. Stidhum

2        (Defendant's Exhibit G, Marked for Identification.)

3        BY MR. KATAEV:

4            Q    It is the same type of report for December

5        of 2018 from D62 through D67.  On this first page it

6        says the total sold in December '18 is 36 cars,

7        correct?

8            A    Yes.

9            Q    Is that accurate, to your knowledge?

10           A    Honestly, I'm not sure because, again,

11       like I said, I compared the documents and it doesn't

12       look like these -- this log shows everything whether

13       it was a walk-in customer or a appointment.  It

14       doesn't look like it shows everything.

15           Q    Looking at page D65.  There are two cars

16       that you sold to two different people on the same

17       day, December 10th of 2018, correct?

18           A    Yes.

19           Q    How was it that you were able to sell two

20       cars in a single day?

21           A    I don't understand the question.  I have

22       sold six cars in a day.

23           Q    In this particular instance with respect

24       to Monica Hampton, for example, was Andris Guzman

25       the individual who helped you with the financing?

A1618

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              171
                              L. Stidhum
1
2         A    I don't recall.  It does say, Pending
3    delivery.  This doesn't mean that I sold them both
4    on the say same.
5         Q    What about Prince Henston, do you recall
6    whether Andris Guzman was the individual that helped
7    you with the financing aspect?
8         A    This is four years ago.  I don't know who
9    did what.
10        Q    The following page, D66, there are two
11   additional cars that were sold on or about
12   December 6 and 8, correct?
13        A    Right.
14        Q    Finally on the last page, D67, there is a
15   fifth car that was sold on December 1st of 2018,
16   correct?
17        A    Correct.
18        Q    It's fair to say you sold at least five
19   cars in December of 2018?
20        A    I guess so, based on this.
21        Q    Do you recall whether you sold more than
22   five cars in December of '18?
23        A    Again, I'm not sure because it was such a
24   long time ago.  I don't want to sit here and lie,
25   but I don't remember selling -- I remember that I

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

172

L. Stidhum

1

2     was very upset because I was probably selling one or

3     two cars a week so this may be accurate.

4          Q    Didn't you testify previously that you

5     typically sold seven cars a month?

6          A    No.  Seven cars a week.

7          Q    What was the least amount of cars you sold

8     prior to December of '18 prior to your recollection?

9          A    Again, it's a long time ago.  I'm not

10    going to give you fake numbers.  I know for sure it

11    was seven cars a week because if we do seven times

12    $150 plus that $300, I would receive a check for

13    $1,050 and that was usually my goal for the week so

14    that way I can bring home at least $800 to $900

15    bucks.

16         Q    I have placed up on the screen what will

17    be marked as Defendant's Exhibit H.

18    (Defendant's Exhibit H, Marked for Identification.)

19    BY MR. KATAEV:

20         Q    My question to you is:  Have you ever

21    seen --

22              MS. TROY:  Did you skip some numbers from

23         the exhibit?

24              MR. KATAEV:  No.

25              MS. TROY:  Okay, this is Exhibit H.

A1620

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

173

1           L. Stidhum

2                MR. KATAEV:  Yes.

3      BY MR. KATAEV:

4           Q    Have you ever seen a document like this

5      before?  It's called cap sheet?

6           A    No.

7                MR. KATAEV:  Let's mark this as

8           Defendant's Exhibit I, I believe.

9      (Defendant's Exhibit I, Marked for Identification.)

10     BY MR. KATAEV:

11          Q    I will represent to you that this is a

12     declaration prepared by Serge and signed by him.

13     Have you ever seen this document before?

14          A    Yes, I did.

15          Q    Serge says here in Paragraph one that he

16     has served as an F&I representative since November

17     of 2018; do you see that?

18          A    Yes.

19          Q    Does that comport with your recollection

20     as to when he started working there?

21          A    I thought it was a little sooner after Jay

22     left.

23          Q    He says here in Paragraph six that

24     whenever the Plaintiff or any other salesperson

25     makes a sale, the customer's information is provided

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

174

L. Stidhum

1    to the sales manager or him, whoever is available

2    and has authorization to pull the prospective

3    customer's credit profile; do you see that?

4

5         A    Yes.

6         Q    That comports with your earlier testimony

7    that typically Andris would handle it but sometimes

8    he would, right?

9         A    Right.

10        Q    Paragraph seven says that once the credit

11   profile is pulled, the customer's application to

12   purchase a vehicle is submitted to chosen lenders;

13   do you see that?

14        A    Yes.

15        Q    Do you know what is meant by, Chosen

16   lenders?

17        A    Yes.  Qualifying, they have to qualify the

18   customer based on their credit history.

19        Q    There are different banks that accept

20   different types of customers with different types of

21   credit histories, correct?

22        A    Correct.

23             MS. TROY:  Can you speak slower?

24             MR. KATAEV:  Sure.

25             MS. TROY:  I'm having difficulty

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

175

L. Stidhum

1           following.

2      BY MR. KATAEV:

3           Q    In Paragraph eight, Serge declares that

4      the timeframe to receive any word back from a chosen

5      lender, which is also based on a customer's credit

6      worthiness, ranges from ten minutes to one hour; do

7      you see that?

8           A    Yes, I do.

9           Q    You have no reason to dispute that,

10     correct?

11          A    I mean --

12               MS. TROY:  Objection.  Argumentative.  She

13          can answer.

14          A    I mean, honestly, most approvals are

15     almost instant.  I can't agree as long as one hour.

16          Q    Has it ever been one hour since submitting

17     something to a chosen lender?

18          A    Honestly from my experiences, an hour, no.

19          Q    Your experience is limited to the time

20     when you had access to Dealertrack, correct?

21          A    Yes.

22          Q    You had access to Dealertrack since what

23     month in 2018?

24          A    I want to say towards the end -- after Jay

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                      176
                            L. Stidhum
1        left but I don't know how soon after.
2            Q    That was somewhere in July or August of
3        '18, correct?
4            A    Yes.
5            Q    That was taken away from you in December
6        of '18, correct?
7            A    Yes.
8            Q    That's approximately two months, right?
9                 MS. TROY:  Objection.  You need to do your
10                math properly.
11           A    It's four or five months.
12           Q    How many submissions did you make to
13       lenders in the four or five months that you had
14       Dealertrack access?
15           A    I didn't make submissions to lenders.  I
16       would run the credit and qualify them myself and
17       prefill the application, so that way when it got to
18       finance, whether it was Isaac or Serge, all they had
19       to do was read over it, make sure I didn't make a
20       mistake, check out their credit, submit the deal.
21       Everything would be done.
22           Q    When you submit the deal, that's when you
23       have to wait for the lender to get back, right?
24           A    Like I said, approvals are almost instant.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

177

L. Stidhum

1    Everything is done electronically.

3        Q    You're saying that every time you submit a

4    deal, a bank gets back instantly every single time?

5            MS. TROY:  Objection.  Mischaracterizes

6        witness testimony.  She can answer.

7        A    Again, I didn't submit it to the lender.

8    I only ran the credit, prefilled the application,

9    would give the folder to the finance.  Most of the

10   time, I would stand right over him and wait and see

11   who is going to pick it up, yes.  The approvals were

12   almost instant.

13       Q    Since you didn't submit it, you had no

14   independent knowledge as to how long it took,

15   correct?

16       A    That's incorrect.  I had access to

17   Dealertrack so I was able to see when the deal got

18   approved or did not get approved.

19       Q    Is there any data as far as you know

20   that's kept in Dealertrack as to how long each deal

21   takes from submission to response?

22       A    No.

23       Q    Paragraph nine, Serge declares that this

24   timeframe of submission is completely outside the

25   control of himself or any sales manager who pulls a

A1625

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 179 of 294 PageID #: 2289

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

178

L. Stidhum

1        credit profile and is further dependent on the
2        amount of verification requested by each chosen
3        lender, which is also completely outside the control
4        of himself or any sales manager; do you see that?
5        A    Yes.
6        Q    Do you agree that it's outside the control
7        of the sales manager, you know, the contents of this
8        paragraph?
9        A    Partially, because my argument was not
10       whether or not the lender is taking x amount of
11       time.  It was about my customer's credit being ran
12       and qualifying the customers within a certain amount
13       of time so that's not properly worded.
14       Q    What you're saying is what took longer is
15       the part before this part?
16       A    Right.
17       Q    Okay.  In order to complete the part
18       before this part, you have to obtain information
19       from the customer, correct?
20       A    Right.
21       Q    Sometimes the customer does not have all
22       of the information, correct?
23       A    Right.
24       MS. TROY:  Objection.  Asked and answered.

A1626

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 180 of 294 PageID #: 2290

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

179

1                          L. Stidhum

2          Q    It says in Paragraphs 12 through 14 the

3     following, During the time Plaintiff worked here, I

4     worked closely with her as well as all the other

5     salespersons.  Everybody liked each other and

6     treated each other well.  There was no animosity

7     amongst the salespeople, myself or nor sales

8     managers; is that true?

9          A    Right up until the announcement of my

10    pregnancy, of course.

11         Q    Of course.  What about the fact that you

12    and Andris Guzman had two prior incidents where you

13    got into an argument before you announced your

14    pregnancy?

15         A    Again, we still we kept it very

16    professional.  It's not somewhere where you're going

17    to be bickering back and forth in front of potential

18    customers.

19         Q    Number 19 says, if a customer was forced

20    to wait, the only reason for that would be based on

21    circumstances outside of the dealership's control

22    such as the failure of the customer to provide

23    necessary information to the lender or because the

24    lender requested additional documentation or simply

25    because the dealership had to wait for the lender's

A1627

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

180

1          L. Stidhum

2     response.

3               Do you have any reason to dispute

4     that statement?

5          A    No.

6          Q    Finally at the end it says, In the course

7     of the last four years working at the dealership,

8     customers have waited to obtain information

9     concerning approvals from 20 minutes until three

10    hours on average.

11              Do you have any reason to dispute

12    that statement?

13         A    I have never seen it go as long as three

14    hours, but...

15         Q    What is the longest you have seen a

16    customer wait to get a deal done?

17         A    Probably, like -- I'm talking about wait

18    times between him actually doing anything with my

19    customer.  That's what I'm talking about.  I'm not

20    talking about in general the total amount of buying

21    a car.  It's two different things we are talking

22    about here.  He's speaking about overall car

23    purchase.

24         Q    That's a fair distinction, but does the

25    customer know?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                    181
                                L. Stidhum
 1
 2              MS. TROY:  Objection.  Argumentative.
 3      A     I'm sorry.
 4      Q     Does the customer know?
 5      A     Does the customer know what?
 6      Q     That there is a distinction between
 7   waiting for their credit to be pulled versus
 8   submitting it to the bank?
 9      A     Absolutely.  When your credit is pulled
10   and you're qualified for a customer, you're told to
11   start working on insurance, which can take up to --
12   anywhere from ten minutes to an hour.  Yes, the
13   customer would know because immediately they are
14   like, are we approved, are we wasting our time.
15   Once I get the folder, I expect to respond to my
16   customers and say, we are going to get this done,
17   let's work on insurance.
18      Q     In general, the whole car-buying process
19   sometimes takes hours, right?
20      A     It can.
21              MS. TROY:  Objection.  Argumentative.  I'm
22          going to direct my client to please wait if I
23          have an objection or not because she's
24          immediately answering your question.
25

A1629

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                    182
 1                      L. Stidhum
 2     BY MR. KATAEV:
 3          Q    You can answer now.
 4          A    It can take up to -- it can take longer,
 5     but for the most part, we work relatively quick.  So
 6     I'm speaking based on my experience, we would move
 7     pretty quickly because we were a store that would
 8     get a lot of walk-in traffic.  I would want to grab
 9     two or three customers at a time.
10          Q    What is the fastest that you ever
11     processed the deal for a transaction?
12               MS. TROY:  Objection.  Specify timeframe.
13          Q    Whenever you worked at Hillside Auto
14     Outlet.
15          A    I mean, getting them in and out the door,
16     probably within an hour or less.  I have had
17     instances where I have gotten people out and in
18     their car, registered and everything, in less than
19     an hour.
20          Q    How often does that happen?
21          A    I work relatively quick.  I would want to
22     say maybe 40 to 50 percent.  It's very rare I have
23     customers waiting for hours.
24          Q    Very impressive.  I don't think that's the
25     world's perception of how long it takes a car deal
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          183

1                           L. Stidhum
2          to go through, but very impressive.
3                   MS. TROY:  No need to do your commentary.
4               Ask your question.
5                   MR. KATAEV:  Do you have an objection,
6               Counselor?
7                   MS. TROY:  You were not asking a question.
8               You're making a commentary and talking to my
9               client.
10                  MR. KATAEV:  Do you have an objection?
11                  MS. TROY:  Again, you can tell the judge.
12              You're talking directly to my client and not
13              asking a question.
14                  MR. KATAEV:  I'm making sanctions against
15              you for interrupting my deposition.
16                  MS. TROY:  For telling you not to speak
17              directly to my client?
18                  MR. KATAEV:  Anything other than object
19              and state the grounds.  Please stop
20              interrupting my deposition.
21                  MS. TROY:  I'm objecting.  It's not a
22              question.  You're talking to my client.
23                  MR. KATAEV:  Say, Objection, you're
24              talking to my client and shut up.
25                  MS. TROY:  Let the record reflect you told

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 185 of 294 PageID #: 2295

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              184
                               L. Stidhum
1
2          me to shut up.
3               MR. KATAEV:  You are interrupting my
4          deposition and I want you to stop.  I'm tired
5          of this problem with you.  Please conduct
6          yourself the way you're supposed to conduct
7          yourself at a deposition.
8               MS. TROY:  Telling another counselor to
9          shut up is not professional.
10              MR. KATAEV:  Okay.
11     BY MR. KATAEV:
12         Q    I'm placing up on the screen what has been
13     marked as Defendants's J.  I will represent to you
14     that this a document bearing Bates-stamp numbers
15     D151 through D157.
16     (Defendant's Exhibit J, Marked for Identification.)
17     BY MR. KATAEV:
18         Q    It concerns the lead for an individual
19     named Charles Clark.  Do you recognize that
20     individual?
21         A    No.
22         Q    On D151 it says here, Working with
23     Leticia; do you see that?
24         A    Yes.
25         Q    In status, there is multiple statuses

A1632

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

185

1                         L. Stidhum

2      listed but two of them are lost, correct?

3            A     Right.

4            Q     What does that mean to you that the status

5      of a lead is lost?

6            A     That they either didn't want to come in or

7      they purchased it elsewhere.  The lead was lost.

8            Q     Typically in this program, there is a log

9      of everything that happened with this lead, correct?

10           A     I guess, yes.

11           Q     Let's look at the log.  Starting from the

12     bottom of page D157, there is a inbound phonecall by

13     Aditia on March 17, 2021, correct?

14           A     Okay.

15           Q     You see that?

16           A     Yes.

17                 MS. TROY:  Objection as to timeframe.

18           Objection to relevance.

19           Q     We will skip this one.

20                 MR. KATAEV:  Let the record reflect that

21           for this particular lead, it's a customer that

22           returned after December 2018.  A lead was lost.

23           The information from December 2018 is not

24           listed.

25

A1633

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                   186
                              L. Stidhum
 1
 2    BY MR. KATAEV:
 3         Q    The next exhibit is Defendant's Exhibit J,
 4    I believe and it's Bates-stamped D201 through D206.
 5    For this particular lead, on D201, the manager is
 6    listed as Andris Guzman, correct?
 7         A    Yes.
 8         Q    Going all the way to the bottom on
 9    January 11th of 2019, Tiffany listed that this
10    customer is interested and will be here tomorrow any
11    time from 10:00 to 2:00?
12              MS. TROY:  Objection.  The document speaks
13         for itself.
14         A    Yes.
15         Q    On January 12th of 2019, there is a
16    listing that says the showroom visit started on
17    January 12th at 10:45 a.m. lasting six hours; do you
18    see that?
19         A    Yes.
20              MS. TROY:  Objection.  Document speaks for
21         itself.
22         Q    Is that common that a showroom visit can
23    last up to six hours without a sale being made?
24         A    BDC is in the back so they do not see what
25    is going on in the front so they have to come out,
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

187

L. Stidhum

1
2    grab the book where customers were logged and then
3    they can log them.
4              So realistically was that customer
5    there for six hours, absolutely not.  She ended up
6    logging it in after she saw what happened after she
7    was able to communicate with whatever salesperson
8    was working with them so that way she can log them
9    in.  That is not realistic.
10       Q    Do you have any recollection as to why
11   this particular lead was lost?
12       A    No, I do not.
13       Q    Let's go to Defendant's Exhibit K.  This
14   is Bates-stamped D249 and it ends with D254.
15   (Defendant's Exhibit K, Marked for Identification.)
16   BY MR. KATAEV:
17       Q    At the top of this on January 1, 2019, it
18   says that the customer is here now with Leticia,
19   correct?
20       A    Yes.
21       Q    Then it says the showroom visit started on
22   January 1st of '19 at 4:15 p.m. and lasted for
23   22 hours.
24       A    That goes to show it depends on when the
25   BDC rep decides to come and check on their customer

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

188

                              L. Stidhum

1          and log it in.

3          Q    It says here at 5:15, an hour after the

4      showroom visit started that, Going out under dad

5      Antonio Yanes; do you see that?

6          A    Okay.

7          Q    What does that mean to you?

8          A    He needed a cosigner and he did it under

9      his father.

10         Q    The customer left, as far as you could

11     tell from reading this document, without buying the

12     vehicle, correct?

13         A    It's hard to say because if it went out

14     under Antonio, there would be a new lead set up

15     under Antonio.

16         Q    Over here on January 8 of '19, it says

17     that you made an outbound phonecall to him, correct?

18         A    Yes.

19         Q    How is that tracked?  How did they know

20     you made an outbound phonecall?

21         A    I have no idea.  You can log a call and

22     then put what representative or who made that

23     contact so I don't remember this.

24         Q    It says here on January 26th that this

25     lead was lost, correct?

A1636

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

189

L. Stidhum

1

2      A    Yes.

3      Q    There were emails sent just to try to

4    bring the customer back in and none of that worked,

5    correct?

6           MS. TROY:  Objection.  Goes beyond what

7           the witness would know.  She can answer.

8      A    Then again, there is a note there that

9    said that it went out under the dad.  If it says it

10   went out under the dad, that means the car was

11   delivered under the father's name.

12     Q    Are you saying that they marked the lead

13   as lost and that's incorrect?

14     A    Possibly, because it says it went out

15   under the dad.  If we are going to write that it

16   went out under the dad, that means he did not

17   qualify so his father purchased the vehicle for him.

18     Q    It's possible that he did, correct?

19     A    I'm sorry.

20     Q    It's possible that he did, correct?

21     A    I mean, it wouldn't be there in a note if

22   it wasn't true.

23     Q    Let's look at Defendant's Exhibit L.  This

24   is Bates-stamped D288 through D293.

25   (Defendant's Exhibit L, Marked for Identification.)

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

190

1              L. Stidhum

2    BY MR. KATAEV:

3         Q    Starting from the bottom, there is a note

4    here that on December 10th of '18, an appointment

5    was set for December 10, right?

6         A    Yes.

7         Q    There is another text message here from

8    one of the BDC people to come with proof of address

9    and two recent paystubs if available, right?

10        A    Yes.

11             MS. TROY:  Objection.  Document speaks for

12        itself.

13        Q    On the same day later that day, it says

14   the customer was here with you, correct?

15        A    Yes.

16        Q    The next item in the log is outbound

17   phonecalls by you and two days later another by the

18   BDC rep, right?

19        A    Right.

20        Q    As far as you can tell from this document

21   so far, this customer did not purchase any vehicle,

22   correct?

23        A    Right.

24        Q    On December 15th based on a phonecall by

25   the BDC rep, the customer said he needed money down

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

191

1                           L. Stidhum

2       and wouldn't be ready until February, correct?

3              A     Yes.

4              Q     At least this customer didn't leave

5       because of your waiting to check creditworthiness,

6       correct?

7              A     From what we can tell at least.

8              Q     The reason he knows he needs money down is

9       because his credit was checked, correct?

10             A     Yes.

11             Q     This happened on December of 2018,

12      correct?

13             A     As it states.

14             Q     Was this a one-off to all the situations

15      that you experienced?

16             MS. TROY:  Objection.  Argumentative.

17             Q     You can answer.

18             A     One more time.

19             Q     Is this a one-off to all the

20      discrimination you allege you suffered from the

21      waiting times?

22             A     I'm not understanding.

23             Q     You claimed the customers walked out

24      because they couldn't their credit checked, right?

25             A     Partially.  That's not exactly what I

A1639

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

192

                         L. Stidhum

1                        L. Stidhum

2    said.

3         Q    You testified it took too long for their

4    credit to be checked such they would get frustrated

5    and leave, right?

6         A    Right.  I didn't state that for every

7    single customer I sat with.

8         Q    How many customers did it happen with?

9         A    I don't remember.  It's four years later.

10        Q    This is very important because it's part

11   of your federal lawsuit in federal court with a

12   federal judge, and I would like to understand how

13   many customers on a ratio basis did this happen with

14   and how many did it not happen with?

15        A    Realistically, I would say I would sit

16   with about two, two to three people daily.  Out of

17   those two to three people, at least two of them were

18   walking out at this time because of the longer wait

19   periods.

20        Q    Every day two out of three people?

21        A    More or less.

22        Q    This is one of the three that didn't walk

23   out?

24        A    Possibly, but then again you did state

25   that I made a phonecall to him.  Can we go back to

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        193

                               L. Stidhum

1       that?

2            Q    Sure.

3            A    It's possible that he did walk out because

4       that phonecall was regarding the results of the

5       credit being run finally.

6            Q    Here with Leticia, outbound phonecall two

7       days later, unable to leave message by the BDC rep.

8       Outbound text message, phonecall by BDC rep said he

9       needs money down and won't be ready until February

10      on December 15th.  December 31st, holding off until

11      February.  Lead lost January 16, 2018.

12           A    It's really hard to remember by customer

13      for something that happened four years ago

14      especially since I have been in the business a

15      couple of years and dealt with a bunch of customers.

16           Q    That's why we have records of these

17      things, correct?

18               MS. TROY:  Objection.  Argumentative.

19           Q    You can answer.

20           A    I mean if the stuff was accurate, I would

21      agree.

22           Q    You're saying this isn't accurate, that he

23      called and said --

24           A    I'm not saying that that isn't accurate.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

194

1                          L. Stidhum

2        I'm talking about the documents overall.

3             Q    Let's look at Defendant's Exhibit M.

4        Bates-stamped D397 through D402.  This is a bunch of

5        messages here between the customer and someone named

6        Tiffany, a BDC person about doing an application; do

7        you see that?

8        (Defendant's Exhibit M, Marked for Identification.)

9             A    Yes.

10            Q    What is that application referring to?

11            A    It's a prequalification application.

12            Q    Which is something that is designed to

13       assist customers with getting financing if they need

14       it, correct?

15            A    More or less.

16            Q    It's a process that's done in advance to

17       avoid having to do what have you complained about in

18       this case, correct?

19            A    Right.

20            Q    On January 5th of 2019, Brianna, one of

21       your witnesses, listed that the customer wants to

22       know how much she would put down as a down payment,

23       correct?

24            A    Right.

25            Q    The following day, Brianna set up an

A1642

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

195

                              L. Stidhum

1

2      appointment for the next Saturday, no money down and

3      has a trade-in, right?

4          A     Right.

5          Q     On January 12th, he was working with you

6      and he was greeted by Louis and Manuel, correct?

7              MS. TROY:  Objection.  Documents speak for

8              itself.

9          A    I don't remember who this was, but I

10     guess.

11         Q    After that, the lead is marked lost the

12     following month, correct?

13         A    That was marked lost by the system so what

14     that means is that after a certain amount of time

15     that the customer is not contacted for whatever the

16     case may be, that lead goes into a loss folder.  So

17     like it says there, it's by the system, not by a rep

18     or anybody's name.  There is no telling if that car

19     was sold or not.  I don't recall the name.

20         Q    We will ascertain whether it was sold and

21     we will provide evidence of that.

22              Going back to the January 6, 2019

23     phonecall with Brianna to the customer, when it

24     says, No money down and has a trade-in, what does

25     that mean to you?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

196

L. Stidhum

1

2      A     They want to trade in their car.

3      Q     In that situation, is it the normal

4    process that there is no money down required?

5      A     One more time.

6      Q     In a situation where there is a trade-in,

7    is it normal that there is no money down required on

8    the financing?

9      A     In certain situations.  It all depends on

10   a person's credit.

11     Q     On January 5th of '19, before this

12   customer came in, he did the application necessary

13   to check for financing in advance, correct?

14           MS. TROY:  Objection.

15     A     Yes.

16     Q     So you didn't have to wait for anybody for

17   this customer, correct?

18     A     That's not true because this is the

19   prequalification application.  This is not an

20   application that does a hard inquiry on the credit

21   and shows exactly what the banks are looking for.

22   We still have to run the credit ourselves, we still

23   have to handwrite the application in order to do so,

24   so that's not accurate.

25     Q     The prequalification made it easier,

A1644

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

197

                              L. Stidhum

1

2    didn't it?

3              MS. TROY:  Objection.  Argumentative.

4         A    No.  The prequalification doesn't make it

5    easier unless we have access to those applications

6    prior to them coming in.

7         Q    We are going to look at Defendant's

8    Exhibit N, I believe, which is Bates-stamped D522

9    through D527.  With this lead, Brianna set up an

10   appointment for the following day after January 4th

11   of '19, correct?

12   (Defendant's Exhibit N, Marked for Identification.)

13             MS. TROY:  Objection.  The document speaks

14        for itself.

15        A    Yes.

16        Q    On January 10th, this customer came in for

17   a showroom visit, correct?

18        A    Right.

19             MS. TROY:  Objection.  The document speaks

20        for itself.

21        Q    In this particular instance, the customer

22   left information on a car she was looking for and

23   asked the dealership to let her know if you find

24   that car, correct?

25             MS. TROY:  Objection.  The document speaks

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

198

1                    L. Stidhum

2          for itself.

3          A    Yes.

4          Q    Did you take any steps to find the car she

5     wanted?

6          A    Can we go back down to the dates?

7          Q    Sure.

8          A    That was towards the end of me leaving.

9     So again, I don't recall.  I don't remember this

10    customer specifically, but I'm sure I did everything

11    I could to look and see, especially at that point

12    where I was at being at that time and that

13    dealership.

14         Q    This customer you didn't lose because of

15    waiting for financing, right?

16         A    No.

17         Q    You lost this customer because you

18    couldn't find the car she wanted, correct?

19         A    I wouldn't say I lost the customer.  If

20    I'm not mistaken, I was out of that dealership a day

21    or two later.

22         Q    On January 14th, three days later,

23    correct?

24         A    I guess so.

25         Q    It takes you an hour to sell a car,

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                             199

1                          L. Stidhum

2       correct?

3            A     More or less.

4            Q     You had 36 hours to sell a car to this

5       individual customer, correct?

6            A     Yes.  If you see there, it says she wants

7       a E43 convertible or a 6 Series convertible.  We

8       never had those cars on our lot.  Not a convertible,

9       maybe an E class, maybe a 6 Series, yes, but

10      convertible, to my knowledge, we did not have

11      convertibles, either E43 or a 6 Series, on our lot.

12           Q     You could procure one, couldn't you?

13           A     I'm sorry?

14                 MS. TROY:  Objection.  Argumentative.

15           Repeat your question since she didn't hear.

16           Q     You could procure one, couldn't you?

17                 MS. TROY:  Objection.  Argumentative.  She

18           can answer.

19           A     I'm sure I did look and I'm sure if I

20      would have found it, she would been right back in

21      the store.

22           Q     Let's look at Defendant's O.  It's

23      Bates-stamped D536 through D543.  Towards the bottom

24      of this exhibit on November 24th of '18, it says

25      that this customer has a 2010 Pathfinder for trade

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                200
                                L. Stidhum

1

2       and mentioned trouble with credit and set an

3       appointment for November 25th; do you see that?

4            A    Yes.

5            Q    On November 26th, it says that this

6       customer worked with you recently, filed for

7       bankruptcy, needs to bring back a letter from the

8       trustee as to the budget she's allowed monthly

9       towards vehicle.  Will follow up, correct?

10           A    Yes.

11           Q    Do you remember working with this

12      customer?

13           A    No.

14           Q    Do you recall whether the knowledge of the

15      bankruptcy in this note indicates whether the credit

16      check was done yet?

17           A    Of course it was.  How else would we have

18      known about the bankruptcy being active?

19           Q    With respect to this customer, performing

20      the credit check was not an issue, correct?

21           A    It looks like this was in November, so no.

22           Q    Isn't it true you announced your pregnancy

23      on November 23rd of '18?

24           A    I believe so.

25           Q    This happened after you announced your

A1648

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            201
                              L. Stidhum

1       pregnancy, correct?

2            A     Yes.

3            Q     Your argument that your pregnancy was the

4       reason why it took longer to check credit history is

5       inaccurate with respect to this customer, correct?

6            A     No, that's incorrect.  If you recall, I

7       did say that Isaac was the dad of the dealership and

8       when the dad left, everybody did as they pleased, so

9       there is that.

10           Q     As far as you know, Isaac was the one who

11      pulled the credit for this one?

12           A     I'm not sure.  What I'm saying is that,

13      yes, I announced my pregnancy on November 23rd.  I

14      only remember that because it's my mother's

15      birthday.  I remember announcing my pregnancy then,

16      but the discrimination did not happen until after

17      Isaac left because the dad of the dealership was no

18      longer watching.  There was no jumping in or trying

19      to stop things from happening.  That's what my point

20      is.

21           Q     It says here on December 27th, The

22      customer came for a second time and left very upset.

23      She's in the middle of a bankruptcy and we can't

24      help her; do you see that?

A1649

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        202

1                        L. Stidhum

2          A     Yes.

3          Q     Isn't it true that sometimes you can't

4    help a customer even if you do the credit check?

5                MS. TROY:  Objection.  Argumentative.

6          A     Of course that's true, but again, I

7    mentioned that I might have sat with two or three or

8    maybe more customers a day.  That could have been

9    one of the very few that that happened with.

10         Q     Let's go to Defendant's Exhibit O,

11   Bates-stamped D633 through D636.

12   (Defendant's Exhibit O, Marked for Identification.)

13   BY MR. KATAEV:

14         Q     On this particular one it says, On

15   December 29 of 2018, Brianna found out that this

16   customer was interested in a RAV4 and will be in

17   today and if not with follow up; do you see that?

18         A     Yes.

19         Q     On January 4th, she reiterated the

20   interest in the RAV4 and set an appointment for the

21   following day, correct?

22         A     Yes.

23         Q     It says that on January 5th, the text

24   message by Brianna asked the customer to ask for you

25   when the customer arrives, correct?

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 204 of 294 PageID #: 2314

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        203

1                    L. Stidhum

2              MS. TROY:  Objection.  Document speaks for

3         itself.

4         A    Yes.

5         Q    On January 6th, there is a message by

6    Brianna saying the customer will call back if he's

7    still interested, correct?

8         A    Correct.

9              MS. TROY:  Objection.  The document speaks

10        for itself.

11             MR. KATAEV:  Your objection is noted.

12        Q    On March 28, this individual bought a

13   different car from somewhere else, correct?

14        A    I guess so.

15             MS. TROY:  Objection.  The document speaks

16        for itself.

17        Q    There is no indication there that there

18   were any issues with getting a credit check done,

19   correct?

20        A    It also doesn't indicate that the customer

21   ever came in.  Yes, he made the appointment, yes,

22   Brianna told him to ask for me.  It doesn't look

23   like he ever came in.

24   (Defendant's Exhibit P, Marked for Identification.)

25             MR. KATAEV:  Bates numbered to be D804 to

A1651

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                     204
 1                        L. Stidhum
 2           D806.  This will be P.
 3      BY MR. KATAEV:
 4           Q    This is a December 2018 lead, correct?
 5                MS. TROY:  Same objection as before, which
 6           is again, you're not having the client testify
 7           on her personal knowledge.  You're having her
 8           read off the document.
 9                MR. KATAEV:  Your objection to noted.
10      BY MR. KATAEV:
11           Q    Leticia, is this correct that it's a
12      December 2018 lead?
13           A    Yes.
14           Q    It says here on December 20th of '18 that
15      the cosigner will do an application tomorrow,
16      correct?
17           A    Yes.
18                MS. TROY:  Objection.  The document speaks
19           for itself.  This is document is cut off.
20                MR. KATAEV:  It's right here.
21      BY MR. KATAEV:
22           Q    Based on this note, is it accurate to
23      state that the customer came in?
24                MS. TROY:  Objection.  You're not having
25           her testify on her personal knowledge.  You're
```

A1652

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

205

1                      L. Stidhum

2         having her read off the document.

3         Q    I'm asking her based on her personal

4    knowledge whether, based on this note, the customer

5    would have come in?

6         A    If the customer did come in?

7         Q    Yes.

8         A    Can you scroll down a little more?

9         Q    Did the customer come in?

10        A    Yes.

11        Q    It says here that the customer is coming

12   with his cosigner tomorrow.  Worked with Leticia

13   last night.  He was here, doesn't know specific

14   time; do you see that?

15        A    Yes.

16        Q    In order for all of this to have happened,

17   is it accurate to state that the financing was done

18   already?

19        A    Possible.

20        Q    You did not end up selling this car

21   because the lead was lost?

22             MS. TROY:  Objection.  The document speaks

23        for itself.

24        A    Again, that's a lost lead by the system

25   that was put in three months later which is the

A1653

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                  206
                                    L. Stidhum

1          general timeframe of a lost lead when not contacted,

2          so I can't say it was not sold because he did

3          mention bringing in a cosigner so I can't confirm or

4          deny that.

5              Q    You don't know if it was sold or not?

6              A    I do not.

7              Q    This is Defendant's Exhibit Q.

8          Bates-stamped D812 to D814.

9          (Defendant's Exhibit Q, Marked for Identification.)

10         BY MR. KATAEV:

11             Q    At the bottom over here it says that this

12         individual came in with approval from Capital One,

13         correct?

14                  MS. TROY:  Same objection.  You're not

15                  having her testify on her personal knowledge.

16                  You're having her read off the document.

17             A    Yes.  It does state that, but it doesn't

18         necessarily mean they are approved.

19             Q    You have a note over here, Bonus all

20         capital S's; do you see that?

21             A    Yes.

22             Q    Why did you write this note?

23             A    I have no idea.  I don't remember.

24             Q    This note was written about almost four

*Note: line numbers 1-25 appear in the left margin; text above reflects content.*

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 208 of 294 PageID #: 2318

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

207

1                          L. Stidhum

2        hours after the showroom visit started?

3              A    I don't recall.  It's four years ago.

4              Q    It says here on January 2 of '19 that

5        Brianna noted that she's happy with the purchase?

6              A    Okay.

7              Q    And that means that you were able to make

8        a sale on this vehicle, correct?

9              A    Right.

10             Q    Isaac was not here at this time, correct?

11             A    Right.

12             Q    Andris was the one who did the financing,

13       correct?

14             A    I can't answer that question because it

15       could have been Serge or Andris.

16             Q    Defendant's Exhibit R.  Bates-stamped D815

17       through D820.

18       (Defendant's Exhibit R, Marked for Identification.)

19             MS. TROY:  Same objection.  You're not

20             having her testify on her personal knowledge.

21             You're having her read off the document.

22             MR. KATAEV:  You're only repeating

23             yourself to waste time.  Make a blanket

24             objection.

25             MS. TROY:  I'm going to make a blanket

A1655

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              208

                                    L. Stidhum

1

2          objection which is the whole set of documents

3          from I think Exhibit C onwards.  You're

4          basically having her read off the document.  A

5          lot of the times you're not even asking her to

6          testify on her personal knowledge.  So that's

7          not an appropriate objection.  The document

8          speaks for itself.

9              MR. KATAEV:  It is an inappropriate

10         objection and is a violation of Rule 30 and you

11         have been warned multiple times not to do that.

12             MS. TROY:  You asked me to make a blanket

13         objection so I did.

14             MR. KATAEV:  That's it, stop.

15             MS. TROY:  I did.

16             MR. KATAEV:  Stop already.

17             MS. TROY:  I did what you asked me to.  I

18         don't know want you want to me to do.  You

19         asked me to do something and I do it and then

20         you're like, Stop.

21             MR. KATAEV:  Please stop.

22     BY MR. KATAEV:

23         Q    Look at D818 in this particular exhibit.

24     There is a note here from Brianna that the customer

25     is waiting to see if Uber is going to hire him; do

A1656

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            209

                              L. Stidhum

1
2      you see that?

3           A    Yes.

4           Q    In this particular instance no credit

5      check was probably performed because he was waiting

6      to see if he was going to be hired, correct?

7           A    That's not entirely true.

8           Q    As far as you know, the credit was done on

9      this particular customer?

10          A    I'm not saying it was or was not done

11     because there is no telling on this document.  I

12     can't really tell.

13          Q    That's fine.  This is Defendant's

14     Exhibit S, bearing Bates-stamped numbers D842 to

15     D847.

16     (Defendant's Exhibit S, Marked for Identification.)

17               MS. TROY:  Same objections as the

18               uniformed one, blanket one.

19          Q    This customer visited the showroom on

20     December 12th of 2018, correct?

21          A    Yes.

22          Q    This lead was subsequently marked lost,

23     correct?

24          A    Again, it's by the system three months

25     later, which is uniform for that CRM to do.  It does

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          210
                              L. Stidhum

1       that.  If it has not been contacted within three

2       months as it shows on every one you mentioned that

3       shows lost by the system, it's uniform.

4           Q    Isn't it true that if a vehicle is sold

5       it's marked in the CRM system?

6                MS. TROY:  Objection.  Argumentative.  She

7           can answer.

8           A    Again, it's if they do it.  It's not a yes

9       or no.  If they do it.

10          Q    If they fail to do it, isn't it true they

11      won't get paid a commission?

12          A    I don't believe that is entirely true

13      because they do not get paid on shows that are

14      walk-ins, so I can't say that's entirely true.

15               MR. KATAEV:  Off the record for a minute.

16      (Whereupon, an off-the-record discussion was held.)

17      BY MR. KATAEV:

18          Q    During the course of your employment with

19      Hillside Auto Outlet, there came an occasion where

20      you brought another employee on to work with us,

21      correct?

22          A    Yes.

23          Q    That individual's name is Brianna,

24      correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                               211
                              L. Stidhum
 1
 2          A    Yes.
 3          Q    Brianna is a childhood friend of yours,
 4     correct?
 5          A    Yes.
 6          Q    She continued working at the dealership
 7     after you left, correct?
 8          A    Right.
 9          Q    To your knowledge, is she still working at
10     the dealership?
11          A    No.  Not that I know of.
12          Q    This is Defendant's Exhibit T.  1165
13     through 1167.
14     (Defendant's Exhibit T, Marked for Identification.)
15               MS. TROY:  Also just the blanket objection
16          applies to Exhibit T.
17     BY MR. KATAEV:
18          Q    For this particular lead, this customer
19     was noted by Tiffany from BDC as a cash buy,
20     correct?
21          A    Yes.
22          Q    For a cash buy, that means there will be
23     no financing, correct?
24          A    Correct.
25          Q    There is showroom visit on December 8th,
```

A1659

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 213 of 294 PageID #: 2323

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

212

                            L. Stidhum

1

2       correct?

3            A     Right.

4            Q     You followed up with a phonecall two days

5       later, correct?

6            A     Right.

7            Q     You follow up again two days after that,

8       correct?

9            A     Right.

10           Q     You were not able to sell the vehicle,

11      correct?

12           A     Right.

13           Q     Andris Guzman did not play any role in

14      that because there was no financing, correct?

15           A     Just because it's not noted there doesn't

16      mean he did not because Serge was in the back office

17      so he probably prepared the buyer's order but the

18      first point of contact would have been Guzman.

19           Q     For what?

20           A     Because he's the sales manager so he's

21      going to want to know what's going on, what the

22      customer is asking for, how much he's looking to pay

23      and so on.

24           Q     Going to Defendant's Exhibit U.  It's a

25      document Bates-stamped 1186.  I will represent to

A1660

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

213

L. Stidhum

1    you that this is from the payroll company and it
2    lists your hire date and termination date; do you
3    see that?
4
5        A    Yes.
6    (Defendant's Exhibit U, Marked for Identification.)
7    BY MR. KATAEV:
8        Q    To your knowledge, is this accurate you
9    were hired on May 22nd of 2018?
10       A    Yes.
11       Q    And you were separated from employment on
12   January 14th of 2019, correct?
13       A    Yes.
14       Q    That means you were employed with the
15   dealership for approximately eight months, correct?
16       A    Right.
17       Q    I will represent to you that we are
18   looking at your first paystub, which will be part of
19   this exhibit D1187.
20            I have D1186 through D1250 will be
21   marked as Defendant's Exhibit V.
22   (Defendant's Exhibit V, Marked for Identification.)
23   BY MR. KATAEV:
24       Q    This pay period starts on May 22nd until
25   May 28th of 2018, correct?

A1661

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

214

                              L. Stidhum

1
2       A     Right.

3       Q     This pay period you only received the $300

4    weekly salary, correct?

5       A     That's incorrect.  It shows the $780 in

6    commissions.  We were paid in two separate checks.

7    You get a salary check every week of $300 and

8    commission was separated to reduce the amount of

9    taxes taken out.

10      Q     On this particular case, your first week

11   you sold approximately five cars, correct?

12      A     I think it averages out to 5.2 cars

13   because that's when I was receiving the 5 percent.

14      Q     Right.  The following week, you only sold

15   approximately two cars, correct?

16            MS. TROY:  Can you break that down,

17         Emanuel?

18      A     That looks like it might have been

19   two-and-a-half cars because if another salesperson

20   had to help out, you would split the deal with the

21   other salespeople, so I mean, it could have been

22   carrying over from the 5 percent.

23      Q     Approximately two to three cars in this

24   one, right?

25      A     It might been two.  It could have been

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

215

```
 1                        L. Stidhum
 2        that 5 percent carrying over.
 3              Q    For the third week it was just two cars,
 4        correct?
 5              A    Right.
 6              Q    In the week of June 12 to June 18, it was
 7        no cars, correct?
 8                   MS. TROY:  Emanuel, you're scrolling
 9              really fast.  Could you show us the two
10              paystubs corresponding?
11        BY MR. KATAEV:
12              Q    I will represent to you that I see one
13        paystub and it's June 12th to June 18th and the one
14        before is for the week prior and the one after is
15        for the week after.  This is D1193.
16                   MS. TROY:  You're saying there is only one
17              for that week?
18        BY MR. KATAEV:
19              Q    You know what, I want to do this on the
20        record.  If you go to the week prior, it shows
21        year-to-date of $1,505.  If you go to the week after
22        if shows $2,165.
23              A    That paystub must just not be in there.
24              Q    Maybe it's later on in the production but
25        we will see.
```

A1663

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

216

```
1                         L. Stidhum

2                         Based on the difference in the gross

3          for commissions and the total being $660, you sold

4          approximately four cars, correct?

5               A    One more time.

6                    MS. TROY:  How did you come up with your

7               numbers?

8          BY MR. KATAEV:

9               Q    You look at D1193, which is the week from

10         June 12th, it shows a gross year-to-date of $2,165,

11         if you go to the week prior, it's $1,505.  You get

12         $660.

13                   MS. TROY:  What is your question?

14              Q    $660 and you divide that by $150, I get

15         4.4 cars.  You sold approximately four cars,

16         correct?

17              A    Yes.

18              Q    In the following week with the commission

19         being $615, you also sold approximately four cars,

20         correct?

21              A    Yes.

22              Q    In the week after that, $655, again

23         approximately four cars, correct?

24              A    It's hard to say because it's confusing

25         with that 5 percent.
```

A1664

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            217

                              L. Stidhum

1

2        Q     Four to five, right?

3        A     Yes.

4        Q     Going into the week of July 3rd through

5    July 9 from the prior week that we just went over,

6    your gross remains the same and you didn't receive

7    any commission check.  So you didn't sell any cars

8    that week?

9             MS. TROY:  Slow down a little bit.  In the

10            July 3 to the July 9 for 1198 is your question?

11            MR. KATAEV:  That's correct.

12   BY MR. KATAEV:

13       Q     I'm showing the week before had the same

14   gross and I'm showing going back to the same paystub

15   it's the same gross and this is the following week.

16   So is it accurate to say that you sold no cars the

17   week of July 2018, the first week?

18            MS. TROY:  Could you show me the two pages

19            again with the two numbers?

20            MR. KATAEV:  Yes, of course.

21            MS. TROY:  What number are you talking

22            about?

23            MR. KATAEV:  D1198 is the benchmark.  The

24            gross is listed as $3,435 year to date.  If you

25            go back to $1,197 to the week prior, it remains

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

218

1                          L. Stidhum

2              the same, it's $3,435 year to date.  If you go

3              to D1199, which is the one after, it's the

4              following week.

5     BY MR. KATAEV:

6              Q    Based on those three paystubs from D1197

7         to D1199, is it fair to say that you did not sell

8         any vehicles that week?

9              A    I don't recall.  I'm trying to think back.

10        Maybe I was on vacation or something.

11                  MR. KATAEV:  Off the record.

12        (Whereupon, an off-the-record discussion was held.)

13        BY MR. KATAEV:

14             Q    We have reviewed the pages bearing

15        Bates-stamped numbers D1197 through D1200, which is

16        a comparison of two weeks worth of regular pay of

17        $300 a week and commissions for those two weeks.

18        And my question is:  Based on our review of the

19        record of the paystub for July 3rd through July 9th

20        bearing Bates-stamped D1198, you did not sell any

21        cars during that week, correct?

22             A    I did not say that I did not sell any

23        cars.  I was not paid any commission.  Sometimes you

24        wouldn't get paid on all your cars if the deal was

25        not funded.  Sometimes the deals were funded and I

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          219
                              L. Stidhum
1
2      would still receive pay on it.  I'm not sure what
3      happened there.
4           Q    In the following week, you received $900
5      in commissions and that means you sold at least --
6           A    Six cars.
7           Q    Correct?
8           A    I don't know if it was all for that week
9      or if there were was some carried over.  $900 would
10     be for six cars.
11          Q    The following week you made $1,400 which
12     means you sold at least nine cars, correct?
13          A    Right.  So there is definitely a
14     possibility they were carried over from previous
15     weeks or I had a really great week.
16          Q    This is your best week so far, two months
17     into your employment?
18          A    I don't remember.
19          Q    I will represent to you that this is the
20     first four-figure week you had.  The following week
21     after you made the $1,400, you made $450 and that
22     means you sold at least three cars, correct?
23          A    Right.
24          Q    The week after that $300 which means at
25     least two cars, correct?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

220

L. Stidhum

1
2    A    Right.

3    Q    The week after that you top your prior

4    record and made $1,450 which is a least nine cars,

5    correct?

6    A    Right.

7         MS. TROY:  Could you do the division for

8    us?

9    A    It's a little over nine cars.

10   Q    $1,450 divided by $150 is 9.67.

11   A    It might have been a split deal in there.

12   That looks like it was after the time that I stopped

13   receiving the 5 percent.

14   Q    This is for the week ending August 20th

15   from August 14th with a pay date of August 24th.  I

16   will represent to you that your complaint states

17   that Jay stopped working on August 24.

18   A    Okay.  It might have been part of it.

19   Again, this is a long time ago.  I don't recall

20   exact dates of which she left or was fired.

21   Q    My question is basically:  Did you sell at

22   least nine cars this week?

23   A    Yes.

24   Q    We are moving now into the next week and

25   here you sold -- you have $1,200 in commissions

A1668

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 222 of 294 PageID #: 2332

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          221
                              L. Stidhum
1

2        which means you sold at least eight cars, correct?

3            A    Right.  It could have been cars carrying

4        over.

5            Q    I understand.  This following week the

6        commission was only $150, which means you sold only

7        one car?

8            A    Possibly.

9            Q    The following week, $450, which means only

10       three cars?

11           A    Again possibly.

12           Q    The following week, again just three cars

13       which is $450, correct?

14           A    Yes.

15           Q    And now the next week, which we are

16       looking at September 18 to September 24, it's $750

17       which is five cars, correct?

18           A    Yes.

19           Q    Again, $750 for the following week is five

20       cars, correct?

21           A    Yes.

22           Q    And this particular week $900 is seven

23       cars, correct?

24           A    Which one are you talking about?  What

25       number are you talking about?

A1669

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          222

1                        L. Stidhum

2              MS. TROY:  Could you do your calculation

3         on the screen.

4         Q    We are up to D1223 for the period starting

5    and ending December 2nd through 8th of 2018, and

6    $900 divided by $150 is six.  You sold at least six

7    cars that week, correct?

8         A    Correct.

9         Q    The following week is $700.  Divide that

10   by $150, you sold at least four cars, correct?

11        A    Right.

12        Q    The following week is $800, which means

13   you sold at least five cars, correct?

14        A    I'm sorry.

15        Q    Five cars.

16             MS. TROY:  Put your calculator on the

17        screen.  It's easier.  You're saying $800.  How

18        many cars?

19        A    Five and change.

20        Q    You sold at least five cars that week.

21        A    Again, it might be carried over.  It's

22   hard to say.

23        Q    Okay.  The next week we are approaching

24   the end of October of '18 is $1,050.  When you

25   divide that by $150, it equals exactly seven.  You

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

223

1                    L. Stidhum

2       sold at least seven cars that week, correct?

3            A    Yes.

4            Q    The following week, again, I have $1,050

5       which means you sold at least seven cars the next

6       week?

7                 MS. TROY:  Emanuel, instead of at least,

8            do the -- at least seven cars.

9            A    Yes.

10           Q    The same for the following week, which is

11      Bates-stamped D1230, correct?

12           A    Right.

13           Q    I have the first week of November from the

14      6th to the 12th with Bates-stamp D1232 and $900,

15      which means you sold at least six cars, correct?

16           A    Right.

17           Q    And here we have $1,375 for the middle

18      week of November from the 13th to the 19th.  That

19      means you sold at least nine cars, correct?

20           A    Right.

21           Q    Then during the almost last week of

22      November, the 20th to 26th, I have $450 which means

23      three cars, correct?

24           A    Right.

25           Q    And then during the last week of November,

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 225 of 294 PageID #: 2335

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                          224

                          L. Stidhum

1        I think following Thanksgiving, I have $1,600 which

2    is your best week ever so far and that means you

3    sold at least ten cars, correct?

4        A    Yes.

5        Q    Now we are entering into the first week of

6    December 2018.  By the way, your best week after the

7    $1,600 was for the pay period November 27th to

8    December 3rd after you announced your pregnancy,

9    correct?

10       A    Yes.

11       Q    The following week you made $825, which is

12   at least five cars, correct?

13       A    Right.

14       Q    The second week in December you made $625,

15   which means at least four cars, correct?

16       A    Right.

17       Q    And then $500 for the third week in

18   December, which is approximately three cars,

19   correct?

20       A    Right.

21       Q    The final week in December you didn't sell

22   any cars, correct?

23       A    It looks like I sold two.

24       Q    I apologize, I saw zero.  I didn't see the

A1672

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            225

                             L. Stidhum

 1
 2       $350.  Withdrawn.
 3                   For the final week during the
 4       Christmas holiday season from December 25th to
 5       December 31st, you sold at least two cars, correct?
 6            A    Right.
 7            Q    Finally in January of '19, you sold at
 8       least five cars based on your commission of $825,
 9       correct?
10            A    Right.
11            Q    The second week of January, you have $350
12       in commissions which means you sold at least two
13       cars, correct?
14            A    Right.
15            Q    And then you no longer sold anymore
16       vehicles because you quit, correct?
17            A    Correct.
18            Q    Okay.
19            MS. TROY:  With the qualification that
20            it's for the Defendants.
21            MR. KATAEV:  What does that mean?
22            MS. TROY:  Like, she sold cars at other
23            places, just not at the Defendants'.  You said
24            she no longer sold any cars.
25            MR. KATAEV:  Right, only for defendants.

A1673

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

226

                              L. Stidhum

1

2              Skipping a bunch of exhibits, I want to

3          see if I want to do any of the others.  We can

4          take a quick break.  It's 3:59.  Let's

5          reconvene at 4:05.

6            (Whereupon, a short recess was taken.)

7      BY MR. KATAEV:

8          Q    I have placed up on the screen what will

9      be marked as Defendant's Exhibit W.

10         A    Before we move on to this, you caught me

11     in a little bit of confusion.  You said my best week

12     was $1,600 in the first week of December.  If you

13     recall, that was $1,000 of that was a bonus from

14     November.

15         Q    Okay.

16         A    It was really four cars for that first

17     week and that was definitely cars rolling over from

18     November because if we go back to the other document

19     where the sold log was, I didn't sell a car until

20     the 6th or something like that.

21         Q    Okay.  You want to supplement your answer

22     just to explain that?  That's okay, I understand

23     that.

24         A    Of course.  It looks like I sold

25     20-something cars for that month, when there is no

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

227

1                        L. Stidhum

2      way I sold that many in three days.

3          Q    What is the most cars you ever sold in a

4      month?

5          A    30.  33, actually but not at this

6      dealership.  When I went to NYC Motor Cars.

7          Q    I'm saying at this dealership?

8          A    27, I believe or 28.

9          Q    Do you remember what month that was?

10         A    That was in the month of November.  That's

11     why I received that $1,000 bonus on December 3rd.

12         Q    The $1,600 that you received was a $1,000

13     bonus and the $600 was for at least four cars,

14     correct?

15         A    Correct.

16         Q    Thank you for clarifying your answer.

17                    Going back to Exhibit W, I will

18     represent to you this is an April 28, 2022 order

19     from Judge Pamela J. Chen.  She's the judge that I

20     will represent to you was the prior judge assigned

21     to this case, and the order says here on April 1st,

22     2022, this Court ordered Plaintiff to notify the

23     Court by filing a letter on the docket within seven

24     days of the Second Circuit issuing a decision in

25     Case Number 21-1653.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

228

1              L. Stidhum

2              It says Second Circuit issued its

3      decision on April 12, 2022.  As of today, April 28,

4      2022, Plaintiff has not filed a letter on the docket

5      to notify the Court.  Accordingly, on or before

6      May 4th, 2022, Plaintiff shall file a letter on her

7      docket with the proposed next step of how this case

8      should proceed.

9                   Do you see that?

10        A    Yes.

11              MR. KATAEV:  Off the record.

12     (Whereupon, an off-the-record discussion was held.)

13              MR. KATAEV:  Back on the record.  I was

14         about to ask some questions about this, but

15         Plaintiff wanted to make some objections.  Go

16         ahead.

17              MS. TROY:  The same objection as before.

18         The same blanket objection applies to this

19         exhibit.

20     BY MR. KATAEV:

21        Q    Just a question I have about this,

22     Ms. Stidhum, are you aware that there was an appeal

23     of a prior case?

24        A    Yes.

25        Q    You're aware that the prior case that was

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                 229
                              L. Stidhum

1       filed was dismissed, correct?

2           A    Yes.

3           Q    You're aware it was dismissed because it

4       didn't remain with the EEOC for the statutory period

5       of time?

6           A    Yes.

7           Q    You're aware that your law firm decided to

8       appeal that decision?

9           A    Yes, I am.

10          Q    Are you aware --

11               MS. TROY:  I'm going to make sure to

12          direct my client to not divulge any

13          communication she may have had with her

14          attorney as part of any response.

15      BY MR. KATAEV:

16          Q    For this whole line of questioning, don't

17      tell me anything that you said to your attorneys or

18      your attorneys said to you.

19               You're aware that because there was

20      an appeal filed with the Second Circuit, that there

21      was something scheduled that was called a Camp

22      conference?

23          A    I'm not sure.

24          Q    Just to explain what a Camp conference is,

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

230

```
                        L. Stidhum
 1
 2      it's a conference designed for the purpose of
 3      discussing settlement over the phone.
 4          A    Okay, yes.
 5          Q    Are you aware that that Camp conference
 6      was held?
 7          A    Yes.
 8          Q    Did you participate in that conference?
 9          A    I don't believe so.  This is not the one
10      we are talking about that was in person, correct?
11          Q    It's not, that's correct.
12          A    So no.
13          Q    You were not present, correct?
14          A    No.
15          Q    Are you aware of what transpired at this
16      conference without telling me what was said?
17          A    Yes.
18               MR. KATAEV:  Go off the record.
19      (Whereupon, an off-the-record discussion was held.)
20      BY MR. KATAEV:
21          Q    Just some general questions.
22               When you quit, you're not alleging
23      that you were constructively discharged, correct?
24          A    No.
25               MS. TROY:  Objection.  Calls for legal
```

A1678

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

231

L. Stidhum

1

2          conclusion.  I don't know if she knows what

3          you're asking.

4     BY MR. KATAEV:

5          Q    I will give some more layman's terms

6     question.

7                    The reason why you quit was because

8     you were not willing to wait until Isaac dealt with

9     the issues that you were raising to his attention,

10    correct?

11         A    That's not true, because I indeed did wait

12    for Isaac and we did have an in-person conversation

13    prior to me making my final decision.

14         Q    The reason why you quit is because you did

15    not want to wait any further after having that

16    discussion, correct?

17         A    I mean, at that point it was very, you

18    know, obvious that I wasn't getting the promotion I

19    wanted or was promised, not wanted I should say, or

20    any type of raise or anything like that, so yes, I

21    did quit because of that.

22         Q    You're not saying it was intolerable to

23    work at Hillside Auto Outlet based on those

24    conditions, correct?

25         A    I mean, it was because who wants to sit in

A1679

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 233 of 294 PageID #: 2343

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

232

                            L. Stidhum

1    
2    a place for ten hours a day pregnant, tired and not
3    make any money.
4         Q    And the reason why you found it
5    intolerable to work there is because you were not
6    making money?
7         A    And because of the way I was being
8    treated.  I would be blatantly ignored when I had a
9    customer.
10        Q    And the only person that was ignoring you
11   was Andris Guzman, correct?
12        A    Which was my point of contact at the time
13   of Isaac's vacation, yes.
14        Q    You testified earlier that with respect to
15   your workweek, you were off on Wednesdays and every
16   other Sunday, correct?
17        A    Yes.
18        Q    What time would you come in every morning
19   and what time would you leave every evening?
20        A    10:00 to 8:00, sometimes 9:00, 10:00 p.m.
21   Depends on the workday, how many customers we have.
22        Q    You had at least a one-hour lunch break,
23   correct?
24        A    Not necessarily.  We would eat as we went.
25   There was no set time or timeframe to eat.

A1680

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

233

                        L. Stidhum
1
2        Q    Would you eat together with other
3    salespeople or did you eat on your own?
4        A    Depends.  If we both didn't have a
5    customer at the time, we would go grab lunch
6    together.  We didn't have a designated area to eat
7    so we would eat right at our desk.
8        Q    Did you go to restaurants and sit there
9    and eat?
10       A    Never.
11       Q    Never?
12       A    Never.  Picked up food and come back.
13       Q    You had the option of staying at the
14   restaurant if you wanted, correct?
15       A    Not really.  It was kind of eat and go
16   type of place.  Eat and get back to work.
17       Q    When you went to get lunch, how did you
18   pay for lunch?
19       A    I mean, with my money earned there, cash,
20   credit, whatever.
21       Q    Sometimes you used cash, sometimes you
22   used credit?
23       A    Yes.
24       Q    Did you ever have a charge back?
25       A    A charge back?

A1681

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 235 of 294 PageID #: 2345

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

234

L. Stidhum

1
2          MS. TROY:  Explain that.
3     Q     Dealership parlance.
4     A     I know what a charge back is.  If a car
5     was returned, they would take my commission back.  I
6     never dealt with a charge back, not that I remember
7     at least.
8     Q     Are you aware of any vehicles you sold
9     being returned for any reason?
10    A     Not that I can remember.
11         MS. TROY:  Again, qualifying this is
12         during Hillside?
13         MR. KATAEV:  Yes.
14    BY MR. KATAEV:
15    Q     Would you be surprised to learn there were
16    vehicles that were charged back that were not taken
17    from you?
18    A     Yes.
19         MR. KATAEV:  Off the record.
20    (Whereupon, an off-the-record discussion was held.)
21    BY MR. KATAEV:
22    Q     Are you aware that Defendants filed a
23    motion to dismiss this case?
24    A     Yes.
25    Q     Are you in receipt of a copy of the

A1682

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 236 of 294 PageID #: 2346

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

235

1                          L. Stidhum

2      decision from Judge Gonzalez denying the motion to

3      dismiss?

4           A    Yes.

5           Q    You read it, correct?

6           A    Yes.

7           Q    I'm going to place up on the screen what

8      will be marked as Defendant's Exhibit X.

9      (Defendant's Exhibit X, Marked for Identification.)

10     BY MR. KATAEV:

11          Q    I will represent to you that this is the

12     decision by Judge Gonzalez and I want to point you

13     to a particular paragraph and ask you some questions

14     about it, okay?

15          A    Okay.

16          Q    Look at page seven.  It says, Plaintiff's

17     allegations that she was deprived access to the

18     Dealertrack program and "could no longer run

19     customer credit scores or prefill financing

20     applications," are not enough to constitute adverse

21     actions because as Plaintiff herself described, she

22     was given unique access and received a benefit that

23     none of her colleagues received.

24                    You see that?

25          A    Yes.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    236

1                          L. Stidhum

2        Q    It says in the next sentence, However, the

3   Court finds that a decrease in Plaintiff's take-home

4   pay can constitute an adverse action.

5                  Do you see that?

6        A    Yes.

7        Q    You're saying that your decrease in

8   take-home pay occurred because you had to wait

9   longer for Andris to check customer's credit

10  histories, correct?

11       A    Correct.

12       Q    But I have shown you multiple examples

13  where you lost sales for reasons other than that,

14  correct?

15       A    You have showed me examples that don't

16  really apply to this because you showed me a cash

17  deal, which obviously there is no need to run

18  anybody's credit and you showed me two examples of

19  customers needing cosigners and then there is no

20  more notes after, and then it will say that the lead

21  was lost three months later because nobody wrote

22  anything so I can't agree to that.  That is not

23  correct.

24       Q    It says here, Plaintiff has plausibly

25  alleged that Defendants decreased her bonus by

A1684

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

237

```
                              L. Stidhum
 1
 2     increasing the average wait time for her customers
 3     after she announced her pregnancy without doing the
 4     same to the customer's of her nonpregnant coworkers
 5     thereby decreasing the number of sales she was able
 6     to make.
 7                    Do you see that?
 8          A    Yes.
 9          Q    How is it that the Defendants increased
10     the average wait time for your customers?
11          A    Again, by making them wait to run their
12     credit, by prioritizing other customers even though
13     they came afterwards, after me having no Dealertrack
14     access.
15          Q    During your employment with Hillside Auto
16     Outlet, did you physically witness new customers
17     coming in, being checked before your customers that
18     were already waiting?
19          A    Yes.  That's how I knew that my customers
20     were being pushed to the side and taken -- I'm
21     sorry, not taken, other customers were being
22     prioritized.
23          Q    You acknowledge either way that even if
24     Andris Guzman quickly processed the applications,
25     you would still have to face the hurdle of closing
```

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

238

L. Stidhum

1

2     the sale based on whatever the numbers were and so

3     on and so forth, correct?

4          A     That's not my original complaint.

5          Q     I'm asking you even if Andris complied

6     with your request to more quickly do it, there was a

7     greater potential that you would still not be able

8     to close the sale for a variety of different

9     reasons, correct?

10          MS. TROY:  Objection.  Argumentative.  She

11          may answer.

12          A     I'm sorry, one more time.

13          MR. KATAEV:  Read it read.

14     (Whereupon, the referred to question was read back

15               by the reporter.)

16          MS. TROY:  Objection.  Calls for

17          conjecture.  She may answer.

18          A     I don't know how to answer that question

19     properly because if that was the case then it would

20     be the same as before pretty much, before I even had

21     Dealertrack access.  I'm not really sure how to

22     answer that question.

23          Q     Even after Andris would give you the

24     numbers, there was a potential the customer would

25     say, You know what, I don't want to buy this

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

239

1                        L. Stidhum

2     vehicle, correct?

3          A    Of course, but that would have been the

4     case the whole time regardless.  That's not what the

5     complaint is.

6          Q    Even after Andris provided you the

7     numbers, the numbers could be such that the monthly

8     payment that would be required by the bank could be

9     too high, correct?

10         A    Yes.

11         Q    The down payment amount required by the

12    bank could also be too high, correct?

13         A    Yes.

14         Q    Even if Andris timely provided you the

15    numbers, it didn't necessary mean you would close

16    the sale, correct?

17         A    It's partially correct.

18         Q    It only increased your chance at making

19    the sale, but it didn't in any way guarantee you

20    would make the sale, correct?

21         A    Correct.

22         Q    Okay.  I have a couple more exhibits.  Let

23    me see if I need them.

24              MS. TROY:  Emanuel, we are sitting at the

25         4:30 mark.

A1687

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

240

                              L. Stidhum

1
2          MR. KATAEV:  We are almost done.
3          MS. TROY:  This has never been produced to
4      us as any document production.
5          MR. KATAEV:  It has been produced to the
6      judge in this case.  Please stop interrupting
7      my deposition.
8          MS. TROY:  I'm 1,000 percent --
9          MR. KATAEV:  Stop interrupting my
10     deposition.
11         MS. TROY:  I'm going to note my objection.
12     This has never been produced before.
13         MR. KATAEV:  Your objection is noted.  It
14     has been produced to the court.  Stop.
15         MS. TROY:  I'm 1,000 percent sure it was
16     not produced.
17         MR. KATAEV:  Are you willing to bet
18     $10,000 on it?
19         MS. TROY:  The Dropbox is only the
20     documents.  This is no audio file.
21         MR. KATAEV:  Stop interrupting my
22     deposition.
23         MS. TROY:  Go ahead.  I'm noting my
24     objection.
25     (Defendant's Exhibit Y, Marked for Identification.)

A1688

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

                                                          241

1                         L. Stidhum

2      BY MR. KATAEV:

3          Q    Defendants are producing Exhibit Y and

4      it's an audio recording, which I'm going to play.

5      It's approximately three minutes long.  I would like

6      the witness to listen and I will ask some questions

7      afterwards.

8                    Are you ready?

9          A    Yes.

10         Q    Thank you.

11                    (Audio is played.)

12             MS. TROY:  Let the record reflect that

13             this was not produced as part of the document

14             production response.  Instead Mr. Kataev

15             recorded me without my consent and subsequently

16             other courts have found that he should not be

17             able to record such conversations.

18     BY MR. KATAEV:

19         Q    Okay.  I have some questions about this

20     recording, Ms. Stidhum.  Were you ever apprized of

21     the fact that your attorney and I had what's called

22     a telephonic meet and confer?

23         A    Yes.

24         Q    Were you aware that this was the tenor of

25     the communications that were had?

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                        242

                              L. Stidhum

1           A     No.

2           Q     Do you believe the way the attorneys are

3     acting in this phonecall are acting professional?

4               MS. TROY:  I'm going to object.

5           A     Can I object?  Can I object?

6           Q     No, you can't object.  Your attorney can

7     object and you can answer the question.  Please go

8     ahead and make your objection.

9               MS. TROY:  Repeat your question.  What is

10              your question?

11    BY MR. KATAEV:

12          Q     From what you hear on this phonecall, do

13    you believe the way the attorneys are acting on this

14    phonecall are acting professional?

15              MS. TROY:  How is this relevant?

16              MR. KATAEV:  Are you objecting because of

17              relevance, Counselor?

18              MS. TROY:  I'm objecting.

19              MR. KATAEV:  Your objection is noted.

20              Please answer the question.

21              MS. TROY:  Great.  We will make a motion

22              to strike and potentially move for costs

23              afterward.

24

25

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                            243

                                    L. Stidhum

1                        BY MR. KATAEV:

2                            Q    Please answer the question.

3                            A    I'm not sure.  I don't know the nature.  I

4                        know that things can get heated.

5                            Q    Are you aware that interrogatory number 9

6                        is not something that Defendants were compelled to

7                        provide?

8                            A    Can I know what an interrogatory is?  I

9                        don't know what it is.

10                           Q    Withdrawn.

11                                I believe I have two or three more

12                       exhibits.

13                                MS. TROY:  You had a couple of exhibits

14                           30 minutes ago.

15                                MR. KATAEV:  Well, now I have a couple of

16                           exhibits 30 minutes later.

17                                MS. TROY:  For the record, it's now 4:40.

18                           We were supposed to start at 9:00.  He wasn't

19                           ready to start at 9:00.

20                                MR. KATAEV:  Based on testimonial time.

21                           Enough with this.

22                                I'm placing up on the screen what will be

23                           marked as Defendant's Exhibit Z.

24                       (Defendant's Exhibit Z, Marked for Identification.)

A1691

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                              244

1                            L. Stidhum

2    BY MR. KATAEV:

3         Q    I will represent to you that this is a

4    December 6, 2022 order from Judge Mann, who

5    previously presided as the magistrate judge in this

6    case.  You can read the whole thing but my focus

7    will be on this aspect right here.  Let me know when

8    you're done reading it.

9              (Witness perusing document.)

10             MS. TROY:  I would like to note for the

11        record that this does not reflect our

12        correction to some of the misrepresentations

13        made by Defendants' counsel.

14        A    I'm finished.

15        Q    Do you see this part of this order that

16   Judge Mann notes that Plaintiff's counsel persisted

17   in engaging in gratuitous and ad hominem attacks on

18   me, Defense counsel?

19        A    Yes.

20        Q    Are you aware that your attorney spends

21   time on your case engaging in personal attacks

22   against unnecessarily?

23        A    No.

24        Q    You should be aware of that.

25             MS. TROY:  We are going to motion to

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

245

L. Stidhum

1    strike that after this deposition.

2            MR. KATAEV:  Make the motion after.

3        Please don't interrupt my deposition.

4    BY MR. KATAEV:

5        Q    I'm placing up on the screen what will be

6    marked as Defendant's Exhibit AA.  I will represent

7    to you this is a December 22, 2022 decision by

8    Magistrate Judge Mann who previously presided over

9    this case.  It's resolving a letter motion filed by

10   your law firm that's representing you.

11           MS. TROY:  Scroll through the entirety of

12       the document.  It's 10 pages.

13           MR. KATAEV:  You have the document.  I'm

14       going to focus on what I need to ask.

15           MS. TROY:  She's entitled to review the

16       entirety of the document.

17           MR. KATAEV:  That's fine.  I would like to

18       finish asking the question before I do that.

19           MS. TROY:  She can review the entirety of

20       the document.

21           MR. KATAEV:  Stop interrupting my

22       deposition.  I'm asking a question.  Please do

23       not interrupt me.  You've interrupted me three

24       times during this question.  Make your

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

246

L. Stidhum

1
2       objection after I'm done speaking.  Wait until
3       I'm done.  Have some manners.
4              MS. TROY:  I'm asking that she be --
5              MR. KATAEV:  Stop.  Stop.  I want to ask
6       my question.  Stop interrupting my deposition.
7              MS. TROY:  My request was noted.  To the
8       extent you ignore it, it's also noted for the
9       record.
10             MR. KATAEV:  It's not being ignored.  I
11      would like to ask my question.  Please stop
12      interrupting my deposition.
13             MS. TROY:  Again, my request was noted.
14             MR. KATAEV:  Stop interrupting my
15      deposition.  When I finish asking my question,
16      I will give you an opportunity to make an
17      objection.  Stop interrupting my deposition.
18   BY MR. KATAEV:
19      Q    As I was saying, I'm presenting to you
20   Defendant's Exhibit AA which is a Memorandum of
21   Order by Judge Mann, the previous judge in this
22   case, and in this decision she's resolving a letter
23   motion filed by your attorneys to compel Defendants
24   to provide supplemental responses to Plaintiff's
25   interrogatories and document demands.

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

247

1                        L. Stidhum

2                   Do you see that?

3        A    Yes.

4        Q    Thank you.  If you would like to take a

5    second to read through this and tell me when to

6    scroll I will do so.

7                 (Witness perusing document.)

8        A    Okay.

9        Q    I don't have any questions about this, but

10   at your counsel's request, we are going to waste our

11   time reviewing the entire document.

12            MS. TROY:  If you don't have any questions

13        about it, we don't need to waste our time going

14        through the document.

15            MR. KATAEV:  Thank you, I'm so glad we

16        were able to achieve that.

17   BY MR. KATAEV:

18        Q    I'm highlighting a portion --

19            MS. TROY:  If you have a question --

20            MR. KATAEV:  I said I don't have a

21        questions about this portion.

22   BY MR. KATAEV:

23        Q    Back on the record.  Page two of

24   Document 37.  This is Defendants' Exhibit AA and I'm

25   highlighting, Nevertheless Plaintiff's ad hominem

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

248

1                        L. Stidhum

2       attacks are unwarranted; do you see that?

3           A    Yes.

4           Q    This is the second reference in which your

5       attorneys are being accused of making personal

6       attacks against me.

7                        Are you aware of that?

8           A    No.

9           Q    It says in here that while the judge in

10      the Southern District of New York did, in fact,

11      criticize me for quote/unquote making frivolous

12      requests in that case, the firm, Troy Law PLLC,

13      which represents the Plaintiff in the instant action

14      has been sanctioned, punished in literally dozens of

15      cases, too numerous to recount in both this district

16      and the Southern District of New York.

17                       Are you aware, Ms. Stidhum, that the

18      law firm that you hired has been sanctioned,

19      punished in dozens of cases too numerous recount?

20              MS. TROY:  I'm going to make my objection

21          to this question.  Irrelevant to the case and

22          we are going to motion to strike that question

23          and response and we are going to move for costs

24          and fees to that question.

25              MR. KATAEV:  Your objection is noted.

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 250 of 294 PageID #: 2360

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

```
                                                      249
 1                     L. Stidhum
 2     BY MR. KATAEV:
 3          Q    Please answer the question.
 4          A    No.
 5          Q    I have one final exhibit and this
 6     deposition is over.
 7                     Ms. Stidhum, are you aware that there
 8     was an appeal of the decision denying the motion to
 9     dismiss?
10          A    Yes.
11          Q    Are you aware that that appeal has been
12     withdrawn?
13          A    Yes.
14               MR. KATAEV:  I believe I'm done.  I will
15          be right back.
16                     (Short recess taken.)
17     BY MR. KATAEV:
18          Q    Ms. Stidhum, do you have a recollection as
19     to when Ali came to first work at Hillside Auto
20     Outlet?
21          A    I don't really remember.  It was between
22     sometime in mid November to early December.  Isaac
23     was trying to train him for when he leaves to kind
24     of handle what he handles while he was on vacation.
25          Q    When did Isaac go on vacation?
```

A1697

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

                                                                    250

                                    L. Stidhum

1

2        A    Early December.  Maybe mid December.

3        Q    It wouldn't be outside the realm of reason

4    for Ali to have come to begin work in the beginning

5    of December, correct?

6             MS. TROY:  Objection as to form.  She may

7         answer.

8        A    I'm sorry.  I don't understand.  I don't

9    understand.

10       Q    You wouldn't find it hard to believe that

11   Ali began working in the beginning of December 2018,

12   correct?

13       A    No.  That's what I just stated.

14       Q    Okay.  You disclosed to everyone that you

15   were pregnant in late November of 2018, correct?

16       A    Correct.

17       Q    The conversation about a sales manager

18   promotion happened after Ali started working there,

19   correct?

20       A    That's incorrect.  That happened prior.

21       Q    That conversation happened between

22   yourself, Ali and Isaac; did it not?

23       A    No.

24       Q    You're saying that Isaac had an

25   independent conversation with you first without Ali

A1698

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

251

1              L. Stidhum

2       present?

3            A    Ali was never in the equation when we had

4       that managerial talk.

5                 MR. KATAEV:  Give me one second.

6                      Last question.

7                 MS. TROY:  You have like five last

8            questions already.

9                 MR. KATAEV:  Congratulations for noting

10           that.

11      BY MR. KATAEV:

12           Q    If the first conversation you had about

13      the promotion occurred with Ali present, then it

14      is --

15                MS. TROY:  Objection.  Mischaracterizes

16           witness testimony.  You can continue to ask

17           your question.

18                MR. KATAEV:  You can't object in the

19           middle of my question.  I'm going to rephrase

20           the question.

21      BY MR. KATAEV:

22           Q    If it is, in fact, true that your

23      conversation with Isaac about a promotion occurred

24      with Ali present, then it is true that that

25      conversation occurred after you told everyone you're

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

252

1                    L. Stidhum

2     pregnant, correct?

3            MS. TROY:  Objection.  Mischaracterizes

4         witness testimony.  That's not what she said.

5         A    I just said Ali was not present for that

6     conversation at all.  In fact, I thought that the

7     month of November me exceeding expectations of every

8     other month was going to push me into that position

9     even more because it was already a conversation

10    prior to me doing the max cars I ever did at that

11    dealership.

12           MR. KATAEV:  Thank you for your time

13        today.  I have no further questions.

14

15                  (Time noted: 4:57 p.m.)

16              _____

17                  LETICIA F. STIDHUM

18

19    Subscribed and sworn to before me this _____ day

20    of _____ 2023.

21    _____, Notary Public.

22

23

24

25

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

253

1                          L. Stidhum

2                       I N D E X

3    WITNESS

4    LETICIA FRANCINE STIDHUM

5

6    EXAMINATION BY                          PAGE

7    MR. KATAEV                               4

8

9    COUNSEL REQUESTS                         PAGE

10   Dates in Florida                         20
     Childcare assistance                     29
11   Response to Interrogatory 7             157
     Response to Interrogatory 19            158

12

13                     E X H I B I T S

14

     DEFENDANT'S          DESCRIPTION         PAGE

15

16   Exhibit A          Kissimmee Police      21
                        Department record
17   Exhibit 2          Complaint             81
     Exhibit C          Plaintiff's Initial  143
18                      Disclosures
     Exhibit D          Damage calculations  148
19   Exhibit E          Response to          154
                        Interrogatories
20   Exhibit F          Monthly sheets       162
     Exhibit G          Monthly sheets       170
21   Exhibit H          Cap sheet            172
     Exhibit I          Declaration of       173
22                      Serge
     Exhibit J          Bates-stamped        184
23                      D151-D157
     Exhibit K          Bates-stamped        187
24                      D249-254
     Exhibit L          Bates-stamped        190
25                      D288-D293

A1701

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 255 of 294 PageID #: 2365

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

254

1                           L. Stidhum

2

3                    E X H I B I T S (Continued)

4
        DEFENDANT'S            DESCRIPTION          PAGE
5
6       Exhibit M              Bates-stamped        194
                               D397-D402
7       Exhibit N              Bates-stamped        197
                               D522-D527
8       Exhibit O              Bates-stamped        202
                               D633-D636
9       Exhibit P              Bates-stamped        203
                               D804-D806
10      Exhibit Q              Bates-stamped        206
                               D812-D814
11      Exhibit R              Bates-stamped        207
                               D815-D820
12      Exhibit S              Bates-stamped        209
                               D842-D847
13      Exhibit T              Bates-stamped        211
                               D1165-D1167
14      Exhibit U              Bates-stamped 1186   213
        {TR       Exhibit V           Bates-stamped
15                             D1186-D1250
        Exhibit X              Decision by Judge    235
16                             Gonzalez
        Exhibit Y              Audio recording      241
17      Exhibit Z              Order by Judge Mann  244

18

19      Attorney Kataev has retained all exhibits.

20

21

22

23

24

25

A1702

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

255

2          C E R T I F I C A T I O N

3

4          I, RUTHAYN SHALOM, a Court Reporter

5      and Notary Public within and for the State

6      of New York, do hereby certify:

7              That the witness whose deposition

8      is hereinbefore set forth, was duly sworn

9      by me, and that the within transcript is a

10     true record of the testimony given by such

11     witness.

12             I further certify that I am not

13     related to any of the parties to this action

14     by blood or marriage, and that I am in no way

15     interested in the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto

17     set my hand this 6th day of March, 2023.

18

19

20             *Ruthayn Shalom*

21             RUTHAYN SHALOM

22

23

24

25

A1703

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

256

ERRATA SHEET


NAME OF CASE: STIDHUM v HILLSIDE AUTO et al.
DATE OF DEPOSITION: February 17, 2023
NAME OF DEPONENT: Leticia Stidhum
PAGE  LINE(S)        CHANGE            REASON
____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

                    _____
                    LETICIA F. STIDHUM

Subscribed and sworn to before me
this _____ day of _____, 2023
_____, Notary Public.


        _____

        MY COMMISSION EXPIRES:

A1704

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 258 of 294 PageID #: 2368

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

257

**A**

**a.m** 1:12 186:17
**AA** 245:7 246:20 247:24
**abide** 26:25
**ability** 9:13 41:17 46:10,24 66:25
**able** 45:20,22 98:22 98:25 114:11 144:3 170:19 177:17 187:7 207:7 212:10 237:5 238:7 241:17 247:16
**absolutely** 74:5,9 75:7 181:9 187:5
**accept** 138:22 174:19
**access** 45:16 46:9,20 47:7,11 62:11,18 63:8 69:2 82:20 91:24 103:9 105:8 106:5 146:4 163:15 175:21,23 176:15 177:16 197:5 235:17,22 237:14 238:21
**account** 47:24 117:14 146:6
**accounted** 85:8,11,25
**accurate** 34:17 158:19 168:2,4,8,9 168:17 169:2 170:9 172:3 193:21,23,25 196:24 204:22 205:17 213:8 217:16
**accused** 248:5
**achieve** 247:16
**achieved** 68:11
**acknowledge** 46:19 110:17 237:23
**acknowledging** 108:3
**acting** 242:4,4,14,15
**action** 7:12 15:9 236:4 248:13 255:13

**actions** 7:19 96:21 235:21
**active** 80:15 200:18
**activities** 162:13
**activity** 134:12
**actual** 21:6 37:23 82:5 136:13 145:15 150:16 164:6 166:15 167:2
**ad** 52:17 56:4 244:17 247:25
**add** 79:13 165:7 169:7
**additional** 171:11 179:24
**address** 4:5 16:18 65:10 130:15,17,20 149:8 155:23 190:8
**Aditia** 185:13
**administrative** 26:15 27:7
**admit** 105:7
**advance** 194:16 196:13
**adverse** 235:20 236:4
**advertise** 118:16
**affect** 9:13
**affidavit** 11:14
**affirmation** 11:16
**afloat** 93:8
**aftermarket** 164:9
**Afternoon** 143:12
**afterward** 242:24
**against-** 1:5
**agency** 26:15,18 27:7
**ago** 15:23 18:17 24:8 102:5 129:20 171:8 171:24 172:9 193:14 207:3 220:19 243:15
**agree** 4:9 175:16 178:7 193:22 236:22
**Agreed** 3:2,7,11 4:11
**agreement** 17:10

**ahead** 14:8 23:7 24:15 36:4 42:6 149:22 228:16 240:23 242:9
**airport** 33:7
**al** 256:4
**alarming** 128:11
**Alco** 30:9
**alcohol** 9:11
**Ali** 49:17 50:3 55:10 93:21,23 94:20 97:23 98:8 139:8 144:14 155:12,14 155:17 249:19 250:4,11,18,22,25 251:3,13,24 252:5
**Ali's** 50:2
**allegations** 235:17
**allege** 83:13 191:20
**alleged** 112:9,17 139:10,14 141:5,10 141:14 142:10,15 156:24 236:25
**alleges** 109:4
**alleging** 35:9 92:7 109:24 230:22
**alleviated** 115:8,15
**allow** 8:9
**allowed** 104:24 200:8
**alternating** 37:19
**ambiguous** 13:6 72:11 73:12,16 124:3,6 125:20
**amend** 144:20
**America** 18:9
**amount** 79:22 83:22 99:8 111:6 120:12 157:13 158:24 159:10,13 165:14 166:6,24 168:23 172:7 178:3,11,13 180:20 195:14 214:8 239:11
**amounts** 90:11 101:15 168:10

**and/or** 57:19 59:4 67:20
**Andris** 1:9 5:6 6:12 6:12 36:25 46:12 57:25 60:4,11 62:8 63:4 64:10,12 66:21 66:25 67:4,20 69:5 69:12 70:18 71:3,10 73:6 75:5 78:2,17 78:20,24 80:10 82:11 87:2 88:2,20 91:7,11 92:8 95:15 95:18,21,24 96:4 99:23 100:25 106:7 107:14,16 110:17 161:11 170:24 171:6 174:7 179:12 186:6 207:12,15 212:13 232:11 236:9 237:24 238:5 238:23 239:6,14
**Angeles** 133:22
**animosity** 179:6
**announced** 71:8 72:3 72:10 79:2,7 82:25 96:25 98:4 150:21 150:25 179:13 200:22,25 201:14 224:9 237:3
**announcement** 70:17 73:3 93:14 97:19 103:16 105:22,22 105:23,24 179:9
**announcing** 73:23 201:16
**annual** 158:24
**answer** 8:7,10,18 9:6 14:13 18:17 20:16 23:5,6,7,22 24:10 27:4 36:4 39:17 40:7 41:16,17,23,25 42:3,4 46:15 48:25 49:5,8 65:10,22 66:7 72:12 73:13,17 76:22 77:6 81:13

A1705

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

258

88:24,25 89:10
90:21 91:21 93:20
93:22 95:5 99:11,13
103:11 106:6 107:8
108:16 109:7,22
110:6,7 113:12,18
115:10 116:2,3,6,13
119:2,21 120:3,10
120:25 121:4 123:3
124:8,24 125:21
127:5 131:6 132:9
132:22 133:19
134:2,14 138:8
148:3,16 149:20,21
149:22 152:14
153:19 154:4
156:10,17 160:15
161:16,20 163:5
175:14 177:6 182:3
189:7 191:17
193:20 199:18
207:14 210:8
226:21 227:16
238:11,17,18,22
242:8,21 243:3
249:3 250:7
**answered** 41:24
76:21 77:6 136:25
178:25
**answering** 6:25 81:6
161:18 181:24
**answers** 8:25 9:17
74:23 104:2
**Antonio** 188:5,14,15
**antsy** 78:10
**anxiety** 112:12,15
117:5
**anybody** 16:7 41:6
48:2 105:25 128:10
196:16
**anybody's** 195:18
236:18
**anymore** 90:19
117:10 225:15
**anyone's** 141:2

**apologize** 224:25
**appeal** 228:22 229:9
229:21 249:8,11
**application** 48:20,23
49:11,22 55:7,12,14
56:5,6 62:15 87:6
88:6 104:12 106:8
174:11 176:18
177:8 194:6,10,11
196:12,19,20,23
204:15
**applications** 63:10
64:22 65:25 67:2
69:14 82:12 83:7
87:22 88:2 97:8,12
106:12,16 130:3
161:12,13 197:5
235:20 237:24
**applied** 28:6 29:4
55:21 127:19
135:24 136:8 137:3
137:9 159:5
**applies** 211:16
228:18
**apply** 28:10,17 29:20
62:23 135:14,21
137:16 236:16
**applying** 137:15
**appointment** 85:23
170:13 190:4 195:2
197:10 200:3
202:20 203:21
**appointments** 85:5
**appreciate** 68:9
**apprized** 241:20
**approaching** 222:23
**appropriate** 104:3,12
208:7
**approval** 206:13
**approvals** 175:15
176:25 177:11
180:9
**approved** 177:18,18
181:14 206:19
**approximately** 51:13

136:11 176:9
213:15 214:11,15
214:23 216:4,15,19
216:23 224:19
241:5
**April** 53:20 54:20
227:18,21 228:3,3
**area** 126:9 233:6
**arguing** 73:24
**argument** 71:21
73:21 89:13,24
178:10 179:13
201:4
**Argumentative**
41:22 88:23 99:10
103:10 115:9
161:15 175:13
181:2,21 191:16
193:19 197:3
199:14,17 202:5
210:7 238:10
**Argumentive** 65:21
118:25
**arithmetic** 151:6,22
**arrest** 24:6,7
**arrested** 20:21 23:9
23:15
**arrives** 202:25
**aside** 63:6
**asked** 7:16 14:11
21:25 41:24 49:8
61:17 76:21 77:5
108:25 136:25
137:3 146:17 152:6
154:18,19 178:25
197:23 202:24
208:12,17,19
**asking** 6:24 12:14
23:22 109:20
162:21 183:7,13
205:3 208:5 212:22
231:3 238:5 245:19
245:23 246:4,15
**asks** 156:14

**aspect** 45:4 60:14
171:7 244:7
**aspects** 45:6
**asserted** 154:21
**assigned** 227:20
**assist** 87:22 194:13
**assistance** 29:5,10,19
29:23 253:10
**assume** 8:18 122:23
**Assuming** 45:22
**assumptions** 89:16
**asymptomatic** 68:16
**attacks** 244:17,21
248:2,6
**attempt** 87:25
**attend** 29:25 30:10
30:16
**attended** 139:4
**attending** 134:25
**attention** 81:3 231:9
**attorney** 4:17 5:4
10:2,2,20 15:13
111:15 145:16
153:18 154:3
229:15 241:21
242:7 244:20
254:19
**attorney/client** 9:24
148:7
**attorneys** 2:3,8 3:3
16:4,8 147:5,6,20
147:21,23,24
148:17 152:25
229:18,19 242:3,14
246:23 248:5
**Audi** 127:23 128:6
129:25
**audio** 240:20 241:4
241:11 254:16
**August** 43:18,20 44:3
60:8,10 64:15,17
132:23 176:3
220:14,15,15,17
**authority** 95:16
**authorization** 174:3

A1706

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

259

**Auto** 1:7,7,7,8 5:5,6,8
  5:9,11,12,25 6:2,3
  11:17 12:4,9,18
  13:12,16,16,22,23
  13:23 14:6,9,12
  33:19,21,24 34:7,10
  34:11,14,21,21,22
  34:24 35:2,5,6,7,13
  35:16 36:7,13,22
  48:6 50:9 55:14,22
  57:12 66:24 74:20
  77:8 97:20 107:24
  116:22 117:2 118:8
  118:19,24 120:14
  121:9,14,22,25
  122:5,15,18,22
  124:17 125:14
  127:24,25 128:19
  128:22 129:25
  130:2 131:17,19,22
  134:21 138:4
  146:22 156:15
  157:23 158:7,21,25
  159:25 160:5,19
  182:13 210:20
  231:23 237:15
  249:19 256:4
**automobile** 33:25
  34:5 126:2,3 131:18
**available** 118:7 174:2
  190:9
**Ave** 1:7 5:5,8
**Avenue** 2:9
**average** 150:21,25
  180:10 237:2,10
**averaged** 150:13
**averages** 214:12
**avoid** 194:17
**aware** 31:5 40:12
  42:13 138:16
  228:22,25 229:4,8
  229:11,20 230:5,15
  234:8,22 241:24
  243:6 244:20,24
  248:7,17 249:7,11

**B**

**B** 80:25 151:8 253:13
  254:3
**back** 19:13,17,24
  20:2,8 22:14 24:19
  24:22 32:7 35:22,23
  40:14 46:15,16
  51:14 53:16 66:9,10
  67:7 68:4,21 81:10
  81:20,23,24,24
  82:22 83:21 84:10
  91:16,17 93:10 97:5
  99:15,16 102:12,13
  103:13 105:3,4
  108:18 115:12
  118:10,11 120:7
  122:13 126:25
  138:10,11 142:18
  156:20 163:7,25
  164:8 165:5,14,22
  167:6 168:12 175:5
  176:24 177:4
  179:17 186:24
  189:4 192:25
  195:22 198:6
  199:20 200:7 203:6
  212:16 217:14,25
  218:9 226:18
  227:17 228:13
  233:12,16,24,25
  234:4,5,6,16 238:14
  247:23 249:15
**background** 107:14
**backpay** 119:19
  120:8,12,23,25
  121:18
**backtrack** 83:2 97:18
**backup** 146:2
**bad** 52:24 54:23,23
  56:17
**bank** 39:13 66:5
  177:4 181:8 239:8
  239:12
**bankruptcy** 159:19
  200:7,15,18 201:24

**banks** 64:25 65:6
  67:17 174:19
  196:21
**Baron** 1:8,9 5:7,7 6:6
  6:15,16,20 127:25
  128:22,23 129:3
  130:2
**Barons** 6:19
**based** 50:21 56:4
  92:9 109:25 113:24
  120:25 123:16
  150:16 168:13
  169:7 171:20
  174:18 175:6
  179:20 182:6
  190:24 204:22
  205:3,4 216:2 218:6
  218:18 225:8
  231:23 238:2
  243:21
**basic** 8:2 120:19,21
**basically** 37:3 208:4
  220:21
**basis** 57:14 78:23
  91:10 109:5,13
  110:11 111:12
  152:13 192:13
**Bates** 203:25
**Bates-stamp** 184:14
  223:14
**Bates-stamped** 162:6
  186:4 187:14
  189:24 194:4 197:8
  199:23 202:11
  206:9 207:16
  209:14 212:25
  218:15,20 223:11
  253:22,23,24 254:6
  254:7,8,9,10,11,12
  254:13,14,14
**BDC** 51:24 86:10
  128:20 168:17
  186:24 187:25
  190:8,18,25 193:8,9
  194:6 211:19

**bearing** 184:14
  209:14 218:14,20
**began** 250:11
**beginning** 16:19 37:5
  38:15,17 48:18
  63:25 64:22 66:19
  72:24 114:13,16
  250:4,11
**belief** 91:11
**believe** 17:11,18
  18:16 31:22 56:2
  57:17 70:12,13
  78:23 79:17 80:12
  89:6 92:5,13,18
  96:7,11 97:8,13,21
  98:9,24 99:18 100:9
  100:14 101:4,11
  102:2 103:5 105:20
  107:4 108:5 110:16
  118:21 132:7 136:9
  136:15 137:24
  147:19 148:4 159:8
  168:4 173:8 186:4
  197:8 200:24
  210:13 227:8 230:9
  242:3,14 243:12
  249:14 250:10
**bell** 38:20
**benchmark** 217:23
**benefit** 29:21 235:22
**benefits** 122:17
  135:12 136:7,19,20
  136:23 137:3,4,4,7
  137:10,16
**Benjamin** 30:12
**Bermuda** 132:15
**best** 8:21 9:2 41:17
  56:11 87:15 118:17
  158:23 219:16
  224:3,7 226:11
**bet** 240:17
**better** 114:16,17,19
  158:20
**beyond** 8:24 189:6
**bickering** 179:17

A1707

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

260

| | | | |
|---|---|---|---|
| **big** 154:14 | **break** 9:4,7 22:17,23 | 255:2 | 182:25 189:10 |
| **bigger** 154:13 | 24:13,15 39:2 81:7 | **calculated** 150:9 | 195:18 196:2 |
| **bills** 114:24 126:10 | 81:10,19,25 82:4,4 | 152:17 168:13 | 197:22,24 198:4,18 |
| **birth** 17:7,13,17 | 145:14 162:20,21 | **calculating** 166:2 | 198:25 199:4 |
| 50:25 51:4 54:5 | 214:16 226:4 | **calculation** 10:24 | 203:13 205:20 |
| 55:18 100:20 | 232:22 | 145:8 150:20,24 | 221:7 226:19 234:4 |
| 126:21,24 131:4 | **Brianna** 98:7 100:13 | 153:13,15 154:20 | **car-buying** 181:18 |
| 134:18,22 135:14 | 100:16 139:9 | 222:2 | **Cardozo** 30:12 |
| **birthdate** 17:2,3 | 144:13 194:20,25 | **calculations** 149:4,10 | **care** 40:4,16 89:4 |
| **birthday** 201:16 | 195:23 197:9 | 154:24 155:3 | **cared** 98:24 |
| **bit** 67:8 87:12 144:3 | 202:15,24 203:6,22 | 253:18 | **carefully** 13:3 |
| 217:9 226:11 | 207:5 208:24 | **calculator** 165:25 | **carried** 219:9,14 |
| **blank** 96:10 | 210:24 211:3 | 222:16 | 222:21 |
| **blanket** 207:23,25 | **brief** 144:16 | **California** 133:10,15 | **carrying** 214:22 |
| 208:12 209:18 | **bring** 126:13 172:14 | 133:17 | 215:2 221:3 |
| 211:15 228:18 | 189:4 200:7 | **call** 13:7 26:25 35:19 | **cars** 34:14 36:17 |
| **blatantly** 232:8 | **bringing** 99:3 115:14 | 56:3,8 86:14,17,19 | 39:15 42:17 48:8 |
| **blood** 255:14 | 206:4 | 157:16 158:12 | 49:12 50:6,24 51:12 |
| **blue** 76:7 | **broker** 125:23,25 | 188:21 203:6 | 52:4 53:6,13,14,16 |
| **board** 80:2,8 169:13 | 126:2,4 135:10 | **called** 53:7 56:4,17 | 54:18 55:10 61:21 |
| 169:22 | **brought** 49:14,23 | 60:18 173:5 193:24 | 76:8 77:16 79:13,15 |
| **boat** 132:14 | 55:11 93:21 210:21 | 229:22 241:21 | 79:17,18,19,21,22 |
| **body** 8:8 | **brushed** 44:8 | **calling** 68:9 151:24 | 79:25 87:14 90:11 |
| **bonus** 42:23,25 50:18 | **bucks** 172:15 | 152:3 | 99:5 109:2 115:5 |
| 50:19 61:13,15,20 | **budget** 200:8 | **calls** 9:24 23:4,20 | 121:10,12,21 |
| 75:9,13,19,25 76:3 | **bummed** 56:15 | 24:24 36:2 92:11 | 123:15,17 124:13 |
| 76:5,6 105:18,18 | **bunch** 85:14 94:13 | 110:4 119:20 | 125:6 127:7 136:4 |
| 157:3,4,6,8,13 | 193:16 194:4 226:2 | 230:25 238:16 | 137:24 155:18 |
| 164:19,21,22,24 | **busiest** 85:13 | **calm** 97:25 | 157:14 162:5 |
| 166:5,8 167:9 | **business** 33:25 52:2 | **Camp** 229:22,25 | 167:25 168:2,7,10 |
| 206:20 226:13 | 62:24 85:4,19 97:16 | 230:5 | 168:14,15,23 |
| 227:11,13 236:25 | 97:18 99:7 124:14 | **cap** 136:16 173:5 | 169:17 170:6,15,20 |
| **bonuses** 106:5 | 125:5,7 127:9 | 253:21 | 170:22 171:11,19 |
| **book** 187:2 | 131:19 167:11 | **capital** 206:13,21 | 171:22 172:3,5,6,7 |
| **born** 17:25 19:10 | 193:15 | **capitalizing** 101:22 | 172:11 199:8 |
| 135:20,22,25 | **busy** 64:6,8 67:9 88:8 | **capped** 136:15 159:9 | 214:11,12,15,19,23 |
| **bother** 129:18 | **buy** 211:19,22 238:25 | 159:12 | 215:3,7 216:4,15,15 |
| **bottom** 185:12 186:8 | **buyer's** 212:17 | **car** 31:14,15 39:5,5,8 | 216:19,23 217:7,16 |
| 190:3 199:23 | **buying** 180:20 | 50:13 60:17 75:16 | 218:21,23,24 219:6 |
| 206:12 | 188:11 | 83:23,23 89:21 | 219:10,12,22,25 |
| **bought** 142:7 203:12 | _____ | 118:8 128:8,14 | 220:4,9,22 221:2,3 |
| **Boulevard** 2:4 33:9 | **C** | 160:9,11,13 163:20 | 221:10,12,17,20,23 |
| 48:10 53:10 | **C** 2:2 4:2,2 143:14,14 | 164:10,16,20 165:9 | 222:7,10,13,15,18 |
| **box** 149:13 | 143:19,20 151:9 | 169:16 171:15 | 222:20 223:2,5,8,15 |
| **brain** 151:23 | 208:3 253:17 255:2 | 180:21,22 182:18 | 223:19,23 224:4,13 |

A1708

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

261

| | | | |
|---|---|---|---|
| 224:16,19,23 225:5 | certify 255:6,12 | choose 64:11 | Club 27:23 51:25 |
| 225:8,13,22,24 | chance 239:18 | chose 148:19 | 52:12 55:8 137:18 |
| 226:16,17,25 227:3 | chances 46:2 | chosen 174:12,15 | clue 78:22 |
| 227:6,13 252:10 | change 47:20 76:24 | 175:5,18 178:3 | coach 26:21 119:22 |
| case 1:2 5:4 7:10,17 | 95:22,25 128:8 | Christmas 142:5 | coaching 26:24 |
| 11:18,20 12:5,7,21 | 222:19 256:5 | 225:4 | 103:25 |
| 15:6 16:9 17:10 | changed 45:17 47:18 | circle 70:7 | cold 79:15,16 |
| 23:23 34:16 35:16 | 74:14 | Circuit 227:24 228:2 | Collado 165:17 |
| 39:23 41:5 62:17 | changes 4:23 | 229:21 | colleagues 235:23 |
| 80:22 106:10 | changing 141:24 | circumstance 69:7 | college 30:16 |
| 111:10 119:19 | characterization | 102:2 | combination 44:20 |
| 120:23 121:18 | 140:13 | circumstances | 44:25 112:13 |
| 129:14 141:24 | charge 21:6 24:10 | 124:18 125:9 | combining 123:20 |
| 144:25 149:13,14 | 233:24,25 234:4,6 | 138:13 179:21 | come 42:13 44:5 |
| 150:2,2 156:7,9 | charged 21:8 160:25 | Civil 4:20 | 47:21 49:25 56:13 |
| 162:22 194:18 | 234:16 | claim 27:22 28:3 | 56:14 85:11,22 |
| 195:16 214:10 | charges 21:4,12 | 102:9 110:10 | 89:20 108:22 122:4 |
| 227:21,25 228:7,23 | Charles 184:19 | 120:15 147:17,21 | 128:10 142:18 |
| 228:25 234:23 | chart 152:24 169:21 | claimed 191:23 | 185:6 186:25 |
| 238:19 239:4 240:6 | Charter 147:13,18 | claiming 119:18 | 187:25 190:8 205:5 |
| 244:6,21 245:10 | check 38:3,4 46:13 | 120:22 121:17 | 205:6,9 216:6 |
| 246:22 248:12,21 | 172:12 176:21 | clarification 157:22 | 232:18 233:12 |
| 256:4 | 187:25 191:5 | clarified 34:13 | 250:4 |
| cases 248:15,19 | 196:13 200:16,20 | clarify 14:8,13 18:13 | comes 65:5 85:2 |
| cash 211:19,22 | 201:5 202:4 203:18 | 19:5 24:5 91:10 | 166:2 |
| 233:19,21 236:16 | 209:5 214:7 217:7 | 166:12 | comfortable 148:21 |
| categories 154:20 | 236:9 | clarifying 50:17 | comforting 100:16 |
| caught 226:10 | checked 168:7 191:9 | 227:16 | coming 128:10 |
| caused 64:25 67:5 | 191:24 192:4 | Clark 184:19 | 153:16,25 197:6 |
| 69:4,13 | 237:17 | class 199:9 | 205:11 237:17 |
| caution 24:23 | checks 214:6 | classes 135:2 | commentary 154:15 |
| cease 51:20 | Chen 227:19 | clear 4:19 8:6 12:24 | 183:3,8 |
| ceased 52:4 | child 115:13,16,18 | 25:17 79:10 95:5 | comments 73:7 |
| cellphone 40:24 | 116:7,17,18 126:22 | 98:18,20 125:2 | commission 40:17 |
| 86:18 145:19 | 126:25 131:4 | client 68:14 104:20 | 50:12 88:12,15,18 |
| center 52:2 70:9 85:5 | 134:18,22,24 | 151:21 181:22 | 90:20 94:21 107:9 |
| centralized 130:6 | 135:20,22,25 | 183:9,12,17,22,24 | 109:2 166:15 |
| certain 47:18 87:22 | child's 116:14,16 | 204:6 229:13 | 210:12 214:8 |
| 97:12 98:23,25 | childcare 29:4 | clock 162:14 | 216:18 217:7 |
| 146:4 178:13 | 253:10 | close 33:10,13 72:21 | 218:23 221:6 225:8 |
| 195:14 196:9 | childhood 211:3 | 129:23 148:19 | 234:5 256:23 |
| certification 4:13 | children 16:23,24 | 238:8 239:15 | commissionable |
| 31:3,6 | 18:22 55:19 74:17 | closely 179:4 | 164:5 167:6 |
| certifications 128:12 | 74:19 78:21 131:10 | closer 119:9 | commissions 42:12 |
| 128:13,15 | children's 139:23 | closing 237:25 | 42:15 88:22 214:6 |

A1709

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

262

216:3 218:17 219:5
220:25 225:12
**common** 186:22
**communicate** 187:7
**communicating**
62:19
**communication** 9:24
229:14
**communications**
131:23 241:25
**comp** 136:22
**companies** 12:11,11
**company** 13:19 43:16
213:2
**compared** 170:11
**comparison** 218:16
**compel** 25:6,7,23,24
246:23
**compelled** 243:7
**compensation** 28:4
37:4 39:2 43:5 45:4
50:8,11 60:25 75:8
75:12
**compensatory**
153:10 155:3
**competition** 87:12
**complain** 96:20
140:7
**complained** 140:23
156:14 161:10
194:17
**complaint** 7:2 11:9
11:11 15:19,21
26:14,18 27:7,10,14
27:16 69:10,12
80:21 81:9 82:2
83:9,13 86:12
102:18 109:4,10
111:5 156:16
157:14 220:16
238:4 239:5 253:17
**complete** 8:9 83:16
128:17 178:18
**completed** 128:15
**completely** 51:22

85:9 104:9 138:20
177:24 178:4
**complied** 238:5
**comport** 173:19
**comports** 174:6
**computation** 145:11
**computer** 82:17,20
104:14
**concerned** 68:14
**concerning** 7:9 11:16
139:9 180:9
**concerns** 184:18
**conclusion** 23:5 36:2
92:12 110:5 119:21
231:2
**conditions** 95:25
231:24
**conduct** 7:18 27:2
156:15 184:5,6
**confer** 241:22
**conference** 1:18
138:18 139:2,4
148:4 229:23,25
230:2,5,8,16
**confidential** 17:8,17
17:22
**confidentiality** 17:9
**confirm** 34:17 169:6
206:4
**confirmed** 166:23
**confirming** 24:18
**conflict** 71:16
**conflicts** 71:10,25
**confront** 78:3 96:18
**confronted** 96:16
**confusing** 13:17,20
13:21 216:24
**confusion** 5:17,22
226:11
**congratulations**
51:10 70:20,23
251:9
**conjecture** 238:17
**consent** 241:15
**considered** 39:8

**consistent** 17:14
101:15,17
**consisting** 11:3
**constantly** 78:5,7
86:14
**constitute** 235:20
236:4
**constructively**
230:23
**consult** 147:23
**consumed** 9:11
**contact** 79:5 155:25
188:23 212:18
232:12
**contacted** 195:15
206:2 210:2
**contents** 15:24 178:8
**continue** 13:5 95:14
251:16
**continued** 43:23 63:3
120:13 122:22
143:18 211:6 254:3
**control** 177:25 178:4
178:7 179:21
**conversation** 10:3
14:21 16:7 56:12,21
61:23 71:4 83:24
90:8 108:11,23
110:24 145:15
156:18 157:9,12
231:12 250:17,21
250:25 251:12,23
251:25 252:6,9
**conversations** 16:3
78:11,14 82:6
144:15 241:17
**convertible** 199:7,7,8
199:10
**convertibles** 199:11
**convicted** 20:23
**conviction** 24:6,7
**convictions** 21:12
**copies** 38:11 40:25
41:4
**coplaintiff** 12:20 15:8

**copy** 4:16,21 81:8
108:8,9 234:25
**corporate** 5:15
**corporation** 5:15
**correct** 4:18,19 7:11
7:13 10:24 15:9,10
15:11,25 17:4 23:10
23:12,25 25:21
27:11,25 28:12,13
28:15,24 29:2,17,18
30:14,15,22 33:19
33:20,22 34:2,5,6,8
34:12 35:2,7,11,16
35:20 36:8,9,10,14
36:17 37:15,22 38:5
39:6 40:5,11 41:15
42:10 43:8,21,22,24
44:18 45:24 46:3,21
46:24 47:4,9 48:4
48:16 49:19 50:21
50:22 51:13 52:5
53:15 55:15,19,23
57:10,12,21 58:2,5
58:10,14,17,24
59:25 60:5,12,13,21
60:22 61:3,6,9,12
62:23 63:4,13 64:2
64:3,10 65:2,15,25
66:5,14,17,18,21
67:2,3,6,21 69:5,6,8
69:9,15,19 71:22
73:7,15 74:14,20
75:6,10,14,17,19
76:14,16,20,25 77:4
78:14 80:11,12
83:11,16 85:3,4
87:20,23 88:12 90:3
91:14,22 92:10 94:4
95:4,9,16,19,22
96:2,13 105:9,12
106:8,13,20 108:14
109:6 110:18
111:10 113:20
115:4,8 116:19
119:13,16 121:7,15

A1710

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

263

122:2 124:2 125:15
126:19,22 130:15
133:15 136:14
137:7,10 138:17,19
139:2 140:21
144:25 145:5,8,12
146:10,19,23 149:8
149:11,15 150:3,7
150:14,18,22,25
151:20 152:18,22
152:25 153:4,7,13
154:4,21,24 155:18
155:19,21 156:4,18
156:24 157:25
158:2,9 159:23
160:3,7,8 161:7
164:6,11,14,17,20
165:2,7,14,17,19,23
166:3,19,24 168:23
168:24 170:7,17
171:12,16,17
174:21,22 175:11
175:21 176:4,7
177:15 178:20,23
185:2,9,13 186:6
187:19 188:12,17
188:25 189:5,18,20
190:14,22 191:2,6,9
191:12 193:18
194:14,18,23 195:6
195:12 196:13,17
197:11,17,24
198:18,23 199:2,5
200:9,20 201:2,6
202:21,25 203:7,8
203:13,19 204:4,11
204:16 206:14
207:8,10,13 209:6
209:20,23 210:22
210:25 211:4,7,20
211:23,24 212:2,5,8
212:11,14 213:12
213:15,25 214:4,11
214:15 215:4,7
216:4,16,20,23

217:11 218:21
219:7,12,22,25
220:5 221:2,13,17
221:20,23 222:7,8
222:10,13 223:2,11
223:15,19,23 224:4
224:10,13,16,20,23
225:5,9,13,16,17
227:14,15 229:2
230:10,11,13,23
231:10,16,24
232:11,16,23
233:14 235:5
236:10,11,14,23
238:3,9 239:2,9,12
239:16,17,20,21
250:5,12,15,16,19
252:2
**correction** 244:12
**correctly** 53:12 96:7
164:23 167:13
**corresponding**
215:10
**cosigner** 188:8
204:15 205:12
206:4
**cosigners** 236:19
**costs** 242:23 248:23
**cough** 68:19
**coughing** 68:6
**counsel** 4:8 20:17
24:18 29:8 82:7
103:19,25 104:5,23
139:5 157:20
158:15 244:13,16
244:18 253:9
**counsel's** 80:24
247:10
**counselor** 24:13
123:11 183:6 184:8
242:18
**country** 18:5 132:11
132:14
**couple** 20:8 36:24
37:10 38:15,18

39:25 44:22 45:15
54:9 58:20 61:21
62:14 64:18 84:11
101:19 111:24
114:19 121:23,24
126:5 128:9 129:20
144:2 147:3 161:2
193:16 239:22
243:14,16
**course** 40:18 42:20
55:16 65:20 71:18
82:21,23 99:18
100:23 101:19
103:15 113:25
114:16,22 126:14
138:14 163:11
179:10,11 180:6
200:17 202:6
210:19 217:20
226:24 239:3
**courses** 31:10 135:4
**court** 1:1 7:7 8:7,8,11
12:20 13:8 15:8
17:12 26:3,7 27:2
151:24 152:3,5,7
192:11 227:22,23
228:5 236:3 240:14
255:4
**courtesy** 8:11 22:10
**courtroom** 139:6
**courts** 241:16
**Covid** 52:23,24 55:20
122:7,8,11,14 126:7
134:6 137:25
**coworkers** 12:19
237:4
**Craigslist** 56:2,4
130:11,14,21
**crazy** 72:14
**cream** 114:13
**credit** 46:13 62:16,22
67:8,11,15,16,24
82:18 88:5,6 89:12
89:20,23 94:11,12
174:4,10,18,21

175:6 176:17,21
177:8 178:2,12
181:7,9 191:9,24
192:4 193:6 196:10
196:20,22 200:2,15
200:20 201:5,12
202:4 203:18 209:4
209:8 233:20,22
235:19 236:9,18
237:12
**creditworthiness**
89:16 191:5
**cried** 74:3,7
**crime** 20:23
**criticize** 248:11
**CRM** 84:18,20 85:25
162:5 163:16,19
209:25 210:6
**cruise** 132:15 134:4,9
**cry** 74:3 98:2
**crying** 73:25 74:11
**current** 16:18 147:24
**currently** 18:18,22
28:9,20 29:12 74:16
131:14 134:25
**customer** 39:11
62:16 65:13 66:13
66:16 67:11 78:7
80:16 84:20 85:2
87:5,5 89:11 97:12
128:18 160:25
170:13 174:18
178:20,22 179:19
179:22 180:16,19
180:25 181:4,5,10
181:13 185:21
186:10 187:4,18,25
188:10 189:4
190:14,21,25 191:4
192:7 193:13 194:5
194:21 195:15,23
196:12,17 197:16
197:21 198:10,14
198:17,19 199:5,25
200:6,12,19 201:6

A1711

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

264

201:23 202:4,16,24
202:25 203:6,20
204:23 205:4,6,9,11
208:24 209:9,19
211:18 212:22
232:9 233:5 235:19
238:24
**customer's** 173:25
174:4,11 175:6
178:12 236:9 237:4
**customers** 45:21,23
46:7,11 64:23,23
78:5 79:8 80:11,17
82:12 83:15 84:8,15
85:7,7,10,17,21
86:14,24 89:8,15
106:2 115:5 120:5
161:13 174:20
178:13 179:18
180:8 181:16 182:9
182:23 187:2
191:23 192:8,13
193:16 194:13
202:8 232:21
236:19 237:2,10,12
237:16,17,19,21
**customers'** 102:4
**cut** 204:19

**D**
**D** 4:2 143:14 148:23
148:24 253:2,18
**d/b/a** 1:7,8
**D1165-D1167** 254:13
**D1186** 213:20
**D1186-D1250** 254:15
**D1187** 213:19
**D1193** 215:15 216:9
**D1197** 218:6,15
**D1198** 217:23 218:20
**D1199** 218:3,7
**D1200** 218:15
**D1223** 222:4
**D1230** 223:11
**D1232** 223:14

**D1250** 213:20
**D151** 184:15,22
**D151-D157** 253:23
**D157** 184:15 185:12
**D2** 162:6 163:3
168:18
**D201** 186:4,5
**D206** 186:4
**D249** 187:14
**D249-254** 253:24
**D254** 187:14
**D288** 189:24
**D288-D293** 253:25
**D293** 189:24
**D397** 194:4
**D397-D402** 254:6
**D402** 194:4
**D522** 197:8
**D522-D527** 254:7
**D527** 197:9
**D536** 199:23
**D543** 199:23
**D62** 170:5
**D633** 202:11
**D633-D636** 254:8
**D636** 202:11
**D65** 170:15
**D66** 171:10
**D67** 170:5 171:14
**D804** 203:25
**D804-D806** 254:9
**D806** 204:2
**D812** 206:9
**D812-D814** 254:10
**D814** 206:9
**D815** 207:16
**D815-D820** 254:11
**D818** 208:23
**D820** 207:17
**D842** 209:14
**D842-D847** 254:12
**D847** 209:15
**D9** 162:6 163:3
**dad** 93:6 188:4 189:9
189:10,15,16 201:8

201:9,18
**daily** 58:16 80:15
192:16
**damage** 10:24 145:8
149:3 253:18
**damages** 111:5,13
145:11 149:10
153:3,10,12,21
154:21,24 155:3,4
**Darell** 165:10
**data** 169:21 177:19
**date** 53:11 213:3,3
217:24 218:2
220:15 256:4
**dates** 20:14 64:20
198:6 220:20
253:10
**David** 13:15 14:3,4,5
14:14,15,18 15:5,7
16:8 70:9,11 87:13
87:13 97:23 98:17
129:4,10,11,19
139:8 144:9
**day** 51:8 56:3,6,8,14
56:17,19,22 57:5,7
59:17 66:14 70:5,15
79:10 95:6 123:6
131:3 133:7 170:17
170:20,22 190:13
190:13 192:20
194:25 197:10
198:20 202:8,21
232:2 252:19
255:17 256:20
**days** 37:20,21 62:4
62:14 190:17 193:8
198:22 212:4,7
227:2,24
**deal** 41:18 43:2,12
67:17 84:3 98:11,15
115:2 129:9 164:13
166:18 167:21
176:21,23 177:4,17
177:20 180:16
182:11,25 214:20

218:24 220:11
236:17
**dealership** 11:17
16:9 31:2 40:15
43:24 47:3 50:6
54:8,11,24 57:9
58:2,17,19 59:2,5
62:21 64:23,24
69:18 74:14 76:13
77:22 79:25 82:15
84:17 91:8 93:7
98:24 99:7,20
100:21 105:15
107:20 110:18
114:25 136:3,14
139:19 140:3,20,21
140:22 156:4,5
160:2,6 162:5
163:13,17 169:11
179:25 180:7
197:23 198:13,20
201:8,18 211:6,10
213:15 227:6,7
234:3 252:11
**dealership's** 179:21
**dealerships** 31:13
35:6,10 85:14,20
89:15,25 107:17
122:19 157:22,25
158:20
**Dealertrack** 45:16
46:10,20 47:12,24
63:6,8 91:24 103:9
103:16 105:8 106:4
175:21,23 176:15
177:17,20 235:18
237:13 238:21
**dealing** 151:25
**deals** 218:25
**dealt** 193:16 231:8
234:6
**December** 23:15 52:5
62:4,6 68:24 77:25
78:3 79:14,23 86:13
134:7 140:17 142:4

Case 1:21-cv-07163-OEM-LB    Document 102-11    Filed 03/27/24    Page 266 of 294 PageID #: 2376

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

265

150:6 170:4,6,17
171:12,15,19,22
172:8 176:6 185:22
185:23 190:4,5,24
191:11 193:11,11
201:22 202:15
204:4,12,14 209:20
211:25 222:5 224:7
224:9,15,19,22
225:4,5 226:12
227:11 244:4 245:8
249:22 250:2,2,5,11
**decent** 138:15
**decide** 6:3,22
**decided** 52:24 54:25
83:19 108:13 126:9
229:8
**decides** 187:25
**deciding** 64:4
**decision** 45:6 57:20
58:4,13,23 95:4
125:4,10 227:24
228:3 229:9 231:13
235:2,12 245:8
246:22 249:8
254:15
**decision-maker**
110:18
**decisions** 110:20
111:2,4
**declaration** 11:15
173:12 253:21
**declares** 175:4
177:23
**declined** 128:25
**decrease** 10:23 92:2
101:7,13 103:17
114:23 236:3,7
**decreased** 236:25
**decreasing** 237:5
**defendant** 26:9
**Defendant's** 21:15,17
80:20,25 143:19,20
148:23,24 154:7,10
162:2 169:24 170:2

172:17,18 173:8,9
184:16 186:3
187:13,15 189:23
189:25 194:3,8
197:7,12 199:22
202:10,12 203:24
206:8,10 207:16,18
209:13,16 211:12
211:14 212:24
213:6,21,22 226:9
235:8,9 240:25
243:24,25 245:7
246:20 253:14
254:4
**defendants** 1:10 2:8
5:4 7:2,17 15:11
27:11,25 144:9
225:20,25 234:22
236:25 237:9 241:3
243:7 246:23
**Defendants'** 154:8
161:25 225:23
244:13 247:24
**Defendants's** 184:13
**Defense** 244:18
**definitely** 48:15 55:8
55:9 70:4 71:23
73:4 77:20 93:9
94:7 111:2,25
114:25 126:8 128:7
168:17 219:13
226:17
**definition** 121:2
**delay** 65:14,25 66:3
**delayed** 66:4
**delays** 64:24 65:5
**delete** 104:14
**deleted** 104:15 119:5
141:23
**delivered** 39:9
189:11
**delivery** 171:3
**demands** 246:25
**denied** 25:7 158:9
**Denise** 38:17,18

**deny** 206:5
**denying** 235:2 249:8
**department** 21:21
86:8 100:3 147:3
253:16
**depend** 138:13
**dependent** 178:2
**depends** 187:24
196:9 232:21 233:4
**DEPONENT** 256:5
**deposed** 7:21
**deposition** 7:18 8:3,4
9:20 10:7,13 11:12
15:14,17,20 16:5,19
21:24 22:9 25:13
26:4 68:12,13,20
74:24 75:3 104:3
151:11,16 152:4,11
155:9 162:16
183:15,20 184:4,7
240:7,10,22 245:2,4
245:23 246:6,12,15
246:17 249:6 255:7
256:4
**depressed** 111:19
112:3,24
**depression** 117:3
**deprived** 235:17
**describe** 37:3 111:16
**described** 235:21
**Description** 22:25
253:14 254:4
**designated** 233:6
**designed** 162:13
194:12 230:2
**desire** 90:17 94:18
**desk** 47:21 233:7
**desks** 86:20
**detail** 21:3 154:19
**development** 52:2
85:5
**diagonal** 86:20
**Dianna** 38:20
**diary** 141:8
**difference** 79:6

121:17 151:3,18
152:16 167:15
216:2
**different** 29:20 51:22
51:23 87:3 127:21
128:7 135:17,18
158:3,4,4 170:16
174:19,20,20
180:21 203:13
238:8
**difficulty** 174:25
**Dina** 38:22,23
**diploma** 30:13
**direct** 23:21 181:22
229:13
**directed** 154:23
**directly** 34:11 73:6
183:12,17
**disability** 109:25
110:3 135:12,15
136:7,19 159:16
**disagreement** 71:20
**discard** 41:12
**discarded** 41:13
**discharged** 230:23
**discipline** 95:16
**disciplined** 77:8
**disclosed** 69:14,17
82:10 83:9 91:14
250:14
**disclosing** 106:11
**disclosures** 143:21
144:21 253:18
**discovery** 22:22
160:24 163:11
**discretion** 40:11
**discretionary** 75:19
**discriminated** 92:9
92:14 102:9 109:5
109:11,14,16,21,25
110:10
**discrimination** 7:10
44:21 45:3 92:6
93:13 97:22 98:9
100:15 101:5,12

A1713

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

266

102:19,25 107:24
108:4 111:18 112:6
112:10,17 139:10
139:14 141:6,11,14
142:10,15 150:13
157:2,2,15 191:20
201:17
**discriminatory** 97:9
97:13 102:2 156:15
**discuss** 15:5 25:12
82:6 93:11 111:14
139:14 140:6
145:15 154:2
**discussed** 83:15
112:20,23 114:9
123:23 125:11,19
140:4 144:13
153:18 155:20
156:7
**discussing** 230:3
**discussion** 44:14
54:16 81:21 93:3,25
94:3,6,8,16 95:12
126:16 140:14,18
156:24,25 210:17
218:12 228:12
230:19 231:16
234:20
**discussions** 141:4
**dishonestly** 18:17
**dismiss** 234:23 235:3
249:9
**dismissed** 229:2,4
**dispose** 141:19
**disposing** 141:21
**dispute** 175:10 180:3
180:11
**distinction** 180:24
181:6
**district** 1:1,1 17:15
248:10,15,16
**divide** 216:14 222:9
222:25
**divided** 220:10 222:6
**division** 220:7

**divulge** 229:13
**divulging** 82:5
145:14
**DMV** 100:3
**doc** 154:11
**docket** 227:23 228:4
228:7
**document** 11:15
21:15,20,23,24 22:2
22:5,6,17,18,21
23:14 24:24 25:2,3
25:18,19,20 42:8
65:6 66:5 81:5
108:2 143:23,25
144:4 149:5,16
154:9 162:9 163:12
168:6,16 173:4,13
184:14 186:12,20
188:11 190:11,20
197:13,19,25 203:2
203:9,15 204:8,18
204:19 205:2,22
206:17 207:21
208:4,7 209:11
212:25 226:18
240:4 241:13 244:9
245:13,14,17,21
246:25 247:7,11,14
247:24
**documentation**
179:24
**documenting** 142:15
**documents** 10:16,18
10:21 11:3,6 24:25
41:10 65:8 101:4,7
101:9 144:24 145:3
170:11 194:2 195:7
208:2 240:20
**doing** 5:19 15:16
38:17 51:23 59:10
61:17 63:4 73:25
93:19 96:5 104:6,24
104:25 125:23
127:22 135:10
142:19 157:13

180:18 194:6 237:3
252:10
**Dollar** 32:8,12,15,21
32:23
**dollars** 83:22 111:6
111:10 118:24
146:19 147:3
153:22
**door** 84:7 182:15
**double** 94:20
**doubled** 50:12
**dozens** 248:14,19
**drastic** 101:13
**draw** 50:15,16
**dressed** 89:22
**drive** 33:14
**drop** 101:19
**Dropbox** 143:4
240:19
**drugs** 9:11
**due** 44:24 134:21
163:10
**duly** 4:3 143:15
255:8
**duties** 76:15

### E

**E** 2:2,2 4:2,2 143:14
143:14 154:7,10
199:9 253:2,13,19
254:3 255:2
**E43** 199:7,11
**earlier** 14:11 123:23
146:16 155:21
174:6 232:14
**early** 48:15 52:23
53:20 62:4,6 117:25
249:22 250:2
**earn** 126:3 158:24
**earned** 233:19
**easier** 142:25 196:25
197:5 222:17
**Eastern** 1:1 17:15
**easygoing** 8:4
**eat** 232:24,25 233:2,3

233:6,7,9,15,16
**economic** 153:3
**edification** 80:24
**education** 30:18
**educational** 29:23
107:13
**EEOC** 27:5,6,10
229:5
**effort** 110:23 126:24
**efforts** 127:4
**eight** 175:4 213:15
221:2
**either** 26:22 37:20
59:6 66:25 73:22
89:3 90:12 107:10
185:6 199:11
237:23
**electronically** 177:2
**else's** 48:3
**email** 14:24 22:5,8
130:14,17,20
141:13
**emails** 141:16,19
142:10 189:3
**Emanuel** 2:10 5:3
24:23 151:5 155:6
214:17 215:8 223:7
239:24
**emanuel@mllabor...**
2:10
**emotion** 74:10
**emotional** 112:5,19
112:23 113:22
115:8
**employed** 51:18 91:8
126:19 213:14
**employee** 14:6 34:12
58:2 106:19 108:5
210:21
**employee's** 100:11
**employees** 12:4,18
13:12 14:12 51:23
103:6 105:19
106:23 144:8
**employer** 27:21

A1714

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

267

| | | | |
|---|---|---|---|
| 35:11 137:16 | 193:15 198:11 | 197:8,12 199:24 | 29:19 35:25 65:13 |
| **employers** 26:15 | **ESQ** 2:5,10 | 202:10,12 203:24 | 148:6 246:8 |
| 35:19 127:15 | **estate** 125:25 | 206:8,10 207:16,18 | **extra** 43:5 75:16 76:9 |
| **employment** 11:16 | **esteemed** 80:23 81:8 | 208:3,23 209:14,16 | **eyes** 96:10 |
| 27:24 36:6 43:23 | **estimate** 158:23 | 211:12,14,16 | |
| 48:20 49:11,22 | **et** 256:4 | 212:24 213:6,19,21 | **F** |
| 52:17 55:2,7,12,13 | **evaluation** 77:14 | 213:22 226:9 | **F** 4:2 143:14 161:25 |
| 59:15 66:23 95:25 | **evening** 232:19 | 227:17 228:19 | 162:2 252:17 |
| 123:23 125:22 | **event** 101:25 | 235:8,9 240:25 | 253:20 255:2 |
| 128:6 134:17 | **events** 8:22,23 9:2 | 241:3 243:24,25 | 256:18 |
| 161:12 210:19 | **everybody** 70:25 | 245:7 246:20 | **F&I** 47:3,5 173:16 |
| 213:11 219:17 | 80:3 87:17 96:12 | 247:24 249:5 | **face** 237:25 |
| 237:15 | 179:5 201:9 | 253:16,17,18,19 | **Facebook** 117:9,22 |
| **Emporium** 127:25 | **evidence** 104:7,12 | 253:20,21,21,22 | 118:6,22,24 146:16 |
| 128:22 130:2 | 144:18 195:21 | 253:23,24 254:6,7,8 | **fact** 10:3 20:19 58:7 |
| **ended** 36:7 38:17 | **exact** 53:8,11,24 | 254:9,10,11,12,13 | 73:11 97:7,11 |
| 147:22 187:5 | 64:20 220:20 | 254:14,14,15,16,17 | 105:17 108:11 |
| **ends** 187:14 | **exactly** 5:18 20:6 | **exhibits** 142:19,22 | 115:7 118:7,23 |
| **engaging** 244:17,21 | 21:6 47:6 77:19 | 226:2 239:22 | 179:11 241:21 |
| **enter** 126:25 | 93:11 136:4 191:25 | 243:13,14,17 | 248:10 251:22 |
| **entered** 139:5 | 196:21 222:25 | 254:19 | 252:6 |
| **entering** 224:6 | **examination** 1:16 3:4 | **existing** 53:14 | **factors** 45:13 |
| **entire** 5:16 38:5 | 3:8 4:15,25 143:17 | **expect** 181:15 | **facts** 23:23 |
| 247:11 | 253:6 | **expectations** 252:7 | **factually** 155:6 |
| **entirely** 80:18 121:5 | **examined** 4:6 143:16 | **expecting** 42:21 | **fail** 210:11 |
| 209:7 210:13,15 | **example** 31:5 60:16 | **experience** 34:4 | **failed** 25:22 158:8 |
| **entirety** 81:5 245:12 | 118:2 124:12 125:3 | 55:15,18 86:10 | **failure** 179:22 |
| 245:17,20 | 125:5,8 170:24 | 107:17,19 112:11 | **fair** 63:3 83:3 90:5 |
| **entitle** 17:21 | **examples** 236:12,15 | 114:2 118:19 | 102:18,24 107:13 |
| **entitled** 8:25 25:4 | 236:18 | 123:17 175:20 | 108:10 114:4 |
| 88:18 119:18 | **exceeded** 79:19 | 182:6 | 125:13 140:9 157:4 |
| 120:13 167:9 | **exceeding** 252:7 | **experienced** 117:3 | 171:18 180:24 |
| 245:16 | **excited** 70:25 167:20 | 191:15 | 218:7 |
| **entity** 5:15 | **exclusive** 63:10 | **experiences** 175:19 | **fake** 172:10 |
| **environment** 71:14 | **Excuse** 6:18 102:11 | **EXPIRES** 256:23 | **false** 166:25 |
| 128:8 | **exhibit** 21:16,17 22:3 | **explain** 42:24 65:4 | **familiar** 31:2 84:16 |
| **equal** 85:18 151:9 | 22:14 80:20,25 | 120:8 123:24 135:9 | 84:23 154:8 |
| 165:6 | 143:19,20 148:23 | 226:22 229:25 | **family** 92:25 135:16 |
| **equals** 222:25 | 148:24 154:7,10 | 234:2 | 135:19 136:6,10 |
| **equation** 251:3 | 161:25 162:2 163:6 | **explanation** 83:4 | 139:21 |
| **equivalent** 85:16 | 169:25 170:2 | 120:19,20,21 | **far** 8:14 32:7 36:25 |
| **erasing** 169:21 | 172:17,18,23,25 | **expressly** 95:8 | 57:19 58:5,7,9,22 |
| **ERRATA** 256:2 | 173:8,9 184:16 | **extended** 68:25 | 73:3 92:7 102:8 |
| **error** 126:8,8 | 186:3,3 187:13,15 | **extent** 5:21 7:15 9:23 | 159:21 177:19 |
| **especially** 42:21 | 189:23,25 194:3,8 | 20:11 23:6,22 25:2 | 188:10 190:20,21 |

A1715

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

268

| | | | |
|---|---|---|---|
| 201:11 209:8 | **filling** 49:13 | 137:18 139:5 | 221:12,19 222:9,12 |
| 219:16 224:3 | **final** 224:22 225:3 | 148:20 154:18 | 223:4,10 224:2,12 |
| **fast** 82:16 215:9 | 231:13 249:5 | 159:14 168:12 | **follows** 4:7 143:16 |
| **fastest** 182:10 | **finally** 171:14 180:6 | 170:5 212:18 | **food** 28:6,10 29:19,20 |
| **father** 74:16,19 | 193:6 225:7 | 213:18 214:10 | 233:12 |
| 116:15,16 139:24 | **finance** 63:17 67:12 | 217:17 219:20 | **forced** 179:19 |
| 147:6 188:9 189:17 | 93:19 123:7 169:14 | 223:13 224:6 | **Ford** 31:6,6 |
| **father's** 189:11 | 176:19 177:9 | 226:12,16 249:19 | **forensic** 104:6,12 |
| **favorable** 160:19,20 | **financial** 45:6 | 250:25 251:12 | **forged** 23:2,3,16 |
| 160:23 | **financially** 116:18 | **five** 37:20 171:18,22 | **form** 3:12 4:14 27:15 |
| **favorably** 103:6 | **financing** 62:21,23 | 176:12,14 214:11 | 38:10 40:6,21,23 |
| 105:12,15,20,25 | 63:10 64:22 67:2 | 217:2 221:17,19 | 48:24 49:3 66:6 |
| 106:4,20,24 107:2 | 69:13 82:12 106:8 | 222:13,15,19,20 | 72:11 77:5 91:19 |
| **fear** 128:22 | 106:16 161:5,12 | 224:13 225:8 251:7 | 108:15 114:21 |
| **February** 1:12 48:14 | 170:25 171:7 | **fix** 92:16 | 148:15 160:22 |
| 48:16,18 191:2 | 194:13 196:8,13 | **flashy** 89:22 | 250:6 |
| 193:10,12 256:4 | 198:15 205:17 | **flat** 37:8,13 39:3 | **format** 142:15 |
| **fed** 94:24 | 207:12 211:23 | 42:19 167:16,22 | **forth** 19:13 154:19 |
| **federal** 4:9,20 139:6 | 212:14 235:19 | **Florida** 19:9,10,17,23 | 179:17 238:3 255:8 |
| 192:11,11,12 | **find** 197:23 198:4,18 | 19:25 20:2,12,15,18 | **forum** 149:14 |
| **feel** 62:12 71:6 74:25 | 250:10 | 30:4 31:17 32:10,11 | **forward** 42:21 |
| 90:18 92:2 97:4 | **finding** 129:13 | 132:23 133:11,15 | **found** 103:24 104:13 |
| 148:21 | **finds** 236:3 | 253:10 | 199:20 202:15 |
| **feelings** 111:25 | **fine** 36:6 53:21 141:3 | **fluctuate** 101:15 | 232:4 241:16 |
| **fees** 248:24 | 143:7 145:23 | **Flushing** 2:4 4:6 | **four** 38:25 82:22 |
| **felt** 80:13 89:5,7 95:5 | 209:13 245:18 | 30:12 | 101:8 117:22 144:9 |
| 96:20 108:11,24 | **finish** 245:19 246:15 | **focus** 45:4,7 81:3 | 167:25 168:2 171:8 |
| 112:2 116:14 | **finished** 244:14 | 85:5 244:6 245:15 | 176:12,14 180:7 |
| **fifth** 23:24 24:3,11 | **fire** 95:19 | **focusing** 18:7 | 192:9 193:14 |
| 171:15 | **fired** 32:17 37:11 | **folder** 87:7 177:9 | 206:25 207:3 216:4 |
| **file** 17:19 26:18 27:6 | 43:5 55:3 79:5 | 181:15 195:16 | 216:15,19,23 217:2 |
| 27:21 228:6 240:20 | 129:2,9 220:20 | **follow** 17:23 20:10,15 | 222:10 224:16 |
| **filed** 7:12 15:25 | **firing** 129:13 | 25:6,22 29:7 67:11 | 226:16 227:13 |
| 26:14 27:10,19 28:3 | **firm** 148:8 229:8 | 108:21,24,25 | **four-figure** 219:20 |
| 80:22 119:7 159:19 | 245:11 248:12,18 | 157:18 158:14 | **Fourth** 8:16 |
| 200:6 228:4 229:2 | **firm's** 149:7 | 200:9 202:17 212:7 | **Francine** 1:3,17 |
| 229:21 234:22 | **first** 4:3 7:24 8:6 | **followed** 108:13 | 16:12 253:4 |
| 245:10 246:23 | 15:22 31:18,24 | 212:4 | **Franklin** 52:14 |
| **filing** 3:8 4:13 147:17 | 33:18,24,25 37:5,10 | **following** 81:4 131:4 | **Freddie** 129:4,5 |
| 227:23 | 60:3 62:14,20 68:23 | 171:10 175:2 179:3 | **free** 74:25 |
| **filings** 17:12 | 70:6 79:3 89:5 91:3 | 194:25 195:12 | **frequently** 80:10 |
| **fill** 48:20 49:11,21 | 93:3 101:19 111:24 | 197:10 202:21 | **fresh** 158:10 |
| 55:6,12 94:3,9 | 121:13,23,24 | 214:14 216:18 | **Friday** 37:15,25 |
| 100:19 | 128:17 134:24 | 217:15 218:4 219:4 | 68:17 |
| **filled** 55:13 136:5 | 135:20,24,25 | 219:11,20 221:5,9 | **friend** 97:25 100:16 |

A1716

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

269

| | | | |
|---|---|---|---|
| 211:3 | 91:3 92:21 101:20 | 240:23 242:8 | 142:17 152:12 |
| **friends** 129:6,24 | 105:17 182:15 | 249:25 | **Google** 148:12 |
| **frivolous** 248:11 | 194:13 203:18 | **goal** 172:13 | **gotten** 182:17 |
| **front** 70:9 74:4,5,7 | 231:18 | **goes** 92:4 187:24 | **grab** 64:7 128:17 |
| 85:20 163:25 164:4 | **gift** 142:6,8 | 189:6 195:16 | 182:8 187:2 233:5 |
| 164:5,25 165:5,14 | **girl** 38:13 | **going** 4:9,21 8:2,22 | **graduate** 30:8,21 |
| 165:21 167:6 | **give** 8:10 34:15 38:13 | 13:7,8,18 17:6,12 | **graduated** 30:7 |
| 179:17 186:25 | 45:19 46:10 47:16 | 21:3,14,22 22:16,22 | **grand** 161:2 |
| **frustrated** 84:6 192:4 | 56:24 57:23 60:16 | 23:21 24:23 25:15 | **grandmother** 139:23 |
| **full** 6:20 13:19 50:2 | 62:15 69:2 76:9 | 25:16 26:3,25 34:15 | **granular** 45:5 |
| 82:2,3 136:16 159:4 | 82:20 88:9 90:19 | 42:23 45:2,7 49:4 | **grass** 111:22 114:15 |
| 159:6 169:5 | 91:25 95:6 119:6 | 59:11 74:22 75:13 | **gratuitous** 244:17 |
| **funded** 39:16,19,21 | 156:10 158:23 | 78:6 79:11 80:16,22 | **great** 54:12,13,19 |
| 39:24 40:10,16 | 172:10 177:9 231:5 | 81:9,19 89:12 90:10 | 55:9 69:22 114:2 |
| 218:25,25 | 238:23 246:16 | 90:12,14,19 91:4 | 127:13 137:20 |
| **funding** 40:2 | 251:5 | 93:11 94:3,9 95:14 | 219:15 242:22 |
| **funds** 39:12 | **given** 38:9 40:20 | 98:5,20 100:17 | **great-grandmother** |
| **further** 3:7,11 66:4 | 47:13 77:17 90:24 | 101:24 103:21 | 146:15 |
| 143:16 178:2 | 95:7 103:8 108:9 | 104:8 108:12,22,23 | **greater** 238:7 |
| 231:15 252:13 | 166:22 235:22 | 113:13 114:14 | **greener** 111:23 |
| 255:12 | 255:10 | 115:2,13 120:6,8 | 114:15 |
| | **gives** 46:4 | 128:7,13,21,23 | **greet** 80:17 |
| **G** | **giving** 47:23 67:12 | 133:19 138:23 | **greeted** 195:6 |
| **G** 169:25 170:2 | 95:9 127:11 | 140:8 148:22 | **gross** 43:13 164:4 |
| 253:20 | **glad** 247:15 | 151:15,22,25 | 167:6 216:2,10 |
| **Gantt** 163:21 | **glances** 103:20 | 152:10 157:15,16 | 217:6,14,15,24 |
| **gap** 30:18 | **GM** 129:4 | 158:12 169:24 | **ground** 8:3,13 9:9 |
| **gaps** 55:17 | **go** 5:25 8:2 14:8 | 172:10 177:11 | **grounds** 13:4 26:22 |
| **Gateway** 30:6 | 20:18 23:7 24:15 | 179:16 181:16,22 | 109:14 151:12 |
| **GED** 30:9,14 31:17 | 36:4 38:8 42:6 | 186:8,25 188:4 | 183:19 |
| 31:23 | 45:17 51:14 53:16 | 189:15 195:22 | **GROUP** 2:8 |
| **gender** 109:6,17 | 56:12 60:2 62:14,22 | 197:7 207:25 | **grow** 91:4 97:17 |
| **general** 15:21 47:5 | 64:4,4,8 66:25 | 208:25 209:6 | **growth** 97:15 |
| 67:10 76:2 103:3 | 67:19 69:8 83:20 | 212:21,21,24 217:4 | **guarantee** 239:19 |
| 139:19,20 141:5 | 87:21,25 93:11 | 217:14 227:17 | **guess** 8:25 40:8 44:23 |
| 142:13 180:20 | 100:24 127:12,21 | 229:12 235:7 | 71:2 105:17 109:23 |
| 181:18 206:2 | 133:21 137:17 | 240:11 241:4 242:5 | 144:19 171:20 |
| 230:21 | 149:22 163:7 | 244:25 245:15 | 185:10 195:10 |
| **generally** 31:15 | 180:13 183:2 | 247:10,13 248:20 | 198:24 203:14 |
| 37:15 47:2 67:18 | 187:13 192:25 | 248:22,23 251:19 | **guesstimate** 142:21 |
| 83:6,20 111:9 | 198:6 202:10 | 252:8 | **Guzman** 1:9 5:6 6:12 |
| **gestures** 8:8 | 215:20,21 216:11 | **Gonzalez** 235:2,12 | 36:25 45:18 57:25 |
| **getting** 13:20 39:18 | 217:25 218:2 | 254:16 | 60:4,11 62:8 67:15 |
| 41:18 42:18 54:24 | 226:18 228:15 | **good** 5:3,25 40:3 | 70:4,8 74:4,7 75:6 |
| 64:12 78:10 82:14 | 230:18 233:5,8,15 | 97:16 105:2 114:3 | 78:17,20,24 80:10 |

A1717

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 271 of 294 PageID #: 2381

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

270

82:11,23 83:5 86:14
86:22 87:2 88:2,7,9
88:9,17,20 91:7,11
92:8 93:18,23 95:15
95:18,21,24 96:4
100:25 102:4 106:7
107:14 110:17
170:24 171:6
179:12 186:6
212:13,18 232:11
237:24
**Guzman's** 88:4 99:24
107:16

### H

**H** 4:2 143:14 172:17
172:18,25 253:13
253:21 254:3
**half** 148:18
**hall** 158:8
**Hampton** 170:24
**hand** 88:4,4 92:4,5
109:18,18 255:17
**handle** 83:7 92:23
174:7 249:24
**handles** 249:24
**handwrite** 196:23
**handy** 66:14
**hang** 90:15 101:20
**happen** 20:25 39:19
72:9 86:21 93:12
114:14 129:10,11
140:14 182:20
192:8,13,14 201:17
**happened** 37:11
39:25 40:13,13 44:6
61:23,24,24 72:6
73:20,21 74:8 78:10
79:2 84:11 87:10
91:13 97:6 98:3
140:24 146:7
152:20 185:9 187:6
191:11 193:14
200:25 202:9
205:16 219:3

250:18,20,21
**happening** 87:2 97:2
201:20
**happens** 114:3
**happy** 61:18 123:5
207:5
**hard** 19:15 65:10
79:19 88:25 89:10
90:25 93:20 110:23
154:14 188:13
193:13 196:20
216:24 222:22
250:10
**hated** 72:14
**header** 80:23
**health** 68:15
**healthcare** 113:2
116:24
**hear** 41:25 199:15
242:13
**heated** 243:5
**held** 1:17,18 41:9
44:14 54:16 81:21
95:12 123:9 126:16
140:18 210:17
218:12 228:12
230:6,19 234:20
**help** 8:11 53:14 87:2
116:16 120:9
201:25 202:4
214:20
**helped** 115:2 170:25
171:6
**helps** 116:15
**Henston** 171:5
**hereinbefore** 255:8
**hereto** 3:4
**hereunto** 255:16
**Hey** 84:5
**HG** 1:2
**hiccups** 73:5
**high** 29:25 30:6,11,12
30:13,19 31:21
239:9,12
**high-end** 128:16

**higher** 59:25 167:10
**highlighting** 247:18
247:25
**Hillside** 1:7,7,7,8 5:5
5:5,8,8,11,12,25 6:2
6:3 11:17 12:4,9,18
13:12,16,22,23,23
14:6,9,12 33:19,21
33:24 34:7,10,11,14
34:21,21,22,24 35:2
35:4,6,7,13,15 36:7
36:12,22 48:6 50:9
55:14,22 57:12
66:24 74:20 77:8
85:14 97:20 107:23
116:22 117:2 118:8
118:19,24 120:14
120:18 121:9,14,22
121:25 122:5,15,18
122:21 124:17
125:14 131:19
134:21 138:4
146:22 156:14
157:23 158:21,25
159:25 160:5,19
182:13 210:20
231:23 234:12
237:15 249:19
256:4
**hire** 57:20 58:5,13,23
100:21 147:20
208:25 213:3
**hired** 37:5 57:15,17
57:25 58:12 59:15
59:18 63:17 76:6
209:6 213:9 248:18
**histories** 174:21
236:10
**history** 174:18 201:5
**hit** 52:23 76:9 99:4,4
122:8
**hold** 41:7,19 84:5
92:18
**holding** 193:11
**holiday** 225:4

**home** 131:10 172:14
**hominem** 244:17
247:25
**honest** 167:12
**honestly** 20:9 24:8
47:17 56:23 71:5,12
71:17 72:13 73:23
75:22 77:18 79:17
85:12 88:25 96:9
97:4 118:4 120:4
121:5 129:18 134:3
134:15 144:2,15
146:13 148:17
153:17 157:11
158:10 170:10
175:15,19
**hoping** 61:21 142:20
**hospitalized** 113:4
**hotel** 33:2,3,16,18
56:16
**hour** 7:12 15:8 26:7
175:7,16,17,19
181:12 182:16,19
188:3 198:25
**hours** 9:12 10:8,12
113:14 128:9
180:10,14 181:19
182:23 186:17,23
187:5,23 199:4
207:2 232:2
**Housekeeping** 33:6
**housing** 29:10
**hundred** 112:12
**hundreds** 84:14
**hurdle** 237:25
**hypothetical** 123:2

### I

**iCloud** 146:2,6
**ID** 65:9
**idea** 32:4 38:2 78:19
91:9 124:4 188:21
206:24
**identification** 21:17
80:25 143:19 146:5

A1718

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

271

| | | | |
|---|---|---|---|
| 148:24 154:10 | increased 46:2 | insistence 163:2 | interrupting 151:7 |
| 162:2 170:2 172:18 | 114:25 237:9 | **Instagram** 117:11,23 | 151:10 183:15,20 |
| 173:9 184:16 | 239:18 | **instance** 102:3 | 184:3 240:6,9,21 |
| 187:15 189:25 | **increases** 46:4 | 170:23 197:21 | 245:22 246:6,12,14 |
| 194:8 197:12 | **increasing** 237:2 | 209:4 | 246:17 |
| 202:12 203:24 | **independent** 177:14 | **instances** 102:19,25 | **interview** 32:24 57:9 |
| 206:10 207:18 | 250:25 | 182:17 | 58:10 64:19 127:21 |
| 209:16 211:14 | **indicate** 203:20 | **instant** 175:16 | 129:7 |
| 213:6,22 235:9 | **indicates** 200:15 | 176:25 177:12 | **interviewed** 49:25 |
| 240:25 243:25 | **indication** 203:17 | 248:13 | **interviewing** 37:6 |
| **identified** 158:17 | **indications** 103:21 | **instantly** 177:4 | **intolerable** 231:22 |
| **identify** 102:8 105:14 | **individual** 67:5 99:20 | **instructing** 115:25 | 232:5 |
| 105:19 144:5,8,24 | 144:9 155:25 | 152:14 | **intriguing** 131:8 |
| 155:12 158:7 | 163:21 170:25 | **instruction** 104:9 | **involved** 72:4 80:13 |
| **identity** 155:13 | 171:6 184:18,20 | 120:24 | 111:2 131:18,19 |
| **ignore** 246:8 | 199:5 203:12 | **instructions** 104:2 | 147:9 |
| **ignored** 232:8 246:10 | 206:13 | **instruments** 23:2,3 | **Iris** 38:18 139:18 |
| **ignoring** 232:10 | **individual's** 210:24 | 23:16 | 140:4,6 144:13 |
| **immediately** 70:7 | **individuals** 46:21 | **insurance** 135:12 | 155:20,20 156:3 |
| 114:12 181:13,24 | 47:4,8 65:17 69:17 | 136:20 137:7,10,16 | **irrelevant** 74:23 |
| **important** 192:10 | 84:13 139:13 | 164:10 181:11,17 | 127:5 162:22 |
| **impossible** 167:19,23 | **industry** 34:5 | **intend** 24:25 | 248:21 |
| **impressive** 182:24 | **Infiniti** 160:10 | **interact** 59:5 | **Isaac** 6:10 32:24 |
| 183:2 | **inform** 44:2 | **interacted** 61:5 | 36:23 37:6 44:10,11 |
| **in-person** 231:12 | **information** 11:3 | **interaction** 59:8 | 45:16 46:12 47:15 |
| **inaccurate** 201:6 | 17:21 28:11,14,23 | **interactions** 61:11 | 49:14 56:10,19,22 |
| **inappropriate** | 29:2,14,17 47:19 | **interest** 202:20 | 57:19,22 60:2 61:2 |
| 104:10 208:9 | 64:25 66:14,17 | **interested** 186:10 | 61:24 63:14,15,25 |
| **inbound** 185:12 | 82:19 87:3 136:2 | 202:16 203:7 | 64:10,11,21 66:20 |
| **incidents** 72:20 73:9 | 145:5 156:16,17,23 | 255:15 | 66:21,25 67:15,20 |
| 73:11 179:12 | 165:13 173:25 | **internet** 130:7 | 68:23 69:4 70:2,5 |
| **include** 12:19 147:24 | 178:19,23 179:23 | **interpersonal** 71:10 | 70:14 74:6 80:12,14 |
| 158:8 | 180:8 185:23 | 71:15,25 | 82:16 87:18,22 90:5 |
| **included** 35:15 | 197:22 | **interrogatories** 11:23 | 92:3,13 93:25 94:15 |
| **including** 136:19 | **initial** 143:21 144:20 | 154:8 246:25 | 96:20 101:3 108:11 |
| **income** 28:11,15,23 | 157:14 253:17 | 253:19 | 111:3,21 123:4 |
| 29:15 125:15,17 | **initially** 62:21 121:21 | **interrogatory** 20:11 | 156:18 161:10 |
| 126:3,11 136:2,13 | 123:17 | 102:22,24 154:18 | 176:19 201:8,11,18 |
| **incorrect** 25:25 | **injuries** 111:16 112:5 | 155:13 156:13 | 207:10 231:8,12 |
| 120:20,25 121:2 | 112:9,16,19,23 | 157:18 158:6,14,18 | 249:22,25 250:22 |
| 155:7 177:16 | 113:2,5,8,23 114:5 | 243:6,9 253:11,11 | 250:24 251:23 |
| 189:13 201:7 214:5 | 114:8 115:8 | **interrupt** 68:13,20 | **Isaac's** 46:9 48:2 |
| 250:20 | **injury** 159:16 | 152:3,10 155:9 | 91:24 232:13 |
| **incorrectly** 158:7 | **input** 168:17 | 161:17 245:4,24 | **Ishaque** 1:8 2:13 5:6 |
| **increase** 45:19 | **inquiry** 196:20 | **interrupted** 245:24 | 6:9 |

A1719

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

272

**issue** 60:15 76:19
  77:9 78:6 92:16
  200:20
**issued** 228:2
**issues** 203:18 231:9
**issuing** 227:24
**item** 190:16
**items** 164:9

_____
**J**

**J** 184:13,16 186:3
  227:19 253:22
**Jamaica** 46:6
**January** 8:24 18:8,15
  20:13 34:8,23 36:7
  44:16 48:11,16,17
  54:6,7 60:20 61:3
  76:16,19 77:4 86:13
  90:6 94:2,15 124:18
  125:3 149:4 150:6
  150:18 186:9,15,17
  187:17,22 188:16
  188:24 193:12
  194:20 195:5,22
  196:11 197:10,16
  198:22 202:19,23
  203:5 207:4 213:12
  225:7,11
**Jay** 36:23 37:10 43:5
  43:7,15 56:25 57:24
  60:2,7,8 62:13,22
  63:3,9,10,15,18,23
  63:25 64:9,13,15,21
  66:20 67:19 75:9,14
  79:5,9 167:12
  173:21 175:25
  220:17
**Jay's** 82:14 139:18
**Jenneque** 36:23 37:7
  43:8 57:3,5,20 62:7
**Jennings** 38:20,22
**job** 36:13 40:3 48:19
  54:18,19 56:15,15
  56:16,17,18 57:7
  67:10 74:13 88:4

114:12 120:16
  121:6 122:24 123:9
  124:11 127:19,23
  128:18,23 130:3
  131:2 134:11
  159:22
**jobs** 55:3,6 125:13,14
  125:18
**John** 165:17
**joint** 35:19
**Jory** 1:8 5:7 6:6,6,18
  58:12,16,19 59:4
  60:13 61:7 156:18
**journal** 141:8
**judge** 104:13 183:11
  192:12 227:19,19
  227:20 235:2,12
  240:6 244:4,5,16
  245:9 246:21,21
  248:9 254:15,17
**July** 43:18,20 44:3
  51:3,4 60:8,10
  64:15 176:3 217:4,5
  217:10,10,17
  218:19,19
**jump** 84:2
**jumping** 201:19
**June** 19:21,21,25
  133:9,10,12,23
  134:10 143:23
  215:6,6,13,13
  216:10

_____
**K**

**K** 187:13,15 253:23
**Kataev** 2:10 4:8,12
  4:24 5:2,3,18,24 6:5
  6:21,23 7:15,20
  11:20 12:7,13,15,22
  13:2,7,10,21 14:2
  17:9,18,24 19:7
  20:10 21:14,18,25
  22:7,13,20,24 23:24
  24:2,4,12,15,22
  25:5,12,18,21 26:2

26:5,21 27:3,15,18
  29:7,9 35:22 36:3
  42:5 44:13,15 46:14
  46:18 49:4,7 54:15
  54:17 66:9 68:3,5,7
  68:11,18 74:25 75:4
  81:2,19,22 91:16,20
  95:11,13 99:15
  102:12 103:18,24
  104:11,19 105:2,6
  113:15,17 115:23
  115:25 116:4,5
  118:10 119:22
  120:2 121:3 124:5,7
  124:21,23 126:14
  126:17 133:20
  137:2,5 142:17
  143:3,8,18 144:22
  144:23 145:24
  149:2,19 151:7,10
  151:14,17,24 152:7
  152:12,15 154:15
  154:17 155:8,11
  157:16,21 158:12
  158:16 161:17,19
  161:22 162:3,12,23
  162:25 163:4,9
  170:3 172:19,24
  173:2,3,7,10 174:24
  175:3 182:2 183:5
  183:10,14,18,23
  184:3,10,11,17
  185:20 186:2
  187:16 190:2
  202:13 203:11,25
  204:3,9,10,20,21
  206:11 207:22
  208:9,14,16,21,22
  210:16,18 211:17
  213:7,23 215:11,18
  216:8 217:11,12,20
  217:23 218:5,11,13
  225:21,25 226:7
  228:11,13,20
  229:16 230:18,20

231:4 234:13,14,19
  234:21 235:10
  238:13 240:2,5,9,13
  240:17,21 241:2,14
  241:18 242:12,17
  242:20 243:2,16,21
  244:2 245:3,5,14,18
  245:22 246:5,10,14
  246:18 247:15,17
  247:20,22 248:25
  249:2,14,17 251:5,9
  251:11,18,21
  252:12 253:7
  254:19
**keep** 8:6 40:19 79:24
  80:3,5,10 141:8,17
  169:12
**keeping** 80:7
**kept** 34:25 71:13,14
  141:15 169:16
  177:20 179:15
**kid** 91:3
**kids** 52:25 131:15
**kind** 13:17 19:15
  24:9 31:9 32:20
  34:13 35:13 44:7
  49:24 56:14 64:13
  65:10 79:19 82:15
  87:11,15,17 88:3
  90:21 92:13 93:6,17
  93:19 95:5 98:10
  110:22,22 140:7
  157:6,7 167:11
  233:15 249:23
**Kissena** 2:4
**Kissimmee** 21:21
  253:16
**knew** 98:22 120:5
  156:9 237:19
**know** 5:22 12:22
  20:14,19 21:6 24:10
  26:24 37:11,23 38:2
  38:17 41:16 42:16
  42:17,20 46:25 47:6
  50:2,7 58:5,7,8,9,23

A1720

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

273

| | | | |
|---|---|---|---|
| 61:18,24 62:16,25 | 20:1 21:1 22:1 23:1 | 174:1 175:1 176:1 | 163:11 192:11 |
| 70:4,15 73:18 77:20 | 24:1 25:1 26:1 27:1 | 177:1 178:1 179:1 | **lawsuits** 26:11 |
| 79:6,10,24 81:7 | 28:1 29:1 30:1 31:1 | 180:1 181:1 182:1 | **lawyer** 81:8 |
| 83:18 95:17,20 | 32:1 33:1 34:1 35:1 | 183:1 184:1 185:1 | **layman's** 231:5 |
| 97:15 104:16 107:5 | 36:1 37:1 38:1 39:1 | 186:1 187:1 188:1 | **laziness** 86:8 |
| 107:8,11,12,13,15 | 40:1 41:1 42:1 43:1 | 189:1,23,25 190:1 | **LB** 1:2 |
| 107:16,19 120:4 | 44:1 45:1 46:1 47:1 | 191:1 192:1 193:1 | **lead** 84:16,18 184:18 |
| 128:24 129:15,17 | 48:1 49:1 50:1 51:1 | 194:1 195:1 196:1 | 185:5,7,9,21,22 |
| 134:3 141:25 | 52:1 53:1 54:1 55:1 | 197:1 198:1 199:1 | 186:5 187:11 |
| 144:16 146:14,25 | 56:1 57:1 58:1 59:1 | 200:1 201:1 202:1 | 188:14,25 189:12 |
| 148:14 153:19 | 60:1 61:1 62:1 63:1 | 203:1 204:1 205:1 | 193:12 195:11,16 |
| 154:4 159:21 | 64:1 65:1 66:1 67:1 | 206:1 207:1 208:1 | 197:9 204:4,12 |
| 166:21 167:8 168:6 | 68:1 69:1 70:1 71:1 | 209:1 210:1 211:1 | 205:21,24 206:2 |
| 169:9 171:8 172:10 | 72:1 73:1 74:1 75:1 | 212:1 213:1 214:1 | 209:22 211:18 |
| 174:15 176:2 | 76:1 77:1 78:1 79:1 | 215:1 216:1 217:1 | 236:20 |
| 177:19 178:8 | 80:1 81:1 82:1 83:1 | 218:1 219:1 220:1 | **leads** 11:3 |
| 180:25 181:4,5,13 | 84:1 85:1 86:1 87:1 | 221:1 222:1 223:1 | **learn** 148:8,11 |
| 188:19 189:7 | 88:1 89:1 90:1 91:1 | 224:1 225:1 226:1 | 234:15 |
| 194:22 197:23 | 92:1 93:1 94:1 95:1 | 227:1 228:1 229:1 | **learned** 55:25 72:21 |
| 201:11 205:13 | 96:1 97:1 98:1 99:1 | 230:1 231:1 232:1 | 73:2,10 82:23 83:5 |
| 206:6 208:18 209:8 | 100:1 101:1 102:1 | 233:1 234:1 235:1 | 89:19 |
| 211:11 212:21 | 103:1 104:1 105:1 | 236:1 237:1 238:1 | **learning** 82:15 |
| 215:19 219:8 231:2 | 106:1 107:1 108:1 | 239:1 240:1 241:1 | 101:21 |
| 231:18 234:4 | 109:1 110:1 111:1 | 242:1 243:1 244:1 | **leave** 18:9,11 45:21 |
| 238:18,25 243:4,5,9 | 112:1 113:1 114:1 | 245:1 246:1 247:1 | 52:24 54:25 81:18 |
| 243:10 244:7 | 115:1 116:1 117:1 | 248:1 249:1 250:1 | 94:19 100:21 |
| **knowledge** 78:17,20 | 118:1 119:1 120:1 | 251:1 252:1 253:1 | 120:14 124:2 |
| 88:14,17 91:7 | 121:1 122:1 123:1 | 253:24 254:1 | 135:17,19 136:6,10 |
| 107:23 143:25 | 124:1 125:1 126:1 | **L-e-t-t-y** 16:14 | 191:4 192:5 193:8 |
| 147:16 169:11,23 | 127:1 128:1 129:1 | **LABUDA** 2:8 | 232:19 |
| 170:9 177:14 | 130:1 131:1 132:1 | **LaGuardia** 33:2 | **leaves** 249:23 |
| 199:10 200:14 | 133:1 134:1 135:1 | **Lake** 2:9 | **leaving** 42:22 56:16 |
| 204:7,25 205:4 | 136:1 137:1 138:1 | **lasted** 187:22 | 60:7 85:21 111:22 |
| 206:16 207:20 | 139:1 140:1 141:1 | **lasting** 186:17 | 118:14 123:4 |
| 208:6 211:9 213:8 | 142:1 143:1,14 | **late** 53:19 69:24 | 124:11 198:8 |
| **known** 200:18 | 144:1 145:1 146:1 | 250:15 | **led** 125:9 |
| **knows** 23:6 26:20,23 | 147:1 148:1 149:1 | **latest** 145:19 | **left** 18:4 19:23 24:18 |
| 123:5,7 129:17 | 150:1 151:1 152:1 | **laughed** 161:23 | 27:24 51:21 60:8 |
| 151:23 191:8 231:2 | 153:1 154:1 155:1 | **law** 2:3,8 148:8,11 | 62:7 63:3,18,23 |
| | 156:1 157:1 158:1 | 149:7 229:8 245:11 | 64:9,13,15 67:20 |
| **L** | 159:1 160:1 161:1 | 248:12,18 | 68:23 75:9,14 99:9 |
| **L** 4:1,2 5:1 6:1 7:1 | 162:1 163:1 164:1 | **lawsuit** 26:6,7,8 | 100:6 110:13 |
| 8:1 9:1 10:1 11:1 | 165:1 166:1 167:1 | 117:21 119:8 | 118:18 119:7,9,11 |
| 12:1 13:1 14:1 15:1 | 168:1 169:1 170:1 | 146:19,21,23 147:6 | 121:9 123:22 |
| 16:1 17:1 18:1 19:1 | 171:1 172:1 173:1 | 147:10,12,17,25 | 124:14 125:14 |

A1721

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

274

134:21 149:7
173:22 176:2
188:10 197:22
201:9,18,23 211:7
220:20
**legal** 23:4 35:19 36:2
92:11 110:5 119:20
230:25
**lender** 175:6,18
176:24 177:7 178:4
178:11 179:23,24
**lender's** 179:25
**lenders** 174:12,16
176:14,16
**let's** 24:16 37:14 39:2
63:6 128:6 173:7
181:17 185:11
187:13 189:23
194:3 199:22
202:10 226:4
**Leticia** 1:3,17 16:12
184:23 187:18
193:7 204:11
205:12 252:17
253:4 256:5,18
**letter** 200:7 227:23
228:4,6 245:10
246:22
**letting** 104:16
**Letty** 16:13
**level** 72:2 87:11
**lie** 171:24
**lieu** 166:15 167:9
**life** 18:24 19:7,8,14
123:12 137:12
**liked** 179:5
**Lily** 100:12 156:9
**limited** 175:20
**line** 103:23 104:9,18
229:17
**LINE(S)** 256:5
**lines** 94:14
**link** 143:6
**LinkedIn** 117:13,23
**list** 4:22 55:14 102:25

144:12 153:6 157:9
167:5 169:14
**listed** 149:8,15
150:10,17 153:3
165:9,16 185:2,24
186:6,9 194:21
217:24
**listen** 241:6
**listing** 168:22 186:16
**lists** 102:18 150:2
213:3
**literally** 248:14
**little** 45:3 67:7 70:14
72:17 73:5,21 82:24
87:12 106:3 144:3
173:21 205:8 217:9
220:9 226:11
**live** 16:21 18:22 19:2
19:19 33:13
**lived** 18:24 33:10
**living** 19:2 74:16
**LLC** 1:7 5:5
**local** 17:14
**located** 35:5
**location** 85:19 130:6
**locations** 158:3,4
**log** 86:3 163:15
168:19 169:18
170:12 185:8,11
187:3,8 188:2,21
190:16 226:19
**logged** 86:4 187:2
**logging** 86:5,6 187:6
**long** 18:16 24:8 33:17
34:16 79:9 82:11
84:10 86:14,22
122:23 132:24
161:11 171:24
172:9 175:16
177:14,20 180:13
182:25 192:3
220:19 241:5
**long-term** 135:11
**longer** 43:15,21 44:2
67:6 69:4,13 78:2,5

78:24 80:11 83:12
83:14 91:6,12,13,23
97:8,12 102:16
106:15 126:18
131:25 178:15
182:4 192:18 201:5
201:19 225:15,24
235:18 236:9
**longest** 123:8 180:15
**look** 13:2 54:25 90:17
96:10 131:7 168:12
170:12,14 185:11
189:23 194:3 197:7
198:11 199:19,22
203:22 208:23
216:9 235:16
**looked** 61:18 130:23
168:6
**looking** 8:21 40:14
42:21 70:24 80:14
89:11,16 170:15
196:21 197:22
212:22 213:18
221:16
**looks** 200:21 214:18
220:12 224:24
226:24
**Los** 133:22
**lose** 128:23 146:4
198:14
**losing** 56:15,15
**loss** 164:14 195:16
**lost** 25:23 185:2,5,7
185:22 187:11
188:25 189:13
193:12 195:11,13
198:17,19 205:21
205:24 206:2
209:22 210:4
236:13,21
**lot** 46:7 73:25 79:17
103:20 112:11,15
114:2 128:8,13
182:8 199:8,11
208:5

**lots** 31:14,15
**loud** 8:6
**Louis** 195:6
**low** 128:21
**Lsticia3@Gmail**
130:19
**lunch** 142:18 145:14
162:20,21 232:22
233:5,17,18
**Luncheon** 143:10
**luxury** 27:23 51:24
52:11 54:22 55:8
124:13 125:6 127:8
128:16 136:4
137:18 157:24

_____
**M**

**M** 1:9 4:2 5:7 6:15
143:14 194:3,8
254:6
**magistrate** 244:5
245:9
**main** 33:8 85:13
114:22
**maintain** 155:24
**maintained** 34:25
**Major** 107:21
**making** 46:2 78:2,5
90:24 94:20 95:2
104:11 110:20
115:11 121:6,14
122:8 125:4 166:10
183:8,14 231:13
232:6 237:11
239:18 248:5,11
**Mall** 1:8,8 5:6,11,12
6:2,3 12:9,18 13:12
13:16,23,23 14:6,10
34:11,12,14 35:2,7
35:13,16 127:24
128:19 130:2 158:7
**manage** 89:19
**management** 84:16
84:18,21 110:25
**manager** 38:12 45:18

A1722

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

275

47:3,5,6 49:14
51:24 53:17 54:19
63:17 67:10,12
83:24 84:4,5 86:10
89:18,24 90:14,18
90:21 92:4 93:16,18
94:4,7,10,17 123:7
128:20 131:24
174:2 177:25 178:5
178:8 186:5 212:20
250:17
**manager's** 67:10
**managerial** 251:4
**managers** 179:8
**Mann** 244:4,16 245:9
246:21 254:17
**manners** 246:3
**Manrique** 14:4,5,14
14:15,18 15:7 16:8
26:7 87:13 98:17
144:9
**Manuel** 195:6
**March** 18:8 52:23,23
53:3 134:6 185:13
203:12 255:17
**Marco** 33:2
**Marcus** 2:9
**marijuana** 21:5,7
24:7
**marijuana-related**
23:10
**mark** 17:21 21:15
80:5 169:24 173:7
239:25
**marked** 17:7,17
21:17 80:20,25
143:19 148:23,24
154:7,10 161:25
162:2 170:2 172:17
172:18 173:9
184:13,16 187:15
189:12,25 194:8
195:11,13 197:12
202:12 203:24
206:10 207:18

209:16,22 210:6
211:14 213:6,21,22
226:9 235:8,9
240:25 243:24,25
245:7
**marriage** 255:14
**married** 18:18,20
78:18
**math** 176:11
**matter** 21:19 22:9
255:15
**max** 252:10
**maximize** 99:8
**McDonald's** 31:25
32:5,9,17
**mean** 13:15 23:2
39:14 41:18 42:3
45:23 49:2,20 57:16
57:22 59:23 62:24
65:5,23 69:23 73:18
75:24 76:12 78:15
86:17,19 98:19
99:21 101:6 103:3
103:15 105:17,21
108:20 109:18
110:19,22 111:19
111:20 113:21
115:3 122:7 127:20
160:21 164:22
171:3 175:12,15
182:15 185:4 188:7
189:21 193:21
195:25 206:19
212:16 214:21
225:21 231:17,25
233:19 239:15
**meaning** 12:20 51:8
84:20
**means** 39:11 160:23
189:10,16 195:14
207:7 211:22
213:14 219:5,12,22
219:24 221:2,6,9
222:12 223:5,15,19
223:22 224:3,16

225:12
**meant** 138:21 174:15
**media** 117:7
**mediate** 72:4
**mediation** 169:8
**Medicaid** 28:18
**medical** 112:25
**Medicare** 28:17
**Medicare/Medicaid**
28:22
**medication** 9:12
113:7
**meet** 24:16 38:23
241:22
**meeting** 10:11,15
24:19 57:24
**Memorandum**
246:20
**mental** 116:24
**mention** 44:7,9 79:4
92:2 99:25 206:4
**mentioned** 45:15
61:18,19 127:7,13
200:2 202:7 210:3
**mess** 93:22
**message** 14:24 60:19
190:7 193:8,9
202:24 203:5
**messages** 142:9 194:5
**met** 10:8 56:19
**mid** 52:19 249:22
250:2
**middle** 72:25 76:8
169:4 201:24
223:17 251:19
**mile** 148:18
**milestones** 99:4
**million** 111:6,9
118:23 147:3
153:22
**millions** 146:18
**MILMAN** 2:8
**mind** 23:2 157:11
158:11
**mine** 97:25

**minor** 68:18
**minus** 151:8
**minute** 210:16
**minutes** 69:24 83:6
83:11 131:7 175:7
180:9 181:12 241:5
243:15,17
**Mischaracterizes**
132:8 145:23 165:3
177:5 251:15 252:3
**misrepresentations**
244:12
**missing** 60:17
**mistake** 176:21
**mistaken** 27:5 79:20
137:23 198:20
**mistreated** 41:7
**mitigation** 120:16
**model** 145:19
**mom** 131:14,17
**Monday** 37:15,24
108:23
**money** 42:11,14
44:21 90:24 95:2
101:23 114:24
115:3,7,11 120:12
121:12,20 122:14
128:20 157:13
158:24 190:25
191:8 193:10 195:2
195:24 196:4,7
232:3,6 233:19
**Monica** 170:24
**month** 20:7 32:2,14
33:15 51:21 53:11
53:18 58:21 62:2
76:8 79:15,18,21
85:10 93:6 128:14
133:5 140:14 168:5
168:15 169:4,5,5,12
169:17,20,21,22
172:5 175:24
195:12 226:25
227:4,9,10 252:7,8
**month-long** 87:19

A1723

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

276

monthly 40:22 50:19 162:4 200:8 239:7 253:20,20
months 36:25 37:10 51:13 75:20,23,25 76:11,13 82:22 97:15 101:20 110:15 111:24 114:17,18,20 121:13 128:15 169:6 176:9,12,14 205:25 209:24 210:3 213:15 219:16 236:21
moot 68:7,19
morning 5:3 68:6 232:18
mother 16:22 139:23 142:8 147:9,12,16 148:9
mother's 133:6 146:23 201:15
motion 25:6,7,22,23 74:25 104:3 234:23 235:2 242:22 244:25 245:3,10 246:23 248:22 249:8
Motor 27:23 48:8 49:11 50:5,23 51:12 51:25 52:4,12 53:6 53:13,14,16 54:12 54:18,19 55:8,10 121:10,12,21 123:15,17 124:13 125:6 127:7 136:4 137:18,20,24 155:18 227:6
Motors 54:22 127:8 127:14 129:12
mouth 141:2
move 19:12 25:14,14 152:13 182:6 226:10 242:23 248:23

moving 25:24 169:6 220:24
multiple 74:5 78:10 87:4 104:20 128:25 142:24 152:21 167:20 184:25 208:11 236:12
mumbling 8:9
Murray 4:5
mystery 42:20

N

N 2:2 4:2,2 143:14,14 197:8,12 253:2 254:7 255:2
name 5:3,16,20,23 6:20 13:19 16:11 21:6 30:5 50:2 70:12 80:4 98:6 100:11,12 128:23 149:7,14 150:2 156:9,11 157:24 189:11 195:18,19 210:24 256:4,5
named 163:21 184:19 194:5
names 16:16 84:12
nature 59:8 62:8 71:15 129:21 243:4
navigate 82:23
near 148:17
necessarily 36:20 45:23 46:4 65:18 85:4 101:17 206:19 232:24
necessary 80:11 179:23 196:12 239:15
Neck 54:12,13,19 55:9 127:13 137:20
need 5:9 9:6 12:24 13:2 34:13 68:8 83:22,23 92:2 108:24 116:14 149:17 152:10

154:15 176:10 183:3 194:13 236:17 239:23 245:15 247:13
needed 41:2 53:13 65:7,10,12,14 188:8 190:25
needing 236:19
needs 191:8 193:10 200:7
negative 163:25
Neither 69:7
never 21:23,25 22:4,5 34:11 41:9 48:2 60:13 61:5,8 66:16 69:4 73:6 74:14 75:5 78:13 89:25 99:4 108:13 130:23 159:21 169:17 180:13 199:8 233:10,11,12 234:6 240:3,12 251:3
Nevertheless 247:25
new 1:1,20 2:4,9 4:5 4:6 17:15 18:12,24 19:3,12,17,24 30:11 32:10,13 50:6 53:7 53:9,13 62:24 120:16 128:8 141:22 145:25 146:8 169:21 188:14 237:16 248:10,16 255:6
newest 141:23
news 69:22
night 205:13
nine 177:23 219:12 220:4,9,22 223:19
nonpregnant 237:4
normal 196:3,7
North 129:12
Northern 33:9
notary 1:19 3:5 4:4 4:16 252:21 255:5 256:20

note 47:21 189:8,21 190:3 200:15 204:22 205:4 206:20,23,25 208:24 240:11 244:10
noted 104:21 116:4 151:14 203:11 204:9 207:5 211:19 212:15 240:13 242:20 246:7,8,13 248:25 252:15
notes 104:21,23 141:3 142:14 236:20 244:16
notice 1:18 125:5
noticed 125:6
notify 227:22 228:5
noting 240:23 251:9
November 52:5,19 62:5,6 79:20 93:4 93:10 173:16 199:24 200:3,5,21 200:23 201:14 223:13,18,22,25 224:8 226:14,18 227:10 249:22 250:15 252:7
number 77:16 79:25 80:7 85:23 149:14 150:2,9 151:19,20 153:16,25 155:13 155:24 156:13 157:18 158:18 164:24 168:11,19 168:25 179:19 217:21 221:25 227:25 237:5 243:6
numbered 203:25
numbers 94:13 98:19 98:19 99:3 131:8 151:4 168:12 169:7 169:7 172:10,22 184:14 209:14 216:7 217:19

A1724

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

277

218:15 238:2,24
239:7,7,15
**numerical** 154:20
**numerous** 248:15,19
**NY** 54:22 127:8
**NYC** 48:8 49:11 50:5
50:23 51:12 52:4
53:6,13,14,16 54:18
55:10 121:10,12,20
123:15 127:7
137:24 155:17
227:6

**O**

**O** 199:22 202:10,12
254:8 255:2
**oath** 7:6 11:16
**object** 21:22 104:8,17
183:18 242:5,6,6,7
242:8 251:18
**objected** 25:5,21
103:19
**objecting** 183:21
242:17,19
**objection** 9:23 13:4,6
19:4 23:20 26:22
27:13,15 35:25 40:6
41:22,24 48:24 49:3
65:21 66:6 72:11
73:12,16 76:21 77:5
88:23 91:19 92:11
99:10 103:10,23
108:15 109:7,22
110:4 111:8 113:11
113:15 114:21
115:9,21 116:4,12
118:25 119:20
120:22,24 121:4
122:25 124:3,5,19
125:20 131:5
132:21 133:18,25
134:13 140:12
145:22 147:15
148:2,6,15 149:16
151:12,13,14,21

152:13 153:5
155:10 160:14,22
161:9,15 165:3
175:13 176:10
177:5 178:25 181:2
181:21,23 182:12
183:5,10,23 185:17
185:18 186:12,20
189:6 190:11
191:16 193:19
195:7 196:14 197:3
197:13,19,25
199:14,17 202:5
203:2,9,11,15 204:5
204:9,18,24 205:22
206:15 207:19,24
208:2,7,10,13 210:7
211:15 228:17,18
230:25 238:10,16
240:11,13,24 242:9
242:20 246:2,17
248:20,25 250:6
251:15 252:3
**objections** 3:12 4:14
13:5 23:4 25:13
27:17 152:9 209:17
228:15
**observe** 86:25 103:20
**observed** 104:20,22
**obtain** 12:3,17 13:11
13:14 14:11 28:22
52:15 66:4 104:6
115:18 116:7
125:18 147:2
160:18 178:19
180:8
**obtained** 47:11
125:15 145:25
151:19
**obtaining** 146:18
**obvious** 167:14
231:18
**obviously** 91:23
236:17
**occasion** 210:20

**occasions** 78:11 87:4
167:20
**occur** 87:8
**occurred** 8:23 76:24
236:8 251:13,23,25
**October** 51:16,17
222:24
**off-the-record** 44:14
54:16 81:21 95:12
126:16 210:17
218:12 228:12
230:19 234:20
**offense** 23:10
**offer** 31:15 59:14
127:23 128:5,19
138:3,14,16,25
**offered** 31:12 76:12
94:20 127:24 128:3
128:25 129:3,7
**offering** 44:3 98:11
**offers** 31:6
**office** 80:2 82:18
212:16
**okay** 5:9,12 6:7,10,13
6:16 8:4,5,19,20 9:2
9:3,7,8 11:24 27:17
34:18,19 36:6 45:8
68:2 81:12,16 82:9
96:4 104:19 110:8,9
114:4 116:21
120:10 137:19
138:20 142:22
144:22 163:8
172:25 178:18
184:10 185:14
188:6 207:6 220:18
222:23 225:18
226:15,21,22 230:4
235:14,15 239:22
241:19 247:8
250:14
**old** 16:24 90:25 91:3
146:9,12
**once** 45:16 60:25
64:13 72:14 79:5

80:14 83:5 137:10
146:4 174:10
181:15
**one-hour** 232:22
**one-off** 191:14,19
**ones** 83:20 112:24
**onwards** 208:3
**opening** 53:7,9,13
**opportunity** 46:5
82:2 246:16
**option** 64:9 233:13
**order** 28:22 39:8
48:19 62:21,22
120:9 178:18
196:23 205:16
212:17 227:18,21
244:4,15 246:21
254:17
**ordered** 227:22
**original** 68:3 119:8
238:4
**outbound** 188:17,20
190:16 193:7,9
**outcome** 255:15
**Outlet** 1:7 5:9 6:2
11:17 12:4 13:16,22
14:13 33:19,22,24
34:7,21,22,22,24
35:5,6,13 36:7,13
36:22 48:7 50:9
55:14,22 57:12
66:24 74:20 77:9
97:20 116:23 117:3
118:8 121:9,14,22
121:25 122:5,15,18
122:22 124:17
125:14 131:20
134:21 138:4
146:22 156:15
158:21,25 159:25
160:5,19 182:14
210:20 231:23
237:16 249:20
**Outlet's** 107:24
**outlined** 75:13

A1725

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

278

**outside** 75:6 177:24
  178:4,7 179:21
  250:3
**overall** 180:22 194:2
**overlap** 7:16
**overwhelmed** 88:5
**owed** 42:11,14,16,18
  44:21 109:2
**owner** 53:6,12
**owners** 128:24 158:5

**P**

**P** 2:2,2 70:12 203:24
  204:2 254:9
**p.m** 143:10,12 187:22
  232:20 252:15
**packet** 108:5
**page** 80:23 163:7
  168:18 170:5,15
  171:10,14 185:12
  235:16 247:23
  253:6,9,14 254:4
  256:5
**pages** 11:2 142:25
  162:10 168:13
  217:18 218:14
  245:13
**paid** 34:22 37:7 38:9
  39:15,18,20,24 40:9
  41:11,14,18,21 42:9
  42:18 43:2 44:22
  85:6,7 109:3 120:6
  120:17 135:16,19
  136:6,10 166:24
  167:13,15 210:12
  210:14 214:6
  218:23,24
**Pamela** 227:19
**paper** 82:20
**paragraph** 86:12
  173:15,23 174:10
  175:4 177:23 178:9
  235:13
**paragraphs** 81:4,16
  179:2

**parenthesis** 168:19
**parlance** 35:19 234:3
**Parsons** 87:13
**part** 25:3,18,19 26:12
  64:13 65:7,11 67:9
  92:3 96:14 99:23
  110:19 111:3
  130:10 133:17
  157:7 178:16,16,18
  178:19 182:5
  192:10 213:18
  220:18 229:15
  241:13 244:15
**partially** 68:25 82:13
  101:3 114:11
  178:10 191:25
  239:17
**participate** 58:4,13
  58:23 230:8
**particular** 162:7
  164:13,20 165:21
  166:18 170:23
  185:21 186:5
  187:11 197:21
  202:14 208:23
  209:4,9 211:18
  214:10 221:22
  235:13
**parties** 3:4 255:13
**partner** 56:25 57:2
**party** 26:8
**password** 45:17
  47:18,20,22,23
  91:25
**Pathfinder** 199:25
**pay** 10:23 60:18
  76:18 95:22 101:8
  101:13,19 103:17
  114:23,24 128:21
  150:13 158:19
  167:2 212:22
  213:24 214:3
  218:16 219:2
  220:15 224:8
  233:18 236:4,8

**paying** 126:10
**payment** 194:22
  239:8,11
**payroll** 38:13,18
  213:2
**paystub** 101:7 167:4
  167:7 213:18
  215:13,23 217:14
  218:19
**paystubs** 37:10 43:6
  65:9,19 101:11,14
  101:24 145:4
  150:16,17 168:14
  169:8 190:9 215:10
  218:6
**peaches** 114:12
**penalty** 7:6 15:3
**pending** 9:5 171:2
**people** 8:12 35:14
  38:19 64:18 78:8,10
  89:14,20,22 90:2
  140:4 142:11,12
  144:13 148:20
  170:16 182:17
  190:8 192:16,17,20
**percent** 37:9 42:23
  42:25 43:3,21 44:3
  44:6 45:10 48:14,22
  49:3,10 50:18 59:19
  75:9,13 76:3,19,24
  112:12 138:2
  164:24 166:6,14,17
  167:3,9 168:14
  182:22 214:13,22
  215:2 216:25
  220:13 240:8,15
**percentage** 136:13
**perception** 182:25
**perfectly** 68:15
**performance** 77:13
**performed** 209:5
**performing** 200:19
**period** 20:13 36:24
  47:19 91:23 93:24
  103:3 123:8 137:25

  150:5,10 159:7,17
  213:24 214:3 222:4
  224:8 229:5
**periods** 192:19
**perjury** 7:6 15:3
**permissible** 10:4
**persisted** 244:16
**person** 10:9,11 43:7
  56:19,22 63:11 89:4
  92:8 96:10 131:9
  140:18,21,22 194:6
  230:10 232:10
**person's** 98:6 196:10
**personal** 71:24 99:21
  99:23 107:6,15
  204:7,25 205:3
  206:16 207:20
  208:6 244:21 248:5
**personality** 71:6
**perusing** 244:9 247:7
**phone** 140:19 141:23
  142:3 145:25 146:2
  146:9,12 155:23
  230:3
**phonecall** 56:6
  185:12 188:17,20
  190:24 192:25
  193:5,7,9 195:23
  212:4 242:4,13,15
**phonecalls** 190:17
**phones** 141:22,24
**physical** 112:16
**physically** 74:4 86:17
  237:16
**pick** 177:11
**Picked** 233:12
**picture** 70:2 169:22
**pictures** 40:23 41:3
**piece** 89:23
**pieces** 38:11
**pinpoint** 102:17
**pissed** 61:19
**place** 31:24 57:9
  80:19 91:4 100:19
  100:22 127:13

A1726

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

279

130:12 148:22
153:4,4,4 232:2
233:16 235:7
**placed** 161:24 172:16
226:8
**places** 127:6,18,19,22
128:10 130:5
153:22 225:23
**placing** 154:6 184:12
243:23 245:6
**plaintiff** 1:4,16 2:3
4:3 24:3,18 26:9
104:4 154:21
157:17 158:13
162:14 173:24
179:3 227:22 228:4
228:6,15 235:21
236:24 248:13
**Plaintiff's** 24:17
103:19,25 143:21
163:2 235:16 236:3
244:16 246:24
247:25 253:17
**plans** 41:6
**plausibly** 236:24
**play** 109:18 162:17
212:13 241:4
**played** 91:4 92:3
110:19 157:6
241:11
**playing** 108:12
**plays** 88:3
**pleading** 23:24 24:1
**pleasantries** 59:12
61:6,12
**please** 5:9 8:7 13:23
27:4 49:8 68:19
91:16 102:12 104:6
113:18 119:22
152:12 155:9
161:17 181:22
183:19 184:5
208:21 240:6 242:8
242:21 243:3 245:4
245:23 246:11

249:3
**pleased** 104:13 201:9
**pled** 24:3
**PLLC** 2:3,8 248:12
**plus** 166:10 172:12
**podium** 70:9 86:20
96:18
**point** 20:12 43:20
48:12 68:7,13,19
72:2 79:5,11 81:15
82:21 84:6 87:12
90:23 91:6 92:15
93:12 94:25 95:7
98:23 99:2 103:7
108:20 138:22
159:25 198:11
201:20 212:18
231:17 232:12
235:12
**points** 110:20
**Police** 21:21 253:16
**policy** 107:24 108:3
**pop** 58:20
**portion** 247:18,21
**position** 33:5 36:13
44:23 45:3 52:15
55:21,25 64:14 77:3
89:3,18 91:2 94:17
94:20 95:6,9 98:11
127:25 128:20,25
129:3,8 158:17
252:8
**positions** 114:2 128:2
130:3 158:9
**positive** 20:20
**possession** 39:11
146:10
**possibility** 168:6
219:14
**possible** 167:17
189:18,20 193:4
205:19
**possibly** 138:6,15,23
189:14 192:24
221:8,11

**post** 118:6,18,22
146:16,21,22,25
**posted** 117:21 118:3
119:4 146:17
**potential** 85:2 179:17
238:7,24
**potentially** 242:23
**power** 95:18,21,24
**prefill** 176:18 235:19
**prefilled** 177:8
**prefilling** 82:12
**pregnancy** 44:21,24
45:2 71:9 72:3,10
73:3,7,23 76:25
78:14,25 79:3,7,10
80:10 82:11,25
83:10 91:12,14 92:5
92:9,19 93:13,14
96:22,24 98:4
106:11 107:7
108:12 109:15
110:14 150:21,25
157:2,5,7,15 179:10
179:14 200:22
201:2,4,14,16 224:9
237:3
**pregnant** 61:22 69:15
69:18 72:22 73:2,10
90:25 96:5 99:22
100:2,3,10,18
107:12 109:19
110:2 112:14 113:9
137:21 232:2
250:15 252:2
**preparation** 11:12
15:20 16:4
**prepare** 9:20,22 10:6
10:12
**prepared** 173:12
212:17
**preparing** 93:5
**prequalification**
194:11 196:19,25
197:4
**presence** 70:7

**present** 2:12 21:14
58:16,19 59:2 69:21
69:23 96:15 230:13
251:2,13,24 252:5
**presented** 21:23
138:14
**presenting** 246:19
**presided** 244:5 245:9
**press** 78:6
**pretty** 10:21 19:13
20:4 33:14 40:3
54:5 59:13 61:7
62:13,17 72:8 82:16
94:5,10 106:14
108:6 123:5 130:11
131:14 140:5
141:22 142:12
146:7 182:7 238:20
**prevent** 66:3
**prevented** 114:9
159:16
**previous** 89:25
219:14 246:21
**previously** 137:15
139:8 143:15 172:4
244:5 245:9
**primarily** 6:21
**primary** 36:16
**Prince** 171:5
**prior** 18:7 19:2 21:24
34:5 38:5 67:11
71:8 72:9 73:10
76:24 79:21 80:9
82:10 99:5 105:22
116:22 117:2
118:13 123:4,9,22
125:4 129:6 132:19
132:20 133:2,8,23
134:9 146:2 150:13
172:8,8 179:12
197:6 215:14,20
216:11 217:5,25
220:3 227:20
228:23,25 231:13
250:20 252:10

A1727

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

280

prioritized 89:6
  237:22
prioritizing 237:12
privilege 148:7
probably 38:24 48:17
  52:16 53:19 60:24
  68:23 72:13 79:22
  100:4 118:16 123:5
  123:6 129:20
  141:23 172:2
  180:17 182:16
  209:5 212:17
problem 4:24 18:14
  22:7 184:5
procedure 4:20 65:8
proceed 25:9 26:3
  151:15 228:8
process 63:7 65:15
  106:16 161:11
  181:18 194:16
  196:4
processed 106:11
  182:11 237:24
processing 106:7
procure 199:12,16
produce 25:2,19
produced 41:4 145:4
  149:4 240:3,5,12,14
  240:16 241:13
producing 145:3
  241:3
production 24:24
  25:3,20 143:5
  215:24 240:4
  241:14
professional 30:21
  71:13,13,14 179:16
  184:9 242:4,15
professionals 116:24
profile 174:4,11
  178:2
profit 43:13 164:5
  165:22 167:6,18
program 84:23,25
  185:8 235:18

programs 31:3,7
promise 142:21
promised 44:23 76:6
  90:13 92:20 231:19
promote 92:4 94:18
promoted 90:14
promoting 90:17
  92:14
promotion 92:17
  93:2 231:18 250:18
  251:13,23
promptly 106:3
  107:3
proof 65:9 190:8
proper 27:2
properly 38:9 41:14
  41:21 42:10 83:6
  89:19 176:11
  178:14 238:19
proposed 228:7
prospective 64:23
  174:3
protection 164:10
prove 104:7
provide 4:21 9:13,17
  14:16,18 28:11,23
  29:2,14,17 87:3
  115:13 136:2
  156:16,23 179:22
  195:21 243:8
  246:24
provided 5:20 10:21
  16:18 28:14 105:8,9
  110:7 137:15 145:8
  145:11 173:25
  239:6,14
provides 17:19
  116:18 156:17
prying 148:7
psychological 112:9
public 1:19 3:5 4:4
  4:16 21:20 22:2
  23:14 252:21 255:5
  256:20
publicly 17:20

Puerto 133:6,13
pull 174:3
pulled 174:11 181:7
  181:9 201:12
pulls 177:25
punished 248:14,19
punitive 153:21
  155:4
purchase 83:16 84:9
  160:9 161:3 174:12
  180:23 190:21
  207:5
purchased 160:2,6
  185:7 189:17
Purely 122:25
purpose 94:11 230:2
purposefully 67:5
purposely 88:21
pursuant 1:17 4:20
pursue 147:21
pursuing 147:22
push 252:8
pushed 24:9 237:20
pushing 157:8
put 47:20 80:5 85:23
  89:3,21 90:20 91:2
  131:10 140:25
  143:4 151:25
  188:22 194:22
  205:25 222:16
puts 120:22
Putting 22:14

———————

Q

Q50 160:10
qualification 10:7,19
  225:19
qualified 62:16 89:9
  181:10
qualify 45:20,22 46:8
  46:10,21 47:4 49:4
  83:21 89:11 174:17
  176:17 189:17
qualifying 174:17
  178:13 234:11

Queens 48:10 53:10
  127:24,24 128:6,19
  129:25,25 158:7
question 6:22 8:9,16
  8:19 9:5,6 12:9,14
  12:16,25 13:9 14:3
  18:11 19:15 23:6,7
  23:8,18 27:4 34:13
  34:16 35:23 41:16
  46:14 49:5,6,8
  58:22 65:11 66:8,10
  68:4,21 72:12 75:22
  82:9 89:10 91:17
  93:20,22 99:12,16
  102:13,21 103:12
  103:13 105:3,4
  108:17,18 110:6,21
  113:12,18 118:11
  120:3,9 124:8,22,24
  124:25 138:9,11,25
  149:21,23,24
  153:21 156:20
  161:23 170:21
  172:20 181:24
  183:4,7,13,22
  199:15 207:14
  216:13 217:10
  218:18 220:21
  228:21 231:6
  238:14,18,22 242:8
  242:10,11,21 243:3
  245:19,23,25 246:6
  246:11,15 247:19
  248:21,22,24 249:3
  251:6,17,19,20
questioning 229:17
questions 3:12 6:4,25
  7:16 9:18 22:15,19
  22:22 23:23 45:5
  63:7 74:23 81:14,14
  81:25 146:17
  162:22 163:5
  228:14 230:21
  235:13 241:6,19
  247:9,12,21 251:8

A1728

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 282 of 294 PageID #: 2392

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

281

252:13
**quick** 22:16 25:16
  62:13 81:10 182:5
  182:21 226:4
**quicker** 64:12 82:24
**quickly** 40:2 182:7
  237:24 238:6
**quit** 32:18,22 36:10
  37:11 44:16,19 45:6
  45:9,12 48:6 52:7,9
  60:21,25 79:9
  108:14 125:4,10
  225:16 230:22
  231:7,14,21
**quite** 15:23 20:8
  43:17 127:20
**quote/unquote**
  248:11

**R**

**R** 2:2 4:2 143:14
  207:16,18 254:11
  255:2
**R-a-s-k-e-s-n-i-a**
  155:14
**raggedy** 89:20
**raise** 94:19 231:20
**raising** 231:9
**ran** 177:8 178:12
**ranges** 175:7
**rare** 67:23 69:7
  182:22
**Raskesnia** 50:4
  155:14
**rate** 75:8
**ratio** 192:13
**RAV4** 202:16,20
**reach** 60:18 61:14,16
**read** 5:23 13:3 35:22
  35:23 46:15,16 66:9
  66:10 68:4,21 91:16
  91:17 94:12 99:15
  99:16 102:12,13
  103:13 105:3,4
  108:18 118:10,11

138:10,11 156:20
176:20 204:8 205:2
206:17 207:21
208:4 235:5 238:13
238:13,14 244:6
247:5
**reading** 188:11 244:8
**ready** 75:2 81:13
  131:3 163:5 191:2
  193:10 241:8
  243:20
**Real** 125:25
**realistic** 187:9
**realistically** 123:4
  187:4 192:15
**realize** 8:22 100:20
**really** 24:9 31:4
  38:23 41:2 52:24
  60:6 61:18,21 62:18
  67:16,20 73:25 84:2
  85:17 89:2,4 90:4
  90:12,18 91:5 92:13
  93:22 97:19 105:24
  107:7,10 108:7,13
  117:14 124:13
  127:22 144:17
  163:18 193:13
  209:12 215:9
  219:15 226:16
  233:15 236:16
  238:21 249:21
**realm** 250:3
**rear-ended** 160:16
**reason** 9:5,16 35:15
  41:13,19 42:8 44:19
  55:17 68:25 69:11
  79:3 86:5 87:21
  100:9 109:20
  128:18 129:9 157:7
  161:11 175:10
  179:20 180:3,11
  191:8 201:5 231:7
  231:14 232:4 234:9
  250:3 256:5
**reasons** 114:3 236:13

238:9
**recall** 11:22 31:20
  44:12 55:10 56:21
  59:14 60:6 70:19,20
  70:22 72:5,20 73:14
  77:10,19 78:15 87:9
  94:23 95:10 96:17
  98:14 119:3,12,15
  132:4 136:7 139:10
  140:2,16,25 141:16
  142:9 159:9,12
  171:2,5,21 195:19
  198:9 200:14 201:7
  207:3 218:9 220:19
  226:13
**receipt** 108:3 234:25
**receive** 37:9 60:25
  77:13 88:12,15
  115:16 159:6
  164:19,24 166:18
  166:25 167:22
  172:12 175:5 217:6
  219:2
**received** 38:2,4 39:12
  105:18 120:17
  135:11,19 136:10
  136:16,18,22 137:3
  137:4,6 138:3
  158:19,21 159:14
  164:16 168:12
  214:3 219:4 227:11
  227:12 235:22,23
**receiving** 37:12 43:4
  44:23 45:9 59:14
  157:13 160:24
  214:13 220:13
**recess** 24:21 143:10
  226:6 249:16
**recognize** 143:23
  149:5 162:8 184:19
**recollection** 8:21 9:2
  56:11 172:8 173:19
  187:10 249:18
**reconvene** 226:5
**record** 4:12 21:20

22:11,12 23:14 24:2
24:17 25:16,17 27:9
28:10 44:13 54:15
68:5,8 81:15,20,23
95:11 103:18
126:15 143:8
151:15 152:2
161:22 162:4,12,18
162:25 183:25
185:20 210:16
215:20 218:11,19
220:4 228:11,13
230:18 234:19
241:12,17 243:18
244:11 246:9
247:23 253:16
255:10
**recorded** 120:5
  241:15
**recording** 241:4,20
  254:16
**records** 77:19 141:4
  141:15 193:17
**recount** 248:15,19
**recovered** 113:25
**recruiters** 130:23
**redact** 17:20
**redacted** 17:14,22
**reduce** 214:8
**refer** 5:8,11 6:6,9,12
  6:15 57:2 115:3
**reference** 162:15
  248:4
**referred** 35:23 43:7
  46:16 66:10 68:21
  91:17 99:16 102:13
  103:13 105:4
  108:18 118:11
  138:11 156:20
  166:21 238:14
**referring** 5:14,19
  194:10
**refers** 164:4,8
**reflect** 22:11 24:2,17
  43:6 103:18 161:22

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

282

| | | | |
|---|---|---|---|
| 162:12,18,25 167:3 | 38:16 43:19 47:17 | 118:12 138:12 | **responded** 92:23 |
| 167:7 183:25 | 49:13,18,19,21 53:8 | 156:21 238:15 | **response** 49:5 94:22 |
| 185:20 241:12 | 53:11,18,24 55:11 | 255:4 | 96:8,11 97:3 154:23 |
| 244:11 | 56:9,13,23,23 62:2 | **reporting** 60:11 62:7 | 155:12 156:13 |
| **reflected** 37:9 | 64:16,18 69:24 70:2 | **represent** 21:19 | 157:10,17 158:6,13 |
| **refused** 45:19 91:25 | 70:10,11 71:17 | 80:20 143:21 144:4 | 158:18 177:21 |
| **regard** 25:8,24 | 72:13,23 73:4,5,8 | 149:3 173:11 | 180:2 229:15 |
| 105:11 | 73:22 84:12 94:23 | 184:13 212:25 | 241:14 248:23 |
| **regarding** 156:8 | 97:4 100:8,12 | 213:17 215:12 | 253:11,11,19 |
| 193:5 | 107:21 120:6 | 219:19 220:16 | **responses** 102:22,25 |
| **regardless** 239:4 | 124:14 133:5 134:3 | 227:18,20 235:11 | 154:7 246:24 |
| **registered** 182:18 | 134:4,15 141:2 | 244:3 245:7 | **responsibilities** 36:19 |
| **regular** 218:16 | 148:17 161:4,14,21 | **representative** | 36:20 74:13 |
| **reinstatement** 138:4 | 167:19 171:25,25 | 173:16 188:22 | **responsibility** 36:16 |
| 138:17,25 | 188:23 192:9 | **representing** 4:17 | 47:2 |
| **reiterated** 202:19 | 193:13 195:9 198:9 | 147:5,7 245:11 | **rest** 124:6 |
| **rejected** 128:5 | 200:11 201:15,16 | **represents** 248:13 | **restaurant** 233:14 |
| 138:25 | 206:24 219:18 | **reproduced** 145:4 | **restaurants** 233:8 |
| **related** 7:2 45:6 | 227:9 234:6,10 | **request** 20:17 24:24 | **restore** 146:2 |
| 74:20 81:15 255:13 | 249:21 | 25:3,18,20 29:8 | **result** 83:14 111:17 |
| **relates** 27:10 | **remembering** 96:6 | 157:20 158:15 | 112:5,9,17 124:2 |
| **relating** 71:21 | **remote** 68:12 | 163:2 238:6 246:7 | **results** 85:3 193:5 |
| **relation** 64:16 106:7 | **rent** 16:19,20 | 246:13 247:10 | **resume** 56:7 130:3,11 |
| **relationship** 62:9 | **rep** 187:25 190:18,25 | **requested** 25:17 | **resumed** 143:15 |
| 66:24 75:5 84:20 | 193:8,9 195:17 | 178:3 179:24 | **retained** 254:19 |
| 129:21 | **repeat** 12:16 13:9 | **requests** 155:13 | **return** 51:15 53:2 |
| **relatively** 40:2 182:5 | 23:8 49:9 103:12 | 248:12 253:9 | 66:16 90:13 131:3 |
| 182:21 | 124:9 161:20 | **required** 196:4,7 | 138:7 |
| **relevance** 113:16 | 199:15 242:10 | 239:8,11 | **returned** 90:6 94:2 |
| 116:12 131:5 | **repeatedly** 162:15 | **research** 127:22 | 94:15 123:18 138:5 |
| 132:21 133:18,25 | **repeating** 207:22 | **reserve** 7:17 | 185:22 234:5,9 |
| 134:13 147:15 | **rephrase** 8:17 49:6 | **reserved** 3:13 4:14 | **returning** 19:25 |
| 148:2,16 160:14 | 99:12 100:5 125:2 | **resolved** 114:6 | 24:19 |
| 161:9 185:18 | 251:19 | **resolving** 245:10 | **review** 4:22 10:16,18 |
| 242:18 | **rephrasing** 99:13 | 246:22 | 11:7,9,11 15:19,20 |
| **relevant** 113:12,13 | **replaced** 142:2 | **respect** 93:2 102:21 | 22:18 81:5 82:2 |
| 115:22,23,24 | **report** 59:21,23 60:4 | 106:6 110:13 | 218:18 245:16,20 |
| 144:25 242:16 | 62:9 170:4 | 117:20 123:25 | **reviewed** 154:24 |
| **remain** 229:5 | **reported** 59:24 60:13 | 124:12,17 128:2 | 218:14 |
| **remained** 75:9,14 | 61:8 | 137:14 158:17 | **reviewing** 247:11 |
| 76:15,18 77:3 | **reporter** 8:7,8,11 | 170:23 200:19 | **Rico** 133:6,13 |
| **remains** 217:6,25 | 35:24 46:17 66:11 | 201:6 232:14 | **ridiculous** 152:8 |
| **remember** 11:24 | 68:22 91:19 97:17 | **respective** 3:3 | **right** 4:10 7:18 11:4 |
| 20:6,9 21:4 31:24 | 102:14 103:14 | **respectively** 165:22 | 15:12 22:20 23:11 |
| 32:2,7,14 33:15 | 105:5 108:19 | **respond** 181:15 | 23:13 28:2,16,20,21 |

The Little Reporting Company
646.650.5055 | www.littlereporting.com

A1730

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

283

| | | | |
|---|---|---|---|
| 29:15 33:8 34:9<br>35:12,17 36:15,18<br>39:3,9,10,13 40:17<br>41:21 43:14 44:17<br>45:25 47:10,12<br>49:23 51:14 54:8<br>55:20,24 57:8 60:2<br>60:11 61:4,10 62:12<br>62:24 63:5 64:11<br>66:22 76:3,4 79:2<br>81:17 83:12 84:21<br>88:8,15 93:15 99:24<br>99:25 105:13 106:9<br>109:11 111:6<br>120:16 122:9,10,12<br>123:20,21 126:19<br>127:16 130:24<br>131:14 136:11,16<br>140:4 141:18<br>144:10 145:2,6,13<br>145:21 146:3,20<br>150:10,20 154:25<br>155:4,5 156:22<br>158:10 165:15<br>166:4,7,8,16,24<br>168:11,11 171:13<br>174:8,9 176:9,24<br>177:10 178:17,21<br>178:24 179:9<br>181:19 185:3 190:5<br>190:9,18,19,23<br>191:24 192:5,6<br>194:19,24 195:3,4<br>197:18 198:15<br>199:20 204:20<br>207:9,11 211:8<br>212:3,6,9,12 213:16<br>214:2,14,24 215:5<br>217:2 219:13,23<br>220:2,6 221:3<br>222:11 223:12,16<br>223:20,24 224:14<br>224:17,21 225:6,10<br>225:14,25 233:7<br>244:7 249:15 | **ring** 38:20<br>**rings** 66:19<br>**rise** 72:2<br>**Road** 54:13<br>**Robert** 163:21<br>**role** 82:15 94:3,9<br>  108:12 212:13<br>**rolling** 226:17<br>**Ron** 58:22 59:4 61:14<br>**Ronald** 1:9 5:7 6:15<br>  6:16,19,21 59:2<br>  61:8 156:24 157:10<br>**room** 169:14<br>**ropes** 82:16 101:21<br>**Roughly** 122:16<br>**routine** 80:15<br>**rule** 5:24 13:3,24<br>  17:19,23 208:10<br>**rules** 4:20 8:3,13 9:9<br>  17:14<br>**run** 35:13 53:9 62:15<br>  62:22 64:22 67:2,7<br>  67:8,10,14,15,23<br>  69:13 82:18 87:25<br>  88:4,7 94:11 162:14<br>  176:17 193:6<br>  196:22 235:18<br>  236:17 237:11<br>**runaround** 90:24<br>**running** 89:12<br>**Ruthayn** 1:19 4:4<br>  255:4,21<br><br>**S**<br>**S** 2:2 4:2 143:14<br>  209:14,16 253:13<br>  254:3,12<br>**S's** 206:21<br>**salary** 39:4 50:16<br>  214:4,7<br>**sale** 45:24 46:3 71:21<br>  85:3 88:11 107:9<br>  164:5 165:21<br>  166:10 173:25<br>  186:23 207:8 238:2 | 238:8 239:16,19,20<br>**sales** 38:12 47:6<br>  49:14 53:17 54:19<br>  65:8 67:10 80:3,6<br>  83:24 84:4,5 88:22<br>  89:18,24 90:14,18<br>  90:20 92:3,4 93:16<br>  93:18 94:4,7,10,16<br>  99:8 174:2 177:25<br>  178:5,8 179:7<br>  212:20 236:13<br>  237:5 250:17<br>**salespeople** 31:7<br>  46:23 47:8 69:23<br>  70:24 87:3,8 89:7,8<br>  169:15 179:7<br>  214:21 233:3<br>**salesperson** 34:20<br>  36:14 46:20 47:4<br>  55:22 59:24 70:11<br>  77:22 79:12 83:25<br>  87:15 100:22<br>  101:22 103:9 105:9<br>  173:24 187:7<br>  214:19<br>**salesperson's** 80:4<br>**salespersons** 179:5<br>**saleswoman** 79:11<br>**sanction** 104:4<br>**sanctioned** 248:14,18<br>**sanctions** 183:14<br>**Sanitation** 147:4<br>**sat** 82:17 128:9 192:7<br>  202:7<br>**satisfied** 41:14,21<br>  42:9<br>**Saturday** 37:25<br>  195:2<br>**Saturdays** 85:12<br>**saw** 80:14 82:16<br>  123:24 124:11,13<br>  187:6 224:25<br>**saying** 8:12 14:5 41:9<br>  43:10 51:7 56:24<br>  67:18 70:20,22 83:2 | 94:23 100:25<br>  101:14 109:13,16<br>  109:21 123:16<br>  150:12 166:5<br>  168:25 177:3<br>  178:15 189:12<br>  193:23,25 201:13<br>  203:6 209:10<br>  215:16 222:17<br>  227:7 231:22 236:7<br>  246:19 250:24<br>**says** 13:3 22:25 23:15<br>  69:10,12 163:20,24<br>  163:25 170:6<br>  173:15,23 174:10<br>  179:2,19 180:6<br>  184:22 186:16<br>  187:18,21 188:3,16<br>  188:24 189:9,14<br>  190:13 195:17,24<br>  199:6,24 200:5<br>  201:22 202:14,23<br>  204:14 205:11<br>  206:12 207:4<br>  227:21 228:2<br>  235:16 236:2,24<br>  248:9<br>**scared** 91:2 111:20<br>  111:25 112:4,24<br>  117:4<br>**schedule** 37:14,17<br>**scheduled** 229:22<br>**school** 19:14,14<br>  29:25 30:6,11,12,13<br>  30:19,22,24 31:21<br>  135:2<br>**schools** 30:10<br>**scores** 89:21 235:19<br>**screen** 80:19 81:18<br>  103:20 104:2,24<br>  142:23 148:22<br>  154:6 161:24<br>  165:25 172:16<br>  184:12 222:3,17<br>  226:8 235:7 243:23 |

A1731

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

284

| | | | |
|---|---|---|---|
| 245:6 | seeing 154:14 | 173:12,15 175:4 | 150:17 187:24 |
| **scroll** 80:22 144:3 | **seek** 111:5 112:25 | 176:19 177:23 | 215:9 217:18 |
| 154:11 162:10 | **seeking** 111:9,12 | 207:15 212:16 | **showed** 82:18 90:10 |
| 205:8 245:12 247:6 | 114:9 118:23 | 253:22 | 167:2 168:7,16 |
| **scrolled** 163:3 167:24 | **seen** 22:5,17 38:24 | **Serge's** 80:2 | 236:15,16,18 |
| **scrolling** 215:8 | 89:20 90:2 97:15,16 | **Series** 199:7,9,11 | **showing** 94:11 |
| **seal** 4:13 | 163:12 172:21 | **Serrano** 155:20 | 110:14 217:13,14 |
| **sealing** 3:8 | 173:4,13 180:13,15 | **served** 173:16 | **shown** 236:12 |
| **Sean** 70:10 87:10,10 | **self-employed** 65:18 | **session** 143:12 | **showroom** 186:16,22 |
| **search** 131:3 134:12 | 135:7 | **set** 63:6 134:10 | 187:21 188:4 |
| 148:13 | **self-incrimination** | 154:19 162:7 | 197:17 207:2 |
| **season** 225:4 | 23:21 | 169:17 188:14 | 209:19 211:25 |
| **second** 8:7 119:24 | **sell** 31:6 42:17 118:7 | 190:5 194:25 197:9 | **shows** 101:13 150:5 |
| 126:12,21,25 131:4 | 128:14 167:18 | 200:2 202:20 208:2 | 168:15 170:12,14 |
| 134:18,22 135:21 | 168:15 170:19 | 232:25 255:8,17 | 196:21 210:3,4,14 |
| 163:7 201:23 | 198:25 199:4 | **sets** 11:6 | 214:5 215:20,22 |
| 224:15 225:11 | 212:10 217:7 218:7 | **settlement** 143:5 | 216:10 |
| 227:24 228:2 | 218:20,22 220:21 | 230:3 | **shut** 183:24 184:2,9 |
| 229:21 247:5 248:4 | 224:22 226:19 | **seven** 77:18,20 | **sick** 52:25 |
| 251:5 | **selling** 36:16 79:15 | 113:13 172:5,6,11 | **side** 111:23 237:20 |
| **second-to-last** 87:16 | 87:14 164:16 | 172:11 174:10 | **sign** 11:14 15:2 108:2 |
| **securing** 146:18 | 171:25 172:2 | 221:22 222:25 | **signed** 173:12 |
| **Security** 136:18,19 | 205:20 | 223:2,5,8 227:23 | **signing** 11:25 |
| **see** 23:16 46:5 51:7 | **sells** 131:17 | 235:16 | **similar** 73:11 |
| 86:3,15 87:5 108:7 | **send** 142:25 143:6 | **sex** 109:6,17 | **similarly** 88:14 |
| 124:18 128:10 | **sending** 141:16 142:9 | **Shalom** 1:19 4:4 | **simply** 179:24 |
| 131:8 144:6 148:5 | **sense** 82:25 91:5 | 255:4,21 | **single** 84:25 86:2 |
| 149:24,25 153:10 | 97:19 100:24 131:9 | **sheet** 163:20 166:22 | 127:9 170:20 177:4 |
| 153:23 155:15 | **sensitive** 47:19 | 166:23 167:5 173:5 | 192:7 |
| 163:22 164:2 | **sent** 4:17 22:11 56:5 | 253:21 256:2 | **sir** 13:19 22:4 49:6 |
| 165:11 167:5,17 | 60:18 136:5 143:22 | **sheets** 162:4 253:20 | **sister** 139:18 |
| 168:20 173:17 | 189:3 | 253:20 | **sit** 70:8 171:24 |
| 174:4,13 175:8 | **sentence** 236:2 | **Shore** 129:12 | 192:15 231:25 |
| 177:10,17 178:5 | **separate** 7:12,18 24:6 | **short** 5:20 24:21 | 233:8 |
| 184:23 185:15 | 157:24 214:6 | 36:24 42:14 93:23 | **sites** 118:20 |
| 186:18,24 188:5 | **separated** 213:11 | 226:6 249:16 | **sitting** 87:7 239:24 |
| 194:7 198:11 199:6 | 214:8 | **short-lived** 125:24 | **situation** 37:12 54:23 |
| 200:3 201:25 | **September** 18:6 | 126:6 | 61:13,15 98:2 |
| 202:17 205:14 | 51:16 132:4,16,19 | **short-term** 135:12,15 | 142:13 144:16 |
| 206:21 208:25 | 221:16,16 | 136:7 | 196:3,6 |
| 209:2,6 213:4 | **Serge** 63:20,21 64:16 | **shorted** 42:12 | **situations** 65:24 |
| 215:12,25 224:25 | 66:21,25 67:8,14,16 | **shortfall** 152:22 | 191:14 196:9 |
| 226:3 228:9 235:24 | 67:23 69:7 70:13 | **shot** 56:24 57:23 | **six** 37:20 51:13 80:23 |
| 236:5 237:7 239:23 | 87:25 88:5,7,14 | **show** 70:15 77:19 | 170:22 173:23 |
| 244:15 247:2 248:2 | 106:10,11 167:20 | 80:23 101:7,14 | 186:17,23 187:5 |

A1732

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

285

| | | | |
|---|---|---|---|
| 219:6,10 222:6,6 223:15 | 97:24 100:2,18 108:21 | 147:13,18 | 14:18,20 96:7 180:4 180:12 |
| **six-month** 159:7 | **sonogram** 70:2,16 145:5 | **spell** 50:3 | **statements** 12:3,17 13:11,14 14:12,16 |
| **skimmed** 82:3 | **soon** 59:21 176:2 | **spends** 244:20 | 71:3 97:21 100:14 139:9 |
| **skip** 172:22 185:19 | **sooner** 98:22 100:6 173:21 | **spent** 131:2 | **states** 1:1 17:25 18:9 |
| **Skipping** 226:2 | **sorry** 11:10 23:8 | **split** 12:11,13 214:20 220:11 | 191:13 220:16 |
| **slash** 93:18 | 32:25 35:21 42:7 | **spoke** 56:25 57:5 | **stating** 4:5 |
| **slightly** 154:13 | 52:8 60:24 67:7 | 90:5 128:12 129:19 | **status** 15:6 184:25 |
| **slipped** 157:11 | 75:11 91:15 97:10 | 142:12 148:20 | 185:4 |
| **slow** 54:10 79:14 | 102:11,23 112:21 | 156:3,6 | **statuses** 184:25 |
| 97:17 217:9 | 118:9 119:14 125:2 | **Sports** 54:12,20 | **statutory** 229:5 |
| **slower** 174:23 | 127:7 145:9 156:19 | 127:14 137:20 | **stay** 33:17 91:6 |
| **smooth** 8:4 | 159:11 160:17 | **spot** 54:23 85:22 | 122:23 |
| **Snapchat** 117:18,23 156:6,7 | 161:12 181:3 | **spread** 10:22 | **stayed** 51:3 93:8 |
| **sned** 144:21 | 189:19 199:13 | **Square** 52:14 | 133:22 |
| **social** 117:7 136:18 | 222:14 237:21 | **squibbles** 72:17 | **staying** 233:13 |
| 136:19 | 238:12 250:8 | **stamps** 28:6,10 29:20 | **step** 228:7 |
| **sold** 34:14,25 35:5,10 | **sort** 72:7 123:24 | **stand** 177:10 | **stepfather** 16:22 |
| 39:6,9 40:20 43:11 | **sought** 116:23 | **start** 42:16 48:11,13 | 146:24 147:2 |
| 75:16 77:17 79:17 | **soul** 127:9 | 52:18 59:17 125:3 | **steps** 115:18 116:7 |
| 79:20,22,25 99:5,5 | **source** 125:17 126:11 | 125:23 128:6 | 198:4 |
| 115:5 162:5 163:15 | **Southern** 248:10,16 | 142:19 162:19 | **stereotype** 89:15 |
| 163:20,24 164:9,13 | **speak** 10:4 12:3,17 | 168:5 181:11 | **stereotypes** 90:3 |
| 165:9,10,14,16 | 13:11 15:13 72:15 | 243:19,20 | **sticky** 47:21 |
| 167:25 168:2,8,10 | 84:4 91:9 108:22 | **started** 31:18 32:3,15 | **Stidhum** 1:3,17 4:1 |
| 168:19,23 169:12 | 174:23 183:16 | 33:16,18,21 37:12 | 5:1 6:1 7:1,22 8:1 |
| 169:16 170:6,16,22 | 195:7 | 50:5 59:22 60:3,11 | 9:1 10:1 11:1 12:1 |
| 171:3,11,15,18,21 | **speaking** 8:22 13:5 | 62:7,20 64:16 78:2 | 13:1 14:1 15:1 16:1 |
| 172:5,7 195:19,20 | 27:17 37:6 86:9 | 114:23 120:17 | 16:12 17:1 18:1,2 |
| 206:3,6 210:5 | 105:21 180:22 | 162:19 167:11 | 19:1 20:1 21:1 22:1 |
| 214:11,14 216:3,15 | 182:6 246:2 | 169:4 173:20 | 23:1 24:1 25:1 26:1 |
| 216:19 217:16 | **speaks** 149:16 186:12 | 186:16 187:21 | 26:6 27:1 28:1 29:1 |
| 219:5,12,22 220:25 | 186:20 190:11 | 188:4 207:2 250:18 | 30:1 31:1 32:1 33:1 |
| 221:2,6 222:6,10,13 | 197:13,19,25 203:2 | **starting** 169:20 | 34:1 35:1 36:1 37:1 |
| 222:20 223:2,5,15 | 203:9,15 204:18 | 185:11 190:3 222:4 | 38:1 39:1 40:1 41:1 |
| 223:19 224:4,24 | 205:22 208:8 | **starts** 70:12 213:24 | 42:1 43:1 44:1 45:1 |
| 225:5,7,12,15,22,24 | **special** 103:8 | **state** 1:19 4:4 12:20 | 46:1 47:1 48:1 49:1 |
| 226:19,24 227:2,3 | **specific** 154:20 | 15:8 18:11 26:7 | 50:1 51:1 52:1 53:1 |
| 234:8 | 205:13 | 113:23 145:7,10 | 54:1 55:1 56:1 57:1 |
| **sole** 36:13 | **specifically** 14:10 | 158:19 183:19 | 58:1 59:1 60:1 61:1 |
| **solely** 78:24 81:15 | 21:5 147:2 198:10 | 192:6,24 204:23 | 62:1 63:1 64:1 65:1 |
| 91:12 106:6 | **Specify** 182:12 | 205:17 206:18 | 66:1 67:1 68:1 69:1 |
| **solve** 42:20 | **Spectrum** 131:23 | 255:5 | 70:1 71:1 72:1 73:1 |
| **somebody** 46:12 | | **stated** 169:13 250:13 | |
| | | **statement** 11:15 | |

A1733

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

286

| | | | |
|---|---|---|---|
| 74:1 75:1 76:1 77:1 | 211:1 212:1 213:1 | **strip** 85:13 | **Sundays** 37:19 |
| 78:1 79:1 80:1,21 | 214:1 215:1 216:1 | **structure** 37:4 50:8 | **super** 54:9 128:21 |
| 81:1,23 82:1 83:1 | 217:1 218:1 219:1 | 50:11,20 75:12 | **superfluous** 124:6 |
| 84:1 85:1 86:1 87:1 | 220:1 221:1 222:1 | **stuck** 111:21 | **supervising** 45:18 |
| 88:1 89:1 90:1 91:1 | 223:1 224:1 225:1 | **stuff** 41:8 61:22 | **supervisors** 36:21 |
| 92:1 93:1 94:1 95:1 | 226:1 227:1 228:1 | 64:19 68:10 100:19 | 37:2 |
| 96:1 97:1 98:1 99:1 | 228:22 229:1 230:1 | 102:5 164:11 | **supplement** 157:17 |
| 100:1 101:1 102:1 | 231:1 232:1 233:1 | 193:21 | 158:13 226:21 |
| 103:1 104:1 105:1 | 234:1 235:1 236:1 | **stupid** 32:20 68:8,10 | **supplemental** 246:24 |
| 106:1 107:1 108:1 | 237:1 238:1 239:1 | **subject** 7:5 120:15,21 | **support** 115:16,19 |
| 109:1 110:1,6 111:1 | 240:1 241:1,20 | 121:4 151:22 | 116:7 |
| 112:1 113:1 114:1 | 242:1 243:1 244:1 | **subjects** 7:3 | **supporting** 131:12,15 |
| 115:1 116:1 117:1 | 245:1 246:1 247:1 | **submission** 177:21 | **supposed** 184:6 |
| 118:1 119:1 120:1 | 248:1,17 249:1,7,18 | 177:24 | 243:19 |
| 121:1 122:1 123:1 | 250:1 251:1 252:1 | **submissions** 176:13 | **sure** 18:14 22:7 24:9 |
| 124:1 125:1 126:1 | 252:17 253:1,4 | 176:16 | 29:6 31:19 36:5 |
| 127:1 128:1 129:1 | 254:1 256:4,5,18 | **submit** 65:24 66:5 | 40:14 43:17 48:13 |
| 130:1 131:1 132:1 | **stips** 4:9 | 67:16 88:6 130:2 | 48:14,22 49:3,10 |
| 133:1 134:1 135:1 | **STIPULATED** 3:2,7 | 176:21,23 177:3,7 | 50:3 53:25 57:18 |
| 136:1 137:1 138:1 | 3:11 | 177:13 | 59:19,20 64:20 70:5 |
| 139:1 140:1 141:1 | **stop** 13:24 27:16 | **submitted** 15:22 | 70:14 80:6 81:9 |
| 142:1 143:1,22 | 50:23 52:22 53:23 | 130:10,13 174:12 | 93:8 96:23 108:6 |
| 144:1 145:1 146:1 | 54:4 104:6,24 126:9 | **submitting** 175:17 | 111:14 112:11 |
| 147:1 148:1 149:1 | 142:18 151:7,10,11 | 181:8 | 118:5 119:11 120:4 |
| 150:1 151:1 152:1 | 183:19 184:4 | **Subscribed** 252:19 | 121:5,19 136:4 |
| 152:16 153:1 154:1 | 201:20 208:14,16 | 256:19 | 138:2 146:15,25 |
| 155:1 156:1 157:1 | 208:20,21 240:6,9 | **subsequent** 86:9 | 148:5 156:11 159:3 |
| 158:1 159:1 160:1 | 240:14,21 245:22 | 122:19 | 162:12 163:18 |
| 161:1 162:1,8 163:1 | 246:5,5,6,11,14,17 | **subsequently** 209:22 | 164:21 167:13 |
| 163:10 164:1 165:1 | **stopped** 45:9 220:12 | 241:15 | 169:10 170:10 |
| 166:1 167:1 168:1 | 220:17 | **subtract** 151:19 | 171:23 172:10 |
| 169:1 170:1 171:1 | **store** 51:22 53:7,9,10 | **Success** 2:9 | 174:24 176:20 |
| 172:1 173:1 174:1 | 53:13,14 61:17 | **sucks** 161:13 | 193:3 198:7,10 |
| 175:1 176:1 177:1 | 79:22 107:11 182:7 | **sued** 12:12 | 199:19,19 201:13 |
| 178:1 179:1 180:1 | 199:21 | **suffer** 112:4,14,16 | 219:2 229:12,24 |
| 181:1 182:1 183:1 | **stores** 128:8,16 | **suffered** 88:21 112:8 | 238:21 240:15 |
| 184:1 185:1 186:1 | **storming** 100:8 | 191:20 | 243:4 |
| 187:1 188:1 189:1 | **story** 127:21 | **suggest** 5:22 6:19 | **surprised** 234:15 |
| 190:1 191:1 192:1 | **strategy** 98:21 100:9 | 97:21 101:5,11 | **suspended** 77:11 |
| 193:1 194:1 195:1 | **street** 4:6 33:8 85:21 | **suggested** 100:14 | **sustained** 111:17 |
| 196:1 197:1 198:1 | **stress** 112:24 | **suggestion** 98:9 | **swearing** 15:2 |
| 199:1 200:1 201:1 | **stressed** 111:20 112:4 | **suing** 34:10 | **sworn** 3:5 4:3,15 |
| 202:1 203:1 204:1 | 114:13,24 117:4 | **Suite** 2:4,9 | 143:15 252:19 |
| 205:1 206:1 207:1 | **strike** 74:22 242:23 | **summer** 43:19 | 255:8 256:19 |
| 208:1 209:1 210:1 | 245:2 248:22 | **Sunday** 37:24 232:16 | **symptoms** 112:20,22 |

A1734

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 288 of 294 PageID #: 2398

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

287

114:5,8
**system** 84:17,18
 85:25 162:6 163:16
 195:13,17 205:24
 209:24 210:4,6

**T**

**T** 4:2,2 143:14,14
 211:12,14,16
 253:13 254:3,13
 255:2,2
**take** 8:8 9:4,6 22:23
 24:11,12,15 26:2
 40:4,23 41:2 81:7,9
 81:19 82:11 83:6,10
 89:5 100:22 107:2
 110:7 113:7 128:18
 132:20 142:18
 152:20 155:8
 169:22 181:11
 182:4,4 198:4 226:4
 234:5 247:4
**take-home** 236:3,8
**taken** 24:21 31:9
 92:17 96:21 103:17
 106:2,2 115:18
 116:6 132:17 135:4
 176:6 214:9 226:6
 234:16 237:20,21
 249:16
**takes** 177:21 181:19
 182:25 198:25
**talk** 90:22 94:24 97:5
 97:6 251:4
**talked** 45:3 55:4
 113:23 114:5 141:5
 146:16
**talking** 11:18 12:5
 13:15 14:9 19:5
 82:22 93:5 118:13
 119:9 124:4 132:10
 139:19 145:18
 146:25 162:11
 180:17,19,20,21
 183:8,12,22,24

194:2 217:21
 221:24,25 230:10
**tally** 80:5 169:15
**taught** 63:2
**taxes** 214:9
**team** 110:23
**telephone** 155:24
**telephonic** 241:22
**tell** 8:17 9:25 10:4,19
 12:23 15:16 45:14
 70:4 78:7 79:5
 81:14 83:21 84:8
 86:23 95:8 96:4
 135:18 146:13
 152:5,7 167:15
 183:11 188:11
 190:20 191:7
 209:12 229:18
 247:5
**telling** 10:5 61:2 67:4
 94:9 98:10,15 129:6
 157:3 183:16 184:8
 195:18 209:11
 230:16
**tells** 108:21
**ten** 175:7 181:12
 224:4 232:2
**Ten-minute** 33:14
**ten-pounder** 167:21
**tend** 107:2
**tended** 106:3
**tenor** 241:24
**term** 124:19,21
**terminated** 159:22
**termination** 134:17
 136:20 213:3
**terms** 39:18 67:19
 73:9 95:25 113:22
 145:3 160:19,20,23
 231:5
**territory** 131:24
**test** 151:6,22
**testified** 4:7 44:16
 102:8 124:10
 126:18 132:3 137:6

139:8 143:16 192:3
 232:14
**testify** 172:4 204:6,25
 206:16 207:20
 208:6
**testifying** 7:7
**testimonial** 243:21
**testimony** 7:5 9:13
 46:16 82:7 85:24
 88:20 91:10 123:24
 124:15 132:9
 137:14 139:11
 145:16,23 165:4
 174:6 177:6 251:16
 252:4 255:10
**text** 14:24 60:19
 141:13 142:9 190:7
 193:9 202:23
**texted** 92:22
**texts** 141:16,20
**Thank** 27:9 50:17
 154:16 155:10
 227:16 241:10
 247:4,15 252:12
**Thanks** 51:11
**Thanksgiving** 224:2
**Thanwalla** 1:8 2:13
 5:6 6:9
**therefor** 13:4
**thing** 57:24 59:3 72:7
 99:21 114:22,23
 135:10,16 156:8
 244:6
**things** 44:20,22,25
 59:11 62:25 65:18
 68:8 80:17 98:16
 100:24 101:20
 144:5 180:21
 193:18 201:20
 243:5
**think** 9:16 13:2,19
 25:4 29:22,24 41:6
 53:25 71:5,24 75:21
 85:11 96:5 100:17
 101:10 108:20

110:2 112:7 130:25
 133:3 136:12
 142:20 144:17
 182:24 208:3
 214:12 218:9 224:2
**third** 8:9 165:16
 215:3 224:18
**Thomas** 165:11
**thought** 91:4 98:21
 138:21 173:21
 252:6
**thousand** 76:10
 126:5
**thousands** 84:15
**three** 10:8,12 16:25
 38:11,24 110:15
 129:8 139:13 140:4
 142:11 144:13
 153:22 167:25
 180:9,13 182:9
 192:16,17,20,22
 198:22 202:7
 205:25 209:24
 210:2 214:23 218:6
 219:22 221:10,12
 223:23 224:19
 227:2 236:21 241:5
 243:12 245:24
**threw** 41:20 42:8
 166:23
**Thursdays** 38:3,4
**Tiffany** 2:5 151:7
 186:9 194:6 211:19
**time** 7:24 8:13 9:4
 15:23 18:4,7,17
 19:16 20:2,12 21:2
 24:8 28:8 31:18
 33:11 34:5,24 35:4
 35:21 36:12,24
 39:22 45:18 46:5,6
 46:11,24 47:19 53:8
 57:25 58:12 60:5
 62:13,20 64:12 66:8
 67:13 71:8 72:10,21
 72:21 73:10 79:6,9

A1735

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

288

| | | | |
|---|---|---|---|
| 79:14 82:10,11,21 | **timeframes** 101:18 | **touched** 87:6 | 68:5,9,14 72:11 |
| 82:23,24 83:5 85:13 | **timely** 239:14 | **tougher** 128:9 | 73:12,16 74:22 |
| 86:25 87:18 91:15 | **times** 20:8,18 38:25 | **TR** 254:14 | 75:21 76:21 77:5 |
| 92:24 93:3,16,17,24 | 39:15,25 45:12,14 | **track** 40:19 79:24 | 88:23 91:19 92:11 |
| 94:24,25 97:10,24 | 45:15,20 58:20 59:4 | 80:3,5,8 84:25 | 99:10,12 102:11 |
| 99:14 100:22 | 68:25 72:9 74:5 | 169:12,16 | 103:10,23 104:8,17 |
| 101:21,23 103:19 | 77:24 83:14,19 | **tracked** 188:19 | 104:25 108:15 |
| 108:17 110:13 | 84:11 102:9,16 | **trade** 196:2 199:25 | 109:7,22 110:4 |
| 118:15 119:7,9,11 | 104:21 128:25 | **trade-in** 195:3,24 | 111:8 113:11 |
| 119:24 122:4,9 | 129:8 159:6,7,15 | 196:6 | 114:21 115:9,21,24 |
| 123:8 125:9 127:10 | 172:11 180:18 | **Trader** 131:17,22 | 116:3,8,12 118:9,25 |
| 129:19 131:2 132:3 | 191:21 208:5,11 | **traffic** 54:24 128:11 | 119:14,20 120:20 |
| 132:20 134:19 | 245:25 | 182:8 | 120:24 122:25 |
| 135:24 138:21,23 | **tired** 90:23 184:4 | **train** 249:23 | 123:10 124:3,19 |
| 139:5 142:2,17 | 232:2 | **trained** 64:13 | 125:20 126:12 |
| 143:2 144:17 | **title** 36:13 | **training** 135:4 | 127:5 131:5 132:8 |
| 149:17,22 150:5,10 | **titled** 149:10 | **transaction** 182:11 | 132:21 133:18,25 |
| 154:14 156:3,19 | **titles** 47:6 | **transcript** 4:16,22 | 134:13 136:25 |
| 159:14,17,24,25 | **today** 6:25 7:5,9,10 | 17:16 255:9 | 137:11 138:8 |
| 160:4 162:14,15 | 8:22 9:14,18 15:14 | **transferring** 82:19 | 140:12 142:24 |
| 167:14 169:15 | 15:17 55:4 85:24 | **transpired** 73:4 | 143:7 144:20 |
| 171:24 172:9 | 155:21 202:17 | 230:15 | 145:22 147:15 |
| 175:20 177:3,4,10 | 228:3 252:13 | **travel** 134:6 | 148:2,6,11,15 |
| 178:12,14 179:3 | **today's** 9:20 | **treated** 103:5 105:11 | 149:16,21 151:5,8 |
| 181:14 182:9 | **told** 23:9 37:7 53:8 | 105:15,20,25 | 151:13,21 152:5,9 |
| 186:11 191:18 | 56:13 57:22 68:16 | 106:20,23,25 179:6 | 153:5 154:11,13 |
| 192:18 195:14 | 69:21 90:10 92:23 | 232:8 | 155:6 160:14,22 |
| 196:5 198:12 | 93:10 94:12,18 | **treatment** 112:25 | 161:9,15 162:10,17 |
| 201:23 205:14 | 96:24 98:18 107:21 | 116:23 | 162:24 163:7 165:3 |
| 207:10,23 216:5 | 111:21,22,22 129:5 | **Tree** 32:8,12,15,21 | 172:22,25 174:23 |
| 220:12,19 229:6 | 129:16 181:10 | 32:23 | 174:25 175:13 |
| 232:12,18,19,25 | 183:25 203:22 | **trial** 1:16 3:13 4:15 | 176:10 177:5 |
| 233:5 237:2,10 | 251:25 | 126:7 | 178:25 181:2,21 |
| 238:12 239:4 | **tomorrow** 186:10 | **triplicate** 166:22 | 182:12 183:3,7,11 |
| 243:21 244:21 | 204:15 205:12 | **trouble** 200:2 | 183:16,21,25 184:8 |
| 247:11,13 252:12 | **ton** 130:5 | **Troy** 2:3,5 4:11,19 | 185:17 186:12,20 |
| 252:15 | **top** 22:3,25 77:22 | 5:14,21 6:18 9:23 | 189:6 190:11 |
| **timeframe** 18:8,13 | 79:11,12 87:7 149:7 | 11:18 12:5,10,19,24 | 191:16 193:19 |
| 18:14 19:4,5,18 | 167:9 168:18 | 13:6,18 17:6,11 | 195:7 196:14 197:3 |
| 53:24 119:6 123:10 | 187:17 220:3 | 19:4 21:22 22:4,16 | 197:13,19,25 |
| 131:10 134:5 | **total** 79:25 150:9,12 | 23:4,20,25 24:14,23 | 199:14,17 202:5 |
| 137:11 138:8 175:5 | 165:5 166:2,6,9 | 25:10,15,25 26:20 | 203:2,9,15 204:5,18 |
| 177:24 182:12 | 168:23 169:12 | 27:13 35:25 40:6 | 204:24 205:22 |
| 185:17 206:2 | 170:6 180:20 216:3 | 41:22,24 42:2 48:24 | 206:15 207:19,25 |
| 232:25 | **totaled** 160:16 | 49:2,6 65:21 66:6 | 208:12,15,17 |

A1736

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

289

| | | | |
|---|---|---|---|
| 209:17 210:7 | two 8:12 10:8,11 11:6 | 145:22 | 117:4 172:2 201:23 |
| 211:15 214:16 | 12:11 16:22 26:11 | unable 193:8 | use 6:20,21 13:18 |
| 215:8,16 216:6,13 | 51:21 55:18 62:4 | unavailable 134:16 | 24:25 25:4 117:7,9 |
| 217:9,18,21 220:7 | 65:9 72:4,6,17,20 | 134:20 | 117:14,22 145:25 |
| 222:2,16 223:7 | 73:9,20 111:6,9 | underlying 23:23 | 163:18 |
| 225:19,22 228:17 | 118:23 127:15 | understand 7:3,7 | useful 144:18 |
| 229:12 230:25 | 128:15 129:8 | 8:13,16 9:9 25:10 | username 47:24 |
| 234:2,11 238:10,16 | 130:11 132:25 | 25:15 34:16 53:12 | usual 4:9 |
| 239:24 240:3,8,11 | 137:22 151:3 | 70:6 83:3 89:2 | usually 70:13 98:19 |
| 240:15,19,23 | 153:22 157:24 | 90:12 92:7 94:14 | 172:13 |
| 241:12 242:5,10,16 | 158:3,4,8 159:15 | 102:7 107:10 109:8 | utilizing 147:24 |
| 242:19,22 243:14 | 165:7 166:2 170:15 | 116:21 120:9 121:8 | uttering 22:25 23:3 |
| 243:18 244:10,25 | 170:16,19 171:10 | 138:20 164:23 | 23:16 |
| 245:12,16,20 246:4 | 172:3 176:9 179:12 | 170:21 192:12 | |
| 246:7,13 247:12,19 | 180:21 182:9 185:2 | 221:5 226:22 250:8 | V |
| 248:12,20 250:6 | 190:9,17 192:16,16 | 250:9 | v 213:21,22 254:14 |
| 251:7,15 252:3 | 192:17,17,20 193:7 | understanding 35:12 | 256:4 |
| troylaw2troypllc.c... | 198:21 202:7 212:4 | 35:18 57:14 77:21 | vacation 20:4 45:17 |
| 2:5 | 212:7 214:6,15,23 | 106:22 168:22 | 87:19 90:6 92:23,25 |
| true 32:25 65:17 | 214:25 215:3,9 | 191:22 | 93:6 132:4,20 |
| 66:19 79:14 80:9,18 | 217:18,19 218:16 | understands 119:21 | 133:24 218:10 |
| 82:9,13 83:4 85:9 | 218:17 219:16,25 | 119:23 | 232:13 249:24,25 |
| 89:14 118:22 119:4 | 224:24 225:5,12 | understood 8:18 | vacations 132:17 |
| 121:20 161:10 | 236:18 243:12 | 19:16 32:21 57:19 | 133:23 134:10,11 |
| 179:8 189:22 | 247:23 | 67:18 75:21 109:4 | 134:12 |
| 196:18 200:22 | two-and-a-half | 138:3 156:10 | valid 68:15 |
| 202:3,6 209:7 210:5 | 123:13,16 214:19 | unemotional 96:9 | variety 238:8 |
| 210:11,13,15 | two-factor 146:5 | unemployed 131:13 | vehicle 39:12,20,23 |
| 231:11 251:22,24 | type 47:22 52:17 | unemployment 27:19 | 40:9 43:11 160:2,6 |
| 255:10 | 57:24 72:7 76:3 | 27:22 137:7,9,15 | 160:18 161:3,7 |
| trustee 200:8 | 170:4 231:20 | 159:5,6 | 164:6 165:10,16 |
| truth 95:3 | 233:16 | uniform 209:25 | 174:12 188:12 |
| truthful 9:13,17 | typed 158:7 | 210:4 | 189:17 190:21 |
| truthfully 93:23 | types 98:16 174:20 | uniformed 209:18 | 200:9 207:8 210:5 |
| truthfulness 21:9 | 174:20 | unique 235:22 | 212:10 239:2 |
| try 34:15 97:25 | typically 172:5 174:7 | United 1:1 17:25 | vehicles 31:6 34:25 |
| 118:16 143:3 189:3 | 185:8 | 18:9 | 35:5,10 39:18 40:19 |
| trying 12:10,13 25:10 | typing 104:2,23 | unknown 155:24 | 167:18 169:12 |
| 53:25 64:7 90:15 | | unlawful 111:17 | 218:8 225:16 234:8 |
| 166:12 201:19 | U | unnecessarily 244:22 | 234:16 |
| 218:9 249:23 | U 4:2 143:14 212:24 | unrelated 35:6 | venting 140:9 |
| turn 38:12 | 213:6 254:14 | unwarranted 248:2 | verbal 101:6 |
| turned 127:23 | Uber 208:25 | upgraded 142:5 | verification 178:3 |
| twice 72:14 77:6 | Uh-huh 120:11 | upset 73:25 98:2 | verified 15:24 |
| Twitter 117:16 | Um 36:20 139:16 | 100:8 111:19 112:3 | verifying 38:8 |

A1737

Case 1:21-cv-07163-OEM-LB   Document 102-11   Filed 03/27/24   Page 291 of 294 PageID #: 2401

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

290

**versus** 86:6 181:7
**violating** 13:24
**violation** 208:10
**visit** 59:5 186:16,22
    187:21 188:4
    197:17 207:2
    211:25
**visited** 133:12 209:19
**vocational** 30:24
**voice** 8:6
**volume** 50:21 51:24
    85:16,17 114:22,25
    115:3,5

**W**

**W** 226:9 227:17
**wage** 7:12 15:8 26:7
**wait** 46:12 56:25 67:5
    68:25 69:4,13 78:2
    78:5,8,8,24 83:14
    83:19 86:15,23 88:9
    88:21 91:11,23 95:3
    97:7,11 102:16
    137:23 176:24
    177:10 179:20,25
    180:16,17 181:22
    192:18 196:16
    231:8,11,15 236:8
    237:2,10,11 246:2
**waited** 48:13 91:13
    180:8
**waiting** 45:12,14,20
    79:8 80:11 102:5
    181:7 182:23 191:5
    191:21 198:15
    208:25 209:5
    237:18
**waived** 3:9 4:13
**walk** 83:15,19 127:9
    128:11 192:22
    193:4
**walk-in** 85:7,7,10
    170:13 182:8
**walk-ins** 85:24
    210:15

**walked** 191:23
**walking** 84:6 192:18
**wall** 123:25 124:12
    124:20
**want** 8:24 13:8 14:13
    18:17 19:21 20:14
    24:12 25:14 32:7
    40:17 45:4 51:16
    59:19 69:2 70:6
    71:6 77:18 81:3,24
    84:2,9 90:18 94:25
    96:6 99:8 100:18
    112:12 117:24
    123:13 129:2,4,8
    152:8 162:17
    171:24 175:25
    182:8,21 184:4
    185:6 196:2 208:18
    208:18 212:21
    215:19 226:2,3,21
    231:15 235:12
    238:25 246:5
**wanted** 53:9 56:16
    64:25 68:11 80:6
    89:5 94:19 95:6
    107:11 162:18,20
    198:5,18 228:15
    231:19,19 233:14
**wanting** 92:3
**wants** 194:21 199:6
    231:25
**warned** 208:11
**warning** 104:5,22
**warranty** 164:11
**wasn't** 40:12 41:2
    42:19,20,25 44:23
    54:24 73:24 76:5
    78:9 79:8 80:14
    91:23 94:8 102:15
    108:24 111:23,24
    114:12,15 125:7
    126:10 128:21
    141:21 156:11,25
    158:10 189:22
    231:18 243:19

**waste** 46:11 67:12
    95:2 143:2 149:17
    162:13 207:23
    247:10,13
**wasting** 46:5,6
    149:22 181:14
**watched** 97:17
**watching** 93:7 201:19
**water** 126:13
**water-under-the-b...**
    72:7
**waving** 69:25
**way** 10:12 14:22
    17:19 49:19 51:10
    66:3 73:15,18,22
    74:2,20 77:21 81:13
    89:11,19 93:12
    95:16 96:12 100:24
    106:13,19 119:13
    119:15 162:18
    172:14 176:18
    184:6 186:8 187:8
    224:7 227:2 232:7
    237:23 239:19
    242:3,14 255:14
**ways** 105:14
**websites** 117:7,20,22
    118:3
**Wednesdays** 37:18
    232:15
**week** 10:8,15 37:20
    37:24 38:5,6,9 39:3
    39:3 40:20 51:3
    68:23 77:17 100:4,6
    100:7 101:8 172:3,6
    172:11,13 214:7,10
    214:14 215:3,6,14
    215:15,17,20,21
    216:9,11,18,22
    217:4,5,8,13,15,17
    217:17,25 218:4,8
    218:17,21 219:4,8
    219:11,15,16,20,20
    219:24 220:3,14,22
    220:24 221:5,9,12

    221:15,19,22 222:7
    222:9,12,20,23
    223:2,4,6,10,13,18
    223:21,25 224:3,6,7
    224:12,15,18,22
    225:3,11 226:11,12
    226:17
**week's** 85:16
**weekend** 85:12,15
**weekly** 37:7 38:10
    42:17,18 50:15
    150:12 214:4
**weeks** 54:9 121:23,24
    127:10 129:20
    132:25 136:11
    150:9 152:21
    218:16,17 219:15
**weight** 115:12
**weird** 93:18
**welcome** 81:23
**went** 19:17 20:2
    52:11 56:17 64:21
    79:12 82:22 100:21
    106:14 121:10
    122:13 127:7
    128:20 129:7
    132:10,14,14,23
    133:6,10,11 134:3
    152:24 153:12
    155:2,17 168:7,13
    188:13 189:9,10,14
    189:16 217:5 227:6
    232:24 233:17
**weren't** 108:9 122:8
**WHEREOF** 255:16
**willing** 56:24 57:23
    231:8 240:17
**win** 89:4
**wins** 89:4
**withdrawn** 69:11
    128:4 225:2 243:11
    249:12
**witness** 4:18 5:21
    23:5 26:21 42:4
    103:25 119:23

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum    ---    February 17, 2023

291

| | | | |
|---|---|---|---|
| 132:8 145:23 | 160:5 163:16 179:3 | 123:25 124:11,19 | **zero** 224:25 |
| 161:23 165:4 177:6 | 179:4 182:13 189:4 | 157:19 158:14 | **Zoom** 1:18 |
| 189:7 237:16 241:6 | 200:6 205:12 | **writings** 142:14 | |
| 244:9 247:7 251:16 | **workers'** 28:3 136:22 | **written** 14:22 59:14 | **0** |
| 252:4 253:3 255:7 | **workforce** 53:2 | 103:4 141:4 169:18 | |
| 255:11,16 | 122:13 127:2 | 206:25 | **1** |
| **witnessed** 87:13,17 | **working** 31:18,24 | **wrong** 25:5 | **1** 187:17 |
| **witnesses** 144:5,12 | 33:16,19,21 48:6,11 | **wrote** 236:21 | **1,000** 48:22 49:3,10 |
| 155:14 194:21 | 49:15 50:5,23 51:20 | | 105:18 168:13 |
| **woman** 90:25 | 52:4,20,22 54:2,3,4 | **X** | 226:13 227:11,12 |
| **women** 100:10 | 59:22 62:9,20 66:21 | **x** 1:2,11 83:22 157:13 | 240:8,15 |
| 109:19 | 76:12 92:20 97:24 | 178:11 235:8,9 | **1,050** 172:13 222:24 |
| **word** 102:6,6 167:12 | 99:4,6 100:2,7,7 | 253:2,13 254:3,15 | 223:4 |
| 168:18 175:5 | 107:20 114:9 | **XX-XX-1998** 17:5 | **1,197** 217:25 |
| **worded** 61:19 178:14 | 116:22 117:2 | **XY** 96:25 | **1,200** 220:25 |
| **words** 8:7 42:24 | 118:19 120:13 | **XYZ** 15:3 | **1,238.64** 150:13 |
| 50:13 96:23 140:25 | 122:22 125:22 | | 151:19 152:17 |
| **work** 32:6,23 33:5 | 126:9 127:11 | **Y** | **1,375** 223:17 |
| 34:20 37:18,23 48:7 | 129:12 147:3 | **Y** 240:25 241:3 | **1,400** 219:11,21 |
| 53:23 54:8,9,20 | 159:17 163:12 | 254:16 | **1,450** 220:4,10 |
| 55:18 59:17 75:6 | 173:20 180:7 | **Yanes** 188:5 | **1,505** 215:21 216:11 |
| 77:11 86:7 89:15 | 181:11 184:22 | **yeah** 65:23 67:14 | **1,600** 224:2,8 226:12 |
| 90:19 98:22,25 | 187:8 195:5 200:11 | 98:3 | 227:12 |
| 107:16,19 114:10 | 211:6,9 220:17 | **year** 17:7,13,17 20:7 | **1,628** 165:22 |
| 121:10 127:8,12 | 250:11,18 | 32:2,14 33:15 48:15 | **1,857** 165:22 |
| 131:4 134:16,20 | **works** 17:19 131:25 | 54:5,6 62:3 140:15 | **1:21-cv-7163** 1:2 |
| 143:3,5 159:4 | **workweek** 232:15 | 159:4 217:24 218:2 | **1:30** 142:18 |
| 181:17 182:5,21 | **world** 107:22 115:14 | **year-to-date** 215:21 | **1:51** 143:12 |
| 210:21 231:23 | **world's** 182:25 | 216:10 | **10** 190:5 245:13 |
| 232:5 233:16 | **worried** 112:14 | **years** 90:25 91:3 | **10,000** 89:21 167:21 |
| 249:19 250:4 | 114:14 | 102:5 113:24,25 | 240:18 |
| **work-related** 71:18 | **worry** 115:12 | 120:7 123:13,16 | **10:00** 186:11 232:20 |
| 71:23 77:9 102:16 | **worth** 85:16 218:16 | 171:8 180:7 192:9 | 232:20 |
| **workday** 232:21 | **worthiness** 175:7 | 193:14,16 207:3 | **10:05** 24:16,20,22 |
| **worked** 31:13,14,20 | **wouldn't** 79:16 84:2 | **yes-and-no** 39:16 | **10:45** 186:17 |
| 32:5,9 33:2,25 34:7 | 84:4 87:11 98:15,25 | **York** 1:1,20 2:4,9 4:5 | **100** 48:14 59:19 |
| 34:11,21,24 35:4 | 99:7 108:20 115:11 | 4:6 17:15 18:12,24 | 138:2 |
| 36:12,21 37:14,20 | 115:14 128:14 | 19:3,12,17,24 30:11 | **100,000** 153:9,13,15 |
| 40:5 53:10 63:9,13 | 129:23 140:25 | 32:10,13 248:10,16 | **103** 2:4 |
| 66:20 71:13 97:14 | 166:8,25 189:21 | 255:6 | **10th** 170:17 190:4 |
| 105:16 107:21 | 191:2 198:19 | **young** 32:20 | 197:16 |
| 118:15 120:16 | 218:24 250:3,10 | | **11:14** 81:10 |
| 121:21 122:19,21 | **write** 8:12 141:10 | **Z** | **11:30** 81:11,20 |
| 127:18 131:23 | 189:15 206:23 | **Z** 96:25 243:24,25 | **11042** 2:9 |
| 157:23 159:24 | **writing** 20:10,15 29:7 | 254:17 | **11354** 4:6 |

A1739

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum   ---   February 17, 2023

292

**11355** 2:4
**1165** 211:12
**1167** 211:13
**1186** 212:25 254:14
**1198** 217:10
**11th** 186:9
**12** 136:11 179:2
  215:6 228:3
**12,600** 163:24
**12:58** 143:10
**12th** 186:15,17 195:5
  209:20 215:13
  216:10 223:14
**13th** 223:18
**14** 158:18 179:2
**143** 253:17
**148** 253:18
**14th** 150:6 198:22
  213:12 220:15
**150** 37:8,13 39:5
  42:19 43:3 75:16
  164:16 166:9,10,15
  166:17,19 167:10
  167:10,16,22
  172:12 216:14
  220:10 221:6 222:6
  222:10,25
**154** 253:19
**157** 253:11
**158** 253:11
**15th** 190:24 193:11
**16** 193:12
**161-10** 1:7 5:5,8 6:2
  13:22
**162** 253:20
**17** 1:12 20:2 185:13
  256:4
**170** 253:20
**172** 253:21
**173** 253:21
**174.25** 166:6,9,11,13
  166:19 167:15
**18** 33:22 34:8,23
  64:15 76:16,19 77:4
  78:3 86:13 150:6,18

168:3 170:6 171:22
  172:8 176:4,7 190:4
  199:24 200:23
  204:14 215:6
  221:16 222:24
**184** 253:22
**187** 253:23
**18th** 215:13
**19** 8:24 18:8,15 20:13
  34:8,23 36:7 44:17
  48:12,16 60:20 61:3
  76:16,19 77:4 86:13
  90:6,25 91:3 94:2
  94:15 150:6,18
  158:6 179:19
  187:22 188:16
  196:11 197:11
  207:4 225:7 253:11
**190** 253:24
**194** 254:6
**197** 254:7
**19th** 223:18
**1st** 150:6 171:15
  187:22 227:21

___
**2**

**2** 80:20 155:13 207:4
  253:17
**2,000** 11:2
**2,165** 215:22 216:10
**2,755.54** 152:22
**2:00** 186:11
**20** 76:8 83:6 180:9
  253:10
**20-something** 51:4,7
  226:25
**2010** 199:25
**2011** 163:25
**2017** 19:22 21:2
  23:12,15
**2018** 8:23 18:8,15
  19:21 20:13 43:21
  60:9,10 77:25
  140:17 162:7
  163:21 165:10,11

165:19 167:25
  168:23 169:3 170:5
  170:17 171:15,19
  173:17 175:24
  185:22,23 191:11
  193:12 202:15
  204:4,12 209:20
  213:9,25 217:17
  222:5 224:7 250:11
  250:15
**2019** 51:6 52:5,19
  124:18 125:4 186:9
  186:15 187:17
  194:20 195:22
  213:12
**202** 254:8
**2020** 18:6 51:5 53:3
  53:18 54:21 132:4,6
  132:13,16 134:7
**2021** 133:4,9,9,10,11
  133:12,24 134:10
  185:13
**2022** 54:7 132:13,19
  143:23 227:18,22
  228:3,4,6 244:4
  245:8
**2023** 1:12 149:4
  252:20 255:17
  256:4,20
**203** 254:9
**206** 254:10
**207** 254:11
**209** 254:12
**20th** 204:14 220:14
  223:22
**21** 253:16
**21-1653** 227:25
**211** 254:13
**213** 254:14
**21st** 143:23
**22** 187:23 245:8
**22nd** 213:9,24
**235** 254:15
**23rd** 200:23 201:14
**24** 9:12 220:17

221:16
**241** 254:16
**244** 254:17
**24th** 165:19 199:24
  220:15
**25th** 165:11 200:3
  225:4
**26th** 188:24 200:5
  223:22
**27** 163:21 227:8
**27th** 201:22 224:8
**28** 203:12 227:8,18
  228:3
**2815** 4:5
**28th** 213:25
**29** 202:15 253:10
**2nd** 222:5

___
**3**

**3** 217:10
**3,000** 37:8 43:2,3,10
  164:25 166:16
**3,435** 217:24 218:2
**3,485** 166:3
**3,500** 164:25
**3:00** 142:20
**3:59** 226:4
**30** 13:3,24 76:9 149:4
  208:10 227:5
  243:15,17
**30-minute** 162:20
**300** 37:7 39:2,3 50:13
  50:15 172:12 214:3
  214:7 218:17
  219:24
**3000** 2:9
**30E** 4:21 5:25
**31st** 193:11 225:5
**33** 227:5
**35** 81:16
**350** 225:2,11
**36** 170:6 199:4
**37** 247:24
**38** 81:16
**3rd** 217:4 218:19

A1740

STIDHUM v. 161-10 HILLSIDE AUTO AVE, et al.
Leticia Francine Stidhum  ---  February 17, 2023

293

| | |
|---|---|
| 224:9 227:11 | 199:7,9,11 244:4 |
| **3W8** 2:9 | **6.43** 150:10 152:21 |
| | **60** 79:18 83:10 159:3 |
| **4** | **600** 227:13 |
| **4** 253:7 | **615** 216:19 |
| **4.4** 216:15 | **625** 224:15 |
| **4:05** 226:5 | **65** 79:19 |
| **4:15** 187:22 | **655** 216:22 |
| **4:30** 239:25 | **660** 216:3,12,14 |
| **4:40** 243:18 | **6th** 203:5 223:14 |
| **4:57** 252:15 | 226:20 255:17 |
| **40** 83:10 182:22 | |
| **40/60** 85:15 | **7** |
| **4125** 2:4 | **7** 156:13 157:18 |
| **428.64** 151:18 152:17 | 253:11 |
| 152:20 | **70,000** 159:3 |
| **45** 79:18 | **700** 136:15 222:9 |
| **45-minute** 162:21 | **750** 221:16,19 |
| **450** 219:21 221:9,13 | **780** 214:5 |
| 223:22 | |
| **46** 168:19 | **8** |
| **4th** 197:10 202:19 | **8** 171:12 188:16 |
| 228:6 | **8:00** 232:20 |
| | **800** 89:20 172:14 |
| **5** | 222:12,17 |
| **5** 37:9 42:23,25 43:3 | **81** 253:17 |
| 43:21 44:3,6 45:10 | **810** 151:20 152:17 |
| 50:18 75:9,13 76:3 | **825** 224:12 225:8 |
| 76:19,24 164:24 | **8th** 23:15 211:25 |
| 166:6,14,17 167:3,9 | 222:5 |
| 168:14 214:13,22 | |
| 215:2 216:25 | **9** |
| 220:13 | **9** 217:5,10 243:6 |
| **5.2** 214:12 | **9.67** 220:10 |
| **5:15** 188:3 | **9:00** 162:19 232:20 |
| **50** 182:22 | 243:19,20 |
| **50/50** 85:15 | **9:23** 1:12 |
| **500** 101:8 224:18 | **9:30** 162:19 |
| **53** 86:12 | **900** 172:14 219:4,9 |
| **586** 163:25 | 221:22 222:6 |
| **5th** 194:20 196:11 | 223:14 |
| 202:23 | **9th** 218:19 |
| | |
| **6** | |
| **6** 171:12 195:22 | |

A1741

# 25-490

## United States Court of Appeals
## For The Second Circuit

LETICIA FRANCINE STIDHUM,

*Plaintiff-Appellant,*

v.

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside Auto Outlet,
HILLSIDE AUTO MALL INC d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA, JORY BARON, and ANDRIS GUZMAN

*Defendants-Appellees.*

RONALD M. BARON

*Defendant.*

On Appeal from the United States District Court
for the Eastern District of New York

### APPENDIX (VOL. 7 OF 7)

John Troy
Aaron Schweitzer
Tiffany Troy
Troy Law, PLLC
*Counsel for Plaintiff-Appellant*

41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355

```
 1              UNITED STATES DISTRICT COURT

 2        EASTERN DISTRICT OF NEW YORK        COPY

 3        ----------------------------------------X

 4        LETICIA FRANCINE STIDHUM,

 5                              Plaintiff,

 6              -against-          CASE: 21-CV-07163

 7        161-10 HILLSIDE AUTO AVE, LLC d/b/a HILLSIDE
          AUTO OUTLET, and HILLSIDE AUTO MALL INC
 8        d/b/a HILLSIDE AUTO MALL, ISHAQUE THANWALLA,
          JORY BARON, RONALD M. BARON and ANDRIS GUZMAN,

 9

10                              Defendants.

11        ----------------------------------------X

12                              March 03, 2023

13                              10:00 A.M.

14

15              VIRTUAL EXAMINATION BEFORE TRIAL of

16        JORY BARON, via Zoom, a Defendant herein,

17        held at the above-mentioned time and taken

18        before Lynn Luckman, a Notary Public and

19        Shorthand Reporter within and for the State

20        of New York.

21

22

23                  SANDY SAUNDERS REPORTING
                 254 South Main Street, Suite 216
24                  New City, New York 10956
                       (845) 634-7561
25
```

2

```
 1
 2              A P P E A R A N C E S:
 3
 4
 5         TROY LAW, PLLC
 6         Attorneys for the Plaintiff
 7         41-25 Kissena Boulevard, Suite 103
 8         Flushing, New York 13555
 9         BY: Tiffany Troy, Esq.
10
11         MILMAN, LABUDA LAW GROUP, LLC
12         3000 Marcus Avenue, Suite 3W8
13         Lake Success, New York 11042-1073
14         BY: Emanuel Kataev, Esq
15         emanuel@mllaborlaw.com
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    FEDERAL STIPULATIONS

 2

 3            IT IS HEREBY STIPULATED AND AGREED by

 4      and between counsel for the respective parties

 5      hereto that all objections except as to the

 6      form shall be reserved to the time of trial.

 7            IT IS FURTHER STIPULATED AND AGREED

 8      that the sealing and filing of this deposition

 9      shall be hereby waived.

10            IT IS FURTHER STIPULATED AND AGREED

11      that this examination may be sworn to by the

12      witness being examined before a notary public

13      other than the notary public before whom

14      examination was begun examination was begun.

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    Jory Baron

 2                       BY THE COURT REPORTER:

 3                    The attorneys participating

 4                    in this deposition

 5                    acknowledge that I am not

 6                    physically present in the

 7                    deposition room and that I

 8                    will be reporting this

 9                    deposition remotely.  They

10                    further acknowledge that, in

11                    lieu of an oath administered

12                    in person, I will administer

13                    the oath remotely.  The

14                    parties and their counsel

15                    consent to this arrangement

16                    and waive any objections to

17                    this manner of reporting.

18                       MS. TROY:  I consent

19                       MR. KATAEV:     I

20                    consent.

21

22

23                       *     *     *

24

25
```

5

```
 1                    Jory Baron
 2                    MS. TROY:  Mr. Kataev,
 3               will you please have your
 4               witness show his ID to me?
 5                    MR. KATAEV:  Why is this
 6               necessary?
 7                    MS. TROY:  Because, it is
 8               acceptable in a video
 9               deposition; how else can I
10               know who it is?
11                    MR. KATAEV:  I'll
12               represent to you that it is
13               Jory Baron.  Okay, please
14               proceed with your deposition.
15                    MS. TROY:  For the record,
16               Mr. Kataev wanted to switch
17               the witnesses, he switched
18               the witness that I had
19               requested for today.  I asked
20               for the ID, and apparently
21               Mr. Kataev was advised that I
22               asked for his ID to be
23               presented today. I made a
24               request for him to bring his
25               ID to the deposition so that
```

6

```
 1                    Jory Baron

 2                    I could confirm who he is.

 3                    I'm going to make a demand

 4                    for Mr. Baron's driver's

 5                    license.  We're going to mark

 6                    that deemed marked as

 7                    Plaintiff's Exhibit 13.

 8                    (Plaintiff's Exhibit 13 was

 9                    deemed marked for

10                    identification)

11                       MR. KATAEV:  Please

12                    follow-up in writing.

13                       MS. TROY:  Please have him

14                    go to his car to get his ID.

15                       MR. KATAEV:  He is not

16                    going to go to his car to get

17                    his ID.

18                       MS. TROY:  I need to have

19                    his ID to confirm who he is.

20                       MR. KATAEV:  I'll

21                    represent it to you that he

22                    is Jory Baron.

23                       MS. TROY:  Please show me

24                    his ID.

25                       MR. KATAEV:  You can call
```

7

1                    Jory Baron

2              the Court and let's get a

3              decision on this.

4                   MS. TROY:  All right.  We

5              are going to do that.

6                   MR. KATAEV:  This is

7              harassment.

8              (A phone call was being made

9              to the Court at 10:03 a.m.)

10                  MS. TROY:  I will put it

11             on the speaker so that you

12             can all hear.

13             (A call was made at 10:06

14             a.m.)

15                  And we are still waiting.

16             I've now put it on speaker

17             phone and I'm going to go

18             mute myself also.  Let's go

19             off the record.

20             (A discussion was held off

21             the record)

22                  ''MS. TROY:  Good morning,

23             Your Honor.  This is

24             plaintiff's counsel, Tiffany

25             Troy, and I'm appearing on

8

```
 1                      Jory Baron
 2                       behalf of the plaintiff,
 3                       Leticia Stidhum.
 4                          MR. KATAEV:  Good morning,
 5                       Your Honor.  My name is
 6                       Emanuel Kataev and I am with
 7                       the law firm of Milman Labuda
 8                       Law Group LLC, for the
 9                       defendants.
10                          THE COURT:  Good morning,
11                       Ms. Troy and Mr. Kataev.  Let
12                       the record reflect that this
13                       is not a scheduled
14                       conference, and you have now
15                       called at the start of a
16                       deposition for the defendant
17                       Jory Baron.
18                          Ms. Troy, I was told by my
19                       law clerk, and I want to make
20                       the record clear, I got the
21                       reason for the call that Mr.
22                       Kataev would not have his
23                       witness produce any
24                       identification; is that
25                       correct?
```

9

1              Jory Baron

2                    MS. TROY:  Yes, Your

3              Honor.

4                    THE COURT:  Mr. Kataev,

5              why won't Mr. Baron produce

6              his ID?

7                    MR. KATAEV:  Good morning,

8              Your Honor.  The reason why

9              Mr. Baron, is not giving his

10             ID is because I've made a

11             representation to the

12             plaintiff that this is in

13             fact Jory Baron.  There is no

14             issue of mistaken identity or

15             --

16                   THE COURT:  Why won't he

17             produce his ID?  I'm asking

18             you the question, and he does

19             and Ms. Troy does not have to

20             take your representation.

21             Why won't he produce some ID?

22                   MR. KATAEV:  I'm objecting

23             to the ID, I have authority

24             on my objection that she has

25             no right to --

10

```
 1                    Jory Baron

 2                    THE COURT:  I am

 3             overruling your objection,

 4             Mr. Kataev.

 5                    MR. KATAEV:  Judge --

 6                    THE COURT:  Excuse me,

 7             sir.  Please don't interrupt

 8             me.  If we have to do this

 9             in-person we will do that.

10             There is a fight between the

11             lawyers at every turn in this

12             case and I will not tolerate

13             that.  It is a waste of

14             everyone's time, and I've

15             been asked at the last minute

16             to effectuate a substitute,

17             Mr. Kataev, this morning and

18             I granted that wish to you as

19             a courtesy to you even though

20             it was objected to.

21                    I am now telling you Mr.

22             Kataev, that he should

23             produce some ID to show that

24             he is Jory Baron.  That is my

25             ruling, do you understand?
```

11

```
 1                    Jory Baron
 2            MR. KATAEV:  I understand
 3       the ruling, but I would still
 4       like to make a record about
 5       my objection.
 6            THE COURT:  Again, sir,
 7       this is a deposition and you
 8       need to follow the Magistrate
 9       Judge.  Your witness does
10       have to show that he is who
11       he says he is. What is this
12       about?
13            MR. KATAEV:  I will
14       explain to you if you'll
15       allow me to explain it, I am
16       entitled to have an
17       opportunity to be heard. This
18       is a case, a US District
19       Court case for the Northern
20       District of New York, CIV No.
21       1:15-CV-727.
22            Ms. Troy is asking for
23       the witness's identification,
24       and not withstanding that
25       there will be some numbers in
```

12

```
1              Jory Baron
2              the Court, notwithstanding,
3              refusal to compel the witness
4              to do so on the grounds of
5              privacy, and this is a Zoom
6              deposition.
7                   THE COURT:  Excuse me.
8              Excuse me, Mr. Kataev, my
9              time is valuable to me and I
10             am not telling him that he
11             has to produce his social
12             security number.  He is the
13             defendant in this case and it
14             is being conducted by Zoom.
15             Everything has been done as a
16             courtesy to your client, he
17             can produce the ID.  This is
18             the Order of the Court.  Do
19             you want to go up on Appeal
20             on this issue or do you want
21             to accept the Ruling of the
22             court?
23                  MR. KATAEV:  I will accept
24             the Ruling.  I have one final
25             thing to say that this
```

A1753

13

```
 1                    Jory Baron

 2                    deposition is being recorded

 3                    by Zoom, and I just want to

 4                    add that the ID can be

 5                    produced while the Zoom

 6                    deposition is not being

 7                    recorded.

 8                       THE COURT:  I'm sorry, I

 9                    don't really understand what

10                    the issue is.  I understand

11                    that people are entitled to

12                    privacy about things like

13                    social security numbers.

14                    What is it that you are

15                    trying to protect, Mr.

16                    Kataev?  This is a named

17                    defendant, and Ms. Troy is

18                    just trying to verify that he

19                    is who he says he is.  What

20                    is it that you are really

21                    trying to protect?  I don't

22                    understand at all.

23                       MR. KATAEV:  The driver's

24                    license contains information

25                    other than his identity, it
```

A1754

14

| | |
|---|---|
| 1 | Jory Baron |
| 2 | contains his home address, |
| 3 | his driver's license number |
| 4 | and contains other |
| 5 | information.  It is not |
| 6 | appropriate that the |
| 7 | plaintiff is entitled to |
| 8 | record that, and it's going |
| 9 | to be kept in plaintiff's |
| 10 | counsel's records and it is |
| 11 | required to produce.  All I |
| 12 | ask is that the plaintiff |
| 13 | stop the recording, he will |
| 14 | give that identification and |
| 15 | represent who it is. |
| 16 | MS. TROY:  Fine. |
| 17 | THE COURT:  I will stay on |
| 18 | the line and I will ask for |
| 19 | the record in the Zoom |
| 20 | deposition to stop. I will |
| 21 | stay on the record while this |
| 22 | happens. |
| 23 | Ms. Troy, is that going to |
| 24 | be okay for you? |
| 25 | MS. TROY:  Yes.  In fact, |

15

```
 1                    Jory Baron

 2                    even before the deposition,

 3                    we just asked for a scan of

 4                    the ID and Mr. Kataev said

 5                    that he wasn't going to

 6                    produce the ID without a

 7                    formal demand. Previously at

 8                    Friday's deposition last

 9                    week, at Mr. Thanwalla's

10                    deposition, he agreed to

11                    produce the ID later in the

12                    day because the witness

13                    supposedly left his ID in the

14                    car.  Today, he says the same

15                    thing, which is that his

16                    witness forgot his ID in the

17                    car.

18                        So, we are fine with the

19                    production of the redacted

20                    version of the ID which is

21                    what we asked for all along.

22                        MR. KATAEV:  It's not, you

23                    never asked for a redacted

24                    version.

25                        THE COURT:  Stop, stop.
```

16

```
 1                    Jory Baron

 2               She is entitled to verify

 3               that the person she is

 4               deposing is the person that

 5               is identified and you don't

 6               want plaintiff's counsel to

 7               have his driver's license ID

 8               number or to have his home

 9               address.  That is fine with

10               me.

11                    But, it is her right to

12               verify that the witness is

13               who he says he is and she

14               doesn't have to take your

15               word for it. It's ridiculous

16               for you to be citing one

17               reported case as the reason

18               that you are making that

19               call.

20                    Can I just state that I

21               have 5 other cases and this

22               is not a reason to be

23               contacting the Federal Court.

24               Mr. Kataev and Ms. Troy, I

25               understand that you have not
```

17

```
 1                    Jory Baron
 2               had any goodwill between the
 3               two of you but I will not
 4               tolerate this level that
 5               everything has to be brought
 6               to the Court.  I will tell
 7               you that you are doing
 8               injustice, you are both doing
 9               injustice service to your
10               client.  Again, Ms. Troy is
11               entitled to get some
12               verification of whoever the
13               witness was by virtue of the
14               ID, and as of last week, do
15               you understand me?
16                    MR. KATAEV:  I am claiming
17               a redacted version would be
18               fine, but it is -- I need the
19               authority for the appropriate
20               certification that she's
21               entitled to some form of ID.
22                    THE COURT:  I am her
23               authority and she's entitled
24               to that.  Is that enough for
25               you?
```

18

```
 1                    Jory Baron
 2                    MR. KATAEV:  Yes, Your
 3              Honor.
 4                    THE COURT:  Mr. Kataev, if
 5              we have to do this on every
 6              single point, Mr. Kataev, it
 7              will not end up being useful
 8              for you or for your client or
 9              for Ms. Troy or her client.
10              We need to get through the
11              litigation here and you do
12              not need to raise every
13              single thing as another issue
14              to address the Court about;
15              do you understand?
16                    MR. KATAEV:  I understand,
17              Your Honor.
18                    THE COURT:  Mr. Kataev and
19              Ms.Troy, we stand by that the
20              fact that Mr. Baron is
21              directed to produce his ID.
22              You will then turn off the
23              recording right now and I
24              will stay on the line to make
25              sure that it doesn't become
```

19

```
 1                        Jory Baron
 2                   an issue.
 3                        MS. TROY:  Recording
 4                   stopped, Your Honor.
 5                        MR. KATAEV:  He has
 6                   already gone downstairs.
 7                        THE COURT: Well, now we
 8                   have to waste my time waiting
 9                   for him to come back to give
10                   Ms. Troy his ID so that I
11                   don't get interrupted again.
12                        MR. KATAEV:  I apologize,
13                   Your Honor.
14                        THE COURT:  Ms. Troy and
15                   Mr. Kataev, please get your
16                   focus back on the case and
17                   don't make it about both of
18                   you.  It will not be a
19                   pleasant thing to have
20                   lawyers at this pitch, do you
21                   understand that?
22                        MS. TROY:  Yes, Your
23                   Honor.
24                        MR. KATAEV:  Understood,
25                   Your Honor.
```

A1760

20

```
 1                        Jory Baron

 2            [Time noted is 10:23]

 3                        THE COURT:  Ms. Troy is

 4                        being asked not to write down

 5                        the driver's ID number or the

 6                        home address.  Ms. Troy, I

 7                        assume that you have no

 8                        problem with that?

 9                        MS. TROY:  No, I don't

10                        have a problem with that.

11                        THE COURT:  Thank you.

12                        So, the case does not --

13                        there is no reason for

14                        someone to prove who they

15                        were at a deposition because

16                        it was about a social

17                        security number.

18                        I am convinced that Ms.

19                        Troy has no bad intent and

20                        she just wants to verify that

21                        Mr. Baron is who he says he

22                        is, whoever the other witness

23                        is.  I believe there will be

24                        no further issue on this

25                        case. Please make sure that
```

21

```
 1                        Jory Baron

 2                        your witness comes prepared

 3                        to show ID, okay?

 4                            MR. KATAEV:  Your Honor, I

 5                        have to go to my office and

 6                        it will be one minute.

 7            [Time noted: 10:32 a.m.]

 8                            MR. KATAEV:  I'm going to

 9                        show the ID.

10                        (Ms. Troy peruses.)

11                            MS. TROY:  That is

12                        satisfactory.

13                            THE COURT:  Is that

14                        satisfactory?

15                            MS. TROY:  Yes, it is.

16                            THE COURT:  I don't

17                        believe there will be any

18                        other matters that needs the

19                        Court's intervention?

20                            MS. TROY:  No, Your Honor,

21                        not from me.

22                            MR. KATAEV:  No, Your

23                        Honor, not from --

24                            MS. TROY:  Not from the

25                        plaintiff's side.
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 22 of 117 PageID #:
2426

22

```
 1                         Jory Baron
 2                         MR. KATAEV:  Nothing
 3                         further.
 4                         THE COURT:  This matter is
 5                         now adjourned and I am going
 6                         to advise Ms. Troy and Mr.
 7                         Kataev to get on with the
 8                         deposition.  Thank you very
 9                         much.
10                         MS. TROY:  Thank you, Your
11                         Honor.
12                         MR. KATAEV:  Thank you.
13                         (The recording has stopped.)
14          [Time noted: 10:34 a.m.]
15                         MS. TROY:  10:35 the
16                         recording is back on.  Let's
17                         get started.
18          [Time noted: 10:35 a.m.]
19          J-O-R-Y B-A-R-O-N, a Defendant herein,
20          after having been duly sworn by a Notary
21          Public of the State of New York, was
22          examined and testified as follows:
23
24          BY THE REPORTER:
25                    Q.  Please state your full name for
```

23

```
 1                    Jory Baron
 2          the record.
 3                    A.  Jory Baron.
 4                    Q.  Please state your present
 5          address for the record.
 6                    A.  21 Wayside Lane, Huntington, New
 7          York 11743.
 8          EXAMINATION BY
 9          TIFFANY TROY:
10                    Q.  Good morning, Mr. Baron.  My
11          name is Tiffany Troy and I represent the
12          plaintiff in this matter, Leticia Stidhum.
13          Before we get started, have you ever been
14          deposed before?
15                    A.  No.
16                    Q.  In that case, I'm going to
17          explain what a deposition is and lay down
18          some ground rules going forward; do you
19          understand?
20                    A.  Yes.
21                    Q.  First, this deposition is for me
22          to ask you questions and for you to answer
23          my questions about the subject matter of
24          this lawsuit.  To be clear, this lawsuit is
25          about the pregnancy discrimination claims
```

24

```
 1              Jory Baron

 2       brought by Leticia Stidhum.  There is also a

 3       separate State Court Action that is about

 4       the wage and hour claim, but we will be

 5       addressing the pregnancy discrimination

 6       claim today; do you understand?

 7              A.  Yes.

 8              Q.  Since the court reporter has to

 9       take down everything that you say, I ask

10       that you give verbal responses; no shaking

11       or nodding of your head and no gestures; do

12       you understand that?

13              A.  Yes.

14              Q.  For the same reason, please

15       speak loudly and clearly when you answer a

16       question; do you understand?

17              A.  Yes.

18              Q.  The stenographer can only write

19       down one person speaking at a time.

20       Therefore, please do not start to answer one

21       of my questions before I stop asking it,

22       likewise I will not start a new question

23       until you have finished answering my last

24       question; do you understand?

25              A.  Yes.
```

25

```
 1                    Jory Baron
 2              Q.  If you need to take a break, for
 3         example to get a drink of water or to use
 4         the restroom, please let me know and I will
 5         call for a break; do you understand?
 6              A.  Yes.
 7              Q.  The only exception is that there
 8         can be no break in between one of my
 9         questions and your answer to that question;
10         you must finish answering my question before
11         you ask for a break; do you understand?
12              A.  Yes.
13              Q.  From time to time your attorney
14         may make objections to my questions.
15         Generally, however, unless your attorney
16         tells you not to respond you will still have
17         to respond; do you understand?
18              A.  Yes.
19              Q.  If you don't understand a
20         question, tell me and I will rephrase it so
21         that you can.  If you don't hear a question,
22         tell me and I will repeat it so that you do;
23         do you understand?
24              A.  Yes.
25              Q.  We are here together for facts
```

26

```
 1                    Jory Baron
 2         and not speculation.  If you don't know an
 3         answer to a question, say so; do you
 4         understand that?
 5                   A.  Yes.
 6                   Q.  Do you understand that you have
 7         taken an oath to tell the truth today?
 8                   A.  Yes.
 9                   Q.  Do you understand that the oath
10         that you have taken to tell the truth
11         carries the same force and effect as if you
12         were testifying in Court before a Judge?
13                   A.  Yes.
14                   Q.  Are you currently taking any
15         medications that could prevent you from
16         recalling the truth or testifying truthfully
17         today?
18                   A.  No.
19                   Q.  How about any physical or
20         emotional conditions, are you currently
21         under any condition that could prevent you
22         from recalling the truth or testifying
23         truthfully and completely today?
24                   A.  No.
25                   Q.  Besides your attorney, have you
```

27

```
                         Jory Baron
 1
 2      spoken with anyone to prepare for today's
 3      deposition?
 4                 A.  No.
 5                 Q.  Without telling me the contents
 6      of your communications with your attorney,
 7      did you, yes or no, talk to your attorney to
 8      prepare for this deposition?
 9                 A.  Yes.
10                 Q.  Again, without telling me the
11      contents of the communications, for how long
12      did you speak with your attorney?
13                 A.  A few hours.
14                 Q.  In preparation for today's
15      deposition, did you review any documents?
16                 A.  Yes.
17                 Q.  What were those documents?
18                 A.  All the documents that were
19      provided to me, the allegations set forth in
20      the case, the Interrogatories and other
21      documents that I signed.
22                 Q.  Mr. Baron, what is your full
23      name?
24                 A.  Jory Philip Baron.
25                 Q.  How do you spell Philip?
```

28

```
 1                    Jory Baron
 2              A.   P-H-I-L-I-P.
 3              Q.   Since this is a virtual
 4        deposition, when you are on break, do you
 5        affirm that you are not going to communicate
 6        by email, chat, or instant message on your
 7        phone or any other device?
 8              A.   No.
 9                   MR. KATAEV:  Let the
10                   record reflect that there is
11                   no such device before him.
12              Q.   Do you agree that besides the
13        documents that I will be showing you on the
14        screen as exhibits today that you will not
15        be reviewing any notes on your computer,
16        cell phone or your notepad?
17              A.   Yes.
18                   MR. KATAEV:  Same notation
19                   for the record.
20              Q.   Have you ever been arrested
21        before?
22              A.   No.
23              Q.   Have you ever been a party to a
24        lawsuit besides this one in a State Court
25        Action?
```

A1769

29

```
 1                      Jory Baron

 2              A.   No.

 3              Q.   During this deposition, I'm

 4       going to be referring to 161-10 Hillside

 5       Auto which is at 161-10 Hillside Avenue as

 6       Hillside Auto Outlet; do you understand

 7       that?

 8                      MR. KATAEV:  Objection to

 9                      the form.  The corporate

10                      entity is 161-10 Hillside

11                      Auto Ave.  It is Auto Avenue,

12                      LLC d/b/a Hillside Auto

13                      Outlet.  You can answer the

14                      question.

15              A.   Yes.

16              Q.   I'm going to be referring to

17       Hillside Auto Mall, Inc. as Hillside Auto

18       Mall; do you understand?

19              A.   Yes.

20              Q.   Do you own the residence that

21       you gave at the beginning of this deposition

22       today?

23                      MR. KATAEV:  Objection to

24                      relevance.  You can answer.

25              A.   Yes.
```

30

```
 1                    Jory Baron
 2              Q.   In the past five years, have you
 3         lived anywhere else?
 4              A.   Yes.
 5              Q.   Starting from the most recent,
 6         where have you lived prior to your current
 7         address?
 8              A.   35 Woodland W-O-O-D-L-A-N-D
 9         Street in Huntington.
10              Q.   Besides the 35 Woodland Street
11         address, have you lived anywhere else in
12         addition to the address that you gave at the
13         beginning of this deposition within the past
14         5 years?
15              A.   No.
16              Q.   What is your highest level of
17         education?
18              A.   College.
19                   MR. KATAEV:   Objection to
20                   that.
21              A.   (Continuing) Business
22         Management, Bachelor's of Science.
23              Q.   What school did you attend?
24              A.   Michigan and then Hofstra
25         University.
```

31

```
1                    Jory Baron
2              Q.  Are you familiar with the
3     company 161-10 Hillside Auto Avenue LLC.?
4              A.  Yes.
5              Q.  How are you familiar with it?
6              A.  I am a member/shareholder.
7              Q.  What is the percentage of shares
8     that you own?
9              A.  I am a 25 percent.
10             Q.  Do you recall when you began as
11    a member, the year and the month?
12             A.  I don't recall specifically, but
13    it was from the beginning of the business
14    when we opened.
15             Q.  How about do you recall when the
16    business opened?
17             A.  Approximately 5 years ago.
18             Q.  What is your role as the
19    member/shareholder at 161-10 Hillside Auto
20    Avenue LLC?
21             A.  My role is very minimal; I sign
22    checks and speak to Ishaque on a weekly
23    basis just to review where we are in the
24    month.
25             Q.  When you had the conversations
```

32

```
 1                    Jory Baron
 2          with Ishaque on a weekly basis, would that
 3          be you and Isaac only or was it you,
 4          Ishaque, and someone else?
 5                    A.  Typically, Ishaque and myself.
 6                         MR. KATAEV:  Let the
 7                         attorney finish her question.
 8                         THE WITNESS:  I apologize.
 9                         MR. KATAEV:  It's to make
10                         the court reporter's life
11                         easier.
12                    Q.  When you say that you spoke to
13          Ishaque on a weekly basis, just to review,
14          on a weekly basis, can you describe what
15          kind of information you and Ishaque
16          exchanged during those conversations?
17                         MR. KATAEV:  Objection as
18                         to relevance. You can answer.
19                    A.  It could vary on a weekly basis.
20          Sometimes it could be how many vehicles do
21          we have currently sold for the month?  How
22          was our cash position? Certain general
23          questions just to get a general sense of the
24          health of the dealership at the moment.
25                    Q.  Do you still have those weekly
```

33

```
1                    Jory Baron
2          meetings with Ishaque currently?
3                    A.  It can vary.  I can come in
4          weekly, it could be every other week or as-
5          needed.
6                    Q.  Let's start from the car sales,
7          did you discuss with Ishaque the number of
8          vehicles sold at Hillside Auto Outlet in
9          2018/2019?
10                   A.  On a monthly basis, yes.
11                   Q.  In 2018/2019, do you recall how
12         many cars were sold by the dealership on a
13         monthly basis?
14                   A.  I cannot recall.
15                   Q.  Can you give us a range?
16                   A.  I would be guessing from 5 years
17         ago, but I would prefer not to.
18                   Q.  Was the number of vehicles sold
19         in 2018 and 2019 more or less than the
20         number of vehicles sold on a monthly basis
21         currently?
22                   A.  Again, unfortunately I cannot
23         recall every month, it varied.
24                   Q.  How about the revenue generated
25         by the deals on a monthly basis, do you
```

34

```
 1                      Jory Baron
 2          recall that in 2018 and 2019, again, on a
 3          monthly basis?
 4                      A.  I cannot recall.
 5                          MR. KATAEV:  Objection to
 6                      that one.
 7                      Q.  During those meetings, would you
 8          ever discuss issues that may arise on the
 9          human resources front?
10                          MR. KATAEV:  Objection to
11                      the form.  You can answer.
12                      A.  No, that was not my position as
13          a shareholder at that time.
14                      Q.  When you say ''at that time'' does
15          that mean in 2018 and 2019?
16                      A.  Yes.
17                      Q.  What is your position as a
18          shareholder currently, and I mean regarding
19          perhaps human resources discussed with you
20          currently?
21                      A.  Ishaque handles the day-to-day
22          of the human resources aspect.  If I need to
23          get involved, he will call.
24                      Q.  When was the most recent time
25          when he called you with respect to a human
```

35

```
 1                        Jory Baron
 2          resources issue?
 3                    A.  None.
 4                        MS. TROY:  Emmanuel, can
 5                        you do me a favor?  You
 6                        usually project pretty well,
 7                        but if you don't mind moving
 8                        the microphone closer to the
 9                        witness.
10                        MR. KATAEV:  How is it
11                        now?
12                        MS. TROY:  No problem.
13                        MR. KATAEV:  So the record
14                        is clear, there is a shared
15                        microphone on the table and
16                        we just moved it closer to
17                        the witness so that it is
18                        clear.
19                        MS. TROY:  I believe the
20                        witness said ''none.''  We can
21                        move on.
22                        MR. KATAEV:  That is
23                        correct.
24                    Q.  From the beginning of the time
25          when you became the shareholder at Hillside
```

36

```
1                    Jory Baron
2         Auto Outlet five years ago until the present
3         day, has there ever been an occasion when
4         Ishaque called you regarding a human
5         resource issue?
6                    A.  No.
7                    Q.  Back in 2018 and 2019 what would
8         be a number of cars sold on a good month?
9                    A.  I can't give you a specific
10        number.
11                   Q.  What would be the number?
12                        MR. KATAEV:  Objection.
13                          Asked and answered for that
14                          one.
15                   Q.  How about in a slow month?
16                   A.  I cannot recall, i can't give
17        you a specific answer.
18                   Q.  Do you recall if there were
19        months or seasons when the car sales would
20        be slower?
21                   A.  Yes.  The car sales can vary
22        from month-to-month depending on the time of
23        year and other factors.
24                   Q.  What other factors would car
25        sales would depend on?
```

37

```
 1                    Jory Baron
 2              A.  It could be holiday times,
 3         certain promotions, people know that deals
 4         would be going on at the end of the year,
 5         different things like that, weather, tax
 6         returns, so on and so forth.
 7              Q.  Let's go to holiday times, what
 8         were the major holidays that would affect
 9         car sales, and we are still talking about
10         Hillside Auto Outlet?
11              A.  Everything within the industry
12         can typically run hand-in-hand.  It would be
13         Memorial Day, President's Week, the end of
14         the year, vice-a-versa, major holidays can
15         adversely affect business.  Mother's Day,
16         Easter, Christmas.  They tend to be slow,
17         but again, it could vary.
18              Q.  What are the busier months at
19         Hillside Auto Outlet?
20              A.  I cannot recall what would be
21         the busiest months.
22              Q.  Are you familiar with Ishaque
23         Thanwalla?
24              A.  Yes.
25              Q.  How are you familiar with him?
```

A1778

38

```
 1                    Jory Baron
 2              A.  He is a partner of mine.
 3              Q.  What is his role and exact title
 4         at Hillside Auto Outlet?
 5              A.  To manage day-to-day aspects of
 6         the dealership throughout.
 7              Q.  Is it fair to say that he has
 8         the power to hire employees?
 9              A.  Yes.
10              Q.  How about firing?
11              A.  Yes.
12              Q.  How about setting their
13         schedule?
14              A.  Yes.
15              Q.  How about setting their pay?
16              A.  Yes.
17              Q.  To your knowledge, what was the
18         work schedule at Hillside Auto Outlet in
19         2018/2019?
20              A.  I don't know.
21              Q.  How about the store hours, what
22         were the store hours at Hillside Auto Outlet
23         in 2018/2019?
24              A.  I cannot recall.
25              Q.  Do you, as a shareholder, have
```

39

```
 1                    Jory Baron
 2         the power to hire employees?
 3                    A.  That is not my role.
 4                    Q.  Please listen carefully to the
 5         question.  The question is: do you have the
 6         power or authority to hire employees?
 7                         MR. KATAEV:  Objection.
 8                              Asked and answered, but you
 9                              can answer the question
10                              again.
11                    A.  Again, it is not my role.
12         Ishaque is in charge of that aspect.
13                    Q.  Do you have the power to --
14                         MR. KATAEV:  Objection.
15                              Asked and answered.
16                         MS. TROY:  Mr. Kataev, if
17                              you listened carefully, he
18                              did not actually answer the
19                              question which is why I am
20                              asking the question again.
21                              The question is ''yes or no,
22                              do you have the authority to
23                              hire employees?''
24                         MR. KATAEV:  My objection
25                              stands, and you can answer
```

40

```
 1                      Jory Baron
 2                      the question again.
 3              A.   That's Ishaque's role and I
 4        don't have that power to do that.
 5              Q.   How about to fire employees?
 6              A.   No, that is Ishaque's
 7        responsibility.
 8              Q.   How about setting the schedule?
 9              A.   No, that is not my
10        responsibility.
11              Q.   How about setting the pay?
12              A.   That was not my responsibility.
13              Q.   Do you know the payment
14        structure for the car salespeople at
15        Hillside Auto Outlet?
16              A.   No.
17              Q.   During the discussions about the
18        cash positions, and by discussions, I mean
19        discussions with Ishaque, did the cash
20        position involve payroll expenses?
21                      MR. KATAEV:  Objection.
22                      Vague, but you can answer.
23              A.   No.
24              Q.   When you talked about the cash
25        positions, what was being discussed
```

41

```
 1                    Jory Baron
 2         specifically?
 3                      MR. KATAEV:  Objection to
 4                 relevance.  You can answer.
 5              A.  The amount of money needed to
 6         operate a business successfully; just making
 7         sure that again, there was enough money for
 8         floor plans and different things like that.
 9              Q.  When you discussed the cash
10         position, would you discuss the income as
11         well as the expenses?
12              A.  Can you repeat the question,
13         please?
14                      MS. TROY:  Sure.  Let's
15                 strike that last question.
16              Q.  During your discussions with
17         Ishaque, would you discuss the payroll
18         expenses at all?
19              A.  No.
20              Q.  Would he ever discuss with you
21         how much he was paying either a specific
22         employee who was working for Hillside Auto
23         Outlet or a certain position, for instance,
24         a car salesperson?
25              A.  No.
```

42

```
 1                    Jory Baron
 2              Q.  During all of your time as a
 3         shareholder at Hillside Auto Outlet, have
 4         you ever hired anyone?
 5              A.  I have trouble hearing you. I'm
 6         so sorry.  If you could just repeat that one
 7         more time.
 8              Q.  Have you ever hired anyone on
 9         behalf of Hillside Auto Outlet?
10              A.  No.
11              Q.  How about firing people?
12              A.  No.
13              Q.  Besides 161-10 Hillside Auto
14         Avenue LLC, do you own any other company's?
15              A.  No.  Oh, I apologize.  We do
16         have Hillside Auto Outlet 2 that is down the
17         road.
18                    MR. KATAEV:  Do you mean
19                 the numeral?
20                    THE WITNESS:  Yes.
21              Q.  What is the address of Hillside
22         Auto Outlet 2?
23              A.  179-10, I believe.  I would have
24         to double check, but I believe that is the
25         address.
```

43

```
 1                    Jory Baron
 2              Q.  Does Hillside Auto Outlet 2 also
 3     sell cars?
 4              A.  We store cars there and they can
 5     sell them, but it's mostly for service of
 6     vehicles.
 7              Q.  Besides yourself, are there any
 8     other shareholders of Hillside Auto Outlet
 9     2?
10              A.  Yes.
11              Q.  Who are they?
12                   MR. KATAEV:  Objection as
13                    to relevance.  You can
14                     answer.
15              A.  The Estate of David Baron and
16     Josh Aaronson, as well as Ishaque.
17              Q.  Is it fair to say that you each
18     have a 25 percent share?
19              A.  Yes.
20              Q.  Turning your attention back to
21     Hillside Auto Outlet, is it fair to say that
22     you and Josh Aaronson and the Estate of
23     David Baron as well as Ishaque, that you
24     each own 25 percent of the shares of the
25     company?
```

44

```
 1                    Jory Baron
 2              A.  Yes.
 3              Q.  Are you familiar with Josh
 4       Aaronson?
 5              A.  Yes.
 6              Q.  How are you familiar with him?
 7              A.  He is a business partner.
 8              Q.  Besides 161-10, Hillside Auto
 9       Avenue, d/b/a, Hillside Auto Outlet, LLC and
10       Hillside Auto Outlet 2, are you business
11       partners with him and any other
12       corporations?
13              A.  Not at the moment.
14              Q.  What was his role or
15       responsibility at Hillside Auto Outlet?
16              A.  Shareholder.
17              Q.  As the shareholder, what did he
18       do?
19              A.  I don't know.
20                    MR. KATAEV:  Who is ''he?''
21                    MS. TROY:  Josh Aaronson.
22                    MR. KATAEV:  Go ahead.
23              A.  (Continuing) I cannot speak for
24       his responsibilities.
25              Q.  Earlier you mentioned that you
```

45

```
 1                    Jory Baron

 2          had monthly back and forth in 2018 and 2019

 3          and weekly meetings with Ishaque about

 4          everything about Hillside Auto Outlet. Would

 5          Josh Aaronson ever join the two of you at

 6          any of those meetings?

 7                    A.   There were occasions where we

 8          might have been on the phone together.

 9                    Q.   During those occasions, were the

10          same types of things discussed or was it

11          something different in those discussions?

12                    A.   It could vary.

13                    Q.   Let's turn your attention to the

14          late David Baron for a second.  At the time

15          when the company was formed, David Baron was

16          still alive; is that correct?

17                    A.   Yes.

18                    Q.   Let's backtrack, do you recall

19          what year and month he passed away?

20                    A.   It would be 2 years in May.

21                    Q.   Between 2018 and 2019, what role

22          or responsibilities did he have as the

23          shareholder of 161-10 Hillside Auto Avenue,

24          LLC?

25                    A.   I cannot recall, nor was I
```

46

```
 1                    Jory Baron
 2         involved.
 3                    Q.  After 2021 when, essentially the
 4         Estate of David Baron was the executor for
 5         the late David Baron, what, if any
 6         discussions were had between or amongst the
 7         shareholders regarding anything related to
 8         Hillside Auto Outlet?
 9                    A.  Can you please repeat that
10         question?
11                    Q.  So, sure.  Sort of a similar
12         question that I had asked you with respect
13         to Josh Aaronson, but now we are talking,
14         I'm turning your attention to the Estate of
15         David Baron.
16            Did the Estate of David Baron ever
17         participate in shareholder meetings?
18                    A.  I cannot recall, nor do I
19         remember.
20                    Q.  When was the last meeting that
21         was attended either by the Estate of David
22         Baron or by the late Mr. Baron?
23                    A.  I cannot remember.
24                    Q.  Are you familiar with a company
25         called Hillside Auto Mall, Inc?
```

47

```
1                        Jory Baron
2                A.   If I may ask, familiar in what
3        way?
4                Q.   Do you know of the company?
5                A.   Yes.
6                Q.   How do you know of the company?
7                A.   They are down the block from
8        where we are.
9                Q.   Were there ever occasions from
10       your perspective as a shareholder, were
11       there ever occasions when Hillside Auto
12       Outlet employees would sell cars from
13       Hillside Auto Mall?
14               A.   They are 2 companies, they are 2
15       different businesses.
16               Q.   Let me just turn your attention
17       and focus on the question, which was: were
18       there ever occasions when Hillside Auto
19       Outlet's employees sold cars from Hillside
20       Auto Mall?
21                    MR. KATAEV:  Objection.
22                    Asked and answered. You can
23                    answer the question.
24               A.   Throughout we could have
25       vehicles brought to Hillside Auto Outlet to
```

48

```
 1                    Jory Baron
 2         be shown.  But, every vehicle that gets sold
 3         would be a Hillside Auto Outlet vehicle.
 4         They could again have the vehicle brought to
 5         be shown if the customer likes it, Hillside
 6         Auto Outlet, we do that with other locations
 7         where they can purchase the vehicles from
 8         those stores and then try to sell them.
 9               Q.  When you mentioned that the
10         vehicles could be brought to Hillside Auto
11         Outlet, I am going to follow-up on that and
12         ask you: were there occasions when the car
13         salespeople would bring customers down the
14         block to Hillside Auto Mall to sell cars at
15         Hillside Auto Mall?
16               A.  No, not that I'm aware of.
17               Q.  Are you familiar with the co-
18         defendant, Andris Guzman?
19               A.  I am familiar with his name,
20         yes.
21               Q.  Do you recall his position with
22         Hillside Auto Outlet?
23               A.  I cannot recall.
24               Q.  Do you recall if he had
25         managerial responsibilities?
```

49

```
 1                    Jory Baron
 2              A.  I cannot recall.
 3              Q.  Do you recall what the hiring
 4       process was like at Hillside Auto Outlet?
 5              A.  That was not my responsibility,
 6       so I cannot answer that.
 7              Q.  To your knowledge, were there
 8       any posters regarding Labor Law posted
 9       within the store of Hillside Auto Outlet?
10              A.  Yes.
11              Q.  Where were those posters posted?
12              A.  I believe in the lunch area or
13       in the back area.  There is a kitchen,
14       that's where the kitchen is, if I remember
15       correctly.
16              Q.  Do you remember what the
17       contents on the poster was?
18              A.  I cannot remember specifically.
19              Q.  Do you recall if the poster was
20       there back in 2018/2019?
21              A.  Yes.
22              Q.  Do you recall how much in flat
23       commissions per car was given to Hillside
24       Auto Outlet employees?
25              A.  It was not my responsibility.
```

50

```
 1                   Jory Baron
 2         So, again, I cannot recall.
 3              Q.  Do you know what the bonus
 4         structure was at Hillside Auto Outlet?
 5              A.  That was not my responsibility,
 6         so I was unaware.
 7              Q.  Do you know if the bonus
 8         structure was fixed or varied from time-to-
 9         time at Hillside Auto Outlet?
10              A.  Again, that was not my
11         responsibility.  So, I'm unaware, I could
12         say it is not unusual for structures and
13         bonus structures to vary from time to time.
14              Q.  When you said that, are you
15         speaking generally in the industry?
16              A.  Yes.
17              Q.  Are you familiar with the
18         plaintiff Leticia Stidhum?
19              A.  Yes.
20              Q.  How are you familiar with her?
21              A.  I am familiar with her based on
22         this lawsuit.
23              Q.  Did you know of her prior to
24         this lawsuit?
25              A.  No.
```

51

```
 1                    Jory Baron
 2              Q.   From time to time, did you visit
 3         Hillside Auto Outlet as one of the
 4         shareholders?
 5              A.   I would visit there and it would
 6         vary every so often.
 7              Q.   Usually what time of day would
 8         you visit?
 9              A.   It could vary depending on my
10         schedule.
11              Q.   What was the earliest time of
12         the day when you would visit the store?
13              A.   After they opened, typically
14         around 10:30 in the morning would be the
15         earliest.
16              Q.   How about the latest time when
17         you visited?
18              A.   I would want to be out of there
19         by 2 o'clock due to traffic.
20              Q.   Would you visit weekdays as well
21         as on weekend days?
22              A.   Typically it would be within the
23         week.
24              Q.   Meaning Monday through Friday?
25              A.   Yes.
```

52

```
 1                    Jory Baron
 2                Q.  What was Ishaque's title at
 3       Hillside Auto Outlet?
 4                A.  He was a shareholder/partner,
 5       whichever you prefer, as well as the manager
 6       of the store.
 7                Q.  What are the responsibilities of
 8       the finance manager, and specifically we are
 9       talking about Hillside Auto Outlet?
10                A.  The finance manager would
11       receive credit, I should say they would
12       receive a folder from the salesperson once a
13       deal is formally agreed upon.  Then, their
14       job would be to run credit and submit credit
15       to the bank and then finalize the paperwork
16       with the customers.
17                Q.  To your knowledge, did any of
18       the car salespeople stay after the store
19       hours in order to finish a deal?
20                A.  It is not uncommon within the
21       industry for people to have to remain past
22       our set hours to complete a deal.
23                Q.  Specifically and typically, how
24       much longer would they stay past the set
25       hours to complete a deal after hours?
```

53

```
 1                      Jory Baron
 2              A.  I cannot tell you that.  It
 3      varied.
 4              Q.  Can you give me a range?
 5                      MR. KATAEV:  Objection.
 6                      Asked and answered.  You can
 7                      answer the question.
 8              A.  It completely varied.
 9              Q.  Are you familiar with the
10      Dealertrack system?
11              A.  Yes.
12              Q.  Can you explain what that system
13      is?
14              A.  This is the system, this is our
15      dealer management system.  I call it like
16      the brain function of the store.  It is the
17      database that we use to operate the
18      dealership, they use the main database.
19              Q.  To your knowledge, were any
20      records kept for employee hours, and let's
21      start from the time clock; are you aware if
22      there was a time clock at Hillside Auto
23      Outlet?
24              A.  Not that I know specifically.
25              Q.  How about any written records
```

54

```
 1                    Jory Baron

 2          about employee's attendance?

 3                   A.  That is not my responsibility

 4          and I cannot answer that.

 5                        THE WITNESS:  Is it okay

 6                   if I have a sip of my

 7                   Gatorade?

 8                        MS. TROY:  Okay.  For the

 9                   record, you don't have to ask

10                   for a drink.

11                        THE WITNESS:  I just

12                   wanted to make sure.

13                   Q.  How about a record of the

14          employee's pay; what records, if any, were

15          kept?

16                   A.  That was not my responsibility

17          and I cannot recall.

18                   Q.  Earlier you mentioned that you

19          learned of Leticia Stidhum through a

20          lawsuit.  Prior to this lawsuit, did you

21          have any communications with Ishaque about

22          Leticia?

23                   A.  So, to clarify then the first

24          knowledge of this lawsuit was a text message

25          that I received from Leticia.  That was the
```

55

```
 1                    Jory Baron
 2          first contact that I had with her.  But, no,
 3          I did not have any conversations with
 4          Ishaque about Leticia prior to any of the
 5          legal ---
 6                    Q.  Did you have conversations with
 7          anyone about Leticia prior to this lawsuit?
 8                    A.  Just to clarify, when you say
 9          ''prior to this lawsuit,'' upon receiving a
10          text message from her, that is when the
11          conversations began about the matter that
12          day.  We did not have conversations until
13          this lawsuit began.
14                    Q. To backtrack for a second, the
15          text message that you were referring to, was
16          that the text message that you received from
17          Leticia?
18                    A.  Yes.
19                         MR. KATAEV:  Let the
20                         record reflect that I
21                         produced this morning those
22                         text messages.
23                    Q.  Were those the text messages
24          from January 24th?
25                    A.  That is correct.
```

56

```
 1                      Jory Baron
 2               MS. TROY:  Let the record
 3          reflect that D1905 to D1907,
 4          I have however, it appears to
 5          me that the text message was
 6          cut off.  And that there is
 7          another page.  This does not
 8          represent the entirety of the
 9          text messages.  But, there is
10          a message that was cut off.
11               Emanuel, are you going to
12          produce the full text
13          messages?
14               MR. KATAEV:  I'm sorry for
15          this.  If we have them, we
16          will produce it.  Please make
17          a formal demand. For what
18          it's worth,in my review with
19          the client, we believe that
20          the bottom portion of the
21          text message either says
22          ``thank you for your time'' or
23          ``thank you for your help.''
24          It was one of those two
25          things based on the client's
```

57

```
1                        Jory Baron
2                     recollection.
3                          I believe we can also
4                     represent and confirm, and
5                     it's accurate that we can
6                     also represent that there are
7                     no further text messages
8                     after that one; correct?
9                          THE WITNESS:  That is
10                    correct.
11              Q.  Let me just backtrack for a
12        second.  I will show it on the screen and
13        maybe that will be easier.  Just give me one
14        second.
15            I believe it's going to be easier if we
16        just use this same folder and we're just
17        going to name it as the next number.
18                         MR. KATAEV:  That is fine.
19                         But, when you say ''folder,''
20                    what do you mean?
21                         MS. TROY:  We're going to
22                    mark this as Exhibit 14.
23                    (Plaintiff's Exhibit 14
24                    marked for identification)
25              Q.  So, I'm going to show you what
```

58

```
 1                    Jory Baron
 2          we have just marked as Plaintiff's Exhibit
 3          14, which is also D1905 to D1907.
 4          First, what is your cell phone number?
 5                         MR. KATAEV:  Objection as
 6                          to relevance.  You can
 7                           answer.
 8                    A.  516 840-2524.
 9                    Q.  Since when have you used this
10          number?
11                    A.  I can't remember the specifics,
12          but several years.
13                    Q.  Is it fair to say that in 2019
14          you used the number, you were using this
15          number?
16                    A.  Yes.
17                    Q.  How did you obtain this text
18          message that I'm showing you on the screen
19          today?
20                    A.  Leticia texted me.
21                    Q.  How did you obtain this
22          screenshot of the text message?
23                    A.  I screenshot it.
24                    Q.  When did you screenshot it?
25                    A.  Upon the allegations brought
```

59

```
 1                    Jory Baron
 2        forth, I thought that it may be relevant and
 3        I went through my history of conversations.
 4        I then screenshotted the text message.
 5                    Q.  Are you saying that you
 6        screenshotted it back in 2019?
 7                    A.  No, I screenshotted it --
 8        honestly, whenever the lawsuit came forth,
 9        but I cannot say whether it was 2019 or not.
10                    Q.  You did not screenshot that this
11        year or last year, but it was sometime
12        prior; correct?
13                    A.  I cannot recall.  Again,
14        whenever the lawsuit was brought forth and
15        it was shortly thereafter.
16                    Q.  Do you still use that 516 840-
17        2524 number today?
18                    A.  I do.
19                    Q.  Do you still have text messages
20        on your phone today?
21                    A.  I would have to go back and I
22        don't know if my text messages are now set
23        to delete after a certain time period.  So,
24        I cannot answer.  I may have changed it
25        during the pandemic, the cell phone was
```

A1800

60

```
 1                       Jory Baron
 2         constantly being used.  I may have changed
 3         the setting in terms of how long my text
 4         messages were kept.
 5                   Q.  In other words, you use the same
 6         number, and you had those text messages
 7         before, but you are not sure if you have it
 8         currently because the setting was changed to
 9         possibly delete them after a certain period
10         of time?
11                   A.  That is correct, I would have to
12         check.
13                   Q.  When did you provide those
14         screenshots?
15                   A.I produced those screenshots again
16         shortly after the allegations.
17                       MR. KATAEV:  Objection.
18                       Asked and answered.
19                   Q.  I am now showing you the third
20         page of D1907.  Do you recall what, if
21         anything, followed the last text message
22         that appears to be cut off?
23                   A.  From what I was told, I
24         confidentially received the text messages
25         and I took those text messages very
```

61

```
 1                    Jory Baron

 2          seriously and had a conversation with

 3          Leticia about everything.  I told her that I

 4          had to speak with Ishaque to discuss it, and

 5          in fact if she was owed anything, if she was

 6          owed anything, she would indeed get paid.

 7          It showed that she quit, and I wanted to

 8          discuss if any money to the penny was owed

 9          as well as that was the complaint in the

10          text message.

11               I did then reach out to her again, and,

12          and she was unable to take my call as you

13          can see, she was at work.  I reached out

14          about my availability for the text message

15          and then said to her, sent her a text

16          message and she said, ``Nevermind.  I plan to

17          go a different route.''

18               So, the answer that I promised to call

19          her on the 28th is in fact incorrect as seen

20          based on this message.  There was no contact

21          after this text message and no promise of

22          it.

23                    Q.  Let's backtrack for a second.

24          When you said that you took the text message

25          ``very seriously,'' can you take us and walk
```

A1802

Case 1:21-cv-07163-OEM-LB  Document 102-12  Filed 03/27/24  Page 62 of 117 PageID #: 2466

62

```
 1                    Jory Baron
 2          us through what specifically the steps were
 3          that were taken after you received this text
 4          message?
 5                    A.   In regard to the first text
 6          message, to clarify?
 7                    Q.   Right.  You were talking about
 8          how you took it very seriously, et cetera.
 9          Please walk us back to the first page after
10          you received this text message dated January
11          24th, which continues onto the second page.
12                    A.   Yes.
13                    Q.   What did you do?
14                    A.   I called Leticia and I wanted to
15          speak to her to see what she had to say. I
16          told her that I would have to speak with
17          Ishaque again, because I am not there
18          consistently, and the responsibility, again
19          it does not fall within my responsibility.
20          I had to find out from him in fact, if any
21          monies and so on and so forth was owed.  It
22          is not my practice to withhold money from
23          people, and indeed if it was owed to them.
24          Again, long story short, I just wanted to
25          speak to her and get her side and verify
```

A1803

63

```
 1                    Jory Baron
 2           with Ishaque.
 3                    Q.   When did you call her?
 4                    A.   So, I called her, I would say
 5           almost immediately after this text message.
 6           Shortly after the time stamp on this, and
 7           then after speaking with her, I immediately
 8           spoke with Ishaque.  Then, as seen by the
 9           text, I tried to call her back, and I guess
10           going back an hour or so after our initial
11           conversation in which she then -- you can
12           see her response.
13                    Q.   So, after you read the text
14           message, you did not text her back, instead
15           you called her; is that correct?
16                    A.   Yes.  It is much easier to speak
17           over-the-phone.
18                    Q.   Then, can you walk through with
19           me exactly what transpired during the
20           conversation; in other words, who spoke
21           first, who said what to whom and what was
22           said in response?
23                    A.   So, the summary, I cannot recall
24           who spoke first except for the niceties of
25           ''hi, how are you?  I am Jory, I am Jory
```

64

```
 1                    Jory Baron
 2           Baron.''
 3                    Again, I had not spoken or met her
 4           prior.  After the niceties are exchanged,
 5           there was just an exchange of information in
 6           terms of what was going on, what happened
 7           ''let me try to get to the bottom of it and I
 8           will speak to Ishaque to again see his side
 9           of the case, to see if indeed the
10           allegations were correct that were brought
11           forth in her text
12              Again, upon hanging up the phone on that
13           conversation, I would have looked into it
14           and called her back and I spoke to Ishaque,
15           and I did team call her back.
16                    Q.  Let's backtrack for a second.
17           What did she say to you during that
18           telephone conversation?
19                    A.  That she had quit and they just
20           wanted to make sure if she got the pay for
21           the deals that she believes she was
22           potentially owed on.  That her reason for
23           quitting was due to her pay.
24                    Q.  Did she say anything else to you
25           besides what you have already mentioned?
```

65

```
 1                    Jory Baron
 2              A.   Anything else?
 3              Q.   Yes, during that telephone
 4       conversation.
 5              A.   In regard to anything else
 6       pertaining to the above text, I can't recall
 7       any other niceties or former exchanges.
 8              Q.   During that conversation, you
 9       said that you were going to check with
10       Ishaque.  Did you at that time tell her that
11       you were going to get back to her, call her
12       back or what did you say?
13              A.   Yes, I said ''I would like to
14       speak to Ishaque,'' and then I would call her
15       back.
16              Q.   So, now let's turn to what
17       happened next; what happened next after you
18       hung up with Leticia, how soon thereafter
19       did you call Ishaque?
20              A.   Immediately.
21              Q.   Then, you called Ishaque on his
22       personal phone or did you call him on the
23       Hillside Auto number?
24                   MR. KATAEV:  Objection as
25                   to relevance. You can answer.
```

66

```
 1                    Jory Baron
 2                    MS. TROY:  If he knows.
 3            A.  Most likely it would've been on
 4       his cell phone but I can't recall
 5       specifically. Ishaque's cell phone, yes.
 6            Q.  Let's backtrack a second.  The
 7       516 840-2524 number, what service provider
 8       did you use, and let's start from back in
 9       2018/2019?
10            A.  I know that the number -- the
11       carrier was Verizon and it is still Verizon.
12            Q.  From 2018 until the present day,
13       has it always been Verizon?
14            A.  It had been AT&T, but I don't
15       know what time I switched.
16            Q.  Turning your attention back to
17       this period of time which is roughly
18       speaking from 2019 in January, were you in
19       fact using Verizon or was it AT&T?
20            A.  I would again believe it was
21       Verizon.  But, I cannot exactly say.  I
22       can't confirm it exactly.
23            Q.  When you said that you called
24       Ishaque , was it from your 516 840-2524
25       number that you called him?
```

67

```
 1                    Jory Baron

 2              A.  Yes.

 3              Q.  Just to clarify, the only

 4         communications you had with Ishaque on this

 5         day, which was January 24th, was by phone;

 6         is that correct?

 7              A.  I can't recall.  But, I do know

 8         that I did speak with him via phone, though.

 9              Q.  Let's take a look at the time

10         stamp 10:56 a.m.  Is that when you called

11         Ishaque?

12              A.  Shortly after receiving the text

13         message and after speaking with Leticia.

14                   MS. TROY:  Emanuel, what

15                   are you talking about with

16                   your witness?  I see that you

17                   are mumbling something.

18                   MR. KATAEV:  I didn't

19                   mumble anything.  I told him

20                   that there was a question

21                   pending and to wait for the

22                   question.

23                   MS. TROY:  If you are

24                   going to talk with the

25                   witness, it is going to have
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 68 of 117 PageID #: 2472

68

```
 1                    Jory Baron
 2                    to be part of the record.
 3                    For instance, if you have any
 4                    directions, please just
 5                    project so that the court
 6                    reporter can write it down,
 7                    your direction to the witness
 8                    on the record.  But, there
 9                    should not be any
10                    communications between you
11                    and the witness that the
12                    court reporter does not take
13                    down.
14                         MR. KATAEV:  That is fine.
15              Q.  When you called Ishaque, can you
16         walk me through what was said during that
17         telephone conversation?
18              A.  He had indicated as the text
19         message that was received, it indicated, and
20         he then told me that she had quit and that
21         there was no money owed to her at that
22         point.  I did infer to him should we find
23         that there were any deals that we should
24         make sure that she got paid.  He agreed, but
25         at that time to his knowledge, there was no
```

69

```
 1                      Jory Baron
 2        money owed to her.  Then, I would then
 3        communicate to her after speaking with him
 4        that anything that she had, that she
 5        would've had to follow-up with Ishaque.
 6        But, I had no role in helping resolve any
 7        issues.
 8                  Q.  What specifically did Ishaque
 9        say to you besides what you have already
10        mentioned?
11                  A.  Nothing that I can recall
12        specifically.  Again, most likely ''how are
13        you?''
14                  Q.  When you said that he indicated
15        with regard to the text messages that you
16        received, did you at any point whether prior
17        or after or during the telephone
18        conversation screenshot the text messages
19        and send it to Ishaque?
20                  A.  Not that I can recall.
21                  Q.  What was the conclusion at the
22        end of the telephone call between you and
23        Ishaque?
24                  A.  The conclusion that was most
25        likely no money was owed, but that we would
```

70

```
 1                    Jory Baron

 2          look into it and do our due diligence.  That

 3          I would then call Leticia back, which I did,

 4          to let her know the process that would take

 5          place.  Again, she was unable to answer my

 6          phone call in which she texted me back.  You

 7          can see my text message responses, and she

 8          no longer wanted to have communications with

 9          me post that last attempt.

10               Q.  To clarify, after your one phone

11          call with Leticia, were there any subsequent

12          phone call conversations between you and

13          her?

14               A.  I had my initial phone call and

15          I attempted to call her back.  As I said, I

16          like to try to rectify these situations and

17          her response was even in the text message,

18          she said, I said ``can I call you?'' and I'm

19          paraphrasing a little bit.  I don't have the

20          text message in front of me.  But, that was

21          the last attempt to communicate with her

22          aside from the text message saying that I

23          would be available for about 10 minutes or

24          the following day.  Again, I never shut

25          anyone down if they have issues that they
```

71

```
 1                     Jory Baron
 2         want to try to resolve.
 3                    Q.  Going back to telephone
 4         conversations you had with Leticia, did you
 5         at any point tell her to ''stop?''
 6                    A.  To stop what?
 7                    Q.  Did you say the word ''stop'' at
 8         all during that telephone conversation?
 9                    A.  No.  Most likely not at all.  I
10         like to hear everybody's point and then let
11         them speak. It's not in my nature to
12         interrupt or tell someone or tell them to
13         ''stop.''
14                    Q.  Did you ever tell her to ''stop
15         ranting'' during that telephone conversation?
16                    A.  No, I can hardly even remember
17         using the word ''rant'' in my life.
18                    Q.  Did you in fact pay any amount
19         that Leticia alleged that she was owed to
20         Leticia?
21                    A.  To the best of my ability,
22         Ishaque handled whatever monies were owed to
23         Leticia. That was to the best of my
24         understanding.
25                    Q.  To the best of your
```

72

```
 1                    Jory Baron
 2        understanding, after the telephone
 3        conversation between you and Ishaque, where
 4        you both sort of concluded that she was not
 5        owed any money, was any money paid to
 6        Leticia?
 7                 A.  I cannot recall, nor confirm.
 8        Again, I would just like to state that I had
 9        a conversation with Ishaque to look into the
10        matter further and let him make the decision
11        from there.
12                 Q.  Between January 24th when you
13        had this telephone conversation with Ishaque
14        until January 28th, did you and Ishaque have
15        any subsequent conversations either by phone
16        or in-person?
17                 A.  Not recalling specifically.  I
18        cannot recall.
19                 Q.  Subsequent to the January 24th
20        conversation between you and Ishaque that
21        you just mentioned, when was the next
22        conversation that you can recall between you
23        and Ishaque about Leticia?
24                 A.  Can you please re-ask the
25        question?
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 73 of 117 PageID #: 2477

73

```
 1                    Jory Baron
 2              Q.   Sure.  So, you had a
 3         conversation on January 24th with Ishaque
 4         about Leticia; is that correct?
 5              A.   That is correct.
 6              Q.   You said that you could not
 7         recall whether subsequent conversations with
 8         Ishaque took place.
 9            Now, my question for you is: of the
10         conversations that you can recall, when was
11         the next conversation, the date?
12              A.   I can't recall a specific date.
13         But, as my business partner, we obviously
14         did speak at some point after January 24th.
15              Q.   Was that specifically about
16         Leticia?
17              A.   Again, I am sure that we did
18         have a conversation.  I don't know
19         specifically, but that was put into his
20         hands to handle.
21              Q.   Let's backtrack for a second: do
22         you recall besides Leticia Stidhum, if there
23         were any female, any other female car
24         salespersons at Hillside Auto Outlet at the
25         time?
```

74

```
 1                    Jory Baron
 2              A.   I was not familiar with the
 3         staff at the time.  So, I can't answer that
 4         properly.
 5              Q.   Do you know who was the top car
 6         salesperson at the time at Hillside Auto
 7         Outlet?
 8              A.   I cannot recall, nor -- I said,
 9         nor was I familiar with the staff at that
10         time.
11              Q.   Now, turning your attention to
12         Leticia Stidhum, how was she as a car
13         salesperson?
14              A.   I cannot speak to that.  Again,
15         that was not my responsibility on a daily
16         role.
17              Q.   Turning your attention now to
18         again, the text message which was marked as
19         Plaintiff's Exhibit 14, to your knowledge,
20         did she sell 28 to 30 cars a month for
21         Hillside Auto Outlet?
22              A.   I cannot answer that question.
23         Again, I was unaware of who sold what during
24         that time.
25              Q.   How about the 5 percent on any
```

75

```
 1                    Jory Baron
 2          deal made that was over $3,000 or $3,500?
 3                  A.  That was not my responsibility.
 4          So, I was unaware of the pay plan.
 5                  Q.  At any time during your
 6          conversations with Ishaque, did you at any
 7          point mention to Ishaque that Leticia said
 8          that she sold 20 to 30 cars a month?
 9                  A.  I cannot specifically recall
10          that, any amount of units that she said she
11          sold.
12                  Q.  How about that she was number
13          one for sales for a good seven to eight
14          months?
15                  A.  Again, I cannot remember
16          specifically her status as a salesperson;if
17          it was just in this phone call in relation
18          to the amount of vehicles that she sold.
19                  Q.  How about that Ishaque refused
20          to pay her her last check that allegedly was
21          addressed during the phone call?
22                  A.  That allegation was addressed,
23          again, because I take these text messages
24          seriously and I wanted to make sure that
25          there were no issues.
```

76

```
 1                     Jory Baron
 2                     MR. KATAEV:  Can we take a
 3                break?
 4                     MS. TROY:  We're going to
 5                take a break in five minutes,
 6                give or take.
 7                     MR. KATAEV:  I have to use
 8                the restroom.
 9           Q.  How about 5 percent on any deal,
10      did you mention this during your
11      conversation with Ishaque?
12           A.  I cannot recall.
13           Q.  Did you mention that Leticia was
14      pregnant during your conversation with
15      Ishaque?
16           A.  I was unaware that she was until
17      the text message, and I cannot recall if
18      that was discussed.
19           Q.  The question is: during the
20      telephone conversation that you had with
21      Ishaque, did you mention just Leticia's
22      paycheck or was it Leticia as well as David
23      Manrique's paycheck?
24           A.  I can't recall.
25           Q.  How would you describe the tone
```

77

```
 1                    Jory Baron
 2         of the conversation, meaning between you and
 3         Leticia; what was her tone?
 4                 A.  I can't recall her tone.
 5                     MS. TROY:  Emanuel, do you
 6                     guys want to take 5 minutes
 7                     or 10 minutes or we can also
 8                     take lunch.  How much time do
 9                     you need?
10                     MR. KATAEV:  Let's come
11                     back at noon.
12                     MS. TROY:  Let's just come
13                     back at noon. And the time
14                     now is 11:47.
15                     We are going to try keep
16                     this short, Emanuel.
17                     (A recess was taken from
18                     11:47 a.m. until 12:00 p.m.)
19                     MR. KATAEV:  We are ready
20                     when you are.
21                     MS. TROY:  Demand Number 2
22                     will be for the calls from
23                     516 840-2524; the numbers
24                     that were called from and
25                     everything other than the
```

78

```
 1                        Jory Baron
 2                          calls to Leticia including
 3                          any representative and
 4                          parties of this lawsuit,
 5                          including Ishaque Thanwalla
 6                          and plaintiff Leticia Stidhum
 7                          can be redacted.
 8                              MR. KATAEV:  Please
 9                          follow-up in writing.  Thank
10                          you.
11                  Q.  Mr. Baron, do you recall how
12          long the conversation was between you and
13          Leticia?
14                  A.  I cannot recall.
15                  Q.  Do you recall how long the
16          conversation between you and Ishaque was?
17                  A.  I cannot recall.
18                  Q.  Earlier during this deposition,
19          you mentioned that you had reviewed the
20          Interrogatories; is that correct?
21                  A.  That is correct.
22                  Q.  Did you review both the
23          Interrogatories and the Supplemental
24          Interrogatories?
25                  A.  Yes.
```

79

```
 1                    Jory Baron
 2              Q.  To the best of your knowledge,
 3         is everything contained in the
 4         Interrogatories and the Supplemental
 5         Interrogatories; correct?
 6            A.  Yes.
 7              Q.  How about for the document
 8         production responses and the supplemental
 9         document responses; to your knowledge, is
10         the information contained in both of those
11         documents; correct?
12                A.  Yes.
13              Q.  As to the document production
14         responses as well as the supplemental
15         document production responses that had to do
16         with the actual operations, as well as the
17         employment records at Hillside Auto Outlet
18         for that type of response, to the best of
19         your knowledge, did you, yourself have any
20         personal knowledge of that?
21                A.  Can you clarify or repeat the
22         question?
23                     MS. TROY:  Sure, Ms.
24                     Luckman.  If you don't mind
25                        reading back the last
```

80

```
 1                    Jory Baron
 2                       question.
 3                          (The reporter read back the
 4                          last question)
 5                 A.  I would be lying if I didn't say
 6           that.  I was confused by the question.  If
 7           you can repeat it one more time.
 8                          (The reporter read back the
 9                          requested question again)
10                 A.  (continuing) Not -- I would have
11           to guess about the legal language, but I
12           apologize. To the best of my knowledge that
13           I can recall, again, there were certain
14           things that were not my responsibility and I
15           had to trust the people that provided those
16           said documents.
17                 Q.  Who were the said people that
18           provided those documents; to clarify, let's
19           start with the employment records?
20                 A.  So, Deana at that time.
21                 Q.  How about documents like the
22           sales records, do you, yourself have any
23           personal knowledge about what documents
24           pertain to what response?
25                 A.  That was not within my realm of
```

81

```
 1                      Jory Baron

 2          responsibility.

 3                      Q.  For those responses, you

 4          basically relied upon Ishaque and Deana to

 5          provide the appropriate responses; is that

 6          correct?

 7                      A.  For those records, that is

 8          correct.

 9                      Q.  Are you familiar with who was

10          given access to the Dealertrack system at

11          Hillside Auto Outlets?

12                      A.  No.

13                      Q.  If I were to show you paperwork

14          from Hillside Auto Outlet car salespeople,

15          would you be able to describe the pay stub

16          for me?

17                      A.  I am not familiar with the pay

18          stub, just involved in relation to Hillside.

19                      Q.  Do you know how to read a pay

20          stub, but you don't have specific personal

21          knowledge as to how employees were paid at

22          Hillside Auto Outlet; is that correct?

23                      A.  Yes, that was not within the

24          realm of my responsibilities.

25                      Q.  Are you familiar with a person
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 82 of 117 PageID #: 2486

82

```
1                        Jory Baron
2             by the name of Jeanique?
3                      A.  I am not familiar with that
4             person.
5                      Q.  How many days of the week did
6             Hillside employees work?
7                      A.  I'm not sure of employee's
8             schedule.
9                      Q.  What is your birthday?
10                     A.  My birthday?
11                     Q.  Yes.
12                     A.  March 2nd, of 1988.
13                     Q.  Are you familiar with David
14            Manrique?
15                     A.  I can't recall.
16                     Q.  Do you recall when Ishaque
17            traveled to Pakistan at the end of 2018?
18                     A.  I can't recall.
19                     Q.  Do you recall if employees were
20            provided with a particular break time at
21            Hillside Auto Outlet?
22                     A.  I cannot speak to the day-to-day
23            operations within the store.
24                     Q.  What, if any, policies were in
25            place at Hillside Auto Outlet with respect
```

A1823

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 83 of 117 PageID #: 2487

83

```
 1                    Jory Baron
 2          to discrimination?
 3                    A.  New York State Labor Law and all
 4          of the laws had to be provided, and a poster
 5          had to be provided.
 6                    Q.  Besides the poster, were there
 7          any other policies that were in place?
 8                    A.  I cannot speak to the day-to-
 9          day.
10                    Q.  Have you ever interviewed any
11          potential hires for Hillside Auto Outlet?
12                    A.  No.
13                    Q.  How about for Hillside Auto
14          Mall?
15                    A.  No.  I have nothing to do with
16          that store.
17                    Q.  Are you familiar with an
18          employee by the name of Lily who is a DMV
19          clerk at Hillside Auto Outlet?
20                    A.  No, I cannot recall.
21                    Q.  Do you recall if said employee
22          made a complaint about losing her job
23          because she was pregnant?
24                    A.  That was not part of my day-to-
25          day responsibilities and I cannot speak to
```

84

```
 1                    Jory Baron
 2        that.
 3                    Q.  Do you recall if there was a
 4        robbery that took place at Hillside Auto
 5        Outlet?
 6                    A.  I cannot recall.
 7                    Q.  Earlier you mentioned that you
 8        recognize the name Andris Guzman. What is
 9        your knowledge as to Andres Guzman's role
10        within Hillside Auto Outlet?
11                    A.  I am not familiar with nor was I
12        familiar with his role within the
13        dealership.
14                    Q.  Understood.  You don't recognize
15        his name?
16                    A.  I recognize it, I saw it in the
17        lawsuit.
18                    Q.  So, you are only recognizing his
19        name because he is part of the lawsuit; is
20        that correct?
21                    A.  I cannot recall his name prior.
22                    Q.  Are you familiar with a program
23        called VIN V-I-N Solutions?
24                    A.  Yes, VIN Solutions, I am
25        familiar.
```

A1825

85

```
 1                    Jory Baron
 2              Q.  To your knowledge, what is that
 3      program?
 4              A.  It is a program that is
 5      predominantly used in the industry.
 6                    MR. KATAEV:  Let the
 7                    record reflect that the
 8                    plaintiff has now joined in
 9                    this virtual deposition by
10                    and through her cell phone.
11                    I'm just noting for the
12                    record that the, she has just
13                    come back onto the record at
14                    12:13 p.m.
15              Q.  What is your knowledge of VIN
16      Solutions, is it used within Hillside Auto
17      Outlet?
18              A.  I'm not familiar with the day-
19      to-day usage within the store.
20              Q.  Is it fair to say that VIN
21      Solutions did not log, does not log all the
22      customers because the customers would
23      include walk-in customers?
24              A.  VIN Solutions is reliance on
25      certain salespeople's inputs.
```

86

```
 1                    Jory Baron
 2              Q.  In other words, VIN Solutions
 3       required manual entries by the car
 4       salespeople; is that correct?
 5              A.  It does require manual entries
 6       by the salespeople.
 7              Q.  Is it accurate to say that VIN
 8       Solutions typically understates the actual
 9       number of cars sold?
10                    MR. KATAEV:  Objection to
11                    the form.  You can answer.
12              A.  There is a discrepancy between
13       the salesperson's input and the connection
14       to the DMS.  It is quite accurate for the
15       DMS.  It could also vary, but it is
16       typically quite accurate due to its
17       connection with the DMS.
18              Q.  What is your knowledge of
19       Leticia's performance at Hillside Auto
20       Outlet?
21              A.  I'm unaware of her sales
22       performance.
23              Q.  To your knowledge, was Leticia
24       ever disciplined?
25              A.  I cannot recall nor speak to
```

87

```
 1                    Jory Baron
 2          that.
 3                    Q.  Do you know if she was ever
 4          suspended?
 5                    A.  Again, I was not involved in the
 6          day-to-day, and I cannot speak to that.
 7                    Q.  During your time as a
 8          shareholder of Hillside Auto Outlet, were
 9          employees ever given written performance
10          evaluations?
11                    A.  I was not responsible for the
12          day-to-day activities and I cannot speak to
13          that.
14                    Q.  Are you familiar with an
15          individual by the name of David Parsons?
16                    A.  Can you please repeat the last
17          name?
18                    Q.  Parsons.
19                    A.  I am not familiar with that
20          person.
21                    Q.  How about an individual by the
22          name of Sean or Shane, was he ever a car
23          salesperson who worked at Hillside Auto
24          Outlet?
25                    A.  No, I cannot recall any
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 88 of 117 PageID #: 2492

88

```
 1                    Jory Baron
 2         familiarity with him.
 3                    Q.  To your knowledge, did Leticia
 4         run the credit at Hillside Auto Outlet?
 5                    A.  I cannot speak to that due to my
 6         lack of role in the day-to-day
 7         responsibilities.
 8                    Q.  To your knowledge, besides the
 9         January 24th phone call that you described
10         for us earlier, were there any other
11         conversations that you had with Leticia
12         subsequently?
13                    A.  Not as shown in the text
14         messages.  She essentially -- she stated
15         that there was no further need to
16         communicate.
17                    Q.  Do you recall what the time was
18         for that text message, when was that text
19         message received from Leticia?
20                    A.  Which text message? From Leticia
21         to me or from me to Leticia?
22                    Q.  From her to you.
23                    A.  Everything took place within --
24                    Q.  Let me just show you so that we
25         are clear.  We're going to take a lunch
```

A1829

89

```
 1                    Jory Baron

 2           break shortly and I just ask you to search

 3           on your phone if you still have the text

 4           messages and please give it to Emanuel and

 5           Emanuel will be able to provide the text

 6           messages to the office.  There are just some

 7           questions with respect to the completeness

 8           as well as other questions that are raised

 9           with respect to the production in its

10           current form.

11                         MR. KATAEV:  Hold on, I

12                         have to say something.  The

13                         witness will not, does not

14                         have his phone with him.  We

15                         will ask you to follow-up in

16                         a written demand and we will

17                         respond.

18                    Q.  Mr. Baron, you don't have your

19           phone on you?

20                    A.  No.  I did not want to be

21           distracted during today's deposition.

22                    Q.  Where is your phone?

23                    A.  It is currently at home.

24                    Q.  Did someone tell you to leave

25           your phone at home for today's deposition?
```

90

```
 1                    Jory Baron
 2            A.   I have a secondary number that I
 3       use for my work purposes, for messages.  So,
 4       that's the phone that I typically carry.
 5            Q.   Let's backtrack for a second.
 6       So, you said that you have two phones?
 7            A.   I am now stating yes, but it did
 8       not come up before.  I have recently gotten
 9       a secondary number this year, yes.
10            Q.   So, the secondary number is for
11       non-emergencies or emergencies?
12            A.   No, it's not emergencies, it's
13       the work phone.  So, if I need it for
14       messages or the contact with my wife.  And
15       it's okay,  not for contacts, just such as
16       for my wife, not customers.
17            Q.   Then you also have a work phone;
18       is that correct?
19            A.   Yes.  I wouldn't designate my
20       work phone, but I use the 840-2524 for work
21       due to privacy.
22            Q.   So, you have two phones, and one
23       is the 516 840-2524 phone?  That is the
24       phone that you use to text and call Leticia,
25       and you recently obtained a non-work phone,
```

91

```
1                      Jory Baron
2          which is basically for your family; is that
3          correct?
4                      A.  Yes.  I was receiving calls and
5          texts at all hours of the day and it was
6          becoming quite annoying, to be honest.  A
7          secondary number gives me peace.
8                      Q.  What you brought today is your
9          non-work phone and what you left at home was
10         your work phone?
11                     A.  I would not designate it as a
12         work phone, I would designate it as a second
13         number, but yes.
14                     Q.  When did you obtain your non-
15         work phone?
16                     A.  A few months ago.
17                     Q.  So, as to any conversations that
18         occurred via the phone with the plaintiff or
19         with any of the co-defendants with respect
20         to the present discrimination claim, the
21         pregnancy discrimination claim, that
22         would've occurred on your other phone and
23         not the phone that you brought today; is
24         that correct?
25                     A.  That is correct.
```

92

```
 1                         Jory Baron

 2                              MS. TROY:  Demand number 3

 3                         will be for the full and

 4                         complete text messages

 5                         between Jory Baron and

 6                         Leticia Stidhum.  The

 7                         timeframe will be essentially

 8                         from January of 2019 to the

 9                         present day.  But,

10                         specifically, we are looking

11                         for any messages that may

12                         have been sent or received

13                         after the third page, which

14                         was cut off, and produced

15                         only this morning.

16                    Q.  Do you recall when you sent this

17           text message that is on the screen?  For the

18           record, we are looking on page 3 of

19           Plaintiff's Exhibit 14.  I am talking about

20           the message right after the gray message,

21           which is timestamped Thursday, January 24th

22           at 12:50 p.m.  The reply, that message does

23           not have a timestamp.

24                    A.  So, I can only assume that it

25           was shortly after her 12:50 text.
```

93

```
 1              Jory Baron
 2              Q.  How about the message that
 3      happened after the gray message that begins
 4      ``okay, give me a second to step out.''
 5              A.  I can again only assume because
 6      I was only available for 10 minutes and
 7      responded immediately on the same day.
 8      Then, as you can see she then wrote her
 9      response thereafter.
10              Q.  Do you know what was the time
11      between the two gray messages?
12              A.  I cannot give you specifics.
13      But, I can tell you that it was not very
14      long.
15                      MS. TROY:  Let's now just
16                  take a quick lunch break from
17                  now to what time is good for
18                  everyone?
19                      MR. KATAEV:  We're going
20                  to go outside the building.
21                  It's probably going to take a
22                  little bit longer.
23                      Let's come back then at
24                  1:15.
25                      (A recess was taken from
```

94

```
 1                    Jory Baron
 2                12:30 p.m. until 1:16 p.m.)
 3                    MS. TROY:  It is now 1:16
 4                    and we are back on the
 5                    record.
 6             Q.  Are you familiar with an
 7        individual by the name of Ali A-L-I R-A-S-K-
 8        E-S-N-I-A?
 9             A.  To answer your question, no, I
10        am not familiar with that name.
11             Q.  How about Iris Serrano, S-E-R-R-
12        A-N-O?
13             A.  Iris?  No, I am not familiar
14        with that name.
15             Q.  Let's backtrack for a second.
16        Before the break you mentioned an individual
17        by the name of Jeanique.  For context,
18        Jeanique was the manager at Hillside Auto
19        Outlet, and let me just ask you again: are
20        you familiar with that individual?
21             A.  No, I'm not familiar with that
22        individual.
23                 Again, sporadically again, maybe I
24        saw a face, but the name, no.
25                    MS. TROY:  Let's mark
```

95

```
 1                    Jory Baron

 2                       Plaintiffs 15.

 3                       (Plaintiffs Exhibit 15 marked

 4                       for identification.)

 5               Q.  I am now showing you Plaintiff's

 6          Exhibit 15, a Verification.

 7               A.  Yes.

 8               Q.  Do you recognize your signature

 9          on this page?

10               A.  Yes, I do.

11               Q.  Do you recall when you signed

12          this document?

13               A.  I can't give you the exact date.

14          But, it was not too long ago.

15                    MR. KATAEV:  I can

16                    represent for the record,

17                    that it was the day that I

18                    emailed to you, I think it

19                    was February 3rd, Friday,

20                    February 3rd I believe.

21                    MS. TROY:  Okay.  For the

22                    record, I still have not

23                    received the Verification of

24                    Deana Jennings and Andris

25                    Guzman.
```

96

```
 1                    Jory Baron

 2                         MR. KATAEV:  I received

 3                    it, I have not forwarded to

 4                    you and I should have

 5                    Guzman's, you should have it

 6                    on Monday.  Also, maybe I

 7                    will stay with him today and

 8                    get his notarized and I'll

 9                    work on the others as well.

10                         MS. TROY:  That is fine.

11                    I have no other questions for

12                    you.  Thank you for your

13                    time.

14                         THE WITNESS:  No problem.

15

16           [Time noted: 1:20 p.m.]

17

18

19

20

21

22

23

24

25
```

97

```
 1
 2
 3    WITNESS              EXAMINATION BY              PAGE
 4    Jory Baron          Ms. Troy                     23
 5                        PLAINTIFF EXHIBITS
 6       Number              Description              PAGE
 7
 8       EX 13         Mr. Baron's driver's license     6
 9              (To be Deemed marked)
10       EX 14         D1905 to D1907                  56
11       EX 15         Verification                    94
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

98

```
 1

 2

 3                         REQUESTS

 4      Number            Description                PAGE

 5         1     MS. TROY:  Demand No. 1 is,          6

 6                I'm going to make a demand

 7                for Mr. Baron's driver's license.

 8         2     MS. TROY:  Demand No. 2 is,         56

 9                Emanuel, are you going to

10                produce the full text messages?

11         3     MS. TROY:  Demand No. 3 is,         78

12                the calls from 516 840-2524.

13                The numbers that were called

14                from and everything other

15                than the calls to Leticia

16                including any representative

17                and parties of this lawsuit,

18                including Ishaque Thanwalla

19                and plaintiff Leticia Stidhum

20                can be redacted.

21         4     MS. TROY:  Demand No. 4 is,         92

22                for the full and complete

23                text messages between Jory

24                Baron and Leticia Stidhum.

25                The timeframe will be
```

99

```
 1
 2              essentially from January
 3              of 2019 to the present day.
 4              But, specifically, we are
 5              looking for any messages
 6              that may have been sent or
 7              received after the third page,
 8              which was cut off, and produced
 9              only this morning.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:21-cv-07163-OEM-LB   Document 102-12   Filed 03/27/24   Page 100 of 117 PageID #: 2504

100

1

2          QUESTIONS MARKED FOR A RULING:      PAGE/LINE

3       (None)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

101

```
 1
 2                        ACKNOWLEDEGMENT
 3

 4      STATE OF NEW YORK  )
 5                         )s.s.
 6      COUNTY OF SUFFOLK  )
 7             I, JORY BARON, hereby certify that
 8      I have read the transcript of my testimony
 9      taken under oath in my deposition of March
10      03, 2023; that the transcript is a true,
11      complete and correct record of my
12      testimony, and that the answers on the
13      record as given by me are true and correct.
14

15

16            _____
17                      JORY BARON
18

19      Signed and subscribed before me
20      this _____ day of _____, 2023.
21

22

23      _____
24            Notary Public
25
```

A1842

102

```
 1                  C E R T I F I C A T E

 2

 3      STATE OF NEW YORK      )

 4                             )s.s.

 5      COUNTY OF NASSAU       )

 6

 7                I, LYNN LUCKMAN, a Shorthand

 8      Reporter and Notary Public within and for

 9      the State of New York, do certify that;

10                THAT the witness whose deposition

11      is hereinbefore set forth, was duly sworn by

12      me, and that such deposition is a true

13      record of the testimony given by such

14      witness.

15                I further certify that I am not

16      related to any of the parties to this action

17      by blood or marriage; that I am in no way

18      interested in the outcome of this matter.

19                IN WITNESS WHEREOF, I have

20      hereunto set my hand this 20th day of March,

21      2023.

22

23      _____

24                LYNN LUCKMAN

25
```

103

```
1    Errata Sheet

2

3    NAME OF CASE: LETICIA FRANCINE STIDHUM -against- 161-10 HILLSIDE AUTO AVE, LLC

4    DATE OF DEPOSITION: 03/03/2023

5    NAME OF WITNESS: JORY BARON

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                     _____
```

**Exhibits**

**Ex 14 -**
**JORY BARON**
57:22,23 58:2,3
74:19 92:19

**Ex 15 -**
**Jory Verification**
95:3,6

**$**

**$3,000** 75:2

**$3,500** 75:2

**1**

**10** 70:23 77:7 93:6

**10:03** 7:9

**10:06** 7:13

**10:23** 20:2

**10:30** 51:14

**10:32** 21:7

**10:34** 22:14

**10:35** 22:15,18

**10:56** 67:10

**11743** 23:7

**11:47** 77:14,18

**12:00** 77:18

**12:13** 85:14

**12:30** 94:2

**12:50** 92:22,25

**13** 6:7,8

**14** 57:22,23 58:3
74:19 92:19

**15** 95:2,3,6

**161-10** 29:4,5,10
31:3,19 42:13 44:8
45:23

**179-10** 42:23

**1988** 82:12

**1:15** 93:24

**1:15-CV-727**
11:21

**1:16** 94:2,3

**2**

**2** 42:16,22 43:2,9
44:10 45:20 47:14
51:19 77:21

**20** 75:8

**2018** 33:19 34:2,
15 36:7 45:2,21
66:12 82:17

**2018/2019** 33:9,
11 38:19,23 49:20
66:9

**2019** 33:19 34:2,
15 36:7 45:2,21
58:13 59:6,9 66:18
92:8

**2021** 46:3

**21** 23:6

**24th** 55:24 62:11
67:5 72:12,19
73:3,14 88:9 92:21

**25** 31:9 43:18,24

**2524** 59:17

**28** 74:20

**28th** 61:19 72:14

**2nd** 82:12

**3**

**3** 92:2,18

**30** 74:20 75:8

**35** 30:8,10

**3rd** 95:19,20

**5**

**5** 16:21 30:14
31:17 33:16 74:25
76:9 77:6

**516** 58:8 59:16
66:7,24 77:23
90:23

**8**

**840-** 59:16

**840-2524** 58:8
66:7,24 77:23
90:20,23

**A**

**A** 7:8,13,20 77:17
93:25

**A-L-I** 94:7

**A-N-O** 94:12

**A.i** 60:15

**a.m.** 7:9,14 21:7
22:14,18 67:10
77:18

**Aaronson** 43:16,
22 44:4,21 45:5
46:13

**ability** 71:21

**able** 81:15 89:5

**above** 65:6

**accept** 12:21,23

**acceptable** 5:8

**access** 81:10

**accurate** 57:5
86:7,14,16

**Action** 24:3 28:25

**activities** 87:12

**actual** 79:16 86:8

**actually** 39:18

**add** 13:4

**addition** 30:12

**address** 14:2 16:9
18:14 20:6 23:5
30:7,11,12 42:21,
25

**addressed** 75:21,
22

**addressing** 24:5

**adjourned** 22:5

**adversely** 37:15

**advise** 22:6

**advised** 5:21

**affect** 37:8,15

**affirm** 28:5

**after** 22:20 46:3
51:13 52:18,25
57:8 59:23 60:9,16
61:21 62:3,9 63:5,
6,7,10,13 64:4
65:17 67:12,13
69:3,17 70:10 72:2
73:14 92:13,20,25
93:3

**again** 11:6 17:10
19:11 27:10 33:22
34:2 37:17 39:10,
11,20 40:2 41:7
48:4 50:2,10 59:13
60:15 61:11 62:17,
18,24 64:3,8,12
66:20 69:12 70:5,
24 72:8 73:17
74:14,18,23 75:15,
23 80:9,13 87:5
93:5 94:19,23

**ago** 31:17 33:17
36:2 91:16 95:14

**agree** 28:12

**agreed** 15:10
52:13 68:24

**ahead** 44:22

**Ali** 94:7

**alive** 45:16

**all** 7:4,12 13:22
14:11 15:21 27:18
41:18 42:2 71:8,9
83:3 85:21 91:5

**allegation** 75:22

**allegations** 27:19
58:25 60:16 64:10

**alleged** 71:19

**allegedly** 75:20

**allow** 11:15

**almost** 63:5

**along** 15:21

**already** 19:6
64:25 69:9

**also** 7:18 24:2
43:2 57:3,6 58:3
77:7 86:15 90:17

**always** 66:13

**am** 8:6 10:2,21
11:15 12:10 17:16,
22 20:18 22:5
31:6,9 39:19
48:11,19 50:21
60:19 62:17 63:25
73:17 81:17 82:3
84:11,24 87:19
90:7 92:19 94:10,
13 95:5

**amongst** 46:6

**amount** 41:5
71:18 75:10,18

**an** 11:16 19:2
26:2,7 36:3 63:10
64:5 83:17 87:14,
21 94:6,16

**Andres** 84:9

**Andris** 48:18 84:8
95:24

**annoying** 91:6

**another** 18:13
56:7

**answer** 23:22
24:15,20 25:9 26:3
29:13,24 32:18
34:11 36:17 39:9,
18,25 40:22 41:4
43:14 47:23 49:6
53:7 54:4 58:7
59:24 61:18 65:25
70:5 74:3,22 86:11
94:9

**answered** 36:13
39:8,15 47:22 53:6
60:18

**answering** 24:23
25:10

**any** 8:23 17:2
21:7 26:14,19,21
27:15 28:7,15
42:14 43:7 44:11
45:6 46:5 49:8
52:17 53:19,25
54:14,21 55:3,4
61:8 62:20 65:7
68:3,9,23 69:6,16

105Index: anyone–but

70:11 71:5,18 72:5,15 73:23 74:25 75:5,6,10 76:9 78:3 79:19 80:22 82:24 83:7,10 87:25 88:10 91:17,19 92:11

**anyone** 27:2 42:4,8 55:7 70:25

**anything** 46:7 60:21 61:5,6 64:24 65:2,5 67:19 69:4

**anywhere** 30:3,11

**apologize** 19:12 32:8 42:15 80:12

**apparently** 5:20

**Appeal** 12:19

**appearing** 7:25

**appears** 56:4 60:22

**appropriate** 14:6 17:19 81:5

**Approximately** 31:17

**area** 49:12,13

**arise** 34:8

**around** 51:14

**arrested** 28:20

**as-** 33:4

**aside** 70:22

**ask** 14:12,18 23:22 24:9 25:11 47:2 48:12 54:9 89:2,15 94:19

**asked** 5:19,22 10:15 15:3,21,23 20:4 36:13 39:8,15 46:12 47:22 53:6 60:18

**asking** 9:17 11:22 24:21 39:20

**aspect** 34:22 39:12

**aspects** 38:5

**assume** 20:7

92:24 93:5

**at** 7:9,13 8:15 10:11,15 13:22 15:7,9 19:20 20:15 24:19 29:5,21 30:12 31:19 32:24 33:8 34:13,14 35:25 37:4,18 38:4,18,22 40:14 41:18 42:3 44:13,15 45:5,14 48:14 49:4 50:4,9 52:2 53:22 61:13 65:10 67:9 68:21,25 69:16,21 71:5,7,9 73:14,24 74:3,6,9 75:5,6 77:11,13 79:17 80:20 81:10,21 82:17,20,25 83:19 84:4 85:13 86:19 87:23 88:4 89:23,25 91:5,9 92:22 93:23 94:18

**AT&T** 66:14,19

**attempt** 70:9,21

**attempted** 70:15

**attend** 30:23

**attendance** 54:2

**attended** 46:21

**attention** 43:20 45:13 46:14 47:16 66:16 74:11,17

**attorney** 25:13,15 26:25 27:6,7,12 32:7

**authority** 9:23 17:19,23 39:6,22

**Auto** 29:5,6,11,12,17 31:3,19 33:8 36:2 37:10,19 38:4,18,22 40:15 41:22 42:3,9,13,16,22 43:2,8,21 44:8,9,10,15 45:4,23 46:8,25 47:11,13,18,20,25 48:3,6,10,14,15,22 49:4,9,24 50:4,9 51:3 52:3,9 53:22 65:23 73:24 74:6,21 79:17 81:11,14,22 82:21,25 83:11,

13,19 84:4,10 85:16 86:19 87:8,23 88:4 94:18

**availability** 61:14

**available** 70:23 93:6

**Ave** 29:11

**Avenue** 29:5,11 31:3,20 42:14 44:9 45:23

**aware** 48:16 53:21

**away** 45:19

**B**

**B-A-R-O-N** 22:19

**Bachelor's** 30:22

**back** 19:9,16 22:16 36:7 43:20 45:2 49:13,20 59:6,21 62:9 63:9,10,14 64:14,15 65:11,12,15 66:8,16 70:3,6,15 71:3 77:11,13 79:25 80:3,8 85:13 93:23 94:4

**backtrack** 45:18 55:14 57:11 61:23 64:16 66:6 73:21 90:5 94:15

**bad** 20:19

**bank** 52:15

**Baron** 5:1,13 6:1,22 7:1 8:1,17 9:1,5,9,13 10:1,24 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,20 19:1 20:1,21 21:1 22:1 23:1,3,10 24:1 25:1 26:1 27:1,22,24 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,15,23 44:1 45:1,14,15 46:1,4,5,15,16,22 47:1 48:1 49:1 50:1

51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1,2 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1,11 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1,18 90:1 91:1 92:1,5 93:1 94:1 95:1

**Baron's** 6:4

**based** 50:21 56:25 61:20

**basically** 81:4 91:2

**basis** 31:23 32:2,13,14,19 33:10,13,20,25 34:3

**became** 35:25

**because** 5:7 9:10 15:12 20:15 60:8 62:17 75:23 83:23 84:19 85:22 93:5

**become** 18:25

**becoming** 91:6

**been** 10:15 12:15 22:20 23:13 28:20,23 36:3 45:8 66:3,13,14 92:12

**before** 15:2 23:13,14 24:21 25:10 26:12 28:11,21 60:7 90:8 94:16

**began** 31:10 55:11,13

**beginning** 29:21 30:13 31:13 35:24

**begins** 93:3

**behalf** 8:2 42:9

**being** 7:8 12:14 13:2,6 18:7 20:4 40:25 60:2

**believe** 20:23 21:17 35:19 42:23,24 49:12 56:19

57:3,15 66:20 95:20

**believes** 64:21

**besides** 26:25 28:12,24 30:10 42:13 43:7 44:8 64:25 69:9 73:22 83:6 88:8

**best** 71:21,23,25 79:2,18 80:12

**between** 10:10 17:2 25:8 45:21 46:6 68:10 69:22 70:12 72:3,12,20,22 77:2 78:12,16 86:12 92:5 93:11

**birthday** 82:9,10

**bit** 70:19 93:22

**block** 47:7 48:14

**bonus** 50:3,7,13

**both** 17:8 19:17 72:4 78:22 79:10

**bottom** 56:20 64:7

**brain** 53:16

**break** 25:2,5,8,11 28:4 76:3,5 82:20 89:2 93:16 94:16

**bring** 5:24 48:13

**brought** 17:5 24:2 47:25 48:4,10 58:25 59:14 64:10 91:8,23

**building** 93:20

**busier** 37:18

**busiest** 37:21

**business** 30:21 31:13,16 37:15 41:6 44:7,10 73:13

**businesses** 47:15

**but** 11:3 16:11 17:3,18 24:4 31:12 33:17 35:7 37:17 39:8 40:22 42:24 43:5 46:13 48:2 55:2 56:9 57:19

106Index: call–customer

58:12 59:9,11 60:7
66:4,14,21 67:7
68:8,24 69:6,25
70:20 73:13,19
80:11 81:20 86:15
90:7,20 91:13 92:9
93:13 94:24 95:14

**C**

**call**  6:25 7:8,13
8:21 16:19 25:5
34:23 53:15 61:12,
18 63:3,9 64:15
65:11,14,19,22
69:22 70:3,6,11,
12,14,15,18 75:17,
21 88:9 90:24

**called**  8:15 34:25
36:4 46:25 62:14
63:4,15 64:14
65:21 66:23,25
67:10 68:15 77:24
84:23

**calls**  77:22 78:2
91:4

**came**  59:8

**can**  5:9 6:25 7:12
12:17 13:4 16:20
24:18 25:8,21
29:13,24 32:14,18
33:3,15 34:11
35:4,20 36:21
37:12,14 39:9,25
40:22 41:4,12
43:4,13 46:9 47:22
48:7 53:4,6,12
57:3,5 58:6 61:13,
25 63:11,18 65:25
68:6,15 69:11,20
70:7,18 71:16
72:22,24 73:10
76:2 77:7 78:7
79:21 80:7,13
86:11 87:16 92:24
93:5,8,13 95:15

**can't**  36:9,16
58:11 65:6 66:4,22
67:7 73:12 74:3
76:24 77:4 82:15,
18 95:13

**cannot**  33:14,22
34:4 36:16 37:20
38:24 44:23 45:25

46:18,23 48:23
49:2,6,18 50:2
53:2 54:4,17 59:9,
13,24 63:23 66:21
72:7,18 74:8,14,22
75:9,15 76:12,17
78:14,17 82:22
83:8,20,25 84:6,21
86:25 87:6,12,25
88:5 93:12

**car**  6:14,16 15:14,
17 33:6 36:19,21,
24 37:9 40:14
41:24 48:12 49:23
52:18 73:23 74:5,
12 81:14 86:3
87:22

**carefully**  39:4,17

**carrier**  66:11

**carries**  26:11

**carry**  90:4

**cars**  33:12 36:8
43:3,4 47:12,19
48:14 74:20 75:8
86:9

**case**  10:12 11:18,
19 12:13 16:17
19:16 20:12,25
23:16 27:20 64:9

**cases**  16:21

**cash**  32:22 40:18,
19,24 41:9

**cell**  28:16 58:4
59:25 66:4,5 85:10

**certain**  32:22 37:3
41:23 59:23 60:9
80:13 85:25

**certification**
17:20

**cetera**  62:8

**changed**  59:24
60:2,8

**charge**  39:12

**chat**  28:6

**check**  42:24 60:12
65:9 75:20

**checks**  31:22

**Christmas**  37:16

**citing**  16:16

**CIV**  11:20

**claim**  24:4,6
91:20,21

**claiming**  17:16

**claims**  23:25

**clarify**  54:23 55:8
62:6 67:3 70:10
79:21 80:18

**clear**  8:20 23:24
35:14,18 88:25

**clearly**  24:15

**clerk**  8:19 83:19

**client**  12:16 17:10
18:8,9 56:19

**client's**  56:25

**clock**  53:21,22

**closer**  35:8,16

**co-**  48:17

**co-defendants**
91:19

**College**  30:18

**come**  19:9 33:3
77:10,12 85:13
90:8 93:23

**comes**  21:2

**commissions**
49:23

**communicate**
28:5 69:3 70:21
88:16

**communications**
27:6,11 54:21 67:4
68:10 70:8

**companies**  47:14

**company**  31:3
43:25 45:15 46:24
47:4,6

**company's**  42:14

**compel**  12:3

**complaint**  61:9
83:22

**complete**  52:22,
25 92:4

**completely**  26:23
53:8

**completeness**
89:7

**computer**  28:15

**concluded**  72:4

**conclusion**
69:21,24

**condition**  26:21

**conditions**  26:20

**conducted**  12:14

**conference**  8:14

**confidentially**
60:24

**confirm**  6:2,19
57:4 66:22 72:7

**confused**  80:6

**connection**
86:13,17

**consistently**
62:18

**constantly**  60:2

**contact**  55:2
61:20 90:14

**contacting**  16:23

**contacts**  90:15

**contained**  79:3,
10

**contains**  13:24
14:2,4

**contents**  27:5,11
49:17

**context**  94:17

**continues**  62:11

**continuing**  30:21
44:23 80:10

**conversation**
61:2 63:11,20
64:13,18 65:4,8
68:17 69:18 71:8,
15 72:3,9,13,20,22
73:3,11,18 76:11,
14,20 77:2 78:12,

16

**conversations**
31:25 32:16 55:3,
6,11,12 59:3 70:12
71:4 72:15 73:7,10
75:6 88:11 91:17

**convinced**  20:18

**corporate**  29:9

**corporations**
44:12

**correct**  8:25
35:23 45:16 55:25
57:8,10 59:12
60:11 63:15 64:10
67:6 73:4,5 78:20,
21 79:5,11 81:6,8,
22 84:20 86:4
90:18 91:3,24,25

**correctly**  49:15

**could**  6:2 26:15,
21 32:19,20 33:4
37:2,17 42:6 45:12
47:24 48:4,10
50:11 51:9 73:6
86:15

**counsel**  7:24 16:6

**counsel's**  14:10

**court**  7:2,9 8:10
9:4,16 10:2,6 11:6,
19 12:2,7,18,22
13:8 14:17 15:25
16:23 17:6,22
18:4,14,18 19:7,14
20:3,11 21:13,16
22:4 24:3,8 26:12
28:24 32:10 68:5,
12

**Court's**  21:19

**courtesy**  10:19
12:16

**credit**  52:11,14
88:4

**current**  30:6
89:10

**currently**  26:14,
20 32:21 33:2,21
34:18,20 60:8
89:23

**customer**  48:5

107Index: customers–example

**customers** 48:13 52:16 85:22,23 90:16

**cut** 56:6,10 60:22 92:14

---

**D**

**d/b/a** 29:12 44:9

**D1905** 56:3 58:3

**D1907** 56:3 58:3 60:20

**daily** 74:15

**database** 53:17, 18

**date** 73:11,12 95:13

**dated** 62:10

**David** 43:15,23 45:14,15 46:4,5, 15,16,21 76:22 82:13 87:15

**day** 15:12 36:3 37:13,15 51:7,12 55:12 66:12 67:5 70:24 83:9,25 91:5 92:9 93:7 95:17

**day-** 85:18

**day-to** 83:8,24

**day-to-day** 34:21 38:5 82:22 87:6,12 88:6

**days** 51:21 82:5

**deal** 52:13,19,22, 25 75:2 76:9

**dealer** 53:15

**dealership** 32:24 33:12 38:6 53:18 84:13

**Dealertrack** 53:10 81:10

**deals** 33:25 37:3 64:21 68:23

**Deana** 80:20 81:4 95:24

**decision** 7:3 72:10

**deemed** 6:6,9

**defendant** 8:16 12:13 13:17 22:19 48:18

**defendants** 8:9

**delete** 59:23 60:9

**demand** 6:3 15:7 56:17 77:21 89:16 92:2

**depend** 36:25

**depending** 36:22 51:9

**deposed** 23:14

**deposing** 16:4

**deposition** 5:9, 14,25 8:16 11:7 12:6 13:2,6 14:20 15:2,8,10 20:15 22:8 23:17,21 27:3,8,15 28:4 29:3,21 30:13 78:18 85:9 89:21, 25

**describe** 32:14 76:25 81:15

**described** 88:9

**designate** 90:19 91:11,12

**device** 28:7,11

**didn't** 67:18 80:5

**different** 37:5 41:8 45:11 47:15 61:17

**diligence** 70:2

**directed** 18:21

**direction** 68:7

**directions** 68:4

**disciplined** 86:24

**discrepancy** 86:12

**discrimination** 23:25 24:5 83:2 91:20,21

**discuss** 33:7 34:8 41:10,17,20 61:4,8

**discussed** 34:19 40:25 41:9 45:10 76:18

**discussion** 7:20

**discussions** 40:17,18,19 41:16 45:11 46:6

**distracted** 89:21

**District** 11:18,20

**DMS** 86:14,15,17

**DMV** 83:18

**document** 79:7,9, 13,15 95:12

**documents** 27:15,17,18,21 28:13 79:11 80:16, 18,21,23

**does** 9:18,19 11:9 20:12 34:14 43:2 56:7 62:19 68:12 85:21 86:5 89:13 92:22

**doesn't** 16:14 18:25

**doing** 17:7,8

**don't** 10:7 13:9,21 16:5 19:11,17 20:9 21:16 25:19,21 26:2 31:12 35:7 38:20 40:4 54:9 59:22 66:14 70:19 73:18 79:24 81:20 84:14 89:18

**done** 12:15

**don't** 44:19

**double** 42:24

**down** 20:4 23:17 24:9,19 42:16 47:7 48:13 68:6,13 70:25

**downstairs** 19:6

**drink** 25:3 54:10

**driver's** 6:4 13:23 14:3 16:7 20:5

**due** 51:19 64:23 70:2 86:16 88:5 90:21

**duly** 22:20

**during** 29:3 32:16 34:7 40:17 41:16 42:2 45:9 59:25 63:19 64:17 65:3,8 68:16 69:17 71:8, 15 74:23 75:5,21 76:10,14,19 78:18 87:7 89:21

---

**E**

**E-S-N-I-A** 94:8

**each** 43:17,24

**earlier** 44:25 54:18 78:18 84:7 88:10

**earliest** 51:11,15

**easier** 32:11 57:13,15 63:16

**Easter** 37:16

**education** 30:17

**effect** 26:11

**effectuate** 10:16

**eight** 75:13

**either** 41:21 46:21 56:21 72:15

**else** 5:9 30:3,11 32:4 64:24 65:2,5

**email** 28:6

**emailed** 95:18

**Emanuel** 8:6 56:11 67:14 77:5, 16 89:4,5

**emergencies** 90:11,12

**Emmanuel** 35:4

**emotional** 26:20

**employee** 41:22 53:20 83:18,21

**employee's** 54:2, 14 82:7

**employees** 38:8 39:2,6,23 40:5 47:12,19 49:24 81:21 82:6,19 87:9

**employment** 79:17 80:19

**end** 18:7 37:4,13 69:22 82:17

**enough** 17:24 41:7

**entirety** 56:8

**entitled** 11:16 13:11 14:7 16:2 17:11,21,23

**entity** 29:10

**entries** 86:3,5

**essentially** 46:3 88:14 92:7

**Estate** 43:15,22 46:4,14,16,21

**et** 62:8

**evaluations** 87:10

**even** 10:19 15:2 70:17 71:16

**ever** 23:13 28:20, 23 34:8 36:3 41:20 42:4,8 45:5 46:16 47:9,11,18 71:14 83:10 86:24 87:3, 9,22

**every** 10:11 18:5, 12 33:4,23 48:2 51:6

**everybody's** 71:10

**everyone** 93:18

**everyone's** 10:14

**everything** 12:15 17:5 24:9 37:11 45:4 61:3 77:25 79:3 88:23

**exact** 38:3 95:13

**exactly** 63:19 66:21,22

**EXAMINATION** 23:8

**examined** 22:22

**example** 25:3

108Index: except–herein

**except** 63:24

**exception** 25:7

**exchange** 64:5

**exchanged** 32:16 64:4

**exchanges** 65:7

**Excuse** 10:6 12:7, 8

**executor** 46:4

**Exhibit** 6:7,8 57:22,23 58:2 74:19 92:19 95:3,6

**exhibits** 28:14

**expenses** 40:20 41:11,18

**explain** 11:14,15 23:17 53:12

**F**

**face** 94:24

**fact** 9:13 14:25 18:20 61:5,19 62:20 66:19 71:18

**factors** 36:23,24

**facts** 25:25

**fair** 38:7 43:17,21 58:13 85:20

**fall** 62:19

**familiar** 31:2,5 37:22,25 44:3,6 46:24 47:2 48:17, 19 50:17,20,21 53:9 74:2,9 81:9, 17,25 82:3,13 83:17 84:11,12,22, 25 85:18 87:14,19 94:6,10,13,20,21

**familiarity** 88:2

**family** 91:2

**favor** 35:5

**February** 95:19, 20

**Federal** 16:23

**female** 73:23

**few** 27:13 91:16

**fight** 10:10

**final** 12:24

**finalize** 52:15

**finance** 52:8,10

**find** 62:20 68:22

**fine** 14:16 15:18 16:9 17:18 57:18 68:14

**finish** 25:10 32:7 52:19

**finished** 24:23

**fire** 40:5

**firing** 38:10 42:11

**firm** 8:7

**first** 23:21 54:23 55:2 58:4 62:5,9 63:21,24

**five** 30:2 36:2 76:5

**fixed** 50:8

**flat** 49:22

**floor** 41:8

**focus** 19:16 47:17

**folder** 52:12 57:16,19

**follow** 11:8

**follow-up** 6:12 48:11 69:5 78:9 89:15

**followed** 60:21

**following** 70:24

**follows** 22:22

**force** 26:11

**forgot** 15:16

**form** 17:21 29:9 34:11 86:11 89:10

**formal** 15:7 56:17

**formally** 52:13

**formed** 45:15

**former** 65:7

**forth** 27:19 37:6 45:2 59:2,8,14

62:21 64:11

**forward** 23:18

**Friday** 51:24 95:19

**Friday's** 15:8

**from** 21:21,23,24 25:13 26:15,22 30:5 31:13 33:6,16 35:24 36:22 47:7, 9,12,19 48:7 50:8, 13 51:2 52:12 53:21 54:25 55:10, 16,24 60:23 62:20, 22 66:8,12,18,24 70:22 72:11 77:17, 22,24 81:14 88:19, 20,21,22 92:8 93:16,25

**front** 34:9 70:20

**full** 22:25 27:22 56:12 92:3

**function** 53:16

**further** 20:24 22:3 57:7 72:10 88:15

**G**

**Gatorade** 54:7

**gave** 29:21 30:12

**general** 32:22,23

**generally** 25:15 50:15

**generated** 33:24

**gestures** 24:11

**get** 6:14,16 7:2 17:11 18:10 19:11, 15 22:7,17 23:13 25:3 32:23 34:23 61:6 62:25 64:7 65:11

**gets** 48:2

**give** 14:14 19:9 24:10 33:15 36:9, 16 53:4 57:13 76:6 89:4 93:4,12 95:13

**given** 49:23 81:10 87:9

**gives** 91:7

**giving** 9:9

**go** 6:14,16 7:17,18 12:19 21:5 37:7 44:22 59:21 61:17 93:20

**going** 6:3,5,16 7:5,17 14:8,23 15:5 21:8 22:5 23:16,18 28:5 29:4,16 37:4 48:11 56:11 57:15,17,21, 25 63:10 64:6 65:9,11 67:24,25 71:3 76:4 77:15 88:25 93:19,21

**gone** 19:6

**good** 7:22 8:4,10 9:7 23:10 36:8 75:13 93:17

**goodwill** 17:2

**got** 8:20 64:20 68:24

**gotten** 90:8

**granted** 10:18

**gray** 92:20 93:3, 11

**ground** 23:18

**grounds** 12:4

**Group** 8:8

**guess** 63:9 80:11

**guessing** 33:16

**guys** 77:6

**Guzman** 48:18 84:8 95:25

**Guzman's** 84:9

**H**

**hand-in-hand** 37:12

**handle** 73:20

**handled** 71:22

**handles** 34:21

**hands** 73:20

**hanging** 64:12

**happened** 64:6 65:17 93:3

**happens** 14:22

**harassment** 7:7

**hardly** 71:16

**has** 9:24 12:11,15 17:5 19:5 20:19 22:13 24:8 36:3 38:7 66:13 85:8,12

**having** 22:20

**he** 5:17 6:2,15,19, 21 9:16,18,21 10:22,24 11:10,11 12:10,12,16 13:18, 19 14:13 15:5,10, 14 16:13 19:5 20:21 34:23,25 38:2,7 39:17 41:20,21 44:7,17, 20 45:19,22 48:24 52:4 66:2 68:18, 20,24 69:14 84:19 87:22

**head** 24:11

**health** 32:24

**hear** 7:12 25:21 71:10

**heard** 11:17

**hearing** 42:5

**held** 7:20

**help** 56:23

**helping** 69:6

**her** 16:11 17:22 18:9 32:7 50:20, 21,23 55:2,10 61:3,11,15,19 62:15,16,25 63:3, 4,7,9,12,14,15 64:3,11,14,15,22, 23 65:10,11,14 68:21 69:2,3 70:4, 13,15,17,21 71:5, 14 75:16,20 77:3,4 83:22 85:10 86:21 88:22 92:25 93:8

**here** 18:11 25:25

**herein** 22:19

A1849

**hi** 63:25

**highest** 30:16

**Hillside** 29:4,5,6, 10,12,17 31:3,19 33:8 35:25 37:10, 19 38:4,18,22 40:15 41:22 42:3, 9,13,16,21 43:2,8, 21 44:8,9,10,15 45:4,23 46:8,25 47:11,13,18,19,25 48:3,5,10,14,15,22 49:4,9,23 50:4,9 51:3 52:3,9 53:22 65:23 73:24 74:6, 21 79:17 81:11,14, 18,22 82:6,21,25 83:11,13,19 84:4, 10 85:16 86:19 87:8,23 88:4 94:18

**him** 5:24 6:13 12:10 19:9 28:11 37:25 44:6,11 62:20 65:22 66:25 67:8,19 68:22 69:3 72:10 88:2 89:14

**hire** 38:8 39:2,6,23

**hired** 42:4,8

**hires** 83:11

**hiring** 49:3

**his** 5:4,22,24 6:14, 16,17,19,24 8:22 9:6,9,17 12:11 13:25 14:2,3 15:13,15,16 16:7,8 18:21 19:10 38:3 44:14,24 48:19,21 64:8 65:21 66:4 68:25 73:19 84:12, 15,18,21 89:14

**history** 59:3

**Hofstra** 30:24

**Hold** 89:11

**holiday** 37:2,7

**holidays** 37:8,14

**home** 14:2 16:8 20:6 89:23,25 91:9

**honest** 91:6

**honestly** 59:8

**Honor** 7:23 8:5 9:3,8 18:3,17 19:4, 13,23,25 21:4,20, 23 22:11

**hour** 24:4 63:10

**hours** 27:13 38:21,22 52:19,22, 25 53:20 91:5

**how** 5:9 26:19 27:11,25 31:5,15 32:20,21 33:11,24 35:10 36:15 37:25 38:10,12,15,21 40:5,8,11 41:21 42:11 44:6 47:6 49:22 50:20 51:16 52:23 53:25 54:13 58:17,21 60:3 62:8 63:25 65:18 69:12 74:12,25 75:12,19 76:9,25 77:8 78:11,15 79:7 80:21 81:19,21 82:5 83:13 87:21 93:2 94:11

**however** 25:15 56:4

**human** 34:9,19, 22,25 36:4

**hung** 65:18

**Huntington** 23:6 30:9

**I**

**I'LL** 5:11 6:20

**I'VE** 7:16 9:10 10:14

**ID** 5:4,20,22,25 6:14,17,19,24 9:6, 10,17,21,23 10:23 12:17 13:4 15:4,6, 11,13,16,20 16:7 17:14,21 18:21 19:10 20:5 21:3,9

**identification** 6:10 8:24 11:23 14:14 57:24 95:4

**identified** 16:5

**identity** 9:14 13:25

**immediately** 63:5,7 65:20 93:7

**in-person** 10:9 72:16

**Inc** 29:17 46:25

**include** 85:23

**including** 78:2,5

**income** 41:10

**incorrect** 61:19

**indeed** 61:6 62:23 64:9

**indicated** 68:18, 19 69:14

**individual** 87:15, 21 94:7,16,20,22

**industry** 37:11 50:15 52:21 85:5

**infer** 68:22

**information** 13:24 14:5 32:15 64:5 79:10

**initial** 63:10 70:14

**injustice** 17:8,9

**input** 86:13

**inputs** 85:25

**instance** 41:23 68:3

**instant** 28:6

**instead** 63:14

**intent** 20:19

**Interrogatories** 27:20 78:20,23,24 79:4,5

**interrupt** 10:7 71:12

**interrupted** 19:11

**intervention** 21:19

**interviewed** 83:10

**into** 64:13 70:2 72:9 73:19

**involve** 40:20

**involved** 34:23 46:2 81:18 87:5

**Iris** 94:11,13

**Isaac** 32:3

**Ishaque** 31:22 32:2,4,5,13,15 33:2,7 34:21 36:4 37:22 39:12 40:19 41:17 43:16,23 45:3 54:21 55:4 61:4 62:17 63:2,8 64:8,14 65:10,14, 19,21 66:24 67:4, 11 68:15 69:5,8, 19,23 71:22 72:3, 9,13,14,20,23 73:3,8 75:6,7,19 76:11,15,21 78:5, 16 81:4 82:16

**Ishaque's** 40:3,6 52:2 66:5

**issue** 9:14 12:20 13:10 18:13 19:2 20:24 35:2 36:5

**issues** 34:8 69:7 70:25 75:25

**its** 86:16 89:9

**I'm** 50:11

**J**

**J-O-R-Y** 22:19

**January** 55:24 62:10 66:18 67:5 72:12,14,19 73:3, 14 88:9 92:8,21

**Jeanique** 82:2 94:17,18

**Jennings** 95:24

**job** 52:14 83:22

**join** 45:5

**joined** 85:8

**Jory** 5:1,13 6:1,22 7:1 8:1,17 9:1,13 10:1,24 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1,3 24:1

**involved** 25:1 26:1 27:1,24 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1,25 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1,5 93:1 94:1 95:1

**Josh** 43:16,22 44:3,21 45:5 46:13

**Judge** 10:5 11:9 26:12

**just** 13:3,18 15:3 16:20 20:20 31:23 32:13,23 35:16 41:6 42:6 47:16 54:11 55:8 57:11, 13,16 58:2 62:24 64:5,19 67:3 68:4 72:8,21 75:17 76:21 77:12 81:18 85:11,12 88:24 89:2,6 90:15 93:15 94:19

**K**

**Kataev** 5:2,5,11, 16,21 6:11,15,20, 25 7:6 8:4,6,11,22 9:4,7,22 10:4,5,17, 22 11:2,13 12:8,23 13:16,23 15:4,22 16:24 17:16 18:2, 4,6,16,18 19:5,12, 15,24 21:4,8,22 22:2,7,12 28:9,18 29:8,23 30:19 32:6,9,17 34:5,10 35:10,13,22 36:12

110Index: keep–mistaken

39:7,14,16,24
40:21 41:3 42:18
43:12 44:20,22
47:21 53:5 55:19
56:14 57:18 58:5
60:17 65:24 67:18
68:14 76:2,7
77:10,19 78:8 85:6
86:10 89:11 93:19
95:15

**keep** 77:15

**kept** 14:9 53:20
54:15 60:4

**kind** 32:15

**kitchen** 49:13,14

**know** 5:10 25:4
26:2 37:3 38:20
40:13 44:19 47:4,6
50:3,7,23 53:24
59:22 66:10,15
67:7 70:4 73:18
74:5 81:19 87:3
93:10

**knowledge** 38:17
49:7 52:17 53:19
54:24 68:25 74:19
79:2,9,19,20
80:12,23 81:21
84:9 85:2,15
86:18,23 88:3,8

**knows** 66:2

---

**L**

**Labor** 49:8 83:3

**Labuda** 8:7

**lack** 88:6

**Lane** 23:6

**language** 80:11

**last** 10:15 15:8
17:14 24:23 41:15
46:20 59:11 60:21
70:9,21 75:20
79:25 80:4 87:16

**late** 45:14 46:5,22

**later** 15:11

**latest** 51:16

**law** 8:7,8,19 49:8
83:3

**laws** 83:4

**lawsuit** 23:24
28:24 50:22,24
54:20,24 55:7,9,13
59:8,14 78:4
84:17,19

**lawyers** 10:11
19:20

**lay** 23:17

**learned** 54:19

**leave** 89:24

**left** 15:13 91:9

**legal** 55:5 80:11

**less** 33:19

**let** 8:11 25:4 28:9
32:6 47:16 55:19
56:2 57:11 64:7
70:4 71:10 72:10
85:6 88:24 94:19

**let's** 7:2,18 22:16
33:6 41:14 45:13,
18 53:20 61:23
64:16 65:16 66:6,8
67:9 73:21 77:10,
12 80:18 90:5
93:15,23 94:15,25

**Leticia** 8:3 23:12
24:2 50:18 54:19,
22,25 55:4,7,17
58:20 61:3 62:14
65:18 67:13 70:3,
11 71:4,19,20,23
72:6,23 73:4,16,22
74:12 75:7 76:13,
22 77:3 78:2,6,13
86:23 88:3,11,19,
20,21 90:24 92:6

**Leticia's** 76:21
86:19

**Let's** 37:7

**level** 17:4 30:16

**license** 6:5 13:24
14:3 16:7

**life** 32:10 71:17

**like** 11:4 13:12
37:5 41:8 49:4
53:15 65:13 70:16
71:10 72:8 80:21

**likely** 66:3 69:12,
25 71:9

**likes** 48:5

**likewise** 24:22

**Lily** 83:18

**line** 14:18 18:24

**listen** 39:4

**listened** 39:17

**litigation** 18:11

**little** 70:19 93:22

**lived** 30:3,6,11

**LLC** 8:8 29:12
31:3,20 42:14 44:9
45:24

**locations** 48:6

**log** 85:21

**long** 27:11 60:3
62:24 78:12,15
93:14 95:14

**longer** 52:24 70:8
93:22

**look** 67:9 70:2
72:9

**looked** 64:13

**looking** 92:10,18

**losing** 83:22

**loudly** 24:15

**Luckman** 79:24

**lunch** 49:12 77:8
88:25 93:16

**lying** 80:5

---

**M**

**made** 5:23 7:8,13
9:10 75:2 83:22

**Magistrate** 11:8

**main** 53:18

**major** 37:8,14

**make** 6:3 8:19
11:4 18:24 19:17
20:25 25:14 32:9
54:12 56:16 64:20
68:24 72:10 75:24

**making** 16:18
41:6

**Mall** 29:17,18
46:25 47:13,20
48:14,15 83:14

**manage** 38:5

**management**
30:22 53:15

**manager** 52:5,8,
10 94:18

**managerial** 48:25

**Manrique** 82:14

**Manrique's**
76:23

**manual** 86:3,5

**many** 32:20 33:12
82:5

**March** 82:12

**mark** 6:5 57:22
94:25

**marked** 6:6,9
57:24 58:2 74:18
95:3

**matter** 22:4 23:12,
23 55:11 72:10

**matters** 21:18

**may** 25:14 34:8
45:20 47:2 59:2,24
60:2 92:11

**maybe** 57:13
94:23

**me** 5:4 6:23 10:6,8
11:15 12:7,8,9
16:10 17:15 21:21
23:21 25:4,20,22
27:5,10,19 35:5
47:16 53:4 56:5
57:11,13 58:20
63:19 64:7 68:16,
20 70:6,9,20 81:16
88:21,24 91:7 93:4
94:19

**mean** 34:15,18
40:18 42:18 57:20

**meaning** 51:24
77:2

**medications**

26:15

**meeting** 46:20

**meetings** 33:2
34:7 45:3,6 46:17

**member** 31:11

**member/
shareholder**
31:6,19

**Memorial** 37:13

**mention** 75:7
76:10,13,21

**mentioned** 44:25
48:9 54:18 64:25
69:10 72:21 78:19
84:7 94:16

**message** 28:6
54:24 55:10,15,16
56:5,10,21 58:18,
22 59:4 60:21
61:10,14,16,20,21,
24 62:4,6,13 63:5,
14 67:13 68:19
70:7,17,20,22
74:18 76:17 88:18,
19,20 92:17,20,22
93:2,3

**messages** 55:22,
23 56:9,13 57:7
59:19,22 60:4,6,
24,25 69:15,18
75:23 88:14 89:4,6
90:3,14 92:4,11
93:11

**met** 64:3

**Michigan** 30:24

**microphone**
35:8,15

**might** 45:8

**Milman** 8:7

**mind** 35:7 79:24

**mine** 38:2

**minimal** 31:21

**minute** 10:15 21:6

**minutes** 70:23
76:5 77:6,7 93:6

**mistaken** 9:14

A1851

111Index: moment–on

**moment** 32:24 44:13

**Monday** 51:24

**money** 41:5,7 61:8 62:22 68:21 69:2,25 72:5

**monies** 62:21 71:22

**month** 31:11,24 32:21 33:23 36:8, 15 45:19 74:20 75:8

**month-to-month** 36:22

**monthly** 33:10, 13,20,25 34:3 45:2

**months** 36:19 37:18,21 75:14 91:16

**more** 33:19 42:7 80:7

**morning** 7:22 8:4, 10 9:7 10:17 23:10 51:14 55:21 92:15

**most** 30:5 34:24 66:3 69:12,24 71:9

**mostly** 43:5

**Mother's** 37:15

**move** 35:21

**moved** 35:16

**moving** 35:7

**Mr** 5:2,5,11,16,21 6:4,11,15,20,25 7:6 8:4,11,21 9:4, 5,7,9,22 10:4,5,17, 21 11:2,13 12:8,23 13:15,23 15:4,9,22 16:24 17:16 18:2, 4,6,16,18,20 19:5, 12,15,24 20:21 21:4,8,22 22:2,6, 12 23:10 27:22 28:9,18 29:8,23 30:19 32:6,9,17 34:5,10 35:10,13, 22 36:12 39:7,14, 16,24 40:21 41:3 42:18 43:12 44:20, 22 46:22 47:21 53:5 55:19 56:14

57:18 58:5 60:17 65:24 67:18 68:14 76:2,7 77:10,19 78:8,11 85:6 86:10 89:11,18 93:19 95:15

**ms** 5:2,7,15 6:13, 18,23 7:4,10,22 8:11,18 9:2,19 11:22 13:17 14:16, 23,25 16:24 17:10 18:9 19:3,10,14,22 20:3,6,9,18 21:10, 11,15,20,24 22:6, 10,15 35:4,12,19 39:16 41:14 44:21 54:8 56:2 57:21 66:2 67:14,23 76:4 77:5,12,21 79:23 92:2 93:15 94:3,25 95:21

**Ms.troy** 18:19

**much** 22:9 41:21 49:22 52:24 63:16 77:8

**mumble** 67:19

**mumbling** 67:17

**must** 25:10

**mute** 7:18

**my** 8:5,18 9:24 10:24 11:5 12:8 19:8 21:5 23:10,23 24:21,23 25:8,10, 14 31:21 34:12 39:3,11,24 40:9,12 49:5,25 50:5,10 51:9 54:3,6,16 56:18 59:3,22 60:3 61:12,14 62:19,22 70:5,7,14 71:11, 17,21,23 73:9,13 74:15 75:3 80:12, 14,25 81:24 82:10 83:24 88:5 90:3, 14,16,19

**myself** 7:18 32:5

---

**N**

**name** 8:5 22:25 23:11 27:23 48:19 57:17 82:2 83:18

84:8,15,19,21 87:15,17,22 94:7, 10,14,17,24

**named** 13:16

**nature** 71:11

**necessary** 5:6

**need** 6:18 11:8 17:18 18:10,12 25:2 34:22 77:9 88:15 90:13

**needed** 33:5 41:5

**needs** 21:18

**never** 15:23 70:24

**Nevermind** 61:16

**new** 11:20 22:21 23:6 24:22 83:3

**next** 57:17 65:17 72:21 73:11

**niceties** 63:24 64:4 65:7

**no** 9:13,25 11:20 20:7,9,13,19,24 21:20,22 23:15 24:10,11 25:8 26:18,24 27:4,7 28:8,11,22 29:2 30:15 34:12 35:12 36:6 39:21 40:6,9, 16,23 41:19,25 42:10,12,15 48:16 50:25 55:2 57:7 59:7 61:20,21 68:21,25 69:6,25 70:8 71:9,16 75:25 81:12 83:12,15,20 87:25 88:15 89:20 90:12 94:9,13,21, 24

**nodding** 24:11

**non-** 91:14

**non-emergencies** 90:11

**non-work** 90:25 91:9

**none** 35:3,20

**noon** 77:11,13

**nor** 45:25 46:18 72:7 74:8,9 84:11 86:25

**Northern** 11:19

**not** 6:15 8:13,22 9:9,19 10:12 11:24 12:10 13:6 14:5 15:22 16:22,25 17:3 18:7,12 19:18 20:4,12 21:21,23, 24 24:20,22 25:16 26:2 28:5,14 33:17 34:12 39:3,11,18 40:9,12 44:13 48:16 49:5,25 50:5,10,12 52:20 53:24 54:3,16 55:3,12 56:7 59:9, 10 60:7 62:17,19, 22 63:14 64:3 68:9,12 69:20 71:9,11 72:4,17 73:6 74:2,15 75:3 80:10,14,25 81:17, 23 82:3,7 83:24 84:11 85:18,21 87:5,11,19 88:13 89:13,20 90:8,12, 15,16 91:11,23 92:23 93:13 94:10, 13,21 95:14,22

**Notary** 22:20

**notation** 28:18

**noted** 20:2 21:7 22:14,18

**notepad** 28:16

**notes** 28:15

**nothing** 22:2 69:11 83:15

**noting** 85:11

**notwithstanding** 12:2

**now** 7:16 8:14 10:21 18:23 19:7 22:5 35:11 46:13 59:22 60:19 65:16 73:9 74:11,17 77:14 85:8 90:7 93:15,17 94:3 95:5

**number** 12:12 14:3 16:8 20:5,17 33:7,18,20 36:8,

10,11 57:17 58:4, 10,14,15 59:17 60:6 65:23 66:7, 10,25 75:12 77:21 86:9 90:2,9,10 91:7,13 92:2

**numbers** 11:25 13:13 77:23

**numeral** 42:19

---

**O**

**o'clock** 51:19

**oath** 26:7,9

**objected** 10:20

**objecting** 9:22

**objection** 9:24 10:3 11:5 29:8,23 30:19 32:17 34:5, 10 36:12 39:7,14, 24 40:21 41:3 43:12 47:21 53:5 58:5 60:17 65:24 86:10

**objections** 25:14

**obtain** 58:17,21 91:14

**obtained** 90:25

**obviously** 73:13

**occasion** 36:3

**occasions** 45:7,9 47:9,11,18 48:12

**occurred** 91:18, 22

**off** 7:19,20 18:22 56:6,10 60:22 92:14

**office** 21:5 89:6

**often** 51:6

**Oh** 42:15

**okay** 5:13 14:24 21:3 54:5,8 90:15 93:4 95:21

**on** 7:3,11,16,25 9:24 12:4,19,20 14:17,21 18:5,24 19:16 20:24 22:7,

112Index: once–proceed

16 28:4,6,13,15
31:22 32:2,13,14,
19 33:10,12,20,25
34:2,8 35:15,21
36:8,22,25 37:4,6
42:8 45:8 47:17
48:11 49:17 50:21
51:9,21 56:25
57:12 58:18 59:20
61:19,20 62:21
63:6 64:6,12,22
65:21,22 66:3 67:4
68:8 73:3 74:15,25
76:9 85:24 89:3,
11,19 91:22 92:17,
18 93:7 94:4 95:9

**once** 52:12

**one** 12:24 16:16
21:6 24:19,20 25:8
28:24 34:6 36:14
42:6 51:3 56:24
57:8,13 70:10
75:13 80:7 90:22

**only** 24:18 25:7
32:3 67:3 84:18
92:15,24 93:5,6

**onto** 62:11 85:13

**opened** 31:14,16
51:13

**operate** 41:6
53:17

**operations** 79:16
82:23

**opportunity**
11:17

**order** 12:18 52:19

**other** 13:25 14:4
16:21 20:22 21:18
27:20 28:7 33:4
36:23,24 42:14
43:8 44:11 48:6
60:5 63:20 65:7
73:23 77:25 83:7
86:2 88:10 89:8
91:22

**our** 32:22 52:22
53:14 63:10 70:2

**out** 51:18 61:11,13
62:20 93:4

**Outlet** 29:6,13
33:8 36:2 37:10,19

38:4,18,22 40:15
41:23 42:3,9,16,22
43:2,8,21 44:9,10,
15 45:4 46:8
47:12,25 48:3,6,
11,22 49:4,9,24
50:4,9 51:3 52:3,9
53:23 73:24 74:7,
21 79:17 81:14,22
82:21,25 83:11,19
84:5,10 85:17
86:20 87:8,24 88:4
94:19

**Outlet's** 47:19

**Outlets** 81:11

**outside** 93:20

**over** 75:2

**over-the-phone**
63:17

**overruling** 10:3

**owed** 61:5,6,8
62:21,23 64:22
68:21 69:2,25
71:19,22 72:5

**own** 29:20 31:8
42:14 43:24

────────────

**P**

**P-H-I-L-I-P** 28:2

**p.m.** 77:18 85:14
92:22 94:2

**page** 56:7 60:20
62:9,11 92:13,18
95:9

**paid** 61:6 68:24
72:5 81:21

**Pakistan** 82:17

**pandemic** 59:25

**paperwork** 52:15
81:13

**paraphrasing**
70:19

**Parsons** 87:15,18

**part** 68:2 83:24
84:19

**participate** 46:17

**particular** 82:20

**parties** 78:4

**partner** 38:2 44:7
73:13

**partners** 44:11

**party** 28:23

**passed** 45:19

**past** 30:2,13
52:21,24

**pay** 38:15 40:11
54:14 64:20,23
71:18 75:4,20
81:15,17,19

**paycheck** 76:22,
23

**paying** 41:21

**payment** 40:13

**payroll** 40:20
41:17

**peace** 91:7

**pending** 67:21

**penny** 61:8

**people** 13:11 37:3
42:11 52:21 62:23
80:15,17

**per** 49:23

**percent** 31:9
43:18,24 74:25
76:9

**percentage** 31:7

**performance**
86:19,22 87:9

**perhaps** 34:19

**period** 59:23 60:9
66:17

**person** 16:3,4
24:19 81:25 82:4
87:20

**personal** 65:22
79:20 80:23 81:20

**perspective**
47:10

**pertain** 80:24

**pertaining** 65:6

**peruses** 21:10

**Philip** 27:24,25

**phone** 7:8,17
28:7,16 45:8 58:4
59:20,25 64:12
65:22 66:4,5 67:5,
8 70:6,10,12,14
72:15 75:17,21
85:10 88:9 89:3,
14,19,22,25 90:4,
13,17,20,23,24,25
91:9,10,12,15,18,
22,23

**phones** 90:6,22

**physical** 26:19

**pitch** 19:20

**place** 70:5 73:8
82:25 83:7 84:4
88:23

**plaintiff** 8:2 9:12
14:7,12 23:12
50:18 78:6 85:8
91:18

**plaintiff's** 6:7,8
14:9 16:6 21:25
57:23 58:2 74:19
92:19 95:5

**plaintiffs** 95:2,3

**plaintiff's** 7:24

**plan** 61:16 75:4

**plans** 41:8

**pleasant** 19:19

**please** 5:3,13
6:11,13,23 10:7
19:15 20:25 22:25
23:4 24:14,20 25:4
39:4 41:13 46:9
56:16 62:9 68:4
72:24 78:8 87:16
89:4

**point** 18:6 68:22
69:16 71:5,10
73:14 75:7

**policies** 82:24
83:7

**portion** 56:20

**position** 32:22
34:12,17 40:20

41:10,23 48:21

**positions** 40:18,
25

**possibly** 60:9

**post** 70:9

**posted** 49:8,11

**poster** 49:17,19
83:4,6

**posters** 49:8,11

**potential** 83:11

**potentially** 64:22

**power** 38:8 39:2,
6,13 40:4

**practice** 62:22

**predominantly**
85:5

**prefer** 33:17 52:5

**pregnancy** 23:25
24:5 91:21

**pregnant** 76:14
83:23

**preparation**
27:14

**prepare** 27:2,8

**prepared** 21:2

**present** 23:4 36:2
66:12 91:20 92:9

**presented** 5:23

**President's**
37:13

**pretty** 35:6

**prevent** 26:15,21

**Previously** 15:7

**prior** 30:6 50:23
54:20 55:4,7,9
59:12 64:4 69:16
84:21

**privacy** 12:5
13:12 90:21

**probably** 93:21

**problem** 20:8,10
35:12

**proceed** 5:14

A1853

113Index: process–run

**process** 49:4 70:4

**produce** 8:23 9:5, 17,21 10:23 12:11, 17 14:11 15:6,11 18:21 56:12,16

**produced** 13:5 55:21 60:15 92:14

**production** 15:19 79:8,13,15 89:9

**program** 84:22 85:3,4

**project** 35:6 68:5

**promise** 61:21

**promised** 61:18

**promotions** 37:3

**properly** 74:4

**protect** 13:15,21

**prove** 20:14

**provide** 60:13 81:5 89:5

**provided** 27:19 80:15,18 82:20 83:4,5

**provider** 66:7

**Public** 22:21

**purchase** 48:7

**purposes** 90:3

**put** 7:10,16 73:19

**Q**

**question** 9:18 24:16,22,24 25:9, 10,20,21 26:3 29:14 32:7 39:5,9, 19,20,21 40:2 41:12,15 46:10,12 47:17,23 53:7 67:20,22 72:25 73:9 74:22 76:19 79:22 80:2,4,6,9 94:9

**questions** 23:22, 23 24:21 25:9,14 32:23 89:7,8

**quick** 93:16

**quit** 61:7 64:19 68:20

**quite** 86:14,16 91:6

**quitting** 64:23

**R**

**R-A-S-K-** 94:7

**raise** 18:12

**raised** 89:8

**range** 33:15 53:4

**rant** 71:17

**ranting** 71:15

**re-ask** 72:24

**reach** 61:11

**reached** 61:13

**read** 63:13 80:3,8 81:19

**reading** 79:25

**ready** 77:19

**really** 13:9,20

**realm** 80:25 81:24

**reason** 8:21 9:8 16:17,22 20:13 24:14 64:22

**recall** 31:10,12,15 33:11,14,23 34:2,4 36:16,18 37:20 38:24 45:18,25 46:18 48:21,23,24 49:2,3,19,22 50:2 54:17 59:13 60:20 63:23 65:6 66:4 67:7 69:11,20 72:7,18,22 73:7, 10,12,22 74:8 75:9 76:12,17,24 77:4 78:11,14,15,17 80:13 82:15,16,18, 19 83:20,21 84:3, 6,21 86:25 87:25 88:17 92:16 95:11

**recalling** 26:16, 22 72:17

**receive** 52:11,12

**received** 54:25 55:16 60:24 62:3, 10 68:19 69:16 88:19 92:12 95:23

**receiving** 55:9 67:12 91:4

**recent** 30:5 34:24

**recently** 90:8,25

**recess** 77:17 93:25

**recognize** 84:8, 14,16 95:8

**recognizing** 84:18

**recollection** 57:2

**record** 5:15 7:19, 21 8:12,20 11:4 14:8,19,21 23:2,5 28:10,19 35:13 54:9,13 55:20 56:2 68:2,8 85:7,12,13 92:18 94:5 95:16, 22

**recorded** 13:2,7

**recording** 14:13 18:23 19:3 22:13, 16

**records** 14:10 53:20,25 54:14 79:17 80:19,22 81:7

**rectify** 70:16

**redacted** 15:19, 23 17:17 78:7

**referring** 29:4,16 55:15

**reflect** 8:12 28:10 55:20 56:3 85:7

**refusal** 12:3

**refused** 75:19

**regard** 62:5 65:5 69:15

**regarding** 34:18 36:4 46:7 49:8

**related** 46:7

**relation** 75:17 81:18

**relevance** 29:24 32:18 41:4 43:13 58:6 65:25

**relevant** 59:2

**reliance** 85:24

**relied** 81:4

**remain** 52:21

**remember** 46:19, 23 49:14,16,18 58:11 71:16 75:15

**repeat** 25:22 41:12 42:6 46:9 79:21 80:7 87:16

**rephrase** 25:20

**reply** 92:22

**reported** 16:17

**reporter** 22:24 24:8 68:6,12 80:3, 8

**reporter's** 32:10

**represent** 5:12 6:21 14:15 23:11 56:8 57:4,6 95:16

**representation** 9:11,20

**representative** 78:3

**request** 5:24

**requested** 5:19 80:9

**require** 86:5

**required** 14:11 86:3

**residence** 29:20

**resolve** 69:6 71:2

**resource** 36:5

**resources** 34:9, 19,22 35:2

**respect** 34:25 46:12 82:25 89:7,9 91:19

**respond** 25:16,17 89:17

**responded** 93:7

**response** 63:12, 22 70:17 79:18 80:24 93:9

**responses** 24:10 70:7 79:8,9,14,15 81:3,5

**responsibilities** 44:24 45:22 48:25 52:7 81:24 83:25 88:7

**responsibility** 40:7,10,12 44:15 49:5,25 50:5,11 54:3,16 62:18,19 74:15 75:3 80:14 81:2

**responsible** 87:11

**restroom** 25:4 76:8

**returns** 37:6

**revenue** 33:24

**review** 27:15 31:23 32:13 56:18 78:22

**reviewed** 78:19

**reviewing** 28:15

**ridiculous** 16:15

**right** 7:4 9:25 16:11 18:23 62:7 92:20

**road** 42:17

**robbery** 84:4

**role** 31:18,21 38:3 39:3,11 40:3 44:14 45:21 69:6 74:16 84:9,12 88:6

**roughly** 66:17

**route** 61:17

**rules** 23:18

**ruling** 10:25 11:3 12:21,24

**run** 37:12 52:14 88:4

## S

**S-E-R-R-** 94:11

**said** 15:4 35:20 50:14 61:15,16,24 63:21,22 65:9,13 66:23 68:16 69:14 70:15,18 73:6 74:8 75:7,10 80:16,17 83:21 90:6

**sales** 33:6 36:19, 21,25 37:9 75:13 80:22 86:21

**salespeople** 40:14 48:13 52:18 81:14 86:4,6

**salespeople's** 85:25

**salesperson** 41:24 52:12 74:6, 13 87:23

**salesperson's** 86:13

**salesperson;if** 75:16

**salespersons** 73:24

**same** 15:14 24:14 26:11 28:18 45:10 57:16 60:5 93:7

**satisfactory** 21:12,14

**saw** 84:16 94:24

**say** 12:25 24:9 26:3 32:12 34:14 38:7 43:17,21 50:12 52:11 55:8 57:19 58:13 59:9 62:15 63:4 64:17, 24 65:12 66:21 69:9 71:7 80:5 85:20 86:7 89:12

**saying** 59:5 70:22

**says** 11:11 13:19 15:14 16:13 20:21 56:21

**scan** 15:3

**schedule** 38:13,

18 40:8 51:10 82:8

**scheduled** 8:13

**school** 30:23

**Science** 30:22

**screen** 28:14 57:12 58:18 92:17

**screenshot** 58:22,23,24 59:10 69:18

**screenshots** 60:14,15

**screenshotted** 59:4,6,7

**Sean** 87:22

**search** 89:2

**seasons** 36:19

**second** 45:14 55:14 57:12,14 61:23 62:11 64:16 66:6 73:21 90:5 91:12 93:4 94:15

**secondary** 90:2, 9,10 91:7

**security** 12:12 13:13 20:17

**see** 61:13 62:15 63:12 64:8,9 67:16 70:7 93:8

**seen** 61:19 63:8

**sell** 43:3,5 47:12 48:8,14 74:20

**send** 69:19

**sense** 32:23

**sent** 61:15 92:12, 16

**separate** 24:3

**seriously** 61:2,25 62:8 75:24

**Serrano** 94:11

**service** 17:9 43:5 66:7

**set** 27:19 52:22,24 59:22

**setting** 38:12,15 40:8,11 60:3,8

**seven** 75:13

**several** 58:12

**shaking** 24:10

**Shane** 87:22

**share** 43:18

**shared** 35:14

**shareholder** 34:13,18 35:25 38:25 42:3 44:16, 17 45:23 46:17 47:10 87:8

**shareholder/ partner** 52:4

**shareholders** 43:8 46:7 51:4

**shares** 31:7 43:24

**she** 9:24 16:2,3,13 20:20 61:5,6,7,12, 13,16 62:15 63:11 64:17,19,20,21,24 68:20,24 69:4 70:5,6,7,18 71:19 72:4 74:12,20 75:8,10,12,18 76:16 83:23 85:12 87:3 88:14 93:8

**she's** 17:20,23

**short** 62:24 77:16

**shortly** 59:15 60:16 63:6 67:12 89:2 92:25

**should** 10:22 52:11 68:9,22,23

**show** 5:4 6:23 10:23 11:10 21:3,9 57:12,25 81:13 88:24

**showed** 61:7

**showing** 28:13 58:18 60:19 95:5

**shown** 48:2,5 88:13

**shut** 70:24

**side** 21:25 62:25 64:8

**sign** 31:21

**signature** 95:8

**signed** 27:21 95:11

**similar** 46:11

**Since** 24:8 28:3 58:9

**single** 18:6,13

**sip** 54:6

**sir** 10:7 11:6

**situations** 70:16

**slow** 36:15 37:16

**slower** 36:20

**social** 12:11 13:13 20:16

**sold** 32:21 33:8, 12,18,20 36:8 47:19 48:2 74:23 75:8,11,18 86:9

**Solutions** 84:23, 24 85:16,21,24 86:2,8

**some** 9:21 10:23 11:25 17:11,21 23:18 73:14 89:6

**someone** 20:14 32:4 71:12 89:24

**something** 45:11 67:17 89:12

**sometime** 59:11

**Sometimes** 32:20

**soon** 65:18

**sorry** 13:8 42:6 56:14

**sort** 46:11 72:4

**speak** 24:15 27:12 31:22 44:23 61:4 62:15,16,25 63:16 64:8 65:14 67:8 71:11 73:14 74:14 82:22 83:8,25 86:25 87:6,12 88:5

**speaker** 7:11,16

**speaking** 24:19 50:15 63:7 66:18 67:13 69:3

**signature** 95:8

**specific** 36:9,17 41:21 73:12 81:20

**specifically** 31:12 41:2 49:18 52:8,23 53:24 62:2 66:5 69:8,12 72:17 73:15,19 75:9,16 92:10

**specifics** 58:11 93:12

**speculation** 26:2

**spell** 27:25

**spoke** 32:12 63:8, 20,24 64:14

**spoken** 27:2 64:3

**sporadically** 94:23

**staff** 74:3,9

**stamp** 63:6 67:10

**stand** 18:19

**stands** 39:25

**start** 8:15 24:20, 22 33:6 53:21 66:8 80:19

**started** 22:17 23:13

**Starting** 30:5

**state** 16:20 22:21, 25 23:4 24:3 28:24 72:8 83:3

**stated** 88:14

**stating** 90:7

**status** 75:16

**stay** 14:17,21 18:24 52:18,24

**stenographer** 24:18

**step** 93:4

**steps** 62:2

**Stidhum** 8:3 23:12 24:2 50:18 54:19 73:22 74:12 78:6 92:6

**still** 7:15 11:3 25:16 32:25 37:9

45:16 59:16,19 66:11 89:3 95:22

**stop** 14:13,20 15:25 24:21 71:5, 6,7,13,14

**stopped** 19:4 22:13

**store** 38:21,22 43:4 49:9 51:12 52:6,18 53:16 82:23 83:16 85:19

**stores** 48:8

**story** 62:24

**Street** 30:9,10

**strike** 41:15

**structure** 40:14 50:4,8

**structures** 50:12, 13

**stub** 81:15,18,20

**subject** 23:23

**submit** 52:14

**subsequent** 70:11 72:15,19 73:7

**subsequently** 88:12

**substitute** 10:16

**successfully** 41:6

**such** 28:11 90:15

**summary** 63:23

**supplemental** 78:23 79:4,8,14

**supposedly** 15:13

**sure** 18:25 20:25 41:7,14 46:11 54:12 60:7 64:20 68:24 73:2,17 75:24 79:23 82:7

**suspended** 87:4

**switch** 5:16

**switched** 5:17 66:15

**sworn** 22:20

**system** 53:10,12, 14,15 81:10

---

**T**

**table** 35:15

**take** 9:20 16:14 24:9 25:2 61:12,25 67:9 68:12 70:4 75:23 76:2,5,6 77:6,8 88:25 93:16,21

**taken** 26:7,10 62:3 77:17 93:25

**taking** 26:14

**talk** 27:7 67:24

**talked** 40:24

**talking** 37:9 46:13 52:9 62:7 67:15 92:19

**tax** 37:5

**team** 64:15

**telephone** 64:18 65:3 68:17 69:17, 22 71:3,8,15 72:2, 13 76:20

**tell** 17:6 25:20,22 26:7,10 53:2 65:10 71:5,12,14 89:24 93:13

**telling** 10:21 12:10 27:5,10

**tells** 25:16

**tend** 37:16

**terms** 60:3 64:6

**testified** 22:22

**testifying** 26:12, 16,22

**text** 54:24 55:10, 15,16,22,23 56:5, 9,12,21 57:7 58:17,22 59:4,19, 22 60:3,6,21,24,25 61:10,14,15,21,24 62:3,5,10 63:5,9, 13,14 64:11 65:6 67:12 68:18 69:15,

18 70:7,17,20,22 74:18 75:23 76:17 88:13,18,20 89:3,5 90:24 92:4,17,25

**texted** 58:20 70:6

**texts** 91:5

**than** 13:25 33:19 77:25

**thank** 20:11 22:8, 10,12 56:22,23 78:9

**Thanwalla** 37:23 78:5

**Thanwalla's** 15:9

**that's** 40:3 49:14 90:4

**their** 38:12,15 52:13

**them** 43:5 48:8 56:15 60:9 62:23 71:11,12

**then** 18:22 30:24 48:8 52:13,15 54:23 59:4 61:11, 15 63:7,8,11,18 65:14,21 68:20 69:2 70:3 71:10 90:17 93:8,23

**there** 9:13 10:10 11:25 20:13,23 21:17 24:2 25:7 28:10 35:14 36:3, 18 41:7 43:4,7 45:7 47:9,11,18 48:12 49:7,13,20 51:5,18 53:22 56:6,9 57:6 61:20 62:17 64:5 67:20 68:8,21,23,25 70:11 72:11 73:22 75:25 80:13 83:6 84:3 86:12 88:10, 15 89:6

**thereafter** 59:15 65:18 93:9

**Therefore** 24:20

**these** 70:16 75:23

**they** 20:14 37:16 43:4,11 47:7,14 48:4,7 51:13

18 70:7,17,20,22 74:18 75:23 76:17 88:13,18,20 89:3,5 90:24 92:4,17,25

**texted** 58:20 70:6

52:11,24 53:18 64:19 70:25

**thing** 12:25 15:15 18:13 19:19

**things** 13:12 37:5 41:8 45:10 56:25 80:14

**think** 95:18

**third** 60:19 92:13

**those** 27:17 32:16,25 34:7 45:6,9,11 48:8 49:11 55:21,23 56:24 60:6,13,15, 25 79:10 80:15,18 81:3,7

**though** 10:19 67:8

**thought** 59:2

**through** 18:10 51:24 54:19 59:3 62:2 63:18 68:16 85:10

**throughout** 38:6 47:24

**Thursday** 92:21

**Tiffany** 7:24 23:9, 11

**time** 10:14 12:9 19:8 20:2 21:7 22:14,18 24:19 25:13 34:13,14,24 35:24 36:22 42:2,7 45:14 50:9,13 51:2,7,11,16 53:21,22 56:22 59:23 60:10 63:6 65:10 66:15,17 67:9 68:25 73:25 74:3,6,10,24 75:5 77:8,13 80:7,20 82:20 87:7 88:17 93:10,17

**time-to-** 50:8

**timeframe** 92:7

**times** 37:2,7

**timestamp** 92:23

**timestamped** 92:21

**title** 38:3 52:2

**to-day** 85:19

**today** 5:19,23 15:14 24:6 26:7, 17,23 28:14 29:22 58:19 59:17,20 91:8,23

**today's** 27:2,14 89:21,25

**together** 25:25 45:8

**told** 8:18 60:23 61:3 62:16 67:19 68:20

**tolerate** 10:12 17:4

**tone** 76:25 77:3,4

**too** 95:14

**took** 60:25 61:24 62:8 73:8 84:4 88:23

**top** 74:5

**traffic** 51:19

**transpired** 63:19

**traveled** 82:17

**tried** 63:9

**trouble** 42:5

**Troy** 5:2,7,15 6:13,18,23 7:4,10, 22,25 8:11,18 9:2, 19 11:22 13:17 14:16,23,25 16:24 17:10 18:9 19:3, 10,14,22 20:3,6,9, 19 21:10,11,15,20, 24 22:6,10,15 23:9,11 35:4,12,19 39:16 41:14 44:21 54:8 56:2 57:21 66:2 67:14,23 76:4 77:5,12,21 79:23 92:2 93:15 94:3,25 95:21

**trust** 80:15

**truth** 26:7,10,16, 22

**truthfully** 26:16, 23

**try** 48:8 64:7 70:16 71:2 77:15

**trying** 13:15,18,21

**turn** 10:11 18:22 45:13 47:16 65:16

**turning** 43:20 46:14 66:16 74:11, 17

**two** 17:3 45:5 56:24 90:6,22 93:11

**type** 79:18

**types** 45:10

**typically** 32:5 37:12 51:13,22 52:23 86:8,16 90:4

**U**

**unable** 61:12 70:5

**unaware** 50:6,11 74:23 75:4 76:16 86:21

**uncommon** 52:20

**under** 26:21

**understand** 10:25 11:2 13:9, 10,22 16:25 17:15 18:15,16 19:21 23:19 24:6,12,16, 24 25:5,11,17,19, 23 26:4,6,9 29:6, 18

**understanding** 71:24 72:2

**understates** 86:8

**Understood** 19:24 84:14

**unfortunately** 33:22

**units** 75:10

**University** 30:25

**unless** 25:15

**until** 24:23 36:2 55:12 66:12 72:14 76:16 77:18 94:2

**unusual** 50:12

**up** 12:19 18:7 64:12 65:18 90:8

**upon** 52:13 55:9 58:25 64:12 81:4

**usage** 85:19

**use** 25:3 53:17,18 57:16 59:16 60:5 66:8 76:7 90:3,20, 24

**used** 58:9,14 60:2 85:5,16

**useful** 18:7

**using** 58:14 66:19 71:17

**usually** 35:6 51:7

**V**

**V-I-N** 84:23

**Vague** 40:22

**valuable** 12:9

**varied** 33:23 50:8 53:3,8

**vary** 32:19 33:3 36:21 37:17 45:12 50:13 51:6,9 86:15

**vehicle** 48:2,3,4

**vehicles** 32:20 33:8,18,20 43:6 47:25 48:7,10 75:18

**verbal** 24:10

**verification** 17:12 95:6,23

**verify** 13:18 16:2, 12 20:20 62:25

**Verizon** 66:11,13, 19,21

**version** 15:20,24 17:17

**very** 22:8 31:21 60:25 61:25 62:8 93:13

**via** 67:8 91:18

**vice-a-versa** 37:14

**video** 5:8

**VIN** 84:23,24 85:15,20,24 86:2,7

**virtual** 28:3 85:9

**virtue** 17:13

**visit** 51:2,5,8,12, 20

**visited** 51:17

**W**

**W-O-O-D-L-A-N-D** 30:8

**wage** 24:4

**wait** 67:21

**waiting** 7:15 19:8

**walk** 61:25 62:9 63:18 68:16

**walk-in** 85:23

**want** 8:19 12:19, 20 13:3 16:6 51:18 71:2 77:6 89:20

**wanted** 5:16 54:12 61:7 62:14, 24 64:20 70:8 75:24

**wants** 20:20

**wasn't** 15:5

**waste** 10:13 19:8

**water** 25:3

**way** 47:3

**Wayside** 23:6

**we're** 6:5 57:16,21 76:4 88:25 93:19

**weather** 37:5

**week** 15:9 17:14 33:4 37:13 51:23 82:5

**weekdays** 51:20

**weekend** 51:21

**weekly** 31:22 32:2,13,14,19,25

33:4 45:3

**well** 19:7 35:6 41:11 43:16,23 51:20 52:5 61:9 76:22 79:14,16 89:8

**went** 59:3

**were** 20:15 26:12 27:17,18 33:12 36:18 37:8 38:22 45:7,9 46:6 47:9, 10,17 48:12 49:7, 11 53:19 54:14 55:15,23 58:14 60:4 62:2,3,7 64:10 65:9,11 66:18 68:23 70:11 71:22 73:23 75:25 77:24 80:13,14,17 81:13,21 82:19,24 83:6,7 87:8 88:10

**what** 11:11 13:9, 14,19 15:21 23:17 27:17,22 30:16,23 31:7,18 32:14 34:17 36:7,11,24 37:7,18,20 38:3, 17,21 40:25 42:21 44:14,17 45:19,21 46:5 47:2 49:3,16 50:3 51:7,11 52:2, 7 53:12 54:14 56:17 57:20,25 58:4 60:20,23 62:2,13,15 63:19, 21 64:6,17,25 65:12,16,17 66:7, 15 67:14 68:16 69:8,9,21 71:6 74:23 77:3 80:23, 24 82:9,24 84:8 85:2,15 86:18 88:17 91:8,9 93:10,17

**whatever** 71:22

**when** 24:15 28:4 31:10,14,15,25 32:12 34:14,24,25 35:25 36:3,19 40:24 41:9 45:15 46:3,20 47:11,18 48:9,12 50:14 51:12,16 55:8,10 57:19 58:9,24 60:13 61:24 63:3

66:23 67:10 68:15 69:14 72:12,21 73:10 77:20 82:16 88:18 91:14 92:16 95:11

**whenever** 59:8, 14

**where** 30:6 31:23 45:7 47:8 48:7 49:11,14 72:3 89:22

**whether** 59:9 69:16 73:7

**which** 15:15,20 29:5 39:19 47:17 58:3 62:11 63:11 66:17 67:5 70:3,6 74:18 88:20 91:2 92:13,21

**whichever** 52:5

**while** 13:5 14:21

**who** 5:10 6:2,19 11:10 13:19 14:15 16:13 20:14,21 41:22 43:11 44:20 63:20,21,24 74:5, 23 80:17 81:9 83:18 87:23

**whoever** 17:12 20:22

**whom** 63:21

**why** 5:5 9:5,8,16, 21 39:19

**wife** 90:14,16

**wish** 10:18

**with** 5:14 8:6 15:18 16:9 20:8,10 22:7 27:2,6,12 31:2,5 32:2 33:2,7 34:19,25 37:22,25 40:19 41:16,20 44:3,6,11 45:3 46:12,24 48:6,17, 19,21 50:17,20,21 52:16 53:9 54:21 55:2,3,6 56:18 61:2,4 62:16 63:2, 7,8,18 65:9,18 67:4,8,13,15,24 69:3,5,15 70:8,11, 21 71:4 72:9,13

A1857

117Index: withhold–Zoom

73:3,7 74:2,9 75:6
76:11,14,20 79:16
80:19 81:9,17,25
82:3,13,20,25
83:15,17 84:11,12,
22 85:18 86:17
87:14,19 88:2,11
89:7,9,14 90:14
91:18,19 94:6,10,
14,20,21

**withhold** 62:22

**within** 30:13
37:11 49:9 51:22
52:20 62:19 80:25
81:23 82:23 84:10,
12 85:16,19 88:23

**without** 15:6 27:5,
10

**withstanding**
11:24

**witness** 5:4,18
8:23 11:9 12:3
15:12,16 16:12
17:13 20:22 21:2
32:8 35:9,17,20
42:20 54:5,11 57:9
67:16,25 68:7,11
89:13

**witness's** 11:23

**witnesses** 5:17

**won't** 9:5,16,21

**Woodland** 30:8,
10

**word** 16:15 71:7,
17

**words** 60:5 63:20
86:2

**work** 38:18 61:13
82:6 90:3,13,17,20
91:10,12,15

**worked** 87:23

**working** 41:22

**worth,in** 56:18

**would** 8:22 11:3
17:17 32:2 33:16,
17 34:7 36:7,11,
19,24,25 37:4,8,
12,20 41:10,17,20
42:23 45:4,20
47:12 48:3,13

51:5,7,12,14,18,
20,22 52:10,11,14,
24 59:21 60:11
61:6 62:16 63:4
64:13 65:13,14
66:20 69:2,25
70:3,4,23 72:8
76:25 80:5,10
81:15 85:22 91:11,
12

**would've** 66:3
69:5 91:22

**wouldn't** 90:19

**write** 20:4 24:18
68:6

**writing** 6:12 78:9

**written** 53:25 87:9
89:16

**wrote** 93:8

———————

Y

**year** 31:11 36:23
37:4,14 45:19
59:11 90:9

**years** 30:2,14
31:17 33:16 36:2
45:20 58:12

**yes** 9:2 14:25 18:2
19:22 21:15 23:20
24:7,13,17,25
25:6,12,18,24
26:5,8,13 27:7,9,
16 28:17 29:15,19,
25 30:4 31:4 33:10
34:16 36:21 37:24
38:9,11,14,16
39:21 42:20 43:10,
19 44:2,5 45:17
47:5 48:20 49:10,
21 50:16,19 51:25
53:11 55:18 58:16
62:12 63:16 65:3,
13 66:5 67:2 78:25
79:6,12 81:23
82:11 84:24 90:7,
9,19 91:4,13 95:7,
10

**York** 11:20 22:21
23:7 83:3

**you'll** 11:14

**your** 5:3,14 7:23
8:5 9:2,8,20 10:3
11:9 12:16 16:14
17:9 18:2,8,17
19:4,13,15,22,25
21:2,4,20,22
22:10,25 23:4
24:11 25:9,13,15
26:25 27:6,7,12,22
28:6,15,16 30:6,16
31:18 34:17 38:17
41:16 42:2 43:20
45:13 46:14 47:10,
16 49:7 52:17
53:19 56:22,23
58:4 59:20 66:16,
24 67:16 68:7
70:10 71:25 74:11,
17,19 75:5 76:10,
14 79:2,9,19 82:9
84:9 85:2,15
86:18,23 87:7
88:3,8 89:3,18,22,
25 91:2,8,10,14,22
94:9 95:8

**yourself** 43:7
79:19 80:22

———————

Z

**Zoom** 12:5,14
13:3,5 14:19

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                      Plaintiff,

       -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a Hillside
Auto Outlet, HILLSIDE AUTO MALL INC. d/b/a
Hillside Auto Mall, ISHAQUE THANWALLA,
JORY BARON, RONALD M. BARON, and
ANDRIS GUZMAN,

                    Defendants.
-------------------------------------------------------------------X

**Case No.:** 1:21-cv-7163 (HG) (RLM)

**DECLARATION**
**OF SERGE ZANAN**

    **SERGE ZANAN** declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

    1.    I serve as a Finance & Insurance ("F&I") representative for 161-10 Hillside Auto Ave, LLC, a Defendant in this case, since November 2018.

    2.    I respectfully submit this Declaration to address the allegations of the Plaintiff in this case.

    3.    The Plaintiff was already working as a salesperson at 161-10 Hillside Auto Ave, LLC.

    4.    I never performed any work for Hillside Auto Mall Inc., a separate dealership located three (3) blocks away from 161-10 Hillside Auto Ave, LLC.

    5.    As far as I know, the Plaintiff worked for Hillside Auto Mall Inc. either.

    6.    Whenever the Plaintiff or any other salesperson makes a sale, the customer's information is provided to the Sales Manager or myself (whoever is available and has authorization) to pull the prospective customer's credit profile.

A1859

7.      Once the credit profile is pulled, the customer's application to purchase a vehicle is submitted to chosen lenders.

8.      The timeframe to receive any word back from a chosen lender, which is also based on the customer's creditworthiness, ranges from ten (10) minutes to one (1) hour.

9.      This timeframe is completely outside the control of myself or any Sales Manager who pulls a credit profile, and is further dependent on the amount of verification requested by any chosen lender, which is also completely outside the control of myself or any Sales Manager.

10.     Sometimes, a chosen lender instantly approves a loan for a customer, usually for a customer with excellent creditworthiness, which is rare at our dealership.

11.     Even in perfect circumstances, this process can sometimes take up to an hour.

12.     During the time Plaintiff worked here, I worked closely with her as well as all the other salespersons.

13.     Everybody liked each other and treated each other well.

14.     There was no animosity amongst the salespeople, myself, nor the sales managers.

15.     My compensation at 161-10 Hillside Auto Ave, LLC is directly tied to the success of the dealership's sales force.

16.     As a result, it is in my interest as well as the Sales Managers' interests, to do everything possible to ensure a sale is made for each and every customer the dealership processes an application for.

17.     It would not make sense for me to make any customer wait longer than necessary to process an application because doing so would affect my bottom line, the saleperson's bottom line, the sales manager's bottom line, and the dealership as a whole.

2

A1860

18.    In other words, I have no reason to believe anybody would act to sabotage Plaintiff's sales, or any other salesperson's sales.

19.    If a customer was forced to wait, the only reason for that would be based on circumstances outside of the dealership's control, such as the failure of a customer to provide necessary information to the lender, or because the lender requested additional documentation or simply because the dealership had to wait for the lender's response.

20.    In the course of the last four years working at the dealership, customers have waited to obtain information concerning financing approval from twenty (20) minutes until three (3) hours, on average.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 10, 2022.

_____
**SERGE ZANAN**

3

A1861

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                          Case No.: 1:21-cv-7163 (OEM) (LB)

              Plaintiff,

      -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

              Defendants.
-----------------------------------------------------------------X

## DEFENDANTS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Matthew A. Brown, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
matt@mllaborlaw.com

*Attorneys for Defendants*

### PRELIMINARY STATEMENT

Plaintiff fails to raise a genuine dispute of material facts in order to avoid summary judgment. Plaintiff misconstrues the record, ignores dispositive evidence and disregards unfavorable precedent that forecloses her claims. Consequently, summary judgment must be granted.

### ARGUMENT
### POINT I
### PLAINTIFF'S OPPOSITION IS UNTIMELY

Plaintiff failed to timely file her opposition to this motion by February 1, 2024 deadline. [See 1/2/24 ECF entry extending deadline]. Without notice or explanation, Plaintiff served her opposition a day late on February 2, 2024. [Dkt. No. 95].[1] Accordingly, the Court should reject her opposition out of hand. See Interglobo Customs Broker, Inc. v. Herschel Imports, Inc., 2015 U.S. Dist. LEXIS 73227, at *4 (S.D.N.Y. 2015)(defendant's summary judgment opposition "untimely"). See also Fed. R. Civ. P. 6 (regarding extensions).

### POINT II
### PLAINTIFF WAS NOT SUBJECTED TO UNLAWFUL DISCRIMINATION

#### A. Title VII/PDA/NYSHRL Discrimination Claims Related to Pregnancy & Sex

##### 1. Plaintiff Did Not Suffer An Adverse Employment Action

Plaintiff argues that she suffered adverse employment actions, such as, (1) longer wait times for credit reports causing customers to walk out, resulting in lower commission payments, (2) a failure to discuss a previously promised promotion and (3) constructive discharge. To reiterate, in determining whether an adverse employment action has occurred, the Court must

---

[1] Troy Law has a history of non-compliance with Court orders, so Plaintiff's untimely opposition cannot be chalked up as a simple mistake. See e.g., Rodpracha v. Pongsri Thai Rest. Corp., 2021 U.S. Dist. LEXIS 53290, at *2 (S.D.N.Y. 2021)(finding Troy Law inadequate to class counsel and noting that the Court "shares the broader concern that has been expressed by other judges … that, regardless of its professed level of experience in wage-and-hour cases, Troy Law has shown a tendency towards prejudicial neglect of its clients' interests"); Guangqing Lin v. Teng Fei Rest. Grp. Inc., 2020 U.S. Dist. LEXIS 9122, at *3 (S.D.N.Y. 2020)(sanctioning Troy Law for repeated "noncompliance with court-ordered deadlines").

consider whether the action in question "is more disruptive than a mere inconvenience or an alteration of job responsibilities," and instead rises to the level of "a materially significant disadvantage with respect to the terms of the plaintiff's employment." Littlejohn v. City of New York, 795 F.3d 297, 311 n.10 (2d Cir. 2015)(internal quotation marks, alterations, citations omitted). Here, the alleged actions do not rise to the level of an adverse employment action.

For instance, the claim that increased wait times for customer credit applications caused a loss of customers which in turn resulted in lower commissions is conclusory and mischaracterizes the record. Plaintiff first clings to her own unsubstantiated and self-serving testimony that approximately two (2) out of three (3) potential customers she met with on a daily basis walked out due to longer wait times for credit applications. (CSMF ¶ 189). This is the epitome of speculation as to each customer's psychological state and is not supported by any evidence (i.e. customer testimony) as to why they left the dealership. Clarke v. JPMorgan Chase Bank, N.A., 2010 U.S. Dist. LEXIS 33264, *25 (S.D.N.Y. 2010)(plaintiffs' personal and ungrounded beliefs constitute wholly inadmissible evidence and a court "may not rely on conclusory allegations or unsubstantiated speculation.").

The record is also devoid of any evidence that such customers would have purchased a vehicle if the wait was shorter, or if there were other reasons for leaving (e.g. better price at a competitor). Nor is there evidence as to what percentage of customers that Plaintiff met with did not actually purchase a vehicle prior to announcing her pregnancy. Further undermining the claim, there is absolutely no substantiating evidence that wait times for customers of male employees was shorter than Plaintiff's customers.

Moreover, there is no evidence that Plaintiff's commissions actually suffered due to the increased wait times. At best, Plaintiff argues in a conclusory fashion that as a direct result of the

wait times, she went from top saleswoman to selling near the least amount of cars. (CSMF ¶¶ 87, 172). Clarke v. JPMorgan Chase Bank, N.A., 2010 U.S. Dist. LEXIS 33264, at *25. Additionally, there is no evidence (aside from Plaintiff's own inadmissible conclusory statements) to support that the fluctuation in weekly commissions resulted from the longer waiting times. In fact, various factors contributed to such fluctuations and as per the evidence, the number of cars Plaintiff sold changed on a weekly basis. Of critical importance, Plaintiff cites no evidence accompanying the commissions earned by any other employees and her, let alone those outside of her protected class.

Plaintiff also avers that the Court should not consider her average weekly commissions ("AWC") from all weeks prior to December 18, 2018, but only consider the change in her AWC from September 4, 2018 to December 17, 2018 against the time period starting December 18, 2018. The Court should reject this argument for multiple reasons.

First, Plaintiff admits that she announced, and Guzman was aware of, her Pregnancy on November 23, 2018. (CSMF ¶ 80). Plaintiff provides no legal or factual basis to utilize December 18, 2018 as an inflection point as opposed to her pregnancy announcement date of November 23, 2018.

Second, coupling Plaintiff's failure to include AWC earned prior to September 2018 and use of December 18, 2018 as an inflection point only serves to mischaracterize and skew the evidentiary record to show a 40% decrease in AWC during her last few weeks of employment. In reality, Plaintiff's AWC after announcing her pregnancy on November 23, 2018 was $690.63. While Plaintiff argues without any evidentiary support that she did not work in Week 12 when she earned no wages, excluding that week increases her AWC prior to November 23, 2018 from

$710 to $734.40. In sum, the difference in AWC after announcing her pregnancy was a measly $47.77 (i.e. less than 1/3 of a car sale per week based on $150 per car commission).[2]

Third, Plaintiff cites no evidence as to why her sales figures were higher in November and early December compared other weeks before or after her pregnancy announcement. Similarly, she fails to account for the reality that auto sales fluctuate on a weekly basis due to various factors (i.e. sales programs, seasonal changes, holidays, etc.). In fact, the end of December and early January are a holiday season when millions of Americans travel.

In addition, the fact that Plaintiff was not yet provided with a previously promised promotion at her time of separation cannot give rise to an adverse employment action considering the totality of the circumstances. Although Thanwalla denies promising her a promotion, this claim is solely premised on Plaintiff's subjective belief that she would not be promoted. Devastating her claim, Plaintiff concedes that Thanwalla never denied the promotion or stated she would not be promoted. Instead, she speculates that because Thanwalla made her wait to discuss the promotion after he returned from vacation, it was tantamount to a failure to promote. (CSMF ¶¶ 123-124). Yet Plaintiff admits other key facts that undermine her position. Specifically, she admits Thanwalla told her he would discuss the promotion with her later and that she quit due to her did not want to wait longer for a decision. (CSMF ¶¶ 119-121).

Finally, Plaintiff argues that her voluntary resignation was a constructive discharge because any reasonable person would have quit as a result of the "intolerable work atmosphere" caused by the complained of conduct.[3] Specifically, she claims that she was "pregnant, tired, and

---

[2] Plaintiff's argument that she earned base pay of $200 in week 34 is a red-herring because (1) she admitted this was a bonus, not base pay. (See Dkt. No. 1, ¶ 57) and (2) the claim centers around commissions, not changes to base pay.
[3] A "constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Walsh v. Scarsdale Union Free Sch. Dist., 375 F. Supp. 3d 467, 478 (S.D.N.Y. 2019). Working conditions are intolerable when, viewed as a whole, they are "difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Lowe v. Cusa, LLC, 2011 U.S. Dist. LEXIS 172700, at *10 (S.D.N.Y. 2011).

not making any money." However, this conclusory position is belied by the evidence as outlined above. Further, such a fact is insufficient to establish a constructive discharge. See Stetson v. NYNEX Serv. Co., 995 F.2d. 355, 361 (2d. Cir. 1993)(holding no claim for constructive discharge where employee was dissatisfied with his compensation, assignments, and criticisms of his work, but rank and salary was never reduced). Moreover, the alleged conduct lasted for approximately (4) weeks before she quit, shortly after Thanwalla returned from vacation, holidays ended and before Thanwalla was able to discuss a promotion. Even worse, Plaintiff even texted Baron that she and David Manrique ("Manrique") a male employee, quit for the same reason (i.e. non-payment of compensation).

Based on the facts most favorable to Plaintiff, she simply cannot establish that she suffered any adverse employment action.

### 2.  Plaintiff Has Not Raised An Issue of Fact Concerning Causation

Plaintiff there is causation between the pregnancy announcement and i) decrease in sales because of increased credit application approval times and ii) lost access to Dealer Track; both are unavailing.

With respect to increased wait times, Plaintiff relies solely on speculation. Here, there is ample evidence that outside parties could have affected application times (e.g. response times from third parties and financial institutions, failure from customers to provide required information right away, etc.). Additionally, as Plaintiff asserts, Guzman was solely "responsible for running credit" as of late December 2018. In fact, as the records shows the slowdown related to Thanwalla, the General Sales Manager, taking a vacation, which caused Guzman to have double the amount of work to do in Thanwalla's absence.

Despite the factual shortcomings of her claims, Plaintiff peddles a theory without evidentiary support that Guzman intentionally delayed her customer's applications due to her pregnancy but did not delay her co-workers' applications. In reality, there is absolutely no evidence as to the wait times for other salespersons as of December 18, 2018 or that the time for the outside third parties to respond to credit applications was different or other salesperson.

In addition, she argues that the delays in credit processing caused a "statistically-significant decrease" in her car sales "immediately after she announced her pregnancy" because she went from top saleswoman in November 2018 to the bottom salesperson in late December 2018. But, this contradicts the evidence on this motion demonstrating there was no material change in her commissions and that her claim of that her sales decreased "immediate" afer announcement belies the discovery production showing a decrease a month later. Plaintiff's additional attempt to support the claim that wait times caused an impact is nothing more than useless speculation.

Moreover, as described above in Section 1, there was a nominal change in AWC after her pregnancy announcement, but no evidence directly connecting it with the complained of conduct as opposed to outside factors. Moreover, as noted above, Plaintiff does not present evidence concerning the amount of commissions earned by comparators.[4] Similarly torpedoing the claim

---

[4] Plaintiff's last-ditch argument to avoid summary by claiming spoliation of weekly salesperson commission is unavailing. First, Plaintiff never previously raised such alleged spoliation or sought related relief. Second, commission earnings performance is based on many variables so the complained of "spoliation" does not foreclose summary dismissal. Third, any additional documents on this point are superfluous and no inference against Defendants should be taken because Defendants produced weekly paystubs for all salespersons from the relevant time period that include a separate line-item for commission payments. (See Troy Aff. in Opp. Exhibit 10).

Plaintiff also relies upon her "fact" that many coworkers observed and commented on the drastic decrease in Plaintiff's sales after her pregnancy announcement. Such comments are inadmissible hearsay that should not be considered. See Fraser v. MTA Long Island Rail Rd., 2018 U.S. Dist. LEXIS 55422, *38 (E.D.N.Y. 2018)(holding that a party cannot sustain its burden in opposing summary judgment by relying on inadmissible hearsay evidence.).

that she was treated less well than males is Plaintiff's text to Baron that she quit for the same reason as Manrique (i.e. failure to pay wages).

With respect DealerTrack, Plaintiff does not dispute with evidence the fact that no salespeople had access to DealerTrack. Plaintiff cannot show with evidence that Guzman had knowledge of Plaintiff's alleged access to DealerTrack or that he was authorized to provide her the password and still refused Plaintiff. Plaintiff concedes that Guzman's refusal to provide access occurred weeks after her announcement, which undercuts her claim of an "immediate" access impediment. Plaintiff does not credibly contradict the fact that Thanwalla, not Guzman gave her such access, and the delay was only because Thanwalla was out on vacation and could not log in to the system for Plaintiff. Further, there is no evidence that Guzman gave Dealertrack access to Plaintiff's co-workers or treated Plaintiff differently concerning Dealertrack.

Also weighing against any inference of discrimination, Plaintiff readily admits that Guzman never made any comments about her pregnancy. (CSMF ¶ 94). Yet, without any support she argues that Guzman's conduct alone is enough. See Lizardo v. Denny's Inc., 270 F.3d 94, 104 (2d Cir. 2001)(finding no inference of race discrimination where "[n]o comment or statement made by the defendants had any racial content or overtone").

Further undermining any discriminatory animus is Plaintiff's admission that she had interpersonal conflicts with Guzman pre-dating her pregnancy announcement. (CSMF ¶ 93). While Plaintiff claims they worked professionally, this is of no moment as she cites no facts to support this position, nor any evidence of Guzman's psychological state.

Lastly, with repesct to the delay in promotion theory, as discussed above, Plaintiff concedes that Thanwalla never denied the promotion or told her she would not be promoted. Instead, he stated that he was simply not prepared to discuss the issue with Plaintiff at the

specific time she raised it. Plaintiff chose to quit shortly thereafter before she could be promoted. Her explanation that she was "tired of being given the runaround and not making money" does not provide an inference of discrimination, as there is nothing connecting the failure to promote to her protected class. (CSMF ¶¶ 119-121). Also, the mere fact that Thanwalla knew she was pregnant is also not enough to create an inference of discriminatory animus. [5]

In sum, there is no evidence that raises a question of fact to defeat summary judgment. Plaintiff's federal and state pregnancy/sex discrimination claims must be dismissed.[6]

**B. <u>NYSHRL Disability Discrimination Claim</u>**

Plaintiff waived her NYSHRL claim for disability discrimination for failure to oppose it <u>Johnston v. Town of Orangetown</u>, 2013 U.S. Dist. LEXIS 40517, at *7 n.3 (S.D.N.Y. 2013)(claim dismiss for failure to respond to summary judgment. Thus, Plaintiff's disability discrimination claim should be dismissed.

**POINT VI**
**AUTO MALL CANNOT BE HELD LIABLE FOR THE COMPLAINT OF CONDUCT**

To the extent any discrimination claims survive dismissal, which should not be the case, there is simply no evidence that Auto Mall is liable for any unlawful discrimination. In her opposition, Plaintiff alleges that Auto Mall is held liable because it "constituted a single integrated enterprise" with Auto Outlet, her direct employer. However, this argument wholly misses the mark. Instead, as discussed in Defendants' initial moving papers, Plaintiff must still establish that Auto Mall, the alleged joint employer, knew or should have known of the

---

[5] Similarly, Plaintiff's unsubstantiated assertion that another pregnant employee in a different position quit months prior after being disciplined (CSMF ¶ 202) is irrelevant, especially where there is no evidence as to who disciplined her, whether the purported discipline was unfounded as opposed to discriminatory animus.

[6] Under the NYCHRL's more liberal standard, Plaintiff's discrimination claim still fails for the same reasons, as there is no evidence that Plaintiff was treated "less well" than non-pregnant or male employees. In addition, Plaintiff never asserted a claim for NYCHRL sex discrimination in the Complaint, so any arguments regarding such a claim should not be countenanced.

discriminatory conduct and failed to take corrective measures within its control. Yet, Plaintiff failed to address or otherwise oppose this branch of the motion on this basis, which is again tantamount to waiver. See Johnston, 2013 U.S. Dist. LEXIS 40517, at *7 n.3. Even worse, Plaintiff admits critical facts undermining her position (i.e. she only worked for Auto Outlet and Auto Mall had no control over her daily employment activities). (CSMF ¶¶ 21-23, 147). Thus, summary judgment dismissing the Complaint against Auto Mall is appropriate.

<div align="center">

**POINT VII**
**THE INDIVIDUAL DEFENDANTS ARE NOT LIABLE**

</div>

As to Guzman, assuming Guzman did assist Thanwalla in running day-to-day operations at Auto Outlet as the financial manager on site and was "involved [in employment] decisions", there is no dispute that Guzman had authority to hire/fire/discipline. As such, the claims fails. *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365 (SDNY 2012).

Guzman's alleged participation in the alleged discrimaintory (e.g. access to DealerTrack and "purposeful delay") did not occur as established above. White v. Pacifica Found., 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (noting that where a plaintiff "has not demonstrated a primary violation, there can be no liability for aiding and abetting")

As to Thanwalla, Plaintiff premises liability on allegedly not taking corrective action against Guzman's alleged discrimination. However, Plaintiff does not cite to any evidentiary support for this position. (See P's MOL p. 23-24). Therefore, Plaintiff cannot defeat dismissal of the claim for aiding and abetting with respect to Thanwalla. White, 973 F. Supp. at 378.

Concerning Baron, Plaintiff presents several bases for aiding and abetting liability – being present at the dealership, speculation about the meaning of being Plaintiff's point of contact at the dealership, a text message and call 10 days after she quit where she referenced wages - but none establish that he 'actually participated in the conduct' as is required to impute

liability. Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) ("Employees may be held personally liable under the NYSHRL and the  NYCHRL" if they participate "in the conduct giving rise to a discrimination claim."). Such facts, even if true, are inadequate to establish that Baron knew about or participated in the alleged conduct during Plaintiff's employment to attach liability. Accord Deveaux v. Skechers USA, 2020 U.S. Dist. LEXIS 63356, at *3 (S.D.N.Y. 2020)("Individual liability may be imposed on an 'employer' who 'actually participates in the conduct giving rise to the discrimination.'")

In sum, there are no facts that any of the individual Defendants held the requisite authority and/or aided and abetted the purported discrimination. Accordingly, summary judgment dismissing the claims against these individuals is appropriate.

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court grant the instant motion dismissing the complaint in its entirety, or in the alternative, dismissing the complaint against Auto Mall and the individual defendants, and awarding such other relief as deemed just and proper.

Dated: March 27, 2024                    **MILMAN LABUDA LAW GROUP PLLC**

                                         By:    /s/ Joseph M. Labuda, Esq.
                                                Joseph M. Labuda, Esq.
                                                Matthew A. Brown, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LETICIA FRANCINE STIDHUM,

                                    Case No.: 1:21-cv-7163 (OEM) (LB)

              Plaintiff,

        -against-

161-10 HILLSIDE AUTO AVE, LLC d/b/a
HILLSIDE AUTO OUTLET, HILLSIDE AUTO
MALL INC d/b/a HILLSIDE AUTO MALL,
ISHAQUE THANWALLA, JORY BARON,
RONALD M BARON, and ANDRIS GUZMAN,

                        Defendants.
-------------------------------------------------------------------X

### DEFENDANTS' REPLY STATEMENT OF MATERIAL FACTS IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

    Defendants 161-10 Hillside Auto Ave, LLC d/b/a Hillside Auto Outlet ("Hillside Auto Outlet"), Hillside Auto Mall Inc. d/b/a Hillside Auto Mall ("Hillside Auto Mall"), Isaque Thanwalla ("Mr. Thanwalla"), Jory Baron ("Jory Baron"), Ronald M. Baron ("Ronald Baron") and Andris Guzman ("Mr. Guzman") (collectively, the "Defendants"), hereby set forth, pursuant to Rule 56.1 of the Local Civil Rules for the Eastern District of New York, the following Reply Statement of Material Facts as to which they contend no genuine issues exists to be tried by a jury:

### ADDITIONAL MATERIAL FACTS

A. **Each of the members of Hillside Auto Outlet, Josh Aaronson, Jory Baron, The Estate of David Baron, and Ishaque Thanwalla, had the power to hire and fire at Hillside Auto Outlet.**

1. The role of hiring and hiring at Hillside Auto Outlet was Ishaque Thanwalla's. (Baron Dep. 37:22-38:16). Jory Baron had no authority to hire or fire any employee. (Baron Dep. 38:25-40:12). Jory Baron never hired or fired anyone at Hillside Auto Outlet. (Baron Dep. 42:1-

42:12). Hiring and firing was the responsibility of the general manager. (Guzman Dep. 68:19-69:15).

**B. Between late December 2018 and early January 2019, Ishaque Thanwalla was in Pakistan. During this period of time, Andris Guzman assisted Thanwalla in running the day-to-day operations at Hillside Auto, being the financial manager on site.**

2. Ishaque Thanwalla was in Pakistan between on or about December 20th or 21st, 2018 and January 6th or 7th, 2019. (Thanwalla Dep. 65:7-65:16). At all relevant times, Thanwalla ran the day-to-day operations at Hillside Auto Outlet and served as its general manager. (Thanwalla Dep. 17:3-18:11, 27:7-28:3; Baron Dep. 38:3-38:6, Jennings Dep. 25:2-5, Baron Dep. 52:2-6).

**C. Jory Baron was present at the dealership a couple of months each month. As a result, he knew of the Plaintiff, including her identity, her schedule and compensation at the time when she reached out to him in January 2019.**

3. Jory Baron's visitation to the dealership would "vary every so often." (Baron Dep. 51:2-51:10). Jory Baron did not know basic information about employees' identities, schedules, compensation, and hiring processes, including that of the Plaintiff because he did not deal with that aspect of the dealership. (Baron Dep. 34:7-16, 38:17-24, 40:13-23, 41:9-25, 48:17-49:6, 50:17-25, 54:13-55:18 (did not know of Plaintiff until after she quit and complained and later sued), 81:13-24, Plaintiff Dep. 59:4-13).

**D. When there was an issue that goes beyond the responsibilities of Isaac or Jay, she would report to Jory Baron "Only when there was an issue."**

4. Jory Baron communicated to Plaintiff that if there were any problems or issues, she would have had to follow up with Thanwalla, and that Jory Baron had no role in helping resolve any issues. (Baron Dep. 69:2-7).

**E. Guzman was a sales manager at Hillside Auto Outlet from Plaintiff's hiring through July or August 2018.**

5. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019. (Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.)

**F. Thereafter, from September 2018 through Plaintiff's termination in January 2019, Guzman was the financial manager.**

6. As a general manager, Guzman worked with banks and helped obtain loans for customers. (Guzman Dep. 52:4-14). Guzman would work with the finance manager in facilitating the deal with the customer. (Guzman 59:6-21).

**G. As the financial manager, Guzman was part of the "team effort" and was "involved [in employment] decisions "even while not having the sole authority to hire, fire or discipline. For instance, Plaintiff was hired only after the general manager, Ishaque Thanwalla conferred with the financial manager Jeanique.**

7. The general manager was in charge of hiring and firing employees. (Guzman Dep. 68:19-25). The sales manager had no power to hire, fire or discipline any employees. (Guzman Dep. 69:2-12).

**H. Guzman was not the general sales manager.**

8. Guzman was a sales manager and general sales manager at Hillside Auto Outlet from 2018 through August 2019. (Thanwalla Dep. 55:21-25, 56:2-24; Guzman Dep. 17:8-18:2, 50:24-51:17, 83:5-8; Jennings Dep. 60:13-18; Guzman Decl.). His main responsibility as a sales manager was to ensure that all deals were processed; his responsibilities as a general sales manager included being involved in finance, which required him to work with banks, get customers approved for loans, and running credit for customers (which he also did as a sales manager). (Guzman Dep. 51:18-53:7; Guzman Decl.)

**I. The general manager was Ishaque Thanwalla.**

9. Admit.

**J.  At all relevant times, Deanna Jennings worked concurrently for Hillside Auto Outlet and Hillside Auto Mall.**

10. Deanna Jennings worked at Hillside Auto Outlet. (Guzman Dep. 72:23-73:2).

**K.  At the time, Aaronson said he "was opening another store and he wanted me to be controller until they found a full-time person for the position."**

11. Deanna Jennings was the controller for Hillside Auto Outlet when it opened. (Jennings

Dep. 20:21-25).

**L.  Plaintiff, a saleswoman, is expressly given authorization to access to Dealertrack by general manager Ishaque Thanwalla.**

12. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**M.  Plaintiff was given Ishaque Thanwalla's username and password to run and read credit between August 2018 and December 2018.**

13. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**N.  Plaintiff states that 40 to 50 percent of the time, she can get customers in and out of the door within an hour or less; therefore, the time it takes a customer to purchase a vehicle is predictable.**

14. Every single deal is different. No two customers are the same in the car sales business.

(Thanwalla 146:6-19). Further, after the verifications are completed, the dealership runs

the customer's credit and determines whether any additional verifications are required

based on the credit check, which could take anywhere from twenty to thirty minutes or

hours depending on the circumstances. (Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-

51:15; Jennings Dep. 78:18-79:22; Guzman Decl.)

**O.  Between August and December 2018, Plaintiff was given express authorization to run, read, and pre-approve the credit applications with DealerTrack.**

15. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**P.  For the period of time between late December 2018 and January 2019 up until Thanwalla's return from Pakistan, Plaintiff Leticia Stidhum's only point of contact upon completion of the credit application was Andris Guzman. At that time, Jeanique**

**had departed from Hillside Auto Outlet, Thanwalla was overseas, and Zanan did not typically run the credit.**

16. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

**Q. In 2018 prior to Thanwalla's trip to Pakistan in late December 2018, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away between late December 2018 and January 2019, Guzman was the only one who was responsible for running the credit.**

17. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

**R. Prior to Thanwalla's trip overseas, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away in December 2018 and January 2019, Guzman was the only one who was responsible for running the credit.**

18. Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

**S. Serge Zanan qualified a customer only very rarely.**

19. Serge Zanan ("Zanan") is a finance manager at Hillside Auto Outlet since November 2018.

(Thanwalla Dep. 55:8-13, 210:15-212:19).   Upon completion of the credit application, Plaintiff and other salespeople had the option of going to Thanwalla, Jeanique, Guzman, or Zanan to ascertain whether a customer qualified for financing, and Plaintiff chose who to go to based on whoever was less busy, always grabbing whoever she could. (Plaintiff Dep. 63:6-64:8, 66:23-67:25, 173:11-174:9; Thanwalla Dep. 154:17- 155:25; Guzman Decl.)

**T.   In August 2018, Thanwalla taught Plaintiff how to run and read credit and expressly gave her access to DealerTrack.**

20. Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**U.   "[F]or the most part" because the sales procedure is to "get [the] ID, the most recent two paystubs, and that proof of address if needed," the verification process is instantaneous and conducted not by any employee of Hillside Auto Outlet but by the banks.**

21. "[W]e check the credit, and we check to see if there are any additional verifications. There are times that you are going to see, you are going to see more recently, that there are a lot of fraud alerts and if there is a fraud alert, that means that extra verification that we have to do and put that in place. (Guzman Dep. 57:16-23). deler

**V.   The sales manager did not have to contact the employer to verify that the paystubs are legitimate. Instead, the sales manager simply deploys a heuristic to quickly determine by sight whether the paystubs are legitimate to upload for the banks.**

22. Every single deal is different. No two customers are the same in the car sales business. (Thanwalla 146:6-19)

**W.   The dealerships' determination would never take twenty to thirty minutes or hours. Rather, the determination is for the most part instantaneous.**

23. After the verifications are completed, the dealership runs the customer's credit and determines whether any additional verifications are required based on the credit check, which could take anywhere from twenty to thirty minutes or hours depending on the

circumstances. Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep. 78:18-
79:22; Guzman Decl.

**X.** **Fraud alerts on Hillside Auto Outlet customer's profile occurred rarely.**

24. Fraud is frequent and the dealership deals with identifying fraud in a multifaceted way.
(Guzman Dep. 57:2-23).

**Y.** **Additional verification on the part of credit bureaus occurred rarely and does not require one or two days to update.**

25. After the verifications are completed, the dealership runs the customer's credit and
determines whether any additional verifications are required based on the credit check,
which could take anywhere from twenty to thirty minutes or hours depending on the
circumstances. (Guzman Dep. 55:2-62:2; Thanwalla Dep. 50:5-51:15; Jennings Dep.
78:18-79:22; Guzman Decl.). Sometimes, customers have fraud alerts on their credit
profiles which cause delays due to extra verification requirements; when that happens,
customers receive calls from the bank to make sure that they are, in fact, the ones seeking
to obtain vehicle financings. (Guzman Dep. 55:2-62:2). Other times, when information
with the credit agencies do not match those the customer provides, additional verification
is required by the credit bureaus, which can take one or two days to update. (Guzman Dep.
55:2-62:2; Guzman Decl.). Dealerships do not control the process. (Guzman Dep. 55:2-
62:2; Guzman Decl.).

**Z.** **Guzman intentionally delayed the credit applications of Plaintiff's customers despite Plaintiff asking Guzman multiple times about the status of the credit applications after her pregnancy announcement in late November 2018 and Ishaque Thanwalla's trip to Pakistan in late December 2018.**

26. It would not make sense for Guzman to take more time than necessary to ascertain qualified
for financing, as he and everyone at the dealership, except porters, received a commission

for every sale. (Plaintiff Dep. 82:9-83:1, 88:11-19, 107:4-12; Thanwalla Dep. 96:12-99:4, 102:5-19; Zanan Decl. ¶¶ 15-17; Guzman Decl.)

**AA. How quickly Guzman chooses to run the credit is squarely within his—and by extension—the dealership's control.**

27. All of the foregoing issues are outside of the dealership's control; it could take three (3) to six (6) hours or sometimes even days for a customer to purchase a vehicle. (Guzman Dep. 55:2- 62:2; Plaintiff Dep. 65:13-66:18, 177:23-178:24, 181:18-182:9; Thanwalla Dep. 220:20-221:14; Zanan Decl. ¶ 19; Guzman Decl.)

**BB. Car insurance is mandatory in New York. Thus, regardless of whether customers are paying in cash or through finance, customers who have funds to purchase a vehicle secure enough funds to purchase car insurance in addition to the car purchase.**

28. There is also a requirement for every customer to purchase insurance for the vehicle he or she wishes to buy; often, customers have to wait before they have the funds to pay the insurance company before they can insure the vehicle. (Guzman Dep. 55:2-62:2; Guzman Decl.)

**CC. Of the two to three people who Plaintiff was seeing daily, on average two customers walked out (roughly 2/3 of the customers) walked out due to the longer wait time caused by Guzman's targeted and intentional delay in running and reading the credit applications.**

29. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**DD. At Hillside Auto Outlet, Plaintiff was the only female salesperson for the first four months of her employment.**

30. Plaintiff was one of many female salespersons at Hillside Auto Outlet. (Thanwalla Dep. 231:21-232:7).

**EE. Thereafter she was one of two female salespeople at Hillside Auto Outlet.**

31. Plaintiff was one of many female salespersons at Hillside Auto Outlet. (Thanwalla Dep. 231:21-232:7).

**FF. Thanwalla knew of Stidhum's pregnancy.**

32. Plaintiff announced her pregnancy on November 23, 2018 to most of the employees at Hillside Auto Outlet, including Guzman; she is unsure whether Thanwalla was there during the announcement. (Plaintiff Dep. 69:17-71:2, 200:22-24). Thanwalla was unaware of any pregnancy, announcement, or such. (Thanwalla Dep. 128:20-129:16).

**GG. Guzman had access to the Dealertrack password.**

33. Admit.

**HH. Guzman refused to provide Plaintiff Leticia Stidhum with the Dealertrack password.**

34. Plaintiff complained that Guzman did not provide her with the Dealertrack password when Thanwalla left for vacation. (Plaintiff Dep. 67:4-6, 68:3-4, 68:21-69:3). But Guzman did not have the ability to change the password for Dealertrack. (Plaintiff Dep. 91:10-92:6, 94:15-95:2; Guzman Dep. 90:14-19). Thanwalla never gave any password to any employee, ever. (Thanwalla Dep. 62:4-19).

**II. Plaintiff was the top salesperson at the dealership up and until November 2018.**

35. There were always three top people at the dealership. (Thanwalla Dep. 160:16-161:5). Otherwise, she was a good salesperson. (Jennings Dep. 56:15-17, Guzman Dep. 86:19-25). Additionally, after announcing her pregnancy, Plaintiff was almost always one of the commission-earners in the Dealership on a weekly basis.

| Pay Cycle | Plaintiff's Commission Earned | Comparators Who Earned More | Total Salespersons |
|---|---|---|---|
| November 27, 2018-December 3, 2018 | $1,600.00 (Bates Stamped No. D1269) | N/A | 8 |
| December 4, 2018-December 10, 2018 | $825.00 (Bates Stamped No. D1299) | Comparator 1: $975.00 (Bates Stamped No. D1304) | 10 |
| December 11, 2018-December 17, 2018 | $625.00 (Bates Stamped No. D1331) | Comparator 1: $715.00 (Bates Stamped No. D1335)<br><br>Comparator 2: $1,105.00 (Bates Stamped No. D1336)<br><br>Comparator 3: $875.00 (Bates Stamped No. D1338) | 10 |
| December 18, 2018-December 24, 2018 | $500.00 (Bates Stamped No. D1361) | Comparator 1: $545.00 (Bates Stamped No. D1364) | 8 |
| December 25, 2018-December 31, 2018 | $325.00 (Bates Stamped No. D1389) | Comparator 1: $1,365.00 (Bates Stamped No. D1393)<br><br>Comparator 2: $700.00 (Bates Stamped No. D1394)<br><br>Comparator 3: $500.00 (Bates Stamped No. D1396)<br><br>Comparator 4: $345.00 (Bates Stamped No. D1391) | 8 |
| January1, 2019-January 7, 2019 | $825.00 (Bates Stamped No. D1418) | Comparator 1: $1,105.00 (Bates Stamped No. D1422)<br><br>Comparator 2: $1,175.00 (Bates Stamped No. D1424) | 9 |

**JJ.  Over time, between July or August 2018 to December 2018, Guzman "learned how**

**to navigate through it a little quicker." Between late December 2018 through the end of Plaintiff's employment in January 2019, Guzman intentionally delayed the credit applications of Leticia Stidhum's customers despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer.**

36. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**KK. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer.**

37. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**LL. While previously, the wait time was around 20 minutes to handle these applications, the wait time increased to 40-60 minutes, or longer. This lead to customers walking out.**

38. Only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**MM. This happened "only right after I announced my pregnancy, that would be the first reason why, and not to mention, like I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I**

**announced my pregnancy. It wasn't [like] I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out."**

39. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation. (Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D).

**NN. A text message sent Thanwalla from Stidhum reads, in relevant part: "and for you to call me your daughter and say you love/ me and all this bull shit knowing wtf I been going thru this past month you been gone/ not making shit because your team fucking sucks I work 60 hours a week for 7/ months straight no days off n december i slacked because you left and everything went to shift from there."**

40. Prior to the filing of her complaint in court, Plaintiff complained to Thanwalla in a text message that the reason Guzman took so long to process financing applications for customers is not because she was pregnant but because he "sucks," and that the dealership was a "shit show" since he went on vacation. (Plaintiff Dep. 161:10-23; Thanwalla Dep. 192:14-193:4; Kataev Decl. ¶ 6, Ex. D).

**OO. Plaintiff lost many customers to Guzman's deliberate delay, including a "couple of customers" who explicitly stated that it was due to the wait time.**

41. Nobody was aware of the fact that Plaintiff complained about a longer wait time than usual. (Jennings Dep. 80:16-19). Further, only a couple of customers informed Plaintiff that they did not want to purchase a vehicle because it took too long for her to get back to them about qualifying for financing, such that – at most – Plaintiff lost $300.00 in commissions. (Plaintiff Dep. 84:8-15; Guzman Dep. 106:13-16 (no recollection of any customers walking out due to long wait times); Guzman Decl.)

**PP.  DMV Clerk Lilly was disciplined while pregnant and departed and she stormed out upset at Hillside Auto Outlet's treatment of her within a week of Plaintiff's start at Hillside Auto Outlet.**

42. Lilly clerk left the position as a DMV Clerk from Hillside Auto Outlet on her own accord because she was unsatisfied with Thanwalla's disciplining of her work as her work involved very sensitive information. (Thanwalla Dep. 71:21-73:5). Lilly never complained that she was terminated for being pregnant. (Thanwalla Dep. 73:6-8). She started her position pregnant. (Thanwalla Dep. 73:9-14).

Dated: Lake Success, NY
March 27, 2024

**MILMAN LABUDA LAW GROUP PLLC**

By: ___*/s/ Joseph M. Labuda, Esq.*___
Joseph M. Labuda, Esq.
Matthew A. Brown, Esq.
*Attorneys for Defendants*
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
LETICIA FRANCINE STIDHUM
*on her own behalf and on behalf of others similarly*
*situated*,                                                                  **Case No. 21-cv-07163**

                                         Plaintiffs,

-against-
161-10 HILLSIDE AUTO AVE, LLC
        d/b/a Hillside Auto Outlet
HILLSIDE AUTO MALL INC
     d/b/a Hillside Auto Mall
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN

                                         Defendants
-------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

                              TROY LAW, PLLC
                              John Troy, *esq.*
                              Aaron Schweitzer, *esq.*
                              Tiffany Troy, *esq.*
                              41-25 Kissena Boulevard, Suite 110
                              Flushing, NY 11355
                              Tel: (718) 762-1324
                              *Attorneys for Plaintiff*

A1886

## TABLE OF CONTENTS

LEGAL STANDARD ....................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 1

ARGUMENT .................................................................................................................... 6

I.   Plaintiff's Title VII Claims for Sex Discrimination and PDA Claim for Pregnancy
Discrimination Should Not be Dismissed ............................................................... 6

A.   Defendants Admit that Plaintiff is a Member of the Protected Class and Was
Qualified for the Position She Held ..................................................................... 7

B.   Adverse Action is Established ..................................................................... 8

C.   Causation is Established ............................................................................ 11

II.   Plaintiff's NYSHRL Claim for Sex Discrimination Should Not be Dismissed .............. 16

III.   Plaintiff's NYCHRL Claim for Pregnancy Discrimination Should not be Dismissed .. 17

IV.   Claims against Hillside Auto Mall Should Not Dismissed ........................................... 19

V.   Claims Against Baron, Guzman and Thanwalla Should Not be Dismissed ..................... 20

Conclusion ........................................................................................................................ 24

A1887

## TABLE OF AUTHORITIES

**Cases**

*Ahmad v NY City Health & Hosps. Corp.*, 2021 US Dist LEXIS 62986 [SDNY Mar. 31, 2021] 22

*Anderson v. Liberty Lobby, Inc.*, 4777 U.S. 242 (1986) ................................................ 1

*Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) ...................................... 20

*Cahill v. Northeast Sav., F.A.*, No. 91-CV-1278, 1993 U.S. Dist. LEXIS 11650, 1993 WL
    313633, *3 (N.D.N.Y. Aug. 16, 1993) ................................................... 16

*Campo v City of NY*, 2022 US Dist LEXIS 60288 [EDNY Mar. 31, 2022, No. 19-CV-04364
    (NGG) (SJB)] .......................................................................... 22

*Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2020 U.S. Dist. LEXIS 198655,
    2020 WL 6274826, at *22 (S.D.N.Y. Oct. 24, 2020) ................................... 14

*Celotex Corp.*, 477 U.S. 317, 323 (1986) ................................................... 1

*Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671 (WO), 2013 U.S. Dist. LEXIS
    76208, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) .......................... 17

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.- Owned Media*, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d
    356 (2020) ........................................................................... 12

*Detouche v. JTR Transp. Corp.*, No. 17-CV-7719, 2020 U.S. Dist. LEXIS 235002, 2020 WL
    7364116, at *10 (S.D.N.Y. Dec. 14, 2020) ........................................... 12

*Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 325-26 (S.D.N.Y. 2020) ......... 11

*Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) ........................................ 21

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ............ 1

*Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015) ......................... 21

*Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) ...................................... 19

ii

A1888

*Grimes-Jenkins v. Consol. Edison Co. of N.Y.*, No. 16 Civ. 4897, 2017 U.S. Dist. LEXIS 77710, 2017 WL 2258374, *5 n.8 (S.D.N.Y. May 22, 2017) ............................................................. 17

*Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62 (2d Cir. 2001) ........................................................ 1

*Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), aff'd, 363 F. App'x 805 (2d Cir. 2010) ...................................................................................................................... 6

*Hsieh Liang Yeh v. Han Dynasty*, Inc., No. 18-CV-6018, 2019 U.S. Dist. LEXIS 24298, 2019 WL 633355, at *4 (S.D.N.Y. Feb. 14, 2019) .......................................................................... 19

*Hu v. City of N.Y.*, 927 F.3d 81, 96-97 (2d Cir. 2019) .................................................................. 13

*Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) .............................................................. 14

*Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014).................. 17

*Kirkland-Hudson v Mount Vernon City Sch Dist*, No 21-CV-695 (KMK), 2023 US Dist LEXIS 54339 (SDNY Mar 29, 2023) ........................................................................................... 12, 14

*Kirkland-Hudson v Mount Vernon City Sch. Dist.*, 2023 US Dist LEXIS 54339 [SDNY Mar. 29, 2023, No. 21-CV-695 (KMK)] ........................................................................................... 9

*Lazaar v. Anthem Companies, Inc.*, No. 22-CV-3075, 2023 U.S. Dist. LEXIS 13027, 2023 WL 405016, at *4 (S.D.N.Y. Jan. 25, 2023)....................................................................................... 20

*Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) ..................................................... 12

*Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) ............................................................ 11

*LeTtieri v Anti-Defamation League Found.*, 2023 US Dist LEXIS 141914 [SDNY Aug. 10, 2023] ............................................................................................................................... 18

*Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012)..................... 17

*Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)..................................................... 16

*Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)..................................................... 13

A1889

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) ............................................................ 8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) . 6, 7, 17

*McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ...................................................... 14

*McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 75 (S.D.N.Y. 2020) ........................ 22

*McMyler v Bank of Utica*, 2021 US Dist LEXIS 124703 [NDNY July 2, 2021, No. 6:19-CV-812 (MAD/ATB)] .................................................................................................................... 17

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013).......... 18

*Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996)........................................................................ 19

*Osekavage v Sam's E., Inc.*, 619 F Supp 3d 379 [SDNY 2022] .................................................... 7

*Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000)....................................... 19

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) ...................................................................... 16

*Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ........................ 9

*Quaratino v. Tiffany & Co.*, 71 F.3d 58, 63 (2d Cir. 1995)............................................................. 6

*Raji v. Societe Generale Ams. Sec. LLC*, No. 15 Civ. 1144 (AT) (ILC), 2018 U.S. Dist. LEXIS 36715, 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018)..................................................... 17

*Richards v. Dep't of Educ. of City of N.Y.*, No. 21 Civ. 338 (LJL), 2022 U.S. Dist. LEXIS 19674, 2022 WL 329226, at *20 (S.D.N.Y. Feb. 2, 2022).................................................................. 18

*Saks v. Franklin Covey Co.*, 316 F.3d 337, 343 (2d Cir. 2003)................................................... 16

*Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) .................................... 8

*Shimanova v TheraCare of NY, Inc.*, 2017 US Dist LEXIS 35031 [SDNY Mar. 10, 2017].......... 7

*Sutter v. Dibello*, No. 18-CV-817, 2021 U.S. Dist. LEXIS 46312, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021) ...................................................................................................... 13

A1890

*Syed v S&P Pharm. Corp.*, 2023 US Dist LEXIS 49653 [EDNY Mar. 23, 2023, No. 21-CV-6000 (AMD) (PK)] ............................................................................................................ 20

*Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) ......................................... 18

*Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) ........................................................................ 9

*Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) ........................................... 21

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) ................................................................................................................................. 11

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) ................................ 17

*Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013) . 7

*Williams v. NYC. Hous. Auth.*, 61 A.D.3d 62, 73, 872 N.Y.S.2d 27 (2009) ................................ 18

*Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) ............................................... 18

*Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) ....................................................................... 6

*Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) ......................................................................... 21

**Statutes**

§1981 ............................................................................................................................................. 12

42 U.S.C. § 2000e(k) ..................................................................................................................... 16

**Rules**

N.Y. Exec. Law § 296(1) ............................................................................................................... 21

N.Y.C. Admin. Code § 8-107(1)(a) .............................................................................................. 18

A1891

## **LEGAL STANDARD**

In the summary judgment context, the evidence adduced must be construed in the light most favorable to Plaintiff LETICIA STIDHUM, as the non-movant. *See, e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon Defendants as the moving parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such showing, the onus shifts to Stidhum to present evidence sufficient to satisfy every element of the claim. In so doing, Stidhum is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." Id. at 324. But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in Stidhum's favor. *Anderson v. Liberty Lobby, Inc.*, 4777 U.S. 242, 249-50 (1986). In discrimination cases, the merits typically turn upon an employer's intent, necessitating abundant caution in granting summary judgment for the employer. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Naturally, where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## **STATEMENT OF FACTS**

Plaintiff respectfully refer this Court to Plaintiff's Local Civil Rule 56.1 Counter-Statement of Undisputed Facts for a complete recitation of the undisputed facts and counter-statement of facts in the record. Below, Plaintiff highlights the most salient facts:

1

A1892

"Plaintiff worked at Hillside Auto Outlet as a salesperson and her sole responsibilities was selling cars." Exhibit 13 Plaintiff's Counter-Statement of Undisputed Material Facts (hereinafter "CSUMF") ¶ 23 (Plf Dep. 36:12-20; Thanwalla Dep. 81:23-82:4; Guzman Dep. 80:4-12). Her "responsibilities included showing customers vehicles, meeting and greeting customers, and taking a credit application and documentation from the customer in anticipation for making a sale." In addition, Plaintiff was responsible for "running and reading the credit of customers, before her DealerTrak access was taken away in December 2018 after the announcement of her pregnancy in November 2018." See id. ¶ 27 and Resp. ¶ 27 (Plf. Dep. 94:6-94:14). Plaintiff's compensation structure at Hillside Auto Outlet consisted of a $300.00 weekly salary, $150.00 flat commission for each car sold (even if it was sold at a loss)." See Response to 56.1 Statement 33. A bonus of 5% was paid until "Jeanique left in July or August 2018." See id. Resp. ¶ 33 (Plf Depo. 75:8-78:15).

At Hillside Auto Outlet, Plaintiff was the only female salesperson for the first four months of her employment. See id. Resp. ¶ 90 (Plf Dep 96:4-10). Thereafter she was one of two female salespeople at Hillside Auto Outlet. See id. ¶ 191 (Plf Aff. ¶ 35). Plaintiff was the top saleswoman and made the most sales in the store in November 2023 directly preceding the pregnancy announcement, and was accorded a $1000 bonus a result, but became the bottom salesperson in the store in late December 2023 after Guzman took away the credit card application and purposefully delayed the application. See id. Resp. to ¶¶ 87 (Plf Dep 78:23-79:13), 113 (Plf Dep 78:23-79:13), 114 (Plf Aff. ¶ 39), ¶ 199 (Plf Depo. 78:23-79:13).

Dealertrack is a dealership management system used by Hillside Auto Outlet; it stores customer information that is sensitive, which is why access to it is limited, and serves as a liaison with banks that provide financing for vehicles.  See id. Resp. ¶ 40 (Thanwalla Dep. 54:11-19,

A1893

145:6-146:19; Baron Dep. 53:9-18; Guzman Dep. 62:7-63:15, 84:9-86:6; Guzman Decl.). In 2018 prior to Thanwalla's trip to Pakistan in late December 2018, it "was mostly up to Isaac and Guzman" to run the credit, and when Ishaque Thanwalla was away between late December 2018 and January 2019, Guzman was the only one who was responsible for running the credit. *See* CSUMF ¶ 177 (Plf Dep 67:4-67:22). When Ishaque Thanwalla was away in December 2018 and January 2019, Guzman was the only one who was responsible for running the credit. *See i.d.* ¶ 178 (Plf Dep 67:4-67:22). Serge Zanan qualified a customer only very rarely. *See i.d.* ¶ 179 (Plf Dep 67:23-25).

In December 2018 after Plaintiff's pregnancy announcement through the end of Plaintiff's employment in January 2019, Guzman made the customers of Leticia Stidhum wait much longer in running and reading the credit that despite having become *faster* in running Dealertrack since taking the helm of finance manager in July or August 2018, Guzman in fact processed Leticia's customer's applications *more slowly*, despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there is no rational basis for Guzman making her wait longer. *See i.d.* Resp. ¶ 85 (Plaintiff Dep. 78:2-12; 78:23-79:13; Plf. Aff. ¶¶ 8-9). When Plaintiff brought this issue to Adris Guzman, Andris had no clear response as to why this was happening but just stated to plaintiff that she had to wait. Prior to the pregnancy announcement, 40 to 50 percent of the time, [Plaintiff] can get customers in and out of the door within an hour or less; therefore, the time it takes a customer to purchase a vehicle is predictable. *See i.d.* Resp. ¶ 43 While previously, the wait time was around 20 minutes to handle these applications the wait time increased to 40-60 minutes, or longer. This led to customers walking out. *See i.d.* ¶ 198 (Plf. Dep. 182:15-23, 78:1-12, 83:3-17). After the pregnancy announcement, of the two to three people who Plaintiff was seeing daily, on average two customers walked out (roughly 2/3 of the customers)

walked out due to the longer wait time caused by Guzman's targeted and intentional delay in running and reading the credit applications. *See id.* ¶ 189 (Plf Dep. 192:10-192:21).

"[F]or the most part" because the sales procedure is to "get [the] ID, the most recent two paystubs, and that proof of address if needed," the verification process is instantaneous and conducted not by any employee of Hillside Auto Outlet but by the banks. *See id.* ¶ 181 ((Plf Dep. 64:21-65:12, Plf. Aff. ¶¶ 19-20). The sales manager did not have to contact the employer to verify that the paystubs are legitimate. Instead, the sales manager simply deploys a heuristic to quickly determine by sight whether the paystubs are legitimate to upload for the banks. *See id.* ¶ 182. ((Plf. Aff. ¶ 21). The dealerships' determination would never take twenty to thirty minutes or hours. Rather, the determination is for the most part instantaneous. *See id.* ¶ 183 (Plf. Aff. ¶ 22). Fraud alerts on Hillside Auto Outlet customer's profiles occurred rarely. *See id.* ¶ 182 (Plf. Aff. ¶ 23). Additional verification on the part of credit bureaus occurred rarely and does not require one or two days to update. *See id.* ¶ 185 (Plf. Aff. ¶ 24). Guzman intentionally delayed the credit applications of Plaintiff's customers despite Plaintiff asking Guzman multiple times about the status of the credit applications after her pregnancy announcement in late November 2018 and Ishaque Thanwalla's trip to Pakistan in late December 2018. *See id.* ¶ 186 (Plf. Aff. ¶ 25).

Plaintiff's average total pay from September 4, 2018 to December 17, 2018 is $1,145.00, while the average commission is $845. In contrast, the average total pay from December 18, 2018 to January 14, 2019 as $781.25 and the average commission is $506.25. The difference in total pay is $363.75 per week, representing a 31.8% decrease in total pay, while the difference in commission is $338.75, representing a 40% decrease in commission. *See id.* Resp. ¶ 106 (Troy Aff ¶¶ 5-8; see Exhibit 8 D1187-1250).

Plaintiff stated: "[Guzman making Plaintiff wait longer] happened only right after I announced my pregnancy, that would be the first reason why, and not to mention, like I said before, he was my point of contact once Jay was fired so I can tell the difference in, you know, from that time and after I announced my pregnancy. It wasn't -- I had customers waiting so long after Jay quit. From that time after my pregnancy, I know it's clear as day that that's what was going on. I was a top saleswoman at a point and I went from being the top salesperson to being the one with the least cars out. *It doesn't add up* (emphasis added)." Plaintiff meant that pregnancy discrimination was the only possible reason for Guzman's slowness; all other reasons do not "add up." *See i.d.* Resp. ¶ 87 (Plf Dep 78:23-79:13.)

Each of the members of Hillside Auto Outlet, Josh Aaronson, Jory Baron, The Estate of David Baron, and Ishaque Thanwalla, had the power to hire and fire at Hillside Auto Outlet. *See i.d.* ¶161 (Jennings Dep. 38:12-39:5). Jory Baron was present at the dealership a couple of times each month; as a result, he knew of the Plaintiff, including her identity, her schedule and compensation at the time when she reached out to him in January 2019. *See i.d.* ¶ 163 (Stidhum Aff. ¶¶ 3-4; Plf Dep. 58:19-21; 59:4-7). When there was an issue that goes beyond the responsibilities of Isaac or Jay, she would report to Jory Baron "Only when there was an issue." *See i.d.* ¶ 164 (Plf Dep. Dep 59:21- 60:15). Guzman was a sales manager at Hillside Auto Outlet from Plaintiff's hiring through July or August <u>2018</u>. *See i.d.* ¶ 165 (Stidhum Aff. ¶5). Thereafter, from September 2018 through Plaintiff's termination in January 2019, Guzman was the financial manager. *See i.d.* ¶ 166 (Stidhum Aff. ¶7). As the financial manager, Guzman was part of the "team effort" and was "involved [in employment] decisions" even while not having the sole authority to hire, fire, or discipline. (Plf Dep. 110-17:111:4). For instance, Plaintiff was hired only after the general manager Ishaque Thanwalla conferred with the financial manager

5

Jeanique. *See i.d.* ¶ 167 (Plf Dep. 56:21-57:6). Guzman was not the general sales manager. *See i.d.* ¶ 168 (Stidhum Aff. ¶11). The general manager was Ishaque Thanwalla. *See i.d.* ¶ 169 (Guzman Dep. 68:14-15.) At all relevant times, Deanna Jennings worked concurrently for Hillside Auto Outlet and Hillside Auto Mall. *See i.d.* ¶ 170 (Jennings Dep. 17:9-14). At the time, Aaronson said he "was opening another store and he wanted me to be controller until they found a full-time person for the position." *See i.d.* ¶ 171 (Jennings Dep. 20:7-20). Plaintiff, a saleswoman, is expressly given authorization to access to Dealertrack by general manager Ishaque Thanwalla. *See i.d.* ¶ 172 (Plf Dep. 46:19-22).

## **ARGUMENT**

### I.   **Plaintiff's Title VII Claims for Sex Discrimination and PDA Claim for Pregnancy Discrimination Should Not be Dismissed**

"Claims of discrimination under Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), aff'd, 363 F. App'x 805 (2d Cir. 2010). Phase one of the McDonnell Douglas test places upon the plaintiff the burden of establishing a prima facie case of discrimination by alleging that: "(1) [s]he is a member of a protected class; (2) [her] job performance was satisfactory; (3) [s]he was subject to an adverse employment action; [and] (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on [sex]." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). Under Title VII and the NYSHRL, discrimination on the basis of a woman's pregnancy is discrimination on the basis of sex. *Young*, 135 S. Ct. at 1343 ("The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy."); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 63 (2d Cir. 1995) (noting that the NYSHRL

6

"provides the same sort of protection" regarding pregnancy discrimination as Title VII). At summary judgment, Plaintiff's claims alleging discrimination under Title VII and NYSHRL are subject to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Young*, 135 S. Ct. at 1353-54 (applying McDonnell Douglas framework to Title VII pregnancy discrimination claim); *Walsh*, 828 F.3d at 74-75 (applying McDonnell Douglas framework to NYSHRL sex-based discrimination claim). (*Shimanova v TheraCare of NY, Inc.*, 2017 US Dist LEXIS 35031 [SDNY Mar. 10, 2017]).

If the plaintiff sets forth a prima facie case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), aff'd, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). (*Osekavage v Sam's E., Inc.*, 619 F Supp 3d 379 [SDNY 2022])

### A. Defendants Admit that Plaintiff is a Member of the Protected Class and Was Qualified for the Position She Held

Defendants admit that the first and second factors of *McDonnell Douglas* are satisfied, namely that Plaintiff is a member of the protected class and was qualified for the position she held. Defendants argue that Plaintiff fails to establish a *prima facie* case for Title VII and PDA Claims for Pregnancy Discrimination, the third and fourth factors of *McDonnell Douglas,* because the "trivial complaints" in additional waiting time does not constitute an adverse action giving rise to

A1898

an inference of discriminatory action and that the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on sex.

### B.  Adverse Action is Established

Defendants' arguments as to whether Plaintiff is subject to adverse employment actions is flawed on two grounds: first, Defendants improperly concludes that Plaintiff does not claim that she is constructively discharged when her resignation was in fact involuntary as a result of coercion and duress. *See* CSUMF Resp ¶117 (Plf Depo. 230:22-232:9). In describing why she ultimately left employment at Hillside Auto Outlet, Plaintiff described the workplace as "intolerable" and how she was "pregnant, tired, and not making any money" as a result of pregnancy discrimination in the form of the longer wait time. *See i.d.* Resp ¶117 (Plf Depo. 230:22-232:9). Second, rather than "trivial complaints," Plaintiff can show that Defendants had created "an intolerable work atmosphere that forces an employee to quit voluntarily" and that the working conditions she was put under are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."' *Trinidad v. New York City Dep't of Correction*, 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006) (quoting *Chamblee*, 154 F.Supp.2d at 675). *Cadet v. Deutsche Bank Sec., Inc.*, 2013 U.S. Dist. LEXIS 87328, at *30 (S.D.N.Y. June 18, 2013).

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). The Second Circuit has instructed that: To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. *Id.* (quoting *Sanders*, 361 F.3d at 755); *see also*

A1899

*Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (holding similarly). "Moreover, while there is no exhaustive list of what constitutes an adverse employment action, courts have also held that denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions" under certain circumstances. *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (quotation marks and citation omitted). (*Kirkland-Hudson v Mount Vernon City Sch. Dist.*, 2023 US Dist LEXIS 54339 [SDNY Mar. 29, 2023, No. 21-CV-695 (KMK)]). Here the court should find that there was an adverse action against the plaintiff in the form of a demotion evidenced by a decrease in her salary that she received.

Defendants cite to *Sealy v. State Univ. of N.Y. at Stony Brook*, 408 F. Supp. 3d 218, 226 (E.D.N.Y. 2019), for the proposition that "wait time" does not constitute an employment action. However, unlike Sealy, who was required to wait for 45 minutes to access the supply room on one occasion, Plaintiff lost customers due to the increased wait time from walk outs, translating to lower commissions and lower wages. Indeed, "[o]f the two to three people who Plaintiff was seeing daily, on average two customers walked out (roughly 2/3 of the customers) walked out due to the longer wait time caused by Guzman's targeted and intentional delay in running and reading the credit applications." *See* CSUMF Resp. ¶189 (Plf Dep. 192:10-192:21). *Batchelor v. City of N.Y.*, No. 11-CV-2058 (MKB) (VMS), 2014 U.S. Dist. LEXIS 46921, at *28 (E.D.N.Y. Feb. 16, 2014) is similarly inapposite because the wait time for the employee to "claim" a locker by bringing a locker from home is uncorrelated with the actual pay. Furthermore, unlike the "normal administrative delay" involved in a merit promotion in *Evans v. City of N.Y.*, the

targeted delay resulted in a statistically significant decrease in car sales. 2003 U.S. Dist. LEXIS 18281, at *32 (S.D.N.Y. Oct. 9, 2003)

At the time of Plaintiff's pregnancy announcement, she was a "top saleswoman." *See* CSUMF ¶ 195 (Plf Depo. 77:21-25). As a result of the increased waiting time, Plaintiff "went from being the top salesperson to being the one with the least cars out." *See* CSUMF Resp. ¶¶ 87 (Plf Dep 78:23-79:13), 113 (Plf Dep 78:23-79:13), 114 (Plf Aff. ¶ 39), ¶¶ 172 (Plf Dep. 46:19-22), 199 (Plf Depo. 78:23-79:13). The adverse employment action—in the form of increased waiting time—directly correlates and *caused* a decrease in sales and a corresponding *decrease in pay*. That is because Plaintiff's compensation structure at Hillside Auto Outlet consisted of a $300.00 weekly salary, $150.00 flat commission for each car sold (even if it was sold at a loss)." *See i.d.* Resp. ¶ 33 (Plf Depo. 75:8-78:15).

Defendant's computation of average commission for the 26 weeks before she announced her pregnancy was $710.00 per week and for the eight (8) weeks after she announced her pregnancy was $690.63 per week is flawed because Defendants incorrectly put the base pay for the last week as $300, rather than $200.00 base pay for Week 34 and further improperly included a $0 pay per week for Week 12, rather than excluding it as an outlier. In contrast, Plaintiff's calculation shows that the average total pay from September 4, 2018 to December 17, 2018 is $1,145.00, while the average commission is $845. In contrast, the average total pay from December 18, 2018 to January 14, 2019 as $781.25 and the average commission is $506.25. The difference in total pay is $363.75 per week, representing a 31.8% decrease in total pay, while the difference in commission is $338.75, representing a 40% decrease in commission. *See i.d.* ¶¶ 186 (Plf. Aff. ¶ 25), 187 (Plf Dep. 69:12-69:16), *i.d.* Resp. ¶¶ 105-108 (Troy Aff ¶ 4; *see* Exhibit 8 D1250 (showing a salary of

$200, not $300); D1187-1250 paystubs during the relevant period), 109 (Exhibit 10 Jennings Jackson Aff.; Troy Aff ¶ 11).

Plaintiff was also promised a promotion to a manager position by Thanwalla. Thanwalla's actions—making Plaintiff wait, and then wait some more—made it clear to Plaintiff that she would not be promoted. *See i.d.* Resp. ¶ 123 (Plf Dep. 92:7-25, 95:3-7). Plaintiff was "was promised that when [Thanwalla] return[ed] that [she] was going to be promoted to sales manager" When Thanwalla came back, his refusal to discuss about the promotion was "clear as day" a denial of the same. *See i.d.* Resp. ¶ 124 (Plf Dep. 90:8-90:15, 92:7-25, 95:3-7).

### C.  Causation is Established

Defendants' argument as to causation is flawed as well because there is a clear causal connection in the temporal proximity of Plaintiff's pregnancy announcement and her decrease in sales due to the increased wait time. "Under Title VII and the NYSHRL, a plaintiff need not prove (or plead) that 'the causal link between injury and wrong is so close that the injury would not have occurred but for the act.'" *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 325-26 (S.D.N.Y. 2020) (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019)). "So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Lenzi, 944 F.3d at 107 (emphasis omitted) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)). "The necessary inference may be derived from a variety of circumstances, including 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group[.]'" *Detouche v. JTR Transp. Corp.*, No. 17-CV-7719, 2020 U.S. Dist. LEXIS

11

A1902

235002, 2020 WL 7364116, at *10 (S.D.N.Y. Dec. 14, 2020) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). However, under § 1981, to "prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.- Owned Media*, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020). (*Kirkland-Hudson v Mount Vernon City Sch Dist*, No 21-CV-695 (KMK), 2023 US Dist LEXIS 54339 (SDNY Mar 29, 2023)).

Defendants first advance the unavailing argument that "Guzman took too long to process credit applications *before* [Ms. Stidhum's] pregnancy." In fact, however, Guzman was trained in and became trained in using DealerTrack for a period of less than a month in August 2018. *See* CSUMF Resp ¶ 178 (Plf Dep 67:4-67:22). This misses Plaintiff's contention which is that between late December 2018 through the end of Plaintiff's employment in January 2019, Guzman made the customers of Leticia Stidhum wait much longer in running and reading the credit that despite having become *faster* in running Dealertrack since taking the helm of finance manager in July or August 2018, Guzman in fact processed Leticia's customer's applications *more slowly*, despite Leticia Stidhum inquiring about the status of the credit applications multiple times. Thus, it was "clear as day" that there are no rational basis for Guzman making her wait longer. *See i.d.* ¶ 185 (Plf. Aff. ¶ 24). When plaintiff brought this issue to Adris Guzman, Andris had no clear response as to the cause of the delay, only telling Plaintiff that she had to wait. Plf Dep. 78:1-12.

Defendants' other argument that "any delays in processing credit applications was not attributable to Defendants but rather, the response times from financial institutions or other third party involved in the verification process" is similarly unavailing. It is unavailing because notwithstanding the variables that go into a car sale, the running of the credit by Mr. Guzman is an integral part of most transactions as most customers require a loan to finance the purchase. *See*

Plf Depo Tr, 82:9-83:2. The fact is the timing of the taking away of Ms. Stidhum's DealerTrack access and the *increase* in wait time targeted for Ms. Stidhum came *after* Plaintiff's pregnancy announcement, resulting in a statistically-significant decrease in cars sold and take-home pay, which is based in part on commissions. *See* CSUMF Resp ¶ 70 (Plf Dep. 69:12-69:16). Specifically, between December 2018 through the end of Plaintiff's employment in January 2019, when Guzman "was the only one responsible for running the credit" *See i.d.* ¶ 178 (Plf Dep 67:4-67:22). Guzman intentionally delayed the credit applications of Leticia Stidhum's customers despite Leticia Stidhum inquiring about the status of credit applications multiple time." *See i.d.* ¶ 202 (Plf. Dep. 100:13-84:11). The temporal proximity between Plaintiff's pregnancy announcement in November 2018 and the immediate increase in wait time and decrease in car sales and take-home pay based upon commissions demonstrate the inverse relationship between wait time and cars sold.

The targeting of Plaintiff right after her pregnancy announcement—while leaving other car salesmen alone—is a showing of disparate treatment, a recognized method of raising an inference of discrimination for the purpose of making out a prima facie case. Ruiz, 609 F.3d at 493 (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted)). "[A] plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of at least one similarly situated employee outside [her] protected group and sufficient facts from which it may reasonably be inferred that 'the plaintiff's 2023 U.S. Dist. LEXIS 54339 F.Supp.3d 2023 WL 2691622 at 55 and comparator's circumstances . . . bear a reasonably close resemblance.'" *Sutter v. Dibello*, No. 18-CV-817, 2021 U.S. Dist. LEXIS 46312, 2021 WL 930459, at *21 (E.D.N.Y. Mar. 10, 2021) (quoting *Hu v. City of N.Y.*, 927 F.3d 81, 96-97 (2d Cir. 2019)). The alleged comparator must be similar enough "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263

F.3d 49, 54 (2d Cir. 2001); *see also Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) (summary order); *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2020 U.S. Dist. LEXIS 198655, 2020 WL 6274826, at *22 (S.D.N.Y. Oct. 24, 2020). (*Kirkland-Hudson v Mount Vernon City Sch Dist*, No 21-CV-695 (KMK), 2023 US Dist LEXIS 54339 (SDNY Mar 29, 2023)).

The statement that "Guzman took the same time to process credit applications for all salespeople so Plaintiff was treated no differently" is simply belied by both the increased wait time and decrease in car sales and by the fact how many coworkers who were car salesmen observed and commented upon the drastic decrease in numbers after Plaintiff's pregnancy announcement, which made other salespeople that didn't sell that many cars look successful. *See* Plf. Depo Tr. 86:25-87:17 (Other Co-Workers Witnessing Discrepancy in cars for Plaintiff) 98:17-23 (Co-Worker Explaining Discrepancy in cars).

In contrast, Plaintiff can show that delays in *putting in* credit applications was drawn solely from Guzman's treatment of Plaintiff after the pregnancy announcement. During Plaintiff's deposition, there was a lengthy discussion regarding Plaintiff's pay before and after her pregnancy announcement, which demonstrated that Plaintiff was selling far fewer cars at the end of her employment (close in time to her pregnancy announcement) than during the middle period of employment. *See* Depo Plf 171:18-172:6; 213:24-225:17. Indeed, Ms. Stidhum experienced a statistically-significant decrease in the number of car sales made in credit card applications immediately after she announced her pregnancy: Plaintiff was the top saleswoman and made the most sales in the store in November 2023 directly preceding the pregnancy announcement but became the bottom salesperson in the store in late December 2023 after Guzman took away the credit card application and purposefully delayed the application. *See i.d.* Resp. to ¶¶ 87 (Plf Dep 78:23-79:13), 113 (Plf Dep 78:23-79:13), 114 (Plf Aff. ¶ 39), ¶ 199 (Plf Depo. 78:23-79:13).

Plaintiff was also the only female salesperson for the first four months of her employment and one of two female salespersons during the remainder of her employment at Hillside Auto. *See i.d.* Resp. ¶¶ 90 (Plf Dep 96:4-10); 191 (Plf Aff. ¶ 35). Defendants attempt to show that the cause of the delay and targeting of Ms. Stidhum is due to personal animus, as there were two (2) prior interpersonal conflicts with Guzman. However, nothing became of these isolated arguments and Plaintiff and Guzman maintained a professional relationship. *See* Plf Depo Tr. 71:8-72:8. Similarly, the lack of verbal comments about her pregnancy is belied by the actions taken by Guzman in sabotaging Plaintiff's employment at Hillside Auto Outlet.

Rather than address Ms. Stidhum's concerns, Mr. Thanwalla instead delayed a promised promotion opportunity to Ms. Stidhum. Thanwalla's refusal to discuss a promotion suggested to Plaintiff that she was "being given the runaround" and "getting played." *See i.d.* Resp. ¶ 120 (Plf Dep. 90:23- 91:6). Thanwalla knew of Stidhum's pregnancy. *See i.d.* ¶ 192 (Jennings Dep. 62:19-63:3; Decipher Chat Excerpt between Defendant Ishaque Thanwalla and Ali Raskesnia about Plaintiff Leticia Stidhum's pregnancy (Ali: "Your daughter is having a baby [pregnant woman emoji]" Thanwalla: "Which one" Ali: "Leticia" Thanwalla "I know"). This is not the first or isolated incidence in which a pregnant woman—while pregnant—is forced to leave the employ of Hillside Auto Outlet. In fact, previously, the DMV clerk Lilly a/k/a Lily was also required to leave. *See i.d.* ¶ 202 (Plf. Dep. 100:13-84:11).

The Court should also take judicial notice of Defendants' loss of weekly commission sales sheets identifying Plaintiff and her comparators in car sales between November 2018 and January 2019. *See* Troy Dec. Ex. 11 Jennings Jackson Affidavit. It is widely accepted in the Second Circuit that parties should not benefit from spoliation, and the district court may impose sanctions, such as an adverse inference instruction at trial under Rule 37(b) or pursuant to "its inherent power to manage its own affairs" when a party destroys evidence. *See Residential Funding Corp.*, 306 F.3d at 107; *see also*

A1906

*Zubalake IV*, at \*216. Here, Defendants noticeably failed to produce the sales records for the relevant period of time which would establish the actual cars sold by Plaintiff versus her comparators. Instead, Defendants claim that the payroll records of Hillside Auto Outlet are stored in tandem with the payroll records of Hillside Auto Mall and were lost. *See* Dkt. Nos. 73–1–73–4 (June 12, 2023). The evidence submitted is clear that there still is an issue of material fact regarding plaintiff's discrimination clears for Defendants' evidence submitted is inconclusive and plaintiffs can sufficiently meet the four parts it takes to prove discrimination. Thus, in the light most favorable to the Plaintiff, should be considered to be beneficial to the Plaintiff. Said evidence—if it hadn't been "lost" or "destroyed"—would have corroborated Plaintiff's account, which is that business *did not* slow during the subsequent weeks following the implementation of the delayed by Guzman. That is because, relative to her and in fact relative to their own performance, her colleague in fact earned *more commission* while she earned *less*.

## II. Plaintiff's NYSHRL Claim for Sex Discrimination Should Not be Dismissed

As an initial matter, the Court notes that the same standard is used when analyzing Title VII and NYSHRL claims. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (citation omitted). Additionally, "[t]he Pregnancy Discrimination Act amends Title VII's definition of discrimination 'because of sex' to include discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Saks v. Franklin Covey Co.*, 316 F.3d 337, 343 (2d Cir. 2003) (quoting 42 U.S.C. § 2000e(k)). "[A] claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Cahill v. Northeast Sav., F.A.*, No. 91-CV-1278, 1993 U.S. Dist. LEXIS 11650, 1993 WL 313633, \*3 (N.D.N.Y. Aug. 16, 1993) (collecting cases); *Grimes-Jenkins v. Consol. Edison Co. of N.Y.*, No. 16 Civ. 4897, 2017 U.S. Dist. LEXIS 77710, 2017 WL 2258374, \*5 n.8 (S.D.N.Y. May 22,

A1907

2017). Discrimination claims under Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

"[T]he plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *McDonnell Douglas*, 411 U.S. at 802. It is the plaintiff's burden to establish a prima facie case of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citation omitted); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 346 (W.D.N.Y. 2012) (citation omitted). (*McMyler v Bank of Utica*, 2021 US Dist LEXIS 124703 [NDNY July 2, 2021, No. 6:19-CV-812 (MAD/ATB)]). As established in Point I, plaintiff has sufficiently prove that she can establish a prima facie case for discrimination against defendants due to her pregnancy. As stated in Point I, the evidence does not suggest that plaintiff was not discriminated against as defendants would like the court believe. The evidence at best shows that there is an issue of material fact for the court to find out and that plaintiff's claims do have merit.

### III. Plaintiff's NYCHRL Claim for Pregnancy Discrimination Should not be Dismissed

Under the NYCHRL, "[t]he standards for discrimination and hostile work environment are the same." *Raji v. Societe Generale Ams. Sec. LLC*, No. 15 Civ. 1144 (AT) (ILC), 2018 U.S. Dist. LEXIS 36715, 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018); *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (same); *Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671 (WO), 2013 U.S. Dist. LEXIS 76208, 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims; rather, there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on

A1908

gender." (internal quotation marks omitted)). "Section 8-107(1)(a) of the NYCHRL makes it 'an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the [protected characteristic] of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(1)(a)) (brackets and ellipses omitted). To allege discrimination under the NYCHRL, a plaintiff need only allege that she was "treated 'less well' . . . because of a discriminatory intent." Id. at 110 (citing *Williams v. NYC. Hous. Auth.*, 61 A.D.3d 62, 73, 872 N.Y.S.2d 27 (2009)). "[T]he challenged conduct need not even be 'tangible' (like hiring or firing)." *Id.* (quoting Williams, 61 A.D.3d at 79); *see also Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013) ("To state a claim for discrimination, a plaintiff must only show differential treatment of any degree based on a discriminatory motive."). However, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive," and "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Richards v. Dep't of Educ. of City of N.Y.*, No. 21 Civ. 338 (LJL), 2022 U.S. Dist. LEXIS 19674, 2022 WL 329226, at *20 (S.D.N.Y. Feb. 2, 2022). Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109; *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021). (*LeTtieri v Anti-Defamation League Found.*, 2023 US Dist LEXIS 141914 [SDNY Aug. 10, 2023]). Applying this standard, to establish a pregnancy discrimination claim, "the plaintiff need only show differential treatment — that she is treated 'less well' — because of a discriminatory intent." *See Mihalik*, 715 F.3d at 110. Under NYCHRL, Plaintiff can show that she is treated less well as compared to her

A1909

non-pregnant coworkers after late-December 2018 because her customers were made to wait for a longer period of time, resulting in a loss of customers and commissions from sales. But for her gender, she would also have been promoted. As set forth above, Plaintiff has provided sufficient evidence throughout their opposition to clearly show that due to her pregnancy announcement, plaintiff was discriminated against.

### IV. Claims against Hillside Auto Mall Should Not Dismissed

The court should find that plaintiff's claim against defendant Hillside Auto Mall should not be dismissed because both corporate defendants engaged in a single integrated enterprise. To prevail in an employment action against a defendant who is not the plaintiff's direct or joint employer, "the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) (internal citations omitted). "The single employer doctrine provides that, in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger single-employer entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (citation and internal quotations omitted).

A court determining whether a plaintiff has pleaded single integrated enterprise liability considers: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Hsieh Liang Yeh v. Han Dynasty*, Inc., No. 18-CV-6018, 2019 U.S. Dist. LEXIS 24298, 2019 WL 633355, at *4 (S.D.N.Y. Feb. 14, 2019). "Although no one factor is determinative[,] . . . control of labor relations is the central concern." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996) (citations omitted). (*Syed v S&P Pharm.*

A1910

*Corp.*, 2023 US Dist LEXIS 49653 [EDNY Mar. 23, 2023, No. 21-CV-6000 (AMD) (PK)]).

Further "[w]hether two related entities are sufficiently integrated to be treated as a single employer

is generally a question of fact not suitable to resolution on a motion to dismiss." *Brown v. Daikin*

*Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014); *see also Lazaar v. Anthem Companies, Inc.*, No. 22-

CV-3075, 2023 U.S. Dist. LEXIS 13027, 2023 WL 405016, at *4 (S.D.N.Y. Jan. 25, 2023) ("It is

rarely appropriate to determine joint employer status at the summary judgment stage, let alone on

a motion for judgment on the pleadings, because of the [inquiry's] fact-intensive character."

(internal quotation marks and citation omitted)). (*Syed v S&P Pharm. Corp.*, 2023 US Dist LEXIS

49653 [EDNY Mar. 23, 2023, No. 21-CV-6000 (AMD) (PK)]).

Plaintiff can sufficiently show that Hillside Auto Outlet and Hillside Auto Mall constituted

a single integrated enterprise. As to interrelation of operations, while Plaintiff worked directly only

for Hillside Auto Outlet, Plaintiff sold cars from Hillside Auto Mall as well. *See* Response to 56.1

Statement 141; *see also* Plf Depo Tr. 34:10-35:17. As to central control of labor relations, the

Comptroller Deanna Jennings worked at the same time for Hillside Auto Outlet and Hillside Auto

Mall, and "maintain the books, payrolls, bills, sales tax" for both locations at the Hillside Auto

Mall office. *See* Jennings Depo Tr. 17:9-18:5. Hillside Auto Outlet and Hillside Auto Mall shared

owners: Josh Aaronson and the Estate of David Baron, who hold 50% of the stocks, and common

management. *See* Plaintiff's 56.1 Statements 3 and 20. Deana Jennings was the person in charge

of both corporate Defendants' payroll, which show that there was common financial control for

both defendants. *See* Deana Jennings Depo. Tr. 22:2-25; 25:25-31:25.

In light of this, there is a statement of material fact that still needs to be decided regarding

corporate defendant Hillside Auto Mall.

**V.   Claims Against Baron, Guzman and Thanwalla Should Not be Dismissed**

A1911

"The NYSHRL [also] allows for individual liability." *Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020). There are two available theories of liability: where the individual defendant is considered an "employer," N.Y. Exec. Law § 296(1), or aided and abetted the unlawful discriminatory acts of others, id. § 296(6); *see Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015). An individual defendant is liable as an "employer" under § 296(1) "when that individual has an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others," i.e., the power to hire or fire. *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (emphasis added) (internal quotations and citation omitted). "A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to the discrimination." *Feingold v. New York,* 366 F.3d 138, 157 (2d Cir. 2004) (cleaned up) (quoting Tomka, 66 F.3d at 1317).

Aiding-and-abetting liability is available under the NYSHRL, provided that the principal—the employer—has been found liable for discriminatory conduct. *Xiang*, 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5. To make out an aiding and abetting claim, a plaintiff must allege that "[defendant] 'actually participate[d] in the conduct giving rise to a discrimination claim.'" *Id.* (quoting *Feingold*, 366 F.3d at 158). The Second Circuit has held that "a co-worker who actually participates in the conduct giving rise to a discrimination claim [can] be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold*, 366 F.3d at 158 (internal quotation marks and citation omitted). "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employer's conduct has also been found to be discriminatory under the

A1912

NYSHRL." *Xiang*, 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5 (alteration in original) (citations omitted).

As the Second Circuit has held, "an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL [and NYCHRL] if he actually participates in the conduct giving rise to a discrimination claim." *Francis*, 992 F.3d at 81. "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employee's conduct has also been found to be discriminatory under the NYSHRL." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 75 (S.D.N.Y. 2020) (emphasis in original). (*Campo v City of NY*, 2022 US Dist LEXIS 60288 [EDNY Mar. 31, 2022, No. 19-CV-04364 (NGG) (SJB)]).

As set forth below, each of the three individual Defendants ANDRIS GUZMAN, ISHAQUE THANWALLA, JORY BARON is liable under NYSHRL and NYCHRL for aiding and abetting the discriminatory conduct.

At the time of Ms. Stidhum's pregnancy announcement, Ishaque Thanwalla was in Pakistan. During this period of time, Andris Guzman assisted Thanwalla in running the day-to-day operations at Hillside Auto, being the financial manager on site. *See* CSUMF ¶ 176 (Plf. Dep. 64:15-20; 68:23-69:3; 175:20-176:8). As the financial manager, Guzman was part of the "team effort" and was "involved [in employment] decisions" even while not having the sole authority to hire, fire, or discipline. (Plf Dep. 110-17:111:4). For instance, Plaintiff was hired only after the general manager Ishaque Thanwalla conferred with the financial manager Jeanique. *See i.d.* ¶ 167 (Plf Dep. 56:21-57:6). GUZMAN actively and actually participated in the conduct giving rise to a discrimination claim. While Ms. Stidhum was one of two female salespeople at Hillside Auto

Outlet, GUZMAN, while the general manager intentionally took away the credit card application and purposefully delayed the application, leading to a statistically significant decrease in Ms. Stidhum's salary. *See i.d.* Resp. to ¶¶ 87 (Plf Dep 78:23-79:13), 113 (Plf Dep 78:23-79:13), 114 (Plf Aff. ¶ 39), ¶ 199 (Plf Depo. 78:23-79:13).

ISAHQUE THANWALLA, as shareholder of Hillside Auto Outlet and the general manager, had the power to hire and fire, and discipline employees. *See i.d.* Resp. to ¶ 161 (Jennings Dep. 38:12-39:5). He denied a promotion that was initially promised to Ms. Stidhum prior to her trip to Pakistan. *See i.d.* Resp. to ¶¶ 4 (Stidhum Aff. ¶ 25); 161 (Jennings Dep. 38:12-39:5). Defendants' argument that Thanwalla treated Ms. Stidhum better than any other employee at the dealership cuts against their argument that Thanwalla was not engaged in aiding and abetting the discriminatory conduct. Ms. Stidhum was poised for a promotion based on her exceptional performance as a salesperson before Thanwalla found out about Stidhum's pregnancy. When Thanwalla came back, his refusal to discuss about the promotion was "clear as day" a denial of the same. *See i.d.* Resp. ¶ 124 (Plf Dep. 90:8-90:15, 92:7-25, 95:3-7).

Thanwalla knew of Stidhum's pregnancy. (Jennings Dep. 62:19-63:3; Decipher Chat Excerpt between Defendant Ishaque Thanwalla and Ali Raskesnia about Plaintiff Leticia Stidhum's pregnancy (Ali: "Your daughter is having a baby [pregnant woman emoji]" Thanwalla: "Which one" Ali: "Leticia" Thanwalla "I know"). *See i.d.* ¶ 192 (Jennings Dep. 62:19-63:3; Decipher Chat Excerpt between Defendant Ishaque Thanwalla and Ali Raskesnia about Plaintiff Leticia Stidhum's pregnancy (Ali: "Your daughter is having a baby [pregnant woman emoji]" Thanwalla: "Which one" Ali: "Leticia" Thanwalla "I know"). When GUZMAN took away Ms. Stidhum's DealerTrak access and forced Ms. Stidhum to wait for a longer period of time, Thanwalla was informed and failed to take actions to cure Defendant GUZMAN's actions and

himself. Instead, previously Thanwalla has disciplined DMV Clerk Lilly was disciplined while pregnant and departed and she stormed out upset at Hillside Auto Outlet's treatment of her within a week of Plaintiff's start at Hillside Auto Outlet. *See i.d.* ¶ 202 (Plf. Dep. 100:13-84:11).

JORY BARON is one of the members and shareholders of Hillside Auto Outlet and the point person when "there was an issue that goes beyond the responsibilities of Isaac or Jay, she would report to Jory Baron (Plf Dep. Dep 59:21- 60:15). *See i.d.* Resp. to ¶ 161 (Jennings Dep. 38:12-39:5), ¶ 164 (Plf Dep. Dep 59:21- 60:15). Jory Baron was present at the dealership a couple of times each month; as a result, he knew of the Plaintiff, including her identity, her schedule and compensation at the time when she reached out to him in January 2019. *See i.d.* ¶ 163 (Stidhum Aff. ¶¶ 3-4; Plf Dep. 58:19-21; 59:4-7). Further, approximately ten (10) days after Plaintiff quit, Plaintiff texted Jory Baron that she "had not been paid." After Jory Baron called Plaintiff back, Plaintiff "calmly explained how [she] had been sabotaged, why [she] had quit, and THANWALLA still owed [her] money." At the time, "Jory Baron replied that Plaintiff should 'stop ranting.' Plaintiff is "sabotaged" as a result of her pregnancy. (Exhibit 7 Supplemental Response to Interrogatory 7.) *See i.d.* ¶ 126(Exhibit 7 Supplemental Response to Interrogatory 7.) The court should find that defendant Baron failing to sufficiently deal with plaintiffs claims of not receiving her pay, defendant Baron aided in plaintiff being discriminated against.

## **CONCLUSION**

For the above-stated reasons, Defendants' Motion for Summary Judgement should be denied in its entirety.

Dated: January 30, 2024
       Flushing, NY

                                  Respectfully submitted,

                                  /s/ John Troy
                                  John Troy

A1915

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

LETICIA FRANCINE STIDHUM,                           Case No: 21-cv-07163
                                    Plaintiff,

                    v.

                                                    **DECLARATION OF JOHN
161-10 HILLSIDE AUTO AVE, LLC                       TROY**
      d/b/a Hillside Auto Outlet, and
HILLSIDE AUTO MALL INC
      d/b/a Hillside Auto Mall,
ISHAQUE THANWALLA,
JORY BARON, and
ANDRIS GUZMAN,
                                    Defendants.
----------------------------------------------------------------x

I, John Troy, declare under penalty of perjury and pursuant to Section 1746 of Title 28 of

the United States Code, that:

    1.    I am admitted to practice before this Court and I represent the Plaintiff LETICIA

FRANCINE STIDHUM in this case.

    2.    I respectfully submit this declaration in opposition to Defendants' Motion for

Summary Judgment and to supply this Court with exhibits relevant to its determination of the

Motion.

    3.    Attached hereto are the following exhibits:

        Exhibit 1.    Affidavit of Leticia Stidhum;

        Exhibit 2.    Deposition Transcript of Leticia Stidhum;

        Exhibit 3.    Deposition Transcript of Ishaque Thanwalla;

        Exhibit 4.    Deposition Transcript of Andris Guzman;

        Exhibit 5.    Deposition Transcript of Jory Baron;

A1916

Exhibit 6.      Deposition Transcript of Corporate Witness Deanna Jennings;

Exhibit 7.      Text Message between Leticia Stidhum and Ishaque Thanwalla;

Exhibit 8.      D1187-D1250 Paystubs of Plaintiff Leticia Stidhum;

Exhibit 9.      Supplemental Response to Interrogatory 7;

Exhibit 10.     D1253-1447 Paystubs of Comparators; and

Exhibit 11.     Jennings Jackson Aff.

4.      The salary of Week 34 in Defendants' 56.1 Statement is <u>incorrectly</u> stated as $300.00 when in fact it is $200. *See* Exhibit 8 (D1250).

5.      Applying the correction of $200.00 base pay for Week 34, the average total pay from September 4, 2018 to December 17, 2018 is $1,145.00, while the average commission is $845.

6.      In contrast, the average total pay from December 18, 2018 to January 14, 2019 as $781.25 and the average commission is $506.25.

7.      The difference in total pay is $363.75 per week, representing a 31.8% decrease in total pay.

8.      The difference in commission is $338.75, representing a 40% decrease in commission.

9.      After accounting for the week of absence (Week 12), during which no salary is earned, the average commission is $726.82.

10.     The average commission earned between December 18, 2018 and January 4, 2019, as stated in Counter-Statement 106 is $506.25, which is significantly less than the average commission of 726.82.

A1917

11.     Further, while Defendants failed to provide *any* comparator's weekly commission sheets, claiming that they were lost, the comparators identified as #24, #17, and #20, which each earned a base salary of ($300) all had an increase in the amount of bonus in the months of December 2018 and January 2019, thus debunking the theory that the sales slowed down during the winter months. (D1253-1447).

| ID | 11/27/2018-12/03/2018 | 12/04/2018-12/10/2018 | 12/11/2018-12/17/2018 | 12/18/2018-12/24/2018 | 12/25/2018-12/31/2018 | 01/01/2019-01/07/2019 | 01/08/2019-01/14/2019 |
|---|---|---|---|---|---|---|---|
| Plaintiff | $ 1,600.00 | $ 825.00 | $ 625.00 | $ 500.00 | $ 350.00 | $ 825.00 | $ 350.00 |
| 24 | $ 420.00 | $ 215.00 | $ 495.00 | $ 260.00 | $ 345.00 | $ 535.00 | $ 365.00 |
| 17 | $ 290.00 | $ 445.00 | $ 400.00 | $ 445.00 | $ 700.00 | $ 385.00 | $ 490.00 |
| 20 | $ 150.00 | $ 225.00 | $ 300.00 | | $ 500.00 | $ 150.00 | |

12.     I declare under penalty of perjury and under the laws of the United States that the foregoing statements are true and correct.

Dated: Flushing, NY
        February 2, 2024

                                TROY LAW, PLLC
                                *Attorneys for Plaintiffs*

                                 /s/ John Troy
                                John Troy
                                41-25 Kissena Boulevard, Suite 110
                                Flushing, NY 11355
                                (718) 762-1324
                                troylaw@troypllc.com

A1918